1  DAVID B. GOLUBCHIK (State Bar No. 185520)
   TODD M. ARNOLD (State Bar No. 221868)
2  LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3  2818 La Cienega Avenue
   Los Angeles, California 90034
4  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
5  Email: dbg@lnbyg.com; tma@lnbyg.com

6  Attorneys for Debtor and Debtor in Possession

7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  LOS ANGELES DIVISION

11

| 12 | In re: | Case No.: 2:21-bk-18205-DS |
|---|---|---|
| 13 | CRESTLLOYD, LLC, | Chapter 11 Case |
| 14 | Debtor and Debtor in Possession. | **DEBTOR'S NOTICE OF MOTION AND MOTION FOR ENTRY OF INTERIM AND FINAL** |

**DEBTOR'S NOTICE OF MOTION AND MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS:**

(I)    **AUTHORIZING DEBTOR TO OBTAIN SENIOR SECURED POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE,**

(II)   **GRANTING SUPER-PRIORITY ADMINISTRATIVE CLAIMS AND SENIOR LIENS,**

(III)  **SCHEDULING A FINAL HEARING, AND**

(IV)  **GRANTING RELATED RELIEF**

**MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION IN SUPPORT THEREOF**

Hearing:
Date:   December 10, 2021
Time:   12:00 p.m.
Place:   Courtroom 1639
         255 E. Temple St.
         Los Angeles, CA 90012
         **VIA ZOOMGOV ONLY**

1

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 11

    A.    GENERAL BACKGROUND. ...................................................................... 11

    B.    THE DEBTOR'S REAL PROPERTY. ........................................................ 11

    C.    ALLEGED CLAIMS PURPORTEDLY SECURED BY THE REAL PROPERTY
AND OTHER CLAIMS. .................................................................................. 12

    D.    THE REASON FOR FILING BANKRUPTCY AND EXIT STRATEGY................ 14

    E.    THE DEBTOR'S NEED FOR THE DIP LOAN AND INFORMATION RELATED
THERETO. ........................................................................................................ 15

II. LEGAL ARGUMENT ............................................................................................ 17

  A.    THE DEBTOR SHOULD BE AUTHORIZED TO OBTAIN THE PROPOSED
POSTPETITION SECURED DIP LOAN FROM THE LENDER. .......................... 17

      1.    THE DEBTOR IS UNABLE TO OBTAIN UNSECURED CREDIT OR SECURED
CREDIT ON A JUNIOR LIEN BASIS. ................................................................ 20

      2.    THE TERMS OF THE PROPOSED POSTPETITION DIP LOAN FROM THE
LENDER ARE FAIR, REASONABLE, AND ADEQUATE. ................................ 21

      3.    ANY LIENS BEING "PRIMED" ARE ADEQUATELY PROTECTED. ................ 22

  B.    THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE. .......................... 25

III. CONCLUSION ...................................................................................................... 25

DECLARATION OF LAWRENCE R. PERKINS ....................................................... 26

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*In re 495 Cent. Park Ave. Corp.*
    136 B.R. 626 (Bankr. S.D.N.Y. 1992)............................................................................22

*In re Ames Dept. Stores*
    115 B.R. 34 (Bankr. S.D.N.Y. 1990)........................................................................17, 20

*In re Aqua Assoc.*
    123 B.R. 192 (Bankr. E.D.Pa. 1991) .......................................................................19, 22

*In re Beker Ind. Corp.*
    58 B.R. 725 (Bankr. S.D.N.Y. 1986)..............................................................................22

*In re C.B.G. Ltd.*
    150 B.R. 570 (Bankr. M.D.Pa. 1992) .............................................................................19

*In re Crouse Group, Inc.*
    71 B.R. 544 (Bankr. E.D.Pa. 1987) ................................................................................19

*In re Defender Drug Stores*
    126 B.R. 76 (Bankr. D. Ariz. 1991), *aff'd* 145 B.R. 312 (Bankr. 9th Cir. 1992)............19

*In re Ellingsen MacLean Oil Co.*
    834 F.2d 599 (6th Cir. 1987) ..........................................................................................19

*In re Hubbard Power & Light*
    202 B.R. 680 (Bankr. E.D.N.Y. 1996) ...........................................................................22

*In re McGowan*
    6 B.R. 241 (Bankr. E.D. Pa. 1980) .................................................................................23

*In re Mellor*
    734 F.2d 1396 (9th Cir. 1984) ........................................................................................23

*In re Photo Promotion Associates, Inc.*
    87 B.R. 835 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989) ........................18

*In re Planned System, Inc.*
    78 B.R. 852 (Bankr. S.D. Ohio 1987) ............................................................................22

*In re Rogers Development Corp.*
    2 B.R. 679 (Bankr. E.D. Va. 1980) .................................................................................23

*In re Simasko Production Co.*
    47 B.R. 444 (D. Colo. 1985).............................................................................................17

1

2

*In re Snowshoe Co.*
   789 F.2d 1085 (4th Cir. 1986) ........................................................................................20

3

*In re Stein*
   19 B.R. 458 (Bankr. E.D. Pa. 1982) ...........................................................................23

4

5

*In re T.M. Sweeney & Sons LTL Services, Inc.*
   131 B.R. 984 (Bankr. N.D. Ill. 1991) ..........................................................................18

6

7

*In re Triplett*
   87 B.R. 25 (Bankr. W.D.Tex. 1988) .............................................................................23

8

**Federal Statutes**

9

11 U.S.C.

10

   §§ 101, *et seq.* Title 11 Chapter 11 §§ 105(a), 361, 362, and 364 .............................2, 6, 11
   §§ 361(1), (2), (3) ........................................................................................................22
   § 363(c) .........................................................................................................................7
   § 364 ................................................................................................................... *passim*
   § 364(c) ....................................................................................................7, 17, 18, 19
   § 364 (d) ...............................................................................................16, 18, 19
   § 362 ...............................................................................................................3, 6, 23
   § 549 .................................................................................................................3, 5, 9
   §§ 550, 551 and 552 ....................................................................................3, 6, 9
   §§ 544, 545, 547, 548, 549, 553(b), 723(a) .............................................................9

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLEASE TAKE NOTICE** that, Crestlloyd, LLC, the Chapter 11 debtor and debtor in possession herein (the "Debtor"), hereby moves (the "Motion"), pursuant to Local Bankruptcy Rules ("LBR") 4001-2 and 9075-1, Federal Rule of Bankruptcy Procedure ("FRBP") 2002, 4001, and 9014, and sections 105(a), 361, 362, and 364 of chapter 11 of title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code"),[1] for the entry of an interim order in substantially the form attached hereto as **Exhibit "1"** (the "Interim Order") and a final order (the "Final Order" and, with the Interim Order, the "Financing Orders"), among other things:

(1)     Authorizing the Debtor, as borrower, to obtain postpetition financing up to the principal amount of $12 million (the "DIP Loan"), with that amount available under the Interim Order, from Hankey Capital, LLC or its designee ("Hankey" or the "Lender"),[2] as lender, pursuant to the terms of the Senior Secured Super-Priority Debtor in Possession Credit Agreement (the "Loan Agreement") attached hereto as **Exhibit "2,"** and the related Promissory Note (the "Note") attached to the Loan Agreement as **Exhibit "A,"** Senior Secured Superior-Priority Construction Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents (the "Deed of Trust") attached to the Loan Agreement as **Exhibit "B,"** Security Agreement – Senior Super-Priority Lien (the "Security Agreement") attached to the Loan Agreement as **Exhibit "C,"** and all other related documents and agreements (collectively, the "DIP Loan Documents")[3] to pay the Debtor's expenses, including those required to maintain the Debtor's real property located at 944 Airole Way, Los Angeles, CA 90077 (the "Real Property"), as set forth in the budget attached hereto as **Exhibit "3"** (the "Budget"), provided that the Debtor shall be entitled to a variance by line item and by time each weekly time period of fifteen percent (15.0%) per line item, with any negative variances to carry forward to the next weekly time period.

---

[1] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.
[2] Hankey is a pre-petition lender to the Debtor with a claim allegedly secured by the Debtor's Real Property (as defined below).
[3] All summaries and descriptions of the terms of the DIP Loan Documents are for informational purposes only. If there are any inconsistencies between the summaries and descriptions of the terms of the DIP Loan Documents herein and the actual provisions of the DIP Loan Documents, the terms of the DIP Loan Documents shall control.

(2)    Authorizing and empowering the Debtor to execute and enter into the DIP Loan Documents, and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(3)    Providing, pursuant to Sections 364(c) and (d), that the obligations under the Loan Agreement and DIP Loan Documents, including, without limitation, principal, accrued interest, unpaid reasonable fees and expenses incurred by Lender in connection with the DIP Loan, and all other obligations and amounts due from time to time under the Loan Agreement be and be deemed (a) an allowed super-priority administrative claim subject in priority only to the Carve Out (as defined in the DIP Loan Documents and discussed below) (the "Super-Priority Claim") and (b) immediately secured by (i) a valid, binding, continuing, enforceable, fully perfected and unavoidable first position security interest and lien upon the Debtor's Real Property and all rents, profits and proceeds therefrom (the "Real Property Lien"), subject in priority only to the Carve Out, and (ii) valid, binding, continuing, enforceable, fully perfected and unavoidable first position security interests and liens upon all of the Debtor's personal property (the "Personal Property" and, with the Real Property, the "Collateral"), other than claims and causes of action under Chapter 5 of the Bankruptcy Code and the proceeds thereof, except that (y) actions under Section 549 (and the proceeds thereof) shall be included in the Collateral to the extent they concern the recovery of what was, before the avoided transfer, any of the Collateral, and (z) any lien or security interest avoided pursuant to any or all of Sections 550, 551 and 552 shall have the same priority as such avoided lien (the "Personal Property Liens" and, with the Real Property Lien, the "DIP Liens"), subject in priority only to the Carve Out, with such DIP Liens effective immediately upon the entry of the Interim Order without the Lender being required to take any action or to record or file any Deeds of Trust or UCC Financing Statements, provided that the Lender shall be authorized to do so;

(4)    Vacating and modifying the automatic stay imposed by Section 362 solely to the extent necessary to permit the creation and perfection of the DIP Liens in and to the Collateral and to perform the obligations under the DIP Loan Documents;

(5)    Finding that adequate notice of the Motion has been provided;

3

(6)    Finding that the Lender has acted in good faith in connection with the DIP Loan Documents and is entitled to the protections afforded under Section 364(e);

(7)    Scheduling, pursuant to FRBP 4001, a final hearing (the "<u>Final Hearing</u>") before this Court to consider entry of the Final Order approving the DIP Loan on a final basis;

(8)    Waiving any applicable stay, including under FRBP 4001(c) and providing for the immediate effectiveness of the Interim Order; and

(9)    Granting related relief.

## OTHER INFORMATION REGARDING THE DIP LOAN DOCUMENTS AND DIP LOAN

*This case is intended to be a relatively fast-paced process. Specifically, based on discussions with parties in interest, the Debtor is working expeditiously to procure insurance (largest single expense of the DIP Loan), and prepare the Property for sale to take place in early February 2022, with a closing to occur by February 28, 2022. As a result, virtually all funds provided for under the DIP Loan are intended to be utilized in the early stages of this case to prepare the Property for showings prior to the anticipated auction.*

*The Debtor's alleged first position secured lender, Hankey, is providing the DIP Loan. The Debtor is informed and believes that (1) Inferno Investments, Inc. ("<u>Inferno</u>"), the Debtor's alleged second position secured lender, and (2) YOGI Securities Holdings, LLC ("<u>Yogi</u>"), the Debtor's alleged third position secured lender, will not oppose the relief requested in the Motion. The Debtor also attempted to contact Hilldun Corporation ("<u>Hilldun</u>"), the next largest alleged secured creditor to determine if it would oppose the relief requested in the Motion. To date, Hilldun has not advised the Debtor if it will oppose the Motion. As set forth in the annexed Memorandum of Points and Authorities, the balance of alleged liens against the Real Property are held by the Los Angeles County Tax Collector and a number of alleged mechanic's/materialmen's claimants, with claims much smaller than those of Hankey, Inferno, Yogi, and Hilldun. The Debtor has no known creditors with secured claims against personal property owned by the estate. Mike Fields, who appears on the UCC Report attached hereto as Exhibit "5," owns the sculpture he has a lien on. The Debtor indicated that in its Schedules, so any DIP Liens will not extend to the sculpture.*

1    ***In addition, it is important to point out to all parties, including junior secured creditors,***
2    ***that the proposed financing pursuant to this Motion shall not affect any validity or extent of any***
3    ***pre-petition extension of financing by any secured creditors, including Hankey.***

4    In addition to the summary of terms set forth above, the Debtor provides the following
5    information regarding principal terms of the DIP Loan Documents as required by FRBP 4001 and
6    (c)(1)(B):

7    •    **The Material Terms of the DIP Loan:**[4]

8    •    **Loan Amount:** Up to $12 million (principal amount).

9    •    **Interest Rate:** 8.5% per annum.  Default rate of 13.5%.

10    •    **Lender Fees:**  Origination fee equal to 1% of the amount loaned. To be
11    deducted from amount(s) drawn.  Additional fee equal to 1% of the funded DIP Loan amount if the
12    Debtor exercises its Extension Option to extend the term of the DIP Loan (see below).

13    •    **Cost Reimbursement:**  Lender's reasonable fees and expenses incurred in
14    connection with the DIP Loan.  To be deducted from the draw on the DIP Loan.

15    •    **Term of the DIP Loan:**  The earlier of (1) February 28, 2022, or if
16    Borrower has duly and timely elected the Extension Option in writing, April 30, 2022, (2) the closing
17    date of any Asset Sale affecting all or substantially all of the Real Property, (3) the effective date of
18    any Restructuring Plan of the Debtor confirmed by the Court, and (4) the acceleration of the DIP Loan
19    as a result of the occurrence of an Event of Default.

20    •    **Liens and Other Adequate Protection:** The obligations under the Loan
21    Agreement shall be deemed (1) an allowed Super-Priority Claim, subject in priority only to the Carve
22    Out and (2) immediately secured by (a) a valid, binding, continuing, enforceable, fully perfected and
23    unavoidable first position Real Property Lien upon the Debtor's Real Property and all rents, profits
24    and proceeds therefrom, subject in priority only to the Carve Out, and (b) valid, binding, continuing,
25    enforceable, fully perfected and unavoidable first position Personal Property Liens upon all of the
26    Debtor's Personal Property, other than claims and causes of action under Chapter 5 of the Bankruptcy
27    Code and the proceeds thereof, except that (i) actions under Section 549 (and the proceeds thereof)

28

---

[4] Capitalized terms not defined herein have the meanings ascribed to them in the DIP Loan Documents.

shall be included in the Collateral to the extent they concern the recovery of what was, before the

avoided transfer, any of the Collateral, and (ii) any lien or security interest avoided pursuant to any or

all of Sections 550, 551 and 552 shall have the same priority as such avoided lien, subject in priority

only to the Carve Out, with the foregoing DIP Liens effective immediately upon the entry of the

Interim Order without the Lender being required to record any Deeds of Trust or UCC Financing

Statements, provided that the Lender shall be authorized to do so.

- **Prepayment Penalty:**  None.

- **Events of Default:**  *See* Loan Agreement, Section 10.1.

- **Remedies on Default:** Upon the occurrence and during the continuance of

any Event of Default, at the sole discretion of Lender without the need for further order of or

application to the Bankruptcy Court, and (1) with respect to items (a) and (b) below, upon notice to the

Debtor; or (2) with respect to items (c) and (d) below, upon five (5) Business Days' notice to the

Debtor, any committee appointed in the Chapter 11 Case and the United States Trustee for the Central

District of California, the Lender shall have the right to take any or all of the following actions, at the

same or different times: (a) immediately terminate the Commitment, (b)declare any or all Obligations

(in whole or in part), including the unpaid principal amount of and accrued interest on the DIP Loan,

to be immediately due and payable, whereupon the same shall become immediately due and payable,

in each case without presentment, demand, protest or other requirements of any kind, all of which are

hereby expressly waived by the Debtor, (c) subject to Section 362, exercise its remedies as a secured

party against the Collateral pursuant to the Security Documents and applicable law; and (d) subject to

Bankruptcy Code section 362, enforce its other rights and remedies under the Loan Documents or

applicable law.

Pursuant to FRBP 4001, the Debtor hereby provides the following disclosures with respect to the terms of the DIP Loan Documents and Interim Order:

| | DIP LOAN DOCUMENTS | INTERIM ORDER |
|---|---|---|
| **Disclosures Tracking FRBP 4001(c)(1)(B)(i) through (xi) and (d)(1)(B).** | | |
| (i): "[A] grant of priority or a lien on property of the estate under § 364(c) or (d)." | Loan Agreement: Recital C and §§ 3.4, 3.5. *See also* Deed of Trust and Security Agreement. | Interim Order: ¶¶ 5, 6, 12. |
| (ii): "[T]he providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim" | N/A | N/A |
| (iii): "[A] determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim." | N/A | N/A |
| (iv): "[A] waiver or modification of Code provisions or applicable rules relating to the automatic stay." | Implied, but only to the extent necessary to permit the creation and perfection of the DIP Liens in and to the Collateral.<br><br>*See* Loan Agreement, at Definition of Final Order. | Explicit, but only to the extent necessary to permit the creation and perfection of the DIP Liens in and to the Collateral.<br><br>Interim Order: ¶¶ 5, 6, 12. |
| (v): "[A] waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral | The Debtor shall not incur, create, assume, suffer to exist or permit any administrative expense, unsecured claim, or other super-priority claim or Lien on the | Interim Order: ¶¶ 8, 9, 11. |

|  | **DIP LOAN DOCUMENTS** | **INTERIM ORDER** |
|---|---|---|
| under § 363(c), or request authority to obtain credit under § 364." | Collateral that is *pari passu* with or senior to the claims of Lender against the Debtor or the Collateral, or apply to the Court for authority to do so, except for Permitted Liens and the Carve Out.<br><br>Loan Agreement: ¶¶ 8.3(i), 10.1(j). *See also* Deed of Trust and Security Agreement. |  |
| (vi): "[T]he establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order." | N/A | N/A |
| (vii): "[A] waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien." | Implied, but only to the extent necessary to permit the creation and perfection of the DIP Liens in and to the Collateral.<br><br>*See* Loan Agreement, at Definition of Final Order. | Explicit, but only to the extent necessary to permit the creation and perfection of the DIP Liens in and to the Collateral.<br><br>Interim Order: ¶¶ 5, 6, 12. |
| (viii): "[A] release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action." | The Debtor is prohibited from asserting claims arising under Section 506(c) against the Lender or commencing other actions adverse to the Lender's rights and remedies under the DIP Loan Documents.<br><br>Loan Agreement, at Definition of Final Order and §§ 3.4 (d). | Interim Order: ¶ 7. |
| (ix): "[T]he indemnification of any entity." | Loan Agreement, at Definition of Final Order and §§ 4.6 (Debtor indemnification of Lender and related parties only in connection with the DIP Loan Documents | N/A |

| | **DIP LOAN DOCUMENTS** | **INTERIM ORDER** |
|---|---|---|
| | and the transaction thereunder). | |
| (x): "[A] release, waiver, or limitation of any right under § 506(c)." | The Debtor is prohibited from asserting claims arising under Section 506(c) against the Lender or commencing other actions adverse to the Lender's rights and remedies under the DIP Loan Documents.<br><br>Loan Agreement, at Definition of Final Order and §§ 3.4 (d). | Interim Order: ¶ 7. |
| (xi): "The granting of any lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a)." | Collateral shall not include Avoidance Actions, except that (1) actions under Bankruptcy Code section 549 (and the proceeds thereof) shall be included in the Collateral to the extent they concern the recovery of what was, before the avoided transfer, any of the Collateral, and (2) any lien or security interest avoided pursuant to any or all of Bankruptcy Code sections 550, 551 and 552 shall have the same priority as such avoided lien.<br><br>Loan Agreement, at Definition of Collateral and §§ 3.4 (d). | Interim Order: ¶ 5. |

In addition to the foregoing, pursuant to LBR 4001-2, concurrently herewith, the Debtor filed a *Statement Regarding Cash Collateral Or Debtor In Possession Financing [FRBP 4001; LBR 4001-2]*.

**INFORMATION REGARDING OTHER PURPORTED SECURED CREDITORS AND NOTICE OF THE MOTION**

As set forth in the Preliminary Title Report (the "Title Report") attached hereto as **Exhibit "4,"** which is summarized in the annexed Memorandum of Points and Authorities, there are a number

of alleged liens on Debtor's Real Property.  As set forth in the UCC Report (the "UCC Report") attached hereto as **Exhibit "5,"** the Debtor has no known creditors with un-lapsed liens on personal property owned by the estate.  which is summarized in the annexed Memorandum of Points and Authorities, there are a number of alleged liens on Debtor's Real Property.  In order to provide maximum notice of the Motion, concurrently with the filing of the Motion with the Court, the Debtor served by either NEF on counsel to purported secured creditors and/or overnight mail, a copy of the Motion and related moving papers, upon (1) the Lender, (2) creditors with claims purportedly secured by the Real Property, (3) the twenty (20) largest general unsecured creditors listed in the Debtor's list of creditors, (4) the Office of the United States Trustee, and (5) any other party that has filed a request for notice pursuant to FRBP 2002 or is required to receive notice under the FRBP or LBRs.

**PLEASE FURTHER TAKE NOTICE THAT (1) THE HEARING ON THE MOTION WILL TAKE PLACE AT THE ABOVE-REFERENCED DATE, TIME, AND LOCATION (VIA ZOOMGOV ONLY) AND (2) ANY OPPOSITIONS TO THE MOTION MUST BE FILED BY NO LATER THAN FRIDAY, DECEMBER 10, 2021, AT 9 A.M. (PACIFIC).**

**WHEREFORE**, the Debtor respectfully requests that the Court:

(1)	grant the relief requested in the Motion on an interim basis;

(2)	enter the proposed form of the Interim Order attached hereto as **Exhibit "1;"**

(3)	schedule a Final Hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

grant such further relief as the Court deems just and proper.

Dated: December 8, 2021

CRESTLLOYD, LLC

*/s/ David B. Golubchik*
DAVID B. GOLUBCHIK
TODD M. ARNOLD
LEVENE, NEALE, BENDER, YOO
    & GOLUBCHIK L.L.P.
Attorneys for Debtor and Debtor in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES[5]

**A.** **GENERAL BACKGROUND.**

On October 26, 2021 (the "Petition Date"), the Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtor is operating its estate and managing its financial affairs as a debtor in possession pursuant to Sections 1107 and 1108.

**B.** **THE DEBTOR'S REAL PROPERTY.**

The Debtor's primary asset is the residential Real Property that it developed, which is located at 944 Airole Way, Los Angeles, CA 90077.[6] The Real Property is one of the finest pieces of real property in America. The Real Property is situated on a four-acre Bel Air promontory, featuring the best views of Los Angeles. A moat that encompasses the Real Property gives the impression that it's floating on water. The approximately 105,000-square-foot glass and marble compound holds 20 bedrooms, each with sweeping views of Los Angeles and the ocean, and 30 bathrooms, as well as every amenity in the world. It features a 30-car garage, four swimming pools, a two-story waterfall, and numerous other water features, as well as two restaurant-grade kitchens, an indoor/outdoor entertainment center with its own VIP room, a movie theater, charitable organization rooms, a four-lane bowling alley, a library with floor-to-ceiling windows, a full beauty salon, a spa with a steam room and jacuzzi, a cigar lounge, and a gym. Three smaller villas also sit on the property, spread across the four acres. The 5,000-square-foot master suite is an oasis within the mansion. Designed with its own separate office and walk-in closet, the suite also has its own pool and kitchen. To guarantee privacy, it's isolated from the rest of the house. The mansion includes five elevators and LED ceilings that display images of moving clouds. The Real Property features state-of-the-art technology, with a full security center. The design encompasses secondary corridors for staff to use.

---

[5] Unless otherwise stated, capitalized terms in this Memorandum have the same meanings ascribed to them in the preceding Notice of Motion and Motion.

[6] Additional information about the Property can be obtained at https://www.societygrouppr.com/real-estate/the-one/ and https://www.dirt.com/more-dirt/real-estate-listings/nile-niami-the-one-house-bel-air-1203360444/.

The Real Property requires some work to be fully completed, which the Debtor believes will cost approximately $5-$10 million.  However, even in its current state of near-completion, the Real Property can be and has been marketed for sale.  The Debtor believes that the Real Property has a current fair market value of approximately $325 million in its "as-is" nearly complete condition.

## C.    ALLEGED CLAIMS PURPORTEDLY SECURED BY THE REAL PROPERTY AND OTHER CLAIMS.

As set forth in the Title Report attached hereto as **Exhibit "5,"** there are a number of claims allegedly secured by liens on Debtor's Real Property.  Based on the Title Report and information received from certain alleged secured creditors, the claims allegedly secured by liens on Debtor's Real Property and Debtor's equity in the Real Property are summarized as follows:[7]

| Alleged Secured Creditor | Approximate Alleged Claim Amount | Notes |
|---|---|---|
| Los Angeles County Tax Collector | $1,764,820.15 | |
| County of Los Angeles (MRCA-Brush Fire Clear'g Dist #1) | $0.00 | Unknown claim amount, possibly $0. |
| County of Los Angeles (Wildlife Corridor and Open Space Protection) | $0.00 | Unknown claim amount, possibly $0. |
| County of Los Angeles (Local Fire Prevention, Water Quality and Open Space Measure ) | $0.00 | Unknown claim amount, possibly $0. |
| Hankey Capital, LLC | $123,827,745.00 | Includes Receivership Certificates July 577,745, August 250,000, September TBD. |
| Inferno Investment Inc. | $20,902,106.00 | Subordinated to Hankey per Subordination Agreement (2nd Position).  Claim being investigated and not deemed allowed. |

---

[7] The chart below is solely for the purpose of illustrating claims purportedly secured by alleged liens on the Real Property for the purposes of this Motion.  The Debtor does not admit to the validity of any lien or claim amount, and inclusion in the chart below is not intended to be, and shall not serve as, an admission as to the validity of any lien or claim amount included in the chart below.  All secured claims are subject to ongoing review and potential objection by the Debtor.

| Alleged Secured Creditor | Approximate Alleged Claim Amount | Notes |
|---|---|---|
| YOGI Securities Holdings, LLC | $27,199,837.00 | Junior to Inferno (3rd Position). Claim being investigated and not deemed allowed. |
| American Truck & Tool Rentals Inc./American Rentals | $97,050.34 | Mechanic's/Materialman's Lien |
| J&E Texture, Inc. | $214,147.50 | Mechanic's/Materialman's Lien |
| Rolls Scaffold, Inc. | $0.00 | Mechanic's/Materialman's Lien |
| Hilldun Corporation | $5,000,000.00 | Lien related to obligations for non-Debtor transactions |
| JMS Air Conditioning and Appliance Services, Inc. | $51,290.00 | Mechanic's/Materialman's Lien |
| Calgrove Rentals Inc. | $12,804.00 | Mechanic's/Materialman's Lien |
| BMC West LLC | $2,398.60 | Mechanic's/Materialman's Lien |
| City of Los Angeles | $0.00 | Unknown claim amount, possibly $0. |
| Parquet By Dian | $40,846.00 | Mechanic's/Materialman's Lien |
| Powertek Electric, Inc. | $40,480.00 | Mechanic's/Materialman's Lien |
| Kennco Plumbing, Inc. | $23,956.00 | Mechanic's/Materialman's Lien |
| **TOTAL ALLEGED SECURED CLAIMS** | **$179,177,480.59** | |
| | | |
| **EQUITY (APPROX.)** | **$145,822,519.41** | |

1   Based on the foregoing and other information available to the Debtor regarding alleged

2   unsecured claims, the Debtor believes that the overall pre-petition claims asserted against the Debtor

3   total approximately $182.6 million, with approximately $179.2 million of such claims allegedly

4   secured by the Real Property and approximately $3.4 million in unsecured claims.  Thus, the Debtor

5   has approximately $145.8 million of equity in the Real Property.  Even if the Real Property sold for

6   substantially less than $325 million, for example $250 million, the Debtor would still have $70.8

7   million of equity in the Real Property and more than substantial funds to pay all allowed claims in

8   full.

9   **D.**        **THE REASON FOR FILING BANKRUPTCY AND EXIT STRATEGY.**

10   Unfortunately, before the Real Property could be fully completed and sold (either as a

11   fully completed or nearly completed project), the Debtor's primary secured lender, Hankey, as well

12   as a number of other junior secured lenders and mechanic's lien holders initiated a multitude of state

13   court actions against the Debtor seeking, among other things, to recover amounts allegedly owed and

14   to foreclose on the Real Property.  In connection with its action, Hankey sought and obtained the

15   appointment of a receiver for the Real Property (the "Receiver").  In addition, Hankey had a

16   foreclosure sale of the Real Property set for October 27, 2021.

17   In order to protect its substantial equity in the Real Property and address myriad litigation

18   and other claims against it, the Debtor filed its bankruptcy case on the Petition Date of October 26,

19   2021, which stayed the foreclosure sale.  It was imperative for the Debtor regain possession and

20   control over the Real Property from the Receiver, and to obtain the breathing spell afforded by the

21   automatic stay, not only to stop the foreclosure and protect equity in the Real Property, but also to

22   provide time and a means for the Debtor to sell the Real Property.

23   As a precursor selling the Real Property, the Debtor had to regain possession and control

24   of the Real Property from the Receiver.  To that end, immediately after the Petition Date, pursuant to

25   Section 543, the Debtor's counsel demanded that the Receiver, among other things, (1) turnover the

26   Real Property and other property of the estate and (2) to cease exercising control over such estate

27   property.  As can be seen from the docket, soon after the Petition Date, the Debtor, with the

28   assistance of its counsel and manager, quickly negotiated an interim stipulation with Hankey and the

14

Receiver regarding access to the Real Property to facilitate efforts to employ brokers and market and sell the Property.  Recently, based on the efforts of the Debtor's counsel and manager, the Receiver voluntarily turned over the Real Property and all other estate property to the Debtor as of December 1, 2021.

The Debtor is now in position to sell the Real Property.  The Debtor intends to sell the Real Property as soon as practicable for the highest price possible under the circumstances.  In fact, the Debtor is in the process of retaining new brokers and an auctioneer and seeking Court approval thereof.  Thereafter, the Debtor will seek to sell the Real Property pursuant to an auction and to close such sale by on or about February 28, 2028, or as soon as practicable thereafter.  Importantly, the Debtor is informed and believes that Hankey and other large stakeholders support such a sale of the Real Property in the context of the Debtor's bankruptcy case.

The Debtor believes that a near-term sale of the Real Property will generate sufficient funds to pay all allowed claims in full, which will allow the Debtor to exit bankruptcy, either pursuant to a plan or an alternative exit strategy, with a surplus for the Debtor's owner.  While the Debtor believes that the structured dismissal option is more favorable because it offers substantial cost and time savings, which will benefit all parties in interest, in the event dismissal is not possible, the Debtor will propose a simple reorganization plan with terms similar to the expected conditions for dismissal – *i.e.*, paying all allowed claims in full on the effective date of the plan.

E.    **THE DEBTOR'S NEED FOR THE DIP LOAN AND INFORMATION RELATED THERETO.**

Pending a sale of the Real Property, the Debtor needs additional funds to pay certain expenses, which are set forth in the Budget attached hereto as **Exhibit "3"** and include expenses related to, among other things, insuring the Real Property, the maintenance and upkeep of the Real Property, and the uninterrupted provision of utility services to the Real Property, all of which are essential to the Debtor's efforts to protect the estate against loss and market and effectuate a sale of the Real Property as soon as possible for the highest price under the circumstances.  The Debtor will suffer immediate and irreparable harm if the Debtor is not able to pay the expenses set forth in the Budget, pending a final hearing on the Motion.

15

Not including the Debtor's existing alleged secured lender creditors, the Debtor contracted approximately 15 potential lenders seeking proposals for debtor in possession financing. The Debtor also reached out to Hankey, Inferno, and Yogi (*i.e.*, the Debtor's alleged senior secured lenders) seeking proposals for debtor in possession financing. The Debtor was unable to obtain sufficient financing from sources other than the Lender on terms and subject to conditions more favorable to the Debtor than under the Loan Agreement, likely because putative lenders were not willing to lend to a debtor without regular income and substantial liens on assets without obtaining liens to protect and secure claims arising from postpetition financing. Indeed, no putative lender contacted by the Debtor was willing to provide financing on an unsecured or even administrative priority basis. All potential lenders required a first priority lien on the Real Property (junior only to valid real property tax liens) to secure any debtor in possession financing.

Accordingly, the Lender requested that the Debtor provide, and the Debtor agreed to provide, the Lender with the DIP Liens (*i.e.*, a first priority lien on the Real Property and Personal Property) pursuant to Section 364(d), as well as the other protections provided for in the DIP Loan Documents and Financing Orders, as described in the preceding Notice of Motion and Motion, to protect and secure the Lender's claims arising from the DIP Loan.

Based on the foregoing, the Debtor is seeking (1) approval to obtain the DIP Loan, up to the principal amount of $12 million, from Hankey pursuant to the terms of the Loan Agreement attached hereto as **Exhibit "2,"** and the related Note attached to the Loan Agreement as **Exhibit "A,"** the Deed of Trust attached to the Loan Agreement as **Exhibit "B,"** the Security Agreement attached to the Loan Agreement as **Exhibit "C,"** and all other DIP Loan Documents, to pay the Debtor's expenses, including those required to maintain the Debtor's Real Property, as set forth in the Budget attached hereto as **Exhibit "3,"** provided that the Debtor shall be entitled to a variance by line item and by time each weekly time period of fifteen percent (15.0%) per line item, with any negative variances to carry forward to the next weekly time period, (2) approval to execute and enter into the DIP Loan Documents, and to perform such other and further acts as may be required in connection with the DIP Loan Documents, and (3) provide the Lender with a super-priority administrative claim pursuant to Section 364(c)(1) and the DIP Liens pursuant to Section 364(d), subject only to the Carve

Out, as well as the other protections provided for in the DIP Loan Documents and Financing Orders, all as described in the preceding Notice of Motion and Motion, to protect and secure the Lender's claims arising from the DIP Loan.

After considering the lack of better alternatives, the Debtor concluded, in an exercise of its sound business judgment, that obtaining the DIP Loan and providing the DIP Liens and other protections afforded by the DIP Loan Documents and the Financing Orders is in the best interests of the estate and its creditors.

Importantly, the Debtor is informed and believes that (1) Inferno, the Debtor's alleged second position secured lender, and (2) Yogi, the Debtor's alleged third position secured lender, will not oppose the relief requested in the Motion.

As discussed above, Hankey is a prepetition lender.  However, the proposed DIP Loan is being done as a stand-alone basis and is based on terms that were better than those offered by other existing and potential new postpetition lenders.  Further, the terms of the DIP Loan were the result of arms-length negotiations between the Debtor and the Lender.  Thus, any credit extended, loans made, and other financial accommodations extended to the Debtor by the Lender have been extended, issued or made, as the case may be, in "good faith" within the meaning of Section 364(e).

## II.

## LEGAL ARGUMENT

A.    **THE DEBTOR SHOULD BE AUTHORIZED TO OBTAIN THE PROPOSED POSTPETITION SECURED DIP LOAN FROM THE LENDER.**

Pursuant to Section 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate.  *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where debtor's business judgment indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties" … "the court's discretion under

17

section 364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to be exercised . . .").

Section 364(c) provides, in pertinent part, that:

(c)  If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
(1)  with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:
(2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
(3)  secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Section 364(d)(1) governs the incurrence of senior secured debt or "priming" loans. Pursuant to Section 364(d)(1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if –

(1)    the trustee is unable to obtain such credit otherwise; and
(2)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364 (d).

