Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address

DAVID SEROR – Bar No. 67488
JESSICA WELLINGTON – Bar No. 324477
BRUTZKUS GUBNER
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email: dseror@bg.law
jwellington@bg.law

☐ *Individual appearing without attorney*
☒ *Attorney for:* Theodore Lanes

FOR COURT USE ONLY

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

In re:

CRESTLLOYD, LLC

Debtor(s).

CASE NO.: 2:21-bk-18205-DS

CHAPTER: 11

## NOTICE OF MOTION FOR:

Motion of Theodore Lanes, Court-Appointed Receiver, and Brutzkus Gubner Rozansky Seror Weber LLP for Entry of Orders Allowing and Directing Immediate Payment of Administrative Expense Claims Pursuant to 11 U.S.C. §§ 543(c), 503(b)(3)(E), and 503(b)(4)

(***Specify name of Motion***)

DATE: 01/13/2022
TIME: 11:30 am
COURTROOM: 1639
PLACE: 255 E. Temple Street
Los Angeles, CA 90012
Via ZoomGov only

1. TO (*specify name*): the Honorable Deborah J. Saltzman, the U.S. Trustee, the Debtor, and all interested parties

2. NOTICE IS HEREBY GIVEN that on the following date and time and in the indicated courtroom, Movant in the above-captioned matter will move this court for an Order granting the relief sought as set forth in the Motion and accompanying supporting documents served and filed herewith. Said Motion is based upon the grounds set forth in the attached Motion and accompanying documents.

3. **Your rights may be affected**. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2012* Page 1 **F 9013-1.1.HEARING.NOTICE**

Main Document Page 2 of 373

4. **Deadline for Opposition Papers:** This Motion is being heard on regular notice pursuant to LBR 9013-1. If you wish to oppose this Motion, you must file a written response with the court and serve a copy of it upon the Movant or Movant's attorney at the address set forth above no less than fourteen (14) days prior to the above hearing date. If you fail to file a written response to this Motion within such time period, the court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief.

5. **Hearing Date Obtained Pursuant to Judge's Self-Calendaring Procedure:** The undersigned hereby verifies that the above hearing date and time were available for this type of Motion according to the judge's self-calendaring procedures.

Date: 12/23/2021

Brutzkus Gubner
Printed name of law firm

/s/ Jessica S. Wellington
Signature

Jessica S. Wellington
Printed name of attorney

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2012* Page 2 **F 9013-1.1.HEARING.NOTICE**

# MOTION

DAVID SEROR – Bar No. 67488
JESSICA WELLINGTON – Bar No. 324477
BRUTZKUS GUBNER
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email: dseror@bg.law
jwellington@bg.law

Counsel for Court-Appointed Receiver, Theodore Lanes

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

In re

CRESTLLOYD, LLC,

Debtor.

Case No. 2:21-bk-18205-DS

Chapter 11

**MOTION OF THEODORE LANES, COURT-APPOINTED RECEIVER, AND BRUTZKUS GUBNER ROZANSKY SEROR WEBER LLP FOR ENTRY OF ORDERS ALLOWING AND DIRECTING IMMEDIATE PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS PURSUANT TO 11 U.S.C. §§ 543(c), 503(b)(3)(E), AND 503(b)(4); MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF THEODORE LANES AND DAVID SEROR IN SUPPORT THEREOF**

Hearing:

Date: January 13, 2022
Time: 11:30 a.m.
Place: Courtroom 1639
United States Bankruptcy Court
255 E. Temple Street
Los Angeles, CA 90012
Via ZoomGov only

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. RELEVANT FACTUAL BACKGROUND ..... 2

A. Debtor's Bankruptcy Case ..... 2

B. Underlying State Court Litigation ..... 2

C. Summary of Receiver's Efforts to Preserve Property of the Estate ..... 4

D. Summary of Services Provided by Brutzkus Gubner ..... 8

III. THE ADMINISTRATIVE EXPENSE CLAIMS SHOULD BE ALLOWED AND THE COURT SHOULD ORDER IMMEDIATE PAYMENT THEREOF ..... 10

A. Relevant Legal Standard Under 11 U.S.C. §§ 543(c) and 503(b) ..... 10

B. The Receiver's Services Benefitted the Estate ..... 11

C. BG's Fees and Costs Were Necessary and Reasonable ..... 12

D. The Court Should Order Immediate Payment of the Receiver and BG's Administrative Expense Claims ..... 12

IV. CONCLUSION ..... 14

DECLARATION OF THEODORE LANES ..... 15

DECLARATION OF DAVID SEROR ..... 20

## TABLE OF AUTHORITIES

Page

### CASES

*In re 29 Brooklyn Ave., LLC*,
548 B.R. 642 (Bankr. E.D.N.Y. 2016)....................11

*In re Bayou Group, LLC*,
431 B.R. 549 (Bankr. S.D.N.Y. 2010)....................11

*In re Chips 'N Twigs, Inc.*,
58 B.R. 109 (Bankr. E.D. Pa. 1986)....................13

*In re Eliapo*,
468 F.3d 592 (9th Cir. 2006)....................12

*In re Garden Ridge Corp.*,
323 B.R. 136 (Bankr. D. Del. 2005)....................14

*In re Hunt's Health Care, Inc.*,
161 B.R. 971 (Bankr. N.D. Ind. 1993)....................12

*In re Snergy Properties, Inc.*,
130 B.R. 700 (Bankr. S.D.N.Y. 1991)....................10, 11

*Varsity Carpet Servs. V. Richardson (In re Colortex Indus.)*,
146 B.R. 881 (Bankr. N.D. Ga. 1992), *aff'd* 19 F.3d 1371 (11th Cir. 1994)....................13

### STATUTES

11 U.S.C. § 101(11)(A)....................10

11 U.S.C. § 503(b)....................12

11 U.S.C. § 503(b)(3)(E)....................2, 10, 11

11 U.S.C. § 503(b)(4)....................2, 11

11 U.S.C. § 507(a)(2)....................13

11 U.S.C. § 543(c)....................2, 10

11 U.S.C. § 543(c)(2)....................10

**TO THE HONORABLE DEBORAH J. SALTZMAN, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTOR AND ITS COUNSEL OF RECORD, AND ALL OTHER INTERESTED PARTIES:**

Theodore Lanes, the court-appointed receiver (the "Receiver" or "Mr. Lanes") and his counsel Brutzkus Gubner Rozansky Seror Weber LLP ("BG"), hereby move (the "Motion") this Court for entry of orders allowing and directing immediate payment of administrative expense claims in the amount of $75,445.15 in favor of the Receiver and $59,704.44 in favor of his counsel, BG, pursuant to Sections 543(c), 503(b)(3)(E) and (b)(4) of Title 11 of the United States Code (the "Bankruptcy Code"). In support of the Motion, the Receiver and BG respectfully represent as follows:

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

By this Motion, the Receiver and BG respectfully seek allowance and immediate payment of administrative expense claims in the amount of $75,445.15 in favor of the Receiver and $59,704.44 in favor of his counsel, BG, for unpaid fees and costs for prepetition services. As discussed below, the Receiver was appointed prepetition in the underlying state court action, however, his services have provided a significant benefit to this estate. During his time as court-appointed receiver, the Receiver, with the assistance of counsel, worked diligently to maintain and protect the most valuable asset of the debtor's estate, the real property located at 944 Airole Way, Los Angeles, CA 90077 (the "Airole Property") by, among other things, recovering the debtor's books and records, including permits and construction plans, working with the City of Los Angeles towards obtaining a Certificate of Occupancy, engaging on-site security after several break-ins and completing the alarm system, working with the Bel Air Homeowner's Association to resolve issues with the permits that it had threatened to appeal, engaging individuals and entities to provide daily services to maintain and upkeep the property, entering into short-term rental agreements which generated $342,000 in profits, engaging a broker to market and sell the property, and engaging contractors to repair construction defect issues on the property.

These efforts were necessary, reasonable and provide a significant benefit to the estate. Thus, the Receiver and BG submit that they are entitled to administrative expense claims for the balance of their unpaid fees and costs, and propose that these claims be paid immediately pursuant to Sections 543(c) and 503(b)(3)(E) and (b)(4) of the Bankruptcy Code.

## II. RELEVANT FACTUAL BACKGROUND

### A. Debtor's Bankruptcy Case

On October 26, 2021 (the "Petition Date"), Crestlloyd, LLC ("Debtor") filed a voluntary chapter 11 petition, commencing this bankruptcy case [Doc. 1]. As identified in its schedule A/B [Doc. 52], the Debtor's most valuable asset is real property located at 944 Airole Way, Los Angeles, CA 90077 (the "Airole Property"). As discussed below, prior to the Petition Date, the Airole Property was in the possession of the Receiver. Since Debtor's filing, the Receiver has worked with Debtor's counsel and has turned over the Airole Property to the Debtor and all Debtor's books and records that were in the Receiver's possession on the Petition Date, as well as all funds that were held by the Receiver, and additional funds that were paid to the Receivership estate as recently as December 20, 2021.

### B. Underlying State Court Litigation

Prior to the Petition Date, on or about May 26, 2021, the Receiver was engaged by the Debtor to be its manager to complete construction of the Airole Property and manage its marketing and ultimate sale [Declaration of Theodore Lanes ("Lanes Decl."), ¶ 4]. The Receiver was engaged by Debtor because of his expertise in dealing with troubled real property developments. *Id.* The Receiver has no interest in the Debtor and his engagement as manager was limited to dealing with the Airole Property. *Id.*

Subsequently, on June 24, 2021, Debtor's primary secured lender, Hankey Capital, LLC ("Hankey"), filed a verified complaint against Debtor for judicial foreclosure of deed of trust and specific performance, commencing the case titled *Hankey Capital, LLC. v. Crestlloyd, LLC*, Case No. 21SMCV01113, pending in the Superior Court of California, County of Los Angeles, West District (the "State Court Action"). On July 1, 2021, Hankey filed an *Ex Parte* Application seeking an order appointing a receiver, issuing a temporary restraining order, and issuing an order to show

cause why the receiver should not be confirmed *pendente lite* and why a preliminary injunction should not be granted in the State Court Action. On July 2, 2021, the state court entered its Order for Appointment of Receiver and other related relief (the "Receivership Order"), appointing Mr. Lanes as the court-appointed receiver. A true and correct copy of the Receivership Order is attached to the Lanes Decl. as **Exhibit 1** and incorporated herein by this reference. Prior to his appointment as receiver, Mr. Lanes resigned his position of manager of the Debtor. Lanes Decl., ¶ 4.

Pursuant to the Receivership Order, the Receiver was appointed by the state court to take possession, custody and control of the Receivership Property and to protect the Receivership Property. The Receivership Property included the following: the Airole Property, together with improvements thereon, all permits, plans (including all architectural, building, electrical, plumbing, and landscape plans), entitlements and certificates pending, prepared, or issued in connection with the Airole Property, all books, records, and bank records of the Debtor (including all digital and electronic versions) and all revenues, profits, and proceeds thereof (collectively, the "Receivership Property").

Pursuant to the Receivership Order (¶ 4), the Receiver's duties and powers included, among other things: (i) taking possession of the Receivership Property; (ii) protecting, caring for, and preserving the Receivership Property; (iii) maintaining or obtaining any certificates, licenses, entitlements, or permits necessary to maintain or increase the value of the Receivership Property; (iv) maintaining or obtaining and paying for any insurance necessary to protect the Receivership Property; (v) managing the Receivership Property until it was sold; (vi) protecting and completing construction of the Airole Property; (vii) doing all this necessary to obtain any required permits and sign-offs of all open permits; (viii) obtaining a certificate of occupancy; and (ix) engaging a broker to market and assist with the sale of the Airole Property.

On July 23, 2021, the state court entered its Amended (1) Order Confirming Appointment of Receiver *Pendente Lite*; and (2) Preliminary Injunction in Aid of Receiver (the "Preliminary Injunction Order"). A true copy of the Preliminary Injunction Order is attached to the Lanes Decl. as **Exhibit 2** and incorporated herein by this reference. The Preliminary Injunction Order

additionally granted the Receiver with the authority to enter into short terms agreement to rent the Airole Property (¶ 2).

The State Court Action was stayed by the Debtor's filing of its chapter 11 petition.

**C. Summary of Receiver's Efforts to Preserve Property of the Estate**

As set forth in his Receiver Reports, during his appointment as receiver, Mr. Lanes worked diligently to protect and preserve the Airole Property and fulfill his receivership duties. True and correct copies of the Receiver's First, Second and Third Reports are attached to the Lanes Decl. as **Exhibits 3, 4 and 5**, respectively. A full description of the services provided by Mr. Lanes is set forth in his reports, however, below is a summary of such services.

Although the Receivership Order included a temporary restraining order prohibiting any party from withholding from the Receiver any Receivership Property, including any plans and permits, the Debtor and the purported developer of the Airole Property, Skyline Development, refused several demands made by the Receiver to turn over the books and records of the Debtor. Lanes Decl., ¶ 8, Exh. 3, 3:3–27, 4:1–3. Debtor's refusal to comply with the Receivership Order precipitated the Receiver's need to employ counsel. *Id.* Accordingly, on July 16, 2021, the Receiver filed a motion to employ BG as his counsel to assist him in fulfilling his receivership duties. A true and correct copy of that motion is attached to the Lanes Decl. as **Exhibit 6**. On July 23, 2021, the state court entered an order authorizing the Receiver to retain BG as his counsel. A true and correct copy of this order is attached to the Lanes Decl. as **Exhibit 7** and incorporated herein by this reference. Notwithstanding, the Receiver worked diligently to recover the plans and permits and ultimately, with the assistance of his counsel, recovered a large portion of what was missing. Lanes Decl., ¶ 10; Exhibit 3, 4:1.

However, the Receiver was not able to recover the Debtor's financial books and records from the Debtor or Skyline Development. Accordingly, the Receiver, with the assistance of his counsel, served several subpoenas on First Republic Bank and Sail North Hollywood Escrow, Inc., which were both entities known by the Receiver to have financial records relating to the Debtor. Lanes Decl., ¶ 11. It was imperative that the Receiver obtain the Debtor's financial records because immediately after being appointed numerous parties began contacting the Receiver demanding

payment for services and work performed prior to his appointment, including a $366,000 claim by the previous project manager and a $300,000 claim by Centurion. *Id.* The claim by Centurion was based on an agreement entered into by the Debtor's former manager, Nile Niami, after the appointment of the Receiver and without the Receiver's knowledge or consent. *Id.* Additionally, several mechanic's liens had been filed. *Id.* Without the Debtor's financial records, it was impossible for the Receiver to determine which parties had legitimate claims for unpaid services and work. After obtaining the Debtor's bank statements from First Republic Bank, the Receiver worked diligently to investigate the legitimacy of the claims and the filed mechanic's liens. *Id.*

Prior to his appointment, there was very limited security at the property, and as a result, there were numerous break-ins and even some social media challenges regarding gaining access to the property. Lanes Decl., ¶ 12. Accordingly, immediately after his appointment, the Receiver engaged on-site security at the Airole Property, which company continues to be utilized by the Debtor. *Id.* Additionally, the alarm system was not complete at the property, so the Receiver contracted to complete the portions of the system that were not finished. *Id.*

At the time of his appointment, the Airole Property was not insured as all forms of insurance coverage on the Airole Property lapsed in early 2021. Lanes Decl., ¶ 13, Exhibit 3, 7:2–8. This was obviously a major concern. Accordingly, the Receiver immediately began working towards placing new coverage on the Airole Property, and was able to initially secure liability insurance. *Id.* Understanding that fire and construction defect insurance was also needed, the Receiver employed insurance agents to work to obtain more fulsome insurance coverage on the property. *Id.* These efforts took significant time and were complicated by the state of the unfinished construction on the Airole Property, the lack of plans and permits, the size and scope of the project and the fire risk associated with the location. *Id.* Notwithstanding, the Receiver worked diligently with the insurance agents and ultimately was able to obtain an insurance policy on the property. *Id.* The Receiver paid the initial payment on the policy with the consent of Debtor's bankruptcy counsel after the Petition Date. *Id.* However, it is the Receiver's understanding that the Debtor subsequently chose not to pursue the insurance policy obtained by the Receiver.

The Receiver also worked diligently to protect and repair the Airole Property as needed. With regard to the repairs, while he was Receiver, large portions of the marble that make up the perimeter wall of the main outside pool and the perimeter wall of the property cracked and ultimately separated from the structure. Lanes Decl., ¶ 14. The Receiver contracted to have the marble fixed. *Id.* However, even after the marble was fixed, water issues continued to occur, including leaking from the skylights at the entry of the Airole Property. *Id.* In order to prevent further damage to the Airole Property, the Receiver drained the pools surrounding the Property, and began discussions with a contractor to fix the leaking skylights. *Id.* The initial review of the ceiling area raised concerns of potential mold. *Id.* In order to fully understand the scope of the water issues and to create a plan to properly fix the issues, the Receiver engaged Xpera Group to provide a comprehensive report of the water issues and other issues at the Airole Property. *Id.* A true and correct copy of Xpera Group's initial report is attached to the Lanes Decl. as **Exhibit 8**. Xpera Group was only able to provide an initial report because the day they were conducting their investigation of the water and mold issues was the Petition Date. The Receiver, with the assistance of counsel sent a notice of claim letter to the insurer on the Airole Property regarding the potential mold issue. Lanes Decl., ¶ 15. Additionally, the Receiver provided on-site management services to oversee the repairs at the Airole Property and engaged entities to maintain the property, including, among other things, housekeeping services, landscape maintenance services, a property caretaker, and pool cleaning services. Lanes Decl., ¶ 16.

The Receiver also worked diligently to resolve outstanding issues with the Bel Air Homeowner's Association (the "Bel Air HOA") and the City of Los Angeles (the "City") in order to obtain a Certificate of Occupancy. Lanes Decl., ¶ 17. As detailed in his Third Report, Exhibit 5, the Receiver planned an on-site meeting the inspectors from the City to begin the process of completing the items needed to obtain a Certificate of Occupancy. *Id.* Additionally, the Receiver worked diligently with the Bel Air HOA to resolve significant issues it had concerning the permits as compared to the as-built structure of the Airole Property. Lanes Decl., ¶ 18. The Bel Air HOA, on numerous occasions, indicated its intent to appeal certain permits, however, based on the Receiver's efforts, the Bel Air HOA agreed to forgo taking any further action until an independent forensics

engineering firm could conduct a detailed evaluation of the as-built structure compared to the approved plans and permits. *Id.* Accordingly, the Receiver engaged Vertex to complete this evaluation. *Id.* Vertex's initial findings are detailed in the Receiver's Third Report, Exhibit 5.

The Receiver also engaged On Location Inc. to market the Airole Property for short-term rentals for photoshoots and other similar engagements. Lanes Decl., ¶ 19. This engagement proved successful for the receivership estate, and ultimately the Debtor, generating $342,000 in rental payments. *Id.* The funds were identified by the Debtor in its schedule A/B [Doc. 52] as the only funds it had on the Petition Date.

Prior to his appointment, the Debtor had engaged Compass Realty and The Beverly Hills Estates, Inc. as brokers to market and sell the Airole Property. Lanes Decl., ¶ 20. However, the initial period lapsed without a sale, and the Receiver asked the existing brokers to submit a more cost effective proposal as the listing agreement contained a Promissory Note Secured by Personal Guaranty in the principal amount of $400,000 in favor of the prior brokers. *Id.* Thereafter, the Receiver began interviewing additional real estate brokers that specialize in high-end real estate. On October 4, 2021, the Receiver, with the assistance of his counsel, filed an application in the State Court Action to employ Vista Sotheby's International Realty and Westside Estate Agency as his brokers to market, advertise and assist the Receiver in the sale of the Airole Property. Lanes Decl., ¶ 21. On October 8, 2021, the state court entered an order granting that motion. A true and correct copy of the order granting the Receiver's motion to employ brokers is attached to the Lanes Decl. as **Exhibit 9** and incorporated herein by this reference. Through the assistance of his new brokers, the Receiver was able to obtain offers to purchase the Airole Property from qualified buyers for $123,000,000 on an "as is, where is" basis and $138,000,000 with a Certificate of Occupancy. Lanes Decl., ¶ 22. The Receiver countered the "as is, where is" at $148,000,000, however, the potential buyer rejected the counter. *Id.* Further, the Receiver worked diligently to obtain higher offers to purchase the Airole Property, including communicating with potential purchasers and investigating their qualifications. *Id.*

The Airole Property is fully furnished with artwork, furniture and sculptures provided by several different companies to stage the property. The Receiver worked with these companies to

obtain copies of the contracts with each company and an inventory of all items provided by each company, which documents were missing from the Debtor's books and records. Lanes Decl., ¶ 23. The Debtor used the inventory lists obtained by the Receiver in its schedule A/B [Doc. 52]. The Receiver was also working with these companies to re-negotiate the rental agreements. *Id.*

As detailed above, the Receiver worked diligently to protect and maintain the Airole Property, and to market and sell the Airole Property and to fulfill his receivership duties. As of the Petition Date, the Receiver was owed $75,445.15 for his unpaid pre-petition services. Lanes Decl., ¶ 25. This claim includes $74,514.25 in fees and $930.90 in expenses. Attached to the Lanes Decl. as **Exhibit 10** is a true and correct copy of Mr. Lanes' invoice for his unpaid services as manager and receiver.

**D. <u>Summary of Services Provided by Brutzkus Gubner</u>**

BG was engaged by the Receiver in July 2021. As detailed in the Declaration of David Seror ("Seror Decl."), while BG was employed as the Receiver's counsel, BG assisted the Receiver in his efforts by, among other things:

1. Preparing and filing an employment application and *ex parte* application to advance the hearing on the employment application based on the Receiver's immediate need for the assistance of counsel to aid in the recovery of the Debtor's books and records.
2. Drafting an agreement wherein an employee of Skyline Development agreed to turn over the Debtor's plans and permits in exchange for the payment of his unpaid services and a release of his claims against the Debtor, Hankey, and the receivership estate.
3. Communicating with secured creditors regarding the status of the State Court Action, potential foreclosure by Hankey, and the Receiver's efforts to finish construction on the Airole Property and to market and sell the property.
4. Drafting and serving several subpoenas to First Republic Bank and Sail North Hollywood Escrow, Inc. to assist the Receiver in obtaining the Debtor's financial records.
5. Communicating with First Republic Bank's counsel regarding the subpoenas and production of documents.
6. Communicating with potential purchasers and their attorneys, as requested by the Receiver,

in order to conduct due diligence into the purchasers' qualifications.

7. Providing legal advice regarding the negotiations with the Bel Air HOA.

8. Reviewing and editing the agreement with On Site Location Inc.

9. Reviewing and analyzing the agreements with the vendors providing the artwork, furniture and sculptures staged at the Airole Property, and communicating with vendors regarding outstanding issues.

10. Drafting and filing the Receiver's motion to employ a broker and *ex parte* application to advance the hearing.

11. Drafting and filing a motion for further instructions from the state court in response to certain lienholders threats to sue the Receiver for not stopping Hankey's foreclosure efforts and intervening in related state court litigation and *ex parte* application to advance the hearing so that it was held prior to the scheduled foreclosure.

12. Attending on-site meetings with the secured creditors and their counsel to address the outstanding issues on the Airole Property and to give legal advice to the Receiver regarding the same.

13. Representing the Receiver in related state court litigation by Yogi Securities to postpone the pending foreclosure by Hankey.

14. Drafting a notice of claim to the insurer on the Airole Property regarding the mold issue, and providing legal advice regarding the same.

15. Drafting and serving a cease and desist demand letter regarding authorized advertising of the Ariole Property.

16. Communicating with counsel for the Debtor's former manager, Nile Niami, to negotiate turnover of the Debtor's books and records.

Attached to the Seror Decl. as **Exhibit 11** and incorporated herein by this reference is a list of all services performed by BG to assist the Receiver for which BG had not received payment as of the Petition Date. This Exhibit also sets forth the attorney or paralegal providing the services rendered, the time spent by each professional and their billing rate.  BG incurred and is seeking allowance of an administrative claim in the amount of $59,704.44 for the prepetition services it provided to the

Receiver. This claim includes fees in the amount of $57,715.00 and costs and expenses in the amount of $1,989.44. This Exhibit also contains a summary of costs and expenses incurred by BG associated with the services it provided to the Receiver.

As set forth in the Seror Decl., BG made every effort to limit the expenditure of expenses and to use the most economical means available for accomplishing the tasks requiring expenditure of costs. BG regularly charges $0.25 cents per page for in-house photocopying, scans and prints, which represents BG's estimate of its actual cost for these services for the machines, supplies and extra labor associated therewith. The number of photocopies, scans and prints is recorded each time these are made. BG charged for postage expenses incurred for mailing notices to creditors, serving pleadings, and sending general correspondences. Attorney service, messenger and overnight delivery services are used only when necessary, and BG attempts to avoid extra charges for messenger and overnight delivery expenses when information can be transmitted by other means, such as mail, e-mail or facsimile. Computer research service expenses are passed on at the actual cost incurred by BG.

## III. THE ADMINISTRATIVE EXPENSE CLAIMS SHOULD BE ALLOWED AND THE COURT SHOULD ORDER IMMEDIATE PAYMENT THEREOF

### A. Relevant Legal Standard Under 11 U.S.C. §§ 543(c) and 503(b)

Compensation for a superseded custodian is governed by two provisions of the Bankruptcy Code, namely, sections 543(c)(2) and 503(b)(3)(E). Section 543(c) provides in relevant part, that "[t]he court, after notice and a hearing, shall . . . provide for the payment of reasonable compensation for services rendered and costs and expenses incurred by such custodian." "After being superseded, the custodian is entitled to apply to the bankruptcy court pursuant to 11 U.S.C. § 543(c)(2) for reasonable compensation for services rendered and costs and expenses incurred, including legal fees reasonably incurred in connection with the custodian's services." *In re Snergy Properties, Inc.*, 130 B.R. 700, 705 (Bankr. S.D.N.Y. 1991). Section 101(11)(A) of the Bankruptcy Code defines a custodian to include a court-appointed receiver.

"This compensation is entitled to administrative priority under § 503(b)(3)(E), which provides for an allowed administrative expense for 'the actual, necessary expenses ... incurred by ...

a custodian superseded under § 543 of this title, and compensation for the services of such custodian.'" *In re 29 Brooklyn Ave., LLC*, 548 B.R. 642, 645 (Bankr. E.D.N.Y. 2016) (quoting 11 U.S.C. § 503(b)(3)(E)). "A custodian's actions must result in a benefit to the estate to be accorded administrative priority under § 503(b)(3)(E)." *Id.* at 651.

"In addition to the expenses and compensation that may be awarded to a custodian under § 503(b)(3)(E), § 503(b) also allows compensation for a custodian's attorney." *Id.* Specifically, "[s]ection 503(b)(4) grants an allowed administrative expense for 'reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph . . . (E) of paragraph (3) of this subsection.'" *Id.* at 645–46 (quoting 11 U.S.C. § 503(b)(4)). "Reasonable compensation for legal services for a superseded custodian is determined in accordance with standards prescribed under the Bankruptcy Code, and 'based on the time, nature, the extent and the value of such services, and the cost of comparable services other than in a case under [the Bankruptcy Code].'" *Snergy*, 130 B.R. at 705 (quoting 11 U.S.C. § 503(b)(4)). "These factors mirror the factors considered to determine reasonable compensation under § 330(a)(3), and courts generally apply the same analysis and approach to fee requests under § 503(b)(4) that are used for fee applications under § 330(a)." *29 Brooklyn*, 548 B.R. at 652 (citing *In re Bayou Group, LLC,* 431 B.R. 549, 566 (Bankr. S.D.N.Y. 2010)).

**B. <u>The Receiver's Services Benefitted the Estate</u>**

As detailed above, the Receiver worked diligently to protect and maintain the Airole Property, which is the most valuable asset of the Debtor's estate. The Receiver's efforts benefitted the Debtor's estate by, among other things: (i) generating funds that the Debtor has been able to use towards its reorganization efforts in its chapter 11 case; (ii) securing the Airole Property so that it would not continue to get broken into; (iii) maintaining the property, including making essential repairs and daily upkeep and maintenance; (iv) working with the Bel Air HOA so that it would forgo appealing the Debtor's permits thereby avoiding significant litigation and expense behalf of the Debtor; (v) engaging brokers who were able to obtain the only signed offers received for the Airole Property; (vi) recovering the Debtor's plans and permits, which are essential to receiving a Certificate of Occupancy; and (viii) obtaining insurance on the Airole Property.

Accordingly, the Receiver respectfully submits that he is entitled to an administrative expense claim for his pre-petition fees and expenses in the amount of $75,445.15.

**C. BG's Fees and Costs Were Necessary and Reasonable**

To determine reasonable compensation of bankruptcy professionals, bankruptcy courts use the "lodestar" method by multiplying reasonable hourly rates time hours reasonably spent. *In re Hunt's Health Care, Inc.*, 161 B.R. 971, 976 (Bankr. N.D. Ind. 1993). "…The customary method for assessing an attorney's fee application in bankruptcy is the lodestar," under which the number of hours reasonably expended" is multiplied by a reasonable hourly rate" for the person providing the services"…" *In re Eliapo*, 468 F.3d 592, 598 (9th Cir. 2006) (internal citations omitted).

The fees and expenses incurred by BG were necessary and reasonable. As detailed above, BG provided essential and necessary services to the Receiver in order for the Receiver to fulfill his receivership duties to protect and maintain the Receivership Property, which services befitted the Debtor's estate. The attorneys that were primarily working on the matter were David Seror and Jessica Wellington, both of whom have significant experience in representing fiduciaries. Seror Decl., ¶ 7. Mr. Seror has been appointed by as receiver in state court and has previously served as an assignee for the benefit of creditors. *Id.* He regularly represents receivers, assignees for the benefit of creditors and chapter 7 and 11 bankruptcy trustees. Mr. Seror is also a standing panel chapter 7 bankruptcy trustee in this district. *Id.* The full C.V's for Mr. Seror and Ms. Wellington are attached to the Seror Decl. as **Exhibit 12**.

Mr. Seror's customary hourly rate is $695.00 and Ms. Wellington's customary hourly rate is $395.00. A true and correct copy of BG's hourly rates is attached to the Seror Decl. as **Exhibit 13**. BG's blended hourly rate for this matter is approximately $580.63. Seror Decl., ¶ 9. These rates are reasonable given Mr. Seror and Ms. Wellington's significant experience and expertise in representing fiduciaries, and as compared to similarly experienced attorneys in the Los Angeles area. Accordingly, BG submits that its fees and costs are necessary and reasonable such that it is entitled to an administrative expense claim its pre-petition services in the amount of $59,704.44.

**D. <u>The Court Should Order Immediate Payment of the Receiver and BG's Administrative Expense Claims</u>**

Although Section 503(b) does not set a date for the payment of an administrative claim, bankruptcy courts have discretion with which to require a debtor-in-possession to make immediate payment of such a claim. *Varsity Carpet Servs. V. Richardson (In re Colortex Indus.)*, 146 B.R. 881, 888 (Bankr. N.D. Ga. 1992), *aff'd* 19 F.3d 1371 (11th Cir. 1994) (determination of the timing of payment of administrative expenses is a matter within the discretion of the bankruptcy court). *See also, In re Chips 'N Twigs, Inc.,* 58 B.R. 109, 110–11 (Bankr. E.D. Pa. 1986). Courts typically consider the following three factors in determining how to exercise their discretion regarding timing of an administrative claim: (i) prejudice to the debtor; (ii) hardship to the claimant; and (iii) potential detriment to other creditors. *In re Garden Ridge Corp.,* 323 B.R. 136, 143 (Bankr. D. Del. 2005).

It is the Receiver and BG's understanding that the Debtor is paying other administrative expenses in the ordinary course of its business, i.e., the notice of insider compensation [Doc. 66, Exhibit 3], and that the Debtor has received interim DIP financing in the amount of $12 million from Hankey [Doc. 70]. Accordingly, there does not appear to be any hardship to the Debtor in making immediate payment to the Receiver and BG. The Receiver and BG on the other hand will suffer hardship as they have not been paid for fees and costs that directly relate to service rendered for the benefit of the Debtor and its creditors.

Lastly, with respect to other creditors, the Debtor will ultimately have to pay the Receiver and BG's administrative expense claims in any chapter 11 plan of reorganization or liquidation. Or, in the alternative, if this case is converted to one under chapter 7 of the Bankruptcy Code, section 507(a)(2) provides that chapter 11 administrative expenses receive the second highest priority. Thus, other creditors will not be harmed by the immediate payment of the Receiver and BG's administrative expense claims.

/ / /

/ / /

/ / /

## IV. CONCLUSION

Based on the foregoing, the Receiver and BG respectfully request that the Court enter an order granting the Motion, providing that the Receiver has an allowed administrative priority claim in the amount of $75,445.15 and that BG has an allowed administrative priority claim in the amount of $59,704.44, to be paid immediately, and granting the Receiver and BG such other and further relief as the Court deems just and proper under the circumstances.

DATED: December 23, 2021

BRUTZKUS GUBNER

By: /s/ Jessica S. Wellington
David Seror
Jessica S. Wellington
Attorneys for Theodore Lanes, Court-Appointed Receiver

**DECLARATION OF THEODORE LANES**

I, Theodore Lanes, declare and state as follows:

1. I am the court-appointed receiver in the case titled *Hankey Capital, LLC vs. Crestlloyd LLC,* Case No. 21SMCV01113.

2. The following facts are true and known to me of my own personal knowledge, or I have gained such knowledge based on documents provided to me by the parties in this litigation and these documents are maintained by me in the ordinary course of my business as a receiver. If called as a witness, I could and would competently testify with respect thereto.

3. I make this declaration in support of the Motion to which it is appended. All initial capitalized terms not defined herein shall have the same meaning ascribed to them in the Motion.

4. Prior to my appointment as receiver, on or about May 26, 2021, I was engaged by the Debtor to be its manager to complete construction of the Airole Property and manage its marketing and ultimate sale. I was engaged by Debtor because of my expertise in dealing with troubled real property developments. I have no interest in the Debtor and my engagement as manager was limited to dealing with the Airole Property. Prior to my appointment as receiver, I resigned my position of manager of the Debtor.

5. On July 2, 2021, the Court entered its Order for Appointment of Receiver (the "Receivership Order"). A true and correct copy of the Receivership Order is attached hereto as **Exhibit 1**.

6. On July 23, 2021, the state court entered its Amended (1) Order Confirming Appointment of Receiver *Pendente Lite*; and (2) Preliminary Injunction in Aid of Receiver (the "Preliminary Injunction Order"). A true copy of the Preliminary Injunction Order is attached hereto as **Exhibit 2**.

7. True and correct copies of my First, Second and Third Receiver Reports filed in the State Court Action are attached hereto as **Exhibits 3, 4 and 5**, respectively.

8. Although the Receivership Order included a temporary restraining order prohibiting any party from withholding from me any Receivership Property, including any plans and permits, the Debtor and the purported developer of the Airole Property, Skyline Development, refused

several demands made by me to turn over the books and records of the Debtor. Debtor's refusal to comply with the Receivership Order precipitated my need to employ counsel. Accordingly, on July 16, 2021, I filed a motion to employ BG as my counsel to assist me in fulfilling my receivership duties. A true and correct copy of that motion is attached hereto as **Exhibit 6**.

9. On July 23, 2021, the state court entered an order authorizing me to retain BG as my counsel. A true and correct copy of this order is attached hereto as **Exhibit 7**.

10. Notwithstanding the Debtor's refusal to turnover its books and records, I worked diligently to recover the plans and permits and ultimately, with the assistance of my counsel, recovered a large portion of what was missing.

11. However, I was not able to recover the Debtor's financial books and records from the Debtor or Skyline Development. Accordingly, I, with the assistance of my counsel, served several subpoenas on First Republic Bank and Sail North Hollywood Escrow, Inc., which were both entities known by me to have financial records relating to the Debtor. It was imperative that I obtain the Debtor's financial records because immediately after being appointed numerous parties began contacting me demanding payment for services and work performed prior to my appointment, including a $366,000 claim by the previous project manager and a $300,000 claim by Centurion. The claim by Centurion was based on an agreement entered into by the Debtor's former manager, Nile Niami, after my appointment and without my knowledge or consent. Additionally, several mechanic's liens had been filed. Without the Debtor's financial records, it was impossible for me to determine which parties had legitimate claims for unpaid services and work. After obtaining the Debtor's bank statements from First Republic Bank, I worked diligently to investigate the legitimacy of the claims and the filed mechanic's liens.

12. Prior to my appointment, there was very limited security at the property, and as a result, there were numerous break-ins and even some social media challenges regarding gaining access to the property. Accordingly, immediately after my appointment, I engaged on-site security at the Airole Property, which company continues to be utilized by the Debtor. Additionally, the alarm system was not complete at the property, so I contracted to complete the portions of the system that were not finished.

13.     At the time of my appointment, the Airole Property was not insured as all forms of insurance coverage on the Airole Property lapsed in early 2021.  This was obviously a major concern of mine.  Accordingly, I immediately began working towards placing new coverage on the Airole Property, and was able to initially secure liability insurance.  Understanding that fire and construction defect insurance was also needed, I employed insurance agents to work to obtain more fulsome insurance coverage on the property.  These efforts took significant time and were complicated by the state of the unfinished construction on the Airole Property, the lack of plans and permits, the size and scope of the project and the fire risk associated with the location. Notwithstanding, I worked diligently with the insurance agents and ultimately was able to obtain an insurance policy on the property.  I paid the initial payment on the policy with the consent of Debtor's bankruptcy counsel after the Petition Date.

14.     I also worked diligently to protect and repair the Airole Property as needed.  While I was Receiver, large portions of the marble that make up the perimeter wall of the main outside pool and the perimeter wall of the property cracked and ultimately separated from the structure.  I contracted to have the marble fixed.  However, even after the marble was fixed, water issues continued to occur, including leaking from the skylights at the entry of the Airole Property.  In order to prevent further damage to the Airole Property, I drained the pools surrounding the Property, and engaged a contractor to fix the leaking skylights.  The initial review of the ceiling area raised concerns of potential mold.  In order to fully understand the scope of the water issues and to create a plan to properly fix the issues, I engaged Xpera Group to provide a comprehensive report of the water issues at the Airole Property.  A true and correct copy of Xpera Group's initial report is attached hereto as **Exhibit 8**.

15.     I, with the assistance of counsel, sent a notice of claim letter to the insurer on the Airole Property regarding the potential mold issue.

16.     Additionally, I provided on-site management services to oversee the repairs at the Airole Property and engaged entities to maintain the property, including, among other things, housekeeping services, landscape maintenance services, a property caretaker, and pool cleaning services.

17.     I also worked diligently to resolve outstanding issues with the Bel Air HOA and the City in order to obtain a Certificate of Occupancy.  As detailed in my Third Report, Exhibit 5, I planned an on-site meeting the inspectors from the City to begin the process of completing the items needed to obtain a Certificate of Occupancy.

18.     Additionally, I worked diligently with the Bel Air HOA to resolve significant issues it had concerning the permits as compared to the as-built structure of the Airole Property.  The Bel Air HOA, on numerous occasions, indicated to me its intent to appeal certain permits.   I worked with the Bel Air HOA to get it to agree to forgo taking any further action until an independent forensics engineering firm could conduct a detailed evaluation of the as-built structure compared to the approved plans and permits.  Accordingly, I engaged Vertex to complete this evaluation.  Vertex's initial findings are detailed in my Third Report, Exhibit 5.

19.     I also engaged On Location Inc. to market the Airole Property for short-term rentals for photoshoots and other similar engagements.  This engagement proved successful for the receivership estate, and ultimately the Debtor, generating $342,000 in rental payments.

20.     Prior to my appointment, the Debtor had engaged Compass Realty and The Beverly Hills Estates, Inc. as brokers to market and sell the Airole Property.  However, the initial period lapsed without a sale, and I asked the existing brokers to submit a more cost effective proposal as the listing agreement contained a Promissory Note Secured by Personal Guaranty in the principal amount of $400,000 in favor of the prior brokers.

21.     Thereafter, I began interviewing additional real estate brokers that specialize in high-end real estate.  On October 4, 2021, I, with the assistance of his counsel, filed an application in the State Court Action to employ Vista Sotheby's International Realty and Westside Estate Agency as my brokers to market, advertise and assist me in the sale of the Airole Property.  On October 8, 2021, the state court entered an order granting that motion.  A true and correct copy of the order granting the Receiver's motion to employ brokers is attached to hereto as **Exhibit 9**.

22.     Through the assistance of my new brokers, I was able to obtain offers to purchase the Airole Property from qualified buyers for $123,000,000 on an "as is, where is" basis and $138,000,000 with a Certificate of Occupancy.  The Receiver countered the "as is, where is" at

$148,000,000, however, the potential buyer rejected the counter. Further, I worked diligently to obtain higher offers to purchase the Airole Property, including communicating with potential purchasers and investigating their qualifications.

23. The Airole Property is fully furnished with artwork, furniture and sculptures provided by several different companies to stage the property. I worked with these companies to obtain copies of the contracts with each company and an inventory of all items provided by each company, which documents were missing from the Debtor's books and records. I was also working with these companies to re-negotiate the rental agreements.

24. As detailed above, I worked diligently to protect and maintain the Airole Property, and to market and sell the Airole Property and to fulfill my receivership duties. I believe my services provided a significant benefit to the Debtor's estate.

25. As of the Petition Date, I was owed $75,445.15 for my unpaid pre-petition services as manager and receiver of the Debtor. Attached hereto as **Exhibit 10** is a true and correct copy of my invoice for my unpaid services.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 22, 2021, at Rolling Hills Estates, California.

THEODORE LANES

**DECLARATION OF DAVID SEROR**

I, David Seror, declare:

1. I am admitted to practice before this Court and am a partner at Brutzkus Gubner Rozansky Seror Weber LLP ("Brutzkus Gubner"), counsel for Theodore Lanes, the court appointed receiver in the State Court Action. I have personal knowledge of the facts in this declaration and, if called as a witness, could and would testify competently to these facts.

2. I make this declaration in support of the Motion to which it is appended. All initial capitalized terms not defined herein shall have the same meaning ascribed to them in the Motion.

3. BG was engaged by the Receiver in July 2021. While BG was employed as the Receiver's counsel, BG assisted the Receiver in his efforts by, among other things:

a. Preparing and filing an employment application and *ex parte* application to advance the hearing on the employment application based on the Receiver's immediate need for the assistance of counsel to aid in the recovery of the Debtor's books and records.

b. Drafting an agreement wherein an employee of Skyline Development agreed to turn over the Debtor's plans and permits in exchange for the payment of his unpaid services and a release of his claims against the Debtor, Hankey, and the receivership estate.

c. Communicating with secured creditors regarding the status of the State Court Action, potential foreclosure by Hankey, and the Receiver's efforts to finish construction on the Airole Property and to market and sell the property.

d. Drafting and serving several subpoenas to First Republic Bank and Sail North Hollywood Escrow, Inc. to assist the Receiver in obtaining the Debtor's financial records.

e. Communicating with First Republic Bank's counsel regarding the subpoenas and production of documents.

f. Communicating with potential purchasers and their attorneys, as requested by the Receiver, in order to conduct due diligence into the purchasers'

qualifications.

g. Providing legal advice regarding the negotiations with the Bel Air HOA.

h. Reviewing and editing the agreement with On Site Location Inc.

i. Reviewing and analyzing the agreements with the vendors providing the artwork, furniture and sculptures staged at the Airole Property, and communicating with vendors regarding outstanding issues.

j. Drafting and filing the Receiver's motion to employ a broker and *ex parte* application to advance the hearing.

k. Drafting and filing a motion for further instructions from the state court in response to certain lienholders threats to sue the Receiver for not stopping Hankey's foreclosure efforts and intervening in related state court litigation and *ex parte* application to advance the hearing so that it was held prior to the scheduled foreclosure.

l. Attending on-site meetings with the secured creditors and their counsel to address the outstanding issues on the Airole Property and to give legal advice to the Receiver regarding the same.

m. Representing the Receiver in related state court litigation by Yogi Securities to postpone the pending foreclosure by Hankey.

n. Drafting a notice of claim to the insurer on the Airole Property regarding the mold issue, and providing legal advice regarding the same.

o. Drafting and serving a cease and desist demand letter regarding authorized advertising of the Ariole Property.

p. Communicating with counsel for the Debtor's former manager, Nile Niami, to negotiate turnover of the Debtor's books and records.

4. Attached hereto as **Exhibit 11** is a list of all services performed by BG to assist the Receiver for which BG had not received payment as of the Petition Date. This Exhibit also sets forth the attorney or paralegal providing the services rendered, the time spent by each professional and their billing rate. This Exhibit also contains a summary of costs and expenses incurred by BG

associated with the services it provided to the Receiver.

5. BG incurred and is seeking allowance of an administrative claim in the amount of $59,704.44 for the prepetition services it provided to the Receiver. This claim includes fees in the amount of $57,715.00 and costs and expenses in the amount of $1,989.44.

6. BG made every effort to limit the expenditure of expenses and to use the most economical means available for accomplishing the tasks requiring expenditure of costs. BG regularly charges $0.25 cents per page for in-house photocopying, scans and prints, which represents BG's estimate of its actual cost for these services for the machines, supplies and extra labor associated therewith. The number of photocopies, scans and prints is recorded each time these are made. BG charged for postage expenses incurred for mailing notices to creditors, serving pleadings, and sending general correspondences. Attorney service, messenger and overnight delivery services are used only when necessary, and BG attempts to avoid extra charges for messenger and overnight delivery expenses when information can be transmitted by other means, such as mail, e-mail or facsimile. Computer research service expenses are passed on at the actual cost incurred by BG.

7. The attorneys at BG that primarily worked on the engagement for the Receiver were Jessica Wellington and myself. We both have significant experience in representing fiduciaries. I have been appointed Receiver by this Court and have previously served as an assignee for the benefit of creditors. I regularly represent receivers, assignees for the benefit of creditors and chapter 7 and 11 bankruptcy trustees. I am also a standing panel chapter 7 bankruptcy trustee in this district.

8. The full C.V.s for Ms. Wellington and myself are attached hereto as **Exhibit 12**.

9. BG's hourly rate schedule is attached hereto as **Exhibit 13**.

10. BG's blended hourly rate for this matter is approximately $580.63.

/ / /

/ / /

/ / /

11. I believe these rates are reasonable given the significant experience and expertise of Ms. Wellington and myself in representing fiduciaries, and as compared to similarly experienced attorneys in the Los Angeles area.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 23, 2021, at Woodland Hills, California.

DAVID SEROR

# EXHIBIT "1"

Electronically Received 07/01/2021 09:12 AM

BUCHALTER
A Professional Corporation
JEFFREY S. WRUBLE (SBN: 94734)
JACK R. SCHARRINGHAUSEN (SBN: 205483)
DAVID E. MARK (SBN: 247283)
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Telephone: 213.891.0700
Fax: 213.896.0400
Email: jwruble@buchalter.com

Attorneys for Plaintiff,
HANKEY CAPITAL, LLC,
a California limited liability company

FILED
Superior Court of California
County of Los Angeles
JUL 02 2021
Sherri R. Carter, Executive Officer/Clerk
By ____ Deputy
K. Metoyer

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES, WEST DISTRICT**

HANKEY CAPITAL, LLC, a California limited liability company,

Plaintiff,

v.

CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,

Defendants.

Case No. 21SMCV01113
Assigned to: Hon. Mark Young
Department: M

**[PROPOSED] ORDER:**

**(1) APPOINTING RECEIVER;**

**(2) ISSUING TEMPORARY RESTRAINING ORDER; AND**

**(3) ORDER TO SHOW CAUSE WHY RECEIVER SHOULD NOT BE CONFIRMED *PENDENTE LITE* AND WHY PRELIMINARY INJUNCTION IN AID OF RECEIVER SHOULD NOT BE GRANTED**

Date: July 2, 2021
Time: 9:00 a.m.
Place: Dept. M

**Order to Show Cause Hearing**
Date: July 23, 2021
Time: 9:00 a.m.
Place: Dept. M

The Court considered the *ex parte* application of Plaintiff, Hankey Capital, LLC, a California limited liability company ("**Plaintiff**"), for an Order Appointing Receiver and related orders, the memorandum of points and authorities and declarations filed in support thereof, including the declaration filed by Defendant, Crestlloyd, LLC, a California limited liability company ("**Borrower**"), the Declaration of Theodore Lanes, the proposed receiver, including the disclosures made in that declaration, all pleadings and documentary evidence in the Court's file, and oral arguments of the parties and their counsel. Based upon the record, the agreement of the parties, and good cause appearing:

**<u>*EX PARTE* ORDER APPOINTING RECEIVER</u>**

**IT IS HEREBY ORDERED** that Theodore Lanes (the "**Receiver**") is appointed as receiver to take possession, custody and control of the Receivership Property, as defined herein, and to protect the Receivership Property. The Receiver shall have all the usual and customary powers of a receiver to take control of and preserve the Receivership Property, in addition to the duties and powers enumerated in this Order.

**IT IS FURTHER ORDERED** that:

1. **<u>Plaintiff's *Ex Parte* Bond</u>**. Plaintiff shall immediately file an applicant's bond under Code of Civil Procedure section 566(b) in the amount of $10,000.00.

2. **<u>Receivership Property</u>**. Includes the following: The real property commonly known as 944 Airole Way, Los Angeles, CA 90077 (APN: 4369-026-021) (the "**Real Property**"), together with improvements thereon, all permits, plans (including all architectural, building, electrical, plumbing, and landscape plans), entitlements and certificates pending, prepared, or issued in connection with the Real Property, all books, records, and bank records of Borrower (including all digital and electronic versions) and all revenues, profits, and proceeds thereof (the "**Personal Property**" and, together with the Real Property, the "**Receivership Property**").

3. **<u>Receiver's Oath and Bond</u>**. Before performing his duties, the Receiver shall execute a receiver's oath and file a bond in the sum of $100,000.00, conditioned upon the faithful performance of the Receiver's duties. The bond shall be from a surety approved by the Court and shall be filed in this Court by no later than 4:00 p.m., on July 9, 2021.

4.  **Receiver's Duties and Powers**. The Receiver shall be vested with the authority to do each and all of the following:

a.    Take possession, custody, and control of the Receivership Property, wherever located, and all of Borrower's bank and brokerage accounts, deposits, equities, profits, and all books, records and writings (as defined in California Evidence Code § 250) related thereto; and open, transfer and change all bank and trade accounts relating to the Receivership Property, so that all such accounts are in the name of the Receiver;

b.    Protect, care for, and preserve the Receivership Property and incur the expenses necessary for such care, preservation and maintenance of the Receivership Property;

c.    Maintain or obtain any certificates, licenses, entitlements, or permits that the Receiver reasonably believes necessary to maintain or increase the value of the Receivership Property, or which may be useful or necessary for the completion, marketing, and sale of the Receivership Property;

d.    Maintain or obtain and pay for any insurance that the Receiver reasonably believes necessary for the protection of the Receivership Property; and

e.    Collect all issues, profits, and income resulting from the sale of the Receivership Property.

f.    **Protection, Management and Liquidation of the Receivership Property**. The Receiver shall manage the Receivership Property until it may be sold, as set forth in this Order, and may employ agents, clerks, contractors or other professionals needed to assist him with the completion of his duties as receiver.  In the exercise of his discretion, the Receiver is authorized and directed, and the Court appoints and makes the Receiver, the attorney in fact for Borrower, for the limited purpose of managing, protecting and preparing the Receivership Property for sale, including:

g.    Protecting and completing construction of the Real Property;

h.    Doing all things necessary to obtain any required permits and sign-offs of all open permits;

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

3

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER
SHOULD NOT BE CONFIRMED, ETC.

27

Main Document Page 34 of 373

i. Obtaining a Certificate of Occupancy and any other governmental approval necessary or useful to complete, sell, and transfer title to the Real Property;

j. Engaging a broker and others to market and assist with the sale of the Real Property, and to do all things appropriate or necessary to complete, market, and sell the Real Property;

k. Entering into a conditional contract(s) to sell the Real Property, and disclose to any proposed purchaser(s) that any contract for sale entered into by the Receiver shall be subject to final approval of the Court pursuant to California Code of Civil Procedure §568.5. The claims of any lienholders shall attach to the net sale proceeds and the Court shall determine how any such proceeds shall be distributed based upon the priority of any lienholder's respective interests in the Real Property; and

l. Opening an escrow for the sale of the Real Property, and to sell the Real Property, on behalf of, and in the name of, Borrower, subject to the terms of this Order.

All fees, charges, commissions, and expenses charged or incurred by anyone engaged by the Receiver for any of the foregoing shall be subject to the Court's review and approval.

5. **No Risk to Receiver**. No risk, obligation, or expense incurred by the Receiver shall be the personal risk or obligation of the Receiver, but shall be the risk, obligation, and expense of the Receivership estate established hereby.

6. **Trustee's Sale, Deed-In Lieu and Cure**. Upon receipt by the Receiver of a Trustee's Deed Upon Sale, notice that Plaintiff has accepted a deed in lieu of foreclosure, or notice from Plaintiff that Borrower has cured the defaults existing under the applicable Loan Documents (as defined in the Complaint in this matter), the Receiver shall turn over possession, custody and control of the Real Property to Plaintiff, Borrower, or a successful bidder at a Trustee's Sale (whichever is appropriate) without further order of this Court. To the extent that the Receiver is divested of possession, custody, and control of the Real Property, and, if consistent with existing law, the Receiver shall thereafter have no liability as to the divested Real Property. After the Receiver turns over possession, custody, and control of the Real Property, the Receiver shall file an application to be discharged by the Court, which may only be accomplished by a court order

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

4

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

28

after a properly noticed motion approving the Receiver's Final Report and Account and any exoneration of the Receiver's Bond.

7. **Litigation**. Any litigation or other legal proceeding involving the Receivership Property will be reviewed by the Receiver and, at the Receiver's discretion and with Plaintiff's and the Court's approval, the Receiver can prosecute or defend such claims. Any proceeds or other assets generated from such legal proceedings are Receivership Property, and any expenses incurred in prosecuting or defending such claims are expenses of the Estate.

8. **Receiver Certificates**.

a. The Receiver may borrow funds from Plaintiff and issue Receivership Certificates to obtain funds necessary to complete the Receiver's duties. At its sole discretion, Plaintiff may advance funds in exchange for Receivership Certificates, upon agreed-upon terms, to fund the Receiver's operations.

b. Funds loaned to the Receiver by Plaintiff pursuant to Receivership Certificates shall become a first lien on the Receivership Property with super priority over all preexisting private liens and encumbrances, except for federal, state, or local tax liens of record upon the Receivership Property.

9. **Use of Funds**. All monies coming into the Receiver's possession shall only be expended for the purposes herein authorized, and the balance of funds shall be held by the Receiver pending further Order of this Court.

10. **Prohibited Agreements**. Except as otherwise provided in this Order, the Receiver shall not enter into an agreement with any party to this action about the administration of the receivership or about any post-receivership matter without further Court order. The Court acknowledges receipt of the disclosures made by the Receiver in connection with the application for this Order.

11. **Receivership Fees and Costs**. The Receiver may charge, as interim fees, his or her standard hourly billing rate, which is currently **$395** per hour, plus reimbursement of costs, for the Receiver's services. The Receiver's staff's hourly rates range from **$85** to **$275**. Where appropriate, the Receiver will have an appropriate staff member handle certain aspects of the

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

5

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

29

Receivership as a cost saving measure. The Receiver is also authorized to employ the services of accountants and attorneys without further Court Order and pay for those services in the amount of the normal fees charged by those professionals.

12. **Monthly Reports and Statements**. The Receiver shall prepare monthly reports that conform with California Rules of Court, Rule 3.1182 and serve monthly statements reflecting the Receiver's fees and administrative expenses, including fees and costs of staff, as well as professionals or others the Court has authorized the Receiver to engage, incurred for each monthly period in the operation and administration of the Receivership Property. Pursuant to California Rules of Court Rule 3.1183, objections to each of the Receiver's interim reports and statements of account, if any, must be made within ten (10) days of notice of the report and statement. If an objection, which shall be made in writing on a line item basis with a statement of the reason for such objection, is timely served, the specific items objected to in such statement of account shall not be paid absent further order of the Court. Failure of a party to object within this ten-day period shall constitute a waiver of that party's objection(s) to the fees for that period. Upon expiration of this ten-day period, the Receiver may disburse from estate funds, if any, the amount of each item that has not been objected to in accordance with this Order. Notwithstanding periodic payment of fees and expenses, all fees and expenses shall be submitted to the Court for its approval and confirmation, in the form of either a properly noticed interim request for fees, a stipulation of all parties, or in the Receiver's Final Account and Report.

13. **Inventory**. Within thirty (30) days after qualification, the Receiver shall file an inventory of all of the property of which the Receiver has taken possession.

14. **Opening of Bank Accounts.** The Receiver is empowered to establish bank accounts for the deposit of monies collected and received in connection with the Receivership Property, at federally insured banking institutions or savings associations located within this state which are not parties to this case. Monies coming into the possession of the Receiver and not expended for any purposes herein authorized shall be held by the Receiver in interest-bearing accounts.

Main Document Page 37 of 373

15. **Insurance**. The Receiver shall determine whether, in the Receiver's judgment, there is sufficient insurance coverage for the Receivership Property. With respect to any insurance coverage, the Receiver shall be named as an additional insured on the policies for the period that the Receiver shall be in possession of the Receivership Property. If the Receiver determines that sufficient insurance coverage does not exist, the Receiver shall immediately notify the parties to this lawsuit and shall, within thirty (30) calendar days, procure such insurance for the Receivership Property; provided, however, that if the Receiver does not have sufficient funds to do so, or if Plaintiff will neither purchase such insurance nor lend the Receivership Estate the monies necessary to do so, the Receiver shall seek instructions from the Court with regard to whether insurance shall be obtained and the mechanism for payment of any insurance policy. If consistent with existing law, the Receiver shall not be responsible for claims arising from the lack of procurement or inability to obtain insurance.

16. **Entry to Receivership Property**. The Receiver shall be entitled to engage a locksmith and security or alarm experts for the purposes of gaining entry to the Receivership Property. The Receiver may have locks or security codes changed, or have keys created that will work for the existing locks.

17. **Tax Identification**. Borrower shall provide the Receiver with all tax identification numbers utilized in connection with the operation of the Receivership Property. The Receiver shall also be entitled to utilize the tax identification numbers during the Receiver's operation of the Receivership Property, or at the Receiver's discretion, the Receiver may obtain new tax identification numbers. Notwithstanding the foregoing, the Receiver shall the ability, but have no obligation, to prepare or file any tax returns on behalf of Borrower.

18. **Mail**. The Receiver is authorized to have all mail addressed to Borrower or the Real Property forwarded to an address to be designated by the Receiver and is authorized to open and review such mail.

19. **Documents in Receiver's Possession**. The parties to this action shall be entitled to have access to, and make copies of, documents in the Receiver's possession—including electronic records—during normal business hours, or at such times as the Receiver may otherwise agree,

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

7

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

31

consistent with all applicable government orders regarding the emergency response to the Covid-19 pandemic.

20. **Further Instructions**. The Receiver and the parties to this case may at any time apply to this Court for further or other instructions or Orders and for further powers necessary to enable the Receiver to perform the Receiver's duties, including issues arising from the Covid-19 pandemic. Any such application by the Receiver for further or other instructions or Orders and for further powers necessary to enable the Receiver to perform the Receiver's duties may be filed on an ex parte basis or by noticed motion, as the Receiver shall determine. The parties shall file any application for further or other instructions by noticed motion unless exigent circumstances support the filing of any such application on an ex parte basis.

21. **Discharge**. Discharge of the Receiver shall require a Court Order after a properly noticed motion approving the Receiver's Final Report and Account.

22. **Plaintiff's Notice to Receiver**. Plaintiff shall promptly notify the Receiver in writing of the names, addresses, and telephone numbers of all parties who appear in the action and their counsel. The parties to this action shall give notice to the Receiver of all events that affect the Receivership, including all Court proceedings in this action.

23. **Bankruptcy – Plaintiff's Duty to Give Notice**. If any of the Defendants files a bankruptcy case during the receivership, Plaintiff shall give notice of the bankruptcy case to the Court, to all parties, and to the Receiver by the close of the next business day after the day on which Plaintiff receives notice of the bankruptcy filing.

24. **Bankruptcy – Receiver's Duties**. If the Receiver receives notice that a bankruptcy has been filed and part of the bankruptcy estate includes property that is the subject of this Order, the Receiver shall comply with 11 U.S.C. § 543. The Receiver may retain legal counsel to assist the Receiver with issues arising out of the bankruptcy proceedings that affect the receivership.

## TEMPORARY RESTRAINING ORDER

**IT IS FURTHER ORDERED** that, pending further Order of this Court, Borrower, all other defendants, and each of them, and their respective members, agents, employees, assignees, successors, representatives, and all persons acting under, in concert with, or for them shall not:

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

8

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

32

1. Directly or indirectly interfere in any manner with the discharge of the Receiver's duties under this Order, including the Receiver's control, management, preservation, marketing and sale of the Receivership Property;

2. Conceal, remove, expend, disburse, transfer, assign, sell, convey, devise, pledge, create a security interest in, encumber, or in any manner whatsoever deal in or dispose of the whole or any part of the Receivership Property;

3. Withhold from the Receiver any Receivership Property, including any plans, permits, monies, books, or records;

4. Commit or permit any waste of the Receivership Property or any part thereof, or suffer or commit or permit any act on the Receivership Property or any part thereof in violation of law, or remove, transfer, encumber or otherwise dispose of any of the Receivership Property or any part thereof; and

5. Do any act which will, or which will tend to, impair, defeat, divert, prevent, or prejudice the preservation, marketing, and sale of the Receivership Property.

**THE COURT ORDERS PLAINTIFF** to promptly file a temporary restraining order bond under Code of Civil Procedure section 529 in the amount of $____________.

**IT IS FURTHER ORDERED** that no individual or entity may sue the Receiver without first obtaining permission of this Court.

**ORDER TO SHOW CAUSE**

**IT IS HEREBY ORDERED** that Borrower appear on ____________________, 2021, at _____ ____.m., in Department ____ of the above-captioned Court, located at 1725 Main St., Santa Monica, CA 90401, to show cause, if Borrower has any:

1. Why Borrower, all other defendants, and each of them, and their respective members, agents, employees, assignees, successors, representatives, and all persons acting under, in concert with, or for them should not be enjoined and restrained from, in any manner, directly or indirectly, receiving, collecting, diverting or otherwise taking any Receivership Property, or any revenue or profit derived therefrom, expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering,

concealing, or in any manner whatsoever dealing in, disposing of or impairing the value of the whole or any part of the Receivership Property, or any proceeds or other income derived therefrom; and

2. Why the Receiver should not be confirmed *pendente lite* to take possession, custody and control of the Receivership Property, and to maintain, conserve and liquidate such Receivership Property with the powers and duties enumerated above and in accordance with the terms of this Order and until further Order of this Court.

**SERVICE AND BRIEFING SCHEDULE**

The Summons and Complaint, Plaintiff's *ex parte* Application, Memorandum of Points and Authorities, this Order and all declarations and supporting papers are to be personally served on Borrower, or its attorneys of record, no later than July 9, 2021, with proof of service to be filed in Department M no later than July 12, 2021.

Any opposition to this Order to Show Cause is to be personally served on Plaintiff's attorneys of record and filed in Department M no later than July 15, 2021.

Any reply is to be personally served on Borrower, or its attorneys of records, and filed in Department M by no later than July 20, 2021.

**IT IS SO ORDERED.**

Dated: July 2, 2021

Judge of the Los Angeles Superior Court

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

10

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

34

**PROOF OF SERVICE**

**HANKEY CAPITAL, LLC v. CRESTLLOYD, LLC, et al.**
**LASC CASE NO. 21SMCV01113**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is at BUCHALTER, A Professional Corporation, 1000 Wilshire Blvd., 15th Floor, Los Angeles, CA 90017; and my email address is rauceda@buchalter.com.

On the date set forth below, I served the foregoing document described as:

**[PROPOSED] ORDER: (1) APPOINTING RECEIVER; (2) ISSUING TEMPORARY RESTRAINING ORDER; AND (3) ORDER TO SHOW CAUSE WHY RECEIVER SHOULD NOT BE CONFIRMED *PEDENTE LITE* AND WHY PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED**

on all other parties and/or their attorney(s) of record to this action by ☐ electronically serving ☒ emailing, and/or ☐ placing a true copy thereof in a sealed envelope as follows:

**See attached Service List**

☐ **BY MAIL** I am readily familiar with the business' practice for collection and processing of correspondence for mailing with the United States Postal Service. The address(es) shown above is(are) the same as shown on the envelope. The envelope was placed for deposit in the United States Postal Service at Buchalter in Irvine, California on July 1, 2021. The envelope was sealed and placed for collection and mailing with first-class prepaid postage on this date following ordinary business practices.

☑ **BY EMAIL** On July 1, 2021, I caused the above-referenced document(s) to be sent in electronic PDF format as an attachment to an email addressed to the person(s) on whom such document(s) is/are to be served at the email address(es) shown above, as last given by that person(s) or as obtained from an internet website(s) relating to such person(s), and I did not receive an email response upon sending such email indicating that such email was not delivered.

☐ **BY ELECTRONIC SERVICE** On July 1, 2021, via electronic transmission to One Legal LLC e-service via the Internet as a pdf scanned image of the document.

☑ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge. Executed on July 1, 2021, at Los Angeles, California.

| Ronnie Auceda | */s/ Ronnie Auceda* |
|---|---|
| (Print Name) | (Signature) |

**SERVICE LIST**

| | |
|---|---|
| Theodore "Ted" Lanes<br>Lanes Management Services<br>655 Deep Valley Drive, Suite 125-P<br>Rolling Hills Estate, CA 90274 | Manager and Agent for Service of Process for Defendant Crestlloyd, LLC<br><br>Email: tl@lanesmgmt.com<br>Telephone: (310) 766-1414 |
| Marcos Almeida<br>Legal Executive<br>Southpac Group<br>Registrado na Ordem dos Advogados do Brasil/ MG 132.407 | Advisor to Southpac Trust International, Inc., as Trustee of the Park City Family Settlement, the sole member of Crestlloyd, LLC ("Borrower")<br><br>Email: malmeida@southpacgroup.com |

# EXHIBIT “2”

Electronically Received 07/22/2021 03:20 PM

BUCHALTER
A Professional Corporation
JEFFREY S. WRUBLE (SBN: 94734)
JACK R. SCHARRINGHAUSEN (SBN: 205483)
DAVID E. MARK (SBN: 247283)
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Telephone: 213.891.0700
Fax: 213.896.0400
Email: jwruble@buchalter.com

Attorneys for Plaintiff,
HANKEY CAPITAL, LLC,
a California limited liability company

**FILED**
Superior Court of California
County of Los Angeles
07/23/2021
Sherri R. Carter, Executive Officer / Clerk of Court
By: K. Metoyer Deputy

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES, WEST DISTRICT**

HANKEY CAPITAL, LLC, a California limited liability company,

Plaintiff,

v.

CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,

Defendants.

Case No. 21SMCV01113
Assigned to: Hon. Mark Young
Department: M

**[AMENDED ~~PROPOSED~~]**

**(1) ORDER CONFIRMING APPOINTMENT OF RECEIVER *PENDENTE LITE*; AND**

**(2) PRELIMINARY INJUNCTION IN AID OF RECEIVER**

**Order to Show Cause Hearing**
Date: July 23, 2021
Time: 9:00 a.m.
Place: Dept. M

The hearing on the Order to Show Cause Why Receiver Should Not Be Confirmed *Pendente Lite* and for Issuance of A Preliminary Injunction In Aid of Receiver having come on regularly for hearing on July 23,, 2021 at 9:00 a.m., the Court, having considered the *ex parte* application of Plaintiff Hankey Capital, LLC, a California limited liability company (“**Plaintiff**”), for the appointment of a receiver, the Memorandum of Points and Authorities and Declarations previously filed in support thereof, the pleadings in this action, and good cause appearing:

**ORDER CONFIRMING APPOINTMENT OF RECEIVER**

**IT IS HEREBY ORDERED** that:

1. Theodore Lanes is hereby confirmed as receiver ("**Receiver**");

2. In addition to the powers specified by law, Receiver shall continue to have the powers and duties as set forth in the Order (1) Appointing Receiver; (2) Issuing Temporary Restraining Order; and (3) Order to Show Cause Why Receiver Should Not Be Confirmed *Pendente Lite* and Why Preliminary Injunction In Aid of Receiver Should Not Be Granted issued by this Court on July 2, 2021 (the "**Receivership Order**"), as well as the power to enter into short term agreements to rent the Real Property (as that term is defined in the Receivership Order), or a portion thereof, for a term of no more than 21 days at a time and collect all issues, rents, profits, and income resulting therefrom;

3. The Receiver, having taken and filed an oath to perform his duties as receiver as required by the Receivership Order, and the Receiver's bond having been filed, no additional bond is required.

**PRELIMINARY INJUNCTION**

IT IS FURTHER ORDERED that effective upon entry of this Order, Defendant Crestlloyd, LLC, a California limited liability company ("**Receivership Defendant**"), its officers, members, directors, agents, servants, employees and all persons or entities acting under, or in concert with them or for them, are enjoined from engaging in, or performing, directly or indirectly, any or all of the following acts:

1. Directly or indirectly interfering in any manner with the discharge of the Receiver's duties under this Order, including the Receiver's control, management, preservation, marketing and sale of the Receivership Property as described in the Receivership Order;

2. Concealing, removing, expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, creating a security interest in, encumbering, or in any manner whatsoever dealing in or disposing of the whole or any part of the Receivership Property;

3. Withholding from the Receiver any Receivership Property, including any plans, permits, monies, books, or records;

4. Committing or permitting any waste of the Receivership Property or any part thereof, or suffering or committing or permitting any act on the Receivership Property or any part thereof in violation of law, or removing, transferring, encumbering or otherwise disposing of any of the Receivership Property or any part thereof; and

5. Doing any act which will, or which will tend to, impair, defeat, divert, prevent, or prejudice the preservation, marketing, and sale of the Receivership Property.

Plaintiff, having previously filed a bond for temporary restraining order and/or preliminary injunction, no further bond is required.

**IT IS SO ORDERED.**

Dated: 07/23/2021

Judge of the Los Angeles County Superior Court

# EXHIBIT "3"

Electronically FILED by Superior Court of California, County of Los Angeles on 08/10/2021 06:02 PM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Mohammadi,Deputy Clerk

Theodore Lanes
Receiver
Lanes Management Services
655 Deep Valley Drive, Suite 125-P
Rolling Hills Estates, CA 90274
Telephone: 424.237.8030
Facsimile: 310.693.9494
E-Mail: tl@lanesmgmt.com

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES – WEST JUDICIAL DISTRICT**

HANKEY CAPITAL, LLC, a California limited liability company,

Plaintiff,

vs.

CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,

Defendants.

**Case No. 21SMCV01113**

**Hon. Mark Young, Dept. M**

**RECEIVER'S FIRST REPORT FOR THE PERIOD ENDING JULY 31, 2021**

**RECEIVER'S INVENTORY**

Receiver Theodore Lanes hereby submits the following First Interim Report regarding his administration of the receivership in this matter for the period ending July 31, 2021 and Receiver's Inventory.

Theodore Lanes was appointed as Receiver in this matter by an Order Appointing Receiver issued by Los Angeles Superior Court Judge Mark Young on July 2, 2021 (the "Receivership Order"). The Receiver

was further confirmed by an Order of this Court entered July 23, 2021. The Receivership Order directs the receiver to take possession, custody and control of the real property commonly known as 944 Airole Way, Los Angeles, CA 09977 (APN: 4369-026-021) (the "**Real Property**"), together with improvements thereon, all permits, plans (including all architectural, building, electrical, plumbing, and landscape plans), entitlements and certificates pending, prepared, or issued in connection with the Real Property, all books, records, and bank records of Borrower(including all digital and electronic versions) and all revenues, profits, and proceeds thereof (the "**Personal Property**" and, together with the Real Property, the "**Receivership Property**").

The Receiver filed his oath on July 2, 2021, and a $100,000 bond on July 7, 2021. A true and correct copy of the oath and bond are attached hereto as "**Exhibits 1 & 2**". Immediately thereafter, Mr. Lanes began serving as the Receiver in this matter.

As a reminder to the Court, prior to being appointed Receiver, Mr. Lanes was engaged as the Manager of Crestlloyd, LLC on or about May 26, 2021. As noted in the declaration in connection with the motion for appointment of Receiver, Mr. Lanes resigned that position.

**Banking Records & Inventory**

A bank account was established by the Receiver at Wells Fargo in the name of the Receivership of 944 Airole. Shortly thereafter, the account received the initial funding of $577,745.00, from Hankey Investment Capital. The initial budget supporting that request,

and the Receivers Certificate in support of that advance, is attached hereto as **"Exhibit 3"**.

Shortly after the July 2 appointment hearing, The Receiver sent demand letters to the individuals that he was informed were in possession of all the books and records that comprise the Personal Property of the Receivership Estate. Both those individuals, Doug Witkins and Tony Camarena, are employed by Skyline Development, the purported developer of the 944 Airole Way project. Both Witkins and Camarena denied having access to, or control of, the Personal Property.

Specifically, attached as hereto as **"Exhibit 4"**, is a true and correct copy of email correspondence between the Receiver, Witkins and Camarena. Witkins replied, denying having any of the requested documents, other than a few lender statements and permit applications. Those were ultimately provided but are of little use due to their age. Also attached as **"Exhibit 5"**, is a true and correct copy of the response from Camarena, acknowledging receipt of the Order, but denying having any of the Personal Property.

After a significant amount of discussion with multiple parties, Mr. Camarena acknowledged that he did in fact have control of the plans and permits for 944 Airole, and in exchange for reimbursement of his expenses incurred on behalf of the property, and his unpaid wages during 2021, he would return the documents. Since this expenditure was not in the budget provided with the initial Receivership Certificate request, Hankey Investment Capital was consulted and approved the expenditure. On Friday July 30, the Receiver met Mr. Camarena and recovered the assets. Although a

large portion of what was missing was recovered, it does not appear that all of the plans and permits were recovered. The missing documents will need to be replaced or recreated.

**Financial records**

What is known to be missing are all of the financial books and records defined in the Appointment Order. As previously stated, the Receiver requested that Doug Witkins of Skyline Development provide a copy of the financials and banking information for the 944 Airole project. He stated that he does not have them and claimed that Tony Camarena had those books and records. Mr. Camarena also denied having the financial records.

**Furniture and Artwork**

Attached hereto as **"Exhibit 6"**, is a true and correct copy of the agreement with Creative Art Partners ("CAP") detailing the artwork that is onsite at 944 Airole. This document details the numerous pieces that have been provided to stage the house for sale. It appears that this is actually a purchase agreement, and not a rental agreement, however it is between CAP and a previously unknown entity, 1620 Carla Estate, LLC. The Receiver has yet to determine the best path forward on this issue.

**"Exhibit 7"** is a true and correct copy of the agreement with Vesta detailing the furniture that is onsite at 944 Airole. This document details the terms under which numerous pieces have been provided to stage the house for sale. There are approximately 200 pieces provided by Vesta, and it does not have an inventory of what

was provided, however one is being prepared. At this moment the receivership has yet to determine the best path forward on this issue.

In the entryway of the home is a large, rotating sculpture. A picture of which is attached as **"Exhibit 8"**. The artist provided this artwork under an Artwork Display Agreement, attached as **"Exhibit 9"**. The Receiver has yet to determine the best path forward on this issue.

**Property Financials**

**Mechanics Liens**

Attached as **"Exhibit 10"** is a true and correct copy of a title report that was prepared as of May 20, 2021. It details the following mechanics liens and unpaid property taxes which total $2,100,112.21 before any accruing interest or legal fees. To date, the Receiver has not confirmed the validity of the mechanics liens, nor their balances.

| Date | Type | Amount |
|---|---|---|
| 2020 - 2021 | Property Taxes | $ 1,697,232.63 |
| August 10, 2018 | Cemex Construction | $ 25,978.90 |
| June 29, 2020 | American Truck & Tool | $ 97,050.34 |
| June 30, 2020 | J&E Texture, Inc. | $ 214,147.50 |
| Sept 20, 2020 | Rolls Scaffold, Inc. | $ 14,412.84 |
| May 6, 2021 | JMS Air Conditioning | $ 51,290.00 |
| | **Total** | **$ 2,100,112.21** |

//// 

**Unfinished construction issues**

To date, a number of construction related issues have been discovered, and resolution will require not only funding, but interaction with the City of Los Angeles. A partial list includes:

- The catering kitchen permit was denied, and that space remains completely unimproved.
- The driveway appears to be encroaching on City land. A survey will be required and repairs may be needed.
- The Gas Company will not provide utility service until the Certificate of Occupancy is issued.
- The house remains on temporary power until the appropriate plans are completed and approved by the City.

There is additional work that needs to be done in order to apply for a Certificate of Occupancy. That list is being prepared and the Receiver will keep the Court apprised on the expected budget, timing and progress.

**Other financial issues**

The previous project manager, Dennis Palma, resigned his position in June of 2021. He claims that he is owed approximately $366,000 and has provided some initial documents in support of that claim. The Receiver will continue to investigate and keep the Court apprised.

**Insurance**

All forms of insurance coverage for 944 Airole lapsed in early 2021. The Receiver immediately began working towards placing new coverage, and has secured liability insurance that is now in place. The state of unfinished construction, and until recently, the lack of plans and permits, have greatly complicated the Receivers ability to obtain any form of fire or construction defect insurance. Those discussions are ongoing.

**Security**

Initially there was very limited security at the property. As a result, there were numerous break-ins, and even some social media challenges around gaining access. The Receiver immediately instituted onsite security. Despite the security presence, on July 4th, 4 individuals were caught on property after having scaled a fence to gain access to the house. They were escorted off property without incident. Additionally, the access code to the exterior gate and the keys to the house have all been changed.

The alarm system for the property was not complete, but the Receiver has contracted to complete the installation as to the portions of the system that were not finished. That work is currently underway.

**Property listing**

On or about April 21, 2021, Crestlloyd, LLC entered into a joint listing agreement with Compass realty and The Beverly Hills Estates, Inc. Both firms specialize in very high end properties

and are known to the lenders. Since the Property did not sell during the initial listing period, the Receiver has asked the existing listing brokers to submit a more cost effective proposal and has begun interviewing additional real estate brokerage firms with an expertise in extremely high end homes.

**Financial summary**

| | | Amount |
|---|---|---|
| **Receivers Certificates** | | |
| Hankey Investment Capital | $ | 577,745.00 |
| **Carpenter** | | |
| Jesus Agudelo | $ | (2,600.00) |
| **Housekeeping** | | |
| Yaly Arrazola | $ | (2,800.00) |
| **Insurance** | | |
| Liberty Insurance | $ | (10,149.48) |
| **Pool cleaning** | | |
| Luis Contreras | $ | (2,560.00) |
| **Prior Project Management** | | |
| Tony Camarena | $ | (48,517.57) |
| **Project Management** | | |
| Christopher Torrey | $ | (11,076.90) |
| **Receivership Expenses** | | |
| Banking Fees | $ | (30.00) |
| Bond services | $ | (1,000.00) |
| **Security** | | |
| Draken Security | $ | (13,887.50) |
| **Utilities** | | |
| Frontier | $ | (1,800.00) |
| LADWP | $ | (30,000.00) |
| **Vendor** | | |
| CalGrove | $ | (12,338.95) |
| Italian Luxury Group - ILG | $ | (224,300.00) |
| Midland Construction | $ | (50,000.00) |
| Western electrical supply | $ | (27,132.48) |
| **Ending Balance** | **$** | **139,552.12** |

**Summary**

This is a very complicated property with quite a few open issues. At present the focus is to obtain complete insurance and develop a timeline and budget to secure the Certificate of Occupancy in order to maximize value and to make property more marketable.

Respectfully submitted,

Theodore Lanes

Receiver

# Exhibit 1

Electronically FILED by Superior Court of California, County of Los Angeles on 07/02/2021 04:14 PM Sherri R. Carter, Executive Officer/Clerk of Court, by S. Watson,Deputy Clerk

THEODORE LANES
Receiver
Lanes Management Services
655 Deep Valley Drive, Suite 125-P
Rolling Hills Estates, CA 90274
Tel: 424.237.8030
Fax: 310.693.9494
Email: tl@lanesmgmt.com

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES, WEST DISTRICT**

HANKEY CAPITAL, LLC, a California limited liability company

Plaintiff,

vs.

CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,

Defendants.

CASE NO. 21SMCV01113
Assigned to Hon. Mark Young
Department: M

**OATH OF RECEIVER**

**OATH**

I, Theodore Lanes, having been appointed Receiver in the above-entitled action, do solemnly swear that I will faithfully perform the duties of Receiver and observe all the instructions of the above-entitled Court.

Moreover, I have not entered into any contract, agreement, arrangement or understanding with any of the parties to this action as to (i) what my role as receiver will be during or after the proposed receivership; (ii) whether I, or any management company with whom I work, will receive any listing or right to manage the property at issue after termination of the proposed receivership; (iii) how I will administer the proposed receivership or how much my charges will be; or (iv) what capital expenditures will be made to the property at issue.

Dated: July 2, 2021

THEODORE LANES, Receiver

# Exhibit 2

# American Contractors Indemnity Company

In the SUPERIOR Court
County of LOS ANGELES State of California

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JUL 07 2021

Sherri R. Carter, Executive Officer/Clerk
By: Marcos Mariscal Deputy

HANKEY CAPITAL, LLC, a California limited liability company,

Plaintiff,

v.

CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,

Defendants.

COPY

**Case No.** 21SMCV01113

**UNDERTAKING UNDER SECTION** 567(b) C.C.P.

American Contractors Indemnity Company
801 S. Figueroa St., Suite 700
Los Angeles, CA 90017

**WHEREAS**, the above named THEODORE LANES desires to give an undertaking for RECEIVER as provided in Section 567(b) C.C.P.

**NOW THEREFORE**, the undersigned Surety, does hereby obligate itself, jointly and severally, to THE STATE OF CALIFORNIA under said statutory obligations in the sum of ONE HUNDRED THOUSAND and 00/100 Dollars ($ 100,000.00 ).

**IN WITNESS WHEREOF**, The corporate seal and name of the said Surety Company is hereto affixed and attested by JUSTIN BUENAVENTURA who declares under penalty of perjury that he is its duly authorized Attorney-in-Fact acting under an unrevoked power of attorney on file with the Clerk of the County in which above entitled Court is located.

Executed at LOS ANGELES, California on JULY 6, 2021

**Bond No.** 1001152329

The premium charge for this bond is
$ 1,000.00 per annum.

**AMERICAN CONTRACTORS INDEMNITY COMPANY**

[signature]

Attorney-in-Fact JUSTIN BUENAVENTURA

# Exhibit 3

THEODORE LANES
655 Deep Valley Drive, Suite 125-P
Rolling Hills Estates, CA 90274
Telephone: (424) 237-8030
Fax: (310) 693-9494
Email: tl@lanesmgmt.com

Court-Appointed Receiver

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES, WEST DISTRICT**

HANKEY CAPITAL, LLC, a California limited liability company,

Plaintiff,

vs.

CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,

Defendants.

Case No. 21SMCV01113
Assigned to: Hon. Mark Young
Department: M

**RECEIVER'S CERTIFICATE #1**

**RECEIVER'S CERTIFICATE OF INDEBTEDNESS**

Certificate Number: 1

Amount of Advance: $577,742.73

Date of Advance: July 14, 2021

Related to: 944 Airole Way, Los Angeles, CA 90077 (APN: 4369-026-021 (the "**Property**"), the legal description of which is attached hereto as Exhibit "A"

This Receiver's Certificate of Indebtedness ("**Certificate**") is issued by Theodore Lanes, not individually, but solely in his capacity as Receiver of the property put in his possession and control by that "Order (1) Appointing Receiver; (2) Issuing Temporary Restraining Order; and (3) Order to Show Cause Why Receiver Should Not Be Confirmed Pendente Lite and Why Preliminary Injunction In Aid of Receiver Should Not Be Granted" entered on July 2, 2021 in that certain action pending in the Superior Court of California for the County of Los Angeles as Case No. 21SMCV01113 (the "**Receivership Action**").

This Certificate evidences that there is due to Hankey Capital, LLC, a California limited liability company ("**HC**") from the receiver and the receivership estate in the Receivership Action, the principal sum of FIVE HUNDRED SEVENTY SEVEN THOUSAND, SEVEN HUNDRED FORTY FIVE dollars ($577,745.00) (the "**Indebtedness**"). Interest shall accrue on the unpaid portion of the Indebtedness from the date of advance at the rate of ten per cent per annum.

The Indebtedness may be prepaid in whole or in part at any time without penalty. In any event, the Indebtedness is payable on the next business day after the second anniversary of the date of execution of this Certificate, upon the date of the final distribution of the receivership estate's assets, or upon further order of the Court in the Receivership Action, whichever first occurs.

This Certificate is subject to redemption in whole or in part at any time before maturity at par with accrued interest, provided that at the time of redemption, the Receiver holds funds totaling in excess of the sum of (i) the amount to be redeemed, (ii) current accounts payable and (iii) other fees and expenses of the receivership estate projected to be due within the next 60 days after redemption.

This Certificate is related to the Property. The Indebtedness evidenced by this Certificate is senior in priority to all other indebtedness relating to the Property and is secured by a super priority lien and security interest in favor of HC with priority over all other liens, claims, and interests encumbering or related to the Property, provided, however, the Indebtedness evidenced by this Certificate does not have priority over the Court-approved fees, costs, and expenses of the

receivership estate, or the court-approved fees, costs, and expenses of the Receiver's agents and professionals employed and retained by the Receiver in connection with the Receiver's administration of the receivership estate.

This Certificate is issued under the authority of, and in accordance with, the orders entered in the Receivership Action. This Certificate is a debt of the receivership estate and is not the personal obligation or liability of the Receiver.

IN WITNESS WHEREOF, Theodore Lanes has executed this Certificate solely in his capacity as Receiver, on July 14, 2021, at Rolling Hills Estates, California.

Theodore Lanes, Solely in his Capacity as Receiver

Exhibit A
Legal Description of the Property

**LEGAL DESCRIPTION**

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGES 81 TO 83 INCLUSIVE, OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET, AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 52"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE;

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET; THENCE NORTH 89° 27' 20" WEST 214.07 FEET MORE OR LESS, TO A POINT IN THE WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: 4369-026-021

| | | | |
|---|---|---|---|
| **Christopher Torrey** | | | |
| week ended June 11 | 1,846.15 | | |
| week ended June 18 | 1,846.15 | | |
| week ended June 25 | 1,846.15 | | |
| week ended July 2 | 1,846.15 | | |
| week ended July 9 | 1,846.15 | | |
| week ended July 16 | 1,846.15 | | |
| week ended July 23 | 1,846.15 | | |
| **Total** | | 12,923.05 | |
| | | | |
| **Italian Luxury Group** | | 224,300.00 | |
| | | | |
| **Biabani Electrical** | | | |
| Down Payment on Proposal | | | |
| 40% of $28,000 | | 11,200.00 | |
| | | | |
| **Midland Contractors** | | | |
| RFP SD070721Q-4 | 65,000.00 | | |
| Change order #2G | 350.00 | | |
| **Total** | | 65,350.00 | |
| | | | |
| **Parquet by Dian** | | | |
| Invoice 52421 | | 40,846.00 | |
| | | | |
| **BMC** | | 2,398.60 | intent to lien |
| | | | |
| **Calgrove Rentals** | | | |
| Invoice 125929E-1 | 3,059.55 | | |
| Invoice 125929F-1 | 3,059.55 | | |
| Invoice 125929G-1 | 3,059.55 | | |
| Invoice 125929H-1 | 3,160.30 | | |
| **Total** | | 12,338.95 | |
| | | | |
| **Western Electric Supply** | | | |
| Powertek Electric | | 27,132.48 | |
| | | | |
| **Anawalt** | | | |
| Total Balance | 6,726.63 | | |
| Less: Other Properties | (2,116.82) | | |
| **Net Airole balance** | | 4,609.81 | |
| | | | |
| **Liberty (Liability Insurance)** | | | |
| Invoice 1127750 | 3,054.14 | | |
| Invoice 1127749 | 6,940.42 | | |
| Total | | 9,994.56 | |

| | | |
|---|---|---|
| **Draken Security** | | |
| week ended July 9 | 2,800.00 | |
| week ended July 16 | 2,800.00 | |
| week ended July 23 | 2,800.00 | |
| Total | | 8,400.00 |
| | | |
| **Frontier** | | |
| Past Due | 892.78 | |
| July | 451.32 | |
| Total | | 1,344.10 |
| | | |
| **LADWP** | | |
| Past Due | 34,705.18 | |
| Current Months estimate | 20,000.00 | |
| Total | | 54,705.18 |
| | | |
| **Pest Control** | | 1,600.00 |
| | | |
| **Plus Development** | | 21,000.00 |
| | | |
| **Gardener** | | |
| Past Due | 28,000.00 | |
| Current Month | 5,000.00 | |
| Total | | 33,000.00 |
| | | |
| Housekeeping | | 2,000.00 |
| Jesus Aguelo - carpenter | | 2,600.00 |
| Pool Service | | 2,000.00 |
| | | |
| Misc. and unknown | | 10,002.27 |
| | | |
| Receivership Fee Retainer | | 30,000.00 |
| | | |
| **Total** | | $ 577,745.00 |

# Exhibit 4

**From:** **Douglas Witkins** doug@skylinedevelopment.net
**Subject:** Re: Airole Way Receivership
**Date:** July 8, 2021 at 5:14 PM
**To:** Ted Lanes tl@lanesmgmt.com

Ted

I do not have in my possession any permits, books or bank statements re Crestlloyd, but I do have some lender statements and copies of some permit applications.
All the entity docs I have previously provided to Hankey and Buchalter. Yvonne's attorney has the dropbox link. Let me know if you still need them.
There are some miscellaneous items that crossed my desk (title reports, marketing materials, loan docs, tax returns, surveys, floor plans, soils reports, etc.
I will gather these in a dropbox and forward them to you tomorrow.
There is an artist who has a UCC-1 on his sculpture at the entrance which is not owned by Crestlloyd, LLC. I will send you what I have on that as well.

Doug

---

**From:** Ted Lanes <tl@lanesmgmt.com>
**Date:** Tuesday, July 6, 2021 at 7:48 AM
**To:** Tony Camarena <tonyc@skylinedevelopment.net>, Doug Witkins <doug@skylinedevelopment.net>
**Subject:** Airole Way Receivership

Gentlemen,

Attached please find the conformed copy of the Court Order dated July 2 appointing me as Receiver over 944 Airole Way.

Section 2 of the Order defines the assets included in my estate to include not only the house, but all permits, plans, books, records and bank records (including bank statements and cancelled checks), among other things.

Starting on page 8 of the Order, is a Temporary Restraining Order which states that you need to deliver to me directly, or in the case of the plans and permits, they can be delivered to 944 Airole, all the aforementioned items in your possession. I can arrange to have the items picked up if that is easier.

Please let me know how you would like to proceed in the collection of the documents as it needs to be completed this week.

Best regards,

- Ted

---

Ted Lanes
tl@lanesmgmt.com
(424) 237-8030 office
(310) 766-1414 cell
(310) 693-9494 fax

PLEASE READ: The information contained in this e-mail is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this e-mail you must not copy, distribute or take any further action in reliance upon it and you should delete it and notify the sender immediately. E-mail is not a secure method of communication. Lanes Management Services cannot accept responsibility for the accuracy or completeness of this message or any attachment(s).

# Exhibit 5

**From:** tonyc@skylinedevelopment.net
**Subject:** Re: Airole Way Receivership
**Date:** July 8, 2021 at 8:05 PM
**To:** Douglas Witkins doug@skylinedevelopment.net, Ted Lanes tl@lanesmgmt.com

Hi Ted,

Per our discussion today, I acknowledge receipt of the emailed court order in regards to receivership. However, I do not possess the plans or documents the receivership is requesting.

Regards,

Tony Camarena
SKYLINE DEVELOPMENT
8981 W Sunset Blvd. Suite 303
West Hollywood, CA 90069
(818)523-3401 (cell)
tonyc@skylinedevelopment.net

---

**From:** Douglas Witkins <doug@skylinedevelopment.net>
**Date:** Tuesday, July 6, 2021 at 12:00 PM
**To:** Ted Lanes <tl@lanesmgmt.com>
**Cc:** Tony Camarena <tonyc@skylinedevelopment.net>
**Subject:** Re: Airole Way Receivership

Certainly.

---

**From:** Ted Lanes <tl@lanesmgmt.com>
**Date:** Tuesday, July 6, 2021 at 11:51 AM
**To:** Doug Witkins <doug@skylinedevelopment.net>
**Cc:** Tony Camarena <tonyc@skylinedevelopment.net>
**Subject:** Re: Airole Way Receivership

Ok, no problem

When you know who it is, please give me a heads up so I know who to expect a call from.

Thanks,

- Ted

Ted Lanes
tl@lanesmgmt.com
(424) 237-8030 office
(310) 766-1414 cell
(310) 693-9494 fax

PLEASE READ: The information contained in this e-mail is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this e-mail you must not copy, distribute or take any further action in reliance upon it and you should delete it and notify the sender immediately. E-mail is not a secure method of communication. Lanes Management Services cannot accept responsibility for the accuracy or completeness of this message or any attachment(s).

On Jul 6, 2021, at 11:05 AM, Douglas Witkins <doug@skylinedevelopment.net> wrote:

Thank you for informing us of this development.
Mr. Niami has instructed me to retain counsel on his behalf.
They will be contacting you directly

---

**From:** Ted Lanes <tl@lanesmgmt.com>
**Date:** Tuesday, July 6, 2021 at 7:48 AM
**To:** Tony Camarena <tonyc@skylinedevelopment.net>, Doug Witkins <doug@skylinedevelopment.net>
**Subject:** Airole Way Receivership

Gentlemen,

Attached please find the conformed copy of the Court Order dated July 2 appointing me as Receiver over 944 Airole Way.

Section 2 of the Order defines the assets included in my estate to include not only the house, but all permits, plans, books, records and bank records (including bank statements and cancelled checks), among other things.

Starting on page 8 of the Order, is a Temporary Restraining Order which states that you need to deliver to me directly, or in the case of the plans and permits, they can be delivered to 944 Airole, all the aforementioned items in your possession. I can arrange to have the items picked up if that is easier.

Please let me know how you would like to proceed in the collection of the documents as it needs to be completed this week.

Best regards,

- Ted

Ted Lanes
tl@lanesmgmt.com
(424) 237-8030 office
(310) 766-1414 cell
(310) 693-9494 fax

PLEASE READ: The information contained in this e-mail is confidential and intended for the named recipient(s) only. If you are not an intended recipient of this e-mail you must not

copy, distribute or take any further action in reliance upon it and you should delete it and notify
the sender immediately. E-mail is not a secure method of communication. Lanes
Management Services cannot accept responsibility for the accuracy or completeness of
this message or any attachment(s).

# Exhibit 6

# CREATIVE ART PARTNERS

## SALE and CURATION SERVICE AGREEMENT for: 944 Airole "The One"

THIS ARTWORK SALE AGREEMENT (this "Agreement") provides for curation, delivery, installation and sale of artwork (the "Artwork").

This Agreement is dated for identification purposes only as of September 23, 2020 and is entered into between and among **CREATIVE ART PARTNERS, LLC** a California limited liability company, located for notice purposes at 6542 Hayes Drive, Los Angeles, CA ("**CAP**") on the one hand, and **1620 CARLA ESTATE, LLC ("CRS")** located for notice purposes at 944 Airole Way, Los Angeles, CA 90077. For purposes of this Agreement, CAP and CRS may be referred to individually as a "Party" and collectively as the "Parties."

**RECITALS**

A. CAP and its associates own all right, title and interest (other than the copyright) in and to those certain pieces of artwork subject of this Agreement (the "Artwork")

B. CRS has listed 944 Airole Way, Los Angeles, CA 90077 (the "Premises") for sale, and in conjunction therewith, CRS wishes to purchase the Artwork for purposes of staging the same at the premises in the course of opening the premises to prospective purchasers

C. The Parties are entering into this Agreement in order to memorialize the terms by which CRS will purchase the Artwork from CAP, on the terms and subject to the conditions set forth in this Agreement

NOW, THEREFORE, the Parties hereby agree as follows

**1. ARTWORK SALE AND RELATED MATTERS**

1.1 **Sale** CRS hereby purchases from CAP, and CAP hereby sells to CRS, the Artwork, on the terms and subject to the conditions set forth in this Agreement.

1.2 **Exclusive Ownership** At all times between the install date and the transfer of ownership, executed via payment in full (the "Art Sale Period"), as between the Parties, the Artwork shall remain the exclusive property of CAP and its associates, and CAP shall remain the legal and rightful owner and title holder of the Artwork, without any right, claim or interest in favor of CRS therein or thereto. At no time shall the Artwork, or any item thereof, constitute or

CREATIVE ART PARTNERS

be deemed a "fixture" (in any context or under any meaning given to such term), for any purpose whatsoever.

1.3 **Protection of Artwork** At all times during the "Art Sale Period" and for so long as the Artwork remains in CRS's possession or under CRS's control, CRS shall take all reasonable precautions necessary to assure the safety, protection and care of the Artwork, including protecting and securing the same against theft, damage or other degradation.

2. **LOGISTICS FEE** In consideration of CAP's agreement for the installation of the Artwork, presently anticipated to be on September 24, 2020, CRS commits to payment in advance, as set forth below:

➢ **Installation cost commitment, broken down as follows:**

- $7,500 to CAP due prior to delivery and installation of Artwork, covering installation

3. **ARTWORK PURCHASE** CRS commits to a pre-purchase of the Artwork per the below payment schedule as follows:

➢ **$510,000 due to CAP (Refer to Addendum A for list of artworks committed to for purchase by CRS), payable within 3 days after close of escrow, or any other "Transfer Event" pursuant to section 5.4 below**

3.1 **PARTIAL PAYMENT TERMS** In the event the property does not sell in the first 12-month period following the installation date, partial payment terms go into effect, as follows:

- At the 12-month date from art installation, presently anticipated to be on September 24, 2021, 50% of the total commitment ($255,000) must be released

- At the 24-month date from art installation, presently anticipated to be on March 24, 2022, 100% of the total commitment ($510,000) must be released

## 4.    DELIVERY: LOCATION: RISK OF LOSS: AND RELATED MATTERS

4.1    **Delivery of the Artwork** Upon commencement of the "Art Sale Period", CAP shall cause the Artwork to be delivered to the Premises. CRS acknowledges that the Artwork shall be deemed to have been delivered to, and received by CRS in excellent condition, without substantial faults, unless CRS notifies CAP in writing to the contrary within twenty-four (24) hours after such delivery.

4.2    **Adjustments to Installation** CRS shall have the one-time opportunity to request reasonable amendments to the locations of the Artwork installed at the Premises within seven (7) days of the completion of the installation, and CAP shall be responsible for the associated logistical fees. Any changes to custom artwork installation thereafter will be subject to additional logistics fees, to be determined under the specific circumstances.

4.3    **Insurance on Artwork** CAP shall provide an insurance policy covering Artwork at all times during the "Art Sale Period", of a general fine art policy of insurance on the Artwork in such amount as is sufficient to cover any reasonably foreseeable risk of loss or damage to the Artwork (including risks associated with theft, loss, defacement, accidental occurrences, recklessness, intentional acts, acts of conscious disregard, acts of God etc) but in no event less than the full replacement cost of the Artwork.

4.4    **Material Change to Property Usage** If the understood usage of the property changes materially (i.e. if an unoccupied property is to be rented out or otherwise inhabited, or a property is to be used as an event or party space) CAP must be notified immediately in order to draw up a new agreement relative to the change

## 5.    TRANSFER AND RELATED MATTERS

5.1    **Right to Transfer** Notwithstanding anything to the contrary in this Agreement, upon the occurrence of a "Transfer Event" (as defined below), CAP shall have the right to immediately terminate the "Art Sale Period" by providing CRS with written notice that the full balance for the artwork sale is due

5.2    **No Refund** Notwithstanding any termination of the "Art Sale Period", CAP shall not be required to refund all or any portion of the Logistics Fee, or any of the Partial Payment obligations set forth in Sections 3. and 3.1, all of which shall be non-refundable upon CAP's receipt thereof

5.3    **"Transfer Event" Defined** For purposes of this Agreement, a "Transfer Event" means the occurrence of any of the following events:



5.3.1 CRS consummates a sale, transfer or other disposition of the Premises, or, in the alternative, CRS removes the Premises from being listed for sale;

5.3.2 The Premises becomes distressed, through a foreclosure or other similar action or proceeding or otherwise

5.3.3. CRS breaches or defaults under any material term, provision, covenant, agreement, representation or warranty under this Agreement, including non-payment or late payment of any fees, and such breach or default is not cured within five (5) business days after CRS's receipt of written notice of such breach or default

5.5 **Party Leaves Listing** In the event that CRS, its associates and principals, become no longer associated with the property listed for sale, all fees outlined in Sections 3. and 3.1 will become immediately due in full

6. **NO WARRANTY** CRS expressly acknowledges that, except as provided in this Agreement, CAP has not made, and is not now making, any promises, covenants, guarantees, assurances, representations or warranties of any kind or nature, express or implied, regarding the Artwork and CAP hereby expressly disclaims all of the same, including any warranty of a particular result or a particular benefit to be realized by CRS as a direct or indirect result of the arrangement contemplated by this Agreement, warranty of fitness for a particular purposes, non-infringement, marketability and title, and any warranties arising from course of dealing, usage or trade practice.

7. **GENERAL PROVISIONS**

7.1 **Limits on CAP's Liability for Damage to Property** CRS understands, acknowledges and accepts that in the process of installing and moving out artwork, walls may be scuffed or scratched and the Property my suffer some incidental damage. Although CAP will in good faith attempt to minimize any such damage, CAP shall not be liable for any such incidental damage. Moreover, any holes in the walls that would reasonably be anticipated for what is needed to hang the artwork are not considered damage, and CAP is therefore not liable for the repair of any such holes

7.2 **Confidential Nature of Agreement** CRS acknowledges and agrees that this Agreement and all of its terms shall be and remain confidential. Except when CAP provides its prior express written authorization, CRS shall not disclose this agreement and/or its terms to anyone or any entity other than CRS's agents and/or employees, if applicable, and/or CRS's tax, financial and/or legal advisors

7.3 **Notices** Any written notice required to be given to CAP shall be emailed to CAP at accounting@creativeartpartners.com. Any written notice required to be given to CRS,

including statements and invoices, shall be emailed to CRS at the email address indicated below (on Signature Page). All parties are required to advise the other of any change in email addresses.

7.4 **Counterpart Signatures, Scanned Signatures, Electronic Signatures** This Agreement may be executed in counterparts, by photocopy/scan, or electronically. All counterpart, photocopied or electronic signatures shall have equal validity and enforceability as a fully-signed original agreement

7.5 **Entire Agreement** This Agreement constitutes the entire agreement between the Parties with respect to CRS's purchase of the Artwork and supersedes and cancels any prior agreements, representations, warranties, or communications, whether oral or written, between the Parties relating to the transactions contemplated by this Agreement or the subject matter herein.

7.6 **Governing Law** California law, without regard to conflict or choice of law principles, shall govern the construction and interpretation of this Agreement.

7.7 **Assignment** Parties may not assign this Agreement or any interest herein to any other party without the other party's written consent, which consent either party may withhold in its sole and absolute discretion.

7.8 **Binding Effect** This Agreement, and all rights and obligations hereunder, shall be binding on and inure to the benefit of the Parties and their respective agents, representatives, and successors.

7.9 **Insurance Information** The following Addendum A must be filled out by CRS accurately in order to properly insure the artworks staged in the Premises. If the information filled out in Addendum A is not accurate and jeopardizes the insurance in the event of loss or damage, CRS shall be liable to CAP for payment of the full replacement cost / current market value.

# SIGNATURE PAGE

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed on its behalf on the date first above written.

Dated: 9/25/2020

"CAP"
By: Rosmarie Reidl, CREATIVE ART PARTNERS LLC

SIGN: DocuSigned by: Rosmarie Riedl 5ECC886860E941A...

Dated: 9/24/20

"CRS"
By: Yvonne Niami, 1620 CARLA ESTATE, LLC

SIGN: [signature]

Email: Yvonne@nphilanthropy.com

The following Addenda are a part of this Agreement:

___ Addendum A – List of Artworks

___ Addendum B - Insurance Questionnaire

CAP
CREATIVE ART PARTNERS

DocuSign Envelope ID: 8AD36002-A45A-49F3-8C6F-DC566A9BCD67

# ADDENDUM A

C A P
CREATIVE ART PARTNERS

78



# THE ONE

**Petra Cortright** **$ 155,000.00**
*10year_braxton contractions_divine comedy*, 2018
Digital painting on anodized aluminium
60h x 118w in
152.40h x 299.72w cm
Unique

**Ammon Rost** **$ 25,000.00**
*I'm on your side #1*, 2018
Oil, flashe, pastel, air brush on canvas
96h x 78w in
243.84h x 198.12w cm
Unique

**José Diaz** **$ 15,000.00**
*P.O.V.*, 2017
Oil on Linen
75.59h x 59.84w in
192h x 152w cm

**Stefan Simchowitz** **$ 20,000.00**
*Palmy Nights*, 2018
Archival pigment print on gloss paper
59h x 87w in
149.86h x 220.98w cm
ED 1 of 5 (+2 AP)

**Marc Horowitz** **$ 4,500.00**
*PSLLL*, 2020
Flashe, gouache, and emulsified gesso on linen/canvas blend over aluminium strainer
99h x 6.50w x 1.50d in
251.46h x 16.51w x 3.81d cm
Unique

**Leif Ritchey** **$ 18,000.00**
*Red Dirt Wine*, 2013
Acrylic on Canvas
83.50h x 72w in
212.09h x 182.88w cm

**Ryan Estep** **$ 25,000.00**
***Sterilized Dirt AA13*, 2014**
**Sterilized dirt on canvas**
**84h x 60w in**
**213.36h x 152.40w cm**

**CAP Custom Artist Commission** **$ 25,000.00**
***To Be Titled***
***[*Image as reference only]*, 2020**
**95h x 45w in**
**241.30h x 114.30w cm**

**Matthew Chambers** **$ 25,000.00**
***That youthful expectation of expanse*, 2017**
**Acrylic, enamel based adhesive and nylon flocking on canvas**
**96h x 48w in**
**243.84h x 121.92w cm**

**Jennifer Boysen** **$ 25,000.00**
***Untitled*, 2016**
**Tempera on canvas**
**80h x 60w x 9d in**
**203.20h x 152.40w x 22.86d cm**

**Luke Diiorio** **$ 15,700.00**
***Untitled*, 2019**
**Oil on linen**
**41.50h x 40w in**
**105.41h x 101.60w cm**
**Unique**

**Kenneth Alme** **$ 18,500.00**
***Untitled*, 2014**
**Oil, acrylic and primer on cotton canvas**
**78.74h x 62.99w in**
**200h x 160w cm**
**Unique**







**Tiziano Martini**
***Untitled*, 2015**
**Acrylic, acrylic sediments and dirt from the studio floor on primed cotton, painted artist frame**
**83.46h x 59.84w in**
**212h x 152w cm**
**Unique**

**$ 17,000.00**

**Tiziano Martini**
***Untitled*, 2015**
**Acrylic, acrylic sediments and dirt from the studio on canvas, artist frame**
**79.13h x 55.51w in**
**201h x 141w cm**
**Unique**

**$ 12,000.00**

**Tiziano Martini**
***Untitled*, 2016**
**Acrylic, monotype process and dirt from the studio on primer on cotton canvas**
**84h x 61w in**
**213.36h x 154.94w cm**
**Unique**

**$ 17,000.00**

**Morgan-Richard Murphey**
***Untitled (Black Ratchet Clamp #10)*, 2014**
**Acrylic and ratchet clamp on canvas with customised aluminium stretcher bars**
**63h x 46w x 2d in**
**160.02h x 116.84w x 5.08d cm**

**$ 8,500.00**

**Morgan-Richard Murphey**
***Untitled (Black Ratchet Clamp #9)*, 2014**
**Acrylic and ratchet clamp on canvas with customised aluminium stretcher bars**
**63h x 46w x 2d in**
**160.02h x 116.84w x 5.08d cm**

**$ 8,500.00**

**Morgan-Richard Murphey**
***Untitled (Grey Ratchet Clamp #1)*, 2014**
**Acrylic and ratchet clamp on canvas with customised aluminium stretcher bars**
**63h x 46w x 2d in**
**160.02h x 116.84w x 5.08d cm**

**$ 8,500.00**

**Morgan-Richard Murphey**
***Untitled (Grey Ratchet Clamp #2)*, 2014**
**Acrylic and ratchet clamp on canvas with customised aluminium stretcher bars**
**63h x 46w x 2d in**
**160.02h x 116.84w x 5.08d cm**

**$ 8,500.00**

**Morgan-Richard Murphey**
***Untitled (Raw Ratchet Clamp #1)*, 2014**
**Acrylic and ratchet clamp on canvas with customised aluminium stretcher bars**
**63h x 46w x 2d in**
**160.02h x 116.84w x 5.08d cm**

**$ 8,500.00**

**CAP Custom Artist Commission**
***To Be Titled***
***[*Image as reference only]*, 2020**
**120h x 120w in**
**304.80h x 304.80w cm**

**$ 25,000.00**

**Cameron Platter**
***Untitled (Grid#19)*, 2018**
**Charcoal on paper**
**37.75h x 27.13w in**
**95.89h x 68.90w cm**
**Unique**

**$ 6,500.00**

**Cameron Platter**
***Untitled (One Love_02)*, 2017**
**Charcoal on Paper**
**35h x 25w in**
**88.90h x 63.50w cm**

**$ 6,000.00**

**Cameron Platter**
***Untitled (Private number_10)*, 2017**
**Charcoal on Paper**
**35h x 25w in**
**88.90h x 63.50w cm**

**$ 6,000.00**



**Cameron Platter**
***Untitled (Private number_16)*, 2017**
**Charcoal on Paper**
**35h x 25w in**
**88.90h x 63.50w cm**

**$ 6,000.00**

**Cameron Platter**
***Untitled (Slush_17)*, 2017**
**Charcoal on Paper**
**35h x 25w in**
**88.90h x 63.50w cm**

**$ 6,000.00**

# ADDENDUM B

**Insurance Information** The following must be filled out by CRS accurately in order to properly insure the artworks staged in the Premises. If the information filled out below is not accurate and jeopardizes the insurance in the event of loss or damage, CRS shall be liable to CAP for payment of the full replacement cost / current market value.

1. Are the Premises equipped with smoke and fire alarms? Y / N

2. Is the Burglar Alarm connected to a Monitoring Station? Y / N

3. Are Fire Alarms/Smoke Detectors connected to a Central Monitoring Station? Y / N

4. Any additional security (guards, gated community)? Y / N

5. Who has access to property?

6. Is the property occupied?

# Exhibit 7



STAGING SERVICES AND LEASE AGREEMENT

This Staging Services and Lease Agreement (**"Agreement"**) provides for staging and decorating services, and the delivery, installation and rental of furniture and furnishings (**"Inventory"**).

It is understood that 944 Airole Way, Los Angeles, CA 90077 (**"the Property"**) is for sale and that collectively Yvonne Niami and Crestlloyd LLC (**"Homeowner"**), has entered into this Agreement with Showroom Interiors LLC (**"VESTA HOME"**), a Delaware Limited Liability Company, to stage the Property for the purpose of selling the Property. Homeowner represents and warrants that Homeowner is the legal owner of the property, and hereby personally guarantees the obligations under this Agreement. If the Homeowner is not a natural person (e.g., an LLC, LP, or Corporation), VESTA HOME requires that a natural person that is a significant owner and/or officer of the entity that is the Homeowner of the Property to personally guarantee the obligations under this Agreement.

1. **Initial Staging Fee:** In addition to the consideration already paid, Homeowner agrees to pay to VESTA HOME an additional non-refundable fee for its Staging Services in the sum of $950,000 (**"Initial Staging Fee"**) for staging the Property. The Initial Staging Fee is due according to the following terms:
   - $317,000 due immediately upon execution of this contract **("Tranche 1")**
   - $317,000 due immediately upon Vesta submitting bills of lading showing the furniture referenced in Addendum A ("Custom Furniture Schedule") has been shipped **("Tranche 2")**
   - $316,000 due immediately upon Vesta completing installation of the furniture at Property **("Tranche 3")**

   As part of the Initial Staging Fee, Vesta Home is custom manufacturing furniture specifically as requested by Homeowner in Addendum A ("Custom Furniture Schedule").

2. **Total Square Footage:** Homeowner attests the total square footage of the home is 110,000 SF (**"Total Square Footage Staged"**). If the entire Property is not staged, then Addendum B lists all areas of the Property that are included in this Agreement. In the event **Total Square Footage Staged** is misstated in this contract, Vesta Home reserves the right to increase the Initial Staging Fee and Rental Fee proportionally to the misstatement.

3. **Estimated Installation Dates:** VESTA HOME anticipates that it will resume installing the **Inventory** no later than 2 weeks from the date this contract is executed and the first payment of $317,000 is received (**"Estimated New Installation Date"**). VESTA HOME will not schedule the installation until this agreement is signed. The delivery and installation of the Inventory will not be confirmed until the Initial Staging Fee is fully paid. If the initial staging fee is not received ten (10) business days prior to the scheduled installation date, VESTA HOME has the right to postpose the installation to the first available delivery day after receipt of payment of the full installation fee. For the avoidance of doubt, the **Confirmed Installation Start Date** will be defined as the first day VESTA HOME employees began the installation of furniture and the Initial Staging Term will begin no later than 5 days after the first day VESTA HOME employees began the installation of furniture (**"Initial Staging Term Start Date"**).

   Homeowner acknowledges that the furniture referenced in Addendum A ("Custom Furniture Schedule") will not arrive until an estimated four to six (4-6) weeks after this contract is executed and the first payment of $317,000 **(Tranche 1)** is received by Vesta Home. Additionally, Homeowner acknowledges that it must pay Vesta Home Tranche 2 as soon as Vesta provides bills of lading for the furniture, and that Vesta Home will not install any of the furniture in the Custom Furniture Schedule until Tranche 2 is paid.

4. **Change Requests:** Vesta Home will work closely with Yvonne Niami and Katherine Rotondi to select furntirue for the home. However, by entering into this Agreement, the Parties agree that VESTA HOME shall, in its sole and absolute discretion, determine the design for the staging of the Property and the selection and installation of the **Inventory**. If changes are requested and deemed required for any of the following reasons, a $2,500 fee per instance (**"Change Fee"**) will apply:

- Homeowner requests a change in the **Confirmed Installation Start Date** less than 48 hours of the **Confirmed Installation Start Date**
- VESTA HOME arrives at the Property for installation, and the Property is not ready for installation. A project's readiness for installation will be determined by VESTA HOME at its sole discretion and shall generally mean that the appropriate access is provided, there is no longer construction onsite, there is nothing impeding the installation of furniture, and professional cleaning has occurred.
- Any design changes requested after the second to last day of install.
- If Homeowner requires a move-out in less than the subsequently mentioned 10 day period

5. **Cancellation Prior to Install:** Significant work is performed by Vesta Home prior to the installation of the Inventory at the Property. Because of the size and highly specific nature of this project, if the Agreement is cancelled at any time there will be no refund, unless Vesta Home materially breaches the terms of this contract.

6. **Inventory Removal**: VESTA HOME shall have the right to remove the **Inventory** after any breach of the obligation to pay any amounts due under this Agreement. Additionally, in connection with the sale of the Property, the Homeowner shall as part of the purchase documents notify the buyer of the Property that the **Inventory** is subject to this Agreement and that VESTA HOME has the absolute right hereunder to remove the **Inventory** from the Property before or after the close of escrow. Homeowner shall provide VESTA HOME with written notice at least ten (10) calendar days prior to the anticipated move-out date. Prior to the removal of the **Inventory**, Homeowner shall tag any of Homeowner's property to ensure that VESTA HOME does not inadvertently remove Homeowner's personal property. VESTA HOME shall not be liable to Homeowner for any damages if VESTA HOME moves untagged property.

7. **Acknowledgement of Post-Installation Inventory Summary and Rental Start Date**: Homeowner is exclusively responsible for placing the Property on the market and expressly acknowledges and agrees that no action by VESTA HOME, such as a delayed **Estimated New Installation Date** shall inhibit their decision to list the property. Homeowner agrees to hold VESTA HOME harmless from any damages relating to a delayed listing, whether or not VESTA HOME is believed to have caused that delay .Once the installation is complete, Homeowner shall promptly inspect the installation to assure that VESTA HOME has complied with its obligations under this Agreement. Homeowner shall acknowledge receipt of inventory via the **Post-Installation Summary** which will be delivered to Homeowner via email upon the completion of the installation confirming that all of the Inventory has been delivered. All items listed on said **Post-Installation Summary** List is herein referred to as **"Inventory"**. Unless an objection is raised in writing and sent to hello@vestahome.com within two (2) calendar days following the **Post-Installation Summary**, any objection to the installation shall be waived.

8. **Homeowner's Liability:** Except as provided below, Homeowner expressly acknowledges that Homeowner shall be liable for the safety and security of the **Inventory** that has been delivered by VESTA HOME and is located on the Property and has not been removed from the Property by VESTA HOME. As such, any damage to and/or loss, theft, or destruction of the **Inventory,** from any cause, including criminal conduct or acts of persons authorized to be on the Property shall be the sole responsibility of Homeowner. VESTA HOME strongly recommends that Homeowner maintain appropriate insurance to cover this risk.

9. **Indemnity of VESTA HOME:** Homeowner shall protect, indemnify and hold harmless VESTA HOME and VESTA HOME 's officers, directors, shareholders, participants, partners, members, managers, affiliates, employees, representatives, invitees, agents and contractors free and from and against any and all claims, damages, liens, stop notices, liabilities, losses, costs and expenses, including without limitation reasonable attorneys' fees, reasonable expert fees and court costs (collectively **"Claims"**), resulting from access to or inspection of the Property by any person either explicitly or implicitly allowed access to the Property by Homeowner except to the extent such Claims are caused solely by the willful misconduct or gross negligence of VESTA HOME. Homeowner's indemnification obligations set forth herein shall survive the termination of this Agreement and the Close of Escrow for the sale of the Property. In the event that VESTA HOME is required to retain counsel in connection with any Claims, Homeowner will reimburse Vesta Home for reasonable defense costs.

10. **Liability Insurance Requirement:** As a condition to the installation by VESTA HOME of any furniture, Homeowner shall have in place comprehensive liability insurance for personal injuries sustained on the Property in the amount of One Million Dollars



($3,000,000). Prior to the installation of any furniture at the Property by VESTA HOME or VESTA HOME 's authorized agents, contractors or representatives Homeowner shall furnish VESTA HOME with certificates of insurance evidencing the requisite liability insurance referenced above, as well as an endorsement issued by the appropriate insurer (1) naming Showroom Interiors, LLC dba VESTA HOME as an additional insured as to the comprehensive liability coverage, and (2) indicating that Homeowner's insurance shall be primary coverage and VESTA HOME's insurance shall be excess and non-contributory with regard to claims in connection with VESTA HOME 's activities on the Property pursuant to this Agreement. Homeowner shall provide written notice to VESTA HOME at least thirty (30) days prior to any cancellation or reduction in coverage.

11. **Customer Protection Plan** VESTA HOME's **Inventory** at the Property must be protected. VESTAHOME offers a **Customer Protection Plan** for a monthly fee equal to Two Percent (2%) per month for each month that the furniture remains on the Property. The **Customer Protection Plan** covers accidental damage to the **Inventory**. Homeowner shall remain liable for any damage to, loss, and/or destruction of the **Inventory** as a result of any other cause, including without limitation, Homeowner's intentional acts, and/or Homeowner's negligence, and/or conscious disregard for the protection of the **Inventory**. Homeowner shall also remain liable if any piece of **Inventory** is lost, stolen or not returned to VESTA HOME for any reason. In the event of a failure to pay the **Customer Protection Plan** fee on or before the first day of each month during which the fee is due, the Customer Protection Plan will automatically terminate on the tenth (10th) day of that month without further notice or action by VESTA HOME.

If Homeowner wishes to opt out of the VESTA HOME's customer protection plan, and to assume all liability for the **Inventory**, the Homeowner must initial here _______________.

12. **Irrevocable Escrow Instruction:** If the Property is the subject of an escrow pursuant to which it will be sold during any time period in which Homeowner is in default in payment of any amount due under this agreement, VESTA HOME may deliver a copy of this Agreement along with the most recent invoice delivered to Homeowner to the Escrow Holder. This provision shall constitute an irrevocable escrow instruction pursuant to which Homeowner authorizes and directs the Escrow Holder to remit payment, on behalf of the Homeowner from the sale of the Property, for the amounts submitted by VESTA HOME as herein set forth.

13. **Credit Card Authorization:** Prior to the delivery and installation of the **Inventory**, VESTA HOME shall require a completed Credit Card Authorization Form. The credit card authorization shall not be a limit, express or implied, on Homeowner's liability under this Agreement. VESTA HOME is authorized to charge the credit card on file for any and all unpaid rent, insurance and/or additional fees described in this Agreement.

14. **Reasonable and Timely Access to Property:** VESTA HOME shall have access to the Property for the purposes of designing the staging, installation, inspection, and/or replacement of the **Inventory**, and for the removal of the **Inventory** at the end of the Staging Term. VESTA HOME shall have the right to utilize any lock box placed on the Property to gain access and carry out its rights and obligations under this Agreement. Prior to the **Estimated New Installation Date** and move-out dates, Homeowner shall notify VESTA HOME in writing ten (10) calendar days prior to the move-in and move-out dates, of any physical or regulatory restrictions or special circumstances that may affect VESTA HOME's ability to move-in or move-out, such as truck access, truck size limitations, tree clearance, property management rules and regulations, and delivery time restrictions. Homeowner agrees to pay any extra moving costs associated with any restrictions or special circumstances which including but not limited to parking permits, parking tickets received due to parking inability, HOA/elevator fees, etc. For the avoidance of doubt, notwithstanding the above, immediately following the **Staging Term Expiration Date** VESTA HOME shall have the right to remove its **Inventory** immediately, and at any time during any subsequent rental period.

15. **Inventory Removal in the Event of Default:** If Homeowner and/or Responsible Party fails to perform any of its obligations under this Agreement, including, but not limited to the payment of the Initial Staging Fee and/or **Inventory** Rental Fee, Homeowner or Responsible Party shall automatically be deemed in default (**"Default"**). Upon **Default**, VESTA HOME shall have the right to immediately take possession of the **Inventory** and recover from Homeowner or Responsible Party any unpaid amounts due hereunder, including but not limited to the Initial Staging Fee, **Inventory** Rental Fees and any other amounts that may be due together with any additional costs incurred in connection with the removal of the **Inventory** prior to the expiration of this Agreement without further notice. Homeowner irrevocably expressly authorizes VESTA HOME to have access to the Property to

effectuate the removal of the **Inventory**. In the event of Default, any fees or other amount that had previously been agreed to be paid through escrow will be immediately owed to VESTA HOME.

16.**Stipulated Value of Loss of Inventory:** Homeowner and/or Responsible Party expressly acknowledges and agree that, by failing or refusing to return all or any part of the **Inventory** to VESTA HOME, or by refusing to allow VESTA HOME access to its **Inventory** in the event of Default or following the **Staging Term Expiration Date,** THAT BASED UPON THE CIRCUMSTANCES NOW EXISTING, KNOWN AND UNKNOWN, IT WOULD BE IMPRACTICAL OR EXTREMELY DIFFICULT TO ESTABLISH VESTA HOME'S DAMAGES BY REASON OF HOMEOWNER'S FAILURE TO RETURN THE **INVENTORY** DELIVERED TO THE PROPERTY UNDER THIS AGREEMENT. ACCORDINGLY, BUYER AND SELLER AGREE THAT IN THE EVENT OF HOMEOWNER'S FAILURE TO RETURN THE **INVENTORY** DELIVERED TO THE PROPERTY UNDER THIS AGREEMENT, IT WOULD BE REASONABLE AT SUCH TIME TO AWARD SELLER IN AN AMOUNT EQUAL TO THREE (3) TIMES THE STATED RETAIL VALUE AS SET FORTH IN THE **POST-INSTALLATION INVENTORY SUMMARY** OF ANY ITEM OF **INVENTORY** NOT RETURNED. WITH RESPECT TO ANY DELAY IN RETURNING **INVENTORY**, THE STIPULATED RENTAL RATE FOR THE PERIOD OF DELAY IS THREE (3) TIMES THE RENTAL RATE IN EFFECT IMMEDIATELY PRIOR TO THE DATE ON WHICH THE **INVENTORY** WAS TO BE MADE AVAILABLE TO BE PICKED UP BY VESTA HOME.

17.**Advertisement**: VESTA HOME has the right to advertise that the Property was staged by VESTA HOME, and place signs and business cards at the Property indicating that the **Inventory** is for sale. Homeowner shall not remove, obscure or deface the signs or permit any other person to do so. Homeowner will inform broker that no photography or filming by anyone other than VESTA HOME is permitted, except for virtual tours and photography for real estate sales ads. VESTA HOME will have the right to film, photograph, and record furniture staged in the property for its own use. Client releases all rights to any film, photograph, or other content produced by VESTA HOME at the property. Any other photography or filming must be with VESTA HOME's prior express written permission which may be conditioned on VESTA HOME being credited in the on-screen credits with the following "Property Designed and Furnished by VESTA HOME" and receipt of a copy of the completed photography or filming. If any photography or filming for any purposes outside of selling the home (including but not limited to filming a movie, TV show, or photo shoot) is undertaken without VESTA HOME's written permission, this will constitute a Default and VESTA HOME will be entitled to compensation of two (2) times the original Staging Fee. Homeowner agrees to provide VESTA HOME with all photography and or filming shot in the home and expressly grants VESTA HOME permission to use these visual assets in its own advertising. Any violation of any part of this section will constitute a Default.

18.**Conversion to Inventory Lease:** The Initial Staging Fee includes **Inventory** rental for staging purposes only through December 31, 2020 (**"Initial Staging Term"**). The Staging Term Expiration Date will be defined as the final day of the Initial Staging Term. If this Agreement remains in effect for beyond the end of the Initial Staging Term, VESTA HOME, in its sole discretion, and on five (5) days written notice to Homeowner (**"Notice Period"**), with or without cause, may terminate this Agreement, and at the end of the Notice Period, remove the **Inventory**. If VESTA HOME does not exercise this option and Homeowner does not instruct VESTA HOME to remove the **Inventory** then the provisions of this **INVENTORY LEASE** portion shall apply to the amounts due and payments to be made by Homeowner to VESTA HOME.

19.**Inventory Rental Payments:** Following the expiration of the Initial Staging Term, Homeowner agrees to pay to VESTA HOME a non-refundable monthly fee for **Inventory** rental in the sum of fifty thousand dollars ($50,000) per month (plus applicable taxes) (**"Inventory Rental Fee(s)"**). **Inventory** rental will automatically begin on the first day following the expiration of the Initial Staging Term (**"Inventory Rental Start Date"**). Seventeen thousand five hundred ($17,500) dollars of the Inventory Rental Fee is due immediately upon the **Inventory Rental Start Date**. The first **Inventory Rental Fee** shall be pro-rated based upon the **Inventory** Rental Start Date such that all rent due for the balance of the month in which the **Inventory Rental Start Date** occurs plus the rent for the first calendar month thereafter is paid. All subsequent **Inventory** Rental Fees shall be invoiced for the full month and are due on the first of each month (**"Rent Due Date"**). The remaining balance of thirty-two thousand five hundred ($32,500) will accrue monthly and be due immediately to Vesta at the sooner of, Vesta removing its furniture from the Property or the Property being sold or delisted from the market for any reason. No refunds and/or prorations will be made on **Inventory** Rental Fee payments if the pick-up of the **Inventory** occurs other than on the last day of any calendar month.

Any **Inventory** Rental Fee not received by VESTA HOME within ten (10) calendar days of the Rent Due Date shall incur a late fee of 10% of the monthly **Inventory Rental Fee**. Any **Inventory Rental Fee** not received by VESTA HOME within thirty (30) calendar days of the **Rent Due Date** shall constitute Default under this Agreement.

Effective on the first day of the 13th month following the Staging Term Expiration Date, the **Inventory** Rental Fee shall increase by **15%**, and thereafter, shall increase an additional **10%** every six months (**"Inventory Rental Fee Increase"**).

20.**Use of furniture for non-staging purposes:** This contract provides for the Homeowner's use of **Inventory** for staging purposes only. Any use of the **Inventory** for any purpose other than staging is strictly prohibited and will constitute a breach of contract and Default under the terms of this Agreement. For the avoidance of doubt, non-staging purposes include, without limitation any occupancy of the Property (i.e., including by Homeowner, guests or any other tenants using or living on the furniture), holding any party or other event, posting of the Property on any rental site (such as AirBnB, HomeAway, VRBO etc.), and/or any use of the Property as a set for film and/or television purposes).

Any use of the **Inventory** for other non-staging purposes, requires written permission from VESTA HOME and a fully executed Luxury Lease contract. Without written permission and a new Luxury Lease contract, any non-staging use of **Inventory** shall be considered a breach of this Agreement and will automatically be deemed a "Luxury Lease". In such event, Homeowner will be required to immediately pay a $10,000 security deposit, a $5,000 first use fee, and the **Inventory** Rental Fee will be increased retroactively to an amount equal to four (4) times, the **Inventory** Rental Fee, beginning on the **Confirmed Installation Start Date.** All accrued payments plus applicable taxes shall become due and payable immediately. Use of **Inventory** for any adult content is strictly prohibited, and, in addition to the above fees, Homeowner will be obligated to purchase all **Inventory** used for adult content purposes at the full retail value stated in the **Post-Installation Inventory Summary.**

**GENERAL PROVISIONS**

21. **Assignment of Agreement**: This Agreement is not assignable without the express prior written consent of VESTA HOME.

22.**Counterpart Signatures, Facsimile Signatures, Electronic Signatures:** This Agreement may be executed in counterparts, by facsimile, and/or electronically. All counterpart, facsimile or electronic signatures shall have equal validity and enforceability as a fully-signed original Agreement.

23. **Entire Agreement; Written Modification Required:** This Agreement, which includes the Appendices hereto, is the only agreement between the Parties relating to the subject matter hereof and constitutes the entire agreement between the Parties and is the final expression of the Parties' understanding. No prior discussions or communications shall form any part of this Agreement, unless expressly noted herein. Any modification to this Agreement must be made on a formal Amendment which (i) specifically refers to the provision of this Agreement to be amended and (ii) is signed by all Parties and must be countersigned by a Vice President or higher of VESTA HOME. For the avoidance of doubt, no email, text message, verbal or other communication regarding a modification of this contract will be valid without the aforementioned executed Amendment.

24.**Severability.** This Agreement will be construed and enforced in accordance with the laws of the State of California. If any provision of this Agreement is held to be unenforceable by a court of competent jurisdiction for any reason whatsoever, (i) the validity, legality, and enforceability of the remaining provisions of this Agreement (including without limitation, all portions of any provisions containing any such unenforceable provision that are not themselves unenforceable) will not in any way be affected or impaired thereby, and (ii) to the fullest extent possible, the unenforceable provision will be deemed modified and replaced by a provision that approximates the intent and economic effect of the unenforceable provision and the Agreement will be deemed amended accordingly.

25.**Choice of Law and Venue**. This Agreement and the rights of the parties hereunder shall be determined, governed by and construed in accordance with the internal laws of the State of California without regard to conflicts of laws principles. Any dispute under this Agreement shall be resolved solely by a court having its situs within Los Angeles County, California, and the Parties consent and submit to the jurisdiction of any court located within such venue.

26.**WAIVER OF RIGHT TO JURY TRIAL.** GUARANTOR AND VESTA HOME EACH WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY OF ANY CONTRACT OR TORT CLAIM, COUNTERCLAIM, CROSS-COMPLAINT OR CAUSE OF ACTION IN ANY ACTION, PROCEEDING OR HEARING E3ROUGIIT BY EITHER GUARANTOR OR VESTA HOME AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN

ANY WAY CONNECTED TO THIS AGREEMENT, THE RELATIONSHIP OF GUARANTOR AND VESTA HOME OR HOMEOWNERS USE OR OCCUPANCY OF THE PROPERTY, INCLUDING ANY CLAIM OF INJURY OR DAMAGE OR THE ENFORCEMENT OF ANY REMEDY UNDER ANY CURRENT OR FUTURE LAW, STATUTE, REGULATION, CODE OR ORDINANCE.

27.**Attorneys' Fees and Costs.** If any action of any kind is commenced to enforce or interpret, or in any way relates to this Agreement, the prevailing party in such action shall be entitled to recover its reasonable attorneys' fees and costs.

28.**Limits on VESTA HOME's Liability for Damage to Property.** Homeowner understands, acknowledges, and accepts that in the process of installing and moving in or moving out the **Inventory**, floors may be scuffed or scratched, walls may be marked or scratched, and the Property may suffer some incidental damage. Although VESTA HOME will in good faith attempt to minimize any such damage, Homeowner hereby waives any claim against VESTA HOME from any such incidental damage.

29.**Confidential Nature of Agreement.** Homeowner acknowledges and agrees that this Agreement and all of its terms shall be and remain confidential. Except when VESTA HOME provides its prior express written authorization, Homeowner shall not disclose this Agreement and/or its terms to anyone or any entity other than Homeowner's immediate family members, Homeowner's agent(s) and/or employees, if applicable, and/or Homeowner's tax, financial, and/or legal advisors.

30.**Notices.** Any written notice required to be given to VESTA HOME shall be emailed to VESTA HOME at hello@vestahome.com. Any written notice required to be given to Homeowner shall be emailed to Homeowner at the email address indicated in this Agreement. All parties are required to advise the other of any change in email addresses.

31.**Expenses.** If this contract is placed in the hands of an attorney for collection, Homeowner promises to pay the collection costs, including attorneys' fees, even though no legal proceeding is filed on this contract.

32.**Personal Property** In the event that VESTA HOME is requested or required to move Homeowner's personal property , Homeowner hereby acknowledges having been advised of the risk of harm for activities requested by or for Homeowner and agrees that VESTA HOME is not responsible for any damages to the customer's furniture or property which may occur during the moving process, and is released from all liability in this regard. Homeowner hereby releases VESTA HOME and all of its employees from liability associated with any of the activities described above. Homeowner assumes all liability for any above damages which may occur.

33.**No Warranties or Guarantees.** Homeowner understands that VESTA HOME does not and cannot guarantee success or any particular result in connection with the sale of the Property. VESTA HOME makes no warranty or guarantee expressed or implied as to the successful sale of the Property.

**SIGNATURE PAGE**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the dates set forth below.

| | |
|---|---|
| Dated: 12/31/2020 | VESTA HOME<br>By: Julian Buckner<br>(sign) Julian Buckner<br>Name: CEO<br>Its Authorized Agent |
| Dated: 9/4/20 | HOMEOWNER:<br>By:<br>(sign)<br>Name: Yvonne Niami<br>Title for Crestlloyd LLC |

| Dated: 9/4/20 | RESPONSIBLE PERSON & GUARANTOR:<br>By: (sign) [signature]<br>Name: Yvonne Niami for Crestlloyd LLC |
|---|---|

**Addendum B**
**Areas to be Staged**

**Dining room:** Add consoles and accessories along wall
**Cigar room:** Add table and accessories
**Family room:** Add accessories, consoles, tables behind each couch, console along wall with accessories
**Outdoor area off family room:** Staged with outdoor furniture per schedule provided by Vesta
**Pool deck:** outdoor furniture per schedule provided by Vesta
**Outdoor seating off dining room:** outdoor sofa, chairs and table
**Living room:** full staging with accessories, flower arrangement, and furniture per scheduled provided by Vesta
**Library:** replace desk, other existing furniture is acceptable
**Gallery 1+2:** Benches per schedule provided by Vesta
**Under stairs on East Side of house:** staged as sitting area
**Under stairs on main floor West Side of house:** art piece (not provided by Vesta) or flower arrangement on table
**Guest bedroom west side facing ocean:** full bedroom staging
**Master bed sitting:** add table and accessories
**Master bathrooms:** remove consoles, add standing mirror to HER bathroom
**His and Her closet:** accessorize, floral arrangement, purses (not provided by Vesta), etc.
**Master bedroom:** fully stage
**2nd master bedroom sitting area:** desk / seating per scheduled provided by Vesta
**Upstairs sitting east side of house:** sitting area per scheduled provided by Vesta
**Corner near upstairs sitting area East side:** art piece (not provided by Vesta) or floral arrangement
**Secondary bedrooms:** fully stage
**Downstairs sitting area:** stage as sitting area per scheduled provided by Vesta
**Entry to elevator:** add console with accessories
**Downstairs seating off wine room:** replace existing items, stage as fireplace seating
**Downstairs bar:** barstools
**Wine tasting room:** add table
**Gym:** add yoga mats (no equipment to be provided by Vesta)
**Spa rooms:** add 1 massage table per room
**Billiards area:** add barstools

NOTE: Vesta Home will not be responsible for staging guest house, nightclub, staff quarters or any other areas not included above.

**Addendum C**
**PERSONAL GUARANTY**
**OF**
**STAGING SERVICES AND STAGING SERVICES AND LEASE AGREEMENT**

THIS **PERSONAL GUARANTY OF STAGING SERVICES AND STAGING SERVICES AND LEASE AGREEMENT** (this "Guaranty") is made for valuable consideration by each of the persons whose signatures appear at the end of this document (each a "Guarantor"), in favor of SHOWROOM INTERIORS, LLC which does business as VESTA HOME ("VESTA HOME"), in connection with that certain STAGING SERVICES AND LEASE AGREEMENT dated JULY 10, 2020 the ",STAGING SERVICES AND LEASE AGREEMENT"), pursuant to which VESTA HOME has provided Inventory to Yvonne Niami. ("Homeowner"), at 944 Airole Way, Los Angeles, CA 90077 (" (the " Property").

1. Guarantor does hereby absolutely, unconditionally and irrevocably guarantee and promise to VESTA HOME the due, punctual and full performance by Homeowner of each and all of the agreements, covenants, obligations, liabilities and promises of Homeowner to be performed under the STAGING SERVICES AND LEASE AGREEMENT and the truth and accuracy of each and all of the representations and warranties of Homeowner contained in the STAGING SERVICES AND LEASE AGREEMENT, including without limitation, the payment of any and all other sums payable thereunder.

2. Guarantor does hereby agree that, without the consent of or notice to Guarantor and without affecting any of the obligations of Guarantor hereunder: (a) any term, covenant or condition of the STAGING SERVICES AND LEASE AGREEMENT may be amended, compromised, or otherwise altered by VESTA HOME and Homeowner, and Guarantor does guarantee and promise to perform all the obligations of Homeowner under the STAGING SERVICES AND LEASE AGREEMENT as so amended, compromised, or altered; (b) any guarantor of or party to the STAGING SERVICES AND LEASE AGREEMENT may be released, substituted or added; (e) any right or remedy under the STAGING SERVICES AND LEASE AGREEMENT, this Guaranty or any other instrument or agreement may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) VESTA HOME or any other Person may deal in any manner with Homeowner, any guarantor, any party to the STAGING SERVICES AND LEASE AGREEMENT or any other Person.

3. Guarantor hereby waives and agrees not to assert or take advantage of (a) any right to require VESTA HOME to proceed against Homeowner or any other Person or to pursue any other remedy before proceeding against Guarantor; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the STAGING SERVICES AND LEASE AGREEMENT; (c) any right or defense that may arise by reason of the incapacity, lack of authority. death or disability of Homeowner or any other Person; (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election or remedies, or otherwise) of the liability of Homeowner, of the subrogation rights of Guarantor or of the right of Guarantor to proceed against Homeowner for reimbursement; and (e) the benefits of any statutory provision or procedural rule limiting the liability of a surety.

4. Guarantor hereby waives and agrees not to assert or take advantage of any right or defense based on the absence of any or all presentments, demands (including demands for performance), notices (including notices of adverse change in the financial status of Homeowner or other facts which increases the risk to Guarantor, notices of nonperformance and notices of acceptance of this Guaranty) and protests of each every kind.

5. Guarantor does hereby agree that if claim is ever made upon VESTA HOME for repayment or recovery of any amount or amounts received by VESTA HOME in payment or on account of the amounts hereby guaranteed and VESTA HOME repays all or part or such amount by reason of (a) any judgment, decree or order or of any court or administrative body having jurisdiction or (b) any settlement or compromise of any such claim effected by VESTA HOME with any such claimant (including Homeowner or any other guarantor), then in such event Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon Guarantor. notwithstanding the expiration or termination of the STAGING SERVICES AND LEASE AGREEMENT or other instrument evidencing any of the amounts hereby guaranteed and Guarantor shall be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by VESTA HOME.

6. Guarantor does hereby agree that for VESTA HOME's benefit and the benefit of Homeowner and to the fullest extent permitted by law, Guarantor irrevocably and unconditionally waives any and all rights of subrogation, reimbursement, indemnification, contribution, or similar rights against Homeowner or its assets (arising by contract or by law or otherwise) as a consequence of this Guaranty, including, without limitation, the payment or performance of any obligations hereby guaranteed, and further agrees that Guarantor will not assert any such right of subrogation, reimbursement, indemnification, contribution or similar right at any time in respect to the STAGING SERVICES AND LEASE AGREEMENT. It is agreed that VESTA HOME's rights under this Paragraph 6 are such that the remedy at law for breach thereof would be inadequate, and that VESTA HOME shall be entitled to specific performance and enforcement thereof, including, without limitation, the imposition of a restraining order or injunction. Nothing in this Paragraph 6 shall diminish or relieve any obligations

or liabilities of Homeowner to VESTA HOME. VESTA HOME and Homeowner and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements made in this Paragraph 6 and VESTA HOME's rights under this Paragraph 6 shall survive the expiration or termination of the STAGING SERVICES AND LEASE AGREEMENT.

7. The liability of Guarantor and all rights, powers and remedies of VESTA HOME hereunder and the liability and obligations of Homeowner and all rights, powers and remedies of VESTA HOME under the STAGING SERVICES AND LEASE AGREEMENT and under this Guaranty shall be in addition to all rights, powers and remedies given to VESTA HOME by law.

8. This Guaranty applies to, inures to the benefit of and binds all parties hereto, their heirs, devisees, legatees, executors, administrators, representatives, successors and assigns (including any purchaser at judicial foreclosure or trustee's sale or a holder of a deed in lieu thereof). This Guaranty may be assigned by VESTA HOME voluntarily or by operation of law without reducing or modifying the liability of Guarantor hereunder.

9. This Guaranty shall constitute the entire agreement between Guarantor and VESTA HOME with respect to the Guarantor's guaranty of performance of all of Homeowner's obligations under the STAGING SERVICES AND LEASE AGREEMENT. No provision of this Guaranty or right of VESTA HOME hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director, trustee or partner of VESTA HOME.

10. If more than one Person signs this Guaranty, each such Person shall he deemed a Guarantor and the obligation of all such Guarantor shall be joint and several. When the context and construction so requires, all words used in the singular herein shall be deemed to have been used in the plural. The word "Person" as used herein shall include an individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

11. Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall nevertheless be effective.

12. The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof.

13. If either VESTA HOME or Guarantor participates in an action against the other arising out of or in connection with this Guaranty, the one prevailing shall be entitled to have and recover from the other reasonable attorneys' fees, collection costs and other costs incurred in and in preparation for the actions.

14. Guarantor agrees that all questions with respect to this Guaranty shall be governed by, and deciding in accordance with the laws of the State of California.

15. If Guarantor executes this Guaranty as a partnership, each individual executing this Guaranty on behalf of the partnership represents and warrants that he or she is a general partner of the partnership and that this Guaranty is binding upon the partnership in accordance with its terms. If Guarantor executes this Guaranty as a corporation, each of the Persons executing this Guaranty on behalf of the corporation covenants and warrants that the corporation is a duly authorized and existing corporation, that the corporation has and is qualified to transact business in the State of California, that the corporation has full right, authority and power to enter into this Guaranty and to perform its obligations hereunder, that each Person signing this Guaranty on behalf of the corporation is authored so that this Guaranty is binding upon the corporation in accordance with its terms.

16. In the event Homeowner shall become insolvent or shall be adjudicated a bankrupt, or shall file a petition for reorganization, arrangement or other relief under any present or future provisions of the United States Bankruptcy Code, or if such a petition be filed by creditors of Homeowner, or if Homeowner shall seek a judicial readjustment of the rights of its creditors under any present or future Federal or State law, or if a receiver of all or part of Homeowner's properly **or** assets is appointed by the State or Federal court, no such proceeding or action taken therein shall modify, diminish, or in any way affect the liability of Guarantor under this Guaranty, and the liability of Guarantor with respect to the STAGING SERVICES AND LEASE AGREEMENT shall be of the same scope as if Guarantor had itself executed the STAGING SERVICES AND LEASE AGREEMENT as the named Homeowner therein, and no "rejection" and/or "termination" of the STAGING SERVICES AND LEASE AGREEMENT in any of the proceedings referred to in this Paragraph 16 shall be effective to release and/or terminate the continuing liability of Guarantor to VESTA HOME under this Guaranty. If, in connection with any of the circumstances referred to in this Paragraph 16, VESTA HOME should request that Guarantor execute a new STAGING SERVICES AND LEASE AGREEMENT for the balance of the STAGING SERVICES AND LEASE AGREEMENT Term (unaffected by any such "rejection" and/or "termination" in any of such proceedings), but in all other respects identical with the STAGING SERVICES AND LEASE AGREEMENT, Guarantor shall do so as the named Homeowner under such new STAGING SERVICES AND LEASE AGREEMENT (irrespective or the fact that the STAGING SERVICES AND LEASE AGREEMENT may have been "rejected" or "terminated" in connection with any of the proceedings referred to in this Paragraph 16). Should Guarantor fail or re ruse to execute such a new STAGING SERVICES AND LEASE AGREEMENT,

without limiting any of the legal or equitable remedies available to VESTA HOME on account of such failure or refusal, Guarantor acknowledges and agrees that VESTA HOME may seek specific performance of the covenant of Guarantor contained in this Paragraph 16 to execute such a new STAGING SERVICES AND LEASE AGREEMENT.

17. Any legal action or proceeding with respect to this Guaranty may be brought in the courts of the State of California for the County of Los Angeles or, if the requisites of jurisdiction are obtained, in District Court of the United States of America for the Central District of California and, by the execution and delivery of this Guaranty, Guarantor hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforementioned courts. Nothing herein sluff, however, affect the right of VESTA HOME to commence legal action or otherwise proceed against Guarantor in any other jurisdiction.

18. **WAIVER OF RIGHT TO JURY TRIAL.** GUARANTOR AND VESTA HOME EACH WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY OF ANY CONTRACT OR TORT CLAIM, COUNTERCLAIM, CROSS-COMPLAINT OR CAUSE OF ACTION IN ANY ACTION, PROCEEDING OR HEARING E3ROUGIIT BY EITHER GUARANTOR OR VESTA HOME AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS GUARANTY, THE RELATIONSHIP OF GUARANTOR AND VESTA HOME OR HOMEOWNERS USE OR OCCUPANCY OF THE PROPERTY, INCLUDING ANY CLAIM OF INJURY OR DAMAGE OR THE ENFORCEMENT OF ANY REMEDY UNDER ANY CURRENT OR FUTURE LAW, STATUTE, REGULATION, CODE OR ORDINANCE.

**SIGNATURE PAGE**

| | |
|---|---|
| Dated: 9/4/20 | RESPONSIBLE PERSON & GUARANTOR:<br>By: [signature]<br>(sign)<br>Name: Yvonne Niami for CrossHloyd LLC |
| Dated: ______ | RESPONSIBLE PERSON & GUARANTOR:<br>By: ______<br>(sign)<br>Name: ______ |
| Dated: ______ | RESPONSIBLE PERSON & GUARANTOR:<br>By: ______<br>(sign)<br>Name: ______ |

**PAYMENT SUMMARY**

Homeowner agrees to pay the **Initial Staging Fee** upon execution of this Agreement and the **Inventory Rental Fee** in the manner selected below by initialaling the option selected.

__________ If by check, pay to VESTA HOME: 4900 E 50th St, Vernon, CA 90058

__________ If credit card, please provide card information by filling out Addendum A below.

Any **Inventory Rental Fee** payment not received by VESTA HOME within ten (10) calendar days of the Rent Due Date shall constitute a Default under this Agreement and shall be subject to a late charge of ten percent (10%) of the overdue **Inventory Rental Fee** amount. Homeowner shall have three (3) business days following written notice to Homeowner to cure the Default (**"Rent Cure Date"**).

**Incoming Wire and ACH Instructions:**
Bank Name: City National Bank
ABA/Routing Number: 122016066
Beneficiary Name: Showroom Interiors, LLC DBA- VESTA HOME
Beneficiary Account Number: 432960633
SWIFT Code (international): CINAUS6L

**Special Instructions for Receiving Bank:**
Bank Address and Contact Info:
City National Bank
1315 Lincoln Boulevard, Suite 110
Santa Monica, CA 90401
310.264.2959
Nadine Wasada: Operations Manager, Technology and Venture Capital Banking

**CREDIT CARD AUTHORIZATION**

Date: ____________________

Name on Credit Card: ________________________________

Billing Address: ________________________________

Phone: ____________________ Fax: ____________________

Email address: ________________________________

Credit Card Type:

Credit Card #: ________________________________

Expiration Date : ____________________

Security Code : ____________ on reverse side of card.

Signature of Cardholder : ________________________________

*I authorize* Showroom Interiors LLC ("VESTA HOME") *to charge my credit card for any amount due resulting from this staging/design agreement, including, but not limited to any outstanding balances on the staging contract or any damages done to the furniture. I agree by signing below to personally guarantee to VESTA HOME any obligations that may become due.*

*Upon acceptance of this application, the Homeowner agrees to the payment terms stated by the creditor, VESTA HOME. A 10% finance charge will apply on any open balances beyond terms. I understand that I am fully responsible for all balances on my account, and I am liable for additional charges that may be incurred by VESTA HOME as a result of collection and/or legal proceedings.*

**CREDIT CARD REQUIREMENT:** Vesta Home requires a credit card on file for each individual named on the contract regardless of preferred payment method. If payment is made by credit card for the Initial Staging Fee any of the charges incurred under this Agreement, the credit cardholder agrees to pay and authorizes VESTA HOME to charge a convenience fee equal to 2.95% of each credit card charge.

**PLEASE NOTE:** In the event of non-payment, the credit card on file will be charged for any outstanding balance. By signing this Agreement, I hereby authorize the use of the above credit card for any overdue payment.

*I have read and understand the above conditions.*

Print Full Name : Yvonne Niami for Crestlloyd LLC.

Date : 9/4/20

Signature of Cardholder : [signature]

# Exhibit 8



# Exhibit 9

# ARTWORK DISPLAY AGREEMENT

**THIS AGREEMENT** (**"Agreement"**) is entered into by **Mike Fields Bronzes LLC,** a Washington limited liability company ("Artist") and **Crestlloyd, LLC, a California limited liability company** (**"Client"**) (each a **"Party"** and collectively, the **"Parties"**) and is effective as of the date it is completely signed by both Parties (the **"Effective Date"**).

## Recitals

A. Client desires to sell certain real property, the description and location of which are set forth in Exhibit A hereto (the **"Property"**);

B. Client wants to engage the services of Artist to place Artist's sculpture(s) described in Exhibit A hereto (the **"Artwork"**) at the Property with the intent of displaying the Artist's Artwork within the Property to Potential Purchasers (defined below) of the Property and Potential Purchasers of the Artwork.

NOW THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, and in consideration of the mutual promises and covenants set forth below, the Parties agree as follows:

**1. Scope of Agreement**

(i) Client hereby engages, and Artist agrees to provide, Artist's services with respect to placing the Artwork at a designated location within the Property, and removing the Artwork from the Property upon termination of this Agreement (collectively, the **"Services"**).

(ii) Client through its engagement of Artist agrees to comply with all of the terms of this Agreement, including without limitation: the obligation to pay Artist when required to do so, restrictions on the permissible uses of the Artwork such as reproduction and marketing efforts, requirements to use reasonable efforts to safeguard the Artwork while in Client's possession, and obligations to only display the Artwork in the location and manner allowed under this Agreement.

(iii) The Parties intend that Client's sole compensation under this Agreement shall be the right to receive a percentage of the gross proceeds from the sale of the Artwork to a purchaser of the Property in conjunction with Client's sale of the Property.

(iv) Exhibit A sets forth certain unique details and requirements applicable to the Parties' Agreement. Exhibit A is attached hereto and incorporated as if fully set forth herein, and, where applicable, shall constitute affirmative obligations of Client under this Agreement.

**2. Term of Agreement.** The term of this Agreement shall commence on the Effective Date and shall continue until the date that is 12 months after the Effective Date, after which this Agreement shall continue on a month-to-month basis until the Property is sold or until this Agreement is terminated by either Party as provided herein (the **"Term"**).

**3. Delivery, Placement, and Display of Artwork Within the Property**

(i) Artist shall be responsible for the delivery and placement of the Artwork at the Property, and shall exercise commercially reasonable efforts to effect delivery and placement of the Artwork. If, despite said efforts, Artist is unable to deliver or place the Artwork or is delayed in delivering

or placing the Artwork, Artist shall not be subject to any liability therefor, nor shall such failure affect the validity of this Agreement. Client hereby releases and holds Artist harmless from and against any and all claims, losses, damages, liabilities, costs and expenses arising out of or relating to any failure or delay in delivery of the Artwork, provided that Artist exercises commercially reasonable efforts to effect delivery or placement, as applicable.

(ii) Client shall designate the proposed location for placement of the Artwork within the Property, and Artist shall provide and install any required pedestal or turntable, special lighting and signage that Artist deems reasonably appropriate for display of the Artwork. Client shall provide reasonable cooperation in the placement of the Artwork and arrangement of the Artwork display room to Artist's reasonable satisfaction, including without limitation providing appropriate access to electrical power for any such pedestal or turntable.

(iii) Client is responsible for cleaning the Property and clearing and preparing the space where the Artwork is to be displayed. If the floor area of the Property where the Artwork is to be displayed or transported across is a hard surface such as wood, laminate, metal, marble, or other stone, Client is responsible for providing appropriate floor coverings as indicated in the Display Requirements (defined below).

(iv) Artist's name, website, and/or logo, at Artist's discretion, shall be displayed in writing on the Artwork, in addition to any other physical forms of attribution that the Parties may agree to for the display of the Artwork.

(v) Once the Artwork has been placed within the Property by Artist, Client shall comply with the display requirements set forth in Exhibit A (the "**Display Requirements**"). Client shall not cause or allow any disturbance of the placement of the Artwork without Artist's prior consent. Client shall exercise reasonable efforts to prevent any guests, licensees, contractors, agents, representatives, employees, or Potential Purchasers of the Property or the Artwork from touching or disturbing the Artwork, disturbing the placement or display of the Artwork, or handling or touching the Artwork while on display.

4. **Sale of Artwork; Commission**

(i) It is the intent of the Parties that during the Term, the Artwork shall be displayed at the Property for sale to Potential Purchasers of the Property and/or the Artwork and as part of the staging with the goal of enhancing the Property's appearance, making the Property more desirable, and helping the Property sell faster and for a higher price.

(ii) Client understands and agrees that the Artwork to be displayed at the Property is known as an "**Artist Proof**" that is different from other versions of the Artwork, known as "**Standard Editions**" of the Artwork, that are available for purchase from Artist. Potential Purchasers of the Artwork may purchase either the Artist Proof (with the purchase price being the Artist Proof Value, defined below) or a Standard Edition of the Artwork (with the purchase price being the Purchase Price, defined below), whether in conjunction with a sale of the Property or otherwise. Client agrees that every Artwork displayed may, at Artist's option, have a plaque indicating the Artist's website. Client further understands and agrees that the Artwork is available for purchase, in various sizes and finishes, either independently or in conjunction with a sale of the Property, for the sale price(s) listed in Exhibit A hereto, if any (the "**Sale Price**"). The Sale Price listed in Exhibit A (if any) applies only to a Standard Edition of the Artwork that is of equivalent size to the Artist Proof of the Artwork, but the Sale Price of a Standard Edition of the Artwork may vary depending on the size and finish selected by a purchaser of the Artwork. Artist reserves the right to change the Sale Price at any time and from time to time during the Term at

Artist's sole and absolute discretion. Artist reserves the right to include disclosure of any or all of the foregoing information in this paragraph as part of the Display Requirements or the Form of Attribution.

(iii) During the Term, Client shall use reasonable efforts to market the sale of the Artwork in conjunction with a sale of the Property, which shall include without limitation: affirmatively informing Potential Purchasers of the Property that the Artwork is the work of Artist; providing any Potential Purchasers with any written information Artist has provided to Client for dissemination pursuant to the Display Requirements; and making Direct Referrals (defined below) to Artist of any and all Potential Purchasers of the Artwork. "**Potential Purchasers**" of the Artwork for purposes of this Agreement shall mean individuals who inquire about the Artwork to Client orally or in writing. Likewise, "Potential Purchasers" of the Property shall mean individuals who inquire about the Property to Client orally or in writing. In furtherance of Client's efforts to market the sale of the Artwork, Client shall allow Artist to attend any unveiling or grand opening of the Property for sale, as well as any open houses for the Property.

(iv) Client agrees to refer to Artist all inquiries for sale of the Artwork and for sale of any other works by Artist, whether or not such inquiries are made in conjunction with a potential sale of the Property. If Artist sells the Artwork to a Potential Purchaser resulting from a Direct Referral (defined below) from Client, whether or not such sale occurs in conjunction with a sale of the Property, then Artist will pay Client the Commission (defined below), subject to the following terms:

a. Client agrees that the purchase price for any sale of the Property shall not include the Purchase Price for the Artwork, but the two amounts shall instead be separate consideration for separate contracts of sale. If a sale of the Property includes a bona fide sale of the Artwork, then Client shall cause the terms of the purchase and sale agreement ("PSA") for the Property to require, as an irrevocable condition of closing, that the purchaser of the Property shall pay the actual Purchase Price amount (defined below) for the Artwork, which Purchase Price may deviate from the Sale Price at Artist's sole and absolute discretion (the "**Purchase Price**"), directly to Artist at or before close of escrow on the Property, less the percentage described in Exhibit A of the final Purchase Price of the Artwork (the "**Commission**"), which may be retained by Client. Additionally, Client shall provide to Artist for review and approval a copy of any offer or acceptance of a PSA for the Property prior to Client signing such document so that Artist can verify that agreement contains the above-referenced irrevocable condition of closing.

b. If purchaser does not want to purchase the Artwork as part of its purchase of the Property, then Client shall notify Artist of that fact and Artist shall have the right to terminate this Agreement after that purchaser pays the deposit for the purchase (or, if there is no deposit, after purchaser signs the PSA), and Artist and/or a moving company of Artist's choice have the right to access the Property immediately and remove the Artwork before the closing of the sale to that purchaser.

c. **If purchaser does want to purchase the Artwork as part of its purchase of the Property, Client shall be solely responsible for informing the purchaser of the Property, the title company, the escrow agent, and all other parties involved in the sale of the Property that the Purchase Price of the Artwork is not included in the purchase price of the Property but is included in the escrow for the purchase of the Property, and that payment to Artist of the Purchase Price of the Artwork is a condition of closing for the sale of the Property. If the purchaser changes his mind or otherwise indicates it does not want to purchase the Artwork, then: (i) Client shall immediately notify Artist in writing that the purchaser will not be purchasing the Artwork, and; (ii) Client and purchaser shall be required to sign an amendment ("Amendment") to the PSA, which Amendment must be reviewed and approved by Artist before Client and purchaser sign it, stating that purchaser will not be purchasing the Artwork, and Client and purchaser give Artist the right to have access to the Property and to cause the Artwork to be removed from the**

**Property by a company of Artist's choosing as soon as reasonably possible even if that removal does not occur until after the closing of the purchase. Client agrees that Artist shall be a party to the escrow so that Artist may independently contact escrow to know when a new development in the escrow has occurred that could impact Artist's rights with respect to the Artwork. Client agrees that in the event of a sale of the Property that includes the sale of the Artwork, Artist may pursue all available remedies against the purchaser of the Property as well as against Client, jointly and severally, in the event the Purchase Price of the Artwork is not paid to Artist in full.**

d. In the event that a bona fide purchase of the Artwork occurs as result of a Direct Referral of the purchaser to Artist by Client, but does not occur in conjunction with the sale of the Property, then Artist agrees that Client shall be entitled to the Commission, provided the Purchase Price (less the Commission) has been remitted to Artist. Client shall not be entitled to any compensation under this Agreement absent full payment due hereunder having been received by Artist.

e. Notwithstanding the foregoing, Client shall not be entitled to any Commission for any additional or subsequent sales of the Artwork, or any other Artwork, to any purchaser referred to Artist from Client, nor shall Client be entitled to any Commission for sales of any works other than the Artwork to anyone, regardless of whether or not they were referred to Artist by Client. For purposes of this paragraph and for purposes of determining the rights and obligations pertaining to payment of the Commission under this Agreement, "**Direct Referral**" means an inquiry for purchase received by Client orally or in writing, which Client then refers directly to Artist by direct communication between Client and Artist in writing, by email, by telephone, or by in-person introduction. "Direct Referral" does not include purchasers who independently inquire with Artist as to purchase of the Artwork or other works, regardless of whether they learned of Artist by speaking to Client, viewing the Artwork displayed at the Property, or otherwise.

**5. Grant of Copyright License to Client; Artist Reservation of Rights**

(i) The Parties acknowledge that Client may seek to use images or video of the Artwork in the process of marketing and advertising the Property to Potential Purchasers of the Property, and may seek to utilize the professional services of others in such efforts.

(ii) Accordingly, Artist hereby grants Client a non-exclusive right to make photographic and video reproductions of the Artwork, and to incorporate such reproductions into other works (the "**Derivative Works**"), subject to the following conditions (the "**License**"): Client may not create or use the Derivative Works, or allow the Derivative Works to be created or used, for any purpose other than for the sole purpose of marketing or advertising the Property to Potential Purchasers of the Property. Any use of the Derivative Works in Instagram shall include proper credit and attribution to Artist in the specific form described in Exhibit A hereto (the "**Form of Attribution**"). Client shall be solely responsible for ensuring that any use of the Derivative Works by any third party complies with the terms of the License and this Agreement.

(iii) Any deviation from the allowable use of the Derivative Works described herein, or from the Form or Attribution in the course of utilizing the Derivative Works, shall constitute a default of this Agreement.

(iv) The License shall terminate upon termination of this Agreement. Upon termination of this Agreement, Client shall cease creating, reproducing, or distributing any new Derivative Works, but Client may continue advertising, marketing and distributing any Derivative Works created prior to termination of the Agreement, provided that they comply with the Form of Attribution requirements, and provided that Artist shall not be obligated to pay Client any Commission as a result of

any sales of any works (including without limitation the Artwork) to any purchasers of such works after this Agreement is terminated.

(v) All right, title, and interest in the Artwork, including without limitation, any copyright, shall remain with Artist. Artist shall own the copyright in the Derivative Works. Artist reserves unto itself all rights of every kind and nature except those specifically granted to Client herein.

(vi) Client acknowledges and agrees that Artist may take photographs and videos of the Artwork during the placement and display of the Artwork for Artist's own marketing and advertising purposes. Client hereby consents to Artist's creation and use of such materials, provided, however, that Artist agrees not to use such materials for any marketing or advertising purposes until Client publicly releases images or videos of the Property after Artist has placed the Artwork within the Property, or at such earlier time as Client may designate to Artist in writing that use of such materials is authorized, or if the photographs and video of the Artwork do not show any recognizable image of the interior of the Property. Client agrees that Artist owns all rights, title, and interest (including without limitation all copyright) in all such photographs and videos.

**6. Client's Representations, Warranties, and Covenants**

(i) Client represents and warrants to Artist that Client has full power and authority to authorize the movement of items within the Property or temporary removal of items from the Property by Artist as required in order for Artist to perform the Services.

(ii) Client represents and warrants to Artist that Client and the undersigned representative(s) of Client have full power, authority and legal right to execute and deliver this Agreement, and that the terms of the Agreement constitute valid and binding obligations of Client. Client's undersigned representative(s) warrant and represent that they are duly authorized to execute this Agreement on behalf of the Client and that their signatures on behalf of Client below satisfy all requirements of applicable law, including, inter alia, Cal. Corp. Code § 17703.01 to, and hereby do, bind Client to the terms of this Agreement.

(iii) Client covenants that concurrently with or prior to execution of this Agreement, Client shall deliver to Artist a duly executed resolution of the members of Client in substantially the form and substance attached hereto as Exhibit B authorizing execution of this Agreement and performance of the obligations hereunder.

(iv) Client represents and warrants to Artist that if Client is not the owner of the Property, that Client has authority from the owner of the Property to enter into and perform this Agreement, and to authorize Artist to perform the Services. Client shall produce written evidence of such authority at any time upon written request from Artist.

(v) Client represents that the area within the Property where the Artwork will be displayed is reasonably safe and that the floor underlying such area can safely support the size and weight of the Artwork as described in Exhibit A.

(vi) Client covenants not to disclose, orally or in writing, the Artist Proof Value to any Potential Purchasers of the Artwork, to any Potential Purchasers of the Property, or to anyone else without Artist's prior written consent.

(vii) The foregoing representations shall survive termination of the Agreement.

**7. Artist's Representations**

(i) Artist warrants and represents that it owns all rights to the Artwork and has authority to perform the Services, and has authorization to enter into this Agreement.

(ii) The foregoing representation shall survive termination of the Agreement.

**8. Default; Termination**

(i) **Default.**

a. Except as otherwise provided elsewhere herein, a default of this Agreement shall occur if either Party fails to perform any term or condition of this Agreement after having received 15 days' prior written notice from the other Party to cure such default and having failed to cure such default within such time.

b. In the event of an uncured default, the non-defaulting Party may terminate this Agreement upon 15 days' prior written notice to the other Party, in addition to any other remedies available at law, in equity, or under this Agreement.

(ii) **Termination.**

a. Either Party may terminate the Agreement at any time during the Term in the event of an uncured default by the other Party, subject to the requirements hereinabove to provide notice and opportunity to cure.

b. After the initial 12 months of the Term, either Party may terminate this Agreement without cause after providing 30 days' written notice to the other Party, which notice may be given before the expiration of the initial 12-month Term.

c. In the event of a bona fide sale of the Property that includes or purports to include sale of the Artwork, then in addition to the rights and obligations set forth elsewhere herein, Client shall provide Artist with the purchaser's contact information, and Artist shall separately coordinate with such purchaser for removal of the Artist Proof and/or delivery of the purchased Artwork, as applicable, at a time that is mutually agreeable for both Artist and such purchaser, and this Agreement shall thereafter terminate upon Client's satisfaction of Client's obligations to Artist hereunder and Artist's receipt of the Purchase Price for each Artwork purchased. Client shall exercise best efforts to ensure that Artist receives payment of the Purchase Price for all purchased Artwork at or before close of escrow on the Property. If such payment does not occur as required, then and in addition to the other remedies set forth elsewhere herein, Artist shall have the right to reclaim and remove the Artwork from the Property. Client shall provide, and shall cause the purchaser of the Property to provide, reasonable cooperation towards Artist's efforts to reclaim and remove the Artwork including reasonable access to the Property for reclamation purposes, and in no event shall Client prevent or obstruct Artist from reclaiming and removing the Artwork from the Property.

d. In the event of a bona fide sale of the Property that does not include sale of the Artwork, this Agreement shall terminate, provided that Client shall provide Artist with 30 days' written notice of termination, and Artist shall have the right to reclaim and remove the Artwork from the Property. Client shall provide, and shall cause the purchaser of the Property to provide, reasonable cooperation towards Artist's efforts to reclaim and remove the Artwork including reasonable access to the

Property for reclamation purposes, and in no event shall Client prevent or obstruct Artist from reclaiming and removing the Artwork from the Property.

e. In the event of any termination of the Agreement for any reason other than as described herein, in addition to the other remedies set forth elsewhere herein, Artist shall have the right to reclaim and remove the Artwork from the Property. Client shall provide, and shall cause the purchaser of the Property to provide, reasonable cooperation towards Artist's efforts to reclaim the Artwork including reasonable access to the Property for reclamation purposes, and in no event shall Client prevent or obstruct Artist from reclaiming the Artwork from the Property.

f. Upon any termination of the Agreement, the License shall terminate immediately.

g. The remedies provided above for termination of this Agreement shall be cumulative, and no exercise by Artist of any remedy provided hereunder shall preclude or limit Artist's right to exercise any other remedy provided at law, in equity, or elsewhere in this Agreement. The termination of this Agreement shall not relieve either Party from its indemnification obligations under this Agreement, and such obligations shall survive termination of this Agreement.

h. Client hereby irrevocably grants Artist a license to enter upon the Property for the purpose of reclaiming and removing the Artwork in the event Client seeks to exercise any of the reclamation remedies included within the foregoing Subsection 8(ii) hereof.

(iii) **Liquidated Damages.** In the event that a sale of the Property purports to include the Artwork and Artist does not receive payment of the Purchase Price for the Artwork at or before close of escrow on the Property, then Client shall be in immediate default of this Agreement and, notwithstanding any purported transfer of title of the Artwork to a purchaser of the Property, shall be immediately liable to Artist for liquidated damages in the amount of the full value of the Artist Proof of the Artwork listed in Exhibit A (the "**Artist Proof Value**"), in addition to Artist's general and special damages and other remedies available at law, in equity, and elsewhere in this Agreement. The Parties agree that the Artist Proof Value is a reasonable amount to compensate Artist for Artist's anticipated losses in the event of such breach. In the event of the default described in this paragraph, Artist shall not be required to provide Client notice or opportunity to cure. This provision shall survive termination of the Agreement.

(iv) **Fixture Filing.** In the event that a sale of the Property purports to include the Artwork and Artist does not receive payment of the Purchase Price for the Artwork at or before close of escrow on the Property, Artist shall thereupon have the right, in addition to all available remedies at law and in equity, to file all appropriate liens and other documents reasonably necessary to protect Artist's right to recover payment for the Artwork in the amount of the full Artist Proof Value for the Artwork listed in Exhibit A, including without limitation a fixture filing made pursuant to Article 9 of California's Uniform Commercial Code, whether against the Property or otherwise. Client hereby expressly consents to Artist's filing of any such lien or document, and Client shall at Client's sole expense provide reasonable assistance towards filing, recording, effectuating and enforcing any such liens or other documents. This provision shall survive termination of the Agreement.

**9. Bailment**

(i) This Agreement shall be deemed to create a voluntary bailment as defined by California law, with benefit to both bailee and bailor. Accordingly, Client as bailee shall owe Artist as bailor a duty of reasonable care with respect to safeguarding the Artwork while in Client's possession.

(ii) At all times, the Artwork shall remain the sole property of Artist. Client shall have no right or interest in the Artwork at any time.

(iii) This Agreement shall not be construed to create a partnership, joint venture, agency or employment relationship between the Parties.

**10. Insurance.**

(i) Throughout the Term, Client shall maintain or cause to be maintained property owner's and/or homeowner's insurance on the Property for the full replacement cost of the Property, with coverage for personal property that (i) includes coverage of the Artwork and its attendant display equipment, and (ii) has policy limits of at least the full Artist Proof Value of the Artwork as described in Exhibit A plus all other personal property located at the Property.

(ii) Throughout the Term, Client shall maintain a commercial general liability policy with limits of at least $1,000,000 per occurrence/$2,000,000 aggregate.

(iii) Throughout the Term, Artist shall maintain a commercial general liability policy with limits of at least $1,000,000 per occurrence/$2,000,000 aggregate, naming as additional insured the party(ies) set forth in Exhibit A.

**11. Indemnification**

(i) Artist shall indemnify and hold Client harmless for any damages, losses or personal injury occurring during or as a result of Artist's performance of the Services during the Term, or if Artist violates its obligation in Section 5(vi) above (regarding not using materials for marketing or advertising until Client publicly releases images or videos of the Property) or if any part of the Artwork breaks off and injures somebody except when due to actions, negligence or willful misconduct on the part of Client, his/her family, partners, associates, agents, representatives, contractors, invitees, or employees.

(ii) Client shall indemnify, hold harmless, defend with counsel reasonably satisfactory to Artist, and reimburse Artist for and from any and all injuries, losses, damages, liabilities, claims, actions, causes of action, suits, demands, costs, and expenses (including, but not limited to, reasonable attorneys' fees) (collectively, "**Losses**"), arising directly or indirectly out of or relating to Client's breach of its obligations under this Agreement, including without limitation: (i) any Losses resulting from Client preventing Artist's reclamation of the Artwork; (ii) any Losses pertaining to the use of the License or the Derivative Works at any time, including any such Losses that Artist seeks to recover from third parties as a result of Client's breach; and (iii) any Losses resulting from any purchaser of the Property failing to pay the Purchase Price of the Artwork to Artist upon a sale of the Property that purports to include the Artwork.

(iii) Client shall indemnify, hold harmless, defend with counsel reasonably satisfactory to Artist, and reimburse Artist for and from any and all Losses arising out of or relating to Artist's use of any images or video of the Artwork while displayed within the Property.

(iv) Client shall indemnify and reimburse Artist for any damage Losses pertaining to the Artwork or its attendant display equipment while the Artwork is located within the Property, except when due to the negligence or willful misconduct of Artist or Artist's employees or contractors.

(v) The foregoing indemnification provisions shall survive termination of this Agreement.

**12. Dispute Resolution.** Notwithstanding any other language in this Agreement or any other document, all disputes and/or claims are subject to the following:

(i) **Mediation**. If any dispute or claim of any kind whatsoever arising directly or indirectly out of this Agreement cannot be resolved through direct discussions, the Parties shall mediate such dispute or claim before resorting to arbitration or court action. Mediation fees, if any, shall be divided equally between the Parties. If, for any such dispute or claim, a Party commences an arbitration or court action without first attempting to resolve the matter through mediation or, within 15 days after a request for mediation has been made fails to agree to mediate and thereafter make best efforts to engage in mediation as soon as reasonably possible, then that Party shall not be entitled to recover attorney fees, even if that Party would otherwise have been entitled to recover attorney fees pursuant to this Agreement. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED. Exclusions from this mediation agreement are specified in Section 12(iii) hereof.

(ii) **ARBITRATION OF DISPUTES. By initialing this Section 12(ii), the Parties agree that any dispute of any kind whatsoever (including without limitation any dispute in law or equity) arising directly or indirectly out of this Agreement that is not otherwise resolved through direct discussions or mediation, including the determination of the scope or applicability of this agreement to arbitrate, shall then be resolved by neutral, binding arbitration in Los Angeles, California. Either Party may demand arbitration by sending a written notice to the other, by registered or certified mail to the address set forth immediately following the Party's signature below, that includes a statement of the matter in controversy and the relief requested. The arbitration shall be administered by the American Arbitration Association (AAA) and shall be conducted in accordance with the AAA rules then in effect. The arbitrator shall be an attorney licensed to practice in California with at least 10 years of business law experience or a retired judge with substantial business law experience, and shall be selected pursuant to the rules of AAA then in effect. Should either Party refuse or neglect to appoint said arbitrator, or to furnish the arbitrator with any papers or information demanded, or refuse or neglect to otherwise participate in the arbitration process, the arbitrator is empowered by the Parties to proceed *ex parte* (that is, the Parties hereby authorize the arbitrator to render an award that will be binding and enforceable against all Parties, even if one of the Parties fails to participate in the arbitration). The arbitrator shall render an award in accordance with California substantive and statutory law. The Parties shall have the right to discovery in accordance with AAA rules. Judgment upon the award of the arbitrator may be entered by any court having jurisdiction. The remedy for any claim brought pursuant to this Agreement shall be limited to actual damages, and in no event shall any Party be entitled to recover punitive or exemplary damages.**

**NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF CALIFORNIA LAW. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.**

**WE HAVE READ AND UNDERSTAND THE FOREGOING AND BY INITIALING BELOW WE AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.**

INITIALS: ______ ______
Artist Client

(iii) **Exclusions and Preservation of Actions.**

a. Exclusions: The following matters are excluded from mediation and arbitration: any matter that is within the jurisdiction of a probate, small claims or bankruptcy court.

b. Preservation Of Actions: The following shall not constitute a waiver of the mediation and arbitration provisions: (i) the filing of a court action to preserve a statute of limitations; or (ii) the filing of a court action to enable the recording of pending action, for order of attachment, receivership, injunction, or other provisional remedies.

(iv) **Attorneys' Fees**. Except as otherwise expressly set forth in this Agreement, each Party shall pay its own costs and expenses incurred in connection with preparing and negotiating this Agreement and such Party's performance under this Agreement, provided, that if either Party commences an action, proceeding, demand, claim, action, cause of action or suit against the other Party arising out of or in connection with this Agreement after complying with the mediation and arbitration provisions herein where applicable, then the prevailing Party shall be reimbursed by the other Party for all reasonable costs and expenses, including reasonable attorneys' fees and expenses, incurred by the prevailing Party in such action, proceeding, demand, claim, action, cause of action or suit, and in any appeal in connection therewith (regardless of whether the applicable action, proceeding, demand, claim, action, cause of action, suit or appeal is voluntarily withdrawn or dismissed).

(v) **Venue; Jurisdiction**. In the event of a dispute pertaining to this Agreement, the Parties stipulate that Los Angeles, California will be the proper venue and jurisdiction for any and all legal actions. The Parties waive all challenges to personal jurisdiction in the courts of Los Angeles, California.

**13. Miscellaneous Provisions**

(i) **Brokers**. There are no brokers involved in the Agreement or the negotiations pertaining thereto and the Parties shall indemnify, defend, reimburse and hold each other harmless from and against any claims from any brokers, salesperson, agents, finders or other parties for a commission or any compensation in connection with this transaction.

(ii) **Parties' Independent Judgment**. Each Party represents and warrants that he has relied wholly upon his own judgment, belief and knowledge in entering into this Agreement and each has had the opportunity to seek the advice of his own attorney prior to entering into this Agreement. This Agreement shall not be construed against the Party preparing it, and it shall be construed without regard to the identity of the person who drafted it, and shall be interpreted as if all Parties jointly prepared it as their joint work product. Each and every provision of this Agreement shall be construed as though all of the Parties hereto participated equally in the drafting hereof, and any uncertainty or ambiguity shall not be interpreted against any one Party. As a result of the foregoing, California Civil Code Section 1654, which provides "In cases of uncertainty not removed by the preceding rules, the language of a contract should be

interpreted most strongly against the party who caused the uncertainty to exist", is waived by the Parties and shall not apply to this Agreement.

(iii) **Notice.** All notices shall be in writing and sent to the recipient at the address under their signature below. Depending on which of the following delivery methods is used (which list is exclusive, meaning no other methods may be used), that notice shall be deemed effective upon the number of days specified below for each delivery method:

a. If sent by certified or first-class mail, deemed effective two (2) business days after deposited (as determined by the postmark), sufficient postage and fees prepaid, in the United States mail;

b. If sent by Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, or other comparable overnight courier service, for guaranteed overnight delivery, all applicable charges prepaid or charged to the sender's account, deemed effective the next business day;

c. If personally delivered to the recipient, deemed effective the date of recipient's actual receipt; or,

d. If sent by fax or email, and such transmission is electronically confirmed by the recipient as having been successfully transmitted; or confirmed by a fax delivery confirmation receipt generated by the sender's fax machine in the ordinary course of business, deemed effective the date of such receipt if received before 5:00 P.M. on a business day, otherwise deemed effective on the next business day.

(iv) **Paragraph Headings.** Except where headings establish obligations of the Parties, the headings or titles of paragraphs herein are solely for convenience of reference and are not a part of, or are they intended to govern or aid in the construction of, any provision hereof.

(v) **Counterparts.** This Agreement may be executed in one or more counterparts, but they all shall constitute one agreement. If so executed, each counterpart shall have the force and effect of the original. Fax and electronic signatures shall have the same force and effect as original signatures.

(vi) **No Third-Party Beneficiaries.** No party other than Artist and Client and their successors and assigns, shall have any rights to enforce or rely upon this Agreement, which is made solely for the benefit of Artist and Client and their successors and assigns, and not for the benefit of any other party or alleged third-party beneficiary.

(vii) **Severability.** If any provision of this Agreement shall be held invalid, the remainder of this Agreement shall nevertheless be deemed valid and binding upon the Parties hereto.

(viii) **Waiver-Modification.** No waiver or modification of this Agreement or of any covenant, condition, or limitation herein contained shall be valid unless in writing and duly executed by the Party to be charged therewith. Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein.

(ix) **California Law.** This Agreement shall be governed by and construed under and in accordance with the laws of the State of California.

(x) **Entire Agreement.** This document contains, as to the subject matter to which this Agreement applies, the entire agreement between the Parties and cancels and supersedes all other

prior representations or agreements between same, whether written or verbal arising from or in any way relating to the subject matter of this Agreement.

(xi) **Benefit and Burden**. The terms of this Agreement shall be binding upon, and shall inure to the benefit of the respective Parties, their heirs, legal representatives, successors and assigns.

(xii) **No Assignment by Client.** Client may not assign its obligations under this Agreement without prior written consent of Artist and signed by Artist, which consent may be withheld at Artist's sole and absolute discretion; provided however, that Artist agrees to reasonably cooperate with Client in the event Client requests Artist's consent to allow Client to assign its obligations under this Agreement to an entity as part of a refinance of the Property and that entity agrees in writing to assume full responsibility for all of Client's obligations under this Agreement.

(xiii) **Continuing Obligation.** The agreements contained herein shall remain in full force and applicable notwithstanding any changes in the members comprising, or the managers, officers or agents relating to, the Client's limited liability company. The term "Client", as used herein, shall include any alternate or successor partnership, corporation, limited liability company or other entity or person to the Client named herein, but any predecessor partnership (and their partners), corporation, limited liability company, other entity or person shall not thereby be released from any liability hereunder.

(xiv) **Further Assurances.** Each Party shall from time to time, at the other Party's request and without cost to the Party receiving the request, execute and deliver to the requesting Party such other instruments and take such other action as the requesting Party may reasonably request so as to enable it to exercise and enforce its rights under and fully enjoy the benefits and privileges with respect to this Agreement and to carry out the provisions and purposes hereof and thereof.

[*Remainder of page intentionally left blank – signatures follow*]

By signing below, the Parties respectively represent that they have read the terms of this Agreement and have had adequate opportunity to have the same reviewed by competent legal counsel.

| **ARTIST:** | **CLIENT:** |
|---|---|
| **MIKE FIELDS BRONZES LLC** | **CRESTLLOYD, LLC** |
| **SIGNATURE** **DATE** | [signature] 1-27-2020 **SIGNATURE** **DATE** |
| **By: Mike Fields** | **By: Nile Niami** |
| **Its: Member-Manager** | **Its: Manager** |
| **A duly authorized agent of Artist** | **A duly authorized agent of Client** |
| | 8981 W. Sunset Bl. Ste 300 |
| Address | West Hollywood CA 90069 Address |

**DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF CALIFORNIA LAW. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.**

**WE HAVE READ AND UNDERSTAND THE FOREGOING AND BY INITIALING BELOW WE AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.**

INITIALS: ______ ______
Artist Client

(iii) **Exclusions and Preservation of Actions.**

a. Exclusions: The following matters are excluded from mediation and arbitration: any matter that is within the jurisdiction of a probate, small claims or bankruptcy court.

b. Preservation Of Actions: The following shall not constitute a waiver of the mediation and arbitration provisions: (i) the filing of a court action to preserve a statute of limitations; or (ii) the filing of a court action to enable the recording of pending action, for order of attachment, receivership, injunction, or other provisional remedies.

(iv) **Attorneys' Fees**. Except as otherwise expressly set forth in this Agreement, each Party shall pay its own costs and expenses incurred in connection with preparing and negotiating this Agreement and such Party's performance under this Agreement, provided, that if either Party commences an action, proceeding, demand, claim, action, cause of action or suit against the other Party arising out of or in connection with this Agreement after complying with the mediation and arbitration provisions herein where applicable, then the prevailing Party shall be reimbursed by the other Party for all reasonable costs and expenses, including reasonable attorneys' fees and expenses, incurred by the prevailing Party in such action, proceeding, demand, claim, action, cause of action or suit, and in any appeal in connection therewith (regardless of whether the applicable action, proceeding, demand, claim, action, cause of action, suit or appeal is voluntarily withdrawn or dismissed).

(v) **Venue; Jurisdiction**. In the event of a dispute pertaining to this Agreement, the Parties stipulate that Los Angeles, California will be the proper venue and jurisdiction for any and all legal actions. The Parties waive all challenges to personal jurisdiction in the courts of Los Angeles, California.

**13. Miscellaneous Provisions**

(i) **Brokers**. There are no brokers involved in the Agreement or the negotiations pertaining thereto and the Parties shall indemnify, defend, reimburse and hold each other harmless from and against any claims from any brokers, salesperson, agents, finders or other parties for a commission or any compensation in connection with this transaction.

By signing below, the Parties respectively represent that they have read the terms of this Agreement and have had adequate opportunity to have the same reviewed by competent legal counsel.

**ARTIST:**
**MIKE FIELDS BRONZES LLC**

[signature] 1-27-2020
**SIGNATURE** **DATE**

**By: Mike Fields**
**Its: Member-Manager**
**A duly authorized agent of Artist**

2715 E 36th Ave Apt 6203
Spokane WA 99223
Address

**CLIENT:**
**CRESTLLOYD, LLC**

**SIGNATURE** **DATE**

**By: Nile Niami**
**Its: Manager**
**A duly authorized agent of Client**

Address

**EXHIBIT A**
**TO ARTWORK DISPLAY AGREEMENT**

1. **Client**
   i. Name: Crestlloyd, LLC, c/o Nile Niami, Manager, 8981 W. Sunset Bl. #303, West Hollywood, CA 90069
2. **Property**
   i. Description: *The One* – private residence
   ii. Address: 944 Airole Way, Los Angeles 90077

3. **Artwork**
   i. Name: *Unity*
   ii. Date of production (Artist Proof): 2019
   iii. Material
      i. Artist Proof: Composite
      ii. Standard Edition: to be determined by Artist
   iv. Artist Proof Value: $750,000 (including sculpture plus pedestal turntable)
   v. Sale Price (based on Artist Proof dimensions): to be determined by Artist

4. **Display Requirements**
   i. Required location and placement of Artwork: centered below the chandelier in the foyer of *The One*, placed upon turntable pedestal to be provided by Artist, Client to provide adequate electrical power and hookups for pedestal. For purposes of delivery, placement, removal, and/or reclamation of the Artwork, Client shall provide and install appropriate floor protective coverings such as plywood or high-density plastic in the Foyer where the Artwork is to be displayed, as well as in the entryway leading from the main front door to the Foyer.
   ii. Required written materials to be made available to Potential Purchasers of the Artwork: Artist's business card and brochure, to be provided by Artist.
   iii. Required written materials to accompany display of Artwork: none.

5. **Form of Attribution**
   i. Required text: "@mike_fields_sculpture" for Instagram.

6. **Commission**
   i. Percentage of Purchase Price: 10%

**EXHIBIT B**

**RESOLUTIONS OF THE MANAGER**

**OF**

**CRESTLLOYD, LLC**

The undersigned, constituting the Manager of Crestlloyd, LLC, a California limited liability company (the "**Company**"), hereby adopts the following resolutions.

**RESOLVED,** that the Manager of the Company has determined that is in the best interest of the Company and the Company's members that the Company enter into that certain Artwork Display Agreement with Mike Fields Bronzes LLC to which these resolutions are attached;

**RESOLVED**, that the Manager of the Company is authorized to sign and deliver all documents and to take or cause to be taken all other acts on behalf of the Company that he deems necessary or appropriate to effect and carry out the intent of the preceding resolution.

**RESOLVED**, that all acts previously taken by the Manager of the Company on behalf of the Company to effect and carry out the intent of the above resolutions are approved, ratified, and confirmed, provided the acts were not inconsistent with the Company's Certificate of Formation or Limited Liability Company Agreement, or any applicable law.

Signing of this Consent constitutes a written waiver of any notice required by the Company's Certificate of Formation or Limited Liability Company Agreement, or otherwise.

Dated effective: January 27, 2020

Nile Niami, Manager

# Exhibit 10

**updated**

# First American Title Company

**4 First American Way**
**Santa Ana, CA 92707**
California Department of Insurance License No. 151

Order Number: O-SA-6594496 (rbjs)

Title Officer: Robert Baca/ Joel Sotto
Phone: (714)250-8579
Fax No.: (714)481-2956
E-Mail: FAHQ-RA-OCTitle3@firstam.com

Buyer: TBD
Owner: Crestlloyd LLC
Property: 944 Airole Way
Los Angeles, CA 90077

## PRELIMINARY REPORT

In response to the above referenced application for a policy of title insurance, this company hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Exhibit A attached. *The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.* Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit A. Copies of the policy forms should be read. They are available from the office which issued this report.

**Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of May 25, 2021 at 7:30 A.M.

The form of Policy of title insurance contemplated by this report is:

ALTA/CLTA Homeowner's (EAGLE) Policy of Title Insurance (2013) and ALTA Ext Loan Policy 1056.06 (06-17-06) if the land described is an improved residential lot or condominium unit on which there is located a one-to-four family residence; or ALTA Standard Owner's Policy 2006 (WRE 06-17-06) and the ALTA Loan Policy 2006 (06-17-06) if the land described is an unimproved residential lot or condominium unit

A specific request should be made if another form or additional coverage is desired.

Title to said estate or interest at the date hereof is vested in:

Crestlloyd, LLC, A California Limited Liability Company

The estate or interest in the land hereinafter described or referred to covered by this Report is:

FEE

The Land referred to herein is described as follows:

(See attached Legal Description)

At the date hereof exceptions to coverage in addition to the printed Exceptions and Exclusions in said policy form would be as follows:

1. General and special taxes and assessments for the fiscal year 2021-2022, a lien not yet due or payable.

2. General and special taxes and assessments for the fiscal year 2020-2021.

| | |
|---|---|
| First Installment: | $708,939.11, DELINQUENT |
| Penalty: | $70,893.91 |
| Second Installment: | $708,939.09, DELINQUENT |
| Penalty: | $70,903.90 |
| Tax Rate Area: | 44-00067 |
| A. P. No.: | 4369-026-021 |

3. The lien of tax for escaped assessment pursuant to Article 4 of Chapter 3 of Part 2 of Division 1 of the California Revenue and Taxation Code.

| | |
|---|---|
| First Installment: | $545,759.15,PAID |
| Penalty: | $54,575.91 |
| Second Installment: | $629,825.77,DELINQUENT |
| Penalty: | $8,416.66 |
| Tax Rate Area: | 44-00067 |

A.P. No.:                           4369-026-021

The County Tax Collector could not verify the amounts shown above at this time.  Please verify the amounts with the County Tax Collector prior to the close of the contemplated transaction.

4.   The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

5.   Any and all offers of dedications, conditions, restrictions, easements, notes and/or provisions shown or disclosed by the filed or recorded map referred to in the legal description including but not limited to: DRAINAGE and incidental purposes affecting said land.

6.   Covenants, conditions, restrictions and easements in the document recorded  as BOOK 14375, PAGE 132 AND IN BOOK 14380, PAGE 16, BOTH of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition, or restriction, if any, indicating a preference, limitation, or discrimination based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, handicap, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, to the extent that such covenants, conditions or restrictions violate applicable state or federal laws. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

7.   Covenants, conditions, restrictions and easements in the document recorded November 13, 1947 as INSTRUMENT NO. 1860 of Official Records, but deleting any covenant, condition, or restriction, if any, indicating a preference, limitation, or discrimination based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, handicap, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, to the extent that such covenants, conditions or restrictions violate applicable state or federal laws. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

Document(s) declaring modifications thereof recorded February 07, 1949 as INSTRUMENT NO. 2309 AND APRIL 15, 1949 AS INSTRUMENT NO. 2654, BOTH of Official Records.

8.   Covenants, conditions, restrictions and easements in the document recorded  as BOOK 7069, PAGE 218 AND IN BOOK 7807, PAGE 33, BOTH of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition, or restriction, if any, indicating a preference, limitation, or discrimination based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, handicap, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, to the extent that such covenants, conditions or restrictions violate applicable state or federal laws. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

Document(s) declaring modifications thereof recorded July 27, 1970 as INSTRUMENT NO. 2810 of Official Records.

9. An agreement or covenant to hold land as one parcel recorded June 22, 1981 as INSTRUMENT NO. 81-620826 of Official Records.

10. The terms and provisions contained in the document entitled "COVENANT AND AGREEMENT" recorded July 03, 1981 as INSTRUMENT NO. 81-668860 OF OFFICIAL RECORDS.

11. An agreement or covenant to hold land as one parcel recorded December 22, 1994 as INSTRUMENT NO. 94-2260589 of Official Records.

12. A deed of trust to secure an original indebtedness of $14,040,000.00 recorded March 13, 2013 as INSTRUMENT NO. 13-384037 OF OFFICIAL RECORDS.

| | |
|---|---|
| Dated: | March 13, 2013 |
| Trustor: | CRESTLLOYD LLC, A CALIFORNIA LIMITED LIABILITY COMPANY |
| Trustee: | FIRST AMERICAN TITLE INSURANCE COMPANY |
| Beneficiary: | INFERNO REALTY, L.P. AS TO AN UNDIVIDED $7,040,000.00 INTEREST AND MAYBACH CORPORATION HOLDINGS, INC. AS TO AN UNDIVIDED $7,000,000.00 INTEREST, AS TENANTS IN COMMON |

a. If this deed of trust is to be eliminated in the policy or policies contemplated by this report/commitment, the company will require the following for review prior to the recordation of any documents or the issuance of any policy of title insurance:
   i. Original note and deed of trust.
   ii. Payoff demand statement signed by all present beneficiaries.
   iii. Request for reconveyance or substitution of trustee and full reconveyance must be signed by all present beneficiaries and must be notarized by a First American approved notary.

b. If the payoff demand statement or the request for reconveyance is to be signed by a servicer, we will also require a full copy of the loan servicing agreement executed by all present beneficiaries.

c. If any of the beneficial interest is presently held by trustees under a trust agreement, we will require a certification pursuant to Section 18100.5 of the California Probate Code in a form satisfactory to the Company.

According to the public records, the beneficial interest of MAYBACH CORPORATION, A CANADIAN CORPORATION under the deed of trust was assigned to INFERNO REALTY, LP, A CALIFORNIA LIMITED LIABLILITY COMPANY by assignment recorded November 10, 2015 as INSTRUMENT NO. 15-1375606 of Official Records.

According to the public records, the beneficial interest of INFERNO REALTY, LP, A CALIFORNIA LIMITED PARTNERSHIP under the deed of trust was assigned to INFERNO INVESTMENT INC. by assignment recorded November 10, 2015 as INSTRUMENT NO. 15-1375607 of Official Records.

A document recorded November 10, 2015 as INSTRUMENT NO. 15-1375608 OF OFFICIAL RECORDS provides that the deed of trust or the obligation secured thereby has been modified.

A document recorded November 06, 2018 as INSTRUMENT NO. 18-1122920 OF OFFICIAL RECORDS provides that the lien or charge of the deed of trust was subordinated to the lien or charge of the deed of trust recorded November 06, 2018 as INSTRUMENT NO. 18-1122917 OF OFFICIAL RECORDS.

13. An agreement or covenant to hold land as one parcel recorded September 05, 2013 as INSTRUMENT NO. 13-1298666 of Official Records.

14. The terms and provisions contained in the document entitled "MASTER COVENANT AND AGREEMENT REGARDING ON-SITE BMP MAINTENANCE" recorded September 24, 2013 as INSTRUMENT NO. 13-1385742 OF OFFICIAL RECORDS.

15. The terms and provisions contained in the document entitled "MASTER COVENANT AND AGREEMENT REGARDING ON-SITE BMP MAINTENANCE" recorded February 07, 2014 as INSTRUMENT NO. 14-139714 OF OFFICIAL RECORDS.

16. An offer of dedication for PUBLIC STREET and incidental purposes, recorded June 04, 2014 as INSTRUMENT NO. 14-578201 of Official Records.
    To: LOS ANGELES

17. The terms and provisions contained in the document entitled "RESOLUTION" recorded April 10, 2015 as INSTRUMENT NO. 15-395929 OF OFFICIAL RECORDS.

18. The terms and provisions contained in the document entitled "COVENANT AND AGREEMENT REGARDING MAINTENANCE OF BUILDING" recorded February 17, 2016 as INSTRUMENT NO. 16-172858 OF OFFICIAL RECORDS.

19. A claim of lien recorded August 10, 2018 as INSTRUMENT NO. 18-810142 OF OFFICIAL RECORDS.

    Lien claimant: CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC
    Debtor: CRESTLLOYD, LLC
    Amount: $25,978.90

Notice of pendency of action recorded October 01, 2018 as instrument no. 18-1000997 of Official Records.

Court: SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES, SANTA MONICA
Case No.: SC129904
Plaintiff: CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC, A LIMITED LIABILITY COMPANY
Defendant: INDIGO CONSTRUCTION CORP, A CALIFORNIA CORPORATION; BAHMAN J. ZALL, AN INDIVIDUAL; CRESTLLOYD, LLC, A LIMITED LIABILITY COMPANY; AIROLE ESTATE, AN ENTITY OF UNKNOWN FORM; AND DOES 1 THROUGH 50, INCLUSIVE
Purpose: Foreclosure of a mechanics' lien.

20. A deed of trust to secure an original indebtedness of $82,500,000.00 recorded November 06, 2018 as INSTRUMENT NO. 18-1122917 OF OFFICIAL RECORDS.
    Dated: October 25, 2018
    Trustor: CRESTLLOYD, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY
    Trustee: CHICAGO TITLE COMPANY
    Beneficiary: HANKEY CAPITAL, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

a. If this deed of trust is to be eliminated in the policy or policies contemplated by this report/commitment, the company will require the following for review prior to the recordation of any documents or the issuance of any policy of title insurance:
    i. Original note and deed of trust.
    ii. Payoff demand statement signed by all present beneficiaries.
    iii. Request for reconveyance or substitution of trustee and full reconveyance must be signed by all present beneficiaries and must be notarized by a First American approved notary.

b. If the payoff demand statement or the request for reconveyance is to be signed by a servicer, we will also require a full copy of the loan servicing agreement executed by all present beneficiaries.

c. If any of the beneficial interest is presently held by trustees under a trust agreement, we will require a certification pursuant to Section 18100.5 of the California Probate Code in a form satisfactory to the Company.

The above deed of trust states that it is a construction deed of trust.

A document recorded August 31, 2020 as INSTRUMENT NO. 20-1030024 OF OFFICIAL RECORDS provides that the deed of trust or the obligation secured thereby has been modified.

A notice of default recorded March 05, 2021 as INSTRUMENT NO. 21-367447 OF OFFICIAL RECORDS.

21. Any statutory lien for labor or materials arising by reason of a work of improvement, as disclosed by a document recorded November 06, 2018 as INSTRUMENT NO. 18-1122917 of Official Records.

22. The terms and provisions contained in the document entitled "MEMORANDUM OF AGREEMENT" recorded November 06, 2018 as INSTRUMENT NO. 18-1122919 OF OFFICIAL RECORDS.

23. A deed of trust to secure an original indebtedness of $30,188,235.00 recorded November 07, 2018 as INSTRUMENT NO. 18-1126580 OF OFFICIAL RECORDS.

| | |
|---|---|
| Dated: | October 16, 2018 |
| Trustor: | CRESTLLOYD, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY |
| Trustee: | CHICAGO TITLE COMPANY |
| Beneficiary: | YOGI SECURITIES HOLDINGS, LLC, A NEVADA LIMITED LIABILITY COMPANY |

a. If this deed of trust is to be eliminated in the policy or policies contemplated by this report/commitment, the company will require the following for review prior to the recordation of any documents or the issuance of any policy of title insurance:
    i. Original note and deed of trust.
    ii. Payoff demand statement signed by all present beneficiaries.
    iii. Request for reconveyance or substitution of trustee and full reconveyance must be signed by all present beneficiaries and must be notarized by a First American approved notary.

b. If the payoff demand statement or the request for reconveyance is to be signed by a servicer, we will also require a full copy of the loan servicing agreement executed by all present beneficiaries.

c. If any of the beneficial interest is presently held by trustees under a trust agreement, we will require a certification pursuant to Section 18100.5 of the California Probate Code in a form satisfactory to the Company.

24. A deed of trust to secure an original indebtedness of $6,196,810.64 recorded September 23, 2019 as INSTRUMENT NO. 19-989746 OF OFFICIAL RECORDS.

| | |
|---|---|
| Dated: | September 18, 2019 |
| Trustor: | CRESTLLOYD, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY |
| Trustee: | CHICAGO TITLE COMPANY |
| Beneficiary: | YOGI SECURITIES HOLDINGS, LLC, A NEVADA LIMITED LIABILITY COMPANY |

a. If this deed of trust is to be eliminated in the policy or policies contemplated by this report/commitment, the company will require the following for review prior to the recordation of any documents or the issuance of any policy of title insurance:
   i. Original note and deed of trust.
   ii. Payoff demand statement signed by all present beneficiaries.
   iii. Request for reconveyance or substitution of trustee and full reconveyance must be signed by all present beneficiaries and must be notarized by a First American approved notary.

b. If the payoff demand statement or the request for reconveyance is to be signed by a servicer, we will also require a full copy of the loan servicing agreement executed by all present beneficiaries.

c. If any of the beneficial interest is presently held by trustees under a trust agreement, we will require a certification pursuant to Section 18100.5 of the California Probate Code in a form satisfactory to the Company.

A document recorded October 28, 2019 as INSTRUMENT NO. 19-1154393 OF OFFICIAL RECORDS provides that the deed of trust or the obligation secured thereby has been modified.

The effect of a document entitled "SUBSTITUTION OF TRUSTEE AND DEED OF FULL RECONVEYANCE", recorded January 14, 2021 as INSTRUMENT NO. 21-76458 of Official Records.

Note: The Company will require satisfactory proof of full payment of the debt secured by said mortgage or deed of trust prior to removing this exception or insuring the contemplated transaction.

25. The terms and provisions contained in the document entitled "COVENANT AND AGREEMENT REGARDING MAINTENANCE OF BUILDING" recorded December 02, 2019 as INSTRUMENT NO. 19-1317943 OF OFFICIAL RECORDS.

26. Any lien, assessment, and/or violation or enforcement of any law, ordinance, permit or governmental regulation arising from the document entitled NOTICE OF PENDING LIEN recorded January 31, 2020 as INSTRUMENT NO. 20-124042 of Official Records.

27. A claim of lien recorded June 29, 2020 as INSTRUMENT NO. 20-709010 OF OFFICIAL RECORDS.

| | |
|---|---|
| Lien claimant: | AMERICAN TRUCK & TOOL RENTALS INC/AMERICAN RENTALS |
| Debtor: | CRESTLLOYD, LLC |
| Amount: | $97,050.34 |

28. A claim of lien recorded June 30, 2020 as INSTRUMENT NO. 20-712043 OF OFFICIAL RECORDS.

| | |
|---|---|
| Lien claimant: | J&E TEXTURE, INC. |
| Debtor: | CRESTLLOYD, LLC |
| Amount: | $214,147.50 |

29. The terms and provisions contained in the document entitled "MEMORANDUM OF AGREEMENT" recorded August 31, 2020 as INSTRUMENT NO. 20-1030294 OF OFFICIAL RECORDS.

30. A claim of lien recorded September 02, 2020 as INSTRUMENT NO. 20-1044741 OF OFFICIAL RECORDS.

| | |
|---|---|
| Lien claimant: | ROLLS SCAFFOLD, INC. |
| Debtor: | CRESTLLOYD, LLC |
| Amount: | $14,412.84 |

31. A deed of trust to secure an original indebtedness of $5,000,000.00 recorded September 04, 2020 as INSTRUMENT NO. 20-1058770 OF OFFICIAL RECORDS.

| | |
|---|---|
| Dated: | February 11, 2020 |
| Trustor: | CRESTLLOYD, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY |
| Trustee: | PACIFIC COAST TITLE |
| Beneficiary: | HILLDUN CORPORATION, A NEW YORK CORPORATION |

a. If this deed of trust is to be eliminated in the policy or policies contemplated by this report/commitment, the company will require the following for review prior to the recordation of any documents or the issuance of any policy of title insurance:
    i. Original note and deed of trust.
    ii. Payoff demand statement signed by all present beneficiaries.
    iii. Request for reconveyance or substitution of trustee and full reconveyance must be signed by all present beneficiaries and must be notarized by a First American approved notary.

b. If the payoff demand statement or the request for reconveyance is to be signed by a servicer, we will also require a full copy of the loan servicing agreement executed by all present beneficiaries.

c. If any of the beneficial interest is presently held by trustees under a trust agreement, we will require a certification pursuant to Section 18100.5 of the California Probate Code in a form satisfactory to the Company.

32. Notice of pendency of action recorded December 14, 2020 as INSTRUMENT NO. 20-1647158 OF OFFICIAL RECORDS.

| | |
|---|---|
| Court: | SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF LOS ANGELES, SANTA MONICA COURTHOUSE |
| Case No.: | 20SMCV01229 |
| Plaintiff: | J&E TEXTURE, INC., A CALIFORNIA CORPORATION |
| Defendant: | CRESTLLOYD, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, HANKEY CAPITAL, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, INFERNO INVESTMENT INC., AN ENTITY OF UNKNOWN FORM, YOGI SECURITIES HOLDINGS, LLC, A NEVADA LIMITED LIABILITY COMPANY, AMERICAN TRUCK & TOOL RENTALS, INC., A CALIFORNIA CORPORATION, AND DOES 1 THROUGH 50, INCLUSIVE |
| Purpose: | AFFECTS THE TITLE TO REAL PROPERTY |

33. Confirmation that neither the foreclosure transfer instrument or foreclosure-related instrument recorded March 05, 2021 as INSTRUMENT NO. 21-367447 nor the judicial proceeding or non-judicial foreclosure process on which that instrument is based was in violation of the Coronavirus Aid, Relief, and Economic Stimulus Act ("CARES Act") moratorium or any moratorium/suspension imposed by an institutional loan guarantor or insurer, secondary market investor, loan servicer, financial institution regulator, State Executive Order, Court Order or Legislative Act.

34. Notice of pendency of action recorded 05/05/21 as INSTRUMENT NO. 21-717597 OF OFFICIAL RECORDS.

| | |
|---|---|
| Court: | SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF LOS ANGELES |
| Case No.: | 20SMCV01264 |
| Plaintiff: | J&E TEXTURE, INC., A CALIFORNIA CORPORATION |
| Defendant: | CRESTLLOYD, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, HANKEY CAPITAL, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, INFERNO INVESTMENT INC., AN ENTITY OF UNKNOWN FORM, YOGI SECURITIES HOLDINGS, LLC, A NEVADA LIMITED LIABILITY COMPANY, AMERICAN TRUCK & TOOL RENTALS, INC., A CALIFORNIA CORPORATION, AND DOES 1 THROUGH 50, INCLUSIVE |
| Purpose: | AFFECTS THE TITLE TO REAL PROPERTY |

35. A claim of lien recorded May 06, 2021 as INSTRUMENT NO. 21-722265 OF OFFICIAL RECORDS.

| | |
|---|---|
| Lien claimant: | JMS AIR CONDITIONING AND APPLIANCE SERVICES, INC. |
| Debtor: | CRESTLLOYD LLC |
| Amount: | $51,290.00 |

36. Any statutory lien for labor or materials arising by reason of a work of improvement, as disclosed by a document recorded May 06, 2021 as INSTRUMENT NO. 21-722265 of Official Records.

37. Any statutory lien for labor or materials arising by reason of a work of improvement, as disclosed by a document recorded June 01, 2021 as INSTRUMENT NO. 21-868958 of Official Records.

38. Rights of the public in and to that portion of the Land lying within any Road, Street, Alley or Highway.

39. The new lender, **if any**, for this transaction may be a Non-Institutional Lender. If so, the Company will require the Deed of Trust to be signed before a First American approved notary.

40. This transaction may be subject to a Geographic Targeting Order ("GTO") issued pursuant to the Bank Secrecy Act. Information necessary to comply with the GTO must be provided prior to the closing. This transaction will not be insured until this information is submitted, reviewed and found to be complete.

**Prior to the issuance of any policy of title insurance, the Company will require:**

41. With respect to CRESTLLOYD, LLC, a limited liability company:
a. A copy of its operating agreement and any amendments thereto;
b. If it is a California limited liability company, that a certified copy of its articles of organization (LLC-1) and any certificate of correction (LLC-11), certificate of amendment (LLC-2), or restatement of articles of organization (LLC-10) be recorded in the public records;
c. If it is a foreign limited liability company, that a certified copy of its application for registration (LLC-5) be recorded in the public records;
d. With respect to any deed, deed of trust, lease, subordination agreement or other document or instrument executed by such limited liability company and presented for recordation by the Company or upon which the Company is asked to rely, that such document or instrument be executed in accordance with one of the following, as appropriate:
(i) If the limited liability company properly operates through officers appointed or elected pursuant to the terms of a written operating agreement, such document must be executed by at least two duly elected or appointed officers, as follows: the chairman of the board, the president or any vice president, and any secretary, assistant secretary, the chief financial officer or any assistant treasurer;
(ii) If the limited liability company properly operates through a manager or managers identified in the articles of organization and/or duly elected pursuant to the terms of a written operating agreement, such document must be executed by at least two such managers or by one manager if the limited liability company properly operates with the existence of only one manager.
e. Other requirements which the Company may impose following its review of the material required herein and other information which the Company may require

## INFORMATIONAL NOTES

Note: The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than the certain dollar amount set forth in any applicable arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. If you desire to review the terms of the policy, including any arbitration clause that may be included, contact the office that issued this Commitment or Report to obtain a sample of the policy jacket for the policy that is to be issued in connection with your transaction.

1. This report is preparatory to the issuance of an ALTA Loan Policy. We have no knowledge of any fact which would preclude the issuance of the policy with CLTA endorsement forms 100 and 116 and if applicable, 115 and 116.2 attached.

   When issued, the CLTA endorsement form 116 or 116.2, if applicable will reference a(n) known as 944 AIROLE WAY, LOS ANGELES, CA.

2. According to the public records, there has been no conveyance of the land within a period of twenty-four months prior to the date of this report, except as follows:

   None

3. It appears that a work of improvement is in progress or recently completed on the land. The Company will require various documents and information, including but not limited to a completed mechanics' lien risk analysis, construction contract(s), lien waivers, loan agreement, disbursement information, executed indemnity agreement and current financial information from proposed indemnitors, in order to determine whether mechanics' lien insurance can be issued. Other requirements may be made following the review of such documents and information.

   NOTE to proposed insured lender only: No Private transfer fee covenant, as defined in Federal Housing Finance Agency Final Rule 12 CFR Part 1228, that was created and first appears in the Public Records on or after February 8, 2011, encumbers the Title except as follows: None

The map attached, if any, may or may not be a survey of the land depicted hereon. First American expressly disclaims any liability for loss or damage which may result from reliance on this map except to the extent coverage for such loss or damage is expressly provided by the terms and provisions of the title insurance policy, if any, to which this map is attached.

**LEGAL DESCRIPTION**

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGES 81 TO 83 INCLUSIVE, OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET, AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 52"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE;

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET; THENCE NORTH 89° 27' 20" WEST 214.07 FEET MORE OR LESS, TO A POINT IN THE WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: 4369-026-021

Main Document Page 138 of 373
Order Number: **O-SA-6594496**
Page Number: 13

OFFICE OF THE ASSESSOR
COUNTY OF LOS ANGELES
COPYRIGHT © 2002
SEARCH NO
REVISED
950404100001002-07
950404100001004-07
20111120602-07
20131126020014001-07
20160308020/0001-07
TRA
67
P.A.
1124-26
26
SHEET
4369
MAPPING AND GIS SERVICES
SCALE 1" = 100'
Date Printed: 3/3/2016 8:28:50 AM
Date Saved: 3/3/2016 8:28:47 AM
STRADELLA
AIROLE
WAY
RD
WEST
TRACT NO 22727
M B 623 - 1
M B 623 - 3
TRACT NO 9745
M B 141 - 93
M B 83 - 81
BK 4370
PG 25
PG 24
PG 36
2016

*First American Title*
Page 13 of 21

132



***NOTICE***

Section 12413.1 of the California Insurance Code, effective January 1, 1990, requires that any title insurance company, underwritten title company, or controlled escrow company handling funds in an escrow or sub-escrow capacity, wait a specified number of days after depositing funds, before recording any documents in connection with the transaction or disbursing funds. This statute allows for funds deposited by wire transfer to be disbursed the same day as deposit. In the case of cashier's checks or certified checks, funds may be disbursed the next day after deposit. In order to avoid unnecessary delays of three to seven days, or more, please use wire transfer, cashier's checks, or certified checks whenever possible.

**EXHIBIT A**
**LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS (BY POLICY TYPE)**

**CLTA STANDARD COVERAGE POLICY – 1990**
EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public, records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6. Any lien or right to a lien for services, labor or material unless such lien is shown by the public records at Date of Policy.

**CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)**
EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;

d. improvements on the Land;
e. land division; and
f. environmental protection.
This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5. Failure to pay value for Your Title.
6. Lack of a right:
   a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

**LIMITATIONS ON COVERED RISKS**

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1% of Policy Amount Shown in Schedule A or $2,500 (whichever is less) | $10,000 |
| Covered Risk 18: | 1% of Policy Amount Shown in Schedule A or $5,000 (whichever is less) | $25,000 |
| Covered Risk 19: | 1% of Policy Amount Shown in Schedule A or $5,000 (whichever is less) | $25,000 |
| Covered Risk 21: | 1% of Policy Amount Shown in Schedule A or $2,500 (whichever is less) | $5,000 |

**2006 ALTA LOAN POLICY (06-17-06)**
EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;

   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
(a) a fraudulent conveyance or fraudulent transfer, or
(b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

EXCEPTIONS FROM COVERAGE

[Except as provided in Schedule B - Part II,[ t[or T]his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

**[PART I**

[The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.

**PART II**

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:]

**2006 ALTA OWNER'S POLICY (06-17-06)**

EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;

   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
(a) created, suffered, assumed, or agreed to by the Insured Claimant;
(b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 or 10); or
(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
(a) a fraudulent conveyance or fraudulent transfer, or
(b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:
[The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency  that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by  persons in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.  Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.
7.  [Variable exceptions such as taxes, easements, CC&R's, etc. shown here.]

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (07-26-10)**
EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

(i) the occupancy, use, or enjoyment of the Land;
(ii) the character, dimensions, or location of any improvement erected on the Land;
(iii) the subdivision of land; or
(iv) environmental protection;

or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk  5, 6, 13(c), 13(d), 14 or 16.
(b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters
(a) created, suffered, assumed, or agreed to by the Insured Claimant;
(b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6.  Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the

Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.
10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

First American Title™

**Privacy Notice**

**Effective:** October 1, 2019

**Notice Last Updated:** January 1, 2021

This Privacy Notice describes how First American Financial Corporation and its subsidiaries and affiliates (together referred to as "First American," "we," "us," or "our") collect, use, store, and share your information. This Privacy Notice applies to information we receive from you offline only, as well as from third parties, when you interact with us and/or use and access our services and products ("Products"). For more information about our privacy practices, including our online practices, please visit https://www.firstam.com/privacy-policy/. The practices described in this Privacy Notice are subject to applicable laws in the places in which we operate.

**What Type Of Information Do We Collect About You?** We collect a variety of categories of information about you. To learn more about the categories of information we collect, please visit https://www.firstam.com/privacy-policy/.

**How Do We Collect Your Information?** We collect your information: (1) directly from you; (2) automatically when you interact with us; and (3) from third parties, including business parties and affiliates.

**How Do We Use Your Information?** We may use your information in a variety of ways, including but not limited to providing the services you have requested, fulfilling your transactions, comply with relevant laws and our policies, and handling a claim. To learn more about how we may use your information, please visit https://www.firstam.com/privacy-policy/.

**How Do We Share Your Information?** We do not sell your personal information. We only share your information, including to subsidiaries, affiliates, and to unaffiliated third parties: (1) with your consent; (2) in a business transfer; (3) to service providers; and (4) for legal process and protection. To learn more about how we share your information, please visit https://www.firstam.com/privacy-policy/.

**How Do We Store and Protect Your Information?** The security of your information is important to us. That is why we take commercially reasonable steps to make sure your information is protected. We use our best efforts to maintain commercially reasonable technical, organizational, and physical safeguards, consistent with applicable law, to protect your information.

**How Long Do We Keep Your Information?** We keep your information for as long as necessary in accordance with the purpose for which it was collected, our business needs, and our legal and regulatory obligations.

**Your Choices** We provide you the ability to exercise certain controls and choices regarding our collection, use, storage, and sharing of your information. You can learn more about your choices by visiting https://www.firstam.com/privacy-policy/.

**International Jurisdictions**: Our Products are offered in the United States of America (US), and are subject to US federal, state, and local law. If you are accessing the Products from another country, please be advised that you may be transferring your information to us in the US, and you consent to that transfer and use of your information in accordance with this Privacy Notice. You also agree to abide by the applicable laws of applicable US federal, state, and local laws concerning your use of the Products, and your agreements with us.

We may change this Privacy Notice from time to time. Any and all changes to this Privacy Notice will be reflected on this page, and where appropriate provided in person or by another electronic method. **YOUR CONTINUED USE, ACCESS, OR INTERACTION WITH OUR PRODUCTS OR YOUR CONTINUED COMMUNICATIONS WITH US AFTER THIS NOTICE HAS BEEN PROVIDED TO YOU WILL REPRESENT THAT YOU HAVE READ AND UNDERSTOOD THIS PRIVACY NOTICE.**

**Contact Us** dataprivacy@firstam.com or toll free at 1-866-718-0097.

**© 2020 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE:FAF**



## For California Residents

If you are a California resident, you may have certain rights under California law, including but not limited to the California Consumer Privacy Act of 2018 ("CCPA"). All phrases used in this section shall have the same meaning as those phrases are used under California law, including the CCPA.

**Right to Know**. You have a right to request that we disclose the following information to you: (1) the categories of **personal information** we have collected about or from you; (2) the categories of sources from which the **personal information** was collected; (3) the business or commercial purpose for such collection and/or disclosure; (4) the categories of third parties with whom we have shared your **personal information**; and (5) the specific pieces of your **personal information** we have collected. To submit a verified request for this information, go to our online privacy policy at www.firstam.com/privacy-policy to submit your request or call toll-free at 1-866-718-0097. You may also designate an authorized agent to submit a request on your behalf by going to our online privacy policy at www.firstam.com/privacy-policy to submit your request or by calling toll-free at 1-866-718-0097.

**Right of Deletion**. You also have a right to request that we delete the **personal information** we have collected from and about you. This right is subject to certain exceptions available under the CCPA and other applicable law. To submit a verified request for deletion, go to our online privacy policy at www.firstam.com/privacy-policy to submit your request or call toll-free at 1-866-718-0097. You may also designate an authorized agent to submit a request on your behalf by going to our online privacy policy at www.firstam.com/privacy-policy to submit your request or by calling toll-free at 1-866-718-0097.

**Verification Process**. For either a request to know or delete, we will verify your identity before responding to your request. To verify your identity, we will generally match the identifying information provided in your request with the information we have on file about you. Depending on the sensitivity of the information requested, we may also utilize more stringent verification methods to verify your identity, including but not limited to requesting additional information from you and/or requiring you to sign a declaration under penalty of perjury.

**Notice of Sale**. We do not sell California resident information, nor have we sold California resident information in the past 12 months. We have no actual knowledge of selling the information of minors under the age of 16.

**Right of Non-Discrimination**. You have a right to exercise your rights under California law, including under the CCPA, without suffering discrimination. Accordingly, First American will not discriminate against you in any way if you choose to exercise your rights under the CCPA.

**Notice of Collection**. To learn more about the categories of **personal information** we have collected about California residents over the last 12 months, please see "What Information Do We Collect About You" in https://www.firstam.com/privacy-policy. To learn about the sources from which we have collected that information, the business and commercial purpose for its collection, and the categories of third parties with whom we have shared that information, please see "How Do We Collect Your Information", "How Do We Use Your Information", and "How Do We Share Your Information" in https://www.firstam.com/privacy-policy.

**Notice of Sale**. We have not sold the **personal information** of California residents in the past 12 months.

**Notice of Disclosure**. To learn more about the categories of **personal information** we may have disclosed about California residents in the past 12 months, please see "How Do We Use Your Information" and "How Do We Share Your Information" in https://www.firstam.com/privacy-policy.

**© 2020 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE:FAF**

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is **21650 Oxnard Street, Suite 500, Woodland Hills, California 91367**.

On August 10, 2021, I served the foregoing document described as: **RECEIVER'S FIRST REPORT FOR THE PERIOD ENDING JULY 31, 2021; RECEIVER'S INVENTORY** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed as follows:

**(SEE ATTACHED SERVICE LIST)**

☒ **(BY MAIL)** I caused such envelope with postage thereon fully prepaid to be placed in the U.S. mail at Woodland Hills, California. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of a party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY PERSONAL DELIVERY)** I caused such envelope to be delivered by hand by [Name and address of courier service], to the office of the addressee(s) noted on the attached Service List.

☒ **(BY E-MAIL OR ELECTRONIC TRANSMISSION)** I caused said document(s) to be sent to the person(s) at the e-mail address(es) listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ **(BY FEDERAL EXPRESS / OVERNITE EXPRESS)** I caused such envelope to be deposited at the Federal Express/Overnite Express drop box at Woodland Hills, California. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with Federal Express/Overnite Express that same day in the ordinary course of business.

Executed on August 10, 2021, at Woodland Hills, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct and, that I am employed in the office of a member of the bar of this court at whose direction the service was made.

NIKOLA A. FIELDS

HANKEY CAPITAL, LLC v. CRESTLLOYD, LLC, et al.
LASC Case No. 21SMCV01113

**SERVICE LIST**

**BY MAIL**

| | |
|---|---|
| Theodore "Ted" Lanes<br>3 Lanes Management Services<br>655 Deep Valley Drive, Suite 125-P 4<br>Rolling Hills Estate, CA 90274 | Manager and Agent for Service of Process for Defendant Crestlloyd, LLC |
| Honorable Mark Young<br>Department M<br>Santa Monica Courthouse<br>1725 Main Street<br>Santa Monica, CA 90401 | Courtesy Copy |

**BY EMAIL**

| | |
|---|---|
| Marcos Almeida<br>7 Legal Executive<br>Southpac Group<br>8 Registrado na Ordem dos Advogados do Brasil/MG 132.407<br>Email: malmeida@southpacgroup.com | Advisor to Southpac Trust International, Inc., as Trustee of the Park City Family Settlement, the sole member of Crestlloyd, LLC ("Borrower") |
| Me Mathieu Robillard<br>Robillard Prescott Morissette, avocats et médiateurs s.e.n.c.<br>E-mail: mathieu@rpmlex.ca | Attorneys for Inferno Investment, Inc., a Defendant in Los Angeles Superior Court Case No. 21STCV24076 (courtesy copy only) |
| Jeffrey S. Wruble, Esq.<br>David Mark, Esq.<br>Buchalter<br>1000 Wilshire Blvd., Suite 1500<br>Los Angeles, CA 90017-1730<br>Email: jwruble@buchalter.com<br>dmark@buchalter.com | Attorneys for Hankey Capital, LLC |
| Mark J. Rosenbaum, Esq.<br>Elsa M. Horowitz, Esq.<br>Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP<br>11400 W Olympic Blvd., 9th Floor<br>Los Angeles, CA 90064<br>E-mail: mrosenbaum@wrslawyers.com<br>E-mail: ehorowitz@wrslawyers.com | Attorneys for Yogi Securities Holdings, LLC, the Plaintiff in Los Angeles Superior Court Case No. 21STCV24076 (courtesy copy only) |

# EXHIBIT “4”

COPY

Theodore Lanes
Receiver
Lanes Management Services
655 Deep Valley Drive, Suite 125-P
Rolling Hills Estates, CA 90274
Telephone: 424.237.8030
Facsimile: 310.693.9494
E-Mail: tl@lanesmgmt.com

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 20 2021

Sherri R. Carter, Executive Officer/Clerk
By: Stacey Watson, Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES - WEST JUDICIAL DISTRICT**

| | |
|---|---|
| HANKEY CAPITAL, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,<br><br>Defendants. | **Case No. 21SMCV01113**<br><br>**Hon. Mark Young, Dept. M**<br><br>**RECEIVER'S SECOND REPORT FOR THE PERIOD ENDING AUGUST 31, 2021**<br><br>**RECEIVER'S INVENTORY - UPDATED** |

Receiver Theodore Lanes hereby submits the following Second Interim Report regarding his administration of the receivership in this matter for the period ending August 31, 2021 and an update to the Receiver's Inventory.

Theodore Lanes was appointed as Receiver in this matter by an Order Appointing Receiver issued by Los Angeles Superior Court Judge Mark Young on July 2, 2021 (the "Receivership Order"). The

Receivership appointment was further confirmed by an Order of this Court entered July 23, 2021. The Receivership Order directs the receiver to take possession, custody and control of the real property commonly known as 944 Airole Way, Los Angeles, CA 09977 (APN: 4369-026-021) (the **"Real Property"**), together with improvements thereon, all permits, plans (including all architectural, building, electrical, plumbing, and landscape plans), entitlements and certificates pending, prepared, or issued in connection with the Real Property, all books, records, and bank records of Borrower(including all digital and electronic versions) and all revenues, profits, and proceeds thereof (the **"Personal Property"** and, together with the Real Property, the **"Receivership Property"**).

**Banking Records & Inventory**

Shortly after the July 2 appointment hearing, the Receiver sent demand letters to third parties that he was informed were in possession of all the books and records that comprise the Personal Property of the Receivership Estate. Other than the documents provided by Mr. Camarena in exchange for purported back wages and expenses, no further documents have been delivered to the Receiver.

After an exchange of emails between the Receiver's counsel and counsel for Nile Niami, the Receiver requested a series of documents from Mr. Niami. To date, none have been received from either Mr. Niami or his counsel.

Although a portion of the plans and permits have recovered, those are the only documents relating to Crestlloyd or the 944

Airole project that have been turned over to the Receiver.

**Furniture and Artwork**

The Receiver continues to work with both Creative Art Partners and Vesta furniture to obtain a detailed inventory of the furniture and artwork that both companies have provided to stage the house. Additionally, the Receivership will be entering into new and revised rental agreements with both companies in the near future. In the entryway of the home is a large, rotating sculpture, created by Mike Fields. Mr. Fields previously entered into a purchase agreement for the piece upon sale of Airole, which included an obligation by Crestlloyd to provide insurance for this piece. Since that insurance had expired, the receivership has agreed to reimburse Mr. Fields for the insurance he obtained at a cost of approximately $350 per month in exchange for the art remaining at Airole.

**Property Financials**

**Receivership certificates and financial transactions**

On August 27, 2021, the Hankey Investment Capital advanced $250,000 to the Receivership Estate through a receivership certificate. That brings the total advanced to $827,745. The Receivers Certificate in support of that advance, is attached hereto as **"Exhibit 1"**. Also attached as **"Exhibit 2"** is the financial overview for the Receivership estate.

**Property Taxes**

At present, there is an outstanding balance of $ 1,719,716.80

for unpaid property taxes. Penalties of $ 22,529.17 per month continue to accrue and the Receiver will be addressing this issue in the near future to ensure that no adverse action is taken due to the unpaid balance.

**Unfinished construction issues**

The list of construction related issues is still being developed, and more issues are being discovered. As an example, on August 24, a large portion of the marble that makes up the perimeter wall of the main outside pool cracked and ultimately separated from the pool. The marble had to be removed, and in doing so, other leaks became evident. A temporary repair is being implemented, however this issue will need to be addressed further as it may impact the entire pool.

All of the construction issues will need to be addressed prior to any application for a Certificate of Occupancy.

**Other financial issues**

On August 20, 2021, the Receiver entered into an agreement with On Location Inc., to allow 944 Airole to be rented out for the filming of an event. A copy of the agreement is attached as **"Exhibit 3"**. The event extends from September 14 through 19, including setup and cleanup, and will net the Receivership approximately $132,000.

**Insurance**

The Receiver has secured liability insurance and continues to work towards other forms of property insurance. This effort is

complicated by not only the size and scope of the project, but the fire risk associated with its location. Those discussions are active and ongoing.

**Security**

Due to the frequent and continued efforts by various individuals to gain access to the property, the onsite security remains in place and continues to turn away people on virtually a daily basis.

The alarm system for the property was not complete, but the Receiver has contracted to complete the installation as to the portions of the system that were not finished. That work is remains underway. As part of that system, the Receiver and his staff can now see the security cameras remotely.

**Bel Air Association**

During August, both in-person meetings and telephonic conferences were held with representatives of the Bel Air Association. The Association has raised what it believes are significant issues concerning permits and the actual construction. Discussions around potential resolution are ongoing. As part of those discussions the Receiver proposed the retention of an independent firm to perform construction forensics and hopefully determine if there are in fact any variances to what was approved. The receiver is currently reviewing proposals and the Bel Air Association has agreed to not take any further action until that evaluation is complete and can be reviewed.

**Summary**

This is a very complicated property with quite a few open issues. At present the focus is to obtain complete insurance and develop a timeline and budget to secure the Certificate of Occupancy in order to maximize value and to make property more marketable.

Respectfully submitted,

Theodore Lanes

Receiver

# Exhibit 1

THEODORE LANES
655 Deep Valley Drive, Suite 125-P
Rolling Hills Estates, CA 90274
Telephone: (424) 237-8030
Fax: (310) 693-9494
Email: tl@lanesmgmt.com

Court-Appointed Receiver

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES, WEST DISTRICT**

HANKEY CAPITAL, LLC, a California limited liability company,

Plaintiff,

vs.

CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,

Defendants.

Case No. 21SMCV01113
Assigned to: Hon. Mark Young
Department: M

**RECEIVER'S CERTIFICATE #2**

**RECEIVER'S CERTIFICATE OF INDEBTEDNESS**

Certificate Number: 2

Amount of Advance: $250,000.00

Date of Advance: August 24, 2021

Related to: 944 Airole Way, Los Angeles, CA 90077 (APN: 4369-026-021 (the "**Property**"), the legal description of which is attached hereto as Exhibit "A"

This Receiver's Certificate of Indebtedness ("**Certificate**") is issued by Theodore Lanes, not individually, but solely in his capacity as Receiver of the property put in his possession and control by that "Order (1) Appointing Receiver; (2) Issuing Temporary Restraining Order; and (3) Order to Show Cause Why Receiver Should Not Be Confirmed Pendente Lite and Why Preliminary Injunction In Aid of Receiver Should Not Be Granted" entered on July 2, 2021 in that certain action pending in the Superior Court of California for the County of  Los Angeles as Case No. 21SMCV01113 (the "**Receivership Action**").

This Certificate evidences that there is due to Hankey Capital, LLC, a California limited liability company ("**HC**") from the receiver and the receivership estate in the Receivership Action, the principal sum of TWO HUNDRED FIFTY THOUSAND dollars ($250,000.00) (the "**Indebtedness**"). Interest shall accrue on the unpaid portion of the Indebtedness from the date of advance at the rate of ten per cent per annum.

The Indebtedness may be prepaid in whole or in part at any time without penalty. In any event, the Indebtedness is payable on the next business day after the second anniversary of the date of execution of this Certificate, upon the date of the final distribution of the receivership estate's assets, or upon further order of the Court in the Receivership Action, whichever first occurs.

This Certificate is subject to redemption in whole or in part at any time before maturity at par with accrued interest, provided that at the time of redemption, the Receiver holds funds totaling in excess of the sum of (i) the amount to be redeemed, (ii) current accounts payable and (iii) other fees and expenses of the receivership estate projected to be due within the next 60 days after redemption.

This Certificate is related to the Property. The Indebtedness evidenced by this Certificate is senior in priority to all other indebtedness relating to the Property and is secured by a super priority lien and security interest in favor of HC with priority over all other liens, claims, and interests encumbering or related to the Property, provided, however, the Indebtedness evidenced by this Certificate does not have priority over the Court-approved fees, costs, and expenses of the receivership estate, or the court-approved fees, costs, and expenses of the Receiver's agents and

professionals employed and retained by the Receiver in connection with the Receiver's administration of the receivership estate.

This Certificate is issued under the authority of, and in accordance with, the orders entered in the Receivership Action. This Certificate is a debt of the receivership estate and is not the personal obligation or liability of the Receiver.

IN WITNESS WHEREOF, Theodore Lanes has executed this Certificate solely in his capacity as Receiver, on AUGUST 25, 2021, at Rolling Hills Estates, California.

Theodore Lanes, Solely in his Capacity as Receiver

Exhibit A
Legal Description of the Property

**LEGAL DESCRIPTION**

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGES 81 TO 83 INCLUSIVE, OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET, AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 52"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE;

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET; THENCE NORTH 89° 27' 20" WEST 214.07 FEET MORE OR LESS, TO A POINT IN THE WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: 4369-026-021

| | | |
|---|---|---|
| **Contractors** | | |
| **Biabani Electrical** | | |
| Down Payment on Proposal | | |
| 40% of $28,000 | 11,200.00 | |
| **Kenco Plumbing** | 3,357.00 | |
| **Midland Contractors** | | |
| Balance of RFP SD070721Q-4 | 15,000.00 | |
| Change orders | 6,500.00 | |
| **KN Waterproofing** | 9,875.00 | |
| **Brunswick** | | |
| Bowling Alley monitors/install | 7,500.00 | |
| Centurion wiring | 5,000.00 | |
| **Centurion** | | |
| July / August finished work | 10,000.00 | |
| Change Order for security | 5,600.00 | |
| **Total Contractors** | | **74,032.00** |
| **Monthly** | | |
| **Christopher Torrey** | | |
| Balance of August | 2,000.00 | |
| **Calgrove Rentals** | | |
| July / August | 6,119.10 | |
| **Draken Security** | | |
| August | 15,000.00 | |
| **Frontier** | | |
| August | 450.00 | |
| **LADWP** | | |
| Past Due | 24,705.00 | |
| August | 20,000.00 | |
| **Pest Control** | 1,600.00 | |
| **Plus Development** | 21,000.00 | |
| **Vesta Home** | 15,000.00 | |

| | | |
|---|---|---|
| **Gardener** | | |
| August | 6,000.00 | |
| **Housekeeping, Pool etc.** | | |
| Yaly Martinez Arrazola | 3,200.00 | |
| Jesus Agudelo - carpenter | 5,600.00 | |
| **Pool Service** | | |
| Luis Contreras | 2,560.00 | |
| Melchor A. Perez | 2,560.00 | |
| **Total Monthly** | | **125,794.10** |
| **Receivership** | | |
| July Receivership Fees | 35,063.00 | |
| **Total Receivership** | | **35,063.00** |
| **Misc & Other** | | **15,110.90** |
| **Total Request** | | **250,000.00** |

# Exhibit 2

10:25 AM
09/10/21
Accrual Basis

# Aircole
## Profit & Loss
### July through August 2021

| | Aug 21 | TOTAL |
|---|---|---|
| Income | | |
| Receivership Certificates | 250,000 | 827,745 |
| Total Income | 250,000 | 827,745 |
| Expense | | |
| Construction | | |
| AV | 40,000 | 40,000 |
| CalGrove | - | 12,339 |
| Electrical | - | 27,132 |
| ILG | - | 224,300 |
| Midland | - | 50,000 |
| Stone Care | 6,875 | 6,875 |
| Waterproofing | 9,875 | 9,875 |
| Total Construction | 56,750 | 370,521 |
| Miscellaneous | 2,464 | 2,464 |
| Professional Fees | | |
| Bond Services | - | 1,000 |
| Insurance | 343 | 10,492 |
| Total Professional Fees | 343 | 11,492 |
| Receivership Expenses | | |
| Banking Fees | 60 | 90 |
| LMS | 35,063 | 35,063 |
| Total Receivership Expenses | 35,123 | 35,153 |
| Security | 17,625 | 31,513 |
| Site Services | | |
| Carpenter | 5,480 | 8,080 |
| Furn Rental | 14,783 | 14,783 |
| Housekeeping | 500 | 3,300 |
| Misc | 1,510 | 1,510 |
| Pool | 5,946 | 8,506 |
| Project Mgmt | 26,797 | 37,874 |
| Project Mgmt - Prior | - | 48,518 |
| Total Site Services | 55,016 | 122,570 |
| Utilities | 755 | 32,555 |
| Total Expense | 168,076 | 606,269 |
| Net Income | 81,924 | 221,476 |
| Bank Balance | | 221,476 |
| Variance | | - |

# Exhibit 3



TONI MAIER-
ON LOCATION, INC.
8033 West Sunset Blvd., #569, Los Angeles, CA 90046

**JOB #**

# Location Agreement

This agreement is made on August 6, 2021 by and between **Public Occurrences a California limited liability company,** (the "Lessee") and **Theodore Lanes, solely in his capacity as Receiver over 944 Airole Way.** ("Lessor") regarding the exclusive usage of **944 AIROLE WAY, BEL AIR, CA 90077,** ("Property") for the **NARS HOUSE** (the "Event"). Lessor hereby grants permission to Lessee to exclusively use the Property for the purpose of the **NARS HOUSE Event** which will be held on **September 15-18, 2021.** Permission shall include the exclusive right to bring personnel and equipment onto the Premises and garage on **September 14, 2021 at 7am**, and to remove the same thereafter the completion of the Event on **September 19, 2021 at 10pm as per the definitions herein**. Lessor is not liable for any damage or loss of any equipment, vehicles, or any other property or possessions brought onto the Premises by the Lessee or their agents or guests, or any personal injury.

1. SCOPE: Except as otherwise provided herein, Lessee may use designated areas of the Property solely for the Event during the Rental Term. Lessee shall not allow anyone on the roof of the Property at any time. The maximum number of people allowed on the Property at any one time during the Event is **75.**

2. DURATION: The number of days of exclusive usage of Property by Lessee for Event is as follows ("Rental Term"):

| | |
|---|---|
| Preparation Period: | **September 14, 2021 from 7a-10p**, the Preparation Period is defined as the time required for Event set-up, including deliveries and set-up of equipment, furniture, catering, decorations, etc. |
| Event Period: | **September 15-18, 2021 from 7a-12mid each day.** The Event Period is the setup of catering, rental furniture, floral arrangements and décor as well as the duration of the Event itself. The Event and shall not extend past ***12 midnite on Sept 18.*** |

Cleanup Day: **September 19, 2021:** The Cleanup Period is defined as the number of days required for rentals pick-up, and vendor readjustment, including furniture restoration of Property to its original condition, clean-up and final walkthrough. Lessee agrees to bag up and remove all trash at close of Event. Lessee shall pay Lessor's actual, out of pocket costs upon presentation to Lessee of paid invoices for any of the following that may be required at the Property at the conclusion of the Event: dumpster, power wash and gardening and repairs.

Holdover: Lessee's failure to depart from the Property by 10 pm on September 19, 2021 shall be considered a hold over by Lessee and Lessee shall be charged a daily fee of $20,000 for each day (or partial day) which Lessee is on the Property past 10pm on September 19, 2021.

Hold Period: None

3. FEES:

a. As compensation to Lessor for use of the Property during the Rental Term and the Site Representative as described in this Agreement, Lessee shall pay Lessor, through Toni Maier-On Location, Inc., **$165,000.00 (The Rental Fee)** (excluding any other fees and the Security Deposit). Such Rental Fee includes the site rental fee for the Property and commission to Toni Maier-On Location, Inc. The total location fee and security deposit shall be paid directly to TTONI MAIER-ON LOCATION, INC. (TMOL, INC.) prior to the first prep day. TONI MAIER-ON LOCATION, INC. shall disburse funds to the Lessor pursuant to the fee agreement entered into between the Lessor and TONI MAIER-ON LOCATION, INC. Lessor hereby waives and releases Lessee from any claims, suits, damages (other than normal wear and tear), losses, costs or expenses arising out of any breach or alleged breach of the fee agreement by TONI MAIER-ON LOCATION, INC.

b. **Rental Fee: Twenty five percent (25%)** ($41,250) of the Rental Fee shall be paid by Lessee to Lessor the day after a fully executed copy of this contract has been received by Lessee. No later than August 25, 2021, Lessee shall pay Lessor an additional twenty five percent (25%) of the Rental Fee ($41,250). The balance of the Rental Fee ($82,500) shall be paid by Lessee to Lessor on or before Sept 10, 2021.

c. **Security Deposit. $25,000.00 refundable (Twenty Five Thousand Dollars)**. Lessee agrees to deposit with Toni Maier-On Location, Inc. **NO LATER THAN 2pm on August 25, 2021.** . The Security Deposit shall be held in an escrow account separate from Toni Maier- On Location, Inc.'s and Lessor's personal accounts, and is to be utilized only for payment of any additional days, overtime, overage, Lessor's documented, out of pocket costs to repair damages (other than normal wear and tear) or cleanup charges, if any. If Toni Maier On Location, Inc. holds deposit then, Toni Maier-On Location, Inc. agrees to return any unused

Security Deposit within 5 business days of completion of restoration of the Property to its original state; provided, that, Lessor agrees in writing that the restoration is complete, which written agreement shall be provided by Lessor to Lessee shall be within 5 business days of completion of restoration of the Property to its original state and shall not be unreasonably withheld or delayed. Lessor agrees to pay Lessee monthly interest of 1.5% on any unused portion of the Security Deposit not returned to Lessee within 5 business days of completion of restoration of the Property to its original state. Nothing contained in the Paragraph is intended to constitute a waiver or limitation of any right or remedy available to Lessor or Lessee.

d. Omitted.

e. **Site Representative.**  In addition to the Rental Fee, Lessee will pay Lessor no later than September 20, a $500.00 per day per 12 hours and $84.00 per hour after the first 12 hours per representative to be on-site at the Property to preserve Lessor's interests as well as assist Lessee with all house requests involving house-specific knowledge.

f. **Cleaning/Daily Maid Service Fees:**  Lessee shall provide daily maid service at their own expense.  Lessee agrees to pay their own personnel.  Lessee will provide and pay for cleaning crew unless otherwise instructed.

g. **Security Guard.** Lessee shall hire, and pay directly, its  own security guards for the Event. One (1) guard from the beginning of prep through the end of the Event, and a minimum of 1 guard one hour prior to the commencement of the Event through the end of the Event.   Lessor, agrees to provide its normal security each day at no cost to Lessee.

Lessee will pay interest on all overdue amounts at a rate of one percent (1%) per month, or the maximum amount allowed by law, whichever is less, until all amounts due are paid in full.  Payments of fees to Lessor, and Site Representative shall be made by wire to Toni Maier-On Location, Inc., 8033 West Sunset Blvd., #569, Los Angeles, CA 90046.

4.    **DAMAGES TO PROPERTY:**  Lessee agrees to leave Property and all items located thereon in as good order and condition as they were immediately prior to any use of Property pursuant to this Agreement.

a. Entry: On September 14 at 7:00am, Site Representative and Lessee shall do a walkthrough of the Property (including driveway) to inspect Property and assess and record, at Lessee's option, by photography, videography or both, the condition thereof, and Lessee will notify Site Representative of any existing damages in writing or orally if such notice is recorded.  Site Representative and Lessee will acknowledge existing damages and the parties shall document the same through photographs or videos taken during such walk through.

b. Décor: Lessee shall be responsible for damage to Lessor's fixtures, furnishings, decorations or other personal property.  There shall be no special effects, i.e:  stunts, pyrotechnics or any similar requests not listed as permitted herein, and any requests shall be submitted in writing and must be approved by Lessor prior to Event.  There shall be NO tape, nailing, gluing, painting, dulling spray, or any other process that would cause any surface to change from its original condition without Lessor's prior written approval.

No oil based smoke is permitted. No smoking is allowed on the Property. No animals are allowed on the Property without the prior written consent of Lessor.

c. Exit: Site Representative and Lessee shall do a walkthrough of the Property on September 20 in daylight, to determine any damages and will notify Lessee of any damages in writing, and the parties shall document the same through photographs or videos taken during such walk through.

d. Damages: Lessor agrees to submit a list of damages in writing to Lessee by end of day on September 24, 2021. Within 5 business days of receipt of damage report, Lessor and Lessee shall discuss resolution. Lessor will then proceed to repair or replace all items in the damages list and use the Security Deposit for this purpose. If the amount of the Security Deposit is insufficient, Lessee will be responsible for providing additional funds immediately and within 5 days of receipt of the damages list from Lessor. Lessor and Lessee agree that all costs for damages and replacements will be borne by Lessee, shall be documented, reasonable and actual out-of pocket costs, mutually agreed upon by both parties before work is done. Any funds advanced by Lessor for repair and replacement of damage items that are not reimbursed by Lessee in a timely fashion will carry a 1% monthly interest penalty.. Lessor agrees to pay Lessee monthly interest of 1.5% on any unused portion of the Security Deposit not returned to Lessee within 5 business days after completion of such agreed repair(s) or replacement(s).

5. LIABILITY AND INSURANCE REQUIREMENTS: Lessee hereby agrees to indemnify, defend, and hold harmless Toni Maier-On Location, Inc., Lessor and Crestlloyd, LLC, and their officers, directors, employees, agents, contractors, tenants, successors, and assigns, from and against any and all claims, actions, damages, liabilities, and expenses, including reasonable attorney's fees, arising from or connected in any manner with Lessee's use of the Property. However, Lessee shall not be responsible for any such damage or injury (or both) caused by the negligence or intentional misconduct of Lessor or his related parties as listed earlier in this paragraph. Prior to entering upon Property, Lessee represents that it has obtained and maintains GENERAL LIABILITY insurance with coverage of no less than $1,000,000.00 per occurrence and $2,000,000.00 aggregate, and workers compensation insurance in statutorily required amounts, each specified IN WRITING on the certificate of insurance and/or declarations page. The certificate of insurance and/or declarations page shall name TONI MAIER-ON LOCATION, INC. and LESSOR as additional insureds on the Lessee's policy WITH THE LESSOR'S ADDRESS. A copy of the certificate of insurance and/or declarations page shall be provided to Lessor and TONI MAIER-ON LOCATION, IN prior to Lessee's entry and is a necessary condition for entry onto the Property. Lessee shall pay any and all deductibles in connection with Lessee's Insurance policy for any claims submitted on behalf of Lessor. Notwithstanding anything to the contrary under any insurance agreement, Lessee shall be obligated to pay full repair or replacement cost of any item damaged or stolen as a result of Lessee's or its agents, employees or invitees' negligence or willful misconduct. Lessor shall have the unconditional right to recover from Lessee the full replacement cost value of said items. This provision shall govern Lessee's liability herein, notwithstanding anything to the contrary in any insurance contract associated with this Agreement. The Event cannot take place without a certificate of insurance outlined in this paragraph. In addition, Caterer shall be required to obtain and maintain alcohol insurance for the

Event. The alcohol liability insurance certificate shall name TONI MAIER-ON LOCATION, INC., and LESSOR and CRESTLLOYD LLC and shall also be provided to the Toni Maier-On Location, Inc. on behalf of Lessor, prior to the commencement of the event, if alcohol will be served. Lessee shall give Lessor 30 days prior written notice of any change to or cancellation of Lessee's insurance policies.

6. USAGE AND SECURITY: Lessee agrees not to use the Property for any illegal purpose. In particular, at no time are drugs and/or any illegal substances allowed on the Property, including without limitation, cannabis and cannabis related products. Lessee shall not charge guests for entrance tickets, beverages or anything else. If any Lessee's employees or guests appear unruly, intoxicated or under the influence of any substance, Lessee agrees to see to it that they are immediately caused to leave the location. Lessee is responsible to ensure that no person is served alcoholic beverages if they are less than 21 years of age and further agrees to hold Lessor harmless, and pay for the defense of any action resulting from, any injury or damage caused as a result of any person's intoxication occurring at the Property known to Lessee.

7. MEDIA RIGHTS. Lessee shall own and control all intellectual property rights, including, without limitation, copyright, related to still photo and video images taken during the Rental Term at the property (the "Media"), and subject to Section 12 of this Agreement, NARS shall have the right to use, reuse, publish, republish, exhibit, display the Media in its or their publicity or promotional materials for public relations and editorial purposes; provided, that, such Media shall not be used for or in any advertisement without the express written consent of the Lessor. Lessee does not have the right to feature the art at the Property unless permission is granted from each artist. Lessee does NOT have permission to refer to the Property as the NARS HOUSE and shall not disclose the address, owner of the Property or refer to the Property as THE ONE.

8. PARKING: Lessee may use vans for shuttling, which are allowed to park on Property, or if necessary, and shall NOT park on Airole Way or adjacent streets. Guests will Uber or be driven to the Property for the Event, and shall drive up the driveway for drop offs and pickups. No parking or stopping shall occur on Airole Way.

9. UTILITIES: Designated Bathrooms are available at the Property. Lessor will remove from the Security Deposit any amounts necessary for septic tank fees, unclogging, pumping and/or damage caused directly or indirectly by Lessee's or its agents, employees or invitees' use of the Property bathrooms.

   9a. **Electric**: House power ok if draw is equal to a house lamp only. Lessee agrees to pay for any damage to electrical workings of Property caused by Lessee's rental of the Property.

   9b. Gas: There is no gas available at the Property and therefore gas appliances and water heating will not work

10. INDEMNIFICATION AND RELEASE: Lessee hereby agrees to indemnify, defend, and hold harmless Lessor, Toni Maier – On Location, Inc., and its and their respective officers, directors, employees, agents, contractors, landlords, tenants, successors, and assigns, from and against any and all claims, actions, damages, liabilities, and expenses, including

reasonable attorney's fees, arising from or connected in any manner with Lessee's or its agents, employees or invitees' use of the Property.

11. NEIGHBORS: Lessee shall exercise common courtesy to all neighbors and shall not block driveways or impose on the neighbors. Failure to comply might result in premature shutdown of the Event by police at the request of neighbors. No refunds will be provided by Lessor in the event of such premature Event termination. Lessee shall defend, indemnify, and hold lessor free and harmless, from any and all nuisance claims by Lessor's neighbors, that result directly from, Lessee's use of the Property. There shall be no amplified music at levels that can be heard outside of Property boundaries at any time.

12. Non-Disparagement/Media.    Lessee agrees, for and on behalf of itself and each of its employees, that it will not make any statement whatsoever to the press or media or public forum (including but not limited to any reporter, national, regional, or local newspaper, magazine, internet blog or site, news organization, social media website, or radio or television station) of any matter related to the Lessor's or any of Lessor's affiliates, officers, directors, clients, stockholders, suppliers investigators, employees, partners, vendors, contractors, consultants, or agents or digitally manipulate or alter the Property or its image or do such other things in a manner that would disparage or inaccurately represent the Property. If at any time Lessee receives a request for any statement or information from the press or other media regarding Lessor, Lessee will direct that request to Toni Maier-On Location, Inc. and will say nothing further.

13. Protection of Confidential Information: For purposes of this Agreement, "Confidential Information" shall mean non-public information concerning the financial data, strategic business plans, product development (or other proprietary product data), projects, customer lists, marketing plans, methodologies, business or vendor relationships, relationships with strategic or business partners, its high speed networks, or equipment, tools or other materials developed for use on such networks, and all information and know-how (whether or not patentable, copyrightable or otherwise able to be registered or protected under laws governing intellectual property) owned, possessed, or used by the Lessor, any affiliate or any customer, including, without limitation, any formula, method, procedures, composition, project, development, plan, market research, vendor information, customer or client lists or information, contacts at or knowledge of customers or clients, prospective customers and clients, business or strategic partners of the Lessor, trade secret, process, research, reports, financial data, technical data, test data, know-how, computer program, software, software documentation, source code, hardware design, technology, marketing or business plan, forecast, unpublished financial statement, budget, license, patent applications, contracts, joint ventures, price, cost and personnel data, any trade names, trademarks or slogans and other non-public, proprietary and confidential information of the Lessor, its affiliates or customers, that, in any case, is not otherwise available to the public (other than by the Lessee's breach of the terms hereof). Lessee agrees (i) that all Confidential Information, whether or not in writing, shall be treated as being confidential and/or proprietary information and is the exclusive property of the Lessor and (ii) to hold in a fiduciary capacity for the sole benefit of the Lessor all Confidential Information. Confidential Information shall not include information that (i) is or becomes public knowledge through legal means

without fault by Lessee, (ii) is already public knowledge prior to the signing of this Agreement, or (iii) must be disclosed pursuant to applicable law or court order.

14. PERMITS:  Although this project is considered a short term lease, Lessee at its sole cost shall comply with all applicable laws and shall be solely responsible for obtaining, should they be necessary, all the required permits from any public or governmental entity including any city or state film office or buildings department, and including filming, police, crane usage and parking permits, as required, for all the activities at the Property. Lessee shall follow all rules and regulations set forth by the applicable public or governmental entities including the County of **Los Angeles** Fire Department and the City of **Los Angeles** Police Department in regard to the Property and neighborhood.  Lessee request permission in advance to approach neighbors, should this be required and shall provide copies of any and all such letters to neighbors and permits to Toni Maier-On Location, Inc. in advance of the Event or contact w neighbors.  Lessee shall hold Lessor free and harmless from any and all claims, costs, damages, expenses, and fines, including legal fees, in connection with Lessor's breach hereof.

15.  RULES:  Lessee agrees to comply with the following rules in its use of the Premises:

a. ACTIVITY:       Any activity not reasonably within the scope of the Event, defined as the Event is expressly prohibited.

b. Any action, dressing, construction, placement of equipment, or placement of any other materials on the Premises is prohibited unless expressly agreed to in writing by Lessor.

c. Lessee must provide reasonable protective covering and take all reasonable precautions to protect floors, walls, countertops railings, driveways, lawn, landscaping, **hardscape in front of garages.** Lessor agrees to take care to protect property surfaces where the scullery and trash bin shall be located and to protect other applicable surfaces from marring or excessive wear and tear, including but, not limited to, use of layout board or protective coverings under all equipment used.  There shall be no cooking done on the interior of the Premises, the exterior kitchen is available but there is no gas service at the house.

d. There shall be no attaching materials onto or drilling into any part of the existing structures or trees or fauna on the Premises, including, but not limited to, taping onto painted surfaces (including floors) and the installation of nails or hooks.

e. No amplified music is permitted outdoors past 10p or as may be regulated or permitted by Ordinance.  Music may extend to 12 midnight at Lessor's discretion.

f. intentionally omitted

g. No pyrotechnics or smoke devices on the Premises.

h. No disposal of any ice on the grass or plants on the Premises.

16.  REPRESENTATIONS:  Lessor represents that Lessor is fully authorized to enter into this Agreement, subject to the terms of the Receivership appointment Order dated July 2, 2021, Case number 21SMCV01113, and has the right to grant to Lessee the use of the

Property as described herein and to grant each of the rights granted herein.  Lessor is only responsible for providing Lessee access to Property, electricity and water.  Lessee is responsible for and shall provide and pay for all of the Event rentals, entertainment, security, door, valet, invitations, permits, lighting, sound, food and beverage service, cleaning, dumpsters and any other Event-related items. No house power available except as otherwise noted herein.

17. THIRD PARTY CLAIMS:  Lessee agrees to pay for any injury or damage that may occur through the use of the Property by Lessee or its employees, agents or representatives. Any claim or dispute out of or relating to this agreement or the breach thereof shall be settled by arbitration in **Los Angeles**, California in accordance with the rules and regulations then pertaining, of the American Arbitration Association, using a single arbitrator acceptable to the parties and who is a retired Superior Court judge.  The parties hereto agree to be bound by the award in such arbitration, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  Any companies that are hired by Lessee must carry liability and third property damage coverage and evidence of this coverage shall be forwarded to Toni Maier-On Location, Inc. in advance of their work or repair on the Property.  Lessee hereby indemnifies Lessor and Toni Maier-On Location, Inc. for any and all claims, actions, damages, liabilities, and expenses, including reasonable attorney's fees, by any guests of the Event directly or indirectly arising from or connected in any manner with Lessee's use of the Property.

18. TIME IS OF THE ESSENCE:  Time is of the essence under this Agreement and every provision thereof.

19. WAIVER:  Waiver of any provision of this Agreement shall not be deemed or constitute a waiver of any other provision, nor shall such waiver constitute a continuing waiver.

20. ASSIGNMENT:  Lessee shall not assign or sub-contract any portion of this agreement.

21. SUCCESSION:  This agreement shall inure to the benefit of, and be binding upon the heirs, executors, administrators, and successors.

22. ENTIRE AGREEMENT: This agreement supersedes any and all agreements, either oral or written, between the parties, and contains all of the representations, covenants and agreement between them.  Each party to this agreement acknowledges that any party or anyone acting on behalf of any party, orally or otherwise, has made no representation, inducement, promise, or agreement, which is not contained in this Agreement.  Any modification of the Agreement will be effective only if it is in writing and signed by both parties.

23. SEVERABILITY:  If any provision of the agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then such provision shall be ineffective only to the extent of such invalidity and the remainder of such provision and the remaining provisions will continue in full force and effect without being impaired or invalidated in any way.

24. HEADINGS: The headings set forth in this Agreement are for the convenience of the parties and shall not by themselves determine the interpretation or construction of this Agreement.

25. COUNTERPARTS: The Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, all of which constitute one and the same Agreement.

26. LEGAL COSTS: If any legal action or proceeding, including an action for declaratory relief, is brought to enforce or interpret the provisions of the Agreement, the prevailing party shall be entitled to its reasonable attorney's fees and costs.

27. GOVERNING LAW: This Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to conflict of law principles.

28. FORCE MAJEUR: The parties shall not be liable for any failure to perform their obligations where such failure is as a result of Acts of God (including fire, flood, earthquake, storm, hurricane or other natural disaster), epidemic, pandemic, war, invasion, act of foreign enemies, hostilities (whether war is declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation, terrorist activities, nationalization, government sanction, blockage, embargo, labor dispute, strike, lockout or interruption, server unavailability, failure of any technology hardware or software algorithm or instruction set, or failure of electricity/telephone/internet service. Upon written notice of a Force Majeure event, either Party may cancel this Agreement without liability or obligation to the other. Lessor shall, upon receipt of such notice, refund to Lessee all Rental Fees, Security Deposit and other payments made by Lessee.

29. CANCELLATION: For any reason, other than a Force Majeur event, Lessee may cancel this Agreement by written notice to Lessor at any time prior to August 26, 2021 and Lessor shall, upon receipt of such notice, refund to Lessee Rental Fees, Security Deposit and other payments made by Lessee , if Producer cancels the Event as per the following schedule:

    Before August 14, 2021 then 25% of the Site Rental Fee shall be due
    Before August 25 then 50% of the Site Rental Fee shall be due
    After August 26 then the entire location fee shall be due. Lessee understands and acknowledges that a cancellation will have caused Lessor to sustain costs and expenses and turned away other events and film or photo productions in making the Property available for use by Lessee pursuant to this Agreement. The parties deem that the schedule noted in this paragraph to be a fair and reasonable value for the time, effort, expense, inconvenience, turning away other projects, etc., associated with a cancellation by the Lessee.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date set forth above.

LESSOR
Theodore Lanes, solely in his capacity
As Receiver over 944 Airole.

LESSEE Public Occurrences, LLC

BY ______________________

TITLE Theodore Lanes, solely in his capacity as Receiver of 944 Airole

DATE August 20, 2021

:

BY ______________________

TITLE Lauren Drablier

DATE August 17, 2021

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is **21650 Oxnard Street, Suite 500, Woodland Hills, California 91367**.

On September 20, 2021, I served the foregoing document described as: **RECEIVER'S SECOND REPORT FOR THE PERIOD ENDING AUGUST 31, 2021; RECEIVER'S INVENTORY - UPDATED** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed as follows:

**(SEE ATTACHED SERVICE LIST)**

☒ **(BY MAIL)** I caused such envelope with postage thereon fully prepaid to be placed in the U.S. mail at Woodland Hills, California. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of a party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY PERSONAL DELIVERY)** I caused such envelope to be delivered by hand by [Name and address of courier service], to the office of the addressee(s) noted on the attached Service List.

☒ **(BY E-MAIL OR ELECTRONIC TRANSMISSION)** I caused said document(s) to be sent to the person(s) at the e-mail address(es) listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ **(BY FEDERAL EXPRESS / OVERNITE EXPRESS)** I caused such envelope to be deposited at the Federal Express/Overnite Express drop box at Woodland Hills, California. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with Federal Express/Overnite Express that same day in the ordinary course of business.

Executed on September 20, 2021, at Woodland Hills, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct and, that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Jessica Studley
JESSICA STUDLEY

HANKEY CAPITAL, LLC v. CRESTLLOYD, LLC, et al.
LASC Case No. 21SMCV01113

**SERVICE LIST**

**BY MAIL**

| | |
|---|---|
| Theodore "Ted" Lanes<br>3 Lanes Management Services<br>655 Deep Valley Drive, Suite 125-P 4<br>Rolling Hills Estate, CA 90274 | Manager and Agent for Service of Process for Defendant Crestlloyd, LLC |
| Honorable Mark Young<br>Department M<br>Santa Monica Courthouse<br>1725 Main Street<br>Santa Monica, CA 90401 | Courtesy Copy |

**BY EMAIL**

| | |
|---|---|
| Marcos Almeida<br>7 Legal Executive<br>Southpac Group<br>8 Registrado na Ordem dos Advogados do Brasil/MG 132.407<br>Email: malmeida@southpacgroup.com | Advisor to Southpac Trust International, Inc., as Trustee of the Park City Family Settlement, the sole member of Crestlloyd, LLC ("Borrower") |
| Me Mathieu Robillard<br>Robillard Prescott Morissette, avocats et médiateurs s.e.n.c.<br>E-mail: mathieu@rpmlex.ca | Attorneys for Inferno Investment, Inc., a Defendant in Los Angeles Superior Court Case No. 21STCV24076 (courtesy copy only) |
| Jeffrey S. Wruble, Esq.<br>David Mark, Esq.<br>Buchalter<br>1000 Wilshire Blvd., Suite 1500<br>Los Angeles, CA 90017-1730<br>Email: jwruble@buchalter.com<br>dmark@buchalter.com | Attorneys for Hankey Capital, LLC |
| Mark J. Rosenbaum, Esq.<br>Elsa M. Horowitz, Esq.<br>Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP<br>11400 W Olympic Blvd., 9th Floor<br>Los Angeles, CA 90064<br>E-mail: mrosenbaum@wrslawyers.com<br>E-mail: ehorowitz@wrslawyers.com | Attorneys for Yogi Securities Holdings, LLC, the Plaintiff in Los Angeles Superior Court Case No. 21STCV24076 (courtesy copy only) |

Nathan M. Carle, Esq.
Raines Feldman
1800 Avenue of the Stars 12th floor
Los Angeles, CA 90067
Email: ncarle@raineslaw.com

Attorney for Nile Niami, Interested Party

# EXHIBIT "5"

Theodore Lanes
Receiver
Lanes Management Services
655 Deep Valley Drive, Suite 125-P
Rolling Hills Estates, CA 90274
Telephone: 424.237.8030
Facsimile: 310.693.9494
E-Mail: tl@lanesmgmt.com

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES – WEST JUDICIAL DISTRICT**

HANKEY CAPITAL, LLC, a California limited liability company,

Plaintiff,

vs.

CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,

Defendants.

**Case No. 21SMCV01113**

**Hon. Mark Young, Dept. M**

**RECEIVER'S THIRD REPORT FOR THE PERIOD ENDING SEPTEMBER 30, 2021**

**RECEIVER'S INVENTORY - UPDATED**

Receiver Theodore Lanes hereby submits the following Third Interim Report regarding his administration of the receivership estate in this matter for the period ending September 30, 2021.

Theodore Lanes was appointed as Receiver in this matter pursuant to Order Appointing Receiver issued by Los Angeles Superior Court on July 2, 2021 (the "Receivership Order"). The Receivership appointment was further confirmed by an Order of this Court entered July 23, 2021. The Receivership Order directs the receiver to take

possession, custody and control of the real property commonly known as 944 Airole Way, Los Angeles, CA 09977 (APN: 4369-026-021) (the "**Real Property**"), together with improvements thereon, all permits, plans (including all architectural, building, electrical, plumbing, and landscape plans), entitlements and certificates pending, prepared, or issued in connection with the Real Property, all books, records, and bank records of Borrower(including all digital and electronic versions) and all revenues, profits, and proceeds thereof (the "**Personal Property**" and, together with the Real Property, the "**Receivership Property**").

**Banking Records & Inventory**

Shortly after his appointment, the Receiver sent demand letters to third parties that he was informed were in possession of all the books and records of the Receivership Estate.

Further, counsel for Nile Niami promised to provide documents however, no documents have been received from either Mr. Niami or his counsel. A small number of very old documents were provided by Doug Witkins of Skyline Development however they are of marginal use at this point.

**Plans and Permits**

Although a portion of the plans and permits were recovered, they are far from a complete set. Attached as "**Exhibit 1**" is a listing of the plans and permits that were recovered by the Receiver. Green designates recovered documents. Orange designates documents that are missing, but not mandatory. Red designates

documents that were not recovered but are mandatory. Of the 45 Plans and Permits listed, at least 25 of them are missing the plans, permits or both.

Attached as **"Exhibit 2"** is a supplemental list comparing the permit list from the Los Angeles Department of Building and Safety website ("LADBS") and the hard copy records in the receivership files. This listing shows 33 permits labeled as "Not Found". The Receiver is working to recover the hard copy submissions of these permits for the receivership files.

All of the foregoing documents should have been provided by Mr. Niami per the Court's Order.

The lack of documentation plans[1] and permits has a significant negative impact on the value of the Property and its marketability. Construction is not completed. Many of the subcontractors who performed services pre-Receivership were not paid and are reluctant to perform further work without assurances of payment. Without plans and permits, it will be difficult to obtain the services of other subcontractors to do the necessary work. AS discussed below in greater detail, there are significant construction deficiencies that further affect value and marketability. Based upon information provided by others, the Receiver estimates the approximate amount of $10 Million will be required to complete construction and correct construction deficiencies. Unless the Receiver can accomplish a

[1] With regard to the Plans for the construction of the Property, the Receiver was recently advised that the building Plans bear the stamp of Paul McClean, with the designation "Designer". The Receiver believes Paul McClean is also an architect and performed architectural services for the Property, and is currently researching and investigating the meaning, if any, concerning the designation of "designer" as opposed to "architect."

sale on an AS-IS basis, without a Certificate of Occupancy and without any corrective work, and based upon information provided by others, the Receiver further estimates it could take up to a year to complete the work.

**Certificate of Occupancy and Construction issues**

Attached as **"Exhibit 3"** is the list of currently identified repair items necessary to complete the house. The initial 16 items are believed to be required to be completed prior to the application for the Certificate of Occupancy. The remainder of the items are of lesser significance, but many may need to be addressed in order to maximize the value of the property. There is an onsite meeting planned with city inspectors to begin the process of completing those steps.

The receiver recently had an online meeting with the team from Vertex to review the initial findings from the forensic engineering review of the structure at 944 Airole.

In brief, Vertex completed the LiDAR survey of the property, and an independent land survey, to arrive at measurements to begin to address certain questions about the house.

While these findings may change, the initial results are as follows:

1) the approved stamped plans, recovered by the Receiver, do not match the CAD-CAM plans as provided by the architect. Some of those variances are meaningful, some are incidental and to be expected.

2) The as-built survey of the existing structure does not

exactly match the CAD-CAM plans. Again, some of those variances are meaningful, some are incidental and to be expected.

3) The lot coverage calculations on the approved set of plans appear to exclude certain areas of the house that should likely be included in the calculation. Specifically, the driveway, lawn and staff areas, which total in excess of 25,000 sq. ft. If included in the calculation, the lot coverage would far exceed what is allowed.

4) The floor designated as the Basement does not appear to qualify as a basement, and as such its inclusion in the overall calculations of the footprint of the house, would change those calculations dramatically.

5) The overall height of the house may exceed what is allowed by City code.

6) The slope of the grade adjacent to Stradella road appears to be in excess of code. There appears to be a permit allowing this grade for some areas, but not all. And even with this permit exception, there are deviations in what was actually built when compared to the permit.

In addition to the issues above, the Receiver has engaged Vertex to begin testing for mold in areas that have sustained significant and persistent water leaks in the house.

**Water issues**

The list of construction related issues is still being developed, and more issues continue to be discovered. As previously noted, a large portion of the marble that makes up the perimeter

wall of the main outside pool cracked and ultimately separated from the pool. Although repaired, water issues continue to occur.

The Receiver has been informed that the area under both skylights at the entry of the property has leaked repeatedly and was not properly installed nor waterproofed. The current leak is substantial and persistent, and the initial review of the ceiling area around the leak has raised concerns of potential mold.

Although the source of the leak into the ceiling of the garage has not yet been found, in an effort to minimize any further damage, the water features above the skylights have been drained. An evaluation has begun to determine the source and fix for the leaks.

The water feature that forms essentially the perimeter of the property also has leaking and water proofing issues. A 2 x 3 foot section of tile that has swollen up and pulled away from the wall. The Receiver has been informed that this has happened multiple times and that there is insufficient, if any, water proofing behind the tiles along the entire wall.

The pool adjacent to the master bedroom also has a history of leaks and it is unclear if proper repairs have been implemented. The pool sits on top of the outdoor family room, and the ceiling shows distinct water stains, although it’s unclear if they are new or old. It is likely that this area will require testing for continuing leaks.

**Marble flooring**

The house contains approximately 30,000 square feet of white marble flooring covering both the interior and exterior. The

Receiver is informed that little, if any, of the marble was properly treated, and as such a number of issues have begun to occur.

a) There are significant cracks in the marble throughout the house, both inside and out.

b) There is staining in the marble that the Receiver is informed is the result of incorrect installation and the porous nature of marble allowing glue or other materials to seep up from below.

c) The stairs surrounding the main pool are badly cracked or broken off and in order to prevent further damage, wooden supports were installed below the lip of each.

**Pool plumbing**

The water features outside the night club are a consistent problem. The Receiver has been advised that the pumps were incorrectly installed, and they are not only above the night club, but so far away that they cannot be effective, so no water is being filtered. The other water features around the house have similar problems. The filtration systems appear to either be inadequate, or have been installed incorrectly, and as a result, the pools need to be cleaned very frequently an attempt to keep up with the algae.

**Bel Air Association**

Over the past few months, the Receiver has had significant discussions with representatives of the Bel Air Association ("BAA"). The BAA has expressed concern about some key aspects of the house and its compliance with not only the permits, but the

approved architectural plans. Specifically, the BAA is threatening to appeal certain permits and alleges:

(a) The house exceeds allowable lot coverage.

(b) The slope of the hillside above Stradella road exceeds what is allowable. Note, there have been landslides here in the past during construction, but significant steps were taken last year to address this.

(c) The night club is attached to the house. Steps were also taken to remedy this, but the BAA deems them insufficient.

(d) The basement as constructed does not qualify as a basement per the code or plans.

In order to achieve a better understanding of the issues concerning the condition of the Property, the Receiver retained Vertex to perform a detailed forensic evaluation of the house, initially focusing on the 4 issues raised by BAA as set forth above.

**Furniture and Artwork**

Attached as **"Exhibit 4"** is the inventory list provided by Vesta Furniture. This list was audited by the Receivers' staff, and other than one small table which is not at the property, appears accurate. **"Exhibit 5"** is the inventory provided by Creative Art Partners. The accuracy of this is being confirmed. The Receiver continues to reimburse Mike Fields $350 per month for the insurance on his artwork in the entryway to the house. Since Mr. Fields agreement with Crestlloyd, which was entered into pre-Receivership, allowed for a $750,000 payment out of escrow, it is unclear if he will be willing to leave the art at the house without further agreement.

**Property Financials**

**Receivership certificates and financial transactions**

During September, the Receiver entered into agreements to rent the property for two commercial shoots. Both events went smoothly and the Receivership was paid $132,000 by NARS, and $210,000 by Universal Television, for their use of the house. As such, the Receivership had sufficient funds to operate during September, and closed the month with a balance of $351,788.57. The September financials are attached at **"Exhibit 6"**.

During October, the Receiver anticipates some significant expenses, including the forensic engineering review of the property, and will submit additional receivership certificates if necessary.

**Property Taxes**

At present, there is an outstanding balance of $ 1,742,290.98 for unpaid property taxes. The next payment of $701,465.73 is delinquent if not paid by December 10, 2021 and penalties of $22,529.17 per month continue to accrue. The Receiver will be addressing this issue in the near future to ensure that no adverse action is taken due to the unpaid balance.

**Claims by Sub Contractors**

Attached as **"Exhibits 7 & 8"** are two personal guarantees signed by Nile Niami. While one was signed on April 2, 2021 for $434,235 with CGS Custom Glass, the other, for $300,000 with Centurion, was

signed July 19, 2021, which is almost 3 weeks after the appointment of the Receiver.

**Foreclosure and Litigation**

Currently, there is pending litigation commenced by Yogi Securities Holdings, LLC against Hankey Capital, LLC and Inferno Investment Inc., and Crestlloyd, LLC concerning disputes involving the extent and priority of their respective liens on the property, entitled *Yogi Securities Holdings Plaintiff vs. Hankey Capital, Inferno Investment Inc., and Crestlloyd, LLC*, Case No.21STCV24076, assigned for all purposes to Honorable Gregory Keosian in Department 61. On October 8, 2021 a hearing was held on the Motion by Yogi Securities for a Temporary Restraining Order and OSC re Preliminary Injunction to Enjoin Foreclosure Sale. Attached as **"Exhibit 9"** is the Court's Minute Order concerning this Motion.

The Receiver believes the appointment order does not authorize him in intercede in any matter concerning a foreclosure of the Property. Certain parties have threatened to sue the Receiver if he does not take an active role in efforts to delay the foreclosure. Within the next few days, the Receiver will seek instructions from this court concerning his authority to intercede with the pending foreclosure sale.

**Insurance**

The Receiver has secured liability insurance and continues to work towards other forms of property insurance. This effort is complicated by not only the size and scope of the project, but the

fire risk associated with its location. Attached as **"Exhibits 10 & 11"** are the summaries from Jon Axel of Liberty Insurance, the Broker of Record. Those discussions are active and ongoing.

With regard to insurance, the Receiver is aware that insurance coverage may have previously been placed with United Specialty Insurance. On October 15, 2021 the carrier was given notice of possible claim dealing with property damage.

**Security**

Due to the frequent and continued efforts by various individuals to gain access to the property, the onsite security remains in place and continues to turn away people frequently.

**Summary**

This is a very complicated property with quite a few open issues. At present the focus is to obtain complete insurance and develop a timeline and budget to secure the Certificate of Occupancy in order to maximize value and to make property more marketable.

Respectfully submitted,

Theodore Lanes

Receiver

# Exhibit 1



Document appears to be Obtained
Missing and mandatory
Missing and lower risk for resolution

| | Permits & Permit Card | Plans | Permit Card | Description |
|---|---|---|---|---|
| 1 | 13010-30005-01331 | | | Supplemental to original permit 13010-30000-01331 to make addition for mechanical room at basement level and make minor alterations to floor plan. |
| 2 | 13010-30004-01331 | | | Supplemental ref to permit #13010-30000-01331 for revision to plans to enclose patio areas to extend building area. Revisions to interior layout and entry way. ** 1 of 2 *** |
| 3 | 13010-30002-02339 | | | SUPPLEMENTAL TO ORIGINAL 13010-30000-02339 TO REVISE ACC BUILDING AND CHANGE OVERALL DIMENSIONS. PC FEES PAID AND COLLECTED UNDER 13010-30002-01329.***2 OF 2** |
| 4 | 13010-30002-01331 | | | Supplimental permit to #13010-30000-01331 to revise floor plan of single family dwelling |
| 5 | 13010-30002-01330 | | | Supplemental permit to 13010-30000-01330 to capture changes to floor plans and structural alterations to accessory living quarters |
| 6 | 13010-10009-01331 | | | Supplemental ref: 13010-30000-01331 to allow main house to be structurally connected to the accessory living quarters but to consider the buildings to be separated |
| 7 | 13010-70008-01331 | | | Supplemental ref: 13010-30000-01331 to revise structural plans to remove finished floor and close mechanical access door with 3ftx4ft access hatch. Revision to beam connection at basement level. |
| 8 | 13010-30007-01331 | | | Supplemental to 13010-30000-01331 to remove portion of interior concrete wall at basement level. |
| 9 | 13010-30006-01331 | | | Supplemental to 13010-30000-01331 to revise height and framing of elevator and stairwell shaft. |
| 10 | 13010-30004-01330 | | | Supplemental to original 13010-30000-01330 to modify structural foundation walls to allow ducting penetrations and alteration to structural detail for facade furing connection. |
| 11 | 13010-30002-03648 | | | Supplimental permit to #13010-30000-03648 to revise floor plan layout. No change in floor area or exterior of structure. |
| 12 | 13010-30003-01330 | | | Supplimental permit to #13010-30000-01330 add two bathrooms. Infilling small wall segment between lounge room and dance floor along with minor revisions to pool house roof framing plan. |
| 13 | 13010-10010-01331 | | | Supplemental ref: 13010-30000-01331 to revise fire separation wall at basement level of parking garage. |
| 14 | 13010-30001-01330 | | | Supplemental to permit# 13010-30000-01330 to change use from single family dwelling to new Accessory Living Quarters. (FULLY SPRINKLERED) |
| 15 | 13010-30000-01329 | | | NEW 50'8" X 98'1" IRR ONE STORY, TYPE VB, ACCESSORY LIVING QUARTERS WITH ATT DECK. (FULLY SPRINKLERED). |
| 16 | 13010-30000-03648 | | | NEW SINGLE LEVEL BASEMENT, TYPE VB, ACCESSORY LIVING QUARTERS(STAFF QUARTERS). FULLY SPRINKLERED. |
| 17 | 13010-30000-02339 | | | NEW 25'8" X 48'6" IRR, ONE STORY, TYPE-VB, FULLY SPRINKLERED, ACCESSORY LIVING QUARTERS WITH ROOF DECK AND ATTACHED DECK. (MOST NORTHERN PART OF PROPERTY) |
| 18 | 13010-30000-02338 | | | NEW 112' X 120' TRELLIS |
| 19 | 13010-30000-01330 | | | NEW 113'8" X 133'7" IRR TWO(2) STORY, TYPE VB, SINGLE FAMILY DWELLING WITH 2ND STORY DECK AND SWIMMING POOL.(FULLY SPRINKLERED) |
| 20 | 13010-30000-01331 | | Dennis? | NEW TWO STORY, TYPE V-B, SINGLE FAMILY DWELLING OVER BASEMENT WITH ATTACHED 5-CAR GARAGE. FULLY SPRINKLERED |
| 21 | 16010-30000-04284 | | Dennis? | NEW GUARD HOUSE WITH GATE FOR SINGLE FAMILY DWELLING |
| 22 | 13041-20000-35747 | | Dennis? | New 2-story, 96k+ sq. ft. single family residence with 2000 amp, 3-phase service. Plan check for power only. |
| 23 | 16041-30000-31174 | | Electrician? | CENTRAL STATION MONITORING SYSTEM AND SMOKE ALARM FOR RESIDENTIAL. |
| 24 | 19046-20000-00289 | | | INSTALL NEW RESIDENTIAL ELEVTOR FOR SFD. - |
| 25 | 19046-20000-00290 | | Expect w/ Elevator Sub | INSTALL NEW RESIDENTIAL ELEVTOR FOR SFD. |



Document appears to be Obtained
Missing and mandatory
Missing and lower risk for resolution

| | Permits & Permit Card | Plans | Permit Card | Description |
|---|---|---|---|---|
| 26 | 19046-20000-00436 | | | INSTALL NEW RESIDENTIAL ELEVTOR FOR SFD. |
| 27 | 13043-20000-03951 | | Plumber? | INSTALLUNDERGROUND PIPING AND FIRE HYDRANT. 8" DC VALVE, 8" RP DEVICE. FIRE HYDRANT REQUIRES 1500 GPM @ 20 PSI. |
| 28 | 14043-20000-05259 | | | NEW TWO STORY SINGLE FAMILY DWELLING OVER BASEMENT WITH ATTACHED 5-CAR GARAGE. INSTALL FIRE SPRINKLER SYSTEM. NEW 2" DOMESTIC METER. |
| 29 | 15043-20000-01117 | | Sprinkler Sub? | INSTALL FIRE SPRINKLER SYSTEM IN NEW SINGLE FAMILY DWELLING. 2" METER. |
| 30 | 13030-30000-02390 | | | SITE GRADING FOR SINGLE FAMILY DWELLING, ACCESSORY BUILDINGS, SWIMMING POOLS, EXCAVATION AND BACKFILL FOR NEW RETAINING WALLS, AND SITE DRAINAGE.(4,605CY TOTAL CUT) |
| 31 | 13030-30000-02393 | | Dennis? | SITE GRADING FOR NEW 2-STORY SINGLE FAMILY DWELLING OVER BASEMENT, ACCESSORY LIVING QUARTERS, DRAINAGE, CUT/FILL, AND RETAINING WALLS. (43,955 CY) |
| 32 | 13030-30000-05259 | | | Backfill existing swimming pool per information bulletin P/BC 2011-111. Shell to be removed. |
| 33 | 19030-10000-03130 | | Sub? | BACKFILL SLOPE PRIOR TO INSTALLATION OF THE GEOBRRUGG SYSTEM . APPROVED MODFOR OVER STEEPENED SLOPE HAS BEEN APPROVED BY GRADING DIVISION UNDER FILE NO. 226427. |
| 34 | 16044-20000-14727 | | | NEW HVAC FOR 2 STORY SINGLE FAMILY DWELLING WITH BASEMENT. PLAN CHECK FOR HEATING, VENTING, AIR CONDITIONING AND GARAGE VENTILATION SYTEMS. |
| 35 | 13020-30000-01077 | | | N)10' MAX HEIGHT SITE RETAINING WALL AT NORTHERN PART OF PROPERTY |
| 36 | 13020-30000-02931 | | | 10' max height and 303' long Retaining wall to create/expand driveway. |
| 37 | 18020-30000-03431 | | Dennis? | NEW ENTRY GATE. (9FT TALL X 13FT LONG) |
| 38 | 19020-10000-01428 | | | PROPOSED SITE STABILIZATION IN RESPONSE TO AN "ORDER TO COMPLY" ISSUED ON 12/09/2016. INSTALL SOIL NAILS/ANCHORS TO HOLD IN PLACE A GEOBRUGG NETTING SYSTEM |
| 39 | 14042-20000-10489 | | Plumber? | 96,000 SP FT 2 STORY PLUS GARAGE SINGLE FAMLY DWELLING. PLUMBING DESIGN FOR A HOUSE. PLAN CHECK FOR POTABLE WATER, WASTE/VENT, FUEL GAS AND RAINWATER SYSTEMS. |
| 40 | 13047-30000-00644 | | | PROPERTY. |
| 41 | 13047-30000-00645 | | | (N) 26'3" X 55'8" SWIMMING POOL AT 2ND FLOOR ROOF DECK OF DWELLING AT SOUTH SIDE OF PROPERTY. |
| 42 | 13047-30000-00520 | | | (N) 63'8" X 121'4" SWIMMING POOL ADJACENT TO DWELLING AT SOUTH SIDE OF PROPERTY. |
| 43 | 13047-30000-01419 | | | (N) 28'8" X 47'3" SWIMMING POOL AT 2ND FLOOR OF SINGLE FAMILY DWELLING ADJACENT TO MASTER BEDROOM. |
| 44 | 13047-30000-01420 | | | (N) 16' X 62' SWIMMING POOL AT BASEMENT OF SINGLE FAMILY DWELLING |
| 45 | **Public Works Permits** | | | |

# Exhibit 2

| Handover List / Receivership records | LADBS Permit | Plan Check / Job Number | Type | Status | Work Description |
|---|---|---|---|---|---|
| 1 | 13010-30005-01331 | B17WL01522 | Bldg-Addition | Issued 3/31/2017 | Supplemental to original permit 13010-30000-01331 to make addition for mechanical room at basement level and make minor alterations to floor plan. |
| 2 | 13010-30004-01331 | B16WL06251 | Bldg-Addition | Issued 1/11/2017 | Supplemental ref to permit #13010-30000-01331 for revision to plans to enclose patio areas to extend building area. Revisions to interior layout and entry way. *********************** 1 of 2 **************************** |
| 3 | 13010-30002-02339 | B16WL06251 | Bldg-Addition | Issued 5/8/2017 | SUPPLEMENTAL TO ORIGINAL 13010-30000-02339 TO REVISE ACC BUILDING AND CHANGE OVERALL DIMENSIONS. PC FEES PAID AND COLLECTED UNDER 13010-30002-01329.******2 OF 2*****SEE COMMENTS |
| 4 | 13010-30002-01331 | B16WL01028 | Bldg-Addition | Permit Expired 4/20/2018 | Supplimental permit to #13010-30000-01331 to revise floor plan of single family dwelling |
| 5 | 13010-30002-01330 | B15WL06183 | Bldg-Alter/Repair | Permit Expired 4/20/2018 | Supplemental permit to 13010-30000-01330 to capture changes to floor plans and structural alterations to accessory living quarters |
| 6 | 13010-10009-01331 | B20LA12394 | Bldg-Alter/Repair | Issued 7/19/2020 | Supplemental ref: 13010-30000-01331 to allow main house to be structurally connected to the accessory living quarters (13010-30000-01330) but to consider the buildings to be separated, since the required 10-ft separation required will be maintained with an unoccupied space between the structures. Per building modification, see comments. |
| 7 | 13010-70008-01331 | B19SL01643 | Bldg-Alter/Repair | Issued 12/11/2019 | Supplemental ref: 13010-30000-01331 to revise structural plans to remove finished floor and close mechanical access door with 3ftx4ft access hatch. Revision to beam connection at basement level. |
| 8 | 13010-30007-01331 | B19WL00201 | Bldg-Alter/Repair | Issued 1/15/2019 | Supplemental to 13010-30000-01331 to remove portion of interior concrete wall at basement level. |
| 9 | 13010-30006-01331 | B18WL07302 | Bldg-Alter/Repair | Issued 11/15/2018 | Supplemental to 13010-30000-01331 to revise height and framing of elevator and stairwell shaft. |
| 10 | 13010-30004-01330 | B17WL01522 | Bldg-Alter/Repair | Issued 3/31/2017 | Supplemental to original 13010-30000-01330 to modify structural foundation walls to allow ducting penetrations and alteration to structural detail for facade furing connection. |
| Not Found | 13010-30003-01331 | B16WL04940 | Bldg-Alter/Repair | PC Approved 5/5/2017 | SUPPLEMENTAL PERMIT TO 13010-30000-01331 TO REVISE ENTRY LAYOUT TO SFD |
| 11 | 13010-30002-03648 | B16WL00099 | Bldg-Alter/Repair | Issued 3/21/2016 | Supplimental permit to #13010-30000-03648 to revise floor plan layout. No change in floor area or exterior of structure. |
| 12 | 13010-30003-01330 | B16WL00272 | Bldg-Alter/Repair | Issued 12/5/2016 | Supplimental permit to #13010-30000-01330 to revise floor plan layout and capture structural revisions. Reducing pool equipment room to add two bathrooms. Infilling small wall segment between lounge room and dance floor along with minor revisions to pool house roof framing plan. See comments. |
| 13 | 13010-10010-01331 | B21LA01921 | Bldg-Alter/Repair | Issued 2/24/2021 | Supplemental ref: 13010-30000-01331 to revise fire separation wall at basement level of parking garage. |
| 14 | 13010-30001-01330 | B14WL01296 | Bldg-Alter/Repair | Permit Expired 5/4/2016 | Supplemental to permit# 13010-30000-01330 to change use from single family dwelling to new Accessory Living Quarters. (FULLY SPRINKLERED)(SEE COMMENTS) |
| Not Found | 13010-30001-01331 | B13WL04025 | Bldg-Alter/Repair | Verifications in Progress 11/15/2013 | supplemental ref to pcis # 13010-30000-01331, to revise structural & arch. plans. (Plan Check Only - Permit to be issued on the original application) |

| Handover List / Receivership records | LADBS Permit | Plan Check / Job Number | Type | Status | Work Description |
|---|---|---|---|---|---|
| Not Found | 13010-30001-01329 | B13WL02797 | Bldg-Alter/Repair | Reviewed by Supervisor 8/29/2013 | SUPPLEMENTAL REF TO PCIS # 13010-30000-01329, FOR (N) TRELLIS, CREATE (N) ACC. BLDG. APPLICATION AND RESUBMITTAL FOR CHANGES |
| Not Found | 13019-30000-02495 | B13WL03447 | Bldg-Demolition | Permit Finaled 9/17/2016 | Demolition of existing 100' x 210' single family dwelling, tennis court, 40' x 70' accessory building, and garage to clear lot. (see comments) |
| Not Found | 13019-30000-01125 | B13WL01364 | Bldg-Demolition | Application Submittal 4/26/2013 | DPI FOR ALL (E) STRUCTURES ON PROPERTY. |
| Not Found | 13010-30002-01329 | B16WL06251 | Bldg-New | PC Approved 12/28/2016 | supplemental ref to permit #13010-30000-01329 for revision to acc building to modify overall dimensions ********************************* 2 of 2 ************************ |
| 15 | 13010-30000-01329 | B13WL01489 | Bldg-New | Issued 3/26/2014 | NEW 50'8" X 98'1" IRR ONE STORY, TYPE VB, ACCESSORY LIVING QUARTERS WITH ATT DECK. (FULLY SPRINKLERED). (SEE COMMENTS) |
| 16 | 13010-30000-03648 | B13WL01491 | Bldg-New | Issued 3/26/2014 | NEW SINGLE LEVEL BASEMENT, TYPE VB, ACCESSORY LIVING QUARTERS(STAFF QUARTERS). FULLY SPRINKLERED.(SEE COMMENTS) |
| Not Found | 13020-30000-01060 | B13WL01468 | Bldg-New | Application Submittal 5/6/2013 | ACCESSORY STRUCTURE |
| Not Found | 13010-30001-02339 | B13WL03061 | Bldg-New | Reviewed by Supervisor 8/29/2013 | supplemental ref to pcis 13010-30000-02339 to capture green. *** green plan check only *** |
| 17 | 13010-30000-02339 | B13WL02799 | Bldg-New | Issued 3/26/2014 | NEW 25'8" X 48'6" IRR, ONE STORY, TYPE-VB, FULLY SPRINKLERED, ACCESSORY LIVING QUARTERS WITH ROOF DECK AND ATTACHED DECK. (MOST NORTHERN PART OF PROPERTY)(SEE COMMENTS) |
| 18 | 13010-30000-02338 | B13WL02799 | Bldg-New | Permit Expired 4/20/2016 | NEW 112' X 120' TRELLIS(see comments) |
| 19 | 13010-30000-01330 | B13WL01489 | Bldg-New | Issued 3/26/2014 | NEW 113'8" X 133'7" IRR TWO(2) STORY, TYPE VB, SINGLE FAMILY DWELLING WITH 2ND STORY DECK AND SWIMMING POOL.(FULLY SPRINKLERED)(SEE COMMENTS) |
| 20 | 13010-30000-01331 | B13WL01491 | Bldg-New | Issued 3/26/2014 | NEW TWO STORY, TYPE V-B, SINGLE FAMILY DWELLING OVER BASEMENT WITH ATTACHED 5-CAR GARAGE. FULLY SPRINKLERED (SEE COMMENTS) |
| Not Found | 13010-30000-01319 | B13WL01468 | Bldg-New | Application Submittal 5/6/2013 | 2nd dwelling unit |
| Not Found | 13010-30001-03648 | B13WL04635 | Bldg-New | Reviewed by Supervisor 12/18/2013 | supplemental ref to pcis # 13010-30000-03648, to capture green plan check only for NEW ONE STORY, TYPE VB, ACCESSORY LIVING QUARTERS(STAFF QUARTERS). FULLY SPRINKLERED. *** green plan check only *** |
| 21 | 16010-30000-04284 | B16WL04940 | Bldg-New | Issued 5/5/2017 | NEW GUARD HOUSE WITH GATE FOR SINGLE FAMILY DWELLING |
| 22 | 13041-20000-35747 | E13VN02685 | Electrical | Issued 7/19/2016 | New 2-story, 96k+ sq. ft. single family residence with 2000 amp, 3-phase service. Plan check for power only. |
| 23 | 16041-30000-31174 | X16WL05023 | Electrical | Issued 9/1/2016 | CENTRAL STATION MONITORING SYSTEM AND SMOKE ALARM FOR RESIDENTIAL. |
| 24 | 19046-20000-00289 | M19VN00520 | Elevator | Issued 3/11/2019 | INSTALL NEW RESIDENTIAL ELEVTOR FOR SFD. |
| 25 | 19046-20000-00290 | M19VN00521 | Elevator | Issued 3/11/2019 | INSTALL NEW RESIDENTIAL ELEVTOR FOR SFD. |
| 26 | 19046-20000-00436 | M19VN00850 | Elevator | Issued 4/9/2019 | INSTALL NEW RESIDENTIAL ELEVTOR FOR SFD. |
| 27 | 13043-20000-03951 | M13VN02439 | Fire Sprinkler | Issued 5/26/2015 | INSTALLUNDERGROUND PIPING AND FIRE HYDRANT. 8" DC VALVE, 8" RP DEVICE. FIRE HYDRANT REQUIRES 1500 GPM @ 20 PSI. |

| Handover List / Receivership records | LADBS Permit | Plan Check / Job Number | Type | Status | Work Description |
|---|---|---|---|---|---|
| Not Found | 13043-10001-03951 | M15LA02294 | Fire Sprinkler | PC Approved 5/8/2015 | Plan check only. Previously approved under 13043-20000-03951. Rerouting underground piping work due to structural. System demand at source:1500 gpm @ 63.3 psi. |
| 28 | 14043-20000-05259 | M14VN03221 | Fire Sprinkler | Issued 3/19/2015 | NEW TWO STORY SINGLE FAMILY DWELLING OVER BASEMENT WITH ATTACHED 5-CAR GARAGE. INSTALL FIRE SPRINKLER SYSTEM. NEW 2" DOMESTIC METER. |
| 29 | 15043-20000-01117 | M15VN00780 | Fire Sprinkler | Issued 6/18/2015 | INSTALL FIRE SPRINKLER SYSTEM IN NEW SINGLE FAMILY DWELLING. 2" METER. |
| Not Found | 13030-30000-02363 | B13WL01468 | Grading | Application Submittal 5/6/2013 | GRADING PERMIT FOR SWIMMING POOL/SITE GRADING. |
| 30 | 13030-30000-02390 | B13WL01489 | Grading | Issued 3/26/2014 | SITE GRADING FOR NEW SINGLE FAMILY DWELLING, NEW ACCESSORY BUILDINGS, NEW SWIMMING POOLS, EXCAVATION AND BACKFILL FOR NEW RETAINING WALLS, AND SITE DRAINAGE.(4,605CY TOTAL CUT) (SEE COMMENTS) |
| Not Found | 13030-30000-02391 | B13WL01490 | Grading | Application Submittal 5/7/2013 | POSTING ONLY FOR (N) 2ND DWELLING UNIT AND BALLROOM / LOUNGE |
| 31 | 13030-30000-02393 | B13WL01491 | Grading | Issued 3/26/2014 | SITE GRADING FOR NEW 2-STORY SINGLE FAMILY DWELLING OVER BASEMENT, ACCESSORY LIVING QUARTERS, DRAINAGE, CUT/FILL, AND RETAINING WALLS. (43,955 CY)(SEE COMMENTS) |
| Not Found | 13030-30000-02195 | B13WL01361 | Grading | Application Submittal 4/26/2013 | GPI FOR (N) HOUSE , ACCESSORY LIVING QUARTERS, POOL |
| Not Found | 13030-30000-04377 | B13WL02857 | Grading | Application Submittal 8/9/2013 | GPI FOR (N) MAIN HOUSE 2 ACCESSORY LIVING QUARTERS, TRELLIS, SITE GRADING AND RETAINING WALLS. |
| Not Found | 13030-30000-04378 | B13WL02858 | Grading | Application Submittal 8/9/2013 | GPI DEMO + BACKFILL (E) POOL |
| Not Found | 13030-30001-02393 | B13WL04407 | Grading | Reviewed by Supervisor 12/12/2013 | supplemental ref to pcis # 13030-30000-02393, site grading for (n) s.f.d. |
| 32 | 13030-30000-05259 | B13WL03450 | Grading | Permit Expired 4/20/2016 | Backfill existing swimming pool per information bulletin P/BC 2011-111. Shell to be removed. |
| Not Found | 14030-30000-00075 | B14WL00036 | Grading | Application Submittal 1/7/2014 | POSTING ONLY FOR (N) HOUSE , ACCESSORY LIVING QUARTERS, POOL, AND GRADING |
| Not Found | 16030-30000-06963 | B16WL04943 | Grading | Application Submittal 9/23/2016 | GPI for new gaurd house |
| Not Found | 17030-30000-02411 | B17WL01882 | Grading | Application Submittal 4/7/2017 | GPI W/ POSTING FOR NEW GUARD HOUSE, NEW STORAGE ROOM AND NEW SHORING |
| 33 | 19030-10000-03130 | G19LA00119 | Grading | Issued 7/1/2019 | PROPOSED TO BACKFILL SLOPE WITH COMPACTED SOIL PRIOR TO INSTALLATION OF THE GEOBRRUGG SYSTEM PER SOILS AND CIVIL ENGINEER'S RECOMMENDATIONS. SEE PCIS# 19020-10000-01428 FOR THE SOILS NAIL AND NETTING PERMIT. "ORDER TO COMPLY" ISSUED ON 12/09/2016. APPROVED MODIFICATION FOR OVER STEEPENED SLOPE HAS BEEN APPROVED BY GRADING DIVISION UNDER FILE NO. 226427. |
| Not Found | 21030-10000-00597 | B21LA01594 | Grading | Application Submittal 1/28/2021 | ***GRADING PRE-INSPECTION ONLY*** FOR DEBRIS FENCE. |
| Not Found | 13044-20000-13843 | M13VN02741 | HVAC | Application Submittal 12/23/2013 | SINGLE FAMLY DWELLING. HVAC DESIGN FOR A HOUSE. PLAN CHECK FOR HEATING, VENTING, AND AIR CONDITIONING. |

| Handover List / Receivership records | LADBS Permit | Plan Check / Job Number | Type | Status | Work Description |
|---|---|---|---|---|---|
| Not Found | 14044-20000-05373 | M14VN01372 | HVAC | PC Info Complete 4/24/2015 | 96,000 SQ FT 2 STORY PLUS BASEMENT SINGLE FAMLY DWELLING. HVAC DESIGN FOR A HOUSE. PLAN CHECK FOR HEATING, VENTING, AND AIR CONDITIONING. |
| 34 | 16044-20000-14727 | M16VN03394 | HVAC | Issued 5/26/2017 | NEW HVAC FOR 2 STORY SINGLE FAMILY DWELLING WITH BASEMENT. PLAN CHECK FOR HEATING, VENTING, AIR CONDITIONING AND GARAGE VENTILATION SYTEMS. |
| Not Found | 16044-10001-14727 | M19LA00376 | HVAC | Corrections Issued 2/20/2019 | NEW HVAC FOR 2 STORY SINGLE FAMILY DWELLING WITH BASEMENT. PLAN CHECK FOR HEATING, VENTING, AIR CONDITIONING AND GARAGE VENTILATION SYTEMS. MODIFY APPROVED PLANS. ADD ADDITIONAL DETAIL FOR SPLIT SYSTEM REFRIGERANT LINES. PLAN CHECK ONLY. PERMIT ISSUED UNDER 16044-20000-14727. |
| Not Found | 13020-30000-01059 | B13WL01468 | Nonbldg-New | Application Submittal 5/6/2013 | NEW RETAINING WALL. |
| 35 | 13020-30000-01077 | B13WL01489 | Nonbldg-New | Permit Expired 4/20/2016 | (N)10' MAX HEIGHT SITE RETAINING WALL AT NORTHERN PART OF PROPERTY.(SEE COMMENTS) |
| 36 | 13020-30000-02931 | B13WL01491 | Nonbldg-New | Issued 3/26/2014 | 10' max height and 303' long Retaining wall to create/expand driveway.(see comments) |
| Not Found | 16020-30000-03279 | B16WL05690 | Nonbldg-New | Verifications in Progress 4/13/2017 | SHORING FOR NEW GUARD HOUSE AND STORAGE ROOM. |
| 37 | 18020-30000-03431 | B18WL07302 | Nonbldg-New | Issued 11/15/2018 | NEW ENTRY GATE. (9FT TALL X 13FT LONG) |
| 38 | 19020-10000-01428 | X19LA09169 | Nonbldg-New | Issued 7/1/2019 | PROPOSED SITE STABILIZATION IN RESPONSE TO AN "ORDER TO COMPLY" ISSUED ON 12/09/2016. INSTALL SOIL NAILS/ANCHORS TO HOLD IN PLACE A GEOBRUGG NETTING SYSTEM PER SOILS AND CIVIL ENGINEER'S RECOMMENDATIONS. APPROVED MODIFICATION FOR OVER STEEPENED SLOPE HAS BEEN APPROVED BY GRADING DIVISION UNDER FILE NO. 226427. |
| Not Found | 21020-10000-00167 | B21LA01621 | Nonbldg-New | PC Info Complete 8/24/2021 | DEBRIS FENCE ON SLOPE. |
| Not Found | 13042-20000-24655 | M13VN02740 | Plumbing | Application Submittal 12/23/2013 | SINGLE FAMLY DWELLING. PLUMBING DESIGN FOR A HOUSE. PLAN CHECK FOR POTABLE WATER, WASTE/VENT, FUEL GAS AND RAINWATER SYSTEMS. |
| 39 | 14042-20000-10489 | M14VN01373 | Plumbing | Issued 5/5/2015 | 96,000 SP FT 2 STORY PLUS GARAGE SINGLE FAMLY DWELLING. PLUMBING DESIGN FOR A HOUSE. PLAN CHECK FOR POTABLE WATER, WASTE/VENT, FUEL GAS AND RAINWATER SYSTEMS. |
| 40 | 13047-30000-00644 | B13WL01489 | Swimming-Pool/Spa | Issued 3/26/2014 | (N) 72'2" X 148'10" SWIMMING POOL AND SPA ADJACENT TO ACCESSORY LIVING QUARTERS AT NORTH SIDE OF PROPERTY. |
| 41 | 13047-30000-00645 | B13WL01489 | Swimming-Pool/Spa | Issued 3/26/2014 | (N) 26'3" X 55'8" SWIMMING POOL AT 2ND FLOOR ROOF DECK OF DWELLING AT SOUTH SIDE OF PROPERTY. |
| 42 | 13047-30000-00520 | B13WL01489 | Swimming-Pool/Spa | Permit Expired 4/20/2016 | (N) 63'8" X 121'4" SWIMMING POOL ADJACENT TO DWELLING AT SOUTH SIDE OF PROPERTY. |
| Not Found | 13047-30000-00514 | B13WL01468 | Swimming-Pool/Spa | Application Submittal 5/6/2013 | Swimming pool |
| 43 | 13047-30000-01419 | B13WL01491 | Swimming-Pool/Spa | Permit Expired 4/20/2016 | (N) 28'8" X 47'3" SWIMMING POOL AT 2ND FLOOR OF SINGLE FAMILY DWELLING ADJACENT TO MASTER BEDROOM.(SEE COMMENTS) |
| 44 | 13047-30000-01420 | B13WL01491 | Swimming-Pool/Spa | Issued 3/26/2014 | (N) 16' X 62' SWIMMING POOL AT BASEMENT OF SINGLE FAMILY DWELLING.(SEE COMMENTS) |

| Handover List / Receivership records | LADBS Permit | Plan Check / Job Number | Type | Status | Work Description |
|---|---|---|---|---|---|
| Not Found | 21047-10000-00013 | B21LA00082 | Swimming-Pool/Spa | Verifications in Progress 2/22/2021 | SUPPLEMENTAL TO PERMIT # 13047-30000-01419 TO INCLUDE (N) 11'7" X 10'2" SPA CONNECTED TO POOL. 4' MAX DEPTH. SEE SHEET A21. (VALUATION = $5000) 1 OF 4 |
| Not Found | 21047-10000-00014 | B21LA00082 | Swimming-Pool/Spa | Verifications in Progress 2/22/2021 | (N) 11'11" X 22'1" SPA AT MAIN LEVEL. MAX DEPTH. SEE SHEET A20. (VALUATION = $12,000) 2 OF 4 |
| Not Found | 21047-10000-00015 | B21LA00082 | Swimming-Pool/Spa | Verifications in Progress 2/22/2021 | (N) 8'0" X 10'0" SPA IN BASEMENT OF SFD. 3' MAX DEPTH. SEE SHEET A17. (VALUATION = $3500) 3 OF 4 |
| Not Found | 21047-10000-00016 | B21LA00082 | Swimming-Pool/Spa | Verifications in Progress 2/22/2021 | (N) 8'0" X 7'6" SPA ADJACENT TO REC ROOM. 3.67' MAX DEPTH. (VALUATION=$14500) 4 OF 4 |

# Exhibit 3

| Item | Description of Work | Status | Req't Type |
|---|---|---|---|
| 1 | **Supplemental Permits for Spas** | **Req'd for CofO** | **Inspector / City** |
| 2 | **Master Bed Pool Permit inspection docs** | **Req'd for CofO** | **Inspector / City** |
| 3 | **Club Pool Permit inspection docs** | **Req'd for CofO** | **Inspector / City** |
| 4 | **Electrical Plans/Field Verification** | **Req'd for CofO** | **Inspector / City** |
| 5 | **A and B permit work** | **Req'd for CofO** | **Inspector / City** |
| 6 | **Demolition/Approval of Illegal Space** | **Req'd for CofO** | **Inspector / City** |
| 7 | **Railings** | **Req'd for CofO** | **Inspector / City** |
| 8 | **Debris Fencing** | **Req'd for CofO** | **Inspector / City** |
| 9 | **Backflow Retaining Wall** | **Req'd for CofO** | **Inspector / City** |
| 10 | **Pathway to Mechanical Space** | **Req'd for CofO** | **Inspector / City** |
| 11 | **Inspection Cards, Permit Cards, Stapmed Plans, Marked up Plans from the inspector all missing** | **Req'd for CofO** | **Inspector / City** |
| 12 | **Missing Compaction Report** | **Req'd for CofO** | **Inspector / City** |
| 13 | **Kitchen drop ceiling and drywall** | **Req'd for CofO** | **Inspector / City** |
| 14 | **Grading and Compaction Report** | **Req'd for CofO** | **Standard Req** |
| 15 | **File for permenant power** | **Req'd for CofO** | **Inspector / City** |
| 16 | **Gas main signoff** | **Req'd for CofO** | **Inspector / City** |
| | | | |
| 17 | VRF Refrigenratnt Calcs and Verification | Good to have | Standard Req |
| 18 | LID Planter Inspection | Good to have | Standard Req |
| 19 | Height Verification | Good to have | Standard Req |
| 20 | HVAC | Good to have | Standard Req |
| 21 | Elevators | Good to have | Standard Req |
| 22 | Finishing Post C of O Rooms | Good to have | Standard Req |
| 23 | UL Listed Fixtures | Good to have | Standard Req |
| 24 | Vent Specs for Garage | Good to have | Standard Req |
| 25 | Fire Sprinklers- heads needed in certain areas | Good to have | Other |
| 26 | Garage - water leak, west coast gates main door | Good to have | Repairs |
| 27 | Sky bar power room - pedestal sink and faucet needs to be installed | Good to have | Cosmetic |
| 28 | Entrance to elevator on sky deck | Good to have | Other |
| 29 | Butlers pantry - appliances need installation | Good to have | Repairs |
| 30 | Family kitchen - downdrafts for cooktops not installed | Good to have | Repairs |
| 31 | Health and wellness sauna needs equipment | Good to have | Cosmetic |
| 32 | Health and wellness Dornbracht horizontal showers need stone covers for access on top of the shower platform | Good to have | Cosmetic |
| 33 | three Mechanical rooms with floor sinks need face waterproofed and floor Apoxsee coated | Good to have | Repairs |
| 34 | Club public entrance from street mechanical gate needs motorized mechanism to be installed by West Coast gates | Good to have | Appliances / Installation |
| 35 | Guest house master bathroom sink to be removed and replaced by ILG | Good to have | Repairs |
| 36 | Guest house appliances need to be installed by certified Meile installer | Good to have | Appliances / Installation |
| 37 | Guest House spa glass rail needs to be finished by CGM | Good to have | Appliances / Installation |
| 38 | Outdoor bbq 2 UC lynx refrigerators need delivered and installed | Good to have | Appliances / Installation |
| 39 | OD bbq electrical outlets covers installed | Good to have | Cosmetic |
| 40 | Outdoor family area ceiling light near camera reinstall | Good to have | Repairs |
| 41 | Angel sculpture base complete installation with screws and run electrical for angel sculpture lights | Good to have | Appliances / Installation |
| 42 | Wiing Palm tree White stone box complete water hook up | Good to have | Appliances / Installation |
| 43 | fire sprinkler head needs to be checked | Good to have | Repairs |
| 44 | X catering kitchen needs to have all utilities capped off and room dry walled and drop ceiling installed | Good to have | |

| Item | Description of Work | Status | Req't Type |
|---|---|---|---|
| 45 | Club men's bathroom Urinal Actuators need to be installed waiting on parts from Toto kennco plumbing to install | Good to have | |
| 46 | Club bathroom doors and hardware waiting on ILG to deliver and install | Good to have | |
| | | | |
| 47 | Leaking Master Pool | Nice to have | Other |
| 48 | Leaking Acrylic Water Feature Skylights | Nice to have | Other |
| 49 | Flooring and wallpaper throughout the house. | Nice to have | Cosmetic |
| 50 | Master - CADstone coping repairs, TV door | Nice to have | Cosmetic |
| 51 | Master bath - cieling lights (CADstone needs to open stone) | Nice to have | Cosmetic |
| 52 | Master Closet - minor issues ILG | Nice to have | Cosmetic |
| 53 | Master bath his tub - needs pump (needs hot water to test) | Nice to have | Repairs |
| 54 | Master closet - her closet, ILG resolve LED and chandelier light | Nice to have | Cosmetic |
| 55 | Master kitchenette - ILG wall plugs | Nice to have | Cosmetic |
| 56 | Sky bar Trex decking needs to be repaired where seperated | Nice to have | Cosmetic |
| 57 | Sky bar counter needs finish and stucco | Nice to have | Cosmetic |
| 58 | Sky bar counter - CADstone needs to finished | Nice to have | Cosmetic |
| 59 | Library office - ILG fix laminations | Nice to have | Cosmetic |
| 60 | Library office - heavy cracks in flooring to be repaired by CAD stone | Nice to have | Cosmetic |
| 61 | Foyer - chandelier missing glass tubes. | Nice to have | Cosmetic |
| 62 | Foyer - wine closet needs completion and ladder | Nice to have | Cosmetic |
| 63 | Butlers pantry - Yorick needs to do light cabinet work | Nice to have | Cosmetic |
| 64 | Cigar room - ILG needs to complete installation of built ins. | Nice to have | Cosmetic |
| 65 | Family kitchen - built in cabinetry finish installation and touchup | Nice to have | Cosmetic |
| 66 | Kitchen pantry - Yorick needs to finish shelving | Nice to have | Cosmetic |
| 67 | Family powder room - wallpaper re-installation | Nice to have | Cosmetic |
| 68 | juice bar/gym cabinets need kick plates /And trim installed ILG | Nice to have | Cosmetic |
| 69 | Beauty salon sewer line cleanout's need 2 round covers | Nice to have | Cosmetic |
| 70 | Health and wellness water sculpture needs finished Michael Schmidt design | Nice to have | Cosmetic |
| 71 | Health and wellness Dornbracht horizontal showers needs trim installed and tested we need hot water before that can be done | Nice to have | Cosmetic |
| 72 | Pool/Health and wellness area floors need detailed cleaning | Nice to have | Cosmetic |
| 73 | bowling/golf simulator kitchenette needs refrigerator and microwave drawer installed,Yorik needs to alter cabinet for microwave drawer | Nice to have | Appliances / Installation |
| 74 | Entertainment Lounge banquet needs repair under cushion in the left corner Yorick to complete | Nice to have | Cosmetic |
| 75 | just a reminder we need the rest of the ILG doors and hardware for the lower level of the house | Nice to have | Cosmetic |
| 76 | Club floor tiles need to be removed and replaced or repaired if possible | Nice to have | Cosmetic |
| 77 | Club bar needs finished installation minor trim and detailing and appliance overlays installed by ILG | Nice to have | Cosmetic |
| 78 | Club coat racks installed in coat check room | Nice to have | Cosmetic |
| 79 | Club AV system minor finishing touches by centurion low-voltage | Nice to have | Appliances / Installation |
| 80 | Guest house laundry room floor tiles to be removed and replaced by Cadstone should be warranty work installation and material not adequate | Nice to have | Repairs |
| 81 | Guest house kitchen microwave needs filler panels on sides installed damaged need to order new ones from Snyder diamond | Nice to have | Repairs |
| 82 | Guest House pool patio when your dream is to be detailed | Nice to have | Cosmetic |
| 83 | Garage valet parking room needs carpet installed | Nice to have | Appliances / Installation |
| 84 | Garage stairway to sturdy command center needs to be carpeted | Nice to have | Appliances / Installation |
| 85 | Security command center needs to be carpeted | Nice to have | Appliances / Installation |
| 86 | Security command center needs monitors etc. finished off by centurion low-voltage | Nice to have | Appliances / Installation |
| 87 | Tennis court rec room needs floor polished and sealed by Cadstone | Nice to have | Appliances / Installation |
| 88 | Rec room needs cabinets/shelving in niche | Nice to have | Appliances / Installation |

| Item | Description of Work | Status | Req't Type |
|---|---|---|---|
| 89 | Rec room and Bath need painted | Nice to have | Appliances / Installation |
| 90 | Rec  room glass door needs lock should be corrected by CGS | Nice to have | Appliances / Installation |
| 91 | also bedroom number eight needs interior latch also should be corrected by CGS | Nice to have | Appliances / Installation |
| 92 | staff quarters miscellaneous drywall repairs and paint touchups also base trim around carpet needs to be figured out/installed | Nice to have | Cosmetic |
| 93 | OD bbq touch up on stone countertops and missing backsplash/grill and cooktop trim | Nice to have | Cosmetic |
| 94 | OD bbq Touch up on stucco where cabinet was removed and other spots around outlets etc. | Nice to have | Cosmetic |
| 95 | Outdoor self serve area touch up on stone countertop and missing backsplash | Nice to have | Cosmetic |
| 96 | Outdoor patio area remove replace damaged Trex boards | Nice to have | Cosmetic |
| 97 | outdoor family area clean white stone floor | Nice to have | Cosmetic |
| 98 | outdoor family area trim around display screen and speakers | Nice to have | Cosmetic |
| 99 | pool changing baths clean and remove all debris | Nice to have | Cosmetic |
| 100 | behind pool changing baths remove unnecessary pool cleaning equipment and debris | Nice to have | Cosmetic |
| 101 | Black stone sitting bench near main spa missing Trex edge and touch up stone | Nice to have | Appliances / Installation |
| 102 | outdoor main pool area clean/conceal glue repaired spots | Nice to have | Cosmetic |
| 103 | backyard angel sculpture clean sculpture and stone base/finish pool equipment access doors with matching stone | Nice to have | Cosmetic |
| 104 | Palm tree Whitestone boxes touchup and repairs | Nice to have | Cosmetic |
| 105 | Outside library whisping Palm tree trim dead fronds | Nice to have | Cosmetic |
| 106 | backyard Moat water feature thorough cleaning | Nice to have | Cosmetic |
| 107 | Backyard moat infinity trough thorough cleaning | Nice to have | Cosmetic |
| 108 | backyard jogging path glass needs to be cleaned both inside and out | Nice to have | Cosmetic |
| 109 | White stucco touchup/repair spots painted | Nice to have | Cosmetic |
| 110 | Main entrance big stone door touchup/repairs on stone around bottom around motion sensors | Nice to have | Cosmetic |
| 111 | main entrance noticeable glue repairs need to be concealed | Nice to have | Cosmetic |
| 112 | main entrance water feature sculpture needs to be cleaned | Nice to have | Cosmetic |
| 113 | main entrance water feature trough needs to be cleaned and needs to have water flow altered so water return ports are not making noise | Nice to have | Cosmetic |
| 114 | Mass black stone walls both and mortar court and backyard need finish sealing | Nice to have | Repairs |
| 115 | Motor court needs power washed (Oil and dirt removed) and Remaining building material removed and brought down to garage entrance | Nice to have | Cosmetic |
| 116 | Garage entrance needs power washed and building material needs to be organized and straightened. | Nice to have | Cosmetic |
| 117 | garage floor needs washed | Nice to have | Cosmetic |
| 118 | drywall repair in right car turn table ceiling | Nice to have | Cosmetic |
| 119 | Lower level main entrance drywall repair around skylight | Nice to have | Repairs |
| 120 | Lower level bedroom bathrooms need tile caulk recolored | Nice to have | Cosmetic |
| 121 | vodka tasting area beverage volts need access doors installed | Nice to have | Repairs |
| 122 | Vodka tasting area bar needs overlay cover on refrigerator | Nice to have | Cosmetic |
| 123 | Gym locker rooms need hardware on locker doors | Nice to have | Cosmetic |
| 124 | VIP powder room near AV command center needs faucet trim changed  out (waiting on replacement) | Nice to have | Cosmetic |
| 125 | juice bar/gym cabinets need kick plates /And trim installed ILG | Nice to have | Cosmetic |

# Exhibit 4

| Piece Name | Quantity | Location |
|---|---|---|
| Eastern King \| Wall Panel V Channel BED - White | 1 | Bedroom 1 |
| Eastern King Box | 2 | Bedroom 1 |
| Eastern King Mattress | 1 | Bedroom 1 |
| Jane Lounge Chair \| Sienna Fabric | 2 | Bedroom 1 |
| Jane Sofa | 1 | Bedroom 1 |
| 2 Drawer Nightstand Large | 2 | Bedroom 1 |
| Bench \| Jenga Domino | 1 | Bedroom 1 |
| Shell Table Lamp | 2 | Bedroom 1 |
| Coral Chair \| Black Coating | 4 | Bedroom 1 |
| Coffee Table | 1 | Bedroom 1 |
| | | |
| Eastern King \| Chevron BED \| Grey | 1 | Bedroom 2 - MASTER |
| Eastern King Box | 2 | Bedroom 2 - MASTER |
| Eastern King Mattress | 1 | Bedroom 2 - MASTER |
| Winston Nightstand \| Charcoal | 2 | Bedroom 2 - MASTER |
| Alta Bench \| Dresden Glacier | 1 | Bedroom 2 - MASTER |
| Glass Bowl \| Small \| Black | 1 | Bedroom 2 - MASTER |
| Glass Bowl \| Large \| Black | 1 | Bedroom 2 - MASTER |
| Keaton Sectional Sofa | 2 | Bedroom 2 - MASTER |
| Petrified Wood Orb \| Medium | 4 | Bedroom 2 - MASTER |
| Jordan Coffee Table | 1 | Bedroom 2 - MASTER |
| | | |
| Aluminum Coffee Table \| Light Gray | 2 | Master Bed Outdoor |
| Outdoor U SIde Table \| Light Gray | 2 | Master Bed Outdoor |
| BITE Outdoor Lounger | 2 | Master Bed Outdoor |
| BITE Outdoor 2 SEATER \| RIGHT END | 1 | Master Bed Outdoor |
| BITE Outdoor 3 SEATER \| RIGHT END | 1 | Master Bed Outdoor |
| | | |
| Eastern King Wall Panel BED \| Vertcal Channel \| Dark Grey | 1 | Bedroom 3 |
| Eastern King Box | 2 | Bedroom 3 |
| Eastern King Mattress | 1 | Bedroom 3 |
| Tufted Bench - Grey | 1 | Bedroom 3 |
| 2 Drawer Nighstand | 2 | Bedroom 3 |
| 14" Jar Lamp \| Silver | 2 | Bedroom 3 |
| Floating Plank Mirror \| Black | 1 | Bedroom 3 |
| Sofa \| Dresden Glacier | 1 | Bedroom 3 |
| 5.5' \| XXX Console \| Black | 1 | Bedroom 3 |
| Leather Shagreen Tray \| LARGE \| Grey | 1 | Bedroom 3 |
| Leather Shagreen Tray \| SMALL \| Grey | 1 | Bedroom 3 |
| BY1495 \| 37" x 55" \| Dark Wood | 1 | Bedroom 3 |
| | | |
| Swanson Dining Chair \| Black \| Black Chrome | 20 | Formal Dining |
| Hauser Table Base | 1 | Formal Dining |
| 12' Dining Table Top | 1 | Formal Dining |
| | | |
| Eastern King \| Wall Panel Tufted BED - White | 1 | Bedroom 4 |
| Eastern King Box | 2 | Bedroom 4 |
| Eastern King Mattress | 1 | Bedroom 4 |
| McCartney Nighstand in Black | 1 | Bedroom 4 |
| 7011 Table Lamp | 2 | Bedroom 4 |
| Bench \| Sienna 900 \| Brushed Silver | 1 | Bedroom 4 |

| Piece Name | Quantity | Location |
|---|---|---|
| BY1601-2 \| 37" x 55" \| Balck Frame | 1 | Bedroom 4 |
| 5.5' \| Sybil Console \| Antique Brass and Black | 1 | Bedroom 4 |
| Leather Tray \| SMALL \| Creamy White | 1 | Bedroom 4 |
| Abstract Ceramic Spiral Decor \| Black \| Small | 1 | Bedroom 4 |
| Abstract Ceramic Spiral Decor \| Black \| Large | 1 | Bedroom 4 |
| | | |
| Eastern King \| Winged \| Velvet Grey | 1 | Bedroom 5 |
| Eastern King Box | 2 | Bedroom 5 |
| Eastern King Mattress | 1 | Bedroom 5 |
| Tri-Leg Side Table \| Black \| SMALL | 1 | Bedroom 5 |
| Tri-Leg Side Table \| Black \| MEDIUM | 1 | Bedroom 5 |
| Mini Sofa \| Pied De Poule/LP911-4 | 2 | Bedroom 5 |
| BY1576 \| 37" x 55" \| Black Frame | 1 | Bedroom 5 |
| Brass Frame Nightstand | 2 | Bedroom 5 |
| Abstract Sculpture Table Lamp | 2 | Bedroom 5 |
| Disk Decoration \| Small \| Smokey | 1 | Bedroom 5 |
| Disk Decoration \| Large \| Smokey | 1 | Bedroom 5 |
| HEXAGON SIDE TABLE | 1 | Bedroom 5 |
| Rea Bench \| Black Chrome \| Light Tan Leather | 1 | Bedroom 5 |
| Coral Chair \| Natte Nature \| Silver Coating | 2 | Bedroom 5 |
| Outdoor U Side Table \| White | 2 | Bedroom 5 |
| Hover Mirror | 1 | Bedroom 5 |
| | | |
| Rectangular Mirror \| Brushed Silver \| 32" x 76" | 1 | Bedroom 6 |
| Cal King \| Waterfall-Lexi \| Wilmer Morocco | 1 | Bedroom 6 |
| Regular Cal King Mattress | 1 | Bedroom 6 |
| Regular Cal King Boxspring | 2 | Bedroom 6 |
| Bibiana Side Table \| Black | 2 | Bedroom 6 |
| 7011 Table Lamp | 2 | Bedroom 6 |
| Ardent Lounge Chair \| Black Leather \| Black Frame | 2 | Bedroom 6 |
| 6' Elden Console | 1 | Bedroom 6 |
| Abstract Stone Loop Sculpture \| White | 1 | Bedroom 6 |
| Lexie Bench \| Black | 1 | Bedroom 6 |
| 60" Round Mirror \| Matte Black | 1 | Bedroom 6 |
| Coral Chair \| Natte Nature \| Silver Coating | 2 | Bedroom 6 |
| Outdoor U Side Table \| White | 1 | Bedroom 6 |
| BY1801 \| 48" x 72" \| Dark Wood | 1 | Bedroom 6 |
| | | |
| Swanson Bench \| Black PU \| Brass | 1 | Bedroom 7 |
| 60" Round Mirror \| Matte Black | 1 | Bedroom 7 |
| BY1668-2 \| 37" 55" \| Black Frame | 1 | Bedroom 7 |
| Tower Glass Table Lamp \| Silver | 2 | Bedroom 7 |
| Nightstand \| Walnut \| Brushed Brass | 2 | Bedroom 7 |
| Custom Cal King Bed \| Panama White | 1 | Bedroom 7 |
| Regular Cal King Mattress | 1 | Bedroom 7 |
| Amelia Tufted Tier Sofa \| Sapphire 102 | 1 | Bedroom 7 |
| X Stool \| Brushed Brass \| Black PU | 2 | Bedroom 7 |
| Credenza \| Oak Veneer + Bronze \| Small | 1 | Bedroom 7 |
| Abstract Decorative Sculpture \| Large \| Black | 1 | Bedroom 7 |
| Abstract Decorative Sculpture \| Medium \| Black | 1 | Bedroom 7 |
| Abstract Decorative Sculpture \| Small \| Black | 1 | Bedroom 7 |
| Coral Chair \| Natte Nature \| Silver Coating | 2 | Bedroom 7 |
| Outdoor U Side Table \| White | 1 | Bedroom 7 |
| | | |
| Tower Glass Table Lamp \| Silver | 2 | Bedroom 8 |
| Zelline Nightstand \| Oak Veneer | 2 | Bedroom 8 |
| Cal King \| Waterfall-Lexi \| Wilmer Silver | 1 | Bedroom 8 |
| Regular Cal King Mattress | 1 | Bedroom 8 |

| Piece Name | Quantity | Location |
| --- | --- | --- |
| Regular Cal King Boxspring | 2 | Bedroom 8 |
| Curved Lounge Chair \| Iron Base \| Grey | 2 | Bedroom 8 |
| SIDE TABLE | 1 | Bedroom 8 |
| Zelline Credenza \| Oak Venner | 1 | Bedroom 8 |
| Rectangular Mirror \| Brushed \| 32" x 76" | 2 | Bedroom 8 |
| | | |
| Felix Lounge Chair \| Cuddle Fur | 1 | Downstairs Lounge - LL Family Room |
| Yves Coffee Tabel \| Smoked Glass \| Black Frame | 1 | Downstairs Lounge - LL Family Room |
| Kliff Faux Marble Side Table \| White | 1 | Downstairs Lounge - LL Family Room |
| Alix Shelf Arm Sectional \| Left \| Vanquish | 1 | Downstairs Lounge - LL Family Room |
| Alix Shelf Arm Sectional \| Armless \| Vanquish | 4 | Downstairs Lounge - LL Family Room |
| Alix Shelf Arm Sectional \| Right\| Vanquish | 2 | Downstairs Lounge - LL Family Room |
| | | |
| 60" Round Mirror \| Matte Black | 1 | Entry Bedroom |
| Alwin Metal Console \| Anti-Copper | 1 | Entry Bedroom |
| Eastern King Wall Panel Bed \| White | 1 | Entry Bedroom |
| Eastern King Box | 2 | Entry Bedroom |
| Eastern King Mattress | 1 | Entry Bedroom |
| Tristan Nightstand | 2 | Entry Bedroom |
| Laslow Oak Veneer Bench \| Black Leather | 1 | Entry Bedroom |
| Dashian Lounge Chair \| Monument 902 \| Chalk | 4 | Entry Bedroom |
| Coffee Table \| tempered Smoked Glass | 1 | Entry Bedroom |
| Abstract Stone Lopp Sculpture \| Black | 2 | Entry Bedroom |
| BY1435 \| 40" x 60" \| White Frame | 1 | Entry Bedroom |
| BY1669 frame color 3 dark wood | 1 | Entry Bedroom |
| | | |
| Severa Lounge Chair \| Black Velvet | 8 | BAR/Game Room |
| CREED COFFEE TABLE | 2 | BAR/Game Room |
| Alexius Stool IV | 2 | BAR/Game Room |
| Alexius Stool I | 2 | BAR/Game Room |
| Alexius Stool II | 2 | BAR/Game Room |
| Alexius Stool III | 2 | BAR/Game Room |
| Lexie Lounge Chair \| Velvet \| Black | 2 | BAR/Game Room |
| Hexagon Top SIde Table | 2 | BAR/Game Room |
| | | |
| KIOSS Dining Chair | 8 | Guest House |
| Hand Dining Table Base \| Gold | 3 | Guest House |
| 60" Round Mirror \| Matte Black | 1 | Guest House |
| Dimitri Credenza | 1 | Guest House |
| Mozart Coffee Table | 1 | Guest House |
| Lenox Counter Stool | 3 | Guest House |
| Tall Shade Table | 2 | Guest House |
| 5' \| Zora Console | 1 | Guest House |
| Round Glass Table Lamp | 2 | Guest House |
| Credenza \| Oak Veneer | 1 | Guest House |
| Black Plate Side Table | 1 | Guest House |
| Bench \| Dresden Glacier \| Brushed brass | 1 | Guest House |
| Petrified Slab Plate | 1 | Guest House |
| Walnut Nightstand \| Brushed Brass Handles | 2 | Guest House |
| Herst Table Lamp | 2 | Guest House |
| Resin Decoration \| White \| HIGH | 1 | Guest House |
| Resin Decoration \| White \| LOW | 1 | Guest House |
| Custom Cal King Pillow Back Bed \| Panama White | 1 | Guest House |
| Regular Cal King Mattress | 1 | Guest House |
| Rectangular Mirror \| Brushed Brass \| 32" x 76" | 1 | Guest House |
| Alpine Lounge Chair \| Sheep Skin | 2 | Guest House |
| Marisa Side Table \| High Gloss White | 1 | Guest House |
| Queen \| Vertical Channel \| Como Grey Cloud | 1 | Guest House |

| Piece Name | Quantity | Location |
|---|---|---|
| Regular Queen Mattress | 1 | Guest House |
| Regular Queen Boxspring | 1 | Guest House |
| RUG - Gladstone Viscose Knotted Rug | 1 | Guest House |
| Black Oak 3 Drawer Nightstand | 2 | Guest House |
| Rive Modern Brass Table Lamp | 2 | Guest House |
| LARGE Crystal Decoration | 1 | Guest House |
| Cal King \| 6" Vertical Channel Michelle \| Como Dark Grey | 1 | Guest House |
| Regular Cal King Mattress | 1 | Guest House |
| Regular Cal King Boxspring | 2 | Guest House |
| Oak Veneer Nightstand \| Black Walnut \| Brushed Brass | 2 | Guest House |
| Glass Cube Table Lamp | 2 | Guest House |
| RUG - Encore \| Ash \| 8x11 | 1 | Guest House |
| Swanson Bench \| Miles Cobble Stone \| Brushed Silver Legs | 1 | Guest House |
| Jacob Right Arm Chaise | 1 | Guest House |
| Jacob Left Arm | 1 | Guest House |
| Jacob One Seater Armless | 1 | Guest House |
| Felix Lounge Chair \| Cuddle Fur | 1 | Guest House |
| White Marble End Table \| Brass Top | 1 | Guest House |
| | | |
| Rope Woven Sofa | 3 | GuestHouse Outdoor |
| Iron Coffee Table \| Black Frame | 1 | GuestHouse Outdoor |
| Rope Arm Chair | 2 | GuestHouse Outdoor |
| Rope Chaise Lounger | 6 | GuestHouse Outdoor |
| | | |
| Plank Mirror in White | 1 | Her Closet |
| X Bench \| Pink Velvet | 1 | Her Closet |
| Cara Stool \| White | 1 | Her Closet |
| Square Stool \| Cuddle Fur Fabric | 2 | Her Closet |
| Coral Chair \| Natte Nature \| Silver Coating | 2 | Her Closet |
| Luxury Bathroom Set \| Towels \| Bathrobe | 1 | Her Closet |
| | | |
| Coral Chair \| Black Coating | 2 | His Closet |
| Luxury Bathroom Set \| Towels \| Bathrobe | 1 | His Closet |
| Floating Plank Mirror \| Black | 1 | His Closet |
| Cara Stool \| Blue | 2 | His Closet |
| 0 | 0 | |
| Nero Magus Coffee Table \| Black Marble \| Brass | 1 | Lounge 2 - Family Room Off Kitchen |
| Sette Leather Barstool \| Cream | 5 | Lounge 2 - Family Room Off Kitchen |
| Channel Tufted Sectional \| Armless V1 | 1 | Lounge 2 - Family Room Off Kitchen |
| Abstract Stone Loop Sculpture \| White | 1 | Lounge 2 - Family Room Off Kitchen |
| Channel Tufted Sectional \| Ottoman | 1 | Lounge 2 - Family Room Off Kitchen |
| Kennedy Modular Sofa Sectional \| Right Arm | 1 | Lounge 2 - Family Room Off Kitchen |
| Kennedy Modular Sofa Sectional \| Left Arm | 1 | Lounge 2 - Family Room Off Kitchen |
| Kennedy Modular Sofa Sectional \| Armless | 4 | Lounge 2 - Family Room Off Kitchen |
| Edge Coffee Table \| Black | 2 | Lounge 2 - Family Room Off Kitchen |
| Tic Tac Toe Ball | 1 | Lounge 2 - Family Room Off Kitchen |
| HEXAGON TOP SIDE TABLE | 1 | Lounge 2 - Family Room Off Kitchen |
| Corset Counter Stool \| Black Chrome | 8 | Lounge 2 - Family Room Off Kitchen |
| | | |
| Severa Lounge Chair \| Black Leather | 2 | Main Family Room |
| Cloud 2.0 Corner \| Zuma White | 4 | Main Family Room |
| Cloud 2.0 Armless \| Zuma White | 10 | Main Family Room |
| Vero Marble Side Table \| Black Metal | 1 | Main Family Room |
| Calvin Marble Coffee Table \| White \| Large | 2 | Main Family Room |
| Corset Counterstool \| Brushed Gold \| White Leather | 5 | Main Family Room |
| | | |
| 6' Calvin Seater Sofa \| LEFT | 3 | Main Living Room |
| 6' Calvin Seater Sofa \| RIGHT | 3 | Main Living Room |

| Piece Name | Quantity | Location |
|---|---|---|
| Alta Sofa Chair | 2 | Main Living Room |
| Calvin Marble Coffee Table \| Small \| White | 2 | Main Living Room |
| Trevor Iron Dining Table | 1 | Main Living Room |
| Erin Ottoman \| Yellow | 1 | Main Living Room |
| Daphnes Lounge Chair \| Sienna 900 | 2 | Main Living Room |
| Marbella Coffee Table | 1 | Main Living Room |
| Prague Coffee | 2 | Main Living Room |
| Rein Lounge Chair \| Blue | 2 | Main Living Room |
| Sylvan Coffee Table \| Grey | 1 | Main Living Room |
| Sylvan Side Table \| Grey | 1 | Main Living Room |
| Glass Bowl \| Small \| Black | 1 | Main Living Room |
| Glass Bowl \| Large \| Black | 1 | Main Living Room |
| Greystone PIece \| Dresden Glacier Part 2 | 2 | Main Living Room |
| Greystone PIece \| Dresden Glacier Part 1 | 2 | Main Living Room |
| | | |
| James Outdoor Coffee Table | 1 | Front Outdoor Area |
| James Outdoor Sofa | 2 | Front Outdoor Area |
| James Outdoor Armchair | 4 | Front Outdoor Area |
| Outdoor U Side Table | 2 | Front Outdoor Area |
| | | |
| Elden DESK \| Iron + Oak Veneer \| White | 1 | Main Office |
| Lounge Chair \| Black PU | 2 | Main Office |
| Mclaren Wingbach Chair \| Black Leather | 1 | Main Office |
| Harpyx Side Table \| Brushed Nickel | 1 | Main Office |
| Minimal Wire Small Armchair \| Black Frame \| Black | 2 | Main Office |
| Damian End Table \| Black Chrome | 1 | Main Office |
| Tic Tac Toe Ball | 1 | Main Office |
| Dome Table Lamp \| Brushed Brass | 1 | Main Office |
| Transparent Crystle Orb \| Gray | 1 | Main Office |
| | | |
| Marianne Leather \| Satin Grey \| White Leather | 3 | Gallery |
| | | |
| PETRIFIED WOOD STAND | 3 | Second Office |
| PETRIFIED WOOD DISK STAND | 3 | Second Office |
| PETRIFIED WOOD BOOKEND | 6 | Second Office |
| PETRIFIED WOOD STAND | 1 | Second Office |
| Helios Desk Chair \| Black Leather | 1 | Second Office |
| Desk - Stainless Steel + Dark Blue Shagreen | 1 | Second Office |
| Lórien Lounge Chair \| Miles Feather | 2 | Second Office |
| | | |
| Sofa \| LP9128-34 | 2 | Cigar Room |
| Marvin Marble Coffee Table \| Back \| Brushed Brass | 2 | Cigar Room |
| Firenze Leather Lounge Chair \| Black | 2 | Cigar Room |
| Brett Bar Cart \| Brushed Gold \| Smoked Glass | 1 | Cigar Room |
| PETRIFIED WOOD \| ASHTRAY | 3 | Cigar Room |
| PETRIFIED WOOD STAND | 2 | Cigar Room |
| | | |
| Pea Sofa \| Belvedere Marshmallow Fabric | 2 | Spa Lounge |
| Sylvan Side Table \| Grey | 1 | Spa Lounge |
| Mongolian Fur Pouf | 2 | Spa Lounge |
| Iron Antique Rectangular Mirror | 2 | Spa Lounge |
| Brando Bench Silver | 1 | Spa Lounge |
| Portable Message Table \| Cream | 2 | Spa Lounge |
| Petrified Wood Disk Stand | 1 | Spa Lounge |
| | | |
| 7' Bernadette 3 Seater Sofa \| Dresden feather | 2 | Upstairs Lounge |
| Bella Coffee Table \| Polished Nickel | 1 | Upstairs Lounge |
| Corset Barstool \| White Leather \| Black Chrome | 4 | Upstairs Lounge |

| Piece Name | Quantity | Location |
|---|---|---|
| Marble Abstract Bench | 2 | Bridge |
| | | |
| Gamond Sectional \| 3 Seater Right Arm \| Grey | 1 | Upstairs Family |
| Gamond Sectional \| 3 Seater Armless \| Grey | 1 | Upstairs Family |
| Gamond Sectional \| Modular Table \| Dark Grey | 1 | Upstairs Family |
| Elden Coffee Table \| Black | 1 | Upstairs Family |
| Lounge Chair \| Corsica 800 | 2 | Upstairs Family |
| Mongolian Fur Pouf \| Black | 2 | Upstairs Family |
| | | |
| Bar Table Charcoal | 1 | Roofdeck |
| Cali Bar Chair | 12 | Roofdeck |
| 84" ALUMINUM FRAME SOFA \| charcoal | 2 | Roofdeck |
| Iron Coffee Table \| Black Frame | 1 | Roofdeck |
| Outdoor U Side Table \| charcoal | 6 | Roofdeck |
| Outdoor Yun Armless \| Sunbrella White | 0 | Roofdeck |
| Outdoor Yun Corner \| Sunbrella White | 10 | Roofdeck |
| 12'x 7' \| Cabana \| Natural | 5 | Roofdeck |
| Outdoor U Side Table \| White | 5 | Roofdeck |
| | | |
| Titus Outdoor \| Right End \| Light Grey | 2 | Outdoor Living |
| Titus Outdoor \| Left End \| Light Grey | 2 | Outdoor Living |
| Titus Outdoor \| Ottoman \| Light Grey | 2 | Outdoor Living |
| Titus Outdoor \| Armless \| Light Grey | 5 | Outdoor Living |
| | | |
| Wen Dining Chair \| Charcoal | 8 | Outdoor Pool |
| Eloise Aluminus Outdoor Table | 1 | Outdoor Pool |
| Aston Chaise | 8 | Outdoor Pool |
| Double Aston Cord Daybed \| Khaki | 4 | Outdoor Pool |
| | | |
| Titus Outdoor \| Right End \| Light Grey | 2 | Covered BBQ |
| Titus Outdoor \| Left End \| Light Grey | 2 | Covered BBQ |
| Titus Outdoor \| Ottoman \| Light Grey | 2 | Covered BBQ |
| Titus Outdoor \| Armless \| Light Grey | 5 | Covered BBQ |
| Fox Dining Chairs | 12 | Covered BBQ |
| 15' Aluminum Outdoor Bar Table | 1 | Covered BBQ |
| Fox Dining Chairs | 6 | Covered BBQ |
| | | |
| Mini Sofa \| Pied De Poule/LP911-4 | 3 | Car Viewing Entrance |
| Barrera Metal Console \| Matte Black \| White | 2 | Car Viewing Entrance |
| Entry Table \| Stainless | 1 | Car Viewing Entrance |
| | | |
| Zielle Dining Chairs | 10 | Lower Level Dining |
| Jonna Ceramic Table | 1 | Lower Level Dining |
| | | |
| Accessories | Accessories | Gym |
| | | |
| Liana Chaise,White | 6 | Indoor Pool |
| Aluminum Coffee Table | 4 | Indoor Pool |
| | | |
| Eomer Hive Coffee Table \| Black Lacquer | 2 | Bowling Alley Viewing |
| | | |
| Sophus Stool | 20 | Nightclub |
| Greystone Piece \| Dresden Charcoal #1 | 10 | Nightclub |
| Greystone Piece \| Dresden Charcoal #2 | 5 | Nightclub |
| Greystone Piece \| Dresden Charcoal #3 | 8 | Nightclub |
| Greystone Piece \| Dresden Charcoal #4 | 9 | Nightclub |

| Piece Name | Quantity | Location |
|---|---|---|
| Greystone Piece \| Dresden Glacier #1 | 9 | Nightclub |
| Greystone Piece \| Dresden Glacier #2 | 6 | Nightclub |
| Greystone Piece \| Dresden Glacier #3 | 7 | Nightclub |
| Greystone Piece \| Dresden Glacier #4 | 8 | Nightclub |
| Sylvan Side Table \| Grey | 2 | Nightclub |
| Sylvan Side Table \| Blue | 4 | Nightclub |
| Sylvan Side Table \| Pink | 4 | Nightclub |
| Sylvan Side Table \| Yellow | 4 | Nightclub |
| Sylvan Coffee Table \| Pink | 2 | Nightclub |
| Sylvan Coffee Table \| Yellow | 2 | Nightclub |
| Sylvan Coffee Table \| Grey | 1 | Nightclub |
| Sylvan Coffee Table \| Blue | 2 | Nightclub |
| | | |
| Mini Sofa \| Pied De Poule/LP911-4 | 1 | Other |
| X Bench \| Pink Velvet | 1 | Other |
| Plank Mirror \| Black (Recolor) | 1 | Other |
| BY1759 \| 40" x 60" \| Black | 1 | Other |
| BY1665 \| 50" x 50" \| Dark Wood | 1 | Other |
| All real and fake plants in property | TBD | Other |
| Art books | 150 | Other |
| Crystals | 35 | |
| All small items / accessories in property | TBD | Other |
| Cigar boxes | TBD | Other |

# Exhibit 5



THE ONE COLLECTION



Creative
Art Partners



Kenneth Alme
*Untitled*, 2014
Oil, acrylic and primer on cotton canvas
78.74h x 62.99w in
200h x 160w cm
Unique
KAL14MAY.4



Creative
Art Partners

Jennifer Boysen
*Untitled*, 2016
Tempera on canvas
80h x 60w x 9d in
203.20h x 152.40w x 22.86d cm
JBo18.07.03



C A
P

Creative
Art Partners



Matthew Chambers
*That youthful expectation of expanse*, 2017
Acrylic, enamel based adhesive and nylon flocking on canvas
96h x 48w in
243.84h x 121.92w cm
MCh18.10.15

CAP Creative Art Partners

Petra Cortright
*celexa_fujixerox +gifts+government+/jackass*, 2018
Digital triptych painting on anodized aluminum
111h x 180w in
281.94h x 457.20w cm
Unique
PC18.05.71

C A
P

Creative
Art Partners



Petra Cortright
*10 year_braxton contractions_divine comedy*, 2018
Digital painting on anodized aluminium
60h x 118w in
152.40h x 299.72w cm
Unique
PC18.05.41

C A P Creative Art Partners

José Diaz
*P.O.V.*, 2017
Oil on Linen
75.59h x 59.84w in
192h x 152w cm
JoD17.12.04



C A
P

Creative
Art Partners

Luke Diiorio
*Untitled*, 2019
Oil on linen
41.50h x 40w in
105.41h x 101.60w cm
Unique
LDi19.11.02



C A
P

Creative
Art Partners



Ryan Estep
*Sterilized Dirt AA13*, 2014
Sterilized dirt on canvas
84h x 60w in
213.36h x 152.40w cm
RE13NOV.13-RE14APR.13



C A
P

Creative
Art Partners



Marc Horowitz
*PSLLL*, 2020
Flashe, gouache, and emulsified gesso on linen/canvas blend over aluminium strainer
99h x 6.50w x 1.50d in
251.46h x 16.51w x 3.81d cm
Unique
MHo20.04a.07



C A
P

Creative
Art Partners

Tiziano Martini
*Untitled*, 2015
Acrylic and acrylic sediments on canvas, artist frame
79.53h x 55.91w in
202h x 142w cm
Unique
TMa15OCT.04

creativeartpartners.com info@creativeartpartners.com @creativeartpartners

218

C A
P
Creative
Art Partners

Tiziano Martini
*Untitled*, 2015
Acrylic, acrylic sediments and dirt from the studio floor on primed cotton, painted artist frame
83.46h x 59.84w in
212h x 152w cm
Unique
TMa15OCT.03



Creative
Art Partners

Tiziano Martini
*Untitled*, 2015
Acrylic, acrylic sediments and dirt from the studio on canvas, artist frame
79.13h x 55.51w in
201h x 141w cm
Unique
TMa15DEC.09

C A
P

Creative
Art Partners



Tiziano Martini
*Untitled*, 2016
Acrylic, monotype process and dirt from the studio on primer on cotton canvas
84h x 61w in
213.36h x 154.94w cm
Unique
TMa16FEB.07



Creative
Art Partners



Morgan-Richard Murphey
*Untitled (Grey Ratchet Clamp #1)*, 2014
Acrylic and ratchet clamp on canvas with customised aluminium stretcher bars
63h x 46w x 2d in
160.02h x 116.84w x 5.08d cm
MRM13SEP.02-MRM14JAN.02

C A P Creative Art Partners

Morgan-Richard Murphey
*Untitled (Black Ratchet Clamp #10)*, 2014
Acrylic and ratchet clamp on canvas with customised aluminium stretcher bars
63h x 46w x 2d in
160.02h x 116.84w x 5.08d cm
MRM13NOV.23-MRM14JANa.23

creativeartpartners.com info@creativeartpartners.com @creativeartpartners

223



Creative
Art Partners

Morgan-Richard Murphey
*Untitled (Raw Ratchet Clamp #2)*, 2014
Acrylic and ratchet clamp on canvas with customised aluminium stretcher bars
63h x 46w x 2d in
160.02h x 116.84w x 5.08d cm
MRM13NOV.01-MRM14JANa.01



Creative
Art Partners

Morgan-Richard Murphey
*Untitled (Grey Ratchet Clamp #2)*, 2014
Acrylic and ratchet clamp on canvas with customised aluminium stretcher bars
63h x 46w x 2d in
160.02h x 116.84w x 5.08d cm
MRM13SEP.06-MRM14JAN.06



C A
P

Creative
Art Partners

Morgan-Richard Murphey
*Untitled (Black Ratchet Clamp #9)*, 2014
Acrylic and ratchet clamp on canvas with customised aluminium stretcher bars
63h x 46w x 2d in
160.02h x 116.84w x 5.08d cm
MRM13NOV.21-MRM14JANa.21

creativeartpartners.com info@creativeartpartners.com @creativeartpartners

226



C A
P

Creative
Art Partners



Cameron Platter
*Untitled (One Love_02)*, 2017
Charcoal on Paper
35h x 25w in
88.90h x 63.50w cm
CP17.06.122



Main Document Page 234 of 373

C A
P

Creative
Art Partners

Cameron Platter
*Untitled (Private number_16)*, 2017
Charcoal on Paper
35h x 25w in
88.90h x 63.50w cm
CP17.06.160

creativeartpartners.com info@creativeartpartners.com @creativeartpartners

228



Main Document Page 235 of 373

C A
P

Creative
Art Partners

Cameron Platter
*Untitled (Grid#19)*, 2018
Charcoal on paper
37.75h x 27.13w in
95.89h x 68.90w cm
Unique
CP18.04.188

creativeartpartners.com info@creativeartpartners.com @creativeartpartners

229



Creative
Art Partners

Cameron Platter
*Untitled (Grid#19)*, 2018
Charcoal on paper
37.75h x 27.13w in
95.89h x 68.90w cm
Unique
CP18.04.189

C A
P

Creative
Art Partners



Cameron Platter
*Untitled (No_1)*, 2017
Charcoal on Paper
35h x 25w in
88.90h x 63.50w cm
CP17.06.097



C A
P

Creative
Art Partners

Leif Ritchey
*Red Dirt Wine*, 2013
Acrylic on Canvas
83.50h x 72w in
212.09h x 182.88w cm
LR13OCT.10-LR14MAR.03

creativeartpartners.com info@creativeartpartners.com @creativeartpartners

232



Creative
Art Partners



Ammon Rost
*I'm on your side #1*, 2018
Oil, flashe, pastel, air brush on canvas
96h x 78w in
243.84h x 198.12w cm
Unique
ARo18.09.02

# Exhibit 6

4:06 PM
10/19/21
Cash Basis

# Airole
## Profit & Loss
### July through September 2021

| | Sep 21 | TOTAL |
|---|---|---|
| **Income** | | |
| **Property Rental** | | |
| **NARS** | 132,000.00 | 132,000.00 |
| **Universal** | 210,000.00 | 210,000.00 |
| **Total Property Rental** | 342,000.00 | 342,000.00 |
| **Receivership Certificates** | 0.00 | 827,745.00 |
| **Total Income** | 342,000.00 | 1,169,745.00 |
| **Expense** | | |
| **Construction** | | |
| **AV** | 0.00 | 40,000.00 |
| **CAD Stone Works** | 20,000.00 | 20,000.00 |
| **CalGrove** | 0.00 | 12,338.95 |
| **Electrical** | 0.00 | 27,132.48 |
| **ILG** | 0.00 | 224,300.00 |
| **Midland** | 0.00 | 50,000.00 |
| **Stone Care** | 0.00 | 6,875.00 |
| **Subcontractor** | 2,730.00 | 2,730.00 |
| **Waterproofing** | 0.00 | 9,875.00 |
| **Total Construction** | 22,730.00 | 393,251.43 |
| **Management Fees** | 42,518.34 | 42,518.34 |
| **Miscellaneous** | 600.00 | 3,064.41 |
| **Professional Fees** | | |
| **Bond Services** | 0.00 | 1,000.00 |
| **Forensics** | 15,747.25 | 15,747.25 |
| **Insurance** | 342.81 | 10,835.10 |
| **Litigation Support** | 694.20 | 694.20 |
| **Total Professional Fees** | 16,784.26 | 28,276.55 |
| **Receivership Expenses** | | |
| **Banking Fees** | 399.80 | 489.80 |
| **LMS** | 0.00 | 35,063.00 |
| **Total Receivership Expenses** | 399.80 | 35,552.80 |
| **Security** | 43,925.00 | 75,437.50 |
| **Site Services** | | |
| **Carpenter** | 4,450.00 | 12,530.00 |
| **Furn Rental** | 44,162.50 | 58,945.00 |
| **Housekeeping** | 2,125.00 | 5,425.00 |
| **Misc** | 900.00 | 2,410.00 |
| **Plumbing** | 3,000.00 | 3,000.00 |
| **Pool** | 5,924.26 | 14,430.13 |
| **Project Mgmt** | 2,000.00 | 39,874.20 |
| **Project Mgmt - Prior** | 0.00 | 48,517.57 |
| **Total Site Services** | 62,561.76 | 185,131.90 |
| **Utilities** | 22,168.24 | 54,723.50 |
| **Total Expense** | 211,687.40 | 817,956.43 |
| **Net Income** | **130,312.60** | **351,788.57** |

# Exhibit 7

# STANDARD PROMISSORY NOTE

**1. THE PARTIES.** On July 19,2021, Rd. Nile Niami acting on his personal behalf, referred to as the "Borrower",

**HAS RECEIVEDAND PROMISES TO PAY:**

Michael Pyle LLC dba Centurion LV of 13932 Arrow Creek Rd, Draper, Utah, 84020 with Michael Pyle acting as President, referred to as the "Lender", the sum of $300,000.00 US Dollars, referred to as the "Borrowed Money", with interest accruing on the unpaid balance at a rate of 10 percent (%) per annum, referred to as the "Interest Rate", beginning on July 19, 2021 under the following terms and conditions:

**2. PAYMENTS.** The full balance of this Note, including any accrued interest, is due and payable from escrow of 944 Airole Way referred to as the "Due Date". The Borrowed Money shall be paid at any time as long as it is on or before the Due Date.

Borrower agrees to pay this note .This note cancels all indebtedness due Michael Pyle LLC dba Centurion LV for all work done on any property connected with Borrower except for the property at 944 Airole Way.

**3. SECURITY.** This note shall be secured under the following:

Personal Guarantee

**4. INTEREST DUE IN THE EVENT OF DEFAULT.** In the event the Borrower fails to pay the note in full on the Due Date, the unpaid principal shall accrue interest at the maximum rate allowed by law until the Borrower is no longer in default.

**5. ALLOCATION OF PAYMENTS.** Payments shall be first credited to interest due and any remainder will be credited to principal.

**6. PREPAYMENT.** Borrower may prepay this Note without penalty.

**7. ACCELERATION.** If the Borrower is in default under this Note or is in default under another provision of this Note, and such default is not cured within the minimum allotted time by law after written notice of such default, then Lender may, at its option, declare all outstanding sums owed on this Note to be immediately due and payable.



This includes rights of possession to the Security mentioned in Section 3.

**8. ATTORNEYS' FEES AND COSTS.** Borrower shall pay all costs incurred by Lender in collecting sums due under this Note after a default, including reasonable attorneys' fees. If Lender or Borrower sues to enforce this Note or obtain a declaration of its rights hereunder, the prevailing party in any such proceeding shall be entitled to recover its reasonable attorneys' fees and costs incurred in the proceeding (including those incurred in any bankruptcy proceeding or appeal) from the non-prevailing party.

**9. WAIVER OF PRESENTMENTS.** Borrower waives presentment for payment, notice of dishonor, protest and notice of protest.

**10. NON-WAIVER.** No failure or delay by Lender in exercising Lender's rights under this Note shall be considered a waiver of such rights.

**11. SEVERABILITY.** In the event that any provision herein is determined to be void or unenforceable for any reason, such determination shall not affect the validity or enforceability of any other provision, all of which shall remain in full force and effect.

**12. INTEGRATION.** There are no verbal or other agreements which modify or affect the terms of this Note. This Note may not be modified or amended except by a written agreement signed by Borrower and Lender.

**13. CONFLICTING TERMS.** The terms of this Note shall have authority and precedence over any conflicting terms in any referenced agreement or document.

**14. NOTICE.** Any notices required or permitted to be given hereunder shall be given in writing and shall be delivered (a) in person, (b) by certified mail, postage prepaid, return receipt requested, (c) by facsimile, or (d) by a commercial overnight courier that guarantees next day delivery and provides a receipt, and such notices shall be made to the parties at the addresses listed below.

**15. GUARANTORS.** Nile Niami, referred to as the "Guarantor", agrees to the liabilities and obligations on behalf of the Borrower under the terms of this Note. If the Borrower does not make payment, the Guarantor shall be personally responsible and is guaranteeing the payment of the principal and all accrued interest under the terms of this Note.

**16. EXECUTION.** The Borrower executes this Note as a principal and not as a surety. If there is a Co-Signer, the Borrower and Co-Signer shall be jointly and severally liable under this Note.

**17. GOVERNING LAW.** This note shall be governed under the laws in the State of California.

With my signature below, I affirm that I have read and understand this promissory note.

**Borrower's Signature** ______________________________
Nile Niami

**Lender's Signature** ______________________________
Michael Pyle LLC dba Centurion LV with Michael Pyle acting as President

**Guarantor's Signature** ______________________________
Nile Niami

# Exhibit 8

# AMENDED AND RESTATED PROMISSORY NOTE

$434,235.00

April 2, 2021
Los Angeles, California

**THIS AMENDED AND RESTATED PROMISSORY NOTE** (this "Note") is made as of April 2, 2021 by **CARCASSONNE FINE HOMES, LLC,** a California Limited Liability Company (hereinafter "**CARCASSONNE**"), and **CRESTLLOYD, LLC,** a California Limited Liability Company (hereinafter "**CRESTLLOYD**", collectively "Debtors"), both having an address at 8981 W. Sunset Blvd., #303, West Hollywood, CA 90069 to and in favor of **C.G.S. CUSTOM GLASS SPECIALISTS, INC.**, a California Corporation (hereinafter "C.G.S. or Creditor"), with an address of 4536 Ish Drive, Simi Valley, CA 93063.

WHEREAS, CARCASSONNE and C.G.S. previously entered into an agreement, pursuant to which CARCASSONNE executed a Promissory Note in the original principal amount of Three Hundred Eighty-Nine Thousand Nine Hundred Four Dollars ($389,904.00) in favor of C.G.S., dated as of June 1, 2016 (the "Original Note" incorporated by reference herein);

CARCASSONNE and C.G.S. acknowledged in the Original Note in pertinent part:

That they had entered into a construction contract (Contract #9415 dated May 31, 2016, for work at 627 Carcassonne Road, Los Angeles, California 90077. Contract #9415 was in the amount of One Million One Hundred Eighty-Nine Thousand Nine Hundred Four Dollars ($1,189,904.00) which was later increased to $1,234,235.00;

CARCASSONNE acknowledged that it was unable to obtain construction funding to pay C.G.S. all monies owed under Contract #9415;

CARCASSONNE acknowledged that it would pay C.G.S. Eight Hundred Thousand Dollars ($800,000.00) under Contract #9415, and the remaining Three Hundred Eighty-Nine Thousand Nine Hundred Four Dollars ($389,904.00) will be paid in conformance with the Original Note;

CARCASSONNE also acknowledged and represented that it was the lawful owner of real property located at 627 Carcassonne Road, Los Angeles, California 90077. Further CRESTLLOYD acknowledged and represented that it is the lawful owner of real property located at 944 Airole Way, Los Angeles, California 90077;

CARCASSONNE represented to C.G.S. that it had the lawful right to place either of these real properties for sale, without limitation;

CARCASSONNE acknowledged that it will pay to C.G.S. all monies owed under the Original Note upon the sale of the property located at 627 Carcassonne Road, Los Angeles, California 90077, which was the property being constructed under Contract #9415 or the sale of 944 Airole Way, Los Angeles, California 90077 whichever property is sold first.

WHEREAS, the Parties hereto wish to revise and amend the Original Note by, *inter alia*,

replacing the property located at 627 Carcassonne Road, Los Angeles, California 90077 with real property located at 944 Airole Way, Los Angeles, California 90077, which is owned by CRESTLLOYD.

**NOW, THEREFORE, FOR VALUE RECEIVED**, the undersigned Debtors unconditionally promise to pay to the order of Creditor, without any counterclaim, setoff or deduction whatsoever, in lawful money of the United States of America, the principal sum of Four Hundred Thirty-Four Thousand Two Hundred Thirty-Five Dollars ($434,235.00) on the unpaid balance of the Original Note, as follows:

1. Maturity. All obligations of Debtors to Creditor, including payment of outstanding principal, interest and all other amounts due under this Promissory Note, shall become due and payable in full upon the close of escrow for the sale of either: (A) that certain real property commonly referred to as 944 Airole Way, Los Angeles, California 90077 (the "Airole Way Property").

2. Interest Rate. The unpaid principal of this Promissory Note shall bear simple interest from the date of the sale of either of the Properties at the rate of seven point seven five percent (7.75%) per annum, or the maximum amount of interest allowed under the laws of the State of California, whichever is less. Interest shall be calculated based on the principal balance outstanding under this Promissory Note as may be adjusted from time to time to reflect the prepayment of outstanding principal and interest. Interest shall not be due and payable until such time as the principal balance of this Note becomes due and payable pursuant to Section 1. Interest not paid when due shall be added to the unpaid principal sum and shall thereafter bear interest at the same rate as the principal sum. All payments hereunder are to be applied first to the payment of accrued and unpaid interest, then to the principal sum.

3. Payment. Upon maturity, all payments shall be paid to C.G.S. Custom Glass Specialists, Inc., 4536 Ish Drive, Simi Valley, California 93063, Attn: Accounts Receivable Department.

4. Representations and Warranties. Debtors represent and warrant that:

    a. The execution, delivery and performance of this Promissory Note are within Debtors' authority, and are not in contravention of any law nor of the terms of Debtors' operating agreement, nor of any indenture, agreement or undertaking to which the Debtors are a party or by which they are bound.

    b. Debtors are the lawful owners of the Properties (as set forth above), and have good, clear, and marketable title thereto.

    c. Debtors have the lawful right to place either of these Properties for sale, without limitation.

    d. Debtors agree not to create or incur or suffer to be incurred or to exist, any mortgage, pledge, security interest, encumbrance, lien or charge of any kind, superior to any such mortgage, pledge, security interest, encumbrance, lien or charge of any kind created by this Promissory Note upon the Properties or upon any income or proceeds therefrom.

e. Debtors will execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts, documents, deeds, conveyances, mortgages, assignments, transfers and assurances as may be necessary or desirable or as the Creditor reasonably may require for the completion of the transactions contemplated by this Promissory Note, including the perfection of the lien being herein provided for in the Properties.

f. Debtors shall notify Creditor, as soon as practicable, but in any event within three weeks, of the closing date and the material terms of the sale of the Properties and the Escrow Company (including the name, address, Escrow Officer, phone number and file number) handling the sale.

5. Security Interests. It is further understood that this Promissory Note is secured by a personal guarantee from Nile Niami, in substantially the form attached hereto as **Exhibit A**.

6. Usury. All agreements between Debtors and Creditor are expressly limited, so that in no event or contingency shall the amount paid or agreed to be paid to Creditor for the use, forbearance, or retention of the money advanced under this Promissory Note exceed the highest lawful rate permissible under applicable usury laws. If, under any circumstances, fulfillment of any provision of this Promissory Note or any other agreement pertaining to this Promissory Note, after timely performance of such provision is due, shall involve exceeding the limit of validity prescribed by law that a court of competent jurisdiction deems applicable, then, ipso facto, the obligations to be fulfilled shall be reduced to the limit of such validity. If, under any circumstances, Creditor shall ever receive as interest an amount that exceeds the highest lawful rate, the amount that would be excessive interest shall be applied to reduce the unpaid principal balance under this Note and not to pay interest, or, if such excessive interest exceeds the unpaid principal balance under this Promissory Note, such excess shall be refunded to Debtors. This provision shall control every other provision of all agreements between Debtors and Creditor.

7. Remedies Cumulative. All of the rights, remedies, powers and privileges (together, "Rights") of the Creditor hereof provided for in this Promissory Note and in any other Contract Documents are cumulative of each other and of any and all other Rights at law or in equity. The resort to any Right shall not prevent the concurrent or subsequent employment of any other appropriate Right. No single or partial exercise of any Right shall exhaust it, or preclude any other or further exercise thereof, and every Right may be exercised at any time and from time to time. No failure by the Creditor hereof to exercise,

or delay in exercising any Right shall be construed as a waiver of any default or as a waiver of the Right. Without limiting the generality of the foregoing provision, the acceptance by the Creditor hereof of any payment under this Promissory Note which is past due or which is less than the payment in full of all amounts due and payable at the time of such payment, shall not (a) constitute a waiver of or impair or extinguish the right of the Creditor to exercise any other Right at the time or at any subsequent time, or nullify any prior exercise of any such Right, or (b) constitute a waiver of the requirement of punctual payment and performance, or a novation in any respect. If the Creditor retains an attorney in connection with any default or at the time Debtors owe the final payment to collect, enforce or defend this Promissory Note or any other Contract Document in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Debtors sue the Creditor in connection with this Promissory Note or any other Contract Document and does not prevail, then Debtors agree to pay to the Creditor, in addition to principal and interest, all reasonable costs and expenses incurred by the Creditor in trying to collect this Promissory Note or in any such suit or proceeding, including reasonable attorneys' fees.

8. Construction; Integration. Captions and headings used in this Promissory Note are for convenience only and shall not be used in the interpretation hereof. This Promissory Note shall be construed fairly in accordance with its true meaning and not strictly for or against either party hereto. This Promissory Note shall not be construed, nor is it intended, to be for the benefit of any third party. In this Promissory Note, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural. Together with the other Contract Documents, this Promissory Note sets out the entire agreement of the parties hereto and may not be modified or amended except in writing executed by Debtors and Creditor. Any capitalized phrase used herein that is not defined shall assume the meaning assigned in the Original Note.

9. Submission to Jurisdiction. DEBTORS VOLUNTARILY (a) SUBMIT TO PERSONAL JURISDICTION IN CALIFORNIA OVER ANY ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS PROMISSORY NOTE OR ANY OTHER CONTRACT DOCUMENT, (b) AGREE THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN THE SUPERIOR COURT FOR THE COUNTY OF LOS ANGELES (c) SUBMIT TO THE JURISDICTION OF SUCH COURT, AND (d) AGREE THAT THEY WILL NOT BRING ANY ACTION OR PROCEEDING IN ANY OTHER FORUM.

10. Joint and Several Obligations. The liability of Debtors hereunder shall be primary, direct, joint, and several. The liability of Debtors shall not be adversely affected by (a) modification, extension, renewal, substitution or replacement of this Promissory Note and any of the other Contract Documents; (b) the extension of additional credit separate from this transaction by the Creditor; (c) the surrender, release, renewal, extension, sale exchange, or other disposition of all or any part of the collateral identified in this Promissory Note or the acceptance of any additional or substituted collateral for this

Promissory Note; (d) any extension of time or any other indulgence granted by the Creditor under this Promissory Note or any of the other Contract Documents; (e) any failure or delay by Creditor in attempting to enforce any of its rights or remedies under this Promissory Note or other Contract Documents; (f) Creditor's proceeding against fewer than all parties liable under this Promissory Note; (g) Creditor's release, settlement, or compromise of its claim against any other party liable on this Promissory Note; or (h) the occurrence of any other event which might otherwise operate as a discharge under principles of suretyship. Each Debtor waives all rights to seek contribution, indemnification, or other form of reimbursement from the other Debtors or any other person liable under this Promissory Note, including any rights of subrogation to the rights of Creditor until the date that is one (1) year and one (1) day from the date the Promissory Note is paid in full. In the event any payment on this Promissory Note is held to constitute a preference under the bankruptcy laws, the liability of each Debtor shall automatically be revived to the full extent of such payment.

11. Validity. Any term or provision of this Promissory Note which is unenforceable, invalid, or contrary to law, or the inclusion of which would affect the validity, legality or enforcement of this Promissory Note shall be of no effect, and in such case, all the remaining terms and provisions of this Promissory Note shall subsist and shall be fully effective according to the terms of this Promissory Note, the same as though any such provision had not been included herein, provided that where the provisions of any such applicable law may be waived, they hereby are waived by Debtors to the full extent permitted by law in order that this Promissory Note shall be deemed to be a valid and binding Promissory Note in accordance with its terms.

12. Consulting with an Attorney. Debtors hereby represent and warrant to the Creditor hereof that Debtors have had the opportunity to consult and confer with competent legal counsel of its choice before executing this Promissory Note. Debtors further represent and warrant to the holder hereof that Debtors have read and understand the terms of this Promissory Note and intend to be bound hereby.

13. Governing Law. This Promissory Note shall be construed in accordance with and governed by the laws of the State of California.

[NO FURTHER TEXT ON THIS PAGE; SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, this Promissory Note is executed as of the above date.

**DEBTOR:**

**CARCASSONNE FINE HOMES, LLC**

By: ______________________________
Nile Niami, Managing Member

**DEBTOR:**

**CRESTLLOYD, LLC**

By: ______________________________
Nile Niami, Managing Member

**CREDITOR:**

**C.G.S. CUSTOM GLASS SPECIALISTS, INC.**

By: ______________________________
Tom Yang, President

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of LOS ANGELES )

On APRIL 7, 2021 before me, MAGDA CORBIN, NOTARY PUBLIC
(insert name and title of the officer)

personally appeared NILE NIAMI,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

MAGDA CORBIN
Notary Public - California
Los Angeles County
Commission # 2286262
My Comm. Expires May 21, 2023

Signature [signature] **(Seal)**



**Exhibit A**

**PERSONAL GUARANTEE**

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of C.G.S. Custom Glass Specialists, Inc. ("C.G.S.") having made loans in connection with the Promissory Note, dated as of April 2, 2021 (the "Note"), in the amount of Four Hundred Thirty-Four Thousand Two Hundred Thirty-Five Dollars ($434,235.00) for the benefit of Carcassonne Fine Homes, LLC ("Carcassonne") and Crestlloyd, LLC ("Crestlloyd") (collectively, "the Companies"), however such loans may be made or evidenced, the undersigned, Nile Niami (the "Guarantor"), does hereby unconditionally guarantee to C.G.S., its successors and assigns, full and prompt payment and performance of all present and future obligations of the Companies to C.G.S. under the Note including all renewals and extensions thereof or substitutions therefor. The Guarantor also agrees to pay in addition thereto all costs, expenses and reasonable attorney's fees at any time paid or incurred by C.G.S. in endeavoring to enforce this Guarantee.

Notice of acceptance of and action taken by C.G.S. from time to time under this Guarantee are hereby waived and this Guarantee shall operate as a continuing, absolute and irrevocable Guarantee covering all obligations of the Companies to C.G.S. now existing or hereafter arising.

Upon any default by the Companies with respect to any of the obligations herein guaranteed, the liability of the Guarantor hereunder shall be deemed to have become immediately due and payable, without demand, presentment, protest or notice of any kind, all of which are hereby waived, and without any suit or action against the Companies or the Guarantor and without further steps to be taken or further conditions to be performed by C.G.S. or anyone. Failure of C.G.S. to make any demand or otherwise to proceed against the Guarantor in respect to any default by the Companies or the Guarantor, or any delay by C.G.S. in doing so, shall not constitute a waiver of any C.G.S. right to proceed in respect to any or all other defaults by the Companies or the Guarantor.

The liability of the Guarantor is primary and shall not be terminated or otherwise affected or impaired by, and the Guarantor waives notice of, any granting time by C.G.S. to the Companies (regardless of the number of length of such grant of time) or any other indulgence or indulgences granted by C.G.S. to the Companies; C.G.S. heretofore, now or hereafter acquiring, releasing or in any way modifying any guarantee from any other person or persons or any collateral or other security in whatever form for any of the obligations hereby guaranteed, whether or not notice thereof shall have been or be given to the Guarantor; any failure on the part of C.G.S. to take any action with respect to, or to realize upon any security, rights, endorsements or guaranties which C.G.S. may now or hereafter hold with respect to any obligation hereby guaranteed, including without limitation rights against the Companies; any alterations, waivers, extensions, renewals or modifications of any such obligation to which C.G.S. may agree from time to time; any invalidity or unenforceability of any of the obligations guaranteed hereby; any

change in the membership of any partnership which shall be the Companies; any fraud, illegal or improper acts of the Companies; any relief of the Companies with respect to their obligations to C.G.S. because of any right of set-off, deduction or defense of any kind or otherwise; any other defenses which might constitute a legal or equitable discharge of a surety or guarantor; the failure of C.G.S. to perfect any lien securing any Companies obligations or the obligations of other parties, including any other guarantors; voluntary or involuntary bankruptcy (including a reorganization in bankruptcy) of the Companies or entry of an order for relief against or with respect to the Companies under any applicable bankruptcy or like laws; composition, extension, moratoria or other forms of debtor relief granted to the Companies pursuant to law presently in force or hereafter enacted; payment of any or all obligations and indebtedness of the Companies in the event such payment is invalidated or avoided by a trustee, custodian or receiver of the Companies; the dissolution of the Companies; or the reorganization, merger or consolidation of the Companies into or with another entity, corporate or otherwise, or the sale or disposition of all or substantially all of the capital stock, business or assets of the Companies to any other person or party. The Guarantor further waives all suretyship defenses and defenses in the nature thereof; any right or claim to right to cause a marshalling of the guarantors before enforcing this guaranty; any right of subrogation to any C.G.S. rights against the Companies and any right of reimbursement, indemnity, contribution, exoneration and the like now or hereafter accorded by law to indemnitors, guarantors, sureties or accommodation parties, provided that such waiver shall not be effective to the extent that by virtue of such waiver the liability of the Guarantor is rendered invalid, avoidable or unenforceable under any applicable law dealing with the recovery of avoidance of so-called fraudulent conveyances or otherwise.

This Guarantee shall be binding upon the heirs, personal representatives and assigns of any individual guarantor, and upon the successors of any other guarantor. The death of any individual guarantor shall not relieve his (her) estate from any liability or obligation accruing prior to such death, nor accruing prior to expiration of five days following the receipt of notice by C.G.S. of such death.

If and as long as there is more than one guarantor of any of the obligations of the Companies to C.G.S., now existing or hereafter arising, the liability of the Guarantor shall be joint and several with any such other guarantor(s), and the continuation of this Guarantee as to the Guarantor shall not be affected by the termination; discontinuance, release or modification thereof as to any other guarantor, including without limitation, termination because of the death of any individual guarantor.

For the purposes of this Guaranty, the term "obligations" shall mean and include, without limitation, the payment and performance of all loans, indebtedness, notes, liabilities (including, without limitation, any Companies written agreements with C.G.S.) and amounts, liquidated or unliquidated, owing by the Companies to C.G.S. at any time, each of every kind, nature and description, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by the Companies to C.G.S.; or are due indirectly by the Companies to C.G.S. as endorser or guarantor, or as obligor of obligations due to third persons, firms, or corporation which have been endorsed or assigned to C.G.S.; or otherwise), absolute or contingent, due or to

become due, now existing or hereafter contracted. Said term shall also include all interests, charges, costs and expenses (including reasonable attorney's fees) now due or that may hereafter become due from the Companies to C.G.S. from time to time.

This Guarantee shall be governed by and construed in accordance with the laws of the State of California without reference to the conflicts of law provisions thereof. The invalidity or unenforceability of any provision hereof shall not limit the validity or enforceability of any other provision hereof. This Guarantee may not be amended except by an instrument in writing signed by the party to be charged.

April 2, 2021

By: __________________________
Nile Niami

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of LOS ANGELES )

On APRIL 7, 2021 before me, MAGDA CORBIN, NOTARY PUBLIC
(insert name and title of the officer)

personally appeared NILE NIAMI,
who proved to me on the basis of satisfactory evidence to be the person~~(s)~~ whose name~~(s)~~ is/~~are~~ subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity~~(ies)~~, and that by his/~~her/their~~ signature~~(s)~~ on the instrument the person~~(s)~~, or the entity upon behalf of which the person~~(s)~~ acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

MAGDA CORBIN
Notary Public - California
Los Angeles County
Commission # 2286262
My Comm. Expires May 21, 2023

Signature [signature] (Seal)



# Exhibit 9

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Stanley Mosk Courthouse, Department 86

**21STCV24076**
**YOGI SECURITIES HOLDINGS, LLC, A NEVADA LIMITED LIABILITY COMPANY vs HANKEY CAPITAL, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, et al.**

October 8, 2021
8:30 AM

Judge: Honorable Mitchell L. Beckloff
Judicial Assistant: F. Becerra
Courtroom Assistant: C. Del Rio

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Mark J Rosenbaum (Telephonic)

For Defendant(s): No Appearances

Other Appearance Notes: For Defendant: Neil Erickson (Telephonic); Jessica S. Wellington and Jeremy Fortier (Telephonic)

**NATURE OF PROCEEDINGS:** Hearing on Plaintiff Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction to Enjoin Foreclosure Sale or in the Alternative to Shorten Time on a Hearing for Motion for Preliminary Injunction

The matter is called for hearing.

The Court, after reading and considering all moving party and opposing party papers, and arguments of counsel, makes the following ruling:

After a lengthy discussion with the parties, the court orders limited relief on the application:

Hankey shall delay its non-judicial foreclosure sale for two weeks—from October 13, 2021 to October 27, 2021 (at the same time of day).

Hankey shall provide Yogi with a statement setting forth the amount due on the original obligation ($82.5M) plus interest due and any other charges related to the original obligation by October 13, 2021 at 5 p.m.

Parties should meet and confer to attempt resolution after Hankey has provided the statement.

The court sets no further hearing in this matter.

Notice is deemed waived.

# Exhibit 10

**From:** **Jonathan Axel** jaxel@libertycompany.com
**Subject:** Property Insurance on 944 Airole Way
**Date:** September 22, 2021 at 10:03 AM
**To:** Ted Lanes tl@lanesmgmt.com
**Cc:** Michael Lohbrunner michael.lohbrunner@amwins.com

Dear Ted
Per our conference call late yesterday this is just a recap:

1. Over 30 insurance companies have been approached including leading markets in the US, London and Bermuda. All markets are being approached by AmWins – the largest property placement company in the world.
2. Delays have been caused from prior multiple insurance brokers attempting to get quotes from the insurance companies with different information and values on the home which has caused confusion and reputational issues. After submitting the letter for our authorization, significant amount of communication and now public information the markets have begun to respond and we are now moving forward with many of them in determining their ability to offer coverage.
3. Costs of the program will be significant due to the value of the residence and more importantly the brush fire hazards represented in that area.
4. Additional challenge is finding the right insurance carriers as the standard homeowners insurance market has limited to no capacity in this area and the homes value is significantly higher than their ability to offer coverage. The commercial market which could easily manage the capacity is also challenged because this is a single family residence, the concentration of values in one location and the brush fire exposure.
5. We have secured primary terms from at least one market and others are expected to sign on and we are now in the process of building upon the primary layer. We hope to have much more movement this week – but we are also up against one of the busiest times in the insurance industry so it maybe slower than expected. Our hope is that we still have much of the capacity and terms by October 1st and then have the ability to provide various deductible options.

Thank you for your patience and we will be updating you every couple of days with additional marketing progress reports until we have this completed.

Best regards
Jon Axel

**Jonathan Axel**
**Managing Partner**
**The Liberty Company Insurance Brokers**

**COVID-19 Resource Center**

5955 De Soto Ave, Suite 250, Woodland Hills, CA 91367
O 818-914-3994 l F 866-835-6983 l C 310-890-4109
libertycompany.com | jaxel@libertycompany.com

• To send me a secure/encrypted email, please click HERE!

   

*Our **mission** is to promote **peace of mind** with great care.*

*We do this by building a culture based on our **core values** of **integrity, excellence, caring, kindness, fairness, teamwork, good feelings,** and **fun**. Our culture guides our daily practices and inspires our community to be their best in both their personal and professional lives.*

Coverage cannot be bound or changed via e-mail without written confirmation from your Agent. CA License #0D79653.

PRIVILEGED AND CONFIDENTIAL INFORMATION: The information contained in this electronic transmission, and any documents attached hereto, may contain confidential information that is legally privileged and confidential. The information is intended only for the use of the recipient(s) named above. If you have received this electronic message in error, please notify the sender and delete the electronic message. Any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information received in error is strictly prohibited.

# Exhibit 11

**Crestlloyd, LLC**

**All Risk Property Marketing Summary as of 9-16-21**

**Effective ASAP**

| Market | Underwriter | Status | Potential Layer(s) | Comments |
|---|---|---|---|---|
| AmWINS SRU | Melisa Mears | Declined | 15 xs 10 25 xs 50, 50 xs 50, | Declined due to high Wildfire Exposure |
| AmWINS Access | Brendon | In Process | Program(s) | I have requested Brendon to see if we could put this into one of our program biz as well as co-market participation of 50%/50% quota share for high valued homes. He advised that he's still working on it. |
| AmWINS Bermuda | Alan Waring | In Process | All layers | Chubb Bermuda is waiting on Fac to support a line of 25% to 50% of a 50 xs 50 or 54,150,000 xs 50. Markel Bermuda doesn't know what they can do yet. They don't entertain many exposures as this one. |
| AmWINS Global Risks | Lauren Moseley | In Process | All layers | Lauren has indicated capacity 20% or of 2 p/o 10 primary comprised of various syndicates with the lead being Argo (that may change next week due to Wildfire Deductible Structure. Initial pricing at $1.2M GLP. Hoping to secure more capacity next week in a Prim 10. In the 15 xs 10, Lauren is hoping to lock down 33.334% or 5 p/o 15 xs 10 |
| Arch | Molly Welsch | Declined | 5 xs 5, 15 xs 10 | Declined due to SFR |
| Arrowhead | Mirza F. | Declined | 50 xs 50 | Declined - Arrowhead E&S (they write A/R prop but it has to include NWS exposure) & they don't entertain SFR exposure on a stand alone basis. Would need to include other assets with a different risk classification. |
| Aspen | Laurie S. | In Process | 5 xs 5, 15 xs 10, 25 xs 25 | UW is in the Fac market looking for 2.5 p/o 5 p/o 25xs 25. |
| Axis | Myron Cahill | In Process | Prim 2.5, Prim 5, 5 xs 5, Prim 10, 15 xs 10 | UW is dragging his feet. He has the modeling back but hasn't started on it. Slammed on 9-15's and 10-1's |
| Beazley | JR | Declined | Prim 2.5, Prim 5, 5 xs 5, Prim 10, 15 xs 10 | Not interested in one off SFR |
| BMS | Kian Wookey | In Process | Prim 2.5, Prim 5, 5 xs 5, Prim 10, 15 xs 10 | The revised modeling was completed on Tuesday. He's hoping to review tomorrow morrning. |
| CNA | Hold Off | | | |
| Colony US | Dave Stewart | Declined | Prim 2.5, 5 & 10. XS layers 15 xs 10, 40 xs 10, 10 xs 15 & 25 xs 25 | Declined due to exposure |
| Core Specialty | Dave Philips | Declined | Prim 2.5, Prim 5, Prim 10, 5 xs 5, 15 xs 10 | Declined due to exposure |
| Crum & Forster | Maria Chen | In Process | 15 xs 10,25 xs 25 | Maria advised this morning she wants to authorize 2.5 p/o 25 xs 25 or maybe 5 p/o at $425K to $450K GLP - Needs to write up a referral due to risk class and exposure as they rarely entertain this class and exposure unless it's an exceptional risk. Best case scenario would be Tuesday or Wednesday of next week. She's out of the office on Friday 9-17. |
| Diamond State | Hold Off | | | |
| Everest | Jorge G. | | Prim 10, Prim 25, 40 xs 10, 25 xs 25 | Jorge indicated 20% line of a 25 Primary at $1.3M to $1.5M GLP. He is working on getting sign off required due to Wildfire exposure. Alternative lines as follows: 20% or 4 p/o 20 xs 5 at $600K to $675K GLP. I have multiple calls into Jorge to firm up asap. |
| General Star | Tara | On Hold | Prim 2.5, 5 & 10 | Tara hasn't given it much time due to the class and Wildfire exposure. It's not dead yet- Last I spoke with her was Sept 2nd. However I'm checking in with her tomorrow to see if she lost any renewal biz and if so, push her to dig into this one in a primary position. Good news is she is comfortable with the deductibles of $250K AOP p/o and $2.5M Wildfire Ded p/o. |
| Global Excess Partners | MJ | Declined | 15 xs 10, 25 xs 25 | Declined due to wildfire exposure. |
| Great American | Laura Tepe | Declined | 25 xs 25, 50 xs 50 | Declined due to wildfire exposure. |
| Hallmark | Ravi P. | ON the Fence | 15 xs 10 , 25 xs 25 | Ravi has very little aggregate capacity for Wildfire exposure - he's dragging his feet hoping pricing will increase in the excess layers. Total capacity if offered is 5 p/o |
| Ironshore | Rob Sadler | Declined | Prim 2.5, Prim 5, Prim 10, 5 xs 5, 15 xs 10 | Not interested in one off SFR, only as part of a large schedule of mixed assets. |
| James River | Ann Prince | In Process | 15 xs 10, 25 xs 25 | The RM score is just over their max threshold for Wildfire risk, generally creating an automatic decline. She's doing what she can. Hoping her 9-15's are buttoned up so she can get back on this one. Followed this morning. |
| **Kinsale** | **Ben is working** | **Follow up** | **15 xs 10, 25 xs 25** | **Need to get advice from Ben Lowery who is working with Kinsale on this one.** |
| Lexington | Jessica Lamp | Declined | Prim 5, Prim 10, Prim 25, 15 xs 10 | Jessica advised they're entertaining one of SFR exposure of this value with Wildfire and EQSL exposure. |
| Markel | Tom Woodstock | In Process | 15 xs 10, 25 xs 25 | Woody's trying to get to new biz as fast as possible without jepordizing renewals. They're 3 UW's down |
| Mitsui | Jason Sternberg | Declined | 50 xs 50 | They attach excess of the 250yr Fire PML, which is normally over multiple locations. Since this is a single location, with a very high wildfire score they are unable to participate. |
| Munich Re Specialty | Carl Hess | In Process | 5 xs 5 15 xs 10 | He's working on it. Re-running the modeling using various Wildfire deductibles and CAEQ deductibles (Flat $250K, 2% of TIV). He's trying to make it work within their Underwriting guidelines. He advised sometime next week. |
| Nationwide | Don Wilson | TBD | 12.5 xs 2.5, 15 xs 10, 25 xs 25, 50 xs 50 or Full limit xs 50 | |
| Navigators | Lexi | Declined | 15 xs 10, 25 xs 25 | Does not meet underwriting guidelines -If exposed to Wildfire, values have to be less than $100M. |
| One Beacon | Ernest Milton | In Process | 15 xs 10, 25 xs 25, 50 xs 50 | Technically not entertaining one of SFR, however with the values being equivalent to many of the risks they're currently on, he's going to take another look at this for us. |
| **Rivington** | **Michael Finnis is working** | **Follow up** | **12.5 xs 2.5, 15 xs 10 & 10 xs 15 (or anywhere that it works)** | **Need to follow up with Finnis.** |
| RSUI | Billy Adams | Follow up | All layers | Billy advised that he's working on it, slow but surely. |
| Sompo | Taylor Duerr | Declined | All layers | Will not write one off SFR, especially with a very high Wildfire score. |
| Westchester | Jim Akin | Declined | Prim5, Prim 10 | Due to exposure and SFR being one off. |
| Zurich | Kevin Doan | In Process | Prim 2.5 , Prim 5 | Yesterday I met with Merritt Oliver (Head of E&S Property) and they're going back at it to get to 2.5 p/o 5 Primary at $750K GLP. Waiting on written confirmation of their capacity of 50% of a Primary 5 at $750K GLP. |

**Berkshire** **We're not quite there yet - this would be only in the last resort.**

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is **21650 Oxnard Street, Suite 500, Woodland Hills, California 91367**.

On October 25, 2021, I served the foregoing document described as: **RECEIVER'S THIRD REPORT FOR THE PERIOD ENDING SEPTEMBER 30, 2021** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed as follows:

**(SEE ATTACHED SERVICE LIST)**

☒ **(BY MAIL)** I caused such envelope with postage thereon fully prepaid to be placed in the U.S. mail at Woodland Hills, California. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of a party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY PERSONAL DELIVERY)** I caused such envelope to be delivered by hand by [Name and address of courier service], to the office of the addressee(s) noted on the attached Service List.

☒ **(BY E-MAIL OR ELECTRONIC TRANSMISSION)** I caused said document(s) to be sent to the person(s) at the e-mail address(es) listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ **(BY FEDERAL EXPRESS / OVERNITE EXPRESS)** I caused such envelope to be deposited at the Federal Express/Overnite Express drop box at Woodland Hills, California. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with Federal Express/Overnite Express that same day in the ordinary course of business.

Executed on October 25, 2021, at Woodland Hills, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct and, that I am employed in the office of a member of the bar of this court at whose direction the service was made.

NIKOLA A. FIELDS

HANKEY CAPITAL, LLC v. CRESTLLOYD, LLC, et al.
LASC Case No. 21SMCV01113

**SERVICE LIST**

**BY MAIL**

| | |
|---|---|
| Theodore "Ted" Lanes<br>3 Lanes Management Services<br>655 Deep Valley Drive, Suite 125-P 4<br>Rolling Hills Estate, CA 90274 | Manager and Agent for Service of Process for Defendant Crestlloyd, LLC |
| Honorable Mark Young<br>Department M<br>Santa Monica Courthouse<br>1725 Main Street<br>Santa Monica, CA 90401 | Courtesy Copy |

**BY EMAIL**

| | |
|---|---|
| Marcos Almeida<br>7 Legal Executive<br>Southpac Group<br>8 Registrado na Ordem dos Advogados do Brasil/MG 132.407<br>Email: malmeida@southpacgroup.com | Advisor to Southpac Trust International, Inc., as Trustee of the Park City Family Settlement, the sole member of Crestlloyd, LLC ("Borrower") |
| Me Mathieu Robillard<br>Robillard Prescott Morissette, avocats et médiateurs s.e.n.c.<br>Email: mathieu@rpmlex.ca | Attorneys for Inferno Investment, Inc., a Defendant in Los Angeles Superior Court Case No. 21STCV24076 (courtesy copy only) |
| Jeffrey S. Wruble, Esq.<br>David Mark, Esq.<br>Buchalter<br>1000 Wilshire Blvd., Suite 1500<br>Los Angeles, CA 90017-1730<br>Email: jwruble@buchalter.com<br>dmark@buchalter.com | Attorneys for Hankey Capital, LLC |
| Mark J. Rosenbaum, Esq.<br>Elsa M. Horowitz, Esq.<br>Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP<br>11400 W Olympic Blvd., 9th Floor<br>Los Angeles, CA 90064<br>Email: mrosenbaum@wrslawyers.com<br>Email: ehorowitz@wrslawyers.com | Attorneys for Yogi Securities Holdings, LLC, the Plaintiff in Los Angeles Superior Court Case No. 21STCV24076 (courtesy copy only) |

| | |
|---|---|
| Nathan M. Carle, Esq.<br>Raines Feldman<br>1800 Avenue of the Stars 12th floor<br>Los Angeles, CA 90067<br>Email: ncarle@raineslaw.com | Attorney for Nile Niami, Interested Party |
| Paul Joseph Weinberg, Esq.<br>Law Offices<br>5 Park Plaza, Suite 1500<br>Irvine, California 92614<br>Email: pjweinberg@pjwmediation.com | Interested Party |
| Kyra Andrassy, Esq.<br>Smiley Wang-Ekvall, LLP<br>3200 Park Center Drive, Suite 250<br>Costa Mesa, CA 92626<br>Email: kandrassy@swelawfirm.com | Interested Party |

# EXHIBIT “6”

Electronically FILED by Superior Court of California, County of Los Angeles on 07/16/2021 04:18 PM Sherri R. Carter, Executive Officer/Clerk of Court, by K. Parenteau,Deputy Clerk

DAVID SEROR – Bar No. 67488
JESSICA WELLINGTON – Bar No. 324477
BRUTZKUS GUBNER ROZANSKY SEROR WEBER LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email: dseror@bg.law
jwellington@bg.law

[Proposed] Counsel for Court-Appointed Receiver, Theodore Lanes

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES – WEST DISTRICT**

HANKEY CAPITAL, LLC, a California limited liability company,

Plaintiff,

vs.

CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,

Defendants.

Case No. 21SMCV01113

Assigned to Hon. Mark Young (Dept. M)

**RECEIVER'S NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING RECEIVER TO RETAIN AND EMPLOY BRUTZKUS GUBNER ROZANSKY SEROR WEBER LLP AS COUNSEL**

**MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF THEODORE LANES AND DAVID SEROR IN SUPPORT THEREOF**

**Hearing Reserved:**

Date: December 17, 2021
Time: 8:30 a.m.
Dept.: M
Place: Santa Monica Courthouse
1725 Main Street
Santa Monica, CA 90401

**RESERVATION ID: 280713514735**[1]

[1] A true copy of the Reservation Confirmation is attached hereto.

**TO THE COURT, ALL PARTIES IN INTEREST AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on December 17, 2021 at 8:30 a.m. in Department M of the West Branch of the above-entitled Court, Theodore Lanes, the Court-appointed Receiver, (the "Receiver") will and hereby does move for an Order authorizing the Receiver to employ and retain the law firm of Brutzkus Gubner Rozansky Seror Weber LLP as counsel (the "Motion"). The Receiver requests that the Application be approved pursuant to Rule 3.1180 of the California Rules of Court.

The Motion is based on the grounds that the Receiver requires counsel for the purpose of fulfilling his duties as set forth in the Receivership Order, communicate with counsel for the parties, obtaining cooperation from the parties in obtaining documents and information, and obtaining further instructions and orders from the Court as necessary

This Motion is filed pursuant to Rule 3.1180 of the California Rules of Court and is based on the attached Memorandum of Points and Authorities, the Declaration of the Receiver, the Declaration of David Seror, all pleadings on file with the Court in this matter and such further oral and documentary evidence as may be introduced at the time of the hearing on this Motion.

Dated: July 16, 2021

BRUTZKUS GUBNER ROZANSKY SEROR WEBER LLP

By: ______________________
DAVID SEROR
Proposed Attorneys for Theodore Lanes, Court-Appointed Receiver

## MEMORANDUM OF POINTS AND AUTHORITIES

### A. Introduction

On July 2, 2021, the Court entered its Order for Appointment of Receiver and other related relief (the "Receivership Order") in the case titled *Hankey Capital, LLC. v. Crestlloyd, LLC*, Case No. 21SMCV01113. Theodore Lanes was thereby appointed by the Court as the receiver (the "Receiver") to take control of the Receivership Property[2], including, but not limited to the real property commonly known as 944 Airole Way, Los Angeles, California 90077. A true copy of the Receivership Order is attached hereto marked **Exhibit 1** and incorporated herein by this reference. Lanes Declaration, ¶ 1.

### B. The Need for the Receiver to Retain and Employ Counsel

In connection with his appointment, this Court issued a Temporary Restraining Order directed to Borrower and Defendants, ordering and directing them to not interfere with the discharge of the Receiver's duties; not conceal Receivership Property; and not to withhold from the Receiver any Receivership Property, including plans, permits, monies, books or records. To date, despite repeated demands from the Receiver, Defendants and Borrower have not provided the Receiver with any of the plans, permits or books and records. Paragraphs 4. h, and i. of the Receivership Order sets forth the duties of the Receiver to include doing all things necessary to obtain permits and sign-offs of all open permits and obtain a Certificate of Occupancy. The Receiver cannot comply with these duties without obtaining the plans, permits, and books or records. It is clear that Borrower and Defendants will not voluntarily produce these documents and things, and further court orders may be necessary to assist the Receiver in fulfilling his duties. In addition, the Receiver has obtained some evidence that Borrower may have misappropriated assets for the benefit of other of his projects. Further investigation and discovery may be required in that regard. Lanes Declaration, ¶ 7.

The Receiver requires counsel for the purpose of fulfilling his duties as set forth in the Receivership Order, communicate with counsel for the parties, obtaining cooperation from the parties in obtaining documents and information, and obtaining further instructions and orders

---

[2] Capitalized terms herein have the same meaning as set forth in the Receivership Order.

from the Court as necessary.

**C. Statutory Requirements for Employment of Counsel**

The Receiver and his proposed counsel are aware that Paragraph 11 of the Receivership Order provides that the Receiver may employ counsel without further Court Order. However, the Receivership Order does not refer to Rule 3.1180 of the California Rules of Court, and out of an abundance of caution, the Receiver brings this Ex Parte Application to Employ Counsel.

Rule 3.1180 of the California Rules of Court states that:

"A receiver must not employ an attorney without the approval of the court. The application for approval to employ an attorney must be in writing and must state:

(1) The necessity of the employment;

(2) The name of the attorney whom the receiver proposes to employ; and

(3) That the attorney is not the attorney for, associated with, nor employed by an attorney for any party."

As set forth above in greater detail, the Receiver requires counsel for the purpose of fulfilling his duties as set forth in the Receivership Order, communicate with counsel for the parties, obtaining cooperation from the parties in obtaining documents and information, and obtaining further instructions and orders from the Court as necessary. Lane Declaration, ¶ 4. Information regarding the Receiver's proposed counsel, Brutzkus Gubner Rozansky Seror Weber LLP ("Brutzkus Gubner"), is as set forth in the section immediately below. Proposed counsel for the Receiver is not the attorney for, associated with, nor employed by an attorney for any party. Seror Declaration, ¶ 4. For purposes of disclosure, Brutzkus Gubner discloses that it represents Hilldun Corporation, the beneficiary of a deed of trust secured by the Airole property. A title report for the Airole property states that there are four (4) deeds and 3 mechanics lien recordings senior in time to the Hilldun Trust Deed. Neither the Receiver, nor his proposed counsel is currently aware of any grounds to challenge or dispute the Hilldun trust deed and accordingly do not believe any conflict of interest exists.

///

**D. The Receiver's Proposed Counsel, Brutzkus Gubner LLP**

The Receiver proposes to employ Brutzkus Gubner as his counsel. The attorneys at Brutzkus Gubner that would primarily be working on the engagement are David Seror and Jessica Wellington, both of whom have significant experience in representing fiduciaries. Mr. Seror has been appointed Receiver by this Court and has previously served as an assignee for the benefit of creditors. He regularly represents receivers, assignees for the benefit of creditors and chapter 7 and 11 bankruptcy trustees. Mr. Seror is also a standing panel chapter 7 bankruptcy trustee. The full C.V.s for Ms. Wellington and Mr. Seror are attached to the Seror Declaration. Seror Declaration, ¶ 3.

The Receiver believes that Brutzkus Gubner is well suited to represent him in this case and has significant experience and knowledge in the areas of representing fiduciaries. Lanes Declaration, ¶ 5.

The Receiver proposes to employ Brutzkus Gubner on an hourly basis, that he be authorized to compensate Brutzkus Gubner for its services on an interim monthly basis, and that in connection with the Receiver's final report and account, a final fee application will be filed, setting forth in specific terms the work performed by Brutzkus Gubner on the Receiver's behalf, and charges for this work. The final fee application shall request that the Court review and approve the work done, the amounts charged, and all interim payments. Lanes Declaration, ¶ 8.

**E. Conclusion**

Based upon the foregoing, the Receiver respectfully represents that he has made a full and complete disclosure of his need for counsel and that Brutzkus Gubner as proposed counsel is well qualified and able to represent the Receiver. The Receiver therefore respectfully requests that the Application be granted.

Dated: July 16, 2021

BRUTZKUS GUBNER ROZANSKY
SEROR WEBER LLP

By: ______________________
DAVID SEROR
Proposed Attorneys for Theodore Lanes,
Court-Appointed Receiver

**DECLARATION OF THEODORE LANES**

I, Theodore Lanes, declare and state as follows:

1. I am the court-appointed receiver in the case titled *Hankey Capital, LLC vs. Crestlloyd LLC,* Case No. 21SMCV01113. On July 2, 2021, the Court entered its Order for Appointment of Receiver (the "Receivership Order").

2. The following facts are true and known to me of my own personal knowledge, or I have gained such knowledge based on documents provided to me by the parties in this litigation and these documents are maintained by me in the ordinary course of my business as a receiver. If called as a witness, I could and would competently testify with respect thereto.

3. I propose to employ Brutzkus Gubner Rozansky Seror Weber LLP ("Brutzkus Gubner") as my counsel. The attorneys at Brutzkus Gubner that would primarily be working on the engagement are David Seror and Jessica Wellington.

4. I require counsel for the purpose of fulfilling my duties as set forth in the Receivership Order, communicate with counsel for the parties, obtaining cooperation from the parties in obtaining documents and information, and obtaining further instructions and orders from the Court as necessary.

5. I believe that Brutzkus Gubner is well suited to represent me in this case and has significant experience and knowledge in the areas of representing fiduciaries.

6. To my knowledge, Brutzkus Gubner is not the attorney for, associated with, nor employed by an attorney for any party.

7. In connection with my appointment, this Court issued a Temporary Restraining Order directed to Borrower and Defendants, ordering and directing them to not interfere with the discharge of the Receiver's duties; not conceal Receivership Property; and not to withhold from the Receiver any Receivership Property, including plans, permits, monies, books or records. To date, I have made repeated demands for plans, permits and books or records, but Defendants and Borrower have not provided me with any of these items. Paragraphs 4. h, and i. of the Receivership Order sets forth the duties of the Receiver to include doing all things necessary to obtain permits and sign-offs of all open permits and obtain a Certificate of Occupancy. I

Receiver cannot comply with these duties without obtaining the plans, permits, and books or records. It is clear that Borrower and Defendants will not voluntarily produce these documents and things, and further court orders may be necessary to assist me in fulfilling my duties. In addition, I have obtained some evidence that Borrower may have misappropriated assets for the benefit of other of his projects. Further investigation and discovery may be required in that regard.

8. I propose to employ Brutzkus Gubner on an hourly basis, that I be authorized to compensate Brutzkus Gubner for its services on an interim monthly basis, and that in connection with my final report and account, a final fee application will be filed, setting forth in specific terms the work performed by Brutzkus Gubner on my behalf, and charges for this work. The final fee application shall request that the Court review and approve the work done, the amounts charged, and all interim payments.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 14, 2021, at Rolling Hills Estates, California.

THEODORE LANES

**DECLARATION OF DAVID SEROR**

I, David Seror, declare:

1. I am admitted to practice before this Court and am a partner at Brutzkus Gubner Rozansky Seror Weber LLP ("Brutzkus Gubner"), proposed counsel for Theodore Lanes, the duly appointed and acting Receiver. I make this declaration in support of the Receiver's Motion for Order Authorizing Receiver to Retain and Employ Brutzkus Gubner as Counsel.

2. I have personal knowledge of the facts in this declaration and, if called as a witness, could and would testify competently to these facts.

3. The attorneys at Brutzkus Gubner that would primarily be working on the engagement for the Receiver are Jessica Wellington and myself. We both have significant experience in representing fiduciaries. I have been appointed Receiver by this Court and have previously served as an assignee for the benefit of creditors. I regularly represent receivers, assignees for the benefit of creditors and chapter 7 and 11 bankruptcy trustees. I am also a standing panel chapter 7 bankruptcy trustee. The full C.V.s for Ms. Wellington and myself are attached hereto, marked **Exhibit 2**. Brutzkus Gubner's hourly rate schedule is attached hereto as **Exhibit 3**.

4. Brutzkus Gubner is not the attorney for, associated with, nor employed by an attorney for any party. For disclosure purposes, Brutzkus Gubner discloses that it represents Hilldun Corporation, the beneficiary of a deed of trust secured by the Airole property. A title report for the Airole property states that there are four (4) deeds and 3 mechanics lien recordings senior in time to the Hilldun Trust Deed. A true copy of the title report prepared by Chicago Title Company, effective as of December 7, 2020 is attached hereto, marked **Exhibit 4**. Neither the Receiver, nor I am currently aware of any grounds to challenge or dispute the Hilldun Trust Deed and accordingly do not believe any conflict of interest exists.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration is executed on July 16, 2021, at Woodland Hills, California.

DAVID SEROR

# EXHIBIT 1

BUCHALTER
A Professional Corporation
JEFFREY S. WRUBLE (SBN: 94734)
JACK R. SCHARRINGHAUSEN (SBN: 205483)
DAVID E. MARK (SBN: 247283)
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Telephone: 213.891.0700
Fax: 213.896.0400
Email: jwruble@buchalter.com

Attorneys for Plaintiff,
HANKEY CAPITAL, LLC,
a California limited liability company

FILED
Superior Court of California
County of Los Angeles
JUL 02 2021
Sherri R. Carter, Executive Officer/Clerk
By K. Metoyer, Deputy

Electronically Received 07/01/2021 09:12 AM

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES, WEST DISTRICT**

HANKEY CAPITAL, LLC, a California limited liability company,

Plaintiff,

v.

CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,

Defendants.

Case No. 21SMCV01113
Assigned to: Hon. Mark Young
Department: M

**[PROPOSED] ORDER:**

**(1) APPOINTING RECEIVER;**

**(2) ISSUING TEMPORARY RESTRAINING ORDER; AND**

**(3) ORDER TO SHOW CAUSE WHY RECEIVER SHOULD NOT BE CONFIRMED *PENDENTE LITE* AND WHY PRELIMINARY INJUNCTION IN AID OF RECEIVER SHOULD NOT BE GRANTED**

Date: July 2, 2021
Time: 9:00 a.m.
Place: Dept. M

**Order to Show Cause Hearing**
Date: July 23, 2021
Time: 8:30 a.m.
Place: Dept. M

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

1

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

274

The Court considered the *ex parte* application of Plaintiff, Hankey Capital, LLC, a California limited liability company (**"Plaintiff"**), for an Order Appointing Receiver and related orders, the memorandum of points and authorities and declarations filed in support thereof, including the declaration filed by Defendant, Crestlloyd, LLC, a California limited liability company (**"Borrower"**), the Declaration of Theodore Lanes, the proposed receiver, including the disclosures made in that declaration, all pleadings and documentary evidence in the Court's file, and oral arguments of the parties and their counsel. Based upon the record, the agreement of the parties, and good cause appearing:

## *EX PARTE* ORDER APPOINTING RECEIVER

**IT IS HEREBY ORDERED** that Theodore Lanes (the **"Receiver"**) is appointed as receiver to take possession, custody and control of the Receivership Property, as defined herein, and to protect the Receivership Property. The Receiver shall have all the usual and customary powers of a receiver to take control of and preserve the Receivership Property, in addition to the duties and powers enumerated in this Order.

**IT IS FURTHER ORDERED** that:

1. **Plaintiff's *Ex Parte* Bond**. Plaintiff shall immediately file an applicant's bond under Code of Civil Procedure section 566(b) in the amount of $10,000.00.

2. **Receivership Property**. Includes the following: The real property commonly known as 944 Airole Way, Los Angeles, CA 90077 (APN: 4369-026-021) (the **"Real Property"**), together with improvements thereon, all permits, plans (including all architectural, building, electrical, plumbing, and landscape plans), entitlements and certificates pending, prepared, or issued in connection with the Real Property, all books, records, and bank records of Borrower (including all digital and electronic versions) and all revenues, profits, and proceeds thereof (the **"Personal Property"** and, together with the Real Property, the **"Receivership Property"**).

3. **Receiver's Oath and Bond**. Before performing his duties, the Receiver shall execute a receiver's oath and file a bond in the sum of $100,000.00, conditioned upon the faithful performance of the Receiver's duties. The bond shall be from a surety approved by the Court and shall be filed in this Court by no later than 4:00 p.m., on July 9, 2021.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

2

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

275

4.     **Receiver's Duties and Powers**.  The Receiver shall be vested with the authority to do each and all of the following:

a.     Take possession, custody, and control of the Receivership Property, wherever located, and all of Borrower's bank and brokerage accounts, deposits, equities, profits, and all books, records and writings (as defined in California Evidence Code § 250) related thereto; and open, transfer and change all bank and trade accounts relating to the Receivership Property, so that all such accounts are in the name of the Receiver;

b.     Protect, care for, and preserve the Receivership Property and incur the expenses necessary for such care, preservation and maintenance of the Receivership Property;

c.     Maintain or obtain any certificates, licenses, entitlements, or permits that the Receiver reasonably believes necessary to maintain or increase the value of the Receivership Property, or which may be useful or necessary for the completion, marketing, and sale of the Receivership Property;

d.     Maintain or obtain and pay for any insurance that the Receiver reasonably believes necessary for the protection of the Receivership Property; and

e.     Collect all issues, profits, and income resulting from the sale of the Receivership Property.

f.     **Protection, Management and Liquidation of the Receivership Property**.  The Receiver shall manage the Receivership Property until it may be sold, as set forth in this Order, and may employ agents, clerks, contractors or other professionals needed to assist him with the completion of his duties as receiver.  In the exercise of his discretion, the Receiver is authorized and directed, and the Court appoints and makes the Receiver, the attorney in fact for Borrower, for the limited purpose of managing, protecting and preparing the Receivership Property for sale, including:

g.     Protecting and completing construction of the Real Property;

h.     Doing all things necessary to obtain any required permits and sign-offs of all open permits;

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

3

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER
SHOULD NOT BE CONFIRMED, ETC.

276

i. Obtaining a Certificate of Occupancy and any other governmental approval necessary or useful to complete, sell, and transfer title to the Real Property;

j. Engaging a broker and others to market and assist with the sale of the Real Property, and to do all things appropriate or necessary to complete, market, and sell the Real Property;

k. Entering into a conditional contract(s) to sell the Real Property, and disclose to any proposed purchaser(s) that any contract for sale entered into by the Receiver shall be subject to final approval of the Court pursuant to California Code of Civil Procedure §568.5. The claims of any lienholders shall attach to the net sale proceeds and the Court shall determine how any such proceeds shall be distributed based upon the priority of any lienholder's respective interests in the Real Property; and

l. Opening an escrow for the sale of the Real Property, and to sell the Real Property, on behalf of, and in the name of, Borrower, subject to the terms of this Order.

All fees, charges, commissions, and expenses charged or incurred by anyone engaged by the Receiver for any of the foregoing shall be subject to the Court's review and approval.

5. **No Risk to Receiver**. No risk, obligation, or expense incurred by the Receiver shall be the personal risk or obligation of the Receiver, but shall be the risk, obligation, and expense of the Receivership estate established hereby.

6. **Trustee's Sale, Deed-In Lieu and Cure**. Upon receipt by the Receiver of a Trustee's Deed Upon Sale, notice that Plaintiff has accepted a deed in lieu of foreclosure, or notice from Plaintiff that Borrower has cured the defaults existing under the applicable Loan Documents (as defined in the Complaint in this matter), the Receiver shall turn over possession, custody and control of the Real Property to Plaintiff, Borrower, or a successful bidder at a Trustee's Sale (whichever is appropriate) without further order of this Court. To the extent that the Receiver is divested of possession, custody, and control of the Real Property, and, if consistent with existing law, the Receiver shall thereafter have no liability as to the divested Real Property. After the Receiver turns over possession, custody, and control of the Real Property, the Receiver shall file an application to be discharged by the Court, which may only be accomplished by a court order

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

4

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

277

after a properly noticed motion approving the Receiver's Final Report and Account and any exoneration of the Receiver's Bond.

7. **Litigation**. Any litigation or other legal proceeding involving the Receivership Property will be reviewed by the Receiver and, at the Receiver's discretion and with Plaintiff's and the Court's approval, the Receiver can prosecute or defend such claims. Any proceeds or other assets generated from such legal proceedings are Receivership Property, and any expenses incurred in prosecuting or defending such claims are expenses of the Estate.

8. **Receiver Certificates**.

a. The Receiver may borrow funds from Plaintiff and issue Receivership Certificates to obtain funds necessary to complete the Receiver's duties. At its sole discretion, Plaintiff may advance funds in exchange for Receivership Certificates, upon agreed-upon terms, to fund the Receiver's operations.

b. Funds loaned to the Receiver by Plaintiff pursuant to Receivership Certificates shall become a first lien on the Receivership Property with super priority over all preexisting private liens and encumbrances, except for federal, state, or local tax liens of record upon the Receivership Property.

9. **Use of Funds**. All monies coming into the Receiver's possession shall only be expended for the purposes herein authorized, and the balance of funds shall be held by the Receiver pending further Order of this Court.

10. **Prohibited Agreements**. Except as otherwise provided in this Order, the Receiver shall not enter into an agreement with any party to this action about the administration of the receivership or about any post-receivership matter without further Court order. The Court acknowledges receipt of the disclosures made by the Receiver in connection with the application for this Order.

11. **Receivership Fees and Costs**. The Receiver may charge, as interim fees, his or her standard hourly billing rate, which is currently **$395** per hour, plus reimbursement of costs, for the Receiver's services. The Receiver's staff's hourly rates range from **$85** to **$275**. Where appropriate, the Receiver will have an appropriate staff member handle certain aspects of the

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

5

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

278

Receivership as a cost saving measure. The Receiver is also authorized to employ the services of accountants and attorneys without further Court Order and pay for those services in the amount of the normal fees charged by those professionals.

12. **Monthly Reports and Statements**. The Receiver shall prepare monthly reports that conform with California Rules of Court, Rule 3.1182 and serve monthly statements reflecting the Receiver's fees and administrative expenses, including fees and costs of staff, as well as professionals or others the Court has authorized the Receiver to engage, incurred for each monthly period in the operation and administration of the Receivership Property. Pursuant to California Rules of Court Rule 3.1183, objections to each of the Receiver's interim reports and statements of account, if any, must be made within ten (10) days of notice of the report and statement. If an objection, which shall be made in writing on a line item basis with a statement of the reason for such objection, is timely served, the specific items objected to in such statement of account shall not be paid absent further order of the Court. Failure of a party to object within this ten-day period shall constitute a waiver of that party's objection(s) to the fees for that period. Upon expiration of this ten-day period, the Receiver may disburse from estate funds, if any, the amount of each item that has not been objected to in accordance with this Order. Notwithstanding periodic payment of fees and expenses, all fees and expenses shall be submitted to the Court for its approval and confirmation, in the form of either a properly noticed interim request for fees, a stipulation of all parties, or in the Receiver's Final Account and Report.

13. **Inventory**. Within thirty (30) days after qualification, the Receiver shall file an inventory of all of the property of which the Receiver has taken possession.

14. **Opening of Bank Accounts**. The Receiver is empowered to establish bank accounts for the deposit of monies collected and received in connection with the Receivership Property, at federally insured banking institutions or savings associations located within this state which are not parties to this case. Monies coming into the possession of the Receiver and not expended for any purposes herein authorized shall be held by the Receiver in interest-bearing accounts.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

6

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

279

15.    **Insurance**.    The Receiver shall determine whether, in the Receiver's judgment, there is sufficient insurance coverage for the Receivership Property.  With respect to any insurance coverage, the Receiver shall be named as an additional insured on the policies for the period that the Receiver shall be in possession of the Receivership Property.  If the Receiver determines that sufficient insurance coverage does not exist, the Receiver shall immediately notify the parties to this lawsuit and shall, within thirty (30) calendar days, procure such insurance for the Receivership Property; provided, however, that if the Receiver does not have sufficient funds to do so, or if Plaintiff will neither purchase such insurance nor lend the Receivership Estate the monies necessary to do so, the Receiver shall seek instructions from the Court with regard to whether insurance shall be obtained and the mechanism for payment of any insurance policy.  If consistent with existing law, the Receiver shall not be responsible for claims arising from the lack of procurement or inability to obtain insurance.

16.    **Entry to Receivership Property**.    The Receiver shall be entitled to engage a locksmith and security or alarm experts for the purposes of gaining entry to the Receivership Property.  The Receiver may have locks or security codes changed, or have keys created that will work for the existing locks.

17.    **Tax Identification**.    Borrower shall provide the Receiver with all tax identification numbers utilized in connection with the operation of the Receivership Property.  The Receiver shall also be entitled to utilize the tax identification numbers during the Receiver's operation of the Receivership Property, or at the Receiver's discretion, the Receiver may obtain new tax identification numbers. Notwithstanding the foregoing, the Receiver shall the ability, but have no obligation, to prepare or file any tax returns on behalf of Borrower.

18.    **Mail**.    The Receiver is authorized to have all mail addressed to Borrower or the Real Property forwarded to an address to be designated by the Receiver and is authorized to open and review such mail.

19.    **Documents in Receiver's Possession**.    The parties to this action shall be entitled to have access to, and make copies of, documents in the Receiver's possession—including electronic records—during normal business hours, or at such times as the Receiver may otherwise agree,

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

7

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER
SHOULD NOT BE CONFIRMED, ETC.

280

consistent with all applicable government orders regarding the emergency response to the Covid-19 pandemic.

20. **Further Instructions**. The Receiver and the parties to this case may at any time apply to this Court for further or other instructions or Orders and for further powers necessary to enable the Receiver to perform the Receiver's duties, including issues arising from the Covid-19 pandemic. Any such application by the Receiver for further or other instructions or Orders and for further powers necessary to enable the Receiver to perform the Receiver's duties may be filed on an ex parte basis or by noticed motion, as the Receiver shall determine. The parties shall file any application for further or other instructions by noticed motion unless exigent circumstances support the filing of any such application on an ex parte basis.

21. **Discharge**. Discharge of the Receiver shall require a Court Order after a properly noticed motion approving the Receiver's Final Report and Account.

22. **Plaintiff's Notice to Receiver**. Plaintiff shall promptly notify the Receiver in writing of the names, addresses, and telephone numbers of all parties who appear in the action and their counsel. The parties to this action shall give notice to the Receiver of all events that affect the Receivership, including all Court proceedings in this action.

23. **Bankruptcy – Plaintiff's Duty to Give Notice**. If any of the Defendants files a bankruptcy case during the receivership, Plaintiff shall give notice of the bankruptcy case to the Court, to all parties, and to the Receiver by the close of the next business day after the day on which Plaintiff receives notice of the bankruptcy filing.

24. **Bankruptcy – Receiver's Duties**. If the Receiver receives notice that a bankruptcy has been filed and part of the bankruptcy estate includes property that is the subject of this Order, the Receiver shall comply with 11 U.S.C. § 543. The Receiver may retain legal counsel to assist the Receiver with issues arising out of the bankruptcy proceedings that affect the receivership.

**TEMPORARY RESTRAINING ORDER**

**IT IS FURTHER ORDERED** that, pending further Order of this Court, Borrower, all other defendants, and each of them, and their respective members, agents, employees, assignees, successors, representatives, and all persons acting under, in concert with, or for them shall not:

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

8

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

281

1. Directly or indirectly interfere in any manner with the discharge of the Receiver's duties under this Order, including the Receiver's control, management, preservation, marketing and sale of the Receivership Property;

2. Conceal, remove, expend, disburse, transfer, assign, sell, convey, devise, pledge, create a security interest in, encumber, or in any manner whatsoever deal in or dispose of the whole or any part of the Receivership Property;

3. Withhold from the Receiver any Receivership Property, including any plans, permits, monies, books, or records;

4. Commit or permit any waste of the Receivership Property or any part thereof, or suffer or commit or permit any act on the Receivership Property or any part thereof in violation of law, or remove, transfer, encumber or otherwise dispose of any of the Receivership Property or any part thereof; and

5. Do any act which will, or which will tend to, impair, defeat, divert, prevent, or prejudice the preservation, marketing, and sale of the Receivership Property.

**THE COURT ORDERS PLAINTIFF** to promptly file a temporary restraining order bond under Code of Civil Procedure section 529 in the amount of $___________.

**IT IS FURTHER ORDERED** that no individual or entity may sue the Receiver without first obtaining permission of this Court.

**ORDER TO SHOW CAUSE**

**IT IS HEREBY ORDERED** that Borrower appear on __________________, 2021, at _____ ___.m., in Department ____ of the above-captioned Court, located at 1725 Main St., Santa Monica, CA 90401, to show cause, if Borrower has any:

1. Why Borrower, all other defendants, and each of them, and their respective members, agents, employees, assignees, successors, representatives, and all persons acting under, in concert with, or for them should not be enjoined and restrained from, in any manner, directly or indirectly, receiving, collecting, diverting or otherwise taking any Receivership Property, or any revenue or profit derived therefrom, expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering,

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

9

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

282

Main Document Page 289 of 373

concealing, or in any manner whatsoever dealing in, disposing of or impairing the value of the whole or any part of the Receivership Property, or any proceeds or other income derived therefrom; and

2. Why the Receiver should not be confirmed *pendente lite* to take possession, custody and control of the Receivership Property, and to maintain, conserve and liquidate such Receivership Property with the powers and duties enumerated above and in accordance with the terms of this Order and until further Order of this Court.

**SERVICE AND BRIEFING SCHEDULE**

The Summons and Complaint, Plaintiff's *ex parte* Application, Memorandum of Points and Authorities, this Order and all declarations and supporting papers are to be personally served on Borrower, or its attorneys of record, no later than July 9, 2021, with proof of service to be filed in Department M no later than July 12, 2021.

Any opposition to this Order to Show Cause is to be personally served on Plaintiff's attorneys of record and filed in Department M no later than July 15, 2021.

Any reply is to be personally served on Borrower, or its attorneys of records, and filed in Department M by no later than July 20, 2021.

**IT IS SO ORDERED.**

Dated: July 2, 2021

Judge of the Los Angeles Superior Court

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

10

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER SHOULD NOT BE CONFIRMED, ETC.

283

**PROOF OF SERVICE**

**HANKEY CAPITAL, LLC v. CRESTLLOYD, LLC, et al.**
**LASC CASE NO. 21SMCV01113**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is at BUCHALTER, A Professional Corporation, 1000 Wilshire Blvd., 15th Floor, Los Angeles, CA 90017; and my email address is rauceda@buchalter.com.

On the date set forth below, I served the foregoing document described as:

**[PROPOSED] ORDER: (1) APPOINTING RECEIVER; (2) ISSUING TEMPORARY RESTRAINING ORDER; AND (3) ORDER TO SHOW CAUSE WHY RECEIVER SHOULD NOT BE CONFIRMED *PEDENTE LITE* AND WHY PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED**

on all other parties and/or their attorney(s) of record to this action by ☐ electronically serving ☒ emailing, and/or ☐ placing a true copy thereof in a sealed envelope as follows:

**See attached Service List**

☐ **BY MAIL** I am readily familiar with the business' practice for collection and processing of correspondence for mailing with the United States Postal Service. The address(es) shown above is(are) the same as shown on the envelope. The envelope was placed for deposit in the United States Postal Service at Buchalter in Irvine, California on July 1, 2021. The envelope was sealed and placed for collection and mailing with first-class prepaid postage on this date following ordinary business practices.

☑ **BY EMAIL** On July 1, 2021, I caused the above-referenced document(s) to be sent in electronic PDF format as an attachment to an email addressed to the person(s) on whom such document(s) is/are to be served at the email address(es) shown above, as last given by that person(s) or as obtained from an internet website(s) relating to such person(s), and I did not receive an email response upon sending such email indicating that such email was not delivered.

☐ **BY ELECTRONIC SERVICE** On July 1, 2021, via electronic transmission to One Legal LLC e-service via the Internet as a pdf scanned image of the document.

☑ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge. Executed on July 1, 2021, at Los Angeles, California.

| Ronnie Auceda | /s/ Ronnie Auceda |
|---|---|
| (Print Name) | (Signature) |

**SERVICE LIST**

| | |
|---|---|
| Theodore "Ted" Lanes<br>Lanes Management Services<br>655 Deep Valley Drive, Suite 125-P<br>Rolling Hills Estate, CA 90274 | Manager and Agent for Service of Process for Defendant Crestlloyd, LLC<br><br>Email: tl@lanesmgmt.com<br>Telephone: (310) 766-1414 |
| Marcos Almeida<br>Legal Executive<br>Southpac Group<br>Registrado na Ordem dos Advogados do Brasil/ MG 132.407 | Advisor to Southpac Trust International, Inc., as Trustee of the Park City Family Settlement, the sole member of Crestlloyd, LLC ("Borrower")<br><br>Email: malmeida@southpacgroup.com |

# EXHIBIT 2

BRUTZKUS GUBNER
YOUR COUNSEL MATTERS®

21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
(818) 827-9000 Main
(818) 827-9099 Fax
www.bg.law

**CURRICULUM VITAE**

*PARTNER*

**David Seror**

Mr. Seror's practice areas include Bankruptcy, Receivership and Commercial Litigation. He is admitted to practice before the United States District Court for the Central and Southern Districts of California, the United States Court of Appeals for the Ninth Circuit and the Supreme Court of the United States. Mr. Seror is a Member of the Panel of Trustees for Chapters 7 and 11 Bankruptcy cases, United States Trustee's Office, Central District of California (1990-present). He has acted as Judge Pro Tem, Los Angeles Municipal Court and Judge Pro Tem, Superior Court of the State of California for the County of Los Angeles. Mr. Seror is a member of the California State Bar Association, Los Angeles County Bar Association and is an Arbitrator for Attorney Client Relations Programs. Mr. Seror received his Bachelor of Arts degree from the University of California at Los Angeles in 1972, and a *Juris Doctor* in 1975 from California Western School of Law, where he was Associate Editor of the California Western International Law Journal from 1974-1975. Mr. Seror was admitted to the State Bar of California in December 1975.

*ASSOCIATE*

**Jessica Wellington**

Ms. Wellington works in the Firm's bankruptcy department. She obtained her Bachelor of Arts, cum laude, in Family and Consumer Sciences from California State University, Sacramento in 2010 and her *Juris Doctor* with Great Distinction, Business Concentration and Tax Concentration from The University of the Pacific, McGeorge School of Law in May 2018. She served as Law Clerk to the Honorable Victoria S. Kaufman at the United States Bankruptcy Court for the Central District of California. Ms. Wellington was admitted to the State Bar of California in December 2018.

# EXHIBIT 3

BRUTZKUS GUBNER
YOUR COUNSEL MATTERS®
21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
818- 827-9000 Main
818- 827-9099 Fax
www.bg.law

| Standard Hourly Rate Schedule – Effective 01/01/2021 | | |
|---|---|---|
| **Professional** | **Professional Type** | **Hourly Rate** |
| Mark D. Brutzkus | Partner | **$ 725.00** |
| Steven T. Gubner | Partner | **$ 895.00** |
| Jeffrey A. Kobulnick | Partner | **$ 625.00** |
| Nicholas Rozansky | Partner | **$ 675.00** |
| David Seror | Partner | **$ 695.00** |
| Corey R. Weber | Partner | **$ 675.00** |
| Jessica Bagdanov | Partner | **$ 525.00** |
| Joseph Balice | Partner | **$ 575.00** |
| Philip J. Bonoli | Partner | **$ 575.00** |
| Jerrold L. Bregman | Partner | **$ 625.00** |
| Jason B. Komorsky | Partner | **$ 675.00** |
| Robyn B. Sokol | Partner | **$ 645.00** |
| Michael P. Weisberg | Partner | **$ 550.00** |
| Ronald Abrams | Of Counsel | **$ 550.00** |
| Racey Cohn | Of Counsel | **$ 550.00** |
| David I. Dubin | Of Counsel | **$ 395.00** |
| Talin Keshishian | Of Counsel | **$ 525.00** |
| Stuart Y. Kim | Of Counsel | **$ 695.00** |
| Susan Seflin | Of Counsel | **$ 675.00** |
| Tamar Terzian | Of Counsel | **$ 495.00** |
| Michael Bernet | Associate | **$ 425.00** |
| Ryan F. Coy | Associate | **$ 395.00** |
| Joseph M. Rothberg | Associate | **$ 495.00** |
| Jessica S. Wellington | Associate | **$ 395.00** |
| Maria Abel | Paralegal | **$ 230.00** |
| Yves Derac | Paralegal | **$ 280.00** |
| Melody Evans | Paralegal | **$ 225.00** |
| Juanita Treshinsky | Paralegal | **$ 270.00** |
| Sheri Broffman | Trademark Administrator | **$ 250.00** |
| | Litigation Support | **$ 125.00** |
| | Law Clerk | **$ 100.00** |
| | | |

# EXHIBIT 4

**Chicago Title Company**

725 South Figueroa Street, Suite 200, Los Angeles, CA 90017
Phone: (213) 488-4300 ● Fax: (213) 488-4377

Issuing Policies of Chicago Title Insurance Company

ORDER NO.: **00124425-994-LT2-DB**

Escrow/Customer Phone: **(213) 488-4300**

Skyline Development
8981 W. Sunset Blvd., Suite 303
West Hollywood, CA 90069
ATTN: Doug Witkins
Email: doug@skylinedevelopment.net
REF: Airole Way

Title Officer: **Dave Balassi (LA/Comm)**
Title Officer Phone: **(213) 488-4394**
Title Officer Fax: **(213) 488-4360**
Title Officer Email: **TeamX49@ctt.com**

PROPERTY: **944 AIROLE WAY, LOS ANGELES, CA**

# PRELIMINARY REPORT

*In response to the application for a policy of title insurance referenced herein,* ***Chicago Title Company*** *hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.*

*The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the policy forms should be read. They are available from the office which issued this report.*

*This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.*

*The policy(s) of title insurance to be issued hereunder will be policy(s) of Chicago Title Insurance Company, a* Florida *corporation.*

***Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.***

***It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.***

Chicago Title Company

By: ______________________
Authorized Signature

CHICAGO TITLE INSURANCE COMPANY CORPORATE SEAL

By: 
ATTEST President
Secretary

Chicago Title Company

725 South Figueroa Street, Suite 200, Los Angeles, CA 90017
Phone: (213) 488-4300 ● Fax: (213) 488-4377

# PRELIMINARY REPORT

---

**EFFECTIVE DATE:** **December 7, 2020 at 7:30 a.m.**

**ORDER NO.: 00124425-994-LT2-DB**

The form of policy or policies of title insurance contemplated by this report is:

ALTA Extended Loan Policy (6-17-06)

1. THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO COVERED BY THIS REPORT IS:

   A Fee

2. TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS VESTED IN:

   CRESTLLOYD, LLC, a California limited liability company

3. THE LAND REFERRED TO IN THIS REPORT IS DESCRIBED AS FOLLOWS:

   See Exhibit A attached hereto and made a part hereof.

# EXHIBIT "A"

## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" 'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET; THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: 4369-026-021

# EXCEPTIONS

**AT THE DATE HEREOF, ITEMS TO BE CONSIDERED AND EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM WOULD BE AS FOLLOWS:**

A. Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the fiscal year 2021-2022.

B. Property taxes, including any personal property taxes and any assessments collected with taxes are as follows:

| | |
|---|---|
| Tax Identification No.: | 4369-026-021 |
| Fiscal Year: | 2020-2021 |
| 1st Installment: | $708,939.11, Unpaid and delinquent |
| Penalty: | $70,893.91 |
| 2nd Installment: | $708,939.09, Unpaid (delinquent after April 10, 2021) |

C. Escaped taxes for the year 2019

| | |
|---|---|
| 1st Installment: | $545,759.15, Paid |
| 2nd Installment: | $629,825.77 (balance is $84,066.63 after partial payment), delinquent after April 10, 2021 |

D. An assessment by the improvement district shown below:

| | |
|---|---|
| Series: | AD #1 |
| District: | County of Los Angeles |
| For: | MRCA-Brush Fire Clear'g Dist #1 |
| Bond issued: | August 6, 2003 |

Said assessment is collected with the county/city property taxes.

E. The herein described property lies within the boundaries of a Mello-Roos Community Facilities District (CFD) as follows:

| | |
|---|---|
| CFD No: | 2016-1 |
| For: | Fire Prevention, Wildlife Corridor and Open Space Protection |
| Disclosed by: | Notice of Special Tax Lien |
| Recording Date: | January 13, 2017 |
| Recording No.: | 20170055098, Official Records |

This property, along with all other parcels in the CFD, is liable for an annual special tax. This special tax is included with and payable with the general property taxes of the County of Los Angeles.

F. The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

1. Water rights, claims or title to water, whether or not disclosed by the public records.

2. Easement(s) for the purpose(s) shown below and rights incidental thereto as delineated or as offered for dedication, on the map of said Tract No. 22727;

| | |
|---|---|
| Purpose: | Drainage |
| Affects: | That portion of said land as shown on said map |

**EXCEPTIONS**
**(Continued)**

3. Covenants, conditions and restrictions but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, citizenship, immigration status, primary language, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document

Recording Date: November 13, 1947
Recording No: 1860, Official Records

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat the lien of any mortgage or deed of trust made in good faith and for value.

Modification(s) of said covenants, conditions and restrictions

Recording Date: February 7, 1949
Recording No: 2309, Official Records

Modification(s) of said covenants, conditions and restrictions

Recording Date: April 15, 1949
Recording No: 2654, Official Records

4. Covenant and agreement wherein the owners agree to hold said Land as one parcel and not to sell any portion thereof separately. Said covenant is expressed to run with the Land and be binding upon future owners.

Recording Date: June 22, 1981
Recording No.: 81-620826, Official Records

Reference is hereby made to said document for full particulars.

5. An instrument entitled Master Covenant and Agreement

Executed by: Michael t. Walkup and Edith A. Press
In favor of: City of Los Angeles
Recording Date: December 22, 1994
Recording No: 94-2260589, Official Records

Reference is hereby made to said document for full particulars.

6. Matters contained in that certain document

Entitled: Certificate of Compliance
Dated: L.A. No. 94-062
Executed by: City of Los Angeles Department of City Planning
Recording Date: December 22, 1994
Recording No: 94-2260586, Official Records

Reference is hereby made to said document for full particulars.

**EXCEPTIONS**
**(Continued)**

7. A deed of trust to secure an indebtedness in the amount shown below,

Amount: $14,040,000.00
Dated: March 13, 2013
Trustor/Grantor Crestlloyd LLC, a California limited liability company
Trustee: First American Title Insurance Company, a California corporation
Beneficiary: Inferno Realty, L.P., as to an undivided $7,040,000.00 and Maybach Corporation Holdings, Inc., as to an undivided $7,000,000.00 interest, as tenants in common
Recording Date: March 13, 2013
Recording No: 20130384037, Official Records

By various assignments, the beneficial interest thereunder is now held of record in:

Assignee: Inferno Investment Inc.
Recording Date: November 10, 2015
Recording No: 20151375607, Official Records

An agreement to modify the terms and provisions of said deed of trust as therein provided

Executed by: Crestlloyd, LLC, a California Limited Liability Company and Inferno Investment Inc.
Recording Date: November 10, 2015
Recording No: 20151375608, Official Records

An agreement recorded November 6, 2018 as Instrument No. 20181122920, Official Records which states that this instrument was subordinated to the document or interest described in the instrument

Recording Date: November 6, 2018
Recording No.: 20181122917, Official Records

8. Covenant and agreement wherein the owners agree to hold said Land as one parcel and not to sell any portion thereof separately. Said covenant is expressed to run with the Land and be binding upon future owners.

Recording Date: September 5, 2013
Recording No.: 20131298666, Official Records

Reference is hereby made to said document for full particulars.

9. An instrument entitled Master Covenant and Agreement Regarding On-Site BMP Maintenance

Executed by: Nile Niami
In favor of: City of Los Angeles
Recording Date: September 24, 2013
Recording No: 20131385742, Official Records

Reference is hereby made to said document for full particulars.

**EXCEPTIONS**
**(Continued)**

10. An instrument entitled Master Covenant and Agreement Regarding On-Site BMP Maintenance

| | |
|---|---|
| Executed by: | Nile Niami |
| In favor of: | City of Los Angeles |
| Recording Date: | February 7, 2014 |
| Recording No: | 20140139714, Official Records |

Reference is hereby made to said document for full particulars.

11. An irrevocable offer to dedicate an easement over a portion of said Land for

| | |
|---|---|
| Purpose(s): | Public street |
| Recording Date: | June 4, 2014 |
| Recording No: | 20140578201, Official Records |

Said offer was accepted by resolution, a certified copy of which was recorded April 10, 2015 as Instrument No. 20150395929, of Official Records..

12. An instrument entitled Covenant and Agreement Regarding Maintenance of Building

| | |
|---|---|
| Executed by: | Nile Niami |
| In favor of: | City of Los Angeles |
| Recording Date: | February 17, 2016 |
| Recording No: | 20160172858, Official Records |

Reference is hereby made to said document for full particulars.

13. A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $82,500,000.00 |
| Dated: | October 25, 2018 |
| Trustor/Grantor | Crestlloyd, LLC, a California limited liability company |
| Trustee: | Chicago Title Company |
| Beneficiary: | Hankey Capital, LLC, a California limited liability company |
| Recording Date: | November 6, 2018 |
| Recording No: | 20181122917, Official Records |

An agreement to modify the terms and provisions of said deed of trust as therein provided

| | |
|---|---|
| Recording Date: | August 31, 2020 |
| Recording No: | 20201030024 of Official Records |

**EXCEPTIONS**
**(Continued)**

14. Matters contained in that certain document

| | |
|---|---|
| Entitled: | Memorandum of Agreement |
| Executed by: | Hankey Capital, LLC, a California limited liability company and Crestlloyd, LLC, a California limited liability company |
| Recording Date: | November 6, 2018 |
| Recording No: | 20181122919, Official Records |
| | |
| Recording Dare: | August 31, 2020 |
| Recording No.: | 20201030294 of Official Records |

Reference is hereby made to said document for full particulars.

15. A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $30,188,235.00 |
| Dated: | October 16, 2018 |
| Trustor/Grantor | Crestlloyd, LLC, a California limited liability company |
| Trustee: | Chicago Title Company |
| Beneficiary: | YOGI Securities Holdings, LLC, a Nevada limited liability company |
| Recording Date: | November 7, 2018 |
| Recording No: | 20181126580, Official Records |

16. This exception has been intentionally deleted.

17. A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $6,196,810.64 |
| Dated: | September 18, 2019 |
| Trustor/Grantor | Crestlloyd, LLC, a California limited liability company |
| Trustee: | Chicago Title Company |
| Beneficiary: | YOGI Securities Holdings, LLC, a Nevada limited liability company |
| Recording Date: | September 23, 2019 |
| Recording No: | 20190989746, Official Records |

18. An instrument entitled Covenant and Agreement Regarding Maintenance of Building

| | |
|---|---|
| Executed by: | Crestlloyd, LLC |
| In favor of: | City of Los Angeles |
| Recording Date: | December 2, 2019 |
| Recording No: | 20191317943, Official Records |

Reference is hereby made to said document for full particulars.

19. Any rights of the parties in possession of a portion of, or all of, said Land, which rights are not disclosed by the public records.

**EXCEPTIONS**
**(Continued)**

20. Matters which may be disclosed by an inspection and/or by a correct ALTA/NSPS Land Title Survey of said Land that is satisfactory to the Company, and/or by inquiry of the parties in possession thereof.

21. **ANY LIEN OR RIGHT TO A LIEN FOR SERVICES, LABOR OR MATERIAL NOT SHOWN BY THE PUBLIC RECORDS.**

22. A claim of mechanic's lien or materialman's lien

Claimant: American Truck & Tool Rentals Inc./American Rentals
Amount: $97,050.34
Recording Date: June 29, 2020
Recording No: 20200709010 of Official Records

23. A claim of mechanic's lien or materialman's lien

Claimant: J&E Texture, Inc.
Amount: $214,147.50
Recording Date: June 30, 2020
Recording No: 20200712043 of Official Records

24. A claim of mechanic's lien or materialman's lien

Claimant: Rolls Scaffold, Inc.
Amount: $14,412.84
Recording Date: September 2, 2020
Recording No: 20201044741 of Official Records

25. A deed of trust to secure an indebtedness in the amount shown below,

Amount: $5,000,000.00
Dated: February 11, 2020
Trustor/Grantor CRESTLLOYD, LLC, a California limited liability company
Trustee: Pacific Coast Title Company
Beneficiary: Hilldun Corporation, a New York corporation
Recording Date: September 4, 2020
Recording No: 20201058770 of Official Records

**PLEASE REFER TO THE "INFORMATIONAL NOTES" AND "REQUIREMENTS" SECTIONS WHICH FOLLOW FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION.**

---

**END OF EXCEPTIONS**

---

## REQUIREMENTS SECTION

1. Unrecorded matters which may be disclosed by an Owner's Affidavit or Declaration. A form of the Owner's Affidavit/Declaration is attached to this Preliminary Report/Commitment. This Affidavit/Declaration is to be completed by the record owner of the land and submitted for review prior to the closing of this transaction. Your prompt attention to this requirement will help avoid delays in the closing of this transaction. Thank you.

   The Company reserves the right to add additional items or make further requirements after review of the requested Affidavit/Declaration.

2. The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below:

   Limited Liability Company: Crestlloyd, LLC, a California limited liability company

   a) A copy of its operating agreement, if any, and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

   b) If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps.

   c) If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member.

   d) A current dated certificate of good standing from the proper governmental authority of the state in which the entity is currently domiciled.

   e) If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

   f) If Limited Liability Company is a Single Member Entity, a Statement of Information for the Single Member will be required.

   g) Each member and manager of the LLC without an Operating Agreement must execute in the presence of a notary public the Certificate of California LLC (Without an Operating Agreement) Status and Authority form.

3. In order to complete this report, the Company requires a Statement of Information to be completed by the following party(s),

   Party(s): All Parties

   The Company reserves the right to add additional items or make further requirements after review of the requested Statement of Information.

   NOTE: The Statement of Information is necessary to complete the search and examination of title under this order. Any title search includes matters that are indexed by name only, and having a completed Statement of Information assists the Company in the elimination of certain matters which appear to involve the parties but in fact affect another party with the same or similar name. Be assured that the Statement of Information is essential and will be kept strictly confidential to this file.

---

**END OF REQUIREMENTS**

---

# INFORMATIONAL NOTES SECTION

1. The Company is not aware of any matters which would cause it to decline to attach CLTA Endorsement Form 116 indicating that there is located on said Land Single Family Residential, known as 944 Airole Way, located within the city of Los Angeles, California, to an Extended Coverage Loan Policy.

2. Note: Please contact your Title Officer to obtain the current recording fees. Chicago Title Company will pay Chicago Title Insurance Company 12% of the title premium, as disclosed on lines 1107 and 1108 of the HUD-1.

3. Note: The policy of title insurance will include an arbitration provision. The Company or the insured may demand arbitration. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Please ask your escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration provisions and any other provisions pertaining to your Title Insurance coverage.

4. Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

5. Due to the special requirements of SB 50 (California Public Resources Code Section 8560 et seq.), any transaction that includes the conveyance of title by an agency of the United States must be approved in advance by the Company's State Counsel, Regional Counsel, or one of their designees.

6. Note: There are NO conveyances affecting said Land recorded within 24 months of the date of this report.

---

**END OF INFORMATIONAL NOTES**

---

WIRE SAFE™ | Inquire before you wire!

# Wire Fraud Alert

This Notice is not intended to provide legal or professional advice. If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.
- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the phone number of relevant parties to the transaction as soon as an escrow account is opened**. DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.
- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.
- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

***Federal Bureau of Investigation:***
http://www.fbi.gov

***Internet Crime Complaint Center:***
http://www.ic3.gov

*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

**FIDELITY NATIONAL FINANCIAL, INC.**
**PRIVACY NOTICE**

Effective January 1, 2020

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

**Collection of Personal Information**
FNF may collect the following categories of Personal Information:
- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:
- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

**Collection of Browsing Information**
FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:
- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

**Other Online Specifics**
Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites. FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

**Use of Personal Information**
FNF uses Personal Information for three main purposes:
- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

**When Information Is Disclosed**
We may disclose your Personal Information and Browsing Information in the following circumstances:
- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;

Copyright © 2017. Fidelity National Financial, Inc. All Rights Reserved

- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law. We do share Personal Information among affiliates (other companies owned by FNF) to directly market to you. Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

**Security of Your Information**
We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

**Choices With Your Information**
If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request by email, phone, or physical mail as directed at the end of this Privacy Notice. We do not share your Personal Information with nonaffiliates for their use to direct market to you.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.

For Oregon Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**Information From Children**
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

**International Users**
FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes; Use of Comments or Feedback**
By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the

Copyright © 2017. Fidelity National Financial, Inc. All Rights Reserved

last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice. We may use comments or feedback that you submit to us in any manner without notice or compensation to you.

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, send your requests to privacy@fnf.com, by phone to (888) 934-3354, or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

Copyright © 2017. Fidelity National Financial, Inc. All Rights Reserved

# Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment. Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the field rate. As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative. These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for each discount. These discounts only apply to transaction involving services rendered by the FNF Family of Companies. This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

| **FNF Underwritten Title Company** | **FNF Underwriter** |
| --- | --- |
| CTC - Chicago Title Company | CTIC - Chicago Title Insurance Company |

**Available Discounts**

**CREDIT FOR PRELIMINARY REPORTS AND/OR COMMITMENTS ON SUBSEQUENT POLICIES (CTIC)**
Where no major change in the title has occurred since the issuance of the original report or commitment, the order may be reopened within 12 months and all or a portion of the charge previously paid for the report or commitment may be credited on a subsequent policy charge within the following time period from the date of the report.

**DISASTER LOANS (CTIC)**
The charge for a lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within 24 months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be 50% of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be 50% to 70% of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be 40% to 50% of the appropriate title insurance rate, depending on the type of coverage selected.

**EMPLOYEE RATE (CTC and CTIC)**
No charge shall be made to employees (including employees on approved retirement) of the Company or its underwritten, subsidiary title companies for policies or escrow services in connection with financing, refinancing, sale or purchase of the employees' bona fide home property. Waiver of such charges is authorized only in connection with those costs which the employee would be obligated to pay, by established custom, as a party to the transaction.

**ATTACHMENT ONE**

**CALIFORNIA LAND TITLE ASSOCIATION**
**STANDARD COVERAGE POLICY – 1990**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

**EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

**CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)**
**ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE**

**EXCLUSIONS**

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;
   d. improvements on the Land;
   e. land division; and
   f. environmental protection.

   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;

    c. that result in no loss to You; or
d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5. Failure to pay value for Your Title.
6. Lack of a right:
a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
b. in streets, alleys, or waterways that touch the Land.
This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

**LIMITATIONS ON COVERED RISKS**

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

- For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% % of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% % of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 5,000.00 |

**2006 ALTA LOAN POLICY (06-17-06)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
(i) the occupancy, use, or enjoyment of the Land;
(ii) the character, dimensions, or location of any improvement erected on the Land;
(iii) the subdivision of land; or
(iv) environmental protection;
or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
(b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
(a) created, suffered, assumed, or agreed to by the Insured Claimant;
(b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13 or 14); or
(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
(a) a fraudulent conveyance or fraudulent transfer, or
(b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

**EXCEPTIONS FROM COVERAGE**

(Except as provided in Schedule B - Part II,( t(or T)his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

**(PART I**

(The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records.

**PART II**

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:)

**2006 ALTA OWNER'S POLICY (06-17-06)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:
(The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records.
7. (Variable exceptions such as taxes, easements, CC&R's, etc. shown here.)

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (12-02-13)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.
10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.



4369
26
SHEET
P. A.
1124-26
TRA
67
REVISED
95040410001002-07
95040410001004-07
2011120602-07
2013112602014001-07
20160308020010001-07
SEARCH NO
OFFICE OF THE ASSESSOR
COUNTY OF LOS ANGELES
COPYRIGHT © 2002
2016
MAPPING AND GIS SERVICES
SCALE 1" = 100'
STRADELLA
TRACT
NO
22727
BK
4370
PG
36
PIQ
AIROLE
M B 623 - 81 - 83
TRACT
NO
9745
M B 141 - 93 - 96
PG
24
PG
25
WAY
RD
WEST
2.45±AC
1.25±AC
This map/plat is being furnished as an aid in locating the herein described Land in relation to adjoining streets, natural boundaries and other land, and is not a survey of the land depicted. Except to the extent a policy of title insurance is expressly modified by endorsement, if any, the Company does not insure dimensions, distances, location of easements, acreage or other matters shown thereon.
Date Printed: 3/3/2016 8:28:50 AM
Date Saved: 3/3/2016 8:28:47 AM
Order: 122260
Doc: CALOSA:MASS 4369-00026
Page 1 of 1
Requested By: dcssabocor, Printed: 12/16/2019 11:57 AM

# OWNER'S DECLARATION

Escrow No.: 00124425-994-LT2-DB
Property Address: 944 Airole Way
Los Angeles, CA

The undersigned hereby declares as follows:

1. (Fill in the applicable paragraph and strike the other)

   a. Declarant ("Owner") is the owner or lessee, as the case may be, of certain premises located at 944 Airole Way, Los Angeles, CA, further described as follows: See Preliminary Report/Commitment No. for full legal description (the "Land").

   b. Declarant is the ______________________________ of ____________________________________ ("Owner"), which is the owner or lessee, as the case may be, of certain premises located at 944 Airole Way, Los Angeles, CA, further described as follows: See Preliminary Report/Commitment No. for full legal description (the "Land").

2. (Fill in the applicable paragraph and strike the other)

   a. During the period of six months immediately preceding the date of this declaration no work has been done, no surveys or architectural or engineering plans have been prepared, and no materials have been furnished in connection with the erection, equipment, repair, protection or removal of any building or other structure on the Land or in connection with the improvement of the Land in any manner whatsoever.

   b. During the period of six months immediately preceding the date of this declaration certain work has been done and materials furnished in connection with _________________________ upon the Land in the approximate total sum of $__________, but no work whatever remains to be done and no materials remain to be furnished to complete the construction in full compliance with the plans and specifications, nor are there any unpaid bills incurred for labor and materials used in making such improvements or repairs upon the Land, or for the services of architects, surveyors or engineers, except as follows: ____________________________________________. Owner, by the undersigned Declarant, agrees to and does hereby indemnify and hold harmless Chicago Title Company against any and all claims arising therefrom.

3. Owner has not previously conveyed the Land; is not a debtor in bankruptcy (and if a partnership, the general partner thereof is not a debtor in bankruptcy); and has not received notice of any pending court action affecting the title to the Land.

4. Except as shown in the above-referenced Preliminary Report/Commitment, there are no unpaid or unsatisfied mortgages, deeds of trust, Uniform Commercial Code financing statements, regular assessments, special assessments, periodic assessments or any assessment from any source, claims of lien, special assessments, or taxes that constitute a lien against the Land or that affect the Land but have not been recorded in the public records. There are no violations of the covenants, conditions and restrictions as shown in the above-referenced Preliminary Report/Commitment.

5. The Land is currently in use as _____________________; _______________________ occupy/occupies the Land; and the following are all of the leases or other occupancy rights affecting the Land:

   ___________________________________________________________________________________

6. There are no other persons or entities that assert an ownership interest in the Land, nor are there unrecorded easements, claims of easement, or boundary disputes that affect the Land.

7. There are no outstanding options to purchase or rights of first refusal affecting the Land.

8. Between the most recent Effective Date of the above-referenced Preliminary Report/Commitment and the date of recording of the Insured Instrument(s), Owner has not taken or allowed, and will not take or allow, any action or inaction to encumber or otherwise affect title to the Land.

This declaration is made with the intention that Chicago Title Company (the "Company") and its policy issuing agents will rely upon it in issuing their title insurance policies and endorsements. Owner, by the undersigned Declarant, agrees to indemnify the Company against loss or damage (including attorneys fees, expenses, and costs) incurred by the Company as a result of any untrue statement made herein.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on ______ at ________________________________.

Signature: ______________________________

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is **21650 Oxnard Street, Suite 500, Woodland Hills, California 91367**.

On July 16, 2021, I served the foregoing document described as: **RECEIVER'S NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING RECEIVER TO RETAIN AND EMPLOY BRUTZKUS GUBNER ROZANSKY SEROR WEBER LLP AS COUNSEL MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF THEODORE LANES AND DAVID SEROR IN SUPPORT THEREOF** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed as follows:

**(SEE ATTACHED SERVICE LIST)**

☒ **(BY MAIL)** I caused such envelope with postage thereon fully prepaid to be placed in the U.S. mail at Woodland Hills, California. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of a party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY PERSONAL DELIVERY)** I caused such envelope to be delivered by hand by [Name and address of courier service], to the office of the addressee(s) noted on the attached Service List.

☒ **(BY E-MAIL OR ELECTRONIC TRANSMISSION)** I caused said document(s) to be sent to the person(s) at the e-mail address(es) listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ **(BY FEDERAL EXPRESS / OVERNITE EXPRESS)** I caused such envelope to be deposited at the Federal Express/Overnite Express drop box at Woodland Hills, California. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with Federal Express/Overnite Express that same day in the ordinary course of business.

Executed on July 16, 2021, at Woodland Hills, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct and, that I am employed in the office of a member of the bar of this court at whose direction the service was made.

*Mela Galvan*
MELA GALVAN

HANKEY CAPITAL, LLC v. CRESTLLOYD, LLC, et al.
LASC Case No. 21SMCV01113

**SERVICE LIST**

**BY MAIL**

Theodore "Ted" Lanes
3 Lanes Management Services
655 Deep Valley Drive, Suite 125-P 4
Rolling Hills Estate, CA 90274

Manager and Agent for Service of Process for Defendant Crestlloyd, LLC

Jeffrey S. Wruble, Esq.
Buchalter
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA 90017-1730
Email: jwruble@buchalter.com

Attorneys for Hankey Capital, LLC

Mark J. Rosenbaum, Esq.
Elsa M. Horowitz, Esq.
Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
11400 W Olympic Blvd., 9th Floor
Los Angeles, CA 90064
E-mail: mrosenbaum@wrslawyers.com
E-mail: ehorowitz@wrslawyers.com

Attorneys for Yogi Securities Holdings, LLC, the Plaintiff in Los Angeles Superior Court Case No. 21STCV24076 (courtesy copy only)

**BY EMAIL**

Marcos Almeida
7 Legal Executive
Southpac Group
8 Registrado na Ordem dos Advogados do Brasil/MG 132.407
Email: malmeida@southpacgroup.com

Advisor to Southpac Trust International, Inc., as Trustee of the Park City Family Settlement, the sole member of Crestlloyd, LLC ("Borrower")

Me Mathieu Robillard
Robillard Prescott Morissette, avocats et médiateurs s.e.n.c.
E-mail: mathieu@rpmlex.ca

Attorneys for Inferno Investment, Inc., a Defendant in Los Angeles Superior Court Case No. 21STCV24076 (courtesy copy only)

Journal Technologies Court Portal

# Make a Reservation

HANKEY CAPITAL, LLC A CALIFORNIA LIMITED LIABILITY COMPANY vs CRESTLLOYD, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, et al.

Case Number: 21SMCV01113 Case Type: Civil Unlimited Category: Other Real Property (not eminent domain, landlord/tenant, foreclosure)
Date Filed: 2021-06-24 Location: Santa Monica Courthouse - Department M

## Reservation

| | |
|---|---|
| Case Name: HANKEY CAPITAL, LLC A CALIFORNIA LIMITED LIABILITY COMPANY vs CRESTLLOYD, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, et al. | Case Number: 21SMCV01113 |
| Type: Motion for Order (Application for Order Authorizing Receiver to Retain and Employ Brutzkus Gubner Rozansky Seror Weber LLP as Counsel) | Status: RESERVED |
| Filing Party: Theodore Lanes (Non-Party) | Location: Santa Monica Courthouse - Department M |
| Date/Time: 12/17/2021 8:30 AM | Number of Motions: 1 |
| Reservation ID: 280713514735 | Confirmation Code: CR-UEHTG7TQPTT9M8YX5 |

## Fees

| Description | Fee | Qty | Amount |
|---|---|---|---|
| First Paper Fees (Unlimited Civil) | 435.00 | 1 | 435.00 |
| Credit Card Percentage Fee (2.75%) | 11.96 | 1 | 11.96 |
| TOTAL | | | **$446.96** |

## Payment

| | |
|---|---|
| Amount: $446.96 | Type: AmericanExpress |
| Account Number: XXXX4014 | Authorization: 289574 |

Print Receipt
Reserve Another Hearing

Chat

Copyright © Journal Technologies, USA. All rights reserved.

# EXHIBIT "7"

Electronically Received 07/21/2021 03:01 PM

DAVID SEROR – Bar No. 67488
JESSICA WELLINGTON – Bar No. 324477
BRUTZKUS GUBNER ROZANSKY SEROR WEBER LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email: dseror@bg.law
jwellington@bg.law

[Proposed] Counsel for Court-Appointed Receiver, Theodore Lanes

FILED
Superior Court of California
County of Los Angeles
07/23/2021
Sherri R. Carter, Executive Officer / Clerk of Court
By: K. Metoyer Deputy

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES – WEST DISTRICT**

HANKEY CAPITAL, LLC, a California limited liability company,

Plaintiff,

vs.

CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,

Defendants.

Case No. 21SMCV01113

Assigned to Hon. Mark Young (Dept. M)

**~~[PROPOSED~~] ORDER SHORTENING TIME TO HEAR RECEIVER'S MOTION FOR ORDER AUTHORIZING RECEIVER TO RETAIN AND EMPLOY BRUTZKUS GUBNER ROZANSKY SEROR WEBER LLP AS COUNSEL**

Current Hearing Date: December 17, 2021
Time: 8:30 a.m.
Dept.: M
Place: Santa Monica Courthouse
1725 Main Street
Santa Monica, CA 90401

**HEARING RESERVED**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on Friday, July 23, 2021 at 9:00 a.m., the parties through their respective attorneys of record appeared for the hearing on Theodore Lanes, the Court-appointed Receiver's (the "Receiver"), *Ex Parte* Application for Order Shortening Time to Hear His Motion for Order Authorizing Receiver to Retain and Employ Brutzkus Gubner Rozansky Seror Weber LLP as Counsel (the "Application").

After considering the Application and attached Memorandum of Points and Authorities, the Declarations of Theodore Lanes and Jessica Wellington and attachments thereto, the complete file in this matter, and further evidence as presented at the hearing in this matter, the Court orders as follows:

1. The Receiver's Application is GRANTED. The hearing on the Receiver's Motion for Order Authorizing Receiver to Retain and Employ Brutzkus Gubner Rozansky Seror Weber LLP as Counsel (the Motion"), originally scheduled for December 17, 2021, shall be advanced to be heard on July 23, 2021 at 9:00 a.m. in Department M.

2. The motion authorizing the Receiver to retain and employ Brutzkus Gubner Rozansky Seror Weber LLP is granted.

DATED: 07/23/2021

Hon. Mark Young

# EXHIBIT “8”

**From:** Ted Bumgardner <tbumgardner@xperagroup.com>
**Subject: Water Intrusion Investigation**
**Date:** October 28, 2021 at 8:11:11 AM PDT
**To:** Ted Lanes <tl@lanesmgmt.com>
**Cc:** Alexander Johnsen <ajohnsen@vertexeng.com>, Lance VanDemark <lvandemark@vertexeng.com>, Matthew Click <mclick@vertexeng.com>, "swilson.wcfc@gmail.com" <swilson.wcfc@gmail.com>

Per your request, at approximately 2:30 pm Tuesday 10/26/212, we stopped work on the intrusive investigation of leaks at the entry pool that had started at around 9am on the morning of the 26th. During that brief investigation we found buckling of the waterproofing membrane at the base of wall, evidence of water intrusion at the failed skylight seals, and evidence of a history of unsuccessful attempts at repair of the skylights. Upon stopping work, temporary sealant was installed to help mitigate further incidental water intrusion. We advise that the entry pools be kept dry until the investigation can resume, all paths of water intrusion can be evaluated, and proper permanent repairs can be made.

Prior to the direction to stop the investigation, Alex Johnson, our certified industrial hygienist was scheduled to be at the site today (10/28/21) to investigate the ceiling cavity below the entry pools and other areas of the property where evidence of water intrusion has been observed. The ceiling cavity below the entry pools exhibits clear evidence of a history of bio-organic growth (BOG) and a history of attempts to encapsulate. There is evidence of current active BOG in the area below the skylights. Until the investigation can resume, and a proper mold abatement protocol can be developed, we advise that the ceiling cavity be immediately evaluated to determine if it is a plenum space that could expose the HVAC system return air to mold spores, and that the ceiling cavity be sealed off to mitigate the potential of spreading mold spores throughout the house.

In preparation for the intrusive investigation that was to occur this week at the entry pools, the vanishing edge pool adjacent to the running track, and the vanishing edge pool above the night club, our building envelope specialist Steve Wilson also observed the following:

At the vanishing edge pool adjacent to the running track, there is approximately 200’ of potential tile dis-bonding with evidence of a history of unsuccessful repair attempts. Rust was observed leaching through the face of the wall, and tile was sounded to determine that there are many dis-bonded locations with hollow areas behind the tile throughout. Some locations were observed to have tile dis-bonded protruding up to 1 ½” from its proper plane with large hollow areas having formed behind the tile. The vanishing edge trough was drained and prepared for intrusive investigation, but work was stopped before that area of our investigation could commence. The observed rust spots are evidence that water is likely making it way past the waterproofing membrane. We recommend that the ceiling spaces below the trough be opened and investigated for evidence of active leaks and potential BOG, and the troughs be kept dry until such determination can be made, and the investigation of observed failures along the vanishing edge wall can be concluded and proper repairs can be made.

At the vanishing edge wall at the main pool, evidence of dis-bonding of marble was observed at around 12 locations and there is evidence of a history of multiple repairs over time.  No work on the intrusive investigation was started at this location as of the stop work. We recommend that the ceiling spaces below the trough be opened and investigated for evidence of active leaks and potential BOG, and the troughs be kept dry until the investigation of observed failures along the vanishing edge wall can be concluded and proper repairs can be made.

The ceiling above the patio and below the master bedroom deck was observed to be leaking in 5 locations with active leaks observed during the rain that occurred on Monday 10/26/21.  At these locations, rust was also observed which is evidence of potential corrosion of steel which could be coming from plaster lath, concrete reinforcing steel decking or steel structure above. These areas should be opened and investigated for failure of the waterproofing system and potential BOG.

The following additional areas of concern were observed:

- Slot drains in the open outdoor deck area below the master bedroom deck were observed to be plugged and causing water to collect on the patio causing ponding during the recent rain event.
- 
- Unsealed conduit penetrations were observed at the front entry sculpture pool and appears to be allowing water into electrical conduits.

- At the Northeast corner of the master bedroom pool, where the acrylic pool wall meets the stone covered wall there is evidence of a leak that should be investigated.  At the NW end of the Master Bedroom pool, more evidence of water intrusion was observed.

- Three windows above the office area on the east and south elevations appear to have failed insulated glazing units that will need to be replaced.

- Evidence of water intrusion into the garage area above the west turntable area was observed.

- Evidence of leaks in the large skylights over the main stair was observed.

- Evidence of water intrusion at planters along the main driveway was observed.

- Then, the Not a complete investigation, just casual observations from being out there the day before the specific investigation at the pools,

- Water testing and performance testing needs to occur at these locations.

These were casual observations made while preparing to start a focused investigation of the three main pool areas.  A through visual investigation of the property has not been made. Water intrusion is the single most common source of ongoing deterioration to structures and can lead to mold growth which can become a health hazard.  I strongly urge that these issues be property investigated resolved immediately.

**Ted Bumgardner**

O: 858-436-7770 | C: 619-843-3874

XPERA GROUP, A VERTEX Company
10911 TECHNOLOGY PLACE
SAN DIEGO, CA 92127
XPERAGROUP.COM

CONFIDENTIALITY NOTICE: This e-mail and any files attached may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please destroy the original transmission and its attachments without reading or saving in any manner.

# EXHIBIT “9”

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

West District, Santa Monica Courthouse, Department M

**21SMCV01113**
**HANKEY CAPITAL, LLC A CALIFORNIA LIMITED LIABILITY COMPANY vs CRESTLLOYD, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, et al.**

October 8, 2021
8:30 AM

Judge: Honorable Mark A. Young
Judicial Assistant: K. Metoyer
Courtroom Assistant: J. Morgan

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Jeffrey Stuart Wruble By: David Mark (Video)

For Defendant(s): No Appearances

Other Appearance Notes: Non-party: By Jessica Wellington (Telephonic)

**NATURE OF PROCEEDINGS:** Hearing on Ex Parte Application FOR ORDER SHORTENING TIME TO HEAR RECEIVERS MOTION FOR ORDER AUTHORIZING RECEIVER TO EMPLOY VISTA SOTHEBYS INTERNATIONAL REALTY AND WESTSIDE ESTATE AGENCY

The matter is called for hearing and ruled in chambers.

The EX PARTE APPLICATION FOR ORDER SHORTENING TIME TO HEAR RECEIVERS MOTION FOR ORDER AUTHORIZING RECEIVER TO EMPLOY VISTA SOTHEBYS INTERNATIONAL REALTY AND WESTSIDE ESTATE AGENCY; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF filed by Theodore Lanes on 10/06/2021 is Granted.

On the Court's own motion, the Hearing on Motion for Order Authorizing Receiver to Employ Vista Sotheby's International Realty and Westside Estate Agency scheduled for 03/17/2022 is advanced to this date and heard .

ORDER SHORTENING TIME TO HEAR RECEIVER’S MOTION FOR ORDER AUTHORIZING RECEIVER TO EMPLOY VISTA SOTHEBY’S INTERNATIONAL REALTY AND WESTSIDE ESTATE AGENCY is signed by the Court and filed this date.

Notice is waived.

# EXHIBIT “10”

**Lanes Management Services**
655 Deep Valley Drive
125-P
Rolling Hills Estates, CA 90274

**Airole Way**
Eugene Leydiker
4751 Wilshire Blvd.
Suite 110
Los Angeles, CA 90010

## Invoice 10012

| | |
|---|---|
| **Date** | Aug 06, 2021 |
| **Terms** | |
| **Service Thru** | Aug 06, 2021 |

**In Reference To: Crestlloyd, LLC (Labor)**

| Date | By | Services | Hours | Amount |
|---|---|---|---|---|
| 06/01/2021 | TL | **Correspondence:** Legal retainer, letter to Title Company re establishment and ownership of Crestlloyd | 5.00 | $ 1,975.00 |
| 06/02/2021 | TL | **Correspondence:** Various emails, NDA review, correspondence re same | 0.90 | $ 355.50 |
| 06/02/2021 | TL | **Correspondence:** Discussions with Doug Watkins | 1.20 | $ 474.00 |
| 06/02/2021 | TL | **Correspondence:** Discussions with Title Company re documentation | 1.60 | $ 632.00 |
| 06/03/2021 | TL | **Correspondence:** Various email re Title etc., review of additional documentation sent from Trustee. Discussions with Title underwriting. | 1.40 | $ 553.00 |
| 06/03/2021 | TL | **Documentation:** Review of documents for Title | 2.00 | $ 790.00 |
| 06/04/2021 | TL | **Correspondence:** Lengthy discussions with Title company re: documentation, Aaron re documents and timing | 5.20 | $ 2,054.00 |
| 06/07/2021 | TL | **Documentation:** Various phone conversations with Fidelity title and lenders and counsel re: title insurance and possible next steps. | 3.10 | $ 1,224.50 |
| 06/08/2021 | TL | **Correspondence:** Emails and discussion re Crestlloyd debt on Airole. Discussion with counsel for Yogi and Hankey re possible receivership appointment. | 2.40 | $ 948.00 |
| 06/09/2021 | TL | **Correspondence:** Various phone conferences re receivership strategy, emails re NDA, review of Workers comp claims. Discussion with counsel for secured lenders | 3.80 | $ 1,501.00 |
| 06/10/2021 | TL | **Documentation:** Review of Airole title report and zoom meeting with Paul Weinberg | 2.20 | $ 869.00 |

**Lanes Management Services**
655 Deep Valley Drive
125-P
Rolling Hills Estates, CA 90274

**Airole Way**
Eugene Leydiker
4751 Wilshire Blvd.
Suite 110
Los Angeles, CA 90010

## Invoice 10012

| | |
|---|---|
| **Date** | Aug 06, 2021 |
| **Terms** | |
| **Service Thru** | Aug 06, 2021 |

| | | | | |
|---|---|---|---|---|
| 06/10/2021 | TL | **Correspondence:** Introduction to Paul Weinberg, attorney for Inferno in the matter of Crestlloyd and Nile Niami in regards of 944 Airole way, L.A. | 1.00 | $ 395.00 |
| 06/11/2021 | TL | **Correspondence:** Various emails and review of supporting docs for debt calculation | 1.20 | $ 474.00 |
| 06/14/2021 | TL | **Documentation:** Review of WCAB lawsuits, correspondence with attorneys re same. | 0.80 | $ 316.00 |
| 06/14/2021 | TL | **Documentation:** Discussion with Mark Cramer re: potential buyer terms | 1.00 | $ 395.00 |
| 06/14/2021 | TL | **Documentation:** Review of Draw requests and banking information. | 1.80 | $ 711.00 |
| 06/15/2021 | TL | **Review:** Review of banking transactions | 1.60 | $ 632.00 |
| 06/16/2021 | TL | **Documentation:** Draft Declaration in support of Receivership filing. Building permit research. Banking research re payments | 1.80 | $ 711.00 |
| 06/17/2021 | TL | **Documentation:** Various emails re Stipulations, banking transaction issues | 0.40 | $ 158.00 |
| 06/17/2021 | TL | **Research:** Various emails and correspondence re payments to certain vendors. | 2.20 | $ 869.00 |
| 06/18/2021 | TL | **Correspondence:** Discussion with Title re status | 0.50 | $ 197.50 |
| 06/18/2021 | TL | **Documentation:** Declaration in support of Receivership filing. Review of downloaded building permits. Discussion with Counsel re WCAB litigation. Discussion with Title re timing. Brief discussion with lenders counsel re declaration in support of receivership | 2.20 | $ 869.00 |
| 06/21/2021 | TL | **Documentation:** Review of Order, phone conferences re same | 2.10 | $ 829.50 |
| 06/22/2021 | TL | **Documentation:** Brief discussion re Declaration, various emails and review of potential mechanics liens. | 0.70 | $ 276.50 |

**Lanes Management Services**
655 Deep Valley Drive
125-P
Rolling Hills Estates, CA 90274

**Airole Way**
Eugene Leydiker
4751 Wilshire Blvd.
Suite 110
Los Angeles, CA 90010

## Invoice 10012

| | |
|---|---|
| **Date** | Aug 06, 2021 |
| **Terms** | |
| **Service Thru** | Aug 06, 2021 |

| | | | | |
|---|---|---|---|---|
| 06/23/2021 | TL | **Correspondence:** Various emails re banking, insurance, other open issues. Discussion with Counsel representing worker in WC case. | 2.10 | $ 829.50 |
| 06/23/2021 | TL | **Documentation:** Discussions re Insurance and Dennis Palma resignation. | 1.10 | $ 434.50 |
| 06/24/2021 | TL | **Documentation:** Various emails, conversation about potential claim settlement | 0.90 | $ 355.50 |
| 06/24/2021 | TL | **Correspondence:** Variouis emails and discussion re Plus Development / Skyline | 0.40 | $ 158.00 |
| 06/24/2021 | TL | **Documentation:** Additional insurance discussions, various emails | 0.90 | $ 355.50 |
| 06/25/2021 | TL | **Documentation:** Insurance review and discussio with J Axel about new policies | 1.20 | $ 474.00 |
| 06/25/2021 | TL | **Documentation:** Declaration and various emails | 0.60 | $ 237.00 |
| 06/28/2021 | TL | **Correspondence:** Discussion with YN re schedule, various emails, schedule | 0.90 | $ 355.50 |
| 06/29/2021 | TL | **Meeting:** Onsite meeting to review C of O, meet with Jonathan Axel re insurance. | 8.00 | $ 3,160.00 |
| 06/30/2021 | TL | **Correspondence:** Various emails and correspondence | 1.00 | $ 395.00 |
| 06/30/2021 | TL | **Phone Call:** Conference call with Counsel re various items | 0.80 | $ 316.00 |
| 06/30/2021 | TL | **Phone Call:** Jonathan Axel re insurance. Discussions with Yvonne re contractors and amounts due. | 0.90 | $ 355.50 |
| 06/30/2021 | TL | **Correspondence:** Discussion with P Hankey re open invoices and payment of same. Discussion with Christopher re various property subcontractors | 1.90 | $ 750.50 |

| | |
|---|---|
| **Total Hours** | 66.80 hrs |
| **Total Labor** | $ 26,386.00 |

**Lanes Management Services**
655 Deep Valley Drive
125-P
Rolling Hills Estates, CA 90274

**Airole Way**
Eugene Leydiker
4751 Wilshire Blvd.
Suite 110
Los Angeles, CA 90010

## Invoice 10012

| | |
|---|---|
| **Date** | Aug 06, 2021 |
| **Terms** | |
| **Service Thru** | Aug 06, 2021 |

| | |
|---|---|
| **Total Invoice Amount** | $ 26,386.00 |
| **Previous Balance** | **$ 0.00** |
| 07/09/2021 Payment - Check<br>Partial payment | ($9,746.50) |
| **Balance (Amount Due)** | **$ 16,639.50** |

**Lanes Management Services**
655 Deep Valley Drive
125-P
Rolling Hills Estates, CA 90274

**Airole Way**
Eugene Leydiker
4751 Wilshire Blvd.
Suite 110
Los Angeles, CA 90010

## Invoice 10025

| | |
|---|---|
| **Date** | Nov 03, 2021 |
| **Terms** | |
| **Service Thru** | Oct 31, 2021 |

**In Reference To: The One (Labor)**

| Date | By | Services | Hours | Amount |
|---|---|---|---|---|
| 10/01/2021 | TL | **Meeting:** R/T and meeting at HIC with team | 4.00 | $ 1,580.00 |
| 10/04/2021 | TL | **Documentation:** Various emails, discussion and review of photos with D Sundberg re new leak above garage entrance<br>Accounting | 1.90 | $ 750.50 |
| 10/04/2021 | TL | **Phone Call:** Lengthy discussion with secured creditor counsel re status<br>Lengthy discussion re onsite engineer and new water leak | 1.20 | $ 474.00 |
| 10/04/2021 | TL | **Correspondence:** Lengthy discussion with Schmidt re what they own, artwork, installation, ring sculpture and amount owed for installation | 0.90 | $ 355.50 |
| 10/04/2021 | TL | **Documentation:** Draft September report | 1.50 | $ 592.50 |
| 10/04/2021 | DS | **Other:** Onsite management. | 7.00 | $ 1,015.00 |
| 10/04/2021 | TL | **Phone Call:** Discussion with xTerra re leaks etc.<br>Discussion re scheduling tours with City | 0.80 | $ 316.00 |
| 10/05/2021 | TL | **Meeting:** Onsite meeting with xPerra re Lidar and property mapping<br>Meeting with DSundberg re additional water issues<br>Various emails and phone calls<br>Onsite meeting with M. Schultz re water issues | 10.00 | $ 3,950.00 |
| 10/05/2021 | DS | **Other:** Onsite management. Leak assessment, surveying, as-built scanning | 7.00 | $ 1,015.00 |
| 10/06/2021 | TL | **Meeting:** Onsite meeting with creditors and counsel<br>Onsite meeting with T. Bumgardner re update to engineering review | 9.00 | $ 3,555.00 |

**Lanes Management Services**
655 Deep Valley Drive
125-P
Rolling Hills Estates, CA 90274

**Airole Way**
Eugene Leydiker
4751 Wilshire Blvd.
Suite 110
Los Angeles, CA 90010

## Invoice 10025

| | |
|---|---|
| **Date** | Nov 03, 2021 |
| **Terms** | |
| **Service Thru** | Oct 31, 2021 |

| | | | | |
|---|---|---|---|---|
| 10/07/2021 | TL | **Meeting:** On site at Airole for further meeting with engineers<br>Review of plans and other documentation in support of forensic engineering review of property<br>Discussion with Trustee re update of receivership | 7.10 | $ 2,804.50 |
| 10/07/2021 | TL | **Documentation:** Discussion with Counsel re creditors and potential foreclosure<br>Discussion with D Sundberg re recovering permits, review of same. | 1.70 | $ 671.50 |
| 10/07/2021 | TL | **Documentation:** Review of permit listing from LADBS in support of forensic review. | 0.90 | $ 355.50 |
| 10/08/2021 | TL | **Documentation:** Various emails<br>Brief discussion with D Neary of Plus re permits and schedule<br>Discussion with Counsel re ex-parte hearing | 1.00 | $ 395.00 |
| 10/08/2021 | VJ | **Other:** Accounting for July - Imported bank download provided by Ted to QuickBooks to establish Company file. Entered activity and submitted list of items for which I needed more info. Reconciled to bank statement. | 2.25 | $ 326.25 |
| 10/08/2021 | VJ | **Other:** Services related to Sep - Imported bank download for sep, recorded transactions with additional info provided by ted and reconciled to the bank statement. Prepared P&L month for July, Aug and Sep. ‘21 | 1.25 | $ 181.25 |
| 10/08/2021 | VJ | **Other:** Services related to Sep - Imported bank download for sep, recorded transactions with additional info provided by ted and reconciled to the bank statement. Prepared P&L month for July, Aug and Sep. ‘21Received dropbox link for outstanding invoices. Deciding how and when to enter invoices maybe as needed? Check with Ted. | 1.25 | $ 181.25 |

**Lanes Management Services**
655 Deep Valley Drive
125-P
Rolling Hills Estates, CA 90274

**Airole Way**
Eugene Leydiker
4751 Wilshire Blvd.
Suite 110
Los Angeles, CA 90010

## Invoice 10025

| | |
|---|---|
| **Date** | Nov 03, 2021 |
| **Terms** | |
| **Service Thru** | Oct 31, 2021 |

| | | | | |
|---|---|---|---|---|
| 10/08/2021 | TL | **Documentation:** review of Airole insurance policies re builders risk<br>Discussion with Jon Axel re potential insurance claim re water leaks<br>Discussion with Andrew of Plus re GC issue<br>Review of purchase offer for property<br>Discussions with counsel re same | 3.80 | $ 1,501.00 |
| 10/08/2021 | TL | **Documentation:** Additional review of permits in support of potential insurance claim | 0.40 | $ 158.00 |
| 10/10/2021 | TL | **Documentation:** Receivers monthly report | 0.70 | $ 276.50 |
| 10/10/2021 | TL | **Documentation:** Monthly report | 2.60 | $ 1,027.00 |
| 10/11/2021 | TL | **Documentation:** Discussion with Jon Axel re insurance.<br>Review of documents from insurance company | 1.00 | $ 395.00 |
| 10/11/2021 | TL | **Documentation:** Review of original insurance application to support potential claim<br>Further discussions with J Axel re coverage | 1.50 | $ 592.50 |
| 10/11/2021 | TL | **Documentation:** Further edits to periodic report | 0.40 | $ 158.00 |
| 10/11/2021 | DS | **Other:** Onsite management. | 4.00 | $ 580.00 |
| 10/12/2021 | TL | **Phone Call:** Discussions with LADBS inspectors office re scheduling onsite meetings<br>Discussions with D Sunberg re additional repairs, cieling leaks, drywall etc. | 1.30 | $ 513.50 |
| 10/12/2021 | TL | **Correspondence:** Discussion with Julian re furniture | 0.40 | $ 158.00 |
| 10/12/2021 | TL | **Correspondence:** Discussion with Vesta furniture re unpaid invoice<br>Discussion with Counsel re same | 0.70 | $ 276.50 |
| 10/12/2021 | DS | **Other:** Onsite management | 3.50 | $ 507.50 |
| 10/13/2021 | TL | **Documentation:** Discussion about proof of funds for potential buyer.<br>Discussion re Subpoena | 0.80 | $ 316.00 |

**Lanes Management Services**
655 Deep Valley Drive
125-P
Rolling Hills Estates, CA 90274

**Airole Way**
Eugene Leydiker
4751 Wilshire Blvd.
Suite 110
Los Angeles, CA 90010

## Invoice 10025

| | |
|---|---|
| **Date** | Nov 03, 2021 |
| **Terms** | |
| **Service Thru** | Oct 31, 2021 |

| | | | | |
|---|---|---|---|---|
| 10/13/2021 | TL | **Phone Call:** Dioscussion with Counsel re insurance | 0.90 | $ 355.50 |
| 10/13/2021 | TL | **Phone Call:** Discussion with Counsel re house repairs and subpoena.<br>Discussion with Ted B of Xterra re schedule of report<br>Update to financials adding new information from subpoena | 2.90 | $ 1,145.50 |
| 10/13/2021 | DS | **Other:** Onsite management. | 7.50 | $ 1,087.50 |
| 10/14/2021 | TL | **Documentation:** Various emals re bidders<br>Draft receivers report | 3.30 | $ 1,303.50 |
| 10/14/2021 | TL | **Phone Call:** Phone discussion with D Sundberg and T Bumgardner re water issues | 0.50 | $ 197.50 |
| 10/14/2021 | TL | **Documentation:** Review of draft report and accounting<br>Discussion regarding access to property for engineering eval. | 1.00 | $ 395.00 |
| 10/14/2021 | DS | **Other:** Onsite management. | 5.00 | $ 725.00 |
| 10/15/2021 | TL | **Documentation:** Various emails and discussion re art, furniture and repairs | 1.10 | $ 434.50 |
| 10/15/2021 | TL | **Documentation:** Update to draft report and financials | 1.30 | $ 513.50 |
| 10/15/2021 | TL | **Documentation:** Discussions with xPerra and D Sundberg re water issues<br>Documentation of same<br>Receivership Financial report | 2.50 | $ 987.50 |
| 10/15/2021 | TL | **Documentation:** Various emails and discussion re furniture | 1.00 | $ 395.00 |
| 10/17/2021 | TL | **Documentation:** production of documents to T Bumgartner for report<br>Edits to draft report<br>Edits to financials | 2.80 | $ 1,106.00 |
| 10/18/2021 | TL | **Meeting:** On site at Airole to meet with City Inspectors, review water issues<br>Discussions with T Bumgartner re same | 10.10 | $ 3,989.50 |
| 10/19/2021 | TL | **Documentation:** Monthly report | 1.80 | $ 711.00 |

**Lanes Management Services**
655 Deep Valley Drive
125-P
Rolling Hills Estates, CA 90274

INVOICE

**Airole Way**
Eugene Leydiker
4751 Wilshire Blvd.
Suite 110
Los Angeles, CA 90010

## Invoice 10025

| | |
|---|---|
| **Date** | Nov 03, 2021 |
| **Terms** | |
| **Service Thru** | Oct 31, 2021 |

| | | | | |
|---|---|---|---|---|
| 10/19/2021 | TL | **Correspondence:** Discussion with Andrew Colton re offer on Airole<br>Discussion with potential buyer<br>Discussion with Counsel re potential offer<br>Further discussion with brokers re offer structure<br>Discussion with Ted B. re plans audit | 3.40 | $ 1,343.00 |
| 10/19/2021 | DS | **Other:** Onsite management. | 7.50 | $ 1,087.50 |
| 10/19/2021 | TL | **Phone Call:** Discussion with D Sundberg re inspector meeting<br>Discussion with Counsel re same | 1.50 | $ 592.50 |
| 10/19/2021 | TL | **Phone Call:** Discussion with Ted Bumgartner re quote for second phase of review | 0.90 | $ 355.50 |
| 10/20/2021 | TL | **Documentation:** Onsite for meeting with Inferno representative<br>Review of water issues onsite<br>Monthly report edits<br>Lengthy meeting and discussion with Dennis Palma re permits and house issues | 11.90 | $ 4,700.50 |
| 10/20/2021 | DS | **Other:** Onsite management. | 4.00 | $ 580.00 |
| 10/21/2021 | TL | **Documentation:** Notes and follow up from onsite meeting with Anthony of Inferno and Dennis Palma<br>Additional discussions with Anthony of Inferno<br>Draft of counter offer to potential buyer<br>Discussion with Ted B re preliminary findings of analysis | 3.70 | $ 1,461.50 |
| 10/21/2021 | TL | **Phone Call:** Discussion with K Rappaport and C Adlam re counter offer to potential buyer | 0.50 | $ 197.50 |
| 10/21/2021 | TL | **Documentation:** Review and edits of counter offer to potential buyer<br>Review and edits of monthly report | 0.90 | $ 355.50 |
| 10/22/2021 | TL | **Documentation:** Varioius emails<br>review of documentation in support of initial forensic engineering findings<br>Online review of initial forensic findings | 2.70 | $ 1,066.50 |

**Lanes Management Services**
655 Deep Valley Drive
125-P
Rolling Hills Estates, CA 90274

**Airole Way**
Eugene Leydiker
4751 Wilshire Blvd.
Suite 110
Los Angeles, CA 90010

## Invoice 10025

| | |
|---|---|
| **Date** | Nov 03, 2021 |
| **Terms** | |
| **Service Thru** | Oct 31, 2021 |

| | | | | |
|---|---|---|---|---|
| 10/22/2021 | TL | **Documentation:** Updated report<br>Court filing for instructions | 2.00 | $ 790.00 |
| 10/25/2021 | TL | **Documentation:** Various emails<br>Final edits to monthly report | 0.80 | $ 316.00 |
| 10/25/2021 | TL | **Documentation:** Various emails<br>discussion with Vesta re furniture<br>Discussion with Vertex re condition of house, additional water issues, schedule for balance of the week for additional testing. | 1.80 | $ 711.00 |
| 10/25/2021 | DS | **Other:** Onsite management. | 6.50 | $ 942.50 |
| 10/26/2021 | TL | **Documentation:** Various emails, receivership draw request edits<br>Discussion with Jon Axel re additional insurance<br>Ex-Parte hearing re Receivership involvement with Foreclosure<br>Discussion with Counsel re hearing<br>Review and response re BK filing by Crestlloyd | 5.50 | $ 2,172.50 |
| 10/26/2021 | DS | **Other:** Onsite management | 6.50 | $ 942.50 |
| 10/27/2021 | TL | **Meeting:** Onsite meeting and tour with BK Counsel and representative.<br>Lengthy discussion with Counsel and T Bumgardner re remaining engineering issues | 4.00 | $ 1,580.00 |
| 10/31/2021 | TL | **Documentation:** Various emails and discussions with security regarding attempted access. | 0.90 | $ 355.50 |

**In Reference To: The One (Expenses)**

| Date | By | Expenses | Amount |
|---|---|---|---|
| 09/25/2021 | TL | **Miscellaneous:** Vanguard security | $ 116.00 |
| 10/04/2021 | DS | **Miscellaneous:** Pool - chlorine / conditioner | $ 200.00 |
| 10/14/2021 | DS | **Miscellaneous:** Chlorine and conditioner for pools | $ 200.00 |
| 10/20/2021 | DS | **Printing/Copying:** Soils engineering documentation scanning | $ 414.90 |

**Lanes Management Services**
655 Deep Valley Drive
125-P
Rolling Hills Estates, CA 90274

**Airole Way**
Eugene Leydiker
4751 Wilshire Blvd.
Suite 110
Los Angeles, CA 90010

## Invoice 10025

| | |
|---|---|
| **Date** | Nov 03, 2021 |
| **Terms** | |
| **Service Thru** | Oct 31, 2021 |

| | |
|---|---|
| **Total Hours** | 186.55 hrs |
| **Total Labor** | $ 57,874.75 |
| **Total Expenses** | $ 930.90 |
| **Total Invoice Amount** | $ 58,805.65 |
| **Previous Balance** | **$ 72,845.86** |
| 10/22/2021 Payment - Check Split Payment | ($72,845.86) |
| **Balance (Amount Due)** | **$ 58,805.65** |

# EXHIBIT “11”



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 9/1/2021 | DS | Telephone call with Receiver re expressions of interest in purchasing Hankey debt and/or property | 0.3 | $695.00 | $208.50 |
| 9/1/2021 | DS | Email exchange and Telephone call with Receiver re issues with Crest and potential conflict with Allen Matkins | 0.3 | $695.00 | $208.50 |
| 9/1/2021 | DS | Telephone call with Receiver re conflict issues with Allen Matkins and issues of waiver | 0.2 | $695.00 | $139.00 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **0.8** | | **$556.00** |
| 9/2/2021 | DS | Telephone call with Fred Rosen of Bel Air HOA re issues re property and Telephone call with Receiver | 1.3 | $695.00 | $903.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **1.3** | | **$903.50** |
| 9/3/2021 | DS | Telephone call with Receiver re forensic inspection of premises and issues related to inspection | 0.6 | $695.00 | $417.00 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **0.6** | | **$417.00** |
| 9/7/2021 | DS | Telephone call with Receiver re subpoenas and issues with pool | 0.7 | $695.00 | $486.50 |
| 9/7/2021 | JSW | Review documents received from Sail North in response to subpoena | 0.2 | $395.00 | $79.00 |
| 9/7/2021 | JSW | Call with First Republic bank re status of response to subpoena [.1] and email to the Receiver re the same [.1] | 0.2 | $395.00 | $79.00 |
| 9/7/2021 | JSW | Review correspondence from the Receiver re issues with Crest and HOA | 0.1 | $395.00 | $39.50 |
| 9/7/2021 | JSW | Review and respond to email from Receiver re status of subpoenas | 0.1 | $395.00 | $39.50 |
| 9/7/2021 | JSW | Email to First Republic Bank re follow up on status of subpoena | 0.1 | $395.00 | $39.50 |
| 9/7/2021 | JSW | Review and respond to email from Receiver re documents received from Sail North | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **1.5** | | **$802.50** |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 9/8/2021 | DS | Telephone call with Receiver re inspector's findings | 0.6 | $695.00 | $417.00 |
| 9/8/2021 | JSW | Review and respond to email from Receiver re settlement payment to Ellen Wolf [.1] and research state court case re the same [.1] | 0.2 | $395.00 | $79.00 |
| 9/8/2021 | JSW | Email to Receiver re First Republic production of documents | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **0.9** | | **$535.50** |
| 9/9/2021 | DS | Receive and review letter from YOGI counsel re monies owed [.9] and Telephone call with Receiver [.8} | 0.9 | $695.00 | $625.50 |
| 9/9/2021 | JSW | Call with Receiver to discuss further information needed from First Republic | 0.3 | $395.00 | $118.50 |
| 9/9/2021 | JSW | Multiple correspondence with Receiver re potential litigation claim against Nile | 0.2 | $395.00 | $79.00 |
| 9/9/2021 | JSW | Review document production by First Republic | 0.2 | $395.00 | $79.00 |
| 9/9/2021 | JSW | Review and respond to email from First Republic re request for additional information [.1] and email to Receiver re the same [.1] | 0.2 | $395.00 | $79.00 |
| 9/9/2021 | JSW | Review and analysis of issues re potential litigation claim against Nile | 0.1 | $395.00 | $39.50 |
| 9/9/2021 | JSW | Email to First Republic Bank re request for additional information pursuant to the subpoena | 0.1 | $395.00 | $39.50 |
| 9/9/2021 | JSW | Review correspondence from Receiver re need for an additional subpoena to First Republic Bank | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **2.1** | | **$1,099.50** |
| 9/10/2021 | DS | Telephone call with Receiver re analysis of bank accounts | 0.9 | $695.00 | $625.50 |
| 9/10/2021 | JLB | Strategize re new First Republic subpoenas | 0.3 | $525.00 | $157.50 |
| 9/10/2021 | JSW | Strategize re new First Republic subpoenas | 0.3 | $395.00 | $118.50 |
| 9/10/2021 | JSW | Review and analysis of multiple correspondence from the Receiver re scheduled foreclosure sale of the Property and issues related thereto | 0.3 | $395.00 | $118.50 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **1.8** | | **$1,020.00** |
| 9/13/2021 | DS | Telephone call with Receiver's report and items to be included [.7] Telephone call with Receiver re listing agreements and terms and conditions and discussions with brokers [.4] zoom call with Yvonne, counsel and receiver re status and marketing efforts [.8] | 1.9 | $695.00 | $1,320.50 |
| 9/13/2021 | DS | Telephone call with Receiver re inspector findings [.3] and ZOOM with Yvonne and counsel [.7] | 1.0 | $695.00 | $695.00 |
| 9/13/2021 | DS | Receive and review letter from Carle re documents | 1.0 | $695.00 | $695.00 |
| 9/13/2021 | JSW | Draft attachment three to second subpoena to First Republic Bank | 0.5 | $395.00 | $197.50 |
| 9/13/2021 | JSW | Draft notice of subpoena to First Republic Bank | 0.2 | $395.00 | $79.00 |
| 9/13/2021 | JSW | Draft second subpoena to First Republic Bank | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **4.7** | | **$3,026.50** |
| 9/14/2021 | DS | Receive and review work plan for Vertex | 0.4 | $695.00 | $278.00 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **0.4** | | **$278.00** |
| 9/15/2021 | DS | Telephone call with Receiver re results from inspection of property and employing brokers [.4]; Telephone call with counsel for Nile re visit to premises [.2] email exchange with Receiver re Nile's request to visit with prospective buyers [.4]; receive and review Sotheby Listing Agreement [.4] | 1.4 | $695.00 | $973.00 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **1.4** | | **$973.00** |
| 9/16/2021 | JSW | Review correspondence from Trustee re new articles published discussing the case | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **0.1** | | **$39.50** |
| 9/17/2021 | DS | Telephone call and email exchange with Receiver re brokers, listings and list price | 0.8 | $695.00 | $556.00 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 9/17/2021 | DS | Telephone call with Receiver re Nile demand for access and lack of documents | 0.4 | $695.00 | $278.00 |
| 9/17/2021 | DS | Telephone call with Receiver re names of prospective interested parties who will view property on Monday | 0.4 | $695.00 | $278.00 |
| 9/17/2021 | DS | Telephone call with Receiver re names of prospective interested parties who will view property on Monday | 0.4 | $695.00 | $278.00 |
| 9/17/2021 | DS | Email exchange with Receiver re furniture | 0.2 | $695.00 | $139.00 |
| 9/17/2021 | DS | Telephone call with Receiver re Yvonne demands re knowledge of offer | 0.2 | $695.00 | $139.00 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **2.4** | | **$1,668.00** |
| 9/20/2021 | DS | Email exchange with Receiver re listing agreement [.3] and review insurance information [.3] | 0.6 | $695.00 | $417.00 |
| 9/20/2021 | DS | Email exchange with Receiver re filing of new Mechanic's Lien | 0.6 | $695.00 | $417.00 |
| 9/20/2021 | JSW | Review and analysis of issues re finalizing Receiver's Second Report | 0.2 | $395.00 | $79.00 |
| 9/20/2021 | JSW | Review and respond to email from Receiver re Second Interim Report | 0.1 | $395.00 | $39.50 |
| 9/20/2021 | JSW | Review correspondence from Receiver re new mechanics lien filed against the Property | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **1.6** | | **$992.00** |
| 9/21/2021 | DS | Telephone call with Receiver utility bills and issues with Inferno loans | 0.6 | $695.00 | $417.00 |
| 9/21/2021 | DS | Email exchange with Receiver re entering into agreement with engineering firm and work product issues | 0.3 | $695.00 | $208.50 |
| 9/21/2021 | JSW | Review and analysis of correspondence from counsel for Google re domain deactivation request [.2] and strategize re the same [.1] | 0.3 | $395.00 | $118.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **1.2** | | **$744.00** |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 9/22/2021 | DS | Telephone call with receiver re Nile entering into sales agreements and Crest issues | 0.4 | $695.00 | $278.00 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **0.4** | | **$278.00** |
| 9/23/2021 | DS | Receive and review Brody email re foreclosure timing and Telephone call with Receiver | 0.4 | $695.00 | $278.00 |
| 9/23/2021 | DS | Telephone call with receiver re status of foreclosure sale | 0.3 | $695.00 | $208.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **0.7** | | **$486.50** |
| 9/24/2021 | DS | Telephone call with Receiver re DWP billing and fraud issues | 0.6 | $695.00 | $417.00 |
| 9/24/2021 | DS | Telephone call with Receiver re disclosures to be made in report [.3] and review email from HOA [.2] | 0.5 | $695.00 | $347.50 |
| 9/24/2021 | DS | Email and Telephone call with receiver re request for interview from French TV | 0.5 | $695.00 | $347.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **1.6** | | **$1,112.00** |
| 9/27/2021 | DS | Telephone call with Receiver re accounting and missing funds [.6] and insurance [.2] | 0.8 | $695.00 | $556.00 |
| 9/27/2021 | DS | Receive and review Patricia Hankey emails re DWP billing | 0.8 | $695.00 | $556.00 |
| 9/27/2021 | DS | Review and approve Subpoena | 0.3 | $695.00 | $208.50 |
| 9/27/2021 | DS | Review and approve subpoena to First Republic Bank | 0.2 | $695.00 | $139.00 |
| 9/27/2021 | JSW | Review correspondence from Receiver re need to file motion to employ broker | 0.1 | $395.00 | $39.50 |
| 9/27/2021 | JSW | Strategize re preparing second subpoena to First Republic Bank | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **2.3** | | **$1,538.50** |
| 9/29/2021 | JSW | Draft motion to employ real estate broker | 2.4 | $395.00 | $948.00 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 9/29/2021 | JSW | Draft declaration of Receiver in support of motion to employ broker | 0.5 | $395.00 | $197.50 |
| 9/29/2021 | JLB | Call with First American re subpoena status | 0.2 | $525.00 | $105.00 |
| 9/29/2021 | JSW | Review and analysis of issues re finalizing subpoena to First Republic Bank | 0.2 | $395.00 | $79.00 |
| 9/29/2021 | JSW | Revise notice of subpoena to First Republic | 0.1 | $395.00 | $39.50 |
| 9/29/2021 | JSW | Revise subpoena to First Republic | 0.1 | $395.00 | $39.50 |
| 9/29/2021 | JSW | Revise attahcment 3 to subpoena to First Republic | 0.1 | $395.00 | $39.50 |
| 9/29/2021 | JSW | Strategize re First Republic Bank's request for extension of time to respond to second subpoena | 0.1 | $395.00 | $39.50 |
| 9/29/2021 | JSW | Review and respond to email from First Republic re response to second subpoena | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **3.8** | | **$1,527.00** |
| 9/30/2021 | DS | Review and revise brokers employment motion | 0.5 | $695.00 | $347.50 |
| 9/30/2021 | JSW | Draft ex parte application re motion to employ broker | 0.7 | $395.00 | $276.50 |
| 9/30/2021 | DS | Telephone call with Receiver re meeting with Hankey and pending foreclosure | 0.3 | $695.00 | $208.50 |
| 9/30/2021 | JSW | Draft declarations of Brokers in support of Receiver's motion to employ a real estate broker | 0.5 | $395.00 | $197.50 |
| 9/30/2021 | JSW | Strategize re Receiver's motion to employ brokers [.2]; revise the same [.2]; and email to Receiver and brokers re the same [.1] | 0.5 | $395.00 | $197.50 |
| 9/30/2021 | JSW | Draft declaration of Receiver in support of ex parte application to shorten time to hear motion to employ broker | 0.5 | $395.00 | $197.50 |
| 9/30/2021 | JSW | Edit Receiver's motion to employ broker | 0.2 | $395.00 | $79.00 |
| 9/30/2021 | JSW | Review and analysis of issues re Receiver's motion to employ Broker | 0.2 | $395.00 | $79.00 |
| 9/30/2021 | JSW | Draft proposed order shortening time to hear Receiver's motion to employ broker | 0.2 | $395.00 | $79.00 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 9/30/2021 | JSW | Review and respond to email from Chris Adlam re changes to motion to employ broker [.1] and revise motion re the same [.1] | 0.2 | $395.00 | $79.00 |
| 9/30/2021 | JSW | Revise motion to employ broker based on Receiver's comments | 0.1 | $395.00 | $39.50 |
| 9/30/2021 | JSW | Review and respond to email from Receiver re comments on the motion to employ broker | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **4.0** | | **$1,820.00** |
| 10/1/2021 | DS | Receive and review email exchanges with brokers re corrections to declarations [.4] and review and revise broker employment application [.7] | 1.1 | $695.00 | $764.50 |
| 10/1/2021 | DS | Email exchange and Telephone call with Mark Rosenbaum counsel for Yogi re foreclosure | 0.9 | $695.00 | $625.50 |
| 10/1/2021 | DS | Telephone call with Receiver re meeting with Hankey and counsel and issues to be addressed | 0.7 | $695.00 | $486.50 |
| 10/1/2021 | JSW | Finalize motion to employ Broker [.2] and pull and organize exhibits thereto [.1] | 0.3 | $395.00 | $118.50 |
| 10/1/2021 | JLB | Analysis of multiple "offers" to purchase property sent from receiver | 0.2 | $525.00 | $105.00 |
| 10/1/2021 | JSW | Revise Chris Adlam's declaration based on his comments [.1] and email to Chris re the same [.1] | 0.2 | $395.00 | $79.00 |
| 10/1/2021 | JSW | Call with Chris Adlam re changes to declaration in support of motion to employ broker | 0.1 | $395.00 | $39.50 |
| 10/1/2021 | JSW | Email to Kurt Rappaport re declaration in support of Receiver's motion to employ broker | 0.1 | $395.00 | $39.50 |
| 10/1/2021 | JSW | Call with Chris Adlam re declaration in support of motion to employ broker | 0.1 | $395.00 | $39.50 |
| 10/1/2021 | JSW | Review and respond to email fro Chris Adlam re declaration in support of motion to employ broker | 0.1 | $395.00 | $39.50 |
| 10/1/2021 | JSW | Call with Receiver re potential foreclosure by lender and motion to employ broker | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **3.9** | | **$2,376.50** |
| 10/4/2021 | DS | Receive and review complaint in Samatas vs. Niami | 0.7 | $695.00 | $486.50 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

**Fees for Professional Services Rendered**

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 10/4/2021 | DS | Email exchange with Receiver re attending meeting on site [.2] and Telephone call with Receiver re meeting and issues to be discussed [.4] | 0.6 | $695.00 | $417.00 |
| 10/4/2021 | JSW | Review complaint in case BC456738 [.1] and email to Receiver re the same [.1] | 0.2 | $395.00 | $79.00 |
| 10/4/2021 | JSW | Edit motion to employ broker | 0.1 | $395.00 | $39.50 |
| 10/4/2021 | JSW | Review and respond to email from Receiver re tour of the Airole property with Hankey and counsel | 0.1 | $395.00 | $39.50 |
| 10/4/2021 | JSW | Review and analysis of issues re finalizing motion to employ broker | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **1.8** | | **$1,101.00** |
| 10/5/2021 | DS | Review and revise ex parte documents for employment of broker | 0.4 | $695.00 | $278.00 |
| 10/5/2021 | JSW | Strategize re ex parte application to advance hearing on Receiver's motion to employ broker | 0.2 | $395.00 | $79.00 |
| 10/5/2021 | JSW | Email to all parties and counsel re notice re ex parte application re motion to employ broker | 0.2 | $395.00 | $79.00 |
| 10/5/2021 | JSW | Edit Receiver's declaration in support of ex parte application to advance hearing on motion to employ broker | 0.1 | $395.00 | $39.50 |
| 10/5/2021 | JSW | Edit Receiver's ex parte application to advance hearing on motion to employ broker | 0.1 | $395.00 | $39.50 |
| 10/5/2021 | JSW | Email to Receiver re ex parte application to advance hearing on motion to employ broker | 0.1 | $395.00 | $39.50 |
| 10/5/2021 | JSW | Review and analysis of issues re finalizing the ex parte application | 0.1 | $395.00 | $39.50 |
| 10/5/2021 | JSW | Gather and organize exhibits for ex parte application | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **1.3** | | **$633.50** |
| 10/6/2021 | DS | Attend meeting with lenders on site at property | 4.5 | $695.00 | $3,127.50 |
| 10/6/2021 | DS | Telephone call with counsel for First Republic Bank re subpoenas | 0.3 | $695.00 | $208.50 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 10/6/2021 | DS | Email exchange with Receiver re Buckner email | 0.3 | $695.00 | $208.50 |
| 10/6/2021 | JSW | Draft declaration of J. Wellington in support of ex parte app re motion to employ broker | 0.5 | $395.00 | $197.50 |
| 10/6/2021 | JSW | Review and analysis of issues re finalizing ex parte application | 0.3 | $395.00 | $118.50 |
| 10/6/2021 | JSW | Revise ex parte application re motion to employ broker | 0.2 | $395.00 | $79.00 |
| 10/6/2021 | JSW | Strategize re ex parte application re motion to employ broker | 0.1 | $395.00 | $39.50 |
| 10/6/2021 | JSW | Call with Mr. Mark, Plaintiff's counsel re ex parte application | 0.1 | $395.00 | $39.50 |
| 10/6/2021 | JSW | Edit my declaration in support of ex parte application re notice | 0.1 | $395.00 | $39.50 |
| 10/6/2021 | JSW | Revise proposed order re ex parte application | 0.1 | $395.00 | $39.50 |
| 10/6/2021 | JSW | Strategize re need to send underlying complaint to attorney for First Republic Bank re second subpoena | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **6.6** | | **$4,137.00** |
| 10/7/2021 | DS | Receive and review motion re request for TRO for Foreclosure Sale [1.5]; Telephone call with Receiver re notice and issues re foreclosure [.6] and receive and review Hankey opposition [.8] | 2.9 | $695.00 | $2,015.50 |
| 10/7/2021 | JSW | Review and analysis of ex parte application filed by Yogi Securities | 0.8 | $395.00 | $316.00 |
| 10/7/2021 | DS | Receive and review correspondence with Aronoff re objections by Nile to subpoena | 0.3 | $695.00 | $208.50 |
| 10/7/2021 | DS | Review email from Mathieu Robillard and Telephone call with Receiver | 0.3 | $695.00 | $208.50 |
| 10/7/2021 | JSW | Multiple correspondence with Plaintiff's counsel re non-opposition to motion to employ broker [.3] and strategize re the same [.1] | 0.4 | $395.00 | $158.00 |
| 10/7/2021 | JSW | Multiple correspondence with Mel Aranoff re subpoena to First Republic Bank | 0.3 | $395.00 | $118.50 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 10/7/2021 | JSW | Review and analysis of Yogi's ex parte notice re preliminary injunction re Hankey's scheduled foreclosure of the property [.1] and strategize re the same in light of ex parte application re motion to employ broker on the same day [.1] | 0.2 | $395.00 | $79.00 |
| 10/7/2021 | JSW | Review and respond to email from Receiver re correspondence from vendor requesting payment [.1] and email to vendor's counsel re the same [.1] | 0.2 | $395.00 | $79.00 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **5.4** | | **$3,183.00** |
| 10/8/2021 | DS | Telephone call and email with Receiver re insurance policies and coverage issues; receive and review policies; email exchange with Joe Balice | 0.9 | $695.00 | $625.50 |
| 10/8/2021 | DS | Telephone call with Receiver re results from hearing on TRO | 0.7 | $695.00 | $486.50 |
| 10/8/2021 | JSW | Attend hearing on Yogi Securities ex parte application to postpone Hankey Capital's foreclosure sale [.8] and email to Receiver re the results [.1] | 0.9 | $395.00 | $355.50 |
| 10/8/2021 | DS | Review email from Jeremy Dube Fortier and Telephone call with Receiver | 0.3 | $695.00 | $208.50 |
| 10/8/2021 | DS | Receive and review new offer on property | 0.3 | $695.00 | $208.50 |
| 10/8/2021 | JSW | Call to Mark Nelson re offer on the Airole property [.1] and call with Receiver re the same [.3] | 0.4 | $395.00 | $158.00 |
| 10/8/2021 | JSW | Multiple calls with Receiver re results of Yogi's ex parte application and postponement of Hankey's scheduled foreclosure sale | 0.3 | $395.00 | $118.50 |
| 10/8/2021 | JSW | Call with Mel Aranoff counsel for First Republic Bank re subpoena [.1] and email to Receiver re the same [.1] | 0.2 | $395.00 | $79.00 |
| 10/8/2021 | JLB | Analysis of issues re outcome of ex parte and broker employment app, strategy re next steps in light of same | 0.1 | $525.00 | $52.50 |
| 10/8/2021 | JSW | Attend ex parte hearing on motion to employ broker | 0.1 | $395.00 | $39.50 |
| 10/8/2021 | JSW | Prepare for hearing on motion to employ broker | 0.1 | $395.00 | $39.50 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 10/8/2021 | JSW | Analysis of issues re outcome of ex parte and broker employment app, strategy re next steps in light of same | 0.1 | $395.00 | $39.50 |
| 10/8/2021 | JSW | Call with Receiver re potential offer on the Property | 0.1 | $395.00 | $39.50 |
| 10/8/2021 | JSW | Strategize re issues with leaks in skylights and potential insurance coverage re the same | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **4.6** | | **$2,490.00** |
| 10/11/2021 | DS | Receive and review WRAP policy on Airole | 0.7 | $695.00 | $486.50 |
| 10/11/2021 | DS | Telephone call with Receiver re Insurance issues and pending foreclosure | 0.6 | $695.00 | $417.00 |
| 10/11/2021 | DS | Telephone call with Receiver re bank records and result of First Republic subpoena (2) | 0.6 | $695.00 | $417.00 |
| 10/11/2021 | DS | Receive and review Precision Agreement | 0.4 | $695.00 | $278.00 |
| 10/11/2021 | JSW | Review correspondence from Receiver re state court lawsuit involving the property [.1] and investigate the same [.2] | 0.3 | $395.00 | $118.50 |
| 10/11/2021 | JSW | Review voicemail from Kimberly Adams re potential offer to purchase the property [.1] and email to Receiver re the same [.1] | 0.2 | $395.00 | $79.00 |
| 10/11/2021 | JSW | Review and analysis of agreement with Precision Building and Development re potential insurance coverage issue | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **2.9** | | **$1,835.50** |
| 10/12/2021 | DS | Email exhange with Joe Balice re tendering claim to carrier[.2] and Telephone call with Receiver (3) re insurance matters and mold issues [.9] | 1.1 | $695.00 | $764.50 |
| 10/12/2021 | DS | Receive and review Wellington email re objection by Niami to subpoena | 0.2 | $695.00 | $139.00 |
| 10/12/2021 | JSW | Review and analysis of state court lawsuit filed by Nile and The One LLC [.2] and email to Receiver re the same [.1] | 0.3 | $395.00 | $118.50 |
| 10/12/2021 | JSW | Multiple correspondence with Receiver with request for extension from First Republic Bank | 0.2 | $395.00 | $79.00 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 10/12/2021 | JSW | Call with Mel Aranoff re subpoena to First Republic Bank | 0.1 | $395.00 | $39.50 |
| 10/12/2021 | JSW | Call with Kimberly Adams re potential offer on the property | 0.1 | $395.00 | $39.50 |
| **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | | | **2.0** | | **$1,180.00** |
| 10/13/2021 | DS | Telephone call with Balice and Receiver re insurance claim issues | 1.1 | $695.00 | $764.50 |
| 10/13/2021 | DS | Telephone call with Receiver and insurance counsel re coverage and claim issues | 1.0 | $695.00 | $695.00 |
| 10/13/2021 | JGB | Initial review of emails and documents from client (.2); Call with client re insurance issues on property (.9) | 1.1 | $575.00 | $632.50 |
| 10/13/2021 | JSW | Conference call with Receiver re potential insurance claim | 0.8 | $395.00 | $316.00 |
| 10/13/2021 | JSW | Call with Mel Aranoff re subpoena to First Republic Bank | 0.4 | $395.00 | $158.00 |
| 10/13/2021 | DS | Telephone call with Receiver re Republic Bank request for 2 month continuance | 0.2 | $695.00 | $139.00 |
| 10/13/2021 | JSW | Call with Receiver re potential offer on the property and issues with production to Subpoena served on First Republic Bank | 0.3 | $395.00 | $118.50 |
| 10/13/2021 | JSW | Review multiple correspondence from Mel Aranoff re subpoena to First Republic Bank [.2] and email to the Receiver re the same [.1] | 0.3 | $395.00 | $118.50 |
| 10/13/2021 | JSW | Review correspondence from Mel Aranoff re potential objection to subpoena by Doug Witkins [.1] and email to the Receiver re the same [.1] | 0.2 | $395.00 | $79.00 |
| 10/13/2021 | JSW | Review and respond to email from Kimberly Adams re potential offer to purchase the property | 0.1 | $395.00 | $39.50 |
| 10/13/2021 | JSW | Call to Mel Aranoff re subpoena to First Republic Bank | 0.1 | $395.00 | $39.50 |
| 10/13/2021 | JSW | Review email response from Kimberly Adams and email to Receiver re the same | 0.1 | $395.00 | $39.50 |
| 10/13/2021 | JSW | Strategize re issues discussed with Mel Aranoff re subpoena to First Republic Bank | 0.1 | $395.00 | $39.50 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 10/13/2021 | JSW | Call with Receiver to discuss issues re subpoena to First Republic Bank | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **5.9** | | **$3,218.50** |
| 10/14/2021 | DS | Telephone call with Receiver and review email attachment re disposition of funds | 0.8 | $695.00 | $556.00 |
| 10/14/2021 | JGB | Draft notice letter (.5) | 0.5 | $575.00 | $287.50 |
| 10/14/2021 | DS | Email exchange with Wellington re threat by Carle to file objection to subpoena [.2] and receive and consider email from Aronoff re subpoena [.2] | 0.4 | $695.00 | $278.00 |
| 10/14/2021 | DS | Review and approve demand letter to carrier and Telephone call with Receiver re letter | 0.3 | $695.00 | $208.50 |
| 10/14/2021 | JSW | Call with Mel Aranoff re production of timing for response to subpoena to First Republic Bank [.2] and strategize re the same [.1] | 0.3 | $395.00 | $118.50 |
| 10/14/2021 | JSW | Review and respond to multiple correspondence from Mel Aranoff re subpoena to First Republic Bank | 0.2 | $395.00 | $79.00 |
| 10/14/2021 | JSW | Review correspondence from Receiver re subpoena to First Republic Bank | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **2.6** | | **$1,567.00** |
| 10/15/2021 | DS | Telephone call with Receiver re missing funds (2) and Niami purchase of airplane | 0.8 | $695.00 | $556.00 |
| 10/15/2021 | DS | Receive and review email exchange re sculpture and right to payment | 0.3 | $695.00 | $208.50 |
| 10/15/2021 | JSW | Call with Receiver re subpoena to First Republic Bank | 0.4 | $395.00 | $158.00 |
| 10/15/2021 | JSW | Call with Mel Aranoff re subpoena to First Republic Bank [.1] and email to Mel re the same [.1] | 0.2 | $395.00 | $79.00 |
| 10/15/2021 | JSW | Review multiple correspondence from Receiver re removal of statute in entryway of the property | 0.2 | $395.00 | $79.00 |
| 10/15/2021 | JSW | Review correspondence from Receiver re issues with Crestlloyd account | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **2.0** | | **$1,120.00** |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 10/18/2021 | DS | Telephone call with Receiver re spreadsheet analysis of missing funds | 0.9 | $695.00 | $625.50 |
| 10/18/2021 | DS | Telephone call with Kyra Andrassy re Inferno deed of trust and foreclosure | 0.3 | $695.00 | $208.50 |
| 10/18/2021 | JSW | Call with Receiver re response from First Republic bank to subpoena | 0.2 | $395.00 | $79.00 |
| 10/18/2021 | JSW | Review multiple correspondence from Reciever re Inferno's request to tour the property for three days with specialists | 0.2 | $395.00 | $79.00 |
| 10/18/2021 | JSW | Review correspondence from Mel Aranoff re subpoena to First Republic Bank | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **1.7** | | **$1,031.50** |
| 10/19/2021 | DS | Review and revise Receiver report | 0.9 | $695.00 | $625.50 |
| 10/19/2021 | DS | Telephone call with Receiver re mold remediation and water intrusion issues | 0.7 | $695.00 | $486.50 |
| 10/19/2021 | DS | Receive and review Aranoff email re production of bank records | 0.3 | $695.00 | $208.50 |
| 10/19/2021 | DS | Review and revise documents re settlement with Niami and Italian Luxury Group | 0.3 | $695.00 | $208.50 |
| 10/19/2021 | DS | Telephone call with Receiver re offer on property | 0.3 | $695.00 | $208.50 |
| 10/19/2021 | JSW | Review and analysis of Receiver's draft of third interim report | 0.3 | $395.00 | $118.50 |
| 10/19/2021 | JSW | Email to Mel Aranoff re subpoena to First Republic Bank | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **2.9** | | **$1,895.50** |
| 10/20/2021 | DS | Telephone call with Receiver re on site visit with Inferno and demands and issues with lot coverage [.8] receive and review email from Mike Fields re sculpture [.2] | 1.0 | $695.00 | $695.00 |
| 10/20/2021 | JSW | Review and respond to email from Receiver re court order staying the scheduled foreclosure [.1] and research case docket re the same [.1] and email to receiver re the same [.1] | 0.3 | $395.00 | $118.50 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 10/20/2021 | JSW | Review minute order re ex parte application to employ broker [.1] and order granting the motion re the same [.1] | 0.2 | $395.00 | $79.00 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **1.5** | | **$892.50** |
| 10/21/2021 | DS | Further revisions to report [.8] and Telephone call with Receiver re meeting with Inferno and threats [.6] and email exchange with Receiver re basement issues [.4] | 1.8 | $695.00 | $1,251.00 |
| 10/21/2021 | JSW | Further strategize re application for further instructions [.2] and draft the same [1.9] | 2.1 | $395.00 | $829.50 |
| 10/21/2021 | DS | Telephone call and email with Receiver re demands from other parties to intercede in foreclosure process and issues with water and plans | 0.9 | $695.00 | $625.50 |
| 10/21/2021 | JSW | Draft ex parte application re application for further instructions | 1.2 | $395.00 | $474.00 |
| 10/21/2021 | DS | Email exchange with Receiver re counter offer | 0.3 | $695.00 | $208.50 |
| 10/21/2021 | DS | Telephone call with Kyra Andrassy re Inferno deed of trust and Receiver's position re foreclosure | 0.3 | $695.00 | $208.50 |
| 10/21/2021 | JSW | Draft declaration of Receiver in support of ex parte application re application for further instructions | 0.4 | $395.00 | $158.00 |
| 10/21/2021 | JSW | Draft declaration J. Wellington declaration in support of ex parte application re application for further instructions | 0.4 | $395.00 | $158.00 |
| 10/21/2021 | JSW | Draft proposed order re ex parte application re application for further instructions | 0.3 | $395.00 | $118.50 |
| 10/21/2021 | JSW | Review multiple correspondence from Receiver re meeting with Inferno at the property | 0.2 | $395.00 | $79.00 |
| 10/21/2021 | JSW | Strategize re preparing motion for further instructions from Court | 0.2 | $395.00 | $79.00 |
| 10/21/2021 | JSW | Reivew Receiver's revised third interim report [.1] and correspondence re the same [.1] | 0.2 | $395.00 | $79.00 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **8.3** | | **$4,268.50** |
| 10/22/2021 | DS | Review and revise Receiver's report and review and revise ex parte motion re further instructions | 2.5 | $695.00 | $1,737.50 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 10/22/2021 | DS | Telephone call with Receiver re result of report from forensic engineer re plans and as built issues | 0.6 | $695.00 | $417.00 |
| 10/22/2021 | DS | Telephone call with Mark Rosenbaum re Ex Parte Hearing and Notice | 0.3 | $695.00 | $208.50 |
| 10/22/2021 | JSW | Strategize re motion for further instructions | 0.5 | $395.00 | $197.50 |
| 10/22/2021 | DS | Email exchange with Dan Dersham re sculpture | 0.2 | $695.00 | $139.00 |
| 10/22/2021 | DS | Email exchange with Receiver re inquiries from Inferno | 0.2 | $695.00 | $139.00 |
| 10/22/2021 | JSW | Review and analysis of issues re finalizing application for further instructions | 0.2 | $395.00 | $79.00 |
| 10/22/2021 | JSW | Email providing ex parte notice re application for further instructions | 0.1 | $395.00 | $39.50 |
| 10/22/2021 | JSW | Revise declaration in support of ex parte application re application for further instructions | 0.1 | $395.00 | $39.50 |
| 10/22/2021 | JSW | Revise ex parte application re application for further instructions | 0.1 | $395.00 | $39.50 |
| 10/22/2021 | JSW | Review and respond to email from Kimberly Adams re request for information regarding a foreclosure sale of the property | 0.1 | $395.00 | $39.50 |
| 10/22/2021 | JSW | Review finalized version of the application for further instructions to ensure proper service thereof | 0.1 | $395.00 | $39.50 |
| 10/22/2021 | JSW | Call with First Republic Bank re costs of first subpoena | 0.1 | $395.00 | $39.50 |
| 10/22/2021 | JSW | Call with Yogi Securities Holdings' counsel re ex parte notice | 0.1 | $395.00 | $39.50 |
| 10/22/2021 | JSW | Strategize re ex parte application re application for further instructions | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **5.3** | | **$3,233.50** |
| 10/25/2021 | DS | Telephone call with Receiver re further revisions to report; revise and finalize | 0.9 | $695.00 | $625.50 |
| 10/25/2021 | DS | Email and Telephone call with Receiver re flooding on property | 0.4 | $695.00 | $278.00 |

21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 10/25/2021 | JSW | Edit Ex Parte Application [.2], J. Wellington declaration in support thereof [.1] and review and analysis of issues re finalizing the same [.3] | 0.6 | $395.00 | $237.00 |
| 10/25/2021 | DS | Receive and review email exchange with Brody re substituting out as counsel for Hankey and receiver's certificates | 0.3 | $695.00 | $208.50 |
| 10/25/2021 | DS | Telephone call with counsel for Inferno re ex parte hearing | 0.3 | $695.00 | $208.50 |
| 10/25/2021 | JSW | Review voicemail from Neil Erickson, counsel for Hankey re ex parte application [.1] call with Mr. Erickson re the same [.1] and multiple correspondence with Mr. Erickson re the same [.2] | 0.4 | $395.00 | $158.00 |
| 10/25/2021 | JSW | Review finalized versions of ex parte application, declarations in support thereof, and application for further instructions to ensure proper service thereof | 0.3 | $395.00 | $118.50 |
| 10/25/2021 | JSW | Review Receiver's Third Interim Report for filing [.1] and strategize filing and service thereof [.2] | 0.3 | $395.00 | $118.50 |
| 10/25/2021 | JSW | Review and analysis of issues re inadvertent omission of reservation confirmation in application for further instructions [.1] and draft errata to application for further instructions re the same [.2] | 0.3 | $395.00 | $118.50 |
| 10/25/2021 | JSW | Call with Receiver re Third Interim Report to be filed | 0.1 | $395.00 | $39.50 |
| 10/25/2021 | JSW | Strategize re appearance at ex parte hearing on Receiver's application for further instructions | 0.1 | $395.00 | $39.50 |
| 10/25/2021 | JSW | Review and respond to email from Sharon Ok-Kubisch, counsel for Inferno Investment, re ex parte application for further instructions | 0.1 | $395.00 | $39.50 |
| 10/25/2021 | JSW | Review correspondence from Receiver re request for dismissal of Kenco Plumbing v. Crestlloyd action | 0.1 | $395.00 | $39.50 |
| 10/25/2021 | JSW | Review correspondence from counsel for Hankey re substitution of attorney | 0.1 | $395.00 | $39.50 |
| 10/25/2021 | JSW | Email to Receiver re Third Interim Report | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **4.4** | | **$2,308.00** |
| 10/26/2021 | DS | Telephone call with Receiver and court appearance re further instructions | 1.2 | $695.00 | $834.00 |



21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

**For the Period from 9/1/2021 through 11/3/2021**

## Fees for Professional Services Rendered

| Date | Initials | Description | Statement Units | Rate | Amount |
|---|---|---|---|---|---|
| 10/26/2021 | JSW | Attend hearing on ex parte application for further instructions | 1.1 | $395.00 | $434.50 |
| 10/26/2021 | JSW | Email to Neil Erickson re Receiver's Third Report | 0.1 | $395.00 | $39.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **2.4** | | **$1,308.00** |
| 11/3/2021 | JSW | Further call with Ted Lanes re next steps in light of bankruptcy filing | 0.3 | $395.00 | $118.50 |
| | | **Subtotal [3506.005] Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way:** | **0.3** | | **$118.50** |
| | | **Subtotal Matter ID: 3506.005:** | **99.4** | | **$57,715.00** |
| | | **Total Fees for Professional Services Rendered:** | | | **$57,715.00** |

## Professional Fees Rate Summary

| Initials | Prof Name | Prof Type | Hours | Avg Hrly Rate | Amount |
|---|---|---|---|---|---|
| JSW | Wellington, Jessica | Associate | 36.8 | $395.00 | $14,536.00 |
| DS | Seror, David | Equity Partner | 60.2 | $695.00 | $41,839.00 |
| JGB | Balice, Joseph | Partner | 1.6 | $575.00 | $920.00 |
| JLB | Bagdanov, Jessica | Partner | 0.8 | $525.00 | $420.00 |
| | | **Total:** | **99.4** | | **$57,715.00** |

## Hard Costs Advanced

| Date | Hard Cost Description | Amount |
|---|---|---|
| 9/7/2021 | Client Cost Advanced to: Integrity Legal Corp - Subpoena Re: Sail North | 45.77 |
| 9/8/2021 | Client Cost Advanced to: Integrity Legal Corp - Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way (6) Auto-Fed Copies + (2) 4GB USB + (1) Copying Fee + (1) Deposition Subpoena Officer Fee | 779.41 |
| 9/9/2021 | Client Cost Advanced to: ASAP Legal, LLC - LASC Central | 75.00 |
| 9/20/2021 | Client Cost Advanced to: ASAP Legal, LLC - SANTA MONICA SUPERIOR COURTHOUSE | 80.75 |
| 9/29/2021 | Client Cost Advanced to: ASAP Legal, LLC - First Republic Bank | 180.00 |
| 9/30/2021 | Client Cost Advanced to: Journal Technologies Court Portal - Motion for Order | 61.65 |
| 10/4/2021 | Client Cost Advanced to: ASAP Legal, LLC - SANTA MONICA SUPERIOR COURTHOUSE | 25.00 |
| 10/6/2021 | Client Cost Advanced to: ASAP Legal, LLC - SANTA MONICA SUPERIOR COURTHOUSE | 86.80 |
| 10/6/2021 | Client Cost Advanced to: ASAP Legal, LLC - SANTA MONICA SUPERIOR COURTHOUSE | 93.70 |
| 10/7/2021 | Client Cost Advanced to: Los Angeles Superior Court - Document Purchase | 40.00 |
| 10/12/2021 | Client Cost Advanced to: Los Angeles Superior Court - Document Retrieval | 20.80 |

BRUTZKUS GUBNER
YOUR COUNSEL MATTERS®
21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
www.bg.law

**Billing Record for Fees and Costs Advanced**

**Hankey v. Crestlloyd 21SMCV01113 Receiver of 944 Airole Way**

Billing Department
billing@bg.law
(818) 827-9000 Main
(818) 827-1366 Direct
(818) 936-0468 DirectFax
FEIN: 75-3102750

## Hard Costs Advanced

| Date | Hard Cost Description | Amount |
|---|---|---|
| 10/20/2021 | Client Cost Advanced to: Los Angeles Superior Court - Order | 2.00 |
| 10/20/2021 | Client Cost Advanced to: Los Angeles Superior Court - Minute order | 2.00 |
| 10/21/2021 | Client Cost Advanced to: Journal Technologies Court Portal - Court hearing reservation for Motion for Further Instruction from the Court | 61.65 |
| 10/25/2021 | Client Cost Advanced to: ASAP Legal, LLC - Santa Monica Superior Courthouse | 116.80 |
| 10/25/2021 | Client Cost Advanced to: ASAP Legal, LLC - Santa Monica Superior Courthouse | 71.70 |
| 10/25/2021 | Client Cost Advanced to: ASAP Legal, LLC - Santa Monica Superior Courthouse | 25.00 |
| 10/25/2021 | Client Cost Advanced to: ASAP Legal, LLC - Santa Monica Superior Courthouse | 55.00 |
| 10/25/2021 | Client Cost Advanced to: ASAP Legal, LLC - Santa Monica Superior Courthouse | 65.00 |
| 11/4/2021 | Client Cost Advanced to: Los Angeles Superior Court - Case Management Statement | 5.80 |
| | **Total Hard Costs Advanced:** | **$1,893.83** |

## Soft Costs Advanced

| Description | Month | Amount |
|---|---|---|
| Postage | Sep 2021 | 6.84 |
| | Oct 2021 | 30.52 |
| | Sub-total Postage: | $37.36 |
| Prints - Inhouse | Sep 2021 | 9.00 |
| | Oct 2021 | 49.25 |
| | Sub-total Prints - Inhouse: | $58.25 |
| | **Total Soft Costs Advanced:** | **$95.61** |

## Billing Record Summary

| Description | Amount |
|---|---|
| Total Fees for Professional Services Rendered: | $57,715.00 |
| Total Costs Advanced (Hard Costs + Soft Costs): | $1,989.44 |
| **Total Billing Record:** | **$59,704.44** |

# EXHIBIT “12”

**BRUTZKUS GUBNER**
YOUR COUNSEL MATTERS®

21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
(818) 827-9000 Main
(818) 827-9099 Fax
www.bg.law

## CURRICULUM VITAE

*PARTNER*

**David Seror**

Mr. Seror's practice areas include Bankruptcy, Receivership and Commercial Litigation. He is admitted to practice before the United States District Court for the Central and Southern Districts of California, the United States Court of Appeals for the Ninth Circuit and the Supreme Court of the United States. Mr. Seror is a Member of the Panel of Trustees for Chapters 7 and 11 Bankruptcy cases, United States Trustee's Office, Central District of California (1990-present). He has acted as Judge Pro Tem, Los Angeles Municipal Court and Judge Pro Tem, Superior Court of the State of California for the County of Los Angeles. Mr. Seror is a member of the California State Bar Association, Los Angeles County Bar Association and is an Arbitrator for Attorney Client Relations Programs. Mr. Seror received his Bachelor of Arts degree from the University of California at Los Angeles in 1972, and a *Juris Doctor* in 1975 from California Western School of Law, where he was Associate Editor of the California Western International Law Journal from 1974-1975. Mr. Seror was admitted to the State Bar of California in December 1975.

*ASSOCIATE*

**Jessica Wellington**

Ms. Wellington works in the Firm's bankruptcy department. She obtained her Bachelor of Arts, cum laude, in Family and Consumer Sciences from California State University, Sacramento in 2010 and her *Juris Doctor* with Great Distinction, Business Concentration and Tax Concentration from The University of the Pacific, McGeorge School of Law in May 2018. She served as Law Clerk to the Honorable Victoria S. Kaufman at the United States Bankruptcy Court for the Central District of California. Ms. Wellington was admitted to the State Bar of California in December 2018.

# EXHIBIT "13"

BRUTZKUS GUBNER
YOUR COUNSEL MATTERS®
21650 Oxnard St., Suite 500
Woodland Hills, CA 91367-4911
818- 827-9000 Main
818- 827-9099 Fax
www.bg.law

| Standard Hourly Rate Schedule – Effective 01/01/2021 | | |
|---|---|---|
| Professional | Professional Type | Hourly Rate |
| Mark D. Brutzkus | Partner | $ 725.00 |
| Steven T. Gubner | Partner | $ 895.00 |
| Jeffrey A. Kobulnick | Partner | $ 625.00 |
| Nicholas Rozansky | Partner | $ 675.00 |
| David Seror | Partner | $ 695.00 |
| Corey R. Weber | Partner | $ 675.00 |
| Jessica Bagdanov | Partner | $ 525.00 |
| Joseph Balice | Partner | $ 575.00 |
| Philip J. Bonoli | Partner | $ 575.00 |
| Jerrold L. Bregman | Partner | $ 625.00 |
| Jason B. Komorsky | Partner | $ 675.00 |
| Robyn B. Sokol | Partner | $ 645.00 |
| Michael P. Weisberg | Partner | $ 550.00 |
| Ronald Abrams | Of Counsel | $ 550.00 |
| Racey Cohn | Of Counsel | $ 550.00 |
| David I. Dubin | Of Counsel | $ 395.00 |
| Talin Keshishian | Of Counsel | $ 525.00 |
| Stuart Y. Kim | Of Counsel | $ 695.00 |
| Susan Seflin | Of Counsel | $ 675.00 |
| Tamar Terzian | Of Counsel | $ 495.00 |
| Michael Bernet | Associate | $ 425.00 |
| Ryan F. Coy | Associate | $ 395.00 |
| Joseph M. Rothberg | Associate | $ 495.00 |
| Jessica S. Wellington | Associate | $ 395.00 |
| Maria Abel | Paralegal | $ 230.00 |
| Yves Derac | Paralegal | $ 280.00 |
| Melody Evans | Paralegal | $ 225.00 |
| Juanita Treshinsky | Paralegal | $ 270.00 |
| Sheri Broffman | Trademark Administrator | $ 250.00 |
| | Litigation Support | $ 125.00 |
| | Law Clerk | $ 100.00 |
| | | |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **21650 Oxnard Street, Suite 500, Woodland Hills, California 91367**

A true and correct copy of the foregoing document entitled: **MOTION OF THEODORE LANES, COURT-APPOINTED RECEIVER AND BRUTZKUS GUBNER ROSANSKY SEROR WEBER LLP FOR ENTRY OF ORDERS ALLOWING AND DIRECTING IMMEDIATE PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS PURSUANT TO 11 U.S.C. §§ 543(C), 503(B)(3)(E), AND 503(B)(4); MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF THEODORE LANES AND DAVID SEROR IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 23, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On **December 23, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Deborah J. Saltzman
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1634 / Courtroom 1639
Los Angeles, CA 90012

☒ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ________________, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 23, 2021 | JESSICA STUDLEY | /s/ Jessica Studley |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

Main Document Page 369 of 373

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Kyra E Andrassy** kandrassy@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- **Todd M Arnold** tma@lnbyg.com
- **Jerrold L Bregman** jbregman@bg.law, ecf@bg.law
- **Marguerite Lee DeVoll** mdevoll@watttieder.com
- **Thomas M Geher** tmg@jmbm.com, bt@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com
- **David B Golubchik** dbg@lnbyg.com, stephanie@lnbyb.com
- **James Andrew Hinds** jhinds@hindslawgroup.com;mduran@hindslawgroup.com, mduran@hindslawgroup.com
- **Robert B Kaplan** rbk@jmbm.com
- **Jane G Kearl** jkearl@watttieder.com
- **Jennifer Larkin Kneeland** jkneeland@watttieder.com
- **Michael S Kogan** mkogan@koganlawfirm.com
- **Noreen A Madoyan** Noreen.Madoyan@usdoj.gov
- **Ryan D O'Dea** rodea@shulmanbastian.com, lgauthier@shulmanbastian.com
- **Sharon Oh-Kubisch** sokubisch@swelawfirm.com, gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com
- **Ronald N Richards** ron@ronaldrichards.com, morani@ronaldrichards.com
- **Victor A Sahn** vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com; cblair@ecf.inforuptcy.com
- **David Seror** dseror@bg.law, ecf@bg.law
- **Zev Shechtman** zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com
- **Lindsey L Smith** lls@lnbyb.com, lls@ecf.inforuptcy.com
- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov
- **Jessica Wellington** jwellington@bg.law, ecf@bg.law

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

Main Document Page 370 of 373

**2. SERVED BY UNITED STATES MAIL:**

**20 Largest Creditors:**

Creative Art Partners
6542 Hayes Drive
Los Angeles, CA 90048

Branden Williams
257 N. Cannon Drive, 2nd Floor
Beverly Hills, CA 90210

C.G.S. Custom Glass Specialists
c/o Tom Yang
4536 Ish Drive
Simi Valley, CA 93063

Dennis Palma
146 Beach Way
Monterey, CA 93940

Vesta aka Showroom Interiors, LLC
c/o Julian Buckner
8905 Rex Road
Pico Rivera, CA 90660

Centurion Air, LLC
c/o Michael T Pyle
13932 Arrow Creek Road
Draper, UT 84020

Made by TSI, Inc.
888 Biscayne Blvd, #209
Miami FL 33132

Italian Luxury Design
4 NE 39 Street
Miami, FL 33137

West Valley Green Landscaping, Inc.
14761 Tupper Street
Panorama City, CA 91402

LA DWP
PO Box 30808
Los Angeles, CA 90030

KN Coating
201 E. Tamarack Ave
Inglewood, CA 90301

West Coast Gates
339 Isis Avenue
Inglewood, CA 90301

Bradford Sheet Metal
4164 Sopp Road
Mojave, CA 93501

CAD Stone Works Inc.
c/o Cesar Hernandez
4533 Van Nuys Blvd. #201
Sherman Oaks, CA 91403

Crest Real Estate
c/o Jason Somers
11150 Olympic Blvd., #700
Los Angeles, CA 90064

Davidson Accountancy Corp.
William N. Davidson, CPA
14011 Ventura Blvd., Ste 302
Sherman Oaks, CA 91423

Jobs Pools and Spas, LLC
c/o Georgina Rendon
8055 Matilija Ave.
Panorama City, CA 91402

Midland Contractors, Inc.
c/o Bruce Partovi
PO Box 8312
Van Nuys, CA 91409

Biabani & Associates, Inc.
c/o Alex Biabani
1600 Sawtelle Blvd., #104
Los Angeles, CA 90025

Draken Security
c/o Jaime Salanga
8225 Encino Ave
Northride, CA 91325

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

Main Document Page 371 of 373

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**21650 Oxnard Street, Suite 500, Woodland Hills, California 91367**

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION FOR: MOTION OF THEODORE LANES, COURT-APPOINTED RECEIVER AND BRUTZKUS GUBNER ROSANSKY SEROR WEBER LLP FOR ENTRY OF ORDERS ALLOWING AND DIRECTING IMMEDIATE PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS PURSUANT TO 11 U.S.C. §§ 543(C), 503(B)(3)(E), AND 503(B)(4); MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF THEODORE LANES AND DAVID SEROR IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.** **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 23, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.** **SERVED BY UNITED STATES MAIL**:
On **December 23, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Deborah J. Saltzman
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1634 / Courtroom 1639
Los Angeles, CA 90012

☒ Service information continued on attached page

**3.** **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ________________, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 23, 2021 | JESSICA STUDLEY | /s/ Jessica Studley |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

Main Document Page 372 of 373

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Kyra E Andrassy** kandrassy@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- **Todd M Arnold** tma@lnbyg.com
- **Jerrold L Bregman** jbregman@bg.law, ecf@bg.law
- **Marguerite Lee DeVoll** mdevoll@watttieder.com
- **Thomas M Geher** tmg@jmbm.com, bt@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com
- **David B Golubchik** dbg@lnbyg.com, stephanie@lnbyb.com
- **James Andrew Hinds** jhinds@hindslawgroup.com;mduran@hindslawgroup.com, mduran@hindslawgroup.com
- **Robert B Kaplan** rbk@jmbm.com
- **Jane G Kearl** jkearl@watttieder.com
- **Jennifer Larkin Kneeland** jkneeland@watttieder.com
- **Michael S Kogan** mkogan@koganlawfirm.com
- **Noreen A Madoyan** Noreen.Madoyan@usdoj.gov
- **Ryan D O'Dea** rodea@shulmanbastian.com, lgauthier@shulmanbastian.com
- **Sharon Oh-Kubisch** sokubisch@swelawfirm.com, gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com
- **Ronald N Richards** ron@ronaldrichards.com, morani@ronaldrichards.com
- **Victor A Sahn** vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com
- **David Seror** dseror@bg.law, ecf@bg.law
- **Zev Shechtman** zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com
- **Lindsey L Smith** lls@lnbyb.com, lls@ecf.inforuptcy.com
- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov
- **Jessica Wellington** jwellington@bg.law, ecf@bg.law

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

Main Document Page 373 of 373

**2. <u>SERVED BY UNITED STATES MAIL</u>:**

**<u>20 Largest Creditors:</u>**

Creative Art Partners
6542 Hayes Drive
Los Angeles, CA 90048

Branden Williams
257 N. Cannon Drive, 2nd Floor
Beverly Hills, CA 90210

C.G.S. Custom Glass Specialists
c/o Tom Yang
4536 Ish Drive
Simi Valley, CA 93063

Dennis Palma
146 Beach Way
Monterey, CA 93940

Vesta aka Showroom Interiors, LLC
c/o Julian Buckner
8905 Rex Road
Pico Rivera, CA 90660

Centurion Air, LLC
c/o Michael T Pyle
13932 Arrow Creek Road
Draper, UT 84020

Made by TSI, Inc.
888 Biscayne Blvd, #209
Miami FL 33132

Italian Luxury Design
4 NE 39 Street
Miami, FL 33137

West Valley Green Landscaping, Inc.
14761 Tupper Street
Panorama City, CA 91402

LA DWP
PO Box 30808
Los Angeles, CA 90030

KN Coating
201 E. Tamarack Ave
Inglewood, CA 90301

West Coast Gates
339 Isis Avenue
Inglewood, CA 90301

Bradford Sheet Metal
4164 Sopp Road
Mojave, CA 93501

CAD Stone Works Inc.
c/o Cesar Hernandez
4533 Van Nuys Blvd. #201
Sherman Oaks, CA 91403

Crest Real Estate
c/o Jason Somers
11150 Olympic Blvd., #700
Los Angeles, CA 90064

Davidson Accountancy Corp.
William N. Davidson, CPA
14011 Ventura Blvd., Ste 302
Sherman Oaks, CA 91423

Jobs Pools and Spas, LLC
c/o Georgina Rendon
8055 Matilija Ave.
Panorama City, CA 91402

Midland Contractors, Inc.
c/o Bruce Partovi
PO Box 8312
Van Nuys, CA 91409

Biabani & Associates, Inc.
c/o Alex Biabani
1600 Sawtelle Blvd., #104
Los Angeles, CA 90025

Draken Security
c/o Jaime Salanga
8225 Encino Ave
Northride, CA 91325

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**