| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| DAVID B. GOLUBCHIK (State Bar No. 185520)<br>TODD M. ARNOLD (State Bar No. 221868)<br>LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.<br>2818 La Cienega Avenue<br>Los Angeles, California 90034<br>Telephone: (310) 229-1234<br>Facsimile: (310) 229-1244<br>Email: dbg@lnbyg.com; tma@lnbyg.com<br><br>☐ *Movant(s) appearing without an attorney*<br>☒ *Attorney for Movant(s)* | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| In re:<br><br>CRESTLLOYD, LLC,<br><br><br><br><br><br>Debtor(s). | CASE NO.: 2:21-bk-18205-DS<br>CHAPTER: 11 |
|---|---|
| | **DECLARATION THAT NO PARTY REQUESTED A HEARING ON MOTION LBR 9013-1(o)(3)** |
| | [No Hearing Required] |

1. I am the ☐ Movant(s) or ☒ attorney for Movant(s) or ☐ employed by attorney for Movant(s).

2. On (*date*): __12/14/2021__ Movant(s) filed a motion or application (Motion) entitled: __APPLICATION OF DEBTOR__ __AND DEBTOR IN POSSESSION TO EMPLOY (SEE ATTACHMENT)__

3. A copy of the Motion and notice of motion is attached to this declaration.

4. On (*date*): __12/14/2021__ Movant(s), served a copy of ☐ the notice of motion or ☒ the Motion and notice of motion on required parties using the method(s) identified on the Proof of Service of the notice of motion.

5. Pursuant to LBR 9013-1(o), the notice of motion provides that the deadline to file and serve a written response and request for a hearing is 14 days after the date of service of the notice of motion, plus 3 additional days if served by mail, or pursuant to F.R.Civ.P. 5(b)(2)(D) or (F).

6. More than __17__ days have passed after Movant(s) served the notice of motion.

7. I checked the docket for this bankruptcy case and/or adversary proceeding, and no response and request for hearing was timely filed.

8. No response and request for hearing was timely served on Movant(s) via Notice of Electronic Filing, or at the street address, email address, or facsimile number specified in the notice of motion.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016                    Page 1                    **F 9013-1.2.NO.REQUEST.HEARING.DEC**

9.    Based on the foregoing, and pursuant to LBR 9013-1(o), a hearing is not required.

Movant(s) requests that the court grant the motion and enter an order without a hearing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Date: 01/04/2022             /s/ Todd M. Arnold
                             Signature


                             Todd M. Arnold
                             Printed name

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016                    Page 2                    F 9013-1.2.NO.REQUEST.HEARING.DEC

ATTACHMENT TO DECLARATION THAT NO PARTY REQUESTED A HEARING ON MOTION

2.  APPLICATION OF DEBTOR AND DEBTOR IN POSSESSION TO: (1) EMPLOY THE
BEVERLY HILLS ESTATES AND COMPASS AS REAL ESTATE BROKERS PURSUANT TO
11 U.S.C § 327(a), WITH COMPENSATION DETERMINED PURSUANT TO 11 U.S.C. § 328,
(2) EMPLOY CONCIERGE AUCTIONS, LLC AS AUCTIONEER PURSUANT TO 11 U.S.C §
327(a), WITH COMPENSATION DETERMINED PURSUANT TO 11 U.S.C. § 328, AND (3)
APPROVE THE PAYMENT OF COMPENSATION TO REAL ESTATE BROKERS AND
AUCTIONEER FROM ESCROW UPON CLOSING; DECLARATIONS IN SUPPORT THEREOF

1   DAVID B. GOLUBCHIK (State Bar No. 185520)
    TODD M. ARNOLD (State Bar No. 221868)
2   LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3   2818 La Cienega Avenue
    Los Angeles, California 90034
4   Telephone: (310) 229-1234
    Facsimile: (310) 229-1244
5   Email: dbg@lnbyg.com; tma@lnbyg.com

6
    Attorneys for Debtor and Debtor in Possession
7

8                    UNITED STATES BANKRUPTCY COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                        LOS ANGELES DIVISION

11

12  In re:                                  Case No.: 2:21-bk-18205-DS

13  CRESTLLOYD, LLC,                        Chapter 11 Case

14          Debtor and Debtor in Possession.

15                                          **APPLICATION OF DEBTOR AND DEBTOR
                                            IN POSSESSION TO:**
16                                          **(1) EMPLOY THE BEVERLY HILLS
                                            ESTATES AND COMPASS AS REAL ESTATE**
17                                          **BROKERS PURSUANT TO 11 U.S.C § 327(a),
                                            WITH COMPENSATION DETERMINED**
18                                          **PURSUANT TO 11 U.S.C. § 328,**
                                            **(2) EMPLOY CONCIERGE AUCTIONS, LLC**
19                                          **AS AUCTIONEER PURSUANT TO 11 U.S.C §
                                            327(a), WITH COMPENSATION**
20                                          **DETERMINED PURSUANT TO 11 U.S.C. §
                                            328, AND**
21                                          **(3) APPROVE THE PAYMENT OF
                                            COMPENSATION TO REAL ESTATE**
22                                          **BROKERS AND AUCTIONEER FROM
                                            ESCROW UPON CLOSING;**
23                                          **DECLARATIONS IN SUPPORT THEREOF**
24

25                                          [No hearing required unless requested per L.B.R.
26                                          2014-1(b)]

27

28

                                    1

Crestlloyd, LLC, the Chapter 11 debtor and debtor in possession herein (the "Debtor") hereby submits this application (the "Application") for the entry of an order authorizing the Debtor to:

(1)     employ The Beverly Hills Estates ("TBHE"), with Branden Williams and Rayni Williams as lead agents, and Compass ("Compass") and, with TBHE the "Brokers"), with Aaron Kirman as lead agent, as real estate brokers pursuant to 11 U.S.C § 327(a), with compensation determined pursuant to 11 U.S.C. § 328, pursuant to the terms of the Residential Listing Agreement (the "Listing Agreement") between the Debtor and the Brokers, which is attached to the Application as **Exhibit "1;"**

(2)     employ Concierge Auctions, LLC ("Concierge" or the "Auctioneer") as auctioneer pursuant to 11 U.S.C § 327(a), with compensation determined pursuant to 11 U.S.C. § 328, pursuant to the terms of the Auction Agreement (the "Auction Agreement") between the Debtor and the Auctioneer, which is attached to the Application as **Exhibit "2;"** and

(3) approve the payment of compensation to the Brokers and the Auctioneer from escrow upon closing.

In support of the Application, the Debtor hereby alleges as follows:

**A.      GENERAL BACKGROUND.**

On October 26, 2021 (the "Petition Date"), the Debtor its bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor is operating its estate and managing its financial affairs as a debtor in possession pursuant to Sections 1107 and 1108.

**B.      THE DEBTOR'S REAL PROPERTY, ALLEGED CLAIMS, THE REASONS FOR FILING BANKRUPTCY, AND EXIT STRATEGY.**

The Debtor's primary asset is a piece of residential real property that it developed, which is located at 944 Airole Way, Los Angeles, CA 90077 (the "Property").[1]  The Property is one of the finest pieces of real property in America.  The Property is situated on a four-acre Bel Air promontory, featuring the best views of Los Angeles. A moat that encompasses the Property gives the impression that it's floating on water.  The approximately 105,000-square-foot glass and marble

---

[1] Additional information about the Property can be obtained at https://www.societygrouppr.com/real-estate/the-one/ and https://www.dirt.com/more-dirt/real-estate-listings/nile-niami-the-one-house-bel-air-1203360444/.

compound holds 20 bedrooms, each with sweeping views of Los Angeles and the ocean, and 30 bathrooms, as well as every amenity in the world.  It features a 30-car garage, four swimming pools, a two-story waterfall, and numerous other water features, as well as two restaurant-grade kitchens, an indoor/outdoor entertainment center with its own VIP room, a movie theater, charitable organization rooms, a four-lane bowling alley, a library with floor-to-ceiling windows, a full beauty salon, a spa with a steam room and jacuzzi, a cigar lounge, and a gym.  Three smaller villas also sit on the property, spread across the four acres.  The 5,000-square-foot master suite is an oasis within the mansion.  Designed with its own separate office and walk-in closet, the suite also has its own pool and kitchen.  To guarantee privacy, it's isolated from the rest of the house.  The mansion includes five elevators and LED ceilings that display images of moving clouds. The Property features state-of-the-art technology, with a full security center.  The design encompasses secondary corridors for staff to use.

The Property requires some work to be fully completed, which the Debtor believes would cost approximately $5 million to 10 million.  However, even in its current state of near-completion, the Property can be and has been marketed for sale, and the Debtor believes that the Property has a current fair market value of approximately $325 million.

The Debtor believes that the overall pre-petition claims asserted against the Debtor total approximately $180 million, with approximately $176 million of such claims allegedly secured by the Property.  Thus, the Debtor has approximately $145 million of equity in the Property.  Even if the Property sold for substantially less than $325 million, for example $250 million, the Debtor would still have $70 million of equity in the Property and more than substantial funds to pay all allowed claims in full.

Unfortunately, before the Property could be fully completed and sold (either as a fully completed or nearly completed project), the Debtor's primary secured lender, Hankey Capital, LLC ("Hankey"), as well as a number of other junior secured lenders and mechanic's lien holders initiated a multitude of state court actions against the Debtor seeking, among other things, to recover amounts allegedly owed and to foreclose on the Property.  In connection with its action, Hankey sought and

obtained the appointment of a receiver for the Property (the "Receiver").  In addition, Hankey had a foreclosure sale of the Property set for October 27, 2021.

In order to protect its substantial equity in the Property and address myriad litigation and other claims against it, the Debtor filed its bankruptcy case on the Petition Date of October 26, 2021, which stayed the foreclosure sale.  It was imperative for the Debtor regain possession and control over the Property from the Receiver, and to obtain the breathing spell afforded by the automatic stay, not only to stop the foreclosure and protect equity in the Property, but also to provide time and a means for the Debtor to sell the Property.

As a precursor to selling the Property, the Debtor had to regain possession and control of the Property from the Receiver.  To that end, immediately after the Petition Date, pursuant to Section 543, the Debtor's counsel demanded that the Receiver, among other things, (1) turnover the Property and other property of the estate and (2) to cease exercising control over such estate property.  As can be seen from the docket, soon after the Petition Date, the Debtor, with the assistance of its counsel and manager, quickly negotiated an interim stipulation with Hankey and the Receiver regarding access to the Property to facilitate efforts to employ brokers and market and sell the Property. Recently, based on the efforts of the Debtor's counsel and manager, the Receiver voluntarily turned over the Property and all other estate property to the Debtor.

The Debtor is now in position to sell the Property.  The Debtor intends to sell the Property as soon as practicable for the highest price possible under the circumstances.  Importantly, the Debtor is informed and believes that Hankey and other large stakeholders support such a sale of the Property in the context of the Debtor's bankruptcy case.  Indeed, the Debtor and Hankey have reached a deal in principle regarding a $12 million debtor in possession loan to be provided by Hankey to pay for budgeted items, which will further the Debtor's efforts to effectuate a sale of the Property as soon as possible.

As discussed above, the Debtor believes that a near-term sale of the Property will generate sufficient funds to pay all allowed claims in full, which will allow the Debtor to exit bankruptcy, either pursuant to a plan or an alternative exit strategy, with a surplus for the Debtor's owner.  While the Debtor believes that the structured dismissal option is more favorable because it

offers substantial cost and time savings, which will benefit all parties in interest, in the event dismissal is not possible, the Debtor will propose a simple reorganization plan with terms similar to the expected conditions for dismissal – *i.e.*, paying all allowed claims in full on the effective date of the plan.

**C.**     **THE DEBTOR'S NEED AND REQUEST TO EMPLOY THE BROKERS AND AUCTIONEER.**

In furtherance of the Debtor's efforts to sell the Property as soon as practicable and to generate funds to pay allowed claims, the Debtor requires the services of the Brokers and the Auctioneer to market and sell the Property. Therefore, pursuant to the Application, the Debtor is seeking to employ the Brokers and the Auctioneer to render, among others, the following types of professional services, as applicable:

    a.     marketing and showing the Property to prospective buyers;

    b.     assisting the Debtor in obtaining and providing due diligence materials to prospective buyers;

    c.     notifying prospective buyers of the intended online auction (the "Auction") of the Property and bid procedures approved by the Court (the "BK Bid Procedures") governing the Auction;[2]

    d.     receiving bids from prospective buyers;

    e.     conducting an online Auction of the Property pursuant to BK Bid Procedures approved by the Court with the ultimate sale subject to Court approval;

    f.     consulting with the Debtor and its professionals and advisors regarding the foregoing; and

    g.     performing any other services which may be appropriate in connection with the Brokers and Auctioneer's retention by the Debtor.

---

[2] The Debtor will file a separate motion seeking approval of BK Bid Procedures and is **not** seeking the approval thereof pursuant to the Application.

**D.       THE BROKERS' AND AUCTIONEER'S QUALIFICATIONS.**

The Brokers and Auctioneer are both well-qualified to perform the services described herein, which involve the marketing and sale of the Property, which is extremely unique and, because of its value, has only a limited number of potential buyers, many of which are foreigners.

**TBHE** – TBHE is the leading real estate firm in Los Angeles.   TBHE is highly experienced in marketing and selling high-end real estate in the area in which the Property is located, and TBHE is familiar with the Property based on prior listing agreements with the Debtor for which of Branden and Rayni Williams served as the lead agents.   TBHE's motto: "We don't follow trends, we set them," has led to numerous record-breaking sales along with building the most affluent client property portfolio. Recognized as Los Angeles' highest-performing real estate team based on their impressive sales record of over $780 million in 2019, with a career totaling over $8.7 billion in sales, the husband-and-wife real estate duo of Branden and Rayni Williams specialize in historic properties in Malibu, Trousdale, Beverly Hills, Los Feliz, and beyond.   In 2019, they broke the record of the highest priced Frank Lloyd Wright property ever sold by closing The Ennis House for $18 million. Branden and Rayni bring an invaluable mix of passion & professionalism to every project and represent some of the most expensive listings in the world. Additional information regarding TBHE, as well as a comprehensive list of sales, can be located here: https://www.thebeverlyhillsestates.com/. Branden and Rayni Williams' personal CV's and a list of recent sales is attached hereto as **Exhibit "3."**

**Compass** – Compass is a large, national, innovative residential real estate firm with more than 18,000 agents and approximately 40 locations across the United States.   Additional information regarding Compass can be located here: https://www.compass.com/.   Aaron Kirman, the lead agent from Compass providing services to the Debtor, has over $8 billion in luxury home sales.   He represents the finest estates across the globe and was ranked in the top 5 luxury real estate agents in the US by the Wall Street Journal.   He has an extensive client base featuring those who seek the luxury lifestyle including titans of industry, celebrities, the royal families, major lending institutions and foreign investors. As a prominent figure in the luxury real estate market, Aaron has received International acclaim for record setting sales across Los Angeles and Southern California solidified

by his investment in technology deployed in every aspect of his business process.  His success in luxury real estate for the last 20 years has elevated Aaron's persona beyond salesman to serial entrepreneur with the launch of Kirman Capital – a branch of the Kirman Group – focused on investing in early-stage technology startups in real-estate.  Over a notable real estate career, Aaron has sold the infamous Danny Thomas Estate, which reportedly sold for $50,000,000; the Eddie Goetz Estate and Lion Gate which sold for $46,250,000, as well as countless others. Aaron's vast knowledge and expertise in selling exclusive properties has helped him to produce some of the highest prices in Beverly Hills, Hollywood Hills, Santa Monica, and Malibu. Aaron also holds the record for highest price per square foot in Hollywood set at $4,722 where he represented the buyer and seller on Case Study 21.   Additional information regarding Aaron Kirman, as well as a comprehensive list of his sales, can be located here: https://aaronkirman.com/.   Aaron Kirman's personal CV is attached hereto as **Exhibit "4."**

**Concierge** – Concierge is the largest luxury real estate auction marketplace in the world with 90%+ market share and the most comprehensive database of high-net-worth property connoisseurs on the planet. Concierge's award-winning team is recognized as a cutting-edge global force, and has garnered global recognition from: Who's Who in Luxury Real Estate, USA Today, National Auctioneers Association, The Telly Awards, Inc. 5000, Inman News, Entrepreneur 360 List, the Financial Times, and more.  Concierge is also a corporate alliance partner to THIRDHOME, and an exclusive or preferred auction provider to many global broker networks including Leverage Global Partners, Sotheby's International Realty, Who's Who in Luxury Real Estate, Luxury Portfolio International, and Engel and Volkers.  A concise version of Concierge's firm CV is hereto as **Exhibit "5."**  Full versions of Concierge's firm CV and case studies can be found here: Full CV, Full List of Case Studies.  As but one example, Concierge was able to secure the successful sale of the highest-priced spec house in Florida listed for $159 million.  That sale is particularly relevant, because it involved Concierge successfully navigating and selling a property that, like the Debtor's property, did not have a certificate of occupancy.  Information regarding this sale can be seen here: Florida Sale. The personal CV of Chad Roffers, who will lead the Concierge team in connection with marketing and selling the Debtor's Property, is attached hereto as **Exhibit "6."**

E.     **THE BROKERS' AND AUCTIONEER'S TERMS OF COMPENSATION AND OTHER MATERIAL TERMS.**

The compensation and other material terms of the Listing Agreement between the Debtor and the Brokers are summarized as follows:[3]

(1)     <u>Listing Period:</u> One year, provided that the Debtor may, in its sole discretion and business judgment and without further Court order, modify the Listing Agreement by extending the term of the Listing Agreement.

(2)     <u>Listing Price:</u> $295 million, provided that (a) the Debtor may, in its sole discretion and business judgment and without further Court order, modify the Listing Agreement by reducing the listing price and (b) the Property will likely be sold pursuant an Auction conducted by the Auctioneer.

(3)     <u>Commission to Brokers:</u>

a.     1% of sale price up to $175 million (plus 1% payable to any buyer broker);

b.     1.5% of sale price over $175 million and up to $200 million (plus 1% payable to any buyer broker); and

c.     2.0% of sale price over $200 million (plus 1% payable to any buyer broker).

(4)     <u>Commission Tail Period:</u> 180 days.

(5)     <u>Other Terms:</u>

a.     Rayni Williams and Branden Williams, who previously served as agents for the sale of the Property pursuant to a pre-petition listing agreement, waive all pre-petition claims against the Debtor, including, but not limited to, any amounts owed under that certain Promissory Note Secured by Personal Guaranty in the principal amount of $400,000 executed in favor of Branden Williams for expenses advanced for marketing the Property under the pre-petition listing agreement;

---

[3] This is a summary only.  To the extent there is any discrepancy between this summary and the actual terms of the Listing Agreement, the terms of the Listing Agreement shall govern in all respects.

b.      Compass and Aaron Kirman, who previously served as broker/agent for the sale of the Property pursuant to a pre-petition listing agreement, waive all pre-petition claims against the Debtor (to be completed by an addendum to the Listing Agreement if not already done);

c.      Any and all prior listing agreements are cancelled with the Listing Agreement between the Debtor and the Brokers superseding all previous listing agreements;

d.      The Brokers acknowledge and understand that (i) the sale of the Property is subject to bidding at Auction in accordance with BK Bid Procedures to be approved by the Court, (ii) any sale of the Property is subject to Court approval after notice to the United States Trustee, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules, (iii) the Property is being sold "AS-IS WITH ALL FAULTS" without any representations and warranties, (iv) the commission to be paid to the Brokers shall only be paid from the proceeds of the sale of the Property, (v) the payment of the commission to the Brokers is subject to prior approval of the Court, (vi) if, without Brokers' prior written consent, the Property is withdrawn from sale by a voluntary act of the Debtor during the listing period or any extension thereof, the Debtor shall pay the Brokers a fee of $875,000, and (vii) the Court shall have exclusive jurisdiction to resolve any and all disputes relating to the Listing Agreement.

The compensation and other material terms of the Auction Agreement between the Debtor and the Auctioneer are summarized as follows and the full Auction Agreement is attached to the annexed Declaration of Chad Roffers as **Exhibit "2"**:[4]

(1)      Auction Date: Commence February 7, 2022 and conclude February 10, 2022.

(2)      Reserve Price: None.

(3)      Auction/Bidding Procedures: The Debtor is to seek Court approval of BK Bid Procedures consistent with the Auction Agreement and as set forth in the Bidder Terms and Conditions attached thereto, and the Auctioneer shall conduct an Auction of the Property

---

[4] This is a summary only. To the extent there is any discrepancy between this summary and the actual terms of the Auction Agreement, the terms of the Auction Agreement shall govern in all respects.

consistent with such Court-approved BK Bid Procedures, which shall require, *inter alia*, that (a) prospective bidders shall make a pre-Auction deposit with an escrow agent (the "Escrow Agent") in the amount of $250,000 to serve as protection for the Debtor and the Auctioneer (the "Bidder's Deposit") and provide proof of funds, (b) any buyer (the "Buyer") shall pay a fee (the "Buyer's Premium") equal to 12% of the bidder's purchase price (of which a significant portion will be rebated to the Debtor as described below), which Buyer's Premium shall (i) be separate from the Purchase Price for the Property to be paid to the Debtor and is an obligation of the Buyer to the Auctioneer and (ii) be paid to the Auctioneer as its fee for conducting the Auction and providing related services to the Debtor, and (c) within two (2) business days of the close of the Auction for the successful bidder Buyer and within three (3) business days of any back-up bidder being declared the Buyer if the initial successful bidder defaults, the successful bidder Buyer or back-up bidder Buyer, as applicable, shall deposit with the Escrow Agent any additional amounts required to equal 12% of the Buyer's purchase price (with such total increased deposit from the successful bidder Buyer, the "Deposit," and from any back-up bidder Buyer, the "Back-Up Deposit") and 12% of the Buyer's purchase price as the Buyer's Premium.

(4)     Buyer's Premium to the Auctioneer:  The Buyer's Premium paid to the Auctioneer will be paid by the Buyer and not the estate.  Thus, the Buyer's Premium paid to the Auctioneer will not reduce the net recovery to the estate on a sale of the Property.  To the contrary, in the event of a sale at Auction, the Auctioneer will rebate to the Debtor a large portion of any Buyer's Premium paid to it by the Buyer (the "Rebate"), which will increase the net recovery to the estate on a sale of the Property.  More specifically, in the event of a sale at Auction, the Auctioneer shall be paid a Buyer's Premium equal to 12% of the purchase price for the Property, provided, however, that (a) if the purchase price is equal to or less than $225,000,000.00, the Rebate will be an amount equal to nine and one half of one percent (9.5%) of the Buyer's Premium that the Auctioneer actually collects, (b) if the purchase price is greater than $225,000,000.00 but less than $275,000,000.00, the Rebate will be an amount equal to nine percent (9.0%) of the Buyer's Premium that the Auctioneer actually collects, and (c) if the purchase price is equal to or greater than $275,000,000.00, the Rebate will be an amount equal to eight and one half of one percent

(8.5%) of the Buyer's Premium that the Auctioneer actually collects.

In the event that the Property is not sold at Auction, fails to close due to a default by either Buyer or Owner, the Auction is cancelled by Owner, or this the Auction Agreement is otherwise terminated other than by the Auctioneer and without a material breach by the Debtor, and the Property is contracted to be sold or otherwise transferred by Owner during (i) the 60-day period after the expiration or termination of the Auction Agreement to anyone or (ii) the 120-day period after the expiration or termination of the Auction Agreement to a prospective or registered bidder identified to the Debtor by the Auctioneer in writing within ten business days after the expiration or earlier termination of the Auction Agreement (or to an entity controlled by such person), the Debtor will be obligated to pay the Auctioneer a fee equal to two percent (2%) of the accepted purchase price of the Property at closing.

If the Auction is conducted and the winning Buyer defaults, then, except as described below in the case of a back-up bidder, the Debtor and the Auctioneer shall split 50/50 any deposit made by the Buyer in connection with the sale of the Property (or any other amounts collected from the Buyer) (collectively the "Deposit Amount").  In the event that a back-up bidder is selected and closes a purchase of the Property, the Debtor shall be entitled to be paid and retain the entire Deposit Amount.

(5)    Other Terms: The Auctioneer acknowledges and understands the terms and conditions of the sale summarized above and set forth fully in the Auction Agreement.

F.    **DISCLOSURES REGARDING THE BROKERS' AND AUCTIONEER'S DISINTERESTEDNESS.**

Prior to the Petition Date, Branden Williams and Rayni Williams (both then with Hilton & Hyland), Compass, and Aaron Kirman served as brokers/agents pursuant to pre-Petition Date Listing Agreements.  The commission tail on the pre-Petition Date Listing Agreement between the Debtor, on one hand and Hilton & Hyland (Branden Williams and Rayni Williams as agents) and Compass (Aaron Kirman as agent) is still in effect.  Further, before the Petition Date, the Debtor executed a Promissory Note Secured by Personal Guaranty in the principal amount of $400,000 in favor of Branden Williams for expenses advanced for marketing the Property under a pre-petition listing

agreement.  However, as discussed above, in connection with the Listing Agreement for the current retention of TBHE (Branden Williams and Rayni Williams as lead agents) and Compass (Aaron Kirman lead agent), which is the subject of this Application, the foregoing brokers/agents have released all pre-Petition Date claims against the Debtor. (To the extent this has not been done by Compass and Aaron Kirman, it will be completed by an addendum to the Listing Agreement).

In addition to the foregoing, certain of TBHE, Branden Williams, Rayni Williams, Compass, and Aaron Kirman may have had dealings with entities and individuals affiliated with the Debtor, but such dealings have do not create claims against the Debtor or affect the foregoing broker/agent's disinterestedness.

As set forth in the annexed declarations, to the best of the Brokers' and the Auctioneer's knowledge, other than as set forth above, the Brokers and Auctioneer do not have any other prior connections with the Debtor or any insiders of the Debtor.

The Brokers and the Auctioneer have not been paid any money by the Debtor.

The Brokers and the Auctioneer understand the provisions of 11 U.S.C. §§ 327, 328, 330 and 331 which require, among other things, Bankruptcy Court approval of the Debtor's employment of the Brokers and the Auctioneer and of all fees and reimbursement that the Brokers and the Auctioneer will receive from the Debtor and the Debtor's estate.

The Brokers and Auctioneer have not received, and do not expect to receive, any lien or other interest in property of the Debtor or of a third party to secure payment of the Broker or Auctioneer's compensation.

The Auctioneer is not a creditor of the Debtor.  Due to the aforementioned waiver of claims by the Brokers, Kirman, and the Williams, they are not creditors of the Debtor.  Further, the Brokers and the Auctioneer are not equity security holders or insiders of the Debtor.

The Brokers and the Auctioneer are not and were not investment bankers for any outstanding security of the Debtor.  The Brokers and the Auctioneer have not been within three (3) years before the Petition Date an investment banker for a security of the Debtor, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtor.

Neither the Brokers nor the Auctioneers, nor any of their agents, are, or were, within two

(2) years before the Petition Date, a director, officer or employee of the Debtor or of any investment banker for any security of the Debtor.

Neither the Brokers nor the Auctioneers, nor any of their agents, are a relative or an employee of the United States Trustee or a Bankruptcy Judge.

The Brokers and the Auctioneer have not shared or agreed to share their compensation for services provided to the Debtor with any other person or entity, except among their respective companies' owners, members and agents, provided that, as discussed above, under particular circumstances, (1) the Auctioneer may rebate to the Debtor a portion of a Buyer's Premium paid to the Auctioneer and/or (2) the Brokers may pay share their commission with a cooperating broker.

As set forth in the annexed declarations, to the best of the Brokers' and the Auctioneer's knowledge, the Brokers and the Auctioneer do not hold or represent any interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor or an investment banker for any security of the Debtor, or for any other reason.

As set forth in the annexed declarations, to the best of the Brokers' and the Auctioneer's knowledge, the Brokers and the Auctioneer are each a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code.

The Debtor believes that his employment of the Brokers and the Auctioneer upon the terms and conditions set forth above is in the best interest of the Debtor's estate.

**WHEREFORE**, the Debtors respectfully requests that the Court enter an order (1) approving this Application, (2) approving the Debtor's employment of TBHE, with Branden Williams and Rayni Williams as lead agents, and Compass, with Aaron Kirman as lead agent, as real estate brokers pursuant to 11 U.S.C § 327(a), with compensation determined pursuant to 11 U.S.C. § 328, pursuant to the terms of the Residential Listing Agreement between the Debtor and the Brokers attached to the Application as **Exhibit "1,"** (2) approving the Debtor's employment of Concierge as auctioneer pursuant to 11 U.S.C § 327(a), with compensation determined pursuant to 11 U.S.C. § 328, pursuant to the terms of the Auction Agreement between the Debtor and the Auctioneer attached to the Application as **Exhibit "2,"** (3) approving the payment of compensation

13

to the Brokers and the Auctioneer from escrow upon closing, and (4) affording such other and

further relief as is warranted under the circumstances.

Dated:  December 13, 2021              CRESTLLOYD, LLC

SIERRACONSTELLATION PARTNERS LLC, AS
MANAGER, BY LAWRENCE R. PERKINS, AS ITS
AUTHORIZED SIGNATORY

PRESENTED BY:

LEVENE, NEALE, BENDER, YOO
   & GOLUBCHIK L.L.P.

By: */s/ Todd M. Arnold*
   DAVID B. GOLUBCHIK
   TODD M. ARNOLD
   Attorneys for the Debtor and
   Debtor in Possession

### DECLARATION OF BRANDEN WILLIAMS

I, BRANDEN WILLIAMS, hereby declare as follows:

1.    I am over 18 years of age.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.    I am a principal of The Beverly Hills Estates ("TBHE"), a leading real estate firm in Los Angeles that specializes in, among other things, architecturally significant and one-of-a-kind properties.  My wife, Rayni, and I are recognized as L.A.'s highest-performing real estate team based on our sales record, including a career totaling over $8.7 billion in sales.

3.    I make this declaration in support of the Application to which this declaration is attached.    Capitalized terms not defined herein have the same meanings as set forth in the Application.

4.    I am informed and believe that, in furtherance of the Debtor's efforts to sell the Property as soon as practicable and to generate funds to pay allowed claims, the Debtor requires the services of the Brokers and the Auctioneer to market and sell the Property.  Therefore, pursuant to the Application, the Debtor is seeking to employ the Brokers and the Auctioneer to render, among others, the following types of professional services, as applicable:

a.    marketing and showing the Property to prospective buyers;

b.    assisting the Debtor in obtaining and providing due diligence materials to prospective buyers;

c.    notifying prospective buyers of the intended online auction (the "Auction") of the Property and bid procedures approved by the Court (the "BK Bid Procedures") governing the Auction;

d.    receiving bids from prospective buyers;

e.    conducting an online Auction of the Property pursuant to BK Bid Procedures approved by the Court with the ultimate sale subject to Court approval;

f.    consulting with the Debtor and its professionals and advisors regarding the foregoing; and

g.    performing any other services which may be appropriate in connection

15

with the Brokers and Auctioneer's retention by the Debtor.

5.     A true and correct copy of the Listing Agreement between the Debtor and the Brokers is attached hereto as **Exhibit "1."**

6.     TBHE, Rayni, and are well-qualified to perform the services described herein, which involve the marketing and sale of the Property, which is extremely unique and, because of its value, has only a limited number of potential buyers, many of which are foreigners.

7.     TBHE is the leading real estate firm in Los Angeles.  TBHE, Rayni, and I are highly experienced in marketing and selling high-end real estate in the area in which the Property is located, and TBHE, Rayni, and I are familiar with the Property based on prior listing agreements with the Debtor for which of Rayni and I served as the lead agents.  TBHE's motto: "We don't follow trends, we set them," has led to numerous record-breaking sales along with building the most affluent client property portfolio. Recognized as Los Angeles' highest-performing real estate team based on their impressive sales record of over $780 million in 2019, with a career totaling over $8.7 billion in sales, Rayni and I specialize in historic properties in Malibu, Trousdale, Beverly Hills, Los Feliz, and beyond.  In 2019, we broke the record of the highest priced Frank Lloyd Wright property ever sold by closing The Ennis House for $18 million.  We bring an invaluable mix of passion & professionalism to every project and represent some of the most expensive listings in the world. Additional information regarding TBHE, as well as a comprehensive list of sales, can be located here: https://www.thebeverlyhillsestates.com/.  Me and Rayni's personal CV's and a list of recent sales is attached hereto as **Exhibit "3."**

8.     Rayni and I acknowledge and understand that (i) the sale of the Property is subject to bidding at Auction in accordance with BK Bid Procedures to be approved by the Court, (ii) any sale of the Property is subject to Court approval after notice to the United States Trustee, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules, (iii) the Property is being sold "AS-IS WITH ALL FAULTS" without any representations and warranties, (iv) the commission to be paid to the Brokers shall only be paid from the proceeds of the sale of the Property, (v) the payment of the commission to

the Brokers is subject to prior approval of the Court, and (vi) the Court shall have exclusive jurisdiction to resolve any and all disputes relating to the Listing Agreement.

9.    Pursuant to the  Listing Agreement, Rayni and I, who previously served as agents for the sale of the Property pursuant to a pre-petition listing agreement, waived all pre-petition claims against the Debtor, including, but not limited to, any amounts owed under that certain Promissory Note Secured by Personal Guaranty in the principal amount of $400,000 executed in my favor for expenses advanced for marketing the Property under the pre-petition listing agreement.

10.    In addition to the foregoing, certain of TBHE, Rayni, and I may have had dealings with entities and individuals affiliated with the Debtor, but such dealings have do not create claims against the Debtor or affect the foregoing broker/agent's disinterestedness.

11.    To the best of my knowledge, other than as set forth above, TBHE, Rayni, and I do not have any other prior connections with the Debtor or any insiders of the Debtor.

12.    TBHE, Rayni, and I have not been paid any money by the Debtor.

13.    TBHE, Rayni, and I understand the provisions of 11 U.S.C. §§ 327, 328, 330 and 331 which require, among other things, Bankruptcy Court approval of the Debtor's employment of the Brokers and of all fees and reimbursement that the Brokers will receive from the Debtor and the Debtor's estate.

14.    TBHE, Rayni, and I have not received, and do not expect to receive, any lien or other interest in property of the Debtor or of a third party to secure payment of our compensation.

15.    Due to the aforementioned waiver of claims by TBHE, Rayni, and I are not creditors of the Debtor.  Further, we are not equity security holders or insiders of the Debtor.

16.    TBHE, Rayni, and I are not and were not investment bankers for any outstanding security of the Debtor.  TBHE, Rayni, and I have not been within three (3) years before the Petition Date an investment banker for a security of the Debtor, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtor.

17.    TBHE, Rayni, and I, and, to the best of my knowledge, none of our agents, are, or were, within two (2) years before the Petition Date, a director, officer or employee of the Debtor or of any investment banker for any security of the Debtor.

18.    TBHE, Rayni, and I, and, to the best of my knowledge, none of our agents, are a relative or an employee of the United States Trustee or a Bankruptcy Judge.

19.    TBHE, Rayni, and I have not shared or agreed to share our compensation for services provided to the Debtor with any other person or entity, except among ourselves, provided that, as discussed above, under particular circumstances, the Brokers may pay share their commission with a cooperating broker.

20.    To the best of my knowledge, TBHE, Rayni, and I do not hold or represent any interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor or an investment banker for any security of the Debtor, or for any other reason.

21.    To the best of my knowledge, TBHE, Rayni, and I are each a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this _13_ day of December 2021, at Los Angeles, California.


_Branden Williams_
BRANDEN WILLIAMS

## DECLARATION OF AARON KIRMAN

I, AARON KIRMAN, hereby declare as follows:

1.     I am over 18 years of age.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.     I am the President of Aaron Kirman Group and of International Estates for Compass based in Beverly Hills, California. I have consistently been named as one of the top agents in the world and the number 1 agent in Los Angeles, consistently breaking records; in 2021 alone, I sold over $1.1 billion dollars in luxury real estate.  Recently, The Wall Street Journal and Real Trends ranked Aaron Kirman Group as the 10 highest producing team in America selling over $700,000,000 in 2020.

3.     I make this declaration in support of the Application to which this declaration is attached.   Capitalized  terms  not  defined  herein  have  the  same  meanings  as  set  forth  in  the Application.

4.     I am informed and believe that, in furtherance of the Debtor's efforts to sell the Property as soon as practicable and to generate funds to pay allowed claims, the Debtor requires the services of the Brokers and the Auctioneer to market and sell the Property.  Therefore, pursuant to the Application, the Debtor is seeking to employ the Brokers and the Auctioneer to render, among others, the following types of professional services, as applicable:

a.     marketing and showing the Property to prospective buyers;

b.     assisting the Debtor in obtaining and providing due diligence materials to prospective buyers;

c.     notifying prospective buyers of the intended online auction (the "Auction") of the Property and bid procedures approved by the Court (the "BK Bid Procedures") governing the Auction;

d.     receiving bids from prospective buyers;

e.     conducting an online Auction of the Property pursuant to BK Bid Procedures approved by the Court with the ultimate sale subject to Court approval;

f.     consulting with the Debtor and its professionals and advisors regarding the

1    foregoing; and

2            g.    performing any other services which may be appropriate in connection

3    with the Brokers and Auctioneer's retention by the Debtor.

4            5.    A true and correct copy of the Listing Agreement between the Debtor and the

5    Brokers is attached hereto as **Exhibit "1."**

6            6.    Compass and I are well-qualified to perform the services described herein, which

7    involve the marketing and sale of the Property, which is extremely unique and, because of its value,

8    has only a limited number of potential buyers, many of which are foreigners.

9            7.    Compass is a large, national, innovative residential real estate firm with more than

10   18,000 agents and approximately 40 locations across the United States.    Additional information

11   regarding Compass can be located here: https://www.compass.com/.  I have over $8 billion in luxury

12   home sales.  I represent the finest estates across the globe and was ranked in the top 5 luxury real

13   estate agents in the US by the Wall Street Journal.  I have an extensive client base featuring those

14   who seek the luxury lifestyle including titans of industry, celebrities, the royal families, major lending

15   institutions and foreign investors. As a prominent figure in the luxury real estate market, I have

16   received International acclaim for record setting sales across Los Angeles and Southern California

17   solidified by my investment in technology deployed in every aspect of his business process.  My

18   success in luxury real estate for the last 20 years has elevated my persona beyond salesman to serial

19   entrepreneur with the launch of Kirman Capital – a branch of the Kirman Group – focused on

20   investing in early-stage technology startups in real-estate.  Over a notable real estate career, I have

21   sold the infamous Danny Thomas Estate, which reportedly sold for $65,000,000; the Eddie Goetz

22   Estate and Lion Gate which sold for $46,250,000, as well as countless others. My vast knowledge

23   and expertise in selling exclusive properties has helped me to produce some of the highest prices in

24   Beverly Hills, Hollywood Hills, Santa Monica, and Malibu. I also hold the record for highest price

25   per square foot in Hollywood set at $4,722 where I represented the buyer and seller on Case Study

26   21.  Additional information about me, as well as a comprehensive list of his sales, can be located

27   here: https://aaronkirman.com/.  My personal CV is attached hereto as **Exhibit "4."**

28

8.    Compass and I acknowledge and understand that (i) the sale of the Property is subject to bidding at Auction in accordance with BK Bid Procedures to be approved by the Court, (ii) any sale of the Property is subject to Court approval after notice to the United States Trustee, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules, (iii) the Property is being sold "AS-IS WITH ALL FAULTS" without any representations and warranties, (iv) the commission to be paid to the Brokers shall only be paid from the proceeds of the sale of the Property, (v) the payment of the commission to the Brokers is subject to prior approval of the Court, and (vi) the Court shall have exclusive jurisdiction to resolve any and all disputes relating to the Listing Agreement.

