DAVID B. GOLUBCHIK (State Bar No. 185520)
TODD M. ARNOLD (State Bar No. 221868)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dbg@lnbyg.com; tma@lnbyg.com

Attorneys for Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>CRESTLLOYD, LLC,<br><br>     Debtor and Debtor in Possession. | Case No.: 2:21-bk-18205-DS<br><br>Chapter 11 Case<br><br>**DEBTOR'S MOTION FOR AN ORDER:**<br>**(1)    APPROVING THE SALE OF THE DEBTOR'S REAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, WITH THE EXCEPTION OF ENUMERATED EXCLUSIONS;**<br>**(2)    FINDING THAT THE BUYER IS A GOOD FAITH PURCHASER;**<br>**(3)    AUTHORIZING AND APPROVING THE PAYMENT OF CERTAIN CLAIMS FROM SALE PROCEEDS;**<br>**(4)    WAIVING THE FOURTEEN-DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULE 6004(h); AND**<br>**(5)    PROVIDING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF**<br><br>Hearing:<br>  Date:     March 18, 2022<br>  Time:    11:00 a.m.<br>  Place:   Courtroom 1639<br>           255 E. Temple St.<br>           Los Angeles, CA 90012<br>           **VIA ZOOMGOV ONLY** |

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 5

I. STATEMENT OF FACTS ........................................................................................................ 5

    A.    GENERAL BACKGROUND. ....................................................................................... 5

    B.    THE DEBTOR'S REAL PROPERTY. .......................................................................... 5

    C.    ALLEGED CLAIMS PURPORTEDLY SECURED BY THE PROPERTY AND OTHER CLAIMS. ................................................................................................................ 6

    D.    THE REASON FOR FILING BANKRUPTCY AND EXIT STRATEGY................ 17

    E.    EFFORTS IN FURTHERANCE OF THE DEBTOR'S EXIT STRATEGY. ............ 18

    F.    THE MARKETING OF THE PROPERTY AND THE AUCTION.......................... 19

    G.    THE PROPOSED SALE. .............................................................................................. 20

II. LEGAL ARGUMENT ........................................................................................................... 23

    A.    THE COURT SHOULD APPROVE THE SALE OF THE PROPERTY TO THE BUYER OR TO OVERBIDDER APPROVED BY THE COURT. ......................................... 23

        1.    THE DEBTOR HAS OR WILL HAVE COMPLIED WITH ALL APPLICABLE NOTICE REQUIREMENTS. ................................................................................................ 23

        2.    THE SALE OF THE PROPERTY TO THE BUYER OR TO ANY WINNING OVERBIDDER APPROVED BY THE COURT SHOULD BE APPROVED, BECAUSE GOOD BUSINESS REASONS FOR THE SALE EXIST, THE PURCHASE PRICE FOR THE PROPERTY IS FAIR AND REASONABLE, AND THE PROPOSED SALE IS IN THE BEST INTERESTS OF THE ESTATE AND ITS CREDITORS. .............................. 24

    B.    THE COURT SHOULD APPROVE THE SALE OF THE PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, OTHER THAN THE EXCEPTED ITEMS, TO THE BUYER OR ANY WINNING OVERBIDDER APPROVED BY THE COURT. .......................................................................................... 28

        1.    APPLICABLE STANDARDS. ................................................................................. 28

        2.    THE COURT SHOULD APPROVE THE SALE OF THE PROPERTY FREE AND CLEAR OF THE NON-EXCEPTED ITEMS IN THE TITLE REPORT TO THE BUYER OR ANY WINNING OVERBIDDER APPROVED BY THE COURT. ........................... 29

    C.    THE COURT SHOULD APPROVE THE PAYMENT OF CERTAIN CLAIMS FROM SALE PROCEEDS UPON THE CLOSE OF THE SALE OF THE PROPERTY AND ANY SALE OF THE FURNITURE. ................................................................................................ 34

    D.    THE COURT SHOULD WAIVE THE 14-DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULES 6004(h). ............................................................................................ 35

III. CONCLUSION ...................................................................................................................... 36

i

DECLARATION OF LAWRENCE R. PERKINS.............................................................................. 37

DECLARATION OF CHAD ROFFERS ........................................................................................ 57

DECLARATION OF BRANDEN WILLIAMS............................................................................... 59

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Federal Cases**

4

*In re Abbotts Dairies*,
    788 F.2d at 149 ............................................................................................... 27

5

*In re Alpha Industries, Inc.*,
    84 B.R. 703 (Bankr. Mont. 1988) .................................................................. 26

6

*Big Shanty Land Corp. v. Comer Properties, Inc.*,
    61 B.R. 272 (Bankr. N.D. Ga. 1985) ............................................................ 26

7

8

*In re Canyon Partnership*,
    55 B.R. 520 (Bankr. S.D. Cal. 1985) ............................................................ 26

9

10

*Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*,
    94 B.R. 343 (Bankr. E.D. Pa. 1988) ............................................................. 29

11

*Clear Channel Out-door, Inc. v. Knupfer (In re PW, LLC)*,
    391 B.R. 25 (B.A.P. 9th Cir. 2008) .......................................................... 31, 32

12

13

*In re Daewoo Motor Am., Inc.*,
    471 B.R. 721 (C.D. Cal. 2012), aff'd, 554 F. App'x 638 (9th Cir. 2014) ............................. 17

14

*In re Daufuskie Island Props., LLC*,
    431 B.R. 626 (Bankr. D.S.C. 2010) .............................................................. 30

15

16

*In re Ex-Cel Concrete Company, Inc.*,
    178 B.R. 198 (B.A.P. 9th Cir. 1995) ............................................................. 29

17

18

*In re Fitness Holdings Int'l, Inc.*,
    714 F.3d 1141 (9th Cir. 2013) ....................................................................... 17

19

*In re Gabel*,
    61 B.R. 661 (Bankr. W.D. La. 1985) ........................................................... 29

20

21

*In re Gerwer*,
    898 F.2d 730 (9th Cir. 1990) ......................................................................... 28

22

23

*In re Grand Slam, U.S.A. Inc.*,
    178 B.R. 460 (E.D. Mich. 1995) ................................................................... 33

24

*In re Gulf States Steel, Inc. of Alabama*,
    285 B.R. 497 (Bankr. N.D. Ala. 2002) ......................................................... 33

25

26

*Higgins v. Vortex Fishing Systems, Inc. (In re Vortex Fishing Sys., Inc.)*,
    277 F.3d 1057 (9th Cir. 2002) ....................................................................... 30

27

28

*In re Hunt Energy Co., Inc.*,
  48 B.R. 472 (Bankr. N.D. Ohio, 1985) .................................................................. 34

*In re Karpe*,
  84 B.R. 926 (Bankr. M.D.Pa. 1988) ....................................................................... 28

*In re Kellogg-Taxe*,
  2014 WL 1016045 (Bankr. C.D. Cal. Mar.17, 2014) ............................................. 30

*In re L. Scott Apparel, Inc.*,
  615 B.R. 881 (C.D. Cal. 2020), appeal dismissed, No. 20-55507, 2020 WL
  6482082 (9th Cir. Aug. 12, 2020) .......................................................................... 17

*In re Lionel Corp.*,
  722 F.2d 1063 (2d Cir. 1983) .................................................................................. 24

*In re Mama's Original Foods, Inc.*,
  234 B.R. 500 (C.D. Cal. 1999) ................................................................................ 25

*Mutual Life Ins. Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms,
  Inc.)*,
  36 B.R. 856 (Bankr. W.D. Mo. 1984) ..................................................................... 29

*In re Paddlewheels, Inc.*,
  2007 WL 1035151 (Bankr. E.D.La. April 2, 2007) ............................................... 29

*In re Perroncello*,
  170 B.R. 189 (Bankr. D. Mass. 1994) ..................................................................... 33

*In re Sandy Ridge Dev. Corp.*,
  881 F.2d 1346 (5th Cir.1989) .................................................................................. 34

*Scherer v. Federal National Mortgage Association (In re Terrace Chalet
  Apartments, LTD.)*,
  159 B.R. ................................................................................................................... 33

*SEC v. Capital Cove Bancorp LLC*,
  2015 WL 9701154 (C.D. Cal. Oct.13, 2015) ......................................................... 30

*In re The Landing*,
  156 B.R. 246 (Bankr. E.D. Mo. 1993) .................................................................... 25

*Walter v. Sunwest Bank (In re Walter)*,
  83 B.R. 14 (B.A.P. 9th Cir. 1988) ........................................................................... 25

*In re Wilde Horse Enterprises, Inc.*,
  136 B.R. 830 (Bankr. C.D. Cal. 1991) ........................................................ 25, 26, 27

**California Cases**

*Bank of Am. v. Graves,*
  51 Cal. App. 4th 607, 59 Cal. Rptr. 2d 288 (1996) ................................................................. 33

*FPCI RE-HAB 01 v. E & G Investments, Ltd.,*
  207 Cal. App. 3d 1018, 255 Cal. Rptr. 157 (Ct. App. 1989 ........................................ 29, 32

**Federal Statutes**

11 U.S.C. § 101(27) .................................................................................................. 2, 3, 35

11 U.S.C. § 102(1)(A) ...................................................................................................... 23

11 U.S.C § 327(a) ............................................................................................................. 18

11 U.S.C. § 328 ................................................................................................................. 18

11 U.S.C. § 363(b)(1) ................................................................................................. 23, 27

11 U.S.C. §§ 363(b) and (f) ............................................................................................... 2

11 U.S.C. § 363(f) ....................................................................................................... 28, 29

11 U.S.C. § 363(f)(5) ................................................................................... 31, 32, 33, 34

11 U.S.C. § 363(m) ...................................................................................................... 3, 28

11 U.S.C. § 510(c) ............................................................................................................ 17

11 U.S.C. § 1129(a)(3), (b)(1), (3) ................................................................................... 33

11 U.S.C. § 1129(b)(1), (2) .............................................................................................. 33

11 U.S.C. § 1129(b)(2)(A) ......................................................................................... 33, 34

11 U.S.C. § 1129(b)(2)(A)(i)(I), and (4) .......................................................................... 34

11 U.S.C. § 1129(b)(2)(A)(i)(II) ...................................................................................... 34

**California Statutes**

Cal.Civ.Code § 2924k ...................................................................................................... 33

Cal. Civ. Code § 8450 ...................................................................................................... 31

**Other Authorities**

Bernhardt, Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 2d ed. 1990) §
  4.8 ................................................................................................................................... 33

*Collier* ¶ 363.06[6][a] ............................................................................................... 33

Fed.R.Bankr.P. 2002(a)(2) ......................................................................................... 23

Fed. R. Bankr. P. 2002(c)(1) ...................................................................................... 23

Fed.R.Bankr.P. 2002(k) .............................................................................................. 23

Fed.R.Bankr.P. 6004(a).............................................................................................. 23

Federal Rules of Bankruptcy Procedure Rule 6004(h) ......................................... 3, 35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Crestlloyd, LLC, the Chapter 11 debtor and debtor in possession herein (the "Debtor"), hereby moves, pursuant to this motion (the "Sale Motion"), for the entry of an order (the "Sale Order"):

(1)    pursuant to 11 U.S.C. §§ 363(b) and (f), approving the sale of the Debtor's real property located at 944 Airole Way, Los Angeles, CA 90077 (APN 4369-026-021) (the "Property") to (a) Richard Saghian or his approved assignee (the "Buyer"), who was the winning Bidder[1] at the Auction conducted pursuant to the Bid Procedures approved by the Court, free and clear of any and all liens, claims, encumbrances, and interests, with the exception of Items 1-6, 8-12, and 17 (the "Excepted Items") set forth in the preliminary title report for the Property (the "Title Report"), a true and correct copy of which is attached hereto as **Exhibit "1,"** provided that the claims of any taxing authorities or governmental units (as defined in 11 U.S.C. § 101(27) apportioned to the Debtor prior to the close of the sale that are secured by liens included in the non-Excepted Items shall be paid in full upon the close of escrow, for a purchase price of $126 million (the "Purchase Price"),[2] pursuant to the California Residential Purchase Agreement and Joint Escrow Instructions and related sale documents (the "Purchase Agreement"), a true and correct copy of which is attached hereto as **Exhibit "2,"**[3] or (b) any bidder that makes a higher and better offer for the Property that is approved by the Court (an "Overbidder"),[4] with any such sale also being free and clear of any and all liens, claims, encumbrances, and interests other than the Excepted Items set forth in the Title Report for the Property, provided that the claims of any taxing authorities or governmental units (as defined in 11 U.S.C. § 101(27) apportioned to the Debtor prior to the close of the sale that are secured by liens

---

[1] Any capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Debtor's *Motion To: (1) Approve Auction And Bid Procedures Regarding The Sale Of Real Property And (2) Set Scheduling For A Motion To Approve The Sale Of Real Property* (the "Bid Procedures Motion") [Dkt. 88], which was granted by an order of the Court [Dkt. 105] with the scheduling regarding the Auction, Sale Motion and closing of the sale of the Property amended by a further order of the Court [Dkt. 115] (the "Bid Procedures Orders").

[2] As discussed below, prior to the payment of taxes, commissions, and escrow expenses paid out of escrow, the Debtor will receive a total of $137.97 million in consideration comprised of the Purchase Price of $126 million, plus a $11.970 million Rebate from the Auctioneer (both as defined and discussed herein).

[3] The attached Purchase Agreement includes the form of the Supplemental Addendum approved by the Court signed by the Debtor but not the Buyer.

[4] The Bid Procedures do not contemplate an overbid process at the Hearing. However, the Debtor has been contacted by numerous parties and advised of interest in purchasing the Property, with at least one interested party asserting that the party was not able to register for the Auction due to technical issues and, therefore, unable to bid. As of the filing of this Notice and accompanying Motion, the Debtor has not received any other offers which, if received, will not be accepted by the Debtor in advance but rather filed with the Court to allow review by parties and consideration by the Court.

1  included in the non-Excepted Items shall be paid in full upon the close of escrow;

2       (2)    pursuant to 11 U.S.C. § 363(m) finding that the Buyer or any Overbidder

3  is a "good faith" purchaser entitled to the protections afforded under 11 U.S.C. § 363(m);

4       (3)    authorizing the Debtor to pay from the proceeds of the sale of the Property

5  out of escrow on closing (a) the outstanding balance of the debtor in possession loan (the "DIP

6  Loan") provided by Hankey Capital, LLC ("Hankey"), which is secured by a first priority lien and

7  which DIP Loan and first priority lien were approved by a prior order of the Court, (b) Hankey's

8  senior receivership certificate loan, which was an advance of funds on a senior secured basis to the

9  pre-petition receivership estate, as evidenced by Hankey's Proof of Claim No 19 in the asserted

10  amount of $848,511, (c) Hankey's first priority pre-petition loan in the principal amount of $82.5

11  million, subject to accounting to be received from Hankey, as described in Hankey's Proof of Claim

12  No. 20, (d) the claims of any taxing authorities or governmental units (as defined in 11 U.S.C. §

13  101(27) apportioned to the Debtor prior to the close of the sale that are secured by liens included in

14  the non-Excepted Items, (e) a commission equal to two percent (2%) of the Purchase Price to be paid

15  to and split equally between (i) The Beverly Hills Estates ("TBHE") and Compass ("Compass" and,

16  with TBHE the "Debtor's Brokers"), whose employment and one percent (1%) commission were

17  previously approved by the Court, and (ii) TBHE and Hilton & Hyland (the "Buyer's Brokers"), with

18  any split between the Debtor's Brokers and the Buyer's Brokers to be determined by them, and (f)

19  any other customary escrow closing fees and charges allocated to the Debtor;

20       (4)    waiving the 14-day stay period set forth in Rule 6004(h) of the Federal

21  Rules of Bankruptcy Procedure ("FRBP") to enable the sale of the Property to close as quickly as

22  possible; and

23       (5)    providing such other relief as is appropriate under the circumstances.

24       The Court has not scheduled an overbid or auction process for the hearing on the Sale

25  Motion since an online auction was recently completed through Concierge Auctions.  As of the date

26  of filing this Sale Motion and the accompanying Notice, the Debtor does not have any other bids or

27  offers to present to the Court.  As a result, the Debtor is proceeding with seeking approval of the sale

28  to Buyer.  In an overabundance of caution, to the extent that the Debtor receives any credible bids

prior to the hearing on the Sale Motion, the Debtor will not accept such bids based on the current

posture of the case, but will submit the bids to the Court in order to disclose the existence thereof and

allow the Court to consider such interest.  As a result, although the Notice and Sale Motion refer to

"Overbidders," there is no scheduled auction or overbid process in place or ordered by the Court in

connection with the hearing on the Sale Motion.

        **WHEREFORE**, the Debtor respectfully requests that this Court enter a Sale Order

granting the Sale Motion and providing the relief requested in paragraphs (1) through (5) of the above

Sale Motion and grant such further and additional relief as the Court deems just and proper.

Dated: March 8, 2022

CRESTLLOYD, LLC

*/s/ David B. Golubchik*
DAVID B. GOLUBCHIK
TODD M. ARNOLD
LEVENE, NEALE, BENDER, YOO
   & GOLUBCHIK L.L.P.
Attorneys for Debtor and Debtor in Possession

### MEMORANDUM OF POINTS AND AUTHORITIES[5]

### I.

### STATEMENT OF FACTS

**A.     GENERAL BACKGROUND.**

On October 26, 2021 (the "Petition Date"), the Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code.[6]  The Debtor is operating its estate and managing its financial affairs as a debtor in possession pursuant to Sections 1107 and 1108.

**B.     THE DEBTOR'S REAL PROPERTY.**

The Debtor's primary asset is the residential Property that it developed, which is located at 944 Airole Way, Los Angeles, CA 90077.[7]  The Property is one of the finest pieces of real property in America.  The Property is situated on an approximately four-acre Bel Air promontory, featuring the best views of Los Angeles. A moat that encompasses the Property gives the impression that it's floating on water.  The approximately 105,000-square-foot glass and marble compound holds 21 bedrooms, each with sweeping views of Los Angeles and the ocean, and 42 full and 7 half bathrooms, as well as every amenity in the world.  It features a 30-car garage, five swimming pools, a two-story waterfall, and numerous other water features, as well as two restaurant-grade kitchens, an indoor/outdoor entertainment center with its own VIP room, a movie theater, charitable organization rooms, a four-lane bowling alley, a library with floor-to-ceiling windows, a full beauty salon, a spa with a steam room and jacuzzi, a cigar lounge, and a gym.  Three smaller villas also sit on the property, spread across the four acres.  The 5,000-square-foot master suite is an oasis within the mansion.  Designed with its own separate office and walk-in closet, the suite also has its own pool and kitchen.  To guarantee privacy, it's isolated from the rest of the house.  The mansion includes five elevators and LED ceilings that display images of moving clouds. The Property

---

[5] Unless otherwise stated, capitalized terms in this Memorandum have the same meanings ascribed to them in the preceding Sale Motion Motion.
[6] Unless otherwise stated, all Section references herein are to title 11 of the United States Code, §§ 101, et seq.
[7] Additional information about the Property can be obtained at https://www.conciergeauctions.com/auctions/944-airole-way-los-angeles-california.

features state-of-the-art technology, with a full security center.  The design encompasses secondary

corridors for staff to use.

## C.    ALLEGED CLAIMS PURPORTEDLY SECURED BY THE PROPERTY AND OTHER CLAIMS.

The Debtor's Schedules of Assets and Liabilities (the "Schedules") listed $176.6 million

in claims allegedly secured by the Property, $0 in priority unsecured claims, and $3.4 million in

general unsecured claims.  The Court set a claims bar date of January 14, 2022 (the "Bar Date")

[Dkt. 60] and 26 proofs of claim (the "POCs") were filed asserting $183.6 million in claims

allegedly secured by the Property, $2,666 in priority unsecured claims, and $59.2 million in general

unsecured claims.  There is substantial overlap between the claims included in the Schedules and

asserted by the POCs.  The main reason for the large difference between general unsecured claims in

the Schedules and asserted by the POCs is a $44.4 million claim asserted by the beneficial owner of

the Debtor (Nile Niami) that was not listed in the Schedules.

In addition, after the Petition Date, the Debtor filed a motion (the "DIP Motion") [Dkt.

66] seeking Court approval to obtain a $12 million DIP Loan from Hankey secured by a first

position lien on the Property and, with limited exceptions, all of the Debtor's personal property,

pursuant to the loan documents for the DIP Loan.  One of the purposes of the DIP Loan was to allow

the Debtor to make certain repairs to the Property and to market and sell the Property on an

expedited basis with a sale to close on March 21, 2022 (the "Closing Date").  On January 27, 2022,

the Court entered its final order granting the DIP Motion. [Dkt. 122]  Thereafter, the Debtor drew

down the entire DIP Loan, less fees and expenses payable to Hankey as the lender.  After identifying

the highest of a creditors scheduled and POC claim amounts, as of the Petition Date, plus the DIP

Loan, the Debtor had approximately $195.771 million in claims allegedly secured by liens on

Debtor's Property.

Based on the foregoing, information received from certain alleged secured creditors, and

other information available to the Debtor, including calculations of post-Petition Date interest for

certain senior alleged secured claims, the Debtor is informed and believes that, as of the projected

Closing Date, the Debtor's alleged secured creditors will be asserting claims totaling approximately

$203.69 million (the "Secured Claims"), which amount may be higher to the extent secured creditors have attorneys' fees and costs allowed as part of their claims.  However, as set forth below, the Debtor believes that there are numerous bases to object to and eliminate or reduce portions of the Secured Claims.   The creditors asserting secured claims against the Debtor (the "Secured Creditors"), together with the estimated amount of the alleged Secured Claims as of the Closing Date (not including any additional allowed attorneys' fees and costs), the priority thereof according to the Title Report, and certain bases to object to some of the Secured Claims are summarized below (the "Secured Claims Summary Chart"):[8]

| Creditor | POC | Secured Claim Per Higher of Schedules of POC | | | | Notes |
| | | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
|---|---|---|---|---|---|---|
| Hankey Capital, LLC | | $12,000,000.00 | $59,500.00 | $12,059,500.00 | $12,059,500.00 | DIP Loan |
| Los Angeles County Tax Collector | 5 | $3,190,280.76 | Not Calculated | $3,190,280.76 | $2,488,815.00 | Property Taxes The County its POC on 12/7/21. The Debtor paid $701,465.73 on 1/6/22 as the first installment of the 2021-2022 tax bill. Thus, the claim is $2,488,815. |
| County of Los Angeles | | $0.00 | Not Calculated | $0.00 | $0.00 | Special Assessment |
| County of Los Angeles | | $0.00 | Not Calculated | $0.00 | $0.00 | Special Assessment |
| County of Los Angeles | | $0.00 | Not Calculated | $0.00 | $0.00 | Special Assessment |
| Hankey Capital, LLC | 20 | $122,638,623.41 | $6,839,418.99 | $129,478,042.40 | $104,541,764.62 | Per the POC and the attachments thereto: (1) Hankey Made these loans to the Debtor: o Oct 25th, 2018: $82,500,000 o Dec 12th, 2019: $91,000,000 (incremental 8.5mm on original) o Aug 20th, 2020: $106,000,000 (incremental $15mm) (2) Hankey recorded these Deeds of Trust (each a "DOT") o Oct 25th, 2018 DOT: secured $82.5mm (Recording No: 20181122917) |

---

[8] This is a summary only and is not an admission as to the validity of any claim or lien, the priority of any claim or lien, the amount of accrued post-petition interest (or the entitlement thereto), or the waiver of any bases to object to any alleged Secured Claim.

| | Secured Claim Per Higher of Schedules of POC | | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| | | | | | | o Aug 31st, 2020 amendment to Oct 25th, 2018 DOT: secured amended $106mm note (Recording No: 20201030024)<br><br>(3) The $106 million loan had a maturity date of Oct. 31, 2020 and the Debtor did not pay the loan by the maturity date so Hankey called a default.<br><br>The Debtor believes that there may be bases to object to the secured status of the subsequent Dec 12th, 2019 loan and/or the subsequent Aug 20th, 2020 loan (and any related interest and attorneys' fees) on the grounds that there was no stand-alone security agreement and recorded DOT for this increased obligation.<br><br>The Debtor believes that there may be a basis to object to the priority of Hankey's DOT to secure anything other than the Oct 25th, 2018 loan for $82,500,00 (and any related attorneys' fees and interest), because, (1) prior to the Oct 25th, 2018 loan and related DOT, Inferno had a senior DOT and (2) pursuant to the Subordination Agreement entered into by the Debtor, Hankey, and Inferno, Inferno only agreed to subordinate its DOT to Hankey's Oct 25th, 2018 DOT to secure the obligations under the Oct 25th, 2018 loan for $82,500,00 (and any related attorneys' fees and interest), not for any further loans.<br><br>The Debtor believes that there may be a basis to object to the secured status of the subsequent Dec 12th, 2019 loan as a constructively fraudulent transfer, because it is allegedly secured by the Aug 31st, 2020 amendment to Oct 25th, 2018 DOT and the Debtor did not get any additional consideration for |

| | Secured Claim Per Higher of Schedules of POC | | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| | | | | | | providing security on the Dec 12th, 2019 loan over 8 months after it was made. |
| Hankey Capital, LLC | 18 | $5,000,000.00 | NA | $5,000,000.00 | $1,300,000.00 | Per 8/20/20 Profit Participation Agreement ("PPA") attached to POC: "If, at any time, *during the term of the Loan or subsequent to Borrower's repayment of the Loan*, the Property is sold by the Borrower, or by any affiliate of the Borrower, for a purchase price in excess of One Hundred Million and No/100 Dollars ($100,000,000), Lender shall be entitled to receive, from the sale proceeds, a Lender *Profit* Participation Payment in the amount equal to the lesser of (a) five percent (5.0%) of the gross sales price for the Property which exceeds $100,000,000, or (b) Five Million and Noll 00 Dollars ($5,000,000.00).

The Debtor believes that there may be bases to object to the secured status of this POC, because **(a)** the Loan matured on October 31, 2020 and the Debtor did not sell the property prior to the expiration of the term of the Loan nor did the Debtor sell the Property after the repayment of the Loan; therefore, the conditions to payment under the 8/20/20 PPA were not satisfied, **(b)** the claim can be re-characterized from debt to equity since it involves and is based on sharing in profit and the obligation could remain even after repayment of the Hankey loans and (one would imagine) re-conveyance of the Hankey DOT's to the Debtor; *see In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1148 (9th Cir. 2013) ("In concluding that the Bankruptcy Code gives courts the authority to recharacterize claims in bankruptcy proceedings, we join our sister |

| | Secured Claim Per Higher of Schedules of POC | | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| | | | | | | circuits, which have reached the same conclusion."); *In re Daewoo Motor Am., Inc.*, 471 B.R. 721, 729 (C.D. Cal. 2012), aff'd, 554 F. App'x 638 (9th Cir. 2014) ("Every Circuit Court of Appeal that has addressed this issue, however, has held that a bankruptcy court may properly order the characterization of debt to equity under the broad authority afforded by 11 U.S.C. § 105(a). ... [T]he question of whether an advance to a corporation is debt or equity is "primarily directed at ascertaining the intent of the parties. ... "In defining the recharacterization inquiry, courts have adopted a variety of multi-factor tests borrowed from non-bankruptcy caselaw. While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by-case. ... [B]bankruptcy courts look to the following eleven factors to determine whether recharacterization is warranted: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the |

| | Secured Claim Per Higher of Schedules of POC | | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| | | | | | | stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; (11) the presence or absence of a sinking fund to provide repayments.") (internal cites omitted); *In re L. Scott Apparel, Inc.*, 615 B.R. 881, 888 (C.D. Cal. 2020), appeal dismissed, No. 20-55507, 2020 WL 6482082 (9th Cir. Aug. 12, 2020) ("The parties agree that a bankruptcy court may recharacterize debt as equity."); **(c)** the PPA does not clearly specify that it is secured by the Property, and **(d)** Hankey, in addition to its DOTs, recorded a Memorandum of Agreement regarding the PPA, which also does not clearly state that the obligations thereunder are secured by the Property. |
| Hankey Capital, LLC | 17 | $3,500,000.00 | NA | $3,500,000.00 | $0.00 | Per 10/25/18 PPA attached to POC: "If, at any time, during the term of the Loan or following repayment of the Loan, the Property is sold by the Borrower, or by any affiliate of the Borrower, for a purchase price in excess of $200,000,000), Lender shall be entitled to receive, from the sale proceeds, a Lender Profit Participation Payment in the amount of $3,500,000." The Purchase Price is under $200 million.  Thus, in addition to the arguments above regarding the 8/20/20 PPA, the condition to trigger this PPA will not be satisfied by the proposed sale under the Sale Motion. |
| Hankey Capital, LLC | 19 | $845,811.04 | $33,569.66 | $879,380.70 | $879,380.70 | Receiver's Certificate 1 and 2. |

| | Secured Claim Per Higher of Schedules of POC | | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| Inferno Investment Inc. | 11 | $20,902,106.12 | $354,473.24 | $21,256,579.36 | $18,256,000.00 | Per the POC and the attachments thereto: **Note 1** dated 3/13/13 for $3,925,545 provides as follows: "Due to the fact that the security for this Note is a deed of trust third in priority to a first and second deed of trust on the Property, thereby making this loan a "high risk loan", Borrower agrees to pay Lender additional consideration and not as additional interest as follows: Fifty percent (50%) of the net profits derived from the sale of each of the residences located at 271 S. Mapleton Drive, Los Angeles, CA and 1175 Hillcrest, Beverly Hills, CA and Fifteen percent (15%) of the net profits derived from the sale of the residence at 944 Airole, Los Angeles, CA" **Note 2** dated 3/13/13 for $14,000,040 was later modified to $7 million in October 2015 for reasons that are unknown to the Debtor's current management. **DOTs** - The DOT recorded on 3/13/13 only secured the second note for $14,000,040, as the first note for $3,925,545 is not referenced until a Modification and Supplement to Deed of Trust recorded on 11/10/15.The Debtor believes that there may be bases to object to a material amount of the claim, because (1) (a) the language of the first note appears to indicate that such loan was related to the Debtor's Property **and** two properties (271 S. Mapleton and 1175 Hillcrest) that were not owned by the Debtor and the first note includes a profit sharing provision, and (b) the second note for $14,000,040 was later modified to $7 million, both of which call into question the amount that was actually loaned to the Debtor, (2) books and records currently available to the Debtor do not |

| | Secured Claim Per Higher of Schedules of POC | | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| | | | | | | indicate that Inferno loaned $17,925,585 to the Debtor, (3) despite the reduction of the second note for $14,000,040 down to $7 million, the interest calculation attached to the POC includes 31 months of interest totaling $2.901 million on the basis of a loan in the amount of $14,000,040, and (4) to the extent any portion of the first note was for profit sharing, such portion would be subject to recharacterization for the reasons discussed above.The Debtor also believes that there may be bases to object to the secured status of the first note for $3,925,5453 because, (1) as noted, the DOT recorded on 3/13/13 only secured the second note for $14,000,040, as the first note for $3,925,5453 is not referenced until a Modification and Supplement to Deed of Trust recorded on 11/10/15 and the Debtor did not get any additional consideration for allegedly providing security for the first note over two and a half years after the loan thereunder was purportedly made and (2) the DOT does not cover any alleged claim to profit sharing under the first note.<br><br>In addition, the Debtor and Inferno entered into a "Memorandum of Agreement" dated January 1, 2016 pursuant to which that parties (including Inferno) agreed that, prior to Inferno receiving any payment, Inferno agrees that payments must first be made to all outstanding loans and construction costs for the Property.  As a result, Inferno has contractually subordinated itself to all other loans and construct costs for the Property. *See* **Exhibit "6"** hereto, which is a true and correct copy of the foregoing Memorandum of Agreement. |

13

| | Secured Claim Per Higher of Schedules of POC | | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| | | | | | | Weeks ago the Debtor's counsel requested that Inferno's counsel send documentation regarding the funding of the purported loans. Despite the foregoing, it was not until March 7, 2022 (i.e., a mere day before the deadline to file the Sale Motion) that Inferno's counsel sent such documentation, so the Debtor has not had time to analyze it. However, it is notable that in the email transmittal of the documentation, Inferno's counsel admitted that Inferno had not yet found documentation regarding funding of $7 million of the alleged loan from Inferno. *See* 3/7/22 email from Inferno's counsel to Debtor's counsel, a true and correct copy of which is attached hereto as **Exhibit "4"** without exhibits. |
| YOGI Securities Holdings, LLC | 15 | $21,943,053.75 | $632,134.92 | $22,575,188.67 | $18,000,000.00 | Per the POC and the attachments thereto:Note dated 10/16/18 for $30,188,235 provides, inter alia, that (1) the loan was to be paid in full upon the sale of the Debtor's property or the Hillcrest Property and that payments would also be due as the Londonderry Property, Bellagio Property, Carcassonne Property, and Stone Ridge Property were sold (with the Hillcrest Property, Londonderry Property, Bellagio Property, Carcassonne Property, and Stone Ridge Property as defined in the note and collectively referred to here as the "Other Properties"), (2) at least in regard to the Londonderry Property, Bellagio Property, Carcassonne Property, and Stone Ridge Property, the DOT's for those properties were provided by entities other than the Debtor.  The Debtor believes that there may be bases to object to a material amount of the claim, because (1) the language of the note appears to indicate that such loan was related to the Debtor's Property |

| | Secured Claim Per Higher of Schedules of POC | | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| | | | | | | and at least four properties (the Londonderry Property, Bellagio Property, Carcassonne Property, and Stone Ridge Property) owned by entities other than the Debtor which calls into question the amount that was actually loaned to the Debtor, (2) $5.2 million of the loan was to be advanced upon request by the Debtor and only if there were no defaults and there is no indication in the books and records currently available to the Debtor that this occurred, (3) books and records currently available to the Debtor do not indicate that YOGI loaned $30,188,235 to the Debtor, (4) four of the Other Properties (the Hillcrest Property, Bellagio Property, Carcassonne Property, and Londonderry Property) providing for a pay down on the note sold, yet YOGI did not collect the required pay down amounts per the note (a) Hillcrest Property sold for $38.3 million, note required payment in full, only $2.917 million received and applied to loan balance by YOGI), (b) Bellagio Property sold for $36 million, note required payment of $10 million, only $2.5 million received and applied to loan balance by YOGI), (c) Carcassonne Property sold for $36 million, note required payment of $15 million, only $4.310 million received and applied to loan balance by YOGI), and (d) Londonderry Property sold for $26 million, note required payment of $10 million, only $6.013 million received and applied to loan balance by YOGI), and (5) one of the Other Properties (the Stone Ridge Property) providing for a pay down on the note sold for $9.95 million, yet YOGI did not collect any payment upon the close of that sale (at least the attachment to the POC does not show any pay |

| Creditor | POC | Secured Claim Per Higher of Schedules of POC | | Total Claim | | Notes |
| | | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
|---|---|---|---|---|---|---|
| | | | | | | down) (property sold for $9.95 million, note required a $5 million pay down, $0 received and applied to loan balance by YOGI.  The Debtor understands that it is possible that the pay downs were less than required by the note based on the sale price for the Other Properties and the position of YOGI's liens on the Other Properties.  However, additional information is needed and the fact that the pay down from the Bellagio Property was exactly $2.5 million calls into question whether YOGI was maximizing recoveries from the Other Properties, which may be a basis for equitable subordination under 11 U.S.C. § 510(c). The Debtor believes that there may be a basis to object to the secured status of a portion of the loan as a constructively fraudulent transfer to the extent the loan rolled up prior loans that were not made to the Debtor and/or and secured them with the Property. |
| American Truck & Tool Rentals Inc. | 14 | $188,087.09 | Not Calculated | $188,087.09 | $188,087.09 | Mechanic's Lien |
| J&E Texture, Inc. | 13 | $284,086.99 | Not Calculated | $284,086.99 | $284,086.99 | Mechanic's Lien |
| Hilldun Corporation | 9 | $5,000,000.00 | NA | $5,000,000.00 | $0.00 | On March 7, 2022, the Debtor and Hilldun filed their stipulation providing that Hilldun's claim was subject to bona fide dispute for the purposes of Section 363(f)(4). |
| JMS Air Conditioning | | $51,290.00 | Not Calculated | $51,290.00 | $51,290.00 | Mechanic's Lien |
| Calgrove Rentals Inc. | | $0.00 | Not Calculated | $0.00 | $0.00 | Mechanic's Lien |
| BMC West LLC | | $2,399.00 | Not Calculated | $2,399.00 | $2,399.00 | Mechanic's Lien |
| City of Los Angeles | | $0.00 | Not Calculated | $0.00 | $0.00 | |
| Parquet by Dian | | $40,846.00 | Not Calculated | $40,846.00 | $40,846.00 | Mechanic's Lien |
| Powertek Electric Inc. | 16 | $40,480.00 | Not Calculated | $40,480.00 | $40,480.00 | Mechanic's Lien |
| Kennco Plumbing, Inc. | 6 | $85,560.17 | Not Calculated | $85,560.17 | $85,560.17 | Mechanic's Lien |
| Kazemi & Associates Constructors | 24 | $59,173.34 | Not Calculated | $59,173.34 | $59,173.34 | Mechanic's Lien Not Attached to POC
Ledger attached to POC makes it |

|  | | Secured Claim Per Higher of Schedules of POC | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
|  |  |  |  |  |  | look like creditor was paid in full or over paid. |
| **TOTALS** | - | **$195,771,797.67** | - | **$203,690,894.48** | **$158,277,382.91** | - |

D.        __THE REASON FOR FILING BANKRUPTCY AND EXIT STRATEGY.__

Unfortunately, before the Property could be fully completed and sold (either as a fully completed or nearly completed project), the Debtor's primary secured lender, Hankey, as well as a number of other junior secured lenders and mechanic's lien holders initiated a multitude of state court actions against the Debtor seeking, among other things, to recover amounts allegedly owed and to foreclose on the Property.  In connection with its action, Hankey sought and obtained the appointment of a receiver for the Property (the "Receiver").  In addition, Hankey had a foreclosure sale of the Property set for October 27, 2021.

In order to protect its substantial equity in the Property and address myriad litigation and other claims against it, the Debtor filed its bankruptcy case on the Petition Date of October 26, 2021, which stayed the foreclosure sale.  It was imperative for the Debtor regain possession and control over the Property from the Receiver, and to obtain the breathing spell afforded by the automatic stay, not only to stop the foreclosure and protect the equity in the Property, but also to provide time and a means for the Debtor to sell the Property.

As a precursor to selling the Property, the Debtor had to regain possession and control of the Property from the Receiver.  To that end, immediately after the Petition Date, pursuant to Section 543, the Debtor's counsel demanded that the Receiver, among other things, (1) turnover the Property and other property of the estate and (2) to cease exercising control over such estate property.  As can be seen from the docket, soon after the Petition Date, the Debtor, with the assistance of its counsel and manager, quickly negotiated an interim stipulation with Hankey and the Receiver regarding access to the Property to facilitate efforts to employ brokers and market and sell the Property.  Based

on the efforts of the Debtor's counsel and manager, the Receiver voluntarily turned over the Property

and all other estate property to the Debtor as of December 1, 2021.

The Debtor's intent before and after the Petition Date was to market and sell the Property

for the highest price possible under the circumstances in order to maximize the distribution to

creditors and exit bankruptcy through a plan or structured dismissal.

**E.**     **EFFORTS IN FURTHERANCE OF THE DEBTOR'S EXIT STRATEGY.**

**1.**     **APPROVAL OF THE EMPLOYMENT OF THE DEBTOR BROKERS AND AUCTIONEER AND THE PAYMENT OF THEIR COMPENSATION ON THE CLOSE OF ESCROW.**

On December 12, 2021, the Debtor filed an application (the "Employment Application")

[Dkts. 74, 78, and 81] to (1) employ the Debtor Brokers as real estate brokers pursuant to 11 U.S.C §

327(a), with compensation determined pursuant to 11 U.S.C. § 328, pursuant to the terms of the

Residential Listing Agreement (the "Listing Agreement") between the Debtor and the Brokers that

was attached to the Employment Application, (2) employ Concierge Auctions, LLC ("Concierge" or

the "Auctioneer") as auctioneer pursuant to 11 U.S.C § 327(a), with compensation determined

pursuant to 11 U.S.C. § 328, pursuant to the terms of the Auction Agreement (the "Auction

Agreement") between the Debtor and the Auctioneer, which is attached to the Employment

Application, and (3) approve the payment of compensation to the Brokers and the Auctioneer from

escrow upon closing.

As set forth in the Employment Application and relevant here, (1) pursuant to the Listing

Agreement, on a sale price up to $175 million, the Debtor Brokers are entitled to a commission of

1% of the sale price (plus 1% payable to any Buyer Broker) and (2) pursuant to the Auction

Agreement, the Auctioneer is entitled to a fee of 12% of the sale price (the "Buyer's Premium")  to

be paid by the Buyer (not the Debtor) separately from the sale price, provided that, on a sale equal to

or less than $225 million, the Auctioneer would rebate 9.5% of the 12% Buyer's Premium to the

Debtor's estate and retain only 2.5% of the Buyer's Premium.

On January 1, 2022, the Court entered an order (the "Employment Order") [Dkt. 104] approving the Employment Application, the compensation provided for thereunder, and payment of such compensation from escrow on closing.

**2.    APPROVAL OF THE BID PROCEDURES.**

On December 29, 2021, the Debtor filed its Bid Procedures Motion to approve the Bid Procedures for an Auction of the Property [Dkt. 88].  On January 10, 2022, the Court entered its order granting the Bid Procedures Motion [Dkt. 105], which Bid Procedures were amended by a further order of the Court entered on January 14, 2022 [Dkt. 115] (the foregoing orders are referred to as the Bid Procedures Orders herein).  Pursuant to the Bid Procedures Orders, the scheduling for the Auction and the instant Sale Motion were/are as follows:

| February 28, 2022 through March 3, 2022 | Online Auction for the Property to be conducted by the Auctioneer. |
| March 8, 2022 | Deadline for the Debtor to file and serve the Sale Motion. |
| March 15, 2022, at 12:00 p.m. (Pacific) | Deadline for any parties in interest to file and serve any oppositions to the Sale Motion. |
| March 16, 2022 | Deadline for any parties in interest to file and serve any replies to any oppositions to the Sale Motion. |
| March 18, 2022, at 11:00 a.m. (Pacific) | Hearing on the Sale Motion |
| March 21, 2022 (unless extended by agreement between the Debtor and the buyer) | Closing Date |

**F.    THE MARKETING OF THE PROPERTY AND THE AUCTION.**

As set forth in the Exposure Report (the "Exposure Report") attached hereto as **Exhibit "3"** (which can also be accessed here with hyperlinks to various publications and documents referenced in the Exposure Report) and the annexed declarations of Chad Roffers and Branden Williams, the Property was extensively marketed through, among other things, (1) the Property being exposed in 171 countries, (2) 83,740 property views, 197,602 web page views, and 16,800 film views on the Auctioneer's website, (3) numerous email blasts to the Auctioneer's private client group, select billionaires, targeted owners of high value properties, and subscriber lists as large as 160,000 members, which email blasts included access to a high-quality catalogue for the Property, (4) numerous publications by media outlets regarding the Property, (5) listings on the MLS,

Luxuryrealestate.com, Juwai.com, Zillow.com, Realtor.com, Sothebys.com, (6) a feature commercial shown in the lead up to the Super Bowl, and (7) social media campaigns on Facebook, Google, Instagram.[9]

The foregoing marketing efforts, as well as the pre-Petition Date marketing efforts by the Debtor's Brokers, resulted in 40 qualified showings of the Property by the Auctioneer, 20 showings of the Property by the Debtor's Brokers (8 by Compass and 12 by TBHE), and five Bidders that qualified for bidding at the Auction by submitting the documents and $250,000 Bidder Deposit required by the Bid Procedures.

The extensive marketing of the Property achieved results.  Consistent with the Court-approved Bid Procedures, the Auctioneer conducted the Auction of the Property starting on February 28, 2022 and ending on March 3, 2022.  The bidding on the Property was as follows:

| PADDLE # | BID AMOUNT | TIME BID PLACED |
|---|---|---|
| 7 #618043 | $126,000,000 | (WINNING BID by the Buyer) 6:10PM 03.03.2022 |
| 6 #618043 | $120,000,000 | 6:02PM 03.03.2022 |
| 5 #463985 | $100,000,000 | 6:02PM 03.03.2022 |
| 4 #618043 | $90,000,000 | 5:58PM 03.03.2022 |
| 3 #463985 | $70,000,000 | 2:43PM 03.03.2022 |
| 2 #423367 | $60,000,000 | 4:12PM 03.01.2022 |
| 1 #222270 | $50,000,000 | (STARTING BID) 02.28.2022) |

**G.**     **THE PROPOSED SALE.**

After the Auction, the Debtor and the Buyer executed the Purchase Agreement, a true and correct copy of which is attached hereto as **Exhibit "2."**[10]  The form of the Purchase Agreement, other than the Purchase Price and identity of the Buyer, which was required to be used by all Bidders, was prepared and approved by the Court before the Auction pursuant to the Bid Procedures Order.  Further, the Property was sold pursuant to an Auction conducted in accordance with the Court-approved Bid Procedures.  Thus, the terms of the Purchase Agreement are the result of more than

---

[9] In addition, as required by LBR 6004-1, concurrently with the filing hereof, the Debtor will submit an additional copy of the Notice of the Motion in case there are other parties interested in seeking to make a bid for the Property.

[10] The attached Purchase Agreement includes the form of the Supplemental Addendum approved by the Court signed by the Debtor but not the Buyer.

1    arms-length negotiations between the Debtor and the Buyer.  Further, the Debtor is informed and

2    believes that, other than in connection with the proposed sale of the Property (which, again, was

3    conducted by the Auctioneer pursuant to the Court-approved Bid Procedures), the Buyer has no prior

4    connections with the Debtor or its current non-Member manager, SierraConstellation Partners LLC.

5    Also, the Debtor has no basis to believe that the Auction and resulting winning bid by the Buyer were

6    the product of any collusion.  A summary of the terms of the proposed sale of the Property under the

7    Purchase Agreement is as follows:[11]

8            •    <u>Name of Buyer:</u>  Richard Saghian or his approved assignee (*i.e.*,

9      the Buyer) or any Overbidder that is approved by the Court.

10           •    <u>Asset to Be Sold:</u> The Property.

11           •    <u>Terms and Conditions of the Proposed Sale:</u>

12        o    <u>Purchase Price:</u> $126 million, plus a $11.97 million Rebate

13      from the Auctioneer for a total of $137.97 million (both as defined and

14      discussed herein).

15        o    <u>Deposit:</u> $250,000 prior to the Auction, plus an additional

16      amount to bring the Deposit to 12% of the Purchase Price within two

17      business days of the conclusion of the Auction, which amount was funded

18      by the Buyer.

19        o    <u>Contingencies:</u> None, other than (1) approval of the sale

20      pursuant to an order of the Court that is not subject to a stay pending

21      appeal and (2) delivery of good and marketable title to the Property to the

22      Buyer.

23           •    <u>Condition of Asset/Property:</u> "As-is" without warranty of any

24      kind.

25

26

27

28    [11] This is a summary for informational purposes only.  To the extent that there is any inconsistency between this summary and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern.

- **Free and Clear:** As discussed above, the Property will be sold free and clear of any and all liens, claims, encumbrances, and interests, with the exception of the Excepted Items.

- **Closing:** March 21, 2022.

- **Estimated Costs of Sale:** The Debtor estimates that the total costs of sale incurred by the estate will total approximately 2.5% of the sale price, comprised of (1) a 1% commission to be paid to the Debtor's Brokers, (2) a 1% commission to be paid to the Buyer's Brokers, and (3) the balance for any closing costs.

- **Potential Tax Consequences:**  Given the Purchase Price for the Property, the amount invested into the Property for land acquisition, permitting, management, and construction, and the large claims allegedly secured by the Property, the Debtor believes no capital gains taxes will be owing.

- **Addendum to Purchase Agreement:**  The Buyer requested that Debtor execute an Supplemental Addendum to the Purchase Agreement that was different from the Court-approved Supplemental Addendum, because it was amended by the Buyer to provide that the Buyer's remedies will not be limited to those in the Court-approved Bid Procedures if the Debtor sells the Property to any party other than the Buyer.  Because the sale is subject to approval of this Court and, in the event that the Court may theoretically order a sale to another party if another offer is presented and viewed as more beneficial to the estate by the Court, the Debtor was unwilling to execute such amended Supplemental Addendum and takes the position that the amendments are material changes to the Court-approved Supplemental Addendum.

## II.
## LEGAL ARGUMENT

A.  **THE COURT SHOULD APPROVE THE SALE OF THE PROPERTY TO THE BUYER OR TO OVERBIDDER APPROVED BY THE COURT.**

    1.  **THE DEBTOR HAS OR WILL HAVE COMPLIED WITH ALL APPLICABLE NOTICE REQUIREMENTS.**

Section 363(b)(1) provides that the Debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1). Section 102(1) defines "after notice and a hearing" as after such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances.  11 U.S.C. § 102(1)(A).

FRBP 6004(a) provides, in pertinent part, that notice of a proposed sale not in the ordinary course of business must be given pursuant to  FRBP 2002(a)(2), (c)(1), (i) and (k), and, if applicable, in accordance with Section 363(b)(2).  Fed.R.Bankr.P.  6004(a).    FRBP 2002(a)(2) requires at least 21 days' notice by mail of a proposed sale of property of the estate other than in the ordinary course of business, unless the Court for cause shown shortens the time or directs another method of giving notice.  Fed.R.Bankr.P. 2002(a)(2).  Here, the Court shortened the notice period pursuant to the Bid Procedures Orders, and the Debtor complied with the Bid procedures by filing and serving the Notice of the Sale Motion and the Sale Motion on Mach 8, 2022.  FRBP 2002(c)(1) requires that the notice of a proposed sale include the date, time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections.  It also provides that the notice of sale or property is sufficient if it generally describes the property.  Fed. R. Bankr. P. 2002(c)(1).    FRBP 2002(k) requires that the notice be given to the United States Trustee. Fed.R.Bankr.P. 2002(k).

In addition, LBR 6004-1 requires that the notice contain the information specified in LBR  6004-1(c)(3) and that an additional copy of the notice be submitted to the Clerk of the Bankruptcy Court together with a Form F 6004-2.NOTICE.SALE at the time of filing for purposes of publication.  LBR 6004-1(c)(3) and (f).

1    The Debtor has or will have complied with all of the above provisions of the Bankruptcy

2    Code, the FRBP and the LBR, as modified by the Bid Procedures Orders.  The Debtor has complied

3    with  FRBP 6004(a) and 2002(a)(2), (c)(1), (i) and (k), as well as LBR 6004-1(c)(3), as far as

4    practicable under the circumstances, because the Notice of the Sale Motion includes all of the

5    required information set forth above, including, without limitation, the date, time and place of the

6    hearing on the Sale Motion to approve the proposed sale of the Property to the Buyer or an

7    Overbidder approved by the Court, the deadline for objecting to the Sale Motion, and related

8    deadlines, and the Notice of the Sale Motion has been served on the Office of the United States

9    Trustee, the Debtor, all of the Debtor's known creditors, all alleged secured creditors appearing on

10    the Title Report, and all parties requesting special notice.  Further, this Sale Motion and its annexed

11    Memorandum, Declarations, and Exhibits will be served on the Office of the United States Trustee,

12    the Debtor, all alleged secured creditors appearing on the Title Report, and all parties requesting

13    special notice.  Additionally, the Notice of the Sale Motion advises parties in interest how and where

14    to obtain a full copy of this Motion and its annexed Memorandum, Declarations, and Exhibits.

15    Further, as required by LBR 6004-1(f), concurrently with the filing hereof, the Debtor

16    submitted an additional copy of the Notice of the Sale Motion, which includes required information

17    about the proposed sale of the Property, with the Clerk of the Bankruptcy Court together with a Form

18    F 6004-2.NOTICE.SALE for purposes of publication.

19    Based on the foregoing, all applicable notice requirements have been satisfied.

20    **2.    THE SALE OF THE PROPERTY TO THE BUYER OR TO ANY
21    WINNING OVERBIDDER APPROVED BY THE COURT SHOULD BE
      APPROVED, BECAUSE GOOD BUSINESS REASONS FOR THE SALE
22    EXIST, THE PURCHASE PRICE FOR THE PROPERTY IS FAIR AND
      REASONABLE, AND THE PROPOSED SALE IS IN THE BEST
23    INTERESTS OF THE ESTATE AND ITS CREDITORS.**

24    As a general matter, a court considering a motion to approve a sale under Section 363(b)

25    should determine from the evidence presented before it that a "good business reason" exists to grant

26    such a motion.  *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).  In addition, the court must

27    further find that the sale is in the best interest of the estate.  To make this determination, the Court

28    should consider whether:

(1)    the sale is fair and reasonable, *i.e.*, the price to be paid is adequate;

(2)    the property has been given adequate marketing;

(3)    the sale is in good faith, *i.e.*, there is an absence of any lucrative deals with insiders, and

(4)    adequate notice has been provided to creditors.

*In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991); *In re The Landing*, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993); *In re Mama's Original Foods, Inc.,* 234 B.R. 500, 502-505 (C.D. Cal. 1999).  Here, the proposed sale of the Property to the Buyer pursuant to the terms of the Purchase Agreement or to successful Overbidder approved by the Court satisfies each of these requirements.

### a.    <u>Sound Business Purpose</u>.

The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19 (B.A.P. 9th Cir. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b).  The facts pertaining to the sale at issue here amply substantiate the Debtor's business decision that the contemplated sale of the Real to the Buyer pursuant to the terms of the Purchase Agreement or to successful Overbidder approved by the Court serves the best interests of the estate and merits the approval of this Court.

As noted above, the Debtor's exit strategy is based on the sale of the Property to generate funds to pay creditors.  After substantial marketing of the Property and an Auction conducted pursuant to the Bid Procedures, the Purchase Price offered by the Buyer is the highest and best binding offer received by the Debtor.  The Debtor believes that the already limited pool of buyers with the means to purchase the Property may have been further reduced due to the conflict in Ukraine and related sanctions against Russia, which may have taken potential Russian, Ukrainian, Chinese and other international buyers out of the market.  It is unfortunate that the Purchase Price will not generate sufficient funds to pay all allowed claims in full and likely not to pay allowed Secured Claims in full.  However, in the absence of the approval of the proposed sale, the distribution on allowed claims would likely be much lower, because, among other things, (1) the Debtor would

1  continue to incur huge per deim interest in the approximate amount of $50,000 on the senior Secured

2  Claims asserted by Hankey, (2) the Debtor would have to pay an extension fee of $126,000 on the

3  DIP Loan, (3) the Debtor would continue to incur large administrative claims arising from the costs

4  associated with securing, insuring, and maintaining the Property, as well as for material ongoing

5  services provided by estate professionals, and (4) the Debtor would continue to incur bi-yearly

6  property taxes in the approximate amount of $700,000.  There is also the possibility that the Debtor

7  never gets an offer as high as the Purchase Price offered by the Buyer.  The proposed sale provides an

8  assured result and allows the debtor to curtail substantial secured and administrative claims.

9     Based on the foregoing, the proposed sale furthers the Debtor's exit strategy and is in the

10  best interests of the estate and its creditors and, therefore, represents a sound exercise of the Debtor's

11  business judgment.

12     **b.** **Fair and Reasonable Price.**

13     In order for a sale to be approved under Section 363(b), the purchase price must be fair

14  and reasonable.  *See generally, In re Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985).  The

15  trustee is given substantial discretion in this regard.  *Id.*  In addition, Courts have broad discretion

16  with respect to matters under section 363(b).  *See Big Shanty Land Corp. v. Comer Properties, Inc.*,

17  61 B.R. 272, 278 (Bankr. N.D. Ga. 1985).  In any sale of estate assets, the ultimate purpose is to

18  obtain the highest price for the property sold.  *Wilde Horse Enterprises, Inc.*, 136 B.R. at 841 (*citing*

19  *In re Chung King, Inc.*, 753 F.2d 547 (7th Cir. 1985)), *In re Alpha Industries, Inc.*, 84 B.R. 703, 705

20  (Bankr. Mont. 1988).

21     As noted above, the Debtor's Brokers and the Auctioneer engaged in expansive

22  marketing efforts regarding the sale of the Property.  Those efforts resulted in the current $126

23  million offer for the Property, which will result in gross sale proceed in the amount of $137.97

24  million after the payment of the $11.97 million Rebate from the Auctioneer.  That offer was obtained

25  after a three day Auction conducted pursuant to the Bid Procedures approved by the Court, which

26  were designed and approved as a means to ensure that the highest price possible was obtained for

27  Property under the circumstances.

28

1    Based on the foregoing, the Debtor submits that the Purchase Price represents fair and

2  reasonable value for the Property in today's marketplace.

3                    **c.    Adequate Marketing.**

4    The intensive marketing efforts undertaken by the Debtor's Former Brokers and Current

5  Brokers Broker after the Petition Date are set forth in detail above and are not repeated here.   In

6  consideration of the foregoing marketing efforts, the Property has been, and will be, adequately

7  marketed.

8                    **d.    Good Faith.**

9    When a Bankruptcy Court authorizes a sale of assets pursuant to Section 363(b)(1), it is

10  required to make a finding with respect to the "good faith" of the purchaser.  *In re Abbotts Dairies*,

11  788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1) will not be employed to circumvent

12  creditor protections.  *Id.* at 150.  With respect to the Debtor's conduct in conjunction with the

13  proposed sale of the Property, the good faith requirement focuses principally on whether there is any

14  evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to

15  take grossly unfair advantage of other bidders."  *Abbotts Dairies*, 788 F.2d at 147; *Wilde Horse*

16  *Enterprises*, 136 B.R. at 842.

17    Here, as discussed above, the form of the Purchase Agreement, which was required to be

18  used by all Bidders, was prepared and approved by the Court before the Auction pursuant to the Bid

19  Procedures Order.  Also, the property was sold pursuant to an Auction conducted in accordance with

20  the Court-approved Bid Procedures.  Therefore, the Debtor submits that the terms of the Purchase

21  Agreement are the result of more than arms-length negotiations. As also discussed above, the Debtor

22  is informed and believes that, other than in connection with the proposed sale of the Property, the

23  Buyer has no prior connections with the Debtor or its current non-Member manager,

24  SierraConstellation Partners LLC, and the Debtor has no basis to believe that the Auction and

25  resulting winning bid by the Buyer were the product of any collusion.

26    Based on the foregoing, and because the Buyer has no affiliation with the Debtor other

27  than as set forth above and is not an "insider" of the Debtor, as that term is defined in Section

28  101(31), the Debtor submits that there has been no fraud or collusion in connection with the proposed

sale of the Property.  Therefore, the good faith requirement has been satisfied, and the Buyer (or a successful Overbidder approved by the Court) should be deemed a "good faith" purchaser under Section 363(m) and entitled to the benefits under Section 363(m).

### e.    **Accurate and Reasonable Notice.**

The purpose of the notice is to provide an opportunity for objections and hearing before the Court if there are objections.  *In re Karpe*, 84 B.R. 926, 930 (Bankr. M.D.Pa. 1988).  A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections.  *Id.*

As set forth in detail in Paragraph II.A.1 above, the Debtor has or will have complied with all of the applicable notice provisions of the Bankruptcy Code, the FRBP and the LBR.  Thus, the Notice of the Sale Motion (and proposed sale of the Property) should be deemed adequate, accurate, and reasonable by the Court.

### B.    **THE COURT SHOULD APPROVE THE SALE OF THE PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, OTHER THAN THE EXCEPTED ITEMS, TO THE BUYER OR ANY WINNING OVERBIDDER APPROVED BY THE COURT.**

### 1.    **APPLICABLE STANDARDS.**

The Court has the power to authorize the sale of property free and clear of liens, claims, or interests.  *See* 11 U.S.C. § 363(f); *In re Gerwer*, 898 F.2d 730, 733 (9th Cir. 1990).

Section 363(f) permits a sale of property "free and clear of any interest in such property of an entity other than the estate" if *any one* of the following five conditions is met:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Section 363(f) is written in the disjunctive; thus, satisfaction of any one of the five conditions is sufficient to sell property free and clear of liens.  *See e.g., Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988); *Mutual Life Ins. Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*, 36 B.R. 856, 858 (Bankr. W.D. Mo. 1984).

**2.** **THE COURT SHOULD APPROVE THE SALE OF THE PROPERTY FREE AND CLEAR OF THE NON-EXCEPTED ITEMS IN THE TITLE REPORT TO THE BUYER OR ANY WINNING OVERBIDDER APPROVED BY THE COURT.**

Here, the sale of the Property to the Buyer can be free and clear of all liens, claims, encumbrances, and interests, other than the Excepted Items, because one or more provisions of Section 363(f) has been or will be satisfied as to each alleged Secured Claim.

**a.** **Section 363(f)(2).**

In regard to Section 363(f)(2), the "consent" of an entity asserting an interest in the property sought to be sold, as referenced in Section 363(f)(2), can be implied if such entity fails to make a timely objection to the sale after receiving notice of the sale.  *In re Eliot*, 94 B.R. 343, 345 (E.D. Pa. 1988); *see also, In re Ex-Cel Concrete Company, Inc.*, 178 B.R. 198, 203 (B.A.P. 9th Cir. 1995) ("The issue here is whether there was consent or non-opposition by Citicorp."); *In re Paddlewheels, Inc.*, 2007 WL 1035151 (Bankr. E.D.La. April 2, 2007) ("The Sale Motion complies with section 363(f) of the Bankruptcy Code, in that the Trustee either obtained the consent of Whitney to the sale of the Vessel to Purchaser or Whitney had no objection to the Sale."); *In re Gabel*, 61 B.R. 661 (Bankr. W.D. La. 1985) (implied consent is sufficient to authorize a sale under § 363(f)(2)).

The Debtor reached out to the alleged lenders asserting Secured Claims – Hankey, Inferno, Yogi, and Hilldun (the "Lenders") – to inquire as to whether each would consent to the proposed sale to the Buyer.  The Debtor believes that some or all of the Lenders will consent, either affirmatively or via non-opposition to the Sale Motion.  In addition, since the secured claim of the Los Angeles County Tax Collector will be paid in full, the Debtor also expects it will consent to the

1  proposed sale by one of the foregoing means.  The Debtor has not reached out to the numerous

2  mechanics' lien creditors listed in the Secured Claims Summary – American Truck & Tool Rental,

3  J&E Texture, Inc., JMS Air, Calgrove Rentals, BMC West, Parquet by Dan, Powertek Electric,

4  Kennco Plumbing, and Kazemi & Associates (the "Construction Creditors"), but some or all of them

5  may also consent to the proposed sale or not oppose the Motion.

6          To the extent that any of the Lenders, Construction Creditors, or other alleged Secured

7  Creditors consents by one of the two means discussed above, the Court should approve the sale of the

8  Property free and clear of such alleged Secured Creditors' liens pursuant to Section 363(f)(2),

9  provided that all alleged liens shall attach to the proceeds of the sale with the same extent, validity,

10  and priority as the alleged pre-petition liens held by the Secured Creditors.

11          **b.**    **Section 363(f)(4).**

12          To satisfy Section 363(f)(4), there need only be an objective basis for a factual or legal dispute

13  as to the validity of the interest.  *In re Kellogg-Taxe,* 2014 WL 1016045, at *6 (Bankr. C.D. Cal.

14  Mar.17, 2014) (*citing In re Gaylord Grain L.L.C.,* 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004)); *In re*

15  *Daufuskie Island Props., LLC,* 431 B.R. 626, 645 (Bankr. D.S.C. 2010); *see also Higgins v. Vortex*

16  *Fishing Systems, Inc. (In re Vortex Fishing Sys., Inc.),* 277 F.3d 1057, 1062 (9th Cir. 2002) (adopting

17  objective test for determining whether claim supporting involuntary petition is subject to *bona fide*

18  dispute).  "[T]he moving party must 'provide ***some*** factual grounds to show some objective basis for

19  the dispute."  *SEC v. Capital Cove Bancorp LLC,* 2015 WL 9701154, at *7 (C.D. Cal. Oct.13, 2015)

20  (emphasis added).  ***The court "'need not determine the probable outcome of the dispute, but merely***

21  ***whether one exists.'"***  *Capital Cove Bancorp,* 2015 WL 9701154, at *7 (citing and quoting *Kellogg-*

22  *Taxe,* 2014 WL 1016045, at *6 (emphasis added).  Notably, there is no requirement that a complaint

23  be filed to establish a bona fide dispute as to a lien or claim.

24          Here, since many alleged Secured Creditors may consent to the proposed sale and/or be

25  "out of the money," the Debtor has not expended additional estate resources to prepare formal

26  complaints and initiate litigation in regard to various the alleged Secured Claims.  However, as set

27  forth in the Secured Claims Summary Chart there are factual grounds establishing a bona fide dispute

28  as to the Secured Claims asserted by Hankey (other than its claim for the DIP Loan), Inferno, and

1    YOGI, which assert approximately $142 million in alleged Secured Claims.  The Debtor and Hilldun

2    filed a stipulation providing that Hilldun's claim was subject to a bona fide dispute such that Section

3    363(f)(4) is satisfied as to its claim.

4    In addition to the foregoing specific disputes, the priority of all of the Secured Claims (other

5    than the secured claim of Hankey for the DIP Loan and the Los Angeles County Tax Collector) vis-à-

6    vis one another are likely subject to bona fide dispute.  The reason for the foregoing is that there are

7    nine Construction Creditors.  As set forth in the Title Report and Secured Claims Summary Chart, the

8    liens of the Construction Creditors are generally recorded later in time from the liens of the Lenders.

9    However, Cal. Civ. Code § 8450 provides that a mechanic's lien priority relates back to the time of

10   commencement of work, not the date of the recordation of the lien.  Construction Creditor J&E

11   Texture, Inc. has already asserted that its mechanic's lien has priority over all other secured claims

12   other than Hankey's claim for the DIP Loan.  *See* 3/7/22 letter from J&E Texture, Inc.'s counsel to

13   Debtor's counsel, a true and correct copy of which is attached hereto as **Exhibit "4."**  Based on the

14   foregoing, all of the Secured Claims (other than the secured claim of Hankey for the DIP Loan and

15   the Los Angeles County Tax Collector) are subject to bona fide dispute as to priority and possibly the

16   extent to which certain claims are undersecured.

17                                    **c.   Section 363(f)(5).**

18   Under Section 363(f)(5), a debtor in possession may sell property free and clear of any

19   interest if the holder of that interest "***could*** be compelled, in a legal or equitable proceeding, to accept

20   a money satisfaction of such interest." 11 U.S.C. § 363(f)(5) (emphasis added).  Section 363(f)(5) has

21   generally been interpreted to mean that if, under applicable law, the holder of the lien or interest

22   could be compelled to accept payment in exchange for its interest, the debtor in possession may take

23   advantage of that right by replacing the holder's lien or interest with a payment or other adequate

24   protection.  COLLIER ON BANKRUPTCY, ¶ 363.06 [6] (15th ed. rev. 2003).

25   In *Clear Channel Out-door, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25 (B.A.P. 9th

26   Cir. 2008) ("*PW*"), the BAP reversed the Bankruptcy Court's approval of a sale to a senior lender

27   free and clear of the liens of the junior lienholder under § 363(f)(5).  In reversing the Bankruptcy

28   Court's decision, the BAP found that Section 363(f)(5) requires that "(1) a proceeding exists or ***could***

1  be brought, in which (2) the nondebtor could be compelled to accept a money satisfaction of (3) its

2  interest." *Id*. at 41 (emphasis added).  Analyzing the aforementioned factors in reverse order, the

3  BAP concluded that a lien constitutes an "interest" for purposes of Section 363(f)(5).  *Id*. With

4  respect to the second factor, the BAP ruled that Section 363(f)(5) refers to those proceedings in which

5  the creditor "***could*** be compelled to take less than the value of the claim secured by the interest." *Id*.

6  (emphasis added).  In order to approve a sale free and clear under Section 363(f)(5), the Court must

7  "make a finding of the existence of … a mechanism [to address extinguishing the lien or interest

8  without paying such interest in full] and the [debtor in possession] must demonstrate how satisfaction

9  of the lien 'could be compelled.'" *Id*. at 45.  Finally, the BAP held that Section 363(f)(5) requires that

10 there be, "or that there be the possibility of, some proceeding, either at law or at equity, in which the

11 nondebtor could be forced to accept money in satisfaction of its interest."  *Id*.

12        Here, all of the factors set forth in *PW* for a sale free and clear of the liens of all alleged

13 Secured Creditors junior to Hankey's first priority lien for the DIP loan (the "Junior Liens") are

14 satisfied.  First, as discussed in *PW*, all of the liens asserted by the alleged Secured Creditors

15 constitute an interest in property for the purposes of Section 363(f)(5).  *PW*, 391 B.R. at 41.

16        Second, in regard to the combined other elements – that a proceeding exists or could be

17 brought, in which the alleged Secured Creditors holding the Junior Liens could be compelled to

18 accept a money satisfaction of their Junior Liens – as set forth above, Hankey has a senior lien on the

19 Property securing the DIP Loan.  Hankey could conduct a judicial or non-judicial foreclosure on its

20 lien.  In the event of foreclosure by Hankey, the Secured Creditors' alleged Junior Liens (and

21 therefore their ability to foreclose on the Property in order to recover on their alleged Secured

22 Claims) could be eliminated and/or Secured Creditors could be compelled to accept money

23 satisfaction of their alleged Junior Liens securing their alleged Secured Claims against the Debtor.

24 *See, e.g., FPCI RE-HAB 01 v. E & G Investments, Ltd.*, 207 Cal. App. 3d 1018, 1023, 255 Cal. Rptr.

25 157, 161 (Ct. App. 1989) ("'The statutory scheme concerning nonjudicial foreclosure contemplates

26 that in order to protect its interest, a junior lienor must pay the trustor's obligation to the senior

27 lienor." (*Arnolds Management Corp. v. Eischen, supra*, 158 Cal.App.3d at p. 579, 205 Cal.Rptr. 15;

28 Civ.Code, §§ 2904, 2876, 2924c, sub. (a)(1).)  If a junior lienor does not cure the default in the senior

obligation or redeem at the senior foreclosure, its lien will be extinguished at the foreclosure sale unless the successful bidder purchases at a price high enough to pay off the senior indebtedness and the junior indebtedness as well. (*See, e.g., Bank of Hemet v. United States*, (9th Cir.1981) 643 F.2d 661.)"); *Bank of Am. v. Graves*, 51 Cal. App. 4th 607, 611–12, 59 Cal. Rptr. 2d 288, 291 (1996) ("*A senior foreclosure sale conveys the property free of all junior liens.... Thus, the junior no longer has a lien on the property, and the security has been entirely destroyed.* A sold-out junior thus holds security that has 'become valueless' and is permitted to sue directly on the note." (Bernhardt, Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 2d ed. 1990) § 4.8, pp. 193–194.)"); Cal.Civ.Code § 2924k (noting that when a senior trust deed holder forecloses, the funds from the sale are first used to pay certain costs of sale, then second used to pay the obligations of the senior foreclosing lender secured by the deed of trust that is the subject of the foreclosure sale, then third to pay the outstanding balance of obligations secured by any junior liens in the order of their priority).

In addition to foreclosure serving as a "legal proceeding" by which an entity may be compelled to accept less than full money satisfaction if its interest, courts have held that chapter 11 cramdown is also a "legal proceeding" by which an entity may be compelled to accept less than full money satisfaction and which will permit the sale of creditor's collateral free and clear of a lien under Section 363(f)(5). 11 U.S.C. § 1129(b)(2)(A); *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002) (holding that the liens or interests identified in the sale motion could be compelled to accept a money satisfaction in a cram down plan of reorganization in a chapter 11 case); *Scherer v. Federal National Mortgage Association (In re Terrace Chalet Apartments, LTD.)*, 159 B.R. at 829 (finding that Section 1129(b)(2) cram down is such a provision); *In re Perroncello*, 170 B.R. 189 (Bankr. D. Mass. 1994); *In re Grand Slam, U.S.A. Inc.*, 178 B.R. 460, 462 (E.D. Mich. 1995); *Collier* ¶ 363.06[6][a]. Thus, the Debtor can sell property free and clear of a creditor's lien it if demonstrates it can cram down the creditor's interest pursuant to § 1129(b)(2).

Section 1129(b)(2)(A) allows cram-down of a secured creditor, provided that it receives "the indubitable equivalent" of its claim. A debtor can cram down a secured creditor if it demonstrates (1) the debtor is not unfairly discriminating against the secured creditor, 11 U.S.C. § 1129(b)(1), (2) it is acting in good faith, 11 U.S.C. § 1129(a)(3), (b)(1), (3) the secured creditor will

retain its lien to the extent of its allowed claim, 11 U.S.C. § 1129(b)(2)(A)(i)(I), and (4) the secured creditor is receiving the actual value of its claim, 11 U.S.C. § 1129(b)(2)(A)(i)(II). S*ee also In re Sandy Ridge Dev. Corp*., 881 F.2d 1346, 1350 (5th Cir.1989) (holding that "indubitable equivalent" of a secured creditor's interest is the actual value of the claim). In *In re Hunt Energy Co., Inc.*, 48 B.R. 472, 485 (Bankr. N.D. Ohio, 1985), the court found that a lien which attaches to the proceeds of a sale would necessarily be reduced by subsequent valuation at a hearing under Section 506(a) to meet the "indubitable equivalence" requirements of Section 1129(b)(2)(A).    Once Section 1129(b)(2)(A) is satisfied, the lienholder would be compelled through the cram-down process to accept such money satisfaction as dictated by the cram-down provisions. *Id.*

All of the above requirements for cram down are met in this case.  The sale of the Property is being conducted in good faith, and, as indicated above, the Debtor believes that the Purchase Price to be paid by the Buyer, or a successful Overbidder approved by the Court, is the highest and best price that can be obtained for the Property under the circumstances.  Further, all of the Junior Liens shall attach to the proceeds of the sale with the same extent, validity, and priority as the alleged pre-petition liens held by the Secured Creditors.  Under these circumstances, to the extent it is allowed, the alleged Secured Creditors with Junior Liens will receive the actual value of their alleged Secured Claims as measured by Section 506(a), and the Secured Creditors with Junior Liens are being treated fairly and in accordance with the priority of their alleged Junior Liens, so there is no unfair discrimination present in the proposed sale.

Based on the foregoing, the Debtor can sell free and clear of the alleged Junior Liens pursuant to Section 363(f)(5) (as well as well as Section 363(f)(1)).

**C.    THE COURT SHOULD APPROVE THE PAYMENT OF CERTAIN CLAIMS FROM SALE PROCEEDS UPON THE CLOSE OF THE SALE OF THE PROPERTY AND ANY SALE OF THE FURNITURE.**

LBR 6004-1(h) provides as follows:

> A disbursement of proceeds [from a sale of estate property] must not be made without a specific order of the court authorizing the disbursement, *except* for payment to secured creditors, payment to a debtor of exempt proceeds, and payment for expenses of sale. Proceeds may be disbursed to pay auctioneer's fees and brokers' commissions without additional order of the court if payment is

consistent with the terms of the order approving the sale or authorizing the employment of the auctioneer or broker.

LBR 6004-1(h).

Here, pursuant to the Sale Motion, the Debtor is requesting authority to pay from the proceeds of the sale of the Property out of escrow on closing: (1) the outstanding balance of the DIP Loan provided by Hankey, which is secured by a first priority lien and which DIP Loan and first priority lien were approved by a prior order of the Court (approximately $12,059,500), (2) Hankey's senior receivership certificate loan, which was an advance of funds on a senior secured basis to the pre-petition receivership estate, as evidenced by Hankey's Proof of Claim No 19 in the asserted amount of $848,511, (3) Hankey's first priority pre-petition loan in the principal amount of $82.5 million, subject to accounting to be received from Hankey, as described in Hankey's Proof of Claim No. 20, (4) the claims of any taxing authorities or governmental units (as defined in 11 U.S.C. § 101(27) apportioned to the Debtor prior to the close of the sale that are secured by liens included in the non-Excepted Items (approximately $2.488 million), (5) a commission equal to two percent (2%) of the Purchase Price to be paid to and split equally between (a) the Debtor's Brokers, whose employment and one percent (1%) commission were previously approved by the Court's Employment Order, and (b) the Buyer's Brokers, whose one percent (1%) commission was previously approved by the Court's Employment Order, with any split between the Debtor's Brokers and the Buyer's Brokers to be determined by them ($2.520 million), and (6) any other customary escrow closing fees and charges allocated to the Debtor (approximately $630,000).   All of the foregoing payments are consistent with allowed disbursements of sale proceeds under LBR 6004-1(h).

**D.**    **THE COURT SHOULD WAIVE THE 14-DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULES 6004(h).**

FRBP 6004(h) provides, among other things, that an "order authorizing the … sale … of property . . . is stayed until the expiration of 14 days after entry of the court order, unless the court orders otherwise." Fed.R.Bankr.P. 6004(h).

Here, the hearing on the Sale Motion is scheduled for March 18, 2022.   Under the Purchase Agreement and the Court approved Bid Procedures, the Buyer is required to close by March

21, 2022.  It is important that the sale close as soon as possible (1) to avoid a breach of the Purchase Agreement, (2) to reduce the chances that the Buyer (or successful Overbidder approved by the Court) fails to close due to the passage of time, (3) to limit the accrual of additional interest, taxes, and upkeep expenses that have to be paid by the estate, and (4) to avoid the need for the Debtor to exercise the term extension option under the DIP Loan, which would result in the estate incurring an extension fee of $126,000.

Based on the foregoing, the Debtor requests that the Court waive the stay under FRBP 6004(h) and that the Sale Order be effective immediately upon entry.

### III.

### <u>CONCLUSION</u>

**WHEREFORE**, the Debtor respectfully requests that this Court enter a Sale Order granting the Sale Motion and providing the relief requested in paragraphs (1) through (5) of the above Sale Motion and granting such further and additional relief as the Court deems just and proper.

Dated: March 8, 2022                    CRESTLLOYD, LLC

                                         */s/ David B. Golubchik*
                                        DAVID B. GOLUBCHIK
                                        TODD M. ARNOLD
                                        LEVENE, NEALE, BENDER, YOO
                                            & GOLUBCHIK L.L.P.
                                        Attorneys for Debtor and Debtor in Possession

## DECLARATION OF LAWRENCE R. PERKINS

I, LAWRENCE R. PERKINS, hereby declare as follows:

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am the Founder and Chief Executive Officer of SierraConstellation Partners LLC ("SCP") and have nearly 20 years of management consulting and advisory experience with companies undergoing transition. I have enhanced business performance for numerous companies on projects ranging from interim management, profit improvement and working capital management to strategic planning and transaction execution.

3.      I have served in a variety of senior level positions including Financial Advisor, Strategic Consultant, Investment Banker, Financial Executive, and Crisis Manager to numerous middle market companies and believe that I am particularly skilled at assisting clients through challenging situations.

4.      Prior to founding SCP, I was a Senior Managing Director and Regional Leader of a national consulting firm where he was responsible for business development, marketing, staffing, and general management of the firm's western region. I joined the firm in 2010 when it acquired El Molino Advisors, a company I founded in January 2007 and led as the CEO.

5.      I began my career in the strategic consulting group of Arthur Andersen after graduating from the University of Southern California Marshall School of Business. I am currently on the board of several non-profits, and two corporate boards, and am a member of the Young Presidents Organization.

6.      SCP became the Non-Member Manager of the Debtor in October 2021 and is the current Non-Member Manager of the Debtor.  I have access to the Debtor's books and records.

7.      I make this Declaration in support of the Sale Motion to which this Declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same meaning as in the Sale Motion.

8.      On October 26, 2021 (the "Petition Date"), the Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor is operating

its estate and managing its financial affairs as a debtor in possession pursuant to Sections 1107 and 1108.

9.    The Debtor's primary asset is the residential Property that it developed, which is located at 944 Airole Way, Los Angeles, CA 90077.  I believe that the Property is one of the finest pieces of property in America.  The Property is situated on an approximately four-acre Bel Air promontory, featuring the best views of Los Angeles.  A moat that encompasses the Property gives the impression that it's floating on water.  The approximately 105,000-square-foot glass and marble compound holds 21 bedrooms, each with sweeping views of Los Angeles and the ocean, and 42 full and 7 half bathrooms, as well as numerous amenities.  It features a 30-car garage, five swimming pools, a two-story waterfall, and numerous other water features, as well as two restaurant-grade kitchens, an indoor/outdoor entertainment center with its own VIP room, a movie theater, charitable organization rooms, a four-lane bowling alley, a library with floor-to-ceiling windows, a full beauty salon, a spa with a steam room and jacuzzi, a cigar lounge, and a gym.  Three smaller villas also sit on the property, spread across the four acres.  The 5,000-square-foot master suite is an oasis within the mansion.  Designed with its own separate office and walk-in closet, the suite also has its own pool and kitchen.  To guarantee privacy, it's isolated from the rest of the house.  The mansion includes five elevators and LED ceilings that display images of moving clouds. The Property features state-of-the-art technology, with a full security center.  The design encompasses secondary corridors for staff to use.

10.    The Debtor's Schedules of Assets and Liabilities (the "Schedules") listed $176.6 million in claims allegedly secured by the Property, $0 in priority unsecured claims, and $3.4 million in general unsecured claims.  The Court set a claims bar date of January 14, 2022 (the "Bar Date") [Dkt. 60] and 26 proofs of claim (the "POCs") were filed asserting $183.6 million in claims allegedly secured by the Property, $2,666 in priority unsecured claims, and $59.2 million in general unsecured claims.  There is substantial overlap between the claims included in the Schedules and asserted by the POCs.  The main reason for the large difference between general unsecured claims in the Schedules and asserted by the POCs is a $44.4 million claim asserted by the beneficial owner of the Debtor (Nile Niami) that was not listed in the Schedules.

11.    In addition, after the Petition Date, the Debtor filed a motion (the "DIP Motion") [Dkt. 66] seeking Court approval to obtain a $12 million DIP Loan from Hankey secured by a first position lien on the Property and, with limited exceptions, all of the Debtor's personal property, pursuant to the loan documents for the DIP Loan.  One of the purposes of the DIP Loan was to allow the Debtor to make certain repairs to the Property and to market and sell the Property on an expedited basis with a sale to close on March 21, 2022 (the "Closing Date").  On January 27, 2022, the Court entered its final order granting the DIP Motion. [Dkt. 122]   Thereafter, the Debtor drew down the entire DIP Loan, less fees and expenses payable to Hankey as the lender.   After identifying the highest of a creditors scheduled and POC claim amounts, as of the Petition Date, plus the DIP Loan, the Debtor had approximately $195.771 million in claims allegedly secured by liens on Debtor's Property.

12.    Based on the foregoing, information received from certain alleged secured creditors, and other information available to the Debtor, including calculations of post-Petition Date interest for certain senior alleged secured claims, I am informed and believe that, as of the projected Closing Date, the Debtor's alleged secured creditors will be asserting claims totaling approximately $203.69 million (the "Secured Claims"), which amount may be higher to the extent secured creditors have attorneys' fees and costs allowed as part of their claims.  However, as set forth below, the Debtor believes that there are numerous bases to object to and eliminate or reduce portions of the Secured Claims.  The creditors asserting secured claims against the Debtor (the "Secured Creditors"), together with the estimated amount of the alleged Secured Claims as of the Closing Date (not including any additional allowed attorneys' fees and costs), the priority thereof according to the Title Report, and certain bases to object to some of the Secured Claims are summarized below (the "Secured Claims Summary Chart"), which is a summary only and is not an admission as to the validity of any claim or lien, the priority of any claim or lien, the amount of accrued post-petition interest (or the entitlement thereto), or the waiver of any bases to object to any alleged Secured Claim.  The Secured Claims Summary is based on the Debtor's books and records, information received from certain alleged Secured Creditors, including the attachments to the POCs filed by the Secured Creditors and referenced below, and other information available to the Debtor.

| Creditor | POC | Secured Claim Per Higher of Schedules of POC | | | | Notes |
|---|---|---|---|---|---|---|
| | | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| Hankey Capital, LLC | | $12,000,000.00 | $59,500.00 | $12,059,500.00 | $12,059,500.00 | DIP Loan |
| Los Angeles County Tax Collector | 5 | $3,190,280.76 | Not Calculated | $3,190,280.76 | $2,488,815.00 | Property Taxes The County its POC on 12/7/21. The Debtor paid $701,465.73 on 1/6/22 as the first installment of the 2021-2022 tax bill. Thus, the claim is $2,488,815. |
| County of Los Angeles | | $0.00 | Not Calculated | $0.00 | $0.00 | Special Assessment |
| County of Los Angeles | | $0.00 | Not Calculated | $0.00 | $0.00 | Special Assessment |
| County of Los Angeles | | $0.00 | Not Calculated | $0.00 | $0.00 | Special Assessment |
| Hankey Capital, LLC | 20 | $122,638,623.41 | $6,839,418.99 | $129,478,042.40 | $104,541,764.62 | Per the POC and the attachments thereto: (1) Hankey Made these loans to the Debtor: o Oct 25th, 2018: $82,500,000 o Dec 12th, 2019: $91,000,000 (incremental 8.5mm on original) o Aug 20th, 2020: $106,000,000 (incremental $15mm) (2) Hankey recorded these Deeds of Trust (each a "DOT") o Oct 25th, 2018 DOT: secured $82.5mm (Recording No: 20181122917) o Aug 31st, 2020 amendment to Oct 25th, 2018 DOT: secured amended $106mm note (Recording No: 20201030024) (3) The $106 million loan had a maturity date of Oct. 31, 2020 and the Debtor did not pay the loan by the maturity date so Hankey called a default. The Debtor believes that there may be bases to object to the secured status of the subsequent Dec 12th, 2019 loan and/or the subsequent Aug 20th, 2020 loan (and any related interest and attorneys' fees) on the grounds that there was no stand-alone security agreement and recorded DOT for this increased obligation. |

| Creditor | POC | Secured Claim Per Higher of Schedules of POC | | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | Notes |
|---|---|---|---|---|---|---|---|
| | | Secured | | | | | |
| | | | | | | | The Debtor believes that there may be a basis to object to the priority of Hankey's DOT to secure anything other than the Oct 25th, 2018 loan for $82,500,00 (and any related attorneys' fees and interest), because, (1) prior to the Oct 25th, 2018 loan and related DOT, Inferno had a senior DOT and (2) pursuant to the Subordination Agreement entered into by the Debtor, Hankey, and Inferno, Inferno only agreed to subordinate its DOT to Hankey's Oct 25th, 2018 DOT to secure the obligations under the Oct 25th, 2018 loan for $82,500,00 (and any related attorneys' fees and interest), not for any further loans.

The Debtor believes that there may be a basis to object to the secured status of the subsequent Dec 12th, 2019 loan as a constructively fraudulent transfer, because it is allegedly secured by the Aug 31st, 2020 amendment to Oct 25th, 2018 DOT and the Debtor did not get any additional consideration for providing security on the Dec 12th, 2019 loan over 8 months after it was made. |

| | Secured Claim Per Higher of Schedules of POC | | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| Hankey Capital, LLC | 18 | $5,000,000.00 | NA | $5,000,000.00 | $1,300,000.00 | Per 8/20/20 Profit Participation Agreement ("PPA") attached to POC: "If, at any time, *during the term of the Loan or subsequent to Borrower's repayment of the Loan*, the Property is sold by the Borrower, or by any affiliate of the Borrower, for a purchase price in excess of One Hundred Million and No/100 Dollars ($100,000,000), Lender shall be entitled to receive, from the sale proceeds, a Lender *Profit* Participation Payment in the amount equal to the lesser of (a) five percent (5.0%) of the gross sales price for the Property which exceeds $100,000,000, or (b) Five Million and Noll 00 Dollars ($5,000,000.00). The Debtor believes that there may be bases to object to the secured status of this POC, because **(a)** the Loan matured on October 31, 2020 and the Debtor did not sell the property prior to  the expiration of the term of the Loan nor did the Debtor sell the Property after the repayment of the Loan; therefore, the conditions to payment under the 8/20/20 PPA were not satisfied, **(b)** the claim can be re-characterized from debt to equity since it involves and is based on sharing in profit and the obligation could remain even after repayment of the Hankey loans and (one would imagine) re-conveyance of the Hankey DOT's to the Debtor, **(c)** the PPA does not clearly specify that it is secured by the Property, and **(d)** Hankey, in addition to its DOTs, recorded a Memorandum of Agreement regarding the PPA, which also does not clearly state that the obligations thereunder are secured by the Property. |

| | Secured Claim Per Higher of Schedules of POC | | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| Hankey Capital, LLC | 17 | $3,500,000.00 | NA | $3,500,000.00 | $0.00 | Per 10/25/18 PPA attached to POC: "If, at any time, during the term of the Loan or following repayment of the Loan, the Property is sold by the Borrower, or by any affiliate of the Borrower, for a purchase price in excess of $200,000,000), Lender shall be entitled to receive, from the sale proceeds, a Lender Profit Participation Payment in the amount of $3,500,000." The Purchase Price is under $200 million.  Thus, in addition to the arguments above regarding the 8/20/20 PPA, the condition to trigger this PPA will not be satisfied by the proposed sale under the Sale Motion. |
| Hankey Capital, LLC | 19 | $845,811.04 | $33,569.66 | $879,380.70 | $879,380.70 | Receiver's Certificate 1 and 2. |
| Inferno Investment Inc. | 11 | $20,902,106.12 | $354,473.24 | $21,256,579.36 | $18,256,000.00 | Per the POC and the attachments thereto:

**Note 1** dated 3/13/13 for $3,925,545 provides as follows: "Due to the fact that the security for this Note is a deed of trust third in priority to a first and second deed of trust on the Property, thereby making this loan a "high risk loan", Borrower agrees to pay Lender additional consideration and not as additional interest as follows: Fifty percent (50%) of the net profits derived from the sale of each of the residences located at 271 S. Mapleton Drive, Los Angeles, CA and 1175 Hillcrest, Beverly Hills, CA and Fifteen percent (15%) of the net profits derived from the sale of the residence at 944 Airole, Los Angeles, CA"

**Note 2** dated 3/13/13 for $14,000,040 was later modified to $7 million in October 2015 for reasons that are unknown to the Debtor's current management. |

| Creditor | POC | Secured Claim Per Higher of Schedules of POC | | Notes |
|---|---|---|---|---|
| | | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |

| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | Notes |
|---|---|---|---|---|---|---|
| | | | | | | **DOTs** - The DOT recorded on 3/13/13 only secured the second note for $14,000,040, as the first note for $3,925,545 is not referenced until a Modification and Supplement to Deed of Trust recorded on 11/10/15.The Debtor believes that there may be bases to object to a material amount of the claim, because (1) (a) the language of the first note appears to indicate that such loan was related to the Debtor's Property **and** two properties (271 S. Mapleton and 1175 Hillcrest) that, to my knowledge, were not owned by the Debtor and the first note includes a profit sharing provision, and (b) the second note for $14,000,040 was later modified to $7 million, both of which call into question the amount that was actually loaned to the Debtor, (2) books and records currently available to the Debtor do not indicate that Inferno loaned $17,925,585 to the Debtor, (3) despite the reduction of the second note for $14,000,040 down to $7 million, the interest calculation attached to the POC includes 31 months of interest totaling $2.901 million on the basis of a loan in the amount of $14,000,040, and (4) to the extent any portion of the first note was for profit sharing, such portion would be subject to recharacterization for the reasons discussed above.<br><br>The Debtor also believes that there may be bases to object to the secured status of the  first note for $3,925,5453 because, (1) as noted, the DOT recorded on 3/13/13 only secured the second note for $14,000,040, as the first note for $3,925,5453 is not referenced until a Modification and Supplement to Deed of Trust recorded on 11/10/15 and the Debtor did not get any |

| | Secured Claim Per Higher of Schedules of POC | | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| | | | | | | additional consideration for allegedly providing security for the first note over two and a half years after the loan thereunder was purportedly made and (2) the DOT does not cover any alleged claim to profit sharing under the first note.

In addition, the Debtor and Inferno entered into a "Memorandum of Agreement" dated January 1, 2016 pursuant to which that parties (including Inferno) agreed that, prior to Inferno receiving any payment, Inferno agrees that payments must first be made to all outstanding loans and construction costs for the Property.  As a result, Inferno has contractually subordinated itself to all other loans and construct costs for the Property. A true and correct copy of the foregoing Memorandum of Agreement is attached as **Exhibit "6"** hereto.

I am informed and believe that, weeks ago the Debtor's counsel requested that Inferno's counsel send documentation regarding the funding of the purported loans.  I am informed and believe that, despite the foregoing, it was not until March 7, 2022 (i.e., a mere day before the deadline to file the Sale Motion) that Inferno's counsel sent such documentation, so the Debtor has not had time to analyze it. However, it is notable that, in the email transmittal of the documentation that was sent to the Debtor's counsel and forwarded to me, Inferno's counsel admitted that Inferno had not yet found documentation regarding funding of $7 million of the alleged loan from Inferno.  A true and correct copy of the 3/7/22 email from Inferno's counsel to the Debtor's counsel that was forwarded to me is attached |

| | | Secured Claim Per Higher of Schedules of POC | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| | | | | | | hereto as **Exhibit "4"** without exhibits. |
| YOGI Securities Holdings, LLC | 15 | $21,943,053.75 | $632,134.92 | $22,575,188.67 | $18,000,000.00 | Per the POC and the attachments thereto:Note dated 10/16/18 for $30,188,235 provides, inter alia, that (1) the loan was to be paid in full upon the sale of the Debtor's property or the Hillcrest Property and that payments would also be due as the Londonderry Property, Bellagio Property, Carcassonne Property, and Stone Ridge Property were sold (with the Hillcrest Property, Londonderry Property, Bellagio Property, Carcassonne Property, and Stone Ridge Property as defined in the note and collectively referred to here as the "Other Properties"), (2) at least in regard to the Londonderry Property, Bellagio Property, Carcassonne Property, and Stone Ridge Property, the DOT's for those properties were provided by entities other than the Debtor.  The Debtor believes that there may be bases to object to a material amount of the claim, because (1) the language of the note appears to indicate that such loan was related to the Debtor's Property and at least four properties (the Londonderry Property, Bellagio Property, Carcassonne Property, and Stone Ridge Property) owned |

| | Secured Claim Per Higher of Schedules of POC | | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| | | | | | | by entities other than the Debtor which calls into question the amount that was actually loaned to the Debtor, (2) $5.2 million of the loan was to be advanced upon request by the Debtor and only if there were no defaults and there is no indication in the books and records currently available to the Debtor that this occurred, (3) books and records currently available to the Debtor do not indicate that YOGI loaned $30,188,235 to the Debtor, (4) four of the Other Properties (the Hillcrest Property, Bellagio Property, Carcassonne Property, and Londonderry Property) providing for a pay down on the note sold, yet YOGI did not collect the required pay down amounts per the note (a) Hillcrest Property sold for $38.3 million, note required payment in full, only $2.917 million received and applied to loan balance by YOGI), (b) Bellagio Property sold for $36 million, note required payment of $10 million, only $2.5 million received and applied to loan balance by YOGI), (c) Carcassonne Property sold for $36 million, note required payment of $15 million, only $4.310 million received and applied to loan balance by YOGI), and (d) Londonderry Property sold for $26 million, note required payment of $10 million, only $6.013 million received and applied to loan balance by YOGI), and (5) one of the Other Properties (the Stone Ridge Property) providing for a pay down on the note sold for $9.95 million, yet YOGI did not collect any payment upon the close of that sale (at least the attachment to the POC does not show any pay down) (property sold for $9.95 million, note required a $5 million pay down, $0 received and applied to loan balance by YOGI). |

| Creditor | POC | Secured Claim Per Higher of Schedules of POC | | Total Claim | | Notes |
|---|---|---|---|---|---|---|
| | | Secured | Estimated Additional Interest to Closing Date | | Estimated Claim Based on Potential Objection | |
| | | | | | | The property sale information set forth above was obtained from online searches at redfin.com, Zillow.com, and similar other websites that show sales dates and prices.

The Debtor understands that it is possible that the pay downs were less than required by the note based on the sale price for the Other Properties and the position of YOGI's liens on the Other Properties.  However, additional information is needed and the fact that the pay down from the Bellagio Property was exactly $2.5 million calls into question whether YOGI was maximizing recoveries from the Other Properties, which may be a basis for equitable subordination.  The Debtor believes that there may be a basis to object to the secured status of a portion of the loan as a constructively fraudulent transfer to the extent the loan rolled up prior loans that were not made to the Debtor and/or and secured them with the Property. |
| American Truck & Tool Rentals Inc. | 14 | $188,087.09 | Not Calculated | $188,087.09 | $188,087.09 | Mechanic's Lien |
| J&E Texture, Inc. | 13 | $284,086.99 | Not Calculated | $284,086.99 | $284,086.99 | Mechanic's Lien |
| Hilldun Corporation | 9 | $5,000,000.00 | NA | $5,000,000.00 | $0.00 | On March 7, 2022, the Debtor and Hilldun filed their stipulation providing that Hilldun's claim was subject to bona fide dispute for the purposes of Section 363(f)(4). |
| JMS Air Conditioning | | $51,290.00 | Not Calculated | $51,290.00 | $51,290.00 | Mechanic's Lien |
| Calgrove Rentals Inc. | | $0.00 | Not Calculated | $0.00 | $0.00 | Mechanic's Lien |
| BMC West LLC | | $2,399.00 | Not Calculated | $2,399.00 | $2,399.00 | Mechanic's Lien |
| City of Los Angeles | | $0.00 | Not Calculated | $0.00 | $0.00 | |
| Parquet by Dian | | $40,846.00 | Not Calculated | $40,846.00 | $40,846.00 | Mechanic's Lien |
| Powertek Electric Inc. | 16 | $40,480.00 | Not Calculated | $40,480.00 | $40,480.00 | Mechanic's Lien |
| Kennco Plumbing, Inc. | 6 | $85,560.17 | Not Calculated | $85,560.17 | $85,560.17 | Mechanic's Lien |

| | | Secured Claim Per Higher of Schedules of POC | | | | Notes |
|---|---|---|---|---|---|---|
| Creditor | POC | Secured | Estimated Additional Interest to Closing Date | Total Claim | Estimated Claim Based on Potential Objection | |
| Kazemi & Associates Constructors | 24 | $59,173.34 | Not Calculated | $59,173.34 | $59,173.34 | Mechanic's Lien Not Attached to POC. Ledger attached to POC makes it look like creditor was paid in full or over paid. |
| **TOTALS** | - | **$195,771,797.67** | - | **$203,690,894.48** | **$158,277,382.91** | - |

13.    Unfortunately, before the Property could be fully completed and sold (either as a fully completed or nearly completed project), the Debtor's primary secured lender, Hankey, as well as a number of other junior secured lenders and mechanic's lien holders initiated a multitude of state court actions against the Debtor seeking, among other things, to recover amounts allegedly owed and to foreclose on the Property.  In connection with its action, Hankey sought and obtained the appointment of a receiver for the Property (the "Receiver").  In addition, Hankey had a foreclosure sale of the Property set for October 27, 2021.

14.    In order to protect its substantial equity in the Property and address myriad litigation and other claims against it, the Debtor filed its bankruptcy case on the Petition Date of October 26, 2021, which stayed the foreclosure sale.  It was imperative for the Debtor regain possession and control over the Property from the Receiver, and to obtain the breathing spell afforded by the automatic stay, not only to stop the foreclosure and protect the equity in the Property, but also to provide time and a means for the Debtor to sell the Property.

15.    As a precursor to selling the Property, the Debtor had to regain possession and control of the Property from the Receiver.  To that end, immediately after the Petition Date, the Debtor's counsel demanded that the Receiver, among other things, (1) turnover the Property and other property of the estate and (2) to cease exercising control over such estate property.  As can be seen from the docket, soon after the Petition Date, the Debtor, with the assistance of its counsel and SCP, quickly negotiated an interim stipulation with Hankey and the Receiver regarding access to the Property to facilitate efforts to employ brokers and market and sell the Property.  Based on the efforts

of the Debtor's counsel and SCP, the Receiver voluntarily turned over the Property and all other estate property to the Debtor as of December 1, 2021.

16.    The Debtor's intent before and after the Petition Date was to market and sell the Property for the highest price possible under the circumstances in order to maximize the distribution to creditors and exit bankruptcy through a plan or structured dismissal.

17.    On December 12, 2021, the Debtor filed an application (the "Employment Application") [Dkts. 74, 78, and 81] to (a) employ the Debtor Brokers as real estate brokers pursuant to 11 U.S.C. § 327(a), with compensation determined pursuant to 11 U.S.C. § 328, pursuant to the terms of the Residential Listing Agreement (the "Listing Agreement") between the Debtor and the Brokers that was attached to the Employment Application, (b) employ Concierge Auctions, LLC ("Concierge" or the "Auctioneer") as auctioneer pursuant to 11 U.S.C § 327(a), with compensation determined pursuant to 11 U.S.C. § 328, pursuant to the terms of the Auction Agreement (the "Auction Agreement") between the Debtor and the Auctioneer, which is attached to the Employment Application, and (c) approve the payment of compensation to the Brokers and the Auctioneer from escrow upon closing.

18.    As set forth in the Employment Application and relevant here, (a) pursuant to the Listing Agreement, on a sale price up to $175 million, the Debtor Brokers are entitled to a commission of 1% of the sale price (plus 1% payable to any Buyer Broker) and (b) pursuant to the Auction Agreement, the Auctioneer is entitled to a fee of 12% of the sale price (the "Buyer's Premium")  to be paid by the Buyer (not the Debtor) separately from the sale price, provided that, on a sale equal to or less than $225 million, the Auctioneer would rebate 9.5% of the 12% Buyer's Premium to the Debtor's estate and retain only 2.5% of the Buyer's Premium.

19.    On January 1, 2022, the Court entered an order (the "Employment Order") [Dkt. 104] approving the Employment Application, the compensation provided for thereunder, and payment of such compensation from escrow on closing.

20.    On December 29, 2021, the Debtor filed its Bid Procedures Motion to approve the Bid Procedures for an Auction of the Property [Dkt. 88].  On January 10, 2022, the Court entered its order granting the Bid Procedures Motion [Dkt. 105], which Bid Procedures were amended by a

further order of the Court entered on January 14, 2022 [Dkt. 115] (the foregoing orders are referred to as the Bid Procedures Orders herein).  Pursuant to the Bid Procedures Orders, the scheduling for the Auction and the instant Sale Motion were/are as follows:

| February 28, 2022 through March 3, 2022 | Online Auction for the Property to be conducted by the Auctioneer. |
|---|---|
| March 8, 2022 | Deadline for the Debtor to file and serve the Sale Motion. |
| March 15, 2022, at 12:00 p.m. (Pacific) | Deadline for any parties in interest to file and serve any oppositions to the Sale Motion. |
| March 16, 2022 | Deadline for any parties in interest to file and serve any replies to any oppositions to the Sale Motion. |
| March 18, 2022, at 11:00 a.m. (Pacific) | Hearing on the Sale Motion |
| March 21, 2022 (unless extended by agreement between the Debtor and the buyer) | Closing Date |

21.    As set forth in the Exposure Report (the "Exposure Report") attached hereto as **Exhibit "3"** (which can also be accessed here with hyperlinks to various publications and documents referenced in the Exposure Report), which I am informed and believe was prepared by the Auctioneer and is accurate, and the annexed declarations of Chad Roffers and Branden Williams, the Property was extensively marketed through, among other things, (a) the Property being exposed in 171 countries, (b) 83,740 property views, 197,602 web page views, and 16,800 film views on the Auctioneer's website, (c) numerous email blasts to the Auctioneer's private client group, select billionaires, targeted owners of high value properties, and subscriber lists as large as 160,000 members, which email blasts included access to a high-quality catalogue for the Property, (d) numerous publications by media outlets regarding the Property, (e) listings on the MLS, Luxuryrealestate.com, Juwai.com, Zillow.com, Realtor.com, Sothebys.com, (f) a feature commercial shown in the lead up to the Super Bowl, and (g) social media campaigns on Facebook, Google, Instagram.

22.    I am informed and believe that the foregoing marketing efforts, as well as the pre-Petition Date marketing efforts by the Debtor's Brokers, resulted in 40 qualified showings of the Property by the Auctioneer, 20 showings of the Property by the Debtor's Brokers (8 by Compass and 12 by TBHE), and five Bidders that qualified for bidding at the Auction by submitting the documents

and $250,000 Bidder Deposit required by the Bid Procedures.

23.    The extensive marketing of the Property achieved results.  I am informed and believe that, consistent with the Court-approved Bid Procedures, the Auctioneer conducted the Auction of the Property starting on February 28, 2022 and ending on March 3, 2022.  I am informed and believe that the bidding on the Property was as follows:

| PADDLE # | BID AMOUNT | TIME BID PLACED |
|---|---|---|
| 7 #618043 | $126,000,000 | (WINNING BID by the Buyer) 6:10PM 03.03.2022 |
| 6 #618043 | $120,000,000 | 6:02PM 03.03.2022 |
| 5 #463985 | $100,000,000 | 6:02PM 03.03.2022 |
| 4 #618043 | $90,000,000 | 5:58PM 03.03.2022 |
| 3 #463985 | $70,000,000 | 2:43PM 03.03.2022 |
| 2 #423367 | $60,000,000 | 4:12PM 03.01.2022 |
| 1 #222270 | $50,000,000 | (STARTING BID) 02.28.2022) |

24.    After the Auction, the Debtor and the Buyer executed the Purchase Agreement, a true and correct copy of which is attached hereto as **Exhibit "2."**  The attached Purchase Agreement includes the form of the Supplemental Addendum approved by the Court signed by the Debtor but not the Buyer.  The Buyer requested that Debtor execute an Supplemental Addendum to the Purchase Agreement that was different from the Court-approved Supplemental Addendum, because it was amended by the Buyer to provide that the Buyer's remedies will not be limited to those in the Court-approved Bid Procedures if the Debtor sells the Property to any party other than the Buyer.  Because the sale is subject to approval of this Court and, in the event that the Court may theoretically order a sale to another party if another offer is presented and viewed as more beneficial to the estate by the Court, the Debtor was unwilling to execute such amended Supplemental Addendum and takes the position that the amendments are material changes to the Court-approved Supplemental Addendum.

25.    The form of the Purchase Agreement, other than the Purchase Price and identity of the Buyer, which was required to be used by all Bidders, was prepared and approved by the Court before the Auction pursuant to the Bid Procedures Order.  Further, the Property was sold pursuant to an Auction conducted in accordance with the Court-approved Bid Procedures.  Thus, in my opinion,

the terms of the Purchase Agreement are the result of more than arms-length negotiations between the Debtor and the Buyer.  Further, I am informed and believe that, other than in connection with the proposed sale of the Property (which, again, was conducted by the Auctioneer pursuant to the Court-approved Bid Procedures), the Buyer has no prior connections with the Debtor or its current non-Member manager, SCP.  Also, I have no basis to believe that the Auction and resulting winning bid by the Buyer were the product of any collusion.

26.    As noted above, the Debtor's exit strategy is based on the sale of the Property to generate funds to pay creditors.  After substantial marketing of the Property and an Auction conducted pursuant to the Bid Procedures, the Purchase Price offered by the Buyer is the highest and best binding offer received by the Debtor.  I believe that the already limited pool of buyers with the means to purchase the Property may have been further reduced due to the conflict in Ukraine and related sanctions against Russia, which may have taken potential Russian, Ukrainian, Chinese and other international buyers out of the market.  It is unfortunate that the Purchase Price will not generate sufficient funds to pay all allowed claims in full and likely not to pay allowed Secured Claims in full.  However, in the absence of the approval of the proposed sale, the distribution on allowed claims would likely be much lower, because, among other things, (a) the Debtor would continue to incur huge per deim interest in the approximate amount of $50,000 on the senior Secured Claims asserted by Hankey, (b) the Debtor would have to pay an extension fee of $126,000 on the DIP Loan, (c) the Debtor would continue to incur large administrative claims arising from the costs associated with securing, insuring, and maintaining the Property, as well as for material ongoing services provided by estate professionals, and (d) the Debtor would continue to incur bi-yearly property taxes in the approximate amount of $700,000.  There is also the possibility that the Debtor never gets an offer as high as the Purchase Price offered by the Buyer.  The proposed sale provides an assured result and allows the debtor to curtail substantial secured and administrative claims.

27.    Based on the foregoing, in an exercise of my business judgment, I have concluded that the proposed sale furthers the Debtor's exit strategy and is in the best interests of the estate and its creditors.

28.     As noted above, the Debtor's Brokers and the Auctioneer engaged in expansive marketing efforts regarding the sale of the Property.  Those efforts resulted in the current $126 million offer for the Property, which will result in gross sale proceed in the amount of $137.97 million after the payment of the $11.97 million Rebate from the Auctioneer.  That offer was obtained after a three day Auction conducted pursuant to the Bid Procedures approved by the Court, which were designed and approved as a means to ensure that the highest price possible was obtained for Property under the circumstances.  Based on the foregoing, in an exercise of my business judgment, I believe that that the Purchase Price represents fair and reasonable value for the Property in today's marketplace.

29.     The Debtor reached out to the alleged lenders asserting Secured Claims – Hankey, Inferno, Yogi, and Hilldun (the "Lenders") – to inquire as to whether each would consent to the proposed sale to the Buyer.  Some or all of the Lenders may consent, either affirmatively or via non-opposition to the Sale Motion.  In addition, since the secured claim of the Los Angeles County Tax Collector will be paid in full, I expect it will consent to the proposed sale by one of the foregoing means.  The Debtor has not reached out to the numerous mechanics' lien creditors listed in the Secured Claims Summary – American Truck & Tool Rental, J&E Texture, Inc., JMS Air, Calgrove Rentals, BMC West, Parquet by Dan, Powertek Electric, Kennco Plumbing, and Kazemi & Associates (the "Construction Creditors"), but some or all of them may also consent to the proposed sale or not oppose the Motion.

30.     Since many alleged Secured Creditors may consent to the proposed sale and/or be "out of the money," the Debtor has not expended additional estate resources to prepare formal complaints and initiate litigation in regard to various the alleged Secured Claims.  However, as set forth in the Secured Claims Summary Chart there are factual grounds establishing a bona fide dispute as to the Secured Claims asserted by Hankey (other than its claim for the DIP Loan), Inferno, and YOGI, which assert approximately $142 million in alleged Secured Claims.  The Debtor and Hilldun filed a stipulation providing that Hilldun's claim was subject to a bona fide dispute such that Section 363(f)(4) is satisfied as to its claim.

31.     In addition to the foregoing specific disputes, the priority of all of the Secured Claims (other than the secured claim of Hankey for the DIP Loan and the Los Angeles County Tax

Collector) vis-à-vis one another are likely subject to bona fide dispute.  The reason for the foregoing is that there are nine Construction Creditors.  As set forth in the Title Report and Secured Claims Summary Chart, the liens of the Construction Creditors are generally recorded later in time from the liens of the Lenders.  However, I am informed that Cal. Civ. Code § 8450 provides that a mechanic's lien priority relates back to the time of commencement of work, not the date of the recordation of the lien.  Construction Creditor J&E Texture, Inc. has already asserted that its mechanic's lien has priority over all other secured claims other than Hankey's claim for the DIP Loan.  *See* 3/7/22 letter from J&E Texture, Inc.'s counsel to Debtor's counsel, a copy of which was provided to me, a true and correct copy of which is attached hereto as **Exhibit "4."**

32.     Pursuant to the Sale Motion, the Debtor is requesting authority to pay from the proceeds of the sale of the Property out of escrow on closing: (a) the outstanding balance of the DIP Loan provided by Hankey, which is secured by a first priority lien and which DIP Loan and first priority lien were approved by a prior order of the Court (approximately $12,059,500), (b) Hankey's senior receivership certificate loan, which was an advance of funds on a senior secured basis to the pre-petition receivership estate, as evidenced by Hankey's Proof of Claim No 19 in the asserted amount of $848,511, (c) Hankey's first priority pre-petition loan in the principal amount of $82.5 million, subject to accounting to be received from Hankey, as described in Hankey's Proof of Claim No. 20, (d) the claims of any taxing authorities or governmental units (as defined in 11 U.S.C. § 101(27) apportioned to the Debtor prior to the close of the sale that are secured by liens included in the non-Excepted Items (approximately $2.488 million), (e) a commission equal to two percent (2%) of the Purchase Price to be paid to and split equally between (i) the Debtor's Brokers, whose employment and one percent (1%) commission were previously approved by the Court's Employment Order, and (ii) the Buyer's Brokers, whose one percent (1%) commission was previously approved by the Court's Employment Order, with any split between the Debtor's Brokers and the Buyer's Brokers to be determined by them ($2.520 million), and (f) any other customary escrow closing fees and charges allocated to the Debtor (approximately $630,000).

33.     The hearing on the Sale Motion is scheduled for March 18, 2022.  Under the Purchase Agreement and the Court approved Bid Procedures, the Buyer is required to close by March

21, 2022.  It is important that the sale close as soon as possible (a) to avoid a breach of the Purchase Agreement, (b) to reduce the chances that the Buyer (or successful Overbidder approved by the Court) fails to close due to the passage of time, (c) to limit the accrual of additional interest, taxes, and upkeep expenses that have to be paid by the estate, and (d) to avoid the need for the Debtor to exercise the term extension option under the DIP Loan, which would result in the estate incurring an extension fee of $126,000.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 8th day of March 2022, at Los Angeles, California.

_____
LAWRENCE R. PERKINS

56

### DECLARATION OF CHAD ROFFERS

I, CHAD ROFFERS, hereby declare as follows:

1.       I am over 18 years of age.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.       I am the President of Concierge Auctions, LLC ("Concierge" or the "Auctioneer") and have access to its books and records.

3.       I make this declaration in support of the Sale Motion to which this declaration is attached.  Capitalized terms not defined herein have the same meanings as set forth in the Sale Motion.

4.       As set forth in the Exposure Report (the "Exposure Report") attached hereto as **Exhibit "3"** (which can also be accessed here with hyperlinks to various publications and documents referenced in the Exposure Report), which was prepared by Concierge, the Property was extensively marketed through, among other things, (a) the Property being exposed in 171 countries, (b) 83,740 property views, 197,602 web page views, and 16,800 film views on Concierge's website, (c) numerous email blasts to Concierge's private client group, select billionaires, targeted owners of high value properties, and subscriber lists as large as 160,000 members, which email blasts included access to a high-quality catalogue for the Property, (d) numerous publications by media outlets regarding the Property, (e) listings on the MLS, Luxuryrealestate.com, Juwai.com, Zillow.com, Realtor.com, Sothebys.com, (f) a feature commercial shown in the lead up to the Super Bowl, and (g) social media campaigns on Facebook, Google, Instagram.

5.       The foregoing marketing efforts, as well as the pre-Petition Date marketing efforts that I understand were undertaken by the Debtor's Brokers, resulted in 40 qualified showings of the Property by Concierge, 20 showings of the Property by the Debtor's Brokers (8 by Compass and 12 by TBHE), and five Bidders that qualified for bidding at the Auction by submitting the documents and $250,000 Bidder Deposit required by the Bid Procedures.

6.       The extensive marketing of the Property achieved results.  Consistent with the Court-approved Bid Procedures, Concierge conducted the Auction of the Property starting on February 28, 2022 and ending on March 3, 2022.  The bidding on the Property was as follows:

| PADDLE # | BID AMOUNT | TIME BID PLACED |
|---|---|---|
| *7* #618043 | $126,000,000 | (WINNING BID by the Buyer) 6:10PM 03.03.2022 |
| *6* #618043 | $120,000,000 | 6:02PM 03.03.2022 |
| *5* #463985 | $100,000,000 | 6:02PM 03.03.2022 |
| *4* #618043 | $90,000,000 | 5:58PM 03.03.2022 |
| *3* #463985 | $70,000,000 | 2:43PM 03.03.2022 |
| *2* #423367 | $60,000,000 | 4:12PM 03.01.2022 |
| *1* #222270 | $50,000,000 | (STARTING BID) 02.28.2022) |

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 8th day of March 2022, at _____Austin_____, _____TX_____.

_____

CHAD ROFFERS

58

## DECLARATION OF BRANDEN WILLIAMS

I, BRANDEN WILLIAMS, hereby declare as follows:

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am a principal of The Beverly Hills Estates ("TBHE"), a leading real estate firm in Los Angeles that specializes in, among other things, architecturally significant and one-of-a-kind properties.  My wife, Rayni, and I are recognized as L.A.'s highest-performing real estate team based on our sales record, including a career totaling over $8.7 billion in sales.

3.      I make this declaration in support of the Sale Motion to which this declaration is attached.  Capitalized terms not defined herein have the same meanings as set forth in the Sale Motion.

4.      As set forth in the Exposure Report (the "Exposure Report") attached hereto as **Exhibit "3"** (which can also be accessed here with hyperlinks to various publications and documents referenced in the Exposure Report), the Property was extensively marketed through, among other things, (a) the Property being exposed in 171 countries, (b) 83,740 property views, 197,602 web page views, and 16,800 film views on the Auctioneer's website, (c) numerous email blasts to the Auctioneer's private client group, select billionaires, targeted owners of high value properties, and subscriber lists as large as 160,000 members, which email blasts included access to a high-quality catalogue for the Property, (d) numerous publications by media outlets regarding the Property, (e) listings on the MLS, Luxuryrealestate.com, Juwai.com, Zillow.com, Realtor.com, Sothebys.com, (f) a feature commercial shown in the lead up to the Super Bowl, and (g) social media campaigns on Facebook, Google, Instagram.

5.      The foregoing marketing efforts, as well as the pre-Petition Date marketing efforts by TBHE and Compass, resulted in 40 qualified showings of the Property by the Auctioneer, 8 showings of the Property by Compass, 12 showings of the Property by TBHE, and, as I am informed and believe, five Bidders that qualified for bidding at the Auction by submitting the documents and $250,000 Bidder Deposit required by the Bid Procedures.

6.      I believe that the already limited pool of buyers with the means to purchase the Property may have been further reduced due to the conflict in Ukraine and related sanctions against Russia, which may have taken potential Russian, Ukrainian, Chinese and other international buyers out of the market.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 8th day of March 2022, at Los Angeles, California.

DocuSigned by:

*Branden Williams*

BRANDEN WILLIAMS

60

# EXHIBIT "1"

# Chicago Title Company

725 South Figueroa Street, Suite 200, Los Angeles, CA 90017
Phone: (213) 488-4300 ● Fax: (213) 488-4377

Issuing Policies of Chicago Title Insurance Company

ORDER NO.: **00166345-994-LT2-1TW**

Chicago Title Company / Los Angeles
725  S. Figueroa St., Suite 200
Los Angeles, CA 90017
ATTN:  Mike Slinger
Email:  mike.slinger@ctt.com
REF:

Main Office Line: **(213) 488-4300**

Title Officer:  Ted Tan/Jennifer Wright (LA/Comm)
Title Officer Phone: (213) 488-4394
Title Officer Fax: (213) 488-4360
Title Officer Email:  TeamX77@ctt.com

PROPERTY:   **944 ARIOLE WAY, LOS ANGELES, CA**

## PRELIMINARY REPORT

*In response to the application for a policy of title insurance referenced herein, **Chicago Title Company** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.*

*The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the policy forms should be read. They are available from the office which issued this report.*

*This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.*

*The policy(s) of title insurance to be issued hereunder will be policy(s) of Chicago Title Insurance Company, a Florida corporation.*

***Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.***

***It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.***

Chicago Title Company

By: _____
    Authorized Signature

By: _____
    Michael J. Nolan
    President

ATTEST: _____
    Marjorie Nemzura
    Secretary

**Chicago Title Company**

725 South Figueroa Street, Suite 200, Los Angeles, CA 90017
Phone: (213) 488-4300 ● Fax: (213) 488-4377

## PRELIMINARY REPORT

**EFFECTIVE DATE:**          **February 4, 2022 at 7:30 a.m.**

**ORDER NO.: 00166345-994-LT2-1TW**

The form of policy or policies of title insurance contemplated by this report is:

Preliminary Report Only

1.      THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO COVERED BY THIS REPORT IS:

A Fee

2.      TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS VESTED IN:

CRESTLLOYD, LLC, a California limited liability company, in receivership by Order of the Superior Court of California, County of Los Angeles, West District, Case No. 21SMCV01113, a certified copy thereof being recorded July 20, 2021 as Instrument No. 2021-1113331 of Official Records, wherein Theodore Lanes was duly appointed as receiver, subject to the terms, provisions and restrictions set out in said Order, and subject to proceedings pending in the bankruptcy court where a petition for relief was filed October 26, 2021 on behalf of Crestlloyd, LLC in U.S. District, Court Central District of California, Case No. B18205.

3.      THE LAND REFERRED TO IN THIS REPORT IS DESCRIBED AS FOLLOWS:

See Exhibit A attached hereto and made a part hereof.

# EXHIBIT "A"

# LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" 'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET; THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN:  **4369-026-021**

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.:  00166345-994-LT2-1TW

# EXCEPTIONS

**AT THE DATE HEREOF, ITEMS TO BE CONSIDERED AND EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM WOULD BE AS FOLLOWS:**

A1.   Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the fiscal year 2022-2023.

A.   Property taxes, including any personal property taxes and any assessments collected with taxes are as follows:

| | |
|---|---|
| Tax Identification No.: | 4369-026-021 |
| Fiscal Year: | 2021-2022 |
| 1st Installment: | $701,465.73, Paid (payment late and penalty applies) |
| **Penalty:** | **$70,146.57** |
| 2nd Installment: | $701,465.71, Unpaid |
| Penalty: | $70,156.57 |

B.   Said property has been declared tax defaulted for non-payment of delinquent taxes for the fiscal year 2020

APN No.:            4369-026-021

Amounts to redeem for the above-stated fiscal year (and subsequent years if any) are:

Amount:             $1,832,407.68 by February 28, 2022

C.   An assessment by the improvement district shown below:

| | |
|---|---|
| Series: | AD #1 |
| District: | County of Los Angeles |
| For: | MRCA-Brush Fire Clear'g Dist #1 |
| Bond issued: | August 6, 2003 |

Said assessment is collected with the county/city property taxes.

Said assessment is also disclosed by a Notice of Amended Assessment, recorded January 26, 2015 as Instrument No. 2015-089995 of Official Records.

D.   The herein described property lies within the boundaries of a Community Facilities District (CFD) as follows:

| | |
|---|---|
| CFD No: | 2016-1 |
| For: | Fire Prevention, Wildlife Corridor and Open Space Protection and other associated purposes |
| Disclosed by: | Notice of Special Tax Lien |
| Recording Date: | January 13, 2017 |
| Recording No.: | 20170055098, Official Records |

This property, along with all other parcels in the CFD, is liable for an annual special tax. This special tax is included with and payable with the general property taxes of the County of Los Angeles.

# EXCEPTIONS
## (Continued)

E.    The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

F.    The herein described property lies within the boundaries of a Community Facilities District (CFD) as follows:

|   |   |
|---|---|
| CFD No: | 2020-1 |
| For: | Local Fire Prevention, Water Quality and Open Space Measure and other associated purposes |
| Disclosed by: | Notice of Special Tax Lien |
| Recording Date: | February 10, 2021 |
| Recording No.: | 2021-0235371, Official Records |

This property, along with all other parcels in the CFD, is liable for an annual special tax. This special tax is included with and payable with the general property taxes of the County of Los Angeles.

1.    Water rights, claims or title to water, whether or not disclosed by the public records.

2.    Easement(s) for the purpose(s) shown below and rights incidental thereto as delineated or as offered for dedication, on the map of said Tract No. 22727;

|   |   |
|---|---|
| Purpose: | Drainage |
| Affects: | That portion of said land as shown on said map |

3.    Covenants, conditions and restrictions but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, citizenship, immigration status, primary language, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document

|   |   |
|---|---|
| Recording Date: | November 13, 1947 |
| Recording No: | 1860, Official Records |

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat the lien of any mortgage or deed of trust made in good faith and for value.

Modification(s) of said covenants, conditions and restrictions

|   |   |
|---|---|
| Recording Date: | February 7, 1949 |
| Recording No: | 2309, Official Records |

Modification(s) of said covenants, conditions and restrictions

|   |   |
|---|---|
| Recording Date: | April 15, 1949 |
| Recording No: | 2654, Official Records |

PRELIMINARY REPORT                                          Chicago Title Company
YOUR REFERENCE:                                    ORDER NO.:  00166345-994-LT2-1TW

# EXCEPTIONS
## (Continued)

4.    Covenant and agreement wherein the owners agree to hold said Land as one parcel and not to sell any portion thereof separately. Said covenant is expressed to run with the Land and be binding upon future owners.

    Recording Date:          June 22, 1981
    Recording No.:           81-620826, Official Records

    Reference is hereby made to said document for full particulars.

5.    An instrument entitled Master Covenant and Agreement

    Executed by:             Michael t. Walkup and Edith A. Press
    In favor of:             City of Los Angeles
    Recording Date:          December 22, 1994
    Recording No:            94-2260589, Official Records

    Reference is hereby made to said document for full particulars.

6.    Matters contained in that certain document

    Entitled:                Certificate of Compliance
    Dated:                   L.A. No. 94-062
    Executed by:             City of Los Angeles Department of City Planning
    Recording Date:          December 22, 1994
    Recording No:            94-2260586, Official Records

    Reference is hereby made to said document for full particulars.

7.    A deed of trust to secure an indebtedness in the amount shown below,

    Amount:                  $14,040,000.00
    Dated:                   March 13, 2013
    Trustor/Grantor          Crestlloyd LLC, a California limited liability company
    Trustee:                 First American Title Insurance Company, a California corporation
    Beneficiary:             Inferno Realty, L.P., as to an undivided $7,040,000.00 and Maybach Corporation Holdings, Inc., as to an undivided $7,000,000.00 interest, as tenants in common
    Recording Date:          March 13, 2013
    Recording No:            20130384037, Official Records

    By various assignments, the beneficial interest thereunder is now held of record in:

    Assignee:                Inferno Investment Inc.
    Recording Date:          November 10, 2015
    Recording No:            20151375607, Official Records

    An agreement to modify the terms and provisions of said deed of trust as therein provided

    Executed by:             Crestlloyd, LLC, a California Limited Liability Company and Inferno Investment Inc.
    Recording Date:          November 10, 2015
    Recording No:            20151375608, Official Records

# EXCEPTIONS
## (Continued)

An agreement recorded November 6, 2018 as Instrument No. 20181122920, Official Records which states that this instrument was subordinated to the document or interest described in the instrument

Recording Date:        November 6, 2018
Recording No.:         20181122917, Official Records

8.      Covenant and agreement wherein the owners agree to hold said Land as one parcel and not to sell any portion thereof separately. Said covenant is expressed to run with the Land and be binding upon future owners.

Recording Date:        September 5, 2013
Recording No.:         20131298666, Official Records

Reference is hereby made to said document for full particulars.

9.      An instrument entitled Master Covenant and Agreement Regarding On-Site BMP Maintenance

Executed by:           Nile Niami
In favor of:           City of Los Angeles
Recording Date:        September 24, 2013
Recording No:          20131385742, Official Records

Reference is hereby made to said document for full particulars.

10.     An instrument entitled Master Covenant and Agreement Regarding On-Site BMP Maintenance

Executed by:           Nile Niami
In favor of:           City of Los Angeles
Recording Date:        February 7, 2014
Recording No:          20140139714, Official Records

Reference is hereby made to said document for full particulars.

11.     An irrevocable offer to dedicate an easement over a portion of said Land for

Purpose(s):            Public street
Recording Date:        June 4, 2014
Recording No:          20140578201, Official Records

Said offer was accepted by resolution, a certified copy of which was recorded April 10, 2015 as Instrument No. 20150395929, of Official Records..

12.     An instrument entitled Covenant and Agreement Regarding Maintenance of Building

Executed by:           Nile Niami
In favor of:           City of Los Angeles
Recording Date:        February 17, 2016
Recording No:          20160172858, Official Records

Reference is hereby made to said document for full particulars.

PRELIMINARY REPORT                                                                          Chicago Title Company
YOUR REFERENCE:                                                                   ORDER NO.:  00166345-994-LT2-1TW

# EXCEPTIONS
## (Continued)

13.    A deed of trust to secure an indebtedness in the amount shown below,

|  |  |
|---|---|
| Amount: | $82,500,000.00 |
| Dated: | October 25, 2018 |
| Trustor/Grantor | Crestlloyd, LLC, a California limited liability company |
| Trustee: | Chicago Title Company |
| Beneficiary: | Hankey Capital, LLC, a California limited liability company |
| Recording Date: | November 6, 2018 |
| Recording No: | 20181122917, Official Records |

An agreement to modify the terms and provisions of said deed of trust as therein provided

|  |  |
|---|---|
| Recording Date: | August 31, 2020 |
| Recording No: | 20201030024 of Official Records |

A notice of default under the terms of said trust deed

|  |  |
|---|---|
| Executed by: | Chicago Title Company |
| Recording Date: | March 5, 2021 |
| Recording No: | 2021-0367447 of Official Records |

A notice of trustee's sale under said deed of trust

|  |  |
|---|---|
| Executed by: | Chicago Title Company, trustee |
| Date, Time and Place of Sale: | July 12, 2021 at 11:00 am by the fountain located at 400 Civic Center Plaza, Pomona, CA 91766 |
| Recording Date: | June 14, 2021 |
| Recording No: | 2021-0934061 of Official Records |

14.    Matters contained in that certain document

|  |  |
|---|---|
| Entitled: | Memorandum of Agreement |
| Executed by: | Hankey Capital, LLC, a California limited liability company and Crestlloyd, LLC, a California limited liability company |
| Recording Date: | November 6, 2018 |
| Recording No: | 20181122919, Official Records |

|  |  |
|---|---|
| Recording Dare: | August 31, 2020 |
| Recording No.: | 20201030294 of Official Records |

Reference is hereby made to said document for full particulars.

15.    A deed of trust to secure an indebtedness in the amount shown below,

|  |  |
|---|---|
| Amount: | $30,188,235.00 |
| Dated: | October 16, 2018 |
| Trustor/Grantor | Crestlloyd, LLC, a California limited liability company |
| Trustee: | Chicago Title Company |
| Beneficiary: | YOGI Securities Holdings, LLC, a Nevada limited liability company |
| Recording Date: | November 7, 2018 |
| Recording No: | 20181126580, Official Records |

# EXCEPTIONS
## (Continued)

16.    A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $6,196,810.64 |
| Dated: | September 18, 2019 |
| Trustor/Grantor | Crestlloyd, LLC, a California limited liability company |
| Trustee: | Chicago Title Company |
| Beneficiary: | YOGI Securities Holdings, LLC, a Nevada limited liability company |
| Recording Date: | September 23, 2019 |
| Recording No: | 20190989746, Official Records |

The effect of a Substitution of Trustee and Full Reconveyance, recorded January 14, 2021 as Instrument No. 2021-076458 of Official Records.

(Note: We will require evidence of the full payment or satisfaction of said deed of trust as there does not appear to be an off-setting transaction of record.)

17.    An instrument entitled Covenant and Agreement Regarding Maintenance of Building

| | |
|---|---|
| Executed by: | Crestlloyd, LLC |
| In favor of: | City of Los Angeles |
| Recording Date: | December 2, 2019 |
| Recording No: | 20191317943, Official Records |

Reference is hereby made to said document for full particulars.

18.    Any rights of the parties in possession of a portion of, or all of, said Land, which rights are not disclosed by the public records.

19.    Matters which may be disclosed by an inspection and/or by a correct ALTA/NSPS Land Title Survey of said Land that is satisfactory to the Company, and/or by inquiry of the parties in possession thereof.

20.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | American Truck & Tool Rentals Inc./American Rentals |
| Amount: | $97,050.34 |
| Recording Date: | June 29, 2020 |
| Recording No: | 20200709010 of Official Records |

A Notice of Pending Action to foreclose said lien

| | |
|---|---|
| County: | Los Angeles |
| Court: | Superior |
| Case No.: | 20SMCV01229 (consolidated with 20SMCV01264) |
| Recording Date: | May 5, 2021 |
| Recording No: | 2021-0717597 of Official Records |

## EXCEPTIONS
### (Continued)

21.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | J&E Texture, Inc. |
| Amount: | $214,147.50 |
| Recording Date: | June 30, 2020 |
| Recording No: | 20200712043 of Official Records |

A Notice of Pending Action to foreclose said lien

| | |
|---|---|
| County: | Los Angeles |
| Court: | Superior |
| Case No.: | 20SMCV01229 |
| Recording Date: | December 14, 2020 |
| Recording No: | 2020-01647158 of Official Records |

A Notice of Pending Action to foreclose said lien

| | |
|---|---|
| County: | Los Angeles |
| Court: | Superior |
| Case No.: | 20SMCV01229 (consolidated with 20SMCV01264) |
| Recording Date: | May 5, 2021 |
| Recording No: | 2021-0717597 of Official Records |

22.    A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $5,000,000.00 |
| Dated: | February 11, 2020 |
| Trustor/Grantor: | CRESTLLOYD, LLC, a California limited liability company |
| Trustee: | Pacific Coast Title Company |
| Beneficiary: | Hilldun Corporation, a New York corporation |
| Recording Date: | September 4, 2020 |
| Recording No: | 20201058770 of Official Records |

23.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | JMS Air Conditioning and Appliance Services, Inc. |
| Amount: | $51,290.00 |
| Recording Date: | May 6, 2021 |
| Recording No: | 2021-0722265 of Official Records |

24.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | Calgrove Rentals Inc. |
| Amount: | $12,338.95 |
| Recording Date: | June 1, 2021 |
| Recording No: | 2021-0868958 of Official Records |

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.:  00166345-994-LT2-1TW

## EXCEPTIONS
### (Continued)

25.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | BMC West LLC |
| Amount: | $2,398.60 |
| Recording Date: | July 16, 2021 |
| Recording No: | 2021-1102584 of Official Records |

26.    A Receiver's Certificate #1

| | |
|---|---|
| In favor of: | Hankey Capital, LLC and Theodore Lanes, in his capacity as Receiver |
| Amount: | $577,745.00 |
| Case No.: | 21SMCV01113 Superior Court Los Angeles County |
| Recording Date: | July 23, 2021 |
| Recording No: | 2021-1136088 of Official Records |

27.    A Notice of Pending Lien

| | |
|---|---|
| Executed by: | City of Los Angeles |
| Recording Date: | January 31, 2020 |
| Recording No: | 2020-0124042 of Official Records |

28.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | Parquet By Dian |
| Amount: | $40,846.00 |
| Recording Date: | September 8, 2021 |
| Recording No: | 2021-1373746 of Official Records |

29.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | Powertek Electric, Inc. |
| Amount: | $40,480.00 |
| Recording Date: | September 23, 2021 |
| Recording No: | 2021-1455960 of Official Records |

30.    A claim of mechanic's lien or materialman's lien

| | |
|---|---|
| Claimant: | Kennco Plumbing, Inc. |
| Amount: | $85,560.17 |
| Recording Date: | October 5, 2021 |
| Recording No: | 2021-1508207 of Official Records |

A Notice of Pending Action to foreclose said lien

| | |
|---|---|
| County: | Los Angeles |
| Court: | Superior |
| Case No.: | 21SMCV01656 |
| Recording Date: | October 21, 2021 |
| Recording No: | 20211585116 of Official Records |

PRELIMINARY REPORT
YOUR REFERENCE:

Chicago Title Company
ORDER NO.:  00166345-994-LT2-1TW

# EXCEPTIONS
## (Continued)

31.    A Chapter 11 Petition

Debtor's Name:         Crestlloyd, LLC
Recording Date:        November 8, 2021
Recording No:          20211666304 of Official Records

**32.    ANY LIEN OR RIGHT TO A LIEN FOR SERVICES, LABOR OR MATERIAL NOT SHOWN BY THE
PUBLIC RECORDS.**

33.    A deed of trust to secure an indebtedness in the amount shown below,

Amount:                $12,000,000.00 and $120,000.00
Dated:                 December 13, 2021
Trustor/Grantor        Crestlloyd, LLC, a California limited liability company, debtor and debtor in
                       possession in a pending Chapter 11 bankruptcy case commenced on October
                       26, 2021
Trustee:               Chicago Title Company
Beneficiary:           Hankey Capital, LLC, a California limited liability company
Recording Date:        January 26, 2022
Recording No:          20220103108, Official Records

**PLEASE REFER TO THE "INFORMATIONAL NOTES" AND "REQUIREMENTS" SECTIONS WHICH
FOLLOW FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION.**

---

**END OF EXCEPTIONS**

---

# REQUIREMENTS SECTION

1.  Unrecorded matters which may be disclosed by an Owner's Affidavit or Declaration. A form of the Owner's Affidavit/Declaration is attached to this Preliminary Report/Commitment. This Affidavit/Declaration is to be completed by the record owner of the land and submitted for review prior to the closing of this transaction. Your prompt attention to this requirement will help avoid delays in the closing of this transaction. Thank you.

    The Company reserves the right to add additional items or make further requirements after review of the requested Affidavit/Declaration.

2.  The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below:

    Limited Liability Company:        Crestlloyd, LLC, a California limited liability company

    a)  A copy of its operating agreement, if any, and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

    b)  If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps.

    c)  If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member.

    d)  A current dated certificate of good standing from the proper governmental authority of the state in which the entity is currently domiciled.

    e)  If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

    f)  If Limited Liability Company is a Single Member Entity, a Statement of Information for the Single Member will be required.

    g)  Each member and manager of the LLC without an Operating Agreement must execute in the presence of a notary public the Certificate of California LLC (Without an Operating Agreement) Status and Authority form.

3.  In order to complete this report, the Company requires a Statement of Information to be completed by the following party(s),

    Party(s):                All Individual Parties

    The Company reserves the right to add additional items or make further requirements after review of the requested Statement of Information.

    NOTE:  The Statement of Information is necessary to complete the search and examination of title under this order. Any title search includes matters that are indexed by name only, and having a completed Statement of Information assists the Company in the elimination of certain matters which appear to involve the parties but in fact affect another party with the same or similar name. Be assured that the Statement of Information is essential and will be kept strictly confidential to this file.

---

**END OF REQUIREMENTS**

---

Chicago Title Company
ORDER NO.:  00166345-994-LT2-1TW

## REQUIREMENTS
### (Continued)

Chicago Title Company
ORDER NO.:  00166345-994-LT2-1TW

# INFORMATIONAL NOTES SECTION

1.     The Company is not aware of any matters which would cause it to decline to attach CLTA Endorsement Form 116 indicating that there is located on said Land Single Family Residential property, known as 944 Ariole Way, located within the city of Los Angeles, California, , to an Extended Coverage Loan Policy.

2.     Note:  The policy of title insurance will include an arbitration provision. The Company or the insured may demand arbitration. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Please ask your escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration provisions and any other provisions pertaining to your Title Insurance coverage.

3.     Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

---

## END OF INFORMATIONAL NOTES

Ted Tan/Jennifer Wright (LA/Comm)/tt6

**WIRE SAFE**™ | Inquire before you wire!

# Wire Fraud Alert

This Notice is not intended to provide legal or professional advice. If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the phone number of relevant parties to the transaction as soon as an escrow account is opened**. DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*
*http://www.fbi.gov*

*Internet Crime Complaint Center:*
*http://www.ic3.gov*

*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

# Chicago Title Company

725 South Figueroa Street, Suite 200, Los Angeles, CA 90017
Phone: (213) 488-4300 ● Fax: (213) 488-4377

## Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment. Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate. As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative. These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount. These discounts only apply to transactions involving services rendered by the FNF Family of Companies. This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company. The discount will only be applicable to the FNF Company as indicated by the named discount.

**FNF Underwritten Title Company**

CTC – Chicago Title company
CLTC – Commonwealth Land Title Company
FNTC – Fidelity National Title Company of California
FNTCCA - Fidelity National Title Company of California
TICOR – Ticor Title Company of California
LTC – Lawyer's Title Company
SLTC – ServiceLink Title Company

**Underwritten by FNF Underwriters**

CTIC – Chicago Title Insurance Company
CLTIC - Commonwealth Land Title Insurance Company
FNTIC – Fidelity National Title Insurance Company
FNTIC - Fidelity National Title Insurance Company
CTIC – Chicago Title Insurance Company
CLTIC – Commonwealth Land Title Insurance Company
CTIC – Chicago Title Insurance Company

## Available Discounts

**DISASTER LOANS (CTIC, CLTIC, FNTIC)**
The charge for a Lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within twenty-four (24) months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be fifty percent (50%) of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, FNTIC)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be fifty percent (50%) to seventy percent (70%) of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be forty (40%) to fifty percent (50%) of the appropriate title insurance rate, depending on the type of coverage selected.

## FIDELITY NATIONAL FINANCIAL, INC.
## PRIVACY NOTICE

Effective August 1, 2021

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

### Collection of Personal Information
FNF may collect the following categories of Personal Information:
- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:
- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

### Collection of Browsing Information
FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:
- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

### Other Online Specifics
Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites. FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

### Use of Personal Information
FNF uses Personal Information for three main purposes:
- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

### When Information Is Disclosed
We may disclose your Personal Information and Browsing Information in the following circumstances:
- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;

- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law. We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you. Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

## Security of Your Information
We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

## Choices With Your Information
If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request as directed at the end of this Privacy Notice. We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888) 714-2710 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.
For Oregon Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

## Information From Children
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

## International Users
FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

## FNF Website Services for Mortgage Loans
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, visit FNF's Opt Out Page or contact us by phone at (888) 714-2710 or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

# ATTACHMENT ONE (Revised 05-06-16)

### CALIFORNIA LAND TITLE ASSOCIATION
### STANDARD COVERAGE POLICY – 1990

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6. Any lien or right to a lien for services, labor or material not shown by the public records.

### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)
### ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE

### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;
   d. improvements on the Land;
   e. land division; and
   f. environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.

4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

    c.   that result in no loss to You; or
    d.   that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5.   Failure to pay value for Your Title.
6.   Lack of a right:
    a.   to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
    b.   in streets, alleys, or waterways that touch the Land.
    This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7.   The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8.   Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9.   Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
- For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 5,000.00 |

## 2006 ALTA LOAN POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.   (a)  Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
       (i)   the occupancy, use, or enjoyment of the Land;
       (ii)  the character, dimensions, or location of any improvement erected on the Land;
       (iii)  the subdivision of land; or
       (iv)  environmental protection;
       or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b)  Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2.   Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.   Defects, liens, encumbrances, adverse claims, or other matters
    (a)  created, suffered, assumed, or agreed to by the Insured Claimant;
    (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c)  resulting in no loss or damage to the Insured Claimant;
    (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13 or 14); or
    (e)  resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.   Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.   Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6.   Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
    (a)  a fraudulent conveyance or fraudulent transfer, or
    (b)  a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7.   Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.  This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

{Except as provided in Schedule B - Part II,{ t{or T}his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

**{PART I**

{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records.}

**PART II**

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:}

## 2006 ALTA OWNER'S POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records. }
7. {Variable exceptions such as taxes, easements, CC&R's, etc. shown here.}

Attachment One – CA (Rev. 05-06-16)                                                                                         Page 3

© **California Land Title Association. All rights reserved.**
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY – ASSESSMENTS PRIORITY (04-02-15)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes.  This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.
10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

© **California Land Title Association. All rights reserved.**
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited. Reprinted under license or express permission from the California Land Title Association.

Insert Map Here

# EXHIBIT "2"



# DISCLOSURE REGARDING
# REAL ESTATE AGENCY RELATIONSHIP
**(As required by the Civil Code)**
**(C.A.R. Form AD, Revised 12/21)**

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code section 2079.13(j), (k), and (l).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT**

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:
To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.
To the Buyer and the Seller:
    (a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b) A duty of honest and fair dealing and good faith.
    (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT**

A Buyer's agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:
To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.
To the Buyer and the Seller:
    (a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b) A duty of honest and fair dealing and good faith.
    (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING BOTH SELLER AND BUYER**

A real estate agent, either acting directly or through one or more salespersons and broker associates, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.
In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
    (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
    (b) Other duties to the Seller and the Buyer as stated above in their respective sections.
In representing both Seller and Buyer, a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered.

**SELLER AND BUYER RESPONSIBILITIES**

Either the purchase agreement or a separate document will contain a confirmation of which agent is representing you and whether that agent is representing you exclusively in the transaction or acting as a dual agent. Please pay attention to that confirmation to make sure it accurately reflects your understanding of your agent's role.

The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

If you are a Buyer, you have the duty to exercise reasonable care to protect yourself, including as to those facts about the property which are known to you or within your diligent attention and observation.

Both Sellers and Buyers should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. **This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE SECOND PAGE.**

| ☒ Buyer ☐ Seller ☐ Landlord ☐ Tenant | _Richard Saghian or approved assignee_ Date 3-4-2022 |
|---|---|
| ☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant | Date _____ |

Agent ___The Beverly Hills Estates and Hilton & Hyland___ DRE Lic. # _____
          Real Estate Broker (Firm)                  01774287/
By _Branden Williams and Stuart Vetterick___ DRE Lic. # _01984753_ Date _____
    (Salesperson or Broker-Associate, if any)

© 2021, California Association of REALTORS®, Inc.

**AD REVISED 12/21 (PAGE 1 OF 2)**



**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)**

The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069        Phone: (310)925-9281    Fax: (310) 388-4638    944 Airole Way
Rayni Romito Williams    Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com

2079.13. As used in Sections 2079.7 and 2079.14 to 2079.26 inclusive, the following terms have the following meanings:
**(a)** "Agent" means a person acting under provision of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. In the real property transaction, whoever bears responsibility for that agent's salespersons or broker associates who perform as agents of the agent. When a salesperson or broker associate owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the salesperson or broker associate functions. **(b)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee of real property. **(c)** "Commercial real property" means all real property in the state, except (1) single-family residential real property, (2) dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, (3) a mobilehome, as defined in Section 798.3, (4) vacant land, or (5) a recreational vehicle, as defined in Section 799.29. **(d)** "Dual agent" means an agent acting, either directly or through a salesperson or broker associate, as agent for both the seller and the buyer in a real property transaction. **(e)** "Listing agreement" means a written contract between a seller of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer, including rendering other services for which a real estate license is required to the seller pursuant to the terms of the agreement. **(f)** "Seller's agent" means a person who has obtained a listing of real property to act as an agent for compensation. **(g)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the seller's agent. **(h)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(i)** "Offer to purchase" means a written contract executed by a buyer acting through a buyer's agent that becomes the contract for the sale of the real property upon acceptance by the seller. **(j)** "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property, and includes (1) single-family residential property, (2) multiunit residential property with more than four dwelling units, (3) commercial real property, (4) vacant land, (5) a ground lease coupled with improvements, or (6) a manufactured home as defined in Section 18007 of the Health and Safety Code, or a mobilehome as defined in Section 18008 of the Health and Safety Code, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. **(k)** "Real property transaction" means a transaction for the sale of real property in which an agent is retained by a buyer, seller, or both a buyer and seller to act in that transaction, and includes a listing or an offer to purchase. **(l)** "Sell", "sale", or "sold" refers to a transaction for the transfer of real property from the seller to the buyer and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(m)** "Seller" means the transferor in a real property transaction and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor of real property. **(n)** "Buyer's agent" means an agent who represents a buyer in a real property transaction.

**2079.14.** A seller's agent and buyer's agent shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and shall obtain a signed acknowledgement of receipt from that seller and buyer, except as provided in Section 2079.15, as follows: **(a)** The seller's agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. **(b)** The buyer's agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase. If the offer to purchase is not prepared by the buyer's agent, the buyer's agent shall present the disclosure form to the buyer not later than the next business day after receiving the offer to purchase from the buyer.

**2079.15.** In any circumstance in which the seller or buyer refuses to sign an acknowledgement of receipt pursuant to Section 2079.14, the agent shall set forth, sign, and date a written declaration of the facts of the refusal.

**2079.16** Reproduced on Page 1 of this AD form.

**2079.17(a)** As soon as practicable, the buyer's agent shall disclose to the buyer and seller whether the agent is acting in the real property transaction as the buyer's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the buyer's agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the seller's agent shall disclose to the seller whether the seller's agent is acting in the real property transaction as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the seller's agent prior to or coincident with the execution of that contract by the seller.

CONFIRMATION: **(c)** The confirmation required by subdivisions (a) and (b) shall be in the following form:

Seller's Brokerage Firm ____ DO NOT COMPLETE. SAMPLE ONLY ____ License Number _____
Is the broker of (check one): ☐ the seller; or ☐ both the buyer and seller. (dual agent)
Seller's Agent ____ DO NOT COMPLETE. SAMPLE ONLY ____ License Number _____
Is (check one): ☐ the Seller's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)
Buyer's Brokerage Firm ____ DO NOT COMPLETE. SAMPLE ONLY ____ License Number _____
Is the broker of (check one): ☐ the buyer; or ☐ both the buyer and seller. (dual agent)
Buyer's Agent ____ DO NOT COMPLETE. SAMPLE ONLY ____ License Number _____
Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

**(d)** The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14. An agent's duty to provide disclosure and confirmation of representation in this section may be performed by a real estate salesperson or broker associate affiliated with that broker.

**2079.18** (Repealed pursuant to AB-1289)

**2079.19** The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

**2079.20** Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

**2079.21** A dual agent may not, without the express permission of the seller, disclose to the buyer any confidential information obtained from the seller. **(b)** A dual agent may not, without the express permission of the buyer, disclose to the seller any confidential information obtained from the buyer. **(c)** "Confidential information" means facts relating to the client's financial position, motivations, bargaining position, or other personal information that may impact price, such as the seller is willing to accept a price less than the listing price or the buyer is willing to pay a price greater than the price offered. **(d)** This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

**2079.22** Nothing in this article precludes a seller's agent from also being a buyer's agent. If a seller or buyer in a transaction chooses to not be represented by an agent, that does not, of itself, make that agent a dual agent.

**2079.23** A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

**2079.24** Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**AD REVISED 12/21 (PAGE 2 OF 2)**

## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com          944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

- **E.** Inquiring about protected characteristics (such as asking tenant applicants if they are married, or prospective purchasers if they have children or are planning to start a family);
- **F.** Using criminal history information before otherwise affirming eligibility, and without a legally sufficient justification;
- **G.** Failing to assess financial standards based on the portion of the income responsible by a tenant who receives government subsidies (such as basing an otherwise neutral rent to income ratio on the whole rent rather than just the part of rent that is the tenant's responsibility);
- **H.** Denying a home loan or homeowner's insurance;
- **I.** Offering inferior terms, conditions, privileges, facilities or services;
- **J.** Using different qualification criteria or procedures for sale or rental of housing such as income standards, application requirements, application fees, credit analyses, sale or rental approval procedures or other requirements;
- **K.** Harassing a person;
- **L.** Taking an adverse action based on protected characteristics;
- **M.** Refusing to permit a reasonable modification to the premises, as requested by a person with a disability (such as refusing to allow a wheel chair bound tenant to install, at their expense, a ramp over front or rear steps, or refusing to allow a physically disabled tenant from installing, at their own expense, grab bars in a shower or bathtub);
- **N.** Refusing to make reasonable accommodation in policies, rules, practices, or services for a person with a disability (such as the following, if an actual or prospective tenant with a disability has a service animal or support animal):
  - **(i)** Failing to allow that person to keep the service animal or emotional support animal in rental property,
  - **(ii)** Charging that person higher rent or increased security deposit, or
  - **(iii)** Failing to show rental or sale property to that person who is accompanied by the service animal or support animal, and;
- **O.** Retaliating for asserting rights under fair housing laws.

**10. EXAMPLES OF POSITIVE PRACTICES:**
- **A.** Real estate licensees working with buyers or tenants should apply the same objective property selection criteria, such as location/neighborhood, property features, and price range and other considerations, to all prospects.
- **B.** Real estate licensees should provide complete and objective information to all clients based on the client's selection criteria.
- **C.** Real estate licensees should provide the same professional courtesy in responding to inquiries, sharing of information and offers of assistance to all clients and prospects.
- **D.** Housing providers should not make any statement or advertisement that directly or indirectly implies preference, limitation, or discrimination regarding any protected characteristic (such as "no children" or "English-speakers only").
- **E.** Housing providers should use a selection process relying on objective information about a prospective buyer's offer or tenant's application and not seek any information that may disclose any protected characteristics (such as using a summary document, e.g. C.A.R. Form SUM-MO, to compare multiple offers on objective terms).

**11. FAIR HOUSING RESOURCES:** If you have questions about your obligations or rights under the Fair Housing laws, or you think you have been discriminated against, you may want to contact one or more of the sources listed below to discuss what you can do about it, and whether the resource is able to assist you.
- **A.** Federal: **https://www.hud.gov/program_offices/fair_housing_equal_opp**
- **B.** State: **https://www.dfeh.ca.gov/housing/**
- **C.** Local: local Fair Housing Council office (non-profit, free service)
- **D.** DRE: **https://www.dre.ca.gov/Consumers/FileComplaint.html**
- **E.** Local Association of REALTORS®. List available at: **https://www.car.org/en/contactus/rosters/localassociationroster.**
- **F.** Any qualified California fair housing attorney, or if applicable, landlord-tenant attorney.

**12. LIMITED EXCEPTIONS TO FAIR HOUSING REQUIREMENTS: No person should rely on any exception below without first seeking legal advice about whether the exception applies to their situation. Real estate licensees are not qualified to provide advice on the application of these exceptions.**
- **A.** Legally compliant senior housing is exempt from FHA, FEHA and Unruh as related to age or familial status only;
- **B.** An owner of a single-family residence who resides at the property with one lodger may be exempt from FEHA for rental purposes, PROVIDED **no real estate licensee is involved** in the rental;
- **C.** An owner of a single-family residence may be exempt from FHA for sale or rental purposes, PROVIDED **(i) no real estate licensee is involved** in the sale or rental and **(ii)** no discriminatory advertising is used, and **(iii)** the owner owns no more than three single-family residences. Other restrictions apply;
- **D.** An owner of residential property with one to four units who resides at the property, may be exempt from FHA for rental purposes, PROVIDED **no real estate licensee is involved** in the rental; and
- **E.** Both FHA and FEHA do not apply to roommate situations. See, *Fair Housing Council v Roommate.com LLC*, 666 F.3d 1216 (2019).
- **F.** Since both the 14th Amendment of the U.S. Constitution and the Civil Rights Act of 1866 prohibit discrimination based on race; the FHA and FEHA exemptions do not extend to discrimination based on race.

Buyer/Tenant and Seller/Landlord have read, understand and acknowledge receipt of a copy of this Fair Housing & Discrimination Advisory.

Buyer/Tenant _____ Richard Saghian or approved assignee    Date 3-4-2022

Buyer/Tenant _____    Date _____

Seller/Landlord _____ Crestlloyd, LLC, Debtor in Possession, by Sierraconstellation Partners, LLC, its Manager    Date 03 / 08 / 2022

Seller/Landlord _____    Date _____

© 2020, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**FHDA 10/20 (PAGE 2 OF 2)**

EQUAL HOUSING OPPORTUNITY

**FAIR HOUSING & DISCRIMINATION ADVISORY (FHDA PAGE 2 OF 2)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

1. **EQUAL ACCESS TO HOUSING FOR ALL:** All housing in California is available to all persons. Discrimination as noted below is prohibited by law. Resources are available for those who have experienced unequal treatment under the law.
2. **FEDERAL AND STATE LAWS PROHIBIT DISCRIMINATION AGAINST IDENTIFIED PROTECTED CLASSES:**
   A. FEDERAL FAIR HOUSING ACT ("FHA") Title VIII of the Civil Rights Act; 42 U.S.C. §§ 3601-3619; Prohibits discrimination in sales, rental or financing of residential housing against persons in protected classes;
   B. CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT ("FEHA") California Government Code ("GC") §§12900-12996,12955; 2 California Code of Regulations ("CCR") §§12005-12271; Prohibits discrimination in sales, rental or financing of housing opportunity against persons in protected classes by providers of housing accommodation and financial assistance services as related to housing;
   C. CALIFORNIA UNRUH CIVIL RIGHTS ACT ("Unruh") California Civil Code ("CC") §51; Prohibits business establishments from discriminating against, and requires full and equal accommodation, advantages, facilities, privileges, and services to persons in protected classes;
   D. AMERICANS WITH DISABILITIES ACT ("ADA") 42 U.S.C. §§12181-12189; Title III of the ADA prohibits discrimination based on disability in public accommodations; and
   E. OTHER FAIR HOUSING LAWS: Section 504 of Rehabilitation Act of 1973 29 U.S.C. §794; Ralph Civil Rights Act CC §51.7.; California Disabled Persons Act; CC §§54-55.32; any local city or county fair housing ordinances, as applicable.
3. **POTENTIAL LEGAL REMEDIES FOR UNLAWFUL DISCRIMINATION:** Violations of fair housing laws may result in monetary civil fines, injunctive relief, compensatory and/or punitive damages, and attorney fees and costs.
4. **PROTECTED CLASSES/CHARACTERISTICS:** Whether specified in Federal or State law or both, discrimination against persons if based on that person's belonging to, association with, or perceived membership to, any of the following classes or categories is prohibited.

| Race | Color | Ancestry | National Origin | Religion |
|---|---|---|---|---|
| Sex | Sexual Orientation | Gender | Gender Identity | Gender Expression |
| Marital Status | Familial Status (family with a child or children under 18) | Source of Income (e.g., Section 8 Voucher) | Disability (Mental & Physical) | Medical Condition |
| Citizenship | Primary Language | Immigration Status | Military/Veteran Status | Age |
| Criminal History (non-relevant convictions) | | | Any arbitrary characteristic | |

5. **THE CALIFORNIA DEPARTMENT OF REAL ESTATE REQUIRES TRAINING AND SUPERVISION TO PREVENT HOUSING DISCRIMINATION BY REAL ESTATE LICENSEES:**
   A. California Business & Professions Code ("B&PC") §10170.5(a)(4) requires 3 hours of training on fair housing for DRE license renewal; Real Estate Regulation §2725(f) requires brokers who oversee salespersons to be familiar with the requirements of federal and state laws relating to the prohibition of discrimination.
   B. Violation of DRE regulations or real estate laws against housing discrimination by a real estate licensee may result in the loss or suspension of the licensee's real estate license. B&PC §10177(l)(1); 10 CCR §2780
6. **REALTOR® ORGANIZATIONS PROHIBIT DISCRIMINATION:** NAR Code of Ethics Article 10 prohibits discrimination in employment practices or in rendering real estate license services against any person because of race, color, religion, sex, handicap, familial status, national origin, sexual orientation, or gender identity by REALTORS®.
7. **WHO IS REQUIRED TO COMPLY WITH FAIR HOUSING LAWS?**
   Below is a non-exclusive list of providers of housing accommodations or financial assistance services as related to housing who are most likely to be encountered in a housing transaction and who must comply with fair housing laws.

   - Sellers
   - Real estate licensees
   - Mobilehome parks
   - Insurance companies
   - Landlords
   - Real estate brokerage firms
   - Homeowners Associations ("HOAs");
   - Government housing services
   - Sublessors
   - Property managers
   - Banks and Mortgage lenders

8. **EXAMPLES OF CONDUCT THAT MAY NOT BE MOTIVATED BY DISCRIMINATORY INTENT BUT COULD HAVE A DISCRIMINATORY EFFECT:**
   A. Prior to acceptance of an offer, asking for or offering buyer personal information or letters from the buyer, especially with photos. Those types of documents may inadvertently reveal, or be perceived as revealing, protected status information thereby increasing the risk of (i) actual or unconscious bias, and (ii) potential legal claims against sellers and others by prospective buyers whose offers were rejected.
   B. Refusing to rent (i) an upper level unit to an elderly tenant out of concern for the tenant's ability to navigate stairs or (ii) a house with a pool to a person with young children out of concern for the children's safety.
9. **EXAMPLES OF UNLAWFUL OR IMPROPER CONDUCT BASED ON A PROTECTED CLASS OR CHARACTERISTIC:**
   A. Refusing to negotiate for a sale, rental or financing or otherwise make a housing opportunity unavailable; failing to present offers due to a person's protected status;
   B. Refusing or failing to show, rent, sell or finance housing; "channeling" or "steering" a prospective buyer or tenant to or away from a particular area due to that person's protected status or because of the racial, religious or ethnic composition of the neighborhood;
   C. "Blockbusting" or causing "panic selling" by inducing a listing, sale or rental based on the grounds of loss of value of property, increase in crime, or decline in school quality due to the entry or prospective entry of people in protected categories into the neighborhood;
   D. Making any statement or advertisement that indicates any preference, limitation, or discrimination;

© 2020, California Association of REALTORS®, Inc.
**FHDA 10/20 (PAGE 1 OF 2)**

**FAIR HOUSING & DISCRIMINATION ADVISORY (FHDA PAGE 1 OF 2)**

The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069          Phone: (310)925-9281          Fax: (310) 388-4638          944 Airole Way
Rayni Romito Williams          Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8



## POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER
## OR SELLER - DISCLOSURE AND CONSENT
### (C.A.R. Form PRBS, Revised 12/21)

A real estate broker (Broker), whether a corporation, partnership or sole proprietorship, may represent more than one buyer or seller. This multiple representation can occur through an individual licensed as a broker or salesperson or through different individual broker's or salespersons (associate licensees) acting under the Broker's license. The associate licensees may be working out of the same or different office locations.

**Multiple Buyers:** Broker (individually or through its associate licensees) may be working with many prospective buyers at the same time. These prospective buyers may have an interest in, and make offers on, the same properties. Some of these properties may be listed with Broker and some may not. Broker will not limit or restrict any particular buyer from making an offer on any particular property whether or not Broker represents other buyers interested in the same property.

**Multiple Sellers:** Broker (individually or through its associate licensees) may have listings on many properties at the same time. As a result, Broker will attempt to find buyers for each of those listed properties. Some listed properties may appeal to the same prospective buyers. Some properties may attract more prospective buyers than others. Some of these prospective buyers may be represented by Broker and some may not. Broker will market all listed properties to all prospective buyers whether or not Broker has another or other listed properties that may appeal to the same prospective buyers.

**Dual Agency:** If Seller is represented by Broker, Seller acknowledges that broker may represent prospective buyers of Seller's property and consents to Broker acting as a dual agent for both seller and buyer in that transaction. If Buyer is represented by Broker, buyer acknowledges that Broker may represent sellers of property that Buyer is interested in acquiring and consents to Broker acting as a dual agent for both buyer and seller with regard to that property.

In the event of dual agency, seller and buyer agree that: a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the buyer's or seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the seller's willingness to accept a price less than the listing price or the buyer's willingness to pay a price greater than the price offered; and except as set forth above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties.

**Offers not necessarily confidential:** Buyer is advised that seller or listing agent may disclose the existence, terms, or conditions of buyer's offer unless all parties and their agent have signed a written confidentiality agreement. Whether any such information is actually disclosed depends on many factors, such as current market conditions, the prevailing practice in the real estate community, the listing agent's marketing strategy and the instructions of the seller.

Buyer and seller understand that Broker may represent more than one buyer or more than one seller and even both buyer and seller on the same transaction and consents to such relationships.

**Seller and/or Buyer acknowledges reading and understanding this Possible Representation of More Than One Buyer or Seller - Disclosure and Consent and agrees to the agency possibilities disclosed.**

| | | | |
|---|---|---|---|
| Seller | _[signature]_ | Crestlloyd, LLC, Debtor in Possession, by Sierraconstellation Partners, LLC, its Manager | Date 03 / 08 / 2022 |
| Seller | | | Date |
| Buyer | _[signature]_ | Richard Saghian or approved assignee | Date 3-4-2022 |
| Buyer | | | Date |

Buyer's Brokerage Firm The Beverly Hills Estates and Hilton & Hyland   DRE Lic #   Date _____
By   Branden Williams and Stuart Vetterick   DRE Lic # 01774287/
01984753   Date _____

Seller's Brokerage Firm *The Beverly Hills Estates / Compass*   DRE Lic # 02126121   Date _____
By   DRE Lic # 01774287   Date _____
*Rayni Williams & Branden Williams & Aaron Kirman*

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**PRBS REVISED 12/21 (PAGE 1 OF 1)**

**POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER OR SELLER (PRBS PAGE 1 OF 1)**

The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069   Phone: (310)925-9281   Fax: (310) 388-4638   944 Airole Way
Rayni Romito Williams   Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com



# WIRE FRAUD AND ELECTRONIC FUNDS

## TRANSFER ADVISORY
### (C.A.R. Form WFA, Revised 12/21)

Property Address: **_944 Airole Way, Los Angeles, CA  90077-2602_**_____ ("Property").

## WIRE FRAUD AND ELECTRONIC FUNDS TRANSFERS ADVISORY:

The ability to communicate and conduct business electronically is a convenience and reality in nearly all parts of our lives. At the same time, it has provided hackers and scammers new opportunities for their criminal activity. Many businesses have been victimized and the real estate business is no exception.

While wiring or electronically transferring funds is a welcome convenience, we all need to exercise extreme caution. Emails attempting to induce fraudulent wire transfers have been received and have appeared to be legitimate. Reports indicate that some hackers have been able to intercept emailed transfer instructions, obtain account information and, by altering some of the data, redirect the funds to a different account. It also appears that some hackers were able to provide false phone numbers for verifying the wiring or funds transfer instructions. In those cases, the victim called the number provided to confirm the instructions, and then unwittingly authorized a transfer to somewhere or someone other than the intended recipient.

## ACCORDINGLY, YOU ARE ADVISED:

1. **Obtain phone numbers and account numbers only from Escrow Officers, Property Managers, or Landlords at the beginning of the transaction.**
2. **DO NOT EVER WIRE OR ELECTRONICALLY TRANSFER FUNDS PRIOR TO CALLING TO CONFIRM THE TRANSFER INSTRUCTIONS. ONLY USE A PHONE NUMBER YOU WERE PROVIDED PREVIOUSLY. Do not use any different phone number or account number included in any emailed transfer instructions.**
3. **Orally confirm the transfer instruction is legitimate and confirm the bank routing number, account numbers and other codes before taking steps to transfer the funds.**
4. **Avoid sending personal information in emails or texts.  Provide such information in person or over the telephone directly to the Escrow Officer, Property Manager, or Landlord.**
5. **Take steps to secure the system you are using with your email account. These steps include creating strong passwords, using secure WiFi, and not using free services.**

If you believe you have received questionable or suspicious wire or funds transfer instructions, immediately notify your bank, and the other party, and the Escrow Office, Landlord, or Property Manager. The sources below, as well as others, can also provide information:

Federal Bureau of Investigation: https://www.fbi.gov/; the FBI's IC3 at www.ic3.gov; or 310-477-6565

National White Collar Crime Center: http://www.nw3c.org/

On Guard Online: https://www.onguardonline.gov/

**NOTE: There are existing alternatives to electronic and wired fund transfers such as cashier's checks. By signing below, the undersigned acknowledge that each has read, understands and has received a copy of this Wire Fraud and Electronic Funds Transfer Advisory.**

| | | | |
|---|---|---|---|
| Buyer/Tenant | _Richard Saghian_ or approved assignee | Date | 3-4-2022 |
| Buyer/Tenant | | Date | |
| Seller/Landlord | _Crestlloyd, LLC, Debtor in Possession, by Sierraconstellation Partners, LLC, its Manager_ | Date | 03 / 08 / 2022 |
| Seller/Landlord | | Date | |

©2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**WFA REVISED 12/21 (PAGE 1 OF 1)**

**WIRE FRAUD AND ELECTRONIC FUNDS TRANSFER ADVISORY (WFA PAGE 1 OF 1)**

| | | |
|---|---|---|
| The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069 | Phone: (310)925-9281    Fax: (310) 388-4638 | 944 Airole Way |
| Rayni Romito Williams | Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com | |

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

In accordance with the terms and conditions of the Purchase Agreement, ~~OR~~ | ~~Request For Repair (C.A.R. Form RR);~~ | ~~Response And Reply To Request For Repair (C.A.R. Form RRRR);~~ | ~~Other~~ _____
dated **March 3, 2022** ,("Agreement"),

on property known as ___**944 Airole Way, Los Angeles, CA  90077-2602**___ ("Property"),
between ___**Richard Saghian  or approved assignee**___ ("Buyer")
and ___**Crestlloyd, LLC, Debtor in Possession, by Sierraconstellation Partners, LLC, its Manager**___ ("Seller").
Buyer and Seller are referred to as the "Parties."

1. **BUYER REMOVAL OF BUYER CONTINGENCIES:** With respect to any contingency and cancellation right that Buyer removes, unless Otherwise Agreed in a separate written agreement between Buyer and Seller, Buyer shall conclusively be deemed to have: **(i)** completed all Buyer Investigations and review of reports and other applicable information and disclosures; **(ii)** elected to proceed with the transaction; and **(iii)** assumed all liability, responsibility and, expense, **if any**, for Repairs, corrections, or for the inability to obtain financing. Waiver of statutory disclosures is prohibited by law.

2. **Buyer removes ONLY the following individually checked Buyer contingencies:**
   - **A.** ☐ Loan (Paragraph 3L(1) and 8A)
   - **B.** ☐ Appraisal (Paragraph 3L(2) and 8B)
   - **C.** Investigation of Property (Paragraph 3L(3), 8C, and 12)
     - (1) ☐ Entire Buyer's Investigation Contingency (Paragraph 12)
     - OR (2) ☐ Only the part of the Investigation related to inspections concerning physical attributes of the Property (Paragraph 12B(1))
     - OR (3) ☐ All Buyer Investigations other than the physical attributes (Paragraph 12B(2) and (3))
     - OR (4) ☐ Entire Buyer's Investigation Contingency, EXCEPT _____
   - **D.** Review of Seller Documents:
     - (1) ☐ Review of All Seller Documents (Paragraph 3L(4), 8D, 9B(6), 10A, and 11)
     - (2) ☐ Review of All Seller Documents, EXCEPT ☐ Government Reports (Paragraph 10A); ☐ Statutory and other Disclosures (Paragraph 11); ☐ Other _____
   - **E.** ☐ Preliminary ("Title") Report (Paragraph 3L(5), 8E, and 13)
   - **F.** ☐ Common Interest (HOA or OA) Disclosures (Paragraph 3L(6), 8F and 11K(1))
   - **G.** ☐ Review of leased or liened items (Paragraph 3L(7) and 8G)
   - **H.** ☐ Sale of Buyer's Property (Paragraph 3L(8) and 8J)
   - **I.** ☐ Other: _____
   - **J.** ☐ Other: _____

3. ☐ **ALL Buyer contingencies are removed, EXCEPT:** ☐ Loan Contingency (Paragraph 3L(1) and 8A); ☐ Appraisal Contingency (Paragraph 3L(2) and 8B); ☐ Contingency for the Sale of Buyer's Property (Paragraph 3L(8) and 8G); ☐ Condominium/Planned Development (HOA) Disclosures (Paragraph 3L(6), 8F and 11I(1)); ☐ Other _____

4. ☒ **BUYER HEREBY REMOVES ANY AND ALL BUYER CONTINGENCIES.**

5. Once all contingencies are removed, whether or not Buyer has satisfied him/herself regarding all contingencies or received any information relating to those contingencies, Buyer may not be entitled to a return of Buyer's deposit if Buyer does not close escrow. This could happen even if, for example, Buyer does not approve of some aspect of the Property or lender does not approve Buyer's loan.

**NOTE:** If this form is attached to a Request for Repairs (C.A.R. Form RR), Seller Response and Buyer Reply to Request for Repairs (C.A.R. Form RRRR), or another form or document such as an addendum (C.A.R. Form ADM) or Amendment to Existing Agreement (C.A.R. Form AEA) it is only valid if Buyer and Seller agree to the requests made on that form or document. (Paragraph numbers refer to C.A.R. Form RPA. Applicable paragraph numbers may be different for different forms.)

Buyer _~~Richard Saghian~~_ Richard Saghian  or approved assignee    Date **3-4-2022**
Buyer _____    Date _____

6. **SELLER REMOVAL OF SELLER CONTINGENCIES:**
   **NOTE:** This section is solely for the purpose of removing Seller contingencies and should only be signed by Seller if they are removing Seller contingencies.
   Seller hereby removes the following Seller contingencies:
   ☐ Finding of replacement property (C.A.R. Form SPRP); ☐ Closing on replacement property (C.A.R. Form SPRP)
   ☐ Other _____

Seller _____    Date _____
Seller _____    Date _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**CR REVISED 12/21 (PAGE 1 OF 1)**

**CONTINGENCY REMOVAL (CR PAGE 1 OF 1)**

Doc ID: 1fadd1b5631473c259b7ad50d0bc5a153b334dca8



**STATEWIDE BUYER AND SELLER ADVISORY**
**(This Form Does Not Replace Local Condition Disclosures.**
**Additional Advisories or Disclosures May Be Attached)**
**(C.A.R. Form SBSA, Revised 6/21)**

**BUYER RIGHTS AND DUTIES:**

- The physical condition of the land and improvements being purchased are not guaranteed by Seller or Brokers.
- You should conduct thorough investigations of the Property both personally and with appropriate professionals.
- If professionals recommend further inspections, you should contact qualified experts to conduct such inspections.
- You should retain your own professional even if Seller or Broker has provided you with existing reports.
- You should read all written reports given to you and discuss those reports with the persons who prepared them. It is possible that different reports provided to you contain conflicting information. If there are discrepancies between reports, disclosures or other information, you are responsible for contacting appropriate professionals to confirm the accuracy of correctness of the reports, disclosures or information.
- You have the right to request that the Seller make repairs or corrections or take other actions based on inspections or disclosures, but the Seller is not obligated to respond to you or make any such repairs, corrections or other requested actions.
- If the Seller is unwilling or unable to satisfy your requests, and you act within certain time periods, you may have the right to cancel the Agreement (the Purchase Agreement and any Counter Offer and Addenda together are the "Agreement"). If you cancel outside of these periods, you may be in breach of the Agreement and your deposit might be at risk.
- You are advised to seek legal, tax, and other assistance from appropriate professionals in order to fully understand the implications of any documents or actions during the transaction. If you are doing a 1031 exchange, you are advised to contact an exchange accommodator to discuss the proper method and timing of the exchange.
- The terms of the Agreement and any counter offers and addenda establish your rights and responsibilities.

**YOU ARE STRONGLY ADVISED TO INVESTIGATE THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE PROPERTY. IF YOU DO NOT DO SO, YOU ARE ACTING AGAINST THE ADVICE OF BROKERS.**

**SELLER RIGHTS AND DUTIES:**

- You have a duty to disclose material facts known to you that affect the value or desirability of the Property.
- You are obligated to make the Property available to the Buyer and have utilities on for inspections as allowed by the Agreement.
- This form is not a substitute for completing a Real Estate Transfer Disclosure Statement, if required, and any other property-specific questionnaires or disclosures.
- The terms of the Agreement establish your rights and responsibilities.
- You are advised to seek legal, tax, and other assistance from appropriate professionals in order to fully understand the implications of any documents or actions during the transaction. If you are doing a 1031 exchange, you are advised to contact an exchange accommodator to discuss the proper method and timing of the exchange.

**BROKER RIGHTS AND DUTIES:**

- Brokers do not have expertise in all areas and matters affecting the Property or your evaluation of it.
- For most sales of residential properties with no more than four units, Brokers have a duty to make a reasonably competent and diligent visual inspection of the accessible areas of the Property and disclose to you material facts or defects that the inspection reveals.
- Many defects and conditions may not be discoverable by a Broker's visual inspection.
- If Brokers give a referral to another professional, Brokers do not guarantee that person's performance. You may select any professional of your own choosing.
- If a Broker gives you reports or other documents, unless otherwise specified, it is possible that different reports provided to you contain conflicting information. Broker has not and will not verify or otherwise investigate the information contained therein.
- Any written agreement between a Broker and either Buyer or Seller or both establishes the rights and responsibilities of those parties.

©2021, California Association of REALTORS®, Inc.



| | | | |
|---|---|---|---|
| The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069 | Phone: (310)925-9281 | Fax: (310) 388-4638 | 944 Airole Way |
| Rayni Romito Williams | Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 | www.lwolf.com | |

# TABLE OF CONTENTS

| SBSA CATEGORIES AND ALPHABETICAL INDEX | | | | | | |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| Investigation of Physical Condition | Property Use and Ownership | Off-Site and Neighborhood Conditions | Legal Requirements (Federal, State and Local) | Contract Related Issues and Terms | Other Factors Affecting Property | Local Disclosures and Advisories |
| Pages 2-5 | Pages 5-8 | Pages 8-10 | Pages 10-11 | Pages 11-12 | Pages 12-14 | Page 14 |

Page

1. Accessory Dwelling Units ........................................ 5
2. Arbitration ................................................................ 11
3. Building Permits, Zoning and Code Compliance................. 5
4. Buyer Intended Future Use ...................................... 5
5. California Fair Plan ................................................. 6
6. Community Enhancement and Private Transfer Fees ...... 12
7. Death on the Property ........................................... 10
8. Earthquake Fault Zones and Seismic Hazard Zones ........ 10
9. Easements, Access and Encroachments ........................... 2
10. Electronic Signatures ............................................ 11
11. Environmental Hazards ........................................... 2
12. EPA's Lead-Based Paint Renovation, Repair and Painting Rule .......................................................... 10
13. Escrow Funds ........................................................ 11
14. Fire Hardening, Defensible Space, and Wildfire Disasters ..5
15. Fire Hazards .......................................................... 10
16. FIRPTA/California Withholding ................................ 10
17. Flood Hazards ....................................................... 10
18. Formaldehyde ......................................................... 3
19. Future Repairs, Replacements and Remodels ................. 6
20. General Recall/Defective Product/Class Action Information ............................................................ 12
21. Geologic Hazards .................................................... 3
22. Golf Course Disclosures .......................................... 8
23. Heating Ventilating and Air Conditioning Systems ............. 6
24. Historical Designation, Coastal Commission, Architectural, Landscape, Agricultural or Open Space and other Restrictions on Buildings or Improvement ................. 6
25. Homeowner Associations and Covenants, Conditions and Restrictions ("CC&Rs"); Charging Stations; FHA/VA Approval .................................................... 13
26. Home Warranty ...................................................... 11
27. Identification of Natural Persons Behind Shell Companies in All-Cash Transactions .......................... 12
28. Inspections ............................................................. 3
29. Insurance, Title Insurance and Title Insurance After Foreclosure .............................................................. 6
30. Land Lease .............................................................. 7
31. Legal Action ........................................................... 13
32. Liquidated Damages ............................................... 12

Page

33. Marijuana and Methamphetamine Labs ............................... 7
34. Marketing; Internet Advertising; Internet Blogs; Social Media ................................................................... 13
35. Mediation .............................................................. 12
36. Megan's Law Database Disclosure ............................ 10
37. Mold ....................................................................... 3
38. Neighborhood, Area, Personal Factors, Buyer Intended Use, High Speed Rails, and Smoking Restrictions ............. 9
39. Neighborhood Noise Sources ................................... 9
40. 1915 Improvement Bond Mello-Roos Community District, and Other Assessment Districts .................................. 8
41. Non-Confidentiality of Offers .................................. 12
42. Notice of Your Supplemental Property Tax Bill ................. 11
43. Online or Wire Funds Transfers ............................... 12
44. Owner's Title Insurance ........................................... 7
45. PACE Loans and Liens ............................................ 13
46. Pets and Animals ..................................................... 4
47. Property Tax Bill Supplemental Notice; Accurate Sales Price Reporting ...................................................... 10
48. Recording Devices ................................................. 14
49. Re-Keying .............................................................. 14
50. Rent and Eviction Control Laws and Ordinances ................. 7
51. Retrofit, Building Requirements, and Point of Sale Requirements ........................................................... 7
52. Schools .................................................................... 9
53. Sea Level Rise ......................................................... 9
54. Septic Systems ........................................................ 4
55. Short Term Rentals and Restrictions ......................... 8
56. Soil and Geologic Conditions ................................... 4
57. Solar Panel Leases ................................................. 14
58. Square Footage, Lot Size, Boundaries and Surveys ........ 4
59. Swimming Pool, Security and Safety ......................... 8
60. Underground Pipelines and Utilities ......................... 9
61. Views ...................................................................... 4
62. Water Intrusion ....................................................... 4
63. Water Shortages and Conservation .......................... 8
64. Well and Water System(s) ........................................ 4
65. Wildlife .................................................................... 9
66. Wood Destroying Pests ............................................ 5
67. Zone Maps May Change ........................................ 11

# A. Investigation of Physical Conditions

1. **EASEMENTS, ACCESS AND ENCROACHMENTS:** Buyer and Seller are advised that confirming the exact location of easements, shared or private driveways or roadways, and encroachments on or to the Property may be possible only by conducting a survey. There may be unrecorded easements, access rights, encroachments and other agreements affecting the Property that may not be disclosed by a survey. Representations regarding these items that are made in a Multiple Listing Service or advertisements, or plotted by a title company are often approximations, or based upon inaccurate or incomplete records. Unless otherwise specified by Broker in writing, Brokers have not verified any such matters or any representations made by Seller(s) or others. If Buyer wants further information, Buyer is advised and Broker(s) recommend that Buyer hire a licensed surveyor during Buyer's inspection contingency period. Brokers do not have expertise in this area.

2. **ENVIRONMENTAL HAZARDS:** Buyer and Seller are advised that the presence of certain kinds of organisms, toxins and contaminants, including, but not limited to, mold (airborne, toxic or otherwise), fungi, mildew, lead-based paint and other lead contamination, asbestos, formaldehyde, radon, pcb's, methane, other gases, fuel oil or chemical storage

**SBSA REVISED 6/21 (PAGE 2 OF 14)**

**STATEWIDE BUYER AND SELLER ADVISORY (SBSA PAGE 2 OF 14)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201  www.lwolf.com    *944 Airole Way*



Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

tanks, contaminated soil or water, hazardous waste, waste disposal sites, electromagnetic fields, nuclear sources, urea formaldehyde, or other materials may adversely affect the Property and the health of individuals who live on or work at the property as well as pets. Some municipalities may impose additional requirements regarding underground storage tanks, which may be more common in certain areas and cities throughout the State, especially where there are larger, older homes built before 1935. It is possible that these tanks, either now or in the future, may require inspections or abatement. If Buyer wants further information, Buyer is advised, and Broker(s) recommends, that Buyer have the Property inspected for the existence of such conditions and organisms, and conditions that may lead to their formation. Not all inspectors are licensed and licenses are not available for all types of inspection activities. Buyer is also advised to consult with appropriate experts regarding this topic during Buyer's inspection contingency period. Broker recommends that Buyer and Seller read the booklets titled, "Residential Environmental Hazards: A Guide for Homeowners, Homebuyers, Landlords and Tenants," and "Protect Your Family From Lead In Your Home." Brokers do not have expertise in this area.

3.  **FORMALDEHYDE:** Formaldehyde is a substance known to the State of California to cause cancer. Exposure to formaldehyde may be caused by materials used in the construction of homes. The United States Environmental Protection Agency, the California Air Resources Board, and other agencies have measured the presence of formaldehyde in the indoor air of select homes in California. Levels of formaldehyde that present a significant cancer risk have been measured in most homes that were tested. Formaldehyde is present in the air because it is emitted by a variety of building materials and home products used in construction. The materials include carpeting, pressed wood products, insulation, plastics, and glues. Most homes that have been tested elsewhere do contain formaldehyde, although the concentrations vary from home to home with no obvious explanation for the differences. One of the problems is that many suppliers of building materials and home products do not provide information on chemical ingredients to builders. Buyers may have further questions about these issues. Buyer is advised to consult with appropriate experts regarding this topic during Buyer's inspection contingency period. Broker(s) recommend that Buyer and Seller read the booklet titled "Residential Environmental Hazards: A Guide for Homeowners, Homebuyers, Landlords and Tenants." Brokers do not have expertise in this area.

4.  **GEOLOGIC HAZARDS:** Buyer and Seller are advised that California has experienced earthquakes in the past, and there is always a potential of future earthquakes. Damage caused by an earthquake may not be discoverable by a visual inspection of Buyer(s) or Broker(s). Inspection by a licensed, qualified professional is strongly recommended to determine the structural integrity and safety of all structures and improvements on the Property. If the Property is a condominium, or located in a planned unit development or in a common interest subdivision, Buyer is advised to contact the homeowners association about earthquake repairs and retrofit work and the possibility of an increased or special assessment to defray the costs of earthquake repairs or retrofit work. Buyer is encouraged to obtain and read the booklet entitled, "The Homeowner's Guide to Earthquake Safety." In most cases a questionnaire within the booklet must be completed by Seller and the entire booklet given to the Buyer if the Property was built prior to 1960. If the Property was built before 1975, and contains structures constructed of masonry or precast (tilt up) concrete walls, with wood frame floors or roof, or if the building has unreinforced masonry walls, then Seller must provide Buyer a pamphlet entitled "The Commercial Property Owner's Guide to Earthquake Safety." Many areas have a wide range of geologic problems and numerous studies have been made of these conditions. Some of this information is available for public review at city and county planning departments. Buyer is encouraged to review the public maps and reports and/or obtain a geologist's inspection report. Buyer may be able to obtain earthquake insurance to protect their interest in the Property. Sellers who agree to provide financing should also consider requiring Buyers to obtain such insurance naming Seller(s) as insured lien holder(s). Brokers do not have expertise in this area.

5.  **INSPECTIONS:** Buyer and Seller are advised that Buyer has the right to obtain various inspections of the Property under most residential purchase agreements. Buyer is advised to have the Property inspected by a professional property inspection service within Buyer's inspection contingency period. A licensed building contractor or other professional may perform these services. The inspector generally does not look behind walls or under carpets, or take equipment apart. Certain items on the Property, such as chimneys and spark arresters, plumbing, heating, air conditioning, electrical wiring, pool and spa, septic system, well, roof, foundation and structural items may need to be inspected by another professional, such as a chimney sweep, plumber, electrician, pool and spa service, septic or well company or roofer. A general physical inspection typically will not test for mold, wood destroying pests, lead-based paint, radon, asbestos and other environmental hazards, geologic conditions, age, remaining useful life or water-tightness of roof, cracks, leaks or operational problems associated with a pool or spa or connection of the Property to a sewer system. If Buyer wants further information on any aspect of the Property, Broker recommends that Buyer have a discussion with the professional property inspector and that Buyer hire an appropriate professional for the area of concern to Buyer. Brokers do not verify the results of any such inspection or guarantee the performance of any such inspector or service. Any election by Buyer to waive the right to a physical inspection of the Property or to rely on somebody other than an appropriate professional is against the advice of Brokers. Not all inspectors are licensed and licenses are not available for all types of inspection activities. Brokers do not have expertise in these area.

6.  **MOLD:** Buyer and Seller are advised that the presence of certain kinds of mold, fungi, mildew and other organisms, sometimes referred to as "toxic mold" (collectively "Mold"), may adversely affect the Property and the health of individuals who live on or work at the Property as well as pets. Mold does not affect all people the same way, and may not affect some people at all. Mold may be caused by water leaks or other sources of moisture such as, but not limited to, flooding, and leaks in windows, pipes and roof. Seller is advised to disclose the existence of any such conditions of which he or she is aware. Buyer should carefully review all of Seller's disclosures for any indication that any of these conditions exist. It is, however, possible that Mold may be hidden and that Seller is completely unaware of its

**STATEWIDE BUYER AND SELLER ADVISORY (SBSA PAGE 3 OF 14)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          944 Airole Way



Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

existence. In addition, Mold is often undetectable from a visual inspection, a professional general property inspection and even a structural pest control inspectors do not have expertise in this area. If Buyer wants further information, Broker recommends that Buyer have the Property tested for Mold by an environmental hygienist or other appropriate professional during Buyer's inspection contingency period. Not all inspectors are licensed and licenses are not available for all types of inspection activities. Brokers do not have expertise in this area.

7. **PETS AND ANIMALS:** Buyer and Seller are advised that the current or previous owner(s) may have had domesticated or other pets and animals at the Property. Odors from animals urine or other contamination may be dormant for long periods of time and then become active because of heat, humidity or other factors and might not be eliminated by cleaning or replacing carpets or other cleaning methods. Pet urine and feces can also damage hardwood floors and other floor coverings. Additionally, an animal may have had fleas, ticks and other pests that remain on the Property after the animal has been removed. If Buyer wants further information, Broker(s) recommend that Buyer discuss the issue with an appropriate professional during Buyer's inspection contingency period. Brokers do not have expertise in this area.

8. **SEPTIC SYSTEMS:** Buyer and Seller are advised that a property may be served by one or more septic systems even though adjoining properties are connected to a sewer line. Buyer and Seller are also advised that some septic tanks and systems may have been abandoned or have leaked into ground water sources. Buyer is advised to contact the appropriate government agency to verify that the Property is connected to a sewer or served by a septic system. If the Property is served by a septic system, it may consist of a septic tank, cesspool, pits, leach lines or a combination of such mechanisms ("collectively, System"). No representation or warranty is made by Seller or Broker concerning the condition, operability, size, capacity or future expansion of a System, nor whether a System is adequate for use by the intended occupants of the Property. A change in the number of occupants or the quantity, composition or methods of depositing waste may affect the efficiency of the System. In addition, the amount of rainfall and ground water table may also affect the efficiency of the System. Many factors including, but not limited to, natural forces, age, deterioration of materials and the load imposed on a System can cause the System to fail at any time. Broker recommends that Buyer obtain an independent evaluation of any System by a qualified sanitation professional during Buyer's inspection contingency period. Buyer should consult with their sanitation professional to determine if their report includes the tank only, or other additional components of the System such as pits and leach fields. Not all inspectors are licensed and licenses are not available for all types of inspection activities. In some cases, Buyer's lender as well as local government agencies may require System inspection. System-related maintenance costs may include, but not be limited to, locating, pumping or providing outlets to ground level. Brokers are unable to advise Buyer or Seller regarding System-related issues or associated costs, which may be significant. If Buyer and Seller agree to obtain a System inspection, Buyer and Seller are cautioned that the inspection cost may include, but not be limited to, the costs of locating, pumping or providing outlets to ground level. Brokers do not have expertise in this area.

9. **SOIL AND GEOLOGIC CONDITIONS:** Buyer and Seller are advised that real estate in California is subject to settling, slippage, contraction, expansion erosion, subsidence, earthquakes and other land movement. The Property may be constructed on fill or improperly compacted soil and may have inadequate drainage capability. Any of these matters can cause structural problems to improvements on the Property. Civil or geo-technical engineers are best suited to evaluate soil stability, grading, drainage and other soil conditions. Additionally, the Property may contain known or unknown mines, mills, caves or wells. If Buyer wants further information, Broker recommends that Buyer hire an appropriate professional. Not all inspectors are licensed and licenses are not available for all types of inspections. Brokers do not have expertise in this area.

10. **SQUARE FOOTAGE, LOT SIZE, BOUNDARIES AND SURVEYS:** Buyer and Seller are advised that only an appraiser or land surveyor, as applicable, can reliably confirm square footage, lot size, Property corners and exact boundaries of the Property. Representations regarding these items that are made in a Multiple Listing Service, advertisements, and from property tax assessor records are often approximations, or based upon inaccurate or incomplete records. Fences, hedges, walls or other barriers may not represent actual boundary lines. Unless otherwise specified by Broker in writing, Brokers have not verified any such boundary lines or any representations made by Seller or others concerning square footage, lot size, Property corners or exact boundaries. Standard title insurance does not insure the boundaries of the Property. If the exact square footage or lot size or location of Property corners or boundaries is an important consideration in Buyer's decision to purchase the Property and/or how much Buyer is willing to pay for the Property, then Buyer must independently conduct Buyer's own investigation through appropriate professionals, appraisers, or licensed surveyors and rely solely on their data, recognizing that all measurements may not be consistent and that different sources may have different size assessments. Brokers do not have expertise in this area.

11. **WATER INTRUSION:** Buyer and Seller are advised that many homes suffer from water intrusion or leakage. The causes of water intrusion are varied, and can include defective construction, faulty grading, deterioration of building materials and absence of waterproof barriers. Water intrusion can cause serious damage to the Property. This damage can consist of wood rot, mold, mildew and even damage to the structural integrity of the Property. The cost of repairing and remediating water intrusion damage and it's causes can be very significant. The existence and cause of water intrusion is often difficult to detect. Because you, your Broker or a general home inspector cannot visually observe any effects of water intrusion, Buyer and Seller should not assume that such intrusion does not exist. Broker recommends that Buyer have the Property inspected for water intrusion by an appropriate professional. Brokers do not have expertise in this area.

12. **WELL AND WATER SYSTEM(S):** Buyer and Seller are advised that the Property may be served by one or more water wells, springs, or private community or public water systems. Any of these private or public water systems may contain

**STATEWIDE BUYER AND SELLER ADVISORY (SBSA PAGE 4 OF 14)**



Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201    www.lwolf.com          944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

bacteria, chemicals, minerals and metals, such as chromium, wells, may have been abandoned on the Property. Buyer is advised to have both the quality and the quantity of water evaluated, and to obtain an analysis of the quality of any domestic and agricultural water in use, or to be used at the Property, from whatever source. Water quality tests can include not only tests for bacteria, such as coliform, but also tests for organic and inorganic chemicals, metals, mineral content and gross alpha testing for radioactivity. Broker recommends that Buyer consult with a licensed, qualified well and pump company and local government agency to determine whether any well/spring or water system will adequately serve Buyer's intended use and that Buyer have a well consultant perform an extended well output test for this purpose. Water well or spring capacity, quantity output and quality may change at any time. There are no guarantees as to the future water quality, quantity or duration of any well or spring. If Buyer wants further information, Broker(s) recommend that Buyer obtain an inspection of the condition, age, adequacy and performance of all components of the well/spring and any water system during Buyer's inspection contingency period. Brokers do not have expertise in this area.

13. **WOOD DESTROYING PESTS:** Buyer and Seller are advised that the presence of, or conditions likely to lead to the presence of infestation or infection of wood destroying pests and organisms may adversely affect the Property. Inspection reports covering these items can be separated into two sections: Section 1 identifies areas where infestation or infection is evident. Section 2 identifies areas where there are conditions likely to lead to infestation or infection. If Buyer wants further information, Buyer is advised and Broker recommends that Buyer have the Property inspected for the existence of such conditions and organisms, and conditions that may lead to their formation, by a registered structural pest control company during Buyer's inspection contingency period. Brokers do not have expertise in this area.

14. **FIRE HARDENING, DEFENSIBLE SPACE, AND WILDFIRE DISASTERS:** California is subject to wildfires which have resulted in damage and destruction of many properties located in the state. Several recent state laws have mandated disclosures by sellers when selling properties in certain identified zones, such as "high" or "very high" fire severity zones. Additionally, state law mandates that sellers provide buyers with statements of compliance with local mandates if adopted by local agencies. The Property may be located in a high or very high fire severity zone. This may impact the availability of insurance and the ability to build or rebuild structures on the Property. Additionally, there may be requirements that certain fire prevention steps may be mandated. Information on fire hardening, including current building standards and information on minimum annual vegetation management standards to protect homes from wildfires, can be obtained on the internet website http://www.readyforwildfire.org.

Cal Fire has made available a "Fire Hazard Severity Zone Viewer" where you can input the Property address to determine which fire hazard zone, if any, that the Property is located in. The viewer is available at https://egis.fire.ca.gov?FHSZ/. Below is a partial list of potential resources provided as a starting point for Buyer/Lessee investigations and not as an endorsement or guarantee that any federal, state, county, city or other resource will provide complete advice.

A. California Department of Insurance "Wildfire Resource" http://insurance.ca.gov/01-consumers/140-catastrophes/WildfireResources.cfm; 1-800-927-4357

B. Governor's Office of Emergency Services "Cal OES" California Wildfires Statewide Recovery Resources http://wildfirerecovery.org/

C. California Department of Forestry and Fire "Cal Fire" http://fire.ca.gov/ and https://www.readyforwildfire.org/

D. California Department of Transportation https://calsta.ca.gov/

E. California Attorney General https://oag.ca.gov/consumers/pricegougingduringdisasters#8C1

**Brokers do not have expertise in this area.**

# B. Property Use and Ownership

1. **ACCESSORY DWELLING UNITS:** Accessory Dwelling Units (ADUs) are known by many names: granny flats, in-law units, backyard cottages, secondary units and more. California has passed laws to promote the development of ADUs. Additional information about ADUs can be found at http://hcd.ca.gov/policy-research/AccessoryDwellingUnits.shtml. Buyer is advised to check with appropriate government agencies or third party professionals to verify permits and legal requirements and the effect of such requirements on current and future use and rentability of the Property, its development and size. Brokers do not have expertise in this area.

2. **BUILDING PERMITS, ZONING AND CODE COMPLIANCE:** Buyer and Seller are advised that any structure on the Property, including the original structure and any addition, modification, remodel or improvement may have been built without permits, not according to building codes, or in violation of zoning laws. Further, even if such structure was built according to the then-existing code or zoning requirement, it may not be in compliance with current building standards or local zoning. It is also possible that local law may not permit structures that now exist to be rebuilt in the event of damage or destruction. Certain governmental agencies may require periodic inspections to occur in the future. If Buyer wants further information, Broker(s) recommend that Buyer discuss the issue with an appropriate professional during Buyer's inspection contingency period. Brokers do not have expertise in this area.

3. **BUYER INTENDED FUTURE USE OF, AND MODIFICATIONS TO, THE PROPERTY:** Buyer and Seller are advised that Seller's existing use of the property may not be consistent with Buyer's intended use or any future use that Buyer makes of the property, whether or not Buyer has any current plans to change the use. Buyer is advised to check with appropriate government agencies or third party professionals to verify what legal requirements are needed to accommodate any change in use. In addition, neither Seller nor Broker make any representations as to what modifications Buyer can make to the Property after close of escrow as well as any cost factors associated with any such modifications. Buyer is advised to check with his own licensed contractor and other such professionals as well as with the appropriate government agencies to determine what modifications Buyer will be allowed to make after close of escrow. Brokers do not have expertise in this area.

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com    944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

4. **CALIFORNIA FAIR PLAN:** Buyer and Seller are advised that insurance for certain hillside, oceanfront and brush properties may be available only from the California Fair Plan. This may increase the cost of insurance for such properties and coverage may be limited. Broker(s) recommend that Buyer consult with Buyer's own insurance agent during Buyer's inspection contingency period regarding the availability of coverage under the California Fair Plan and the length of time it may take for processing of a California Fair Plan application. Brokers do not have expertise in this area.

5. **FUTURE REPAIRS, REPLACEMENTS AND REMODELS:** Buyer and Seller are advised that replacement or repairs of certain systems or rebuilding or remodeling of all or a portion of the Property may trigger requirements that homeowners comply with laws and regulations that either come into effect after Close of Escrow or are not required to be complied with until the replacement, repair, rebuild or remodel has occurred. Permit or code requirements or building standards may change after Close of Escrow, resulting in increasing costs to repair existing features. If Buyer wants further information, Broker recommends that Buyer discuss the issue with an appropriate professional during Buyer's inspection contingency period. Brokers do not have expertise in this area.

6. **HEATING VENTILATING AND AIR CONDITIONING SYSTEMS:** Changes to state and federal energy efficiency regulations impact the installation, replacement and some repairs of heating and air conditioning units (HVAC): **(i)** Federal regulations now require manufacturers of HVAC units to produce only units meeting a new higher Seasonal Energy Efficiency Rating (SEER). This will likely impact repairs and replacements of existing HVAC units. State regulations now require that when installing or replacing HVAC units, with some exceptions, duct work must be tested for leaks. Duct work leaking more than 15 percent must be repaired to reduce leaks. The average existing duct work typically leaks 30 percent. More information is available at the California Energy Commission's website http://www.energy.ca.gov/title24/changeout. Home warranty policies may not cover such inspections or repairs, **(ii)** the phase out of the use of HCFC-22 (R-22 Freon) will have an impact on repairs and replacement of existing air conditioning units and heat pumps. The production and import of HCFC-22 ended January 1, 2020. Existing systems may continue to be used and HCFC-22 recovered and reclaimed or that was produced prior to 2020 can help meet the needs of existing systems, however, costs may rise. More information is available from the Environmental Protection Agency at https://www.epa.gov/sites/production/files/2018-08/documents/residential_air_conditioning_and_the_phaseout_of_hcfc-22_what_you_need_to_know.pdf and http://www.epa.gov/ozone/title6/phaseout/22phaseout.html, and **(iii)** New efficiency standards are also in place for water heaters. As a consequence, replacement water heaters will generally be larger than existing units and may not fit in the existing space. Additional venting and other modifications may be required as well. More information is available from the U.S. Department of Energy at http://www.eere.energy.gov/buildings/appliance_standards/product.aspx/productid/27. If Buyer wants further information, Broker recommends that Buyer discuss the issue with an appropriate professional during Buyer's inspection contingency period. Brokers do not have expertise in this area.

7. **HISTORICAL DESIGNATION, COASTAL COMMISSION, ARCHITECTURAL, LANDSCAPE, AGRICULTURAL OR OPEN SPACE AND OTHER RESTRICTIONS ON BUILDINGS OR IMPROVEMENTS:** Buyer and Seller are advised that the Property may be: **(i)** designated as a historical landmark, **(ii)** protected by a historical conservancy, **(iii)** subject to an architectural or landscaping review process, **(iv)** within the jurisdiction of the California Coastal Commission or other government agency, or **(v)** subject to a contract preserving use of all or part of the Property for agriculture or open space. If the Property is so designated or within the jurisdiction of any such, or similar, government agency, then there may be restrictions or requirements regarding Buyer's ability to develop, remove or trim trees or other landscaping, remodel, make improvements to and build on or rebuild the Property. Broker(s) recommend that Buyer satisfy him/herself during Buyer's inspection contingency period if any of these issues are of concern to Buyer. Brokers do not have expertise in this area.

8. **INSURANCE, TITLE INSURANCE AND TITLE INSURANCE AFTER FORECLOSURE:** Buyer and Seller are advised that Buyer may have difficulty obtaining insurance regarding the Property if there has been a prior insurance claim affecting the Property or made by Buyer but unrelated to the Property. Seller is required by C.A.R. Form RPA to disclose known insurance claims made during the past five years (C.A.R. Form SPQ or ESD). Sellers may not be aware of claims prior to their ownership. If Buyer wants further information, Broker(s) recommend that, during Buyer's inspection contingency period, Buyer conduct his or her own investigation for past claims. Buyer may need to obtain Seller's consent in order to have access to certain investigation reports. If the Property is a condominium, or is located in a planned unit development or other common interest subdivision, Buyer and Seller are advised to determine if the individual unit is covered by the Homeowner's Association Insurance and the type of insurance coverage that Buyer may purchase. Broker(s) recommend that Buyer consult Buyer's insurance agents during Buyer's inspection contingency period to determine the need, availability and possibility of securing any and all forms of other insurance or coverage or any conditions imposed by insurer as a requirement of issuing insurance. If Buyer does any repairs to the property during the escrow period or Buyer takes possession prior to Close of Escrow or Seller remains in possession after Close of Escrow, whether for a limited or extended period of time, Broker(s) recommend that Buyer and Seller each consult with their own insurance agent regarding insurance or coverage that could protect them in the transaction (including but not limited to: personal property, flood, earthquake, umbrella and renter's). Buyer and Seller are advised that traditional title insurance generally protects Buyer's title acquired through the sale of the property. While all title insurance policies, as do all insurance policies, contain some exclusions, some title insurance policies contain exclusions for any liability arising from a previous foreclosure. This can occur when a short sale has occurred and the lender mistakenly has also proceeded with a foreclosure. Buyer is strongly advised to consult with a title insurer to satisfy themselves that the policy to be provided adequately protects their title to the property against other possible claimants. Brokers do not have expertise in this area.

9. **LAND LEASE:** Buyer and Seller are advised that certain developments are built on leased land. This means that: **(i)**



**STATEWIDE BUYER AND SELLER ADVISORY (SBSA PAGE 6 OF 14)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

Buyer does not own the land, **(ii)** the right to occupy the land will terminate at some point in time, **(iii)** the cost to lease the land may increase at some point in the future, and **(iv)** Buyer may not be able to obtain title insurance or may have to obtain a different type of title insurance. If Buyer wants further information, Broker recommends that Buyer discuss the issue with an attorney or other appropriate professional. Brokers do not have expertise in this area.

10. **MARIJUANA, CANNABIS, AND METHAMPHETAMINE LABS:** Buyer and Seller are advised that California law permits individual patients to cultivate, possess and use marijuana for medical purposes. Furthermore, California law permits primary caregivers, lawfully organized cooperatives, and collectives to cultivate, distribute and possess marijuana for medicinal purposes. California law also allows recreational use of marijuana for adults, as well as limited rights for individuals to grow and cultivate marijuana, and rights of others, subject to a licensing process, to grow, cultivate and distribute marijuana for recreational use. California's medical and recreational marijuana laws are in direct conflict with federal law which recognizes no lawful use for marijuana and has no exemptions for medical use. Federal criminal penalties, some of which mandate prison time, remain in effect for the possession, cultivation and distribution of marijuana. Buyer and Seller are strongly advised to seek legal counsel as to the legal risks and issues surrounding owning or purchasing a property where medical or any other marijuana activity is taking place. Marijuana storage, cultivation and processing carry the risk of causing mold, fungus or moisture damage to a property, additionally, some properties where marijuana has been cultivated have had alterations to the structure or the electrical system which may not have been done to code or with permits and may affect the safety of the structure or the safe operation of the electrical system. Buyer is strongly advised to retain an environmental hygienist contractor and other appropriate professionals to inspect a property where medical or any other marijuana activity has taken place. Broker recommends that Buyer and Seller involved with a property where there is medical marijuana activity or where it may take place review the California Attorney General's Guidelines for the "Security and Non-Diversion of Marijuana Grown for Medical Use" https://oag.ca.gov/system/files/attachments/press-docs/MEDICINAL%20CANNABIS%20Guidelines.pdf and the U.S. Department of Justice memo regarding marijuana prosecutions at https://www.justice.gov/opa/press-release/file/1022196/download. Brokers do not have expertise in this area. While no state law permits the private production of methamphetamine, some properties have been the site of an illegal methamphetamine laboratory. State law imposes an obligation to notify occupants, a ban on occupying the property and clean up requirements when authorities identify a property as being contaminated by methamphetamine. Buyer is advised that a property where methamphetamine has been produced may pose a very serious health risk to occupants. Buyer is strongly advised to retain an environmental hygienist contractor or other appropriate professionals to inspect the property if methamphetamine production is suspected to have taken place. Brokers do not have expertise in this area.

11. **OWNER'S TITLE INSURANCE:** The Truth in Lending/RESPA integrated disclosure (TRID) established by the Consumer Financial Protection Bureau (CFPB) requires that lenders must tell borrowers that title insurance is "optional." While obtaining an owner's policy of title insurance may be "optional", it may be a contractual requirement as between Buyer and Seller. Furthermore, California Civil Code § 1057.6 requires that Buyers be provided with the following notice: "IMPORTANT: IN A PURCHASE OR EXCHANGE OF REAL PROPERTY, IT MAY BE ADVISABLE TO OBTAIN TITLE INSURANCE IN CONNECTION WITH THE CLOSE OF ESCROW SINCE THERE MAY BE PRIOR RECORDED LIENS AND ENCUMBRANCES WHICH AFFECT YOUR INTEREST IN THE PROPERTY BEING ACQUIRED. A NEW POLICY OF TITLE INSURANCE SHOULD BE OBTAINED IN ORDER TO ENSURE YOUR INTEREST IN THE PROPERTY THAT YOU ARE ACQUIRING."

Additionally, even the CFPB on its "ask CFPB" "What is owner's title insurance?" page advises "You may want to buy an owner's title insurance policy, which can help protect your financial interest in the home." Moreover, not obtaining an owner's policy may increase the cost of the lender's policy (required by most lenders), possibly require the separate purchase of a preliminary title report, and may have an impact on the sale of the Property in the future.

Buyers who decide to opt out of obtaining an owner's title insurance policy are acting against the advice of Brokers as well as the advice provided in the California Civil Code § 1057.6 and by the CFPB. Brokers do not have expertise in this area.

12. **RENT AND EVICTION CONTROL LAWS AND ORDINANCES:** Buyer and Seller are advised that California and some cities and counties impose or may impose restrictions that limit the rent that can be charged to a tenant, the maximum number of tenants who can occupy the property, the right of a landlord to terminate a tenancy and the costs to do so. If Buyer wants further information, Broker(s) recommend that Buyer investigate the issue with an appropriate government authority or HOA during Buyer's inspection contingency period. Brokers do not have expertise in this area.

13. **RETROFIT, BUILDING REQUIREMENTS, AND POINT OF SALE REQUIREMENTS:** Buyer and Seller are advised that state and local Law may require **(i)** the installation of operable smoke detectors, **(ii)** bracing or strapping of water heaters, and **(iii)** upon sale completion of a corresponding written statement of compliance that is delivered to Buyer. Although not a point of sale or retrofit obligation, state law may require the property to have operable carbon monoxide detection devices. Additionally, some city and county governments may impose additional retrofit standards at time of sale including, but not limited to, installing or retrofitting low-flow toilets and showerheads, gas shut-off valves, fireplaces, and tempered glass. Further, there may be potential health impacts from air pollution caused from burning wood. Exposure to particulate matter from the smoke may cause short-term and long-term health effects. Buyers should consult with licensed professional to inspect, properly maintain, and operate a wood burning stove or fireplace. Broker(s) recommend that Buyer and Seller consult with the appropriate government agencies, inspectors, and other professionals to determine the retrofit standards for the Property, the extent to which the Property complies with such standards, and the costs, if any, of compliance. Brokers do not have expertise in this area.

14. **SHORT TERM RENTALS AND RESTRICTIONS:** Buyer and Seller are advised that some cities, counties and Homeowner Associations (HOAs) do impose or may impose restrictions that limit or prohibit the right of the owner or occupant to rent-

**STATEWIDE BUYER AND SELLER ADVISORY (SBSA PAGE 7 OF 14)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com     944 Airole Way



Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

out the Property for short periods of time (usually 30 days or less). In short term rentals, as well as all rentals, Buyer and Seller are advised to seek assistance to ensure compliance with all fair housing laws and regulations. If Buyer wants further information, Broker(s) recommend that Buyer investigate the issue with an appropriate government authority or HOA during Buyer's inspection contingency period. Brokers do not have expertise in this area.

15. **VIEWS:** Buyer and Seller are advised that present views from the Property may be affected by future development or growth of trees and vegetation on adjacent properties and any other property within the line of sight of the Property. Brokers make no representation regarding the preservation of existing views. If Buyer wants further information, Broker(s) recommend that Buyer review covenants, conditions and restrictions, if any, and contact neighboring property owners, government agencies and homeowner associations, if any, during Buyer's inspection contingency period. Brokers do not have expertise in this area.

16. **SWIMMING POOL, SECURITY AND SAFETY:** Buyer and Seller are advised that state and local Law may require the installation of barriers, anti-entrapment grates, access alarms, self-latching mechanisms, pool covers, exit alarms and/ or other measures to decrease the risk to children and other persons of existing swimming pools and hot tubs, as well as various fire safety and other measures concerning other features of the Property. Compliance requirements differ from city to city and county to county. Unless specifically agreed, the Property may not be in compliance with these requirements. If Buyer wants further information, Broker(s) recommend that Buyer contact local government agencies about these restrictions and other requirements. State law requires that new pools and spas be equipped with at least two of seven specified drowning prevention safety features. Home inspectors have a statutory obligation to perform a non-invasive physical examination of the pool area to identify which safety features are present. Brokers do not have expertise in this area.

17. **WATER SHORTAGES AND CONSERVATION:** Buyer and Seller are advised that the Property may be located in an area that could experience water shortages. The policies of local water districts and the city or county in which the Property is located can result in the occurrence of any or all of the following: **(i)** limitations on the amount of water available to the Property, **(ii)** restrictions on the use of water, and **(iii)** an increasingly graduated cost per unit of water use, including, but not limited to, penalties for excess usage. For further information, Broker recommends that Buyer contact the supplier of water to the Property regarding the supplier's current or anticipated policies on water usage and to determine the extent to which those policies may affect Buyer's intended use of the Property. If the Property is serviced by a private well, Buyer is advised that drought conditions and/or a low water table may make it necessary to arrange, through a private supplier, for delivery of water to the Property. Buyers should contact water truck companies for the costs involved. Brokers do not have expertise in this area.

18. **1915 IMPROVEMENT BOND MELLO-ROOS COMMUNITY DISTRICT, AND OTHER ASSESSMENT DISTRICTS:** Buyer and Seller are advised that the Property may be subject to an improvement bond assessment under the Improvement Bond Act of 1915, a levy of a special tax pursuant to a Mello-Roos Community Facilities district, and/or a contractual assessment as provided in § 5898.24 of the Streets And Highways Code or other assessment districts. Seller is generally required to make a good faith effort to obtain a disclosure notice from any local agency collecting such taxes and deliver such notice to Buyers. If there is a question as to whether an existing bond or assessment will be prorated as of the close of escrow, or whether Seller will pay off the bond or assessment at close of escrow, Buyers are advised to discuss the matter with the appropriate entity and address the responsibility for payment in negotiations for the purchase agreement or amendment prior to removing contingencies. Some cities and other localities have begun, or have the intention to begin, the process of requiring the replacement of utility poles by requiring that utility lines be buried underground. These projects can result in special tax assessments and set-up costs that are imposed on individual property owners. Brokers do not have expertise in this area.

# C. Off-Site and Neighborhood Conditions

1. **GOLF COURSE DISCLOSURES:** Buyer and Seller are advised that if the Property is located adjacent to or near a golf course the following may apply: **(i)** Stray golf balls − Any residence near a golf course may be affected by errant golf balls, resulting in personal injury or destruction to property. Golfers may attempt to trespass on adjacent property to retrieve golf balls even though the project restrictions may expressly prohibit such retrieval. **(ii)** Noise and lighting − The noise of lawn mowers irrigation systems and utility vehicles may create disturbances to homeowners. Maintenance operations may occur in the early morning hours. Residents living near the clubhouse may be affected by extra lighting, noise, and traffic. **(iii)** Pesticides and fertilizer use − A golf course may be heavily fertilized, as well as subjected to other chemicals during certain periods of the year. **(iv)** Irrigation system − Golf course sprinkler systems may cause water overspray upon adjacent property and structures. Also the irrigation system of a golf course may use reclaimed and retreated wastewater. **(v)** Golf carts − Certain lots may be affected more than others by the use of golf carts. Lots adjacent to a tee or putting green may be subject to noise disturbances and loss of privacy. **(vi)** Access to golf course from residences − It is likely that most residences will not have direct access from their lots to the golf course. The project restrictions may disclaim any right of access or other easements from a resident's lot onto the golf course. **(vii)** View obstruction − Residents living near a golf course may have their views over the golf course impacted by maturing trees and landscaping or by changes to the course's configuration. **(viii)** Water restrictions − As some municipalities face water shortages, the continued availability of water to the golf course may be restricted or otherwise reduced by the local water agency. If Buyer wants further information, Broker(s) recommend that Buyer contact the local water agency regarding this matter. Brokers do not have expertise in this area.

2. **NEIGHBORHOOD, AREA, PERSONAL FACTORS, BUYER INTENDED USE, HIGH SPEED RAILS, AND SMOKING RESTRICTIONS:** Buyer and Seller are advised that the following may affect the Property or Buyer's intended use of it:

**STATEWIDE BUYER AND SELLER ADVISORY (SBSA PAGE 8 OF 14)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201   www.lwolf.com   944 Airole Way



Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

neighborhood or area conditions, including schools, proximity and adequacy of law enforcement, crime, fire protection, other government services, availability, adequacy and cost of any speed-wired, wireless internet connections or other telecommunications or other technology services and installations, proximity to medical marijuana growing or distribution locations, cell phone towers, manufacturing, commercial, industrial, airport or agricultural activities or military ordnance locations, existing and proposed transportation, construction, and development, any other source that may affect noise, view, traffic, or odor, wild and domestic animals, susceptibility to tsunami and adequacy of tsunami warnings, other nuisances, hazards, or circumstances, protected species, wetland properties, botanical diseases, historic or other governmentally-protected sites or improvements, cemeteries, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Buyer and FAA requirements for recreational and non-recreational use of Unmanned Aircraft Systems (UAS) (drones) (see UAS frequently asked questions http://www.faa.gov/uas/faqs/). California is potentially moving toward high speed rail service between Northern and Southern California. This rail line could have an impact on the Property if it is located nearby. More information on the timing of the project and routes is available from the California High-Speed Rail Authority at www.cahighspeedrail.ca.gov/. The State of California has long-standing no smoking laws in place restricting smoking in most business and some public spaces. Local jurisdictions may enact laws that are more restrictive than state law. Many California cities have enacted restrictions on smoking in parks, public sidewalks, beaches and shopping areas. Some jurisdictions have restrictions entirely banning smoking inside privately owned apartments and condominiums as well as in the common areas of such structures, or limiting smoking to certain designated areas. If Buyer wants further information, Broker(s) recommend that Buyer contact local government agencies about these restrictions. Brokers do not have expertise in this area.

3. **NEIGHBORHOOD NOISE SOURCES:** Buyer and Seller are advised that even if the Property is not in an identified airport noise influence area, the Property may still be subject to noise and air disturbances resulting from airplanes and other aircraft, commercial or military or both, flying overhead. Other common sources of noise include nearby commercial districts, schools, traffic on streets, highways and freeways, trains and general neighborhood noise from people, dogs and other animals. Noise levels and types of noise that bother one person may be acceptable to others. Buyer is advised to satisfy him/herself with regard to any sources of and amounts of noise at different times of day and night. Brokers do not have expertise in this area.

4. **SCHOOLS:** Buyer and Seller are advised that children living at the Property may not, for numerous reasons, be permitted to attend the school nearest the Property. Various factors including, but not limited to, open enrollment policies, busing, overcrowding and class size reductions may affect which public school serves the Property. School district boundaries are subject to change. Buyer is advised to verify whether the Property is now, and at the Close of Escrow will be, in the school district Buyer understands it to be in and whether residing in the Property entitles a person to attend any specific school in which that Buyer is interested. Broker(s) recommend that Buyer contact the local school or school district for additional information during Buyer's inspection contingency period. Brokers do not have expertise in this area.

5. **UNDERGROUND PIPELINES AND UTILITIES:** Throughout California underground pipelines transport natural gas, liquid fuel and other potentially hazardous materials. These pipelines may or may not provide utility services to the Property. Information about the location of some of the pipelines may be available from a company that also provides disclosures of natural and other hazards or from other sources of public maps or records. Proximity to underground pipelines, in and of itself, does not affirmatively establish the risk or safety of the property. If Buyer wants further information about these underground pipelines and utilities, Buyer is advised to consult with appropriate experts during Buyer's inspection contingency period. Brokers do not have expertise in this area.

6. **WILDLIFE:** California is the home to many species of wildlife. The location of homes in California continues to expand into areas that are the natural habitat of wildlife and the Property may be in such an area. Wildlife may become a nuisance especially if the availability of their natural sources of food or water is limited. Buyer should investigate the need to implement mitigation measures at the Property including but not limited to the use of animal-resistant garbage containers, and other appropriate measures depending on the species and habitat involved. Brokers do not have expertise in this area.

7. **SEA LEVEL RISE/COASTAL PROPERTIES:** Sea level rise has the potential to affect coastal residents, recreation, and development. Coastal communities may or may not have addressed the potential impact. The following is a non-exclusive list of issues that may be impacted by sea level rise: **(i)** Shoreline, beach and bluff erosion; and sand replacement requirements; **(ii)** The effectiveness of seawalls and bulkheads, whether built with or without permits; **(iii)** Seaward construction, development or improvement to existing structures; **(iv)** The enactment of geological hazard abatement districts and assessments; and **(v)** The determination of the "mean high tide line" which is used to figure out the property's boundary. Buyer is advised to consult with appropriate professionals, including having a geological inspection, to identify the effect of the listed conditions, if any, on the property. Brokers do not have expertise in this area.

Below is a non-exhaustive list of potential resources provided as a starting point for Buyer investigations into sea level rise, and not as an endorsement or guarantee that any federal, state, county, city or other resource will provide complete advice.

A. California Coastal Commission contact information: https://www.coastal.ca.gov/contact/#/
B. State Lands Commission contact information: https://www.slc.ca.gov/contact-us/
C. National Oceanic and Atmospheric Administration (sea level rise page): https://search.usa.gov/search?affiliate=csc_search_all&query=sea=level=rise&submit=submit
D. California Coastal Commission (sea level rise page): https://www.coastal.ca.gov/climate/slr/
E. Coastal Adaptation Planning Guidance: Residential Development (draft); California Coastal Commission: https://www.coastal.ca.gov/climate/slr/vulnerability-adaptation/residential/

**STATEWIDE BUYER AND SELLER ADVISORY (SBSA PAGE 9 OF 14)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

# D. Legal Requirements (Federal, State and Local)

1. **DEATH ON THE PROPERTY:** California Civil Code § 1710.2 protects a seller from: **(i)** failing to disclose a death on the property that occurred more than 3 years before a buyer has made an offer on a property; and **(ii)** failing to disclose if an occupant of a property was afflicted with HIV/AIDS, regardless of whether a death occurred or if so, when § 1710.2 does not protect a seller from making a misrepresentation in response to a direct inquiry. If the Buyer has any concerns about whether a death occurred on the Property or the manner, location, details or timing of a death, the buyer should direct any specific questions to the Seller in writing. Brokers do not have expertise in this area.

2. **EARTHQUAKE FAULT ZONES AND SEISMIC HAZARD ZONES:** Buyer and Seller are advised that California Public Resources Code §§ 2622 and 2696 require the delineation and mapping of "Earthquake Fault Zones" along known active faults and "Seismic Hazard Zones" in California. Affected cities and counties must regulate certain development projects within these zones. Construction or development on affected properties may be subject to the findings of a geological report prepared by a registered California geologist. Generally, Seller must disclose if the Property is in such a zone and can use a research company to aid in the process. If Buyer wants further information, Broker recommends that, during Buyer's inspection contingency period, Buyer make independent inquiries with such research companies or with appropriate government agencies concerning the use and improvement of the Property. Buyer is advised that there is a potential for earthquakes and seismic hazards even outside designated zones. Brokers do not have expertise in this area.

3. **EPA's LEAD-BASED PAINT RENOVATION, REPAIR AND PAINTING RULE:** The new rule requires that contractors and maintenance professionals working in pre-1978 housing, child care facilities, and schools with lead-based paint be certified; that their employees be trained; and that they follow protective work practice standards. The rule applies to renovation, repair, or painting activities affecting more than six square feet of lead-based paint in a room or more than 20 square feet of lead-based paint on the exterior. Enforcement of the rule begins October 1, 2010. See the EPA website at http://www.epa.gov/lead for more information. Buyer and Seller are advised to consult an appropriate professional. Brokers do not have expertise in this area.

4. **FIRE HAZARDS:** Buyer and Seller are advised that fires annually cause the destruction of thousands of homes. Due to varied climate and topography, certain areas have higher risks of fires than others. Certain types of materials used in home construction create a greater risk of fire than others. If the Property is located within a State Fire Responsibility Area or a Very High Fire Hazard Zone, generally Seller must disclose that fact to Buyer under California Public Resources Code § 4136 and California Government Code §§ 51178 and 51183.5, and may use a research company to aid in the process. Owners of property may be assessed a fire prevention fee on each structure on each parcel in such zones. The fee may be adjusted annually commencing July 1, 2013. If Buyer wants further information, Broker recommends that, during Buyer's inspection contingency period, Buyer contact the local fire department and Buyer's insurance agent regarding the risk of fire. Buyer is advised that there is a potential for fires even outside designated zones. Brokers do not have expertise in this area.

5. **FIRPTA/CALIFORNIA WITHHOLDING:** Buyer and Seller are advised that: **(i)** Internal Revenue Code § 1445, as of February 17, 2016, requires a Buyer to withhold and to remit to the Internal Revenue Service 15% of the purchase price of the property if the Seller is a non-resident alien, unless an express exemption applies. Only 10% needs to be withheld if the Buyer acquires the property as Buyer's residence and the price does not exceed $1,000,000. Seller may avoid withholding by providing Buyer a statement of non-foreign status. The statement must be signed by Seller under penalty of perjury and must include Seller's tax identification number. Buyer can also avoid having to withhold Federal taxes from Seller's Proceeds if the property price is $300,000 or less, and the Buyer signs an affidavit stating Buyer intends to occupy the property as a principal residence. **(ii)** California Revenue and Taxation Code § 18662 requires that a Buyer withhold and remit to the California Franchise Tax Board 3 1/3% of the purchase price of the property unless the Seller signs an affidavit that the property was the Seller's (or the decedent's, if a trust or probate sale) principal residence or that the sales price is $100,000 or less or another express exemption applies. Exemptions from withholding also apply to legal entities such as corporations, LLCs, and partnerships. Brokers cannot give tax or legal advice. Broker recommends that Buyer and Seller seek advice from a CPA, attorney or taxing authority. Brokers do not have expertise in this area.

6. **FLOOD HAZARDS:** Buyer and Seller are advised that if the Property is located within a Special Flood Hazard Area, as designated by the Federal Emergency Management Agency (FEMA), or an area of Potential Flooding pursuant to California Government Code § 8589.3, generally Seller must disclose this fact to Buyer and may use a research company to aid in the process. The National Flood Insurance Program was established to identify all flood plain areas and establish flood-risk zones within those areas. The program mandates flood insurance for properties within high-risk zones if loans are obtained from a federally-regulated financial institution or are insured by any agency of the United States Government. The extent of coverage and costs may vary. If Buyer wants further information, Broker(s) recommend that Buyer consult his or her lender and/or insurance agent during Buyer's inspection contingency period. Buyer is advised that there is a potential for flooding even outside designated zones. Brokers do not have expertise in this area.

7. **MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to § 290.46 of the Penal Code, information about specific registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at http://www.meganslaw.ca.gov/. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Seller nor Brokers, in any, are required to check this website. If Buyer wants further information, Buyer should obtain information directly from this website.) Brokers do not have expertise in this area.

SBSA REVISED 6/21 (PAGE 10 OF 14)

**STATEWIDE BUYER AND SELLER ADVISORY (SBSA PAGE 10 OF 14)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

8. **NOTICE OF YOUR SUPPLEMENTAL PROPERTY TAX BILL; ACCURATE SALES PRICE REPORTING:** Buyer and Seller are advised that pursuant to Civil Code § 1102.6(c), Seller, or his or her agent, is required to provide the following notice to the Buyer:

"California property tax law requires the Assessor to revalue real property at the time the ownership of property changes. Because of this law, you may receive one or two supplemental tax bills, depending on when your loan closes.

The supplemental tax bills are not mailed to your lender. Even if you have arranged for your property tax payments to be paid through an impound account, the supplemental tax bills will not be paid by your lender. It is your responsibility to pay these supplemental bills directly to the Tax Collector. If you have any questions concerning this matter, please call your Tax Collector's Office."

Although the notice refers to loan closing as a trigger, it is actually the change of ownership which triggers this reassessment of property taxes. Therefore, the Property can be reassessed even if there is no loan involved in the purchase of the Property. The Purchase Agreement may allocate supplemental tax bills received after the Close of Escrow to the Buyer. A change (preliminary change) of ownership form is generally required to be filed by the Buyer with the local taxing agency. The form identifies the sales price of the Property. An assessor may value the Property at its fair market value regardless of the sales price declared by the Buyer. If Buyer wants further information concerning these matters, Broker(s) recommend that Buyer discuss the issue with the County Assessor or Tax Collector or their own tax or legal advisor. Brokers do not have expertise in this area.

9. **ZONE MAPS MAY CHANGE:** Maps that designate, among other things, Earthquake Fault Zones, Seismic Hazard Zones, State Fire Responsibility Areas, Very High Fire Hazard Zones, Special Flood Hazard Areas, and Potential Flooding Areas are occasionally redrawn by the applicable Government Agency. Properties that are currently designated in a specified zone or area could be removed and properties that are not now designated in a specified zone or area could be placed in one or more such zones or areas in the future. A property owner may dispute a FEMA flood hazard location by submitting an application to FEMA. Brokers do not have expertise in this area.

# E. Contract Related Issues and Terms

1. **ARBITRATION:** Buyer and Seller are advised that arbitration is a process by which the disputing parties hire a neutral person to render a binding decision. Generally, arbitration is faster and less expensive than resolving disputes by litigating in court. The rules are usually less formal than in court, and it is a private process not a matter of public record. By agreeing to arbitration, the parties give up the right to a jury trial and to appeal the arbitrator's decision. Arbitration decisions have been upheld even when arbitrators have made a mistake as to the law or the facts. If the parties agree to arbitration, then after first attempting to settle the dispute through mediation, any dispute arising out of their agreement (with a few limited exceptions) must be submitted to binding arbitration. Buyer and Seller must weigh the benefits of a potentially quicker and less expensive arbitration against giving up the right to a jury trial and the right to appeal. Brokers cannot give legal advice regarding these matters. Buyers and Sellers must decide on their own, or with the advice of legal counsel, whether to agree to arbitration. Brokers do not have expertise in this area.

2. **ELECTRONIC SIGNATURES:** The ability to use electronic signatures to sign legal documents is a great convenience, facilitating the ability to send and receive documents and reach agreement in a real estate transaction. However, Buyers and Sellers are cautioned to carefully read each provision. Arrows indicating "sign here" are merely there for the convenience of finding the next signature line. Only sign if you have taken the time necessary to read each document thoroughly, have full knowledge, and consent to the terms provided in the document. Brokers strongly advise Buyers and Sellers to read the entire document before signing even if they have reviewed an earlier draft. Do not just scroll through or skip to the next signature line. You are signing a legally binding agreement. Read it carefully. Ask your Broker, Agent or legal advisor if you have questions or do not understand a provision, and sign only if you agree to be bound by the terms. Brokers do not have expertise in this area.

3. **ESCROW FUNDS:** Buyer and Seller are advised that California Insurance Code § 12413.1 provides that escrow companies cannot disburse funds unless there are sufficient "good funds" to cover the disbursement. "Good funds" are defined as cash, wire transfers and cashiers' or certified checks drawn on California depositories. Escrow companies vary in their own definitions of "good funds." Broker(s) recommend that Buyer and Seller ask the escrow company regarding its treatment of "good funds." All samples and out-of-state checks are subject to waiting periods and do not constitute "good funds" until the money is physically transferred to and received by the escrow holder. Brokers do not have expertise in this area.

4. **HOME WARRANTY:** Buyer and Seller are advised that Buyer and Seller can purchase home warranty plans covering certain standard systems of the Property both before and after Close of Escrow. Seller can obtain coverage for the Property during the listing period. For an additional premium, an upgraded policy providing additional coverage for air conditioning, pool and spa and other features can be purchased. Home warranties do not cover every aspect of the Property and may not cover inspections or upgrades for repairs required by state or federal laws or pre-existing conditions. Broker(s) recommend that Buyer review the policy for details. Brokers do not have expertise in this area.

5. **IDENTIFICATION OF NATURAL PERSONS BEHIND SHELL COMPANIES IN ALL-CASH TRANSACTIONS:** The U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN) has issued Geographic Targeting Orders (GTOs) targeting alleged money laundering risk in the real estate sector. The GTOs will temporarily require



**STATEWIDE BUYER AND SELLER ADVISORY (SBSA PAGE 11 OF 14)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201  www.lwolf.com       944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

U.S. title insurance companies to identify the natural persons behind companies used to pay all-cash for high- and residential real estate in certain major metropolitan areas. FinCEN explained that it remains concerned that all- cash purchases (i.e., those without bank financing) may be conducted by individuals attempting to hide their assets and identity by purchasing residential properties through limited liability companies or other similar structures. Since the original issuance, the GTOs have been renewed and may continue to be renewed. The GTOs cover the following areas in California: Los Angeles, San Francisco, San Mateo, Santa Clara and San Diego Counties. The monetary thresholds for each county is $300,000. GTOs have helped law enforcement identify possible illicit activity. FinCEN reported that a significant portion of covered transactions have dictated possible criminal activity associated with the individuals reported to be the beneficial owners behind shell company purchasers. Brokers do not have expertise in this area.

6. **LIQUIDATED DAMAGES:** Buyer and Seller are advised that a liquidated damages clause is a provision Buyer and Seller can use to agree in advance to the amount of damages that a seller will receive if a buyer breaches the Agreement. The clause usually provides that a seller will retain a buyer's initial deposit paid if a buyer breaches the agreement, and generally must be separately initialed by both parties and meet other statutory requirements to be enforceable. For any additional deposits to be covered by the liquidated damages clause, there generally must be another separately signed or initialed agreement (see C.A.R. Form RID). However, if the Property contains from 1 to 4 units, one of which a buyer intends to occupy, California Civil Code § 1675 limits the amount of the deposit subject to liquidated damages to 3% of the purchase price. Even though both parties have agreed to a liquidated damages clause, an escrow company will usually require either a judge's or arbitrator's decision or instructions signed by both parties in order to release a buyer's deposit to a seller. Buyers and Sellers must decide on their own, or with the advice of legal counsel, whether to agree to a liquidated damages clause. Brokers do not have expertise in this area.

7. **MEDIATION:** Buyer and Seller are advised that mediation is a process by which the parties hire a neutral person to facilitate discussion and negotiation between the parties with the goal of helping them reach a settlement of their dispute. The parties generally share in the cost of this confidential, non-binding negotiation. If no agreement is reached, either party can pursue further legal action. Under C.A.R. Form RPA-CA: **(i)** the parties must mediate any dispute arising out of their agreement (with a few limited exceptions, such as matters within the jurisdiction of a small claims court) before they resort to arbitration or court, and **(ii)** if a party proceeds to arbitration or court without having first attempted to mediate the dispute, that party risks losing the right to recover attorney fees and costs even if he or she prevails. Brokers do not have expertise in this area.

8. **NON CONFIDENTIALITY OF OFFERS:** Buyer is advised that Seller or Listing Agent may disclose the existence, terms, or conditions of Buyer's offer, unless all parties and their agent have signed a written confidentiality agreement (such as C.A.R. Form CND). Whether any such information is actually disclosed depends on many factors, such as current market conditions, the prevailing practice in the real estate community, the Listing Agent's marketing strategy and the instructions of the Seller. Brokers do not have expertise in this area.

9. **ONLINE OR WIRE FUNDS TRANSFERS:** Instructions for the online or wire transfer of escrow deposits have been known to be intercepted by hackers who alter them so that Buyer's funds are actually wired to accounts controlled by criminals rather than the escrow company. Buyers should exercise extreme caution in making electronic funds transfers, verifying that the organization they are transferring funds to is, in fact, the escrow company and that their own bank account information is not being exposed. See C.A.R. Form WFA for further information. Brokers do not have expertise in this area.

# F. Other Factors Affecting Property

1. **COMMUNITY ENHANCEMENT AND PRIVATE TRANSFER FEES:** Buyer and Seller are advised that some areas or communities may have enhancement fees or user-type fees, or private transfer taxes and fees, over and above any stated fees. The Federal Housing Finance Agency has issued a rule that prohibits Fannie Mae and Freddie Mac from purchasing loans made on properties with private transfer fees if those fees were established on or after February 8, 2011. See title 12 Code of Federal Regulations § 1228 for more information and exceptions. Private transfer fees: **(i)** may last for a fixed period of time or in perpetuity, **(ii)** are typically calculated as a percentage of the sales price, and **(iii)** may have private parties, charitable organizations or interest-based groups as their recipients who may use the funds for social issues unrelated to the property. Brokers do not have expertise in this area.

2. **GENERAL RECALL/DEFECTIVE PRODUCT/CLASS ACTION INFORMATION:** Buyer and Seller are advised that government entities and manufacturers may at any time issue recall notices and/or warnings about products that may be present in the Property, and that these notices or warnings can change. The following nonexclusive, non-exhaustive list contains examples of recalled/defective products/class action information: horizontal furnaces, Whirlpool Microwave Hood Combination; RE-ConBuilding products roof tiles; Central Sprinkler Company Fire Sprinklers; Robert Shaw Water Heater Gas Control Valves; Trex Decking; water heaters; aluminum wiring; galvanized, abs, polybutylene PEX, KITEC® and copper pipe; and dry wall manufactured in China. There is no single, all-inclusive source of information on product recalls, defective products or class actions; however, the U.S. Consumer Product Safety Commission (CPSC) maintains a website that contains useful information. If Buyer wants further information regarding the items listed above, Broker(s) recommend that Buyer review the CPSC website at http://www.cpsc.gov/ during Buyer's inspection contingency period. Another source affiliated with the CPSC is http://saferproducts.gov/ which allows a Buyer to search by product type or product name. Buyer may also search using the various search engines on the Internet for the specified product or products in question. Brokers recommend that Buyer satisfy themselves regarding recalled or defective products. Brokers will not determine if any aspect of the Property is subject to a recall or is affected by a class action lawsuit. Brokers do not have expertise in this area.

SBSA REVISED 6/21 (PAGE 12 OF 14)



**STATEWIDE BUYER AND SELLER ADVISORY (SBSA PAGE 12 OF 14)**

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

3. **HOMEOWNER ASSOCIATIONS AND COVENANTS, CONDITIONS, AND RESTRICTIONS ("CC&Rs"); CHARGING STATIONS; FHA/VA APPROVAL:** Buyer and Seller are advised that if the Property is a condominium, or located in a planned unit development, or in a common interest subdivision, there are typically restrictions on use of the Property and rules that must be followed. Restrictions and rules are commonly found in Declarations and other governing documents. Further there is likely to be a homeowner association (HOA) that has the authority to affect the Property and its use. Whether or not there is a HOA, the Property may still be subject to CC&Rs restricting use of the Property. The HOA typically has the authority to enforce the rules of the association, assess monetary payments (both regular monthly dues and special assessments) to provide for the upkeep and maintenance of the common areas, and enforce the rules and assessment obligations. If you fail to abide by the rules or pay monies owed to the HOA, the HOA may put a lien against your Property. Additionally, if an electric vehicle charging station is installed in a common area or an exclusive use common area, each Seller whose parking space is on or near that charging station must disclose its existence and that the Buyer will have the responsibilities set forth in California Civil Code § 4745. The law requires the Seller to provide the Buyer with the CC&Rs and other governing documents, as well as a copy of the HOA's current financial statement and operating budget, among other documents. Effective July 1, 2016, a Common Interest Development (CID) will be required to include in its annual budget report a separate statement describing the status of the CID as a Federal Housing Administration or Department of Veterans Affairs approved Development. While the purchase agreement and the law require that the annual budget be provided by Seller to Buyer, Brokers will not and cannot verify the accuracy of information provided by the CID. Buyer is advised to carefully review all HOA documents provided by Seller and the CC&Rs, if any, and satisfy him/herself regarding the use and restrictions of the Property, the amount of monthly dues and/or assessments, the adequacy of reserves, current and past insurance coverage and claims, and the possibility of any legal action that may be taken by or against the HOA. The HOA may not have insurance or may not cover personal property belonging to the owner of the unit in the condominium, common interest or planned unit development. For more information Buyer may request from Broker the C.A.R. Legal Q&A titled: "Homeowners' Associations: A Guide for REALTORS®". Brokers do not have expertise in this area.

4. **LEGAL ACTION:** Buyer and Seller are advised that if Seller or a previous owner was involved in a legal action (litigation or arbitration) affecting the Property, Buyer should obtain and review public and other available records regarding the legal action to determine: **(i)** whether the legal action or any resolution of it affects Buyer and the Property, **(ii)** if any rights against any parties involved in the legal action survive the legal action or have been terminated or waived as a result of the legal action, whether or not involving the same issue as in the legal action, and **(iii)** if any recommendations or requirements resulting from the legal action have been fulfilled and, if so, that Buyer is satisfied with any such action. Buyer should seek legal advice regarding these matters. Brokers do not have expertise in this area.

5. **MARKETING; INTERNET ADVERTISING; INTERNET BLOGS; SOCIAL MEDIA:** Buyer and Seller are advised that Broker may employ a "staging" company to assist in the presentation of the Property. The furnishings and decorations in the staging are generally not included in the sale unless specifically noted in the Agreement. Statements and inclusion in the MLS entry, flyers, and other marketing materials are NOT part of the Agreement. In addition, Broker may employ a service to provide a "virtual tour" or "virtual staging" or Internet marketing of the Property, permitting potential buyers to view the Property over the Internet. While they are supposed to be an accurate representation of the property, the photos may be enhanced and not fully representative of the actual condition of the property. Further, neither the service provider nor Broker have total control over who will obtain access to materials placed on the internet or what action such persons might take. Additionally, some Internet sites and other social media provide formats for comments or opinions of value of properties that are for sale. Information on the Property, or its owner, neighborhood, or any homeowner association having governance over the Property may be found on the internet on individual or commercial web sites, blogs, Facebook pages, or other social media. Any such information may be accurate, speculative, truthful or lies, and it may or may not reflect the opinions or representations by the Broker. Broker will not investigate any such sites, blogs, social media or other internet sites or the representations contained therein. Buyer is advised to make an independent search of electronic media and online sources prior to removing any investigation contingency. Buyer and Seller are advised that Broker has no control over how long the information or photos concerning the Property will be available on the Internet or through social media, and Broker will not be responsible for removing any such content from the internet or MLS. Brokers do not have expertise in this area.

6. **PACE LOANS AND LIENS:** The acronym PACE stands for Property Assessed Clean Energy. PACE programs allow property owners to finance energy and water conservation improvements and pay for them through an assessment on the owner's property. PACE programs are available in most areas for both residential one to four unit properties and commercial properties. PACE programs may be referred to by different names such as HERO or SCEIP, among others. If a PACE project is approved, an assessment lien is placed on a property for the amount owed plus interest. A property owner repays the entity for the improvements as a special tax assessment on the property tax bill over a period of years. A PACE lien is similar to a property tax lien in that it has "super priority." Sellers are obligated to disclose, pursuant to the C.A.R. Residential Purchase Agreement (C.A.R. Form RPA), whether any improvement is subject to a lien such as a PACE lien. Properties that are subject to PACE liens made on or after July 6, 2010 may not be eligible for financing. For more information, Buyer may request from Broker the C.A.R. Legal Q&A titled: "PACE Programs and Solar Leases". Brokers do not have expertise in this area.

SBSA REVISED 6/21 (PAGE 13 OF 14)

**STATEWIDE BUYER AND SELLER ADVISORY (SBSA PAGE 13 OF 14)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          **944 Airole Way**

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

7. **RE-KEYING:** All locks should be re-keyed immediately upon close of escrow so as to ensure the Buyer's safety and security of their persons as well as their personal belongings. Alarms, if any, should be serviced by professionals and codes should be changed. Garage door openers and remotes should be re-coded. In the event of a lease back to Seller after the close of escrow, Seller is advised that the Buyer is entitled to the keys as the Owner of the Property even though the Seller stays in possession of the Property as provided in the RPA.

8. **SOLAR PANEL LEASES:** Solar panel or power systems may be owned or leased. Although leased systems are probably personal property, they are included in the sale by the C.A.R. purchase agreement which also obligates the Seller to make a disclosure to the Buyer and provide the Buyer with documentation concerning the lease and system. Leasing companies generally secure payments by filing a UCC-1 (a Uniform Commercial Code form giving notice of a creditor's security interest) against the property. Buyers are given a contingency right to investigate the solar related system and documentation and assume any lease. Assumption of the lease may require Buyer to provide financial information to the leasing company who may require a credit report be obtained on the Buyer. Should a solar panel or power system be on the Property, Buyers should determine if the system is leased or owned. Buyers willingness to assume any such lease is a contingency in favor of Seller. For more information, Buyer may request from Broker the C.A.R. Legal Q&A titled: "PACE Programs and Solar Leases". Brokers do not have expertise in this area.

9. **RECORDING DEVICES:** Audio or video recording devices or both may be present on the Property, whether or not notice of any such devices has been posted. Seller may or may not even be aware of the capability of such devices.

# G. Local Disclosures and Advisories

1. **LOCAL ADVISORIES OR DISCLOSURES (IF CHECKED):**
   The following disclosures or advisories are attached:

   A. ☐ _____
   B. ☐ _____
   C. ☐ _____
   D. ☐ _____

**Buyer and Seller are encouraged to read all 14 pages of this Advisory carefully. By signing below, Buyer and Seller acknowledge that each has read, understands and received a copy of all 14 pages of this Advisory.**

BUYER _____    Richard Saghian  or approved assignee    Date 3-4 2022

BUYER _____    Date _____

SELLER _____    *Crestlloyd, LLC, Debtor in Possession, by Sierraconstellation Partners, LLC, its Manager*    Date 03 / 08 / 2022

SELLER _____    Date _____

Real Estate Broker (Selling Firm) *The Beverly Hills Estates / Compass*    DRE Lic. # 02126121

Address _____ City _____ State ____ Zip _____

By _____ Tel. _____ E-mail _____ DRE Lic.# 01774287 Date _____
   Rayni Williams & Branden

By _____ Tel. _____ E-mail _____ DRE Lic.# _____ Date _____

☐ Two Brokers with different companies are co-listing the Property. Co-listing Broker information is on the attached Additional Broker Acknowledgement (C.A.R. Form ABA)

Real Estate Broker (Buyer's Firm) *The Beverly Hills Estates and Hilton Hyland*    DRE Lic. # _____

Address _____ City _____ State ____ Zip _____

By _____ Tel. (310) 776-0737 E-mail brandenwilliams@mac.com DRE Lic.# 01774287 Date _____
   Branden Williams

By _____ Tel. 310.702.9808 E-mail stuart@hiltonhyland.com DRE Lic.# 01984753 Date _____
   Stuart Vetterick

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

SBSA REVISED 6/21 (PAGE 14 OF 14)

**STATEWIDE BUYER AND SELLER ADVISORY (SBSA PAGE 14 OF 14)**



Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

# WILDFIRE DISASTER ADVISORY
### (For use with properties in or around areas affected by a wildfire)
(C.A.R. Form WFDA, Revised 12/21)

1. **WILDFIRE DISASTERS:** Buyer/Lessee is aware that as a result of recent wildfire disasters there are current and unresolved health and safety concerns related to the aftermath and clean up of the wildfire disaster areas, as well as unknown and possible future concerns related to the rebuilding of infrastructure in the affected areas of the wildfires. Unfortunately, the impact of wildfires has not been limited to the fire areas themselves. Many areas have had air quality impacted by smoke and air particulates from distant fires. Additionally, fires continue to occur in previously unaffected areas, and fires may be an issue throughout the state of California.

2. **WILDFIRE DISASTER CONCERNS AND ISSUES:** The following non-exhaustive list represents concerns and issues that may impact Buyer/Lessee decisions about purchasing or leasing property impacted by a wildfire disaster, both currently and in the future. It is not intended to nor can it be a check list for all issues that might arise when purchasing or leasing property impacted by a wildfire disaster; **concerns and issues include, but are not limited to:**
    A. Insurance related issues such as availability, claims and possible liens attached to properties and the importance of identifying both the insurability and the cost of insurance as early in the process as possible.
    B. Lot clearing costs and requirements; toxic materials analysis, debris removal requirements.
    C. Whether the home has been fire hardened, and if so to what extent, to help reduce the risk of the structure catching fire.
    D. Local, state and federal requirements for cleanup and building approvals.
    E. Air quality, soil quality, and any other environmental or personal health concerns, even after the wildfire event has ended.
    F. Timelines, costs and requirements when obtaining required permits for building and utilities installation.
    G. The ability to procure insurance.
    H. Availability of and access to electricity, gas, sewer and other public or private utility services.
    I. Water delivery/potability; septic and/or sewer design; requirements and construction costs.
    J. Potential redesign of streets and infrastructure including possible eminent domain, land condemnation and/or acquisition.
    K. Inconvenience and delays due to road construction and unavailability of various goods, systems, or services.
    L. Impact that federal, state or local disaster declarations may have on materials prices, costs and rents.

3. **BUYER/LESSEE ADVISORIES:** Buyer/Lessee is advised:
    A. To check early in your transaction to determine if you are able to obtain insurance on the property.
    B. To investigate to their own satisfaction any and all concerns of Buyer/Lessee about the intended use of the property.
    C. That the area of the wildfire disaster will likely be under construction for a protracted period of time after a fire, and Buyer/Lessee may be inconvenienced by delays, traffic congestion, noise, dust, intermittent utilities availability.
    D. That due to the extraordinary catastrophe of a wildfire, there may be changes and variations in local, state or federal laws, codes, or requirements throughout the ongoing process of planning and rebuilding in the wildfire disaster area.
    E. That some insurers have reduced or cancelled offerings for fire insurance or increased costs that impact a Buyer/Lessees ability to afford or qualify for loans or meet income ratios for rentals.
    F. That if you are not able to obtain fire insurance and have removed property investigation or loan contingencies you may be in breach of the purchase or rental agreement.

4. **RESOURCES:** Below is a non-exhaustive list of potential resources provided as a starting point for Buyer/Lessee investigations and not as an endorsement or guarantee that any federal, state, county, city or other resource will provide complete advice.
    A. California Department of Insurance "WildfireResource" http://insurance.ca.gov/01-consumers/140-catastrophes/WildfireResources.cfm; 1-800-927-4357
    B. Governor's Office of Emergency Services "Cal OES" California Wildfires Statewide Recovery Resources https://wildfirerecovery.caloes.ca.gov/
    C. California Department of Forestry and Fire "Cal Fire" https://fire.ca.gov/ and https://www.readyforwildfire.org/
    D. California Department of Transportation https://calsta.ca.gov/
    E. California Attorney General https://oag.ca.gov/consumers/pricegougingduringdisasters#8C1
    F. The American Institute of Architects "Wildfire Recovery Resources" https://aia.org/pages/165776-wildfire-recovery-resources
    G. Buyer/Lessee is advised to check all local municipalities (County, City, and/or Town where the property is located) for additional resources.

5. **BUYER/LESSEE ACKNOWLEDGEMENT:** Buyer/Lessee understands that Real Estate Agents and Real Estate Brokers have no authority or expertise for providing guidance through the process of investigating the concerns described herein. Buyer/Lessee has an affirmative duty to exercise reasonable care in protecting themselves.

**Buyer/Lessee has read and understands this Advisory. By signing below, Buyer/Lessee acknowledges receipt of a copy of this Advisory.**

Buyer/Lessee _____ Richard Saghian or approved assignee _____ Date 3-4-2022

Buyer/Lessee _____ Date _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



**WFDA REVISED 12/21 (PAGE 1 OF 1)**

## WILDFIRE DISASTER ADVISORY (WFDA PAGE 1 OF 1)

The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069          Phone: (310)925-9281          Fax: (310) 388-4638          944 Airole Way
Rayni Romito Williams          Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

**COURT CONFIRMATION ADDENDUM**
(C.A.R. Form CCA, Revised 12/21)

This is an addendum to the Purchase Agreement, OR ☐ Counter Offer No. _____ , ☐ Other _____

_____ ("Agreement"), dated <u>the earlier of the close of escrow or 3/18/22</u> , on

property known as _____ **944 Airole Way, Los Angeles, CA  90077-2602** _____ ("Property"),

between _____ Richard Saghian or approved assignee _____ ("Buyer"),

and _____ *Crestlloyd, LLC, Debtor in Possession, by Sierraconstellation Partners, LLC, its Manager* _____ ("Seller").

Buyer and Seller are referred to as the "Parties."

The Agreement is contingent upon court confirmation on or before _____ (date). If court confirmation is not obtained by that date, Buyer may cancel the Agreement in writing. Court confirmation may be required in probate, conservatorship, guardianship, receivership, bankruptcy, divorce or other proceedings. The court may allow open, competitive bidding, resulting in the Property being sold to the highest bidder. Broker recommends that Buyer appear at the court confirmation hearing. Buyer understands that **(i)** Broker and others may continue to market the Property; and **(ii)** Broker may represent other competitive bidders prior to and at the court confirmation.

By signing below Buyer and Seller acknowledge that each has read, understands, has received a copy of and agrees to the terms of this Court Confirmation Addendum.

Date _____ 3-4-2022 _____          Date _____ 03 / 08 / 2022 _____

Buyer _____ *Richard Saghian* _____          Seller _____ _____
Richard Saghian or approved assignee          *Crestlloyd, LLC, Debtor in Possession,*
*by Sierraconstellation Partners, LLC, its Manager*

Buyer _____ _____          Seller _____ _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**CCA Revised 12/21 (PAGE 1 OF 1)**

**COURT CONFIRMATION ADDENDUM (CCA PAGE 1 OF 1)**

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

# EXHIBIT "A"

## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" 'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET; THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: **4369-026-021**

**CALIFORNIA ASSOCIATION OF REALTORS®**

# CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS
(C.A.R. FORM RPA, 12/21)

Date Prepared: **March 3, 2022**

**1. OFFER:**
  **A.** THIS IS AN OFFER FROM _____ Richard Saghian  or approved assignee _____ ("Buyer").
  **B.** THE PROPERTY to be acquired is _____ **944 Airole Way** _____ , situated
    in **Los Angeles** (City), **Los Angeles** (County), California, **90077-2602** (Zip Code),
    Assessor's Parcel No(s). **4369-026-021** _____ ("Property").
    **(Postal/Mailing address may be different from city jurisdiction. Buyer is advised to investigate.)**
  **C.** THE TERMS OF THE PURCHASE ARE SPECIFIED BELOW AND ON THE FOLLOWING PAGES.
  **D.** Buyer and Seller are referred to herein as the "Parties." Brokers and Agents are **not** Parties to this Agreement.

**2. AGENCY:**
  **A.** **DISCLOSURE:** The Parties each acknowledge receipt of a "Disclosure Regarding Real Estate Agency Relationships" (C.A.R. Form AD) if represented by a real estate licensee. Buyer's Agent is not legally required to give to Seller's Agent the AD form Signed by Buyer. Seller's Agent is not legally obligated to give to Buyer's Agent the AD form Signed by Seller.
  **B.** **CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction.
    Seller's Brokerage Firm _____ **The Beverly Hills Estates / Compass** _____ License Number _____ **02126121**
    Is the broker of (check one): [X] the Seller; or [ ] both the Buyer and Seller (Dual Agent).
    Seller's Agent _____ **Rayni Williams & Branden Williams & Aaron Kirman** _____ License Number _____ **01774287**
    Is (check one): [X] the Seller's Agent. (Salesperson or broker associate) [ ] both the Buyer's and Seller's Agent (Dual Agent).
    Buyer's Brokerage Firm _____ The Beverly Hills Estate and Hilton & Hyland _____ License Number _____
    Is the broker of (check one): [X] the Buyer; or [ ] both the Buyer and Seller (Dual Agent).
    Buyer's Agent _____ Branden Williams and Stuart Vetterick _____ License Number 01774287/01984753
    Is (check one): [X] the Buyer's Agent. (Salesperson or broker associate) [ ] both the Buyer's and Seller's Agent (Dual Agent).
  **C.** More than one Brokerage represents [ ] Seller, [ ] Buyer. See, Additional Broker Acknowledgement (C.A.R. Form ABA).
  **D.** **POTENTIALLY COMPETING BUYERS AND SELLERS:** The Parties each acknowledge receipt of a [X] "Possible Representation of More than One Buyer or Seller - Disclosure and Consent (C.A.R. Form PRBS).

**3. TERMS OF PURCHASE AND ALLOCATION OF COSTS:** The items in this paragraph are contractual terms of the Agreement. Referenced paragraphs provide further explanation. This form is 16 pages. The Parties are advised to read all 16 pages.

| | Paragraph # | Paragraph Title or Contract Term | Terms and Conditions | Additional Terms |
|---|---|---|---|---|
| A | 5, 5B (cash) | **Purchase Price** | $ 126,000,000.00 | [X] All Cash |
| B | | **Close of Escrow (COE)** | [ ] Days after Acceptance OR on [X] 3/21/22 (date) | |
| ~~C~~ | ~~32A~~ | ~~Expiration of Offer~~ | ~~3 calendar days after all Buyer Signature(s) or _____ (date), at 5PM or ____ [ ] AM/ [ ] PM~~ | |
| D(1) | 5A(1) | **Initial Deposit Amount** *(Money placed into escrow prior to placing a bid)* | $ 250,000.00 ( ~~% of purchase price~~ ) ~~(% number above is for calculation purposes and is not a contractual term)~~ | ~~within 3 (or ____ ) business days after Acceptance by wire transfer~~ OR [X] *has been deposited* |
| D(2) | 5A(2) | [X] **Increased Deposit** *(Money placed into escrow after the initial deposit. Use form DID at time increased deposit is made.)* | $ 14,870,000.00 ( ____ % of purchase price) (% number above is for calculation purposes and is not a contractual term) ***See Supplemental Addendum*** | Upon removal of all contingencies OR [ ] _____ (date) OR [X] *within two (2) business days* |
| ~~E(1)~~ | ~~5C(1)~~ | ~~Loan Amount(s):~~    First    Interest Rate    Points | ~~$ ____ ( ____ % of purchase price) Fixed rate or [ ] initial adjustable rate not to exceed ____ % Buyer to pay zero points or up to ____ % of the loan amount~~ ~~If FHA or VA checked, Deliver list of lender required repairs  17 (or ____ ) Days after Acceptance~~ | ~~Conventional or, if checked, [ ] FHA [ ] VA (CAR Forms FVAC, HID attached) [ ] Seller Financing [ ] Other:~~ |
| ~~E(2)~~ | ~~5C(2)~~ | ~~Additional Financed Amount~~    Interest Rate    Points | ~~$ ____ ( ____ % of purchase price) Fixed rate or [ ] initial adjustable rate not to exceed ____ % Buyer to pay zero points or up to ____ % of the loan amount~~ | ~~Conventional or, if checked, [ ] Seller Financing [ ] Other:~~ |
| E(3) | 7A | **Occupancy Type** | Primary, or if checked, [ ] Secondary [ ] Investment | |
| F | 5D | **Balance of Down Payment** | $ 110,880,000.00 | |
| | | **PURCHASE PRICE TOTAL** | $ 126,000,000.00 | |

© 2021, California Association of REALTORS®, Inc.

Buyer's Initials _RS_ / _____    Seller's Initials _____ / _____

**RPA 12/21 (PAGE 1 OF 16)**

## CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 1 OF 16)

The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069    Phone: (310)925-9281    Fax: (310) 388-4638    944 Airole Way
Rayni Romito Williams    Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

| | Paragraph # | Paragraph Title or Other Term | | Additional Terms |
|---|---|---|---|---|
| ~~G(1)~~ | ~~5E~~ | ~~Seller Credit, if any, to Buyer~~ | ☐ $ _____ ( _____ % of purchase price) (% number above is for calculation purposes and is not a contractual term) | ~~Seller credit to be applied to closing costs OR~~ ☐ ~~Other:_____~~ |
| G(2) | | ADDITIONAL FINANCE TERMS: ___none___ | | |
| H(1) | 5B | **Verification of All Cash** (sufficient funds) | ~~Attached to the offer or~~ ☒ 3 (or __2__ ) Days after Acceptance | |
| H(2) | 6A | **Verification of Down Payment and Closing Costs** | ~~Attached to the offer or~~ ☒ 3 (or __2__ ) Days after Acceptance | |
| ~~H(3)~~ | ~~6B~~ | ~~Verification of Loan Application~~ | ~~Attached to the offer or~~ ☐ ~~3 (or _____ ) Days after Acceptance~~ | ☐ ~~Prequalification~~ ☐ ~~Preapproval~~ ☐ ~~Fully underwritten preapproval~~ |
| I | | **Intentionally Left Blank** | | |
| J | 16 | **Final Verification of Condition** | 5 (or _____ ) Days prior to COE | |
| ~~K~~ | ~~23~~ | ~~Assignment Request~~ | ~~17 (or _____ ) Days after Acceptance~~ | |
| L | 8 | CONTINGENCIES | TIME TO REMOVE CONTINGENCIES | CONTINGENCY REMOVED |
| L(1) | 8A | **Loan(s)** | 17 (or _____ ) Days after Acceptance | ☒ No loan contingency |
| L(2) | 8B | **Appraisal:** Appraisal contingency based upon appraised value at a minimum of purchase price or ☐ $ _____ | 17 (or _____ ) Days after Acceptance | ☒ No appraisal contingency Removal of appraisal contingency does not eliminate appraisal cancellation rights in FVAC. |
| L(3) | 8C, 12 | **Investigation of Property** | 17 (or _____ ) Days after Acceptance | REMOVAL OR WAIVER OF CONTINGENCY: |
| | | **Informational Access to Property** Buyer's right to access the Property for informational purposes is **NOT** a contingency, does **NOT** create cancellation rights, and applies even if contingencies are removed. | 17 (or _____ ) Days after Acceptance | Any contingency in L(1)-L(7) may be removed or waived by checking the applicable box above or attaching a Contingency Removal (C.A.R. Form CR) and checking the applicable |
| L(4) | 8D, 14A | **Review of Seller Documents** | 17 (or _____ ) Days after Acceptance, or 5 Days after receipt, whichever is later | box therein. Removal or Waiver at time of offer is against Agent advice. See **paragraph 8H**. |
| L(5) | 8E, 13A | **Preliminary ("Title") Report** *has already been delivered* | 17 (or _____ ) Days after Acceptance, or 5 Days after receipt, whichever is later | |
| L(6) | 8F, 11F(1) | **Common Interest Disclosures** required by Civil Code § 4525 or this Agreement | 17 (or _____ ) Days after Acceptance, or 5 Days after receipt, whichever is later | |
| L(7) | 8G, 9B(6) | **Review of leased or liened items** (Such as for solar panels or propane tanks or PACE or HERO liens) | 17 (or _____ ) Days after Acceptance, or 5 Days after receipt, whichever is later | ☒ **CR attached** |
| L(8) | 8J | **Sale of Buyer's Property** Sale of Buyer's property is not a contingency, ~~UNLESS checked here:~~ ☐ ~~C.A.R. Form COP attached~~ | | |
| M | | **Possession** | **Time for Performance** | **Additional Terms** |
| M(1) | | **Time of Possession** | Upon notice of recordation, OR ☒ 6 PM or ☐ __ AM/ ☐ __ PM on date specified, as applicable, in 3M(2) or attached TOPA. | |
| ~~M(2)~~ | ~~7C~~ | ~~Seller Occupied or Vacant units~~ | ~~COE date or, if checked below,~~ ☐ _____ ~~days after COE (29 or fewer days)~~ ☐ _____ ~~days after COE (30 or more days)~~ | ~~C.A.R. Form SIP attached if 29 or fewer days. C.A.R. Form RLAS attached if 30 or more days.~~ |
| ~~M(3)~~ | | ~~Tenant Occupied units~~ | ~~See Tenant Occupied Property Addendum (C.A.R. form TOPA)~~ | ~~If tenant occupied~~ ☐ ~~TOPA or~~ ☐ ~~Other, attached~~ |
| N | | **Documents/Fees/Compliance** | **Time for Performance** | |
| N(1) | 14A | Seller Delivery of Documents | ~~7 (or _____ ) Days after Acceptance~~ *Delivered* | |
| N(2) | 19B | Sign and return Escrow Holder Provisions and Instructions | 5 (or _____ ) Days after receipt | |
| N(3) | 11K(2) | Time to pay fees for ordering HOA Documents | 3 (or _____ ) Days after Acceptance | |
| N(4) | 10B(1) | Install smoke alarm(s), CO detector(s), water heater bracing | 7 (or _____ ) Days after Acceptance | |
| N(5) | 28 | Evidence of representative authority | 3 Days after Acceptance | |
| O | | **Intentionally Left Blank** | | |

**RPA 12/21 (PAGE 2 OF 16)**     Buyer's Initials _RS_ / _____     Seller's Initials _M_ / _____



**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 2 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com     944 Airole Way

| P | Items Included and Excluded | | |
|---|---|---|---|
| P(1) | 9 | **Items Included** - All items specified in Paragraph 9B are included and the following, if checked: | |

Items Included:
- [X] Stove(s), oven(s), stove/oven combo(s);
- [X] Refrigerator(s);
- [X] Wine Refrigerator(s);
- [X] Washer(s);
- [X] Dryer(s);
- [X] Dishwasher(s);
- [X] Microwave(s);

- [X] Video doorbell(s);
- [X] Security camera equipment;
- [X] Security system(s)/alarm(s), other than separate video doorbell and camera equipment;
- [X] Smart home control devices;
- [X] Wall mounted brackets for video or audio equipment;

- [ ] Above-ground pool(s) / [ ] spa(s);
- [X] Bathroom mirrors, unless excluded below;
- [X] Electric car charging systems and stations;
- [X] Potted trees/shrubs; *(other than two artificial olive trees)*

**Additional Items included:**
- [ ] _____
- [ ] _____
- [ ] _____

| P(2) | 9 | **Excluded Items:** *The Property is being sold unfurnished* | X | **"Unity" sculpture in entryway** |
|---|---|---|---|---|
| | | [X] **Artificial olive trees** ; [X] **Artwork** ; | [X] | **Angel glass sculpture** ; |

| Q | Allocation of Costs | | | |
|---|---|---|---|---|
| | Paragraph # | Item Description | Who Pays (if Both is checked, cost to be split equally unless Otherwise Agreed) | Additional Terms |
| Q(1) | 10A, 11A | Natural Hazard Zone Disclosure Report, including tax information | [X] Buyer [ ] Seller [ ] Both _____ <br> _____ <br> [ ] Provided by: _____ | [ ] Environmental <br> [ ] Other _____ |
| Q(2) | | _____ Report | [X] Buyer [ ] Seller [ ] Both _____ | |
| Q(3) | | _____ Report | [X] Buyer [ ] Seller [ ] Both _____ | |
| Q(4) | 10B(1) | Smoke alarms, CO detectors, water heater bracing | [X] Buyer [ ] Seller [ ] Both _____ | |
| Q(5) | 10A 10B(2)(A) | Government Required Point of Sale **inspections, reports** | [X] Buyer [ ] Seller [ ] Both _____ | |
| Q(6) | 10B(2)(A) | Government Required Point of Sale **corrective/remedial actions** | [X] Buyer [ ] Seller [ ] Both _____ | |
| Q(7) | 19B | Escrow Fees | [ ] Buyer [ ] Seller [X] Both _____ <br> [ ] Each to pay their own fees | Escrow Holder: <br> **Chartwell Escrow** |
| Q(8) | 13 | Owner's title insurance policy | [ ] Buyer [X] Seller [ ] Both _____ | Title Company (If different from Escrow Holder): |
| Q(9) | | Buyer's Lender title insurance policy | Buyer | Unless Otherwise Agreed, Buyer shall purchase any title insurance policy insuring Buyer's lender. |
| Q(10) | | County transfer tax, fees | [X] Buyer [ ] Seller [ ] Both _____ | |
| Q(11) | | City transfer tax, fees | [X] Buyer [ ] Seller [ ] Both _____ | |
| Q(12) | 11K(2) | HOA fee for preparing disclosures | Seller | |
| Q(13) | | HOA certification fee | Buyer | |
| Q(14) | | HOA transfer fees | [X] Buyer [ ] Seller [ ] Both _____ | Unless Otherwise Agreed, Seller shall pay for separate HOA move-out fee and Buyer shall pay for separate move-in fee. Applies if separately billed or itemized with cost in transfer fee. |
| Q(15) | | Private transfer fees | Seller, or if checked, [X] Buyer [ ] Both | |
| Q(16) | | _____ fees or costs | [X] Buyer [ ] Seller [ ] Both _____ | |
| Q(17) | | _____ fees or costs | [X] Buyer [ ] Seller [ ] Both _____ | |
| Q(18) | 10C | Home warranty plan: _____ | [ ] Buyer [ ] Seller [ ] Both _____ <br> [X] Buyer waives home warranty plan <br> ~~Issued by:~~ _____ | ~~Cost not to exceed $~~ _____ ; |

| R | OTHER TERMS: *See Supplemental Addendum* |
|---|---|
| | _____ <br> _____ |



**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 3 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com    944 Airole Way




Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

**4. PROPERTY ADDENDA AND ADVISORIES:** (Check all that apply.)

**A. PROPERTY TYPE ADDENDA:** This Agreement is subject to the terms contained in the Addenda checked below:

☐ Probate Agreement Purchase Addendum (C.A.R. Form PA-PA)
☐ Manufactured Home Purchase Addendum (C.A.R. Form MH-PA)
☐ Tenant Occupied Property Purchase Addendum (C.A.R. Form TOPA) (Should be checked whether current tenants will remain or not.)
☐ Tenancy in Common Purchase Addendum (C.A.R. Form TIC-PA)
☐ Stock Cooperative Purchase Addendum (C.A.R. Form COOP-PA)
☐ Other

**B. OTHER ADDENDA:** This Agreement is subject to the terms contained in the Addenda checked below:

☐ Addendum # _____ (C.A.R. Form ADM)    ☐ Short Sale Addendum (C.A.R. Form SSA)
☐ Back Up Offer Addendum (C.A.R. Form BUO)    ☒ Court Confirmation Addendum (C.A.R. Form CCA)
☐ Septic, Well, Property Monument and Propane Addendum (C.A.R. Form SWPI)
☐ Buyer Intent to Exchange Addendum (C.A.R. Form BXA)    ☐ Seller Intent to Exchange Addendum (C.A.R. Form SXA)
☒ Other _Contingency Removal (C.A.R. Form CC)_    ☒ Other _Supplemental Addendum_

**C. BUYER AND SELLER ADVISORIES:** (Note: All Advisories below are provided for reference purposes only and are not intended to be incorporated into this Agreement.)

☒ Buyer's Inspection Advisory (C.A.R. Form BIA)    ☒ Fair Housing and Discrimination Advisory (C.A.R. Form FHDA)
☒ Wire Fraud Advisory (C.A.R. Form WFA)    ☒ Cal. Consumer Privacy Act Advisory (C.A.R. Form CCPA)
    (Parties may also receive a privacy disclosure from their own Agent.)
☒ Wildfire Disaster Advisory (C.A.R. Form WDFA)    ☒ Statewide Buyer and Seller Advisory (C.A.R. Form SBSA)
☐ Trust Advisory (C.A.R. Form TA)    ☐ Short Sale Information and Advisory (C.A.R. Form SSIA)
☐ REO Advisory (C.A.R. Form REO)    ☐ Probate Advisory (C.A.R. Form PA)
☐ Other    ☐ Other

**5. ADDITIONAL TERMS AFFECTING PURCHASE PRICE:** Buyer represents that funds will be good when deposited with Escrow Holder.

**A. DEPOSIT:**

(1) **INITIAL DEPOSIT:** Buyer shall deliver deposit directly to Escrow Holder. If a method other than wire transfer is specified in **paragraph 3D(1)** and such method is unacceptable to Escrow Holder, then upon notice from Escrow Holder, delivery shall be by wire transfer.

(2) **INCREASED DEPOSIT:** Increased deposit specified in **paragraph 3D(2)** is to be delivered to Escrow Holder in the same manner as the Initial Deposit. If the Parties agree to liquidated damages in this Agreement, they also agree to incorporate the increased deposit into the liquidated damages amount by signing a new liquidated damages clause (C.A.R. Form DID) at the time the increased deposit is delivered to Escrow Holder.

(3) **RETENTION OF DEPOSIT: Paragraph 29,** if initialed by all Parties or otherwise incorporated into this Agreement, specifies a remedy for Buyer's default. **Buyer and Seller are advised to consult with a qualified California real estate attorney before adding any other clause specifying a remedy (such as release or forfeiture of deposit or making a deposit non-refundable) for failure of Buyer to complete the purchase. Any such clause shall be deemed invalid unless the clause independently satisfies the statutory liquidated damages requirements set forth in the Civil Code.**

**B. ALL CASH OFFER:** If an all cash offer is specified in **paragraph 3A,** no loan is needed to purchase the Property. This Agreement is NOT contingent on Buyer obtaining a loan. Buyer shall, within the time specified in **paragraph 3H(1),** Deliver written verification of funds sufficient for the purchase price and closing costs.

~~**C. LOAN(S):**~~

~~(1) **FIRST LOAN:** This loan will provide for conventional financing **UNLESS** FHA, VA, Seller Financing (C.A.R. Form SFA), or Other is checked in **paragraph 3E(1).**~~

~~(2) **ADDITIONAL FINANCED AMOUNT:** If an additional financed amount is specified in **paragraph 3E(2),** that amount will provide for conventional financing **UNLESS** Seller Financing (C.A.R. Form SFA), or Other is checked in **paragraph 3E(2).**~~

~~(3) **BUYER'S LOAN STATUS:** Buyer authorizes Seller and Seller's Authorized Agent to contact Buyer's lender(s) to determine the status of any Buyer's loan specified in **paragraph 3E,** or any alternate loan Buyer pursues, whether or not a contingency of this Agreement. If the contact information for Buyer's lender(s) is different from that provided under the terms of **paragraph 6B,** Buyer shall Deliver the updated contact information within 1 Day of Seller's request.~~

~~(4) **FHA/VA:** If FHA or VA is checked in **paragraph 3E(1),** a FHA/VA amendatory clause (C.A.R. Form FVAC) shall be incorporated and Signed by all Parties. Buyer shall, within the time specified in **paragraph 3E(1),** Deliver to Seller written notice (C.A.R. Form RR or AEA) **(i)** of any lender requirements that Buyer requests Seller to pay for or otherwise correct or **(ii)** that there are no lender requirements. Notwithstanding Seller's agreement that Buyer may obtain FHA or VA financing, Seller has no obligation to pay or satisfy any or all lender requirements unless agreed in writing.~~

**D. BALANCE OF PURCHASE PRICE (DOWN PAYMENT, paragraph 3F)** (including all-cash funds) to be deposited with Escrow Holder pursuant to Escrow Holder instructions.

~~**E. LIMITS ON CREDITS TO BUYER:** Any credit to Buyer as specified in **paragraph 3G(1)** or Otherwise Agreed, from any source, for closing or other costs that is agreed to by the Parties ("Contractual Credit") shall be disclosed to Buyer's lender, if any, and made at Close Of Escrow. If the total credit allowed by Buyer's lender ("Lender-Allowable Credit") is less than the Contractual Credit, then **(i)** the Contractual Credit from Seller shall be reduced to the Lender Allowable Credit, and **(ii)** in the absence of a separate written agreement between the Parties, there shall be no automatic adjustment to the purchase price to make up for the difference between the Contractual Credit and the Lender Allowable Credit.~~

**6. ADDITIONAL FINANCING TERMS:**

**A. VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS:** Written verification of Buyer's down payment and closing costs, within the time specified in **paragraph 3H(2)** may be made by Buyer or Buyer's lender or loan broker pursuant to **paragraph 6B.**

~~**B. VERIFICATION OF LOAN APPLICATIONS:** Buyer shall Deliver to Seller, within the time specified in **paragraph 3H(3)** a letter from Buyer's lender or loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified in **paragraph 3E.** If any loan specified in **paragraph 3E** is an adjustable rate loan, the prequalification or preapproval letter shall be based on the qualifying rate, not the initial loan rate.~~

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 4 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com    944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

~~C. **BUYER STATED FINANCING:** Seller is relying on Buyer's representation of the type of financing specified (including, but not limited to, as applicable, all cash, amount of down payment, or contingent or non contingent loan). Seller has agreed to a specific closing date, purchase price, and to sell to Buyer in reliance on Buyer's specified financing. Buyer shall pursue the financing specified in this Agreement, even if Buyer also elects to pursue an alternative form of financing. Seller has no obligation to cooperate with Buyer's efforts to obtain any financing other than that specified in this Agreement but shall not interfere with closing at the purchase price on the COE date (**paragraph 3B**) even if based upon alternate financing. Buyer's inability to obtain alternate financing does not excuse Buyer from the obligation to purchase the Property and close escrow as specified in this Agreement.~~

7. **CLOSING AND POSSESSION:**

   A. **OCCUPANCY:** Buyer intends to occupy the Property as indicated in **paragraph 3E(3)**. Occupancy may impact available financing.

   B. **CONDITION OF PROPERTY ON CLOSING:**

   (1) Unless Otherwise Agreed: **(i)** the Property shall be delivered **"As-Is"** in its PRESENT physical condition as of the date of Acceptance; **(ii)** the Property, including pool, spa, landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance; and **(iii)** all debris and personal property not included in the sale shall be removed by Close Of Escrow or at the time possession is delivered to Buyer, if not on the same date. If items are not removed when possession is delivered to Buyer, all items shall be deemed abandoned. Buyer, after first Delivering to Seller written notice to remove the items within **3 Days**, may pay to have such items removed or disposed of and may bring legal action, as per this Agreement, to receive reasonable costs from Seller.

   (2) **Buyer is strongly advised to conduct investigations of the entire Property in order to determine its present condition. Seller and Agents may not be aware of all defects affecting the Property or other factors that Buyer considers important. Property improvements may not be built according to code, in compliance with current Law, or have had all required permits issued and/or finalized.**

   ~~C. **SELLER REMAINING IN POSSESSION AFTER CLOSE OF ESCROW:** If Seller has the right to remain in possession after Close Of Escrow pursuant to **paragraph 3M(2)** or as Otherwise Agreed, **(i)** the Parties are advised to consult with their insurance and legal advisors for information about liability and damage or injury to persons and personal and real property; **(ii)** Buyer is advised to consult with Buyer's lender about the impact of Seller's occupancy on Buyer's loan; and **(iii)** consult with a qualified California real estate attorney where the Property is located to determine the ongoing rights and responsibilities of both Buyer and Seller with regard to each other, including possible tenant rights, and what type of written agreement to use to document the relationship between the Parties.~~

   D. **At Close Of Escrow: (i)** Seller assigns to Buyer any assignable warranty rights for items included in the sale; and **(ii)** Seller shall Deliver to Buyer available Copies of any such warranties. Agents cannot and will not determine the assignability of any warranties.

   E. Seller shall, on Close Of Escrow unless Otherwise Agreed and even if Seller remains in possession, provide keys, passwords, codes and/or means to operate all locks, mailboxes, security systems, alarms, home automation systems, intranet and Internet-connected devices included in the purchase price, garage door openers, and all items included in either **paragraph 3P** or **paragraph 9**. If the Property is a condominium or located in a common interest development, Seller shall be responsible for securing or providing any such items for Association amenities, facilities, and access. Buyer may be required to pay a deposit to the Homeowners' Association ("HOA") to obtain keys to accessible HOA facilities.

8. **CONTINGENCIES AND REMOVAL OF CONTINGENCIES:**

   ~~A. **LOAN(S):**~~

   ~~(1) This Agreement is, unless otherwise specified in paragraph 3L(1) or an attached CR form, contingent upon Buyer obtaining the loan(s) specified. If contingent, Buyer shall act diligently and in good faith to obtain the designated loan(s). If there is no appraisal contingency or the appraisal contingency has been waived or removed, then failure of the Property to appraise at the purchase price does not entitle Buyer to exercise the cancellation right pursuant to the loan contingency if Buyer is otherwise qualified for the specified loan and Buyer is able to satisfy lender's non-appraisal conditions for closing the loan.~~

   ~~(2) Buyer is advised to investigate the insurability of the Property as early as possible, as this may be a requirement for lending. Buyer's ability to obtain insurance for the Property, including fire insurance, is part of Buyer's Investigation of Property contingency. Failure of Buyer to obtain insurance may justify cancellation based on the Investigation contingency but not the loan contingency.~~

   ~~(3) Buyer's contractual obligations regarding deposit, balance of down payment and closing costs are not contingencies of this Agreement, unless Otherwise Agreed.~~

   ~~(4) If there is an appraisal contingency, removal of the loan contingency shall not be deemed removal of the appraisal contingency.~~

   ~~(5) NO LOAN CONTINGENCY: If "No loan contingency" is checked in paragraph 3L(1), obtaining any loan specified is NOT a contingency of this Agreement. If Buyer does not obtain the loan specified, and as a result is unable to purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.~~

   ~~B. **APPRAISAL:**~~

   ~~(1) This Agreement is, unless otherwise specified in paragraph 3L(2) or an attached CR form, contingent upon a written appraisal of the Property by a licensed or certified appraiser at no less than the amount specified in paragraph 3L(2), without requiring repairs or improvements to the Property. Appraisals are often a reliable source to verify square footage of the subject property. However, the ability to cancel based on the measurements provided in an appraisal falls within the Investigation of Property contingency. The appraisal contingency is solely limited to the value determined by the appraisal. For any cancellation based upon this appraisal contingency, Buyer shall Deliver a Copy of the written appraisal to Seller, upon request by Seller.~~

   ~~(2) NO APPRAISAL CONTINGENCY: If "No appraisal contingency" is checked in paragraph 3L(2), Buyer may not use the loan contingency specified in paragraph 3L(1) to cancel this Agreement if the sole reason for not obtaining the loan is that the appraisal relied upon by Buyer's lender values the property at an amount less than that specified in paragraph 3L(2). If Buyer is unable to obtain the loan specified solely for this reason, Seller may be entitled to Buyer's deposit or other legal remedies.~~

   ~~C. **INVESTIGATION OF PROPERTY:** This Agreement is, as specified in paragraph 3L(3), contingent upon Buyer's acceptance of the condition of, and any other matter affecting, the Property. See paragraph 12.~~

   ~~D. **REVIEW OF SELLER DOCUMENTS:** This Agreement is, as specified in paragraph 3L(4), contingent upon Buyer's review of Seller's documents required in paragraph 14A.~~

**RPA 12/21 (PAGE 5 OF 16)**  Buyer's Initials RS / ___  Seller's Initials ___ / ___

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 5 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com    944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

E.   **TITLE:**
   (1)   This Agreement is, as specified in **paragraph 3L(5)**, contingent upon Buyer's ability to obtain the title policy provided for in **paragraph 13G** and on Buyer's review of a current Preliminary Report and items that are disclosed or observable even if not on record or not specified in the Preliminary Report, and satisfying Buyer regarding the current status of title. Buyer is advised to review all underlying documents and other matters affecting title, including, but not limited to, any documents or deeds referenced in the Preliminary Report and any plotted easements.
   (2)   Buyer has **5 Days** after receipt to review a revised Preliminary Report, if any, furnished by the Title Company and cancel the transaction if the revised Preliminary Report reveals material or substantial deviations from a previously provided Preliminary Report.

F.   ~~**CONDOMINIUM/PLANNED DEVELOPMENT DISCLOSURES (IF APPLICABLE):** This Agreement is, as specified in paragraph 3L(6), contingent upon Buyer's review of Common Interest Disclosures required by Civil Code § 4525 and under paragraph 11K ("CI Disclosures").~~

G.   ~~**BUYER REVIEW OF LEASED OR LIENED ITEMS CONTINGENCY:** Buyer's review of and ability and willingness to assume any lease, maintenance agreement or other ongoing financial obligation, or to accept the Property subject to any lien, disclosed pursuant to paragraph 9B(6), is, as specified in paragraph 3L(7), a contingency of this Agreement. Any assumption of the lease shall not require any financial obligation or contribution by Seller. Seller, after first Delivering a Notice to Buyer to Perform, may cancel this Agreement if Buyer, by the time specified in paragraph 3L(7), refuses to enter into any necessary written agreements to accept responsibility for all obligations of Seller-disclosed leased or liened items.~~

H.   ~~**REMOVAL OR WAIVER OF CONTINGENCIES WITH OFFER:** Buyer shall have no obligation to remove a contractual contingency unless Seller has provided all required documents, reports, disclosures, and information pertaining to that contingency. If Buyer does remove a contingency without first receiving all required information from Seller, Buyer is relinquishing any contractual rights that apply to that contingency. If Buyer removes or waives any contingencies without an adequate understanding of the Property's condition or Buyer's ability to purchase, Buyer is acting against the advice of Agent.~~

I.   ~~**REMOVAL OF CONTINGENCY OR CANCELLATION:**~~
   (1)   ~~For any contingency specified in paragraph 3L or 8, Buyer shall, within the applicable period specified, remove the contingency or cancel this Agreement.~~
   (2)   ~~For the contingencies for review of Seller Documents, Preliminary Report, and Condominium/Planned Development Disclosures, Buyer shall, within the time specified in paragraph 3L or 5 Days after receipt of Seller Documents or CI Disclosures, whichever occurs later, remove the applicable contingency in writing or cancel this Agreement.~~
   (3)   ~~If Buyer does not remove a contingency within the time specified, Seller, after first giving Buyer a Notice to Buyer to Perform (C.A.R. Form NBP), shall have the right to cancel this Agreement.~~

J.   **SALE OF BUYER'S PROPERTY:** This Agreement and Buyer's ability to obtain financing are NOT contingent upon the sale of any property owned by Buyer unless the Sale of Buyer's Property (C.A.R. Form COP) is checked as a contingency of this Agreement in **paragraph 3L(8).**

9.   **ITEMS INCLUDED IN AND EXCLUDED FROM SALE:**
   A.   **NOTE TO BUYER AND SELLER:** Items listed as included or excluded in the Multiple Listing Service (MLS), flyers, marketing materials, or disclosures are NOT included in the purchase price or excluded from the sale unless specified in this paragraph or **paragraph 3P** or as Otherwise Agreed. Any items included herein are components of the home and are not intended to affect the price. All items are transferred without Seller warranty.
   B.   **ITEMS INCLUDED IN SALE:**
      (1)   All EXISTING fixtures and fittings that are attached to the Property;
      (2)   EXISTING electrical, mechanical, lighting, plumbing and heating fixtures, ceiling fans, fireplace inserts, gas logs and grates, solar power systems, built-in appliances and appliances for which special openings or encasements have been made (whether or not checked in **paragraph 3P**), window and door screens, awnings, shutters, window coverings (which includes blinds, curtains, drapery, shutters or any other materials that cover any portion of the window), attached floor coverings, television antennas, satellite dishes, air coolers/conditioners, pool/spa equipment (including, but not limited to, any cleaning equipment such as motorized/automatic pool cleaners, pool nets, pool covers), garage door openers/remote controls, mailbox, in-ground landscaping, water features and fountains, water softeners, water purifiers, light bulbs (including smart bulbs) and all items specified as included in **paragraph 3P**, if currently existing at the time of Acceptance. **Note:** If Seller does not intend to include any item specified as being included above because it is not owned by Seller, whether placed on the Property by Agent, stager or other third party, the item should be listed as being excluded in **paragraph 3P** or excluded by Seller in a counter offer.
      (3)   Security System includes any devices, hardware, software, or control units used to monitor and secure the Property, including but not limited to, any motion detectors, door or window alarms, and any other equipment utilized for such purpose. If checked in **paragraph 3P**, all such items are included in the sale, whether hard wired or not.
      (4)   Home Automation (Smart Home Features) includes any electronic devices and features including, but not limited to, thermostat controls, kitchen appliances not otherwise excluded, and lighting systems, that are connected (hard wired or wirelessly) to a control unit, computer, tablet, phone, or other "smart" device. Any Smart Home devices and features that are physically affixed to the real property, and also existing light bulbs, are included in the sale. Buyer is advised to use **paragraph 3P(1)** or an addendum to address more directly specific items to be included. Seller is advised to use a counter offer to address more directly any items to be excluded.
      (5)   Non-Dedicated Devices: If checked in **paragraph 3P**, all smart home and security system control devices are included in the sale, except for any non-dedicated personal computer, tablet, or phone used to control such features. Buyer acknowledges that a separate device and access to wifi or Internet may be required to operate some smart home features and Buyer may have to obtain such device after Close Of Escrow. Buyer is advised to change all passwords and ensure the security of any smart home features.
      (6)   LEASED OR LIENED ITEMS AND SYSTEMS: Seller, within the time specified in **paragraph 3N(1)**, shall **(i)** disclose to Buyer if any item or system specified in **paragraph 3P** or **9B** or otherwise included in the sale is leased, or not owned by Seller, or is subject to any maintenance or other ongoing financial obligation, or specifically subject to a lien or other encumbrance or loan, and **(ii)** Deliver to Buyer all written materials (such as lease, warranty, financing, etc.) concerning any such item.
      (7)   Seller represents that all items included in the purchase price, unless Otherwise Agreed, **(i)** are owned by Seller and shall be transferred free and clear of liens and encumbrances, except the items and systems identified pursuant to **paragraph 9B(6)**, and **(ii)** are transferred without Seller warranty regardless of value. Seller shall cooperate with the identification of any software or applications and Buyer's efforts to transfer any services needed to operate any Smart Home Features or other items included in this Agreement, including, but not limited to, utilities or security systems.

---

**RPA 12/21 (PAGE 6 OF 16)**

Buyer's Initials  _____    Seller's Initials _____ / _____



**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 6 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com      944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

**C. ITEMS EXCLUDED FROM SALE:** Unless otherwise agreed, the following items are excluded from sale: **(i)** All items specified in **paragraph 3P(2); (ii)** audio and video components (such as flat screen TVs, speakers and other items) if any such item is not itself attached to the Property, even if a bracket or other mechanism attached to the component or item is attached to the Property; **(iii)** furniture and other items secured to the Property for earthquake or safety purposes. **Unless otherwise specified in paragraph 3P(1), brackets attached to walls, floors or ceilings for any such component, furniture or item will be removed and holes or other damage shall be repaired, but not painted.**

**10. ALLOCATION OF COSTS:**

**A. INSPECTIONS, REPORTS AND CERTIFICATES:** Paragraphs **3Q(1), (2), (3), and (5)** only determines who is to pay for the inspection, test, certificate or service ("Report") mentioned; **it does not determine who is to pay for any work recommended or identified in the Report. Agreements for payment of required work should be specified elsewhere in paragraph 3Q, or 3R, or in a separate agreement (such as C.A.R. Forms RR, RRRR, ADM or AEA).**

**B. GOVERNMENT REQUIREMENTS AND CORRECTIVE OR REMEDIAL ACTIONS:**

(1) **LEGALLY REQUIRED INSTALLATIONS AND PROPERTY IMPROVEMENTS:** Any required installation of smoke alarm or carbon monoxide device(s) or securing of water heater shall be completed within the time specified in **paragraph 3N(4)** and paid by the Party specified in **paragraph 3Q(4)**. If Buyer is to pay for these items, Buyer, as instructed by Escrow Holder, shall deposit funds into escrow or directly to the vendor completing the repair or installation. Prior to Close Of Escrow, Seller shall Deliver to Buyer written statement(s) of compliance in accordance with any Law, unless Seller is exempt. If Seller is to pay for these items and does not fulfill Seller's obligation in the time specified, and Buyer incurs costs to comply with lender requirements concerning those items, Seller shall be responsible for Buyer's costs.

(2) **POINT OF SALE REQUIREMENTS:**

(A) Point of sale inspections, reports and repairs refer to any such actions required to be completed before or after Close Of Escrow that are required in order to close under any Law and paid by Party specified in **paragraphs 3Q(5) and 3Q(6)**. ~~Unless Parties Otherwise Agree to another time period, any such repair, shall be completed prior to final verification of Property. If Buyer agrees to pay for any portion of such repair, Buyer, shall (i) directly pay to the vendor completing the repair or (ii) provide an invoice to Escrow Holder, deposit funds into escrow sufficient to pay for Buyer's portion of such repair and request Escrow Holder pay the vendor completing the repair.~~

(B) ~~Buyer shall be provided, within the time specified in paragraph 3N(1), unless Parties Otherwise Agree to another time period, a Copy of any required government conducted or point-of-sale inspection report prepared pursuant to this Agreement or in anticipation of this sale of the Property.~~

(3) ~~REINSPECTION FEES: If any repair in paragraph 10B(1) is not completed within the time specified and the lender requires an additional inspection to be made, Seller shall be responsible for any corresponding reinspection fee. If Buyer incurs costs to comply with lender requirements concerning those items, Seller shall be responsible for those costs.~~

(4) **INFORMATION AND ADVICE ON REQUIREMENTS:** Buyer and Seller are advised to seek information from a knowledgeable source regarding local and State mandates and whether they are point of sale requirements or requirements of ownership. Agents do not have expertise in this area and cannot ascertain all of the requirements or costs of compliance.

**C. HOME WARRANTY:**

(1) Buyer shall choose the coverages, regardless of any optional coverages indicated, of the home warranty plan and Buyer shall pay any cost of that plan, chosen by Buyer, ~~that exceeds the amount allocated to Seller in paragraph 3Q(18)~~. Buyer is informed that home warranty plans have many optional coverages, including but not limited to, coverages for Air Conditioner and Pool/Spa. Buyer is advised to investigate these coverages to determine those that may be suitable for Buyer.

(2) **If Buyer waives the purchase of a home warranty plan in paragraph 3Q(18), Buyer may still purchase a home warranty plan, at Buyer's expense, prior to Close Of Escrow.**

**11. STATUTORY AND OTHER DISCLOSURES (INCLUDING LEAD-BASED PAINT HAZARD DISCLOSURES) AND CANCELLATION RIGHTS:**

**A. TDS, NHD, AND OTHER STATUTORY AND SUPPLEMENTAL DISCLOSURES:**

(1) Seller shall, within the time specified in **paragraph 3N(1)**, Deliver to Buyer: unless exempt, fully completed disclosures or notices required by §§ 1102 et. seq. and 1103 et. seq. of the Civil Code ("Statutory Disclosures"). Statutory Disclosures include, but are not limited to, a Real Estate Transfer Disclosure Statement (C.A.R. Form TDS), Natural Hazard Disclosure Statement ("NHD"), notice or actual knowledge of release of illegal controlled substance, notice of special tax and/or assessments (or, if allowed, substantially equivalent notice regarding the Mello-Roos Community Facilities Act of 1982 and Improvement Bond Act of 1915) and, if Seller has actual knowledge, of industrial use and military ordnance location (C.A.R. Form SPQ or ESD), and, if the Property is in a high or very high fire hazard severity area, the information, notices, documentation, and agreements required by §§ 1102.6(f) and 1102.19 of the Civil Code (C.A.R. Form FHDS).

(2) The Real Estate Transfer Disclosure Statement required by this paragraph is considered fully completed if Seller has completed the section titled Coordination with Other Disclosure Forms by checking a box (Section I), and Seller has completed and answered all questions and Signed the Seller's Information section (Section II) and the Seller's Agent, if any, has completed and Signed the Seller's Agent's section (Section III), or, if applicable, an Agent Visual Inspection Disclosure (C.A.R. Form AVID). Section V acknowledgment of receipt of a Copy of the TDS shall be Signed after all previous sections, if applicable, have been completed. Nothing stated herein relieves a Buyer's Agent, if any, from the obligation to **(i)** conduct a reasonably competent and diligent visual inspection of the accessible areas of the Property and disclose, on Section IV of the TDS, or an AVID, material facts affecting the value or desirability of the Property that were or should have been revealed by such an inspection or **(ii)** complete any sections on all disclosures required to be completed by Buyer's Agent.

(3) Seller shall, within the time specified in **paragraph 3N(1)**, provide "Supplemental Disclosures" as follows: **(i)** unless exempt from the obligation to provide a TDS, complete a Seller Property Questionnaire (C.A.R. Form SPQ) by answering all questions and Signing and Delivering a Copy to Buyer; **(ii)** if exempt from the obligation to provide a TDS, complete an Exempt Seller Disclosure (C.A.R. Form ESD) by answering all questions and Signing and Delivering a Copy to Buyer.

(4) In the event Seller or Seller's Agent, prior to Close Of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information or representations previously provided to Buyer under this paragraph, Seller shall, in writing, promptly provide a subsequent or amended TDS, Seller Property Questionnaire or other document, in writing, covering those items. Any such document shall be deemed an amendment to the TDS or SPQ. **However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies of which Buyer is otherwise aware, or which are discovered by Buyer or disclosed in reports or documents provided to or ordered and paid for by Buyer.**

Buyer's Initials ___RS___ / _____      Seller's Initials ___M___ / _____

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com      944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

**B. LEAD DISCLOSURES:**
    (1) Seller shall, within the time specified in **paragraph 3N(1)**, for any residential property built before January 1, 1978, unless exempted by Law, Deliver to Buyer a fully completed Federal Lead-Based Paint Disclosures (C.A.R. Form LPD) and pamphlet ("Lead Disclosures").
    (2) Buyer shall, within the time specified in **paragraph 3L(3)**, have the opportunity to conduct a risk assessment or to inspect for the presence of lead-based paint hazards.

**C. HOME FIRE HARDENING DISCLOSURE AND ADVISORY:** For any transaction where a TDS is required, the property is located in a high or very high fire hazard severity zone, and the home was constructed before January 1, 2010 , Seller shall, within the time specified in **paragraph 3N(1)**, Deliver to Buyer: **(i)** a home hardening disclosure required by law; and **(ii)** a statement of features of which the Seller is aware that may make the home vulnerable to wildfire and flying embers; and **(iii)** a final inspection report regarding compliance with defensible space requirements if one was prepared pursuant to Government Code § 51182 (C.A.R. Form FHDS).

**D. DEFENSIBLE SPACE DISCLOSURE AND ADDENDUM:** For any transaction in which a TDS is required and the property is located in a high or very high fire hazard severity zone, Seller shall, within the time specified in **paragraph 3N(1)**, Deliver to Buyer **(i)** a disclosure of whether the Property is in compliance with any applicable defensible space laws designed to protect a structure on the Property from fire; and **(ii)** an addendum allocating responsibility for compliance with any such defensible space law (C.A.R. Form FHDS).

**E. WAIVER PROHIBITED:** Waiver of Statutory, Lead, and other Disclosures in **paragraphs 11A(1), 11B, 11C**, and **11D** are prohibited by Law.

**F. RETURN OF SIGNED COPIES:** Buyer shall, within the time specified in **paragraph 3L(3)** OR **5 Days** after Delivery of any disclosures specified in paragraphs **11 A, B, C** or **D**, and defensible space addendum in **paragraph 11D**, whichever is later, return Signed Copies of the disclosures, and if applicable, addendum, to Seller.

~~**G. TERMINATION RIGHTS:**~~
~~**(1) Statutory and Other Disclosures:** If any disclosure specified in paragraphs **11A, B, C, or D**, or subsequent or amended disclosure to those just specified, is Delivered to Buyer after the offer is Signed, Buyer shall have the right to terminate this Agreement within **3 Days** after Delivery in person, or **5 Days** after Delivery by deposit in the mail, or by an electronic record or email satisfying the Uniform Electronic Transactions Act (UETA), by giving written notice of rescission to Seller or Seller's Authorized Agent. If Buyer does not rescind within this time period, Buyer has been deemed to have approved the disclosure and shall not have the right to cancel.~~
~~**(2) Defensible Space Compliance:** If, by the time specified in **paragraph 11F**, Buyer does not agree to the terms regarding defensible space compliance Delivered by Seller, as indicated by mutual signatures on the FHDS, then Seller, after first Delivering a Notice to Buyer to Perform, may cancel this Agreement.~~

**H. WITHHOLDING TAXES:** Buyer and Seller hereby instruct Escrow Holder to withhold the applicable required amounts to comply with federal and California withholding Laws and forward such amounts to the Internal Revenue Service and Franchise Tax Board, respectively. However, no federal withholding is required if, prior to Close Of Escrow, Seller Delivers **(i)** to Buyer and Escrow Holder a fully completed affidavit (C.A.R. Form AS) sufficient to avoid withholding pursuant to federal withholding Law (FIRPTA); **OR (ii)** to a qualified substitute (usually a title company or an independent escrow company) a fully completed affidavit (C.A.R. Form AS) sufficient to avoid withholding pursuant to federal withholding Law AND the qualified substitute Delivers to Buyer and Escrow Holder an affidavit signed under penalty of perjury (C.A.R. Form QS) that the qualified substitute has received the fully completed Seller's affidavit and the Seller states that no federal withholding is required; **OR (iii)** to Buyer other documentation satisfying the requirements under Internal Revenue Code § 1445 (FIRPTA). No withholding is required under California Law if, prior to Close Of Escrow, Escrow Holder has received sufficient documentation from Seller that no withholding is required, and Buyer has been informed by Escrow Holder.

**I. MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to § 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at **www.meganslaw.ca.gov**. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Seller nor Agent are required to check this website. If Buyer wants further information, Agent recommends that Buyer obtain information from this website during Buyer's investigation contingency period. Agents do not have expertise in this area.)

**J. NOTICE REGARDING GAS AND HAZARDOUS LIQUID TRANSMISSION PIPELINES:** This notice is being provided simply to inform you that information about the general location of gas and hazardous liquid transmission pipelines is available to the public via the National Pipeline Mapping System (NPMS) Internet Web site maintained by the United States Department of Transportation at **http://www.npms.phmsa.dot.gov/**. To seek further information about possible transmission pipelines near the Property, you may contact your local gas utility or other pipeline operators in the area. Contact information for pipeline operators is searchable by ZIP Code and county on the NPMS Internet Website. (Neither Seller nor Agent are required to check this website. If Buyer wants further information, Agent recommends that Buyer obtain information from this website during Buyer's investigation contingency period. Agents do not have expertise in this area.)

**K. CONDOMINIUM/PLANNED DEVELOPMENT DISCLOSURES:**
    (1) Seller shall, within the time specified in **paragraph 3N(1)**, disclose to Buyer whether the Property is a condominium or is located in a planned development, other common interest development, or otherwise subject to covenants, conditions, and restrictions (C.A.R. Form SPQ or ESD).
    (2) If the Property is a condominium or is located in a planned development or other common interest development with a HOA, Seller shall, within the time specified in **paragraph 3N(3)**, order from, and pay any required fee as specified in **paragraph 3Q(12)** for the following items to the HOA (C.A.R. Form HOA-IR): **(i)** Copies of any documents required by Law (C.A.R. Form HOA-RS); **(ii)** disclosure of any pending or anticipated claim or litigation by or against the HOA; **(iii)** a statement containing the location and number of designated parking and storage spaces; **(iv)** Copies of the most recent 12 months of HOA minutes for regular and special meetings; **(v)** the names and contact information of all HOAs governing the Property; **(vi)** pet restrictions; and **(vii)** smoking restrictions ("CI Disclosures"). Seller shall itemize and Deliver to Buyer all CI Disclosures received from the HOA and any CI Disclosures in Seller's possession. Seller shall, as directed by Escrow Holder, deposit funds into escrow or direct to HOA or management company to pay for any of the above.

**L. NATURAL AND ENVIRONMENTAL HAZARDS:** Seller shall, within the time specified in **paragraph 3N(1)**, if required by Law: **(i)** Deliver to Buyer the earthquake guide and environmental hazards booklet, and for all residential property with 1-4 units and any manufactured or mobile home built before January 1, 1960, fully complete and Deliver the Residential Earthquake Risk Disclosure Statement; and **(ii)** even if exempt from the obligation to provide a NHD, disclose if the Property is located in a Special Flood Hazard Area; Potential Flooding (Inundation) Area; Very High Fire Hazard Zone; State Fire Responsibility Area; Earthquake Fault Zone; Seismic Hazard Zone; and **(iii)** disclose any other zone as required by Law and provide any other information required for those zones.

RPA 12/21 (PAGE 8 OF 16)      Buyer's Initials _RS_ / _____      Seller's Initials _____ / _____

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 8 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com    944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

Property Address: 944 Airole Way, Los Angeles, CA 90077                                                Date: March 3, 2022

~~M.~~ ~~KNOWN MATERIAL FACTS: Seller, within the time specified in paragraph 3N(1), DISCLOSE KNOWN MATERIAL~~
~~FACTS AND DEFECTS affecting the Property, including, but not limited to, known insurance claims within the past five years,~~
~~or provide Buyer with permission to contact lender to get such information (C.A.R. Form ARC), and make any and all other~~
~~disclosures required by Law.~~

**12. BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:**

**A.** Buyer shall, within the time specified in **paragraph 3L(3)**, have the right, at Buyer's expense unless Otherwise Agreed, to conduct inspections, investigations, tests, surveys and other studies ("Buyer Investigations").

**B.** Buyer Investigations include, but are not limited to:
   (1) Inspections regarding any physical attributes of the Property or items connected to the Property, such as:
      (A) A general home inspection.
      (B) An inspection for lead-based paint and other lead-based paint hazards.
      (C) An inspection specifically for wood destroying pests and organisms. Any inspection for wood destroying pests and organisms shall be prepared by a registered Structural Pest Control company; shall cover the main building and attached structures; may cover detached structures; shall NOT include water tests of shower pans on upper level units unless the owners of property below the shower consent; shall NOT include roof coverings; and, if the Property is a unit in a condominium or other common interest subdivision, the inspection shall include only the separate interest and any exclusive-use areas being transferred, and shall NOT include common areas; and shall include a report ("Pest Control Report") showing the findings of the company which shall be separated into sections for evident infestation or infections (Section 1) and for conditions likely to lead to infestation or infection (Section 2).
      (D) Any other specific inspections of the physical condition of the land and improvements.
   (2) All other Buyer Investigations, such as insurance, not specified above. See, Buyer's Inspection Advisory (C.A.R. Form BIA) for more.
   (3) A review of reports, disclosures or information prepared by or for Seller and Delivered to Buyer pursuant to **paragraphs 3, 10, 11,** and **14A.**

**C.** Without Seller's prior written consent, Buyer shall neither make nor cause to be made: **(i)** invasive or destructive Buyer Investigations, except for minimally invasive testing required to prepare a Pest Control Report, which shall not include any holes or drilling though stucco or similar material; or **(ii)** inspections by any governmental building or zoning inspector or government employee, unless required by Law.

**D.** Seller shall make the Property available for all Buyer Investigations. Seller is not obligated to move any existing personal property. Seller shall have water, gas, electricity and all operable pilot lights on for Buyer's Investigations and through the date possession is delivered to Buyer. Buyer shall, **(i)** by the time specified in **paragraph 3L(3)**, complete Buyer Investigations and satisfy themselves as to the condition of the Property, and either remove the contingency ~~or cancel this Agreement, and (ii) by the time specified in paragraph 3L(3) or 3 Days after receipt of any Investigation report, whichever is later, give Seller at no cost, complete Copies of all such reports obtained by Buyer, which obligation shall survive the termination of this Agreement. This Delivery of Investigation reports shall not include any appraisal, except an appraisal received in connection with an FHA or VA loan.~~

**E.** **Buyer indemnity and Seller protection for entry upon the Property:** Buyer shall: **(i)** keep the Property free and clear of liens; **(ii)** ~~repair all damage arising from Buyer Investigations;~~ and **(iii)** indemnify and hold Seller harmless from all resulting liability, claims, demands, damages and costs. Buyer shall carry, or Buyer shall require anyone acting on Buyer's behalf to carry, policies of liability, workers' compensation and other applicable insurance, defending and protecting Seller from liability for any injuries to persons or property occurring during any Buyer Investigations or work done on the Property at Buyer's direction prior to Close Of Escrow. Seller is advised that certain protections may be afforded Seller by recording a "Notice of Non-Responsibility" (C.A.R. Form NNR) for Buyer Investigations and work done on the Property at Buyer's direction. Buyer's obligations under this paragraph shall survive the termination of this Agreement.

**13. TITLE AND VESTING:**

**A.** Buyer ~~shall, within the time specified in **paragraph 3N(1)**, be~~ has provided a current Preliminary Report by the person responsible for paying for the title report in **paragraph 3Q(8)**. If Buyer is responsible for paying, Buyer shall act diligently and in good faith to obtain such Preliminary Report within the time specified. The Preliminary Report is only an offer by the title insurer to issue a policy of title insurance and may not contain every item affecting title. The company providing the Preliminary Report shall, prior to issuing a Preliminary Report, conduct a search of the General Index for all Sellers except banks or other institutional lenders selling properties they acquired through foreclosure (REOs), corporations, and government entities.

**B.** Title is taken in its present condition subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other matters, whether of record or not, as of the date of Acceptance except for: (i) monetary liens of record unless Buyer is assuming those obligations or taking the Property subject to those obligations; and (ii) those matters which Seller has agreed to remove in writing. For any lien or matter not being transferred upon sale, Seller will take necessary action to deliver title free and clear of such lien or matter.

**C.** Seller shall within **7 Days** after request, give Escrow Holder necessary information to clear title.

**D.** Seller shall, within the time specified in **paragraph 3N(1)**, disclose to Buyer all matters known to Seller affecting title, whether of record or not.

**E.** If Buyer is a legal entity and the Property purchase price is at least $300,000 and the purchase price is made without a bank loan or similar form of external financing, a Geographic Targeting Order (GTO) issued by the Financial Crimes Enforcement Network, U.S. Department of the Treasury, requires title companies to collect and report certain information about the Buyer, depending on where the Property is located. Buyer agrees to cooperate with the title company's effort to comply with the GTO.

**F.** Buyer shall, after Close Of Escrow, receive a recorded grant deed or any other conveyance document required to convey title (or, for stock cooperative or long-term lease, an assignment of stock certificate or of Seller's leasehold interest), including oil, mineral and water rights if currently owned by Seller. Title shall vest as designated in Buyer's vesting instructions. The recording document shall contain Buyer's post-closing mailing address to enable Buyer's receipt of the recorded conveyance document from the County Recorder. THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT LEGAL AND TAX CONSEQUENCES. CONSULT AN APPROPRIATE PROFESSIONAL.

RPA 12/21 (PAGE 9 OF 16)          Buyer's Initials _RS_/_____          Seller's Initials _____/_____

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 9 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

Property Address: 944 Airole Way, Los Angeles, CA 90077  Date: March 3, 2022

G. Buyer shall receive a "ALTA/CLTA Homeowner's Policy of Title Insurance", or equivalent policy of title insurance, if applicable to the type of property and buyer. Escrow Holder shall request this policy. If a ALTA/CLTA Homeowner's Policy of Title Insurance is not offered, Buyer shall receive a CLTA Standard Coverage policy unless Buyer has chosen another policy and instructed Escrow Holder in writing of the policy chosen and agreed to pay any increase in cost. Buyer should consult with the Title Company about the availability, and difference in coverage, and cost, if any, between a ALTA/CLTA Homeowner's Policy and a CLTA Standard Coverage policy and other title policies and endorsements. Buyer should receive notice from the Title Company on its Preliminary (Title) Report of the type of coverage offered. If Buyer is not notified on the Preliminary (Title) Report or is not satisfied with the policy offered, and Buyer nonetheless removes the contingency for Review of the Preliminary Report, Buyer will receive the policy as specified in this paragraph.

14. **TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS: The following time periods may only be extended, altered, modified or changed by mutual written agreement. Any removal of contingencies or cancellation under this paragraph by either Buyer or Seller must be exercised in good faith and in writing (C.A.R. Form CR or CC).**

A. **SELLER DELIVERY OF DOCUMENTS:** Seller shall, within the time specified in **paragraph 3N(1)**, Deliver to Buyer all reports, disclosures and information ("Reports") for which Seller is responsible as specified in **paragraphs 9B(6), 10, 11A, 11B, 11C, 11D, 11H, 11K, 11L, 11M, 13A, and 13D.**

B. ~~**BUYER REVIEW OF DOCUMENTS; REPAIR REQUEST; CONTINGENCY REMOVAL OR CANCELLATION**~~
   ~~(1) Buyer has the time specified in **paragraph 3** to: (i) perform Buyer Investigations; review all disclosures, reports, lease documents to be assumed by Buyer pursuant to **paragraph 9B(6)**, and other applicable information, which Buyer receives from Seller; and approve all matters affecting the Property; and (ii) Deliver to Seller Signed Copies of Statutory and Other Disclosures Delivered by Seller in accordance with **paragraph 11**.~~
   ~~(2) Buyer may, within the time specified in **paragraph 3L(3)**, request that Seller make repairs or take any other action regarding the Property (C.A.R. Form RR). Seller has no obligation to agree to or respond to Buyer's requests (C.A.R. Form RR or RRRR). If Seller does not agree or does not respond, Buyer is not contractually entitled to have the repairs or other requests made and may only cancel based on contingencies in this Agreement.~~
   ~~(3) Buyer shall, by the end of the times specified in **paragraph 3L** (or as Otherwise Agreed), Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement (C.A.R. Form CR or CC). However, if any report, disclosure, or information for which Seller is responsible, other than those in **paragraph 11A or 11B**, is not Delivered within the time specified in **paragraph 3N(1)**, then Buyer has **5 Days** after Delivery of any such items, or the times specified in **paragraph 3L**, whichever is later, to Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement. If Delivery of any Report occurs after a contractual contingency pertaining to that Report has already been waived or removed, the Delivery of the Report does not revive the contingency but there may be a right to terminate for a subsequent or amended disclosure under **paragraph 11G**.~~
   ~~(4) **Continuation of Contingency:** Even after the end of the time specified in **paragraph 3L** and before Seller cancels, if at all, pursuant to **paragraph 14C**, Buyer retains the right, in writing, to either (i) remove remaining contingencies, or (ii) cancel this Agreement based on a remaining contingency. Once Buyer's written removal of all contingencies is Delivered to Seller, Seller may not cancel this Agreement pursuant to **paragraph 14C(1)**.~~

C. ~~**SELLER RIGHT TO CANCEL:**~~
   ~~(1) **SELLER RIGHT TO CANCEL; BUYER CONTINGENCIES:** If, by the time specified in this Agreement, Buyer does not Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement, then Seller, after first Delivering to Buyer a Notice to Buyer to Perform (C.A.R. Form NBP), may cancel this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees incurred by Buyer.~~
   (2) **SELLER RIGHT TO CANCEL; BUYER CONTRACT OBLIGATIONS:** Seller, after first Delivering to Buyer a Notice to Perform, may cancel this Agreement if, by the time specified in this Agreement, Buyer does not take the following action(s): (i) Deposit funds as required by **paragraph 3D(1)** or **3D(2)** or if the funds deposited pursuant to **paragraph 3D(1)** or **3D(2)** are not good when deposited; ~~(ii) Deliver updated contact information for Buyer's lender(s) as required by **paragraph 5C(3)**;~~ (iii) Deliver a notice of FHA or VA costs or terms, if any, as specified in **paragraph 5C(4)** (C.A.R. Form RR); ~~(iv) Deliver verification, or a satisfactory verification if Seller reasonably disapproves of the verification already provided, as required by **paragraph 5B or 6A;**~~ (v) Deliver a letter as required by **paragraph 6B**; (vi) ~~In writing assume or accept leases or liens specified in **paragraph 8G;** (vii) Return Statutory and Other Disclosures as required by **paragraph 11F;** (viii) Cooperate with the title company's effort to comply with the GTO as required by **paragraph 13E;** (ix) Sign or initial a separate liquidated damages form for an increased deposit as required by **paragraphs 5A(2) and 29;** (x) Provide evidence of authority to Sign in a representative capacity as specified in **paragraph 28;** or (xi)~~ Perform any additional Buyer contractual obligation(s) included in this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees incurred by Buyer and other expenses already paid by Escrow Holder pursuant to Buyer's written removal of all contingencies prior to Seller's cancellation.
   ~~(3) **SELLER RIGHT TO CANCEL; SELLER CONTINGENCIES:** Seller may cancel this Agreement by good faith exercise of any Seller contingency included in this Agreement, or Otherwise Agreed, so long as that contingency has not already been removed or waived in writing.~~

D. ~~**BUYER RIGHT TO CANCEL:**~~
   ~~(1) **BUYER RIGHT TO CANCEL; SELLER CONTINGENCIES:** If, by the time specified in this Agreement, Seller does not Deliver to Buyer a removal of the applicable contingency or cancellation of this Agreement, then Buyer, after first Delivering to Seller a Notice to Seller to Perform (C.A.R. Form NSP), may cancel this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees incurred by Buyer and other expenses already paid by Escrow Holder pursuant to Buyer's cancellation.~~
   ~~(2) **BUYER RIGHT TO CANCEL; SELLER CONTRACT OBLIGATIONS:** If, by the time specified, Seller has not Delivered any item specified in **paragraph 3N(1)** or Seller has not performed any Seller contractual obligation included in this Agreement by the time specified, Buyer, after first Delivering to Seller a Notice to Seller to Perform, may cancel this Agreement.~~
   ~~(3) **BUYER RIGHT TO CANCEL; BUYER CONTINGENCIES:** Buyer may cancel this Agreement by good faith exercise of any Buyer contingency included in this Agreement, or Otherwise Agreed, so long as that contingency has not already been removed in writing.~~

RPA 12/21 (PAGE 10 OF 16)

Buyer's Initials  RS / _____   Seller's Initials  _____ / _____

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com   944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

~~**E.** **NOTICE TO BUYER OR SELLER TO PERFORM:** The Notice to Buyer to Perform or Notice to Seller to Perform shall: **(i)** be in writing; **(ii)** be Signed by the applicable Buyer or Seller; and **(iii)** give the other Party at least **2 Days** after Delivery (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A Notice to Buyer to Perform or Notice to Seller to Perform may not be Delivered any earlier than **2 Days** prior to the Scheduled Performance Day to remove a contingency or cancel this Agreement or meet an obligation specified in **paragraph 14**, whether or not the Scheduled Performance Day falls on a Saturday, Sunday or legal holiday. If a Notice to Buyer to Perform or Notice to Seller to Perform is incorrectly Delivered or specifies a time less than the agreed time, the notice shall be deemed invalid and void, and Seller or Buyer shall be required to Deliver a new Notice to Buyer to Perform or Notice to Seller to Perform with the specified timeframe.~~

**F.** **EFFECT OF REMOVAL OF CONTINGENCIES:**

(1) **REMOVAL OF BUYER CONTINGENCIES:** If Buyer removes any contingency or cancellation rights, unless Otherwise Agreed, Buyer shall conclusively be deemed to have: **(i)** completed all Buyer Investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; **(ii)** elected to proceed with the transaction; and **(iii)** assumed all liability, responsibility and expense for the non-delivery of any reports, disclosures or information outside of Seller's control and for any Repairs or corrections pertaining to that contingency or cancellation right, or for the inability to obtain financing.

(2) **REMOVAL OF SELLER CONTINGENCIES:** If Seller removes any contingency or cancellation rights, unless Otherwise Agreed, Seller shall conclusively be deemed to have: **(i)** satisfied themselves regarding such contingency, **(ii)** elected to proceed with the transaction; and **(iii)** given up any right to cancel this Agreement based on such contingency.

**G.** **DEMAND TO CLOSE ESCROW:** Before Buyer or Seller may cancel this Agreement for failure of the other Party to close escrow pursuant to this Agreement, Buyer or Seller must first Deliver to the other Party a Demand to Close Escrow (C.A.R. Form DCE). The DCE shall: **(i)** be Signed by the applicable Buyer or Seller; and **(ii)** give the other Party at least **3 Days** after Delivery to close escrow. A DCE may not be Delivered any earlier than **3 Days** prior to the Scheduled Performance Day for the Close Of Escrow. If a DCE is incorrectly Delivered or specifies a time less than the above timeframe, the DCE shall be deemed invalid and void, and Seller or Buyer shall be required to Deliver a new DCE.

**H.** **EFFECT OF CANCELLATION ON DEPOSITS:** If Buyer or Seller gives written notice of cancellation pursuant to rights duly exercised under the terms of this Agreement, the Parties agree to Sign and Deliver mutual instructions to cancel the sale and escrow and release deposits, if any, to the Party entitled to the funds, less **(i)** fees and costs paid by Escrow Holder on behalf of that Party, if required by this Agreement; and **(ii)** any escrow cancellation fee charged to that Party. Fees and costs may be payable to service providers and vendors for services and products provided during escrow. A release of funds will require mutual Signed release instructions from the Parties, judicial decision or arbitration award. **A Party may be subject to a civil penalty of up to $1,000 for refusal to Sign cancellation instructions if no good faith dispute exists as to which Party is entitled to the deposited funds (Civil Code § 1057.3). Note: Neither Agents nor Escrow Holder are qualified to provide any opinion on whether either Party has acted in good faith or which Party is entitled to the deposited funds. Buyer and Seller are advised to seek the advice of a qualified California real estate attorney regarding this matter.**

~~**15.** **REPAIRS:** Repairs shall be completed prior to final verification of condition unless Otherwise Agreed. Repairs to be performed at Seller's expense may be performed by Seller or through others, provided that the work complies with applicable Law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. Buyer acknowledges that exact restoration of appearance or cosmetic items following all Repairs may not be possible. Seller shall: **(i)** obtain invoices and paid receipts for Repairs performed by others; **(ii)** prepare a written statement indicating the Repairs performed by Seller and the date of such Repairs; and **(iii)** provide Copies of invoices and paid receipts and statements to Buyer prior to final verification of condition.~~

**16.** **FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final verification of the Property condition within the time specified in **paragraph 3J**, NOT AS A CONTINGENCY OF THE SALE, but solely to confirm: **(i)** the Property is maintained pursuant to **paragraph 7B**; **(ii)** ~~Repairs have been completed as agreed;~~ and ~~**(iii)**~~ Seller has complied with Seller's other obligations under this Agreement (C.A.R. Form VP).

**17.** **PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless Otherwise Agreed, the following items shall be PAID CURRENT and prorated between Buyer and Seller as of Close Of Escrow: real property taxes and assessments, interest, Seller rental payments, HOA regular assessments due prior to Close Of Escrow, premiums on insurance assumed by Buyer, payments on bonds and assessments assumed by Buyer, and payments on Mello-Roos and other Special Assessment District bonds and assessments that are now a lien. Seller shall pay any HOA special or emergency assessments due prior to Close Of Escrow. The following items shall be assumed by Buyer WITHOUT CREDIT toward the purchase price: prorated payments on Mello-Roos and other Special Assessment District bonds and assessments and HOA special or emergency assessments that are due after Close Of Escrow. Property will be reassessed upon change of ownership. Any supplemental tax bills delivered to Escrow Holder prior to closing shall be prorated and paid as follows: **(i)** for periods after Close Of Escrow, by Buyer; and **(ii)** for periods prior to Close Of Escrow, by Seller (see C.A.R. Form SPT or SBSA for further information). Seller agrees all service fees, maintenance costs and utility bills will be paid current up and through the date of Close Of Escrow. TAX BILLS AND UTILITY BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER. Prorations shall be made based on a 30-day month.

**18.** **BROKERS AND AGENTS:**

**A.** **COMPENSATION:** Seller or Buyer, or both, as applicable, agree to pay compensation to Broker as specified in a separate written agreement between Broker and that Seller or Buyer. Compensation is payable upon Close Of Escrow, or if escrow does not close, as otherwise specified in the agreement between Broker and that Seller or Buyer.

**B.** **SCOPE OF DUTY:** Buyer and Seller acknowledge and agree that Agent: **(i)** Does not decide what price Buyer should pay or Seller should accept; **(ii)** Does not guarantee the condition of the Property; **(iii)** Does not guarantee the performance, adequacy or completeness of inspections, services, products or repairs provided or made by Seller or others; **(iv)** Does not have an obligation to conduct an inspection of common areas or areas off the site of the Property; **(v)** Shall not be responsible for identifying defects on the Property, in common areas, or offsite unless such defects are visually observable by an inspection of reasonably accessible areas of the Property or are known to Agent; **(vi)** Shall not be responsible for inspecting public records or permits concerning the title or use of Property; **(vii)** Shall not be responsible for identifying the location of boundary lines or other items affecting title; **(viii)** Shall not be responsible for verifying square footage, representations of others or information contained in Investigation reports, Multiple Listing Service, advertisements, flyers or other promotional material; **(ix)** Shall not be responsible for determining the fair market value of the Property or any personal property included in the sale; **(x)** Shall not be responsible for providing legal or tax advice regarding any aspect of a transaction entered into by Buyer or Seller; and **(xi)** Shall not be responsible for providing other advice or information that exceeds the knowledge, education and experience required to perform real estate licensed activity. Buyer and Seller agree to seek legal, tax, insurance, title and other desired assistance from appropriate professionals.

RPA 12/21 (PAGE 11 OF 16)     Buyer's Initials _RS_ / _____     Seller's Initials _____ / _____

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 11 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

19. **JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**
   A. **The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions of Buyer and Seller to Escrow Holder,** which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: **paragraphs 1, 3A, 3B, 3D-G, 3N(2), 3Q, 3R, 4A, 4B, 5A(1-2) 5D, 5E, 10B(2)(A), 10B(3), 10C, 11H, 11K(2), 13 (except 13D), 14H, 17, 18A, 19, 23, 25, 27, 28, 32, 33, and paragraph 3 of the Real Estate Brokers Section.** If a Copy of the separate compensation agreement(s) provided for in **paragraph 18A** or **paragraph C of the Real Estate Brokers Section** is deposited with Escrow Holder by Agent, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s). The terms and conditions of this Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned.
   B. Buyer and Seller will receive Escrow Holder's general provisions, if any, directly from Escrow Holder. To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller shall Sign and return Escrow Holder's general provisions or supplemental instructions within the time specified in **paragraph 3N(2).** Buyer and Seller shall execute additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow and, as directed by Escrow Holder, within **3 Days,** shall pay to Escrow Holder or HOA or HOA management company or others any fee required by **paragraphs 3, 8, 10, 11,** or elsewhere in this Agreement.
   C. A Copy of this Agreement ~~including any counter offer(s)~~ and addenda shall be delivered to Escrow Holder within **3 Days** after **Acceptance.** Buyer and Seller authorize Escrow Holder to accept and rely on Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement. Escrow Holder shall provide Seller's Statement of Information to Title Company when received from Seller, if a separate company is providing title insurance. If Seller delivers an affidavit to Escrow Holder to satisfy Seller's FIRPTA obligation under **paragraph 11H,** Escrow Holder shall deliver to Buyer, Buyer's Agent, and Seller's Agent a Qualified Substitute statement that complies with federal Law. If Escrow Holder's Qualified Substitute statement does not comply with federal law, the Parties instruct escrow to withhold all applicable required amounts under **paragraph 11H.**
   D. Agents are not a party to the escrow, except for Brokers for the sole purpose of compensation pursuant to **paragraph 18A and paragraph 3 of the Real Estate Brokers Section.** If a Copy of the separate compensation agreement(s) provided for in either of those paragraphs is deposited with Escrow Holder by Agent, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s).Buyer and Seller irrevocably assign to Brokers compensation specified in **paragraph 18A,** and irrevocably instruct Escrow Holder to disburse those funds to Brokers at Close Of Escrow or pursuant to any other mutually executed cancellation agreement. Compensation instructions can be amended or revoked only with the written consent of Brokers. Buyer and Seller shall release and hold harmless Escrow Holder from any liability resulting from Escrow Holder's payment to Broker(s) of compensation pursuant to this Agreement.
   E. Buyer and Seller acknowledge that Escrow Holder may require invoices for expenses under this Agreement. Buyer and Seller, upon request by Escrow Holder, within **3 Days** or within a sufficient time to close escrow, whichever is sooner, shall provide any such invoices to Escrow Holder.
   F. Upon receipt, Escrow Holder shall provide Buyer, Seller, and each Agent verification of Buyer's deposit of funds pursuant to **paragraphs 5A(1) and 5A(2).** Once Escrow Holder becomes aware of any of the following, Escrow Holder shall immediately notify each Agent: **(i)** if Buyer's initial or any additional deposit or down payment is not made pursuant to this Agreement, or is not good at time of deposit with Escrow Holder; or **(ii)** if Buyer and Seller instruct Escrow Holder to cancel escrow.
   G. A Copy of any amendment that affects any paragraph of this Agreement for which Escrow Holder is responsible shall be delivered to Escrow Holder within **3 Days** after mutual execution of the amendment.
20. **SELECTION OF SERVICE PROVIDERS:** Agents do not guarantee the performance of any vendors, service or product providers ("Providers"), whether referred by Agent or selected by Buyer, Seller or other person. Buyer and Seller may select ANY Providers of their own choosing.
21. **MULTIPLE LISTING SERVICE ("MLS"):** Agents are authorized to report to the MLS that an offer has been accepted and, upon Close Of Escrow, the sales price and other terms of this transaction shall be provided to the MLS to be published and disseminated to persons and entities authorized to use the information on terms approved by the MLS. Buyer acknowledges that: **(i)** any pictures, videos, floor plans (collectively, "Images") or other information about the Property that has been or will be inputted into the MLS or internet portals, or both, at the instruction of Seller or in compliance with MLS rules, will not be removed after Close Of Escrow; **(ii)** California Civil Code § 1088(c) requires the MLS to maintain such Images and information for at least three years and as a result they may be displayed or circulated on the Internet, which cannot be controlled or removed by Seller or Agents; and **(iii)** Seller, Seller's Agent, Buyer's Agent, and MLS have no obligation or ability to remove such Images or information from the Internet.
22. **ATTORNEY FEES AND COSTS:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney fees and costs from the non-prevailing Buyer or Seller, except as provided in **paragraph 30A.**
23. **ASSIGNMENT:** Buyer shall have the right to assign all of Buyer's interest in this Agreement to Buyer's own trust or to any wholly owned entity of Buyer that is in existence at the time of such assignment. Otherwise, Buyer shall not assign all or any part of Buyer's interest in this Agreement without first having obtained the separate written consent of Seller to a specified assignee. Such consent shall not be unreasonably withheld. Prior to any assignment, Buyer shall disclose to Seller the name of the assignee and the amount of any monetary consideration between Buyer and assignee. Buyer shall provide assignee with all documents related to this Agreement including, but not limited to, the Agreement and any disclosures. If assignee is a wholly owned entity or trust of Buyer, that assignee does not need to re-sign or initial all documents provided. Whether or not an assignment requires seller's consent, at the time of assignment, assignee shall deliver a letter from assignee's lender that assignee is prequalified or preapproved as specified in **paragraph 6B.** Should assignee fail to deliver such a letter, Seller, after first giving Assignee an Notice to Buyer to Perform, shall have the right to terminate the assignment. Buyer shall, within the time specified in **paragraph 3K,** Deliver any request to assign this Agreement for Seller's consent. If Buyer fails to provide the required information within this time frame, Seller's withholding of consent shall be deemed reasonable. Any total or partial assignment shall not relieve Buyer of Buyer's obligations pursuant to this Agreement unless Otherwise Agreed by Seller (C.A.R. Form AOAA).
24. **EQUAL HOUSING OPPORTUNITY:** The Property is sold in compliance with federal, state and local anti-discrimination Laws.
25. **DEFINITIONS and INSTRUCTIONS:** The following words are defined terms in this Agreement, shall be indicated by initial capital letters throughout this Agreement, and have the following meaning whenever used:
   A. **"Acceptance"** means the time the offer or final counter offer is fully executed, in writing, by the recipient Party and is Delivered to the offering Party or that Party's Authorized Agent.

**RPA 12/21 (PAGE 12 OF 16)**          Buyer's Initials _____ / _____          Seller's Initials _____ / _____

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 12 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com          944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

B. **"Agent"** means the Broker, salesperson, or broker-associate or the real estate licensee licensed under the brokerage firm identified in **paragraph 2B**.

C. **"Agreement"** means this document and any counter offers and any incorporated addenda or amendments, collectively forming the binding agreement between the Parties. Addenda and amendments are incorporated only when Signed and Delivered by all Parties.

D. **"As-Is"** condition: Seller shall disclose known material facts and defects as specified in this Agreement. Buyer has the right to inspect the Property and, within the time specified, request that Seller make repairs or take other corrective action, or exercise any contingency cancellation rights in this Agreement. Seller is only required to make repairs specified in this Agreement or as Otherwise Agreed.

E. **"Authorized Agent"** means an individual real estate licensee specified in the Real Estate Broker Section.

F. **"C.A.R. Form"** means the most current version of the specific form referenced or another comparable form agreed to by the Parties.

G. **"Close Of Escrow"**, including **"COE"**, means the date the grant deed, or other evidence of transfer of title, is recorded for any real property, or the date of Delivery of a document evidencing the transfer of title for any non-real property transaction.

H. **"Copy"** means copy by any means including photocopy, facsimile and electronic.

I. **Counting Days** is done as follows unless Otherwise Agreed: (1) The first Day after an event is the first full calendar date following the event, and ending at 11:59 pm. For example, if a Notice to Buyer to Perform (C.A.R. form NBP) is Delivered at 3 pm on the 7th calendar day of the month, or Acceptance of a counter offer is personally received at 12 noon on the 7th calendar day of the month, then the 7th is Day "0" for purposes of counting days to respond to the NBP or calculating the Close Of Escrow date or contingency removal dates and the 8th of the month is Day 1 for those same purposes. (2) All calendar days are counted in establishing the first Day after an event. (3) All calendar days are counted in determining the date upon which performance must be completed, ending at 11:59 pm on the last day for performance ("Scheduled Performance Day"). (4) After Acceptance, if the Scheduled Performance Day for any act required by this Agreement, including Close Of Escrow, lands on a Saturday, Sunday, or legal holiday, the performing party shall be allowed to perform on the next day that is not a Saturday, Sunday or legal holiday ("Allowable Performance Day"), and ending at 11:59 pm. (5) For the purposes of COE, any day that the Recorder's office in the County where the Property is located is closed, the COE shall occur on the next day the Recorder's office in that County is open. (6) COE is considered Day 0 for purposes of counting days Seller is allowed to remain in possession, if permitted by this Agreement.

J. **"Day"** or **"Days"** means calendar day or days. However, delivery of deposit to escrow is based on business days.

K. **"Deliver", "Delivered" or "Delivery"** of documents, unless Otherwise Agreed, means and shall be effective upon personal receipt of the document by Buyer or Seller or their Authorized Agent. Personal receipt means **(i)** a Copy of the document, or as applicable, link to the document, is in the possession of the Party or Authorized Agent, regardless of the Delivery method used (i.e. e-mail, text, other), or **(ii)** an Electronic Copy of the document, or as applicable, link to the document, has been sent to any of the designated electronic delivery addresses specified in the Real Estate Broker Section on page 16. After Acceptance, Agent may change the designated electronic delivery address for that Agent by, in writing, Delivering notice of the change in designated electronic delivery address to the other Party. Links could be, for example, to DropBox or GoogleDrive or other functionally equivalent program. If the recipient of a link is unable or unwilling to open the link or download the documents or otherwise prefers Delivery of the documents directly, Recipient of a link shall notify the sender in writing, within **3 Days** after Delivery of the link (C.A.R. Form RFR). In such case, Delivery shall be effective upon Delivery of the documents and not the link. Failure to notify sender within the time specified above shall be deemed consent to receive, and Buyer opening, the document by link.

L. **"Electronic Copy"** or **"Electronic Signature"** means, as applicable, an electronic copy or signature complying with California Law. Buyer and Seller agree that electronic means will not be used by either Party to modify or alter the content or integrity of this Agreement without the knowledge and consent of the other Party.

M. **"Law"** means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or federal legislative, judicial or executive body or agency.

N. **"Legally Authorized Signer"** means an individual who has authority to Sign for the principal as specified in **paragraph 32** or **paragraph 33**.

O. **"Otherwise Agreed"** means an agreement in writing, signed by both Parties and Delivered to each.

P. **"Repairs"** means any repairs (including pest control), alterations, replacements, modifications or retrofitting of the Property provided for under this Agreement.

Q. **"Sign"** or **"Signed"** means either a handwritten or Electronic Signature on an original document, Copy or any counterpart.

26. **TERMS AND CONDITIONS OF OFFER:** This is an offer to purchase the Property on the terms and conditions herein. The individual Liquidated Damages and Arbitration of Disputes paragraphs are incorporated in this Agreement if initialed by all Parties or if incorporated by mutual agreement in a Counter Offer or addendum. ~~If at least one but not all Parties initial, a Counter Offer is required until agreement is reached. Seller has the right to continue to offer the Property for sale and to accept any other offer at any time prior to notification of Acceptance and to market the Property for backup offers after Acceptance.~~ The Parties have read and acknowledge receipt of a Copy of the offer and agree to the confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, including any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing. By signing this offer or any document in the transaction, the Party Signing the document is deemed to have read the document in its entirety.

27. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the Parties are incorporated in this Agreement. Its terms are intended by the Parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Except as Otherwise Agreed, this Agreement shall be interpreted, and disputes shall be resolved in accordance with the Laws of the State of California. **Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer and Seller.**

28. **LEGALLY AUTHORIZED SIGNER:** Wherever the signature or initials of the Legally Authorized Signer identified in **paragraph 32** or **33** appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Legally Authorized Signer **(i)** represents that the entity for which that person is acting already exists and is in good standing to do business in California and shall Deliver to the other Party and Escrow Holder, within the time specified in **paragraph 3N(5)**, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code § 18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

RPA 12/21 (PAGE 13 OF 16)　　　　Buyer's Initials __RS__ / _____　　Seller's Initials __M__ / _____

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 13 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201　www.lwolf.com　　944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

**29. LIQUIDATED DAMAGES** (By initialing in the space below, you are agreeing to Liquidated Damages):
If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. If the Property is a dwelling with no more than four units, one of which Buyer intends to occupy, then the amount retained shall be no more than 3% of the purchase price. Any excess shall be returned to Buyer. Release of funds will require mutual, Signed release instructions from both Buyer and Seller, judicial decision or arbitration award. AT THE TIME OF ANY INCREASED DEPOSIT BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION INCORPORATING THE INCREASED DEPOSIT AS LIQUIDATED DAMAGES (C.A.R. FORM DID).                    *See Supplemental Addendum*

Buyer's Initials  RS  /              Seller's Initials          /

**30. MEDIATION:**

A. The Parties agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action. The mediation shall be conducted through the C.A.R. Real Estate Mediation Center for Consumers (www.consumermediation.org) or through any other mediation provider or service mutually agreed to by the Parties. The Parties also agree to mediate any disputes or claims with Agents(s), who, in writing, agree to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to the Agent. Mediation fees, if any, shall be divided equally among the Parties involved, and shall be recoverable under the prevailing party attorney fees clause. If, for any dispute or claim to which this paragraph applies, any Party (i) commences an action without first attempting to resolve the matter through mediation, or (ii) before commencement of an action, refuses to mediate after a request has been made, then that Party shall not be entitled to recover attorney fees, even if they would otherwise be available to that Party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED.

B. ADDITIONAL MEDIATION TERMS: (i) Exclusions from this mediation agreement are specified in paragraph 31B; (ii) The obligation to mediate does not preclude the right of either Party to seek a preservation of rights under paragraph 31C; and (iii) Agent's rights and obligations are further specified in paragraph 31D. These terms apply even if the Arbitration of Disputes paragraph is not initialed.

**31. ARBITRATION OF DISPUTES:**

A. The Parties agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration. The Parties also agree to arbitrate any disputes or claims with Agents(s), who, in writing, agree to such arbitration prior to, or within a reasonable time after, the dispute or claim is presented to the Agent. The arbitration shall be conducted through any arbitration provider or service mutually agreed to by the Parties, OR ☐ _____ _____. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of residential real estate Law experience, unless the Parties mutually agree to a different arbitrator. Enforcement of, and any motion to compel arbitration pursuant to, this agreement to arbitrate shall be governed by the procedural rules of the Federal Arbitration Act, and not the California Arbitration Act, notwithstanding any language seemingly to the contrary in this Agreement. The Parties shall have the right to discovery in accordance with Code of Civil Procedure § 1283.05. The arbitration shall be conducted in accordance with Title 9 of Part 3 of the Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered into any court having jurisdiction.

B. EXCLUSIONS: The following matters are excluded from mediation and arbitration: (i) Any matter that is within the jurisdiction of a probate, small claims or bankruptcy court; (ii) an unlawful detainer action; and (iii) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code § 2985.

C. PRESERVATION OF ACTIONS: The following shall not constitute a waiver nor violation of the mediation and arbitration provisions: (i) the filing of a court action to preserve a statute of limitations; (ii) the filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies; or (iii) the filing of a mechanic's lien.

D. AGENTS: Agents shall not be obligated nor compelled to mediate or arbitrate unless they agree to do so in writing. Any Agents(s) participating in mediation or arbitration shall not be deemed a party to this Agreement.

E. **"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."**

**"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."**

Buyer's Initials  RS  /              Seller's Initials  M  /

RPA 12/21 (PAGE 14 OF 16)              Buyer's Initials  RS  /              Seller's Initials  M  /

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 14 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com              944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

**32. BUYER'S OFFER**

A. ~~EXPIRATION OF OFFER: This offer shall be deemed revoked and the deposit, if any, shall be returned to Buyer unless by the date and time specified in **paragraph 3C**, the offer is Signed by Seller and a Copy of the Signed offer is Delivered to Buyer or Buyer's Authorized Agent. Seller has no obligation to respond to an offer made.~~

B. ☐ **ENTITY BUYERS: (Note: If this paragraph is completed, a Representative Capacity Signature Disclosure (C.A.R. Form RCSD) is not required for the Legally Authorized Signers designated below.)**

    (1) One or more Buyers is a trust, corporation, LLC, probate estate, partnership, holding a power of attorney or other entity.

    (2) This Agreement is being Signed by a Legally Authorized Signer in a representative capacity and not in an individual capacity. See **paragraph 28** for additional terms.

    (3) The name(s) of the Legally Authorized Signer(s) is/are: _____, _____ .

    (4) If a trust, identify Buyer as trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust). If the entity is a trust or under probate, the following is the full name of the trust or probate case, including case #: _____
_____ .

C. The RPA has 16 pages. Buyer acknowledges receipt of, and has read and understands, every page and all attachments that make up the Agreement.

D. **BUYER SIGNATURE(S):**

(Signature) By, _____ Date: 3-4-2022

    Printed name of BUYER: _Richard Saghian or approved assignee_

    ☐ Printed Name of Legally Authorized Signer: _____ Title, if applicable, _____

(Signature) By, _____ Date: _____

    Printed name of BUYER: _____

    ☐ Printed Name of Legally Authorized Signer: _____ Title, if applicable, _____

☐ IF MORE THAN TWO SIGNERS, USE Additional Signature Addendum (C.A.R. Form ASA).

**33. ACCEPTANCE**

A. **ACCEPTANCE OF OFFER:** Seller warrants that Seller is the owner of the Property or has the authority to execute this Agreement. Seller accepts the above offer and agrees to sell the Property on the above terms and conditions. Seller has read and acknowledges receipt of a Copy of this Agreement and authorizes Agent to Deliver a Signed Copy to Buyer.

  ~~Seller's acceptance is subject to the attached Counter Offer or Back-Up Offer Addendum, or both, checked below. Seller shall return and include the entire agreement with any response.~~

  ☐ ~~Seller Counter Offer (C.A.R. Form SCO or SMCO)~~

  ☐ ~~Back-Up Offer Addendum (C.A.R. Form BUO)~~

B. ☒ **Entity Sellers: (Note: If this paragraph is completed, a Representative Capacity Signature Disclosure form (C.A.R. Form RCSD) is not required for the Legally Authorized Signers designated below.)**

    (1) One or more Sellers is a trust, corporation, LLC, probate estate, partnership, holding a power of attorney or other entity.

    (2) This Agreement is being Signed by a Legally Authorized Signer in a representative capacity and not in an individual capacity. See **paragraph 28** for additional terms.

    (3) The name(s) of the Legally Authorized Signer(s) is/are: _**Lawrence R. Perkins**_, _____ .

    (4) If a trust, identify Seller as trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust). If the entity is a trust or under probate, the following is the full name of the trust or probate case, including case #: _____
_____ .

C. The RPA has 16 pages. Seller acknowledges receipt of, and has read and understands, every page and all attachments that make up the Agreement.

D. **SELLER SIGNATURE(S):**

(Signature) By, _____ Date: 03 / 08 / 2022

    Printed name of SELLER: _**Crestlloyd, LLC, Debtor in Possession, by Sierraconstellation Partners, LLC, its Manager**_

    ☒ Printed Name of Legally Authorized Signer: _Lawrence R. Perkins_ Title, if applicable, _Manager_

(Signature) By, _____ Date: _____

    Printed name of SELLER: _____

    ☐ Printed Name of Legally Authorized Signer: _____ Title, if applicable, _____

☐ IF MORE THAN TWO SIGNERS, USE Additional Signature Addendum (C.A.R. Form ASA).

~~OFFER NOT ACCEPTED:__/__ No Counter Offer is being made. This offer was not accepted by Seller _____ (date)~~
    Seller's Initials

**RPA 12/21 (PAGE 15 OF 16)**    Buyer's Initials _RS_ / _____    Seller's Initials _____ / _____

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 15 OF 16)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com    944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

**REAL ESTATE BROKERS SECTION:**
1. **Real Estate Agents are not parties to the Agreement between Buyer and Seller.**
2. **Agency relationships are confirmed as stated in paragraph 2.**
3. **Cooperating Broker Compensation:** Seller's Broker agrees to pay Buyer's Broker and Buyer's Broker agrees to accept, out of Seller's Broker's proceeds in escrow, the amount specified in the MLS, provided Buyer's Broker is a Participant of the MLS in which the Property is offered for sale or a reciprocal MLS. If Seller's Broker and Buyer's Broker are not both Participants of the MLS, or a reciprocal MLS, in which the Property is offered for sale, then compensation must be specified in a separate written agreement (C.A.R. Form CBC). Declaration of License and Tax (C.A.R. Form DLT) may be used to document that tax reporting will be required or that an exemption exists.
4. **Presentation of Offer:** Pursuant to the National Association of REALTORS® Standard of Practice 1-7, if Buyer's Agent makes a written request, Seller's Agent shall confirm in writing that this offer has been presented to Seller.
5. **Agents' Signatures and designated electronic delivery address:**

    **A.** Buyer's Brokerage Firm _The Beverly Hills Estates and Hilton & Hyland_ _____ Lic. # _____
    By _____ Branden Williams _____ Lic. # _01774287_ ____ Date _____
    By _____ Stuart Vetterick _____ Lic. # _01984753_ ____ Date _____
    ☐ More than one agent from the same firm represents Buyer. Additional Agent Acknowledgement (C.A.R. Form AAA) attached.
    ☐ More than one brokerage firm represents Buyer. Additional Broker Acknowledgement (C.A.R. Form ABA) attached.

    **Designated Electronic Delivery Address(es):**
    Email _brandenwilliams@mac.com and stuart@hiltonhyland.com_ _____
    Text # Alternate: _____
    ☐ if checked, Delivery shall be made to the alternate designated electronic delivery address only.
    Address _____ City _____ State _____ Zip _____

    **B.** Seller's Brokerage Firm _The Beverly Hills Estates / Compass_ _____ Lic. # _02126121_
    By _**Rayni Williams & Branden Williams**_ & Lic. # _01774287_ ____ Date _____
    By _____ Lic. # _____ Date _____
    ☐ More than one agent from the same firm represents Seller. Additional Agent Acknowledgement (C.A.R. Form AAA) attached.
    ☐ More than one brokerage firm represents Seller. Additional Broker Acknowledgement (C.A.R. Form ABA) attached.

    **Designated Electronic Delivery Address(es)** (To be filled out by Seller's Agent)**:**
    Email _____ Text # _____
    Alternate: _____
    ☐ if checked, Delivery shall be made to the alternate designated electronic delivery address only.
    Address _____ City _____ State _____ Zip _____

---

**ESCROW HOLDER ACKNOWLEDGMENT:**
Escrow Holder acknowledges receipt of a Copy of this Agreement, (if checked, ☐ a deposit in the amount of $ _____ ), Counter Offer numbers _____ and _____ , and agrees to act as Escrow Holder subject to **paragraph 19** of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.
Escrow Holder is advised by _____ that the date of Acceptance of the Agreement is _____
Escrow Holder _____ Escrow # _____
By _____ Date _____
Address _____
Phone/Fax/E-mail _____
Escrow Holder has the following license number # _____
☐ Department of Financial Protection and Innovation, ☐ Department of Insurance, ☐ Department of Real Estate.

---

**PRESENTATION OF OFFER:** _____ / _____ Seller's Brokerage Firm presented this offer to Seller on _____ (date).
Agent or Seller Initials

---

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

RPA 12/21 (PAGE 16 OF 16)          Buyer's Initials _BS_ / _____     Seller's Initials _M_ / _____

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (RPA PAGE 16 OF 16)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com          944 Airole Way

Property Address <u>944 Airole Way, Los Angeles, CA 90077-2602</u>

1. **IMPORTANCE OF PROPERTY INVESTIGATION:** The physical condition of the land and improvements being purchased is not guaranteed by either Seller or Brokers. You have an affirmative duty to exercise reasonable care to protect yourself, including discovery of the legal, practical and technical implications of disclosed facts, and the investigation and verification of information and facts that you know or that are within your diligent attention and observation. A general physical inspection typically does not cover all aspects of the Property nor items affecting the Property that are not physically located on the Property. If the professionals recommend further investigations, including a recommendation by a pest control operator to inspect inaccessible areas of the Property, you should contact qualified experts to conduct such additional investigations.

2. **BROKER OBLIGATIONS:** Brokers do not have expertise in all areas and therefore cannot advise you on many items, such as those listed below. If Broker gives you referrals to professionals, Broker does not guarantee their performance.

3. **YOU ARE STRONGLY ADVISED TO INVESTIGATE THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO THE FOLLOWING. IF YOU DO NOT DO SO, YOU ARE ACTING AGAINST THE ADVICE OF BROKERS.**

   A. **GENERAL CONDITION OF THE PROPERTY, ITS SYSTEMS AND COMPONENTS:** Foundation, roof (condition, age, leaks, useful life), plumbing, heating, air conditioning, electrical, mechanical, security, pool/spa (cracks, leaks, operation), other structural and non-structural systems and components, fixtures, built-in appliances, any personal property included in the sale, and energy efficiency of the Property.

   B. **SQUARE FOOTAGE, AGE, BOUNDARIES:** Square footage, room dimensions, lot size, age of improvements and boundaries. Any numerical statements regarding these items are APPROXIMATIONS ONLY and have not been verified by Seller and cannot be verified by Brokers. Fences, hedges, walls, retaining walls and other barriers or markers do not necessarily identify true Property boundaries.

   C. **WOOD DESTROYING PESTS:** Presence of, or conditions likely to lead to the presence of wood destroying pests and organisms.

   D. **SOIL STABILITY:** Existence of fill or compacted soil, expansive or contracting soil, susceptibility to slippage, settling or movement, and the adequacy of drainage.

   E. **WATER AND UTILITIES; WELL SYSTEMS AND COMPONENTS; WASTE DISPOSAL:** Water and utility availability, use restrictions and costs. Water quality, adequacy, condition, and performance of well systems and components. The type, size, adequacy, capacity and condition of sewer and septic systems and components, connection to sewer, and applicable fees.

   F. **ENVIRONMENTAL HAZARDS:** Potential environmental hazards, including, but not limited to, asbestos, lead-based paint and other lead contamination, radon, methane, other gases, fuel oil or chemical storage tanks, contaminated soil or water, hazardous waste, waste disposal sites, electromagnetic fields, nuclear sources, and other substances, materials, products, or conditions (including mold (airborne, toxic or otherwise), fungus or similar contaminants).

   G. **EARTHQUAKES AND FLOODING:** Susceptibility of the Property to earthquake/seismic hazards and propensity of the Property to flood.

   H. **FIRE, HAZARD, AND OTHER INSURANCE:** The availability and cost of necessary or desired insurance may vary. The location of the Property in a seismic, flood or fire hazard zone, and other conditions, such as the age of the Property and the claims history of the Property and Buyer, may affect the availability and need for certain types of insurance. Buyer should explore insurance options early as this information may affect other decisions, including the removal of loan and inspection contingencies.

   I. **BUILDING PERMITS, ZONING, GOVERNMENTAL REQUIREMENTS, AND ADDRESS:** Permits, inspections, certificates, zoning, other governmental limitations, restrictions, and requirements affecting the current or future use of the Property, its development or size. Postal/mailing address and zip code may not accurately reflect the city which has jurisdiction over the property.

   J. **RENTAL PROPERTY RESTRICTIONS:** The State, some counties, and some cities impose restrictions that limit the amount of rent that can be charged, the maximum number of occupants, and the right of a landlord to terminate a tenancy. Deadbolt or other locks and security systems for doors and windows, including window bars, should be examined to determine whether they satisfy legal requirements.

   K. **SECURITY AND SAFETY:** State and local Law may require the installation of barriers, access alarms, self-latching mechanisms and/or other measures to decrease the risk to children and other persons of existing swimming pools and hot tubs, as well as various fire safety and other measures concerning other features of the Property.

© 2021, California Association of REALTORS®, Inc.

**BIA REVISED 12/21 (PAGE 1 OF 2)**

**BUYER'S INVESTIGATION ADVISORY (BIA PAGE 1 OF 2)**

The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069          Phone: (310)925-9281                    Fax: (310) 388-4638          944 Airole Way
Rayni Romito Williams          Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

**L. NEIGHBORHOOD, AREA, SUBDIVISION CONDITIONS; PERSONAL FACTORS:** Neighborhood or area conditions, including schools, law enforcement, crime statistics, registered felons or offenders, fire protection, other government services, availability, adequacy and cost of internet connections or other technology services and installations, commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, protected species, wetland properties, botanical diseases, historic or other governmentally protected sites or improvements, cemeteries, facilities and condition of common areas of common interest subdivisions, and possible lack of compliance with any governing documents or Homeowners' Association requirements, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Buyer.

**By signing below, Buyers acknowledge that they have read, understand, accept and have received a Copy of this Advisory. Buyers are encouraged to read it carefully.**

Buyer _____  Richard Saghian  or approved assignee  _____ Date 3-4-2022

Buyer _____ Date _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**BIA REVISED 12/21 (PAGE 2 OF 2)**

**BUYER'S INVESTIGATION ADVISORY (BIA PAGE 2 OF 2)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com        944 Airole Way

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8



# CALIFORNIA CONSUMER PRIVACY ACT ADVISORY, DISCLOSURE AND NOTICE

**(C.A.R. Form CCPA, Revised 12/21)**

The California Consumer Privacy Act (commencing with Civil Code § 1798.100) ("CCPA") grants to California residents certain rights in their private, personal information ("PI") that is collected by companies with whom they do business. Under the CCPA, PI is defined broadly to encompass non-public records information that could reasonably be linked directly or indirectly to you, PI could potentially include photographs of, or sales information about, your property.

During the process of buying and selling real estate your PI will be collected and likely shared with others, including real estate licensees, a Multiple Listing Service, real estate internet websites, service providers, lenders, and title and escrow companies, to name several possibilities. Businesses that are covered by the CCPA are required to grant you various rights in your PI, including the right to know what PI is collected, "opt out" or stop the transfer of your PI to others, and the right to request that the business delete your PI entirely. You may get one or more notices regarding your CCPA rights from businesses you interact with in a real estate transaction. However, not all businesses that receive or share your PI are obligated to comply with the CCPA. Also, even businesses that are otherwise covered under the CCPA may have a legal obligation to maintain PI, notwithstanding your instruction to the contrary. For instance, regardless of whether they are covered by CCPA, under California law, brokers and Multiple Listing Services are required to maintain their records for 3 years. If you wish to exercise your rights under CCPA, where applicable, you should contact the respective business directly.

You can obtain more information about the CCPA and your rights under the law from the State of California Department of Justice (oag.ca.gov/privacy/ccpa).

**I/we acknowledge receipt of a copy of this California Consumer Privacy Act Advisory, Disclosure and Notice.**

Buyer/Seller/Landlord/Tenant _____   Richard Saghian  or approved assignee Date 3-4-2022

Buyer/Seller/Landlord/Tenant _____   Date _____

© 2021, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**CCPA REVISED 12/21 (PAGE 1 OF 1)**

**CALIFORNIA CONSUMER PRIVACY ACT ADVISORY (CCPA PAGE 1 OF 1)**

The Beverly Hills Estates, 8878 Sunset Blvd West Hollywood CA 90069   Phone: (310)925-9281   Fax: (310) 388-4638   944 Airole Way
Rayni Romito Williams   Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

**SUPPLEMENTAL ADDENDUM TO CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND
JOINT ESCROW INSTRUCTIONS DATED AS OF FEBRUARY 10, 2022
BETWEEN CRESTLLOYD, LLC, DEBTOR IN POSSESSION, THROUGH ITS MANAGER,
SIERRACONSTELLATION PARTNERS, LLC, AS SELLER,
AND Richard Saghian or approved assignee, AS BUYER**

1. <u>Supplemental Addendum Provisions Prevail</u>.  This Supplemental Addendum (the "***Addendum***") modifies the Residential Purchase Agreement and Joint Escrow Instructions (C.A.R. Form RPA, Revised 12/21) (the "***Agreement***").  In the event of any conflict between any of the provisions of the Agreement and/or this Addendum, this Addendum shall be deemed to be paramount and shall prevail.

2. <u>Definitions</u>. All capitalized terms used in this Addendum which are not defined in this Addendum shall have the meanings ascribed to them in the Agreement.

3. <u>Bankruptcy Court Approval</u>. The parties acknowledge that Seller filed for bankruptcy protection on October 26, 2021 under chapter 11 of title 11 of the United States Code §§ 101, et seq. (the "***Bankruptcy Code***") and is a Chapter 11 debtor in possession of the Property in its bankruptcy case pending in the United States Bankruptcy Court for the Central District of California (the "***Court***") (Case No. 2:21-bk-18205-DS).  The parties acknowledge that any sale of the Property is subject to the approval of the Court and requires the entry of an order of the Court approving the sale which will be obtained by Seller as soon as reasonably practicable after the Auction.

4. <u>Buyer's Premium</u>. In addition to the accepted high bid for the Property acknowledged by the auctioneer Concierge Auctions, LLC ("***Concierge***") at auction (the "***High Bid***") and approved by the Court, Buyer shall pay a fee at Closing to Concierge in an amount equal to twelve percent (12%) of the High Bid (the "***Buyer's Premium***").  Upon Closing, Buyer irrevocably directs Escrow Holder to hold such funds and to pay Concierge the Buyer's Premium, less any amounts owed to Seller.

5. <u>Earnest Money</u>.  Buyer shall deliver, as its initial earnest money deposit, an amount equal to twelve percent (12%) of the total purchase price for the Property, less the bidder's deposit of TWO HUNDRED AND FIFTY THOUSAND ($250,000.00) U.S. DOLLARS submitted prior to the auction (the "***Deposit***").  The Deposit shall be wired to Chartwell Escrow for receipt no later than 5:00 p.m. ET on the second business day after the conclusion of the Auction.  Except as provided herein, Buyer acknowledges and agrees that upon execution of the Agreement, the Deposit becomes Non-Refundable.

6. <u>Title Insurance/Certain Closing Costs</u>.  Chicago Title  shall act as the title insurance issuer and Chartwell Escrow shall act as the closing agent for this transaction (the "***Title Company***" or "***Escrow Holder***").  The Seller shall pay for the title search and a standard owner's CLTA title insurance policy. The Buyer shall pay the conveyance tax on the deed.  Except as expressly provided otherwise in the Agreement, all other closing costs shall be allocated in accordance with the norms in the county and state where the Property is located.  In the event Buyer chooses to order title through a title company other than the company designated by Seller or to order broader ALTA coverage, Buyer shall be solely responsible for the costs of such title search and title insurance and/or for the incremental costs for broader ALTA coverage.

7. <u>Acceptance of Property</u>.  To the fullest extent permitted by applicable law, Buyer accepts the Property in its "AS IS, WITH ALL FAULTS" condition at the time of Closing.  Buyer acknowledges that it has had the opportunity to conduct all due diligence and investigation of the Property (including but not limited to title, survey, and physical condition) that it desires prior to signing this Agreement. Buyer waives all

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

right to rescind or cancel the Agreement to the fullest extent allowed under applicable law. Buyer has no right to rescind or cancel and waives all such rights including, but not limited to, rights under Cal. Civil Code Section 1102.3.

The Seller will convey the Property by warranty deed without any representations or warranties whatsoever, including, without limitation, representations or warranties as to oil and mineral rights, city or government agency notifications regarding work to be done, physical condition, compliance with state, city or federal statutes, codes, ordinances, or regulations, geological stability, zoning, suitability for improvement, and fire insurance policies to cover any improvements on the Property, nor any assurances regarding the subdividability of the Property, provided, however, that the Seller shall be required to deliver good and marketable title to the Buyer or any Back-Up Buyer.

8. <u>Additional Conditions of Sale</u>:

    a.  THE BUYER'S PURCHASE OF THE PROPERTY IS A CASH TRANSACTION WITH NO CONTINGENCIES OR CONDITIONS OF ANY KIND, including, without limitation, a contingency for financing, due diligence or inspections, except that the Seller is required to (y) obtain Court approval and the entry of an order of the Court approving the sale of the Property to the Buyer that is not subject to a stay pending appeal and (z) deliver good and marketable title to the Property to the Buyer.

    b.  The sale of the Property is subject to Court approval after notice to the United States Trustee, all creditors, and all parties in interest as required by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules, which approval will be obtained by Owner as soon as reasonably practicable after the completion of the Auction.

    c.  The Property will be conveyed subject to standard allocations and any and all easements, restrictions, rights and conditions of record and rights of way, against, on or regarding the Property. Title, however, is to be transferred free and clear of all liens, claims and encumbrances except those non-monetary liens and encumbrances set forth on that certain preliminary title report prepared by Chicago Title Company and dated as of November 16, 2021, a copy of which has been delivered to Buyer.

    d.  If for any reason, or no reason whatsoever, the Seller is unable to deliver good and marketable title to the Property to the Bidder, the Bidder's sole remedy shall be the return of any money that it has deposited toward the purchase of the Property.

9. <u>Disclosures</u>. To the extent that Seller is obligated to deliver disclosures or other documents to Buyer by law or under the Agreement, Buyer acknowledges having received all such disclosures and documents prior to the Auction of the Property and/or waives the right to such disclosures, to the fullest extent allowed under applicable law. Buyer waives all rights to rescind the Agreement or to pursue remedies or penalties against Seller (including repairs) under applicable law.

10. **<u>Default</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE AGREEMENT, IF BUYER IS IN DEFAULT, THE DEPOSIT SHALL BE RETAINED BY SELLER AND BY CONCIERGE PER THE TERMS OF THE AUCTION AGREEMENT BETWEEN SELLER AND CONCIERGE AND THE BIDDER TERMS AND CONDITIONS BETWEEN BUYER AND**

**CONCIERGE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW. BUYER SHALL BE RESPONSIBLE FOR THE PAYMENT OF ANY REMAINING BUYER'S PREMIUM TO CONCIERGE, AND SELLER MAY RECOVER SUCH DAMAGES AS MAY BE PROPER; OR SELLER MAY ELECT TO TREAT THIS AGREEMENT AS BEING IN FULL FORCE AND EFFECT AND SELLER SHALL HAVE THE RIGHT TO SPECIFIC PERFORMANCE OR DAMAGES OR BOTH.**

11. <u>Disputes; Venue.</u> The parties agree to submit all controversies, disputes, claims and matters of difference arising out of or relating to the Agreement and/or this Addendum, including but not limited to its enforcement, scope and/or interpretation, as a core proceeding exclusively in the Court and agree to submit to personal jurisdiction in the Court, sitting without a jury, which is expressly waived. In the event of any such Court action, the prevailing party shall be entitled to reimbursement from the non-prevailing party of all reasonable attorney's fees and costs/expenses of the prevailing party and any award of the Court will include costs and reasonable attorneys' fees to the prevailing party.

12. <u>Third-Party Beneficiary.</u> Seller and Buyer designate Concierge as a third-party beneficiary of this Agreement, having the right to enforce any of the provisions that pertain to Concierge.

13. <u>Severability.</u> Whenever possible, each provision of the Agreement and this Addendum shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of the Agreement.

**IN WITNESS WHEREOF**, Seller and Buyer have signed this Addendum as of the day and year first above written.

**SELLER:**                                                        **BUYER:**
CRESTLLOYD, LLC, DEBTOR IN POSSESSION

BY: SIERRACONSTELLATION PARTNERS, LLC,
   ITS MANAGER

_____          _____
By: Lawrence R. Perkins                              Richard Saghian or approved assignee
Its: Authorized Signatory

Doc ID: 1fadd1b5631473c259b7ad50dbc5a153b334dca8

EXHIBIT "3"



**EXPOSURE REPORT**

The One

Bel Air, Los Angeles, California



# Marketing Exposure

Your property is being exposed to an audience of millions worldwide through our robust marketing and sales platform including print collateral, email communication, and print and digital advertising.

Your property is being marketed to the following primary and feeder markets: Los Angeles and Greater Southern California; New York City, New York; Dallas, Houston, and Austin, Texas; Miami, Fort Lauderdale, and Palm Beach, Florida; Aspen, Telluride, and Vail, Colorado; Park City, Utah; Vancouver and Toronto, Canada; London, United Kingdom; Indonesia; Hong Kong, China; Mexico; and The Middle East (Taiwan, Saudi Arabia, Russia, Israel, Lebanon, Dubai, Thailand, Pakistan, Kazakhstan).

# Key Performance Metrics

Our unique approach to marketing your property is designed to deliver certain results predicated on performance against average projections. Below is you property's performance to date:

- **PROSPECTS:** 2,863
  (Projection: 1,000–1,200)
- **QUALIFIED SHOWINGS:** 40
  (Projection: 20–30)
- **REGISTERED BIDDERS:** 5
  (Projection: 3–7)

# Website Performance

Your property is being displayed on the Concierge Auctions website, including a detailed description, photography, film, digital marketing materials, and diligence documents since its launch.

To date, your property has received the following activity:

- **PROPERTY VIEWS:** 83,740
- **PAGE VIEWS:** 197,602
- **FILM VIEWS:** 16,800

**791 REGIONS:**
*Top 10* | California, Texas, Florida, England, Michigan, New York, Illinois, New South Whales, Ontario, and Colorado.

**171 COUNTRIES:**
*Top 10* | United States, Canada, Australia, United Kingdom, Germany, France, Italy, the Netherlands, Brazil, and Denmark.



# Digital Ad & Organic Social Campaign

Your tailored digital advertising strategy featuring your property is reaching global and geo-targeted buyer prospects and brokers throughout multiple channels of paid search, social media, display and retargeting ads via Google and Facebook campaigns in your target markets. In addition, properties on our platform are receiving exposure on Concierge Auctions' global social media channels including Facebook and Instagram. By creating engaging content in varying media formats, we generate inbound traffic, cultivate leads, and further the reach of awareness of this opportunity. Below is a breakdown of the reach and engagement your properties have received to date on each platform.

- **FACEBOOK CAMPAIGN:**
  202,910 REACH
  381 CLICKS
- **GOOGLE CAMPAIGN:**
  61,825 IMPRESSIONS
  841 CLICKS
- **FACEBOOK POST(S):**
  21,386 REACH
  1,521 ENGAGEMENT
- **INSTAGRAM POST(S):**
  17,423 IMPRESSIONS
  1,511 ENGAGEMENT

# 1. Property Collateral

An informational property piece (spec card) and a catalogue were designed and printed for on site distribution, as well as made available digitally on the property webpage.

- Property Spec Cards: Your property is featured in printed informational pieces, made available for local market distribution, as well as direct mailed within target markets with a home valuation overlay.
- Catalogue: Your property is cover-featured andincluded in a high-quality, perfect-bound catalogue printed and made available for on-site distribution in your primary market. The catalogue is additionally made available in markets of same-issue properties with concurrent exposure cycles, and direct mailed to members of the Concierge Auctions' Private Client Group (including preferred agents), select Billionaires in

the US, and to targeted owners of $10M-plus properties across the US. The catalogue is additionally digitally distributed via an eblast to Concierge Auctions' subscribers. Click **here** to view.









# 2. Database & Email Communication

**Concierge Auctions Database, Private Client Group, and Subscriber Outreach**

Your property is being marketed to buyer prospects, agents, and brokers in a series of Concierge Auctions' e-blasts via our Auction Alert® and drip campaign emails, as well as targeted direct sales outreach to members of our global database from like-kind auctions and our Private Client Lists.

Plus, recipients clicking through from e-blasts or other mediums leading to/on the property pages on ConciergeAuctions.com are receiving additional ads on Facebook and across the Google Display Network. With over 2 million Display Network sites, the entire Google Display Network reaches over 90% of Internet users worldwide.

**Agent Email Communication**

A preview event email invitation was sent to key market real estate agents, featuring information about the property, the auction, and the event. E-blasts were also made available to agents for distribution to their clients and other agents for the property.

- 1/7 — General Auction Eblast was sent to the agent for distribution.
- 1/8 — Auction Alert® "Just Launched" sent to 160,000+ subscribers. Click **here** to view.
- 1/9 — Standalone Auction Alert® sent to 160,000+ subscribers. Click **here** to view.
- 1/17 — Standalone "Featured Film" email sent to campaign members. Click **here** to view.
- 1/13, 1/19, 1/26, 2/3, 2/10, 2/17, 2/24 — Cumulative Film and 3D Tour emails have been sent weekly to subscribers. Click to view **1/13**, **1/19**, **1/26**, **2/3**, **2/10**, **2/17**, **2/24**
- 1/15, 1/22, 1/29, 2/5, 2/12, 2/19, 2/26 — Weekly Auction Alert® sent to 120,000+ subscribers. Click to view **1/15**, **1/22**, **1/29**, **2/5**, **2/12**, **2/19**, **2/26**.
- 2/1 — Preview Event invite for The One went to 48,900+ real estate agents in the key markets of Los Angeles, Orange County, San Francisco, and San Diego and historical prospect subscribers from likekind sales. Click **here** to view.
- 1/11 — "Concierge Catalogue" email was sent to 160,000+ subscribers. Click **here** to view.
- 2/25 — Auction Alert® "Going, Going, Gone" will be sent to 160,000+ subscribers. Click **here** to view.
- 2/28 — "Bidding Now Open" email was sent to campaign prospects and over 88,500 agents in the primary target markets of: Los Angeles, Orange County, San Francisco, San Diego, CA; New York; Dallas, Houston, Austin, TX; Miami, Palm Beach, Fort Lauderdale, FL; Aspen, Telluride, Vail, CO. Click **here** to view.

7



**CONCIERGE** AUCTION ALERT:

## THE FIRST AND LAST OF ITS KIND

The One: A 105,000-square-foot oasis, the largest and grandest house ever built in the urban world.

## THE ONE, BEL AIR, CALIFORNIA

Listed for $295M | No Reserve
Selling to the Highest Bidder
1% Co-broke Commission
BIDDING OPENS FEBRUARY 28

Perched on nearly four acres high above Los Angeles, and with 360-degree panoramic views, the estate allows for luxury living on the wildest scale with every imaginable mega-resort style amenity, including five vast pools, a private nightclub, full-service beauty salon, wellness spa, 10,000-square-foot sky deck, 400-foot private outdoor running track, private Dolby Digital theater, and so much more.

TAKE ME THERE »

IN COOPERATION WITH

AARON KIRMAN     WILLIAMS&WILLIAMS

COMPASS          The Beverly Hills Estates

**Aaron Kirman** (#01296524)
Listing Agent, Aaron Kirman Group at Compass

**Rayni Williams** (#01496786)
Listing Agent, Williams & Williams at The Beverly Hills Estates

**Branden Williams** (#01774287)
Listing Agent, Williams & Williams at The Beverly Hills Estates

CONTACT INFO

+1 646.760.8638 | Kyri.Papoul@ConciergeAuctions.com

**Kyri Papoul** (#2067533)
Project Manager

**Chad Roffers** (#02141845)
Business Developer

BUY

SELL

EARN

STAY IN THE KNOW          BID & WATCH AUCTIONS LIVE
FOLLOW US ON SOCIAL        DOWNLOAD OUR *INSTANT GAVEL* APP

App Store    Google Play

8

# 3. Press

Your property was included in a monthly lineup release distributed via the national US wire.

- 12/29  — EIN: Click **here** to view release.

Property pitched by Relevance International in New York to key market media during the exposure period. Additional initiatives include: facilitation of any/all incoming media inquiries, arranging team comments and interviews, and clipping and monitoring press. Pitched to the following publications:

- Forbes
- Fortune
- Barron's
- Businessweek
- CNN Money
- Mansion Global
- Realtor.com
- 6sqft
- Observer
- Abode2
- PrimeRes
- Departures
- Elite Traveler
- Robb Report
- Esquire
- GQ
- Luxe Magazine
- Luxury Daily
- Travel + Leisure
- Town & Country
- Beverly Hills Courier
- Los Angeles Business Journal
- Los Angeles Daily News
- Los Angeles Times
- LA Weekly
- Orange County Register
- Orange County Review
- OC Weekly

- OC Post
- Malibu Times
- The Local Malibu
- The San Diego Union-Tribune
- Times of San Diego
- Santa Barbara News-Press
- Santa Barbara Independent
- San Jose City Times
- The Mercury News
- The New York Times
- New York Post
- Real Estate Weekly
- New York Business Journal
- Dan's Papers
- The East Hampton Star
- The Southampton Press
- Dallas Morning News
- Dallas Business Journal
- Houston Business Journal
- The Austin-American Statesman
- Austin Business Journal
- Miami Herald
- South Florida Sun Sentinel
- South Florida Business Journal
- Tampa Bay Times
- Orlando Sentinel
- Palm Beach Post
- Palm Beach Daily News
- The Aspen Times
- Aspen Daily News
- Telluride Daily Planet
- Vail Daily
- Park Record
- Utah Business
- Provo Daily Herald
- Globe and Mail
- Toronto Star
- Vancouver Sun

- LondonLondon Evening Standard
- The Sun
- The Sunday Times
- Metro
- The Jakarta Post
- Jakarta Globe
- Media Indonesia
- The Bali Times
- South China Morning Post
- Apple Daily, The Standard
- The Beijing News
- Shenzhen Daily
- Shanghai Daily
- Guangzhou Daily
- Daily Jang
- Taiwan News
- Taipei Times
- China Times
- Mexico: El Universal
- La Jornada
- El Norte
- Milenio
- Vallarta Nautica
- Vallarta Lifestyles
- Gulf News
- Khaleej Times
- Business 24-7
- The Moscow Times
- Moskovskij Komsomolets
- Komsomolskaya Pravda
- zvestia
- Kommersant
- Ekspress-K
- Diapazon.kz
- Kazakhstanskaya Pravda
- Arab News
- Saudi Gazette
- Asharq Al-Awsat

- Haaretz
- Jerusalem Post
- Yedioth Ahronoth
- An-Nahar
- L'Orient-Le Jour
- Al Akhbar
- Bangkok Post
- Thai Rath
- The Thaiger
- The News International (Pakistan)
- Dawn (Pakistan)

Press for the property has also been generated in other publications throughout the exposure period.

- 12/29 — Dirt — Full article
- 12/29 — Mansion Global — Full article
- 12/29 — Real Estate Weekly — Full article
- 12/29 — The Real Deal — Full article
- 12/29 — Yahoo Life — Full article
- 12/29 — Yahoo! News — Full article
- 12/30 — ArcaMax — Full article
- 12/30 — autoevolution — Full article
- 12/30 —  Barron's — Full article
- 12/30 —  Bradenton Herald — Full article
- 12/30 — Fox43 — Full article
- 12/30 — Lipstick Alley — Full article
- 12/30 — Luxuo — Full article
- 12/30 — Myrtle Beach — Full article
- 12/30 —  The News & Observer — Full article
- 12/30 —  12/30 —  The Olympian — Full article
- 12/31 —  GlamTouch — Full article
- 12/31 —  NewsBreak — Full article
- 12/31 —  Nine — Full article
- 12/31 —  PourElles — Full article
- 12/31 —  TopFash — Full article
- 1/1 —  Los Angeles Times — Full article
- 1/3 —  Architectural Digest — Full article
- 1/3 —  Los Angeles Magazine — Full article

- 1/3 — People Magazine — Full article
- 1/3 — Yahoo Sport UK — Full article
- 1/3 — Yahoo! Sport — Full article
- 1/4 — Inman News — Full article
- 1/4 — Nine — Full article
- 1/4 — Robb Report — Full article
- 1/4 — Robb Report Newsletter — Full article
- 1/4 — The Hollywood Reporter — Full article
- 1/5 — Boss Hunting — Full article
- 1/5 — Celebrity Net Worth — Full article
- 1/5 — Like RE — Full article
- 1/5 — Living, Etc. — Full article
- 1/5 — Realtor.com — Full article
- 1/5 — Uncrate — Full article
- 1/6 — ABC7 — Full article
- 1/6 — Bloomberg Law — Full article
- 1/6 — California News Times — Full article
- 1/6 — CNN Style — Full article
- 1/6 — Complex Magazine — Full article
- 1/6 — Hypebeast — Full article
- 1/6 — Inside Edition — Full article
- 1/6 — New York Post — Full article
- 1/7 — CNBC — Full article
- 1/7 — Global News — Full article
- 1/7 — NBC Boston — Full article
- 1/7 — NBC Chicago — Full article
- 1/7 — NBC DFW — Full article
- 1/7 — NECN — Full article
- 1/7 — PrimeResi — Full article
- 1/7 — Stuff — Full article
- 1/7 — The Daily Mail — Full article
- 1/7 — The Modesto Bee — Full article
- 1/7 — The Sacramento Bee — Full article
- 1/8 — Apartment Therapy — Full article
- 1/8 — Midland Daily News — Full article
- 1/8 — My San Antonio — Full article
- 1/8 — NBC Connecticut — Full article
- 1/8 — NBC Washington — Full article

13

- 1/8 —  News Break — Full article
- 1/8 —  Oakland News Now — Full article
- 1/8 —  SF Gate — Full article
- 1/9 —  Barron's Penta — Full article
- 1/9 —  Business Insider — Full article
- 1/9 —  MarketWatch — Full article
- 1/10 — Curiocity — Full article
- 1/10 — Headslines Mania — Full article
- 1/10 — Los Angeles Daily News — Full article
- 1/10 — MSN Money — Full article
- 1/10 — The Orange County Register — Full article
- 1/10 — The Sun — Full article
- 1/10 — Tittle Press — Full article
- 1/10 — Top Ten Real Estate Deals — Full article
- 1/11 —  E-Architect — Full article
- 1/11 —  EurWeb — Full article
- 1/11 —  Evening Standard — Full article
- 1/11 —  Manchester TV — Full article
- 1/11 —  oicanadian — Full article
- 1/11 —  The Hollywood Times — Full article
- 1/11 —  Wealth Magazine — Full article
- 1/11 —  Yes! Weekly — Full article
- 1/12 — AZ Family — Full article
- 1/12 — Christabelle's Closet — Full article
- 1/12 — Daily Hive — Full article
- 1/12 — From Press — Full article
- 1/12 — Inman News — Full article
- 1/12 — Mental Floss — Full article
- 1/12 — One News Page — Full article
- 1/12 — PR Web UK — Full article
- 1/12 — Silive — Full article
- 1/12 — Street Insider — Full article
- 1/13 —House Beauitful — Full article
- 1/14 —Abode2 — Full article
- 1/14 — Home Stratosphere — Full article
- 1/14 — Paper Dabba — Full article
- 1/14 — Santa Monica Mirror — Full article
- 1/14 — Tatler Asia — Full article

14

- 1/14 — The Real Deal — Full article
- 1/14 — The Richest — Full article
- 1/14 — Westside Today — Full article
- 1/14 — WKRC-TV — Full article
- 1/15 — Llodo — Full article
- 1/16 — Cottages and Gardens — Full article
- 1/16 — Wealth Creation Investing — Full article
- 1/17 — Yo! Venice — Full article
- 1/18 — Dupont Registry — Full article
- 1/18 — Los Angeles Times — Full article
- 1/19 — Fox 5 San Diego — Full article
- 1/20 — The Late Show with Stephen Colbert — Full article
- 1/20 — Travel + LeisureYahoo!  — Full article
- 1/20 — Yahoo!  — Full article
- 1/21 — 7News — Full article
- 1/21 — 8News Now — Full article
- 1/21 — ArklaTex  — Full article
- 1/21 — Everything Lubbock — Full article
- 1/21 — Fox31 — Full article
- 1/21 — Fox8 — Full article
- 1/21 — Khon2 — Full article
- 1/21 — KTLA-TV — Full article
- 1/21 — KXNews — Full article
- 1/21 — Phil17 — Full article
- 1/21 — Thrillist — Full article
- 1/21 — WFXF Fox — Full article
- 1/21 — WHNT-TV — Full article
- 1/21 — WJTV — Full article
- 1/21 — WoodTV8 — Full article
- 1/21 — WSAV — Full article
- 1/21 — Your Basin — Full article
- 1/22 — Los Angeles Times — Full article
- 1/23 — KFOR-TV — Full article
- 1/25 — The Real Deal — Full article
- 1/27 — Forbes — Full article
- 1/28 — Fox59 — Full article
- 1/28 — L'Officiel USA — Full article
- 1/28 — Moneycontrol — Full article

15

- 1/29 — ReallyList — Full article
- 1/30 — Headtopics — Full article
- 2/3 — Veranda — Full article
- 2/7 — Le Figaro — Full article
- 2/8 — FN Talk — Full article
- 2/8 — Fox Business — Full article
- 2/13 — Superbowl Feature — Video clip
- 2/17 — Patch — Full article
- 2/18 — Daily Mail Newspaper (UK) — Full article
- 2/18 — Daily Mail Online (US) — Full article
- 2/20 — Nine — Full article
- 2/20 — France TV — Full article
- 2/25 — Bloomberg — Full article
- 2/28 — Mansion Global — Full article
- 2/28 — The LA Times — Full article
- 2/28 — Daily Mirror — Full article
- 2/28 — Patch — Full article
- 2/28 — CBS-LA — Full article
- 2/28 — Inman News — Full article
- 3/1 — 10 Tampa Bay — Full article
- 3/1— Yahoo News UK — Full article
- 3/1— The Richest — Full article
- 3/2 — Barron's — Full article

*Post Auction Press:*

- 3/3 — EIN: Click hereto view release.
- 3/3 — LA Times — Full article
- 3/3 — Wall Street Journal — Full article
- 3/3 — Bloomberg.com — Full article
- 3/3 — MyNewsLA.com — Full article

16

# 4. Listing Sites

**Property Listing Sites**

Property listings featuring revised messaging and photography are running on **LuxuryRealEstate.com** and **Juwai.com**. The first, an award-winning web site that currently provides access to over 62,000 multimillion dollar homes and luxury homes for sale from around the world. This site has remained the No. 1 portal for luxury properties since its launch. The second, the largest and most authoritative source for global property in Chinese, spanning 89 countries.

- Luxuryrealestate.com — Click **here** to view listing.
- Juwai.com — Click **here** to view listing.

**Real Estate Listing Sites**

New copy and photography was provided for use on the local MLS and other national real estate listing sites to create fresh and consistent marketing across all platforms. Sample listings below.

- Zillow.com — Click **here** to view listing.
- Realtor.com — Click **here** to view listing.

**Sotheby's**

Your property is included with featured presence on Sothebys.com, the world's largest, most trusted, and dynamic marketplace for art and luxury goods, via a standalone auction tile within the real estate department.

- Sothebys.com — Click **here** to view listing.

# 5.  March Global Sale Highlights

The March Global Sale is being marketed to global buyers—via advertising, marketing, public relations, and sales exposure via our proven platform—including:

- Property featured on Portfolio Sale collection page, with additional sale tile promotion on Current Auctions page on ConciergeAuctions.com.
- Property lifestyle messaging translated into Spanish, Italian, French, German, and Chinese.
- Inclusion in portfolio sale press release and global wire distribution.
- Inclusion in "March Global Sale" Auction Alert emails, sent to 160,000+ subscribers.

17

# EXHIBIT "4"

**W T T**

# WATT TIEDER

WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.

1765 Greensboro Station Place, Suite 1000
McLean, Virginia  22102

Telephone:  703-749-1000
Facsimile:  703-893-8029
www.watttieder.com

March 7, 2022

Jennifer Kneeland
jkneeland@watttieder.com

**VIA EMAIL**

David B. Golubchik (dbg@lnbyg.com)
Todd M. Arnold (tma@lnbyg.com)
Levene, Neale, Bender, Yoo & Golubchik, L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034

Re:     *In re Crestlloyd, LLC* (Bankr. C.D.Cal. 21-18205) – **Outcome of the Auction of 944
        Airole Way, Los Angeles, California 90077 aka "The One" (the "Property")**

Dear David and Todd:

As you know, I represent J & E Texture, Inc. ("J&E") in the above-referenced chapter 11
bankruptcy case filed by Crestlloyd, LLC (the "Debtor").  J&E holds a priority, pre-petition
mechanic's lien against the Property ahead of all other pre-petition secured lenders.[1]  I am writing
regarding the outcome of the March 3, 2022 auction (the "Auction") of the Property.

It is my understanding that the Auction concluded and derived a price that is significantly less than
the total secured debt against the Property.  This price shortfall appears to present an obstacle under
section 363(f)(3) of the Bankruptcy Code for the Debtor, as it must now obtain consent from the
creditors secured by the Property in order to sell it free and clear of all liens.  *See* 11 U.S.C. §
363(f)(3); *see also In re PW, LLC*, 391 B.R. 25 (9th Cir. 2008).

As such, I ask that you confirm that J&E's mechanic's lien will be treated as having priority ahead
all pre-petition secured creditors, subordinate only to the interests of the post-petition DIP-
financing lender.  Also, please let me know if the Debtor intends to go forward with the sale process
via confirmation of the Auction, or if the Debtor will attempt to close the sale under other
possibilities provided for under the Bankruptcy Code.

Very truly yours,

**Watt, Tieder, Hoffar & Fitzgerald, L.L.P.**

*/s/ Jennifer Kneeland*

Jennifer Kneeland

cc:    Robert Shaia, Esq.
       Marguerite Lee DeVoll, Esq.

---

[1] *See* J&E's proof of claim no. 13 filed on January 7, 2022.  *See also* Cal. Civ. Code § 8450 (providing that a
mechanic's lien priority relates back to the time of commencement of work).

# EXHIBIT "5"

## Todd M. Arnold

| | |
|---|---|
| **From:** | Kyra Andrassy <kandrassy@swelawfirm.com> |
| **Sent:** | Monday, March 7, 2022 9:43 AM |
| **To:** | David B. Golubchik |
| **Cc:** | Todd M. Arnold |
| **Subject:** | RE: Crestlloyd |
| **Attachments:** | Summary of transfers from Inferno to crestlloyd.PDF; 04- Inferno Realty - FRB April 2013 ($3 217 000 included in $6 431 000) (003).PDF; Documentation for 2 & 3.PDF; 05- Crestlloyd LLC - FRB - SBC - April 2013 (002).PDF; 06- Crestlloyd LLC - FRB - BMM - April 2013 (002).PDF; 07- 944 Airole Estate - FRB - SBC - July 2013 (002).PDF; 08- 944 Airole Estate - FRB - SBC - Oct 2013 (002).PDF; 09- 944 Airole Estate - FRB - SBC - Dec 2013 (002).PDF; 10- Crestlloyd LLC (944 Airole Interest reserve acct) FRB - BMM - Dec 2013 (002).PDF; 11- 944 Airole Estate -FRB - SBC - Jan 2014 (002).PDF; 12- Crestlloyd LLC (944 Airole Interest reserve acct) - FRB - BMM - Jan 2014 (002).PDF; 13 14 15 16 17 18 19 20 21 Inferno Realty -FRB - Jan to April 2014 (002).PDF |

Attached are the documents gathered so far to substantiate Inferno's claim.  The first attachment contains reference numbers for the various transactions, and those correspond to the documents attached. There are a couple of transactions that we don't have documentation for (such as where the original $7 million put in by Maybach was sent), but the records for Crestlloyd and 944 Airole Estate should demonstrate that the funds went towards the property.

**From:** David B. Golubchik <DBG@lnbyg.com>
**Sent:** Monday, March 7, 2022 9:16 AM
**To:** Kyra Andrassy <kandrassy@swelawfirm.com>
**Cc:** Todd M. Arnold <TMA@lnbyg.com>
**Subject:** RE: Crestlloyd

Kyra,

The representative of that buyer sent an email yesterday that they will not proceed with the sale.  So, unfortunately, that is not on the table.  If the Debtor receives any real offers, it intends to supplement the sale motion and provide any such offers to the Court and let the Court decide.

The Debtor's hope was to have a consensual sale and then deal with the claims and, as a result, the Debtor did not file actions to dispute claims.  Please let me know by noon today if your client's position changes.  Otherwise, we will have to proceed with a disputed claim process.  Incidentally, although we have asked for proof of funding long ago, we still have not received it.  I again ask that the information be provided to us.

Thanks

**DAVID B. GOLUBCHIK,** Esq.

**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.**
2818 La Cienega Ave   **|**   Los Angeles, CA   90034
Phone  310 229 1234   **|**   Direct  310 229 3393   **|**   Mobile  310 490 0330
dbg@lnbyg.com   **|**   **www.lnbyg.com**

The preceding E-mail message is subject to Levene, Neale, Bender, Yoo & Golubchik  L.L.P.'s email policies which can be found at http://www.lnbyg.com/disclaimers.htm.

🌍 Please consider the environment before printing this email

---

**From:** Kyra Andrassy <kandrassy@swelawfirm.com>
**Sent:** Monday, March 7, 2022 9:12 AM
**To:** David B. Golubchik <DBG@lnbyg.com>
**Subject:** Crestlloyd

Is there any hope for getting the higher offer under contract before you have to file your sale motion tomorrow?  I think Inferno will support the $160mm offer but will not support the result of the auction.



SMILEY | WANG-EKVALL
Insolvency. Real Estate. Business Litigation.

**Kyra E. Andrassy**
Attorney at Law

3200 Park Center Drive, Suite 250
Costa Mesa, California 92626

Main    714 445-1000
Direct    714 445-1017
Cell    714 981-7966
Email    kandrassy@swelawfirm.com





# EXHIBIT "6"

## MEMORANDUM OF AGREEMENT

This Memorandum of Agreement is made and entered into this _1st_ day of
_January_, 2016 by and between CRESTLLOYD, LLC, a California Limited Liability
Company ("Crestlloyd") and INFERNO INVESTMENTS INC. ("Inferno").

### RECITALS

The parties desire to set forth their respective rights with regard to distribution
of proceeds at such time as the residence being constructed by Crestlloyd (as successor
to the Company) at 944 Airole Way, Los Angeles, California (the "Residence") is sold.

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

1.     Incorporation of Recitals.   The above Recital is incorporated herein by this
reference as though made a part hereof.

2.     Division of Profits and Losses.   Profits and Losses shall be allocated as
follows:   Fifty percent (50%) to Crestlloyd for Developer fee and fifty percent (50%) to
Crestlloyd and Inferno in proportion to the money loaned by each to finance the
construction of the Residence.

For Example: Assume Inferno loaned $18,000,000.00 and Crestlloyd loaned
$41,000,000.00.   Inferno's share of the profits and losses is 15.25% ($18,000,000 ÷
$59,000,000 = 30.5% multiplied by 50% = 15.25%).   Crestlloyd's share of the profits and
losses is 84.75% ($41,000,000 ÷ $59,000,000 = 69.5% multiplied by 50% = 34.75%), plus
Crestlloyd's Developer fee of 50% = 84.75%.

3.     Distributions.   All proceeds received from a sale, condemnation, financing or
refinancing of the Residence shall be distributed in the following manner:

First, to repay the loan(s) obtained from a bank or third parties (excluding
Crestlloyd and Inferno) and all other unpaid costs of construction of the Residence.

Second, to Crestlloyd and Inferno, pro rata, in repayment of any loans owing
them, together with simple interest thereon at the rate of eight percent (8%) per annum.

Third, to Crestlloyd, the sum of ONE HUNDRED FORTY-FIVE THOUSAND
DOLLARS ($145,000.00) as compensation for general office overhead and services
rendered by it in connection with the construction of the Residence.

Thereafter, to Crestlloyd and Inferno in accordance with their share of the
profits and losses determined in the manner set forth in paragraph 2 above.

IN WITNESS HEREOF, the parties have executed this Memorandum of Agreement,
effective as of the date set forth above.

CRESTLLOYD, LLC, a California
Limited Liability Company

By _____
Nile Niami, Manager

INFERNO INVESTMENTS INC.

By _____
Julian Remillard, Director

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled **DEBTOR'S MOTION FOR AN ORDER: (1) APPROVING THE SALE OF THE DEBTOR'S REAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, WITH THE EXCEPTION OF ENUMERATED EXCLUSIONS; (2) FINDING THAT THE BUYER IS A GOOD FAITH PURCHASER; (3) AUTHORIZING AND APPROVING THE PAYMENT OF CERTAIN CLAIMS FROM SALE PROCEEDS; (4) WAIVING THE FOURTEEN-DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULE 6004(h); AND (5) PROVIDING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **March 8, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Kyra E Andrassy**    kandrassy@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- **Todd M Arnold**    tma@lnbyg.com
- **Jerrold L Bregman**    jbregman@bg.law, ecf@bg.law
- **Marguerite Lee DeVoll**    mdevoll@watttieder.com, zabrams@watttieder.com
- **Danielle R Gabai**    dgabai@danninggill.com, dgabai@ecf.courtdrive.com
- **Thomas M Geher**    tmg@jmbm.com, bt@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com
- **David B Golubchik**    dbg@lnbyg.com, stephanie@lnbyb.com
- **James Andrew Hinds**    jhinds@hindslawgroup.com;mduran@hindslawgroup.com, mduran@hindslawgroup.com
- **Robert B Kaplan**    rbk@jmbm.com
- **Jane G Kearl**    jkearl@watttieder.com
- **Jennifer Larkin Kneeland**    jkneeland@watttieder.com, zabrams@watttieder.com
- **Michael S Kogan**    mkogan@koganlawfirm.com
- **Noreen A Madoyan**    Noreen.Madoyan@usdoj.gov
- **Ryan D O'Dea**    rodea@shulmanbastian.com, lgauthier@shulmanbastian.com
- **Sharon Oh-Kubisch**    sokubisch@swelawfirm.com, gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com
- **Ronald N Richards**    ron@ronaldrichards.com, 7206828420@filings.docketbird.com
- **Victor A Sahn**    vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com
- **William Schumacher**    wschumac@milbank.com, autodocketecf@milbank.com
- **David Seror**    dseror@bg.law, ecf@bg.law
- **Zev Shechtman**    zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com
- **Mark Shinderman**    mshinderman@milbank.com, dmuhrez@milbank.com;dlbatie@milbank.com
- **Lindsey L Smith**    lls@lnbyb.com, lls@ecf.inforuptcy.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Jessica Wellington**    jwellington@bg.law, ecf@bg.law

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

**2.  SERVED BY UNITED STATES MAIL**: On **March 8, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **March 8, 2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

### SERVED BY EMAIL

**Buyer Agent**
Hilton & Hyland/Stuart Vetterick
257 North Cañon Drive, 2nd Floor Reception
Beverly Hills, CA 90210
Email: stuart@hiltonhyland.com

**Buyer Advisors & Attorneys**
Michael G. Burke, mgburke@sidley.com
Erica Meierhans, erica.meierhans@fashionnova.com
Melissa Morton, mmorton@grfllp.com
Samuel A. Newman, sam.newman@sidley.com

☐ *Service information continued on attached page*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| March 8, 2022 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                     **F 9013-3.1.PROOF.SERVICE**

In re Crestlloyd, LLC
Professionals Service List
File No.: 9562

The Beverly Hills Estates
GREG LAPLANT
Managing Director
8878 West Sunset Blvd. West
Hollywood, CA 90069

Compass/Aaron Kirman
Attn: Aaron Kirman
9378 Wilshire Blvd #200
Beverly Hills, CA 90212

Concierge
Chad Roffers, Chairman
228 Park Avenue S
PMB 70835
New York, NY 10003-1502

<u>Concierge Counsel</u>
Anthony (Nino) Capobianco
Capobianco Law Offices, P.C.
41990 Cook Street, Bldg. F, Suite
2006
Palm Desert, CA 92211

In re Crestlloyd, LLC
RSN, Secured Creditors
File No. 9562

Debtor
Crestlloyd, LLC
c/o SierraConstellation Partners LLC
355 S. Grand Avenue Suite 1450
Los Angeles, CA 90071

Noreen A Madoyan
Office of the United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

Counsel For Receiver
Brutzkus Gubner Rozansky Seror
Weber LLP
David Seror/Jessica Wellington
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367

County of Los Angeles
(MRCA-Brush Fire Clear'g Dist #1)
200 North Main Street, 16th Fl
Los Angeles, CA 90012

County of Los Angeles
(Wildlife Corridor and Open Space
Protection)
c/o SCI Consulting Group
4745 Mangels Blvd.
Fairfield, CA 94534

Los Angeles County Tax Collector
PO Box 54110
Los Angeles, CA 90054

Counsel to Hankey Capital
Jeffer Mangels Butler & Mitchell LLP
Neil C. Erickson
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Inferno Investment Inc.
Attn: Julien Remillard, President
4-95 Kandahar, Mont Tremblant
Quebec J8E 1E2, Canada

County of Los Angeles
(Local Fire Prevention, Water Quality
and Open Space Measure )
c/o SCI Consulting Group
4745 Mangels Blvd.
Fairfield, CA 94534

Rolls Scaffold, Inc.
Michael Rolls, CEO
11351 County Dr. Ste B
Ventura, CA 93004

American Truck & Tool Rentals
Inc./American Rentals
c/o Caprenos Inc., Cindee Wood,
Authorized Agent
4345 Murphy Canyon Road #200
San Diego, CA 92123

YOGO Securities Holdings, LLC
Steve Oshins, Authorized Agent
1645 Village Center Circle, Ste. 170
Las Vegas, NV 89131

Calgrove Rentals Inc.
Guadalupe Gomez, President
456 Glenoaks Blvd.
San Fernando, CA 91340

Hilldun Corporation
Jeffrey D. Kapelman, CEO
225 West 35th St.
New York, NY 10001

J&E Texture, Inc.
Francisco Gonzalez, CEO
181 Exter Way
Corona, CA 92882

City of Los Angeles
Mike Feuer, City Attorney
City Hall East, Suite 800
Los Angeles, CA 90012

BMC West LLC
David Filtman, CEO
4800 Falls of Neuse Rd., Ste. 400
Raleigh, NC 27609

JMS Air Conditioning and Appliance
Services, Inc.
Yosi Hesica, CEO
7640 Burnet Ave.
Van Nuys, CA 91405

Kennco Plumbing, Inc.
Robert L. Kennedy, Jr., CEO
21366 Placerita Canyon Rd.
Newhall, CA 91321

Parquet By Dian
Dima Efros, CEO
16601 S. Main St.
Gardena, CA 90248

Powertek Electric, Inc.
Mike Moshrefi, CEO
28364 S, Western Ave. #414
Rancho Palos Verdes, CA 90275

County of Los Angeles (Wildlife Corridor
and Open Space Protection)/Clerk of the
Governing Board, Mountains Recreation
& Conservation Authority
5750 Ramirez Canyon Road
Malibu, CA 90265

County of Los Angeles
(Local Fire Prevention, Water Quality
and Open Space Measure )
Conejo Recreation and Park District
403 W Hillcrest Drive
Thousand Oaks, CA 91360

YOGI Securities Holdings, LLC
c/o Daniel Wiesel, Esq.
Wolf, Rifkin, Shapiro, Schulman &
Rabkin, LLP
11400 W. Olympic Blvd., 9th Fl.
Los Angeles, CA 90064-1582

American Truck & Tool Rentals
Inc./American Rental
Tom Murray, CEO and President
88 W. Victoria St.
Long Beach, CA 90805

Buchalter, APC
Jeffrey S. Wruble
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA 90017

Calgrove Rentals Inc.
21627 Roscoe Bl.
Canoga Park, CA 91304

BMC West LLC
3250 N. San Fernando Rd.
Los Angeles, CA 90065

Kennco Plumbing, Inc.
Robert L. Kennedy, Jr., CEO
26575 Ruether Ave.
Santa Clarita, CA 91350

Los Angeles County Tax Collector
PO Box 54018
Los Angeles, CA 90054

Los Angeles County Tax Collector
225 N. Hill Street # 1
Los Angeles, CA 90012

SHULMAN BASTIAN FRIEDMAN &
BUI LLP
Ryan D. O'Dea
100 Spectrum Center Drive, Ste. 600
Irvine, CA 92618

MIKE FIELDS BRONZES LLC
2715 E. 36TH, APT 6203
SPOKANE, WA 99223