1                  UNITED STATES BANKRUPTCY COURT

2            CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

3                            --oOo--

4   In Re:                      )   Case No. 2:21-bk-18205-DS
                                )
5   CRESTLLOYD, LLC,            )   Chapter 11
                                )   Los Angeles, California
6                               )
    Debtor,                     )   Thursday, 11:30 A.M.
7   ----------------------------X   January 6, 2022

8
                                    HEARING RE: [88] DEBTOR'S
9                                   NOTICE OF MOTION AND
                                    MOTION TO:
10                                  (1) APPROVE AUCTION AND
                                    BID PROCEDURES REGARDING
11                                  THE SALE OF REAL PROPERTY;
                                    AND
12                                  (2) SET SCHEDULING FOR A
                                    MOTION TO APPROVE THE SALE
13                                  OF REAL PROPERTY

14
                     TRANSCRIPT OF ZOOM PROCEEDINGS
15              BEFORE THE HONORABLE DEBORAH SALTZMAN
                    UNITED STATES BANKRUPTCY JUDGE

16

17   APPEARANCES:

18
    For the Debtor:           DAVID B. GOLUBCHIK, ESQ.
19                            TODD ARNOLD, ESQ.
                              Levene Neale Bender Yoo &
20                              Golubchik, LLP
                              2818 La Cienega Avenue
21                            Los Angeles, California  90034

22

23

24
    Proceedings produced by electronic sound recording;
25  transcript produced by transcription service.


P 888.272.0022  F 818.343.7119          www.benhyatt.com
Certified Deposition Reporters

```
 1   For Hankey Capital:      THOMAS M. GEHER, ESQ.
                              Jeffer Mangels Butler &
 2                              Mitchell, LLP
                              1900 Avenue of the Stars
 3                            Seventh Floor
                              Los Angeles, California  90067
 4
     For Inferno Investment,  KYRA E. ANDRASSY, ESQ.
 5   Inc.:                    Smiley Wang-Ekvall, LLP
                              3200 Park Center Drive
 6                            Suite #250
                              Costa Mesa, California  92626
 7
     For Yogi Securities      MARK SHINDERMAN, ESQ.
 8   Holdings:                WILLIAM SCHUMACHER, ESQ.
                              Milbank, LLP
 9                            2029 Century Park East
                              33rd Floor
10                            Los Angeles, California  90067

11   For Hilldun Corp.:       JERROLD BREGMAN, ESQ.
                              BG Law, LLP
12                            21650 Oxnard Street
                              Suite #500
13                            Woodland Hills, California  90032

14   For the U.S. Trustee:    NOREEN MADOYAN, ESQ.
                              U.S. Trustee's Office
15                            915 Wilshire Boulevard
                              Suite #1850
16                            Los Angeles, California  90017

17   Court Recorder:          Dawnette Francis
                              U.S. Bankruptcy Court
18                            Central District of California
                              Edward R. Roybal Federal Building
19                              and Courthouse
                              255 East Temple Street, Room #940
20                            Los Angeles, California  90012
                              (855) 460-9641
21
     Court Transcriptionist:  Ruth Ann Hager, C.E.T.**D-641
22                            Ben Hyatt Certified Deposition
                                Reporters
23                            17835 Ventura Boulevard, Suite 310
                              Encino, California  91316
24

25
```



Page                                                                   3

1                         I N D E X

2

3  WITNESSES              DIRECT    CROSS      REDIRECT   RECROSS

4  CHAD ROFFERS

5    By the Court           35

6    By Mr. Shinderman               42

7

8

9

10

11  *Exhibits*                        *Ident.*    *Evid.*

12  (None)

13

14

15

16

17

18

19

20

21

22

23

24

25

**P** 888.272.0022  **F** 818.343.7119                www.benhyatt.com

Page                                                                    4

1           LOS ANGELES, CALIFORNIA, THURSDAY, JANUARY 6, 2022

2                            10:21 A.M.

3                            --oOo--

4           THE COURT:  For #4.00 next is Crestlloyd, our

5     bidding procedures motion.  And I'm going to start with the

6     appearances we've collected.  I think we may have a number

7     of observers here, so I'll begin calling roll from the list

8     that my law clerks have collected with your assistance.  If

9     I get to the end of that list and you plan on addressing

10    something, not just observing, please speak up and let me

11    know your name and who you represent.  So let me begin with

12    my list here.

13          Mr. Golubchik and Mr. Arnold, good morning -- or

14    good afternoon.

15          MR. GOLUBCHIK:  Good morning, Your Honor.

16          MR. ARNOLD:  Hello.

17          THE COURT:  Yes.  If you could both just state

18    your name for the record and who you represent.

19          MR. GOLUBCHIK:  Sure, Your Honor.  David

20    Golubchik, Levene Neale Bender Yoo & Golubchik, on behalf

21    of the debtor.

22          MR. ARNOLD:  Todd Arnold of Levene Neale Bender

23    Yoo & Golubchik on behalf of the debtor.

24          THE COURT:  Did you hear me focusing (phonetic)

25    here?  Okay.

Page                                                                    5

1          Mr. Geher, good afternoon.

2          MR. GEHER:  Good afternoon, Your Honor.  Thomas

3   M. Geher, Jeffer Mangels Butler & Mitchell, appearing for

4   secured creditor Hankey Capital.

5          THE COURT:  Ms. Andrassy, good afternoon.

6          MS. ANDRASSY:  Good afternoon, Your Honor.  Kyra

7   Andrassy, Smiley Wang-Ekvall, appearing for secured

8   creditor, Inferno Investment, Inc.

9          THE COURT:  Ms. Andrassy, I understood what you

10  were saying because I know your name and I know the name of

11  your client, but your connection is not the greatest.

12  Hopefully it will improve, but you were breaking up a

13  little bit.

14         MS. ANDRASSY:  Okay.  I'll also call in.

15         THE COURT:  Okay.  Thank you.

16         Mr. Shinderman and Mr. Schumacher, good

17  morning -- or good afternoon, rather.

18         MR. SHINDERMAN:  Good afternoon, Your Honor.

19  Mark Shinderman of Milbank, LLP, on behalf of Yogi

20  Securities Holdings, LLC, a secured creditor.  Good

21  afternoon.

22         MR. SCHUMACHER:  Good afternoon, Your Honor, Will

23  Schumacher of Milbank, LLP, on behalf of Yogi Securities

24  Holdings.

25         THE COURT:  Mr. Bregman, good afternoon.

Page                                                                    6

1          MR. BREGMAN:  Good afternoon, Your Honor.

2    Jerrold Bregman from BG Law on behalf of Hilldun Corp., a

3    secured creditor.

4          THE COURT:  Mr. O'Dea, good afternoon.

5          MR. O'DEA:  Good morning, Your Honor.  Ryan O'Dea

6    of Shulman Bastian Friedman & Bui on behalf of American

7    Rentals, Inc.  I'm merely observing this morning -- or this

8    afternoon.

9          THE COURT:  Okay.  Ms. Madoyan, good afternoon

10   again.

11         MS. MADOYAN:  Good afternoon, Your Honor.  Noreen

12   Madoyan on behalf of the U.S. Trustee's Office.

13         THE COURT:  I think everyone else we have here is

14   observing.  Does anyone else plan on speaking to any of the

15   issues in the sale procedures motion?

16         MR. GOLUBCHIK:  Your Honor, this is David

17   Golubchik.  To the extent that we need testimony, we have a

18   few parties with knowledge.  One is Chad Roffers from

19   Concierge and we have Aaron Kirman from Compass, to the

20   extent that the Court wants to hear from the broker

21   auctioneer group.  And to the extent there's any questions

22   about the property from SCP we have Lauren Perkins, Mel

23   Staglik and Colin Moran (phonetic).

24         THE COURT:  Okay.  Thank you.  We have the motion

25   filed under our Local Bankruptcy Rule procedure, which is

Page                                                                        7

1    kind of an abbreviated procedure for bid procedures.  There

2    was a limited opposition that was filed and I have to say

3    it raised a lot of good points and it's highlighted what my

4    concerns were by reading the motion, which is that this is

5    awfully fast.

6            And this is a motion, you know, filed in a case

7    that was filed in October that it basically recites the

8    legal standards.  You know, sales procedures are supposed

9    to, you know, maximize opportunity to bid and maximize the

10   value to the estate, and then just kind of makes a whole

11   bunch of assertions.  These procedures will do that.  Very

12   little discussion, very little actual information as to how

13   these procedures and this timeline really would fulfill the

14   goals, you know, set forth in the Code and the applicable

15   case law.