Section 364 is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the postpetition period. *In re Photo Promotion Associates, Inc.*, 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989).  Where a trustee or debtor in possession cannot otherwise obtain unsecured postpetition credit, such credit may be obtained under certain carefully proscribed conditions. *In re T.M. Sweeney & Sons LTL Services, Inc.*, 131 B.R. 984, 989 (Bankr. N.D. Ill. 1991).  For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d).  *In re Photo Promotion*

18

1   *Associates, Inc.*, 87 B.R. at 839.

2          Section 364(c) also enumerates certain incentives that a court may grant to postpetition

3   lenders.  However, the list set forth in Section 364(c) is not exhaustive.  Courts have frequently

4   authorized the use of inducements not specified in the statute.  *See, e.g., In re Ellingsen MacLean Oil*

5   *Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the

6   validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76 (Bankr. D. Ariz. 1991)

7   (authorizing enhancement fee to postpetition lender), *aff'd* 145 B.R. 312, 316 (Bankr. 9th Cir. 1992)

8   ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing

9   lender incentives beyond the explicit priorities and liens specified in section 364").

10          Two factors courts consider in determining whether to authorize postpetition financing

11  which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor

12  is unable to obtain unsecured credit per Section 364(b), *i.e.*, by allowing a lender only an

13  administrative claim per Section 364(b)(1)(A); and (2) whether the terms of the transaction are fair,

14  reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.  *In*

15  *re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); *see also In re Aqua Assoc.*, 123 B.R.

16  192, 195 (Bankr. E.D.Pa. 1991).

17          In addition to the foregoing, a debtor in possession seeking subordination of liens to new

18  financing must establish adequate protection of the liens to be subordinated to the new financing.  *In*

19  *re C.B.G. Ltd.*, 150 B.R. 570, 571 (Bankr. M.D.Pa. 1992).

20          Here, as discussed above and shown by the Budget, the Debtor's cash on hand is

21  insufficient pay the Debtor's ordinary expenses, many of which relate to the preservation of the

22  Debtor's Real Property.  Additional financing is necessary to pay such expenses pending the Debtor's

23  pursuit of an exit from bankruptcy, which will likely be funded from a sale of the Debtor's Real

24  Property.   Therefore, subject to the approval of the Court, and in order to obtain the necessary DIP

25  Loan, the Debtor has agreed to provide the Lender with a super-priority administrative claim pursuant

26  to Section 364(c)(1) and the DIP Liens pursuant to Section 364(d), subject only to the Carve Out, as

27  well as the other protections provided for in the DIP Loan Documents and the Financing Orders, as

28  described in the preceding Notice of Motion and Motion, to protect and secure the Lender's claims

arising from the DIP Loan.

For all of the reasons explained herein, the Debtor believes that granting the Lender the foregoing protections is warranted, appropriate, and necessary given the circumstances of this case where the Lender has agreed to provide the Debtor with the critically necessary emergency DIP Loan, without which the Debtor would not be able to pay its expenses, including approximately $3 million to $3.5 million to insure the Real Property, and preserve and protect the Real Property while it is being marketed for sale.

The Debtor submits that all of these standards have been satisfied in this case.

**1.     THE DEBTOR IS UNABLE TO OBTAIN UNSECURED CREDIT OR SECURED CREDIT ON A JUNIOR LIEN BASIS.**

In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under § 364(a) and (b).  *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Ames, supra*, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lending institutions).

As discussed above, despite reaching out to a number of potential lenders, to date, the best postpetition financing commitment that has been provided to the Debtor is the one offered by the Lender.  Considering the circumstances and that lenders are likely are not willing to lend to a debtor with no regular income and substantial liens on its primary asset without obtaining senior liens to protect and secure claims arising from postpetition financing, the Debtor believed that it would not be able to obtain sufficient additional financing on an unsecured, administrative priority, or junior secured basis.  That turned out to be the case. No prospective lender was willing to make a loan to the Debtor on an unsecured, administrative priority, or junior secured basis.

Fortunately, the Lender offered to provide the Debtor with postpetition secured financing, but solely on the terms and conditions set forth in the DIP Loan Documents.  Accordingly, at the

Lender's request, the Debtor agreed to provide, the Lender with the protections set forth in the DIP Loan Documents and the Financing Orders described herein.  The Debtor was unable to obtain sufficient financing from sources other than the Lender on terms and subject to conditions more favorable to the Debtor than under the DIP Loan Documents.

After considering all of the foregoing, the Debtor has concluded, in an exercise of its sound business judgment, that obtaining the DIP Loan to be provided by the Lender pursuant to the DIP Loan Documents represents the best financing presently available to the Debtor.

## 2.    THE TERMS OF THE PROPOSED POSTPETITION DIP LOAN FROM THE LENDER ARE FAIR, REASONABLE, AND ADEQUATE.

The Debtor submits that the terms of the proposed DIP Loan from the Lender are fair, reasonable, and adequate.  As noted above, Hankey is a prepetition lender, but the proposed DIP Loan is being done as a stand-alone basis (e.g., without any "roll-up" or terms and conditions related to prepetition loans from Hankey) and is based on terms that were better than those offered by other existing and potential new postpetition lenders.  The Lender is well aware of the fact that the Debtor would have very little chance of avoiding a near-immediate inability to pay its expenses and to continue to operate and protect the Real Property if not for the DIP Loan offered by the Lender.  The Lender has agreed to provide the DIP Loan to the Debtor in an effort to assist the Debtor in paying its ordinary expenses and preserving the value of the Real Property pending a contemplated sale thereof in the near-term, which appears to be supported by all major stakeholders.

The amount of financing being offered to the Debtor is certainly not insignificant. However, the Debtor submits that the benefits afforded to the Debtor by the DIP Loan justify the protections being afforded under the terms of the DIP Loan Documents.  The DIP Loan offers the Debtor its best and likely only opportunity to pay expenses and maintain and preserve the value of its valuable Real Property while pursuing an exit from its bankruptcy case through a sale of the Real Property, which will benefit of all creditors and parties in interest in this case.

Based on the foregoing, the Debtor believes that (1) the terms and conditions of the proposed DIP Loan under the DIP Loan Documents are fair and reasonable, reflect the Debtor's exercise of prudent business judgment in light of the current circumstances and are supported by

reasonably equivalent value and fair consideration, (2) the DIP Loan has been negotiated in good faith and at arm's length by the Debtor and the Lender, and (3) any credit extended, loans made and other financial accommodations extended to the Debtor by the Lender have been extended, issued or made, as the case may be, in "good faith" within the meaning of Section 364(e).

### 3.    ANY LIENS BEING "PRIMED" ARE ADEQUATELY PROTECTED.

Although Section 364 does not specifically define the term "adequate protection," Section 361 requires that adequate protection be furnished to the extent Debtor's "use, sale, lease or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3). Stated succinctly, adequate protection protects a secured creditor against a decrease in the value of its collateral. *See e.g., In re Planned System, Inc.*, 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987). This standard applies equally with respect to "priming" financing under section 364(d)(1)(B). *See, e.g., In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests."); *In re Aqua Assoc.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Beker Ind. Corp.*, 58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986).

The Court has broad discretion to determine whether adequate protection is furnished. *See e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Whether the party entitled to such protection is over or undersecured is not dispositive of whether adequate protection is furnished. As the court in *Aqua Assoc.*, 123 B.R. 192, noted:

> Therefore, we believe that, while the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any 'adequate protection' analysis, and particularly one relating to § 364(d)(1)(B). The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.

*Id.* at 196 (emphasis added; approving priming financing where interest rate was 5% over prime and loan likely would enhance value of estate).

In considering adequate protection under Section 361, the Ninth Circuit has made clear

that, in the case of an oversecured creditor, an equity cushion of 20% is considered *de facto* adequate protection of a secured creditor's interest. *In re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984) (court considered adequate protection under Section 361 in connection with reviewing a relief from stay motion under Section 362 and held that a 20% equity cushion constituted adequate protection); *see also In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding a 10% cushion is sufficient to be adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (court decided that an equity cushion of approximately 15% to 20% was sufficient adequate protection to the creditor, even though the debtors had no equity in the property.)

The law is also clear that the preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988); *see also In re Stein*, 19 B.R. 458 (Bankr. E.D. Pa. 1982). In *Stein*, the court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had no equity cushion for protection. The *Stein* court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. *See also In re McCombs, supra*, where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

Additionally, in determining adequate protection, Courts have stressed the importance of promoting a debtor's reorganization. In *In re O'Connor, supra*, the Tenth Circuit stated:

> In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the

court, the interests of all other creditors also have bearing upon the
question of whether use of cash collateral shall be permitted during
the early stages of administration.

808 F.2d at 1937.

Here, Hankey, the Debtor's alleged first position secured lender obviously consents to the proposed DIP Loan because Hankey is making such loan.  Further, as discussed above, the Debtor is informed and believes that (1) Inferno, the Debtor's alleged second position secured lender, and (2) Yogi, the Debtor's alleged third position secured lender, will not oppose the relief requested in the Motion.  Given that the proposed DIP Loan will further efforts to maintain and expeditiously sell the Real Property, the Debtor believes that other alleged secured creditors will either not object to the DIP Loan or will affirmatively consent to it.

Nevertheless, the Debtor submits that, even with the provision of the "priming" DIP Liens to Hankey for the DIP Loan, to the extent there is not consent, all alleged secured creditors will be adequately protected by an equity cushion in excess of 20%, whether the Property is valued at the Debtor's estimated value of $325 million or a substantially lower value of $250 million – e.g.:

| Value of Property | $325,000,000.00 | $250,000,000.00 |
|---|---|---|
| **Existing Secured Claims (approx.)** | ($179,200,000.00) | ($179,200,000.00) |
| **Secured DIP Loan Claim** | ($12,000,000.00) | ($12,000,000.00) |
| **Overall Equity Cushion ($) (approx.)** | **$133,800,000.00** | **$58,800,000.00** |
| **Overall Equity Cushion (%) (approx.)** | **75%** | **33%** |
| | | |
| Equity Cushions Greater for Higher Priority Lien Holders | | |

In addition to the foregoing equity cushion, secured creditors will be further adequately protected by the use of the DIP Loan to insure, maintain, and preserve the value of the Real Property while pursuing an exit from its bankruptcy case through an near-term sale of the Real Property, which will benefit of all creditors and parties in interest in this case.

**B.**        **THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE.**

For the reasons noted herein, the Debtor will suffer immediate and irreparable harm if the Debtor is not able to pay the expenses set forth in the Budget, pending a final hearing on the Motion. The Debtor requires the terms of the Interim Order to become immediately effective to ensure that the Debtor will be able to obtain the proposed DIP Loan from the Lender and, thereafter, to use the Lender's Cash Collateral to pay ordinary expenses, including to maintain and protect the value of the Real Property. Based on the foregoing, the Debtor requests that any applicable stay, including any stay provided under FRBP 4001(c), be waived to allow the Interim Order to become immediately effective.

**III.**

**CONCLUSION**

**WHEREFORE**, the Debtor respectfully requests that the Court:

(1)        grant the relief requested in the Motion on an interim basis;

(2)        enter the proposed form of the Interim Order attached hereto as **Exhibit "1;"**

(3)        schedule a Final Hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(4)        grant such further relief as the Court deems just and proper.

Dated: December 8, 2021                    CRESTLLOYD, LLC

                                    /s/ David B. Golubchik
                                    DAVID B. GOLUBCHIK
                                    TODD M. ARNOLD
                                    LEVENE, NEALE, BENDER, YOO
                                        & GOLUBCHIK L.L.P.
                                    Attorneys for Debtor and Debtor in Possession

# DECLARATION OF LAWRENCE R. PERKINS

I, LAWRENCE R. PERKINS, hereby declare as follows:

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am the Founder and Chief Executive Officer of SierraConstellation Partners LLC ("SCP") and have nearly 20 years of management consulting and advisory experience with companies undergoing transition. I have enhanced business performance for numerous companies on projects ranging from interim management, profit improvement and working capital management to strategic planning and transaction execution.

3.      I have served in a variety of senior level positions including Financial Advisor, Strategic Consultant, Investment Banker, Financial Executive, and Crisis Manager to numerous middle market companies and believe that I am particularly skilled at assisting clients through challenging situations.

4.      Prior to founding SCP, I was a Senior Managing Director and Regional Leader of a national consulting firm where he was responsible for business development, marketing, staffing, and general management of the firm's western region. I joined the firm in 2010 when it acquired El Molino Advisors, a company I founded in January 2007 and led as the CEO.

5.      I began my career in the strategic consulting group of Arthur Andersen after graduating from the University of Southern California Marshall School of Business. I am currently on the board of several non-profits, and two corporate boards, and am a member of the Young Presidents Organization.

6.      SCP is the current Non-Member Manager of the Debtor.

7.      I make this Declaration in support of the Motion to which this Declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same meaning as in the Motion.

8.      On October 26, 2021 (the "Petition Date"), the Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor is operating

its estate and managing its financial affairs as a debtor in possession pursuant to Sections 1107 and 1108.

9.    The Debtor's primary asset is the residential Real Property that it developed, which is located at 944 Airole Way, Los Angeles, CA 90077.  I believe that the Real Property is one of the finest pieces of real property in America.  The Real Property is situated on an approximately four-acre Bel Air promontory, featuring the best views of Los Angeles. A moat that encompasses the Real Property gives the impression that it's floating on water.  The approximately 105,000-square-foot glass and marble compound holds 20 bedrooms, each with sweeping views of Los Angeles and the ocean, and 30 bathrooms, as well as every amenity in the world.  It features a 30-car garage, four swimming pools, a two-story waterfall, and numerous other water features, as well as two restaurant-grade kitchens, an indoor/outdoor entertainment center with its own VIP room, a movie theater, charitable organization rooms, a four-lane bowling alley, a library with floor-to-ceiling windows, a full beauty salon, a spa with a steam room and jacuzzi, a cigar lounge, and a gym.  Three smaller villas also sit on the property, spread across the four acres.  The approximately 5,000-square-foot master suite is an oasis within the mansion.  Designed with its own separate office and walk-in closet, the suite also has its own pool and kitchen.  To guarantee privacy, it's isolated from the rest of the house.  The mansion includes five elevators and LED ceilings that display images of moving clouds. The Real Property features state-of-the-art technology, with a full security center.  The design encompasses secondary corridors for staff to use.

10.    The Real Property requires some work to be fully completed, which I am informed and believe will cost approximately $5-$10 million.  However, even in its current state of near-completion, the Real Property can be and has been marketed for sale.  I am informed and believe that the Real Property has a current fair market value of approximately $325 million in its "as-is" nearly complete condition.

11.    Based on a review of the Title Report attached hereto as **Exhibit "5"** by the SCP and the Debtor's counsel, I am informed and believe there are a number of claims allegedly secured by liens on Debtor's Real Property.  Based on the Title Report and information received from certain

alleged secured creditors, the claims allegedly secured by liens on Debtor's Real Property and

Debtor's equity in the Real Property are summarized as follows:[8]

| Alleged Secured Creditor | Approximate Alleged Claim Amount | Notes |
|---|---|---|
| Los Angeles County Tax Collector | $1,764,820.15 | |
| County of Los Angeles (MRCA-Brush Fire Clear'g Dist #1) | $0.00 | Unknown claim amount, possibly $0. |
| County of Los Angeles (Wildlife Corridor and Open Space Protection) | $0.00 | Unknown claim amount, possibly $0. |
| County of Los Angeles (Local Fire Prevention, Water Quality and Open Space Measure ) | $0.00 | Unknown claim amount, possibly $0. |
| Hankey Capital, LLC | $123,827,745.00 | Includes Receivership Certificates July 577,745, August 250,000, September TBD. |
| Inferno Investment Inc. | $20,902,106.00 | Subordinated to Hankey per Subordination Agreement (2nd Position).  Claim being investigated and not deemed allowed. |
| YOGI Securities Holdings, LLC | $27,199,837.00 | Junior to Inferno (3rd Position). Claim being investigated and not deemed allowed. |
| American Truck & Tool Rentals Inc./American Rentals | $97,050.34 | Mechanic's/Materialman's Lien |
| J&E Texture, Inc. | $214,147.50 | Mechanic's/Materialman's Lien |
| Rolls Scaffold, Inc. | $0.00 | Mechanic's/Materialman's Lien |
| Hilldun Corporation | $5,000,000.00 | Lien related to obligations for non-Debtor transactions |

---

[8] The chart below is solely for the purpose of illustrating claims purportedly secured by alleged liens on the Real Property for the purposes of this Motion.  The Debtor does not admit to the validity of any lien or claim amount, and inclusion in the chart below is not intended to be, and shall not serve as, an admission as to the validity of any lien or claim amount included in the chart below.  All secured claims are subject to ongoing review and potential objection by the Debtor.

| **Alleged Secured Creditor** | **Approximate Alleged Claim Amount** | **Notes** |
|---|---|---|
| JMS Air Conditioning and Appliance Services, Inc. | $51,290.00 | Mechanic's/Materialman's Lien |
| Calgrove Rentals Inc. | $12,804.00 | Mechanic's/Materialman's Lien |
| BMC West LLC | $2,398.60 | Mechanic's/Materialman's Lien |
| City of Los Angeles | $0.00 | Unknown claim amount, possibly $0. |
| Parquet By Dian | $40,846.00 | Mechanic's/Materialman's Lien |
| Powertek Electric, Inc. | $40,480.00 | Mechanic's/Materialman's Lien |
| Kennco Plumbing, Inc. | $23,956.00 | Mechanic's/Materialman's Lien |
| **TOTAL ALLEGED SECURED CLAIMS** | **$179,177,480.59** | |
| | | |
| **EQUITY (APPROX.)** | **$145,822,519.41** | |

12.     Based on the foregoing and other information available to the Debtor regarding alleged unsecured claims, I believe that the overall pre-petition claims asserted against the Debtor total approximately $182.6 million, with approximately $179.2 million of such claims allegedly secured by the Real Property and approximately $3.4 million in unsecured claims.  Thus, I am informed and believe that the Debtor has approximately $145.8 million of equity in the Real Property.  Even if the Real Property sold for substantially less than $325 million, for example $250 million, I am informed and believe that the Debtor would still have $70.8 million of equity in the Real Property and more than substantial funds to pay all allowed claims in full.

29

13.    Unfortunately, before the Real Property could be fully completed and sold (either as a fully completed or nearly completed project), the Debtor's primary secured lender, Hankey, as well as a number of other junior secured lenders and mechanic's lien holders initiated a multitude of state court actions against the Debtor seeking, among other things, to recover amounts allegedly owed and to foreclose on the Real Property.  In connection with its action, Hankey sought and obtained the appointment of a receiver for the Real Property (the "Receiver").  In addition, Hankey had a foreclosure sale of the Real Property set for October 27, 2021.

14.    In order to protect its substantial equity in the Real Property and address myriad litigation and other claims against it, the Debtor filed its bankruptcy case on the Petition Date of October 26, 2021, which stayed the foreclosure sale.  It was imperative for the Debtor regain possession and control over the Real Property from the Receiver, and to obtain the breathing spell afforded by the automatic stay, not only to stop the foreclosure and protect equity in the Real Property, but also to provide time and a means for the Debtor to sell the Real Property.

15.    As a precursor selling the Real Property, the Debtor had to regain possession and control of the Real Property from the Receiver.  To that end, immediately after the Petition Date, pursuant to Section 543, the Debtor's counsel demanded that the Receiver, among other things, (1) turnover the Real Property and other property of the estate and (2) to cease exercising control over such estate property.  As can be seen from the docket, soon after the Petition Date, the Debtor, with the assistance of its counsel and manager, quickly negotiated an interim stipulation with Hankey and the Receiver regarding access to the Real Property to facilitate efforts to employ brokers and market and sell the Property.  Recently, based on the efforts of the Debtor's counsel and manager, the Receiver voluntarily turned over the Real Property and all other estate property to the Debtor as of December 1, 2021.

16.    The Debtor is now in position to sell the Real Property.  The Debtor intends to sell the Real Property as soon as practicable for the highest price possible under the circumstances. In fact, the Debtor is in the process of retaining new brokers and an auctioneer and seeking Court approval thereof.  Thereafter, the Debtor will seek to sell the Real Property pursuant to an auction and to close such sale by on or about February 28, 2028, or as soon as practicable thereafter.

1   Importantly, the Debtor is informed and believes that Hankey and other large stakeholders support

2   such a sale of the Real Property in the context of the Debtor's bankruptcy case.

3           17.     I believe that that a near-term sale of the Real Property will generate sufficient

4   funds to pay all allowed claims in full, which will allow the Debtor to exit bankruptcy, either

5   pursuant to a plan or an alternative exit strategy, with a surplus for the Debtor's owner.  While I

6   believe that the structured dismissal option is more favorable because it offers substantial cost and

7   time savings, which will benefit all parties in interest, in the event dismissal is not possible, the

8   Debtor will propose a simple reorganization plan with terms similar to the expected conditions for

9   dismissal – *i.e.*, paying all allowed claims in full on the effective date of the plan.

10          18.     Pending a sale of the Real Property, the Debtor needs additional funds to pay

11  certain expenses, which are set forth in the Budget attached hereto as **Exhibit "3"** and include

12  expenses related to, among other things, insuring the Real Property, the maintenance and upkeep of

13  the Real Property, and the uninterrupted provision of utility services to the Real Property, all of

14  which are essential to the Debtor's efforts to protect the estate against loss and market and effectuate

15  a sale of the Real Property as soon as possible for the highest price under the circumstances.  The

16  Debtor will suffer immediate and irreparable harm if the Debtor is not able to pay the expenses set

17  forth in the Budget, pending a final hearing on the Motion.

18          19.     Not including the Debtor's existing alleged secured lender creditors, the Debtor

19  contracted approximately 15 potential lenders seeking proposals for debtor in possession financing.

20  The Debtor also reached out to Hankey, Inferno, and Yogi (*i.e.*, the Debtor's alleged senior secured

21  lenders) seeking proposals for debtor in possession financing.  The Debtor was unable to obtain

22  sufficient financing from sources other than the Lender on terms and subject to conditions more

23  favorable to the Debtor than under the Loan Agreement, likely because putative lenders were not

24  willing to lend to a debtor without regular income and substantial liens on assets without obtaining

25  liens to protect and secure claims arising from postpetition financing.  Indeed, no putative lender

26  contacted by the Debtor was willing to provide financing on an unsecured or even administrative

27  priority basis.  All potential lenders required a first priority lien on the Real Property (junior only to

28  valid real property tax liens) to secure any debtor in possession financing.

20.     Accordingly, the Lender requested that the Debtor provide, and the Debtor agreed to provide, the Lender with the DIP Liens (*i.e.*, a first priority lien on the Real Property and Personal Property) pursuant to Section 364(d), as well as the other protections provided for in the DIP Loan Documents and Financing Orders, as described in the preceding Notice of Motion and Motion, to protect and secure the Lender's claims arising from the DIP Loan.

21.     Based on the foregoing, the Debtor is seeking (1) approval to obtain the DIP Loan, up to the principal amount of $12 million, from Hankey pursuant to the terms of the Loan Agreement attached hereto as **Exhibit "2,"** and the related Note attached to the Loan Agreement as **Exhibit "A,"** the Deed of Trust attached to the Loan Agreement as **Exhibit "B,"** the Security Agreement attached to the Loan Agreement as **Exhibit "C,"** and all other DIP Loan Documents, to pay the Debtor's expenses, including those required to maintain the Debtor's Real Property, as set forth in the Budget attached hereto as **Exhibit "3,"** provided that the Debtor shall be entitled to a variance by line item and by time each weekly time period of fifteen percent (15.0%) per line item, with any negative variances to carry forward to the next weekly time period, (2) approval to execute and enter into the DIP Loan Documents, and to perform such other and further acts as may be required in connection with the DIP Loan Documents, and (3) provide the Lender with a super-priority administrative claim pursuant to Section 364(c)(1) and the DIP Liens pursuant to Section 364(d), subject only to the Carve Out, as well as the other protections provided for in the DIP Loan Documents and Financing Orders, all as described in the preceding Notice of Motion and Motion, to protect and secure the Lender's claims arising from the DIP Loan.

22.     After considering the lack of better alternatives, I concluded, in an exercise of my sound business judgment, that obtaining the DIP Loan and providing the DIP Liens and other protections afforded by the DIP Loan Documents and the Financing Orders is in the best interests of the estate and its creditors.

23.     Importantly, I am informed and believe that (1) Inferno, the Debtor's alleged second position secured lender, and (2) Yogi, the Debtor's alleged third position secured lender, will not oppose the relief requested in the Motion.

24.     As discussed above, Hankey is a prepetition lender.  However, the proposed DIP Loan is being done as a stand-alone basis and is based on terms that were better than those offered by other existing and potential new postpetition lenders.  Further, the terms of the DIP Loan were the result of arms-length negotiations between the Debtor and the Lender.  Thus, in my opinion, any credit extended, loans made, and other financial accommodations extended to the Debtor by the Lender have been extended, issued or made, as the case may be, in "good faith" within the meaning of Section 364(e).

s     I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 8th day of December 2021, at Los Angeles, California.

_____
LAWRENCE R. PERKINS

# EXHIBIT "1"

DAVID B. GOLUBCHIK (State Bar No. 185520)
TODD M. ARNOLD (State Bar No. 221868)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dbg@lnbyg.com; tma@lnbyg.com

Attorneys for Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>CRESTLLOYD, LLC,<br><br>        Debtor and Debtor in Possession. | Case No.: 2:21-bk-18205-DS<br><br>Chapter 11 Case<br><br>**INTERIM ORDER:**<br>**(I)    AUTHORIZING DEBTOR TO OBTAIN SENIOR SECURED POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE,**<br>**(II)   GRANTING SUPER-PRIORITY ADMINISTRATIVE CLAIMS AND SENIOR LIENS,**<br>**(III)  SCHEDULING A FINAL HEARING, AND**<br>**(IV)  GRANTING RELATED RELIEF**<br><br>Hearing:<br>  Date: _____<br>  Time: _____<br>  Place:   Courtroom 1639<br>          255 E. Temple St.<br>          Los Angeles, CA 90012<br>          **VIA ZOOMGOV ONLY** |

A hearing was held at the above-referenced date, time, and location to consider the *Motion For Entry Of Interim And Final Orders: (I) Authorizing Debtor To Obtain Senior Secured Postpetition Financing Pursuant To Section 364 Of The Bankruptcy Code, (II) Granting Super-Priority Administrative Claims And Senior Liens, (III) Scheduling A Final Hearing, And (IV) Granting Related Relief* (the "Motion") [Dkt. ___] filed by Crestlloyd, LLC, the Chapter 11 debtor and debtor in possession herein (the "Debtor"), pursuant to Local Bankruptcy Rules ("LBR") 4001-2 and 9075-1, Federal Rule of Bankruptcy Procedure ("FRBP") 2002, 4001, and 9014, and sections 105(a), 361, 362, and 364 of chapter 11 of title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code").[1] Appearances were made as set forth on the record of the Court.

Pursuant to the Motion, the Debtor sought the entry of an interim order (the "Interim Order") and a final order (the "Final Order" and, with the Interim Order, the "Financing Orders"), among other things:

(1)    Authorizing the Debtor, as borrower, to obtain postpetition financing up to the principal amount of $12 million (the "DIP Loan"), with that amount available under the Interim Order, from Hankey Capital, LLC or its designee ("Hankey" or the "Lender"), as lender, pursuant to the terms of the Senior Secured Super-Priority Debtor in Possession Credit Agreement (the "Loan Agreement") attached to the Motion as **Exhibit "2,"** and the related Promissory Note (the "Note") attached to the Loan Agreement as **Exhibit "A,"** Senior Secured Superior-Priority Construction Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents (the "Deed of Trust") attached to the Loan Agreement as **Exhibit "B,"** Security Agreement – Senior Super-Priority Lien (the "Security Agreement") attached to the Loan Agreement as **Exhibit "C,"** and all other related documents and agreements (collectively, the "DIP Loan Documents")[2] to pay the Debtor's expenses, including those required to maintain the Debtor's real property located at 944 Airole Way, Los Angeles, CA 90077 (the "Real Property"), as set forth in the budget attached to the Motion as **Exhibit "3"** (the "Budget");

---

[1] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

[2] All summaries and descriptions of the terms of the DIP Loan Documents are for informational purposes only.  If there are any inconsistencies between the summaries and descriptions of the terms of the DIP Loan Documents herein and the actual provisions of the DIP Loan Documents, the terms of the DIP Loan Documents shall control.

(2)    Authorizing and empowering the Debtor to execute and enter into the DIP Loan Documents, and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(3)    Providing, pursuant to Sections 364(c) and (d), that the obligations under the Loan Agreement and DIP Loan Documents, including, without limitation, principal, accrued interest, unpaid reasonable fees and expenses incurred by Lender in connection with the DIP Loan, and all other obligations and amounts due from time to time under the Loan Agreement be and be deemed (a) an allowed super-priority administrative claim subject in priority only to the Carve Out (as defined in the DIP Loan Documents and discussed in the Motion) (the "Super-Priority Claim") and (b) immediately secured by (i) a valid, binding, continuing, enforceable, fully perfected and unavoidable first position security interest and lien upon the Debtor's Real Property and all rents, profits and proceeds therefrom (the "Real Property Lien"), subject in priority only to the Carve Out, and (ii) valid, binding, continuing, enforceable, fully perfected and unavoidable first position security interests and liens upon all of the Debtor's personal property (the "Personal Property" and, with the Real Property, the "Collateral"), other than claims and causes of action under Chapter 5 of the Bankruptcy Code and the proceeds thereof, except that (y) actions under Section 549 (and the proceeds thereof) shall be included in the Collateral to the extent they concern the recovery of what was, before the avoided transfer, any of the Collateral, and (z) any lien or security interest avoided pursuant to any or all of Sections 550, 551 and 552 shall have the same priority as such avoided lien (the "Personal Property Liens" and, with the Real Property Lien, the "DIP Liens"), subject in priority only to the Carve Out, with such DIP Liens effective immediately upon the entry of the Interim Order without the Lender being required to take any action or to record or file any Deeds of Trust or UCC Financing Statements, provided that the Lender shall be authorized to do so;

(4)    Vacating and modifying the automatic stay imposed by Section 362 solely to the extent necessary to permit the creation and perfection of the DIP Liens in and to the Collateral and to perform the obligations under the DIP Loan Documents;

(5)    Finding that adequate notice of the Motion has been provided;

(6)     Finding that the Lender has acted in good faith in connection with the DIP Loan Documents and is entitled to the protections afforded under Section 364(e);

(7)     Scheduling, pursuant to FRBP 4001, a final hearing (the "<u>Final Hearing</u>") before this Court to consider entry of the Final Order approving the DIP Loan on a final basis;

(8)     Waiving any applicable stay, including under FRBP 4001(c) and providing for the immediate effectiveness of the Interim Order; and

(9)     Granting related relief.

Upon consideration of the Motion, all papers filed in support of the Motion, the Notice of the Motion, any oppositions to the Motion and any replies thereto, the arguments and comments of counsel at the hearing on the Motion, and for good cause shown,

**THE COURT HEREBY FINDS AS FOLLOWS:**

A.     This Court has jurisdiction over the Debtor's case, the Motion, and the parties and property affected thereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A) and (D).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     Notice of the Motion, the relief requested therein, and the interim hearing on the Motion was served by the Debtor on its twenty largest unsecured creditors, all known secured creditors, the United States Trustee for the Central District of California, and any parties who have requested special notice in this case.  Under the circumstances, the notice given by the Debtor of the Motion, the relief requested therein, and the interim hearing on the Motion constitutes due and sufficient notice thereof and complies with FRBP 4001(c) and any other applicable notice requirements under the FRBP and LBRs.

C.     The Debtor has an immediate need to obtain the DIP Loan from the Lender to pay for the expenses contained in the Budget.  Payment of such expenses is necessary to enable the Debtor to avoid immediate, irreparable harm to the Debtor and its estate.

D.     The Debtor sought postpetition financing from a number of sources, including certain existing alleged secured lenders.

E.     After reasonable inquiry, the Debtor was unable to obtain adequate credit solely

(1) allowable under Section 503(b)(1) as an administrative expense, (2) with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b), (3) secured by a lien on property of the estate that is not otherwise subject to a lien, or (4) secured by a junior lien on property of the estate that is subject to a lien.

F.    To date, the best postpetition financing commitment and terms that have been provided to the Debtor are those offered by the Lender under the DIP Loan Documents.

G.    The terms of the DIP Loan are fair and reasonable, reflect the Debtor's reasonable exercise of its business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.

H.    The terms of the DIP Loan have been the subject of negotiations conducted in good faith and at arm's length between the Debtor and the Lender, and all of the Debtor's obligations and indebtedness to the Lender arising under or in connection with the DIP Loan have been extended by the Lender in "good faith" as such term is used in Section 364(e), and in express reliance upon the protections set forth therein, and the Lender is entitled to, and hereby granted, the full protection of Section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

I.    Any creditors with valid liens on the Collateral will be adequately protected by (1) an equity cushion in excess of 20% and (2) the use of the DIP Loan to fully insure and maintain and preserve the value of the Real Property while the Debtor pursues a near-term sale of the Real Property, for the benefit of creditors.

J.    The Debtor has requested immediate entry and the immediate effectiveness of this Interim Order pursuant to FRBP 4001(c)(2).  Absent granting the interim relief set forth in this Interim Order, the Debtor's estate will be immediately and irreparably harmed.

K.    Authorizing the Debtor to consummate the DIP Loan in accordance with this Interim Order to enable the Debtor to pay the expenses in the Budget is in the best interest of the Debtor's estate.

L.    Good cause has been shown for the entry of this Interim Order.

Based upon the foregoing findings and conclusions, and upon the record made before this

5

Court at the interim hearing, and good and sufficient cause appearing therefor, **THIS COURT HEREBY ORDERS, DETERMINES AND DECREES AS FOLLOWS:**

1.      The Motion is granted on the terms and conditions set forth in this Interim Order, with the foregoing findings incorporated herein by reference.  This Interim Order shall be valid and binding on all parties-in-interest and fully effective immediately upon its entry.  All objections to the Motion are overruled in their entirety.

2.      The Debtor is hereby authorized to borrow the DIP Loan, up to the principal amount of $12 million, from the Lender, pursuant to the DIP Loan Documents and to incur and perform all obligations under the DIP Loan Documents.

3.      The Debtor is hereby authorized and empowered to execute and enter into the DIP Loan Documents, and to perform such other and further acts as may be required in connection with the DIP Loan Documents.  Upon execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms.

4.      The Debtor is hereby authorized to use the proceeds from the DIP Loan to pay the Debtor's expenses as set forth in the Budget attached to the Motion as Exhibit "3."  The Debtor shall comply with the Budget, but may have a variance by line item and by time each weekly time period of fifteen percent (15.0%) per line item, with any negative variances to carry forward to the next weekly time period..

5.      Effective immediately upon entry of this Interim Order, and without the need to take any action or file or record any deeds of trust, financing statements or other documents, the obligations under the DIP Loan and DIP Loan Documents, including, without limitation, principal, accrued interest, unpaid reasonable fees and expenses, and all other obligations and amounts due from time to time under the Loan Agreement and DIP Loan Documents shall be, and are hereby deemed to be (a) an allowed Super-Priority Claim and (b) immediately secured by (i) a valid, binding, continuing, enforceable, fully perfected and unavoidable first position security interest and lien upon the Real Property and all rents, profits and proceeds therefrom (*i.e.,* the Real Property Lien), subject in priority only to the Carve Out, and (ii) valid, binding, continuing, enforceable, fully perfected and unavoidable first position security interests and liens upon all of the Personal Property, other than

claims and causes of action under Chapter 5 of the Bankruptcy Code and the proceeds thereof, except that (y) actions under Section 549 (and the proceeds thereof) shall be included in the Collateral to the extent they concern the recovery of what was, before the avoided transfer, any of the Collateral, and (z) any lien or security interest avoided pursuant to any or all of Sections 550, 551 and 552 shall have the same priority as such avoided lien (*i.e.*, the Personal Property Liens and, with the Real Property Lien, the DIP Liens), subject in priority only to the Carve Out.