9.    Compass and I, who previously served as broker/agent for the sale of the Property pursuant to a pre-petition listing agreement, waive all pre-petition claims against the Debtor (to be completed by an addendum to the Listing Agreement if not already done).

10.    In addition to the foregoing, me or Compass may have had dealings with entities and individuals affiliated with the Debtor, but such dealings have do not create claims against the Debtor or affect the foregoing broker/agent's disinterestedness.

11.    To the best of my knowledge, other than as set forth above, Compass and I do not have any other prior connections with the Debtor or any insiders of the Debtor.

12.    Compass and I have not been paid any money by the Debtor.

13.    Compass and I understand the provisions of 11 U.S.C. §§ 327, 328, 330 and 331 which require, among other things, Bankruptcy Court approval of the Debtor's employment of the Brokers and of all fees and reimbursement that the Brokers will receive from the Debtor and the Debtor's estate.

14.    Compass and I have not received, and do not expect to receive, any lien or other interest in property of the Debtor or of a third party to secure payment of our compensation.

15.    Due to the aforementioned waiver of claims by Compass and I, Compass and I are not creditors of the Debtor.  Further, we are not equity security holders or insiders of the Debtor.

16.    Compass and I are not and were not investment bankers for any outstanding security of the Debtor.  Compass and I have not been within three (3) years before the Petition Date

1   an investment banker for a security of the Debtor, or an attorney for such an investment banker in

2   connection with the offer, sale or issuance of any security of the Debtor.

3          17.     Compass and I, and, to the best of my knowledge, none of our agents, are, or were,

4   within two (2) years before the Petition Date, a director, officer or employee of the Debtor or of any

5   investment banker for any security of the Debtor.

6          18.     Compass and I, and, to the best of my knowledge, none of our agents, are a

7   relative or an employee of the United States Trustee or a Bankruptcy Judge.

8          19.     Compass and I have not shared or agreed to share our compensation for

9   representing the Debtor with any other person or entity, except among ourselves, provided that, as

10  discussed above, under particular circumstances, the Brokers may pay share their commission with a

11  cooperating broker.

12         20.     To the best of my knowledge, Compass and I do not hold or represent any interest

13  materially adverse to the interest of the estate or of any class of creditors or equity security holders,

14  by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor or an

15  investment banker for any security of the Debtor, or for any other reason.

16         21.     To the best of my knowledge, Compass and I are each a "disinterested person" as

17  that term is defined in Section 101(14) of the Bankruptcy Code.

18         I declare and verify under penalty of perjury that the foregoing is true and correct to the

19  best of my knowledge.

20         Executed on this 14th day of December 2021, at Los Angeles, California.

21

22

23  

24  AARON KIRMAN

25

26

27

28

## **DECLARATION OF CHAD ROFFERS**

I, CHAD ROFFERS, hereby declare as follows:

1.    I am over 18 years of age.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.    I am the President of Concierge Auctions, LLC ("Concierge" or the "Auctioneer").

3.    I make this declaration in support of the Application to which this declaration is attached.   Capitalized terms not defined herein have the same meanings as set forth in the Application.

4.    I am informed and believe that, in furtherance of the Debtor's efforts to sell the Property as soon as practicable and to generate funds to pay allowed claims, the Debtor requires the services of the Auctioneer to market and sell the Property in conjunction with the Brokers. Therefore, pursuant to the Application, the Debtor is seeking to employ the Auctioneer to render, among others, the following types of professional services, as applicable:

   a.    marketing and showing the Property to prospective buyers;

   b.    assisting the Debtor in obtaining and providing due diligence materials to prospective buyers;

   c.    notifying prospective buyers of the intended online auction (the "Auction") of the Property and bid procedures approved by the Court (the "BK Bid Procedures") governing the Auction;

   d.    receiving bids from prospective buyers;

   e.    conducting an online Auction of the Property pursuant to BK Bid Procedures approved by the Court with the ultimate sale subject to Court approval;

   f.    consulting with the Debtor and its professionals and advisors regarding the foregoing; and

   g.    performing any other services which may be appropriate in connection with the Brokers and Auctioneer's retention by the Debtor.

5.    A true and correct copy of the Auction Agreement between the Debtor and Concierge is attached hereto as **Exhibit "1."**

6.      Concierge and I are well-qualified to perform the services described herein, which involve the marketing and sale of the Property by auction, which is extremely unique and, because of its value, has only a limited number of potential buyers, many of which are foreigners.

7.      Concierge is the largest luxury real estate auction marketplace in the world with 90%+ market share and the most comprehensive database of high-net-worth property connoisseurs on the planet. Concierge's award-winning team is recognized as a cutting-edge global force, and has garnered global recognition from: Who's Who in Luxury Real Estate, USA Today, National Auctioneers Association, The Telly Awards, Inc. 5000, Inman News, Entrepreneur 360 List, the Financial Times, and more.  Concierge is also a corporate alliance partner to THIRDHOME, and an exclusive or preferred auction provider to many global broker networks including Leverage Global Partners, Sotheby's International Realty, Who's Who in Luxury Real Estate, Luxury Portfolio International, and Engel and Volkers.  A concise version of Concierge's firm CV is hereto as **Exhibit "5."**  Full versions of Concierge's firm CV and case studies can be found here: Full CV, Full List of Case Studies.  As but one example, Concierge was able to secure the successful sale of the highest-priced spec house in Florida listed for $159 million.  That sale is particularly relevant, because it involved Concierge successfully navigating and selling a property that, like the Debtor's property, did not have a certificate of occupancy.  Information regarding this sale can be seen here: Florida Sale.  I will lead the Concierge team in connection with marketing and selling the Debtor's Property.  My personal CV is attached hereto as **Exhibit "6."**

8.      Concierge and I acknowledge and understand that, as set forth in more detail in the Auction Agreement (Ex. "1") (1) the sale of the Property is subject to bidding at Auction in accordance with BK Bid Procedures to be approved by the Court (as set forth in the Auction Terms and Conditions attached to the Auction Agreement), (2) any sale of the Property is subject to Court approval after notice to the United States Trustee, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules, (3) the Property is being sold "AS-IS WITH ALL FAULTS" without any representations and warranties; provided, however that Debtor shall deliver good and marketable title, (4) the fee to be paid to the Auctioneer shall only be paid by the Buyer of the Property, (5) the payment of the Buyer's Premiums

to the Auctioneer is subject to prior approval of the Court as set forth in this application, and (vi) the Court shall have exclusive jurisdiction to resolve any and all disputes relating to the Auction Agreement.

9.     To the best of my knowledge, other than as set forth herein, Concierge and I do not have any other prior connections with the Debtor or any insiders of the Debtor.

10.     Concierge and I have not been paid any money by the Debtor.

11.     Concierge and I understand the provisions of 11 U.S.C. §§ 327, 328, 330 and 331 which require, among other things, Bankruptcy Court approval of the Debtor's employment of Concierge and of all fees and reimbursement that Concierge will receive from the Debtor and the Debtor's estate.

12.     Concierge and I have not received, and do not expect to receive, any lien or other interest in property of the Debtor or of a third party to secure payment of our compensation.

13.     Concierge and I are not creditors of the Debtor.  Further, we are not equity security holders or insiders of the Debtor.

14.     Concierge and I are not and were not investment bankers for any outstanding security of the Debtor.  Concierge and I have not been within three (3) years before the Petition Date an investment banker for a security of the Debtor, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtor.

15.     Concierge and I, and, to the best of my knowledge, none of our agents, are, or were, within two (2) years before the Petition Date, a director, officer or employee of the Debtor or of any investment banker for any security of the Debtor.

16.     Concierge and I, and, to the best of my knowledge, none of our agents, are a relative or an employee of the United States Trustee or a Bankruptcy Judge.

17.     Concierge and I have not shared or agreed to share our compensation for services provided to the Debtor with any other person or entity, except among ourselves, provided that, as discussed above, under particular circumstances, Concierge may rebate to the Debtor a portion of a Buyer's Premium paid to the Auctioneer.

18.     To the best of my knowledge, Concierge and I do not hold or represent any interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor or an investment banker for any security of the Debtor, or for any other reason.

19.     To the best of my knowledge, Concierge and I are each a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 13 day of December 2021, at San Francisco , California .

_____
CHAD ROFFERS

26

Doc ID: 2cbb2566017bd9836aac028cffb2d836af01f5fc

# EXHIBIT "1"

DocuSign Envelope ID: 8915F575B-D998-4381-ADB6-C083B2751C29

# DISCLOSURE REGARDING
# REAL ESTATE AGENCY RELATIONSHIP
**(Seller's Brokerage Firm to Seller)**
**(As required by the Civil Code)**
**(C.A.R. Form AD, Revised 12/18)**

CALIFORNIA
ASSOCIATION
OF REALTORS®

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code section 2079.13(j), (k) and (l).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

## SELLER'S AGENT

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:

To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.

To the Buyer and the Seller:

    (a)  Diligent exercise of reasonable skill and care in performance of the agent's duties.

    (b)  A duty of honest and fair dealing and good faith.

    (c)  A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

## BUYER'S AGENT

A Buyer's agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:

To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.

To the Buyer and the Seller:

    (a)  Diligent exercise of reasonable skill and care in performance of the agent's duties.

    (b)  A duty of honest and fair dealing and good faith.

    (c)  A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

## AGENT REPRESENTING BOTH SELLER AND BUYER

A real estate agent, either acting directly or through one or more salespersons and broker associates, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.

In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:

    (a)  A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.

    (b)  Other duties to the Seller and the Buyer as stated above in their respective sections.

In representing both Seller and Buyer, a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered.

## SELLER AND BUYER RESPONSIBILITIES

Either the purchase agreement or a separate document will contain a confirmation of which agent is representing you and whether that agent is representing you exclusively in the transaction or acting as dual agent. Please pay attention to that confirmation to make sure it accurately reflects your understanding of your agent's role.

The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

If you are a Buyer, you have the duty to exercise reasonable care to protect yourself, including as to those facts about the property which are known to you or within your diligent attention and observation.

Both Sellers and Buyers should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. **This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).**

| | | | | |
|---|---|---|---|---|
| ☐ Buyer | ☒ Seller | ☐ Landlord | ☐ Tenant | *Lawrence Perkins*        Date 12/3/2021 |

CrestlloydLLC 23E64D44A6...

| | | | | |
|---|---|---|---|---|
| ☐ Buyer | ☐ Seller | ☐ Landlord | ☐ Tenant |       Date |

Agent **The Beverly Hills Estates / Compass**                DRE Lic. # **02126121 / 01866771**
           Real Estate Broker (Firm)

By *Rayni Williams* *Branden Williams* *Aaron Kirman*   DRE Lic. # **01496786/01774287**    Date 12/3/2021
   (Salesperson or Broker-Associate, if any)        **R. Williams & B. Williams & A. Kirman**

© 1991-2018, California Association of REALTORS®, Inc.

**AD REVISED 12/18 (PAGE 1 OF 2)**

## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)

The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069     Phone: (310)925-9281     Fax: (310) 388-4638     944 Airole Way
Rayni Romito Williams     Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5    www.lwolf.com

CIVIL CODE SECTIONS 2079.13 – 2079.24 (2079.16 APPEARS ON THE FRONT)

2079.13. As used in Sections 2079.7 and 2079.14 to 2079.24, inclusive, the following terms have the following meanings:
**(a)** "Agent" means a person acting under provisions of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. The agent in the real property transaction bears responsibility for that agent's salespersons or broker associates who perform as agents of the agent. When a salesperson or broker associate owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the salesperson or broker associate functions. **(b)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee of real property. **(c)** "Commercial real property" means all real property in the state, except (1) single-family residential real property, (2) dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, (3) a mobilehome, as defined in Section 798.3, (4) vacant land, or (5) a recreational vehicle, as defined in Section 799.29. **(d)** "Dual agent" means an agent acting, either directly or through a salesperson or broker associate, as agent for both the seller and the buyer in a real property transaction. **(e)** "Listing agreement" means a written contract between a seller of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer, including rendering other services for which a real estate license is required to the seller pursuant to the terms of the agreement. **(f)** "Seller's agent" means a person who has obtained a listing of real property to act as an agent for compensation.**(g)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the seller's agent. **(h)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(i)** "Offer to purchase" means a written contract executed by a buyer acting through a buyer's agent that becomes the contract for the sale of the real property upon acceptance by the seller. **(j)** "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property, and includes (1) single-family residential property, (2) multiunit residential property with more than four dwelling units, (3) commercial real property, (4) vacant land, (5) a ground lease coupled with improvements, or (6) a manufactured home as defined in Section 18007 of the Health and Safety Code, or a mobilehome as defined in Section 18008 of the Health and Safety Code, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. **(k)** "Real property transaction" means a transaction for the sale of real property in which an agent is retained by a buyer, seller, or both a buyer and seller to act in that transaction, and includes a listing or an offer to purchase. **(l)** "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(m)** "Seller" means the transferor in a real property transaction and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor of real property. **(n)** "Buyer's agent" means an agent who represents a buyer in a real property transaction.

2079.14. A seller's agent and buyer's agent shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and shall obtain a signed acknowledgement of receipt from that seller and buyer, except as provided in Section 2079.15, as follows: **(a)** The seller's agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. **(b)** The buyer's agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase. If the offer to purchase is not prepared by the buyer's agent, the buyer's agent shall present the disclosure form to the buyer not later than the next business day after receiving the offer to purchase from the buyer.

2079.15. In any circumstance in which the seller or buyer refuses to sign an acknowledgement of receipt pursuant to Section 2079.14, the agent shall set forth, sign, and date a written declaration of the facts of the refusal.

2079.16 Reproduced on Page 1 of this AD form.

2079.17(a) As soon as practicable, the buyer's agent shall disclose to the buyer and seller whether the agent is acting in the real property transaction as the buyer's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the buyer's agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the seller's agent shall disclose to the seller whether the agent is acting in the real property transaction as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the seller's agent prior to or coincident with the execution of that contract by the seller.

CONFIRMATION: The following agency relationships are confirmed for this transaction:

Seller's Brokerage Firm   DO NOT COMPLETE. SAMPLE ONLY                               License Number _____
Is the broker of (check one): ☐ the seller; or ☐ both the seller and buyer. (dual agent)
Seller's Agent   DO NOT COMPLETE. SAMPLE ONLY                                         License Number _____
Is (check one): ☐ the Seller's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)
Buyer's Brokerage Firm   DO NOT COMPLETE. SAMPLE ONLY                                 License Number _____
Is the broker of (check one): ☐ the buyer; or ☐ both the buyer and seller. (dual agent)
Buyer's Agent   DO NOT COMPLETE. SAMPLE ONLY                                          License Number _____
Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

**(d)** The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14. An agent's duty to provide disclosure and confirmation of representation in this section may be performed by a real estate salesperson or broker associate affiliated with that broker.

2079.18 (Repealed pursuant to AB-1289)

2079.19 The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

2079.20 Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

2079.21 **(a)** A dual agent may not, without the express permission of the seller, disclose to the buyer any confidential information obtained from the seller. **(b)** A dual agent may not, without the express permission of the buyer, disclose to the seller any confidential information obtained from the buyer. **(c)** "Confidential information" means facts relating to the client's financial position, motivations, bargaining position, or other personal information that may impact price, such as the seller is willing to accept a price less than the listing price or the buyer is willing to pay a price greater than the price offered. **(d)** This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

2079.22 Nothing in this article precludes a seller's agent from also being a buyer's agent. If a seller or buyer in a transaction chooses to not be represented by an agent, that does not, of itself, make that agent a dual agent.

2079.23 A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

2079.24 Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

© 1991-2018, California Association of REALTORS®, Inc.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



AD REVISED 12/18 (PAGE 2 OF 2)
**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)**

ASSOCIATION
OF REALTORS®

**FAIR HOUSING & DISCRIMINATION ADVISORY**
(C.A.R. Form FHDA, 10/20)

1. **EQUAL ACCESS TO HOUSING FOR ALL:** All housing in California is available to all persons. Discrimination as noted below is prohibited by law. Resources are available for those who have experienced unequal treatment under the law.
2. **FEDERAL AND STATE LAWS PROHIBIT DISCRIMINATION AGAINST IDENTIFIED PROTECTED CLASSES:**
   A. FEDERAL FAIR HOUSING ACT ("FHA") Title VIII of the Civil Rights Act; 42 U.S.C. §§ 3601-3619; Prohibits discrimination in sales, rental or financing of residential housing against persons in protected classes;
   B. CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT ("FEHA") California Government Code ("GC") §§12900-12996,12955; 2 California Code of Regulations ("CCR") §§12005-12271; Prohibits discrimination in sales, rental or financing of housing opportunity against persons in protected classes by providers of housing accommodation and financial assistance services as related to housing;
   C. CALIFORNIA UNRUH CIVIL RIGHTS ACT ("Unruh") California Civil Code ("CC") §51; Prohibits business establishments from discriminating against, and requires full and equal accommodation, advantages, facilities, privileges, and services to persons in protected classes;
   D. AMERICANS WITH DISABILITIES ACT ("ADA") 42 U.S.C. §§12181-12189; Title III of the ADA prohibits discrimination based on disability in public accommodations; and
   E. OTHER FAIR HOUSING LAWS: Section 504 of Rehabilitation Act of 1973 29 U.S.C. §794; Ralph Civil Rights Act CC §51.7.; California Disabled Persons Act; CC §§54-55.32; any local city or county fair housing ordinances, as applicable.
3. **POTENTIAL LEGAL REMEDIES FOR UNLAWFUL DISCRIMINATION:** Violations of fair housing laws may result in monetary civil fines, injunctive relief, compensatory and/or punitive damages, and attorney fees and costs.
4. **PROTECTED CLASSES/CHARACTERISTICS:** Whether specified in Federal or State law or both, discrimination against persons if based on that person's belonging to, association with, or perceived membership to, any of the following classes or categories is prohibited.

| Race | Color | Ancestry | National Origin | Religion |
|---|---|---|---|---|
| Sex | Sexual Orientation | Gender | Gender Identity | Gender Expression |
| Marital Status | Familial Status (family with a child or children under 18) | Source of Income (e.g., Section 8 Voucher) | Disability (Mental & Physical) | Medical Condition |
| Citizenship | Primary Language | Immigration Status | Military/Veteran Status | Age |
| Criminal History (non-relevant convictions) | | | Any arbitrary characteristic | |

5. **THE CALIFORNIA DEPARTMENT OF REAL ESTATE REQUIRES TRAINING AND SUPERVISION TO PREVENT HOUSING DISCRIMINATION BY REAL ESTATE LICENSEES:**
   A. California Business & Professions Code ("B&PC") §10170.5(a)(4) requires 3 hours of training on fair housing for DRE license renewal; Real Estate Regulation §2725(f) requires brokers who oversee salespersons to be familiar with the requirements of federal and state laws relating to the prohibition of discrimination.
   B. Violation of DRE regulations or real estate laws against housing discrimination by a real estate licensee may result in the loss or suspension of the licensee's real estate license. B&PC §10177(l)(1); 10 CCR §2780
6. **REALTOR® ORGANIZATIONS PROHIBIT DISCRIMINATION:** NAR Code of Ethics Article 10 prohibits discrimination in employment practices or in rendering real estate license services against any person because of race, color, religion, sex, handicap, familial status, national origin, sexual orientation, or gender identity by REALTORS®.
7. **WHO IS REQUIRED TO COMPLY WITH FAIR HOUSING LAWS?**
   Below is a non-exclusive list of providers of housing accommodations or financial assistance services as related to housing who are most likely to be encountered in a housing transaction and who must comply with fair housing laws.

   - Sellers
   - Landlords
   - Sublessors
   - Real estate licensees
   - Real estate brokerage firms
   - Property managers
   - Mobilehome parks
   - Homeowners Associations ("HOAs");
   - Banks and Mortgage lenders
   - Insurance companies
   - Government housing services

8. **EXAMPLES OF CONDUCT THAT MAY NOT BE MOTIVATED BY DISCRIMINATORY INTENT BUT COULD HAVE A DISCRIMINATORY EFFECT:**
   A. Prior to acceptance of an offer, asking for or offering buyer personal information or letters from the buyer, especially with photos. Those types of documents may inadvertently reveal, or be perceived as revealing, protected status information thereby increasing the risk of **(i)** actual or unconscious bias, and **(ii)** potential legal claims against sellers and others by prospective buyers whose offers were rejected.
   B. Refusing to rent **(i)** an upper level unit to an elderly tenant out of concern for the tenant's ability to navigate stairs or **(ii)** a house with a pool to a person with young children out of concern for the children's safety.
9. **EXAMPLES OF UNLAWFUL OR IMPROPER CONDUCT BASED ON A PROTECTED CLASS OR CHARACTERISTIC:**
   A. Refusing to negotiate for a sale, rental or financing or otherwise make a housing opportunity unavailable; failing to present offers due to a person's protected status;
   B. Refusing or failing to show, rent, sell or finance housing; "channeling" or "steering" a prospective buyer or tenant to or away from a particular area due to that person's protected status or because of the racial, religious or ethnic composition of the neighborhood;
   C. "Blockbusting" or causing "panic selling" by inducing a listing, sale or rental based on the grounds of loss of value of property, increase in crime, or decline in school quality due to the entry or prospective entry of people in protected categories into the neighborhood;
   D. Making any statement or advertisement that indicates any preference, limitation, or discrimination;

© 2020, California Association of REALTORS®, Inc.
**FHDA 10/20 (PAGE 1 OF 2)**

EQUAL HOUSING
OPPORTUNITY

The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069        Phone: (310)925-9281        Fax: (310) 388-4638        944 Airole Way
Rayni Romito Williams        Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5        www.lwolf.com

**E.** Inquiring about protected characteristics (such as asking tenant-applicants if they are married, or prospective purchasers if they have children or are planning to start a family);

**F.** Using criminal history information before otherwise affirming eligibility, and without a legally sufficient justification;

**G.** Failing to assess financial standards based on the portion of the income responsible by a tenant who receives government subsidies (such as basing an otherwise neutral rent to income ratio on the whole rent rather than just the part of rent that is the tenant's responsibility);

**H.** Denying a home loan or homeowner's insurance;

**I.** Offering inferior terms, conditions, privileges, facilities or services;

**J.** Using different qualification criteria or procedures for sale or rental of housing such as income standards, application requirements, application fees, credit analyses, sale or rental approval procedures or other requirements;

**K.** Harassing a person;

**L.** Taking an adverse action based on protected characteristics;

**M.** Refusing to permit a reasonable modification to the premises, as requested by a person with a disability (such as refusing to allow a wheel chair bound tenant to install, at their expense, a ramp over front or rear steps, or refusing to allow a physically disabled tenant from installing, at their own expense, grab bars in a shower or bathtub);

**N.** Refusing to make reasonable accommodation in policies, rules, practices, or services for a person with a disability (such as the following, if an actual or prospective tenant with a disability has a service animal or support animal):
   **(i)** Failing to allow that person to keep the service animal or emotional support animal in rental property,
   **(ii)** Charging that person higher rent or increased security deposit, or
   **(iii)** Failing to show rental or sale property to that person who is accompanied by the service animal or support animal, and;

**O.** Retaliating for asserting rights under fair housing laws.

**10. EXAMPLES OF POSITIVE PRACTICES:**

**A.** Real estate licensees working with buyers or tenants should apply the same objective property selection criteria, such as location/neighborhood, property features, and price range and other considerations, to all prospects.

**B.** Real estate licensees should provide complete and objective information to all clients based on the client's selection criteria.

**C.** Real estate licensees should provide the same professional courtesy in responding to inquiries, sharing of information and offers of assistance to all clients and prospects.

**D.** Housing providers should not make any statement or advertisement that directly or indirectly implies preference, limitation, or discrimination regarding any protected characteristic (such as "no children" or "English-speakers only").

**E.** Housing providers should use a selection process relying on objective information about a prospective buyer's offer or tenant's application and not seek any information that may disclose any protected characteristics (such as using a summary document, e.g. C.A.R. Form SUM-MO, to compare multiple offers on objective terms).

**11. FAIR HOUSING RESOURCES:** If you have questions about your obligations or rights under the Fair Housing laws, or you think you have been discriminated against, you may want to contact one or more of the sources listed below to discuss what you can do about it, and whether the resource is able to assist you.

**A.** Federal: **https://www.hud.gov/program_offices/fair_housing_equal_opp**

**B.** State: **https://www.dfeh.ca.gov/housing/**

**C.** Local: local Fair Housing Council office (non-profit, free service)

**D.** DRE: **https://www.dre.ca.gov/Consumers/FileComplaint.html**

**E.** Local Association of REALTORS®. List available at: **https://www.car.org/en/contactus/rosters/localassociationroster**

**F.** Any qualified California fair housing attorney, or if applicable, landlord-tenant attorney.

**12. LIMITED EXCEPTIONS TO FAIR HOUSING REQUIREMENTS: No person should rely on any exception below without first seeking legal advice about whether the exception applies to their situation. Real estate licensees are not qualified to provide advice on the application of these exceptions.**

**A.** Legally compliant senior housing is exempt from FHA, FEHA and Unruh as related to age or familial status only;

**B.** An owner of a single-family residence who resides at the property with one lodger may be exempt from FEHA for rental purposes, PROVIDED **no real estate licensee is involved** in the rental;

**C.** An owner of a single-family residence may be exempt from FHA for sale or rental purposes, PROVIDED **(i) no real estate licensee is involved** in the sale or rental and **(ii)** no discriminatory advertising is used, and **(iii)** the owner owns no more than three single-family residences. Other restrictions apply;

**D.** An owner of residential property with one to four units who resides at the property, may be exempt from FHA for rental purposes, PROVIDED **no real estate licensee is involved** in the rental; and

**E.** Both FHA and FEHA do not apply to roommate situations. See, *Fair Housing Council v Roommate.com LLC*, 666 F.3d 1216 (2019).

**F.** Since both the 14th Amendment of the U.S. Constitution and the Civil Rights Act of 1866 prohibit discrimination based on race; the FHA and FEHA exemptions do not extend to discrimination based on race.

Buyer/Tenant and Seller/Landlord have read, understand and acknowledge receipt of a copy of this Fair Housing & Discrimination Advisory.

| | | | |
|---|---|---|---|
| Buyer/Tenant _____ | *The Beverly Hills Estates* | Date _____ |
| Buyer/Tenant _____ | *Compass* | Date _____ |
| Seller/Landlord *Lawrence Perkins* | *Crestlloyd LLC* | Date 12/3/2021 |
| Seller/Landlord —55DE923E64D44A6... | | Date _____ |

© 2020, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.



Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**FHDA 10/20 (PAGE 2 OF 2)**

**FAIR HOUSING & DISCRIMINATION ADVISORY (FHDA PAGE 2 OF 2)**

**CALIFORNIA ASSOCIATION OF REALTORS®**

## POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER
### OR SELLER - DISCLOSURE AND CONSENT
(C.A.R. Form PRBS, Revised 12/18)

A real estate broker (Broker), whether a corporation, partnership or sole proprietorship, may represent more than one buyer or seller. This multiple representation can occur through an individual licensed as a broker or salesperson or through different individual broker's or salespersons (associate licensees) acting under the Broker's license. The associate licensees may be working out of the same or different office locations.

**Multiple Buyers:** Broker (individually or through its associate licensees) may be working with many prospective buyers at the same time. These prospective buyers may have an interest in, and make offers on, the same properties. Some of these properties may be listed with Broker and some may not. Broker will not limit or restrict any particular buyer from making an offer on any particular property whether or not Broker represents other buyers interested in the same property.

**Multiple Sellers:** Broker (individually or through its associate licensees) may have listings on many properties at the same time. As a result, Broker will attempt to find buyers for each of those listed properties. Some listed properties may appeal to the same prospective buyers. Some properties may attract more prospective buyers than others. Some of these prospective buyers may be represented by Broker and some may not. Broker will market all listed properties to all prospective buyers whether or not Broker has another or other listed properties that may appeal to the same prospective buyers.

**Dual Agency:** If Seller is represented by Broker, Seller acknowledges that broker may represent prospective buyers of Seller's property and consents to Broker acting as a dual agent for both seller and buyer in that transaction. If Buyer is represented by Broker, buyer acknowledges that Broker may represent sellers of property that Buyer is interested in acquiring and consents to Broker acting as a dual agent for both buyer and seller with regard to that property.

In the event of dual agency, seller and buyer agree that: a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the buyer's or seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the seller's willingness to accept a price less than the listing price or the buyer's willingness to pay a price greater than the price offered; and except as set forth above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.

**Offers not necessarily confidential:** Buyer is advised that seller or listing agent may disclose the existence, terms, or conditions of buyer's offer unless all parties and their agent have signed a written confidentiality agreement. Whether any such information is actually disclosed depends on many factors, such as current market conditions, the prevailing practice in the real estate community, the listing agent's marketing strategy and the instructions of the seller.

Buyer and seller understand that Broker may represent more than one buyer or more than one seller and even both buyer and seller on the same transaction and consents to such relationships.

**Seller and/or Buyer acknowledges reading and understanding this Possible Representation of More Than One Buyer or Seller Disclosure and Consent and agrees to the agency possibilities disclosed.**

| | | |
|---|---|---|
| Seller _Lawrence Perkins_ | _Crestlloyd LLC_ Date | 12/3/2021 |
| Seller ⌐55DE923E64D44A6... | Date | |
| Buyer | _The Beverly Hills Estates_ Date | |
| Buyer | _Compass_ Date | |
| Buyer's Brokerage Firm _____ | DRE Lic # | Date |
| By _____ | DRE Lic # | Date |
| Seller's Brokerage Firm _The Beverly Hills Estates / Compass_ | DRE Lic # 02126121 / | Date |
| By _Rayni Williams   Branden Williams  Aaron Kirman_ | DRE Lic # 01496786/0177428 Date | 12/3/2021 |
| R. Williams & B. Williams & A. Kirman   5BEE03049F0D4D0... | | |

© 2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



**PRBS REVISED 12/18 (PAGE 1 OF 1)**

### POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER OR SELLER (PRBS PAGE 1 OF 1)



# CALIFORNIA ASSOCIATION OF REALTORS®

## WIRE FRAUD AND ELECTRONIC FUNDS TRANSFER ADVISORY
### (C.A.R. Form WFA, Revised 12/17)

Property Address: _944 Airole Way, Los Angeles, CA  90077-2602_____ ("Property").

## WIRE FRAUD AND ELECTRONIC FUNDS TRANSFERS ADVISORY:

The ability to communicate and conduct business electronically is a convenience and reality in nearly all parts of our lives. At the same time, it has provided hackers and scammers new opportunities for their criminal activity. Many businesses have been victimized and the real estate business is no exception.

While wiring or electronically transferring funds is a welcome convenience, we all need to exercise extreme caution. Emails attempting to induce fraudulent wire transfers have been received and have appeared to be legitimate. Reports indicate that some hackers have been able to intercept emailed transfer instructions, obtain account information and, by altering some of the data, redirect the funds to a different account. It also appears that some hackers were able to provide false phone numbers for verifying the wiring or funds transfer instructions. In those cases, the victim called the number provided to confirm the instructions, and then unwittingly authorized a transfer to somewhere or someone other than the intended recipient.

## ACCORDINGLY, YOU ARE ADVISED:

1. **Obtain phone numbers and account numbers only from Escrow Officers, Property Managers, or Landlords at the beginning of the transaction.**

2. **DO NOT EVER WIRE OR ELECTRONICALLY TRANSFER FUNDS PRIOR TO CALLING TO CONFIRM THE TRANSFER INSTRUCTIONS. ONLY USE A PHONE NUMBER YOU WERE PROVIDED PREVIOUSLY. Do not use any different phone number or account number included in any emailed transfer instructions.**

3. **Orally confirm the transfer instruction is legitimate and confirm the bank routing number, account numbers and other codes before taking steps to transfer the funds.**

4. **Avoid sending personal information in emails or texts.  Provide such information in person or over the telephone directly to the Escrow Officer, Property Manager, or Landlord.**

5. **Take steps to secure the system you are using with your email account. These steps include creating strong passwords, using secure WiFi, and not using free services.**

If you believe you have received questionable or suspicious wire or funds transfer instructions, immediately notify your bank, and the other party, and the Escrow Office, Landlord, or Property Manager. The sources below, as well as others, can also provide information:

Federal Bureau of Investigation: https://www.fbi.gov/; the FBI's IC3 at www.ic3.gov; or 310-477-6565

National White Collar Crime Center: http://www.nw3c.org/

On Guard Online: https://www.onguardonline.gov/

**NOTE: There are existing alternatives to electronic and wired fund transfers such as cashier's checks. By signing below, the undersigned acknowledge that each has read, understands and has received a copy of this Wire Fraud and Electronic Funds Transfer Advisory.**

Buyer/Tenant _____  _The Beverly Hills Estates_ Date _____

Buyer/Tenant _____  _Compass_ Date _____

Seller/Landlord _Lawrence Perkins_____  _Crestlloyd LLC_ Date 12/3/2021
                └─ DocuSigned by: ─ 55DE923E64D44A6...

Seller/Landlord _____  Date _____

©2016-2017, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
**R** **L** REAL ESTATE BUSINESS SERVICES, LLC.
**E** **S** *a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
**B** **C** 525 South Virgil Avenue, Los Angeles, California 90020

**WFA REVISED 12/17 (PAGE 1 OF 1)**
**WIRE FRAUD AND ELECTRONIC FUNDS TRANSFER ADVISORY (WFA PAGE 1 OF 1)**

**RESIDENTIAL LISTING AGREEMENT**
**(Exclusive Authorization and Right to Sell)**
(C.A.R. Form RLA, Revised 6/21)

Date Prepared: _12/03/2021_

1. **EXCLUSIVE RIGHT TO SELL:** _____ _Crestlloyd LLC_ _____ ("Seller")
   hereby employs and grants _____ _The Beverly Hills Estates / Compass_ _____ ("Broker")
   beginning (date) _December 3, 2021_ and ending at 11:59 P.M. on (date) _December 3, 2022_ ("Listing Period")
   the exclusive and irrevocable right to sell or exchange the real property described as _944 Airole Way_
   _____, situated in _Los Angeles_ (City),
   _Los Angeles_ (County), California, _90077-2602_ (Zip Code), Assessor's Parcel No. _4369-026-021_ ("Property").
   ☐ This Property is a manufactured (mobile) home. See Manufactured Home Listing Addendum (C.A.R. form MHLA) for additional
   terms.
   ☐ This Property is being sold as part of a probate, conservatorship, guardianship, or receivership. See for Probate Listing
   Addendum and Advisory (C.A.R. form PLA) for additional terms.
2. **LISTING PRICE AND TERMS:**
   **A.** The listing price shall be: _Two Hundred Ninety-Five Million_
   _____ Dollars ($ _295,000,000.00_ ).
   **B.** Listing Terms: _____
   _____.

3. **COMPENSATION TO BROKER:**
   **Notice: The amount or rate of real estate commissions is not fixed by law. They are set by each Broker individually and may be negotiable between Seller and Broker (real estate commissions include all compensation and fees to Broker).**
   **A.** Seller agrees to pay to Broker as compensation for services irrespective of agency relationship(s), either ☒ _2.0-3.0_ percent of the listing price (or if a purchase agreement is entered into, of the purchase price), or ☐ $ _____,
   AND _____, as follows:
   **(1)** If during the Listing Period, or any extension, Broker, cooperating broker, Seller or any other person procures a ready, willing, and able buyer(s) whose offer to purchase the Property on any price and terms is accepted by Seller, provided the Buyer completes the transaction or is prevented from doing so by Seller. (Broker is entitled to compensation whether any escrow resulting from such offer closes during or after the expiration of the Listing Period, or any extension.)
   **OR (2)** If within _180_ calendar days (a) after the end of the Listing Period or any extension; or (b) after any cancellation of this Agreement, unless otherwise agreed, Seller enters into a contract to sell, convey, lease or otherwise transfer the Property to anyone ("Prospective Buyer") or that person's related entity: **(i)** who physically entered and was shown the Property during the Listing Period or any extension by Broker or a cooperating broker; or **(ii)** for whom Broker or any cooperating broker submitted to Seller a signed, written offer to acquire, lease, exchange or obtain an option on the Property. Seller, however, shall have no obligation to Broker under paragraph 3A(2) unless, not later than the end of the Listing Period or any extension or cancellation, Broker has given Seller a written notice of the names of such Prospective Buyers.
   **OR** ~~(3) If, without Broker's prior written consent, the Property is withdrawn from sale, conveyed, leased, rented, otherwise transferred, or made unmarketable by a voluntary act of Seller during the Listing Period, or any extension.~~
   **B.** If completion of the sale is prevented by a party to the transaction other than Seller, then compensation which otherwise would have been earned under paragraph 3A shall be payable only if and when Seller collects damages by suit, arbitration, settlement or otherwise, and then in an amount equal to the lesser of one-half of the damages recovered or the above compensation, after first deducting title and escrow expenses and the expenses of collection, if any.
   **C.** In addition, Seller agrees to pay Broker: _____.
   **D.** Seller has been advised of Broker's policy regarding cooperation with, and the amount of compensation offered to, other brokers.
   **(1)** Broker is authorized to cooperate with and compensate brokers participating through the multiple listing service(s) ("MLS") by offering to MLS brokers out of Broker's compensation specified in 3A, either ☐ _1.000_ percent of the purchase price, or ☐ $ _____.
   **(2)** Broker is authorized to cooperate with and compensate brokers operating outside the MLS as per Broker's policy.
   **E.** Seller hereby irrevocably assigns to Broker the above compensation from Seller's funds and proceeds in escrow. Broker may submit this Agreement, as instructions to compensate Broker pursuant to paragraph 3A, to any escrow regarding the Property involving Seller and a buyer, Prospective Buyer or other transferee.
   **F.** ~~(1) Seller represents that Seller has not previously entered into a listing agreement with another broker regarding the Property, unless specified as follows:~~ _____.
   ~~(2) Seller warrants that Seller has no obligation to pay compensation to any other broker regarding the Property unless the Property is transferred to any of the following individuals or entities:~~ _____.
   ~~(3) If the Property is sold to anyone listed above during the time Seller is obligated to compensate another broker: (i) Broker is not entitled to compensation under this Agreement; and (ii) Broker is not obligated to represent Seller in such transaction.~~

© 2021, California Association of REALTORS®, Inc.