16           So, Mr. Golubchik, I have a lot of concerns with

17   these procedures and this timeline.

18           MR. GOLUBCHIK:  I'm happy to address --

19           THE COURT:  Yeah.

20           MR. GOLUBCHIK:  -- our other issues that -- just

21   so I can cover everything or shall we do one by one?

22           THE COURT:  I mean, it really is -- the

23   procedures that -- I don't understand the lack of any

24   minimum bid and, again, I don't see how these proposed

25   procedures will help accomplish the goal in maximizing the

Page                                                                                    8

1    return to these fees.  There's -- I understand and I

2    appreciate the efforts that the debtors have made with the

3    named secured creditor, but that's not the only creditor

4    here.

5              MR. GOLUBCHIK:  Understood.  Let me give it a

6    shot, Your Honor.

7              THE COURT:  Um-hum.

8              MR. GOLUBCHIK:  This property -- I think everyone

9    in the world knows about this property.  We've had

10   brokers -- Mr. Kerman and the Williams were engaged and

11   were marketing the property before the receivership

12   proceeding occurred.  During the receivership proceeding

13   the receiver employed a broker.  So it's not a new property

14   that's coming into the market.  There has been knowledge

15   about the property.

16             The concern that the estate has, is this is a

17   very expensive property to maintain.  I think we've paid

18   close to four million dollars for procuring insurance,

19   property taxes, accrual of interest, regular maintenance

20   for the seven pools and everything.  It's just a very

21   expensive property.

22             In discussions with the real estate broker and

23   Concierge and hopefully the Court saw the employment

24   applications to which --

25             THE COURT:  I did and I did not enter that order

Page                                                                                    9

1    because it kind of incorporated these procedures.

2           MR. GOLUBCHIK:   Sure.  But the experience and the

3    knowledge and including because we'll be talking about the

4    buyer's premium and the credit that's covered by the

5    Concierge declaration, it's important.  Concierge basically

6    is the 800-pound gorilla in the lesser real estate market.

7    Holds over 90 percent market share, has a list of all the

8    top people, and in consultation with Concierge, as well as

9    the brokers.  The decision that was made is there is

10   sufficient time in order to adequately market this

11   property.

12          Unlike other properties that are lower in value,

13   this is not a type of property that the majority of the

14   world would be able to afford.  This is probably geared

15   towards the billionaires of the world.  I understand that

16   there's a list of 3800 or somewhere around there

17   billionaires in the world in order to target them directly.

18   This is not a type of property that's going to require

19   financing because the people that will bid on this property

20   will have funds maybe in their crypto accounts or in their

21   sovereign accounts, the type of buyers that would buy it.

22   So this is not as is the case with many other properties

23   where you need time for financing and due diligence and

24   things like that.

25          So we have a target audience here between

1   Mr. Firman (phonetic) and the Williams and Concierge

2   database or Rolodex -- I don't know if you can say Rolodex

3   these days anymore -- of potential buyers.  They are

4   covering the billionaires of the world that would be able

5   to do it.

6          So based on the business judgment of Mr. Perkins,

7   who's here on behalf of the manager, that costs associated

8   with the process and in consultation with the experts got

9   here and the broker, the decision was made that this is a

10  sale that can happen early February with a closing by the

11  end of -- by the end of February.

12         There has been substantial marketing.  There have

13  been press releases.  They've been absent. *Architectural*

14  *Digest, Robbs Report, Forbes*.  This morning when I left the

15  house there's a big write-up on CNN -- CNN's website on the

16  property.

17         So for purposes of exposure, which is the issue

18  here, at the end of the day the market is going to dictate

19  the value.  The question is, are we going to be able to

20  attract the interested parties and the bidders to bid.  And

21  based on the efforts that have been done today, our

22  professional group believes that that has been accomplished

23  and we still have time, till February, to continue.

24  There'll be showings.  There are showings pretty much every

25  day responding to inquiries.

Page                                                                      11

1          So as to the timing, we believe based on what has

2    been done, what is being done, and our target audience,

3    which is unusual based on real estate transactions, the

4    timeline works.  So now the --

5          THE COURT:  What -- yeah, go ahead.

6          MR. GOLUBCHIK:  I was going to move to the

7    reserve.  No reserve.

8          THE COURT:  Perfect.

9          MR. GOLUBCHIK:   Again, the thought of the

10   manager there, Mr. Perkins, and most other bankruptcy deals

11   would come in thinking, we need a reserve.  The minimum

12   reserve should I think cover the secured debt or maybe

13   undisputed portion of the secured debt.  Again, in

14   consultation with the brokers and consultation with

15   Concierge, the termination was whenever you have a minimum

16   bid set, there's a psychological view by interested parties

17   that that's the value of the property or that should be the

18   value of the property.

19          However, when you have --

20          THE COURT:  I'm not sure that that actually is

21   supported, but okay.

22          MR. GOLUBCHIK:  I'm going -- I'm letting you know

23   our discussions with our experts who are here --

24          THE COURT:  Um-hum.

25          MR. GOLUBCHIK:  -- and can inform and provide

Page                                                                    12

1   additional information.

2          This is such a unique piece of property that the

3   idea is to create a frenzy and a bidding war amongst

4   interested parties.  So again, relying on the experts who

5   are the top experts in the industry, we are going with the

6   suggestion of what's made by them.

7          At the end of the day we have to come back to the

8   court and we have to get court approval.  So theoretically,

9   let's say we have 100 million-dollar sale price, which

10  doesn't cover all the secured debt, but that's a different

11  issue because there may be dispute the secured debt is not

12  allowed.  We'll have to deal with it in the future, but the

13  hope is and the anticipation we'll have sufficient funds to

14  deal with all debts in full.

15         But we would have to come back to the court.  We

16  would have to seek a court order.  And if the amount is

17  low, the secured creditors object and we cannot show the

18  Court that the sale is appropriate under any of the 363(f)

19  standard, including the under (f)(5), the ability to compel

20  a secured creditor to take what they would take in a non-

21  bankruptcy such as a foreclosure process, a sale would not

22  happen.  So there is a protection for the estate.

23         But again, we relied on the experts who are here

24  today that can discuss, if the Court wishes, that a minimum

25  bid is not required in a situation such as this with such a

Page                                                                                    13

1   unique property.

2          THE COURT:  The other specific question and I

3   neglected to mention earlier, this idea that you're

4   basically tying in your backup bidder or -- is it 45 days?

5          MR. GOLUBCHIK:  Forty-five days.

6          THE COURT:  Forty -- it's 45 days.  That sounds a

7   little chilly to me, that that would possibly chill

8   bidding, right?  What -- what's the reason for that

9   procedure?

10          MR. GOLUBCHIK:  Again, the goal here is to sell

11   the property.  If the initial bidder does not perform, we

12   have a backup.  Very often in bankruptcy situations we have

13   backup bidders.

14          THE COURT:  Right.

15          MR. GOLUBCHIK:  That's the case here as well.  So

16   just to be able to have someone in there so that we can

17   have a sale that occurs, if not immediately, within 45 days

18   thereafter.

19          THE COURT:  But what you don't have very often,

20   at least in my 12 years of doing this, is that a sales

21   procedures order that provides for the assistance of the

22   backup bidder who will be locked in for 45 days as a backup

23   bidder.  That I have never seen and I have never approved

24   and what is the reasoning behind that request?

25          MR. GOLUBCHIK:  The reasoning is simple.  Just to

1  have a backup bidder that -- in case the person is not --

2  does not perform.  We will have a sale process February 7th

3  and February 10th with a sale to close by February 28th, so

4  that's about three weeks.  That's close to a month.

5          So we are going to have effectively one more

6  month thereafter for a backup bidder to stick around

7  because 45 days is from the time of the sale, not from

8  February 28th.

9          THE COURT:  Why would that not just be agreed to

10  at the auction at the sale hearing?

11          MR. GOLUBCHIK:  Well, that -- those -- you're

12  asking why is this something that hard and fast rule that

13  has to happen as opposed to --

14          THE COURT:  Yes.

15          MR. GOLUBCHIK:  -- negotiate with interested

16  parties?

17          THE COURT:  Yes.

18          MR. GOLUBCHIK:  I guess my question is,

19  Mr. Roffers, who is here, whether he'd come and if this is

20  something that can be negotiated at the end of the auction.