6.      The Lender is authorized, but not required, to file or record financing statements, deeds of trust, mortgages, notices of lien or similar instruments in any jurisdiction, or take any other action in order to validate and perfect the DIP Liens granted to the Lender hereunder.  Regardless of whether the Lender shall in its sole discretion choose to file such financing statements, deeds of trust, mortgages, notices of lien or similar instruments, the DIP Liens are hereby deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Interim Order.  The automatic stay imposed by Section 362 is hereby vacated and modified solely to the extent necessary to permit the creation and perfection of the DIP Liens in and to the Collateral as set forth in this paragraph.

7.      The Debtor is prohibited from asserting claims arising under Section 506(c) against the Lender or commencing other actions adverse to the Lender's rights and remedies under the DIP Loan Documents.

8.      The Debtor is prohibited from incurring debt with priority equal to or greater than the Lender has under the DIP Loan Documents, except and to the extent as expressly provided in the DIP Loan Documents.

9.      The Debtor is prohibited from granting or imposing liens on the Collateral other than Permitted Liens (as defined in the DIP Loan Documents).

10.      Subject to Section 363(k), the Lender, with respect to the DIP Loan and any other allowed prepetition secured claim it has, shall have the right to "credit bid" up to the full allowed amount of its allowed secured claims in connection with any sale of the Real Property, including any sale occurring pursuant to Section 363 or included as part of a restructuring plan subject to

confirmation under Section 1129 or a sale or disposition by a chapter 7 trustee under Section 725 of the Bankruptcy Code or otherwise.

11. The DIP Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to the DIP Loan Documents and this Interim Order shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Debtor (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of this Chapter 11 Case, or by any other act or omission whatsoever.

12. The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit (a) the Debtor to grant the DIP Liens and the Super-Priority Claim, and to perform such acts as the Lender may reasonably request to assure the perfection and priority of the DIP Liens; and (b) the implementation of the terms of this Interim Order and the DIP Loan Documents.

13. Except as otherwise provided in this Interim Order, the terms and provisions of this Interim Order shall, immediately upon entry of this Interim Order by this Court, become valid and binding upon the Debtor, the Lender, all creditors of the Debtor, the Official Committee of Unsecured Creditors if one is appointed, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtor's estate in this Chapter 11 Case or in any subsequent chapter 7 case.

14. The terms of this Interim Order and any actions taken pursuant hereto, shall survive the entry of any order which may be entered: (a) confirming any plan in this Chapter 11 Case; (b) dismissing this Chapter 11 Case; (c) converting this Chapter 11 Case to any other chapter under the Bankruptcy Code; (d) withdrawing of the references of this Chapter 11 Case from the Bankruptcy Court; and (e) providing for abstention from handling or retaining of jurisdiction of this Chapter 11 Case in this Bankruptcy Court. The terms and provisions of this Interim Order as well as the protections granted pursuant to this Interim Order and the DIP Loan Documents, shall continue in full force and effect notwithstanding the entry of such order, and such protections shall maintain their priority as provided by this Interim Order until all the obligations of the Debtor to the Lender pursuant to the DIP Loan Documents are indefeasibly paid in full and discharged. The obligations of Debtor under the DIP

8

1  Loan Documents shall not be discharged by the entry of any order confirming a chapter 11 plan, the

2  Debtor having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code. The

3  Debtor shall not propose or support any plan that is not conditioned upon the payment in full in cash of

4  all of Debtor's obligations under the DIP Loan Documents on or prior to the effective date of such

5  plan.

6       15.    This Interim Order shall not be modified, amended or extended without the prior

7  written consent of Hankey, and no such consent shall be implied by any action, inaction or

8  acquiescence of Hankey.

9       16.    **A Final Hearing on the Motion shall be held on _____, 2021 at ___:___ __.m.,**

10  **at the above referenced location with appearances via ZoomGov only.  Any oppositions to the**

11  **Motion shall be filed and served by no later than _____.  Any replies to any oppositions to**

12  **the Motion shall be filed and served by no later than _____.**

13       17.    Any applicable stay, including under FRBP 4001(c), is hereby waived, and this

14  Interim Order is immediately effective.

15       **IT IS SO ORDERED.**

16                        ###

17

18

19

20

21

22

23

24

25

26

27

28

9

# EXHIBIT "2"

# SENIOR SECURED SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT

Borrower:    CRESTLLOYD, LLC

Lender:      HANKEY CAPITAL, LLC

# TABLE OF CONTENTS

**Page**

ARTICLE 1    INCORPORATION AND DEFINITIONS ...........................................................1
    1.1    Definitions.................................................................................................1

ARTICLE 2    REPRESENTATIONS AND WARRANTIES...................................................9
    2.1    Representations and Warranties................................................................9
    2.2    Continuation of Representations and Warranties ...................................11

ARTICLE 3    AMOUNT AND TERMS OF COMMITMENT ................................................11
    3.1    The Loan; Maturity Date ........................................................................11
    3.2    Use of Loan Proceeds .............................................................................12
    3.3    Payment; Prepayments and Reduction of Aggregate Commitment ..........12
    3.4    Super-Priority Nature of Obligations and Status of Lender's Liens ..........13
    3.5    No Discharge; Survival of Liens and Claims; Waiver of Priming
         Rights.......................................................................................................13
    3.6    Payment of Obligations............................................................................14
    3.7    No Marshaling .........................................................................................14

ARTICLE 4    PRINCIPAL; INTEREST; SPECIAL PROVISIONS .........................................14
    4.1    Interest on the Loan ................................................................................14
    4.2    Terms of Payment of Principal and Interest ............................................14
    4.3    Method and Place of Payment ................................................................15
    4.4    Reserved...................................................................................................15
    4.5    Taxes .......................................................................................................15
    4.6    Loan Indemnification ..............................................................................16
    4.7    Fees and Expenses ..................................................................................16
    4.8    Advances..................................................................................................17
    4.9    No Waiver ................................................................................................17
    4.10   Advances Secured by Loan Documents ...................................................17

ARTICLE 5    CONDITIONS PRECEDENT TO EACH ADVANCE .......................................17
    5.1    Conditions Precedent to Each Advance...................................................17

ARTICLE 6    CONDITIONS TO CLOSING .......................................................................18
    6.1    Conditions to Closing .............................................................................18

ARTICLE 7    FUNDING CONDITIONS AND MECHANICS ...............................................19
    7.1    Funding Conditions and Mechanics........................................................19

ARTICLE 8    FURTHER AGREEMENTS OF BORROWER...................................................19
    8.1    Furnishing Information ...........................................................................19
    8.2    Affirmative Covenants.............................................................................20
    8.3    Negative Covenants ................................................................................22

ARTICLE 9    ASSIGNMENTS; CONFIDENTIALITY ..........................................................23
    9.1    Successors and Assigns............................................................................23
    9.2    Confidentiality .........................................................................................23

i

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

**TABLE OF CONTENTS**
**(CONTINUED)**

Page

9.3     Dissemination of Information ................................................................23
9.4     Non-Disclosure and Confidentiality Agreements ....................................23

ARTICLE 10   EVENTS OF DEFAULT BY BORROWER ................................................24
10.1    Events of Default ....................................................................24
10.2    Remedies ............................................................................26
10.3    Right of Lender to Make Advances to Cure Events of Default;
        Obligatory Advances ................................................................27
10.4    Attorneys' Fees......................................................................27
10.5    No Waiver ..........................................................................28

ARTICLE 11   MISCELLANEOUS .............................................................28
11.1    Time is of the Essence ..............................................................28
11.2    Amendments, Etc. ..................................................................28
11.3    Determination of Facts ..............................................................28
11.4    Prior Agreements ..................................................................28
11.5    Disclaimer by Lender ..............................................................28
11.6    Captions; Section References .......................................................28
11.7    Inconsistent Terms and Partial Invalidity .............................................29
11.8    Approvals ..........................................................................29
11.9    References and Other Terms .......................................................29
11.10   Notices ............................................................................29
11.11   Effect of Agreement ................................................................30
11.12   Governing Law .....................................................................30
11.13   Waiver of Defenses ................................................................30
11.14   Consent to Jurisdiction .............................................................31
11.15   Waiver of Jury Trial ................................................................31
11.16   Lender's Right to Credit Bid .......................................................31
11.17   Usury Savings Clause ..............................................................31
11.18   Counterparts; Facsimile Signatures .................................................32
11.19   Final Agreement....................................................................32

EXHIBITS

Exhibit A:     Promissory Note

Exhibit B:     Senior Secured Superior-Priority Construction Deed of Trust,
               Security Agreement and Fixture Filing with Assignment of Rents

Exhibit C:     Security Agreement – Senior Super-Priority Lien

Exhibit D:     Interim Order

Exhibit E:     Final Order

Exhibit F:     Budget

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

## SENIOR SECURED SUPER-PRIORITY DEBTOR IN POSSESSION
## CREDIT AGREEMENT

THIS SENIOR SECURED SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT (this "**Agreement**"), is made and entered into as of December __, 2021, by and between **CRESTLLOYD, LLC**, a California limited liability company ("**Borrower**"), and **HANKEY CAPITAL, LLC**, a California limited liability company ("**Lender**").

## RECITALS

A.      On October 26, 2021 (the "**Filing Date**"), Borrower commenced a case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, case number 21-18205 (the "**Chapter 11 Case**").  Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue operating its business as a debtor in possession.

B.      Borrower has requested that Lender provide a debtor in possession term loan to Borrower in the principal amount of Twelve Million and No/100ths Dollars ($12,000,000.00), which is intended to provide short-term bridge financing so that Borrower can operate while marketing substantially all its assets for a sale, which the parties currently envision will occur under an auction process or other sale under Bankruptcy Code section 363.

C.      Lender has indicated its willingness to extend the Loan to Borrower, all on the terms and conditions set forth herein and in the other Loan Documents and in accordance with the Bankruptcy Code, so long as, *inter alia*, such post-petition loan obligations are (a) secured by Liens on all of Borrower's assets, whether now owned or hereafter acquired, as set forth herein, and subject in priority only to the Carve Out, and (b) given super-priority status and priming liens; all as described below and as same shall be provided for in the Final Order.

**NOW, THEREFORE,** in consideration of the mutual representations, warranties, covenants and agreements herein contained, the sufficiency of which hereby is acknowledged, the parties hereto represent and agree as follows:

## ARTICLE 1
## INCORPORATION AND DEFINITIONS

**1.1      Definitions.**   The following terms shall have the following meanings in this Agreement:

**Advance:**  Any advance of Loan Proceeds made by Lender to or for the benefit of Borrower as required or permitted under this Agreement or any other Loan Document.

**Affiliate:**  As applied to any Person, any other Person that, directly or indirectly, controls or is controlled by or is under common control with such Person.  A Person shall be deemed to control another Person if the controlling Person is the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act) of ten percent (10%) or more of any class of voting securities (or other voting interests) of the controlled Person, or possesses, directly or indirectly, the power to direct

or cause the direction of the management or policies of the controlled Person, whether through ownership of stock, any other equity interest or membership interest, by contract or otherwise.

**Aggregate Commitment:**  The aggregate of the Commitment for this Loan, as reduced from time to time by any principal payments made by or on behalf of Borrower and any principal reductions otherwise required under and pursuant to the terms of the Loan Documents.  The Aggregate Commitment as of the Closing Date is Twelve Million and No/100ths Dollars ($12,000,000.00) plus the amount of the Facility Fee; provided, however, that in no event shall the Aggregate Commitment exceed the maximum principal amount of the Loan approved by the Bankruptcy Court pursuant to the Final Order.

**Agreement:**  As defined in the Preamble.

**Asset Sale:**  The sale, lease, conveyance, disposition or other transfer or assignment by Borrower of any of its assets (including by way of a sale-leaseback transaction and including the sale or other transfer of any of the equity interests or membership interests of any Subsidiary of such Person), including any or all of the Collateral, and the assignment of any its executory contracts and unexpired leases.

**Availability Period:**  The period commencing on the Closing Date and ending on the Maturity Date.

**Avoidance Actions:**  Claims and causes of action that first arise on or after the Filing Date under Bankruptcy Code chapter 5 and the proceeds thereof and property received thereby, whether by judgment, settlement, or otherwise.

**Bankruptcy Code:**  Title 11 of the United States Code.

**Bankruptcy Court:**  The United States Bankruptcy Court for the Central District of California, Central Division, or any other court then having jurisdiction over the Chapter 11 Case.

**Borrower:**  As defined in the Preamble.

**Borrowing Date:**  Any date that an Advance is made.

**Budget:**  Budget shall refer to that certain cash budget of expenditures contemplated by Borrower to be made out of the Advance, attached hereto as **Exhibit F**, and also attached to the Interim Order and the Final Order.  Borrower shall comply with the Budget, but may have a variance by line item and by each weekly time period of fifteen percent (15.0%) per line item, with any negative variances to carry forward to the next weekly time period.

**Business Day:**  Any day other than a Saturday, Sunday, or a legal holiday on which banks in the State of California are required or permitted to close.

**Carve Out:**  All fees and costs incurred by the Borrower after the Filing Date as a debtor in possession, including, without limitation, fees and costs required to be paid to the Clerk of the Bankruptcy Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) in the Chapter 11 Case, except such fees that result from the sale of Collateral or any portion thereof,

which shall be paid out of the proceeds from such sale, and Chapter 11 fees and costs of professionals employed by the Borrower as a debtor in possession without prejudice to Lender's right to object to any fee requests, as specified in the Budget.

**Chapter 11 Case:**  As defined in the Recitals.

**Closing Date:**  The date on which the Interim Order is entered by the Bankruptcy Court in the Chapter 11 Case.

**Collateral:**  Collectively, all **"Collateral"** as that term is defined in the Security Documents.   Collateral shall not include Avoidance Actions, except that (a) actions under Bankruptcy Code section 549 (and the proceeds thereof) shall be included in the Collateral to the extent they concern the recovery of what was, before the avoided transfer, any of the Collateral, and (b) any lien or security interest avoided pursuant to any or all of Bankruptcy Code sections 550, 551 and 552 shall have the same priority as such avoided lien.

**Collateral Sale:**  As defined in <u>Section 11.16</u> of this Agreement.

**Commitment:**  Lender's commitment to make the Loan under the terms of the Loan Documents.

**Contingent Obligation:**  As applied to any Person, (a) any Contractual Obligation, contingent or otherwise, of that Person with respect to any Indebtedness of another or other obligation or liability of another, including, without limitation, any such Indebtedness, obligation or liability of another directly or indirectly guaranteed, endorsed (other than for collection or deposit in the ordinary course of business), co-made or discounted or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable, including Contractual Obligations (contingent or otherwise) arising through any agreement to purchase, repurchase, or otherwise acquire such Indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income or other financial condition or to make payment other than for value received; and (b) any other contingent obligation or liability of such Person, whether or not reflected in financial statements of such Person as a liability.

**Contractual Obligation:**  As applied to any Person, any provision of any equity or debt securities issued by that Person or any indenture, mortgage, deed of trust, security agreement, pledge agreement, guaranty, contract, undertaking, agreement or instrument, in any case in writing, to which that Person is a party or by which it or any of its properties is bound, or to which it or any of its properties is subject.

**Deed of Trust:**  Deed of Trust means the Senior Secured Superior-Priority Construction Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents in the form attached hereto as **Exhibit B**.

**Default:**  Any condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

3

**Default Rate:** Five percent (5.0%) in excess of the Interest Rate. The Default Rate shall become effective without further notice upon the occurrence of an Event of Default.

**Deferred Extension Fee:** As defined in Section 3.1(d) of this Agreement.

**Event of Default:** Has the meaning set forth in Section 10.1 of this Agreement.

**Exchange Act:** The Securities Exchange Act of 1934, as amended, and regulations promulgated thereunder.

**Extension Fee:** The Extension Fee is the sum of $120,000.00, which is equal to one percent (1.0%) of the Aggregate Commitment. The Extension Fee must be paid in good United States funds.

**Extension Option:** On or before February 28, 2022, Borrower has a one-time option to elect to extend the Maturity Date from February 28, 2022 to April 30, 2022. The sole method by which Borrower may exercise its one-time option is to give written notice to Lender that Borrower elects to extend the Maturity Date pursuant to the Extension Option, in the manner and at the time set forth in Section 3.1(d).

**Facility Fee:** Has the meaning set forth in Section 4.7 of this Agreement.

**Filing Date:** As defined in the Recitals.

**Final Order:** A final order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2), granting final approval of and authorizing Borrower to enter into and perform under this Agreement and the other Loan Documents and granting the priming liens and Super-Priority Claim and other benefits and protections with respect to Borrower described herein and in the other Loan Documents in favor of Lender, consistent with local rules in the jurisdiction of the Bankruptcy Court, as are satisfactory to Lender.

The Final Order shall be in form and substance approved by Lender in substantially the form of **Exhibit E** attached hereto, and shall include the granting of perfected first priority liens and Super-Priority Claim, as well as provisions: (a) modifying the automatic stay to permit the creation and perfection of the Liens in and to the Collateral; (b) providing for shortened notice to seek a lifting of the automatic stay to permit the enforcement of Lender's remedies under the Loan Documents; (c) prohibiting the assertion of claims arising under Bankruptcy Code section 506(c) (during the period that Borrower is authorized to borrow under the Loan) against Lender or the commencement of other actions adverse to Lender or its rights and remedies under the Loan Documents; (d) prohibiting the incurrence of debt with priority equal to or greater than Lender has under the Loan Documents, except and to the extent as expressly provided in the Loan Documents; (e) prohibiting any grant or imposition of Liens other than Permitted Liens; (f) providing Lender with the right to credit bid as set forth in this Agreement; and (g) finding that Lender is extending credit to Borrower in good faith within the meaning of Bankruptcy Code section 364(e).

**Final Order Entry Date:** The date on which the Final Order is entered in the Chapter 11 Case.

4

**GAAP:**  Generally accepted accounting principles in the United States of America in effect from time to time as applied by nationally recognized accounting firms.

**Governmental Authority:**  Any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

**Highest Lawful Rate:**  The maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged or received under the laws applicable to Lender or Borrower that are presently in effect or, to the extent allowed by law, under such applicable laws that hereafter may be in effect and allow a higher maximum nonusurious interest rate than applicable laws now allow.

**Indebtedness:**  As to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements, or other similar instruments;

(b)      all direct or Contingent Obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)      all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(d)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(e)      capital leases and synthetic lease obligations;

(f)      all obligations of such Person to purchase, redeem, retire, defease, or otherwise make any payment in respect of any equity interest or membership interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(g)      all guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

**Indemnified Party:**  As defined in <u>Section 4.6</u> of this Agreement.

**Intellectual Property:**  As defined in <u>Section 2.1(b)</u> of this Agreement.

5

**Interest Rate:**  The Interest Rate is a fixed rate of eight and one-half percent (8.50%) per annum, calculated on the basis of a 360-day year and actual days elapsed.  Immediately upon the occurrence of an Event of Default, the Interest Rate shall be increased by the Default Rate without notice.

**Interim Order:**  An interim order of the Bankruptcy Court entered in the Chapter 11 Case after a hearing under Bankruptcy Rule 4001(c)(2), granting approval of and authorizing Borrower to enter into and perform under this Agreement and the other Loan Documents and granting the priming liens and Super-Priority Claim and other benefits and protections with respect to Borrower described herein and in the other Loan Documents in favor of Lender, consistent with local rules in the jurisdiction of the Bankruptcy Court, as are satisfactory to Lender.

The Interim Order shall be in form and substance approved by Lender in substantially the form of **Exhibit D** attached hereto, and shall include the granting of perfected first priority liens and Super-Priority Claim, as well as provisions:  (a) modifying the automatic stay to permit the creation and perfection of the Liens in and to the Collateral; (b) providing for shortened notice to seek a lifting of the automatic stay to permit the enforcement of Lender's remedies under the Loan Documents; (c) prohibiting the assertion of claims arising under Bankruptcy Code section 506(c) (during the period that Borrower is authorized to borrow under the Loan) against Lender or the commencement of other actions adverse to Lender or its rights and remedies under the Loan Documents; (d) prohibiting the incurrence of debt with priority equal to or greater than Lender has under the Loan Documents, except and to the extent as expressly provided in the Loan Documents; (e) prohibiting any grant or imposition of Liens other than Permitted Liens; (f) providing Lender with the right to credit bid as set forth in this Agreement; and (g) finding that Lender is extending credit to Borrower in good faith within the meaning of Bankruptcy Code section 364(e).

**Legal Requirements:**  As to any Person, the certificate of incorporation and bylaws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

**Lender:**  As defined in the Preamble.

**Lien:**  With respect to any property or assets of any kind whatsoever, (a) any mortgage, deed of trust, lien, pledge, encumbrance, claim, charge, assignment, hypothecation, security interest or encumbrance of any kind, any other type of preferential arrangement having the practical effect of any of the foregoing in respect of such property or any filing of any financing statement under the UCC or any other similar notice of Lien under any similar notice or recording statute of any Governmental Authority, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.  "Lien" shall exclude any right of offset that arises without agreement in the ordinary course of business with trade creditors.

6

**Loan:** As defined in <u>Section 3.1(a)</u> of this Agreement.

**Loan Documents:** This Agreement, the Note, and the Security Documents.

**Loan Proceeds:** All amounts advanced as part of the Loan, whether advanced directly to Borrower or otherwise.

**Material Adverse Effect:** Any event, condition, obligation, liability, or circumstance or set of events, conditions, obligations, liabilities, or change that:

(a)    has or reasonably could be expected to have a material adverse effect upon or change in (i) the legality, validity, or enforceability of any Loan Document, or (ii) the perfection or priority of any Lien granted to Lender under the Security Documents;

(b)    has or reasonably could be expected to have a material and adverse effect upon the value of any of the Collateral, or the business, operations, prospects, properties, assets, liabilities, or condition (financial or otherwise) of Borrower; or

(c)    materially impairs or reasonably could be expected to materially impair the ability of Borrower to pay or perform any of the Obligations, or to consummate the transactions under the Loan Documents.

Notwithstanding the foregoing, any changes attributable solely to the commencement of the Chapter 11 Case or any defaults under the Prepetition Indebtedness shall not constitute a Material Adverse Effect.

**Maturity Date:** The earlier of:

(a)    February 28, 2022 or if Borrower has duly and timely elected the Extension Option in writing, April 30, 2022;

(b)    the closing date of any Asset Sale affecting all or substantially all of the Real Property;

(c)    the effective date of any Restructuring Plan of Borrower confirmed by the Bankruptcy Court; and

(d)    the acceleration of the Loan as a result of the occurrence of an Event of Default.

**Net Cash Proceeds:** Cash or cash equivalents (including securities) received by Borrower from any Asset Sale (including cash received as consideration for the assumption or incurrence of liabilities incurred in connection with or in anticipation of such Asset Sale), after (a) in connection with any Asset Sale, provision for all income or other taxes actually paid by such Person with respect to such Asset Sale in the taxable year thereof or in the following taxable year, (b) payment of all reasonable brokerage and underwriting commissions and other fees and expenses related to such Asset Sale, including transaction fees payable to Borrower's professional advisors, financial advisors and restructuring advisors, excluding Borrower's Chapter 11 counsel, and (c) in connection with any Asset Sale, all amounts used to repay Indebtedness secured by a prior Lien

7

on any asset disposed of in such Asset Sale or which is or may be required (by the express terms of a post-petition instrument governing such Indebtedness or an order of the Bankruptcy Court) to be repaid in connection with such Asset Sale (including payments made to obtain or avoid the need for the consent of any holder of such Indebtedness).

**Note:**  The Promissory Note dated as of the Closing Date executed and delivered by Borrower and payable to Lender in the form of **Exhibit A**.

**Obligations:**  All obligations of every nature and kind of Borrower from time to time owed or owing to Lender or any Indemnified Party under any Loan Document, whether for principal, interest (including interest that, but for the filing of the Chapter 11 Case with respect to Borrower, would have accrued on any Obligation, whether or not a claim is allowed against Borrower for such interest in the related bankruptcy proceeding), fees, expenses, indemnification, or otherwise.

**Permitted Liens:**  Liens in favor of Lender securing the Obligations and any of the following that are found by the Bankruptcy Court to be legal, valid, enforceable, perfected and non-avoidable:

(a)     Statutory Liens of landlords and Liens of suppliers, mechanics, carriers, materialmen, warehousemen or workmen and other similar Liens imposed by law created in the ordinary course of Borrower's business for amounts not yet due or that are being contested in good faith by appropriate proceedings properly instituted and diligently conducted and with respect to which adequate reserves or other appropriate provisions are being maintained;

(b)     Liens incurred or deposits made in the ordinary course of Borrower's business in connection with worker's compensation, unemployment insurance or other types of social security benefits or to secure the performance of bids, tenders, sales, contracts (other than for the repayment of borrowed money), surety, appeal and performance bonds, but only if all such Liens do not in the aggregate materially detract from the value of Borrower's assets or property taken as a whole or materially impair the use thereof in the operation of Borrower's business taken as a whole;

(c)     Any interest or title of the lessor in the property subject to any operating lease entered into by Borrower in the ordinary course of business; and

(d)     All pre-petition Liens or encumbrances against the Collateral, including the Real Property.

**Person:**  Natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other legal entities and Governmental Authorities.

**Prepetition Indebtedness:**  All Indebtedness and any other obligations of Borrower outstanding on the Filing Date.

**Real Property:**  Real Property shall mean that certain real property and the improvements located thereon commonly known as 944 Airole Way, Los Angeles, California, as more particularly described in Exhibit A to the Deed of Trust.

**Restructuring Plan:**    A plan of reorganization or plan of liquidation subject to confirmation under Bankruptcy Code section 1129 in the Chapter 11 Case.

**Security Documents:**    Collectively, (a) that certain Deed of Trust in the form of **Exhibit B**; (b) that certain Security Agreement, substantially in the form of **Exhibit C**; (c) the Interim Order substantially in the form of **Exhibit D**; (d) the Final Order substantially in the form of **Exhibit** E; and (e) the applicable provisions of this Agreement that grant or purport to grant a Lien on any assets of Borrower in favor of Lender to secure the Obligations.  Security Documents that do not consist of the Interim order and the Final Order shall supplement, and shall not limit, the grant of a Lien on and security interest in the Collateral pursuant to the Interim Order and the Final Order.

**Senior Secured Super-Priority Construction Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents**:  The Senior Secured Superior-Priority Construction Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents (sometime referred to herein as the "**Deed of Trust**") shall be in the form attached hereto as **Exhibit B**.

**Subsidiary:**    As to any Person, (a) any corporation more than fifty percent (50%) of the outstanding securities having ordinary voting power of which shall at the time be owned or controlled, directly or indirectly, by such Person or by one or more of its Subsidiaries or by such Person and one or more of its Subsidiaries, or (b) any partnership, association, joint venture or similar business organization more than fifty percent (50%) of the membership or ownership interests of which shall at the time be so owned or controlled.  For purposes of this Agreement, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, association, joint venture, or similar business organization if such Person or Persons shall be allocated a majority of the partnership, association, joint venture, or similar business organization gains or losses or shall be or control the managing general partner of such partnership, association, joint venture or similar business organization.

**Super-Priority Claim:**    As defined in Section 3.4(c) of this Agreement.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES

**2.1    Representations and Warranties.**    To induce Lender to execute and perform this Agreement, Borrower hereby represents, covenants, and warrants to Lender as follows:

(a)    As of the Closing Date and at all times thereafter until the Obligations are paid in full and the Commitment is terminated, Borrower will have good title to the Collateral, subject only to the Permitted Liens.

(b)    Borrower owns, or is licensed to use, all patents, patent applications, trademarks, trade names, servicemarks, copyrights, technology, trade secrets, proprietary information, information technology, software, databases, domain names, know-how, plans and specifications, and processes necessary for the conduct of its business as currently conducted (the "**Intellectual Property**"), except for those the failure to own or license which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does

Borrower know of any valid basis for any such claim except as would not reasonably be expected to have a Material Adverse Effect.  The use of such Intellectual Property by Borrower does not infringe the rights of any Person, except for such claims and infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  On and as of the date hereof (i) Borrower owns and possesses the right to use, and has done nothing to authorize or enable any other person to use, any copyright, patent, or trademark listed in Exhibit B to the Deed of Trust and (ii) all material registrations listed in Exhibit B to the Deed of Trust are valid and in full force and effect.  To Borrower's knowledge, on and as of the date hereof, there is no material violation by others of any right of Borrower with respect to any copyright, patent or trademark listed in Exhibit A to the Deed of Trust, respectively, pledged by it under the name of Borrower.

(c)      Borrower is a limited liability company duly formed under the laws of California and is duly qualified to do business under the laws of each jurisdiction in which failure to be so qualified could reasonably be expected to have a Material Adverse Effect.

(d)      Subject to the approval of the Bankruptcy Court, the execution, delivery and performance of this Agreement and the other Loan Documents have been duly authorized by all necessary action on the part of Borrower, and no consent of any other party is required for the performance by Borrower of its Obligations hereunder and under the other Loan Documents.

(e)      The Loan Documents, when executed and delivered, will constitute the duly authorized, valid and legally binding obligations of Borrower and will be enforceable strictly in accordance with their respective terms, subject to the approval of the Final Order by the Bankruptcy Court in the Chapter 11 Case.

(f)      The execution, delivery and performance of this Agreement and the other Loan Documents do not and will not, and the use of the Collateral by Borrower does not and will not (i) violate any Legal Requirements, or (ii) upon entry of the Final Order, conflict with, be inconsistent with or result in any breach or default of any of the terms, covenants, conditions or provisions of any Contractual Obligation of any kind to which Borrower is a party or by which it or its assets may be bound.

(g)      Upon the entry of the Final Order by the Bankruptcy Court and the occurrence of the Closing Date, the Loan Documents are effective to create in favor of Lender, a legal, valid and enforceable first priority security interest in and Lien on the Collateral), and the Liens thereby created shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of Borrower in the Collateral, in each case encumbered by no Liens other than Permitted Liens.

(h)      No condition, circumstance, event, agreement, document, instrument, restriction, litigation or proceeding (or to the best knowledge of Borrower, litigation threatened) exists that does or could (i) adversely affect the validity or priority of the Liens and security interests granted to Lender under the Loan Documents; (ii) reasonably be expected to have a Material Adverse Effect; or (iii) constitute an Event of Default or a Default under any of the Loan Documents.

10

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

(i)    Reserved.

(j)    There is no claim, action, litigation, arbitration or other proceeding pending or, to the best of Borrower's knowledge, threatened, against Borrower that (i) relates to the Collateral or that could result in a Lien against the Collateral that is either *pari passu* or senior to the Liens granted to Lender under the Loan Documents or (ii) if adversely determined, could give rise to an event, condition, liability or circumstance that could constitute a Material Adverse Effect.

(k)    Borrower is not, as of the Closing Date and, after giving effect to the transactions contemplated by the Loan Documents, will not be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(l)    Borrower maintains and has paid all necessary premiums for the insurance required to be maintained pursuant to <u>Section 8.2(f)</u> of this Agreement.

**2.2    Continuation of Representations and Warranties.**    Borrower represents and warrants to Lender that each of the foregoing statements is true and correct on the date hereof and will be true and correct at all times thereafter until the Commitment has terminated and the Obligations have been paid or performed in full.

# ARTICLE 3
# AMOUNT AND TERMS OF COMMITMENT

**3.1    The Loan; Maturity Date.**

(a)    Subject to the terms and conditions set forth herein, Lender agrees to lend and Borrower agrees to borrow the principal sum of up to Twelve Million and No/100ths Dollars ($12,000,000.00) (the "**Loan**").   The Loan shall be fully disbursed in one Advance, in the maximum principal amount of $12,000,000.00 on the Closing Date.   Amounts repaid in respect of the Loan may not be reborrowed.

(b)    The Loan and all Advances shall be evidenced by the Note.   The date and amount of each Advance and the payment or prepayment of principal and interest with respect thereto shall be recorded by Lender on its books.   Each such recordation shall constitute prima facie evidence of the accuracy of the information so recorded in the absence of manifest error.

(c)    The Loan will mature on the Maturity Date, at which time the Commitment shall automatically terminate, and all Obligations shall be paid in full, without further application to or order of the Bankruptcy Court.

(d)    On or before February 28, 2022, Borrower has a one-time option to elect to extend the Maturity Date from February 28, 2022 to April 30, 2022.   The sole method by which Borrower may exercise its one-time option is to give written notice to Lender on or before February 28, 2022 that Borrower elects to extend the Maturity Date pursuant to the Extension Option, accompanied by payment of the Extension Fee by wire transfer in accordance with instructions of Lender; <u>provided</u>, <u>however</u>, Borrower may elect to defer payment of the Extension Fee at the time of giving its written notice to elect the Extension Option, in which case the Extension Fee shall be added to the principal balance of the Loan on the date of such written notice

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

(the "**Deferred Extension Fee**").  The Deferred Extension Fee shall be payable on the Maturity Date, as extended by the Extension Option.  The Deferred Extension Fee shall bear interest at the Interest Rate from the date on which notice to elect to defer the Extension Fee is given until paid.  The Extension Option shall expire unless duly and timely exercised by Borrower on or before February 28, 2022.  For avoidance of doubt, in the event Borrower duly and timely exercises the Extension Option, the Maturity Date shall become April 30, 2022, and Borrower's obligation to make monthly interest payments shall continue.

> **3.2**    **Use of Loan Proceeds.**  Loan Proceeds shall be used solely in accordance with the Budget, including for payment of the Facility Fee, Lender's reasonable attorneys' fees and costs incurred in making and documenting the Loan, title insurance premiums, escrow fees, the Extension Fee, and the Carve Out and Borrower's working capital needs and to administer the Chapter 11 Case, including insurance, repair, maintenance and construction costs with respect to the Property.  With respect to the fees and costs of the Manager of the Debtor, Manager shall file monthly fee statements and, absent an objection within seven (7) days thereafter, the fees and costs may be paid in full.  In the event of an objection, the undisputed portion may be paid without prejudice to the balance subject to order of the Court.  Without limiting the foregoing, no Loan Proceeds or proceeds of the Collateral may be used:  (a) to finance in any way any investigation, action, suit, arbitration, proceeding, application, motion, or litigation of any type, provided that the Loan Proceeds may be used to review and investigate claims asserted against the estate, including claims of Lender:  (i) adverse to the interests of Lender or its rights or remedies under this Agreement, or the other Loan Documents, (ii) adverse to the interests of Lender under any pre-petition financing arrangement with, or equity interest in, Borrower, (iii) for monetary, injunctive or any other relief whatsoever against Lender, or (iv) to prevent, hinder, or otherwise delay the exercise by Lender of any rights and remedies under the Loan Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Bankruptcy Court or otherwise) by Lender upon any of the Collateral; (b) to make any distribution under a Restructuring Plan; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of Lender; or (d) to pay any fees or similar amount to any Person in connection with any Asset Sale (including so-called "topping" or "breakup" fees) without the prior written consent of Lender.

> **3.3**    **Payment; Prepayments and Reduction of Aggregate Commitment.**

>> (a)    **Mandatory Prepayments.**

>>> (i)    Asset Sale Prepayments.  Upon the consummation of any Asset Sale, other than sales of assets to the extent permitted pursuant to Section 8.3(b) of this Agreement, Borrower shall make a mandatory prepayment of the Loan from the Net Cash Proceeds in an amount equal to the lesser of such Net Cash Proceeds and the aggregate outstanding Obligations.

>>> (ii)    Proceeds of any Indebtedness.  Upon receipt of any proceeds arising from the incurrence of any Indebtedness, Borrower shall make a mandatory prepayment of the Loan in an amount equal to the lesser of (x) one hundred percent (100%) of the proceeds so received and (y) the aggregate amount of the outstanding Obligations.

(b)    **Reserved.**

3.4    **Super-Priority Nature of Obligations and Status of Lender's Liens.**

(a)    On and after the Closing Date, subject to <u>Section 3.4(b)</u> of this Agreement, the provisions of the Loan Documents shall be effective to create in favor of Lender, legal, valid and perfected Liens on and security interests in all right, title and interest of Borrower in the Collateral, enforceable against Borrower, including as follows:

(i)    Pursuant to Bankruptcy Code section 364(c)(2) and (d), the Interim Order, and the Final Order, all Obligations shall be secured by a perfected first-priority senior Lien on all Collateral.