**RLA REVISED 6/21 (PAGE 1 OF 5)**

Seller's Initials _LP_ / _____

**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 1 OF 5)**

Property Address: **944 Airole Way, Los Angeles, CA 90077-1102**    Date: **12/03/2021**

4.  **A.   ITEMS EXCLUDED AND INCLUDED:** Unless otherwise specified in a real estate purchase agreement, all fixtures and fittings that are attached to the Property are included, and personal property items are excluded, from the purchase price.
    **ADDITIONAL ITEMS EXCLUDED:** _____ .
    **ADDITIONAL ITEMS INCLUDED:** _____ .
    Seller intends that the above items be excluded or included in offering the Property for sale, but understands that: **(i)** the purchase agreement supersedes any intention expressed above and will ultimately determine which items are excluded and included in the sale; and **(ii)** Broker is not responsible for and does not guarantee that the above exclusions and/or inclusions will be in the purchase agreement.

    **B.   (1) LEASED OR NOT OWNED ITEMS:** The following items are leased or not owned by Seller:
    ☐ Solar power system   ☐ Alarm system   ☐ Propane tank   ☐ Water Softener
    ☐ Other _____
    **(2) LIENED ITEMS:** The following items have been financed and a lien has been placed on the Property to secure payment:
    ☐ Solar power system   ☐ Windows or doors   ☐ Heating/Ventilation/Air conditioning system
    ☐ Other _____
    Seller will provide to Buyer, as part of the sales agreement, copies of lease documents, or other documents obligating Seller to pay for any such leased or liened item.

5.  **MULTIPLE LISTING SERVICE:**
    **A.   WHAT IS AN MLS?** The MLS is a database of properties for sale that is available and disseminated to and accessible by all other real estate agents who are participants or subscribers to the MLS. As set forth in **paragraph 7**, participants and subscribers conducting public marketing of a property listing must submit the property information to the MLS. Property information submitted to the MLS describes the price, terms and conditions under which the Seller's property is offered for sale (including but not limited to the listing broker's offer of compensation to other brokers). It is likely that a significant number of real estate practitioners in any given area are participants or subscribers to the MLS. The MLS may also be part of a reciprocal agreement to which other multiple listing services belong. Real estate agents belonging to other multiple listing services that have reciprocal agreements with the MLS also have access to the information submitted to the MLS. The MLS may further transmit listing information to Internet sites that post property listings online.
    **B.   WHAT INFORMATION IS PROVIDED TO THE MLS:** All terms of the transaction, including sales price and financing, if applicable, **(i)** will be provided to the MLS in which the Property is listed for publication, dissemination and use by persons and entities on terms approved by the MLS, and **(ii)** may be provided to the MLS even if the Property was not listed with the MLS. Seller consents to Broker providing a copy of this listing agreement to the MLS if required by the MLS.
    **C.   WHAT IS BROKER'S MLS?** Broker is a participant/subscriber to _____ **CLAW** _____ Multiple Listing Service (MLS) and possibly others. That MLS is (or if checked ☐ is not) the primary MLS for the geographic area of the Property. When required by paragraph 7 or by the MLS, Property will be listed with the MLS(s) specified above.

6.  **BENEFITS OF USING THE MLS; IMPACT OF OPTING OUT OF THE MLS**
    **A.   EXPOSURE TO BUYERS THROUGH MLS:** Listing property with an MLS exposes a seller's property to all real estate agents and brokers (and their potential buyer clients) who are participants or subscribers to the MLS or a reciprocating MLS. The MLS may further transmit the MLS database to Internet sites that post property listings online.
    **B.   IMPACT OF OPTING OUT OF MLS:** If Seller elects to exclude the Property from the MLS, Seller understands and acknowledges that: **(i)** Seller is authorizing limited exposure of the Property and NO marketing or advertising of the Property to the public will occur; **(ii)** real estate agents and brokers from other real estate offices, and their buyer clients, who have access to that MLS may not be aware that Seller's Property is offered for sale; **(iii)** Information about Seller's Property will not be transmitted from the MLS to various real estate Internet sites that are used by the public to search for property listings; and **(iv)** real estate agents, brokers and members of the public may be unaware of the terms and conditions under which Seller is marketing the Property.
    **C.   REDUCTION IN EXPOSURE:** Any reduction in exposure of the Property may lower the number of offers and negatively impact the sales price.
    **D.   NOT LISTING PROPERTY IN A LOCAL MLS:** If the Property is listed in an MLS which does not cover the geographic area where the Property is located then local real estate agents and brokers working that territory, and Buyers they represent looking for property in the neighborhood, may not be aware the Property is for sale.

    | Seller's Initials    _LP_ / | Broker's/Agent's Initials   RW   BW   AE |
    |---|---|

7.  **PUBLIC MARKETING OF PROPERTY:**
    **A.   CLEAR COOPERATION POLICY:** MLS rules require (☐ Do NOT require – see 7F) that residential real property with one to four units and vacant lot listings be submitted to the MLS within 1 business day of any public marketing.
    **B.   PUBLIC MARKETING WITHIN CLEAR COOPERATION: (i) Public marketing** includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays, digital communications marketing and email blasts, multi-brokerage listing sharing networks, marketing to closed or private listing clubs or groups, and applications available to the general public. **(ii)** Public marketing does not include an office exclusive listing where there is direct promotion of the listing between the brokers and licensees affiliated with the listing brokerage, and one-to-one promotion between these licensees and their clients.
    **C.   "COMING SOON" STATUS IMPACT ON MARKETING; Days on Market (DOM):** Seller is advised to discuss with Broker the meaning of "Coming Soon" as that term applies to the MLS in which the Property will be listed, and how any Coming Soon status will impact when and how a listing will be viewable to the public via the MLS. Seller does (☐ does not) authorize Broker to utilize Coming Soon status, if any. Seller is further advised to discuss with Broker how any DOM calculations or similarly utilized tracking field works in the MLS in which the Property will be listed.
    **D.   Seller Instructs Broker:** (MLS may require C.A.R. Form SELM or local equivalent form)
    (1)   Seller instructs Broker to market the Property to the public, and to start marketing on the beginning date of this Agreement or ☐ _____ (date).

**RLA REVISED 6/21 (PAGE 2 OF 5)**                    Seller's Initials   _LP_ / _____

**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 2 OF 5)**
Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5    www.lwolf.com                    **944 Airole Way**

DocuSign Envelope ID: 8915F575B-D998-4281-A9B6-C0636275 1C29

Case 2:21-bk-18205-DS   Doc 98   Filed 02/04/22   Entered 02/04/22 09:03:05   Desc
Main Document   Page 39 of 143
Property Address: *944 Airole Way, Los Angeles, CA 90077-2502*

OR (2) ☐ Seller instructs Broker NOT to market the Property to the public. Seller understands that no public marketing will occur and the scope of marketing that will occur will consist only of direct one-on-one promotion between the brokers and licensees affiliated with the listing brokerage and their respective clients.

**E.** **Whether 7D(1) or 7D(2) is selected,** Seller understands and agrees that should any public marketing of the Property occur, the Property listing will be submitted to the MLS within 1 business day.

**F.** ☐ **CLEAR COOPERATION POLICY DOES NOT APPLY:** Paragraphs 7A (other than the language in the parenthetical), 7B, 7D and 7E do not apply to this listing. Broker shall disclose to Seller and obtain Seller's consent for any instruction to not market the Property on the MLS or to the public.

8. **MLS DATA ON THE INTERNET:** MLS rules allow MLS data to be made available by the MLS to additional Internet sites unless Broker gives the MLS instructions to the contrary. Specific information that can be excluded from the Internet as permitted by (or in accordance with) the MLS is as follows:

   **A.** **PROPERTY OR PROPERTY ADDRESS:** Seller can instruct Broker to have the MLS not display the Property or the Property address on the Internet (C.A.R. Form SELI). Seller understands that either of these opt-outs would mean consumers searching for listings on the Internet may not see the Property or Property's address in response to their search.

   **B.** **FEATURE OPT-OUTS:** Seller can instruct Broker to advise the MLS that Seller does not want visitors to MLS Participant or Subscriber Websites or Electronic Displays that display the Property listing to have the features below (C.A.R. Form SELI). Seller understands **(i)** that these opt-outs apply only to Websites or Electronic Displays of MLS Participants and Subscribers who are real estate broker and agent members of the MLS; **(ii)** that other Internet sites may or may not have the features set forth herein; and **(iii)** that neither Broker nor the MLS may have the ability to control or block such features on other Internet sites.

      **(1)** **COMMENTS AND REVIEWS:** The ability to write comments or reviews about the Property on those sites; or the ability to link to another site containing such comments or reviews if the link is in immediate conjunction with the Property display.

      **(2)** **AUTOMATED ESTIMATE OF VALUE:** The ability to create an automated estimate of value or to link to another site containing such an estimate of value if the link is in immediate conjunction with the Property display.

         ☐ Seller elects to opt out of certain Internet features as provided by C.A.R. Form SELI or the local equivalent form.

9. ~~**SELLER REPRESENTATIONS:** Seller represents that, unless otherwise specified in writing, Seller is unaware of: **(i)** any Notice of Default recorded against the Property; **(ii)** any delinquent amounts due under any loan secured by, or other obligation affecting, the Property; **(iii)** any bankruptcy, insolvency or similar proceeding affecting the Property; **(iv)** any litigation, arbitration, administrative action, government investigation or other pending or threatened action that affects or may affect the Property or Seller's ability to transfer it; and **(v)** any current, pending or proposed special assessments affecting the Property. Seller shall promptly notify Broker in writing if Seller becomes aware of any of these items during the Listing Period or any extension thereof.~~

10. **BROKER'S AND SELLER'S DUTIES:**

    **A.** **Broker Responsibility, Authority and Limitations:** Broker agrees to exercise reasonable effort and due diligence to achieve the purposes of this Agreement. Unless Seller gives Broker written instructions to the contrary, Broker is authorized, but not required, to **(i)** order reports and disclosures including those specified in 10D as necessary, **(ii)** advertise and market the Property by any method and in any medium selected by Broker, including MLS and the Internet, and, to the extent permitted by these media, control the dissemination of the information submitted to any medium; and **(iii)** disclose to any real estate licensee making an inquiry the receipt of any offers on the Property and the offering price of such offers.

    **B.** **Presentation of Offers:** Broker agrees to present all offers received for Seller's Property, and present them to Seller as soon as possible, unless Seller gives Broker written instructions to the contrary.

    **C.** **Broker Supplemental Offer Letters (Buyer Letters):**

       **(1)** Paragraph 8 of the Fair Housing and Discrimination Advisory (C.A.R. Form FHDA) attached to this Agreement informs Seller of the practice of many buyers and their agents of including a Buyer Letter with an offer to try to influence a seller to accept the buyer's offer. Buyer Letters may include photos and video. Whether overt or unintentional, Buyer Letters may contain information about a buyer's or seller's protected class or characteristics. Deciding whether to accept an offer based upon protected classes or characteristics is unlawful. Broker will not review the content of Buyer Letters.

       **(2)** **(A) Seller instructs Broker not to present Buyer Letters,** whether submitted with an offer or separately at a different time. Seller authorizes Broker to specify in the MLS that Buyer Letters will not be presented to Seller.

       **OR (B)** ☐ **Seller instructs Broker to present Buyer Letters.** Broker advises seller that: **(i)** Buyer Letters may contain information about protected classes or characteristics and such information should not be used in Seller's decision of whether to accept, reject, or counter a Buyer's offer; and **(ii)** if Seller relies on Buyer Letters, Seller is acting against Broker's advice and should seek the advice of counsel before doing so.

    **D.** Seller agrees to consider offers presented by Broker, and to act in good faith to accomplish the sale of the Property by, among other things, making the Property available for showing at reasonable times and, subject to paragraph 3F, referring to Broker all inquiries of any party interested in the Property. Seller is responsible for determining at what price to list and sell the Property.

    **E.** **Investigations and Reports:** Seller agrees, within **5 (or _____) Days** of the beginning date of this Agreement, to order and, when required by the service provider, pay for a Natural Hazard Disclosure report and the following reports:

       ☐ Structural Pest Control, ☐ General Property Inspection, ☐ Homeowners Association Documents, ☐ Preliminary (Title) Report, ☐ Roof Inspection, ☐ Pool Inspection, ☐ Septic/Sewer Inspection, ☐ Other _____.

       If Property is located in a Common Interest Development or Homeowners Association, Seller is advised that there may be benefits to obtaining any required documents prior to entering into escrow with any buyer. Such benefits may include, but not be limited to, potentially being able to lower costs in obtaining the documents and avoiding any potential delays or complications due to late or slow delivery of such documents.

    **F.** Seller further agrees to indemnify, defend and hold Broker harmless from all claims, disputes, litigation, judgments, attorney fees and costs arising from any incorrect or incomplete information supplied by Seller, or from any material facts that Seller knows but fails to disclose including dangerous or hidden conditions on the Property.

**RLA REVISED 6/21 (PAGE 3 OF 5)**

Seller's Initials _____/ _____

*LP*

Property Address: **944 Airole Way, Los Angeles, CA 90077-3602**                                        Page **4** of **5**

**11. DEPOSIT:** Broker is authorized to accept and hold on Seller's behalf any deposits to be applied toward the purchase price.

**12. AGENCY RELATIONSHIPS:**

   **A.**   **Disclosure:** The Seller acknowledges receipt of a ☒ "Disclosure Regarding Real Estate Agency Relationships" (C.A.R. Form AD).

   **B.**   **Seller Representation:** Broker shall represent Seller in any resulting transaction, except as specified in paragraph 3F.

   **C.**   **POSSIBLE DUAL AGENCY WITH BUYER:** Depending upon the circumstances, it may be necessary or appropriate for Broker to act as an agent for both Seller and buyer, exchange party, or one or more additional parties ("Buyer"). Broker shall, as soon as practicable, disclose to Seller any election to act as a dual agent representing both Seller and buyer. If a Buyer is procured directly by Broker or an associate-licensee in Broker's firm, Seller hereby consents to Broker acting as a dual agent for Seller and Buyer. In the event of an exchange, Seller hereby consents to Broker collecting compensation from additional parties for services rendered, provided there is disclosure to all parties of such agency and compensation. Seller understands and agrees that: a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered; and except as set forth above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.

   **D.**   **CONFIRMATION:** Broker shall confirm the agency relationship described above, or as modified, in writing, prior to or concurrent with Seller's execution of a purchase agreement.

   **E.**   **POTENTIALLY COMPETING SELLERS AND BUYERS:** Seller understands that Broker may have or obtain listings on other properties, and that potential buyers may consider, make offers on, or purchase through Broker, property the same as or similar to Seller's Property. Seller consents to Broker's representation of sellers and buyers of other properties before, during and after the end of this Agreement. Seller acknowledges receipt of a ☒ "Possible Representation of More than One Buyer or Seller - Disclosure and Consent" (C.A.R. Form PRBS).

**13. SECURITY, INSURANCE, SHOWINGS, AUDIO AND VIDEO:** Broker is not responsible for loss of or damage to personal or real property, or person, whether attributable to use of a keysafe/lockbox, a showing of the Property, or otherwise. Third parties, including, but not limited to, appraisers, inspectors, brokers and prospective buyers, may have access to, and take videos and photographs of, the interior of the Property. Seller agrees: **(i)** to take reasonable precautions to safeguard and protect valuables that might be accessible during showings of the Property; **(ii)** to obtain insurance to protect against these risks. Broker does not maintain insurance to protect Seller. Persons visiting the Property may not be aware that they could be recorded by audio or visual devices installed by Seller (such as "nanny cams" and hidden security cameras). Seller is advised to post notice disclosing the existence of security devices.

**14. PHOTOGRAPHS AND INTERNET ADVERTISING:**

   **A.**   In order to effectively market the Property for sale it is often necessary to provide photographs, virtual tours and other media to buyers. Seller agrees (or ☐ if checked, does not agree) that Broker or others may photograph or otherwise electronically capture images of the exterior and interior of the Property ("Images") for static and/or virtual tours of the Property by buyers and others for use on Broker's website, the MLS, and other marketing materials and sites. Seller acknowledges that if Broker engages third parties to capture and/or reproduce and display Images, the agreement between Broker and those third parties may provide such third parties with certain rights to those Images. The rights to the Images may impact Broker's control or lack of control of future use of the Images. If Seller is concerned, Seller should request that Broker provide any third parties' agreement impacting the Images. Seller also acknowledges that once Images are placed on the Internet neither Broker nor Seller has control over who can view such Images and what use viewers may make of the Images, or how long such Images may remain available on the Internet. Seller further assigns any rights in all Images to the Broker/Agent and agrees that such Images are the property of Broker/Agent and that Broker/Agent may use such Images for advertising, including post sale and for Broker/Agent's business in the future.

   **B.**   Seller acknowledges that prospective buyers and/or other persons coming onto the property may take photographs, videos or other images of the property. Seller understands that Broker does not have the ability to control or block the taking and use of Images by any such persons. (If checked) ☐ Seller instructs Broker to publish in the MLS that taking of Images is limited to those persons preparing Appraisal or Inspection reports. Seller acknowledges that unauthorized persons may take images who do not have access to or have not read any limiting instruction in the MLS or who take images regardless of any limiting instruction in the MLS. Once Images are taken and/or put into electronic display on the Internet or otherwise, neither Broker nor Seller has control over who views such Images nor what use viewers may make of the Images.

**15. KEYSAFE/LOCKBOX:** A keysafe/lockbox is designed to hold a key to the Property to permit access to the Property by Broker, cooperating brokers, MLS participants, their authorized licensees and representatives, authorized inspectors, and accompanied prospective buyers. Seller further agrees that Broker, at Broker's discretion, and without further approval from Seller, shall have the right to grant access to and convey Seller's consent to access the Property to inspectors, appraisers, workers, repair persons, and other persons requiring entry to the Property in order to facilitate the sale of the Property. Broker, cooperating brokers, MLS and Associations/Boards of REALTORS® are not insurers against injury, theft, loss, vandalism or damage attributed to the use of a keysafe/lockbox.

   **A.**   Seller does (or if checked ☐ does not) authorize Broker to install a keysafe/lockbox.

   **B.**   **TENANT-OCCUPIED PROPERTY:** If Seller does not occupy the Property, Seller shall be responsible for obtaining occupant(s)' written permission for use of a keysafe/lockbox (C.A.R. Form KLA).

**16. SIGN:** Seller does (or if checked ☐ does not) authorize Broker to install a FOR SALE/SOLD sign on the Property.

**17. EQUAL HOUSING OPPORTUNITY:** The Property is offered in compliance with federal, state and local anti-discrimination laws.

**18. ATTORNEY FEES:** In any action, proceeding or arbitration between Seller and Broker to enforce the compensation provisions of this Agreement, the prevailing Seller or Broker shall be entitled to reasonable attorney fees and costs from the non-prevailing Seller or Broker, except as provided in paragraph 22A.

**19. ADDITIONAL TERMS:** ☐ REO Advisory Listing (C.A.R. Form REOL) ☐ Short Sale Information and Advisory (C.A.R. Form SSIA)
   ☐ Trust Advisory (C.A.R. Form TA)
   ☐ Seller intends to include a contingency to purchase a replacement property as part of any resulting transaction
   *See Text Overflow Addendum (C.A.R. Form TOA) paragraph 1*

_____

                                                             ┌─ DS
                                                            *LP*

**RLA REVISED 6/21 (PAGE 4 OF 5)**                                        Seller's Initials _____ / _____

**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 4 OF 5)**

Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5    www.lwolf.com                944 Airole Way



Property Address: *944 Airole Way, Los Angeles, CA 00077 2602*

20. **MANAGEMENT APPROVAL:** If an associate-licensee in Broker's office (salesperson or broker-associate) enters into this Agreement on Broker's behalf, and Broker or Manager does not approve of its terms, Broker or Manager has the right to cancel this Agreement, in writing, within **5 Days** After its execution.

21. **SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon Seller and Seller's successors and assigns.

22. **DISPUTE RESOLUTION:**

   A. ~~MEDIATION: Seller and Broker agree to mediate any dispute or claim arising between them regarding the obligation to pay compensation under this Agreement, before resorting to arbitration or court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party **(i)** commences an action without first attempting to resolve the matter through mediation, or **(ii)** before commencement of an action, refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. Exclusions from this mediation agreement are specified in paragraph 22B.~~

   B. ~~**ADDITIONAL MEDIATION TERMS: The following matters shall be excluded from mediation: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code § 2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver or violation of the mediation provisions.**~~

   C. ~~**ARBITRATION ADVISORY:** If Seller and Broker desire to resolve disputes arising between them through arbitration rather than court, they can document their agreement by attaching and signing an Arbitration Agreement (C.A.R. Form ARB).~~

23. **ENTIRE AGREEMENT:** All prior discussions, negotiations and agreements between the parties concerning the subject matter of this Agreement are superseded by this Agreement, which constitutes the entire contract and a complete and exclusive expression of their agreement, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. This Agreement and any supplement, addendum or modification, including any photocopy or facsimile, may be executed in counterparts.

24. **OWNERSHIP, TITLE AND AUTHORITY:** Seller warrants that: **(i)** Seller is the owner of the Property; **(ii)** no other persons or entities have title to the Property; and **(iii)** Seller has the authority to both execute this Agreement and sell the Property. Exceptions to ownership, title and authority are as follows: _____

[X] **REPRESENTATIVE CAPACITY:** This Listing Agreement is being signed for Seller by an individual acting in a Representative Capacity as specified in the attached Representative Capacity Signature Disclosure (C.A.R. Form RCSD-S). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. Seller **(i)** represents that the entity for which the individual is signing already exists and **(ii)** shall Deliver to Broker, within 3 Days After Execution of this Agreement, evidence of authority to act (such as but not limited to: applicable trust document, or portion thereof, letters testamentary, court order, power of attorney, resolution, or formation documents of the business entity).

**By signing below, Seller acknowledges that Seller has read, understands, received a copy of and agrees to the terms of this Agreement.**

Seller *Lawrence Perkins*    Date 12/3/2021
*Crestlloyd LLC*
*1B59D54D44A6...*

Address _____ City _____ State ____ Zip ____

Telephone _____ Fax _____ E-mail _____

Seller _____    Date _____

Address _____ City _____ State ____ Zip ____

Telephone _____ Fax _____ E-mail _____

[ ] Additional Signature Addendum attached (C.A.R. Form ASA)

Real Estate Broker (Firm) *The Beverly Hills Estates / Compass*    DRE Lic. # *02126121 / 01866771*

Address *8878 Sunset Blvd*    City *West Hollywood*    State *CA*    Zip *90069*

By *Rayni Williams*    Tel. *(310)925-9281*    E-mail *rayni@thebeverlyhillsestates.co*    DRE Lic.# *01496786/017*    Date 12/3/2021
*R. Williams & B. Williams & A. Kirman*

By *Aaron Kirman*    Tel. _____ E-mail _____ DRE Lic.# _____ Date 12/3/2021
*5BEE03049F0D4D0...*

[X] Two Brokers with different companies are co-listing the Property. Co-listing Broker information is on the attached Additional Broker Acknowledgement (C.A.R. Form ABA).

© 2021 California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.



Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**RLA REVISED 6/21 (PAGE 5 OF 5)**

**RESIDENTIAL LISTING AGREEMENT - EXCLUSIVE (RLA PAGE 5 OF 5)**

DocuSign Envelope ID: 8915575B-D998-4281-ADB6-C953B275AC29

**CALIFORNIA
ASSOCIATION
OF REALTORS®**

### SELLER'S ADVISORY
**(C.A.R. Form SA, Revised 12/15)**

Property Address: _944 Airole Way, Los Angeles, CA  90077-2602_____ ("Property")

1. **INTRODUCTION:** Selling property in California is a process that involves many steps. From start to finish, it could take anywhere from a few weeks to many months, depending upon the condition of your Property, local market conditions and other factors. You have already taken an important first step by listing your Property for sale with a licensed real estate broker. Your broker will help guide you through the process and may refer you to other professionals, as needed. This advisory addresses many things you may need to think about and do as you market your Property. Some of these things are requirements imposed upon you, either by law or by the listing or sale contract. Others are simply practical matters that may arise during the process. Please read this document carefully and, if you have any questions, ask your broker or appropriate legal or tax advisor for help.

2. **DISCLOSURES:**
   **A. General Disclosure Duties:** You must affirmatively disclose to the buyer, in writing, any and all known facts that materially affect the value or desirability of your Property. You must disclose these facts whether or not asked about such matters by the buyer, any broker, or anyone else. This duty to disclose applies even if the buyer agrees to purchase your Property in its present condition without requiring you to make any repairs. If you do not know what or how to disclose, you should consult a real estate attorney in California of your choosing. Broker cannot advise you on the legal sufficiency of any disclosures you make. If the Property you are selling is a residence with one to four units except for certain subdivisions, your broker also has a duty to conduct a reasonably competent and diligent visual inspection of the accessible areas and to disclose to a buyer all adverse material facts that the inspection reveals. If your broker discovers something that could indicate a problem, your broker must advise the buyer.

   **B. Statutory Duties:** (For one-to-four Residential Units):
   **(1)** You must timely prepare and deliver to the buyer, among other things, a Real Estate Transfer Disclosure Statement ("TDS"), and a Natural Hazard Disclosure Statement ("NHD"). You have a legal obligation to honestly and completely fill out the TDS form in its entirety. (Many local entities or organizations have their own supplement to the TDS that you may also be asked to complete.) The NHD is a statement indicating whether your Property is in certain designated flood, fire or earthquake/seismic hazard zones. Third-party professional companies can help you with this task.
   **(2)** Depending upon the age and type of construction of your Property, you may also be required to provide and, in certain cases you can receive limited legal protection by providing, the buyer with booklets entitled "The Homeowner's Guide to Earthquake Safety," "The Commercial Property Owner's Guide to Earthquake Safety," "Protect Your Family From Lead in Your Home" and "Environmental Hazards: A Guide For Homeowners and Buyers." Some of these booklets may be packaged together for your convenience. The earthquake guides ask you to answer specific questions about your Property's structure and preparedness for an earthquake. If you are required to supply the booklet about lead, you will also be required to disclose to the buyer any known lead-based paint and lead-based paint hazards on a separate form. The environmental hazards guide informs the buyer of common environmental hazards that may be found in properties.
   **(3)** If you know that your property is: (i) located within one mile of a former military ordnance location; or (ii) in or affected by a zone or district allowing manufacturing, commercial or airport use, you must disclose this to the buyer. You are also required to make a good faith effort to obtain and deliver to the buyer a disclosure notice from the appropriate local agency(ies) about any special tax levied on your Property pursuant to the Mello-Roos Community Facilities Act, the Improvement Bond Act of 1915, and a notice concerning the contractual assessment provided by section 5898.24 of the Streets And Highways Code (collectively, "Special Tax Disclosures").
   **(4)** If the TDS, NHD, or lead, military ordnance, commercial zone or Special Tax Disclosures are provided to a buyer after you accept that buyer's offer, the buyer will have 3 days after delivery (or 5 days if mailed) to terminate the offer, which is why it is extremely important to complete these disclosures as soon as possible. There are certain exemptions from these statutory requirements; however, if you have actual knowledge of any of these items, you may still be required to make a disclosure as the items can be considered material facts.

   **C. Death and Other Disclosures:** Many buyers consider death on real property to be a material fact in the purchase of property. In some situations, it is advisable to disclose that a death occurred or the manner of death; however, California Civil Code Section 1710.2 provides that you have no disclosure duty "where the death has occurred more than three years prior to the date the transferee offers to purchase, lease, or rent the real property, or [regardless of the date of occurrence] that an occupant of that property was afflicted with, or died from, Human T-Lymphotropic Virus Type III/Lymphadenopathy-Associated Virus." This law does not "immunize an owner or his or her agent from making an intentional misrepresentation in response to a direct inquiry from a transferee or a prospective transferee of real property, concerning deaths on the real property."

   **D. Condominiums and Other Common Interest Subdivisions:** If the Property is a condominium, townhouse, or other property in a common interest subdivision, you must provide to the buyer copies of the governing documents, the most recent financial statements distributed, and other documents required by law or contract. If you do not have a current version of these documents, you can request them from the management of your homeowner's association. To avoid delays, you are encouraged to obtain these documents as soon as possible, even if you have not yet entered into a purchase agreement to sell your Property.

3. **CONTRACT TERMS AND LEGAL REQUIREMENTS:**
   **A. Contract Terms and Conditions:** A buyer may request, as part of the contract for the sale of your Property, that you pay for repairs to the Property and other items. Your decision on whether or not to comply with a buyer's requests may affect your ability to sell your Property at a specified price.

© 1991-2015, California Association of REALTORS®, Inc.                    Seller's Initials ( __*LP*__ ) ( _____ )

**SA REVISED 12/15 (PAGE 1 OF 2)**

**SELLER'S ADVISORY (SA PAGE 1 OF 2)**

Property Address: *944 Airole Way, Los Angeles, CA 90077-2602*                                    Date: *12/03/2021*

**B. Withholding Taxes:** Under federal and California tax laws, a buyer is required to withhold a portion of the purchase price from your sale proceeds for tax purposes unless you sign an affidavit of non-foreign status and California residency, or some other exemption applies and is documented.

**C. Prohibition Against Discrimination:** Discriminatory conduct in the sale of real property against individuals belonging to legally protected classes is a violation of the law.

**D. Government Required Repairs, Replacements and Alterations:** Under State law, Property owners with limited exceptions, are required to: (1) Install operable smoke alarms and brace water heaters and provide a Buyer with a statement of compliance. Existing operable smoke alarms, that met compliance standards when installed, do not have to be removed even if not up to current legal requirements. Smoke alarms that are added or that replace older versions must comply with current law; and (2) install carbon monoxide detection devices. Some city and county governments may impose additional requirements, including, but not limited to, installing low-flow toilets and showerheads, gas shut-off valves, tempered glass, and barriers around swimming pools and spas. You should consult with the appropriate governmental agencies, inspectors, and other professionals to determine which requirements apply to your Property, the extent to which your Property complies with such requirements, and the costs, if any, of compliance.

**E. EPA's LEAD-BASED PAINT RENOVATION, REPAIR AND PAINTING RULE:** The new rule requires that contractors and maintenance professionals working in pre-1978 housing, child care facilities, and schools with lead-based paint be certified; that their employees be trained; and that they follow protective work practice standards. The rule applies to renovation, repair, or painting activities affecting more than six square feet of lead-based paint in a room or more than 20 square feet of lead-based paint on the exterior. Enforcement of the rule begins October 1, 2010. See the EPA website at www.epa.gov/lead for more information.

**F. Legal, Tax and Other Implications:** Selling your Property may have legal, tax, insurance, title or other implications. You should consult an appropriate professional for advice on these matters.

**4. MARKETING CONSIDERATIONS:**

**A. Pre-Sale Inspections and Considerations:** You should consider doing what you can to prepare your Property for sale, such as correcting any defects or other problems, making cosmetic improvements, and staging. Many people are not aware of defects in or problems with their own Property. One way to make yourself aware is to obtain professional inspections prior to sale. Pre-sale inspections may include a general property inspection; an inspection for wood destroying pest and organisms (Structural Pest Control Report) and an inspection of the septic or well systems, if any, among others. By doing this, you then have an opportunity to make repairs before your Property is sold, which may enhance its marketability. Keep in mind, however, that any problems revealed by such inspection reports or repairs that have been made, whether or not disclosed in a report, should be disclosed to the buyer (see "Disclosures" in paragraph 2 above). This is true even if the buyer gets his/her own inspections covering the same area. Obtaining inspection reports may also assist you during contract negotiations with the buyer. For example, if a Structural Pest Control Report has both a primary and secondary recommendation for clearance, you may want to specify in the purchase agreement those recommendations, if any, for which you are going to pay.

**B. Post-Sale Protections:** It is often helpful to provide the buyer with, among other things, a home protection/warranty plan for the Property. These plans will generally cover problems, not deemed to be pre-existing, that occur after your sale is completed. In the event something does go wrong after the sale, and it is covered by the plan, the buyer may be able to resolve the concern by contacting the home protection company.

**C. Safety Precautions:** Advertising and marketing your Property for sale, including, but not limited to, holding open houses, placing a keysafe/lockbox, erecting FOR SALE signs, and disseminating photographs, video tapes, and virtual tours of the premises, may jeopardize your personal safety and that of your Property. You are strongly encouraged to maintain insurance, and to take any and all possible precautions and safeguards to protect yourself, other occupants, visitors, your Property, and your belongings, including cash, jewelry, drugs, firearms and other valuables located on the Property, against injury, theft, loss, vandalism, damage, and other harm.

**D. Expenses:** You are advised that you, not the Broker, are responsible for the fees and costs, if any, to comply with your duties and obligations to the buyer of your Property.

**5. OTHER ITEMS:** _____

_____

Seller has read and understands this Advisory. By signing below, Seller acknowledges receipt of a copy of this document.

Seller   *Lawrence Perkins*                                                                 Date   12/3/2021
Print Name *Crestlloyd LLC*

Seller   _____   Date _____
Print Name

Real Estate Broker (Listing Firm) *The Beverly Hills Estates / Compass*                DRE Lic.# *02126121 / 01866771*
By *Rayni Williams / Branden Williams*  **R. Williams & B. Williams & A. Kirman**  DRE Lic.# *01496786/01774287*  Date  12/3/2021
By *Aaron Kirman*                                        DRE Lic.#                        Date  12/3/2021
Address *8878 Sunset Blvd*                          City *West Hollywood*          State *CA*      Zip *90069*
Telephone *(310)925-9281*          Fax *(310) 388-4638*      E-mail *rayni@thebeverlyhillsestates.com*

© 1991-2015, California Association of REALTORS®, Inc. Copyright claimed in Form SA, exclusive of language required by California Civil Code §1710.2. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.



Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**SA REVISED 12/15 (PAGE 2 OF 2)**

DocuSign Envelope ID: 8915575B-D998-4281-A9B6-C9535275AC29

# CALIFORNIA CONSUMER PRIVACY ACT ADVISORY

### (C.A.R. Form CCPA, 12/19)

As of January 1, 2020, the California Consumer Privacy Act (commencing with Civil Code § 1798.100) ("CCPA") grants to California residents certain rights in their private, personal information that is collected by companies with whom they do business. Under the CCPA, "personal information" is defined broadly to encompass non-public records information that could reasonably be linked directly or indirectly to you, including, potentially, photographs of or sales information about your property. Some of your personal information will be collected and likely shared with others during the process of buying and selling real estate. Depending on the situation, you may have the right to "opt out" or stop the transfer of your personal information to others and request that certain businesses delete your personal information altogether. Not all businesses you interact with are required to comply with the law, primarily just those who meet the criteria of a covered "Business" as set forth in Section 1798.140 (c)]. For more information, you may ask your Broker for a copy of the C.A.R. Legal Q&A on the subject.

A real estate broker is likely to submit personal information to a Multiple Listing Service ("MLS") in order to help find a buyer for a seller's property. Through the MLS, the information is made available to real estate brokers and salespeople, and others. Even after a sale is complete, the MLS distributes sales information to the real estate community. Brokers, agents and MLSs may also share your personal information with others who post the personal information on websites or elsewhere, or otherwise use it. Thus, there are various service providers and companies in a real estate transaction who may be engaged in using or sharing data involving your personal information.

If your broker is a covered Business, it should have a privacy policy explaining your rights on its website and giving you an opportunity to request that personal information not be shared, used and even deleted. Even if your real estate brokerage is a covered Business, it needs, and is allowed, to keep your information to effectuate a sale and, by law, is required to maintain such information for three years to comply with regulatory requirements. Not all brokers are covered Businesses, however, and those that are not, do not have to comply with the CCPA.

Similarly, most MLSs will not be considered a covered Business. Instead, the MLS may be considered a Third Party in the event a covered Business (ex: brokerages, real estate listing aggregation or advertising internet sites or other outlets who meet the criteria of covered Businesses) exchanges personal information with the MLS. You do not have the right under the CCPA to require a Third Party to delete your personal information. And like real estate brokerages, even if an MLS is a covered Business, MLSs are also required by law to retain and make accessible in its computer system any and all listing and other information for three years.

Whether an MLS is a covered Business or a Third Party, you have a right to be notified about the sharing of your personal information and your right to contact a covered Business to opt out of your personal information being used, or shared with Third Parties. Since the MLSs and/or other entities receiving your personal information do not have direct contact with buyers and sellers and also may not be aware of which entities exchanging personal information are covered Businesses, this form is being used to notify you of your rights under the CCPA and your ability to direct requests to covered Businesses not to share personal information with Third Parties. One way to limit access to your personal information, is to inform your broker or salesperson you want to opt-out of the MLS, and if so, you will be asked to sign a document (Form SELM) confirming your request to keep your listing off the MLS. However, if you do so, it may be more difficult to sell your property or obtain the highest price for it because your property will not be exposed to the greatest number of real estate licensees and others.

**I/we acknowledge receipt of a copy of this California Consumer Privacy Act Advisory.**

| | | |
|---|---|---|
| Buyer/Seller/Landlord/Tenant | *Lawrence Perkins* | Date ___12/3/2021___ |
| | Chestlloyd LLC | |
| Buyer/Seller/Landlord/Tenant | _____ | Date _____ |

© 2019, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**CCPA 12/19 (PAGE 1 OF 1)**

EQUAL HOUSING OPPORTUNITY

## CALIFORNIA CONSUMER PRIVACY ACT ADVISORY (CCPA PAGE 1 OF 1)

| | |
|---|---|
| The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069 | Phone: (310)925-9281   Fax: (310) 388-4638   **944 Airole Way** |
| Rayni Romito Williams | Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5   www.lwolf.com |



**CALIFORNIA
ASSOCIATION
OF REALTORS®**

### TEXT OVERFLOW ADDENDUM No. ___1___
(C.A.R. Form TOA, Revised 6/16)

This addendum is given in connection with the property known as _____*944 Airole Way, Los Angeles, CA  90077-2602*_____
_____ ("Property"),
in which _____*The Beverly Hills Estates, Compass*_____ is referred to as ("Buyer")
and _____*Crestlloyd LLC*_____ is referred to as ("Seller").

*1) RLA, paragraph 19, ADDITIONAL TERMS:*
*All prior listing agreements are cancelled and this listing agreement supersedes all previous agreements. Listing Agents*
*commission as follows: 1% of sale price up to $175 million, 1.5% of sale price above $175 million and up to $200 million, 2%*
*on sale price above $200 million. The BH Estates/Williams & Williams waive any claim including the $400K note. See attached*
*Addendum to Residential Listing Agreement.*

The foregoing terms and conditions are hereby incorporated in and made a part of the paragraph(s) referred to in the document to
which this TOA is attached. The undersigned acknowledge receipt of a copy of this TOA.

Buyer _____ Date _____
*The Beverly Hills Estates*
Buyer _____ Date _____
*Compass*
Seller _____*Lawrence Perkins*_____ Date __12/3/2021__
*Crestlloyd LLC*
Seller _____ Date _____

®2014, California Association of REALTORS®, Inc. United States Copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this
form or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY
OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE
TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from C.A.R. It is not intended to identify the user as a REALTOR®.
REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its
Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**TOA REVISED 6/16 (PAGE 1 OF 1)**

**TEXT OVERFLOW ADDENDUM (TOA PAGE 1 OF 1)**

# CALIFORNIA
## ASSOCIATION
### OF REALTORS®

## SELLER INSTRUCTION TO EXCLUDE LISTING
## FROM THE MULTIPLE LISTING SERVICE
## AND DAYS ON MARKET
**(C.A.R. Form SELM, Revised 6/20)**

This is an addendum ("Addendum") to the Listing Agreement or ☐ Other _____ ("Agreement")
dated _12/03/2021_ on property known as _944 Airole Way, Los Angeles, CA  90077-2602_ ("Property"),
in which _Crestlloyd LLC_ is referred to as Seller
and _The Beverly Hills Estates / Compass_ is referred to as Broker.