21  Would it be okay to --

22          THE COURT:  Roffers?  Yes, please.

23          Go ahead, Mr. Roffers.  Thank you for joining us.

24          MR. ROFFERS:  Good afternoon, Your Honor.  Happy

25  New Year.  So I can speak to what our normal procedure is

1   and obviously this is a unique property.  Rare air, but

2   not -- not that unusual to us.  I mean, it's a -- and we

3   sell properties with this and deal with situations like

4   this, so it's not unchartered territory for us.

5           Normally our procedure locks in the second

6   highest bidder for 72 hours post-auction.  And the reason

7   for that is, you know, if -- the way the gavel falls within

8   24 hours, the bidder is required to sign a purchase and

9   sale contract that's pre-approved and drafted without

10  negotiation, and then within 48 hours deposit an additional

11  ten percent of the purchase price into escrow.

12          So at that point in time if that bidder does not

13  honor any of those obligations or fulfill any of those

14  obligations, then we have the ability to award the property

15  to the second highest bidder.  So that's our normal

16  procedure.  I think in this case what I -- you know, you're

17  dealing with this billionaire crowd and, you know, I think

18  the key here is really to not have a lot -- too much

19  complexity, keep it simple.  Negotiating people like that

20  is -- you know, they all want to be treated specially and I

21  think having just really clear rules of engagement, they're

22  going to focus everybody on the price rather than, you

23  know, other activities.

24          So I don't know if I addressed your question or

25  not, but I'll be quiet.

1           THE COURT:  Well, your normal procedure is -- was

2     very helpful.  And when that -- it seems to me to make a

3     lot of sense of those in the type of property that you're

4     used to dealing with.  And also, you know, in the

5     bankruptcy context where, you know, you typically have a

6     sale hearing there is a highest bidder who is the winning

7     bidder and then there is often a backup bidder who agrees

8     to be the backup in the event the sale isn't closed or by a

9     certain deadline.

10          What I'm not understanding here is this procedure

11    where you're the winning bidder, you're the winning bidder.

12    Everyone bids thinking they're going to be the winning

13    bidder, but if they're not -- if you're not the winning

14    bidder, you are locked in for 45 days.  And I understand

15    this a market where these are parties with an awful lot of

16    liquid cash, but the -- the hundreds and millions of

17    dollars that we're talking about, I think this would not be

18    attractive to potentially not win a property and then have

19    the -- you know, not be able to do anything for 45 days.

20          So that's my concern.  And Mr. Roffers, I think

21    that this is more a question for the bankruptcy lawyers.

22          MR. GOLUBCHIK:  Your Honor, I'm wondering -- and

23    I just sent an email to see if the client is okay with

24    it -- to have a provision that at the conclusion of the

25    auction subject to consent of a backup bidder to be locked

1  in, as opposed to hard and fast lock-in.

2          Mr. Roffers, since this firm is going to be

3  conducting the auction, is that something that's doable?

4          MR. ROFFERS:  Yeah, I think that would be fine

5  and I think if we can procedurally have the 72-hour

6  provision, I think that's pragmatic and then give that

7  person the option to stay in a backup position for 30 days

8  or 45 days, I think that would be an appropriate balance

9  to -- that's what I would recommend.

10          THE COURT:  Okay.  Thank you.

11          Mr. Golubchik, anything else you wanted to speak

12  to before I go around -- you know, objections were due at

13  the hearing.  We had one that was highlighted a little bit

14  in advance, but there may be others as well.

15          MR. GOLUBCHIK:  Sure.  I'll wait and we can

16  comment.  The only question is just because technically

17  Mr. Perkins is the representative client, I want to make

18  sure that he's okay with this backup procedure.

19          THE COURT:  Right.  And if he needs to have a

20  separate conversation, if you want me to open up a breakout

21  room or if you want to, you know, speak separately, let me

22  know.

23          MR. GOLUBCHIK:  Okay.

24          MR. PERKINS:  This is Mr. Perkins.  I think that

25  makes sense on what is -- has been described, so I'm good

Page                                                              18

1   with that, David.

2           MR. GOLUBCHIK:  Okay.  Thank you.

3           THE COURT:  Okay.  And we'll confirm for the

4   record specifics before we get to the end of --

5           MR. GOLUBCHIK:  Yes.

6           THE COURT:  -- our conversations here today.

7           Let me first begin.  We had one written objection

8   and that was from one of the secured creditors, Yogi.  Who

9   would like to speak to that?

10          Mr. Shinderman, will that be you?

11          MR. SHINDERMAN:  Yes.  Thank you, Your Honor.

12  Mark Shinderman, Milbank, on behalf of Yogi Securities, a

13  secured creditor.

14          Your Honor, you understood the concern full well.

15  This is a trade-off, right?  This is an unusual property.

16  It's been marketed for some time, but by a different person

17  with different asks, maybe different conditions.  Nobody

18  knew the terms.  They may have been very different than

19  they are today, so people know the property is in play,

20  they didn't know the terms.

21          So the trade-off between timing, a minimum bid,

22  and what you call the chilling effect, we could live with

23  the timing.  We understand -- and by the way, I should

24  probably preview (phonetic) by saying, debtor's and

25  debtor's counsel has been very accessible to us.  They've

Page                                                                          19

1    been very personable, very reasonable, very professional

2    and we thank that.  As you know, that's not always the

3    case.

4           There's a trade-off here, Your Honor, and that's

5    between the sale time, the minimum bid and the backup bid.

6    With a minimum bid, we feel more comfortable with the time.

7    We understand Mr. Golubchik's representation about the

8    costs, the uncertainty.  Then that's in the estate's best

9    interests to do sooner rather than later.

10          So if you could achieve a certain threshold

11   within that period of time, we'd support it.  We'd support

12   the sale, but the lack of the minimum causes us great

13   concern.

14          Yogi has worked with both of the brokers and has

15   high respect for the brokers.  We heard a couple of things,

16   however.  Mr. Golubchik said that in the normal course they

17   would have a minimum bid.  I believe the brokers have --

18   you know, would also say that in the normal course they

19   would have a minimum bid.  What we don't have, is anything

20   in the record that says having a minimum bid here would be

21   detrimental to the process and that's really what I'm

22   focusing on.

23          So again, we can live with the tradeoffs between

24   timing and the backup bidder if we had a minimum bid and I

25   don't know that anyone says having a minimum bid would be

Page                                                                      20

1  detrimental.  So that's our focus, Your Honor.

2           THE COURT:  Thank you.

3           Well, Mr. Golubchik made that comment and I

4  expressed some skepticism that a minimum bid would somehow

5  inadvertently be setting a valuation or a ceiling.  Maybe

6  it -- let's go around to the parties.  There may be

7  something I'd like to speak with Mr. Roffers about also,

8  but why don't we go around to the other parties who are

9  here today.

10          Are there any other issues or objections?  I'm

11 not quite sure how to do this.  We have a lot of people

12 that -- I guess if someone wants to speak up you can kind

13 of raise your hand or -- Ms. Andrassy?

14          MS. ANDRASSY:  Thank you, Your Honor.  And sorry

15 for my audio problems earlier.  They should be fixed now.

16          THE COURT:  Oh, we can hear you.

17          MS. ANDRASSY:  I represent Inferno Investment --

18 I represent Inferno Investment who holds the -- what was

19 the second priority lien against the property as of the

20 date of the filing.  We filed an opposition yesterday, but

21 I think maybe because of the timing of the filing Your

22 Honor didn't get the opportunity to see it, but it's short.

23          I echo Mr. Shinderman's comments.  That is

24 probably the biggest concern that my client has, both

25 because it could be big waste of time for both the buyer,

1    the Court, the secured creditors.  If a bid comes in that's

2    not high enough to pay off the liens against the property,

3    it's a waste of everyone's time.  My client is not going to

4    consent.  I'm not aware of any basis on which to dispute

5    its lien.

6          And the other issue with that is that there's a

7    listing agreement that's being entered into concurrently

8    with two brokers that has a minimum list price of 225

9    million dollars.  So this isn't a situation where there's

10   not already a number out there and I think that separates

11   it from the psychological -- you know, the psychological

12   effect that not having a reserve is going to be, because

13   there is already a number out there.  So my client would

14   strongly support the request that there be a reserve.