(ii)    Reserved.

Subject to the Interim Order and the Final Order, no filings, recordings or other actions shall be necessary to perfect and maintain the perfection and status of such Liens.

(b)    Notwithstanding anything in this Agreement to the contrary, Lender's Liens pursuant to Bankruptcy Code section 364(c)(2) and (d) shall be subject to the Carve Out; <u>provided</u>, <u>however</u>, that (i) payment of the Carve Out shall not reduce the amounts payable to Lender hereunder or under the other Loan Documents or affect the rights of Lender to receive such payment; and (ii) under no circumstances shall Lender be responsible or liable for, or itself obligated to pay, any of the fees or other items constituting the Carve Out.

(c)    Pursuant to Bankruptcy Code section 364(c)(1), the Interim Order, and the Final Order, all Obligations at all times shall constitute allowed super-priority administrative expense claims in the Chapter 11 Case and any successor case (without need to file a proof of claim), having priority in payment over any and all allowed administrative expense claims, secured claims, unsecured claims, and all other claims against Borrower, whensoever arising, of any kind or nature, subject only to the Carve Out (the "**Super-Priority Claim**").

(d)    Except for the Carve Out (and as subject to <u>Section 3.4(b)(ii)</u> above), no costs or expenses of administration shall be imposed against Lender or any of the Collateral under Bankruptcy Code sections 105 or 506(c), or otherwise, and Borrower hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under Bankruptcy Code sections 105 or 506(c), or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Lender or the Collateral, except that the waiver of Bankruptcy Code section 506(c) shall be effective only during the period in which Borrower is authorized to borrow under the Loan.

3.5    **No Discharge; Survival of Liens and Claims; Waiver of Priming Rights.**

(a)    The Obligations shall not be discharged by (i) the entry of an order confirming a Restructuring Plan (and Borrower pursuant to Bankruptcy Code section 1141(d)(4), hereby waives any such discharge), (ii) the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (iii) the dismissal of the Chapter 11 Case or any such subsequent chapter 7 case.

13

(b)     The Liens and Super-Priority Claim granted to Lender pursuant to any of Loan Documents shall continue in full force and effect and not be affected in any manner by (i) the entry of an order confirming a Restructuring Plan; (ii) the appointment of an examiner or trustee in the Chapter 11 Case; or (iii) the conversion of the Chapter 11 Case to a case proceeding under chapter 7 of the Bankruptcy Code.

**3.6     Payment of Obligations.**     On the Maturity Date, the Commitment shall automatically terminate, and Borrower shall pay to Lender in cash all the Obligations in full, without further application to or order of the Bankruptcy Court.

**3.7     No Marshaling.**     Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or otherwise, and Borrower shall not assert any such theory of law or equity as it relates to the Collateral or collection of the Loan or any other Obligations.

## ARTICLE 4
## PRINCIPAL; INTEREST; SPECIAL PROVISIONS

**4.1     Interest on the Loan.**

(a)     Borrower shall pay to Lender interest on the unpaid principal balance of the Note computed at the Interest Rate.  The Deferred Extension Fee shall be added to the principal balance of the Loan on that date on which Borrower elects the Extension Option and elects the Deferred Extension Fee.  Interest shall be computed on the basis of a 360-day year plus the actual number of days the Note's principal is unpaid, using a 31-day month.  Lender's internal records of applicable interest rates shall be determinative in the absence of manifest error.

(b)     During the continuance of any Event of Default, the aggregate amount of all outstanding principal on the Note and, to the extent permitted by law, all accrued and unpaid interest in respect thereof, and any other amounts due pursuant to the Loan Documents, will at Lender's option and without need for notice to Borrower, accrue interest at the Default Rate, calculated from the occurrence of the Event of Default.

**4.2     Terms of Payment of Principal and Interest.**

(a)     **Interest.**     Interest on the outstanding principal balance of the Note will accrue from and including the date of the first Advance and shall be due and payable by Borrower in arrears on the first day of each successive calendar month and on the Maturity Date in each case, in good United States funds.

(b)     **Principal.**     Except for mandatory prepayments as set forth in <u>Section 3.3</u> of this Agreement, all principal advanced under the Note shall be due and payable by Borrower on the Maturity Date.  Immediately upon any repayment of principal under the Note, the Aggregate Commitment shall be permanently reduced by the principal amount then repaid.

### 4.3    Method and Place of Payment.

(a)    All payments and prepayments of principal, interest, fees, expenses, and other Obligations under the Loan Documents payable to Lender shall be made, without deduction, setoff, or counterclaim, by wire transfer in immediately available United States Dollars not later than 1:00 p.m., prevailing Eastern time on the dates due, to Lender at the office specified by it from time to time.  Funds received on any day after 1:00 p.m., prevailing Eastern time will be deemed to have been received on the next Business Day.  Whenever any payment to be made hereunder or under any other Loan Document is stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time will be included in the computation of any interest or fees.

(b)    So long as no Event of Default has occurred and is then continuing, all payments received by Lender for application to the Obligations shall be applied as follows:

(i)    **First,** to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to Lender, including fees, charges and disbursements of counsel or other professionals to Lender and other amounts payable under <u>Sections 4.7</u> and <u>10.4</u> of this Agreement;

(ii)    **Second,** to payment of accrued and unpaid interest on the Loan and the other Obligations; and

(iii)    **Third,** to payment of unpaid principal on the Loan and the other Obligations.

During the continuance of an Event of Default, all amounts received by Lender will be applied in such amounts, order, and priority as Lender determines at its discretion.

### 4.4    Reserved.

### 4.5    Taxes.  All payments made by Borrower under the Loan Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, impositions, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on Lender as a result of a present or former connection between Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or the other Loan Documents).  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("**Non-Excluded Taxes**") are required to be withheld from any amounts payable to Lender hereunder or under the other Loan Documents, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Non-Excluded Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement.  Whenever any Non-Excluded Taxes are payable by Borrower, as promptly as possible thereafter, Borrower shall send to Lender a certified copy of an original official receipt received by Borrower showing payment thereof.  If Borrower fails to pay

15

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

any Non-Excluded Taxes when due to the appropriate taxing authority or fails to remit to Lender the required receipts or other required documentary evidence, Borrower shall indemnify Lender for any incremental taxes, interest or penalties that may become payable by Lender as a result of any such failures.  This Section 4.4 shall survive the termination of this Agreement and the payment of the Obligations, as set forth in the Loan Documents.  Notwithstanding anything to the contrary contained in this Section, Borrower shall not be required to pay any additional amounts to Lender pursuant to this Section to the extent such additional amounts result from such Lender's gross negligence or willful misconduct as found in a final non-appealable judgment by a court of competent jurisdiction.

4.6     **Loan Indemnification.**  Borrower shall indemnify and hold harmless Lender and its Affiliates, officers, directors, employees, agents, advisors, attorneys, and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including reasonable fees of counsel and disbursements), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or in connection with or relating to this Agreement, the other Loan Documents, or the transactions contemplated hereby or thereby, or any use made or proposed to be made with the proceeds of the Loan, whether or not such investigation, litigation or proceeding is brought by Borrower, any of its shareholders, or creditors, an Indemnified Party, or any other Person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or thereby are consummated, except to the extent such claim, damage, loss, liability, or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to Borrower or any of its shareholders or creditors for or in connection with the transactions contemplated hereby or thereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential, or punitive damages.  Borrower hereby grants each Indemnified Party permission to select counsel of such Indemnified Party's own choosing.  Borrower permits each Indemnified Party to negotiate, mediate, arbitrate, and/or settle any and all claims, damages, losses, liabilities, and expenses (including reasonable fees of counsel and disbursements), joint or several, that may be alleged or asserted against any Indemnified Party, subject only to Borrower's reasonable consent, and Borrower shall not unreasonably withhold its consent to such settlement.  The provisions set forth in this Section shall survive the payment of the Obligations, the termination of the Commitment, and any cancellation of this Agreement.  Without limiting the foregoing, Borrower shall pay, and hold each Indemnified Party harmless from, any and all claims of any brokers, finders or agents claiming a right to any fees in connection with arranging the financing contemplated hereby.  Nothing set forth herein shall be deemed to be an obligation to indemnify Lender in any manner with respect to any obligations or claims of Lender unrelated to the Loan, including, without limitation, claims of Lender with respect to financing extended prior to the Filing Date.

4.7     **Fees and Expenses.**  On the Closing Date, Borrower shall pay Lender all reasonable costs and expenses of Lender incurred in the preparation of this Agreement and the other Loan Documents, including attorneys' fees, which on the Closing Date Lender shall be

16

authorized to advance to itself from the Loan Proceeds.  In addition Borrower shall pay all costs of closing this Loan, including title insurance premiums, escrow fees and other fees incurred in closing, and Borrower shall owe Lender a fee of $120,000.00, which is equal to one percent (1%) of the Aggregate Commitment (the "**Facility Fee**"), which Lender shall be authorized to advance to itself from the Loan Proceeds.  From time to time thereafter, upon demand by Lender, and on the Maturity Date, Borrower shall pay or reimburse Lender for all fees (including attorneys' fees), costs, and expenses associated with the enforcement of rights and remedies set forth in this Agreement and the other Loan Documents.

**4.8    Advances.**  The Loan Proceeds will be advanced by Lender for the benefit of Borrower in accordance with the terms and conditions set forth in this Agreement.  All monies advanced by Lender will constitute a loan made to Borrower under this Agreement, evidenced by the Note and secured by the Security Documents, and interest will be computed thereon, as prescribed by this Agreement, from the date Lender makes, or is deemed to have made, the Advance.

**4.9    No Waiver.**  The making of an Advance will not constitute a waiver of any condition precedent to the obligation of Lender to make any Advance or preclude Lender from thereafter declaring the failure of Borrower to satisfy any such condition precedent to be an Event of Default.  All conditions precedent to the obligation of Lender to make an Advance are imposed hereby solely for the benefit of Lender, and no other party may require satisfaction of any such condition precedent or will be entitled to assume that Lender will make or refuse to make any Advance in the absence of strict compliance with such condition precedent.  Lender may waive any requirement of this Agreement for any Advance.

**4.10    Advances Secured by Loan Documents.**  It is expressly agreed that any Advance made by Lender will, as and when made, be deemed authorized by Borrower and made pursuant to this Agreement and will become and remain secured by the Security Documents and considered part of the obligations secured thereby.

## ARTICLE 5
## CONDITIONS PRECEDENT TO EACH ADVANCE

**5.1    Conditions Precedent to Each Advance.**  The obligation of Lender to make an Advance is subject to the following conditions precedent:

(a)    Lender has obtained a copy of the Interim Order as entered on the Bankruptcy Court's docket in the Chapter 11 Case.

(b)    There exists no Default or Event of Default under this Agreement or any other Loan Document.

(c)    Reserved.

(d)    The representations and warranties in this Agreement and the other Loan Documents are true and correct in all material respects as of such requested Borrowing Date except for changes thereto as the result of actions required by the terms of this Agreement and the other Loan Documents or with the prior written consent of Lender; provided, however, that the words

17

"in all material respects" in this Section 5.1(e) shall, as to any representation or warranty that contains a materiality standard, operate without duplication with such standard.

(e)        Following the entry of the Interim Order and during the Availability Period, (i) the Interim Order is in full force and has not been reversed, modified, amended, rescinded, vacated or subject to a presently effective stay pending appeal, without the prior written consent of Lender, and (ii) the aggregate of all Advances does not exceed the Aggregate Commitment.

(f)        There is no event, condition, obligation, liability, litigation, or circumstance that would constitute a Material Adverse Effect.

(g)        Lender has received such information and materials relating to the Collateral as Lender reasonably requires.

(h)        Borrower has complied with the funding conditions and procedures described in Section 7.1 of this Agreement.

Each request for an Advance shall constitute a representation and warranty by Borrower that the conditions contained in this Section 5.1 have been satisfied unless waived in writing by Lender.

## ARTICLE 6
## CONDITIONS TO CLOSING

**6.1    Conditions to Closing.**  The obligation of Lender to close the Loan and to make any Advance is further subject to the satisfaction, or waiver in accordance with Section 11.2 of this Agreement, of the following conditions, which must be completed and fulfilled to the satisfaction of Lender at its discretion on or before the Closing Date:

(a)        **Delivery of Documents.**  Borrower has furnished to Lender, in form and substance satisfactory to Lender, duly executed copies of this Agreement and each of the other Loan Documents required to be executed and delivered to Lender by Borrower.

(b)        **Fees and Expenses.**  All costs, charges, fees, expenses (including legal fees and expenses) and other compensation payable or reimbursable to Lender, to the extent due as of the Closing Date have been paid to Lender, or provisions satisfactory to Lender have been made to pay such amounts to Lender.

(c)        **Entry of the Final Order.**  No later than December 10, 2021, Borrower has filed a motion for approval of the Loan Documents and entry of the Interim Order, and, no later than seven (7) calendar days after the filing of that motion, the Interim Order has been entered and no later than thirty (30) calendar days after the filing of that motion, the Final Order has been entered.

(d)        **Motions and Other Documents.**  Borrower has provided Lender with a copy of all motions and other documents to be filed by Borrower with and submitted to the Bankruptcy Court in connection with the Loan, which motions and other documents shall be in form and substance reasonably satisfactory to Lender.  Borrower has not filed any motion or

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

pleading that has or may have an effect on the rights granted to Lender under the Loan Documents without first providing Lender with sufficient and reasonable notice of such motion or pleading.

(e) **No Material Adverse Effect.** No change has occurred that results in a Material Adverse Effect.

(f) **Additional Documents.** Lender has received such other papers, reports and documents regarding Borrower or the Collateral as Lender or its counsel reasonably may require.

## ARTICLE 7
## FUNDING CONDITIONS AND MECHANICS

**7.1 Funding Conditions and Mechanics.**

(a) Upon satisfaction of the applicable conditions set forth in this <u>Section 7.1</u>, and <u>Sections 5.1</u> and <u>6.1</u> above, Lender shall disburse the Advance to Borrower (less sums advanced to Lender as provided in this Agreement) by wire transfer not later than 1:00 p.m. prevailing Eastern Time on the second Business Day after the Interim Order is entered.

## ARTICLE 8
## FURTHER AGREEMENTS OF BORROWER

While this Agreement is in effect, and until Lender has been paid all Obligations in full, Borrower agrees to comply with, observe and keep the following covenants and agreements:

**8.1 Furnishing Information.** Borrower shall:

(a) Deliver to Lender, as soon as practicable, and in advance of filing with the Bankruptcy Court: (i) the proposed Interim Order; (ii) the proposed Final Order, (iii) all other proposed orders and pleadings related to the Collateral or the Loan, (iv) any offers, bids, letters of interest, or proposals to purchase assets or restructure obligations, (v) any Restructuring Plan, and (vi) any disclosure statement related to such plan. All of the foregoing (except for (iv)) must be in form and substance reasonably satisfactory to Lender;

(b) Promptly notify Lender in writing of any condition or event that constitutes a Default or an Event of Default;

(c) Promptly notify Lender of any circumstance or condition that constitutes or, unless abated, could constitute a Material Adverse Effect, and of any material adverse change in the financial condition of Borrower;

(d) Promptly after the same is available (to the extent not otherwise previously delivered), furnish to Lender's counsel all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Borrower with the Bankruptcy Court or the United States Trustee in the Chapter 11 Case, or distributed by or on behalf of Borrower to any committee appointed in the Chapter 11 Case; and

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

(e)    Promptly upon receiving a request therefor from Lender, prepare and deliver to Lender such other information with respect to Borrower or the Collateral, including schedules identifying and describing the Collateral and any dispositions thereof or any Asset Sale and the use of the Net Cash Proceeds thereof, as from time to time reasonably may be requested by Lender.

**8.2    Affirmative Covenants.**

(a)    **Existence, Etc.**  Borrower shall at all times maintain its organizational existence and preserve and keep, or cause to be preserved and kept, in full force and effect, all rights and franchises material to its business, and shall be in good standing under the law of California.

(b)    **Powers; Conduct of Business.**  Borrower shall qualify and remain qualified to do business in each jurisdiction in which the nature of its business requires it to be so qualified and where the failure to be so qualified could reasonably be expected to have a Material Adverse Effect.  Borrower shall carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

(c)    **Compliance with Laws, Etc.**  Borrower shall (i) comply with all Legal Requirements and all restrictive covenants affecting Borrower or its business, properties, assets or operations, and (ii) obtain, as needed, all permits necessary for its operations and maintain such permits in good standing unless the failure to comply or obtain same could not reasonably be expected to have a Material Adverse Effect.

(d)    **Use of Proceeds.**  Borrower shall solely and exclusively use the Loan Proceeds in the manner specified in this Agreement, and the Final Order, as applicable.

(e)    **Payment of Taxes.**  Borrower shall pay as and when due all post-petition taxes (other than property taxes contemplated to be paid upon consummation of a sale of the Real Property or the effectiveness of a plan in the Chapter 11 Case), assessments and other governmental charges imposed upon it or on any of its properties or assets or in respect of any of its franchises, business, income or property before any penalty or interest accrues thereon; provided, however, that no such taxes, assessments and governmental charges (and interest, penalties or fines relating thereto) need be paid if being contested in good faith by appropriate proceedings diligently instituted and conducted and for which adequate reserves are maintained.

(f)    **Insurance.**  Lender has been advised and understands that as of the date of execution of this document, insufficient insurance coverage exists on the Property and that Borrower is using best efforts to procure sufficient coverage.  Subject to the foregoing, Borrower shall maintain in full force and effect insurance policies and programs or other policies and programs as reflect coverage that is consistent with prudent industry practice.  In the event Borrower at any time or times hereafter fails to obtain or maintain any of the policies of insurance required herein or to pay any premium in whole or in part relating thereto, then Lender, without waiving or releasing any obligation of Borrower therefor or resulting Event of Default and without obligation to do so, may at any time or times thereafter obtain and maintain such policies of

20

insurance and pay such premiums and take any other action with respect thereto that Lender deems advisable.  All sums so disbursed by Lender shall constitute part of the Obligations.

(g)    **Inspection of Property; Books and Records; Discussions.**    Upon reasonable advance notice, Borrower shall permit any authorized representative(s) designated by Lender to visit and inspect any of the properties of Borrower to examine, audit, check and make copies of its financial and accounting records, books, journals, orders, receipts and any correspondence and other data relating to its business, the Collateral, or the transactions contemplated by the Loan Documents (including in connection with environmental compliance, hazard or liability), and to discuss its affairs, finances and accounts with its officers and independent certified public accountants, all upon reasonable notice and at such reasonable times during normal business hours, as often as reasonably may be requested.  Without limiting the foregoing, Borrower shall permit any authorized representatives designated by Lender to complete each such audit, collateral analysis, appraisal, field examination, environmental survey or other business analysis with respect to Borrower as Lender shall request, all upon reasonable notice and at such reasonable times during normal business hours, as often as reasonably may be requested.

(h)    **Insurance.**  Borrower hereby directs all insurers under policies of insurance relating to the Collateral to pay all proceeds payable under such policies directly to Lender.

(i)    **Maintenance of Property.**  Borrower shall cause all property used or useful in the conduct of its business to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment and shall cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as in the judgment of Borrower may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times; provided, however, that nothing contained herein shall prevent Borrower from discontinuing the operation or maintenance of any of such property if such discontinuance is, in the judgment of Borrower, desirable in the conduct of its business and not disadvantageous in any material respect to the interests of Lender.

(j)    **Further Assurance.**  At Lender's reasonable request, Borrower shall execute and deliver such documents as may be necessary (i) to perfect and maintain perfected and valid Liens upon the Collateral and the personal property located thereon and the Liens granted to Lender pursuant to this Agreement or any of the other Loan Documents, and (ii) to fully consummate the transactions contemplated by this Agreement.

(k)    **Other Reports.**  Borrower shall promptly deliver to Lender, and no less frequently than every four (4) weeks, updates with respect to Asset Sales (including notice of all offers and terms thereof), cost savings and other matters reasonably requested by Lender, including as soon as practicable in advance of filing, all motions, related pleadings, and proposed orders relating to the Loan, any proposed sale of Borrower's assets, and any plan of reorganization or liquidation (all in form and substance reasonably satisfactory to Lender).

(l)    **Auction Sale.**  Borrower shall schedule an Auction Sale of the Real Property to be conducted by a duly qualified auctioneer on or before February 10, 2022.  Terms of the Auction Sale shall include, but shall not be limited to, a closing of the sale of the Real Property on or before February 28, 2022.

SENIOR SECURED SUPER-PRIORITY
                    DEBTOR IN POSSESSION CREDIT AGREEMENT

### 8.3    Negative Covenants.

(a)    **Indebtedness.**    Borrower shall not directly or indirectly create, incur, assume or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except the Obligations and the Prepetition Indebtedness (including intercompany Indebtedness).

(b)    **Sales of Assets.**    Borrower shall not sell, transfer, lease, exchange, alienate or dispose of any or all Collateral, other than in accordance (or not inconsistent) with the Final Order or any other order entered in the Chapter 11 Case.

(c)    **Liens.**    Borrower shall not directly or indirectly create, incur, assume or permit to exist any Lien on or with respect to any of its property or assets, except  for Permitted Liens.

(d)    **Contingent Obligations.**    Neither Borrower nor its Subsidiaries, if any, shall directly or indirectly create or become or be liable with respect to any Contingent Obligation.

(e)    **Reserved.**

(f)    **Restriction on Fundamental Changes.**    Borrower shall not enter into any merger or consolidation, or liquidate, wind-up or dissolve (or suffer any liquidation or dissolution), discontinue or otherwise change any of its lines of business or, except as otherwise permitted or required by this Agreement, the other Loan Documents, or by order of the Bankruptcy Court, convey, lease, sell, transfer or otherwise dispose of, in one transaction or series of transactions, all or substantially all of Borrower's business or property, whether now or hereafter acquired.

(g)    **Corporate Documents.**    Borrower shall not amend, modify or otherwise change (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or order of the Bankruptcy Court.

(h)    **Prohibition Against Additional Recordings.**    Borrower shall not record or permit to be recorded any document, instrument, agreement or other writing against the Collateral, other than Liens in favor of Lender that secure the Obligations.

(i)    **Chapter 11 Claims.**    Borrower shall not incur, create, assume, suffer to exist or permit any administrative expense, unsecured claim, or other super-priority claim or Lien on the Collateral that is *pari passu* with or senior to the claims of Lender against Borrower or the Collateral, or apply to the Bankruptcy Court for authority to do so, except for Permitted Liens and the Carve Out.

(j)    **Limitation on Prepayments of Prepetition Indebtedness.**    Other than payments authorized by the Bankruptcy Court, Borrower shall not (i) make any payment or prepayment on or redemption or acquisition for value of any Prepetition Indebtedness, (ii) pay any interest on any Prepetition Indebtedness (whether in cash, in in-kind securities or otherwise), or (iii) make any payment or create or permit any Lien pursuant to Bankruptcy Code section 361 (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection).

(k)    **Orders.**  Borrower shall not make or permit to be made any change, amendment or modification, or make any application or motion for any change, amendment or modification, to the Final Order other than as approved in writing by Lender.

(l)    **Fiscal Year.**  Borrower shall not change its fiscal year.

## ARTICLE 9
## ASSIGNMENTS; CONFIDENTIALITY

**9.1    Successors and Assigns.**  The terms and provisions of the Loan Documents shall be binding upon and inure to the benefit of Borrower, Lender and their respective successors and assigns, except that Borrower shall not have the right to assign its rights or obligations under the Loan Documents. Lender may at any time, and from time to time, assign or transfer the Loan and the Loan Documents, upon prior notice to Borrower.  No assignment by Lender shall release Lender from its obligations hereunder arising prior to the date of assignment but shall release Lender of all obligations first accruing or arising thereafter.  Any assignee or transferee agrees by acceptance thereof to be bound by all the terms and provisions of the Loan Documents.  Any request, authority or consent of any Person, who at the time of making such request or giving such authority or consent is the holder of the Notes, shall be conclusive and binding on any subsequent holder, transferee or assignee of such Notes or of any instruments issued in exchange therefor.

**9.2    Confidentiality.**  Subject to Section 9.3 of this Agreement, Lender and its representatives, consultants, and advisors shall hold all nonpublic information obtained pursuant to the requirements of this Agreement and identified as such by Borrower in accordance with such Person's customary procedures for handling confidential information of that nature; provided, however, that such Persons may make disclosures (a) to Affiliates of Lender, (b) to prospective transferees or participants in connection with a contemplated participation or assignment, or (c) as required or requested by any Governmental Authority or representative thereof or pursuant to legal process, and shall require any such Affiliate or transferee to agree (and require any of its transferees to agree in writing) to comply with this Section.  In no event shall Lender or any of its Affiliates be obligated or required to return any materials furnished by Borrower; provided, however, that each prospective transferee shall be required to agree that if it does not become a participant or assignee, it shall return all materials furnished to it by or on behalf of Borrower in connection with this Agreement.

**9.3    Dissemination of Information.**  Borrower authorizes Lender and its Affiliates to disclose to any prospective participant or transferee any and all information in the possession of Lender or its Affiliates concerning Borrower and the Collateral; provided, however, that prior to any such disclosure, such prospective participant or transferee shall agree in writing to preserve, in accordance with Section 9.2 of this Agreement, the confidentiality of any confidential information therein.

**9.4    Non-Disclosure and Confidentiality Agreements.**  Notwithstanding any terms herein, in any other Loan Document or in any other agreement between Lender and Borrower or between any third party and Borrower regarding non-disclosure and confidentiality, Lender is hereby granted the right, at its sole discretion (and Borrower hereby agrees that it shall not be a violation of any such non-disclosure or confidentiality agreement if Lender exercises such right),

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

to communicate with, and request and receive information from and use information received from, third parties relating to the transactions described herein, the Collateral and any other matters relating to Borrower, provided, however, that Lender shall hold and use such information subject to the terms of Sections 9.2 and 9.3 of this Agreement.

## ARTICLE 10
## EVENTS OF DEFAULT BY BORROWER

**10.1    Events of Default.**  Notwithstanding the provisions of Bankruptcy Code section 362, the occurrence of any one or more of the following shall constitute an "**Event of Default**" hereunder, and any Event of Default that may occur hereunder shall also constitute an Event of Default under each of the other Loan Documents:

(a)    Borrower fails to pay any of the Obligations when due according to the terms of this Agreement or any other Loan Document;

(b)    Borrower fails to perform or cause to be performed any obligation or observe any condition, covenant, term, agreement or provision required to be performed or observed by Borrower under Sections 8.2(g), 8.2(i), 8.2(j) or 8.2(l) of this Agreement;

(c)    Except as otherwise provided in this Section 10.1, Borrower fails to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed by Borrower under this Agreement or under the other Loan Documents;

(d)    The existence of any inaccuracy or untruth in any material respect in any representation or warranty contained in this Agreement or any of the other Loan Documents or of any statement or certification as to facts delivered to Lender by Borrower, except for changes thereto as the result of actions required by the terms of this Agreement and the other Loan Documents or with the written consent of Lender; provided, however, that the words "in any material respect" in this Section 10.1(d) shall, as to any representation or warranty that contains a materiality standard, operate without duplication with such standard;

(e)    The dissolution, termination, or merger of Borrower;

(f)    Borrower is in default under any term, covenant, or condition of the Note, the Security Documents, or any other Loan Document, other than a default described elsewhere in this Section 10.1;

(g)    Any security interest and Lien purported to be granted by the Security Documents ceases to be in full force and effect or of first priority in favor of Lender, or is asserted by Borrower not to be a valid, perfected, first-priority security interest in or Lien on the Collateral covered thereby;

(h)    The Bankruptcy Court dismisses the Chapter 11 Case, converts the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or appoints a trustee or examiner in the Chapter 11 Case;

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

(i)     Borrower files, supports or fails to oppose a motion seeking, or the Bankruptcy Court enters, an order in the Chapter 11 Case appointing a trustee or an examiner under chapter 11 of the Bankruptcy Code;

(j)     Borrower files, supports or fails to oppose a motion seeking, or the Bankruptcy Court enters, an order in the Chapter 11 Case (i) approving additional financing under Bankruptcy Code sections 364(c) or (d) not otherwise permitted pursuant to this Agreement (unless such financing is proposed to refinance and pay in full the Obligations with the termination of the Commitment), (ii) granting any Lien (other than Permitted Liens) upon or affecting any Collateral that is *pari passu* or senior to the Liens on the Collateral granted in favor of Lender, (iii) granting any claim priority senior to or *pari passu* with the claims of Lender under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b), other than the Carve Out, or (iv) granting any other relief that is adverse to Lender's interests under any Loan Document, its rights and remedies hereunder or thereunder or its interests in the Collateral;

(k)     Borrower fails to comply with the terms of the Interim Order, Final Order or any other Bankruptcy Court order in any material respect;

(l)     Any material term of this Agreement or the other Loan Documents ceases to be valid and binding on Borrower, or Borrower so asserts in any pleading filed in any court;

(m)     If the Interim Order is not confirmed *in toto* by the Final Order, or if the Final Order is (i) reversed, stayed for a period in excess of fourteen (14) days, vacated or rescinded or (ii) amended, supplemented or otherwise modified without the written consent of Lender;

(n)     Borrower, or any of its Affiliates, files a motion for reconsideration or other motion that seeks to materially and adversely affect Lender's rights;

(o)     The right of Borrower to borrow under this Agreement is terminated by an order entered by the Bankruptcy Court;

(p)     Borrower seeks to, or supports (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party in interest executed by or on behalf of Borrower), any other Person's motion to disallow, in whole or in part, Lender's claim in respect of the Obligations or to challenge the validity, perfection, priority, non-avoidability or enforceability of the Liens in favor of Lender;

(q)     Unless in connection with a duly-confirmed Restructuring Plan, the Bankruptcy Court enters an order granting relief from the automatic stay to any creditor or party in interest to permit actions that would have a Material Adverse Effect on Borrower, the Collateral, the estate in the Chapter 11 Case, or Lender;

(r)     Any judgment rendered against Borrower that, to the extent not covered by insurance, exceeds or, in the aggregate with other judgments exceeds, Ten Thousand Dollars ($10,000.00) as to any postpetition obligation, and the enforcement thereof is not stayed (by court ordered stay or by consent of the party litigants), or there is rendered against Borrower a non-

SENIOR SECURED SUPER-PRIORITY
                                                                DEBTOR IN POSSESSION CREDIT AGREEMENT

monetary judgment with respect to a postpetition event that causes or would reasonably be expected to cause a Material Adverse Effect;

(s)  Absent the prior written consent of Lender and unless in connection with a duly-confirmed Restructuring Plan, the Bankruptcy Court enters an order under Bankruptcy Code sections 363 or 365 authorizing or approving the sale or assignment of any of Borrower's assets, or procedures in respect thereof, or Borrower seeks, supports or fails to contest in good faith, the entry of such an order in the Chapter 11 Case, unless, immediately, upon the closing of any such sale or assignment, the proceeds thereof are used to repay the Obligations in full in cash and the Commitment is terminated;

(t)  A Restructuring Plan is filed by Borrower or any other Person, and such plan (including amendments thereto) does not provide for the termination of the Commitment and indefeasible payment in full in cash of all Obligations on or before the effective date thereof;

(u)  The entry of an order in the Chapter 11 Case confirming a plan of reorganization or liquidation that does not contain a provision for termination of the Commitment and repayment in full in cash of all the Obligations on or before the effective date of such plan;

(v)  The sale without Lender's consent, of all or substantially all of Borrower's assets under an Asset Sale that does not provide for payment in full in cash of all Obligations on the closing date thereof, and termination of the Commitment (or Borrower seeks or acquiesces to such relief);

(w)  Borrower is in default under any commitment or Indebtedness (other than in connection with any Prepetition Indebtedness) that could reasonably be expected to have a Material Adverse Effect;

(x)  The entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations;

(y)  The payment by Borrower of, or the application by Borrower for authority to pay, any Prepetition Indebtedness without Lender's prior written consent;

(z)  The allowance of any claim under Bankruptcy Code section 506(c) against Lender or any of the Collateral; or

(aa)  Borrower is named a defendant in any complaint, adversary proceeding, litigation, action or other proceeding, or otherwise is subject to a complaint filed with a court of competent jurisdiction, and such complaint, litigation, action or proceeding could reasonably result in a Material Adverse Effect and is not dismissed as to Borrower within one hundred twenty (120) days from the latest of the date of filing, or commencement or service of such complaint on Borrower, unless otherwise stayed by the Bankruptcy Court or Bankruptcy Code.

**10.2    Remedies.**  Upon the occurrence and during the continuance of any Event of Default, at the sole discretion of Lender without the need for further order of or application to the Bankruptcy Court, and (1) with respect to items (a) and (b) of this Section 10.2, upon notice to Borrower; or (2) with respect to items (c) and (d) of this Section 10.2, upon five (5) Business Days'

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

notice to Borrower, any committee appointed in the Chapter 11 Case and the United States Trustee for the Central District of California, Lender shall have the right to take any or all of the following actions, at the same or different times:

        (a)     immediately terminate the Commitment;

        (b)     declare any or all Obligations (in whole or in part), including the unpaid principal amount of and accrued interest on the Loan, to be immediately due and payable, whereupon the same shall become immediately due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by Borrower;

        (c)     subject to Bankruptcy Code section 362, exercise its remedies as a secured party against the Collateral pursuant to the Security Documents and applicable law; and

        (d)     subject to Bankruptcy Code section 362, enforce its other rights and remedies under the Loan Documents or applicable law.

**10.3    Right of Lender to Make Advances to Cure Events of Default; Obligatory Advances.**  If Borrower fails to perform any of its covenants or agreements herein or in any of the other Loan Documents, Lender may (but shall not be required to) perform any of such covenants and agreements, and any amounts expended by Lender in so doing, and any amounts advanced by Lender pursuant to this Agreement, shall be deemed to be an Advance under the Note even though it may cause the Loan to exceed the Aggregate Commitment or the face amount of the Note regardless of the identity of the person or persons to whom said funds are disbursed.  Loan Proceeds advanced by Lender to protect its security for the Loan are obligatory advances hereunder and shall constitute an Advance and additional indebtedness payable on demand and evidenced and secured by the Loan Documents, regardless of whether such amounts advanced cause the balance due to exceed the Aggregate Commitment or the face amount of the Note.  Such Advances will bear interest at the Default Rate.

**10.4    Attorneys' Fees.**  Borrower shall pay Lender's reasonable attorneys' fees and costs and professionals' fees and costs in connection with the negotiation, preparation, administration and enforcement of this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, if at any time or times hereafter Lender employs counsel or other professionals for advice or other representation with respect to any matter concerning Borrower, the Collateral, this Agreement or the Loan Documents (including any bankruptcy proceeding) or if Lender employs one or more counsel or other professionals to protect, collect, lease, sell, take possession of or liquidate any of the Collateral, or to attempt to enforce or protect any security interest or Lien or other right in any of the Collateral or under any of the Loan Documents, or to enforce any rights of Lender or obligations of Borrower or any other Person that may be obligated to Lender by virtue of this Agreement or under any of the other Loan Documents or any other agreement, instrument or document heretofore or hereafter delivered to Lender in furtherance hereof, then in any such event, all of the attorneys' or other professionals' fees arising from such services, and any expenses, costs and charges relating thereto, shall constitute an Advance and additional indebtedness owing by Borrower to Lender payable on demand and evidenced and secured by the Loan Documents and bearing interest at the Default Rate.

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

**10.5     No Waiver.**  No failure by Lender to exercise, and no delay by Lender in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, remedy, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

## ARTICLE 11
## MISCELLANEOUS

**11.1     Time is of the Essence.**  Borrower agrees that time is of the essence with respect to all of its covenants and Obligations under this Agreement.

**11.2     Amendments, Etc.**  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by Borrower therefrom, shall be effective unless in writing and signed by Lender and Borrower, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**11.3     Determination of Facts.**  Lender shall be free at all times to establish independently to its satisfaction and at its sole and absolute discretion the existence or nonexistence of any fact or facts, the existence or nonexistence of which is a condition of this Agreement.