1. **MULTIPLE LISTING SERVICE:** Broker is a participant/subscriber to the _CLAW_ Multiple Listing Service (MLS). The MLS is a database of properties for sale that is available and disseminated to and accessible by all other real estate licensees who are participants or subscribers to the MLS or a reciprocal MLS. Property information submitted to the MLS describes the price, terms and conditions under which the Seller's Property is offered for sale.

2. **BENEFITS OF USING THE MLS; IMPACT OF OPTING OUT OF THE MLS**
   A. **EXPOSURE TO BUYERS THROUGH MLS:** Listing property with an MLS exposes a seller's property to all real estate agents and brokers (and their potential buyer clients) who are participants or subscribers to the MLS or a reciprocating MLS. The MLS may further transmit the MLS database to Internet sites that post property listings online.
   B. **IMPACT OF OPTING OUT OF MLS:** If Seller elects to exclude the Property from the MLS, Seller understands and acknowledges that: **(i)** Seller is authorizing limited exposure of the Property and NO marketing or advertising of the Property to the public will occur; **(ii)** real estate agents and brokers from other real estate offices, and their buyer clients, who have access to that MLS may not be aware that Seller's Property is offered for sale; **(iii)** Information about Seller's Property will not be transmitted from the MLS to various real estate Internet sites that are used by the public to search for property listings and; **(iv)** real estate agents, brokers and members of the public may be unaware of the terms and conditions under which Seller is marketing the Property.
   C. **REDUCTION IN EXPOSURE:** Any reduction in exposure of the Property may lower the number of offers and negatively impact the sales price.

3. **MANDATORY SUBMISSION TO MLS/CLEAR COOPERATION POLICY:**
   A. The MLS requires (☐ Does NOT require − see paragraph D below) brokers participating in the service to submit all exclusive right to sell and exclusive agency listings for residential real property with one-to-four units or vacant lots to the MLS within 1 business day of any public marketing of the Property.
   B. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays, digital communications marketing and email blasts, multi-brokerage listing sharing networks, marketing to closed or private listing clubs or groups, and applications available to the general public. Public marketing does not include an office exclusive listing where there is direct promotion of the listing between the brokers and licensees affiliated with the listing brokerage, and one-to-one promotion between these licensees and their clients.
   C. Excluding the Property from the MLS means that Seller is authorizing limited exposure of the Property and **(i)** no public marketing will occur and **(ii)** the scope of marketing that will occur will consist only of direct one-on-one promotion between the brokers and licensees affiliated with the listing brokerage and their respective clients.
   D. ☐ **MLS HAS NOT ADOPTED THE NATIONAL ASSOCIATION OF REALTORS® CLEAR COOPERATION POLICY:** Broker's MLS rules govern the submission of listings differently than those set forth in paragraphs 3A, B, and C. With Seller's written consent, Broker may keep the Property out of the MLS. Seller certifies that Seller understands the implications of not submitting Property to the MLS and instructs Broker as follows. **DO NOT** submit Listing to the MLS (Check one):
      (1) ☐ For a period of _____ calendar days from the commencement of the listing
      (2) ☐ Until _____ (date).
      (3) ☐ During the entire listing period provided for in the Agreement.

4. **SELLER INSTRUCTION TO BROKER TO EXCLUDE PROPERTY FROM THE MLS:** (This paragraph 4 applies, unless 3D is checked.)
   A. ☒ Do NOT market the Property immediately. Begin marketing to the public on _as soon as possible_ (date).
   OR B. ☐ Do NOT market the Property to the public during the entire listing period.
   C. Whether **A or B** is selected, Seller understands and agrees that should any public marketing of the property occur, the Property listing will be submitted to the MLS for cooperation with other brokers within 1 business day.

**Seller acknowledges that Seller has read, understands, accepts and has received a copy of this Addendum.**

Seller _Lawrence Perkins_ _Crestlloyd LLC_ Date 12/3/2021
55DE923E64D44A6...
Seller _____ Date _____

Real Estate Broker (Firm) _The Beverly Hills Estates / Compass_ Lic. # 02126121 / 01866771
By (Broker or Office Manager) _Greg LaPlant_ Lic. # 01959830 Date 12/3/2021

© 2020, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the *CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

SELM REVISED 6/20 (PAGE 1 OF 1)

## SELLER INSTRUCTION TO EXCLUDE LISTING FROM MLS (SELM PAGE 1 OF 1)

**CALIFORNIA ASSOCIATION OF REALTORS®**

# REPRESENTATIVE CAPACITY SIGNATURE DISCLOSURE
## (FOR SELLER REPRESENTATIVES)
### (C.A.R. Form RCSD-S, Revised 6/19)

This form is not an assignment. It should not be used to add new parties after a contract has been formed. The purpose of this form is to identify who the principal is in the transaction and who has authority to sign documents on behalf of the principal.

This is a disclosure to one or more of the following: Listing Agreement, Purchase Agreement, or Other Agreement, specified below in which _____ *Crestlloyd LLC* is identified as ("Seller").

If a trust, identify Seller as the trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust 3.) Full name of trust should be identified in 1A below. If power of attorney, insert principal's name as Seller.

1. A. ☐ **TRUST:** (1) The Property is held in trust pursuant to a trust document, titled (full name of trust): _____
_____
_____
   (2) The person(s) signing below is/are Sole/Co/Successor Trustee(s) of the Trust.
   B. ☐ **ENTITY:** Seller is a ☐ Corporation, ☒ Limited Liability Company, ☐ Partnership ☐ Other: _____
   which has authorized the officer(s), managing member(s), partner(s) or person(s) signing below to act on its behalf.
   An authorizing resolution of the applicable body of the entity described above ☐ is ☒ is not attached.
   C. ☐ **POWER OF ATTORNEY:** Seller ("Principal") has authorized the person(s) signing below ("Attorney-In-Fact", "Power of Attorney" or "POA") to act on his/her behalf pursuant to a General Power of Attorney ( ☐ Specific Power of Attorney for the Property), dated _____. **This form is not a Power of Attorney. A Power of Attorney must have already been executed before this form is used.**
   D. ☐ **ESTATE:** (1) Seller is an ☐ estate, ☐ conservatorship, ☐ guardianship, or ☐ _____
   identified by Superior Court Case name as _____, Case # _____ . (2) The person(s) signing below is/are court approved representatives (whether designated as Sole or Co-Executor, Administrator, Conservator, Guardian) of the estate, conservatorship or guardianship identified above.

2. Seller's Representative represents that the trust, entity or power of attorney for which that Party is acting already exists.

**Seller:**
By _____ *Lawrence Perkins* _____ Date: 12/3/2021
(Sign Name of Trustee, Officer, Managing Member, Partner, Attorney-in-Fact or Administrator/Executor)

(Print Representative Name)    Lawrence Perkins     Title: Manager

By _____ Date: _____
(Sign Name of Trustee, Officer, Managing Member, Partner, Attorney-in-Fact or Administrator/Executor)

(Print Representative Name) _____ Title: _____

**Acknowledgement of Receipt:**

---

**AT TIME OF LISTING**
Seller and    *The Beverly Hills Estates / Compass*    ("Seller's Broker") are parties to a
Listing Agreement dated   *12/03/2021*   for property known as *944 Airole Way, Los Angeles, CA  90077-2602* .
Real Estate Broker
By  *Rayni Williams* *Branden Williams Aaron Kirman*    Date 12/3/2021
*R. Williams & B. Williams & A. Kirman*

---

© 2019, California Association of REALTORS®, Inc.

**RCSD-S REVISED 6/19 (PAGE 1 OF 2)**

EQUAL HOUSING OPPORTUNITY

**REPRESENTATIVE CAPACITY SIGNATURE DISCLOSURE (RCSD-S PAGE 1 OF 2)**

**AT TIME OF SALE**

Seller and _____ *The Beverly Hills Estates, Compass* _____ ("Buyer") are parties to a

Purchase Agreement dated _____ for property known as *944 Airole Way, Los Angeles, CA 90077-2602* ____ .

Buyer _____ Date _____
        *The Beverly Hills Estates*

Buyer _____ Date _____
        *Compass*

---

**AT TIME OF OTHER AGREEMENT**

Seller and _____ ("Other Party") are

parties to an _____ Agreement

dated _____ , if applicable, for property known as *944 Airole Way, Los Angeles, CA 90077-2602* ____ .

Other Party _____

_____

By _____ Date _____

© 2019, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**RCSD-S REVISED 6/19 (PAGE 2 OF 2)**

**REPRESENTATIVE CAPACITY SIGNATURE DISCLOSURE (RCSD-S PAGE 2 OF 2)**

## DISCLOSURE INFORMATION ADVISORY
### (FOR SELLERS)
#### (C.A.R. Form DIA, 6/20)

1. **INTRODUCTION:** All sellers in California are required to provide various disclosures in real property transactions. Among the disclosure requirements, sellers have an affirmative duty to disclose to buyers all material conditions, defects and/or issues known to them that might impact the value or desirability of the Property. Failing to provide those disclosures may lead to a claim or a lawsuit against you which can be very costly and time consuming. As a seller, you may be required to fill out one or more of the following: Real Estate Transfer Disclosure Statement ("TDS"); Seller Property Questionnaire ("SPQ"); Exempt Seller Disclosure ("ESD"). (Collectively, or individually, "Disclosure Forms"). Please read this document carefully and, if you have any questions, ask your broker or appropriate legal or tax advisor for help.

2. **PREPARING TO COMPLETE YOUR DISCLOSURE OBLIGATIONS:**
   A. Read and carefully review all questions in the Disclosure Form(s) to make sure that you understand the full extent of the information that is being requested in each question.
   B. While a seller does not have the duty to investigate or discover unknown issues, you may have been given disclosures either from the previous owner at the time of purchase or from a previous buyer who cancelled. Information about the Property may have been revealed if you may have posted or recorded information and material facts about the Property online (social media, blogs, personal websites, Facebook, advertisements, etc.) or received documents or correspondence from a Homeowners' Association ("HOA").
   C. Use any known and available documentation to refresh your memory of past and current issues, condition and/or problems and then provide a copy of that paperwork with your fully completed Disclosure Forms. A seller does not have to find lost documents or to speculate about what was in the documents that they cannot remember, but if the documents are known and available to you, they should be used to assist you in completing the Disclosures forms.
   D. Allow plenty of time to fully complete the Disclosure Forms.
   E. Your knowledge may be based upon what you have been told orally (e.g., in a conversation with a neighbor) or received in writing (such as a repair estimate, report, invoice, an appraisal, or sources as informal as neighborhood or HOA newsletters). Keep in mind that if a neighbor told you something, they are likely to tell the new owner the same information after the transaction.
   F. If you are unsure about whether something is important enough to be disclosed, you should probably disclose it. If you don't want to disclose a piece of information about the Property, think about your reasoning for why you do not want to disclose this information. If the answer is because you think a buyer will not want to buy the Property or will want to purchase at a lower price, that is exactly the reason why the fact ought to be disclosed; it materially affects the value or desirability of the Property.

3. **INSTRUCTIONS FOR COMPLETING ALL DISCLOSURE FORMS:**
   A. **DO NOT** leave any questions blank or unanswered unless the section is not applicable. Answer all questions and provide all documents, information and explanations to every "Yes" response in the blank lines or in an addendum to the Disclosure Form.
   B. Many questions on the Disclosure Forms ask if you "are aware" of a particular condition, fact or item. If you do not know the answer to any question, then you are "not aware" and should answer that question "No."
   C. The Disclosure Forms are designed to get sellers to provide buyers with as much information as possible, and thus many of the questions on these forms may list multiple issues, conditions or problems and/or have subparts. It is important to address each aspect of each question and provide precise details so that Buyers will understand the "who, what, where, when and how."
   D. The Disclosure Forms are written using very broad language. You should not limit the information, documents, and/ or explanations that you provide Buyers.
   E. Be specific and provide facts for each response; you should not let subjective beliefs limit, qualify or downplay your disclosures. Avoid words such as "never," "minor," "insignificant," "small" or "infrequent" as these terms may reflect your opinion but that opinion may not be shared by Buyers, professionals or others. Do not speculate as to what you guess the issue is, or assume something is true without actual knowledge. State your disclosures only to the extent of what you actually know.
   F. Consider all issues, conditions or problems that impact your Property, even those that are not necessarily on your Property but are related to a neighbor's property (such as shared fences, lot-line debates) or exist in the neighborhood (such as noise, smells, disputes with neighbors, or other nuisances).

© 2020, California Association of REALTORS®, Inc.

**DIA 6/20 (PAGE 1 OF 3)**



The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069          Phone: (310)925-9281          Fax: (310) 388-4638          944 Airole Way
Rayni Romito Williams          Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5  www.lwolf.com

**G.** Even if you have learned to live with an issue, condition or problem, disclose it.

**H.** Even if you believe that an issue, condition or problem has been repaired, resolved or stopped, disclose the issue and what has been done, but do not speculate, predict or guarantee the quality or effectiveness of the repair or resolution.

**I.** If there is conflicting information, data, and/or documents regarding any issue, condition or problem, disclose and identify everything.

**J.** Do not assume that you know the answer to all questions; for example, unless you personally obtained or received copies of permits do not assume that anyone who did work on the Property obtained permits.

**K.** If you are relying on written or oral information you received from someone else, even if you disagree with that information or are unsure as to its truth, disclose and identify the source of that information.

## 4. COMPLETING SPECIFIC TYPES OF DISCLOSURE DOCUMENTS:

### REAL ESTATE TRANSFER DISCLOSURE STATEMENT ("TDS") (Civil Code Section 1102.6)

**Section I** allows sellers to incorporate and provide reports and disclosures that relate to the information requested in that Disclosure Form. Providing those "Substituted Disclosures" does not eliminate your responsibility to fully and completely disclose all information known by you that is requested in the TDS. **For the TDS to be complete, one of the three boxes provided in Section I must be checked. If no Substituted Disclosures are being provided, Seller should check the box that indicates *"No substituted disclosures for this transfer."***

**Section I** allows sellers to incorporate and provide reports and disclosures that relate to the information requested in that Disclosure Form. Providing those "Substituted Disclosures" does not eliminate your responsibility to fully and completely disclose all information known by you that is requested in the TDS.

**Section II A** asks you to check a series of boxes to indicate what appliances, fixtures and other items exist on the property and asks whether any of those existing items are "not in operating condition", a term which is not defined. Consider whether the checked appliances, fixtures and items fully function as if they were new and if not, disclose any issues, limitations or problems. The TDS is not a contract and it does not control which items must remain with the property after close of escrow; the purchase agreement determines which items must remain. However, you should be careful not to represent an amenity that the property does not have, so do not assume that feature is there (i.e. sewer or central air conditioning), and only check the box if you know it is a part of the property.

**Section II B** asks if you are <u>aware</u> of any significant defects/malfunctions in certain identified areas of the property. There is no definition for "significant defects/malfunctions"; do not assume this terminology places any limits on what you need to disclose. If you check any of the boxes, please provide as much information as possible regarding the issues, conditions or problems that you know about the checked areas.

**Section II C** asks sixteen questions regarding the Property and the surrounding areas. These questions are written very broadly and contain multiple issues, conditions and/or problems. Make sure that you respond as to each issue, condition or problem. If you respond "Yes" to any question, you should provide as much information as possible about the issue.
If you are answering any of these questions "No" because you lack familiarity with the Property or the topic of any question, then you can explain the reasons, such as that you have not seen the Property in a long time or at all. This may help the buyers to understand that your "No" answer reflects the lack of awareness of the item, not that you are representing that the problem, condition or issue does not exist.

Question 16 in section II C refers to various code sections which part of a law are concerning construction defects that is widely known as SB 800 or Title 7. This law (Civil Code Sections 895-945.5) applies to residential real property built by a "Builder" and sold for the first time on or after January 1, 2003. If you have any questions about the applicability to the Property of any of the laws referenced in Question 16, or how you should answer this question, your Listing Agent recommends that you consult with a qualified California real estate attorney for advice. Your Listing Agent cannot and will not give you legal advice on these matters.

### SELLER PROPERTY QUESTIONNAIRE

The C.A.R. Residential Purchase Agreement requires Sellers to complete an SPQ for any transaction that requires a TDS because the TDS does not include questions regarding everything that sellers need to disclose to buyers. One example of a question not covered in the TDS but that is on the SPQ is whether there has been a death on the Property within the last 3 years (Civil Code Section 1710.2). Another example of a legally required disclosure that is not in the TDS, is the requirement that sellers of single family residences built prior to January 1, 1994 (and other properties built before that date) must disclose if the Property has any noncompliant plumbing fixtures (Civil Code Sections 1101.4 and 1101.5). 1. Any toilet that uses more than 1.6 GPF; 2. Any showerhead that has a flow capacity of more than 2.5 GPM and 3. Any interior faucet that emits more than 2.2 GPM. The SPQ should be used in conjunction with the TDS to help the seller carry out the obligation to disclose known material facts about the Property.

DIA 6/20 (PAGE 2 OF 3)

**DISCLOSURE INFORMATION ADVISORY (DIA PAGE 2 OF 3)**

Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5   www.lwolf.com                    **944 Airole Way**

### EXEMPT SELLER DISCLOSURE ("ESD")

Some sellers of real property may be legally exempt from completing the TDS. For example, probate and bankruptcy court sales and sales by governmental entities are exempt from the obligation to provide a TDS. Some property that is owned by a trust which has trustee(s) acting in the capacity of a seller may also be exempt; but not all trustee(s) are exempt. If a qualified California real estate attorney has advised you that you are exempt from completing the TDS, then you may choose not to complete that form or any supplement to the TDS, but you may still be required to complete the ESD. Being exempt from completing certain Disclosure Forms does not completely eliminate those disclosure obligations that apply to all sellers under federal, state or local laws, ordinances or regulations and/or by contractual agreement with the buyer. The seller is still obligated to disclose all known material facts that may affect the value of the property. Further, the C.A.R. Residential Purchase Agreement requires those sellers who are exempt from the TDS to fill out the ESD. Pay particular attention to the "catch all" question, which asks you to disclose your awareness of any other material facts or defects affecting the property.

### 5.  FINAL RECOMMENDATIONS:

It is important that you fully complete any legally or contractually required Disclosure Forms. To that end, the real estate Broker, and, if different, the real estate licensee, who listed the property for sale ("Listing Broker") strongly recommend that you consider the following points when completing your Disclosure Forms:

- If you are aware of any planned or possible changes to your neighbor's property (such as an addition), changes in the neighborhood (such as new construction or road changes) that may affect traffic, views, noise levels or other issues, conditions or problems, disclose those plans or proposed changes even if you are not certain whether the change(s) will ever occur.

- Disclose any lawsuits, whether filed in the past, presently filed or that will be filed regarding the property or the neighborhood (such as an HOA dispute) even if you believe that the case has been resolved. Provide as much detail as possible about any lawsuit, including the name of the case and the County where the case was filed.

- If any disclosure that you have made becomes inadequate, incomplete, inaccurate or changes over time, including right up until the close of escrow, you should update and correct your Disclosure Forms in a timely fashion.

- **If you have any questions about the applicability of any law to the Property, your Listing Broker recommends that you consult with a qualified California real estate attorney for advice. Your Listing Broker cannot and will not tell you if any law is applicable to the Property.**

- **If you need help regarding what to disclose, how to disclose it or what changes need to be made to your Disclosure Forms, the best advice is to consult with a qualified California real estate attorney for advice. Your Listing Broker cannot and will not tell you what to disclose, how to disclose it or what changes need to be made to your answers.**

- While limited exceptions may exist, such as questions that may impact fair housing and discrimination laws, generally speaking, **when in doubt, the best answer to the question: "Do I need to disclose ...?" is almost always "YES, disclose it."**

Seller has read and understands this Advisory.  By signing below, Seller acknowledges receipt of a copy of this Advisory.

Seller _____ *Lawrence Perkins* _____    Date    12/3/2021
           *Cresthollow, LLC*

Seller _____    Date _____

© 2018, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**DIA 6/20 (PAGE 3 OF 3)**

### DISCLOSURE INFORMATION ADVISORY (DIA PAGE 3 OF 3)



# ADDITIONAL BROKER ACKNOWLEDGEMENT
**(C.A.R. Form ABA, Revised 12/15)**

This is an addendum to the [X] Listing Agreement, [ ] Purchase Agreement, [ ] Other _____
_____ (collectively, "Agreement"),
dated *December 3, 2021*, on property known as *944 Airole Way*
between *The Beverly Hills Estates, Compass* ("Buyer/Tenant/Broker")
and *Crestlloyd LLC* ("Seller/Landlord").

1. **LISTING AGREEMENT:**
   Co-Listing Brokers:

   _____ *The Beverly Hills Estates* _____ (Broker 1) and
   _____ *Compass* _____ (Broker 2)
   Co-listing Brokers under the Listing Agreement identified above and agree to share responsibility and compensation for the representation of Seller/Landlord as follows: *50/50* _____
   _____

   ( [ ] on the terms of the attached agreement).

2. **PURCHASE AGREEMENT/OTHER:**
   Check **ONE** box **ONLY.** If more than one applies, use separate forms for each
   **A.** [ ] Multiple Brokers Representing Seller/Landlord**:**
   _____ (Broker 1) and
   _____ (Broker 2) are
   parties to a Residential Listing Agreement, [ ] Other _____ dated _____
   in which they have agreed to share responsibility and compensation for the representation of Seller/Landlord.

   **OR B.** [ ] Multiple Brokers Representing Buyer/Tenant:
   _____ (Broker 1) and
   _____ (Broker 2) are
   real estate brokers who have entered into an agreement to share responsibility and compensation for the representation of Buyer/Tenant.

3. [ ] Activity under the license of Broker 1 and/or Broker 2 will be conducted by multiple associate licensees, partners or teams as indicated on the attached Additional Agent Acknowledgement form(s) (C.A.R. Form AAA).

4. By signing below, all parties understand, acknowledge and agree that, wherever the name of either Broker 1 or Broker 2, as applicable, is indicated in the Agreement or related documents, as a representative for the Buyer or Seller specified in 1, 2A or B above, the other Broker shall also be deemed to be named. Buyer/Tenant signatures are not necessary if this form is only used as part of a Listing Agreement.

Real Estate Broker (Broker 1) *The Beverly Hills Estates*     DRE Lic.# *02126121*
By *Rayni Williams & Branden Williams* DRE Lic.# *01496786/01774287*     Date 12/3/2021
Real Estate Broker (Broker 2) *Compass*     DRE Lic.# *01866771*
By *Aaron Kirman* DRE Lic.# *01296524*     Date 12/3/2021
Seller/Landlord *Lawrence Perkins*     *Crestlloyd LLC* Date 12/3/2021
Seller/Landlord _____     Date _____
Buyer/Tenant     *The Beverly Hills Estates* Date _____
Buyer/Tenant     *Compass* Date _____

© 2015, California Association of REALTORS®, Inc.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**ABA REVISED 12/15 (PAGE 1 OF 1)**

**ADDITIONAL BROKER ACKNOWLEDGEMENT (ABA PAGE 1 OF 1)**

## ADDENDUM TO RESIDENTIAL LISTING AGREEMENT

Crestlloyd, LLC, solely in the capacity as the Chapter 11 Debtor and Debtor in Possession ("Crestlloyd") in the bankruptcy case in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), agrees to grant to the listing brokers ("Brokers") the exclusive right to negotiate a sale of the real property commonly described as 944 Airole Way, Los Angeles, California ("Property") upon the terms and conditions of the Residential Listing Agreement ("Agreement"), as amended by the following terms and conditions:

1. <u>Addendum</u>. This Addendum applies to the Agreement. Notwithstanding any contrary terms and conditions in the Agreement, this Addendum shall apply.

2. <u>Conditions of Sale</u>. The Brokers agree and understand that any sale of the Property shall be subject to the following terms and conditions:

    a. If for any reason, or no reason whatsoever, Crestlloyd is unable to deliver possession or title to the Property to any potential purchaser, the purchaser's sole remedy shall be the return of any money that the purchaser has deposited towards the purchase of the Property.

    b. Crestlloyd is selling the Property in an "AS IS" condition or basis by quitclaim deed without any representations or warranties whatsoever, including without limitation representations or warranties as to title, oil and mineral rights, city or government agency notifications regarding work to be done, marketability of title, ownership, physical condition, compliance with state, city or federal statutes, codes, ordinances, or regulations, geological stability, zoning, suitability for improvement, and fire insurance policies to cover any improvements on the Property, nor any assurances regarding the subdividability of the Property.

    c. The sale of the Property is subject to Bankruptcy Court approval after notice to the United States Trustee, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules.

    d. The sale is subject to overbids in accordance with procedures approved or to be approved by the Bankruptcy Court..

    e. The purchaser is to arrange for all financing for the acquisition of the Property before the close of escrow.

    f. All escrow fees shall be shared and paid on a 50/50 basis by Crestlloyd and the purchaser.

DocuSign Envelope ID: 8915575B-D99B-4281-A0B6-C083B2751C29

g. The purchaser shall, at the purchaser's sole expense, install all smoke detectors, if any, low flush toilets and similar items, as may be required by state or local law. Crestlloyd is not required to deliver to the purchaser a written statement of compliance with any applicable state and local law.

h. The purchaser shall, at purchaser's sole expense, obtain any and all pest control inspection repairs that purchaser deems appropriate.

i. If any local ordinance requires that the Property be brought into compliance with minimum energy conservation standards as a condition of sale or transfer, the purchaser shall comply with and pay for these requirements at purchaser's sole expense .

j. Any sale is subject to the following conditions being satisfied before the close of escrow:

    1) Crestlloyd must prevail with respect to any objections to the proposed sale and the Bankruptcy Court must have entered an order approving the sale that is not subject to a stay pending appeal; and

    2) Crestlloyd reserves the right to reject any and all offers which in its judgment are insufficient, provided that, if an auction of the Property is conducted by Concierge Auctions, LLC pursuant to bid procedures approved by the Bankruptcy Court, which is contemplated, Crestlloyd will only be entitled to reject any offers that are below any reserve price set for the auction or that otherwise do not conform with bid procedures approved by the Bankruptcy Court.

k. The Property is being sold subject to:

    1) All general and special taxes that are presently due, or may become due, regarding the Property, other than property taxes, which shall be prorated as of the close of escrow; and

    2) Any and all easements, restrictions, rights and conditions of record and rights of way, against, on or regarding the Property. Title, however, is to be transferred free and clear of secured claims of record.

3. <u>Payment of Commission</u>. The commission to be paid to the Brokers shall only be paid from the proceeds of the sale of the Property. The payment of the commission is subject to prior approval of the Bankruptcy Court. Pursuant to the application to employ the Brokers and/or to approve any sale of the Property, Crestlloyd will seek approval from the Bankruptcy Court to pay such commission from escrow on closing.

  

2

4. <u>Reduction of Listing Price and Extension of Term of Listing Agreement</u>. Crestlloyd may, in Crestlloyd's sole discretion and business judgment and without further Court order, modify the Agreement by reducing the listing price and/or extending the term of the Agreement.

5. <u>Entire Agreement</u>. This Addendum and the Agreement, to the extent that such Agreement is not contrary to the terms and conditions herein, constitute the entire contract between the parties. All prior agreements between the parties are incorporated into this agreement. Its terms are intended by the parties as a final expression of their agreement with respect to such terms as are included herein, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. The parties further intend that this Addendum and the Agreement constitute the complete, final and exclusive statement of the terms of the agreement and that no extrinsic evidence whatsoever may be introduced in any judicial or arbitration proceeding, if any , involving this Addendum and the Agreement.

6. <u>Bankruptcy Court Jurisdiction</u>. The Bankruptcy Court, sitting without a jury which is expressly waived, shall have exclusive jurisdiction to resolve any and all disputes relating to this Addendum and the Agreement. This Addendum and the Agreement and any disputes related thereto shall be governed by California law.

7. <u>Withdrawal of Property from Sale</u>.  If, without Brokers' prior written consent, the Property is withdrawn from sale by a voluntary act of Crestlloyd during the Listing Period or any extension thereof, Crestlloyd shall pay listing Brokers a fee of $875,000.

3

# ADDENDUM TO RESIDENTIAL LISTING AGREEMENT

Pacific Union International dba Compass and Aaron Kirman (collectively, "Compass") agrees to amend that certain Residential Listing Agreement, as amended, between Crestlloyd, LLC ("Seller" or "Debtor") on the hand and Compass and The Beverly Hills Estates as listing agents on the other ("Agreement"), upon the following terms and conditions:

1. Addendum. This Addendum applies to the Agreement. Notwithstanding any contrary terms and conditions in the Agreement, the terms of this Addendum shall apply.

2. Bankruptcy filing by Seller. Compass recognizes that on October 26, 2021 (the "Petition Date"), the Seller filed a voluntary petition for relief under Title 11 of the United States Code §§ 101 *et seq.* (the "Bankruptcy Code") in the Bankruptcy Court for the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court").

3. Engagement by the Debtor. Compass recognizes that its post-Petition Date engagement by the Debtor under the Agreement, as amended pursuant to Addendum to Residential Listing Agreement, dated December 3, 2021, is subject to approval of the Bankruptcy Court pursuant to Section 327 of the Bankruptcy Code, including, but not limited to, the requirement that Compass be "disinterested" as that term is defined under Section 101(14) of the Bankruptcy Code.

4. Waiver of Claims.  In order to satisfy the requirements of Section 327, and in consideration of its engagement by the Debtor, Compass hereby waives any and all claims (whether they be contingent or non-contingent, liquidated or unliquidated), actions, complaints, causes of action, promises, obligations, losses, demands, damages, expenses, fees, attorney's fees or costs and any and all liabilities that the Debtor and its estate may have, or had, that relate in any way to the Agreement and arise prior to entry of an order by the Bankruptcy Court authorizing Debtor to employ Compass under the Agreement (the "Engagement Order").

5. Waiver of Section 1542 of the California Civil Code.  Compass recognizes, acknowledges, and waives the provisions of California Civil Code Section 1542, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

In waiving the provisions of Section 1542 of the California Civil Code, Compass acknowledges that it may discover facts in addition to or different than those which it now believes to be true with respect to the matters released by this Addendum, but agree that it has taken that possibility into account in entering into this Addendum, and the release given

herein shall remain in effect as a full and complete release notwithstanding the discovery or existence of such additional or different facts, as to which Compass expressly assumes the risk.

6. <u>Entire Agreement</u>. This Addendum and the Agreement, to the extent that such Agreement is not contrary to the terms and conditions herein, constitute the entire contract between the parties. All prior agreements between the parties are incorporated into the Agreement as modified by this Addendum. Its terms are intended by the parties as a final expression of their agreement with respect to such terms as are included herein, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. The parties further intend that this Addendum and the Agreement constitute the complete, final and exclusive statement of the terms of the agreement and that no extrinsic evidence whatsoever may be introduced in any judicial or arbitration proceeding, if any , involving this Addendum and the Agreement.

7. <u>Bankruptcy Court Jurisdiction</u>. The Bankruptcy Court, sitting without a jury which is expressly waived, shall have exclusive jurisdiction to resolve any and all disputes relating to this Addendum and the Agreement. This Addendum and the Agreement and any disputes related thereto shall be governed by California law.

8. <u>Entry of Final Engagement Order</u>. In the event the Bankruptcy Court does not enter the Engagement Order on a final basis, the terms of this Addendum shall immediately become null and void.



DocuSigned by:

Aaron kirman

5BEE03049F0D4D0...

EXHIBIT "2"



**CONCIERGE** AUCTIONS

**AUCTION AGREEMENT**

| PROPERTY ADDRESS: | 944 Airole Way, Los Angeles, CA 90077 | | ("***Property***") |
|---|---|---|---|
| OWNER'S LEGAL NAME: | Crestlloyd, LLC, Debtor in Possession | | ("***Owner***") |

| CURRENCY: | RESERVE PRICE: | AUCTION COMMENCEMENT DATE: | |
|---|---|---|---|
| USD | N/A | 2/7/2022 [commence] –<br>2/10/2022 [conclude] | ("***AUCTION START DATE***")<br>("***AUCTION END DATE***") |

| MORTGAGES/LIENS? | IF YES, DESCRIPTION & CURRENT BALANCE/PAYOFF: | FURNISHED? |
|---|---|---|
| X YES | See bankruptcy information below | ☐ YES |
| ☐ NO | | ☐ NO |

| SIGNATORY 1 | NAME: | SierraConstellation Partners LLC, as Manager, by Lawrence R. Perkins, as its Authorized Signatory | EMAIL: | lperkins@scpllc.com |
|---|---|---|---|---|
| SIGNATORY 2 | NAME: | | EMAIL: | |

This Auction Agreement (including those terms set forth above, the "***Agreement***") is effective as of the date of the last party's signature between Concierge Auctions, LLC, a Delaware limited liability company, with offices at 405 Lexington Avenue, 26th Floor, New York, NY 10174 ("***Concierge***"), and the Owner. Owner engages Concierge to market the Property for sale via Auction (the "***Auction***") on the terms and conditions set forth in this Agreement.

The Parties acknowledge that Owner has filed for bankruptcy protection and is a Chapter 11 debtor in possession of the Property. The Parties further agree that this Agreement and Concierge's professional employment and the sale of the Property are subject to approval by the United States Bankruptcy Court for the Central District of California (the "***Court***"), and Owner agrees to use best efforts, at its sole expense, promptly to obtain approval from the Court to employ Concierge pursuant to this Agreement and, subject to Court approval, which Owner will obtain as soon as reasonably practicable after the completion of the Auction, to sell the Property pursuant to the terms of this Agreement.  Concierge shall have the prior right to approve in advance any application for employment filed with the Court, in its reasonable discretion.  If the Court does not approve Concierge's employment, this Agreement shall be immediately null and void.

**1.      AUCTION FORMAT/BIDDING PROCEDURES**. The Property will be offered for sale by the Owner's listing agents on an "as-is, where-is" basis. In its marketing, Concierge may use any information conveyed by Owner, its listing agents or any prospective bidder regarding the Property. The Auction shall be conducted through Concierge's digital bidding platform. Bidding shall commence on the Auction Start Date at approximately 4:00 pm local time where the Property is located and shall continue for three (3) business days and conclude on the Action End Date (the "***Auction Duration***").

The Auction will be conducted with no reserve price. Owner shall be obligated to sell the Property to the highest bidder at the Auction (or back-up bidder as described below), regardless of price, subject to Court approval.  Subject to Court approval, which Owner will obtain as soon as reasonably practicable, the Auction will be conducted

pursuant to Concierge's Bidder Terms and Conditions attached as **Exhibit A** to this Agreement (the **"BK Bid Procedures"**).  Subject BK Bid Procedures approved by the Court, Concierge shall have absolute authority to regulate all aspects of the Auction bidding process, including but not limited to, starting the bidding at any threshold amount at or below the highest starting bid and determining the amount and timing of any subsequent bidding increments.

**2.**     **DUTIES OF OWNER.** Owner agrees to cooperate with Concierge in all ways consistent with this Agreement. If Owner does not have a recent survey of the Property, updated title report and/or professional property inspection, then immediately following the execution of this Agreement, Owner promptly will cooperate with Concierge, on Owner's behalf, to obtain a survey of the Property, updated title report and a professional property inspection to allow Concierge to provide them to prospective bidders to conduct due diligence, at Owner's sole expense. Owner will allow Concierge, its agents, Owner's listing real estate agents and potential bidders access to the Property at all reasonable times and shall provide and maintain utilities to the Property throughout the term of this Agreement.

Owner will promptly notify Concierge of any inquiries regarding the Property and/or the Auction and will instruct such person(s) to contact Concierge. Owner will not negotiate or entertain offers or enter into any agreement to sell or otherwise transfer all or any portion of the Property or grant any person the right to acquire any portion of the Property or any interest in the Property, except to the extent coordinated with Concierge pursuant to the express provisions under this Agreement. Owner agrees to take such other actions and to execute such documents consistent with the terms of this Agreement as may be reasonably requested by Concierge to conduct the Auction and to complete the sale of the Property, including, without limitation, working with its listing agents and Concierge to prepare an "as-is" purchase contract with no conditions or contingencies (other than good and marketable title) consistent with applicable laws based upon the California Association of Realtors' standard Residential Purchase Agreement and Joint Escrow Instructions (C.A.R. Form RPA, Revised 12/18) (the "***Purchase and Sale Contract***"). Owner shall not collude with any bidder, or bid, instruct, or permit any other person to bid on Owner's behalf at the Auction. In connection with the sale of the Property and regardless of the customary allocation of costs in the community in which the Property is located, Owner shall pay all costs associated with title searches, title insurance commitments and the issuance of a title insurance policy to Buyer (or the equivalent), and Buyer shall pay all other costs associated with the transfer of the Property and the closing of the sale. Owner agrees that it will pre-execute the Purchase and Sale Contract prior to the commencement of the Auction, subject to Owner's right, if applicable, to cancel the Auction as set forth in this Agreement. Owner agrees that after the Auction, Owner's listing agents and/or Concierge are authorized to complete such Purchase and Sale Contract (including, without limitation, adding the purchaser's name, purchase price, starting bidder credit and other pertinent details determined by the winning bid at Auction or any back up bid, if applicable as set forth below) in accordance with this Agreement, and then submit the completed Purchase and Sale Contract to the winning bidder for execution, which Owner agrees when fully executed will be binding on Owner and Buyer, provided that the Court has approved the sale.

Prior to the commencement of the Auction, and after Owner has authorized Concierge to commence the Auction (i.e. after Owner's cancellation rights, if any, have expired or been waived), Owner agrees to direct its listing agents to modify the list price for the Property in the MLS to reflect the amount of the highest pre-auction starting bid.

**3.**     **CONDITIONS OF SALE.** Concierge agrees and understands that any sale of the Property shall be subject to the following terms and conditions:

        a.       If for any reason, or no reason whatsoever, Owner is unable to deliver title to the Property to any potential purchaser, the purchaser's sole remedy shall be the return of any money that the purchaser has deposited toward the purchase of the Property.

        b.       Owner is selling the Property in an "AS IS" condition or basis by warranty deed without any representations or warranties whatsoever, including, without limitation, representations or warranties as to oil and mineral rights, city or government agency notifications regarding work to be done, physical condition, compliance with state, city or federal statutes, codes, ordinances, or regulations, geological stability, zoning, suitability for improvement, and fire insurance policies to cover any improvements on the

2

Property, nor any assurances regarding the subdividability of the Property, provided, however, that the Debtor shall be required to deliver good and marketable title to the purchaser.

c.        The sale of the Property is subject to Court approval after notice to the United States Trustee, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules, which approval will be obtained by Owner as soon as reasonably practicable after the completion of the Auction.

d.        The purchaser shall, at purchaser's sole expense, obtain any and all inspections and repairs that purchaser deems appropriate.

e.        The Court entering an order approving the sale of the Property that is not subject to a stay pending appeal.

f.        The Property is being sold subject to standard allocations and any and all easements, restrictions, rights and conditions of record and rights of way, against, on or regarding the Property. Title, however, is to be transferred free and clear of all liens, claims and encumbrances except those non-monetary liens and encumbrances set forth on that certain preliminary title report prepared by Chicago Title Company and dated as of November 16, 2021 and attached as **Exhibit B**.