15         The other concern that I have, but it's -- I'm

16   afraid it's going to chill the bidding in this case, is

17   that there's a buyer's premium of 12 percent.  And normally

18   that's intended to compensate the auctioneer for his

19   effort, but in this case under the employment agreement the

20   majority of that is actually being refunded or rebated to

21   the bankruptcy estate, so it's really not intended to

22   compensate the auctioneer.  And given the expected purchase

23   price of this property, 12 percent is a huge number.  And

24   so my client is concerned about that also having a negative

25   impact on the bidding and the price of the property.

Page                                                                      22

1          And the last one is the opposition and it's more

2    of a limited opposition because refutes, of course, the

3    sale  of the property and the retention of the auctioneers

4    and the brokers, that we do have just concerns with some of

5    these procedures.

6          The last request that it made in the opposition

7    was that because of the interest of the secured creditors

8    in this case and this property, we would like to know --

9    get updates from the debtor about the number of bidders

10   who've registered and shown proof of funds.  And there's

11   been a very open communication line in this case, so I

12   don't anticipate that that would be an issue, but my client

13   would request that as well.

14          MR. GOLUBCHIK:  Your Honor, I can address the

15   last two points I think relatively easily, if that's okay.

16          THE COURT:  Okay.  What I'd like to do, if we

17   could, Mr. Golubchik --

18          MR. GOLUBCHIK:  Oh, I'm sorry.

19          THE COURT:  -- is go around and collect all of

20   the issues and then we'll give you an opportunity to

21   respond to everything.

22          MR. GOLUBCHIK:  Fine.

23          THE COURT:  Anything else?  I'm kind of looking

24   for hands or maybe -- Mr. Bregman?

25          MR. BREGMAN:  Thank you, Your Honor.  Good



1   afternoon again.

2           I'd just like to say that on behalf of our

3   client, Hilldun Corporation, we are supportive of the sale

4   process.  We're appreciative of the efforts made by the

5   parties in interest and counsel to get us to this point.

6           Some comments on some issues that have been

7   raised.  We believe the timing proposed is reasonable.  In

8   light of the exposure, in light of the parties we're

9   dealing with and also in light of the macro-economic

10  circumstances, including anticipated fed rate hikes and

11  other variables that could make it problematic if this is

12  kept too far in the future, I think the key point on that

13  is the exposure those properties already had.

14          On the buyer's premiums, that ship has sailed.

15  The Court has approved the applications, but I think the

16  substantive point there is that every buyer who is going to

17  be looking at this property is going to be able to

18  understand the interplay between a buyer's premium and a

19  purchase price, so nobody is going to be misled or chilled

20  because that -- they all can do the math.  They're all

21  sophisticated presumably.  Certainly they are if they can

22  be bidding for this property.  So I think the buyer's

23  premium, it's a non-issue.  It's an economic matter.

24          The backup bidder concept, it seems to me there

25  was a bit of a disconnect in the discussion today between

 1  the notion of locking down the backup bidder, which it

 2  seems to me should be required.  It's easy to say to anyone

 3  participating, if you participate, here's the rules of the

 4  backup bidder.  I've never seen an auction where there

 5  wasn't a lockup of the backup bidder.  I think the issue is

 6  how long that lockup is.  I heard the Court to be saying 45

 7  days doesn't make sense because the buyers are going to

 8  have the ability to close or not.  They don't need --

 9  there's not going to be a financing contingency --

10          THE COURT:  Right.

11          MR. BREGMAN:  -- here, so it should be able to be

12  closed maybe not in 72 hours, but it should be able to be

13  closed in a relatively quick period of time.

14          So our view is the backup bidder should

15  absolutely be required to be locked up to participate.

16  That shouldn't be negotiated at the auction.  That would be

17  our view.  We support the debtor's request in that regard,

18  but would suggest that perhaps the duration be moderated,

19  that that be the issue that folks focus on.

20          And lastly, on the minimum bid, candidly I think

21  it's a good idea to have a minimum bid.  I get that that

22  issue probably will not come into play and I get the game

23  theory of auctions and the notions of coming in with no

24  minimum bid is creating excitement, but that's a double-

25  edged sword.  You also could have a situation where someone

Page                                                                    25

1  looks at this and says, I'm not going to put up 280 million
2  dollars.  So let's say people stay away and the highest bid
3  at the auction is 80 million bucks or 50 million bucks.
4  The debtors would have -- unless there's a change,
5  presumably they'd have to close with that and then the
6  objectors would come in and argue that their lien shouldn't
7  simply attach to the proceeds.  There could be a fight.
8        I'm not super convinced that that is sufficient
9  protection under the circumstances or that that's advisable
10 because if 50 million bucks is the number, a lot of folks
11 might look at this and say, darn it, you know, I would have
12 come in at 50 million, I'd come in at 90 million, or
13 something like that.
14       So I think I would respectfully suggest that the
15 parties perhaps consider a reasonable minimum bid.  Thank
16 you, Your Honor.
17       THE COURT:  Thank you, Mr. Bregman.
18       Mr. Shinderman.
19       MR. SHINDERMAN:  Yes, Your Honor.  Following up
20 on Mr. Bregman, who's done an excellent job, I'm not
21 troubled by the backup bid that Mr. Golubchik and Mr.
22 Perkins proposed and maybe with the modification Mr.
23 Bregman that it should be 21 days or 30 days.  It's not
24 unusual to have a backup bidder if everybody knows those
25 are the rules.  These buyers, we heard, are sophisticated

1  buyers who are not having financing contingency.  So I'll

2  defer to the -- to Mr. Roffers, Mr. Perkins and Mr.

3  Golubchik.  And I agree there's the tradeoff that Mr.

4  Bregman articulated, back to the point about talking of the

5  backup bid isn't material if we have a -- well, the

6  tradeoff would be if we have a minimum bid requirement.

7  Thank you, Your Honor.

8           THE COURT:  Thank you.

9           So I don't see anyone else right now, but the --

10 you can certainly jump in or wave a hand if there are other

11 questions.  Is Mister --

12          MS. MADOYAN:  Your Honor.

13          THE COURT:  Yes, Ms. Madoyan.

14          MS. MADOYAN:  Yes, Your Honor.  I just wanted to

15 let the Court know that we did also raise the issue of the

16 minimum bid early on with the debtor.  However, you know,

17 because it's an issue that's more closely related to the

18 secured creditors and the other creditors, it's something

19 that at this point -- it's an issue that we see as well.  I

20 wanted to let the Court know.

21          In addition, with respect to the buyer's premium,

22 some of other creditors raise, I also did raise that with

23 Mr. Golubchik when the employment application for the

24 brokers was filed.  I did obtain an explanation that we

25 were fairly satisfied with.  So perhaps that's something

1  that Mr. Golubchik can address with the other creditors

2  that had an issue with the buyer's premium.  So I just

3  wanted to let the Court know of the U.S. Trustee's position

4  or non-position at this point, I guess.

5          THE COURT:  Okay.  Thank you.

6          So Mr. Golubchik, a couple of things and, you

7  know, I'll hear your responses to everything.  As you know,

8  when typically an asset is sold in the bankruptcy context,

9  what we often have is a stalking horse and I get a motion

10 to approve sale procedures with the stalking horse bidder.

11 And the big argument is this stalking horse and this price

12 set the market and they set the beginning bid and that's

13 going to encourage everyone to come in and bid more.

14         When you sell real estate, there's a listing

15 price, right?  And the seller hopes that, you know, they're

16 going to generate multiple offers and end up getting what

17 they think the property is actually worth, which is always

18 more than its listed for.

19         So it's difficult for me, especially in light of

20 all the other comments that I've heard, to make a finding

21 that the evidence supports these procedures that don't have

22 any sort of minimum bid.

23         MR. GOLUBCHIK:  Your Honor, if it's okay with

24 you, I'd like to address some of the other comments and if

25 it's still possible to do a breakout room for our group to

1   discuss a minimum bid and come back.  I do know that there

2   are case studies Concierge sent over also where with that

3   reserve numbers sort of substantially higher than

4   anticipated, but I'd like to discuss with them maybe for

5   ten minutes and if it's okay to reconvene, but --

6            THE COURT:  Okay.

7            MR. GOLUBCHIK:  Okay.  But in the meantime, let

8   me address the other comments that were made and I think by

9   Ms. Andrassy.

10           With respect to keeping secured creditors in the

11  loop absolutely.  This applies to an open process so we can

12  have -- hear out of discussions, let them know how the

13  qualifications and the process is going.  No issues --

14           THE COURT:  Yeah.  I mean, perhaps there could be

15  something like a weekly report, you know, or a conference

16  call or something like that.