**11.4     Prior Agreements.**  This Agreement and the other Loan Documents, and any other documents or instruments executed pursuant hereto or thereto, or contemplated hereby or thereby, represent the entire, integrated agreement between the parties hereto with respect to the transactions contemplated hereby and thereby, and shall supersede all prior negotiations, representations or agreements pertaining thereto, either oral or written.  For avoidance of doubt, nothing in this Agreement or the other Loan Documents affects the terms of any pre-petition agreement.

**11.5     Disclaimer by Lender.**  Lender shall not be liable to any subcontractor, supplier, laborer, architect, engineer or any other Person for services performed or materials supplied, nor shall Lender be liable for any debts or claims accruing in favor of any such Persons against Borrower or against the Collateral.  Borrower is not and shall not be an agent of Lender for any purposes, nor shall it be a venture partner with Lender in any manner whatsoever.  Lender shall not be deemed to be in privity of contract with any subcontractor, or provider of services on or to any Collateral, nor shall any payment of funds directly to a subcontractor or provider of services be deemed to create any third party beneficiary status or recognition of same by Lender unless and until Lender expressly assumes such status in writing.  No subcontractor, supplier, laborer, architect, engineer or other Person shall be deemed to be a third party beneficiary of this Agreement or any of the other Loan Documents.

**11.6     Captions; Section References.**  The captions and headings of various articles and sections of this Agreement and exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

Section references in this Agreement refer to sections of this Agreement, unless otherwise provided.

**11.7    Inconsistent Terms and Partial Invalidity.**  In the event of any inconsistency among the terms hereof (including incorporated terms), or between such terms and the terms of any other Loan Document, Lender may elect which terms shall govern and prevail.  If any provision of this Agreement, or any paragraph, sentence, clause, phrase or word, or the application thereof, in any circumstances, is adjudicated by a court of competent jurisdiction to be invalid, the validity of the remainder of this Agreement shall be construed as if such invalid part were never included herein.

**11.8    Approvals.**  All consents and approvals required in this Agreement shall be in writing.  Any approval granted by Lender for any matter covered under this Agreement shall be narrowly construed to cover only the Persons and facts identified in such approval.

**11.9    References and Other Terms.**  Any word herein that is expressed in the masculine or neuter gender shall be deemed to include the masculine, feminine and neuter genders.  Any word herein that is expressed in the singular or plural number shall be deemed, whenever appropriate in the context, to include the singular and the plural.  Any defined term used in the plural in any Loan Document refers to all members of the relevant class and any defined term used in the singular refers to any number of the members of the relevant class.  Any accounting term used and not specifically defined in any Loan Document will be construed in conformity with, and all financial data required to be submitted under any Loan Document must be prepared in conformity with GAAP or in accordance with such other principles or methods as are consistently applied and reasonably acceptable to Lender.  Any reference to any Loan Document or other document includes such document both as originally executed and as it may from time to time be amended, restated, supplemented or modified.  References herein to Articles, Sections and Exhibits will be construed as references to this Agreement unless a different document is named.  References to subsections will be construed as references to the same Section in which the reference appears.  The term "document" is used in its broadest sense and encompasses agreements, certificates, opinions, consents, instruments and other written material of every kind.  The terms "including" and "include" mean "including (include) without limitation."  The terms "hereof," "herein" and "hereunder," and words of similar import when used in this Agreement refers to this Agreement as a whole and not to any particular provision of this Agreement.  All exhibits to this Agreement, as now existing and as the same may from time to time be modified, are incorporated herein by this reference.

**11.10   Notices.**  Any notices, communications and waivers under this Agreement shall be in writing and (1) shall be either (a) delivered in person; (b) mailed, postage prepaid, (c) transmitted by overnight express carrier, addressed in each case as follows; or (d) transmitted via electronic mail, followed by a telephone call by sender, within 24 hours of transmission, to confirm receipt of such electronic mail transmission:

To Lender:               Hankey Capital, LLC
                         Attn:  Eugene Leydiker
                         4751 Wilshire Blvd., Suite 110
                         Los Angeles, CA  90010
                         Email:  eugenel@hankeyinvestments.com

With copy to:            Jeffer Mangels Butler & Mitchell LLP
                         1900 Avenue of the Stars, 7th Floor
                         Los Angeles, CA  90067
                         Attn:  Thomas M. Geher, Esq.
                         Email:  tgeher@jmbm.com
                         Tel:  (310) 712-6820

To Borrower:             Crestlloyd, LLC
                         c/o SierraConstellation, LLC
                         355 S. Grand Avenue, Suite 1450
                         Los Angeles, CA  90071
                         Attn:  Larry Perkins
                         Email:  lperkins@scpllc.com

With copy to:            Levene, Neale, Bender, Yoo & Golubchik LLP
                         2818 La Cienega Ave.
                         Los Angeles, CA  90034
                         Attn:  David B. Golubchik, Esq.
                         Email:  dbg@lnbyg.com
                         Tel:  (310) 229-3393

or to any other address as to any party hereto, as such party shall designate in a written notice to the other party hereto.  All notices sent pursuant to the terms of this Section 11.10 shall be deemed received (i) if personally delivered or sent by email transmission, then on the date of delivery, (ii) if sent by overnight express carrier, then on the next Business Day immediately following the day sent, or (iii) if sent by mail, then on the earlier of the third day following the day sent or when actually received.

**11.11  Effect of Agreement.**  The submission of this Agreement and the other Loan Documents to Borrower for examination does not constitute a commitment or an offer by Lender to lend money to Borrower.  This Agreement shall become effective only after entry of the Final Order and upon execution and delivery hereof by Lender to Borrower.

**11.12  Governing Law.**  This Agreement shall be construed and enforced in accordance with the laws of the State of California, without reference to the choice of law or conflicts of law principles of the State of California.

**11.13  Waiver of Defenses.    OTHER THAN CLAIMS BASED UPON THE FAILURE OF LENDER TO ACT IN A COMMERCIALLY REASONABLE MANNER, BORROWER HEREBY WAIVES EVERY PRESENT AND FUTURE DEFENSE (OTHER THAN THE DEFENSE OF PAYMENT OR PERFORMANCE IN FULL, AS**

30

APPLICABLE), CAUSE OF ACTION, COUNTERCLAIM OR SETOFF THAT BORROWER NOW MAY HAVE OR HEREAFTER MAY HAVE TO ANY ACTION BY LENDER IN ENFORCING THIS AGREEMENT. PROVIDED THAT LENDER ACTS IN GOOD FAITH, BORROWER RATIFIES AND CONFIRMS WHATEVER LENDER MAY DO PURSUANT TO THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO BORROWER.

**11.14   Consent to Jurisdiction.** TO INDUCE LENDER TO ACCEPT THE NOTE, BORROWER IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THE LOAN DOCUMENTS WILL BE LITIGATED BEFORE THE BANKRUPTCY COURT OR, IF THAT COURT DECLINES JURISDICTION, IN COURTS HAVING SITUS IN THE STATE OF CALIFORNIA. LENDER AND BORROWER HEREBY CONSENT AND SUBMIT TO THE JURISDICTION OF ANY COURT LOCATED WITHIN THE STATE OF CALIFORNIA.

**11.15   Waiver of Jury Trial.** EACH OF BORROWER AND LENDER, HAVING BEEN REPRESENTED BY COUNSEL, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY CREDIT RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

**11.16   Lender's Right to Credit Bid.** Borrower hereby irrevocably authorizes Lender (in each case, acting alone or together) to bid and in such manner purchase (either directly or through one or more acquisition entities) all or any portion of the Collateral at any sale thereof conducted (a) by Lender under the provisions of California Uniform Commercial Code 9604, 9610 or 9620, (b) under the provisions of the Bankruptcy Code, including sales pursuant to Bankruptcy Code sections 363, 365, and/or 1129 (including as part of any Restructuring Plan), or (c) by Lender, whether by judicial action or otherwise, including a foreclosure sale, in accordance with applicable law (collectively, a "**Collateral Sale**"). In connection with any Collateral Sale, Lender shall have the right to credit bid and to offset all or any portion of the Obligations then outstanding against the purchase price of such Collateral, at Lender's discretion.

**11.17   Usury Savings Clause.** Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law, shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence)

under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loan made hereunder shall bear interest at the Highest Lawful Rate.

**11.18  Counterparts; Facsimile Signatures.**  This Agreement may be executed in any number of counterparts and by the parties hereto on separate counterparts.  Each such counterpart shall be deemed to be an original, but all such counterparts together shall constitute but one and the same agreement.  Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.  Electronic records of executed Loan Documents maintained by Lender shall be deemed to be originals thereof.

**11.19  Final Agreement.    THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

*[Signature Page Follows]*

SENIOR SECURED SUPER-PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

**IN WITNESS WHEREOF,** Lender and Borrower have caused this Agreement to be executed on the day and year first above written.

**BORROWER:**

CRESTLLOYD LLC,
a California limited liability company
By its Manager, SierraConstellation Partners, LLC

By:_____
    Larry Perkins,
    Chief Executive Officer of Manager

**LENDER:**

HANKEY CAPITAL, LLC,
a California limited liability company

By:_____
Name: _____
Title: _____

33

**EXHIBIT A**

Promissory Note

(See attached)

# EXHIBIT B

Senior Secured Superior-Priority Construction Deed of Trust,
Security Agreement and Fixture Filing with Assignment of Rents

(See attached)

EXHIBIT B
SENIOR SECURED SUPERIOR-PRIORITY
CONSTRUCTION DEED OF TRUST, SECURITY AGREEMENT
AND FIXTURE FILING WITH ASSIGNMENT OF RENTS

69681940v8

# EXHIBIT C

Security Agreement – Senior Super-Priority Lien

(See attached)

**EXHIBIT D**

Interim Order

(See Attached)

**EXHIBIT E**

Final Order

(See Attached)

**EXHIBIT F**

Budget

(See Attached)

# EXHIBIT "A"

# PROMISSORY NOTE

US $12,000,000.00                                             Los Angeles, California
                                                             December __, 2021


     FOR VALUE RECEIVED, CRESTLLOYD, LLC, a California limited liability company
("**Borrower**"), debtor and debtor in possession in a pending Chapter 11 bankruptcy case, hereby
unconditionally promises to pay to the order of HANKEY CAPITAL, LLC, and its respective
successors and assigns (collectively, "**Lender**"), in  the  manner  hereinafter provided, the
aggregate principal sum of Twelve Million and No/100ths Dollars ($12,000,000.00), or so much
thereof as may have been advanced pursuant to the Senior Secured Super-Priority Debtor in
Possession Credit Agreement, dated December __, 2021, between Borrower and Lender (as the
same may be amended, restated, replaced, supplemented, or otherwise modified from time to time,
the "**Credit Agreement**"), in lawful money of the United States of America, with interest thereon
to be computed from the date such proceeds are advanced (this "**Note**"), and to be paid in
accordance with the terms of this Note and the Credit Agreement.  All initial capitalized terms not
defined herein shall have the meanings given to those terms in the Credit Agreement.

     Borrower agrees to pay the principal sum of this Note, to the extent advanced pursuant to
the Credit Agreement, and interest on the unpaid principal sum of this Note from time to time
outstanding at the rates and at the times specified in the Credit Agreement.  The outstanding
principal balance of the principal sum of this Note and all accrued and unpaid interest thereon,
fees, the Facility Fee, the Extension Fee, the Deferred Extension Fee, and all other fees, costs,
charges, and expenses incurred by Lender is due and payable in full on the Maturity Date.  This
Note may only be prepaid in accordance with the terms and conditions of the Credit Agreement.
The Interest Rate of this Note shall increase by five percentage points upon the occurrence of an
Event of Default without notice.

     The outstanding principal balance of the principal sum of this Note together with all interest
accrued and unpaid hereon and all other sums, including late charges, prepayment penalties and
fees, the Facility Fee, the Extension Fee, the Deferred Extension Fee, and all other fees and costs
relating to the Loan, due to Lender under this Note, the Credit Agreement, or any other Loan
Document (the "**Indebtedness**"), will be, at Lender's option, immediately due and payable on the
happening of any Event of Default.

     This Note is the Note referred to in the Credit Agreement.  This Note is secured by the
Security Documents.  All the terms, covenants and conditions contained in the Credit Agreement,
the Security Documents, and the other Loan Documents, are hereby made a part of this Note to
the same extent and with the same force as if they were fully set forth herein.  In the event of a
conflict or inconsistency between the terms of this Note and the Credit Agreement, the terms and
provisions of the Credit Agreement will govern.

     In the event that the interest and/or charges in the nature of interest, if any, provided for by
this Note, the Credit Agreement or by any other Loan Document, contravenes a legal or statutory
limitation applicable to the Loan, if any, Borrower will pay only such amounts as would legally
be permitted; provided, however, that if the defense of usury and all similar defenses are

unavailable to Borrower, Borrower will pay all amounts provided for herein, in the Credit Agreement and in the other Loan Documents. If, for any reason, amounts in excess of the amounts permitted in the foregoing sentence have been paid, received, collected or applied hereunder, whether by reason of acceleration or otherwise, then, and in that event, any such excess amounts will be applied to principal, unless principal has been fully paid, in which event such excess amount will be refunded to Borrower.

Borrower and all others who may become liable for the payment of all or any part of the Indebtedness do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind. No release of any security for the Indebtedness or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Credit Agreement, or the other Loan Documents made by agreement between Lender or any other Person will release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower or any other Person who may become liable for the payment of all or any part of the Indebtedness under this Note, the Credit Agreement or the other Loan Documents. No notice to or demand on Borrower will waive any obligation of Borrower or waive any right of Lender to take further action without further notice or demand as provided for in this Note, the Credit Agreement, or the other Loan Documents. The agreements contained herein will remain in full force and be applicable notwithstanding any changes in the shareholders or members comprising, or the managers, officers and directors of Borrower, and the term "Borrower," as used herein, will include any alternative or successor corporation or entity, but any predecessor corporation will not be relieved of liability hereunder. Nothing in the foregoing may be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such corporation, which may be set forth in the Credit Agreement, the Security Documents, or any other Loan Document.

This Note may not be modified, amended, waived, extended, changed, discharged, or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Borrower's obligations hereunder shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Note, the Credit Agreement, and the other Loan Documents under any and all circumstances whatsoever, and irrespective of the existence of any claim, counter-claim, setoff, defense, right of rescission, recoupment or other right that Borrower may at any time have against Lender.

Wherever possible, each provision of this Note must be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note is prohibited by or invalid under applicable law, such provision will be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

All payments to Lender shall be made in lawful money of the United States of America at Lender's office at 4751 Wilshire Blvd., Suite 110, Los Angeles, California 90010, or at such other place as Lender may from time to time designate in writing to Borrower. All notices or other

written communications hereunder must be delivered in accordance with Section 11.10 of the Credit Agreement.

Borrower may not sell, transfer, pledge, encumber or assign this Note without the prior written consent of Lender and any attempt to do so shall be void.

This Note shall be governed by, and construed in accordance with, the laws of the State of California, without regard to the conflicts of laws principles thereof.  The parties hereto irrevocably submit to the non-exclusive jurisdiction of any state or Federal court (including the Bankruptcy Court) sitting in the State of California, over any suit, action or proceeding arising out of or relating to this Note.

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed and delivered as of the day and year first above set forth.

**CRESTLLOYD LLC,**
a California limited liability company
By its Manager, SierraConstellation Partners, LLC


By: _____
    Larry Perkins,
    Chief Executive Officer of Manager

69684922v4
PROMISSORY NOTE

# EXHIBIT "B"

**RECORDING REQUESTED BY**

**AND WHEN RECORDED MAIL TO:**

HANKEY CAPITAL, LLC
4751 Wilshire Blvd., Suite 110
Los Angeles, CA 90010
Attention: Eugene Leydiker

### SENIOR SECURED SUPER-PRIORITY CONSTRUCTION DEED OF TRUST, SECURITY AGREEMENT AND FIXTURE FILING WITH ASSIGNMENT OF RENTS
[944 Airole Way]

This SENIOR SECURED SUPER-PRIORITY CONSTRUCTION DEED OF TRUST, SECURITY AGREEMENT AND FIXTURE FILING WITH ASSIGNMENT OF RENTS (hereinafter the "Deed of Trust") made on December __, 2021, by CRESTLLOYD, LLC, a California limited liability company (hereinafter referred to as "Trustor"), debtor and debtor in possession in a pending Chapter 11 bankruptcy case commenced on October 26, 2021 ("Petition Date"), whose address is 355 S. Grand Avenue, Suite 1450, Los Angeles, California 90071 to CHICAGO TITLE COMPANY, hereinafter called "Trustee", for the benefit of HANKEY CAPITAL, LLC, a California limited liability company, hereinafter called "Beneficiary", whose address is 4751 Wilshire Blvd., Suite 110, Los Angeles, California 90010.

This Deed of Trust is given for purpose of securing the following:

(1)    Performance of all obligations of Trustor under any agreements of Trustor incorporated by reference or contained herein.

(2)    Payment of indebtedness in the total principal amount of Twelve Million and No/100 Dollars ($12,000,000.00), together with interest thereon, as provided in and evidenced by that certain Promissory Note of even date herewith executed by Trustor in favor of Beneficiary (the "Note"), and any and all modifications, extensions and renewals thereof.

(3)    Payment of the Deferred Extension Fee of One Hundred Twenty Thousand Dollars and No Cents ($120,000.00), together with interest thereon.

(4)    Performance of such other obligations or payment of such other indebtedness now or hereafter owing to Beneficiary from Trustor, when evidenced by a document reciting that it is so secured by this Deed of Trust.

(5)    Payment of all sums advanced or paid out by the Beneficiary under any provision of this Deed of Trust or to protect the security of this Deed of Trust.

(6)    Any and all Obligations of Trustor under the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement.

This Deed of Trust, and any other instruments given to evidence or further secure the payment and performance of any obligation secured hereby may hereinafter be referred to as the

1

SENIOR SECURED SUPER-PRIORITY
CONSTRUCTION DEED OF TRUST, SECURITY AGREEMENT
AND FIXTURE FILING WITH ASSIGNMENT OF RENTS
69684429v5

"Trust Documents".  The payment obligations of Trustor described in Paragraphs 2, 3, 4, and 5 above are hereinafter referred to as the "Indebtedness".

Trustor, in consideration of the premises and the aforesaid Indebtedness, and in order to secure its obligations under the Note, according to their terms, has granted, bargained, sold, conveyed, confirmed, transferred and assigned and by these presents does grant, bargain, sell, convey, confirm, transfer and assign unto Trustee, his successors and assigns, with power of sale and right of entry and possession, Trustor's interest in and to that certain property described as follows:

(A)    The land described in Exhibit A attached hereto, made a part hereof.

(B)    All buildings and improvements now or hereafter located on said land.

(C)    All easements, tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits of the aforesaid property and all the estate, title and interest, homestead or other claim or demand, as well in law as in equity, which Trustor now has or hereafter may acquire, of, in or to said property, or any part thereof, with the appurtenances thereto.

(D)    All of Trustor's right, title and interest in, to or under the property described in Exhibit B attached hereto, made a part hereof and comprising one page.

Trustor's interest in and to the land, buildings, improvements and the rights and property described in paragraphs (A) through (D) above are hereinafter referred to collectively as the "Property" or as the "Collateral".

TO HAVE AND TO HOLD the same unto Trustee, Trustee's successors and assigns, Trustor hereby covenants and agrees as follows:

## ARTICLE I.

## COVENANTS AND AGREEMENTS OF TRUSTOR

Trustor hereby covenants and agrees:

1.00    Payment of Indebtedness.  Trustor will pay the Indebtedness hereby secured promptly when and as said Indebtedness becomes due and payable.

1.01    Liens.  Trustor, absent the written consent of Beneficiary, will not suffer any lien to be created hereafter upon the Property, or any part thereof, prior to, or pari passu with, the lien of this Deed of Trust, and will not do or suffer any act or omission whereby the value of the Property, or lien hereof or of any estate or title covered hereby, may be diminished or impaired in any way.

1.02    Maintenance, Repair and Alterations.  Trustor will keep any buildings and improvements constructed on the Property in good condition and repair, will not remove or

2

demolish any buildings or improvements thereon, and commit or permit no waste thereon. Should said building or buildings, or any part thereof, require inspection, repair or protection other than that given it by Trustor, then, and in that event, Beneficiary may enter or cause entry to be made upon the Property and into said building or buildings for inspection, repair or protection thereof and such repair may be made by Beneficiary and be made or done in such manner as fully to protect the interest of Beneficiary in the opinion of Beneficiary, and any and all sums expended by Beneficiary in doing or causing to be done any of the things above authorized are secured by this Deed of Trust and shall be paid by Trustor on demand.  Trustor shall comply with all laws, ordinances, governmental regulations, covenants, conditions and restrictions affecting the Property or requiring any alteration or improvement thereof, and permit no violation, as to the Property, of any such law, ordinance, governmental regulation, covenant, condition or restriction affecting the Property.

      1.03    <u>Title to Property</u>.  Trustor covenants that Trustor is lawfully seized of each and every part and parcel of the Property as described in the granting clauses hereof and has good and indefeasible title to the same; that there are no liens or encumbrances on said property except for pre-petition liens and statutory real property liens, Permitted Liens and such liens and encumbrances that are approved by Beneficiary; and Trustor forever will warrant and defend the title in the same to the Trustee against the claims and demands of all persons, if during the existence of this Deed of Trust there be commenced or pending any suit or action affecting said property, or any part thereof, or the title thereto, or if any adverse claim for or against said property, or any part thereof, be made or asserted, Trustee or Beneficiary may appear in said suit or action and retain counsel therein and defend the same or otherwise take such action therein as Trustee or Beneficiary may deem advisable, and may settle or compromise the same or the said adverse claim, and in that behalf and for any of the said purposes, may pay and expend such sums of money as Trustee or Beneficiary may deem to be necessary.

      1.04    <u>Taxes and Assessments</u>.  Trustor shall pay, satisfy and discharge at maturity all taxes and assessments and all other charges and encumbrances which now are or hereafter shall be or appear to be a lien upon the Property, or any part thereof, or upon the debt secured hereby; which becomes due and payable after the Petition Date; and if Trustor is in default thereof, Beneficiary, without demand or notice, may pay, satisfy or discharge said taxes, assessments, charges or encumbrances, and pay and expend such suns of money as Beneficiary may deem to be necessary therefor, and shall be the sole judge of the legality or the validity of such taxes, assessments, charges or encumbrances, and the amount necessary to be paid in the satisfaction or discharge thereof.

      1.05    <u>Evidence of Payment of Taxes and Assessments</u>.  Trustor further agrees to deposit with Beneficiary within thirty (30) days of Beneficiary's request, all receipts or other satisfactory evidence of the payment of taxes, assessments, charges, claims and liens of every nature (hereinafter collectively referred to as "taxes" or "tax") affecting or which may affect the Property or any part thereof.

      1.06    <u>Insurance</u>.  Beneficiary has been advised and understands that as of the date of execution of this document, insufficient insurance coverage exists on the Property and that Trustor is using best efforts to procure sufficient coverage.  Subject to the foregoing, Trustor at all times shall keep the buildings and improvements which are now or hereafter erected upon

3

said property insured against loss or damage by vandalism, malicious mischief and fire with extended coverage (and by other hazards as reasonably may be required by Beneficiary) and shall procure and maintain in force such other insurance as may be required by Beneficiary, all in amounts approved by Beneficiary and by an insurance company or companies or governmental agency or instrumentality approved by Beneficiary, and the policies for such insurance shall be made payable, in case of loss, to Beneficiary pursuant to standard mortgagee's loss payable endorsement, and shall be delivered to and held by Beneficiary as further security for payment under the Note and other moneys herein mentioned, said policies shall provide for 30 days' notice to Beneficiary prior to cancellation or nonrenewal for any reason, including nonpayment of premium; and in default thereof, Beneficiary may procure such insurance to be effected upon Beneficiary's interest as Beneficiary or upon the interest of Trustee or upon the interest of the owners of the Property and in their names; loss, if any, being made payable to Beneficiary, and Beneficiary may pay and expend for premiums for such insurance such moneys as Beneficiary may deem to be necessary.  The form of said policies shall be approved by Beneficiary.  In addition, Trustor shall procure and maintain liability insurance insuring Trustor and, if requested, Beneficiary against liability because of personal injury or property damage in amounts and by companies approved by Beneficiary.

   1.07 <u>Insurance and Condemnation Proceeds</u>.  Should a loss occur under any policy of insurance required by Paragraph 1.06 hereof, or should all or any portion of the Property be taken or damaged by reason of any public improvement or condemnation proceeding, Beneficiary shall be entitled to all insurance proceeds, compensation, awards, and other payments or relief therefor (all hereinafter referred to as "proceeds"), and, whether or not the security for the Note secured by this Deed of Trust has been impaired, Beneficiary shall be entitled to apply the proceeds collected, after first deducting therefrom all its expenses, including attorneys' fees, in collecting said proceeds, to any and all indebtedness secured hereby and thereafter shall pay the balance remaining, if any, to Trustor.  At its option, in its own name, Beneficiary shall be entitled to commence, appear in and prosecute any action or proceedings or to make any compromise or settlement, in connection with such loss, taking or damage.  All such proceeds and rights of action hereby are assigned to Beneficiary.  Notwithstanding the foregoing, absent an "Event of Default" as set for in Paragraph 4.00 below, in the event of such insurance loss or that only a portion of the Property is taken or damaged by reason of any public improvement or condemnation proceeding, and restoration is necessary, Beneficiary, after deducting from said proceeds received all its expenses, including attorneys' fees, may release to Trustor as restoration progresses, so much of said amount as equals the costs of restoration effected by Trustor, subject to reasonable conditions, including the right of Beneficiary to withhold up to ten percent (10%) of said amount until completion and the expiration of the period within which mechanics' or materialmen's liens may be filed and until receipt of satisfactory evidence that no liens exist.  Any amount required to complete such restoration in excess of such proceeds shall be paid to Trustor before such proceeds are used.  Trustor agrees to execute such further assignments of any such proceeds and rights of action as Beneficiary or Trustee may require.

   1.08 <u>Performance of Other Obligations</u>.  Trustor promises and agrees to perform all of the obligations in and under the Note, and any other documents given now or hereafter as security for the Indebtedness secured by this Deed of Trust.

4

1.09    Restrictions on Transfer or Further Encumbrance.  Absent the prior written consent of Beneficiary and pursuant to the order of the Bankruptcy Court, Trustor shall not (a) execute or deliver any pledge, security agreement, mortgage, deed of trust or other instrument of hypothecation, covering all or any portion of the Property or any interest therein; (b) sell, convey, alienate, transfer or otherwise dispose of all or any portion of the Property or any interest therein, whether voluntarily or involuntarily, by operation of law or otherwise; (c) in the event Trustor is a corporation, limited liability company, or trust or similar entity, sell, convey, transfer or encumber, whether voluntarily, involuntarily or otherwise, more than ten percent (10%) of the membership interests, issued and outstanding capital stock of Trustor or of the beneficial interest of such trust or similar entity; or (d) in the event Trustor is a limited or general partnership,, or a joint venture, change any constituent general partner or any joint venturer whether voluntarily, involuntarily or otherwise, or sell, convey, transfer, change or encumber any such general partner or joint venturer interests.

1.10    Environmental Compliance.  Trustor shall keep and maintain the Property in compliance with, and shall not cause or permit the Property to be in violation of any federal, state or local laws, ordinances or regulations relating to industrial hygiene or to the environmental conditions on, under or about the Property including, but not limited to, soil and ground water conditions.  Trustor shall not use, generate, manufacture, store or dispose of on, under or about the Property or transport to or from the Property any flammable explosives, radioactive materials, hazardous wastes, toxic substances or related materials, including, without limitation, any substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials" or "toxic substances" under any applicable federal or state laws or regulations (collectively referred to hereinafter as "Hazardous Materials"), except only those materials and substances which are usually and customarily used in the operation of a residential construction project so long as the amount of such materials and substances which are used or stored upon the Property shall not exceed the amount reasonably required for the operation of such business in its normal and ordinary course.

Trustor shall immediately advise Beneficiary in writing of (i) any and all enforcement, cleanup, removal or other governmental or regulatory actions instituted, completed or threatened pursuant to any applicable federal, state or local laws, ordinances, or regulations relating to any Hazardous Materials affecting the Property ("Hazardous Materials Laws"); (ii) all claims made or threatened by any third party against Trustor or the Property relating to damage, contribution, cost recovery compensation, loss or injury resulting from any Hazardous Materials (the matters set forth in clauses (i) and (ii) above are hereinafter referred to as "Hazardous Materials Claims"); and (iii) Trustor's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be classified as "border-zone property" under the provisions of California Health and Safety Code, Sections 25220 et. seq. or any regulation adopted in accordance therewith, or to be otherwise subject to any restrictions on the ownership, occupancy, transferability or use of the Property under any Hazardous Materials Laws.

Beneficiary shall have the right to join and participate in, as a party, if it so elects, any legal proceedings or actions initiated in connection with any Hazardous Materials Claims and to have its reasonable attorneys' fees in connection therewith paid by Trustor.  Trustor shall be solely responsible for, and shall indemnify and hold harmless Beneficiary, its directors, officers,

employees, agents, successors and assigns from and against any loss, damage, cost, expense or liability directly or indirectly arising out of or attributable to the use, generation, storage, release, threatened release, discharge, disposal, or presence of Hazardous Materials on, under or about the Property, including, without limitation: (a) all foreseeable consequential damages; (b) the costs of any required or necessary repair, cleanup or detoxification of the Property, and the preparation and implementation of any closure, remedial or other required plans; and (c) all reasonable costs and expenses incurred by Beneficiary in connection with clauses (a) and (b) including, but not limited to, reasonable attorneys' fees.

Without Beneficiary's prior written consent, which shall not be unreasonably withheld, Trustor shall not take any remedial action in response to the presence of any Hazardous Materials on, under, or about the Property, nor enter into any settlement agreement, consent decree, or other compromise in respect to any Hazardous Material Claims, which remedial action, settlement, consent or compromise might, in Beneficiary's reasonable judgment, impair the value of the Beneficiary's security hereunder; provided, however, that Beneficiary's prior consent shall not be necessary in the event that the presence of Hazardous Materials on, under, or about the Property either poses an immediate threat to the health, safety or welfare of any individual or is of such a nature that an immediate remedial response is necessary and it is not possible to obtain Beneficiary's consent before taking such action, provided that in such event Trustor shall notify Beneficiary as soon as practicable of any action so taken. Beneficiary agrees not to withhold its consent, where such consent is required hereunder, if either (i) a particular remedial action is ordered by a court of competent jurisdiction, or (ii) Trustor establishes to the reasonable satisfaction of Beneficiary that there is no reasonable alternative to such remedial action which would result in less impairment of Beneficiary's security hereunder.

1.11    Indemnification.  Trustor hereby agrees to indemnify Beneficiary and hold Beneficiary harmless from and against any and all claims, losses, damages, liabilities, fines, penalties, charges, administrative and judicial proceedings and orders, judgments, remedial action requirements, enforcement actions of any kind, and all costs and expenses incurred in connection therewith (including, but not limited to, reasonable attorneys' fees and expenses) arising directly or indirectly, in whole or in part, out of (i) the presence on or under the Property of any Hazardous Materials (as defined in Paragraph 1.10), or any releases or discharges of any Hazardous Materials on, under or from the Property, or (ii) any activity carried on or undertaken on or off the Property, whether prior to or during the period during which any indebtedness under the Note is outstanding and whether by Trustor or any predecessor in title or any employees, agents, contractors or subcontractors of Trustor or any predecessor in title, or any third persons at any time occupying or present on the Property, in connection with the handling, treatment, removal, storage, decontamination, clean-up, transport or disposal of any Hazardous Materials (as defined in Paragraph 1.10) at any time located or present on or under the Property. The foregoing indemnity shall further apply to any residual contamination on or under the Property, or affecting any natural resources, and to any contamination of any property or natural resources arising in connection with the generation, use, handling, storage, transport or disposal of, any such Hazardous Materials, and irrespective of whether any of such activities were or will be undertaken in accordance with applicable laws, regulations, codes and ordinances.

1.12    Environmental Provisions.  Trustor hereby acknowledges and agrees that the provisions of Paragraphs 1.10 and 1.11 hereof are intended to be "environmental provisions" (as

defined in Section 736 of the California Code of Civil Procedure), and that Beneficiary is intended to have all of the rights of a secured lender under Section 736 of the California Code of Civil Procedure in respect of such "environmental provisions."  Trustor further acknowledges and agrees that the rights afforded to Beneficiary under Section 736 of the California Code of Civil Procedure are in addition to all rights, powers and remedies otherwise available to Beneficiary under any of the Trust Documents or at law or in equity.

    1.13   <u>Reserved</u>.

    1.14   <u>Covenant to Assign Future Leases</u>.  Until all of the Indebtedness secured by the Deed of Trust shall have been paid in full, Trustor covenants and agrees that it will immediately transfer and assign to Beneficiary any and all other and future leases, location agreements, and licenses on all or any portion of the Property.  Assignor further covenants and agrees to make, execute and deliver to Assignee on demand, and at any time or times, any and all written assignments and other instruments sufficient for this purpose or that Beneficiary may deem advisable for carrying out the true intent of this covenant.

## ARTICLE II.

## ASSIGNMENT OF RENTS, ISSUES AND PROFITS

    2.00   <u>Assignments of Rents</u>.  Trustor hereby assigns to Beneficiary the rents, issues, profits, royalties, and payment payable under any lease of the Property, or portion thereof including any oil, gas or mineral lease, or any installments of money payable pursuant to any agreement or any sale of said property or any part thereof, reserving unto Trustor the rights prior to default by Trustor in payment of the Indebtedness secured hereby or in the performance of any agreement hereunder, to collect and retain such rents, issues, profits, royalties, payments and installments of money as they may become due and payable.  Upon any such default, Beneficiary, without regard to the adequacy of any security for the Indebtedness hereby secured, shall be entitled to (1) collect such rents, issues, profits, royalties, payments and installments of money and apply the same as more particularly set forth in this Paragraph, all without taking possession of the Property, or (2) enter and take possession of the Property or any part thereof, in person, by agent, or by a receiver to be appointed by the court and to sue for or otherwise collect such rents, issues, profits, royalties, payments and installments of money.  Beneficiary may apply any such rents, issues, profits, royalties, payments and installments of money so collected, less costs and expenses of operation and collection, including reasonable attorneys' fees, upon any indebtedness secured hereby, in such order as Beneficiary may determine, and, if such costs and expenses and attorneys' fees shall exceed the amount collected, the excess shall be immediately due and payable.  The collection of such rents, issues, profits, royalties, payments and installments of money and the application thereof as aforesaid shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice, except to the extent any such default fully is cured.  Failure or discontinuance of Beneficiary at any time, or from time to time, to collect any such moneys shall not impair in any manner the subsequent enforcement by Beneficiary of the right, power and authority herein conferred on Beneficiary.  Nothing contained herein, including the exercise of any right, power or authority herein granted to Beneficiary, shall be, or be construed to be, an affirmation by Beneficiary of any tenancy, lease or option, or an assumption of liability under, or the subordination of the lien or charge of

7

this Deed of Trust to any such tenancy, lease or option.  Trustor hereby agrees that, in the event Beneficiary exercises its rights as in this Paragraph provided, Trustor waives any right to compensation for the use of Trustor's furniture, furnishings or equipment in the Property for the period such assignment of rents or receivership is in effect, it being understood that the rents, issues, profits, royalties, payments and installments of money derived from the use of any such items shall be applied to Trustor's obligation hereunder as above provided.  In the event that Trustor concurrently herewith or hereafter executes any separate assignment of rents or of leases to Beneficiary, then to the extent of any inconsistency between the provisions hereof and any such assignment, the provisions of such assignment shall control.