**4.        REPRESENTATIONS OF OWNER**.  Owner represents and warrants to Concierge that as of the date of this Agreement the following statements are true and correct and shall remain true and correct throughout the term of this Agreement: (i) subject to Court approval, Owner has full power and authority to execute this Agreement, to sell the Property at Auction and to consummate the transactions contemplated by this Agreement, which is a valid and binding agreement of Owner, enforceable against Owner in accordance with its terms; (ii) this Agreement and Owner's obligations hereunder do not conflict with any other agreement to which Owner is a party; (iii) no party has been granted a right or option to purchase the Property, in whole or in part; (iv) the conveyance of the Property by Owner to a third party through the Auction process will not require the consent of any third party, other than the Court, or any affiliate of Owner; (v) Owner shall maintain at all times reasonably adequate liability insurance coverage at a level which is standard in the industry for other prudent owners of real property like the Property for the duration of this Agreement, the Auction and activities related to the sale of the Property; (vi) Owner shall exercise its best efforts to maintain at all times reasonably adequate property insurance coverage at a level which is standard in the industry for other prudent owners of real property like the Property for the duration of this Agreement, the Auction and activities related to the sale of the Property; and (vii) Owner has good and marketable, insurable fee simple title (or the equivalent) to the Property.

**5.        ACKNOWLEDGEMENTS OF OWNER**.  Owner acknowledges and agrees that: (i) there is no guarantee (a) that the Property will be sold at the Auction, (b) that any registered bidder will place a bid, (c) that any bidder or the Buyer will or can perform its obligations or that it is qualified or financially able to purchase the Property, or that Owner will receive any specific amount or sales price from the Auction or otherwise, and (d) OWNER HAS NOT RECEIVED FROM CONCIERGE OR ANY OF ITS EMPLOYEES OR AGENTS, AND IS NOT RELYING ON, ANY REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE SALE PRICE FROM THE AUCTION OR THE QUALIFICATIONS OF ANY BIDDER – ANY SUCH STATEMENTS ARE OPINIONS ONLY AND SHOULD NOT BE CONSTRUED AS PROMISES OR GUARANTEES ABOUT THE AUCTION; (ii) Concierge shall have no responsibility whatsoever for any act associated with the closing, escrow or consummation of any sale of the Property, and Owner and/or its third party agents are solely responsible for such acts; (iii) Owner and Concierge hereby acknowledge and agree that all title reports, escrow, closing, and post-closing services will be provided by a competent, licensed (if necessary) title company or closing agent selected by Owner (referred to as both the *"Escrow Agent"* and *"Title Company"*) at Owner's sole expense and Concierge shall not have any liability for the actions or inactions of the Escrow Agent; (iv) Concierge shall have the absolute right: (a) to place a sign on the Property and to remove all other signs, except those placed by the Owner's listing agents, (b) to permit inspections of the Property, (c) to disseminate any information regarding the Property or the Auction to any third-party, (d) subject to the BK Bid Procedures, to Auction the Property for sale to registered bidders, (e) to disclose Owner's identity, and (f) to publicly announce and publicize

3

after the auction details concerning Concierge's marketing efforts, including the amount of the high bid of the Property; (v) Owner agrees to assist and use good faith diligent efforts in gaining the cooperation of the listing agents with the auction marketing process and the Auction; (vi) Owner is responsible to pay all commissions due to the listing real estate agents and selling or cooperating broker, if any; and (vii) Concierge's employees and agents have no authority to add to or vary the terms of this Agreement orally or (except in a written amendment duly executed by an authorized officer of Concierge) in writing. Owner authorizes Concierge and its representatives to enter upon and use the Property for all purposes related to its services under this Agreement, without charging any fee. Owner acknowledges that Concierge is acting as an agent for Owner only in its capacity as auctioneer and is not acting as its real estate broker. Bidders are responsible for due diligence regarding the accuracy of the information about the Property provided to Concierge and Owner expressly releases Concierge from any and all liability related to information disseminated in connection with the sale of the Property if such information was provided by Owner or its agents, provided that Concierge presented such Property information accurately and in good faith.

**6.**      **SERVICES OF CONCIERGE**. Concierge will use commercially reasonable efforts to market the Property for sale by Auction consistent with Section 1 hereof or as otherwise approved by the Court.  To the extent reasonably practicable, Concierge agrees to provide written notice of Starting Bids to Owner prior to the commencement of bidding on the Auction Start Date. Subject to the BK Bid Procedures, Concierge will have the right, in its reasonable discretion, to decline the registration of any potential bidder for the Auction. Immediately upon the close of the Auction, Concierge shall advise Owner of the winning bidder and bid amount and any back-up bidder and its bid amount.

**7.**      **COMPENSATION TO CONCIERGE**.

a.      Only upon consummation of a sale of the Property and the close of escrow for such sale, Concierge will receive as compensation for its services in the amount of twelve percent (12%) of either (a) the high bid for the Property at Auction in a sale that closes, or (b) the accepted purchase price of the Property if sold outside of Auction (the "***Buyer's Premium***").

b.      In the event the Property is sold at Auction, the successful bidder will be required to pay the Buyer's Premium to Concierge, and the Buyer's Premium shall be deemed duly earned and payable upon entry of an order approving the sale and the close of escrow for such sale.  The Buyer's Premium to be paid in connection with an Auction is separate from the purchase price for the Property paid by purchaser to Owner and is an obligation of the purchaser to Concierge. Owner acknowledges and agrees that, in connection with the Auction, Novare Settlement Services shall hold any bidder deposits and that the Buyer's Premium shall be disbursed to Concierge by Novare, provided that the conditions to payment of the Buyer's Premium set forth in this Agreement have been satisfied.

c.      In the event that the Property is sold prior to the Auction, Owner agrees that the terms of such sale shall be substantially similar to the Purchase and Sale Contract for an Auction sale (e.g., "as-is," no-contingencies, 12% deposit, a similar closing timeframe), but with the Buyer's Premium equal to two percent (2%) of the accepted purchase price of the Property, and Owner will be obligated to pay Concierge the Buyer's Premium, which shall be disbursed to Concierge by Owner through a wire from the Escrow Agent at the closing.

d.      In the event that the Property is not sold at Auction, fails to close due to a default by either Buyer or Owner, the Auction is cancelled by Owner, or this Agreement is otherwise terminated other than by Concierge and without a material breach by Owner, and the Property is contracted to be sold or otherwise transferred by Owner during (i) the 60-day period after the expiration or termination of this Agreement to anyone or (ii) the 120-day period after the expiration or termination of this Agreement to a prospective or registered bidder identified to Owner by Concierge in writing within ten business days after the expiration or earlier termination of this Agreement (or to an entity controlled by such person), Owner will be obligated to pay Concierge a fee equal to two percent (2%) of the accepted purchase price of the Property at closing. A sale or transfer of the Property shall include any long-term lease or other form of conveyance intended

4

to accomplish the substantial equivalent of a sale of the Property. After execution by Owner and Buyer of the Purchase and Sale Contract and approval of the sale by the Court, if the sale of the Property does not close due to the actions of Owner or its agents or assigns, Owner shall pay Concierge a Buyer's Premium equal to two percent (2%) of the accepted purchase price of the Property as if the Property had sold for the contracted sale price. Owner shall be obligated to provide Concierge with a copy of the Purchase and Sale Contract promptly following Owner's execution thereof.

e.      <u>Buyer's Premium Rebate to Owner</u>: If the Property sells at Auction and such sale is approved by the Court and closes, or is otherwise subject to the Buyer's Premium, Concierge agrees to rebate to Owner a portion of its Buyer's Premium actually collected from the buyer, as follows (the **"Rebate"**):

    x.    If the purchase price <u>equal to or less than</u> $225,000,000.00, an amount equal to nine and one half of one percent (9.5%) of the Buyer's Premium that Concierge actually collects.

    y.    If the purchase price is <u>greater than</u> $225,000,000.00 but <u>less than</u> $275,000,000.00, an amount equal to nine percent (9.0%) of the Buyer's Premium that Concierge actually collects.

    z.    If the purchase price is <u>equal to or greater than</u> $275,000,000.00, an amount equal to eight and one half of one percent (8.5%) of the Buyer's Premium that Concierge actually collects.

    aa.  By way of example only, if the purchase price is $250,000,000, the Rebate will be 9.0%, and if the purchase price is $275,000,000, the Rebate will be 8.5%.

f.      Any Buyer's Premium due pursuant to this Agreement, shall be reflected on any settlement statement issued for the Property regardless of who is paying the Buyer's Premium and regardless of whether the Property is sold at Auction or otherwise. Owner hereby authorizes Concierge to provide the Escrow Agent with a breakdown of all fees and commissions to be paid. Owner also authorizes the Escrow Agent to provide Concierge with a copy of the settlement statement for the Property without any further instructions or authorizations.

**8.      BUYER DEFAULT**.  If the Auction is conducted and the winning bidder defaults (the "**Buyer**"), whether or not the parties enter into the Purchase and Sale Agreement, then, except as described below in the case of a back-up bidder, Concierge and Owner shall split 50/50 any deposit made by the Buyer in connection with the sale of the Property (or any other amounts collected from the Buyer) (collectively the **"Deposit Amount"**) (subject to applicable laws). In addition, to the extent approved as one of the BK Bid Procedures, (i) the second highest bidder shall be selected as the back-up bidder and buyer of the Property (the **"Back-Up Buyer"**) and (ii) the Back-Up Buyer shall be required to keep its bid open and irrevocable and to allow Novare, the Escrow Company, and/or the Title Company to maintain any deposit made by the Back-Up Buyer in connection with the sale of the Property (or any other amounts collected from the Buyer) (collectively the **"Back-Up Deposit Amount"**) (subject to applicable laws) for a period of 45 days after the close of the Auction.  To the extent approved as one of the BK Bid Procedures, if after the Auction the Buyer defaults, Concierge shall declare the Back-Up Buyer to be the buyer of the Property within no more than 45 days after the completion of the Auction, provided that the Court approves the Back-Up Buyer as the buyer.  The parties agree that, in the event (i) Concierge declares the Back-Up Buyer to be the buyer of the Property, (ii) the Court approves the sale of the Property to the Back-Up Buyer, and (iii) the sale of the Property to the back Back-Up Buyer closes, then Owner will be entitled to be paid and retain the entire Deposit Amount which will be applied toward the purchase price for the Property.   Concierge shall have no obligation to initiate legal action or otherwise to pursue any action to enforce Buyer's or Back-Up Buyer's obligations under any Purchase and Sale Contract and shall not have any liability whatsoever for Buyer's failure to perform thereunder.

**9.      INDEMNIFICATION; LIMITATION OF LIABILITY**.  Owner shall indemnify, defend (by counsel satisfactory to Concierge) and hold harmless Concierge and its officers, employees, agents and representatives (collectively, the "**Indemnitees**"), against any claim, demand, cause of action, loss, liability, deficiency, fine, penalty, damage or expense (including, without limitation, reasonable attorney's fees and costs and including interest and penalties) (a "**Loss**") which any Indemnitee may suffer, incur, sustain or become subject to, as a result of or in connection with: (i) any breach by Owner of any representation, warranty, obligation or covenant set forth in this Agreement; (ii) any material breach by Owner of any Purchase and Sale Contract entered into with any successful bidder that results in

5

a sale approved by the Court not closing, or (iii) any claim from any third party related to the condition of the Property or damage or injury sustained by the third party on, or with respect to, the Property. Owner acknowledges and agrees that Concierge shall not be responsible for damage or injury to the Property resulting from or arising in connection with the sale of the Property, except to the extent that such damage or injury is proximately caused by Concierge's gross negligence or willful misconduct. Except as set forth herein, Concierge shall not be liable for any loss suffered by Owner relating to the Property, including but not limited, to a bidder/Buyer that refuses to enter into a Purchase and Sale Contract or to perform its obligations.

Concierge's maximum liability for the breach of any obligation in connection with this Agreement, and for damages of any type or nature (whether in contract or in tort, compensatory, consequential or punitive in nature) sustained or claimed by Owner or any other person in connection with this Agreement, even if such party shall have been informed of the possibility of such damages or could have foreseen such damages, shall be limited to the greater of (i) the compensation actually received by Concierge under this Agreement and (ii) the limits of liability insurance available to Concierge. Owner hereby agrees and acknowledges that in no event shall Concierge be liable to Owner for any indirect, incidental, consequential, special or punitive damages under this Agreement or at law arising out of any breach of Concierge's obligations in connection with this Agreement.

**10.** **CANCELLATION, TERMINATION & SURVIVAL**. The term of this Agreement will commence upon execution by the last party and terminate either (i) on the date of the closing of the sale of the Property or (ii) the date of delivery of written notice of termination to the other party. In addition to any cancellation rights of Owner, subject to approval by the Court and any required consent by a post-petition lender, Concierge shall have the right to cancel, postpone or reschedule the Auction. If Concierge or Owner cancels the Auction as permitted under this Agreement, this Agreement shall terminate on such date and Concierge shall promptly inform all registered and prospective bidders of such cancellation. Any party electing to terminate this Agreement shall provide prompt written notice of termination to the other party. The obligations contained in Sections 2, 4, 5, 6, 7, 8, 9, 14 and 16 shall survive the termination of this Agreement for any reason; notwithstanding the foregoing, if Concierge terminates this Agreement pursuant to Section 10(ii), other than due to a material breach of Section 2, 4, or 5 by Owner, then Concierge shall not be entitled to any compensation or payments pursuant to Sections 7 or 8 hereof.

**11.** **NOTICES**. Any notice to a party under this Agreement (including but not limited to notice of cancellation) shall be in writing and shall be delivered by electronic mail (to Concierge at notices@conciergeauctions.com) or by facsimile (to Concierge at 888-317-9503), to the Owner at the address or electronic mail set forth on the signature page of this Agreement. Any notice hereunder shall be deemed to have been given upon dispatch, if transmitted by electronic mail or facsimile with receipt confirmed by recipient.

**12.** **ENTIRE AGREEMENT**. This Agreement and the related Exhibits/Addenda contain the complete and final obligation and understanding between the parties relating to the subject matter hereof and merge all prior discussions, negotiations and agreements between them, whether written or oral, and the parties shall not be bound by any representations, warranties, covenants, or other understandings, except as expressly provided or referred to herein.

**13.** **ASSIGNMENT**. This Agreement may not be assigned by any party without the prior written consent of all of the other parties hereto; except that Concierge may assign this Agreement at any time to any of its affiliates. This Agreement shall be binding upon and inure to the benefit of the parties and their successors, heirs, representatives, and permitted assigns.

**14.** **AMENDMENT**. This Agreement may be amended or modified only in writing signed by both parties and approved by the Court, if necessary.

**15.** **TECHNOLOGY**. Owner acknowledges that the Auction may be conducted online over the Internet, through Concierge's digital bidding application and that it may utilize third party technology in order to conduct the Auction and/or to accept bids, all in Concierge's discretion. CONCIERGE DOES NOT WARRANT THAT THE FUNCTIONS, FEATURES OR CONTENT CONTAINED IN ITS WEBSITE OR ANY AUCTION PLATFORM, APPLICATION OR BIDDING

6

SOFTWARE, INCLUDING, WITHOUT LIMITATION, ANY THIRD-PARTY SOFTWARE, TECHNOLOGY, PRODUCTS OR OTHER MATERIALS USED IN CONNECTION WITH THE AUCTION, WILL BE TIMELY, SECURE, UNINTERRUPTED OR ERROR-FREE, OR THAT DEFECTS WILL BE CORRECTED.

**16.    VENUE; PREVAILING PARTY**. The parties agree to submit all controversies, disputes, claims and matters of difference arising out of or relating to this Agreement, including but not limited to its enforcement, scope and/or interpretation, as a core proceeding exclusively in the Court and agree to submit to personal jurisdiction in the Court, sitting without a jury, which is expressly waived.  In the event of any such Court action, the prevailing party shall be entitled to reimbursement from the non-prevailing party of all reasonable attorney's fees and costs/expenses of the prevailing party and any award of the Court will include costs and reasonable attorneys' fees to the prevailing party.

**17.    SEVERABILITY**.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

**18.    GOVERNING LAW**.  This Agreement has been entered into and shall be construed and enforced in accordance with the laws of the State of California, without regard to conflicts of law principles.

**19.    FORCE MAJEURE.** Concierge and Owner will not be liable or responsible nor be deemed to have defaulted or breached this Agreement for any failure or delay in performance under this Agreement when and to the extent such failure or delay is materially interrupted or caused by or results from acts or circumstances beyond Concierge's or Owner's reasonable control, including, without limitation, acts of God, flood, hurricane, typhoon, fire, earthquake, explosion, governmental actions, war, invasion or hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest, national emergency, revolution, insurrection, pandemic, epidemic, lockouts, strikes or other labor disputes (whether or not relating to our workforce), or restraints or delays affecting carriers or inability or delay in obtaining supplies of adequate or suitable materials, materials or telecommunication breakdown or power outage, linking to the website and social media features.

**20.    LICENSING/BONDING**.  Concierge is licensed and/or bonded as required in the jurisdictions in which it conducts business including, but not limited, to the following states: California Auction Bond No. 62662376 (on file with the Secretary of State); Colorado Real Estate License No. EL100032451; Connecticut Real Estate License No. REB0789006; Florida Auction License No. AB2760; Florida Real Estate License No. CQ1032600; Georgia Auction License No. AU-C002842; Illinois Auction License No. 481.011750; Illinois Real Estate License No. CA 471011750; Massachusetts Auction License No. AU 3140; Minnesota Real Estate License No. CA #40259032; North Carolina Auction License No. NCAL#9427; North Carolina Real Estate License No. 23755; Nevada Clark County Auction Bond No. 523455; New York Real Estate License No. 10991209483; Pennsylvania Auction License No. AY002062; South Carolina Auction License No. 4023; Tennessee Auction License No. 00005704; Tennessee Real Estate License No. 00261683; Texas Auction License No. 16847; Vermont Auction License No. 057.0088758; Virginia Auction License No. AU# 2907 002987; Virginia Real Estate License No. 2908000-850; Washington Auction Bond No. 10003391H; Wyoming Real Estate License No. 190600. Licenses and bonds are routinely updated. For Concierge's current licensing and bonding information, contact compliance@conciergeauctions.com.

**21.    INTENTIONALLY OMITTED**.

**22.    COUNTERPARTS AND FACSIMILE COPIES**. This Agreement may be executed in any number of counterparts and electronic or facsimile copies, each of which, when executed, will be deemed to be an original and all of which, when taken together, will be deemed to be but one and the same instrument.

**23.    JOINT DRAFTING.**  The parties have been given the opportunity to seek legal advice and to have this Agreement reviewed by an independent attorney prior to signing it.  This Agreement shall be construed as if it has been jointly drafted by both parties.  Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in interpreting this Agreement.

7

**24.** **WAIVER.** No delay or omission to exercise any right, power, or remedy accruing to Concierge or Owner under this Agreement shall impair any right, power, or remedy of Concierge or Owner, nor shall it be construed as a waiver of, or consent to, any breach or default. No waiver of any breach, any failure of a condition, or any right or remedy under this Agreement (1) shall be effective unless it is in writing and signed by Concierge or Owner, as applicable; (2) shall be deemed to be a waiver of, or consent, to any other breach, failure of a condition, or right or remedy, or (3) shall be deemed to constitute a continuing waiver unless the writing expressly so states.

**25.** **TIME OF THE ESSENCE.** Time is of the essence in respect to all provisions of this Agreement that specify a time for performance.

**Subject to approval by the Court, by signing below, Owner and Concierge acknowledge that they have carefully read, understand, and agree to be bound by the terms and conditions of this Agreement, any related documents, exhibits and addenda, all of which form the Agreement between Concierge and Owner. Owner acknowledges that it has been given the opportunity to seek legal advice and to have this Agreement reviewed by an independent attorney of its choice prior to signing it.**

**CONCIERGE AUCTIONS, LLC**

By: _____
Name: Laura Brady
Title: CEO

Date Signed: _____

**SIERRACONSTELLATION PARTNERS, LLC,
AS MANAGER FOR CRESTLLOYD, LLC:**

By: _____
Name: Lawrence R. Perkins
Title: Authorized Signatory

Date Signed: 12/13/2021 _____

Email: lperkins@scpllc.com with a copy to dbg@lnbyg.com

Address: 355 S. Grand Ave, Suite 1450, Los Angeles, CA 90071

8

**24.** **WAIVER.** No delay or omission to exercise any right, power, or remedy accruing to Concierge or Owner under this Agreement shall impair any right, power, or remedy of Concierge or Owner, nor shall it be construed as a waiver of, or consent to, any breach or default. No waiver of any breach, any failure of a condition, or any right or remedy under this Agreement (1) shall be effective unless it is in writing and signed by Concierge or Owner, as applicable; (2) shall be deemed to be a waiver of, or consent, to any other breach, failure of a condition, or right or remedy, or (3) shall be deemed to constitute a continuing waiver unless the writing expressly so states.

**25.** **TIME OF THE ESSENCE.** Time is of the essence in respect to all provisions of this Agreement that specify a time for performance.

**Subject to approval by the Court, by signing below, Owner and Concierge acknowledge that they have carefully read, understand, and agree to be bound by the terms and conditions of this Agreement, any related documents, exhibits and addenda, all of which form the Agreement between Concierge and Owner. Owner acknowledges that it has been given the opportunity to seek legal advice and to have this Agreement reviewed by an independent attorney of its choice prior to signing it.**

**CONCIERGE AUCTIONS, LLC**

By: _Laura Brady_____
Name: Laura Brady
Title: CEO

Date Signed: __12 / 13 / 2021_____

**SIERRACONSTELLATION PARTNERS, LLC,**
**AS MANAGER FOR CRESTLLOYD, LLC**:

By: _____
Name: Lawrence R. Perkins
Title: Authorized Signatory

Date Signed: _____

Email: lperkins@scpllc.com with a copy to dbg@lnbyg.com

Address: 355 S. Grand Ave, Suite 1450, Los Angeles, CA 90071

8

Doc ID: 66511ff296b2d00a5a656c54db5764e64c87ae7d

# EXHIBIT "A"

BID TERMS AND CONDITIONS – PURCHASE AND SALE AGREEMENT –
TO BE ATTACHED TO BID PROCEDURES MOTION

# EXHIBIT "B"

# Chicago Title Company

725 South Figueroa Street, Suite 200, Los Angeles, CA 90017
Phone: (213) 488-4300 ● Fax: (213) 488-4377

Issuing Policies of Chicago Title Insurance Company

ORDER NO.: **00166345-994-LT2-1TW**

Chicago Title Company / Los Angeles
725  S. Figueroa St., Suite 200
Los Angeles, CA 90017
ATTN:  Mike Slinger
Email:  mike.slinger@ctt.com
REF:

Main Office Line: **(213) 488-4300**

Title Officer:  Ted Tan/Jennifer Wright (LA/Comm)
Title Officer Phone:  (213) 488-4394
Title Officer Fax:  (213) 488-4360
Title Officer Email:  TeamX77@ctt.com

PROPERTY:    **944 ARIOLE WAY, LOS ANGELES, CA**

## PRELIMINARY REPORT

*In response to the application for a policy of title insurance referenced herein, **Chicago Title Company** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.*

*The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the policy forms should be read. They are available from the office which issued this report.*

*This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.*

*The policy(s) of title insurance to be issued hereunder will be policy(s) of Chicago Title Insurance Company, a Florida corporation.*

***Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.***

***It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.***

Chicago Title Company

By: _____
    Authorized Signature

By: _____
    Randy Quirk
    President

ATTEST _____
    Marjorie Nemzura
    Corporate Secretary

# Chicago Title Company

725 South Figueroa Street, Suite 200, Los Angeles, CA 90017
Phone:  (213) 488-4300  ●  Fax:  (213) 488-4377

## PRELIMINARY REPORT

**EFFECTIVE DATE:**            November 16, 2021 at 7:30 a.m.

**ORDER NO.:  00166345-994-LT2-1TW**

The form of policy or policies of title insurance contemplated by this report is:

1.      THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO COVERED BY THIS REPORT IS:

   **A Fee**

2.      TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS VESTED IN:

   CRESTLLOYD, LLC, a California limited liability company, in receivership by Order of the Superior Court of California, County of Los Angeles, West District, Case No. 21SMCV01113, a certified copy thereof being recorded July 20, 2021 as Instrument No. 2021-1113331 of Official Records, wherein Theodore Lanes was duly appointed as receiver, subject to the terms, provisions and restrictions set out in said Order.

3.      THE LAND REFERRED TO IN THIS REPORT IS DESCRIBED AS FOLLOWS:

   **See Exhibit A attached hereto and made a part hereof.**

# EXHIBIT "A"

# LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" 'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET; THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: **4369-026-021**

# EXCEPTIONS

**AT THE DATE HEREOF, ITEMS TO BE CONSIDERED AND EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM WOULD BE AS FOLLOWS:**

A.     Property taxes, including any personal property taxes and any assessments collected with taxes are as follows:

|  |  |
|---|---|
| Tax Identification No.: | 4369-026-021 |
| Fiscal Year: | 2021-2022 |
| 1st Installment: | $701,465.73, Unpaid and delinquent |
| Penalty: | $70,146.57 |
| 2nd Installment: | $701,465.71, Unpaid and delinquent |
| Penalty: | $70,156.57 |

Said property has been declared tax defaulted for non-payment of said delinquent taxes. See tax sale figures in Exception D below.

B.     Said property has been declared tax defaulted for non-payment of delinquent taxes for the fiscal year 2020

APN No.:          4369-026-021

Amounts to redeem for the above-stated fiscal year (and subsequent years if any) are:

Amount:          $1,787,349.33 by December 31, 2021

C.     An assessment by the improvement district shown below:

|  |  |
|---|---|
| Series: | AD #1 |
| District: | County of Los Angeles |
| For: | MRCA-Brush Fire Clear'g Dist #1 |
| Bond issued: | August 6, 2003 |

Said assessment is collected with the county/city property taxes.

Said assessment is also disclosed by a Notice of Amended Assessment, recorded January 26, 2015 as Instrument No. 2015-089995 of Official Records.

D.     The herein described property lies within the boundaries of a Community Facilities District (CFD) as follows:

|  |  |
|---|---|
| CFD No: | 2016-1 |
| For: | Fire Prevention, Wildlife Corridor and Open Space Protection and other associated purposes |
| Disclosed by: | Notice of Special Tax Lien |
| Recording Date: | January 13, 2017 |
| Recording No.: | 20170055098, Official Records |

This property, along with all other parcels in the CFD, is liable for an annual special tax. This special tax is included with and payable with the general property taxes of the County of Los Angeles.

## EXCEPTIONS
### (Continued)

E.  The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

F.  The herein described property lies within the boundaries of a Community Facilities District (CFD) as follows:

CFD No:               2020-1
For:                  Local Fire Prevention, Water Quality and Open Space Measure and other associated purposes
Disclosed by:         Notice of Special Tax Lien
Recording Date:       February 10, 2021
Recording No.:        2021-0235371, Official Records

This property, along with all other parcels in the CFD, is liable for an annual special tax. This special tax is included with and payable with the general property taxes of the County of Los Angeles.

1.  Water rights, claims or title to water, whether or not disclosed by the public records.

2.  Easement(s) for the purpose(s) shown below and rights incidental thereto as delineated or as offered for dedication, on the map of said Tract No. 22727;

Purpose:              Drainage
Affects:              That portion of said land as shown on said map

3.  Covenants, conditions and restrictions but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, citizenship, immigration status, primary language, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document

Recording Date:       November 13, 1947
Recording No:         1860, Official Records

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat the lien of any mortgage or deed of trust made in good faith and for value.

## EXCEPTIONS
### (Continued)

Modification(s) of said covenants, conditions and restrictions

Recording Date:          February 7, 1949
Recording No:            2309, Official Records

Modification(s) of said covenants, conditions and restrictions

Recording Date:          April 15, 1949
Recording No:            2654, Official Records

4.      Covenant and agreement wherein the owners agree to hold said Land as one parcel and not to sell any portion thereof separately. Said covenant is expressed to run with the Land and be binding upon future owners.

Recording Date:          June 22, 1981
Recording No.:           81-620826, Official Records

Reference is hereby made to said document for full particulars.

5.      An instrument entitled Master Covenant and Agreement

Executed by:             Michael t. Walkup and Edith A. Press
In favor of:             City of Los Angeles
Recording Date:          December 22, 1994
Recording No:            94-2260589, Official Records

Reference is hereby made to said document for full particulars.

6.      Matters contained in that certain document

Entitled:                Certificate of Compliance
Dated:                   L.A. No. 94-062
Executed by:             City of Los Angeles Department of City Planning
Recording Date:          December 22, 1994
Recording No:            94-2260586, Official Records

Reference is hereby made to said document for full particulars.

7.      A deed of trust to secure an indebtedness in the amount shown below,

Amount:                  $14,040,000.00
Dated:                   March 13, 2013
Trustor/Grantor:         Crestlloyd LLC, a California limited liability company
Trustee:                 First American Title Insurance Company, a California corporation
Beneficiary:             Inferno Realty, L.P., as to an undivided $7,040,000.00 and Maybach Corporation Holdings, Inc., as to an undivided $7,000,000.00 interest, as tenants in common
Recording Date:          March 13, 2013
Recording No:            20130384037, Official Records

# EXCEPTIONS
## (Continued)

By various assignments, the beneficial interest thereunder is now held of record in:

| | |
|---|---|
| Assignee: | Inferno Investment Inc. |
| Recording Date: | November 10, 2015 |
| Recording No: | 20151375607, Official Records |

An agreement to modify the terms and provisions of said deed of trust as therein provided

| | |
|---|---|
| Executed by: | Crestlloyd, LLC, a California Limited Liability Company and Inferno Investment Inc. |
| Recording Date: | November 10, 2015 |
| Recording No: | 20151375608, Official Records |

An agreement recorded November 6, 2018 as Instrument No. 20181122920, Official Records which states that this instrument was subordinated to the document or interest described in the instrument

| | |
|---|---|
| Recording Date: | November 6, 2018 |
| Recording No.: | 20181122917, Official Records |

8.    Covenant and agreement wherein the owners agree to hold said Land as one parcel and not to sell any portion thereof separately. Said covenant is expressed to run with the Land and be binding upon future owners.

| | |
|---|---|
| Recording Date: | September 5, 2013 |
| Recording No.: | 20131298666, Official Records |

Reference is hereby made to said document for full particulars.

9.    An instrument entitled Master Covenant and Agreement Regarding On-Site BMP Maintenance

| | |
|---|---|
| Executed by: | Nile Niami |
| In favor of: | City of Los Angeles |
| Recording Date: | September 24, 2013 |
| Recording No: | 20131385742, Official Records |

Reference is hereby made to said document for full particulars.

10.    An instrument entitled Master Covenant and Agreement Regarding On-Site BMP Maintenance

| | |
|---|---|
| Executed by: | Nile Niami |
| In favor of: | City of Los Angeles |
| Recording Date: | February 7, 2014 |
| Recording No: | 20140139714, Official Records |

Reference is hereby made to said document for full particulars.

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.:  00166345-994-LT2-1TW

# EXCEPTIONS
## (Continued)

11.     An irrevocable offer to dedicate an easement over a portion of said Land for

Purpose(s):              Public street
Recording Date:          June 4, 2014
Recording No:            20140578201, Official Records

Said offer was accepted by resolution, a certified copy of which was recorded April 10, 2015 as Instrument No. 20150395929, of Official Records..

12.     An instrument entitled Covenant and Agreement Regarding Maintenance of Building

Executed by:             Nile Niami
In favor of:             City of Los Angeles
Recording Date:          February 17, 2016
Recording No:            20160172858, Official Records

Reference is hereby made to said document for full particulars.

13.     A deed of trust to secure an indebtedness in the amount shown below,

Amount:                  $82,500,000.00
Dated:                   October 25, 2018
Trustor/Grantor          Crestlloyd, LLC, a California limited liability company
Trustee:                 Chicago Title Company
Beneficiary:             Hankey Capital, LLC, a California limited liability company
Recording Date:          November 6, 2018
Recording No:            20181122917, Official Records

An agreement to modify the terms and provisions of said deed of trust as therein provided

Recording Date:          August 31, 2020
Recording No:            20201030024 of Official Records

A notice of default under the terms of said trust deed

Executed by:             Chicago Title Company
Recording Date:          March 5, 2021
Recording No:            2021-0367447 of Official Records

A notice of trustee's sale under said deed of trust

Executed by:             Chicago Title Company, trustee
Date, Time and Place of Sale:  July 12, 2021 at 11:00 am by the fountain located at 400 Civic Center Plaza, Pomona, CA 91766
Recording Date:          June 14, 2021
Recording No:            2021-0934061 of Official Records

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.:  00166345-994-LT2-1TW

# EXCEPTIONS
## (Continued)

14.    Matters contained in that certain document

| | |
|---|---|
| Entitled: | Memorandum of Agreement |
| Executed by: | Hankey Capital, LLC, a California limited liability company and Crestlloyd, LLC, a California limited liability company |
| Recording Date: | November 6, 2018 |
| Recording No: | 20181122919, Official Records |
| | |
| Recording Dare: | August 31, 2020 |
| Recording No.: | 20201030294 of Official Records |

Reference is hereby made to said document for full particulars.

15.    A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $30,188,235.00 |
| Dated: | October 16, 2018 |
| Trustor/Grantor | Crestlloyd, LLC, a California limited liability company |
| Trustee: | Chicago Title Company |
| Beneficiary: | YOGI Securities Holdings, LLC, a Nevada limited liability company |
| Recording Date: | November 7, 2018 |
| Recording No: | 20181126580, Official Records |

16.    A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $6,196,810.64 |
| Dated: | September 18, 2019 |
| Trustor/Grantor | Crestlloyd, LLC, a California limited liability company |
| Trustee: | Chicago Title Company |
| Beneficiary: | YOGI Securities Holdings, LLC, a Nevada limited liability company |
| Recording Date: | September 23, 2019 |
| Recording No: | 20190989746, Official Records |

The effect of a Substitution of Trustee and Full Reconveyance, recorded January 14, 2021 as Instrument No. 2021-076458 of Official Records.

(Note: We will require evidence of the full payment or satisfaction of said deed of trust as there does not appear to be an off-setting transaction of record.)

17.    An instrument entitled Covenant and Agreement Regarding Maintenance of Building

| | |
|---|---|
| Executed by: | Crestlloyd, LLC |
| In favor of: | City of Los Angeles |
| Recording Date: | December 2, 2019 |
| Recording No: | 20191317943, Official Records |

Reference is hereby made to said document for full particulars.

18.    Any rights of the parties in possession of a portion of, or all of, said Land, which rights are not disclosed by the public records.

# EXCEPTIONS
## (Continued)

19.    Matters which may be disclosed by an inspection and/or by a correct ALTA/NSPS Land Title Survey of said Land that is satisfactory to the Company, and/or by inquiry of the parties in possession thereof.

20.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | American Truck & Tool Rentals Inc./American Rentals |
| Amount: | $97,050.34 |
| Recording Date: | June 29, 2020 |
| Recording No: | 20200709010 of Official Records |

A Notice of Pending Action to foreclose said lien

| | |
|---|---|
| County: | Los Angeles |
| Court: | Superior |
| Case No.: | 20SMCV01229 (consolidated with 20SMCV01264) |
| Recording Date: | May 5, 2021 |
| Recording No: | 2021-0717597 of Official Records |

21.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | J&E Texture, Inc. |
| Amount: | $214,147.50 |
| Recording Date: | June 30, 2020 |
| Recording No: | 20200712043 of Official Records |

A Notice of Pending Action to foreclose said lien

| | |
|---|---|
| County: | Los Angeles |
| Court: | Superior |
| Case No.: | 20SMCV01229 |
| Recording Date: | December 14, 2020 |
| Recording No: | 2020-01647158 of Official Records |

A Notice of Pending Action to foreclose said lien

| | |
|---|---|
| County: | Los Angeles |
| Court: | Superior |
| Case No.: | 20SMCV01229 (consolidated with 20SMCV01264) |
| Recording Date: | May 5, 2021 |
| Recording No: | 2021-0717597 of Official Records |

22.    A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $5,000,000.00 |
| Dated: | February 11, 2020 |
| Trustor/Grantor | CRESTLLOYD, LLC, a California limited liability company |
| Trustee: | Pacific Coast Title Company |
| Beneficiary: | Hilldun Corporation, a New York corporation |
| Recording Date: | September 4, 2020 |
| Recording No: | 20201058770 of Official Records |

PRELIMINARY REPORT
YOUR REFERENCE:

## EXCEPTIONS
### (Continued)

23.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | JMS Air Conditioning and Appliance Services, Inc. |
| Amount: | $51,290.00 |
| Recording Date: | May 6, 2021 |
| Recording No: | 2021-0722265 of Official Records |

24.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | Calgrove Rentals Inc. |
| Amount: | $12,338.95 |
| Recording Date: | June 1, 2021 |
| Recording No: | 2021-0868958 of Official Records |

25.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | BMC West LLC |
| Amount: | $2,398.60 |
| Recording Date: | July 16, 2021 |
| Recording No: | 2021-1102584 of Official Records |

26.    A Receiver's Certificate #1

| | |
|---|---|
| In favor of: | Hankey Capital, LLC and Theodore Lanes, in his capacity as Receiver |
| Amount: | $577,745.00 |
| Case No.: | 21SMCV01113 Superior Court Los Angeles County |
| Recording Date: | July 23, 2021 |
| Recording No: | 2021-1136088 of Official Records |

27.    A Notice of Pending Lien

| | |
|---|---|
| Executed by: | City of Los Angeles |
| Recording Date: | January 31, 2020 |
| Recording No: | 2020-0124042 of Official Records |

28.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | Parquet By Dian |
| Amount: | $40,846.00 |
| Recording Date: | September 8, 2021 |
| Recording No: | 2021-1373746 of Official Records |

29.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | Powertek Electric, Inc. |
| Amount: | $40,480.00 |
| Recording Date: | September 23, 2021 |
| Recording No: | 2021-1455960 of Official Records |

# EXCEPTIONS
## (Continued)

30.     A claim of mechanic's lien or materialman's lien

Claimant:               Kennco Plumbing, Inc.
Amount:                 $85,560.17
Recording Date:         October 5, 2021
Recording No:           2021-1508207 of Official Records

A Notice of Pending Action to foreclose said lien

County:                 Los Angeles
Court:                  Superior
Case No.:               21SMCV01656
Recording Date:         October 21, 2021
Recording No:           20211585116 of Official Records

31.     A Chapter 11 Petition

Debtor's Name:          Crestlloyd, LLC
Recording Date:         November 8, 2021
Recording No:           20211666304 of Official Records

**PLEASE REFER TO THE "INFORMATIONAL NOTES" AND "REQUIREMENTS" SECTIONS WHICH
FOLLOW FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION.**

---

**END OF EXCEPTIONS**

---

# REQUIREMENTS SECTION

1.    Unrecorded matters which may be disclosed by an Owner's Affidavit or Declaration. A form of the Owner's Affidavit/Declaration is attached to this Preliminary Report/Commitment. This Affidavit/Declaration is to be completed by the record owner of the land and submitted for review prior to the closing of this transaction. Your prompt attention to this requirement will help avoid delays in the closing of this transaction. Thank you.