17           MR. GOLUBCHIK:  Right.  Yeah, it's something we

18  probably would want to do confidentially, substantially not

19  on the record, but --

20           THE COURT:  Right.

21           MR. GOLUBCHIK:  -- that's possible.

22           With respect to the buyer's premium, as

23  Mr. Bregman said, this was part of that employment

24  application that was addressed.  At the end of the day,

25  everything here is about dollars and cents.  If it costs

1   more in a premium to purchase something, presumably someone

2   with also less money, that's exactly why we have the credit

3   provision here for funds to come back.  So presumably a

4   buyer that is concerned about paying a lot for a buyer's

5   premium will offer less money, which means the net of the

6   estate is less.  However, we give the credit back, which

7   brings it up.

8          Ms. Madoyan referenced the additional information

9   provided.  That's the supplemental declaration of

10  Mr. Perkins that talked about incentives for the brokers.

11  As the purchase price goes up, the incremental value would

12  receive a higher commission structure and then with respect

13  to Concierge as the price goes up, the incremental credit

14  will be reduced so that everyone incentive to bring in the

15  maximum value.

16         So I -- but I think that was addressed and that

17  should have been covered with an employment application to

18  which an objection has not been filed by Inferno or anybody

19  else.

20         And I think that addresses all the outstanding

21  issues we discussed today, other than the minimum bid.  And

22  if it'd be okay, I think a ten-minute discussion for our

23  group in a breakout room --

24         THE COURT:  Let me create that right now.  So,

25  Mr. Golubchik, that would be you, Mr. Arnold, Mr. Perkins

Page                                                                    30

1   and who else?

2              MR. GOLUBCHIK:  Mr. Staglik, Mr. Moran,

3   Mr. Roffers, Mr. Kirman.  I see Ms. Williams is on.  Is

4   there anybody else that's on part of the debtor group?

5              THE COURT:  Okay.  Let me see if I can --

6              MR. ARNOLD:  And Katherine McMains (phonetic),

7   please, Your Honor.

8              THE COURT:  Okay.  Hold on.  Let me see this.

9              MR. SHINDERMAN:  I'm not offended that I wasn't

10  invited, Mr. Golubchik.

11             THE COURT:  Let's see here.  Oh, and of course,

12  the -- we don't go alphabetically.  We only go

13  alphabetically by first name, so Mr. Golubchik.  Let me

14  see.

15             MR. GOLUBCHIK:  Let's pull in Mr. Bregman.  He

16  was a nice guy today.

17             THE COURT:  (Laughter)

18             Okay.  I think I may have missed someone.  Oh,

19  Mr. Kirman.  Okay.  All right.  So I have a breakout room

20  consisting of Aaron Kirman, Chad Roffers, David Golubchik,

21  Katherine McMains, Lawrence Perkins, Miles Staglik, Rita

22  Rameda Williams (phonetic), and Todd Arnold.  Anyone else,

23  Mr. Golubchik?

24             MR. GOLUBCHIK:  Did you mention Colin Moran?

25             THE COURT:  I did not.  Colin Moran.



P 888.272.0022  F 818.343.7119          BENHYATT   www.benhyatt.com
                                        Certified Deposition Reporters

Page                                                                    31

1          MR. GOLUBCHIK:  Again, anyone else that we're

2   missing, please speak up.  Guess that's it.

3          And, Your Honor, I'd ask just for everyone's

4   scheduling, ten minutes should suffice for us to talk.

5          THE COURT:  Okay.  That's fine.  Did you all

6   receive an invitation to the room?

7          MR. GOLUBCHIK:  Yes, we're heading there.

8          THE COURT:  Okay.  Go ahead.  When you're

9   finished, just rejoin us.

10          MR. GOLUBCHIK:  Will do.

11          THE COURT:  Thank you.

12          Okay.  For the rest of us here, why don't we do

13   this.  I'm going to -- I will turn off my audio and video

14   for ten minutes.  You can do the same.  I'm going to ask

15   our courtroom deputy to stop recording for ten minutes and

16   we'll resume.  Thanks, everyone.

17          (Off the record at 12:38 p.m.  Back on the record

18   at 12:54 p.m.)

19          THE CLERK:  Please come to order.  This court is

20   now in session.

21          THE COURT:  Thank you so much.

22          Okay.  We are back on the Crestlloyd matter.

23          Mr. Golubchik, you want to fill us in?

24          MR. GOLUBCHIK:  Yes, Your Honor.  Thank you for

25   giving us some time to talk.  In discussions with the

1  brokers, the auctioneer, it is the view of the

2  professionals that a reserve would not be productive in

3  this case.  And if it's okay, I'll do an offer of proof and

4  then if the Court wishes, we can swear Mr. Roffers in and

5  he can provide testimony.

6          THE COURT:  Okay.

7          MR. GOLUBCHIK:  Based on their experience, when

8  you have a reserve price, the sale prices have been closer

9  to the reserve price lower than the fair market value.  So

10 when there are no reserves, the numbers historically based

11 on the experience have been lower.  If you have a reserve,

12 their concern is it knocks out the big group of interested

13 parties who initially perceived this as not a great deal,

14 as opposed to being inside the auction and the frenzy of

15 bidding and bidding up.  Mr. Roffers can discuss several

16 case studies, several experiences that he has that supports

17 it.

18          At the end of the day, as people discussed

19 earlier, this was the type of property that's going to have

20 a sophisticated buyer.  The sophisticated buyer will have

21 the bankruptcy records, which are public, which will show

22 what the secured debt is.  The bankruptcy records are going

23 to show that at the end of the day any sale is subject to

24 approval of Your Honor, so we have to go back so a

25 sophisticated buyer will know what the threshold is that

Page                                                                                          33

1   needs to be achieved.

2          And again, that is the backup where we go back to

3   the court and Your Honor can say, no, I'm not willing to

4   sell it for 120 million dollars.  I assume we would have a

5   lot of objections from secured -- other secured creditors.

6          So while the belief is that the number is going

7   to succeed, especially based on I think a couple days ago

8   we saw that the CEO of Coinbase bought a 25,000 square foot

9   property for 133 million dollars, which is a quarter of our

10  size with less desirable views.

11         So the thought is we're going to achieve the

12  numbers in today's market.  If it makes sense and if it's

13  acceptable to the Court, Mr. Roffers can be sworn in and he

14  can discuss why in his professional opinion he believes

15  that setting a reserve price is going to be detrimental to

16  the sale of this property.

17         THE COURT:  Yeah, because it's an issue that's

18  been raised by a lot of people here today and in the

19  papers, I think I'd like to do that.  I will try to keep

20  this relatively brief.

21         I am going to ask our courtroom deputy, Dawnette,

22  if you would please swear in Mr. Roffers.

23         MR. GOLUBCHIK:  Your Honor, I see Mr. Bregman

24  doing the peace sign prior to testimony.

25         THE COURT:  Mr. Bregman?

Page                                                                34

1          MR. BREGMAN:  Yes.  Having heard what

2    Mr. Golubchik said and his offer of proof, I just wanted to

3    suggest a path forward that may be acceptable to the

4    parties.

5          The concerns that I articulated would be

6    addressed if we didn't have a reserve, but if we included

7    in the order some nebulous opportunity for -- to address

8    the situation that I hypothesized, the sale -- the highest

9    bidder at the particular sale is really, though,  and it's

10   not what anyone anticipated.  You know, the 50 million

11   bucks, for example, is the highest number.

12          I think that could be addressed by including --

13   by expanding the bases to oppose approving the sale, which

14   I think are consistent with Mr. Golubchik's notion that

15   after it's done, it's come back to the Court and the Court

16   may look at this and say, no, I don't want to approve it.

17          I think we could include in the order a mechanism

18   to give -- to animate that concept, something as simple as

19   saying that a basis to not approve the sale would be that

20   the Court determines that it's improvident under the

21   circumstances.

22          THE COURT:  That's always a basis to not approve

23   a sale.  I -- Mr. Golubchik can tell you how much I cut

24   from all of the orders that he lodges with me.  It's not

25   necessary.  It's not necessary language, but thank you.

Page                Chad Roffers - By the Court                35

1              MR. BREGMAN:  Thank you again, Your Honor.

2              THE COURT:  Dawnette, are you with us?  Would you

3    please swear in Mr. Roffers?

4              THE CLERK:  Please raise your right hand.

5                      CHAD ROFFERS, SWORN

6              THE CLERK:  Please state your name and spell it

7    for the record.