      2.01   <u>Performance of Leases</u>.  Trustor promises and agrees to keep, perform and observe all of the lessor's covenants, agreements and obligations, under the terms of all leases, location agreements and licenses now or hereafter executed relating to all or any portion of the Property, to require that lessees under said leases keep, perform, and observe all of the covenants, agreements and obligations thereunder on their part to be kept, performed and observed; not to alter, amend or modify such leases or any of them without the prior written consent of Beneficiary.

## ARTICLE III.

## SECURITY AGREEMENT AND FIXTURE FILING

      3.00   <u>Creation of Security Interest</u>.  This Deed of Trust is deemed a Security Agreement as defined in the California Commercial Code, the Trustor being the Debtor and the Beneficiary being the Secured Party, and the remedies for any violation of the covenants, terms and conditions of the agreements herein contained shall be as prescribed (i) herein, or (ii) by general law, or (iii) as to such part of the security which is also reflected in the financing statement which will be filed to perfect the security interest created herein, by the specific statutory consequences now, or hereafter enacted and specified in the California Commercial Code, all at Beneficiary's sole election.  Trustor and Beneficiary agree that the filing of a financing statement in the records normally having to do with personal property shall never be construed as in anywise derogating from or impairing this declaration and the hereby-stated intention of the parties hereto that everything used in connection with the operation or occupancy of the Property is and, at all times and for all purposes and in all proceedings, both legal and equitable, shall be regarded as real property, irrespective of whether (1) any such item is physically attached to the buildings and improvements, (2) serial numbers are used for the better identification of certain equipment items capable of being filed by the Beneficiary, or (3) any such item is referred to or reflected in any such financing statement so filed at any time.  Such mention in the financing statement is declared to be for the protection of the Beneficiary in the event any court or judge shall at any time hold that notice of Beneficiary's priority of interest must be filed in the California Commercial Code records to be effective against a particular class of persons, including, but not limited to, the federal government and any subdivision or entity of the federal government.  Trustor covenants and agrees to reimburse Beneficiary for any costs incurred in filing such financing statement and any continuation statements.

      3.01   <u>Fixture Filing</u>.  Portions of the Property are goods which are or are to become fixtures relating to the land, buildings and improvements, and Trustor covenants and agrees that

the recording of this Deed of Trust in the real estate records of the County where the land is located shall also operate from the time of recording as a Fixture Filing in accordance with Section 9334 of the California Uniform Commercial Code.

## ARTICLE IV.

## DEFAULTS AND REMEDIES

4.00    Events of Default.  Any of the following events shall be deemed an Event of Default hereunder, upon the expiration of any applicable grace period:

(a)    Default shall be made in the payment of any installment of principal or interest or any other sum secured hereby when due, whether at maturity or by acceleration or as part of any prepayment or otherwise; or

(b)    Entry of an order granting any relief or modification of the automatic stay now in effect in the Chapter 11 case which may affect the Collateral or the security interest of Beneficiary; or

(c)    If any order, judgment or decree shall be entered against Trustor decreeing its dissolution or diversion; or

(d)    Reserved; or

(e)    A writ of execution or attachment or any similar process shall be issued or levied against all or any part of or interest in the Property, or any judgment involving monetary damages shall be entered against Trustor which shall become a lien on the Property or any portion thereof or interest therein which may affect the Collateral or the security interest of Beneficiary; or

(f)    There has occurred a breach of or default under any term, covenant, agreement, condition, provision, representation or warranty contained the Note, or in the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, or other agreement related thereto or any other now or hereafter existing agreement between Trustor or any affiliate of Trustor and Beneficiary.

4.01    Acceleration upon Default.  Additional Remedies.  In the event of any such Event of Default, Beneficiary may declare, by notice given to Trustor, all Indebtedness secured hereby to be due and payable without any further presentment, demand, protest or notice of any kind. Thereafter Beneficiary may, at its sole option, move for relief from, or modification to, the automatic stay now in effect in the Chapter 11 Case:

(a)    Either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of any security for the Indebtedness and obligations hereby secured, enter upon and take possession of the Property hereby granted, or any part thereof, in its own name or in the name of the Trustee, and do any acts which it deems necessary or desirable to preserve the rentability or increase the income of such property or protect the security hereof and with or without taking possession of

9

the Property sue for or otherwise collect the rents, issues and profits thereof, including those past due and unpaid, and apply the rents, issues and profits collected, less costs and expenses of operation and collection including reasonable attorneys' fees and accountants' fees, upon any indebtedness secured hereby, all in such order as Beneficiary may determine.  The entering upon and taking possession of said property, the collection of such rents, issues and profits, or the application thereof as aforesaid shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice; and notwithstanding Beneficiary's or Trustee's continuance in possession of the Property or the collection, receipt and application of rents, issues or profits, Trustee or Beneficiary shall be entitled to exercise every right provided for in this instrument or by law upon the occurrence of any default including the right to exercise the power of sale;

(b)    Commence an action to foreclose this Deed of Trust as a mortgage, appoint a receiver, or specifically enforce any of the covenants hereof;

(c)    Deliver to Trustee a written declaration of default and demand for sale, and a written notice of default and election to cause Trustor's interest in the Property to be sold, which notice Trustee or Beneficiary shall cause to be duly filed for record in the Official Records of the County in which the Property is located.

4.02    <u>Foreclosure by Power of Sale</u>.  If Trustor is a bankruptcy debtor and the Bankruptcy Court that is presiding over the Trustor's bankruptcy case has issued an order lifting, modifying, or terminating the automatic stay and should Beneficiary elect to foreclose by exercise of the power of sale herein contained, Beneficiary shall notify Trustee and shall deposit with Trustee this Deed of Trust and the Note, the Note and such receipts with evidence of expenditures made and secured hereby as Trustee may require.  Trustee shall then have the following duties and powers:

(a)    Upon receipt of such notice from Beneficiary, Trustee shall cause to be recorded, published and delivered to Trustor such Notice of Default and Election to Sell as then required by law and by this Deed of Trust and after lapse of such time as may then be required by law and after recordation of such notice of default, Trustee, without demand on Trustor, shall, after notice of sale having been given as required by law, sell the Property and the Collateral at the time and place of sale fixed by it in said notice of sale, either as a whole or in separate parcels or items and in such order as Trustee may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale.  Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, express or implied.  The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof.  Any person, including, without limitation, Trustor, Trustee or Beneficiary, may purchase at such sale.

(b)    After deducting all costs, fees and expenses of Trustee and of this trust, including costs of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of all sums due under the Note, all other sums then secured hereby, and the remainder, if any, to the person or persons legally entitled thereto.

(c)    Trustee may postpone the sale of all or any portion of the Property by public announcement at the time and place first fixed for sale, and from time to time thereafter may postpone such sale by public announcement at the time and place fixed by the preceding postponement, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give new notice of sale.

4.03    Appointment of Receiver.  If any Event of Default described in Paragraph 4.00 of this Deed of Trust shall have occurred and be continuing and, if Trustor is a bankruptcy debtor and the Bankruptcy Court that is presiding over the Trustor's bankruptcy case has issued an order lifting, modifying, or terminating the automatic stay, Beneficiary, as a matter of right but with notice as provided herein to Trustor, but without notice to anyone claiming under Trustor and without regard to the then value of the Property or the interest of Trustor therein, shall have the right to apply to any court having jurisdiction to appoint a receiver or receivers of the Property. Any such receiver or receivers shall have all the usual powers and duties of Beneficiary in case of entry as provided in Paragraph 4.01(a) and shall continue as such and exercise such powers until the date of confirmation of sale of the Property unless such receivership is sooner terminated.

4.04    Remedies Not Exclusive.  No remedy herein conferred upon or reserved to Trustee or Beneficiary is intended to be exclusive of any other remedy herein, in the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement or other Loan Documents, or by law provided or permitted, but each shall be distinct and cumulative and shall be in addition to every other remedy given hereunder, under the Trust Documents, or now or hereafter existing at law or in equity or by statute.  Every power or remedy given by this Deed of Trust or by the Loan Documents to Trustee or Beneficiary or to which either of them may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Trustee or Beneficiary and either of them may pursue inconsistent remedies.

4.05    Partial or Late Payment.  The acceptance by Beneficiary of any sum after the same is due shall not constitute a waiver of, the right either to require prompt payment, when due, of all other sums secured hereby or to declare a default as herein provided and in either event to assess a late charge or penalty.  The acceptance by Beneficiary of any sum in an amount less than the sum then due shall be deemed an acceptance on account only and upon the condition that it shall not constitute a waiver of the obligation of Trustor to pay the entire sum then due, and Trustors failure to pay said entire sum then due shall be and continue to be a default notwithstanding such acceptance of such amount on account as aforesaid, and Beneficiary or Trustee shall be at all times thereafter and until the entire sum then due shall have been paid, and notwithstanding the acceptance by Beneficiary thereafter of further sums on account, or otherwise, entitled to exercise all rights in this Deed of Trust or the other Trust Documents confirmed upon them or either of them upon the occurrence of a default.

4.06    Failure or Indulgence Not Waiver.  No failure or delay on the part of Beneficiary in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.

11

# ARTICLE V.

# MISCELLANEOUS

5.00    <u>Governing Law</u>.  This Deed of Trust shall be governed by the laws of the State of California.  In the event that any provision or clause of this Deed of Trust conflicts with applicable laws, such conflicts shall not affect other provisions of this Deed of Trust which can be given effect without the conflicting provision, and to this end the provisions of this Deed of Trust are declared to be severable.  This instrument cannot be waived, changed, discharged or terminated orally, but only by an instrument in writing by the party against whom enforcement of any waiver, change, discharge or termination is sought.

5.01    <u>Statements by Trustor</u>.  Trustor, upon fifteen (15) days' written request shall furnish a duly acknowledged written statement setting forth the amount of the debt secured by this Deed of Trust and stating either that there are no known offsets or defenses existing against the debt, or if such known offsets or defenses are alleged to exist, the nature thereof.

5.02    <u>Repayment</u>.  In the event that Trustor fully satisfies its obligations under the Note, in lawful money of the United States of America, and pays all moneys herein agreed to be paid by Trustor, and the interest thereon, and also the reasonable expenses of this trust, as herein specified, then Trustee at the request and expense of Trustor, shall reconvey to Trustor, Trustor's successors or assigns, all the estate in the Property granted to Trustee by this instrument.

5.03    <u>Change in Taxation Method</u>.  In the event of the passage after the date of this Deed of Trust of any law of the State of California, deducting from the value of land, for the purpose of taxation, any lien thereon, or changing in any way the laws now in force for the taxation of deeds of trust or debts secured by deeds of trust for state or local purposes or the manner of the collection of such taxes so as to cause the assessment of a tax on Beneficiary or a lien or charge on this Deed of Trust, the entire amount due under said Note, at the option of said Beneficiary, without demand or notice, forthwith shall become due and payable; provided, however, that such option shall be ineffective if Trustor is permitted by law to pay the whole of such tax, in addition to all other payments required hereunder and, if prior to such specified date, Trustor does pay such tax and agrees to pay any such tax when hereafter levied or assessed against the Property, and such agreement shall constitute a modification of this Deed of Trust.

5.04    <u>Substitution of Trustee</u>.  Beneficiary, from time to time, may substitute another Trustee in place of the Trustee named herein, to execute the trusts hereby created; and upon such appointment, and without conveyance to the successor trustee, the successor trustee shall be vested with all the title, interest, powers, duties and trusts in the Property hereby vested in or conferred upon Trustee herein named.  Each such appointment and substitution shall be made by written instrument executed by the Beneficiary containing reference to this Deed of Trust sufficient to identify it, which, when recorded in the office of the County Recorder of the county or counties in which the Property is situated, shall be conclusive proof of proper appointment of the successor trustee.  The recital or statements in any instrument executed by Trustee, in pursuance of any of said trusts of the due authorization of any agent of the Trustee executing the same, shall for all purposes be conclusive proof of such authorization.

5.05    Legal Proceedings by Trustee.   Trustee at any time, at Trustee's option, may commence and maintain suit in any court of competent jurisdiction and obtain the aid and direction of said court in the execution by it of the trusts or any of them, herein expressed or contained, and, in such suit, may obtain the orders or decrees, interlocutory or final of said court directing the execution of said trusts, and confirming and approving Trustee's acts, or any of them, or any sales or conveyance made by Trustee, and adjudging the validity thereof, and directing that the purchasers of the Property sold and conveyed be let into immediate possession thereof, and providing for orders of court or other process requiring the Sheriffs of the counties in which the Property is situated to place and maintain said purchasers in quiet and peaceable possession of the Property so purchased by them, and the whole thereof.

5.06    Reconveyance by Trustee.   Trustee, at any time, upon request of Beneficiary, may reconvey to Trustor or Trustor's successors or assigns, any portion of the Property without affecting the personal liability of any person for the payment of any of the Indebtedness, or the lien of this Deed of Trust upon the remainder of the Property not reconveyed.

5.07    No Estoppel.   Any failure of Trustee or Beneficiary to exercise any right or option by this Deed of Trust given or preserved to Trustee or Beneficiary shall not stop Trustee or Beneficiary from exercising any such right or option upon any subsequent default of Trustor.

5.08    Further Assurances.   Trustor, forthwith upon request, at any and all times hereafter, at the expense of Trustor, will cause to be made, executed, acknowledged and delivered to Trustee, any and every deed or assurance in law which Trustee or counsel of Trustee shall advise or require for the more sure, effectual and satisfactory granting and confirming of the Property unto Trustee.

5.09    Non-Liability of Trustee.   Trustee shall not be liable or responsible with respect to its acts or omissions hereunder, except for Trustee's own gross negligence or willful default, or be liable or responsible for any acts or omissions of any agent, attorneys or employee by it employed hereunder, if selected with reasonable care.

5.10    Release and Exchange of Collateral.   In the event that any change or changes occur in the title to all or any part of the Property, Beneficiary, from time to time, without notice to or consent of Trustor and without prejudice to any rights which Beneficiary may have against Trustor, may (a) take, exchange, or release any or all of the Collateral for any of the obligations now or hereafter secured hereby; or (b) extend the time for payment of the said obligations.

5.11    Successors and Assigns.   This Deed of Trust applies to, inures to the benefit of, and binds all parties hereto, their successors and assigns.

5.12    Construction.   This Deed of Trust shall be construed so that, wherever applicable and with reference to any of the parties hereto, the use of the singular number shall include the plural number, the use of the plural number shall include the singular number, the use of one gender shall include the neuter, masculine and feminine gender.

5.13    Notices.   Trustor requests that a copy of any notice of default and of any notice of sale hereunder shall be mailed to Trustor at the address set forth above which is Trustor's address.

13

SENIOR SECURED SUPER-PRIORITY
CONSTRUCTION DEED OF TRUST, SECURITY AGREEMENT
AND FIXTURE FILING WITH ASSIGNMENT OF RENTS

5.14 <u>Definitions</u>. Terms not otherwise defined herein shall have the meanings ascribed thereto in the Senior Secured Super-Priority Debtor-in-Possession Credit Agreement.

IN WITNESS WHEREOF, Trustor has executed this instrument the day and year first above written.

**CRESTLLOYD LLC**
a California limited liability company
By its Manager, SierraConstellation Partners, LLC


By:_____
        Larry Perkins,
        Chief Executive Officer of Manager

SENIOR SECURED SUPER-PRIORITY
CONSTRUCTION DEED OF TRUST, SECURITY AGREEMENT
AND FIXTURE FILING WITH ASSIGNMENT OF RENTS

69684429v5

## ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                    )
                                       )
COUNTY OF LOS ANGELES                  )


On _____, before me, _____, Notary

Public, personally appeared _____, who proved to me on the

basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within

instrument and acknowledged to me that he/she/they executed the same in his/her/their

authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or

the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that

the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature      _____


                                                          (SEAL)


15

# EXHIBIT A

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" 'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP,

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET; THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE

16

WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET FROM
THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID WESTERLY LINE
HAVING A LENGTH OF 115.83 FEET.

APN: **4369-026-021**

_____
Initials

17

SENIOR SECURED SUPER-PRIORITY
CONSTRUCTION DEED OF TRUST, SECURITY AGREEMENT
AND FIXTURE FILING WITH ASSIGNMENT OF RENTS

## EXHIBIT B

(1)      All machinery, equipment, materials (including building materials), appliances, and fixtures now or hereafter owned by and installed or placed on or in said land or buildings and improvements for the generation and distribution of air, water, heat, electricity, light, fuel or refrigeration or for ventilating or air conditioning purposes or for sanitary or drainage purposes or for the exclusion of vermin or insects or the removal of dust, refuse or garbage, and all elevators, awnings, window shades, drapery rods and brackets, screens, floor coverings, incinerators, carpeting and all furniture, fixtures, and other property used in the operation or occupancy of said land or buildings and improvements, together with all additions to, substitutions for, changes in or replacements of the whole or any part of any or all of said articles of property, and together with all property of the same character that Trustor may hereafter acquire at any time until the termination of this Deed of Trust and all proceeds received upon the sale, exchange, collection or other disposition of the foregoing.

(2)      All intangible property and rights relating to that land or the operation thereof, or used in connection therewith, including but not limited to all governmental permits relating to construction on said land.

(3)      All reserves, deferred payments, deposits, refunds, cost savings and payments of any kind relating to the construction of any improvements on said land.

(4)      All water stock relating to said property.

(5)      All causes of action, claims, compensation and recoveries for any damage, condemnation or taking of said property, or for any conveyance in lieu thereof, whether direct or consequential, or for any damage or injury to said property, or for any loss or diminution in value of said property.

(6)      All plans and specifications prepared for construction of buildings and improvements on said land and all studies, data and drawings related thereto; and also all contracts and agreements of the Trustor relating to the aforesaid plans and specifications or to the aforesaid studies, data and drawings or to the construction of buildings and improvements on said land.

(7)      All monies on deposit for the payment of real estate taxes or special assessments against said property or for the payment of premiums on policies of fire and other hazard insurance covering the property described herein or said land.

_____
Initials

SENIOR SECURED SUPER-PRIORITY
CONSTRUCTION DEED OF TRUST, SECURITY AGREEMENT
AND FIXTURE FILING WITH ASSIGNMENT OF RENTS

69684429v5

# EXHIBIT "C"

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "**Agreement**"), dated as December ___, 2021, between **CRESTLLOYD, LLC**, a California limited liability company ("**Borrower**"), debtor and debtor in possession in a pending Chapter 11 bankruptcy case commenced on October 26, 2021 ("**Petition Date**"), and **HANKEY CAPITAL, LLC**, a California limited liability company ("**Lender**").

WHEREAS, Borrower has entered into a Senior Secured Super-Priority Debtor In Possession Credit Agreement dated as of December ___, 2021 (as amended and in effect from time to time, the "**Credit Agreement**"), with Lender, pursuant to which Lender, subject to the terms and conditions contained therein, has agreed to provide debtor in possession financing to Borrower;

WHEREAS, it is a condition precedent to Lender making any loans or otherwise extending credit to Borrower under the Credit Agreement that Borrower execute and deliver to Lender a security agreement in substantially the form hereof; and

WHEREAS, Borrower wishes to grant security interests in favor of Lender as herein provided.

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **DEFINITIONS.**

(a)    All capitalized terms used herein without definitions shall have the respective meanings provided therefor in the Credit Agreement.

(b)    The following terms shall have the following meanings:

"**Commercially Reasonable Efforts**" means efforts that are commercially reasonable but in no event require the making of payments or material concessions.

"**Commercial Tort Claims**" shall have the meaning provided in the UCC except it shall refer only to such claims that have been asserted in judicial proceedings.

"**Event of Default**" shall have the meaning provided in the Credit Agreement.

"**Excluded Collateral**" means (1) any property in which Borrower now or hereafter has rights, to the extent in each case, a security interest may not be granted by Borrower in such property as a matter of applicable law, or under the effective terms of the governing document applicable thereto, without the consent of one or more parties thereto other than Borrower, but only for so long as such consent has not been obtained; (2) assets subject to capital leases, purchase money financing and cash to secure letter of credit reimbursement obligations to the extent such capital leases, purchase money financing or letters of credit are permitted under the Credit Agreement; (3) assets sold to a Person in compliance with the Credit Agreement; (4) [reserved];

1

(5) vehicles and other goods subject to a certificate of title; and (6) Avoidance Actions, except that (i) actions under Bankruptcy Code section 549 (and the proceeds thereof) shall be included in the Collateral to the extent they concern the recovery of what was, before the avoided transfer, any of the Collateral, and (ii) any lien or security interest avoided pursuant to Bankruptcy Code sections 550, 551 and/or 552 shall have the same priority as such avoided lien.  Notwithstanding the foregoing any and all proceeds of Excluded Collateral to the extent that the proceeds are not themselves Excluded Collateral shall be Collateral.

**"Excluded Deposit Accounts"** means (1) any deposit account for which Borrower, the depositary bank and Lender have entered into a cash collateral agreement specially negotiated among Borrower, the depositary bank and Lender for the specific purpose set forth therein, and (2) any deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's salaried employees in connection with its operation as a debtor in possession in the Chapter 11 Case.

**"Foreign Subsidiary"** means any Subsidiary of Borrower that is organized under the laws of a jurisdiction other than the United States of America or any State thereof or the District of Columbia.

**"Possessory Collateral"** means certificated securities, tangible chattel paper, instruments or goods evidenced by a negotiable document.

**"Security Documents"** means the Senior Secured Super-Priority Construction Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents, this Agreement, the Credit Agreement, and any other Loan Document purporting to grant a Lien to Lender, and in each case, as same may be supplemented by the Final Order.

**"State"** means the State of California.

**"UCC"** means the Uniform Commercial Code as in effect from time to time in the State; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of Lender's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions relating to such perfection or priority and for purposes of definitions relating to such provisions.

## 2.    GRANT OF SECURITY INTEREST.

**2.1    Grant; Collateral Description.**  Borrower hereby grants and pledges to Lender, to secure the payment and performance in full of all the Obligations, a security interest in all personal and fixture property whether governed by Article 9 of the UCC or other law, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (collectively the **"Collateral"**), including without limitation:

        (i)    accounts (including health-care-insurance receivables);

        (ii)    chattel paper (whether tangible or electronic);

(iii)    Commercial Tort Claims;

(iv)    Deposit Accounts;

(v)    Plans and Specifications relating in any way to, or for use in constructing improvements on, 944 Airole Way, Los Angeles, California;

(vi)    goods (including inventory, equipment, and any accessions thereto) ;

(vii)    instruments (including promissory notes);

(viii)    investment property;

(ix)    letter of credit rights (whether the letter of credit is evidenced by writing);

(x)    money;

(xi)    Building Materials, including the elevator, intended for use in or to be affixed to improvements at 944 Airole Way, Los Angeles, California;

(xii)    general intangibles (including payment intangibles and including the patents, trademarks and other intellectual property rights listed in Exhibit A);

(xiii)    insurance and insurance claims; and

(xiv)    supporting obligations and proceeds.

Notwithstanding the foregoing, in no event shall Collateral include Excluded Collateral, provided however, that all proceeds of Excluded Collateral shall be Collateral to the extent that the proceeds are not themselves Excluded Collateral.

**3.    AUTHORIZATION TO FILE FINANCING STATEMENTS.**  Notwithstanding the automatic perfection of any security interest granted hereunder pursuant to the order of the Bankruptcy Court under the Final Order or other order of the Bankruptcy Court in the Chapter 11 Case, Borrower hereby irrevocably authorizes Lender at any time and from time to time to file in any UCC jurisdiction, financing statements (including amendments and continuations thereto) that (a) indicate the Collateral (i) as all assets of Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether Borrower is an organization, the type of organization and any organization identification number issued to Borrower (if required by the applicable jurisdiction) and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates.  Borrower agrees to furnish any such information to Lender promptly upon Lender's request.  Borrower also ratifies its authorization for Lender to have filed in any UCC jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

SECURITY AGREEMENT

4.    **OTHER ACTIONS.**    Further, and notwithstanding the automatic perfection of any security interest granted hereunder pursuant to the order of the Bankruptcy Court under the Final Order or other order of the Bankruptcy Court in the Chapter 11 Case, to further ensure the attachment, perfection and first priority of, and the ability of Lender to enforce, Lender's security interest in the Collateral (subject to Permitted Liens), Borrower agrees, in each case at Borrower's own expense, to take the following actions with respect to the following Collateral:

4.1    **Commercial Tort Claims.**    If Borrower shall at any time hold or acquire a Commercial Tort Claim, Borrower shall immediately notify Lender in a writing signed by Borrower of the particulars thereof and grant to Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Lender.

4.2    **Other Actions as to Collateral.**    Borrower further agrees, upon request of Lender and at Lender's option, to take any and all other actions as Lender may determine to be necessary or useful for the attachment, perfection and first priority (subject to Permitted Liens) of, and the ability of Lender to enforce, Lender's security interest in any and all of the Collateral, including (a) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC of any relevant jurisdiction, to the extent, if any, that Borrower's signature is required, (b) [reserved], (c) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Lender to enforce, Lender's security interest in such Collateral, (d) using Commercially Reasonable Efforts to obtain governmental and other third-party waivers, consents and approvals in form and substance satisfactory to Lender, including any consent of any licensor, lessor or other person obligated on Collateral and any party or parties whose consent is required for the security interest of Lender to attach, (e) using Commercially Reasonable Efforts to obtain waivers from mortgagees and landlords who may have liens on fixtures in form and substance satisfactory to Lender and (f) taking all actions under any other law, as reasonably determined by Lender to be applicable in any relevant UCC or other jurisdiction, including any foreign jurisdiction.

5.    **RESERVED.**

6.    **RESERVED.**

7.    **COVENANTS CONCERNING BORROWER'S LEGAL STATUS.**    Borrower covenants with Lender as follows: Borrower shall provide notice to Lender within 10 days (i) after (a) changes to Borrower's name, and (b) changes to Borrower's type of organization, jurisdiction of organization or other legal structure, and (ii) following changes to Borrower's organizational identification number if it has one or if it obtains an organizational identification number (if it does not yet have one).

8.    **REPRESENTATIONS AND WARRANTIES CONCERNING COLLATERAL, ETC.**  Borrower further represents and warrants to Lender as follows: (a) Borrower is the owner of the Collateral, free from any right or claim of any person or any adverse lien, security interest or other encumbrance, except for the security interest created by this Agreement and Permitted Liens, (b) [reserved], and (c) none of the account debtors or other persons obligated on any of the

Collateral is a governmental authority owing in excess of $10,000.00 annually, covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral.

**9.      COVENANTS CONCERNING COLLATERAL, ETC.**  Borrower further covenants with Lender as follows: (a) other than in the ordinary course of business the Collateral, to the extent not delivered to Lender pursuant to Section 4 hereof, will be kept at Borrower's principal place of business and Borrower will not remove a material portion of the Collateral from such location, without providing at least 30 days prior written notice to Lender, (b) except for the security interest herein granted and Permitted Liens, Borrower shall be the owner of the Collateral free from any right or claim of any other person or any lien, security interest or other encumbrance, and Borrower shall defend the Collateral against all claims and demands of all persons at any time claiming the Collateral or any interests therein materially adverse to Lender, (c) Borrower shall not pledge, mortgage or create, or suffer to exist any right of any person in or claim by any person to the Collateral, or any security interest, lien or other encumbrance in the Collateral in favor of any person, or become bound (as provided in Section 9-203(d) of the UCC of the State or any other relevant jurisdiction or otherwise) by a security agreement in favor of any person as secured party, other than Lender and Permitted Liens, (d) Borrower will keep the Collateral in good order and repair, (e) Borrower will permit Lender, or its designee, to inspect the Collateral at any reasonable time, wherever located, (f) except and to the extent as otherwise explicitly provided in the Credit Agreement, Borrower will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement, (g) Borrower will continue to operate its business in compliance with all laws as required by the Credit Agreement, and (h) other than in the ordinary course of business, or pursuant to the order of the Bankruptcy Court, Borrower, will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except and to the extent as permitted by the Credit Agreement.

**10.     INSURANCE.**

**10.1     Maintenance of Insurance.**  Lender has been advised and understands that as of the date of execution of this document, insufficient insurance coverage exists on the Property and that Borrower is using best efforts to procure sufficient coverage.  Subject to the foregoing, Borrower will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as is required by Section 8.2(f) of the Credit Agreement.  Such insurance shall be in such minimum amounts that Borrower will not be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to Lender.  In addition, all such insurance shall be payable to Lender as loss payee under a "standard" loss payee clause.  Without limiting the foregoing, Borrower will (i) keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with electronic data processing coverage, in an amount approved in writing by Lender, (ii) maintain all such workers' compensation or similar insurance as may be required by law and (iii) maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death or property damage occurring on, in or about the properties of Borrower.

**10.2    Insurance Proceeds.**  The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights, if any, of other parties with an interest having priority in the property covered thereby, (i) unless an Event of Default has occurred and is continuing, be disbursed to Borrower for direct application by Borrower solely to the repair or replacement of Borrower's property so damaged or destroyed, and (ii) in all other circumstances, be held by Lender as cash collateral for the Obligations.  Lender may, at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as Lender may reasonably prescribe, for direct application by Borrower solely to the repair or replacement of Borrower's property so damaged or destroyed, or Lender may apply all or any part of such proceeds to the Obligations with the commitment (if not then terminated) being reduced by the amount so applied to the Obligations.

**10.3    Continuation of Insurance.**  All policies of insurance shall provide for the insurer to endeavor to provide for at least 30 days prior written cancellation notice to Lender.  In the event of failure by Borrower to provide and maintain insurance as herein provided, Lender may, at its option, provide such insurance and charge the amount thereof to Borrower.  Borrower shall furnish Lender with certificates of insurance and policies evidencing compliance with the foregoing insurance provision.

## 11.    COLLATERAL PROTECTION EXPENSES; PRESERVATION.

**11.1    Expenses Incurred By Lender.**  At Lender's discretion after an Event of Default has occurred and is continuing, Lender may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, make repairs thereto and pay any necessary filing fees or insurance premiums, in each case to the extent that Borrower fails to do so.  Borrower agrees to reimburse Lender on demand for all expenditures so made.  Lender shall have no obligation to Borrower to make any such expenditures, nor shall the making thereof be construed as a waiver or cure of any Event of Default.

**11.2    Limitations on Lender's Obligations And Duties.**  Anything herein or in the Credit Agreement to the contrary notwithstanding, Borrower shall remain obligated and liable under each contract or agreement that constitutes the Collateral.  Lender shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by Lender of any payment relating to any of the Collateral, nor shall Lender be obligated in any manner to perform any of the obligations of Borrower under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by Lender in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to Lender or to which Lender may be entitled at any time or times.  Lender's sole duty with respect to the custody, safe keeping and physical preservation of the Collateral in its possession, under § 9-207 of the UCC of the State or otherwise, shall be to deal with such Collateral in the same manner as Lender deals with similar property for its own account.  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, Lender shall not be obligated to enter into any mortgage, authorize any fixture filing, enter into any agreement providing "control" as defined in Sections 9-104, 9-105, 9-106 and 9-107 of the UCC as in effect in any relevant jurisdiction or to undertake any registration in respect of assets subject to a certificate of

title, it being understood that and all such Liens and security interests shall nonetheless be deemed fully and automatically perfected.

**12.    SECURITIES AND DEPOSITS.**  Lender may at any time after an Event of Default has occurred and is continuing, at its option, transfer to itself or any nominee any securities constituting Collateral, receive any income thereon and hold such income as additional Collateral or apply it to the Obligations.  Whether or not any Obligations are due, Lender may after an Event of Default has occurred and is continuing demand, sue for, collect, or make any settlement or compromise which it deems desirable with respect to the Collateral.  After an Event of Default has occurred and is continuing, regardless of the adequacy of Collateral or any other security for the Obligations, any deposits or other sums at any time credited by or due from Lender to Borrower may at any time be applied to or set off against any of the Obligations.

**13.    NOTIFICATION TO ACCOUNT DEBTORS AND OTHER PERSONS OBLIGATED ON COLLATERAL.**  After an Event of Default has occurred and is continuing, Borrower shall, at the request and option of Lender, notify account debtors and other persons obligated on any of the Collateral of the security interest of Lender in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to Lender or to any financial institution designated by Lender as Lender's agent therefor, and Lender may itself, after an Event of Default has occurred and is continuing, without notice to or demand upon Borrower, so notify account debtors and other persons obligated on the Collateral. After the making of such a request or the giving of any such notification, Borrower shall hold any proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by Borrower as trustee for Lender without commingling the same with other funds of Borrower and shall turn the same over to Lender in the identical form received, together with any necessary endorsements or assignments.  Lender shall apply the proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by Lender to the Obligations, such proceeds to be immediately credited after final payment in cash or other immediately available and irrevocable funds of the items giving rise to them.

**14.    POWER OF ATTORNEY.**

    **14.1    Appointment and Powers of Lender.**  Borrower hereby irrevocably appoints Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full power and authority in the place of Borrower or in Lender's own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or useful to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of Borrower, without notice to or assent by Borrower, to do the following, after an Event of Default has occurred and is continuing: generally to sell, transfer, pledge, make any agreement with respect to or otherwise dispose of or deal with any of the Collateral in such manner as is consistent with the UCC of the State or any other relevant jurisdiction and as fully and completely as though Lender were the absolute owner thereof for all purposes, and to do at Borrower's expense, at any time, or from time to time, all acts and things which Lender deems necessary or advisable to protect, preserve or realize upon the Collateral and Lender's security interest therein, in order to effect the intent of this Agreement, all as fully and effectively as Borrower might do, including, without limitation, (i) the filing and

SECURITY AGREEMENT

prosecuting of registration and transfer applications with the appropriate federal or local agencies or authorities with respect to trademarks, copyrights and patentable inventions and processes, (ii) upon written notice to Borrower, the exercise of voting rights with respect to voting securities, which rights may be exercised, if Lender so elects, with a view to causing the liquidation in a commercially reasonable manner of assets of the issuer of any such securities, and (iii) the execution, delivery and recording, in connection with any sale or other disposition of any Collateral, of the endorsements, assignments or other instruments of conveyance or transfer with respect to such Collateral.

**14.2    Ratification by Borrower.**    To the extent permitted by law, Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  This power of attorney is a power coupled with an interest and is irrevocable.

**14.3    No Duty on Lender.**    The powers conferred on Lender hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers.  Lender shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to Borrower for any act or failure to act, except for Lender's own gross negligence or willful misconduct.

**15.    REMEDIES.**  After an Event of Default has occurred and is continuing, Lender shall, subject to entry of an order of the Bankruptcy Court presiding over Borrower's pending bankruptcy case, without any other notice to or demand upon Borrower other than as expressly required under the Credit Agreement and the Final Order or another order of the Bankruptcy Court, thereafter have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies set forth in the other Security Documents and of a secured party under the UCC of the State or any other relevant jurisdiction and any additional rights and remedies as may be provided by applicable law, including the right to take possession of the Collateral, and for that purpose Lender may, so far as Borrower can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom.  Lender may at its discretion require Borrower to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of Borrower's principal office(s) or at such other locations as Lender may reasonably designate.  Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender shall give to Borrower at least 10 days prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made.  Borrower hereby acknowledges that 10 Business Days prior written notice of such sale or sales shall be reasonable notice.  In addition, Borrower waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Lender's rights and remedies hereunder, including, without limitation, Lender's right after an Event of Default has occurred and is continuing to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.  Notwithstanding anything herein to the contrary, after an Event of Default, Lender may elect to proceed in accordance with California Commercial Code Section 9604.

**16.    STANDARDS FOR EXERCISING REMEDIES.**  To the extent that applicable law imposes duties on Lender to exercise remedies in a commercially reasonable manner, Borrower acknowledges and agrees that it is not commercially unreasonable for Lender (a) to fail to incur

expenses reasonably deemed significant by Lender to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third-party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as Borrower, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure Lender against risks of loss, collection or disposition of Collateral or to provide to Lender a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by Lender, to obtain the services of brokers, investment bankers, consultants and other professionals to assist Lender in the collection or disposition of any of the Collateral.  Borrower acknowledges that the purpose of this Section 16 is to provide nonexhaustive indications of what actions or omissions by Lender would not be commercially unreasonable in Lender's exercise of remedies against the Collateral and that other actions or omissions by Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 16.  Without limitation upon the foregoing, nothing contained in this Section 16 shall be construed to grant any rights to Borrower or to impose any duties on Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 16.