The Company reserves the right to add additional items or make further requirements after review of the requested Affidavit/Declaration.

2.    The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below:

Limited Liability Company:        Crestlloyd, LLC, a California limited liability company

a)    A copy of its operating agreement, if any, and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b)    If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps.

c)    If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member.

d)    A current dated certificate of good standing from the proper governmental authority of the state in which the entity is currently domiciled.

e)    If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

f)    If Limited Liability Company is a Single Member Entity, a Statement of Information for the Single Member will be required.

g)    Each member and manager of the LLC without an Operating Agreement must execute in the presence of a notary public the Certificate of California LLC (Without an Operating Agreement) Status and Authority form.

3.    In order to complete this report, the Company requires a Statement of Information to be completed by the following party(s),

Party(s):        All Individual Parties

The Company reserves the right to add additional items or make further requirements after review of the requested Statement of Information.

NOTE:  The Statement of Information is necessary to complete the search and examination of title under this order. Any title search includes matters that are indexed by name only, and having a completed Statement of Information assists the Company in the elimination of certain matters which appear to involve the parties but in fact affect another party with the same or similar name. Be assured that the Statement of Information is essential and will be kept strictly confidential to this file.

---

**END OF REQUIREMENTS**

---

## REQUIREMENTS
### (Continued)

Case 2:21-bk-18205-DS    Doc 96    Filed 02/04/22    Entered 02/04/22 09:03:05    Desc
Main Document    Page 84 of 143
PRELIMINARY REPORT
YOUR REFERENCE:
Chicago Title Company
ORDER NO.: 00166345-994-LT2-1TW

# INFORMATIONAL NOTES SECTION

1.  None of the items shown in this report will cause the Company to decline to attach ALTA Endorsement Form 9 to an Extended Coverage Loan Policy, when issued.

2.  The Company is not aware of any matters which would cause it to decline to attach CLTA Endorsement Form 116 indicating that there is located on said Land Single Family Residential properties, known as 944 Ariole Way, located within the city of Los Angeles, California, , to an Extended Coverage Loan Policy.

3.  Note:  Please contact your Title Officer to obtain the current recording fees.  Chicago Title Company will pay Chicago Title Insurance Company 12% of the title premium, as disclosed on lines 1107 and 1108 of the HUD-1.

4.  Note:  The policy of title insurance will include an arbitration provision. The Company or the insured may demand arbitration. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Please ask your escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration provisions and any other provisions pertaining to your Title Insurance coverage.

5.  Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

6.  Pursuant to Government Code Section 27388.1, as amended and effective as of 1-1-2018, a Documentary Transfer Tax (DTT) Affidavit may be required to be completed and submitted with each document when DTT is being paid or when an exemption is being claimed from paying the tax. If a governmental agency is a party to the document, the form will not be required. DTT Affidavits may be available at a Tax Assessor-County Clerk-Recorder.

---

## END OF INFORMATIONAL NOTES

Ted Tan/Jennifer Wright (LA/Comm)/tt6

**WIRE SAFE**™ | Inquire before you wire!

# Wire Fraud Alert

This Notice is not intended to provide legal or professional advice. If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the phone number of relevant parties to the transaction as soon as an escrow account is opened**. DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*          *Internet Crime Complaint Center:*
*http://www.fbi.gov*                              *http://www.ic3.gov*

*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

## Chicago Title Company

725 South Figueroa Street, Suite 200, Los Angeles, CA 90017
Phone: (213) 488-4300 ● Fax: (213) 488-4377

# Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment. Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate. As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative. These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount. These discounts only apply to transactions involving services rendered by the FNF Family of Companies. This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company. The discount will only be applicable to the FNF Company as indicated by the named discount.

| **FNF Underwritten Title Company** | **Underwritten by FNF Underwriters** |
|---|---|
| CTC – Chicago Title company | CTIC – Chicago Title Insurance Company |
| CLTC – Commonwealth Land Title Company | CLTIC - Commonwealth Land Title Insurance Company |
| FNTC – Fidelity National Title Company of California | FNTIC – Fidelity National Title Insurance Company |
| FNTCCA - Fidelity National Title Company of California | FNTIC - Fidelity National Title Insurance Company |
| TICOR – Ticor Title Company of California | CTIC – Chicago Title Insurance Company |
| LTC – Lawyer's Title Company | CLTIC – Commonwealth Land Title Insurance Company |
| SLTC – ServiceLink Title Company | CTIC – Chicago Title Insurance Company |

## Available Discounts

**DISASTER LOANS (CTIC, CLTIC, FNTIC)**
The charge for a Lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within twenty-four (24) months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be fifty percent (50%) of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, FNTIC)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be fifty percent (50%) to seventy percent (70%) of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be forty (40%) to fifty percent (50%) of the appropriate title insurance rate, depending on the type of coverage selected.

## FIDELITY NATIONAL FINANCIAL, INC.
## PRIVACY NOTICE

Effective August 1, 2021

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices.  If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

### Collection of Personal Information
FNF may collect the following categories of Personal Information:
- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:
- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

### Collection of Browsing Information
FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:
- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

### Other Online Specifics
Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites.  FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

### Use of Personal Information
FNF uses Personal Information for three main purposes:
- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

### When Information Is Disclosed
We may disclose your Personal Information and Browsing Information in the following circumstances:
- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;

Copyright © 2021. Fidelity National Financial, Inc. All Rights Reserved
Order No. 00166345-994-LT2-1TW

- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law. We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you. Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

### Security of Your Information
We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

### Choices With Your Information
If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request as directed at the end of this Privacy Notice. We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888) 714-2710 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.
For Oregon Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

### Information From Children
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

### International Users
FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

### FNF Website Services for Mortgage Loans
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, visit FNF's Opt Out Page or contact us by phone at (888) 714-2710 or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

## ATTACHMENT ONE (Revised 05-06-16)

**CALIFORNIA LAND TITLE ASSOCIATION
STANDARD COVERAGE POLICY – 1990**

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)
### ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE

### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;
   d. improvements on the Land;
   e. land division; and
   f. environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;

© **California Land Title Association. All rights reserved.**
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

c. that result in no loss to You; or
d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5. Failure to pay value for Your Title.
6. Lack of a right:
a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
b. in streets, alleys, or waterways that touch the Land.
This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
• For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 5,000.00 |

## 2006 ALTA LOAN POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13 or 14); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).
The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

{Except as provided in Schedule B - Part II,{ t{or T}his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

---

Attachment One – CA (Rev. 05-06-16)                                                                                    Page 2

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

### {PART I

{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency  that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by  persons in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown  by the Public Records.
4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.  Any lien or right to a lien for services, labor or material not shown by the Public Records.}

### PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:}

## 2006 ALTA OWNER'S POLICY (06-17-06)

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
      (i)   the occupancy, use, or enjoyment of the Land;
      (ii)  the character, dimensions, or location of any improvement erected on the Land;
      (iii) the subdivision of land; or
      (iv)  environmental protection;
      or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
    (a) a fraudulent conveyance or fraudulent transfer; or
    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses,  that arise by reason of:

{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency  that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.  Any lien or right to a lien for services, labor or material not shown by the Public Records. }
7.  {Variable exceptions such as taxes, easements, CC&R's, etc. shown here.}

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY – ASSESSMENTS PRIORITY (04-02-15)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a)  Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
    (b)  Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a)  created, suffered, assumed, or agreed to by the Insured Claimant;
    (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c)  resulting in no loss or damage to the Insured Claimant;
    (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
    (e)  resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6.  Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8.  The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
    (a)  a fraudulent conveyance or fraudulent transfer, or
    (b)  a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.
10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

**© California Land Title Association. All rights reserved.**
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

Insert Map Here

# EXHIBIT "3"

## BRANDEN WILLIAMS
FOUNDER / OWNER



Born and raised in Beverly Hills, Branden holds as deep understanding of the local real estate market and brings a "hometown" advantage to the Williams & Williams Estates Group brand.

Branden's devotion to out-of-the-box creative marketing strategies, unwavering loyalty and relentless energy has resulted in a number of national and local accolades, including The Wall Street Journal's Top-Producing Agents, Variety's Real Estate Elite, and The Hollywood Reporter's Top Real Estate Agents. Additionally, Branden has provided real estate expert commentary for various top-tier national news outlets including Wall Street Journal, Bloomberg, Fox Business, ABC News, People, CNN, CBS Money and more.

While working at his first brokerage firm, he met his future wife Rayni Romito and the two launched Williams & Williams Estates Group in 2006. Together, Branden and Rayni are the go-to power couple representing clients such as Markus Persson, Dr. Dre, Jennifer Lopez and Bruce Willis, along with some of the world's most notable listings including 924 Bel Air Rd sold for $94 million and a private Malibu estate sold for $110 million.

Branden was a born salesman. The early experience of helping his father sell sheepskin and cowhide rugs at the age of 7 on the side of Fairfax Avenue instilled in him the business acumen and entrepreneurial aptitude that paved way to his success. He continued working in the customer service and entertainment industry through college at the Fashion Institute of Technology in Los Angeles and later parlayed his passion for fashion and style into architecture, design and ultimately luxury real estate.

Branden is an active member of the Los Angeles County Museum of Art and a donor to MOCA, CHLA & UCLA, Baby2Baby and Cayton Children's Museum.

## RAYNI ROMITO WILLIAMS
FOUNDER / OWNER



Specializing in high-end real estate, Rayni Romito Williams has established a remarkable record with more than $8.7 billion total with her partner in career sales.

Her in-depth knowledge of market trends and luxury inventory, paired with her energetic and confident disposition has made her one of the nation's top-producing female agents. Growing up in a family of developers, Rayni is no stranger to the world of real estate. Rayni possesses a unique skillset of being able to creatively market and understand the financial aspect of each transaction, which she acquired through her previous careers in journalism and the lending business.

In 2005, Rayni returned to her real estate roots when she joined a Beverly Hills-based brokerage and immediately proved herself to be an honest and hard-working real estate professional. Shortly thereafter, Rayni met then colleague Branden Williams and began partnering on some of the most notable deals in LA. Growing quickly, Rayni and Branden developed an impressive roster of clientele, which now includes Jeremy Renner, Jennifer Lopez, Angelina Jolie, Bruce Makowsky, Max Martin and many more.

More than a decade later, Rayni and Branden are still setting records in the LA real estate market.

With more than $1 billion in sales in Trousdale alone and notable deals in Beverly Hills, the Bird Streets and Los Feliz, the power couple continues to be nationally recognized as a top-producing team. Rayni has been nationally and locally recognized for her impressive work, and has earned notable accolades including, The Wall Street Journal's Top-Producing Agents, Variety's Real Estate Elite, The Hollywood Reporter's Top Real Estate Agents and Los Angeles Business Journal's 500 influential people in Los Angeles. Additionally, she has provided real estate expert commentary for various top-tier national news outlets including Wall Street Journal, LA Times, Forbes, CNN, Business Insider, Bloomberg TV, Fox Business, The Hollywood Reporter, Variety and more.

Rayni is a member of the Los Angeles County Museum of Art, actively involved with Baby2Baby as an "Angel" and has been recognized by the local community for her charitable work. In 2017, Rayni & Branden were honored for their extensive work with the Cayton Children's Museum, and in 2015, Rayni was awarded Altruist of the Year by Angeleno Magazine, as well as named as one of Los Angeles 500 Most Influential People, consecutively by Los Angeles Business Journal

She's an ambassador for The Wallis Annenberg Center for the Performing Arts, donor to CHLA & UCLA and, for over six years, she's served on the board at Cayton Children's Museum where she's co-chaired initiatives including Free Admission & Equity and the Women's Philanthropy Circle.

# 2021 YTD SALES TOTALS

### OVER 8.7 BILLION IN CAREER SALES

### OVER 1 BILLION SOLD YTD
EXCLUSIVE REPRESENTATION

---

*HIGHEST SALE IN PACIFIC PALISADES*
**1601 SAN ONOFRE**
PACIFIC PALISADES | REPRESENTED SELLER
**$83,000,000**

*HIGHEST 2021 SALE IN BEL-AIR*
**534 BARNABY RD**
BEL-AIR | REPRESENTED BUYER & SELLER
**$70,000,000**

**21958 PACIFIC COAST HWY**
MALIBU | REPRESENTED SELLER
**$51,650,000**

*HIGHEST SALE IN BRENTWOOD*
**1047 N BUNDY**
BRENTWOOD | REPRESENTED BUYER
**$44,000,000**

**514 CHALETTE DR**
TROUSDALE | REPRESENTED SELLER
**$32,500,000**

*HIGHEST SALE IN CALABASAS*
**25354 PRADO DE FELICIDAD**
CALABASAS | REPRESENTED SELLER
**$30,000,000**

**617 N ARDEN DR**
BEVERLY HILLS | REPRESENTED SELLER
**$30,700,000**

**510 & 520 STONEWOOD DR**
BEVERLY HILLS | REPRESENTED BUYER
**$26,000,000**

**23858 MALIBU RD**
MALIBU | REPRESENTED BUYER
**$24,000,000**

**23330 MALIBU COLONY RD (2X)**
MALIBU | REPRESENTED BUYER
**$23,500,000**

**1150 CHANNEL DR**
MONTECITO | REPRESENTED BUYER
**$22,995,000**

**807 CINTHIA ST**
BEVERLY HILLS | REPRESENTED SELLER
**$21,150,000**

**632 N PALM DR**
BEVERLY HILLS | REPRESENTED SELLER
**$20,000,000**

**9966 SUNSET BLVD**
BEVERLY HILLS | REPRESENTED BUYER
**$19,100,000**

**24220 LONG VALLEY RD**
HIDDEN HILLS | REPRESENTED BUYER
**$19,300,000**

**1054 ANGELO DR**
BEVERLY HILLS | REPRESENTED SELLER
**$16,400,000**

**THE OAKMONT ESTATE**
BRENTWOOD | REPRESENTED SELLER
**$15,500,000**

**21606 PACIFIC COAST HWY**
MALIBU | REPRESENTED BUYER
**$14,730,000**

**27228 ESCONDIDO BEACH**
MALIBU | REPRESENTED BUYER
**$14,700,000**

**9380 SIERRA MAR DR**
BIRD STREETS | REPRESENTED BUYER
**$14,000,000**

**805 N HILLCREST RD**
TROUSDALE ESTATES | REPRESENTED BUYER
**$13,500,000**

**1505 CARLA RIDGE**
TROUSDALE | REPRESENTED BUYER
**$12,600,000**

**3312 CLERENDON RD**
BEVERLY HILLS | REPRESENTED BUYER
**$12,500,000**

**719 N ELM DR**
BEVERLY HILLS | REPRESENTED BUYER
**$11,125,000**

*SOLD IN ONE WEEK*
**1160 LOMA VISTA DR**
TROUSDALE | REPRESENTED SELLER
**$10,550,000**

**1674 DOHENY DR**
DOHENY ESTATES | REPRESENTED SELLER
**$10,525,000**

**460 TROUSDALE PL**
TROUSDALE | REPRESENTED SELLER
**$9,000,000**

**12080 SUMMIT CIRCLE**
BEVERLY HILLS | REPRESENTED SELLER
**$9,650,000**

**1547 TOWER GROVE**
BEVERLY HILLS P.O. | REPRESENTED SELLER
**$8,670,000**

**10895 CHALON RD**
BEL-AIR | REPRESENTED SELLER
**$8,500,000**

**1462 N KINGS RD**
SUNSET STRIP | REPRESENTED SELLER
**$8,500,000**

**2463 SOLAR DR**
NICHOLS CANYON | REPRESENTED SELLER
**$8,400,000**

**1709 RISING GLEN RD**
SUNSET STRIP | REPRESENTED SELLER
**$7,800,000**

**1731 RISING GLEN RD**
SUNSET STRIP | REPRESENTED SELLER
**$7,600,000**

**459 LORING AVE**
LITTLE HOLMBY | REPRESENTED BUYER & SELLER
**$7,500,000**

**1967 MOUNT OLYMPUS**
HOLYWOOD HILLS | REPRESENTED SELLER
**$7,280,000**

**1375 BEVERLY ESTATES DR**
BEVERLY HILLS | REPRESENTED SELLER
**$7,172,500**

**8115 MULHOLLAND TERRACE**
SUNSET STRIP | REPRESENTED SELLER
**$6,950,000**

**9855 DEEP CANYON**
BEVERLY HILLS P.O. | REPRESENTED BUYER
**$6,500,000**

**9555 OAK PASS RD**
BEVERLY HILLS P.O. | REPRESENTED SELLER
**$5,925,000**

**2442 BANYAN DR**
BRENTWOOD | REPRESENTED SELLER
**$5,850,000**

**12020 TALUS PL**
BEVERLY HILLS P.O. | REPRESENTED SELLER
**$5,750,000**

**1275 OLD MILL RD**
SAN MARINO | REPRESENTED BUYER
**$5,350,000**

**2501 ASTRAL DR**
SUNSET STRIP | REPRESENTED SELLER
**$5,050,000**

**1423 N DOHENY**
SUNSET STRIP | REPRESENTED SELLER
**$4,800,000**

**4179 VALLEY MEADOW RD**
ENCINO | REPRESENTED BUYER
**$4,720,000**

**8328 MARMONT LN**
SUNSET STRIP | REPRESENTED BUYER
**$4,400,000**

**20607 EAGLEPASS DR**
MALIBU | REPRESENTED BUYER
**$4,290,000**

**75 FREMONT PL**
HANCOCK PARK | REPRESENTED SELLER
**$4,200,000**

**2216 SUMMITRIDGE DR**
BEVERLY HILLS | REPRESENTED BUYER & SELLER
**$4,010,000**

**9767 MONTE MAR DR**
BEVERLYWOOD | REPRESENTED SELLER
**$3,900,000**

**1849 COLDWATER CANYON DR**
BEVERLY HILLS P.O. | REPRESENTED SELLER
**$3,752,500**

**17620 CAMINO DE YATASTO**
PACIFIC PALISADES | REPRESENTED SELLER
**$3,750,000**

**16856 EDGAR ST**
SUNSET STRIP | REPRESENTED BUYER
**$3,650,000**

**25010 JIM BRIDGER RD**
SUNSET STRIP | REPRESENTED SELLER
**$3,500,000**

**7269 OUTPOST COVE**
SUNSET STRIP | REPRESENTED BUYER
**$3,450,000**

**4205 VALLEY MEADOW RD**
ENCINO | REPRESENTED SELLER
**$3,275,000**

**9414 LLOYDCREST DR**
BEVERLY HILLS P.O. | REPRESENTED BUYER
**$3,000,000**

**736 S CLOVERDALE AVE**
MIRACLE MILE | REPRESENTED BUYER
**$2,995,000**

**445 N EDINBURGH AVE**
BEVERLY GROVE | REPRESENTED SELLER
**$2,950,000**

**9151 WARBLER PL**
SUNSET STRIP | REPRESENTED BUYER
**$2,900,000**

**2356 LIVE OAK MEADOWS**
MALIBU | REPRESENTED SELLER
**$2,875,000**

**706 S WESTGATE AVE**
BRENTWOOD | REPRESENTED SELLER
**$2,650,000**

# EXHIBIT "4"

# AARON KIRMAN



# #1
## AGENT IN LA

# #5
## AGENT INTERNATIONALLY

# $14 BILLION
## TEAM SALES

## SOLD THE MOST EXPENSIVE HOUSE GLOBALLY

Aaron Kirman is President of the International Estates Division at Compass and founder, CEO and techpreneur of the eponymously named Aaron Kirman Group, which includes a team of over 100. Kirman currently represents the largest market share of luxury listings in the country with over $2.2 Billion in active luxury inventory. With $8 billion in personal career sales, and $14 billion in team sales, Kirman represents the finest estates across the globe and is sought after by the most discerning clients, including titans of industry, celebrities, royal families, major lending institutions and foreign investors.

Kirman's black book rolodex of billionaires, along with his vast knowledge and expertise in selling exclusive properties, have helped him to produce some of the highest prices in Beverly Hills, Bel Air, Hollywood Hills, Santa Monica, and Malibu. A prominent figure in the luxury real estate market for the past 25 years, Kirman is known for selling homes priced in the hundred millions of dollars and has received international acclaim for record-setting sales across Southern California, including selling the Danny Thomas Estate, the Eddie Goetz Estate, and a $300 million property in the south of France. Kirman was ranked as the number one agent in Los Angeles and among the top five luxury real estate agents in the U.S. by the Wall Street Journal.

The star of TV's newest hit real estate show, Listing Impossible on CNBC, Kirman is regularly featured in publications like The New York Times, BBC, Forbes, CNN, The Los Angeles Times, Variety, the London Times, E! Entertainment and CBS.

# EXHIBIT "5"



# CONCIERGE AUCTIONS

**Concierge Auctions Company Overview**

Concierge Auctions ("*Concierge*") is the global marketplace for buying and selling the world's finest properties. Concierge is the largest luxury real estate auction marketplace in the world with 90%+ market share and the most comprehensive database of high-net-worth property connoisseurs on the planet

Concierge has revolutionized the sale process for the world's most unique properties. Concierge serves high-net-worth individuals internationally through an accelerated solution to obtain outstanding value for one-of-a-kind real estate assets by inviting bidders to compete in a transparent auction process. Concierge adds unmatched exponential reach, speed, and certainty. In short, Concierge helps sellers accomplish in weeks what can otherwise take years.

The Concierge team curates the world's most elite properties, matches them with buyers, and facilitates an easy, market-driven transaction. Typical clients of Concierge are entrepreneurs, business owners, sports and entertainment figures, and executives from the technology and financial sectors that typically have a unique, hard-to-value asset, want to control the timing of sale and are focused on Concierge ability to bring qualified exposure and a field of serious bidders. Concierge excels at setting a schedule, delivering a market, and selling a property in a very efficient timeframe.

Since its founding in 2008, Concierge have auctioned numerous properties in 44 US states and 30 countries, resulting in nearly $3 billion in sales and many record-setting transactions. Moreover, Concierge created and dominates the $10M-plus market for auctioning luxury homes. Concierge hosts a database of over 750,000 global contacts, more than 145,000 of whom are communicated to weekly with auction opportunities—of which has received a significant investment of $20M since 2008 in its growth. Concierge conducts a majority of the auctions through their online marketplace, ConciergeAuctions.com, making bidder participation easy and convenient.

Concierge has assembled specialists in project management, sales, marketing, public relations, finance, legal, infrastructure, and technology. In cooperation with a listing agent, an entire team is engaged on each property. Comprised of over 80 professionals based in six countries, including the United States, Mexico, the UK, Spain, and Switzerland, the Concierge platform and team are focused on reaching more buyers in more places and are a true competitive advantage.

The goal of Concierge is to obtain an exceptional price for the Property by positioning it as a premier, ultra-luxury opportunity and forcing urgency with a set auction date. Combining exposure to targeted members of the Concierge database, sales tactics, and marketing, the goal is to identify 3-7 bidders who will compete at auction to purchase a Property.



# CONCIERGE AUCTIONS

In conjunction with a listing agent, Concierge takes a three-pronged approach to selling a property: 1. Targeted exposure through marketing; 2. Sales outreach; and 3. Outreach to targeted members of the Concierge database, including direct contact to the Concierge Private Client Group, made up of prior registered bidders and their representatives from luxury property sales since 2008.

When Concierge is hired to sell real property by auction, it undertakes an extensive and intense marketing campaign (the "***Exposure Period***").  After experimenting with shorter and longer exposure periods, Concierge determined that a four to six (4-6) week Exposure Period yields the best results at auction because it generates sufficient excitement and sense of urgency with prospective buyers but does not dissuade bidders based on an overly rushed process. The Exposure Period generally involves Concierge undertaking promotional and marketing efforts, press exposure sought in news outlets in key markets, print collateral and signage being provided, targeted database member outreach, a dedicated team being deployed, and the property will be featured on our global marketplace, ConciergeAuctions.com.

Properties are "live" on the Concierge global luxury property and digital bidding marketplace, ConciergeAuctions.com, with a current auction feature and full listing with descriptive copy, photography, map, documents, and more. Media inquiries are handled by Concierge in cooperation with their public relations agency and in-house team. Prior coverage from media has included the Wall Street Journal, Fox News, New York Times and Bloomberg, among others, which can be viewed on the About Us page of ConciergeAuctions.com. Collateral will be printed for on-site distribution. Properties are additionally included in the Concierge catalogue—a high-quality, perfect-bound book, printed and made available for on-site distribution in markets of same-issue properties with concurrent exposure cycles, direct mailed monthly to selected members of the Concierge Auctions' Private Client Group, Preferred Agents, $20M+ U.S. homeowners, and billionaires. The issue is additionally digitally distributed to Concierge Auctions' subscribers. In addition to receiving inclusion in the Concierge Auction Alert® email during the Exposure Period, properties also receive a drip email campaign, inclusive of property email and auction reminder emails to members of the property prospect list. A customized strategy through multiple channels of social media, display, and retargeting campaigns will be deployed—including Google retargeter and Facebook banner ads to reach targeted potential buyers in the primary and feeder markets, as well as previous visitors to the property pages on ConciergeAuctions.com. With over 2 million Display Network sites, the entire Google Display Network reaches over 90% of Internet users worldwide. Properties receive a customized key market advertising strategy that continue throughout the duration of the exposure period. Concierge Auctions uses cutting-edge technology tools to monitor the activity of visitors to the Concierge site and then use this information for marketing and sales outreach efforts.

In tandem with global reach, local market engagement and education play a key role in Concierge outreach endeavors. In addition to notifying via the multiple listing service with the listing agent, top-producing brokers in the local and target markets will be personally contacted. Your property will be available to preview daily. The Concierge sales team and/or Listing Agent will attend every preview to show your property and discuss the opportunity

# CONCIERGE AUCTIONS



The majority of Concierge auctions take place via our online marketplace, ConciergeAuctions.com. Dedicated representatives are also available for assistance via phone. Bidding is typically open for 3–5 days.

# EXHIBIT "6"

# Chad Roffers

## President

Chad Roffers is an entrepreneur who has overseen the successful sale of more than $1.5 billion in real estate worldwide. As the managing director and chairman of international luxury real estate company Concierge Auctions, Roffers draws on his background in online advertising, negotiation and real estate sales to manage the selection and marketing of auction properties spanning the globe.

After graduating from the University of Colorado at Boulder with a degree in political science, Roffers served as the director of business development at US WEST, while simultaneously pursuing his MBA at the University of Denver. During this time, he honed his skills as a negotiator for high-stakes partnerships and investments with leading companies including AOL Time Warner, Palm Computing, Inc., AT&T and Yahoo!

From there, Roffers joined then start-up company AdAuction.com as vice president of business development. The company was supported by $88 million of venture capital, which Roffers helped use to test and study a multitude of diverse online auction formats. AdAuction.com revolutionized the sale of advertising by using a dynamic online auction platform to connect buyers and sellers of online and offline media.

In order to fully understand the residential real estate business on a transactional level, Roffers joined Michael Saunders & Company, a Florida-based luxury real estate brokerage, where he was named Rookie of the Year in 2002. After learning the business and producing volume that ranked him inside the top 10 percent of realtors nationwide, Roffers decided to merge his experience in closing high-value transactions and utilizing emerging technology by co-founding SKY Sotheby's International Realty in 2004.

Roffers served as president of SKY's operations in Sarasota, FL and Minneapolis, MN. He led the movement of turning residential real estate auctions into a mainstream choice for high-net-worth sellers in need of a time efficient and targeted sales campaign. For the first time, high-net-worth sellers could market and sell real estate in a decisively innovative and effective manner, garnering the best value.

Following a series of successful auctions, including numerous record-breaking sales, Roffers developed a growing audience. In less than three years, SKY grew into a 50-person operation that realized $500 million in sales through both the innovative auction process and traditional brokerage format.

In 2008, Roffers joined Concierge Auctions, which has become the preeminent luxury real estate auction firm globally, selling over $1.5 billion in properties to date. Roffers is a member of the National Auctioneers Association. He has been quoted in the media on his insight into the luxury real estate market in top-tier publications including Barron's and The New York Times.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled **APPLICATION OF DEBTOR AND DEBTOR IN POSSESSION TO: (1) EMPLOY THE BEVERLY HILLS ESTATES AND COMPASS AS REAL ESTATE BROKERS PURSUANT TO 11 U.S.C § 327(a), WITH COMPENSATION DETERMINED PURSUANT TO 11 U.S.C. § 328, (2) EMPLOY CONCIERGE AUCTIONS, LLC AS AUCTIONEER PURSUANT TO 11 U.S.C § 327(a), WITH COMPENSATION DETERMINED PURSUANT TO 11 U.S.C. § 328, AND (3) APPROVE THE PAYMENT OF COMPENSATION TO REAL ESTATE BROKERS AND AUCTIONEER FROM ESCROW UPON CLOSING; DECLARATIONS IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 14, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Kyra E Andrassy    kandrassy@swelawfirm.com,**
  **lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com**
- **Todd M Arnold    tma@lnbyg.com**
- **Jerrold L Bregman    jbregman@bg.law, ecf@bg.law**
- **Marguerite Lee DeVoll    mdevoll@watttieder.com**
- **Thomas M Geher    tmg@jmbm.com,**
  **bt@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com**
- **David B Golubchik    dbg@lnbyg.com, stephanie@lnbyb.com**
- **James Andrew Hinds    jhinds@hindslawgroup.com;mduran@hindslawgroup.com,**
  **mduran@hindslawgroup.com**
- **Robert B Kaplan    rbk@jmbm.com**
- **Jane G Kearl    jkearl@watttieder.com**
- **Jennifer Larkin Kneeland    jkneeland@watttieder.com**
- **Michael S Kogan    mkogan@koganlawfirm.com**
- **Noreen A Madoyan    Noreen.Madoyan@usdoj.gov**
- **Ryan D O'Dea    rodea@shulmanbastian.com, lgauthier@shulmanbastian.com**
- **Sharon Oh-Kubisch    sokubisch@swelawfirm.com,**
  **gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com**
- **Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com**
- **Victor A Sahn    vsahn@sulmeyerlaw.com,**
  **pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;c**
  **blair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com**
- **David Seror    dseror@bg.law, ecf@bg.law**
- **Zev Shechtman    zshechtman@DanningGill.com,**
  **danninggill@gmail.com;zshechtman@ecf.inforuptcy.com**
- **Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Jessica Wellington    jwellington@bg.law, ecf@bg.law**

**2. SERVED BY UNITED STATES MAIL**: On **December 14, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Debtor
Crestlloyd, LLC
c/o SierraConstellation Partners LLC
355 S. Grand Avenue Suite 1450
Los Angeles, CA 90071

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **December 14, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| December 14, 2021 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Type Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                        **F 9013-3.1.PROOF.SERVICE**

1  DAVID B. GOLUBCHIK (State Bar No. 185520)
2  TODD M. ARNOLD (State Bar No. 221868)
   LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3  2818 La Cienega Avenue
   Los Angeles, California 90034
4  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
5  Email: dbg@lnbyg.com; tma@lnbyg.com

6  Attorneys for Debtor and Debtor in Possession

7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  LOS ANGELES DIVISION

11

12  In re:                              Case No.: 2:21-bk-18205-DS

13  CRESTLLOYD, LLC,                    Chapter 11 Case

14         Debtor and Debtor in Possession.

15                                      **NOTICE OF APPLICATION OF DEBTOR AND
                                        DEBTOR IN POSSESSION TO:**
16                                      **(1) EMPLOY THE BEVERLY HILLS ESTATES
                                        AND COMPASS AS REAL ESTATE BROKERS
17                                      PURSUANT TO 11 U.S.C § 327(a), WITH
                                        COMPENSATION DETERMINED PURSUANT
18                                      TO 11 U.S.C. § 328,**
                                        **(2) EMPLOY CONCIERGE AUCTIONS, LLC
19                                      AS AUCTIONEER PURSUANT TO 11 U.S.C §
                                        327(a), WITH COMPENSATION DETERMINED
20                                      PURSUANT TO 11 U.S.C. § 328, AND**
                                        **(3) APPROVE THE PAYMENT OF
21                                      COMPENSATION TO REAL ESTATE
                                        BROKERS AND AUCTIONEER FROM
22                                      ESCROW UPON CLOSING**

23

24                                      [No hearing required unless requested per L.B.R.
25                                      2014-1(b)]

26

27

28

                                        1

**PLEASE TAKE NOTICE** that Crestlloyd, LLC, the debtor and debtor in possession herein (the "Debtor"), has submitted an application (the "Application") for the entry of an order authorizing the Debtor to:

(1)     employ The Beverly Hills Estates ("TBHE"), with Branden Williams and Rayni Williams as lead agents, and Compass ("Compass" and, with TBHE the "Brokers"), with Aaron Kirman as lead agent, as real estate brokers pursuant to 11 U.S.C § 327(a), with compensation determined pursuant to 11 U.S.C. § 328, pursuant to the terms of the Residential Listing Agreement (the "Listing Agreement") between the Debtor and the Brokers, which is attached to the Application as **Exhibit "1;"**

(2)     employ Concierge Auctions, LLC ("Concierge" or the "Auctioneer") as auctioneer pursuant to 11 U.S.C § 327(a), with compensation determined pursuant to 11 U.S.C. § 328, pursuant to the terms of the Auction Agreement (the "Auction Agreement") between the Debtor and the Auctioneer, which is attached to the Application as **Exhibit "2;"** and

(3) approve the payment of compensation to the Brokers and the Auctioneer from escrow upon closing.

**PLEASE TAKE FURTHER NOTICE** that, as further discussed in the Application, the Debtor's primary asset is a piece of residential real property that it developed, which is located at 944 Airole Way, Los Angeles, CA 90077 (the "Property"), which is approximately 105,000 square feet and has 20 bedrooms, 30 bathrooms, a spa, a 4-lane bowling alley, and numerous pools and other water features.  The Debtor believes that the Property has a value of approximately $325 million.

Prior to the filing of the Debtor's Chapter 11 case on October 26, 2021 (the "Petition Date"), the Debtor's primary secured lender, Hankey Capital, LLC ("Hankey") initiated a foreclosure action against the Debtor, obtained the appointment of a receiver over the Property (the "Receiver"), and had a non-judicial foreclosure sale set for October 27, 2021.  In addition, also prior to the Petition Date, a number of other junior secured lenders and mechanic's lien holders initiated a multitude of state court actions against the Debtor seeking, among other things, to recover amounts allegedly owed and to foreclose on the Property.

Based on the foregoing and other considerations, on the Petition Date of October 26, 2021, the Debtor filed for bankruptcy protection to protect its substantial equity in the Property and to address myriad claims and litigation against the Debtor.

**PLEASE TAKE FURTHER NOTICE** that the Debtor intends to sell the Property as soon as practicable for the highest price possible under the circumstances.  Importantly, the Debtor is informed and believes that Hankey and other large stakeholders support such a sale of the Property in the context of the Debtor's bankruptcy case.  Indeed, the Debtor and Hankey reached a deal regarding a $12 million debtor in possession loan to be provided by Hankey to pay for budgeted items, which will further the Debtor's efforts to effectuate a sale of the Property as soon as possible.  The foregoing loan was approved on an interim basis by the Court on December 10, 2021.  The Debtor believes that a near-term sale of the Property will generate sufficient funds to pay all allowed claims in full, which will allow the Debtor to exit bankruptcy, either pursuant to a plan or an alternative exit strategy, with a surplus for the Debtor's owner.

In furtherance of the foregoing, the Debtor requires the services of the Brokers and the Auctioneer to market and sell the Property.  Therefore, pursuant to the Application, the Debtor is seeking to employ the Brokers and the Auctioneer to render, among others, the following types of professional services, as applicable:

(1)    marketing and showing the Property to prospective buyers;

(2)    assisting the Debtor in obtaining and providing due diligence materials to prospective buyers;

(3)    notifying prospective buyers of the intended online auction (the "Auction") of the Property and bid procedures approved by the Court (the "BK Bid Procedures") governing the Auction;[1]

(4)    receiving bids from prospective buyers;

(5)    conducting an online Auction of the Property pursuant to BK Bid Procedures approved by the Court with the ultimate sale subject to Court approval;

---

[1] The Debtor will file a separate motion seeking approval of BK Bid Procedures and is ***not*** seeking the approval thereof pursuant to the Application.

(6)     consulting with the Debtor and its professionals and advisors regarding the

foregoing; and

(7)     performing any other services which may be appropriate in connection

with the Brokers and Auctioneer's retention by the Debtor.

**PLEASE TAKE FURTHER NOTICE** that the material terms of the Listing Agreement

between the Debtor and the Brokers are summarized as follows:[2]

(1)     <u>Listing Period:</u> One year, provided that the Debtor may, in its sole discretion and

business judgment and without further Court order, modify the Listing Agreement by extending

the term of the Listing Agreement.

(2)     <u>Listing Price:</u> $295 million, provided that (a) the Debtor may, in its sole discretion

and business judgment and without further Court order, modify the Listing Agreement by

reducing the listing price and (b) the Property will likely be sold pursuant an Auction conducted

by the Auctioneer.

(3)     <u>Commission to Brokers:</u>

a.     1% of sale price up to $175 million (plus 1% payable to any buyer broker);

b.     1.5% of sale price over $175 million and up to $200 million (plus 1%

payable to any buyer broker); and

c.     2.0% of sale price over $200 million (plus 1% payable to any buyer

broker).

(4)     <u>Commission Tail Period:</u> 180 days.

(5)     <u>Other Terms:</u>

a.     Rayni Williams and Branden Williams, who previously served as agents

for the sale of the Property pursuant to a pre-petition listing agreement, waive all pre-petition

claims against the Debtor, including, but not limited to, any amounts owed under that certain

Promissory Note Secured by Personal Guaranty in the principal amount of $400,000 executed in

favor of Branden Williams for expenses advanced for marketing the Property under the pre-

---

[2] This is a summary only.  To the extent there is any discrepancy between this summary and the actual terms of the Listing Agreement, the terms of the Listing Agreement shall govern in all respects.

4

petition listing agreement;

> b.      Compass and Aaron Kirman, who previously served as broker/agent for the sale of the Property pursuant to a pre-petition listing agreement, waive all pre-petition claims against the Debtor (to be completed by an addendum to the Listing Agreement if not already done);

> c.      Any and all prior listing agreements are cancelled with the Listing Agreement between the Debtor and the Brokers superseding all previous listing agreements;

> d.      The Brokers acknowledge and understand that (i) the sale of the Property is subject to bidding at Auction in accordance with BK Bid Procedures to be approved by the Court, (ii) any sale of the Property is subject to Court approval after notice to the United States Trustee, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules, (iii) the Property is being sold "AS-IS WITH ALL FAULTS" without any representations and warranties, (iv) the commission to be paid to the Brokers shall only be paid from the proceeds of the sale of the Property, (v) the payment of the commission to the Brokers is subject to prior approval of the Court, (vi) if, without Brokers' prior written consent, the Property is withdrawn from sale by a voluntary act of the Debtor during the listing period or any extension thereof, the Debtor shall pay the Brokers a fee of $875,000, and (vii) the Court shall have exclusive jurisdiction to resolve any and all disputes relating to the Listing Agreement.