8              THE WITNESS:  Chad Roffers, C-H-A-D  R-O-F-F-E-R-

9    S.

10             THE CLERK:  Thank you.

11             THE COURT:  Thank you.  Thank you, Dawnette;

12   thank you, Mr. Roffers.

13             Mr. Golubchik, if you don't mind, I'll just jump

14   in and ask Mr. Roffers to outline.

15             MR. GOLUBCHIK:  Sure, Your Honor.  If it would be

16   okay for purposes of foundation and background experience

17   can we incorporate his declaration in support of employment

18   application?

19             THE COURT:  Certainly and I was about to

20   reference that.  Those are already in evidence.

21                        EXAMINATION

22   BY THE COURT:

23       Q.   So, Mr. Roffers, we already know your background

24   and your qualifications.  Would you be able to elaborate a

25   little bit on what Mr. Golubchik mentioned, the idea that

Page            Chad Roffers - By the Court            36

1   having here a minimum bid would not be helpful?  And in

2   particular, I think I and the objecting creditors are most

3   interested in hearing some examples of past transactions

4   where you found it to be beneficial not to have a minimum?

5       A.    Yes, Your Honor.  Be happy to.

6       Q.    Okay.

7       A.    So I think the issue -- the issue at hand with

8   this property is there are no costs.  The highest precedent

9   ever is 165 -- 165 million, so this is unchartered

10  territory in Los Angeles and the world.  So what this

11  property is worth?  Who knows.  Right?  I mean, ultimately

12  I would say that our objective in the next five weeks is to

13  generate 1,000 inquiries from around the world.  You know,

14  ultimately to distill that down into probably 20 serious

15  parties really, you know, taking a serious look at this

16  and, you know, target having three to five qualified

17  bidders, I think that's a realistic -- you know, a

18  realistic set of objectives and based on our experience and

19  this type of price point.

20           So we're talking about a very small pool of

21  buyers who are smart and they're going to say, you know,

22  I -- this is a great property, but there is going to be

23  opportunists, right?  The type of man or woman who's going

24  to buy this property is -- you know, they're smart, they're

25  opportunists and they want to feel like they're getting a

Page                 Chad Roffers - By the Court                 37

1  good deal and they don't want to feel like they -- they

2  overpaid, which means the competition that's generated at

3  the auction is really going to prove what this property is

4  worth and I think that the more competition we have, the

5  better result.

6          And I'll just give you a specific example, a

7  recent, you know, property that we sold in Texas.  Slightly

8  different price point, but I think it will articulate the

9  point.  Valued at ten million or listed for ten million and

10 it was -- there was a little under two million dollars of

11 debt and the estate said, we're going to set the floor at

12 the two million dollars and we ultimately got the asking

13 price for the property.  And the reason for that was that

14 there was no question, nobody sitting on the fence saying,

15 I don't know if the judge is going to approve this or, you

16 know, I'm just not going to engage and versus it was such

17 an obvious, you know, opportunity.  There was very little

18 doubt that the property wasn't going to sell, right?  And

19 we ultimately had ten bidders with a very competitive

20 auction and it was a now-or-never thing.  And I think

21 that -- so that's one of many examples.

22         And I think also the -- you know, the notion -- I

23 have empathy towards the secured creditors here, certainly

24 under -- you know, I appreciate that, but unfortunately,

25 you know, what -- what the liabilities on the property

Page                Chad Roffers - By the Court                38

1  really have nothing to do with what it's worth.  And, you

2  know, it might bring 250 million dollars at the auction; it

3  might bring 100 million dollars at the auction.  We don't

4  know because we're not the buyers.  And I think that the

5  purest way to maximize the value for this property is just

6  make it clear that this property is selling, right.

7          We've been given a mandate to figure out what

8  this property is worth.  The -- you know, there's no second

9  bite at the apple.  It's now or never and I think it's

10  going to result in the right amount of competition.  You're

11  going to see who the bidders are.  You're going to know,

12  you know, who ultimately materialized and competed.  And I

13  think that you'll have the discretion to say, you know, I'm

14  not going for it or I am.  It'd be entirely your call.  But

15  I think to try to guess at what a reserve should be or back

16  into a reserve just because it makes the creditors feel

17  good, you know, really is inconsistent with what this

18  property is worth.  Nobody knows.

19      Q.    Okay.  Thank you.

20      A.    Oh, and then one -- one final -- one final thing.

21  I'm sorry, Your Honor.

22      Q.    Okay.

23      A.    The other thing I would just say is that, you

24  know, in our case studies in Los Angeles, I think I've done

25  eight transactions with Mr. Kirman.  And two had minimums

Page              Chad Roffers - By the Court                 39

1  and six didn't and the ones that didn't sell were the ones

2  that had minimums.  And I think that the -- and the reason

3  is, if you set the minimum, you know, arguably too close to

4  whatever the market value is, right, you lose competition.

5  You lose -- you lose people, like, oh, I don't think I want

6  to spend -- let's pretend you set it at 150 million or

7  whatever you -- you know, the -- whatever the secured

8  creditors are.  There's going to be people that say, oh,

9  you know, I'm not going to get in.  And you may have a

10 bidder who's prepared to go north of that, but you lose the

11 competition to push him or her, you know, beyond that

12 point, and I think that's also really important -- really

13 important point in terms of this.

14         And I think the third thing is the last thing

15 this team wants is -- we had the opportunity to work with

16 Michael Jordan 11 years ago and he wanted a minimum and I

17 caved.  I gave -- I said, "Fine, you can have a minimum,"

18 and the minimum was 11 million dollars on a 13 million-

19 dollar asking price.  And we had a high bid at nine-and-a-

20 half million, you know, at the auction and bottom line is

21 it didn't sell and 11 years later, they still owned the

22 property.  Right.  And that, you know, would be -- it --

23 it's -- we have really good momentum right now.  The

24 messaging has been very positive.  You know, the fact the

25 property doesn't have -- doesn't have a certificate of

Page                 Chad Roffers - By the Court                 40

1   occupancy is going to be a head wind we're going to have to

2   deal with.  Right?  You're asking somebody to pay more than

3   any other property ever in the history of the world and,

4   oh, by the way, there's no C of O.  Good luck.  That's a

5   head wind, as you can imagine.  And so that's already a big

6   head wind.  And I think putting a minimum out there that's

7   argu -- you know, either makes the creditors feel good or

8   just too close to perhaps where buyers think the value is,

9   we're going to lose competition and ultimately get an

10  inferior price.

11          THE COURT:  Thank you.  Briefly let me just go to

12  the -- you've raised some concerns on this issue.

13          Ms. Andrassy, any questions or anything you'd

14  like Mr. Roffers to address while he's sworn in?

15          MS. ANDRASSY:  I guess the rub that I have here

16  is that this is a bankruptcy case.  In order to sell free

17  and clear you're still going to have to settle for a price

18  above the lien, you know, a listing price at 295.  And it's

19  kind of like the example he gave with the Texas situation

20  where there was a floor of two million, there was a list

21  price of ten.  Floor of two million happened to be equal to

22  the secured claims.  I'm not quite sure how this is

23  different except that -- I mean, I understand the point --

24  that nobody really know what the value of this is.

25          The fact is that they're not going to be able to

Page                Chad Roffers - By the Court                41

1  sell free and clear of liens unless they meet the statutory

2  requirements and that's why I would propose -- I believe

3  that we should have a reserve price.  I hear what he's

4  saying, but I don't have the answer response to that issue

5  because you do have a listing agreement here at 295

6  million.

7          THE COURT:  Ms. Andrassy, that wasn't exactly a

8  question, but I don't know if there's anything else you

9  wanted to comment on based on counsel's comments there.

10          MS. ANDRASSY:  Well, I think the question is, how

11  it relates to the fact that there's a listing agreement of

12  295,000 and the reality that you've got to come into

13  court --

14          THE COURT:  Yeah.

15          MS. ANDRASSY:  -- into court and still get

16  approval under Section 363 to sell free and clear in order

17  to meet the obligation to convey marketable title.  I think

18  that kind of sets those apart a little bit.

19          MR. GOLUBCHIK:  I think that's more of a legal

20  bankruptcy --

21          THE COURT:  Yeah, I was about to say the same

22  thing.

23          MR. GOLUBCHIK:  -- question.  I'm happy to

24  address it, if you want, Your Honor.  It's we currently

25  have two brokers working -- two broker shops working.  If

Page                    Chad Roffers - Cross                    42

1  theoretically they get someone who comes in tomorrow with a

2  great bid, we can cancel the auction.  Under our employment

3  agreement there's a fee that's paid, a reduced fee, but we

4  have the ability to sell right now before going to auction.