**17.    NO WAIVER BY LENDER, ETC.**  Lender shall not be deemed to have waived any of its rights upon or under the Obligations or the Collateral unless such waiver shall be in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion.  All rights and remedies of Lender with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as Lender deems expedient.

**18.    SURETYSHIP WAIVERS BY BORROWER.**  Borrower waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered, or other action taken in reliance hereon and all other demands and notices of any description.  With respect to both the Obligations and the Collateral, Borrower assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising or adjusting of any thereof, all in such manner

9

and at such time or times as Lender may deem advisable.  Lender shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in Section 11.2 hereof.  Borrower further waives any and all other suretyship defenses.

19.    **MARSHALING.**  Lender shall not be required to marshal any present or future collateral security (including but not limited to this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent that it lawfully may, Borrower hereby agrees that it will not invoke any law relating to the marshaling of collateral under this Agreement or under any other instrument, and, to the extent that it lawfully may, Borrower hereby irrevocably waives the benefits of all such laws.

20.    **PROCEEDS OF DISPOSITIONS; EXPENSES.**  Borrower shall pay to Lender on demand amounts equal to any and all expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred or paid by Lender in protecting, preserving or enforcing Lender's rights under or in respect of any of the Obligations or any of the Collateral.  After deducting all of said expenses, the residue of any proceeds of collection or sale of the Obligations or Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference as Lender may determine or in such order or preference as is provided in the Credit Agreement, proper allowance and provision being made for any Obligations not then due.  Upon the final payment and satisfaction in full of all the Obligations and termination of the Commitment, and after making any payments required by the UCC of the State, any excess shall be returned to Borrower, and Borrower shall remain liable for any deficiency in the payment of the Obligations.

21.    **OVERDUE AMOUNTS.**  Until paid, all amounts due and payable by Borrower hereunder shall be an Obligation secured by the Collateral and shall bear, whether before or after judgment, interest at the applicable rate of interest set forth in the Credit Agreement.

22.    **GOVERNING LAW; CONSENT TO JURISDICTION.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE.**  Borrower agrees that any suit for the enforcement of this Agreement may be brought in the courts of the State or any Federal court (including the Bankruptcy Court) sitting therein and consents to the nonexclusive jurisdiction of such court and to service of process in any such suit being made upon Borrower by mail at the address specified in Section 11.10 of the Credit Agreement.  Borrower hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

23.    **WAIVER OF JURY TRIAL.**  BORROWER WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.  Except as prohibited by law, Borrower waives any right which it may have to claim or recover in

SECURITY AGREEMENT

any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages. Borrower (i) certifies that neither Lender nor any representative, agent or attorney of Lender has represented, expressly or otherwise, that Lender would not, in the event of litigation, seek to enforce the foregoing waivers, and (ii) acknowledges that, in entering into the Credit Agreement and the other Loan Documents to which Lender is a party, Lender is relying upon, among other things, the waivers and certifications contained in this Section 23.

**24.    MISCELLANEOUS.**  The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof.  This Agreement and all rights and obligations hereunder shall be binding upon Borrower and its respective successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.  If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby, and this Agreement shall be construed and be enforceable as if such invalid, illegal or unenforceable term had not been included herein.  Borrower acknowledges receipt of a copy of this Agreement.

**25.    TERMINATION.**  Upon the indefeasible payment in full of the Obligations, including the cash collateralization, expiration, or cancellation of all Obligations, if any, consisting of letters of credit, and termination of the Commitment, the security interests granted herein shall automatically terminate and all rights to the Collateral shall revert to Borrower.  Upon any such termination, Lender will, at Borrower's expense, execute and deliver to Borrower such documents as Borrower shall reasonably request to evidence such termination.  Such documents shall be prepared by Borrower and shall be in form and substance reasonably satisfactory to Lender.

**26.    NOTICES.**  Notices hereunder shall be given as provided in Section 11.10 of the Credit Agreement.

IN WITNESS WHEREOF, intending to be legally bound, Borrower and Lender have caused this Agreement to be duly executed as of the date first above written.

*[Signature Page Follows]*

**BORROWER:**

CRESTLLOYD LLC,
a California limited liability company
By its Manager, SierraConstellation Partners, LLC


By: _____
    Larry Perkins,
    Chief Executive Officer of Manager


**LENDER:**

HANKEY CAPITAL, LLC,
a California limited liability company


By:_____
Name: _____
Title: _____

# EXHIBIT "D"

1   DAVID B. GOLUBCHIK (State Bar No. 185520)
    TODD M. ARNOLD (State Bar No. 221868)
2   LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3   2818 La Cienega Avenue
    Los Angeles, California 90034
4   Telephone: (310) 229-1234
    Facsimile: (310) 229-1244
5   Email: dbg@lnbyg.com; tma@lnbyg.com

6   Attorneys for Debtor and Debtor in Possession

7

8                    UNITED STATES BANKRUPTCY COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                        LOS ANGELES DIVISION

11

12  In re:                              Case No.: 2:21-bk-18205-DS

13  CRESTLLOYD, LLC,                    Chapter 11 Case

14        Debtor and Debtor in Possession.   **INTERIM ORDER:**
                                         **(I)    AUTHORIZING DEBTOR TO OBTAIN**
15                                              **SENIOR SECURED POSTPETITION**
                                                **FINANCING PURSUANT TO SECTION 364**
16                                              **OF THE BANKRUPTCY CODE,**
                                         **(II)   GRANTING SUPER-PRIORITY**
17                                              **ADMINISTRATIVE CLAIMS AND SENIOR**
                                                **LIENS,**
18                                       **(III)  SCHEDULING A FINAL HEARING, AND**
19                                       **(IV)   GRANTING RELATED RELIEF**

20

21                                       Hearing:
                                          Date:    _____
22                                          Time:    _____
                                          Place:   Courtroom 1639
23                                                  255 E. Temple St.
24                                                  Los Angeles, CA 90012
                                                  **VIA ZOOMGOV ONLY**
25

26

27

28

                                    1

1    A hearing was held at the above-referenced date, time, and location to consider the *Motion*

2   *For Entry Of Interim And Final Orders: (I) Authorizing Debtor To Obtain Senior Secured Postpetition*

3   *Financing Pursuant To Section 364 Of The Bankruptcy Code, (II) Granting Super-Priority*

4   *Administrative Claims And Senior Liens, (III) Scheduling A Final Hearing, And (IV) Granting Related*

5   *Relief* (the "Motion") [Dkt. __] filed by Crestlloyd, LLC, the Chapter 11 debtor and debtor in

6    possession herein (the "Debtor"), pursuant to Local Bankruptcy Rules ("LBR") 4001-2 and 9075-1,

7    Federal Rule of Bankruptcy Procedure ("FRBP") 2002, 4001, and 9014, and sections 105(a), 361, 362,

8    and 364 of chapter 11 of title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code").[1]

9    Appearances were made as set forth on the record of the Court.

10    Pursuant to the Motion, the Debtor sought the entry of an interim order (the "Interim

11    Order") and a final order (the "Final Order" and, with the Interim Order, the "Financing Orders"),

12    among other things:

13    (1)    Authorizing the Debtor, as borrower, to obtain postpetition financing up to the

14    principal amount of $12 million (the "DIP Loan"), with that amount available under the Interim Order,

15    from Hankey Capital, LLC or its designee ("Hankey" or the "Lender"), as lender, pursuant to the

16    terms of the Senior Secured Super-Priority Debtor in Possession Credit Agreement (the "Loan

17    Agreement") attached to the Motion as **Exhibit "2,"** and the related Promissory Note (the "Note")

18    attached to the Loan Agreement as **Exhibit "A,"**  Senior Secured Superior-Priority Construction Deed

19    of Trust, Security Agreement and Fixture Filing with Assignment of Rents (the "Deed of Trust")

20    attached to the Loan Agreement as **Exhibit "B,"**  Security Agreement – Senior Super-Priority Lien

21    (the "Security Agreement") attached to the Loan Agreement as **Exhibit "C,"** and all other related

22    documents and agreements (collectively, the "DIP Loan Documents")[2] to pay the Debtor's expenses,

23    including those required to maintain the Debtor's real property located at 944 Airole Way, Los

24    Angeles, CA 90077 (the "Real Property"), as set forth in the budget attached to the Motion as **Exhibit**

25    **"3"** (the "Budget");

26

27    _____

[1] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

28    [2] All summaries and descriptions of the terms of the DIP Loan Documents are for informational purposes only.  If there are any inconsistencies between the summaries and descriptions of the terms of the DIP Loan Documents herein and the actual provisions of the DIP Loan Documents, the terms of the DIP Loan Documents shall control.

(2)    Authorizing and empowering the Debtor to execute and enter into the DIP Loan Documents, and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(3)    Providing, pursuant to Sections 364(c) and (d), that the obligations under the Loan Agreement and DIP Loan Documents, including, without limitation, principal, accrued interest, unpaid reasonable fees and expenses incurred by Lender in connection with the DIP Loan, and all other obligations and amounts due from time to time under the Loan Agreement be and be deemed (a) an allowed super-priority administrative claim subject in priority only to the Carve Out (as defined in the DIP Loan Documents and discussed in the Motion) (the "Super-Priority Claim") and (b) immediately secured by (i) a valid, binding, continuing, enforceable, fully perfected and unavoidable first position security interest and lien upon the Debtor's Real Property and all rents, profits and proceeds therefrom (the "Real Property Lien"), subject in priority only to the Carve Out, and (ii) valid, binding, continuing, enforceable, fully perfected and unavoidable first position security interests and liens upon all of the Debtor's personal property (the "Personal Property" and, with the Real Property, the "Collateral"), other than claims and causes of action under Chapter 5 of the Bankruptcy Code and the proceeds thereof, except that (y) actions under Section 549 (and the proceeds thereof) shall be included in the Collateral to the extent they concern the recovery of what was, before the avoided transfer, any of the Collateral, and (z) any lien or security interest avoided pursuant to any or all of Sections 550, 551 and 552 shall have the same priority as such avoided lien (the "Personal Property Liens" and, with the Real Property Lien, the "DIP Liens"), subject in priority only to the Carve Out, with such DIP Liens effective immediately upon the entry of the Interim Order without the Lender being required to take any action or to record or file any Deeds of Trust or UCC Financing Statements, provided that the Lender shall be authorized to do so;

(4)    Vacating and modifying the automatic stay imposed by Section 362 solely to the extent necessary to permit the creation and perfection of the DIP Liens in and to the Collateral and to perform the obligations under the DIP Loan Documents;

(5)    Finding that adequate notice of the Motion has been provided;

3

1    (6)    Finding that the Lender has acted in good faith in connection with the DIP Loan

2    Documents and is entitled to the protections afforded under Section 364(e);

3    (7)    Scheduling, pursuant to FRBP 4001, a final hearing (the "Final Hearing") before

4    this Court to consider entry of the Final Order approving the DIP Loan on a final basis;

5    (8)    Waiving any applicable stay, including under FRBP 4001(c) and providing for the

6    immediate effectiveness of the Interim Order; and

7    (9)    Granting related relief.

8    Upon consideration of the Motion, all papers filed in support of the Motion, the Notice of

9    the Motion, any oppositions to the Motion and any replies thereto, the arguments and comments of

10    counsel at the hearing on the Motion, and for good cause shown,

11    **THE COURT HEREBY FINDS AS FOLLOWS:**

12    A.    This Court has jurisdiction over the Debtor's case, the Motion, and the parties and

13    property affected thereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion

14    constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A) and (D).  Venue is proper before

15    this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

16    B.    Notice of the Motion, the relief requested therein, and the interim hearing on the

17    Motion was served by the Debtor on its twenty largest unsecured creditors, all known secured

18    creditors, the United States Trustee for the Central District of California, and any parties who have

19    requested special notice in this case.  Under the circumstances, the notice given by the Debtor of the

20    Motion, the relief requested therein, and the interim hearing on the Motion constitutes due and

21    sufficient notice thereof and complies with FRBP 4001(c) and any other applicable notice

22    requirements under the FRBP and LBRs.

23    C.    The Debtor has an immediate need to obtain the DIP Loan from the Lender to pay

24    for the expenses contained in the Budget.  Payment of such expenses is necessary to enable the Debtor

25    to avoid immediate, irreparable harm to the Debtor and its estate.

26    D.    The Debtor sought postpetition financing from a number of sources, including

27    certain existing alleged secured lenders.

28    E.    After reasonable inquiry, the Debtor was unable to obtain adequate credit solely

4

(1) allowable-under Section 503(b)(1) as an administrative expense, (2) with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b), (3) secured by a lien on property of the estate that is not otherwise subject to a lien, or (4) secured by a junior lien on property of the estate that is subject to a lien.

F.      To date, the best postpetition financing commitment and terms that have been provided to the Debtor are those offered by the Lender under the DIP Loan Documents.

G.      The terms of the DIP Loan are fair and reasonable, reflect the Debtor's reasonable exercise of its business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.

H.      The terms of the DIP Loan have been the subject of negotiations conducted in good faith and at arm's length between the Debtor and the Lender, and all of the Debtor's obligations and indebtedness to the Lender arising under or in connection with the DIP Loan have been extended by the Lender in "good faith" as such term is used in Section 364(e), and in express reliance upon the protections set forth therein, and the Lender is entitled to, and hereby granted, the full protection of Section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

I.      Any creditors with valid liens on the Collateral will be adequately protected by (1) an equity cushion in excess of 20% and (2) the use of the DIP Loan to fully insure and maintain and preserve the value of the Real Property while the Debtor pursues a near-term sale of the Real Property, for the benefit of creditors.

J.      The Debtor has requested immediate entry and the immediate effectiveness of this Interim Order pursuant to FRBP 4001(c)(2).  Absent granting the interim relief set forth in this Interim Order, the Debtor's estate will be immediately and irreparably harmed.

K.      Authorizing the Debtor to consummate the DIP Loan in accordance with this Interim Order to enable the Debtor to pay the expenses in the Budget is in the best interest of the Debtor's estate.

L.      Good cause has been shown for the entry of this Interim Order.

Based upon the foregoing findings and conclusions, and upon the record made before this

Court at the interim hearing, and good and sufficient cause appearing therefor, **THIS COURT HEREBY ORDERS, DETERMINES AND DECREES AS FOLLOWS:**

1.    The Motion is granted on the terms and conditions set forth in this Interim Order, with the foregoing findings incorporated herein by reference.  This Interim Order shall be valid and binding on all parties-in-interest and fully effective immediately upon its entry.  All objections to the Motion are overruled in their entirety.

2.    The Debtor is hereby authorized to borrow the DIP Loan, up to the principal amount of $12 million, from the Lender, pursuant to the DIP Loan Documents and to incur and perform all obligations under the DIP Loan Documents.

3.    The Debtor is hereby authorized and empowered to execute and enter into the DIP Loan Documents, and to perform such other and further acts as may be required in connection with the DIP Loan Documents.  Upon execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms.

4.    The Debtor is hereby authorized to use the proceeds from the DIP Loan to pay the Debtor's expenses as set forth in the Budget attached to the Motion as Exhibit "3."  The Debtor shall comply with the Budget, but may have a variance by line item and by time each weekly time period of fifteen percent (15.0%) per line item, with any negative variances to carry forward to the next weekly time period..

5.    Effective immediately upon entry of this Interim Order, and without the need to take any action or file or record any deeds of trust, financing statements or other documents, the obligations under the DIP Loan and DIP Loan Documents, including, without limitation, principal, accrued interest, unpaid reasonable fees and expenses, and all other obligations and amounts due from time to time under the Loan Agreement and DIP Loan Documents shall be, and are hereby deemed to be (a) an allowed Super-Priority Claim and (b) immediately secured by (i) a valid, binding, continuing, enforceable, fully perfected and unavoidable first position security interest and lien upon the Real Property and all rents, profits and proceeds therefrom (*i.e.,* the Real Property Lien), subject in priority only to the Carve Out, and (ii) valid, binding, continuing, enforceable, fully perfected and unavoidable first position security interests and liens upon all of the Personal Property, other than

6

claims and causes of action under Chapter 5 of the Bankruptcy Code and the proceeds thereof, except that (y) actions under Section 549 (and the proceeds thereof) shall be included in the Collateral to the extent they concern the recovery of what was, before the avoided transfer, any of the Collateral, and (z) any lien or security interest avoided pursuant to any or all of Sections 550, 551 and 552 shall have the same priority as such avoided lien (*i.e.*, the Personal Property Liens and, with the Real Property Lien, the DIP Liens), subject in priority only to the Carve Out.

6.    The Lender is authorized, but not required, to file or record financing statements, deeds of trust, mortgages, notices of lien or similar instruments in any jurisdiction, or take any other action in order to validate and perfect the DIP Liens granted to the Lender hereunder.  Regardless of whether the Lender shall in its sole discretion choose to file such financing statements, deeds of trust, mortgages, notices of lien or similar instruments, the DIP Liens are hereby deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Interim Order.  The automatic stay imposed by Section 362 is hereby vacated and modified solely to the extent necessary to permit the creation and perfection of the DIP Liens in and to the Collateral as set forth in this paragraph.

7.    The Debtor is prohibited from asserting claims arising under Section 506(c) against the Lender or commencing other actions adverse to the Lender's rights and remedies under the DIP Loan Documents.

8.    The Debtor is prohibited from incurring debt with priority equal to or greater than the Lender has under the DIP Loan Documents, except and to the extent as expressly provided in the DIP Loan Documents.

9.    The Debtor is prohibited from granting or imposing liens on the Collateral other than Permitted Liens (as defined in the DIP Loan Documents).

10.    Subject to Section 363(k), the Lender, with respect to the DIP Loan and any other allowed prepetition secured claim it has, shall have the right to "credit bid" up to the full allowed amount of its allowed secured claims in connection with any sale of the Real Property, including any sale occurring pursuant to Section 363 or included as part of a restructuring plan subject to

7

confirmation under Section 1129 or a sale or disposition by a chapter 7 trustee under Section 725 of the Bankruptcy Code or otherwise.

11.    The DIP Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to the DIP Loan Documents and this Interim Order shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Debtor (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of this Chapter 11 Case, or by any other act or omission whatsoever.

12.    The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit (a) the Debtor to grant the DIP Liens and the Super-Priority Claim, and to perform such acts as the Lender may reasonably request to assure the perfection and priority of the DIP Liens; and (b) the implementation of the terms of this Interim Order and the DIP Loan Documents.

13.    Except as otherwise provided in this Interim Order, the terms and provisions of this Interim Order shall, immediately upon entry of this Interim Order by this Court, become valid and binding upon the Debtor, the Lender, all creditors of the Debtor, the Official Committee of Unsecured Creditors if one is appointed, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtor's estate in this Chapter 11 Case or in any subsequent chapter 7 case.

14.    The terms of this Interim Order and any actions taken pursuant hereto, shall survive the entry of any order which may be entered: (a) confirming any plan in this Chapter 11 Case; (b) dismissing this Chapter 11 Case; (c) converting this Chapter 11 Case to any other chapter under the Bankruptcy Code; (d) withdrawing of the references of this Chapter 11 Case from the Bankruptcy Court; and (e) providing for abstention from handling or retaining of jurisdiction of this Chapter 11 Case in this Bankruptcy Court. The terms and provisions of this Interim Order as well as the protections granted pursuant to this Interim Order and the DIP Loan Documents, shall continue in full force and effect notwithstanding the entry of such order, and such protections shall maintain their priority as provided by this Interim Order until all the obligations of the Debtor to the Lender pursuant to the DIP Loan Documents are indefeasibly paid in full and discharged. The obligations of Debtor under the DIP

Loan Documents shall not be discharged by the entry of any order confirming a chapter 11 plan, the

Debtor having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code. The

Debtor shall not propose or support any plan that is not conditioned upon the payment in full in cash of

all of Debtor's obligations under the DIP Loan Documents on or prior to the effective date of such

plan.

15.    This Interim Order shall not be modified, amended or extended without the prior

written consent of Hankey, and no such consent shall be implied by any action, inaction or

acquiescence of Hankey.

16.    **A Final Hearing on the Motion shall be held on _____, 2021 at ___:___ __.m.,**
**at the above referenced location with appearances via ZoomGov only.  Any oppositions to the**
**Motion shall be filed and served by no later than _____.  Any replies to any oppositions to**
**the Motion shall be filed and served by no later than _____.**

17.    Any applicable stay, including under FRBP 4001(c), is hereby waived, and this

Interim Order is immediately effective.

**IT IS SO ORDERED.**

### 

9

# EXHIBIT "E"

## RESERVED

# EXHIBIT "F"

**Crestlloyd, LLC**
*Preliminary DIP Budget Forecast*
($USD)

First Projected Week: 12/17/2021 *Filed Ch 11 on 10/26*

| Forecast Period Counter | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| Week ending Friday | Week of 12/17/21 | Week of 12/24/21 | Week of 12/31/21 | Week of 1/7/22 | Week of 1/14/22 | Week of 1/21/22 | Week of 1/28/22 | Week of 2/4/22 | Week of 2/11/22 | Week of 2/18/22 | Week of 2/25/22 | Week of 3/4/22 | Week of 3/11/22 | 13-Week Total |
| Beginning Cash Balance | - | $ 6,084,564 | $ 4,309,262 | $ 3,567,172 | $ 2,807,582 | $ 2,383,192 | $ 2,116,102 | $ 1,831,912 | $ 1,470,259 | $ 1,311,069 | $ 1,044,579 | $ 928,679 | $ 752,779 | $ - |
| **Disbursements:** | | | | | | | | | | | | | | |
| Construction | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance | 4,000,000 | 983,213 | - | - | - | - | - | - | - | - | - | - | - | 4,983,213 |
| Property Taxes | 701,466 | - | - | - | - | - | - | - | - | - | - | - | - | 701,466 |
| Security, Cleaning, and General Carry | 130,320 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | - | 388,160 |
| Utilities | 60,000 | - | - | - | 57,300 | - | - | - | - | 57,300 | - | - | - | 174,600 |
| Furniture Rental | 60,000 | 50,000 | 25,000 | - | 50,000 | - | 25,000 | - | - | 50,000 | 25,000 | - | - | 285,000 |
| Repairs & Maintenance | 400,000 | 500,000 | 500,000 | 500,000 | 100,000 | 50,000 | 50,000 | 50,000 | 50,000 | - | - | - | - | 2,200,000 |
| Contingency / Other | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 100,000 | 100,000 | 100,000 | 50,000 | 50,000 | 50,000 | 50,000 | - | 1,250,000 |
| Total | 5,501,786 | 1,706,653 | 698,440 | 673,440 | 380,740 | 173,440 | 198,440 | 173,440 | 123,440 | 180,740 | 98,440 | 73,440 | - | 9,982,438 |
| **Restructuring Disbursements:** | | | | | | | | | | | | | | |
| Professional and UST Fees | 293,650 | 68,650 | 43,650 | 43,650 | 43,650 | 93,650 | 85,750 | 103,213 | 35,750 | 85,750 | 17,460 | 17,460 | 17,460 | 949,743 |
| Total Restructuring Disbursements | 293,650 | 68,650 | 43,650 | 43,650 | 43,650 | 93,650 | 85,750 | 103,213 | 35,750 | 85,750 | 17,460 | 17,460 | 17,460 | 949,743 |
| Total Disbursements Before Interest | 5,795,436 | 1,775,303 | 742,090 | 717,090 | 424,390 | 267,090 | 284,190 | 276,653 | 159,190 | 266,490 | 115,900 | 90,900 | 17,460 | 10,932,181 |
| **Interest and Fees:** | | | | | | | | | | | | | | |
| Interest & Fees (DIP) | 120,000 | - | - | 42,500 | - | - | - | 85,000 | - | - | - | 85,000 | - | 332,500 |
| Interest & Fees (Existing debt) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Interest and Fees | 120,000 | - | - | 42,500 | - | - | - | 85,000 | - | - | - | 85,000 | - | 332,500 |
| **Total Disbursements** | $ 5,915,436 | $ 1,775,303 | $ 742,090 | $ 759,590 | $ 424,390 | $ 267,090 | $ 284,190 | $ 361,653 | $ 159,190 | $ 266,490 | $ 115,900 | $ 175,900 | $ 17,460 | $ 11,264,681 |
| Ending Cash Balance Before DIP Draw | (5,915,436) | 4,309,262 | 3,567,172 | 2,807,582 | 2,383,192 | 2,116,102 | 1,831,912 | 1,470,259 | 1,311,069 | 1,044,579 | 928,679 | 752,779 | 735,319 | (11,264,681) |
| DIP Advances / (repayments) | 12,000,000 | - | - | - | - | - | - | - | - | - | - | - | - | 12,000,000 |
| **Ending Cash Balance** | $ 6,084,564 | $ 4,309,262 | $ 3,567,172 | $ 2,807,582 | $ 2,383,192 | $ 2,116,102 | $ 1,831,912 | $ 1,470,259 | $ 1,311,069 | $ 1,044,579 | $ 928,679 | $ 752,779 | $ 735,319 | $ 735,319 |
| **DIP Loan:** | | | | | | | | | | | | | | |
| Beginning Loan Balance | - | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | |
| Advances / (repayments) | 12,000,000 | - | - | - | - | - | - | - | - | - | - | - | - | 12,000,000 |
| Ending Loan Balance | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 |

# EXHIBIT "3"

**Crestlloyd, LLC**
*Preliminary DIP Budget Forecast*
($USD)

First Projected Week: 12/17/2021 *Filed Ch 11 on 10/26*

| Forecast Period Counter | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| Week ending Friday | Week of 12/17/21 | Week of 12/24/21 | Week of 12/31/21 | Week of 1/7/22 | Week of 1/14/22 | Week of 1/21/22 | Week of 1/28/22 | Week of 2/4/22 | Week of 2/11/22 | Week of 2/18/22 | Week of 2/25/22 | Week of 3/4/22 | Week of 3/11/22 | 13-Week Total |
| **Beginning Cash Balance** | - | $ 6,084,564 | $ 4,309,262 | $ 3,567,172 | $ 2,807,582 | $ 2,383,192 | $ 2,116,102 | $ 1,831,912 | $ 1,470,259 | $ 1,311,069 | $ 1,044,579 | $ 928,679 | $ 752,779 | $ - |
| **Disbursements:** | | | | | | | | | | | | | | |
| Construction | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance | 4,000,000 | 983,213 | - | - | - | - | - | - | - | - | - | - | - | 4,983,213 |
| Property Taxes | 701,466 | - | - | - | - | - | - | - | - | - | - | - | - | 701,466 |
| Security, Cleaning, and General Carry | 130,320 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | 23,440 | - | 388,160 |
| Utilities | 60,000 | - | - | - | 57,300 | - | - | - | - | - | 57,300 | - | - | 174,600 |
| Furniture Rental | 60,000 | 50,000 | 25,000 | - | 50,000 | - | 25,000 | - | - | 50,000 | 25,000 | - | - | 285,000 |
| Repairs & Maintenance | 400,000 | 500,000 | 500,000 | 500,000 | 100,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | - | - | - | 2,200,000 |
| Contingency / Other | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 100,000 | 100,000 | 100,000 | 50,000 | 50,000 | 50,000 | 50,000 | - | 1,250,000 |
| Total | 5,501,786 | 1,706,653 | 698,440 | 673,440 | 380,740 | 173,440 | 198,440 | 173,440 | 123,440 | 180,740 | 98,440 | 73,440 | - | 9,982,438 |
| **Restructuring Disbursements:** | | | | | | | | | | | | | | |
| Professional and UST Fees | 293,650 | 68,650 | 43,650 | 43,650 | 43,650 | 93,650 | 85,750 | 103,213 | 35,750 | 85,750 | 17,460 | 17,460 | 17,460 | 949,743 |
| Total Restructuring Disbursements | 293,650 | 68,650 | 43,650 | 43,650 | 43,650 | 93,650 | 85,750 | 103,213 | 35,750 | 85,750 | 17,460 | 17,460 | 17,460 | 949,743 |
| Total Disbursements Before Interest | 5,795,436 | 1,775,303 | 742,090 | 717,090 | 424,390 | 267,090 | 284,190 | 276,653 | 159,190 | 266,490 | 115,900 | 90,900 | 17,460 | 10,932,181 |
| **Interest and Fees:** | | | | | | | | | | | | | | |
| Interest & Fees (DIP) | 120,000 | - | - | 42,500 | - | - | - | 85,000 | - | - | - | 85,000 | - | 332,500 |
| Interest & Fees (Existing debt) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Interest and Fees | 120,000 | - | - | 42,500 | - | - | - | 85,000 | - | - | - | 85,000 | - | 332,500 |
| **Total Disbursements** | $ 5,915,436 | $ 1,775,303 | $ 742,090 | $ 759,590 | $ 424,390 | $ 267,090 | $ 284,190 | $ 361,653 | $ 159,190 | $ 266,490 | $ 115,900 | $ 175,900 | $ 17,460 | $ 11,264,681 |
| Ending Cash Balance Before DIP Draw | (5,915,436) | 4,309,262 | 3,567,172 | 2,807,582 | 2,383,192 | 2,116,102 | 1,831,912 | 1,470,259 | 1,311,069 | 1,044,579 | 928,679 | 752,779 | 735,319 | (11,264,681) |
| DIP Advances / (repayments) | 12,000,000 | - | - | - | - | - | - | - | - | - | - | - | - | 12,000,000 |
| **Ending Cash Balance** | $ 6,084,564 | $ 4,309,262 | $ 3,567,172 | $ 2,807,582 | $ 2,383,192 | $ 2,116,102 | $ 1,831,912 | $ 1,470,259 | $ 1,311,069 | $ 1,044,579 | $ 928,679 | $ 752,779 | $ 735,319 | $ 735,319 |
| **DIP Loan:** | | | | | | | | | | | | | | |
| Beginning Loan Balance | - | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | - |
| Advances / (repayments) | 12,000,000 | - | - | - | - | - | - | - | - | - | - | - | - | 12,000,000 |
| Ending Loan Balance | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 |

# EXHIBIT "4"

## Chicago Title Company

725 South Figueroa Street, Suite 200, Los Angeles, CA 90017
Phone: (213) 488-4300 ● Fax: (213) 488-4377

Issuing Policies of Chicago Title Insurance Company

ORDER NO.: **00166345-994-LT2-1TW**

Chicago Title Company / Los Angeles
725  S. Figueroa St., Suite 200
Los Angeles, CA 90017
ATTN:  Mike Slinger
Email:  mike.slinger@ctt.com
REF:

Main Office Line:  **(213) 488-4300**

Title Officer:  Ted Tan/Jennifer Wright (LA/Comm)
Title Officer Phone:  (213) 488-4394
Title Officer Fax:  (213) 488-4360
Title Officer Email:  TeamX77@ctt.com

PROPERTY:    **944 ARIOLE WAY, LOS ANGELES, CA**

## PRELIMINARY REPORT

*In response to the application for a policy of title insurance referenced herein,* **Chicago Title Company** *hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.*

*The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the policy forms should be read. They are available from the office which issued this report.*

*This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.*

*The policy(s) of title insurance to be issued hereunder will be policy(s) of Chicago Title Insurance Company, a Florida corporation.*

***Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.***

***It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.***

Chicago Title Company

By: _____
     Authorized Signature

By: *[signature]*
Randy Quirk
President

ATTEST *[signature]*
Marjorie Nemzura
Corporate Secretary

**Chicago Title Company**

725 South Figueroa Street, Suite 200, Los Angeles, CA 90017
Phone:  (213) 488-4300  ●  Fax:  (213) 488-4377

## PRELIMINARY REPORT

**EFFECTIVE DATE:**              **November 16, 2021 at 7:30 a.m.**

**ORDER NO.:  00166345-994-LT2-1TW**

The form of policy or policies of title insurance contemplated by this report is:

1.      THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO
COVERED BY THIS REPORT IS:

   **A Fee**

2.      TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS VESTED IN:

   CRESTLLOYD, LLC, a California limited liability company, in receivership by Order of the Superior Court
of California, County of Los Angeles, West District, Case No. 21SMCV01113, a certified copy thereof
being recorded July 20, 2021 as Instrument No. 2021-1113331 of Official Records, wherein Theodore
Lanes was duly appointed as receiver, subject to the terms, provisions and restrictions set out in said
Order.

3.      THE LAND REFERRED TO IN THIS REPORT IS DESCRIBED AS FOLLOWS:

   **See Exhibit A attached hereto and made a part hereof.**

# EXHIBIT "A"

# LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" 'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET; THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN:  **4369-026-021**

# EXCEPTIONS

**AT THE DATE HEREOF, ITEMS TO BE CONSIDERED AND EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM WOULD BE AS FOLLOWS:**

A.    Property taxes, including any personal property taxes and any assessments collected with taxes are as follows:

Tax Identification No.:    4369-026-021
Fiscal Year:    2021-2022
1st Installment:    $701,465.73, Unpaid and delinquent
Penalty:    $70,146.57
2nd Installment:    $701,465.71, Unpaid and delinquent
Penalty:    $70,156.57

Said property has been declared tax defaulted for non-payment of said delinquent taxes. See tax sale figures in Exception D below.

B.    Said property has been declared tax defaulted for non-payment of delinquent taxes for the fiscal year 2020

APN No.:    4369-026-021

Amounts to redeem for the above-stated fiscal year (and subsequent years if any) are:

Amount:    $1,787,349.33 by December 31, 2021

C.    An assessment by the improvement district shown below:

Series:    AD #1
District:    County of Los Angeles
For:    MRCA-Brush Fire Clear'g Dist #1
Bond issued:    August 6, 2003

Said assessment is collected with the county/city property taxes.

Said assessment is also disclosed by a Notice of Amended Assessment, recorded January 26, 2015 as Instrument No. 2015-089995 of Official Records.

D.    The herein described property lies within the boundaries of a Community Facilities District (CFD) as follows:

CFD No:    2016-1
For:    Fire Prevention, Wildlife Corridor and Open Space Protection and other associated purposes
Disclosed by:    Notice of Special Tax Lien
Recording Date:    January 13, 2017
Recording No.:    20170055098, Official Records

This property, along with all other parcels in the CFD, is liable for an annual special tax. This special tax is included with and payable with the general property taxes of the County of Los Angeles.

# EXCEPTIONS
## (Continued)

E.  The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

F.  The herein described property lies within the boundaries of a Community Facilities District (CFD) as follows:

| | |
|---|---|
| CFD No: | 2020-1 |
| For: | Local Fire Prevention, Water Quality and Open Space Measure and other associated purposes |
| Disclosed by: | Notice of Special Tax Lien |
| Recording Date: | February 10, 2021 |
| Recording No.: | 2021-0235371, Official Records |

This property, along with all other parcels in the CFD, is liable for an annual special tax. This special tax is included with and payable with the general property taxes of the County of Los Angeles.

1.  Water rights, claims or title to water, whether or not disclosed by the public records.

2.  Easement(s) for the purpose(s) shown below and rights incidental thereto as delineated or as offered for dedication, on the map of said Tract No. 22727:

| | |
|---|---|
| Purpose: | Drainage |
| Affects: | That portion of said land as shown on said map |

3.  Covenants, conditions and restrictions but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, citizenship, immigration status, primary language, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document

| | |
|---|---|
| Recording Date: | November 13, 1947 |
| Recording No: | 1860, Official Records |

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat the lien of any mortgage or deed of trust made in good faith and for value.

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.:  00166345-994-LT2-1TW

# EXCEPTIONS
## (Continued)

Modification(s) of said covenants, conditions and restrictions

Recording Date:         February 7, 1949
Recording No:           2309, Official Records

Modification(s) of said covenants, conditions and restrictions

Recording Date:         April 15, 1949
Recording No:           2654, Official Records

4.      Covenant and agreement wherein the owners agree to hold said Land as one parcel and not to sell any portion thereof separately. Said covenant is expressed to run with the Land and be binding upon future owners.

Recording Date:         June 22, 1981
Recording No.:          81-620826, Official Records

Reference is hereby made to said document for full particulars.