**PLEASE TAKE FURTHER NOTICE** that the material terms of the Auction Agreement between the Debtor and the Auctioneer are summarized as follows:[3]

> (1)      Auction Date: Commence February 7, 2022 and conclude February 10, 2022.

> (2)      Reserve Price: None.

> (3)      Auction/Bidding Procedures: The Debtor is to seek Court approval of BK Bid Procedures consistent with the Auction Agreement and as set forth in the Bidder Terms and Conditions attached thereto, and the Auctioneer shall conduct an Auction of the Property

---

[3] This is a summary only.  To the extent there is any discrepancy between this summary and the actual terms of the Auction Agreement, the terms of the Auction Agreement shall govern in all respects.

5

consistent with such Court-approved BK Bid Procedures, which shall require, *inter alia*, that (a) prospective bidders shall make a pre-Auction deposit with an escrow agent (the "<u>Escrow Agent</u>") in the amount of $250,000 to serve as protection for the Debtor and the Auctioneer (the "<u>Bidder's Deposit</u>") and provide proof of funds, (b) any buyer (the "<u>Buyer</u>") shall pay a fee (the "<u>Buyer's Premium</u>") equal to 12% of the bidder's purchase price (of which a significant portion will be rebated to the Debtor as described below), which Buyer's Premium shall (i) be separate from the Purchase Price for the Property to be paid to the Debtor and is an obligation of the Buyer to the Auctioneer and (ii) be paid to the Auctioneer as its fee for conducting the Auction and providing related services to the Debtor, and (c) within two (2) business days of the close of the Auction for the successful bidder Buyer and within three (3) business days of any back-up bidder being declared the Buyer if the initial successful bidder defaults, the successful bidder Buyer or back-up bidder Buyer, as applicable, shall deposit with the Escrow Agent any additional amounts required to equal 12% of the Buyer's purchase price (with such total increased deposit from the successful bidder Buyer, the "<u>Deposit</u>," and from any back-up bidder Buyer, the "<u>Back-Up Deposit</u>") and 12% of the Buyer's purchase price as the Buyer's Premium.

(4)    <u>Buyer's Premium to the Auctioneer:</u>  The Buyer's Premium paid to the Auctioneer will be paid by the Buyer and not the estate.  Thus, the Buyer's Premium paid to the Auctioneer will not reduce the net recovery to the estate on a sale of the Property.  To the contrary, in the event of a sale at Auction, the Auctioneer will rebate to the Debtor a portion of any Buyer's Premium paid to it by the Buyer (the "<u>Rebate</u>"), which will increase the net recovery to the estate on a sale of the Property.  More specifically, in the event of a sale at Auction, the Auctioneer shall be paid a Buyer's Premium equal to 12% of the purchase price for the Property, provided, however, that (a) if the purchase price is equal to or less than $225,000,000.00, the Rebate will be an amount equal to nine and one half of one percent (9.5%) of the Buyer's Premium that the Auctioneer actually collects, (b) if the purchase price is greater than $225,000,000.00 but less than $275,000,000.00, the Rebate will be an amount equal to nine percent (9.0%) of the Buyer's Premium that the Auctioneer actually collects, and (c) if the purchase price is equal to or greater than $275,000,000.00, the Rebate will be an amount equal to eight and one half of one percent

(8.5%) of the Buyer's Premium that the Auctioneer actually collects.

In the event that the Property is not sold at Auction, fails to close due to a default by either Buyer or Owner, the Auction is cancelled by Owner, or this the Auction Agreement is otherwise terminated other than by the Auctioneer and without a material breach by the Debtor, and the Property is contracted to be sold or otherwise transferred by Owner during (i) the 60-day period after the expiration or termination of the Auction Agreement to anyone or (ii) the 120-day period after the expiration or termination of the Auction Agreement to a prospective or registered bidder identified to the Debtor by the Auctioneer in writing within ten business days after the expiration or earlier termination of the Auction Agreement (or to an entity controlled by such person), the Debtor will be obligated to pay the Auctioneer a fee equal to two percent (2%) of the accepted purchase price of the Property at closing.

If the Auction is conducted and the winning Buyer defaults, then, except as described below in the case of a back-up bidder, the Debtor and the Auctioneer shall split 50/50 any deposit made by the Buyer in connection with the sale of the Property (or any other amounts collected from the Buyer) (collectively the "<u>Deposit Amount</u>").  In the event that a back-up bidder is selected and closes a purchase of the Property, the Debtor shall be entitled to be paid and retain the entire Deposit Amount.

(5)    <u>Other Terms:</u> The Auctioneer acknowledges and understands that (a) the sale of the Property is subject to bidding at Auction in accordance with BK Bid Procedures to be approved by the Court (as set forth in the Auction Terms and Conditions attached to the Auction Agreement), (b) any sale of the Property is subject to Court approval after notice to the United States Trustee, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules, (c) the Property is being sold "AS-IS WITH ALL FAULTS" without any representations and warranties; provided, however that Debtor shall deliver good and marketable title, (d) the fee to be paid to the Auctioneer shall only be paid by the Buyer of the Property, (e) the payment of the Buyer's Premiums to the Auctioneer is subject to prior approval of the Court as set forth in this application, and (vi) the Court shall have exclusive jurisdiction to resolve any and all disputes

1    relating to the Auction Agreement.

2         **PLEASE TAKE FURTHER NOTICE** that the Application is based upon this Notice of

3    Application, the Application, the declarations submitted in support of the Application, the entire

4    record of this case, and any other evidence properly presented to the Court in support of the

5    Application.

6         **PLEASE TAKE FURTHER NOTICE** that any request for a copy of the Application

7    must be made in writing to counsel for the Debtor as follows: Levene, Neale, Bender, Yoo &

8    Golubchik L.L.P., Attention: Todd M. Arnold, Esq., 2818 La Cienega Avenue, Los Angeles,

9    California 90034.  Email: tma@lnbyg.com.  Fax: 310-229-1244.

10        **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 2014-

11    1(b)(3)(E), any response to the Application or request for a hearing on the Application must be made

12    in writing and in the form required by Local Bankruptcy Rule 9013-1(f)(1) within fourteen (14) days

13    of the service of this Notice, and be filed with the Clerk of the United States Bankruptcy Court and

14    served upon the United States Trustee as well as counsel for the Debtor as follows: Levene, Neale,

15    Bender, Yoo & Golubchik L.L.P., Attention: Todd M. Arnold, Esq., 2818 La Cienega Avenue, Los

16    Angeles, California 90034.

17        **PLEASE TAKE FURTHER NOTICE** that failure to file and serve a timely response to

18    the Application or request for a hearing on the Application may be deemed by the Court to be consent

19    to the granting of the relief requested in the Application.

20    Dated: December 13, 2021              CRESTLLOYD, LLC

21
                                          */s/ Todd M. Arnold*
22                                        DAVID B. GOLUBCHIK
                                          TODD M. ARNOLD
23                                        LEVENE, NEALE, BENDER, YOO
                                             & GOLUBCHIK L.L.P.
24                                        Attorneys for Debtor and Debtor in Possession

25

26

27

28

8

1

# PROOF OF SERVICE OF DOCUMENT

2

3

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067.

4

5

6

7

A true and correct copy of the foregoing document entitled **NOTICE OF APPLICATION OF DEBTOR AND DEBTOR IN POSSESSION TO: (1) EMPLOY THE BEVERLY HILLS ESTATES AND COMPASS AS REAL ESTATE BROKERS PURSUANT TO 11 U.S.C § 327(a), WITH COMPENSATION DETERMINED PURSUANT TO 11 U.S.C. § 328, (2) EMPLOY CONCIERGE AUCTIONS, LLC AS AUCTIONEER PURSUANT TO 11 U.S.C § 327(a), WITH COMPENSATION DETERMINED PURSUANT TO 11 U.S.C. § 328, AND (3) APPROVE THE PAYMENT OF COMPENSATION TO REAL ESTATE BROKERS AND AUCTIONEER FROM ESCROW UPON CLOSING** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

8

9

10

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 14, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

11

12

- **Kyra E Andrassy    kandrassy@swelawfirm.com,
lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com**

13

- **Todd M Arnold    tma@lnbyg.com**
- **Jerrold L Bregman    jbregman@bg.law, ecf@bg.law**
- **Marguerite Lee DeVoll    mdevoll@watttieder.com**

14

- **Thomas M Geher    tmg@jmbm.com,
bt@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com**

15

- **David B Golubchik    dbg@lnbyg.com, stephanie@lnbyb.com**
- **James Andrew Hinds    jhinds@hindslawgroup.com;mduran@hindslawgroup.com,
mduran@hindslawgroup.com**

16

- **Robert B Kaplan    rbk@jmbm.com**

17

- **Jane G Kearl    jkearl@watttieder.com**
- **Jennifer Larkin Kneeland    jkneeland@watttieder.com**

18

- **Michael S Kogan    mkogan@koganlawfirm.com**
- **Noreen A Madoyan    Noreen.Madoyan@usdoj.gov**

19

- **Ryan D O'Dea    rodea@shulmanbastian.com, lgauthier@shulmanbastian.com**
- **Sharon Oh-Kubisch    sokubisch@swelawfirm.com,
gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com**

20

- **Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com**

21

- **Victor A Sahn    vsahn@sulmeyerlaw.com,
pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;c
blair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com**

22

- **David Seror    dseror@bg.law, ecf@bg.law**

23

- **Zev Shechtman    zshechtman@DanningGill.com,
danninggill@gmail.com;zshechtman@ecf.inforuptcy.com**

24

- **Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**

25

- **Jessica Wellington    jwellington@bg.law, ecf@bg.law**

26

**2.  SERVED BY UNITED STATES MAIL**: On **December 14, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

27

28

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1

☒ Service information continued on attached page

2    **3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR
     EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR,
3    on **December 14, 2021**, I served the following persons and/or entities by personal delivery, overnight
     mail service, or (for those who consented in writing to such service method), by facsimile transmission
4    and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or
     overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

5
                                        ☐ Service information continued on attached page
6
     I declare under penalty of perjury under the laws of the United States of America that the foregoing is
7    true and correct.

8    | December 14, 2021 | Lourdes Cruz | /s/ Lourdes Cruz |
     |---|---|---|
     | Date | Type Name | Signature |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                **F 9013-3.1.PROOF.SERVICE**

In re Crestlloyd, LLC
D UST Receiver RSN + Amended 20
Largest
File No.: 9562

**Debtor**
Crestlloyd, LLC
c/o SierraConstellation Partners LLC
355 S. Grand Avenue Suite 1450
Los Angeles, CA 90071

Noreen A Madoyan
Office of the United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

**Counsel For Receiver**
Brutzkus Gubner Rozansky Seror
Weber LLP
David Seror/Jessica Wellington
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367

Biabani & Associates, Inc.
Attn: Alex Biabani
1600 Sawtelle Bl #104
Los Angeles, CA 90025

Bradford Sheet Metal
4164 Sopp Road
Mojave, CA 93501

Branden Williams
257 N. Cannon Dr., 2nd Fl.
Beverly Hills, CA 90210

C.G.S. Custom Glass Specialists
Attn: Tom Yang
4536 Ish Drive
Simi Valley, CA 93063

CAD Stone Works Inc.
Attn: Cesar Hernandez
4533 Van Nuys Bl. #201
Sherman Oaks, CA 91403

Centurion Air, LLC
Attn: Michael T. Pyle
13932 Arrow Creek Road
Draper, UT 84020

Davidson Accountancy Corp.
William N. Davidson, CPA
14011 Ventura Blvd., Ste. 302
Sherman Oaks, CA 91423

Creative Art Partners
6542 Hayes Dr.
Los Angeles, CA 90048

Italian Luxury Design
4 NE 39 St.
Miami, FL 33137

Jabs Pools and Spas, LLC
Attn: Georgina Rendon
8055 Matilija Ave.
Panorma City, CA 91402

Dennis Palma
146 Beach Way
Monterey, CA 93940

KN Coating
201 E. Tamarack Ave
Inglewood, CA 90301

LA DWP
P.O. Box. 30808
Los Angeles, CA 90030

Vesta (aka Showroom Interiors, LLC)
Attn: Julian Buckner
8905 Rex Road
Pico Rivera, CA 90660

Made by TSI, Inc.
888 Biscayne Blvd #209
Miami, FL 33132

Midland Contractors, Inc.
Attn: Bruce Partovi
Po Box 8312
Van Nuys, CA 91409

West Valley Green Landscaping, Inc.
14761 Tupper St.
Panorama City, CA 91402

The Vertex Companies, Inc.
12100 Wilshire Blvd 8th floor
Los Angeles CA 90025-0000

West Coast Gates
339 Isis Ave.
Inglewood, CA 90301

1  DAVID B. GOLUBCHIK (State Bar No. 185520)
2  TODD M. ARNOLD (State Bar No. 221868)
   LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3  2818 La Cienega Avenue
   Los Angeles, California 90034
4  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
5  Email: dbg@lnbyg.com; tma@lnbyg.com

6  Attorneys for Debtor and Debtor in Possession

7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  LOS ANGELES DIVISION

11

12 | In re:                              | Case No.: 2:21-bk-18205-DS

13 | CRESTLLOYD, LLC,                    | Chapter 11 Case

14 |       Debtor and Debtor in Possession.

15 |                                     | **ERRATA TO APPLICATION OF DEBTOR
   |                                       AND DEBTOR IN POSSESSION TO:**
16 |                                     | **(1) EMPLOY THE BEVERLY HILLS
   |                                       ESTATES AND COMPASS AS REAL ESTATE
17 |                                       BROKERS PURSUANT TO 11 U.S.C § 327(a),
   |                                       WITH COMPENSATION DETERMINED
18 |                                       PURSUANT TO 11 U.S.C. § 328,**
   |                                     | **(2) EMPLOY CONCIERGE AUCTIONS, LLC
19 |                                       AS AUCTIONEER PURSUANT TO 11 U.S.C §
   |                                       327(a), WITH COMPENSATION
20 |                                       DETERMINED PURSUANT TO 11 U.S.C. §
   |                                       328, AND**
21 |                                     | **(3) APPROVE THE PAYMENT OF
   |                                       COMPENSATION TO REAL ESTATE
22 |                                       BROKERS AND AUCTIONEER FROM
   |                                       ESCROW UPON CLOSING**
23

24

25 |                                     | [No hearing required unless requested per L.B.R.
   |                                       2014-1(b)]
26

27

28

                              1

<table>
<tr><td>1</td><td></td></tr>
</table>

1    Crestlloyd, LLC, the Chapter 11 debtor and debtor in possession herein (the "Debtor"),

2  hereby submits this errata to its *Application Of Debtor And Debtor In Possession To: (1) Employ The*

3  *Beverly Hills Estates And Compass As Real Estate Brokers Pursuant To 11 U.S.C § 327(a), With*

4  *Compensation Determined Pursuant To 11 U.S.C. § 328, (2) Employ Concierge Auctions, Llc As*

5  *Auctioneer Pursuant To 11 U.S.C § 327(a), With Compensation Determined Pursuant To 11 U.S.C. §*

6  *328, And  (3) Approve The Payment Of Compensation To Real Estate Brokers And Auctioneer From*

7  *Escrow Upon Closing* application (the "Application") [Dkt. 74]  Capitalized terms herein have the

8  same meanings as ascribed to them in the Application.

9    The Auction Agreement between the Debtor and the Auctioneer was attached to the

10  Application as **Exhibit "2."  Exhibit "A"** to the Auction Agreement, which is the Bidder Terms and

11  Conditions, was inadvertently excluded from the Application when it was filed.  Therefore, **Exhibit**

12  **"A"** to the Auction Agreement, which is the Bidder Terms and Conditions, is attached hereto as

13  **Exhibit "A."**

14  Dated: December 16, 2021                    CRESTLLOYD, LLC

15                                                             */s/ Todd M. Arnold*

16                                                             DAVID B. GOLUBCHIK
                                                                TODD M. ARNOLD
17                                                             LEVENE, NEALE, BENDER, YOO
                                                                    & GOLUBCHIK L.L.P.
18                                                             Attorneys for Debtor and Debtor in Possession

2

1

2
# "EXHIBIT "A" TO AUCTION AGREEMENT - BID TERMS AND CONDITIONS

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCIERGE AUCTIONS, LLC**
**BIDDER TERMS AND CONDITIONS**
**944 AIROLE WAY, LOS ANGELES,**
**CALIFORNIA (the "*Property*")**

**Bidder Name:** _____ ("**Bidder**")

**Cell Phone:** _____ **Work Phone:** _____

**Email Address:** _____ **Fax Number:** _____

**Mailing Address:** _____

The real property auction services offered by Concierge Auctions, LLC and/or its affiliates or subsidiaries (collectively, "***Concierge,***" "***we,***" "***us***" or the "***Company***") through the www.conciergeauctions.com website and its Mobile Bidding Application (collectively, the "***Website***") or any services provided in connection with the Website (the "***Services***") and the use of the Website including any content, functionality and services offered on or through the Website, whether as a guest or a registered user, are governed by these Terms and Conditions (together with all separate documents/pages linked to these terms and incorporated by reference, the "**Terms and Conditions**" or "***Agreement***"). By accessing or using the Website, you ("**Bidder**" or "***you***") agree that (1) you have read and familiarized yourself with these Terms and Conditions, (2) you understand the Terms and Conditions, and (3) you are bound by the Terms and Conditions in your use of the Website and the Services. IF  YOU DO NOT AGREE TO THESE TERMS AND CONDITIONS, DO NOT USE THE WEBSITE OR THE SERVICES AND DO NOT PARTICIPATE IN THE AUCTION. YOUR USE OF THE WEBSITE AND/OR YOUR PARTICIPATION IN THE AUCTION, CONSTITUTES YOUR ACCEPTANCE OF AND AGREEMENT TO COMPLY WITH THESE TERMS AND CONDITIONS. These Terms and Conditions constitute a binding contract and the entire agreement between you and Concierge regarding their subject matter and supersede and replace any and all prior or contemporaneous agreements between the parties regarding such subject matter.

You acknowledge that the owner of the Property, Crestlloyd, LLC ("***Seller***"), filed for bankruptcy protection on October 26, 2021 under chapter 11 of title 11 of the United States Code §§ 101, et seq. (the "***Bankruptcy Code***") and is a Chapter 11 debtor in possession of the Property in its bankruptcy case pending in the United States Bankruptcy Court for the Central District of California (the "***Court***") (Case No. 2:21-bk-18205-DS).  On December _____, 2021, the Court entered its order approving these Terms and Conditions.  You acknowledge that any sale of the Property at the Auction is subject to the approval of the Court and requires the entry of an order of the Court approving the sale which will be obtained by Seller as soon as reasonably practicable after the Auction.

**Registration and Eligibility**. The Website and the Services are only available to persons with the legal capacity to enter into this Agreement and to purchase real property. Generally, the Website is intended for use  only by persons over 18 years of age.  Concierge may, at its sole and absolute discretion, refuse to accept your registration, and may, at any time after accepting registration, refuse to permit a Bidder's continuing use of the Website or the Services for any reason or no reason at all. Tampering with the Website, misrepresenting the identity of a Bidder or conducting fraudulent activities on the Website are prohibited.

**Accessing the Website and Account Security**. We will not be liable if for any reason all or any part of the Website is unavailable at any time or for any period. From time to time, we may restrict access to some parts of the Website, or the entire Website, to users, including registered users. You are responsible for:

  ☐   Making all arrangements necessary for you to access the Website.
  ☐   Ensuring that all persons who access the Website through your internet connection are aware of these Terms and Conditions and comply with them.

To access the Website or some of the resources it offers, you will be asked to provide certain registration details or other information. It is a condition of your use of the Website that all the information you provide on the Website is correct, current and complete. You agree that all information you provide to register with this Website or otherwise, including through the use of any interactive features on the Website, is governed by our Privacy Policy, and you consent to all actions

Bidder Initials

we take with respect to your information consistent with our Privacy Policy. The Privacy Policy is expressly incorporated into these Terms and Conditions by this reference.

If you choose, or are provided with, a user name, password or any other piece of information as part of our security procedures, you must treat such information as confidential, and you must not disclose it to any other person or entity. You also acknowledge that your account is personal to you and agree not to provide any other person with access to this Website or portions of it using your username, password or other security information. You may be held liable for any losses incurred by Concierge, its affiliates, officers, directors, employees, consultants, agents, and representatives due to someone else's use of your account or password. You agree to notify us immediately of any unauthorized access to or use of your username or password or any other breach of security. You also agree to ensure that you exit from your account at the end of each session. You should use particular caution when accessing your account from a public or shared computer so that others are not able to view or record your password or other personal information. You may not use the account, username, or password of someone else at any time.

We have the right to disable any user name, password or other identifier, whether chosen by you or provided by us, at any time in our sole discretion for any or no reason, including if, in our opinion, you have violated any provision of these Terms and Conditions.

**Electronic Communications.** When you visit the Website or send e-mails to us, you are communicating with us electronically and you consent to receive electronic communications from us. We will communicate with you by e-mail or by posting notices on this Website. You agree that all agreements, notices, disclosures and other communications that we provide to you electronically satisfy any legal requirement that such communications be in writing.

**Property Auction Details**. Concierge will present the Property for sale by auction (the "***Auction***") on behalf of the Seller of the Property. By participating in the Auction, you acknowledge and agree that you are bound by any additional terms that may be imposed by Concierge and the Seller and announced prior to or at the Auction either on the Property web page or otherwise.

Please note that the Property has not been fully constructed and has no Certificate of Occupancy.  Please refer to the Property-specific web page on the Website for the following Auction-specific details, among others:

> Cooperating Broker Commission Percentage
> Due diligence materials and other Property information
> HOA and other Property Ownership restrictions
> The form of Purchase and Sale Agreement that you would be
> required to sign

The information on the Property web page may be updated regularly so please check back to that page on a regular basis to be sure you are reviewing the most recent information regarding the Property Auction.

**Bidding**. Bidding shall commence on February 7, 2022 (the "***Auction Start Date***") at approximately 4:00 p.m. (Pacific Time) and shall continue for three (3) business days and conclude on February 10, 2022 at approximately 4:00 p.m. (Pacific Time) (the "***Auction End Date***").

All Auction bidding is open to the public without regard to race, color, sex, religion, familial status, disability or national origin, as well as to any Secured Creditors Entitled to Credit Bid.  There is no reserve price. Subject to Court approval, the Bidder who submits the highest bid (the "***High Bid***") (meaning the highest bid acknowledged by Concierge) will be the buyer (the "***Buyer***") of the Property, and the Bidder who submits the second highest bid (the "***Second High Bid***") (meaning the second highest bid acknowledged by Concierge) will be the back-up buyer (the "***Back-Up Buyer***") of the Property.

By participating in the Auction, you represent, warrant and covenant that any bid you make constitutes an irrevocable offer to purchase the Property for the full amount of the High Bid (or the Second High Bid for a Back-Up Buyer) and that once a High Bid (or the Second High Bid for a Back-Up Buyer) is accepted, you are obligated to purchase the Property for the amount of the High Bid (or the Second High Bid for a Back-Up Buyer).

In the event of any dispute among Bidders, or in the event of doubt on the part of Concierge as to the validity of any bid, Concierge will have the final discretion to determine the High Bid, the Buyer, the Second High Bid, and the Back-Up Buyer. If any dispute arises after the Auction, Concierge's Auction record shall determine conclusively all bidding issues, including but not limited to the High Bid, the Buyer, the Second High Bid, and the Back-Up Buyer.

Bidder Initials

YOU MAY WISH TO CONSULT WITH A LICENSED REAL ESTATE BROKER, ADVISER, ATTORNEY, CONTRACTOR OR OTHER EXPERT PRIOR TO YOUR PARTICIPATION IN THE AUCTION.

Concierge may allow telephonic, electronic, absentee or proxy bids as a convenience to Bidders who are not present at the Auction and/or are not able to use the Website. Concierge is not responsible for any errors or omissions in connection with such bids, including, without limitation, poor connections, Internet outages, poor reception, dropped calls, recording failures, busy signals and missed calls. Furthermore, Concierge does not represent or warrant that the functions, features or content contained in any telephonic bidding, electronic bidding, internet bidding website or any third-party software, products, or other materials used in connection with internet or electronic bidding, will be timely, secure, uninterrupted or error-free, and Concierge does not represent or warrant that defects will be corrected.

Subject to Section 363(k) of the Bankruptcy Code, Hankey Capital, LLC, which allegedly has a claim against Seller secured by the Property, and any other creditor that allegedly has a claim against Seller secured by the Property (collectively, the "***Secured Creditors***"), may be entitled to "credit bid" ("***Credit Bid***") to purchase the Property up to the full allowed amount of their secured claims as determined by the Court.

**Bidder Requirements**. To be qualified to bid at the Auction and before any bidding at the auction, you must (1) sign these Terms and Conditions and return them to Concierge so that they are actually received by Concierge before any bids are made by Bidder, (2) wire a deposit in the amount of US $250,000 (the "***Bidder's Deposit***") into the Escrow Agent's account per the instructions set forth on the Property web page so that it is actually received by the Escrow Agent before any bids are made by Bidder, provided that any Secured Creditor that is entitled to Credit Bid shall not be required to pay a Bidder's Deposit, (3) show proof of funds and/or readily liquidated assets sufficient to purchase the Property so that such proof of funds and/or readily liquidated assets are actually received by Concierge before any bids are made by Bidder, provided that any Secured Creditor that is entitled to Credit Bid shall not be required to provide proof of funds and/or readily liquidated assets, except to the extent its bid will exceed the amount the Secured Creditor is entitled to Credit Bid. The "***Escrow Agent***" shall be set forth on the Property web page. If Bidder is the Buyer or the Back-Up Buyer, the Bidder's Deposit shall be handled in accordance with these Terms and Conditions and any the Purchase and Sale Contract executed by Bidder. If Bidder is not the Buyer or the Back-Up Buyer, then the Bidder's Deposit shall be refunded by 5:00 p.m. EST on the second business day following the Auction

**Buyer's Premium**. The Buyer (and the Back-Up Buyer if the Buyer defaults) will be required to pay a fee to Concierge in the amount of twelve percent (12.00%) of the Purchase Price to be paid by the Buyer (or the Back-Up Buyer if the Buyer defaults) (the "***Buyer's Premium***"). The Buyer's Premium to be paid to Concierge in connection with the Auction is separate from the Purchase Price for the Property to be paid to Seller and is an obligation of the Buyer to Concierge. The Escrow Agent shall hold any Bidder Deposits and the Buyer's Premium. Buyer acknowledges and agrees that the Buyer's Premium is deemed earned upon conclusion of the Auction and that the Buyer's Premium shall be disbursed to Concierge by the Escrow Agent, provided that the conditions to payment of the Buyer's Premium to Concierge established by the Court have been satisfied. The Buyer's Premium is not a real estate commission; it is the fee that Concierge charges to bidders for bringing the Property to auction. Any applicable real estate commissions will be as set forth in the California Association of Realtors' standard Residential Purchase Agreement and Joint Escrow Instructions (C.A.R. Form RPA, Revised 12/18), Contingency Removal (C.A.R. Form CR, Revised 12/20), and related agreements (the "***Purchase and Sale Contract***") to be signed by the Buyer and any Back-Up Buyer and will be paid by Seller. Concierge is merely an auctioneer – it is not acting as a real estate agent in any capacity for any party and it is not involved in any way in connection with the closing of any real property transaction and all such real estate brokerage, closing and escrow functions will be handled exclusively by third party real estate brokers or other professionals.

**Furnishings**. The Property is being sold unfurnished.

**Bid Acceptance; Completion; Auction Methods**.

Once bidding is completed and the Buyer and any Back-Up Buyer are declared, the Buyer and any Back-Up Buyer (conditioned upon Buyer's default) will be required to immediately execute the Purchase and Sale Contract in the form attached hereto as **Exhibit "A"** and other documents required by the Escrow Agent or otherwise in connection with the purchase of the Property. The executed Purchase and Sale Contract and other documents reasonably required by the Escrow Agent must be received by the Escrow Agent from (1) the Buyer by no later than 5:00 p.m. Pacific Time on the first business day following the Auction End Date and (2) any Back-Up Buyer by no later than 5:00 p.m. Pacific Time on second business day following written notice from Concierge, the Escrow Agent, or Seller (or any of their attorneys) that the Buyer defaulted and that the Back-Up Buyer's Second High Bid is accepted. The Back-Up Buyer's Second High Bid amount shall be

irrevocable and the Back-Up Buyer is required to keep its bid and offer to purchase the Property open, and to allow the Escrow Agent or any other Escrow Company or Title Company holding the Back-Up Buyer's Bidder's Deposit, to maintain any Bidder's Deposit paid by the Back-Up Buyer in connection with the sale of the Property (or any other amounts collected from the Back-Up Buyer) (collectively the "***Back-Up Deposit***") (subject to applicable laws) for a period of 45 days after the Auction End Date.

The Buyer shall initiate a wire transfer to the Escrow Agent to increase its Bidder's Deposit up to twelve percent (12.00%) of the Purchase Price (the "***Deposit***"). The Deposit must be received by the Escrow Agent no later than 5:00 p.m. Pacific Time on the second business day following the Auction End Date.

If the Buyer: (1) defaults under these Terms and Conditions, and/or the applicable Purchase and Sale Contract, or (2) the Court does not approve the sale of the Property to the Buyer, Concierge shall have the right to declare the Back-Up Buyer to be the Buyer of the Property within forty-five (45) days after the Auction End Date. If the Back-Up Buyer is declared the Buyer, the Back-Up Buyer shall initiate a wire transfer to the Escrow Agent to increase its Back-Up Deposit up to twelve percent (12.00%) of the Purchase Price. The Back-Up Buyer's Deposit must be received by the Escrow Agent no later than 5:00 p.m. Pacific Time on the second business day following written notice from Concierge, the Escrow Agent, or Seller (or any of their attorneys) that the Buyer defaulted and that the Back-Up Buyer's Second High Bid is accepted.

Other than in regard to the Default Provisions in the Terms and Conditions, including in regard to the retention of any Bidder's Deposit, Deposit, or Back-Up Deposit by Concierge and/or Seller, as between Buyer and Seller, the Purchase and Sale Contract supersedes any and all other documents or information (including without limitation these Terms and Conditions) and serves as the definitive document for the purchase and sale of the Property. Concierge is not a party to the Purchase and Sale Contract. Concierge does not guarantee that the sale of the Property will be consummated. In addition, the sale of the Property will require post-Auction Court approval. If you are the Buyer or Back-Up Buyer for the Property, your bid remains irrevocable while the Seller seeks approval of your High Bid (or the Second High Bid) and the sale of the Property to you.

The term "***Purchase Price***" shall mean the High Bid, excluding other amounts payable by the Buyer in connection with closing, such as customary closing costs, escrow/closing fees, property taxes, insurance, transfer fees/taxes in accordance with the Purchase and  Sale Contract. Therefore, Buyer's total obligation toward the purchase of the Property is equal to the Purchase Price, the Buyer's Premium and those customary closing costs. To that end, all Bidders are strongly encouraged to review the Purchase and Sale Contract prior to bidding and to consult with an attorney or other professional.

**Closing / Escrow Agent**. Closing will take place in accordance with the Purchase and Sale Contract and any related documents. Unless otherwise stated on the Property web page, escrow services shall be provided exclusively by the Escrow Agent set forth in the Purchase and Sale Contract.

**Closing Date**. The date of closing or completion of the purchase of the Property between Buyer and Seller shall be the "***Closing Date***" set forth in the Purchase and Sale Contract. In certain cases, Seller may extend the Closing Date pursuant to the Purchase and Sale  Contract or as otherwise negotiated between Seller and Buyer.

**Default**. Your failure to comply with the Terms and Conditions will result in a default and, upon default, without any required notice to you, the Bidder's Deposit, Deposit, Back-Up Deposit and any Buyer's Premium shall be retained by Seller and/or Concierge in addition to other equitable and legal remedies under applicable law, all of which are reserved.

**Auction Procedures**. Subject to these Terms and Conditions (1) Concierge's verbal or written announcements made at the Auction will take precedence over all printed material or other previously made statements, (2) Concierge reserves the right to waive or modify any previously announced requirements, (3) Concierge reserves the right in its sole discretion to accept or reject any bids made before the Auction begins, and (4) the method of Auction, order of Auction, and bidding increments shall be determined by Concierge in its sole discretion, including, without limitation, Concierge's right to pause and resume bidding during the Auction. Concierge reserves the right to reject any bid that is only a minimal increase over the preceding bid, or that Concierge believes was made illegally or in bad faith. All decisions of Concierge are final as to bidding issues, cancellation or any other matters that may arise before, during or after the Auction. If Concierge perceives attempted collusion, Concierge will cancel the Auction or refuse to accept a bid. Collusion between bidders is prohibited by various applicable laws. Concierge reserves the right to deny any person admittance to the Auction or expel anyone who Concierge believes may disrupt, cause any nuisance or interfere with the Auction in any way or for any other reason in Concierge's discretion. The Auction does not begin until Concierge accepts the first bid on the Auction Start Day.

Bidder Initials _____

**Property Inspection/Due Diligence/Disclaimer**. Prior to the commencement of the Auction, it is the Bidder's sole responsibility to perform any inspections and due diligence Bidder deems pertinent to the purchase of the Property, to be satisfied as to the condition of the Property prior to bidding and to review all due diligence materials provided with respect to the Property. EACH BIDDER ASSUMES ANY AND ALL RISKS ASSOCIATED WITH ANY SUCH INSPECTION AND ITS DUE DILIGENCE ACTIVITIES. **The Property, both real and personal (if any), is being sold in its existing "AS IS, WHERE IS, WITH ALL FAULTS" condition, with no expressed or implied guarantees, representations or warranties whatsoever, unless required by law.** Personal on-site inspection of the Property is strongly recommended, and you are advised to independently verify all information you deem important. Bidder acknowledges that he/she has reviewed the diligence materials and disclosures provided  on the applicable Property web page; however, Concierge assumes no liability for errors or omissions in these disclosures or any other property listings or advertising, promotional or publicity statements and materials which is why it is important to verify independently all such information. Although information has been obtained from resources deemed reliable, Concierge does not make any guarantee as to the accuracy of any such information.

The Property will be shown upon request made to Owner's brokers whose contact information is posted on the Property's web page. Any open houses or showings are hosted solely by third party real estate agents acting on behalf of Seller, and Concierge has no responsibility for such open houses, including but not limited to cancellations or changes in times, all of which are the sole responsibility of the third-party real estate agents.

In connection with any due diligence, inspection, visit and/or investigation of the Property by you and or any person/entity/representative acting on your behalf (the "*Inspectors*"), you and the Inspectors shall (a) ensure that the Property is kept free and clear of liens, (b) ensure that any and all damage arising from such inspection is repaired, and (c) indemnify, defend and hold Seller and Concierge harmless from all liability, claims, demands, damages and/or costs directly or indirectly arising therefrom. Inspectors shall carry, or require anyone acting on Inspector's behalf to carry, policies of liability insurance, workers' compensation and other applicable insurance with adequate limits, defending and protecting Seller and Concierge from liability for any injuries to persons or property damage occurring during any inspection of the Property.

By registering as a Bidder and bidding at the Auction, you shall be deemed to represent, warrant and agree with respect to each Property you bid on that: (a) you have reviewed all due diligence materials related to the Property, you have inspected the Property, you are familiar and satisfied with the condition of the Property and you have conducted such investigation of the Property as you deemed appropriate, (b) neither Concierge nor Seller, nor any affiliate, agent, officer, employee or representative of either of  them, has made any verbal or written representation, warranty, promise or guarantee whatsoever to you, expressed or implied, and in particular, that no such representations, warranties, guarantees, or promises have been made with respect to the condition, operation, or any other matter or thing affecting or related to the Property and/or the offering or sale of the Property, (c) you have not relied upon any representation, warranty, guarantee or promise or upon any statement made or any information provided concerning the Property, including but not limited to information made available on-line at the Website, in Auction Advertising, in the Auction brochure, or provided or made available by Concierge or by Seller, or their respective affiliates, agents, officers, employees or representatives, (d) you have made your bid after having relied solely on your own independent investigation, inspection, due diligence, analysis, appraisal and evaluation of the Property and the facts and circumstances related thereto, (e) you have actual authority to enter a bid  and to enter into the Purchase and Sale Contract, (f) you have the capacity to close the transaction pursuant to the Purchase and Sale Contract, (g) any information provided or to be provided by or on behalf of the Seller with respect to the Properties including, without limitation, all information contained on the Website, in Auction advertising, or any other printed or online materials being  made available to you by Seller and Concierge, was obtained from Seller and/or Seller's agents, and Concierge has not made any independent investigation or verification of such information, and makes no representations as to the accuracy or completeness of such information, (h) without limiting the generality of the foregoing, Concierge shall not have any obligation to disclose to any Bidder,  and shall have no liability for its failure to disclose to any Bidder, any information known to them relating to any Property except as may be required by law, and (j) Concierge is not liable or bound in any manner by any oral or written statements, representations or information pertaining to the Property, or the operation thereof, made or furnished by any real estate broker, agent, employee, or other person.