5  So if someone comes in sooner, that's great.  But at least

6  the world is going to know that there is no do over after

7  this February 7th to February 10th auction process.  So I

8  think there are two different issues.

9          THE COURT:  Thank you.

10          Mr. Shinderman.

11          MR. SHINDERMAN:  Yes, Your Honor.  I'll be brief.

12  I don't want to fight with Mr. Roffers at all, but I wanted

13  to clarify.

14                    CROSS-EXAMINATION

15  BY MR. SHINDERMAN:

16      Q.    Mr. Golubchik made a proffer that you think a

17  minimum price could be detrimental.  Is that your

18  testimony, sir?

19      A.    Yes.

20      Q.    Okay.  And second, you said your thesis is that

21  if I set the price too high you might limit the amount of

22  competition, but you also said that nobody really knows

23  what the value is until we find out what the value is,

24  correct?  Is that correct, sir?

25      A.    Yes, that's correct.

Page                    Chad Roffers - Cross                    43

1       Q.    So isn't it possible that a bidder sitting at

2   home, such as Mr. Geher might think the property is going

3   to sell for 300 million dollars and not show up for auction

4   because he doesn't have a guidepost?

5       A.    So that's why -- it's a good question of why we

6   run a multi-day auction process that's transparent.  Quite

7   frankly, not just the bidder, but anybody in the world who

8   wants to log in is going to be able to, you know, track

9   this.  You'll have a front row seat.  And, you know, for

10  every bidder it's transparent real time what the bid is and

11  what the, you know, current incremental ask is.  So I think

12  that's the big part of -- and I think, for coming back to

13  the court and, you know, getting in front of Your Honor

14  again to say, hey, we have a five-day auction, we have

15  these five billionaires competing and, you know, these were

16  the different bids and this is where we landed.  You know,

17  there's not going to be any mystery for somebody who's kind

18  of waiting and there will be people who wait till the last

19  day.  No question in my experience or maybe even the last

20  hour to get in because, you know, they're waiting to see

21  what this property is worth because nobody knows, right.

22  And I think that is really important and I think that's --

23  I think that's another reason where we do have an asking

24  price.  The guide right now is 295.  So we -- you know,

25  that's the asking price that's been established for the

Page                    Chad Roffers - Cross                    44

1    property.  It's been determined that all parties want this

2    property sold immediately.  We're going to run an auction

3    process.  We fully anticipate the court to approve, ratify

4    the sale now or never, you know, and I think that's

5    ultimately the way to maximize the value of this property.

6    I think if we put a minimum out there it's going to need to

7    be published and that becomes your new asking price, in my

8    experience.

9           So, for example, you put a 150 million on this

10   property, right, it undermines the 295 because that's going

11   to be the now new number everybody is shooting for and then

12   the next question is going to be, well, can I get it for

13   less than that.

14          So I think it ultimately, you know, undermines

15   the potential of the property and if there's somebody out

16   there who thinks this property is worth 295 million, I

17   don't want to, you know, deter them by saying, hey, we

18   think the minimum should be 150, that's really what we

19   think it's worth.

20      Q.   So let me ask -- and I don't mean to be dense

21   about this -- you say the asking price is 295.  Has that

22   been advertised to the world?

23      A.   It will be.  It will -- I mean, I think my

24   understanding is Monday the property is, you know,

25   scheduled to get, you know, officially put on the MLS, the

Page                    Chad Roffers - Cross                    45

1  market, and it will -- the world will know the asking price

2  is 295.

3       Q.   And so just so I'm clear, this goes to

4  Mr. Golubchik's point about if someone came in and offered

5  you 295 tomorrow, we might cancel the auction.  Is that the

6  point of the asking price?

7       A.   I think the point of the asking price is three

8  things.  And we had a lot of dialogue about establishing

9  the asking price and, you know, this property has been

10 talked about, you know, half a billion at one point, right,

11 and, you know, et cetera.  If you think about the

12 psychology of who's going to buy this, right, it's going to

13 be somebody who, one, has lots of money, probably somebody

14 who has a big ego potentially, high profile.  I mean, these

15 people want to win, right.  They want to feel good about

16 their purchase, they want to feel like they outsmarted

17 everybody else, you know, et cetera.  And I think it's a

18 lot easier to feel like you won at 200 million knowing that

19 the asking price was 295 than you won at 200 million and

20 the asking price was 150, right, and you had to overpay.

21          So I think it establishes.  It sets a mark.  This

22 is what we think this property, you know, is worth.  This

23 is -- you know, this is our asking price but, you know, you

24 the bidders and the buyers are going to -- you know, figure

25 out what this is worth and you're going to compete in a

Case 2:21-bk-18205-DS   Doc 197   Filed 03/15/22   Entered 03/15/22 11:55:27   Desc
Main Document   Page 46 of 55

Page                    Chad Roffers - Cross                    46

1  transparent fair process and at the end of the auction, you

2  know, you, the buyers, can determine the market value of

3  this property.

4      Q.   And so if Mr. Geher has the 295 million lying

5  around, he should call you.

6           Last question would be, given the unique

7  property, given that we haven't started the sale and

8  announce the 295 asking price, is 45 days really the best

9  way to attract the fair market value or would more time

10 be -- if available would that be welcome?

11     A.   I'm comfortable with the timeline.  It's

12 commensurate with our normal protocols.  It's typically

13 five weeks, so -- and I think it is important to point out

14 really, you know, this kind of -- this auction process, you

15 know, kind of got covered in the press, you know, over a

16 month ago.  The word is out and -- and I actually think it

17 might, you know, kind of look back, quite frankly, we start

18 back-pedaling versus we have -- we have momentum.  The

19 team -- you know, the team has been working for a month,

20 you know, obviously subject to being approved to do so but

21 in good faith so that we're ready to hit the ground

22 running.  I'm actually in Los Angeles right now.  I'll be

23 at the property this afternoon with the brokers, you know,

24 so we already have interest.  There's already a showing

25 scheduled I think for Saturday.

Page                    Chad Roffers - Cross                    47

1          So I think and also, I think Mr. Bregman, you

2     know, pointed out, you know, the world is an uncertain

3     place.  Things are pretty good right now.  The stock market

4     is -- you know, there's a lot of momentum and so I don't

5     feel like for some reason if the extra time is going to

6     make a difference.  An extra week or two is not going to

7     make a difference.  I think we have at minimum we have

8     interest.  It's a positive story right now.  There isn't a

9     lot of negativity or a cloud regarding the bankruptcy,

10    almost irrelevant, right.  It's like this is an iconic

11    property and it's selling on February 10th.

12          MR. SHINDERMAN:  Judge, I have one more question

13    and --

14          THE COURT:  Okay.

15          MR. SHINDERMAN:  -- I'm thinking on this and

16    Ms. Andrassy's point.  If we can object to the sale if we

17    need to object the auction won't be presumptive, the end of

18    the story.  We take great, you know, comfort in that.

19    BY MR. SHINDERMAN:

20    Q.   My last question is picking up on Mr. Bregman's

21    point, on having a backup bidder, I believe the profitable

22    point was having a backup bidder is not uncommon.  Given

23    the unique buyer, maybe it doesn't need to be 45 days.  It

24    could be 21 or 30 days.  What is a reasonable period of

25    time for these buyers to close a sale?

Page                    Chad Roffers - Cross                    48

1    A.    So we -- under our procedures we have a deadline

2    of February 28th to close the sale.  So the determination

3    by, let's say, March 1 whether we need a backup bidder or

4    not.

5    Q.    So if that's the case -- I guess, Your Honor,

6    I'll just take a note from Mr. Golubchik -- in that case,

7    having a backup bidder for 10 or 15 days would work.  Then

8    you don't need 45 days to the Judge's point, is that

9    correct?

10   A.    No.  If we're using -- the auction concludes on

11   February 10th, let's say, and I think an agreement has to

12   be executed within 24 hours.

13   Q.    Yes.

14   A.    Okay.  February 11th, so we need 17 days to get

15   to the closing if it happens.  If it doesn't happen, 18

16   days, so 21 days maybe would be -- that'd be acceptable for

17   a backup bidder as of -- less than half of the 45.

18   MR. SHINDERMAN:  Then I know -- Your Honor, I

19   shouldn't do this.  I know I lied.  I have one more

20   question.