5.      An instrument entitled Master Covenant and Agreement

Executed by:            Michael t. Walkup and Edith A. Press
In favor of:            City of Los Angeles
Recording Date:         December 22, 1994
Recording No:           94-2260589, Official Records

Reference is hereby made to said document for full particulars.

6.      Matters contained in that certain document

Entitled:               Certificate of Compliance
Dated:                  L.A. No. 94-062
Executed by:            City of Los Angeles Department of City Planning
Recording Date:         December 22, 1994
Recording No:           94-2260586, Official Records

Reference is hereby made to said document for full particulars.

7.      A deed of trust to secure an indebtedness in the amount shown below,

Amount:                 $14,040,000.00
Dated:                  March 13, 2013
Trustor/Grantor         Crestlloyd LLC, a California limited liability company
Trustee:                First American Title Insurance Company, a California corporation
Beneficiary:            Inferno Realty, L.P., as to an undivided $7,040,000.00 and Maybach Corporation
                        Holdings, Inc., as to an undivided $7,000,000.00 interest, as tenants in common
Recording Date:         March 13, 2013
Recording No:           20130384037, Official Records

PRELIMINARY REPORT                                                                                    Chicago Title Company
YOUR REFERENCE:                                                                                    ORDER NO.:  00166345-994-LT2-1TW

# EXCEPTIONS
## (Continued)

By various assignments, the beneficial interest thereunder is now held of record in:

Assignee:                Inferno Investment Inc.
Recording Date:        November 10, 2015
Recording No:         20151375607, Official Records

An agreement to modify the terms and provisions of said deed of trust as therein provided

Executed by:            Crestlloyd, LLC, a California Limited Liability Company and Inferno Investment
                        Inc.
Recording Date:        November 10, 2015
Recording No:         20151375608, Official Records

An agreement recorded November 6, 2018 as Instrument No. 20181122920, Official Records which
states that this instrument was subordinated to the document or interest described in the instrument

Recording Date:        November 6, 2018
Recording No.:        20181122917, Official Records

8.    Covenant and agreement wherein the owners agree to hold said Land as one parcel and not to sell any
      portion thereof separately. Said covenant is expressed to run with the Land and be binding upon future
      owners.

Recording Date:        September 5, 2013
Recording No.:        20131298666, Official Records

Reference is hereby made to said document for full particulars.

9.    An instrument entitled Master Covenant and Agreement Regarding On-Site BMP Maintenance

Executed by:            Nile Niami
In favor of:            City of Los Angeles
Recording Date:        September 24, 2013
Recording No:         20131385742, Official Records

Reference is hereby made to said document for full particulars.

10.    An instrument entitled Master Covenant and Agreement Regarding On-Site BMP Maintenance

Executed by:            Nile Niami
In favor of:            City of Los Angeles
Recording Date:        February 7, 2014
Recording No:         20140139714, Official Records

Reference is hereby made to said document for full particulars.

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.:  00166345-994-LT2-1TW

# EXCEPTIONS
## (Continued)

11.     An irrevocable offer to dedicate an easement over a portion of said Land for

Purpose(s):              Public street
Recording Date:          June 4, 2014
Recording No:            20140578201, Official Records

Said offer was accepted by resolution, a certified copy of which was recorded April 10, 2015 as
Instrument No. 20150395929, of Official Records..

12.     An instrument entitled Covenant and Agreement Regarding Maintenance of Building

Executed by:             Nile Niami
In favor of:             City of Los Angeles
Recording Date:          February 17, 2016
Recording No:            20160172858, Official Records

Reference is hereby made to said document for full particulars.

13.     A deed of trust to secure an indebtedness in the amount shown below,

Amount:                  $82,500,000.00
Dated:                   October 25, 2018
Trustor/Grantor          Crestlloyd, LLC, a California limited liability company
Trustee:                 Chicago Title Company
Beneficiary:             Hankey Capital, LLC, a California limited liability company
Recording Date:          November 6, 2018
Recording No:            20181122917, Official Records

An agreement to modify the terms and provisions of said deed of trust as therein provided

Recording Date:          August 31, 2020
Recording No:            20201030024 of Official Records

A notice of default under the terms of said trust deed

Executed by:             Chicago Title Company
Recording Date:          March 5, 2021
Recording No:            2021-0367447 of Official Records

A notice of trustee's sale under said deed of trust

Executed by:             Chicago Title Company, trustee
Date, Time and Place of Sale:  July 12, 2021 at 11:00 am by the fountain located at 400 Civic Center
                         Plaza, Pomona, CA 91766
Recording Date:          June 14, 2021
Recording No:            2021-0934061 of Official Records

Chicago Title Company
ORDER NO.:  00166345-994-LT2-1TW

# EXCEPTIONS
## (Continued)

14.    Matters contained in that certain document

Entitled:                Memorandum of Agreement
Executed by:             Hankey Capital, LLC, a California limited liability company and Crestlloyd, LLC, a
                         California limited liability company
Recording Date:          November 6, 2018
Recording No:            20181122919, Official Records

Recording Dare:          August 31, 2020
Recording No.:           20201030294 of Official Records

Reference is hereby made to said document for full particulars.

15.    A deed of trust to secure an indebtedness in the amount shown below,

Amount:                  $30,188,235.00
Dated:                   October 16, 2018
Trustor/Grantor          Crestlloyd, LLC, a California limited liability company
Trustee:                 Chicago Title Company
Beneficiary:             YOGI Securities Holdings, LLC, a Nevada limited liability company
Recording Date:          November 7, 2018
Recording No:            20181126580, Official Records

16.    A deed of trust to secure an indebtedness in the amount shown below,

Amount:                  $6,196,810.64
Dated:                   September 18, 2019
Trustor/Grantor          Crestlloyd, LLC, a California limited liability company
Trustee:                 Chicago Title Company
Beneficiary:             YOGI Securities Holdings, LLC, a Nevada limited liability company
Recording Date:          September 23, 2019
Recording No:            20190989746, Official Records

The effect of a Substitution of Trustee and Full Reconveyance, recorded January 14, 2021 as Instrument
No. 2021-076458 of Official Records.

(Note: We will require evidence of the full payment or satisfaction of said deed of trust as there does not
appear to be an off-setting transaction of record.)

17.    An instrument entitled Covenant and Agreement Regarding Maintenance of Building

Executed by:             Crestlloyd, LLC
In favor of:             City of Los Angeles
Recording Date:          December 2, 2019
Recording No:            20191317943, Official Records

Reference is hereby made to said document for full particulars.

18.    Any rights of the parties in possession of a portion of, or all of, said Land, which rights are not disclosed
       by the public records.

# EXCEPTIONS
## (Continued)

19.    Matters which may be disclosed by an inspection and/or by a correct ALTA/NSPS Land Title Survey of said Land that is satisfactory to the Company, and/or by inquiry of the parties in possession thereof.

20.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | American Truck & Tool Rentals Inc./American Rentals |
| Amount: | $97,050.34 |
| Recording Date: | June 29, 2020 |
| Recording No: | 20200709010 of Official Records |

A Notice of Pending Action to foreclose said lien

| | |
|---|---|
| County: | Los Angeles |
| Court: | Superior |
| Case No.: | 20SMCV01229 (consolidated with 20SMCV01264) |
| Recording Date: | May 5, 2021 |
| Recording No: | 2021-0717597 of Official Records |

21.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | J&E Texture, Inc. |
| Amount: | $214,147.50 |
| Recording Date: | June 30, 2020 |
| Recording No: | 20200712043 of Official Records |

A Notice of Pending Action to foreclose said lien

| | |
|---|---|
| County: | Los Angeles |
| Court: | Superior |
| Case No.: | 20SMCV01229 |
| Recording Date: | December 14, 2020 |
| Recording No: | 2020-01647158 of Official Records |

A Notice of Pending Action to foreclose said lien

| | |
|---|---|
| County: | Los Angeles |
| Court: | Superior |
| Case No.: | 20SMCV01229 (consolidated with 20SMCV01264) |
| Recording Date: | May 5, 2021 |
| Recording No: | 2021-0717597 of Official Records |

22.    A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $5,000,000.00 |
| Dated: | February 11, 2020 |
| Trustor/Grantor | CRESTLLOYD, LLC, a California limited liability company |
| Trustee: | Pacific Coast Title Company |
| Beneficiary: | Hilldun Corporation, a New York corporation |
| Recording Date: | September 4, 2020 |
| Recording No: | 20201058770 of Official Records |

# EXCEPTIONS
## (Continued)

23.   A claim of mechanic's lien or materialman's lien

Claimant:              JMS Air Conditioning and Appliance Services, Inc.
Amount:               $51,290.00
Recording Date:       May 6, 2021
Recording No:         2021-0722265 of Official Records

24.   A claim of mechanic's lien or materialman's lien

Claimant:              Calgrove Rentals Inc.
Amount:               $12,338.95
Recording Date:       June 1, 2021
Recording No:         2021-0868958 of Official Records

25.   A claim of mechanic's lien or materialman's lien

Claimant:              BMC West LLC
Amount:               $2,398.60
Recording Date:       July 16, 2021
Recording No:         2021-1102584 of Official Records

26.   A Receiver's Certificate #1

In favor of:           Hankey Capital, LLC and Theodore Lanes, in his capacity as Receiver
Amount:               $577,745.00
Case No.:             21SMCV01113 Superior Court Los Angeles County
Recording Date:       July 23, 2021
Recording No:         2021-1136088 of Official Records

27.   A Notice of Pending Lien

Executed by:           City of Los Angeles
Recording Date:       January 31, 2020
Recording No:         2020-0124042 of Official Records

28.   A claim of mechanic's lien or materialman's lien

Claimant:              Parquet By Dian
Amount:               $40,846.00
Recording Date:       September 8, 2021
Recording No:         2021-1373746 of Official Records

29.   A claim of mechanic's lien or materialman's lien

Claimant:              Powertek Electric, Inc.
Amount:               $40,480.00
Recording Date:       September 23, 2021
Recording No:         2021-1455960 of Official Records

# EXCEPTIONS
## (Continued)

30.    A claim of mechanic's lien or materialman's lien

Claimant:              Kennco Plumbing, Inc.
Amount:                $85,560.17
Recording Date:        October 5, 2021
Recording No:          2021-1508207 of Official Records

A Notice of Pending Action to foreclose said lien

County:                Los Angeles
Court:                 Superior
Case No.:              21SMCV01656
Recording Date:        October 21, 2021
Recording No:          20211585116 of Official Records

31.    A Chapter 11 Petition

Debtor's Name:         Crestlloyd, LLC
Recording Date:        November 8, 2021
Recording No:          20211666304 of Official Records

**PLEASE REFER TO THE "INFORMATIONAL NOTES" AND "REQUIREMENTS" SECTIONS WHICH
FOLLOW FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION.**

---

**END OF EXCEPTIONS**

---

# REQUIREMENTS SECTION

1.      Unrecorded matters which may be disclosed by an Owner's Affidavit or Declaration. A form of the Owner's Affidavit/Declaration is attached to this Preliminary Report/Commitment. This Affidavit/Declaration is to be completed by the record owner of the land and submitted for review prior to the closing of this transaction. Your prompt attention to this requirement will help avoid delays in the closing of this transaction. Thank you.

The Company reserves the right to add additional items or make further requirements after review of the requested Affidavit/Declaration.

2.      The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below:

Limited Liability Company:        Crestlloyd, LLC, a California limited liability company

a)      A copy of its operating agreement, if any, and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b)      If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps.

c)      If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member.

d)      A current dated certificate of good standing from the proper governmental authority of the state in which the entity is currently domiciled.

e)      If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

f)      If Limited Liability Company is a Single Member Entity, a Statement of Information for the Single Member will be required.

g)      Each member and manager of the LLC without an Operating Agreement must execute in the presence of a notary public the Certificate of California LLC (Without an Operating Agreement) Status and Authority form.

3.      In order to complete this report, the Company requires a Statement of Information to be completed by the following party(s),

Party(s):                All Individual Parties

The Company reserves the right to add additional items or make further requirements after review of the requested Statement of Information.

NOTE:   The Statement of Information is necessary to complete the search and examination of title under this order. Any title search includes matters that are indexed by name only, and having a completed Statement of Information assists the Company in the elimination of certain matters which appear to involve the parties but in fact affect another party with the same or similar name. Be assured that the Statement of Information is essential and will be kept strictly confidential to this file.

---

## END OF REQUIREMENTS

## REQUIREMENTS
### (Continued)

# INFORMATIONAL NOTES SECTION

1.     None of the items shown in this report will cause the Company to decline to attach ALTA Endorsement
       Form 9 to an Extended Coverage Loan Policy, when issued.

2.     The Company is not aware of any matters which would cause it to decline to attach CLTA Endorsement
       Form 116 indicating that there is located on said Land Single Family Residential properties, known as 944
       Ariole Way, located within the city of Los Angeles, California, , to an Extended Coverage Loan Policy.

3.     Note:  Please contact your Title Officer to obtain the current recording fees.  Chicago Title Company will
       pay Chicago Title Insurance Company 12% of the title premium, as disclosed on lines 1107 and 1108 of
       the HUD-1.

4.     Note:  The policy of title insurance will include an arbitration provision. The Company or the insured may
       demand arbitration. Arbitrable matters may include, but are not limited to, any controversy or claim
       between the Company and the insured arising out of or relating to this policy, any service of the Company
       in connection with its issuance or the breach of a policy provision or other obligation. Please ask your
       escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration
       provisions and any other provisions pertaining to your Title Insurance coverage.

5.     Notice: Please be aware that due to the conflict between federal and state laws concerning the
       cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any
       transaction involving Land that is associated with these activities.

6.     Pursuant to Government Code Section 27388.1, as amended and effective as of 1-1-2018, a
       Documentary Transfer Tax (DTT) Affidavit may be required to be completed and submitted with each
       document when DTT is being paid or when an exemption is being claimed from paying the tax. If a
       governmental agency is a party to the document, the form will not be required. DTT Affidavits may be
       available at a Tax Assessor-County Clerk-Recorder.

---

## END OF INFORMATIONAL NOTES

---

Ted Tan/Jennifer Wright (LA/Comm)/tt6

WIRE SAFE™ | Inquire before you wire!

# Wire Fraud Alert

This Notice is not intended to provide legal or professional advice. If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the phone number of relevant parties to the transaction as soon as an escrow account is opened**. DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

| *Federal Bureau of Investigation:* | *Internet Crime Complaint Center:* |
|:---:|:---:|
| *http://www.fbi.gov* | *http://www.ic3.gov* |

*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

## Chicago Title Company

725 South Figueroa Street, Suite 200, Los Angeles, CA 90017
Phone:  (213) 488-4300 ● Fax:  (213) 488-4377

# Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment.  Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate.   As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative.  These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount.  These discounts only apply to transactions involving services rendered by the FNF Family of Companies.  This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company. The discount will only be applicable to the FNF Company as indicated by the named discount.

| **FNF Underwritten Title Company** | **Underwritten by FNF Underwriters** |
|---|---|
| CTC – Chicago Title company | CTIC – Chicago Title Insurance Company |
| CLTC – Commonwealth Land Title Company | CLTIC - Commonwealth Land Title Insurance Company |
| FNTC – Fidelity National Title Company of California | FNTIC – Fidelity National Title Insurance Company |
| FNTCCA - Fidelity National Title Company of California | FNTIC - Fidelity National Title Insurance Company |
| TICOR – Ticor Title Company of California | CTIC – Chicago Title Insurance Company |
| LTC – Lawyer's Title Company | CLTIC – Commonwealth Land Title Insurance Company |
| SLTC – ServiceLink Title Company | CTIC – Chicago Title Insurance Company |

## Available Discounts

**DISASTER LOANS (CTIC, CLTIC, FNTIC)**
The charge for a Lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within twenty-four (24) months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be fifty percent (50%) of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, FNTIC)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be fifty percent (50%) to seventy percent (70%) of the appropriate title insurance rate, depending on the type of coverage selected.  The charge for a lender's policy shall be forty (40%) to fifty percent (50%) of the appropriate title insurance rate, depending on the type of coverage selected.

## FIDELITY NATIONAL FINANCIAL, INC.
## PRIVACY NOTICE

Effective August 1, 2021

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices.  If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

### Collection of Personal Information
FNF may collect the following categories of Personal Information:
- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:
- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

### Collection of Browsing Information
FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:
- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

### Other Online Specifics
<u>Cookies</u>. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

<u>Web Beacons</u>. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

<u>Do Not Track</u>. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

<u>Links to Other Sites</u>.  FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

### Use of Personal Information
FNF uses Personal Information for three main purposes:
- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

### When Information Is Disclosed
We may disclose your Personal Information and Browsing Information in the following circumstances:
- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;

Copyright © 2021. Fidelity National Financial, Inc. All Rights Reserved
Order No. 00166345-994-LT2-1TW

- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law. We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you. Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

## Security of Your Information
We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

## Choices With Your Information
If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request as directed at the end of this Privacy Notice. We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888) 714-2710 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.
For Oregon Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

## Information From Children
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

## International Users
FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

## FNF Website Services for Mortgage Loans
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, visit FNF's Opt Out Page or contact us by phone at (888) 714-2710 or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

# ATTACHMENT ONE (Revised 05-06-16)

### CALIFORNIA LAND TITLE ASSOCIATION
### STANDARD COVERAGE POLICY – 1990

#### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a)  Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
    (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3.  Defects, liens, encumbrances, adverse claims or other matters:
    (a)  whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
    (b)  not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
    (c)  resulting in no loss or damage to the insured claimant;
    (d)  attaching or created subsequent to Date of Policy; or
    (e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6.  Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

#### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2.  Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3.  Easements, liens or encumbrances, or claims thereof, not shown by the public records.
4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6.  Any lien or right to a lien for services, labor or material not shown by the public records.

#### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)
#### ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE

#### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1.  Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
    a.  building;
    b.  zoning;
    c.  land use;
    d.  improvements on the Land;
    e.  land division; and
    f.  environmental protection.
    This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2.  The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3.  The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4.  Risks:
    a.  that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
    b.  that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;

---

Attachment One – CA (Rev. 05-06-16)                                                                                          Page 1

© **California Land Title Association. All rights reserved.**
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

    c.   that result in no loss to You; or
    d.   that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5.   Failure to pay value for Your Title.

6.   Lack of a right:
    a.   to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
    b.   in streets, alleys, or waterways that touch the Land.
    This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7.   The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

8.   Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

9.   Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

- For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 5,000.00 |

## 2006 ALTA LOAN POLICY (06-17-06)

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.   (a)  Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
      (i)   the occupancy, use, or enjoyment of the Land;
      (ii)  the character, dimensions, or location of any improvement erected on the Land;
      (iii) the subdivision of land; or
      (iv) environmental protection;
     or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b)  Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.   Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.   Defects, liens, encumbrances, adverse claims, or other matters
    (a)  created, suffered, assumed, or agreed to by the Insured Claimant;
    (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c)  resulting in no loss or damage to the Insured Claimant;
    (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13 or 14); or
    (e)  resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.   Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5.   Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6.   Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
    (a)  a fraudulent conveyance or fraudulent transfer, or
    (b)  a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7.   Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

{Except as provided in Schedule B - Part II,{ t{or T}his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

## {PART I

{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency  that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by  persons in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown  by the Public Records.
4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.  Any lien or right to a lien for services, labor or material not shown by the Public Records.}

## PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:}

## 2006 ALTA OWNER'S POLICY (06-17-06)

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
       (i)  the occupancy, use, or enjoyment of the Land;
       (ii)  the character, dimensions, or location of any improvement erected on the Land;
       (iii)  the subdivision of land; or
       (iv)  environmental protection;
       or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
     (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters
     (a)  created, suffered, assumed, or agreed to by the Insured Claimant;
     (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
     (c)  resulting in no loss or damage to the Insured Claimant;
     (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
     (e)  resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
     (a)  a fraudulent conveyance or fraudulent transfer; or
     (b)  a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses,  that arise by reason of:

{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency  that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.  Any lien or right to a lien for services, labor or material not shown by the Public Records. }
7.  {Variable exceptions such as taxes, easements, CC&R's, etc. shown here.}

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY – ASSESSMENTS PRIORITY (04-02-15)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i)    the occupancy, use, or enjoyment of the Land;
   (ii)   the character, dimensions, or location of any improvement erected on the Land;
   (iii)  the subdivision of land; or
   (iv)  environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.
10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

© **California Land Title Association. All rights reserved.**
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

Insert Map Here

# EXHIBIT "5"

B0452-8410  12/08/2021  10:28 AM  Received by California Secretary of State

U210108602016

**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**INFORMATION REQUEST (UCC 11)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U210108602016 |
| Date Filed: 12/8/2021 |

| Requester Information: | |
| --- | --- |
| Contact Name | |
| Organization Name | CLAS INFORMATION SERVICES |
| Phone Number | |
| Email Address | |
| Address | 2020 HURLEY WAY
SACRAMENTO, CA 95825 |

| Search Information: | |
| --- | --- |
| Request Type | Search request only |
| Search Type: | Debtor Search |
| Individual or Organization: | Organization |
| Organization name: | CRESTLLOYD, LLC |
| City: | |
| State: | |
| Start Date: | |
| Include lapsed filings on search response: | Yes |

Page 1 of 1



# Secretary of State

**Business Programs Division**

1500 11th Street,  Sacramento, CA 95814

CLAS INFORMATION SERVICES
2020 HURLEY WAY
SACRAMENTO, CA  95825

Request Date:          12/08/2021 10:28 AM
Information
Request No.:           U210108602016
Certification No.:        011012311

## LIEN SEARCH CERTIFICATE

The search results herein reflect only the specific information requested.  The results of this Debtor search will not reflect variances of this name.  If the Debtor is known under other personal names, trade names, business entities, or addresses, separate searches of these names will have to be requested and conducted.  The Secretary of State, his officers and agents disclaim any and all liability for claims resulting from other filings on which the name of the Debtor can be found in any other form than which was requested.

## Search Criteria:

Debtor Organization: CRESTLLOYD, LLC
Request Type:  Lien Information Request (UCC 11)
All Records On File (Lapsed and Unlapsed), List Only

---

### Lien Listing

---

**Lien File No.: 157495183679**              **Filed: 11/10/2015 05:00 PM**          **Lapse: 11/10/2020 11:59 PM**
Lien Type:      Financing Statement

Debtor(s):          CRESTLLOYD, LLC, 10542 VALLEY SPRING LN, TOLUCA LAKE, CA  91602

Secured Party(s):  FIRST REPUBLIC BANK, 111 PINE STREET, SAN FRANCISCO, CA  94111

***Amendment - Termination***

Amendment No.: 1876657871                    Filed: 08/27/2018 01:57 PM
***System Amendment - Lapse***

Amendment No.: U210011747017                 Filed: 01/08/2021 01:18 PM

**Lien File No.: 167541207811**              **Filed: 08/11/2016 01:04 PM**          **Lapse: 08/11/2021 11:59 PM**
Lien Type:      Financing Statement

Debtor(s):          CRESTLLOYD, LLC A CALIFORNIA LIMITED LIABILITY COMPANY, 8981 WEST SUNSET
                    BOULEVARD #303, WEST HOLLYWOOD, CA  90069

Secured Party(s):  FIRST CREDIT BANK, A CALIFORNIA BANKING CORPORATION, 9265 SUNSET
                    BOULEVARD, WEST HOLLYWOOD, CA  90069

***Amendment - Termination***

Amendment No.: 1976990786                    Filed: 02/25/2019 09:14 AM
***System Amendment - Lapse***

Amendment No.: U210074695830                 Filed: 08/12/2021 01:00 AM

CLAS INFORMATION SERVICES
2020 HURLEY WAY
SACRAMENTO, CA  95825

Request Date:      12/08/2021 10:28 AM
Information
Request No.:       U210108602016
Certification No.:      011012311

---

Lien Listing

---

**Lien File No.: 167542523621**          **Filed: 08/19/2016 10:53 AM**          **Lapse: 08/19/2021 11:59 PM**

Lien Type:      Financing Statement

Debtor(s):          CRESTLLOYD, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, 8981 WEST SUNSET
BOULEVARD #303, WEST HOLLYWOOD, CA  90069

Secured Party(s):  FIRST CREDIT BANK, A CALIFORNIA BANKING CORPORATION, 9255 WEST SUNSET
BOULEVARD, WEST HOLLYWOOD, CA  90069

***System Amendment - Lapse***

Amendment No.: U210077198737          Filed: 08/20/2021 01:00 AM

---

**Lien File No.: U200018754836**          **Filed: 09/11/2020 01:08 PM**          **Lapse: 09/11/2025 11:59 PM**

Lien Type:      Financing Statement

Debtor(s):          CRESTLLOYD, LLC, 8981 W. SUNSET BLVD, WEST HOLLYWOOD, CA  90069

Secured Party(s):  MIKE FIELDS BRONZES LLC, 2715 E. 36TH, APT 6203 SPOKANE, WA  99223

Certification No.: 011012311

Page Count: 3

I, Shirley N. Weber, Ph.D., Secretary of State, do hereby certify that the above listing is a record of all presently active financing statements, tax liens, attachment liens and judgment liens, including any change documents relating to them, which name the referenced debtor, subject to any above-stated search qualifiers and are on file in my office as of **12/05/2021 11:59 PM**.



**IN WITNESS WHEREOF**, I execute this certificate and affix the Great Seal of the State of California on December 8, 2021.

**Shirley N. Weber, Ph.D.**
Secretary of State



U200018754836



## STATE OF CALIFORNIA
*Office of the Secretary of State, Alex Padilla*
### UCC FINANCING STATEMENT (UCC 1)
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U200018754836 |
| Date Filed: 9/11/2020 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | JEFFREY H. LERMAN, ESQ. |
| Organization Name | LERMAN LAW PARTNERS, LLP |
| Phone Number | (415) 454-0455 |
| Email Address | JEFF@LERMANLAW.COM |
| Address | 802 B STREET<br>SAN RAFAEL, CA 94901 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| CRESTLLOYD, LLC | 8981 W. SUNSET BLVD<br>WEST HOLLYWOOD, CA 90069 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| MIKE FIELDS BRONZES LLC | 2715 E. 36TH<br>APT 6203<br>SPOKANE, WA 99223 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
This constitutes actual and constructive notice.

Debtor currently holds as a bailment the sculpture known as "Unity" (2019, composite, white finish), whose sole creator and sole owner is and at all times has been Secured Party. Debtor does not have, and has not at any time had, any ownership rights whatsoever in Unity. As of the date hereof, Debtor holds Unity solely as a bailment, and Unity is currently located at the real property commonly known as "The One", 944 Airole Way, Los Angeles CA 90077 ("Real Property"). Unity is not and has never been furniture, a fixture, or otherwise affixed to or in any way a part of the Real Property; is not and has never been used in the operation or occupancy of the Real Property; and is not and has never been the personal property of Debtor.

The rights and obligations of Debtor as Bailee and Secured Party as Bailor with respect to Unity are set forth in that certain private Artwork Display Agreement between Debtor and Secured Party dated January 27, 2020.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:
Not Applicable

Select an additional alternate Financing Statement type:
Not Applicable

Select an alternative Debtor/Secured Party designation for this Financing Statement:
Bailee/Bailor

Optional Filer Reference Information:

☒ This Financing Statement is to be filed in the real estate records (if applicable).

This Financing Statement:

☐ Covers timber to be cut

☐ Covers as-extracted Collateral

☐ Is filed as a fixture filing

Name and address of a Record Owner of real estate described above (if Debtor does not have a record interest):

Description of real estate:
The real property and improvements thereon commonly known as "The One", 944 Airole Way, Los Angeles, CA 90077 (APN 4369-026-021)

Miscellaneous Information:

Search to Reflect:

☐ Order a Search to Reflect

B0325-3228 09/11/2020 1:25 PM Received by California Secretary of State

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067.

A true and correct copy of the foregoing document entitled **DEBTOR'S NOTICE OF MOTION AND MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTOR TO OBTAIN SENIOR SECURED POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) GRANTING SUPER-PRIORITY ADMINISTRATIVE CLAIMS AND SENIOR LIENS, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 8, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Kyra E Andrassy    kandrassy@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com**
- **Todd M Arnold    tma@lnbyg.com**
- **Jerrold L Bregman    jbregman@bg.law, ecf@bg.law**
- **Marguerite Lee DeVoll    mdevoll@watttieder.com**
- **Thomas M Geher    tmg@jmbm.com, bt@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com**
- **David B Golubchik    dbg@lnbyg.com, stephanie@lnbyb.com**
- **James Andrew Hinds    jhinds@hindslawgroup.com;mduran@hindslawgroup.com, mduran@hindslawgroup.com**
- **Robert B Kaplan    rbk@jmbm.com**
- **Jane G Kearl    jkearl@watttieder.com**
- **Jennifer Larkin Kneeland    jkneeland@watttieder.com**
- **Michael S Kogan    mkogan@koganlawfirm.com**
- **Noreen A Madoyan    Noreen.Madoyan@usdoj.gov**
- **Ryan D O'Dea    rodea@shulmanbastian.com, lgauthier@shulmanbastian.com**
- **Sharon Oh-Kubisch    sokubisch@swelawfirm.com, gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com**
- **Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com**
- **Victor A Sahn    vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com**
- **David Seror    dseror@bg.law, ecf@bg.law**
- **Zev Shechtman    zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com**
- **Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Jessica Wellington    jwellington@bg.law, ecf@bg.law**

**2.  SERVED BY UNITED STATES MAIL**: On **December 8, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

**3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **December 8, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒  Service information **BY FEDERAL EXPRESS/OVERNIGHT MAIL** continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| December 8, 2021 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                    **F 9013-3.1.PROOF.SERVICE**

In re Crestlloyd, LLC
D UST Receiver RSN Amended 20
Largest and Secured
File No.: 9562

**Debtor**
Crestlloyd, LLC
c/o SierraConstellation Partners LLC
355 S. Grand Avenue Suite 1450
Los Angeles, CA 90071

Noreen A Madoyan
Office of the United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

Counsel For Receiver
Brutzkus Gubner Rozansky Seror
Weber LLP
David Seror/Jessica Wellington
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367

Biabani & Associates, Inc.
Attn: Alex Biabani
1600 Sawtelle Bl #104
Los Angeles, CA 90025

Bradford Sheet Metal
4164 Sopp Road
Mojave, CA 93501

Branden Williams
257 N. Cannon Dr., 2nd Fl.
Beverly Hills, CA 90210

C.G.S. Custom Glass Specialists
Attn: Tom Yang
4536 Ish Drive
Simi Valley, CA 93063

CAD Stone Works Inc.
Attn: Cesar Hernandez
4533 Van Nuys Bl. #201
Sherman Oaks, CA 91403

Centurion Air, LLC
Attn: Michael T. Pyle
13932 Arrow Creek Road
Draper, UT 84020

Davidson Accountancy Corp.
William N. Davidson, CPA
14011 Ventura Blvd., Ste. 302
Sherman Oaks, CA 91423

Creative Art Partners
6542 Hayes Dr.
Los Angeles, CA 90048

Italian Luxury Design
4 NE 39 St.
Miami, FL 33137

Jabs Pools and Spas, LLC
Attn: Georgina Rendon
8055 Matilija Ave.
Panorma City, CA 91402

Dennis Palma
146 Beach Way
Monterey, CA 93940

KN Coating
201 E. Tamarack Ave
Inglewood, CA 90301

LA DWP
P.O. Box. 30808
Los Angeles, CA 90030

Vesta (aka Showroom Interiors, LLC)
Attn: Julian Buckner
8905 Rex Road
Pico Rivera, CA 90660

Made by TSI, Inc.
888 Biscayne Blvd #209
Miami, FL 33132

Midland Contractors, Inc.
Attn: Bruce Partovi
Po Box 8312
Van Nuys, CA 91409

West Valley Green Landscaping, Inc.
14761 Tupper St.
Panorama City, CA 91402

The Vertex Companies, Inc.
12100 Wilshire Blvd 8th floor
Los Angeles CA 90025-0000

West Coast Gates
339 Isis Ave.
Inglewood, CA 90301

SECURED CREDITORS

Los Angeles County Tax Collector
PO Box 54110
Los Angeles, CA 90054

County of Los Angeles
(MRCA-Brush Fire Clear'g Dist #1)
200 North Main Street, 16th Fl
Los Angeles, CA 90012

County of Los Angeles
(Wildlife Corridor and Open Space
Protection)
c/o SCI Consulting Group
4745 Mangels Blvd.
Fairfield, CA 94534

County of Los Angeles
(Local Fire Prevention, Water Quality
and Open Space Measure )
c/o SCI Consulting Group
4745 Mangels Blvd.
Fairfield, CA 94534

Counsel to Hankey Capital
Jeffer Mangels Butler & Mitchell LLP
Neil C. Erickson
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Inferno Investment Inc.
Attn: Julien Remillard, President
4-95 Kandahar, Mont Tremblant
Quebec J8E 1E2, Canada

YOGI Securities Holdings, LLC
Steve Oshins, Authorized Agent
1645 Village Center Circle, Ste. 170
Las Vegas, NV 89131

Rolls Scaffold, Inc.
Michael Rolls, CEO
11351 County Dr. Ste B
Ventura, CA 93004

American Truck & Tool Rentals
Inc./American Rentals
c/o Caprenos Inc., Cindee Wood,
Authorized Agent
4345 Murphy Canyon Road #200
San Diego, CA 92123

J&E Texture, Inc.
Francisco Gonzalez, CEO
181 Exter Way
Corona, CA 92882

Calgrove Rentals Inc.
Guadalupe Gomez, President
456 Glenoaks Blvd.
San Fernando, CA 91340

Hilldun Corporation
Jeffrey D. Kapelman, CEO
225 West 35th St.
New York, NY 10001

JMS Air Conditioning and Appliance
Services, Inc.
Yosi Hesica, CEO
7640 Burnet Ave.
Van Nuys, CA 91405

City of Los Angeles
Mike Feuer, City Attorney
City Hall East, Suite 800
Los Angeles, CA 90012

BMC West LLC
David Filtman, CEO
4800 Falls of Neuse Rd., Ste. 400
Raleigh, NC 27609

Powertek Electric, Inc.
Mike Moshrefi, CEO
28364 S, Western Ave. #414
Rancho Palos Verdes, CA 90275

Kennco Plumbing, Inc.
Robert L. Kennedy, Jr., CEO
21366 Placerita Canyon Rd.
Newhall, CA 91321

Parquet By Dian
Dima Efros, CEO
16601 S. Main St.
Gardena, CA 90248

YOGI Securities Holdings, LLC
c/o Daniel Wiesel, Esq.
Wolf, Rifkin, Shapiro, Schulman &
Rabkin, LLP
11400 W. Olympic Blvd., 9th Fl.
Los Angeles, CA 90064-1582

County of Los Angeles (Wildlife Corridor
and Open Space Protection)/Clerk of the
Governing Board, Mountains Recreation
& Conservation Authority
5750 Ramirez Canyon Road
Malibu, CA 90265

County of Los Angeles
(Local Fire Prevention, Water Quality
and Open Space Measure )
Conejo Recreation and Park District
403 W Hillcrest Drive
Thousand Oaks, CA 91360

Calgrove Rentals Inc.
21627 Roscoe Bl.
Canoga Park, CA 91304

American Truck & Tool Rentals
Inc./American Rental
Tom Murray, CEO and President
88 W. Victoria St.
Long Beach, CA 90805

Buchalter, APC
Jeffrey S. Wruble
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA 90017

Los Angeles County Tax Collector
PO Box 54018
Los Angeles, CA 90054

BMC West LLC
3250 N. San Fernando Rd.
Los Angeles, CA 90065

Kennco Plumbing, Inc.
Robert L. Kennedy, Jr., CEO
26575 Ruether Ave.
Santa Clarita, CA 91350

MIKE FIELDS BRONZES LLC
2715 E. 36TH, APT 6203
SPOKANE, WA 99223

Los Angeles County Tax Collector
225 N. Hill Street # 1
Los Angeles, CA 90012

SHULMAN BASTIAN FRIEDMAN &
BUI LLP
Ryan D. O'Dea
100 Spectrum Center Drive, Ste. 600
Irvine, CA 92618