WITHOUT LIMITING ANY OTHER PROVISION OF THESE TERMS AND CONDITIONS OR THE PURCHASE AND SALE CONTRACT, ALL BIDDERS ACKNOWLEDGE AND AGREE THAT THEY ARE BIDDING FOR AND, WHEN THE HIGH BIDDER IS CONFIRMED BY CONCIERGE, WILL ACQUIRE THE PROPERTY, INCLUDING THE IMPROVEMENTS CONSTRUCTED ON THE PROPERTY AND ANY APPLIANCES AND BUILDING SYSTEMS, IN ITS "AS IS" CONDITION AS OF AUCTION DAY, WITH ALL DEFECTS, BOTH PATENT AND LATENT, AND WITH ALL FAULTS, WHETHER KNOWN OR UNKNOWN, PRESENTLY EXISTING OR THAT

MAY HEREAFTER ARISE (TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW). ALL PROSPECTIVE BIDDERS ACKNOWLEDGE AND AGREE THAT CONCIERGE HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATION, WARRANTY, PROMISE, COVENANT, AGREEMENT OR GUARANTY OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PROPERTY, INCLUDING WITHOUT LIMITATION: (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY; (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, IF ANY; (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL PURPOSES, ACTIVITIES AND USES WHICH BIDDER MAY CONDUCT THEREON; (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY; (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY; (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY; (H) THE EXISTENCE OF ANY VIEW FROM THE PROPERTY OR THAT ANY EXISTING VIEW WILL NOT BE OBSTRUCTED IN THE FUTURE; (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY, (J) THE STRUCTURAL INTEGRITY OF ANY IMPROVEMENTS ON THE PROPERTY, (K) THE CONFORMITY OF THE IMPROVEMENTS TO ANY PLANS OR SPECIFICATIONS FOR THE PROPERTY THAT MAY BE PROVIDED TO BIDDER, (L) THE CONFORMITY OF THE PROPERTY TO APPLICABLE ZONING OR BUILDING CODE REQUIREMENTS, (M) THE EXISTENCE OF SOIL INSTABILITY, PAST SOIL REPAIRS, SUSCEPTIBILITY TO LANDSLIDES, SUBSIDENCE, SUFFICIENCY OF UNDER-SHORING, SUFFICIENCY OF DRAINAGE, OR ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE LAND OR ANY BUILDINGS OR IMPROVEMENTS SITUATED THEREON, (N) WHETHER THE PROPERTY IS LOCATED IN A SPECIAL STUDIES ZONE UNDER THE PUBLIC RESOURCES CODE OR A SEISMIC HAZARDS ZONE OR A STATE FIRE RESPONSIBILITY AREA, OR A SPECIAL FLOOD HAZARD ZONE OR (O) THE PRESENCE OF TERMITES OR OTHER PESTS AND ANY DAMAGE TO THE PROPERTY AND/OR ITS IMPROVEMENTS THAT MAY HAVE OCCURRED AS A RESULT. BIDDER ACKNOWLEDGES THAT THE PROPERTY AND ITS IMPROVEMENTS MAY NOT BE  IN COMPLIANCE WITH APPLICABLE ZONING, BUILDING, HEALTH OR OTHER LAWS OR CODES, AND NEITHER SELLER, CONCIERGE NOR ANY OF ITS REPRESENTATIVES OR AGENTS HAVE OCCUPIED THE PROPERTY AND THE PROPERTY MAY NOT BE IN HABITABLE CONDITION. ALL PROSPECTIVE BIDDERS FURTHER ACKNOWLEDGE AND AGREE THAT, WITHOUT LIMITATION, SELLER AND CONCIERGE HAVE NOT MADE, DO NOT MAKE, AND SPECIFICALLY DISCLAIM ANY REPRESENTATIONS REGARDING COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT OR WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, AS DEFINED BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY REGULATIONS OR THE DISPOSAL OR EXISTENCE, IN OR ON THE PROPERTIES, OF ANY HAZARDOUS SUBSTANCE, AS DEFINED BY APPLICABLE LAW, INCLUDING THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED, AND REGULATIONS PROMULGATED THEREUNDER. EACH PROSPECTIVE BIDDER AND ANYONE CLAIMING BY, THROUGH OR UNDER THE SAME HEREBY FULLY AND IRREVOCABLY RELEASE SELLER AND CONCIERGE, AND THEIR RESPECTIVE AFFILIATES, EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS AND AGENTS, FROM ANY AND ALL CLAIMS THAT HE/SHE/IT OR THEY MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST SELLERS AND/OR CONCIERGE, AND/OR THEIR RESPECTIVE AFFILIATES, EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS AND AGENTS, FOR ANY COST, LOSS, LIABILITY, DAMAGE, EXPENSE, DEMAND, ACTION OR CAUSE OF ACTION ARISING FROM OR RELATING TO THE CONDUCT OF THE AUCTION AND/OR THE CONDITION OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO ANY CONSTRUCTION DEFECTS, ERRORS, OMISSIONS OR OTHER CONDITIONS, INCLUDING BUT NOT LIMITED TO ENVIRONMENTAL MATTERS, AFFECTING THE PROPERTY, OR ANY PORTION THEREOF. THIS RELEASE INCLUDES CLAIMS OF WHICH PROSPECTIVE BIDDER IS PRESENTLY UNAWARE OR DOES NOT PRESENTLY SUSPECT TO EXIST IN HIS/HER/ITS FAVOR WHICH, IF KNOWN BY PROSPECTIVE BIDDER, WOULD MATERIALLY AFFECT PROSPECTIVE BIDDER'S RELEASE OF SELLERS AND CONCIERGE. EACH PROSPECTIVE BIDDER  SHOULD CONSIDER THESE MATTERS WHEN REGISTERING AS A BIDDER AND BEFORE PARTICIPATING IN ANY AUCTION AND PLACING BIDS.

YOU ACKNOWLEDGE AND AGREE THAT THIS RELEASE AND DISCLAIMER IS INTENDED TO BE VERY BROAD AND YOU HEREBY WAIVE AND RELINQUISH ANY RIGHTS OR BENEFITS YOU MAY HAVE UNDER ANY STATE OR FEDERAL LAW OR LEGAL PRINCIPLE DESIGNED TO INVALIDATE RELEASES OF UNKNOWN OR UNSUSPECTED CLAIMS TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW.

Bidder Initials

Concierge is not acting in any capacity as a real estate agent or broker for any Bidder or for the Seller. **Please note the amount or rate of real estate commissions is not fixed by law. They are set by each broker individually and may be negotiable between the client and broker.**

**Conditions of Sale**. Bidder agrees and understands that any sale of the Property shall be subject to the following terms and conditions:

       a.     The Bidder shall, at the Bidder's sole expense and prior to the commencement of the Auction, obtain any and all inspections and repairs that it deems appropriate.

       b.     If for any reason, or no reason whatsoever, the Seller is unable to deliver good and marketable title to the Property to the Bidder, the Bidder's sole remedy shall be the return of any money that it has deposited toward the purchase of the Property.

       c.     The Seller is selling the Property in its "AS IS, WITH ALL FAULTS" condition or basis by warranty deed without any representations or warranties whatsoever, including, without limitation, representations or warranties as to oil and mineral rights, city or government agency notifications regarding work to be done, physical condition, compliance with state, city or federal statutes, codes, ordinances, or regulations, geological stability, zoning, suitability for improvement, and fire insurance policies to cover any improvements on the Property, nor any assurances regarding the subdividability of the Property, provided, however, that the Seller shall be required to deliver good and marketable title to the Buyer or any Back-Up Buyer.

       d.     THE BUYER'S PURCHASE OF THE PROPERTY IS A CASH TRANSACTION WITH NO CONTINGENCIES OR CONDITIONS OF ANY KIND, including, without limitation, a contingency for financing, due diligence or inspections, except that the Seller is required to (y) obtain Court approval and the entry of an order of the Court approving the sale of the Property to the Buyer that is not subject to a stay pending appeal and (z) deliver good and marketable title to the Property to the Buyer.

       e.     The sale of the Property is subject to Court approval after notice to the United States Trustee, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules, which approval will be obtained by Owner as soon as reasonably practicable after the completion of the Auction.

       f.     The Property is being sold subject to standard allocations and any and all easements, restrictions, rights and conditions of record and rights of way, against, on or regarding the Property. Title, however, is to be transferred free and clear of all liens, claims and encumbrances except those non-monetary liens and encumbrances set forth on that certain preliminary title report prepared by Chicago Title Company and dated as of November 16, 2021, a copy of which is available on the Property web page.

       g. Escrow for the sale of the Property to the Buyer or any Back-Up Buyer shall be scheduled to close on February 28, 2022.

**Dispute and Withdrawal.** Concierge may, in the event of any dispute between bidders, determine the successful bidder or re-offer the subject Property for auction. Should there be any dispute after the Auction, Concierge's record of the High Bid, the Buyer, the Second High Bid, the Back-Up Buyer, and the Purchase Price shall be conclusive to resolve the dispute. Concierge and Seller reserve the right to withdraw the Property before or at the Auction in its sole discretion and shall have no liability whatsoever for such withdrawal.

**Cancellation/Postponement**. SUBJECT TO APPROVAL BY THE COURT AND ANY REQUIRED CONSENT FROM HANKEY CAPITAL, LLC, CONCIERGE SHALL HAVE THE RIGHT TO CANCEL, POSTPONE OR RESCHEDULE THE AUCTION.

**Applicable Laws**. The respective rights and obligations of the parties with respect to these Terms and Conditions and the conduct of the Auction shall be governed, enforced and interpreted by the laws of the state of New York, without regard for conflicts of law principles, provided that any rights and obligations as between Owner and Buyer shall be construed and enforced in accordance with the laws of the State of California, without regard to conflicts of law principles.

Bidder Initials _____

**PRESS RELEASES/PROMOTION.** Each attendee of the Auction shall be deemed to have consented to the issuance of press releases and other public communications by Seller, Concierge and/or their agents regarding the Auction and the Property offered or sold at the Auction. By executing these Terms and Conditions each attendee of the Auction authorizes and consents to the recording of such attendee's participation and appearance on video tape, audio tape, film, photograph or any other medium and the exhibition or distribution of such recording without restrictions or limitation for any promotional purpose which Concierge and those acting pursuant to its authority, deem appropriate. Bidder hereby releases and discharges Concierge, its members, officers, employees, representatives and agents, from any and all claims and demands arising out of or in connection with the use of such photographs, film or tape, including but not limited to any claims for defamation or invasion of privacy or rights to publicity.

**NO WARRANTIES.** *COMPANY HEREBY DISCLAIMS ALL WARRANTIES.* COMPANY IS MAKING THE WEBSITE AVAILABLE "AS IS" WITHOUT WARRANTY OF ANY KIND. YOU ASSUME THE RISK OF ANY AND ALL DAMAGE OR LOSS FROM USE OF, OR INABILITY TO USE, THE WEBSITE OR THE SERVICES. TO THE MAXIMUM EXTENT PERMITTED BY LAW, COMPANY EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE WEBSITE, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. COMPANY DOES NOT WARRANT THAT THE WEBSITE OR THE SERVICES WILL MEET YOUR REQUIREMENTS OR THAT THE OPERATION OF THE WEBSITE OR THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE.

**INDEMNIFICATION.** Bidder shall indemnify, defend (by counsel satisfactory to Concierge) and hold harmless Concierge and its officers, employees, agents and representatives (collectively, the "***Indemnitees***"), against any claim, demand, cause of action, loss, liability, deficiency, fine, penalty, damage or expense (including reasonable attorney's fees and costs and including interest and penalties) (a "***Loss***") which any Indemnitee may suffer, incur, sustain or become subject to, as a result of or in connection with: (i) any breach by Bidder of any representation, warranty, obligation or covenant set forth in these Terms and Conditions; (ii) any breach by Bidder of any Purchase and Sale Contract; and (iii) any damage to person or property caused by Bidder in connection with the Property or the Auction.

**LIMITATION OF LIABILITY.** You agree that Concierge shall not be liable for any damages of any type or nature (whether in contract, tort or otherwise) sustained or claimed by any Bidder or any other person or entity in connection with the Auction and/or the sale of any Property and/or the failure of any party to complete the sale of any Property. Without limiting the foregoing, in no event shall Concierge's liability to any Bidder for any act or omission occurring in connection with the Auction exceed the amount that such you have actually paid to Concierge as a deposit or as payment for a particular Property. Offers made at the Auction are void where prohibited by law. IN NO EVENT WILL CONCIERGE BE LIABLE FOR ANY DAMAGES INCLUDING, WITHOUT LIMITATION, ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES, LOSSES RELATED TO BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION OR LOST PROFITS ARISING OUT OF OR IN CONNECTION WITH THE SALE OF THE PROPERTY OR THE AUCTION, OR OUT OF ANY BREACH OF WARRANTY, EVEN IF CONCIERGE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. This limitation shall apply regardless of whether the damages arise out of breach of contract, tort, or any other legal theory or form of action.

**Limitation on Time to File Claims.** ANY CAUSE OF ACTION OR CLAIM YOU MAY HAVE ARISING OUT OF OR RELATING TO THESE TERMS AND CONDITIONS, THE WEBWEBSITE OR AN AUCTION MUST BE COMMENCED WITHIN ONE (1) YEAR AFTER THE CAUSE OF ACTION ACCRUES, OTHERWISE, SUCH CAUSE OF ACTION OR CLAIM IS PERMANENTLY BARRED.

**NOT AN OFFER TO SELL; SOLICITATION ONLY.** Any information on any website, in any brochure, e-mail or postcard and any and all information available regarding the Properties shall not constitute an offer to sell or a solicitation of any offer to buy any Property. In addition, and without limiting the foregoing, any website, advertisement or brochure shall not constitute an offer to sell  or a solicitation of any offer to buy nor shall there be any Auction of any Property in any state in which such offer, solicitation, or Auction would be unlawful. Offers made at the Auction are void where prohibited by law.

**LICENSING.** For information about Concierge's licensing and bonding, please contact Concierge.

**THIRD PARTIES**. Concierge and/or Seller may provide and/or designate certain third parties to provide ancillary services in connection with a Property Auction and/or links to the websites or products or services of others ("***Third-Party Services***"). Concierge and Seller have no control over, and no liability for any such Third-Party Services. Any such designations do not constitute an endorsement by Concierge or Seller of such third-party service providers, or the products, or services of such third parties. These third parties operate independently of Concierge and Seller and have established their own terms and conditions and policies. Bidder acknowledges and agrees that Concierge and Seller are not responsible for any damages or losses caused or alleged to have been caused by the use of any Third-Party Services.

**SEVERABILITY; WAIVER**. If any provision of these Terms and Conditions is held by a court of competent jurisdiction to be invalid or unenforceable, then such provision shall be enforced to the maximum extent permissible to affect the intent of these Terms and Conditions, and the remainder of these Terms and Conditions shall continue in full force and effect. No waiver of any breach of any provision of these Terms and Conditions shall constitute a waiver of any prior, concurrent, or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving party.

**ENTIRE AGREEMENT**. These Terms and Conditions, together with any additional terms and conditions specific to a particular auction (which are incorporated herein by reference and can be found through one or more links on the detail page for the auction in question), constitute the entire agreement between Concierge and Bidder regarding its subject matter and supersede and replace any and all prior or contemporaneous agreements between the parties regarding such subject matter.

**ARBITRATION; VENUE; PREVAILING PARTY**. The parties agree to submit all controversies, disputes, claims and matters of difference arising out of or relating to these Terms and Conditions, including but not limited to its enforcement, scope and/or interpretation, exclusively to arbitration in New York, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association from time to time in effect (the "***Arbitration Rules***"). The parties may agree on a retired judge as sole arbitrator. In the absence of such agreement, there will be three arbitrators, selected in accordance with the Arbitration Rules. If there are three arbitrators, a decision reached by at least two of the three arbitrators will be the decision of the arbitration panel. The parties agree to abide by all decisions reached and awards rendered in such arbitration proceedings, and all such decisions and awards will be final and binding on both parties. Judgment upon the award may be entered in any court of competent jurisdiction or application may be made to such court for a judicial acceptance of the award and an order of enforcement. By bidding at an auction, whether present in person, or by agent, by proxy, by written bid, telephone bid, internet bid, or other means, the Bidder shall be deemed to consent to the jurisdiction of the state and federal courts located in the County of New York, State of New York (and of the appropriate appellate courts therefrom) in any such action or proceeding (including an action to compel arbitration) and waives any objection to venue. Process in any action or proceeding may be served personally or by registered mail anywhere in the world. In the event of any such arbitration or any permitted court action, the prevailing party shall be entitled to reimbursement from the non- prevailing party of all reasonable attorney's fees and costs/expenses of the prevailing party and any award of the arbitrator(s) or court will include costs and reasonable attorneys' fees to the prevailing party. If any Party files a court action arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, to compel or stay arbitration, or to confirm, vacate or modify an arbitration award (except for a non-contested application to confirm), or to seek payment of any attorneys' fees and/or costs awarded by the arbitrator(s) but not paid by the non-prevailing party in the arbitration, or in the event any Party seeks enforcement of any arbitration award or judgment arising out of an arbitration award, reasonable attorney's fees and other costs incurred by the prevailing Party in such court action or  in connection with such judgment enforcement shall be reimbursed by the non-prevailing Party. THE PARTIES UNDERSTAND THAT, ABSENT THIS AGREEMENT, THEY WOULD HAVE THE RIGHT TO SUE EACH OTHER IN COURT, AND THE RIGHT TO A JURY TRIAL, BUT THEY GIVE UP THOSE RIGHTS VOLUNTARILY AND AGREE TO RESOLVE ANY AND ALL GRIEVANCES BY ARBITRATION.  Notwithstanding the foregoing, in the event there is a controversy, dispute, claim or matter of difference arising between (1) Owner and Concierge, or (2) Owner and any Bidder, Buyer, or Back-up Buyer relating to the Terms and Conditions, the conduct of the auction, and the sale of the Property pursuant to the Purchase and Sale Contract, the parties agree (1) to submit all such controversies, disputes, claims and matters of difference arising as a core proceeding exclusively in the Court and agree to submit to personal jurisdiction in the Court, sitting without a jury, which is expressly waived and (2) in the event of any such Court action, the prevailing party shall be entitled to reimbursement from the non-prevailing party of all reasonable attorney's fees and costs/expenses of the prevailing party and any award of the Court will include costs and reasonable attorneys' fees to the prevailing party.

Bidder Initials

**Intellectual Property Rights**. The Website and its entire contents, features and functionality (including all information, software, text, displays, images, video and audio, and the design, selection and arrangement thereof), are owned by the Company, its licensors  or other providers of such material and are protected by United States and international copyright, trademark, patent, trade secret and other intellectual property or proprietary rights laws.

These Terms and Conditions permit you to use the Website for your personal, noncommercial use only. You must not reproduce, distribute, modify, create derivative works of, publicly display, publicly perform, republish, download, store or transmit any of the material on our Website, except as follows:

☐    Your computer may temporarily store copies of such materials in RAM incidental to your accessing and viewing those materials.

☐    You may store files that are automatically cached by your Web browser for display enhancement purposes.

☐    You may print or download one copy of a reasonable number of pages of the Website for your own personal, noncommercial use and not for further reproduction, publication or distribution.

☐    If we provide desktop, mobile or other applications for download, you may download a single copy to your computer or mobile device solely for your own personal, noncommercial use, provided you agree to be bound by our end user license agreement for such applications.

☐    If we provide social media features with certain content, you may take such actions as are enabled by such features.

You must not:

☐    Modify copies of any materials from this site.

☐    Use any illustrations, photographs, video or audio sequences or any graphics separately from the accompanying text.

☐    Delete or alter any copyright, trademark or other proprietary rights notices from copies of materials from this site.

☐    Access or use for any commercial purposes any part of the Website or any services or materials available through the Website.

If you print, copy, modify, download or otherwise use or provide any other person with access to any part of the Website in breach of the Terms and Conditions, your right to use the Website will cease immediately and you must, at our option, return or destroy any copies of the materials you have made. No right, title or interest in or to the Website or any content on the Website is transferred to you, and all rights not expressly granted are reserved by the Company. Any use of the Website not expressly permitted by these Terms and Conditions is a breach of these Terms and Conditions and may violate copyright, trademark and other laws.

**Trademarks**. The Company name and its logos and all related names, logos, product and service names, designs and slogans are trademarks of the Company or its affiliates or licensors. You must not use such marks without the prior written permission of the Company. All other names, logos, product and service names, designs and slogans on this Website are the trademarks of their respective owners. Copyright Policy.

**Prohibited Uses**. You may use the Website only for lawful purposes and in accordance with these Terms and Conditions. You agree not to use the Website:

☐    In any way that violates any applicable federal, state, local or international law or regulation (including any laws regarding the export of data or software to and from the US or other countries).

☐    For the purpose of exploiting, harming or attempting to exploit or harm minors in any way by exposing them to inappropriate content, asking for personally identifiable information or otherwise.

☐    To transmit, or procure the sending of, any advertising or promotional material, including any "junk mail," "chain letter" or "spam" or any other similar solicitation.

☐    To impersonate or attempt to impersonate the Company, a Company employee, another user or any other person or entity (including by using email addresses or screen names associated with any of the foregoing).

☐    To engage in any other conduct that restricts or inhibits anyone's use or enjoyment of the

Bidder Initials

Website, or which, as determined by us, may harm the Company or users of the Website or expose them to liability.

Additionally, you agree not to:

☐       Use the Website in any manner that could disable, overburden, damage or impair the site or interfere with any other party's use of the Website, including their ability to engage in real time activities through the Website.

☐       Use any robot, spider or other automatic device, process or means to access the Website for any purpose, including monitoring or copying any of the material on the Website.

☐       Use any manual process to monitor or copy any of the material on the Website or for any other unauthorized purpose without our prior written consent.

☐       Use any device, software or routine that interferes with the proper working of the Website.

☐       Introduce any viruses, trojan horses, worms, logic bombs or other material that is malicious or technologically harmful.

☐       Attempt to gain unauthorized access to, interfere with, damage or disrupt any parts of the Website, the server on which the Website is stored, or any server, computer or database connected to the Website.

☐       Attack the Website via a denial-of-service attack or a distributed denial-of-service attack.

☐       Otherwise attempt to interfere with the proper working of the Website.

Concierge reserves the right to terminate your use of the Services and/or the Website. To ensure that Concierge provides a high quality experience for you and for other users of the Website and the Services, you agree that Concierge or its representatives may access your account and records on a case-by-case basis to investigate complaints or allegations of abuse, infringement of third party rights, or other unauthorized uses of the Website or the Services. Concierge does not intend to disclose the existence or occurrence of such an investigation unless required by law, but Concierge reserves the right to terminate your account or your access to the Website immediately, with or without notice to you, and without liability to you, if Concierge believes that you have violated any of the Terms of Use, furnished Concierge with false or misleading information, or interfered with use of the Website or the Services by others.

**Reliance on Information Posted**. The information presented on or through the Website is made available solely for general information purposes. We do not warrant the accuracy, completeness or usefulness of this information. Any reliance you place on such information is strictly at your own risk. We disclaim all liability and responsibility arising from any reliance placed on or use of such materials by you or any other visitor to the Website, or by anyone who may be informed of any of its contents.

This Website may include content provided by third parties, including materials provided by other users, bloggers and third-party licensors, syndicators, aggregators and/or reporting services. All statements and/or opinions expressed in these materials, and all articles and responses to questions and other content, other than the content provided by the Company, are solely the opinions and the responsibility of the person or entity providing those materials. These materials do not necessarily reflect the opinion of the Company. We are not responsible, or liable to you or any third party, for the content or accuracy of any materials provided by any third parties.

**Changes to the Website**. We may update the content on this Website from time to time, but its content is not necessarily complete or up to date. Any of the material on the Website may be out of date at any given time, and we are under no obligation to update such material.

**Information About You and Your Visits to the Website**. All information we collect on this Website is subject to our Privacy Policy. By using the Website, you consent to all actions taken by us with respect to your information in compliance with the Privacy Policy.

**Force Majeure**. We will not be liable or responsible to you, nor be deemed to have defaulted or breached these Terms and Conditions, for any failure or delay in our performance under these Terms and Conditions when and to the extent such failure or delay is caused by or results from acts or circumstances beyond our reasonable control, including, without limitation, acts of God, flood, fire, earthquake, explosion, governmental actions, war, invasion or hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest, national emergency, revolution, insurrection, epidemic, pandemic, lockouts, strikes or other labor disputes (whether or not relating to our workforce), or restraints or delays affecting carriers or inability or delay in obtaining supplies of adequate or suitable materials, materials or telecommunication breakdown or power outage.

**Linking to the Website and Social Media Features**. You may link to our homepage, provided you do so in a way that is

Bidder Initials

fair and legal and does not damage our reputation or take advantage of it, but you must not establish a link in such a way as to suggest any form of association, approval or endorsement on our part.

This Website may provide certain social media features that enable you to:

☐    Link from your own or certain third-party websites to certain content on this Website.

☐    Send emails or other communications with certain content, or links to certain content, on this Website.

☐    Cause limited portions of content on this Website to be displayed or appear to be displayed on your own or certain third-party websites.

You may use these features solely as they are provided by us solely with respect to the content they are displayed with and otherwise in accordance with any additional terms and conditions we provide with respect to such features. Subject to the foregoing, you must not:

☐    Establish a link from any website that is not owned by you.

☐    Cause the Website or portions of it to be displayed, or appear to be displayed by, for example, framing, deep linking or in- line linking, on any other site.

☐    Link to any part of the Website other than the homepage.

☐    Otherwise take any action with respect to the materials on this Website that is inconsistent with any other provision of these Terms and Conditions.

The website from which you are linking, or on which you make certain content accessible, must comply in all respects with these Terms and Conditions. You agree to cooperate with us in causing any unauthorized framing or linking immediately to cease. We reserve the right to withdraw linking permission without notice. We may disable all or any social media features and any links at any time without notice in our discretion.

## Links from the Website

If the Website contains links to other sites and resources provided by third parties, these links are provided for your convenience only. This includes links contained in advertisements, including banner advertisements and sponsored links. We have no control over the contents of those sites or resources, and accept no responsibility for them or for any loss or damage that may arise from your use of them. If you decide to access any of the third-party websites linked to this Website, you do so entirely at your own risk and subject to the terms and conditions of use for such websites.

_____          _____
Bidder Signature                                                              Date

Bidder Initials

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 2818 La Cienega Avenue, Los Angeles, CA 90034.

A true and correct copy of the foregoing document entitled **ERRATA TO APPLICATION OF DEBTOR AND DEBTOR IN POSSESSION TO: (1) EMPLOY THE BEVERLY HILLS ESTATES AND COMPASS AS REAL ESTATE BROKERS PURSUANT TO 11 U.S.C § 327(a), WITH COMPENSATION DETERMINED PURSUANT TO 11 U.S.C. § 328, (2) EMPLOY CONCIERGE AUCTIONS, LLC AS AUCTIONEER PURSUANT TO 11 U.S.C § 327(a), WITH COMPENSATION DETERMINED PURSUANT TO 11 U.S.C. § 328, AND (3) APPROVE THE PAYMENT OF COMPENSATION TO REAL ESTATE BROKERS AND AUCTIONEER FROM ESCROW UPON CLOSING** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 16, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Kyra E Andrassy**    kandrassy@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- **Todd M Arnold**    tma@lnbyg.com
- **Jerrold L Bregman**    jbregman@bg.law, ecf@bg.law
- **Marguerite Lee DeVoll**    mdevoll@watttieder.com
- **Thomas M Geher**    tmg@jmbm.com, bt@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com
- **David B Golubchik**    dbg@lnbyg.com, stephanie@lnbyb.com
- **James Andrew Hinds**    jhinds@hindslawgroup.com;mduran@hindslawgroup.com, mduran@hindslawgroup.com
- **Robert B Kaplan**    rbk@jmbm.com
- **Jane G Kearl**    jkearl@watttieder.com
- **Jennifer Larkin Kneeland**    jkneeland@watttieder.com
- **Michael S Kogan**    mkogan@koganlawfirm.com
- **Noreen A Madoyan**    Noreen.Madoyan@usdoj.gov
- **Ryan D O'Dea**    rodea@shulmanbastian.com, lgauthier@shulmanbastian.com
- **Sharon Oh-Kubisch**    sokubisch@swelawfirm.com, gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com
- **Ronald N Richards**    ron@ronaldrichards.com, morani@ronaldrichards.com
- **Victor A Sahn**    vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com
- **David Seror**    dseror@bg.law, ecf@bg.law
- **Zev Shechtman**    zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com
- **Lindsey L Smith**    lls@lnbyb.com, lls@ecf.inforuptcy.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Jessica Wellington**    jwellington@bg.law, ecf@bg.law

**2.  SERVED BY UNITED STATES MAIL**: On **December 16, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                               **F 9013-3.1.PROOF.SERVICE**

1

2
Debtor
Crestlloyd, LLC
c/o SierraConstellation Partners LLC
3
355 S. Grand Avenue Suite 1450
Los Angeles, CA 90071

4
☐ Service information continued on attached page

5
**3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR
6
EMOVE** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR,
~~EMAIL~~ (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR,
on **December 16, 2021**, I served the following persons and/or entities by personal delivery, overnight
7
mail service, or (for those who consented in writing to such service method), by facsimile transmission
and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or
8
overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

9
☐ Service information continued on attached page

10
I declare under penalty of perjury under the laws of the United States of America that the foregoing is
true and correct.

11
| December 16, 2021 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
12
| Date | Type Name | Signature |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1  DAVID B. GOLUBCHIK (State Bar No. 185520)
   TODD M. ARNOLD (State Bar No. 221868)
2  LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3  2818 La Cienega Avenue
   Los Angeles, California 90034
4  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
5  Email: dbg@lnbyg.com; tma@lnbyg.com

6
   Attorneys for Debtor and Debtor in Possession
7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                **LOS ANGELES DIVISION**

11

12  In re:                                    Case No.: 2:21-bk-18205-DS

13  CRESTLLOYD, LLC,                          Chapter 11 Case

14          Debtor and Debtor in Possession.

15                                            **SUPPLEMENTAL DECLARATION OF
                                              LAWRENCE R. PERKINS IN SUPPORT OF**
16                                            **APPLICATION OF DEBTOR AND DEBTOR
                                              IN POSSESSION TO: (1) EMPLOY THE**
17                                            **BEVERLY HILLS ESTATES AND COMPASS
                                              AS REAL ESTATE BROKERS PURSUANT TO**
18                                            **11 U.S.C § 327(a), WITH COMPENSATION
                                              DETERMINED PURSUANT TO 11 U.S.C. §**
19                                            **328, (2) EMPLOY CONCIERGE AUCTIONS,
                                              LLC AS AUCTIONEER PURSUANT TO 11**
20                                            **U.S.C § 327(a), WITH COMPENSATION
                                              DETERMINED PURSUANT TO 11 U.S.C. §**
21                                            **328, AND (3) APPROVE THE PAYMENT OF
                                              COMPENSATION TO REAL ESTATE**
22                                            **BROKERS AND AUCTIONEER FROM
                                              ESCROW UPON CLOSING**
23

24

25                                            [No hearing required unless requested per L.B.R.
                                              2014-1(b)]
26

27

28

                              1

1       I, LAWRENCE R. PERKINS, hereby declare as follows:

2       1.     I am over 18 years of age.  I have personal knowledge of the facts set forth below

3 and, if called to testify, would and could competently testify thereto.

4       2.     I am the Founder and Chief Executive Officer of SierraConstellation Partners LLC

5 ("SCP") and have nearly 20 years of management consulting and advisory experience with

6 companies undergoing transition. I have enhanced business performance for numerous companies on

7 projects ranging from interim management, profit improvement and working capital management to

8 strategic planning and transaction execution.

9       3.     I have served in a variety of senior level positions including Financial Advisor,

10 Strategic Consultant, Investment Banker, Financial Executive, and Crisis Manager to numerous

11 middle market companies and believe that I am particularly skilled at assisting clients through

12 challenging situations.

13       4.     Prior to founding SCP, I was a Senior Managing Director and Regional Leader of

14 a national consulting firm where he was responsible for business development, marketing, staffing,

15 and general management of the firm's western region. I joined the firm in 2010 when it acquired El

16 Molino Advisors, a company I founded in January 2007 and led as the CEO.

17       5.     I began my career in the strategic consulting group of Arthur Andersen after

18 graduating from the University of Southern California Marshall School of Business. I am currently on

19 the board of several non-profits, and two corporate boards, and am a member of the Young Presidents

20 Organization.

21       6.     SCP is the current Non-Member Manager of the Debtor.

22       7.     I make this Declaration in support of the Application Of Debtor And Debtor In

23 Possession To: (1) Employ The Beverly Hills Estates And Compass As Real Estate Brokers Pursuant

24 To 11 U.S.C § 327(A), With Compensation Determined Pursuant To 11 U.S.C. § 328, (2) Employ

25 Concierge Auctions, LLC As Auctioneer Pursuant To 11 U.S.C § 327(a), With Compensation

26 Determined Pursuant To 11 U.S.C. § 328, and (3) Approve The Payment Of Compensation To Real

27 Estate Brokers And Auctioneer From Escrow Upon Closing (the "Application").

28

8.    Upon filing the Application, the Debtor was contacted by the Office of the U.S. Trustee ("OUST") to clarify certain provisions of the Application with respect to the sliding scale of commissions to be paid to the Debtor's proposed brokers in connection with the marketing and sale of the Debtor's real property.  Based on such inquiry, I contacted the brokers and confirmed the terms which are clarified hereinbelow.

9.    As set forth in the Application, the following commission structure applies to the Brokers, as that term is defined in the Application:

a.    1% of sale price up to $175 million (plus 1% payable to any buyer broker);

b.    1.5% of sale price over $175 million and up to $200 million (plus 1% payable to any buyer broker); and

c.    2.0% of sale price over $200 million (plus 1% payable to any buyer broker).

10.    To clarify the terms, as inquired by the OUST, the increased commission applies to the incremental value of the sale price of the Property and not to the entire sale price.  For example, if the property is sold for $290 million, the Broker's commission will be as follows:

a.    1% on $175 million, which equates to $1,750,000; plus

b.    1.5% on $25 million ($200 million less $175 million), which equates to $375,000; plus

c.    2% on $90 million ($290 million less $200 million), which equates to $1,800,000.

11.    Based on the foregoing, in the event of a sale price of $290 million, the Broker's commission for the listing Brokers will be $3,925,000.

12.    The OUST also sought a clarification with respect to the commission to be received by the Auctioneer, as that term is defined in the Application.

13.    As set forth in the Application, any Buyer, as that term is defined in the Application, shall pay a Buyer's Premium, as that term is defined in the Application, equal to 12% of the bidder's purchase price. The Application further provides that (a) if the purchase price is equal to or less than $225,000,000.00, the Rebate, as that term is defined in the Application, to Debtor will be

3

an amount equal to 9.5% of the Buyer's Premium that the Auctioneer actually collects, (b) if the purchase price is greater than $225,000,000.00 but less than $275,000,000.00, the Rebate will be an amount equal to 9.0% of the Buyer's Premium that the Auctioneer actually collects, and (c) if the purchase price is equal to or greater than $275,000,000.00, the Rebate will be an amount equal to 8.5% of the Buyer's Premium that the Auctioneer actually collects.

14.    The foregoing sliding scale for the credit applies to the incremental value of the sale price.  For example, if the sale price is $290 million, the credit to Debtor shall be computed as follows:

    a.    9.5% of $225 million, which equates to $21,375,000; plus

    b.    9.0% of $50 million ($275 million less $225 million), which equates to $4,500,000; plus

    c.    8.5% of $15 million ($290 million less $275 million), which equates to $1,275,000.

15.    Based on the foregoing, in the event of a sale price of $290 million, the Auctioneer will charge a Buyer's Premium of $34,800,000 (12% of $290 million) and provide to the Debtor a credit of $27,150,000, thereby resulting in net compensation to Auctioneer of $7,650,000.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this ___ day of December 2021, at Los Angeles, California.

_____
LAWRENCE R. PERKINS

4

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **SUPPLEMENTAL DECLARATION OF LAWRENCE R. PERKINS IN SUPPORT OF APPLICATION OF DEBTOR AND DEBTOR IN POSSESSION TO: (1) EMPLOY THE BEVERLY HILLS ESTATES AND COMPASS AS REAL ESTATE BROKERS PURSUANT TO 11 U.S.C § 327(a), WITH COMPENSATION DETERMINED PURSUANT TO 11 U.S.C. § 328, (2) EMPLOY CONCIERGE AUCTIONS, LLC AS AUCTIONEER PURSUANT TO 11 U.S.C § 327(a), WITH COMPENSATION DETERMINED PURSUANT TO 11 U.S.C. § 328, AND (3) APPROVE THE PAYMENT OF COMPENSATION TO REAL ESTATE BROKERS AND AUCTIONEER FROM ESCROW UPON CLOSING** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 21, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Kyra E Andrassy** kandrassy@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- **Todd M Arnold** tma@lnbyg.com
- **Jerrold L Bregman** jbregman@bg.law, ecf@bg.law
- **Marguerite Lee DeVoll** mdevoll@watttieder.com
- **Thomas M Geher** tmg@jmbm.com, bt@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com
- **David B Golubchik** dbg@lnbyg.com, stephanie@lnbyb.com
- **James Andrew Hinds** jhinds@hindslawgroup.com;mduran@hindslawgroup.com, mduran@hindslawgroup.com
- **Robert B Kaplan** rbk@jmbm.com
- **Jane G Kearl** jkearl@watttieder.com
- **Jennifer Larkin Kneeland** jkneeland@watttieder.com
- **Michael S Kogan** mkogan@koganlawfirm.com
- **Noreen A Madoyan** Noreen.Madoyan@usdoj.gov
- **Ryan D O'Dea** rodea@shulmanbastian.com, lgauthier@shulmanbastian.com
- **Sharon Oh-Kubisch** sokubisch@swelawfirm.com, gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com
- **Ronald N Richards** ron@ronaldrichards.com, morani@ronaldrichards.com
- **Victor A Sahn** vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com
- **David Seror** dseror@bg.law, ecf@bg.law
- **Zev Shechtman** zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com
- **Lindsey L Smith** lls@lnbyb.com, lls@ecf.inforuptcy.com
- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov
- **Jessica Wellington** jwellington@bg.law, ecf@bg.law

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

1  2. **SERVED BY UNITED STATES MAIL**: On **December 21, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true

2  and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be

3  completed no later than 24 hours after the document is filed.
*None.*

4
☐  *Service information continued on attached page*

5

6  3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served):**  Pursuant to F.R.Civ.P. 5 and/or controlling LBR,

7  on **December 21, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission

8  and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

9

10  None.

11

12  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

13  December 21, 2021          Stephanie Reichert                    */s/ Stephanie Reichert*

14  *Date*                          *Type Name*                        *Signature*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 2818 La Cienega Avenue, Los Angeles, CA 90034.

A true and correct copy of the foregoing document entitled **DECLARATION THAT NO PARTY REQUESTED A HEARING ON MOTION** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **January 4, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Kyra E Andrassy    kandrassy@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com**
- **Todd M Arnold    tma@lnbyg.com**
- **Jerrold L Bregman    jbregman@bg.law, ecf@bg.law**
- **Marguerite Lee DeVoll    mdevoll@watttieder.com**
- **Thomas M Geher    tmg@jmbm.com, bt@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com**
- **David B Golubchik    dbg@lnbyg.com, stephanie@lnbyb.com**
- **James Andrew Hinds    jhinds@hindslawgroup.com;mduran@hindslawgroup.com, mduran@hindslawgroup.com**
- **Robert B Kaplan    rbk@jmbm.com**
- **Jane G Kearl    jkearl@watttieder.com**
- **Jennifer Larkin Kneeland    jkneeland@watttieder.com**
- **Michael S Kogan    mkogan@koganlawfirm.com**
- **Noreen A Madoyan    Noreen.Madoyan@usdoj.gov**
- **Ryan D O'Dea    rodea@shulmanbastian.com, lgauthier@shulmanbastian.com**
- **Sharon Oh-Kubisch    sokubisch@swelawfirm.com, gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com**
- **Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com**
- **Victor A Sahn    vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com**
- **David Seror    dseror@bg.law, ecf@bg.law**
- **Zev Shechtman    zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com**
- **Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Jessica Wellington    jwellington@bg.law, ecf@bg.law**

**2.  SERVED BY UNITED STATES MAIL**: On **January 4, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **January 4, 2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**

1  email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight
   mail to, the judge will be completed no later than 24 hours after the document is filed.

2
                                            ☐ Service information continued on attached page

3
   I declare under penalty of perjury under the laws of the United States of America that the foregoing is
4  true and correct.

5   January 4, 2022              Lourdes Cruz              /s/ Lourdes Cruz
    Date                         Type Name                 Signature

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                    **F 9013-3.1.PROOF.SERVICE**