21   Mr. Roffers --

22   THE COURT:  Go ahead.

23   BY MR. SHINDERMAN:

24   Q.    Would it hurt in any way to post -- push the

25   auction one week or is it too late to do that?

Page                    Chad Roffers - Cross                    49

1     A.    No.   But, you know, it -- I think it's important.
2   We need to, you know, measure twice and cut once and we
3   want to play offense, right.   We already have this head
4   wind of the C of O, right, and I don't want to
5   underestimate.   That is an issue we're going to have to
6   deal with.   It's our biggest issue, and the other issue is
7   just nobody -- you know, nobody knows what this is worth.
8   And then the third issue is, you know, still got to get
9   approved by the court.   So those are our -- you know, our
10  hurdles.   But if -- an extra week, I have no issue with
11  that.
12          MR. SHINDERMAN:   Okay.   Thank you, Your Honor.   I
13  have nothing further truly this time.   Thank you.
14          THE COURT:   Thank you.   And I do want the record
15  to reflect that Mr. Geer has not indicated one way or
16  another whether or not he plans in bidding.
17          Anyone --
18          MR. GOLUBCHIK:   Your Honor, if I may, just so
19  it's very clear, I think our position is the debtor that --
20  is that the DIP portion of the loan is what could be credit
21  bid.   As to other creditors, we've explained there may be
22  issues which we'll deal with in the future.   I have a
23  feeling 12 million dollars doesn't make sense for Hankey
24  Capital to bid on, but I just want to put that on the
25  record.

1          MR. GEHER:  And, Your Honor, if I may, I've been

2    silent this hearing.  Everything I've heard Hankey would

3    support.  I know minimum bid, we think that would help

4    maximize the bid, bring in the necessary competition to let

5    human nature help us achieve a better price than may be

6    otherwise.  And a minimum bid would just knock out people

7    who maybe had they been in the game would have helped us.

8    They may not have won, but they may have helped us get a

9    winning bid where we wanted to be.

10          And my concern with setting a minimum bid is

11   bluntly, how are we doing that.  Hearing from Mr. Roffers,

12   I don't think we can say, well, the property down the block

13   is -- gee, it's marketed for X dollars because there's a

14   property around the block that's not cheap, but that's not

15   the same property, so it's apples to oranges.

16          And then if we're going to set a minimum bid

17   based on debt, there may or may not be issues with the

18   debt.  My understanding from Mr. Golubchik, he's doing some

19   investigations on everybody's debts.  There may be issues.

20   There's prepetition lawsuits over things like priorities.

21          So if we're going to set a minimum bid based on

22   creditors' claims, to me that's a disconnect because the

23   people that are buying it don't care about the creditor

24   claim.  They're buying a piece of property for what they

25   think is reasonable or even better psychologically if they

Page                                                                         51

1   think they're getting a good deal.  And I -- what I believe

2   based on hearing all the evidence and Mr. Roffers'

3   testimony is what's going too be beneficial for the estate

4   in maximizing the value is bringing more people into the

5   game, letting more players be around the table yelling and

6   screaming which would drive up a price.

7            And there's one thing we can all agree on.  We

8   all on this call, other than potential reporters who are

9   just here taking notes, we want the highest price possible.

10  And from what I'm hearing, the highest price possible would

11  more likely than not to be achieved by the lack of a

12  minimum bid, not by imposing a minimum bid.

13           So, Your Honor, I just wanted to put that out.

14  I've been silent up till now.  I wanted to hear what

15  everybody had to say and based on the totality of what I've

16  heard, we support no minimum bid and the procedures as

17  they're presented, other than a potential spike tweak about

18  the backup bid.

19           THE COURT:  Okay.  Thank you.

20           Mr. Roffers, thank you.

21           Thank you, everyone, for all of your comments and

22  thanks to the debtor and debtor's counsel for -- you're

23  really making every effort to address everything.  I think

24  that with a change in what I guess we'll just call the

25  backup bid lockup to -- I think 21 days sounds like the

Page                                                                          52

1    right number, I'm willing to approve these procedures.

2           I just want to look at the calendar here to make

3    sure.  The suggestion on a sale motion, I just had a couple

4    concerns about that date on the sale hearing.  So you

5    suggested February 25th.  Well, actually, yeah, that should

6    work.  That will work.  Let's make that 11:00 instead of

7    10:00.  I think that should still give you plenty -- give

8    us plenty of time for that day.  I don't love having left

9    in 24 hours from reply to hearing.  We'll be optimistic

10   that there aren't too many issues.

11          MR. GOLUBCHIK:  I'm wondering, Your Honor, if it

12   makes sense -- let me look in the calendar just to move --

13   the 22nd, move by one day.  So deadline of the debtor to

14   file February 14th instead of the 15th.

15          THE COURT:  Okay.

16          MR. GOLUBCHIK:  Opposition would be February 21.

17          THE COURT:  Well, that's a holiday then,

18   Mr. Golubchik.  That's the President's Day holiday.

19          MR. GOLUBCHIK:  How about --

20          THE COURT:  I mean, CM-ECF works but, you know,

21   I --

22          MR. GOLUBCHIK:  In the interests of making it

23   happen, we will -- if that's necessary we will make -- we

24   will have the filing done on or before that date.  So that

25   deadline is for the debtor, I believe, right, February --

BENHYATT
Certified Deposition Reporters
www.benhyatt.com

Page                                                                        53

1            THE COURT:  Well, no.  The debtor --

2            MR. GOLUBCHIK:  Oh, the 21st.  I'm sorry.  I was

3    looking --

4            THE COURT:  -- still is in --

5            MR. GOLUBCHIK:  -- at the 23rd.  Okay.

6            THE COURT:  So right now what you have is

7    debtor's sale motion February 15th, opposition February

8    22nd, which is the day after the holiday, reply February

9    24th, and then your hearing the next day.

10           MR. GOLUBCHIK:  Your Honor, we will give

11   ourselves and if it done about by the 23rd.  We'll make it

12   happen.

13           THE COURT:  All right.

14           MR. GOLUBCHIK:  Mr. Arnold and I can handle

15   everything.

16           THE COURT:  All right.

17           MR. GEHER:  Your Honor, can we go back over that

18   again?  I'm sorry.  I got a little confused.

19           THE COURT:  Okay.

20           MR. GOLUBCHIK:  Sorry, Tom.

21           THE COURT:  And this is what is in the sale

22   procedures motion, so I haven't changed anything from what

23   the debtors have requested.  So debtors file and serve

24   their sale motion February 15th, opposition to the sale

25   motion argue February 22nd.  That's the day after the

Page                                                                    54

1   President's Day holiday.  And Mr. Golubchik has kindly

2   offered to have the reply no later than February 23rd.  I'm

3   not going to put a time deadline on that.

4              MR. GOLUBCHIK:  Your Honor, my request is -- just

5   goes from our practice I know everyone waits till the last

6   minute to file things.  Can we make February 22nd either

7   9:00 a.m. or noon for all positions so at least we'd have

8   some time that date which we'll be filing on the 23rd?

9              THE COURT:  How about at noon?

10             MR. GOLUBCHIK:  Okay.  And then we'll file by

11  midnight by the end of the day on --

12             THE COURT:  Yeah, you can have till midnight,

13  Mr. Golubchik.  That's fine.

14             MR. GOLUBCHIK:  We'll need it.

15             THE COURT:  All right.  So sale -- hearing on the

16  sale motion will be February 25th at 11:00 a.m., so we'll

17  set for an hour later for our start time, but again, that

18  should be fine.  You know, any -- anyone who needs to

19  testify obviously should be available on that date.

20             All right.  We will see what happens.

21             MR. GOLUBCHIK:  We'll submit an order.  Thank

22  you, Your Honor.  Thank you --

23             THE COURT:  Thank you.

24             MR. GOLUBCHIK:  -- everyone else.

25             ATTORNEYS:  Thank you, Your Honor.

Page                                                                    55

1          THE COURT:  Thank you, everyone.  Now we're

2   adjourned for today.

3   (At 1:26 p.m.)

4                      * * * * * * *

5          I certify that the foregoing is a correct

6   transcript from the electronic sound recording of the

7   proceedings in the above-entitled matter.

8

9       *Ruth Ann Hager*

10

11  _____    Date:  3/15/2022

12  RUTH ANN HAGER, C.E.T.**D-641

13

14

15

16

17

18

19

20

21

22

23

24

25