1  Samuel A. Newman (SBN 217042)
   sam.newman@sidley.com
2  Genevieve G. Weiner (SBN 254272)
   gweiner@sidley.com
3  SIDLEY AUSTIN LLP
   555 West Fifth Street
4  Los Angeles, CA 90013
   Telephone: 213.896.6000
5  Facsimile: 213.896.6600

6  Amy P. Lally (SBN 198555)
   alally@sidley.com
7  SIDLEY AUSTIN LLP
   1999 Avenue of the Stars
8  17th Floor
   Los Angeles, CA 90067
9  Telephone: 310.595.9500
   Facsimile: 310.595.9501

10

   Attorneys for Party in Interest
11 Richard Saghian, an Individual

12              **UNITED STATES BANKRUPTCY COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14                 **LOS ANGELES DIVISION**

15 In re                                  ) Case No. 2:21-bk-18205-DS
                                          )
16 CRESTLLOYD, LLC,                       ) Chapter 11
                                          )
17          Debtor and Debtor-in-Possession. ) Assigned to:  The Hon. Deborah J. Saltzman
                                          )
18                                        ) **NOTICE OF FILING OF UNPUBLISHED**
                                          ) **OPINIONS PURSUANT TO LOCAL**
19                                        ) **BANKRUPTCY RULE 9013-2(b)(4)**
                                          )
20                                        ) Hearing:
                                          )   Date: March 18, 2022
21                                        )   Time: 11:00 a.m.
                                          )   Place: Courtroom 1639
22                                        )       255 E. Temple St.
                                          )       Los Angeles, CA 90012
23                                        ) **VIA ZOOMGOV ONLY**
                                          )
24 _____ )

25

26

27

28

2016 WL 7189824
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States Bankruptcy Appellate
Panel of the Ninth Circuit.

IN RE: KEYSTONE MINE
MANAGEMENT II, Debtor.
Keystone Mine Company, Ltd; Keystone
Mine Management, Ltd.; Kirk L. Dushane;
Roger Smith; Patrick O'Brien, Appellants,

v.

Vincent a Gorski, Chapter 7 Trustee;
Bush Management Company; Keystone
Mine Management II, Appellees.

BAP No. EC–15–1202–KuMaJu
|
Bk. No. 13–16845
|
Argued and Submitted on October 20, 2016
|
Filed—December 2, 2016

Appeal from the United States Bankruptcy Court for the Eastern District of California, Honorable W. Richard Lee, Bankruptcy Judge, Presiding

**Attorneys and Law Firms**

Appearances: Meir J. Westreich argued for the appellants;

Lisa Anne Holder of Klein Denatale Goldner Cooper Rosenlieb & Kimball, LLP argued for appellee Vincent A. Gorski, Chapter 7 Trustee;

Charles A. Bird of Dentons US LLP argued for appellee Bush Management Company.

Before: KURTZ, MARTIN[**] and JURY, Bankruptcy Judges.

**MEMORANDUM**[*]

**INTRODUCTION**

**\*1**  The appellants herein are all creditors or equity interest holders of the debtor Keystone Mine Management II. Over the course of roughly 14 months, they opposed every step the chapter 7[1] trustee Vincent A. Gorski attempted to take to liquidate the debtor's assets and reduce them to cash, in accordance with his duties under § 704(a).

Ultimately, the bankruptcy court approved Gorski's proposed sale and compromise transaction with Bush Management Company, pursuant to which Bush purchased all of Keystone Mine Management II's assets. The bankruptcy court's bidding procedures order provided interested parties with an opportunity to make competing bids for the assets, but no competing bids were made, even though Gorski had advertised the sale of the assets for a number of months.

Appellants appealed both the bankruptcy court's bidding procedures order and its sale order, but they did not obtain a stay pending appeal. In addition, the bankruptcy court made ample findings to support its determination that Bush was a good faith purchaser and was entitled to the benefit of § 363(m), which prevents appellate courts from disturbing the validity of a bankruptcy sale even when the appellant prevails on appeal. The bankruptcy court's findings related to Bush's good faith were not clearly erroneous, so § 363(m) applies; it renders moot the appellants' appeals from the bidding procedures order and the sale order.

The appellants also have appealed from the bankruptcy court's order approving the compromise aspects of the transaction between Gorski and Bush. Under the particular circumstances of this case, we decline to hold that § 363(m) applies to the compromise order. Even though § 363(m) has not rendered moot the appeal from the compromise order, the appellants did not include in their appeal brief any arguments specifically and distinctly challenging the compromise order. Nor did they order a transcript of the final compromise hearing, at which the bankruptcy court stated its findings of fact and conclusions of law orally on the record. As a result, we have not been presented with (nor are we aware of) any grounds that would justify reversal of the court's compromise order.

Accordingly, we DISMISS AS MOOT the appeals from the bankruptcy court's bidding procedures order and its sale order. The compromise order is AFFIRMED.

**FACTS**

In re Keystone Mine Management II, Not Reported in B.R. Rptr. (2018)

The litigation history surrounding Keystone Mine Management II's bankruptcy case is voluminous, but most of that history need not be recounted here in order to dispose of this appeal.

**1. Key Parties**

We start with the key parties. At all relevant times before the appointment of Gorski as chapter 7 trustee, Kirk DuShane had been serving as the manager of the debtor and its two affiliates: Keystone Mine Management, Ltd. ("KMM") and Keystone Mining Company ("Company"). Debtor ("KMM II") is a limited partnership in which KMM holds a 60% partnership interest and DuShane holds a 40% partnership interest. In turn, Company nominally is the general partner of KMM, but DuShane is Company's general partner, pursuant to which he exercised management control over all three entities.

**\*2** The other two named appellants—Patrick O'Brien and Roger Smith—are, respectively, an accountant and a geologist who have provided services over the years to the Keystone entities and who claim to be creditors and/or equity investors in one or more of these entities. [2]

The Keystone entities' only significant assets consisted of some mining equipment, 44 mining claims and 4 mill site claims granted by the U.S. Bureau of Land Management, which claims entitled the Keystone entities to conduct mining and milling operations on the applicable U.S. government land.

William Weyerhaeuser is the sole trustee of a trust which, over several years, beginning in 1988, lent the Keystone entities roughly $2.6 million and received in exchange a deed of trust encumbering 20 of the mining claims and a security interest in the mining equipment. Weyerhaeuser's trust also made a $500,000 equity investment in the Keystone entities in 1989.

John Hagestad was a relatively minor equity investor in the Keystone entities who, in addition, loaned $60,000 directly to DuShane. In 2012, Hagestad filed a state court lawsuit against DuShane and KMM II, which lawsuit ultimately led to DuShane filing a chapter 11 bankruptcy petition on behalf of KMM II in October 2013. [3] Hagestad also owns and controls a company known as Bush Management Company. In June 2014, after KMM II commenced its bankruptcy case, Bush acquired all of the Weyerhaeuser trust's loan and lien rights arising from the Weyerhaeuser trust's loans to the Keystone

entities. By way of Bush's acquisition of the Weyerhaeuser trust's rights and interests, Hagestad transformed himself from a minor equity investor into the Keystone entities' sole significant secured creditor.

Gorski is the duly-appointed chapter 7 trustee for KMM II. Almost immediately after he was appointed (in February 2014), he commenced efforts to liquidate the estate's assets by proposing to sell those assets to Bush.

**2. Gorski's Efforts to Sell the Keystone Assets**

Over the course of a year and a half, Gorski persistently sought to sell the mine and mill site claims and the mining equipment on behalf of KMM II's bankruptcy estate. At each step of the way, DuShane and the non-debtor Keystone entities vigorously opposed the trustee's sales efforts. Initially, before the Weyerhaeuser trust sold its loan and lien rights to Bush, Gorski filed a motion seeking to sell the Keystone assets to Bush free and clear of all liens and interests, including Weyerhaeuser's loan and lien rights, which Gorski at the time believed were subject to legitimate dispute.

DuShane and the non-debtor Keystone entities opposed Gorski's first sale motion largely on the ground that the $250,000 proposed sale price was—according to them—grossly inadequate and the trustee's marketing efforts were grossly inadequate. According to DuShane and the non-debtor Keystone entities, Gorski should have been marketing the assets for somewhere between $10 million and $20 million, not including royalty payments. [4]

**\*3** In June 2014, after the bankruptcy court continued the hearing on Gorski's first sale motion, Bush acquired the Weyerhaeuser trust's loan and lien rights and expressed to Gorski its desire to credit bid for the Keystone entities' assets. The trustee initially maintained that the loan and lien rights were still subject to dispute and that Bush's request to credit bid should be restricted or prohibited.

However, by September 2014, Gorski had changed his mind regarding the validity of Bush's loan and lien rights. By then, Gorski had completed his review and analysis of Bush's proof of claim, in which Bush asserted its rights as the successor to the Weyerhaeuser trust's loan and lien rights. In light of his complete review and analysis, Gorski reached a new agreement with Bush for the sale of the Keystone assets and for the allowance of Bush's secured claim in the amount of $8.1 million.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:21-bk-18205-DS    Doc 207    Filed 03/16/22    Entered 03/16/22 22:47:25    Desc

In re Keystone Mine Management II, Not Reported in B.R. Rptr. (2016)    Main Document    Page 4 of 44

The proposed agreement additionally contemplated a complex set of bidding procedures aimed at permitting Bush to credit bid while at the same time attempting to minimize the chilling effect Bush's credit bidding might have on competing bids. Under the agreed bidding procedures, the Keystone assets were broken into two groups: Group A—consisting of those assets over which Bush held lien rights—and Group B —consisting of those assets over which Bush held no lien rights. The Group A assets were subject to an initial Bush credit bid of $500,000 and, if the Group A assets were subject to competing overbids, Bush was permitted to credit bid up to 50% of its $8.1 million allowed secured claim. To the extent Bush's bid exceeded 50% of its allowed secured claim, the bid would be considered a cash bid subject, however, to offset against the remainder of its allowed secured claim. On the other hand, the Group B assets were subject to an all cash sale pursuant to which Bush committed to an initial bid of $250,000.

In furtherance of his newly-proposed sale and compromise transaction with Bush, Gorski filed his first bidding procedures motion and his first compromise approval motion. Meanwhile, Bush filed a motion for relief from stay seeking —in the event Gorski's proposed sale and compromise failed to occur by January 15, 2015—court authorization to proceed with foreclosure pursuant to its lien rights.

In support of the compromise approval motion, Gorski submitted a declaration specifically identifying many of the issues regarding the validity of Bush's loan and lien rights and generally explaining why the trustee determined that the compromise and sale transaction was in the best interests of the KMM II bankruptcy estate. In essence, after fully reviewing and analyzing the arguments challenging Bush's loan and lien rights, and after reviewing the documentation supporting Bush's proof of claim, Gorski concluded that none of the arguments challenging Bush's loan and lien rights had any merit. Gorski then summarized his reasoning why he believed that the compromise and sale transaction should be approved, as follows:

> Because the settlement with [Bush] allows me to sell the Mining Claims, including [Bush's] collateral, without the need to file an adversary proceeding to determine the nature, extent, and validity of [Bush's] Debt

and lien, limits [Bush's] credit bid to a low opening amount, provides other cash and economic benefits to the Bankruptcy Estate, and sets a cap on [Bush's] credit bid as a maximum of 50% of its claim, I believe that the settlement should be approved as being in the best interest of the creditors and the estate.

**\*4** Gorski Decl. (Sept. 4, 2014) at ¶¶ 7–8.

Additionally, Gorski described the arm's-length nature of his negotiations with Bush:

> The settlement was negotiated at arm's length between [Bush] and me through a lengthy and vigorous give-and-take process. It took weeks of negotiation, dozens of emails, and multiple telephone conference calls between [Bush's] attorney, representative, me, and my attorney, and the provision by [Bush] of a 149 page proof of claim, to reach resolution. Every possible challenge was raised to [Bush's] Debt and lien, and was thoroughly analyzed. Debtor has challenged every action by me related to [Bush] as a buyer, and [Bush] as creditor and lien holder.

Id. at ¶ 13.

To bolster Gorski's proposed sale and compromise, Bush filed a detailed legal memorandum asserting that all of the challenges to its loan and lien rights lacked merit.

At the October 2014 hearing on Gorski's and Bush's motions, the bankruptcy court indicated that it was not prepared to grant relief as requested in any of the motions unless and until the parties resolved a pending dispute regarding which of the Keystone entities was entitled to legal title over the Keystone assets. The court noted that the title dispute was the subject of a pending adversary proceeding (Adv. No. 14–1112), denied Bush's relief from stay motion without

Case 2:21-bk-18205-DS    Doc 207    Filed 03/16/22    Entered 03/16/22 22:47:25    Desc

In re Keystone Mine Management II, Not Reported in B.R. Rptr. (2016)
Main Document        Page 5 of 44

prejudice and suspended Gorski's motions pending a final resolution in the adversary proceeding.

In April 2015, after the court resolved the title dispute in favor of Gorski and against DuShane and the non-debtor Keystone entities, Gorski resumed his efforts to obtain bankruptcy court approval of his sale and compromise with Bush. Gorski filed a new compromise motion and a new bidding procedures motion. For purposes of this appeal, these two motions did not materially differ from the motions Gorski had filed in September 2014. Gorski also filed a new sale motion. In support of the sale motion, Gorski detailed his marketing efforts, as follows:

8. I advertised the sale of the mining-related assets with:

(a) the International Mining Journal (both print and on-line publications (icmj.com)), which have run continuously since September 2014 (see Exhibit "M" to the Supplemental Exhibits in Support of the Motion);

(b) minelistings.com which has run continuously since July 2014 (see Exhibit "N" to the Supplemental Exhibits);

(c) Junior Miners (juniorminers.com/gold-mining-claims-for-sale.html) which has run continuously since July 2014 (see Exhibit "O" to the Supplemental Exhibits);

(d) National Association of Bankruptcy Trustees (marketassetsforsale.com), which was posted in May 2014 (see Exhibit "P" to the Supplemental Exhibits); and

(e) Loopnet.com, a real estate listing service, which was posted in May 2014 (see Exhibit "Q" to the Supplemental Exhibits).

I advanced all marketing costs. All online ads pour-over to my firm's website, where voluminous information is posted: http://www.thegorskifirm.com/#!bankruptcy-sales/c18d4 According to the counter on my website, the page has 1,257 hits. (See Exhibit "R" to the Supplemental Exhibits).

 **\*5**  9. I reviewed Alibaba.com and found no listings for gold mining claims—although there were listings for gold mining equipment. I determined Alibaba.com was not an appropriate marketing vehicle for Debtor's mining-related assets. My review of The Northern Miner indicated it does not offer classified ads.

10. I also worked to find a broker to list the mining claims. I contacted two real estate brokerage firms (one in

Bakersfield and one in Ridgecrest), and requested referrals when those firms could not assist [me]. Even so, I did not find a broker who dealt in unpatented BLM mining claims such as those owned by debtor.

Gorski Decl. (June 25, 2015) at ¶¶ 8–10.

DuShane and the non-debtor Keystone entities, once again, opposed Gorski's motions. According to the appellants, Gorski incorrectly had concluded: (1) that the arguments challenging Bush's loan and lien rights had no merit; and (2) that Bush should be permitted to credit bid for the Keystone assets while its loan and lien rights remained the subject of bona fide dispute. Furthermore, the appellants argued, Hagestad's efforts to acquire (through Bush) Keystone's assets constituted a breach of his fiduciary duties to his fellow Keystone partners. They further maintained that the assets should be marketed for at least 90 days—free of any credit bid by Bush to potentially chill competing bidders.

### 3. The Bankruptcy Court's Rulings
In June 2015, the bankruptcy court granted Gorski's bidding procedures motion, thereby permitting Bush to bid up to 50% of its allowed secured claim. And in July 2015, the bankruptcy court granted Gorski's sale motion and his compromise motion. Because no one else bid for KMM II's assets, Bush was the successful bidder and purchaser of KMM II's assets.

The bankruptcy court issued a memorandum decision in which it made a number of factual findings in support of its determination in favor of the sale. Among other things, the bankruptcy court found that the sale was in the "best interest of the estate and its creditors," "was fair and reasonable" under the circumstances, "was negotiated and proposed in good faith," "was subject to competitive bidding at the hearing" and was "the result of an arm's length transaction between the parties after lengthy negotiations."

The court additionally found that the trustee had adequately marketed KMM II's assets and had fully complied with the procedures set forth in the sale motion and in the bidding procedures order.

Furthermore, the bankruptcy court noted that the proposed sale was the only currently-available means for the estate to realize any value from the estate's assets and that a failure to approve the sale would almost certainly lead to Bush obtaining relief from stay and foreclosing on the estate's most valuable assets. Even more to the point, the court opined that,

Case 2:21-bk-18205-DS    Doc 207    Filed 03/16/22    Entered 03/16/22 22:47:25    Desc
Main Document    Page 6 of 44

*In re Keystone Mine Management II, Not Reported in B.R. Rptr. (2018)*

without the sale, the trustee likely never would acquire any funds for distribution to creditors.

As for Bush, the court found that it qualified as a good faith purchaser under § 363(m) and that the consideration to be paid by Bush was "fair and reasonable" under the circumstances, was the "highest or best offer for the assets," and constituted "reasonably equivalent value."

Moreover, the court pointed out that neither the trustee nor any of the parties objecting to the sale had commenced any action to challenge Bush's lien rights or to object to Bush's proof of claim. As a result, the court determined that Bush's proof of claim was prima facie valid under Rule 3001(f) and deemed allowed under § 502(a). The court thus concluded that there was no bona fide dispute as to Bush's loan or lien rights.

**\*6** DuShane and the non-debtor Keystone entities timely appealed the bidding procedures order, the sale order and the compromise order.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(N). Except as otherwise indicated below, we have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1. Do the appellants have standing to appeal?

2. Is this appeal moot?

3. To the extent the appeal from the compromise order is not moot, have the appellants presented us with a sufficient record and briefing that would enable us to reverse the bankruptcy court's compromise order?

## STANDARDS OF REVIEW

The appellants' standing is a question of law we consider de novo. Menk v. LaPaglia (In re Menk), 241 B.R. 896, 903 (9th Cir. BAP 1999).

The bankruptcy court's determination that Bush qualified as a good faith purchaser for purposes of § 363(m) is a finding of fact reviewed for clear error. Adeli v. Barclay (In re Berkeley Delaware Court, LLC), 2016 WL 4437616, *4 (9th Cir. 2016); Thomas v. Namba (In re Thomas), 287 B.R. 782, 785 (9th Cir. BAP 2002). A finding of fact is not clearly erroneous unless it is illogical, implausible, or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).

## DISCUSSION

### 1. Appellate Standing

The appellants lack appellate standing unless they were directly and adversely affected pecuniarily by the orders on appeal. Fondiller v. Robertson (In re Fondiller), 707 F.2d 441, 442 (9th Cir. 1983); Cheng v. K & S Diversified Invs., Inc. (In re Cheng), 308 B.R. 448, 455 (9th Cir. BAP 2004), aff'd, 160 Fed.Appx. 644 (9th Cir. 2005); In re Menk, 241 B.R. at 917. Gorski and Bush argue on appeal that the appellants do not satisfy this "person aggrieved" standard because there is no practicable means by which appellants, under any scenario, reasonably could expect any distribution from the KMM II bankruptcy estate. According to Gorski and Bush, the estate is administratively insolvent, and the appellants, as unsecured creditors and/or equity interest holders in KMM II, consequently have no prospect of receiving any distribution regardless of the efficacy of the orders on appeal.

It is true that, when an appellant's chances of receiving a distribution from the bankruptcy estate are hopeless, the appellant may lack standing to appeal orders affecting the size of the bankruptcy estate. See In re Fondiller, 707 F.2d at 442; see also Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.), 177 F.3d 774, 778 n.2 (9th Cir. 1999). That being said, Gorski and Bush's standing argument assumes that Bush's secured claim is valid and unassailable for purposes of determining the appellants' standing. In other words, Gorski and Bush seek to deny the appellants a merits determination on the primary issue the appellants seek to raise on appeal—the enforceability of Bush's loan and lien rights.

Admittedly, the reasons Gorski and Bush offer about why the enforceability of Bush's loan and lien rights are not properly

Case 2:21-bk-18205-DS   Doc 207   Filed 03/16/22   Entered 03/16/22 22:47:25   Desc
Main Document    Page 7 of 44

In re Keystone Mine Management II, Not Reported in B.R. Rptr. (2016)

at issue in this appeal are compelling. As Gorski and Bush point out, the appellants never objected to Bush's claim, never commenced an adversary proceeding challenging Bush's loan and lien rights, and never took any other action they might have taken to place Bush's loan and lien rights squarely at issue before the bankruptcy court.

**\*7** Gorski and Bush contend that, as a result of the appellants' failures, the appellants should be determined to lack bankruptcy appellate standing. But we are not convinced. The same points that Gorski and Bush make in their appellate standing argument can be considered, if necessary, in addressing the merits of the appellants' appeal. Indeed, the appellants' failure in the bankruptcy court to squarely place at issue Bush's loan and lien rights ultimately might be fatal to their appeal, but we don't think that this failure should deprive them of appellate standing.

Our decision not to dismiss these appeals on appellate standing grounds is supported by the fact that the appellate standing doctrine is not a constitutional mandate but rather is a prudential, judge-made rule applied in the interests of judicial economy and efficiency. See generally In re P.R.T.C., Inc., 177 F.3d at 778 (describing nature of appellate standing doctrine). In light of the circumstances described immediately above, we decline to dismiss these appeals on appellate standing grounds.

## 2. Application of Section 363(m) and Mootness
Gorski and Bush also argue on appeal that § 363(m) applies to this matter and has rendered these appeals moot. Section 363(m) limits the remedies available on appeal when the purchaser has acted in good faith. Section 363(m) provides as follows:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal,

unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

The Bankruptcy Code does not define the term "good faith" for purposes of § 363(m), but the Ninth Circuit Court of Appeals repeatedly has stated that, in this context, a lack of good faith "typically [is] shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." In re Berkeley Delaware Court, LLC, 2016 WL 4437616 at \*4 (citing Paulman v. Gateway Venture Partners III, L.P. (In Re Filtercorp, Inc.), 163 F.3d 570, 577 (9th Cir. 1998)); see also Onouli–Kona Land Co. v. Estate of Richards (In re Onouli–Kona Land Co.), 846 F.2d 1170, 1173 (9th Cir. 1988); Community Thrift & Loan v. Suchy (In re Suchy), 786 F.2d 900, 902 (9th Cir. 1985). The Ninth Circuit also has said that a good faith purchaser is "one who buys in good faith and for value." Ewell v. Diebert (In re Ewell), 958 F.2d 276, 281 (9th Cir. 1992) (citations and internal quotation marks omitted).

Based on these and other Ninth Circuit authorities, we have held that the following factors are relevant to the good faith determination: (1) compliance with approved sale procedures; (2) arms-length negotiations, leading to a sale reflecting a purchase price at or near the market value of the property; (3) opportunity for competitive bidding; (4) knowledge in advance of the sale of who the proposed purchaser is; and (5) the absence of any evidence of fraud, collusion or grossly unfair advantage over other bidders. Zuercher Trust of 1999 v. Schoenmann (In re Zuercher Trust of 1999), 2016 WL 721485, at \*9 (Mem. Dec.) (9th Cir. BAP Feb. 22, 2016).

Here, the bankruptcy court considered all of these factors and concluded that the factors militated in favor of a finding that Bush was a good faith purchaser for purposes of § 363(m). The court found that the sale "was negotiated and proposed in good faith," "was subject to competitive bidding at the hearing" and was "the result of an arm's length transaction between the parties after lengthy negotiations." The court also found that the proposed sale was the only currently available means for the estate to realize any value from the

*In re Keystone Mine Management II, Not Reported in B.R. Rptr. (2016)*

estate's assets and that a failure to approve the sale would almost certainly lead to Bush obtaining relief from stay and foreclosing on the estate's most valuable assets.

**\*8**  The appellants on appeal have not directly challenged any of these findings. Nor did they specifically and distinctly argue that the bankruptcy court's good faith finding was clearly erroneous.

Even so, appellants did argue some points that, if proven correct, arguably would undermine the bankruptcy court's good faith finding. The appellants primarily contend that Bush's loan and lien rights were unenforceable under Washington law. They essentially argue that Gorski must have been acting collusively with Bush because he refused to commence and pursue an action in Washington state court to invalidate Bush's loan and lien rights. The appellants further maintain that, had Gorski done so, the value of KMM II's assets would have been rendered largely unencumbered, and then those assets could have been sold for millions of dollars, without the chilling cloud of Bush's credit bid and Bush's $8.1 million allowed secured claim hanging over KMM II's assets.

The appellants additionally assert that Gorski initially realized and acknowledged (in May and June 2014) that the loan and lien rights were unenforceable but later made a 180–degree turn (in September 2014) in order "to make the easiest sale to a party who made sure [Gorski] was being adequately compensated," and Gorski therefore permitted Bush to buy "a valuable asset for a song, without even a semblance of competitive bidding." Aplt. Opn. Br. (Jan. 12, 2016) at p. 23.

Unfortunately for the appellants, the bankruptcy court found and determined to the contrary. The bankruptcy court's findings reflect its belief that Gorski had diligently determined that allowance of Bush's secured claim for $8.1 million and the proposed compromise and sale with Bush were in the best interests of the bankruptcy estate and its creditors. In so finding, the bankruptcy court apparently credited Gorski's declaration testimony representing that he painstakingly analyzed each and every grounds for attacking Bush's loan and lien rights and ultimately determined that he could not prevail on any of them even if he were to pursue them. The appellants obviously have a different belief; however, the bankruptcy court's findings are not illogical, implausible or without evidentiary support, so we must uphold them. See  Wells Fargo Bank, N.A. v. Loop 76 LLC

(In re Loop 76, LLC), 465 B.R. 525, 544 (9th Cir. BAP 2012) (citing  In re Retz, 606 F.3d at 1196).

It is worth noting that the appellants never fully articulated their argument on how Gorski could have defeated Bush's loan and lien rights in Washington state court. All they ever presented to Gorski and the bankruptcy court were two or three Washington decisions holding that a six-year statute of limitations applies to actions on promissory notes and that the statute of limitations defense can be asserted in Washington to prevent a secured creditor from conducting a nonjudicial foreclosure under a deed of trust encumbering Washington real property. See, e.g., Westar Funding Inc. v. Sorrels, 239 P.3d 1109, 1113 (Wash. Ct. App. 2010);  Walcker v. Benson and McLaughlin, P.S., 904 P.2d 1176, 1177–78 (Wash. Ct. App. 1995). They never offered any analysis or case citations establishing that Washington law can and should be applied to determine the enforceability of a deed of trust encumbering California real property. In fact, the appellants never attempted to present, either in the bankruptcy court or on appeal, any sort of choice of law analysis. In contrast, the choice of law analysis that Bush presented to the court indicated that California law would apply to a mortgage or deed of trust encumbering California real property, even if a lawsuit was commenced elsewhere.

**\*9**  More importantly, the bankruptcy court did not adjudicate the issue of the validity of Bush's loan and lien rights, nor would it have been appropriate for it to do so in the context of the sale and compromise motion. The appellants never placed the validity of Bush's loan and lien rights squarely at issue before the bankruptcy court. The appellants never objected to Bush's proof of claim and never commenced an adversary proceeding seeking to determine the extent and validity of Bush's lien.

On appeal, the appellants essentially concede that, if they had done so, they would have lost because of the forum-related choice of law rules applicable to California bankruptcy courts. Aplt. Opn. Br. at p. 17; see also  Sterba v, PNC Bank (In re Sterba), 516 B.R. 579, 584–85 (9th Cir. BAP 2014). Appellants, nonetheless, claim on appeal that Gorski should have authorized them to pursue the issue in Washington state court if Gorski was unwilling to pursue it there himself. Aplt. Opn. Br. at p. 17. But there is nothing in the record indicating that appellants asked for such authority, either from Gorski or the bankruptcy court. The law is clear that the appellants could have done so. See  Avalanche Mar., Ltd. v. Parekh

Case 2:21-bk-18205-DS    Doc 207    Filed 03/16/22    Entered 03/16/22 22:47:25    Desc
Main Document    Page 9 of 44

*In re Keystone Mine Management II, Not Reported in B.R. Rptr. (2016)*

(In re Parmetex, Inc.), 199 F.3d 1029, 1031 (9th Cir. 1999); Hansen v. Finn (In re Curry and Sorensen, Inc.), 57 B.R. 824, 827 (9th Cir. BAP 1986).

In sum, § 363(m) applies to the appellants' appeals from the bidding procedures order and the sale order. Consequently, appellants could not unwind the sale to Bush even if they were to prevail on appeal. Without this remedy, there is no meaningful relief we could grant to appellants in their appeals from the bidding procedures order and the sale order, so these two appeals are moot. See Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.), 677 F.3d 869, 880 (9th Cir. 2012) (stating that an appeal is moot if it is impossible for the court to grant any effective relief to the appellant).

Alternately, the appellants contend that their appeals from the sale order and the bidding procedures order are not moot because both California and Washington grant to the debtor a right of redemption—and other rights—upon the occurrence of a foreclosure sale. We acknowledge that there are a number of Ninth Circuit cases recognizing a redemption right exception to the mootness rules covering bankruptcy-court-issued sale orders; however, all of these cases involved appeals from bankruptcy court orders pertaining to foreclosure sales. See, e.g., Mann v. ADI Invs., Inc. (In re Mann), 907 F.2d 923, 926 (9th Cir. 1990); Phoenix Bond & Indem. Co. v. Shamblin (In re Shamblin), 890 F.2d 123, 125 n.1 (9th Cir. 1989); Onouli–Kona Land Co. v. Estate of Richards (In re Onouli–Kona Land Co.), 846 F.2d 1170, 1171–73 (9th Cir. 1988); Sun Valley Ranches, Inc. v. Equitable Life Assurance Soc'y of the United States (In re Sun Valley Ranches, Inc.), 823 F.2d 1373, 1375 (9th Cir. 1987). Here, in contrast, the sale at issue was a trustee-initiated bankruptcy sale, rather than a creditor-initiated foreclosure sale. We know of no Ninth Circuit, California or Washington authority indicating that a debtor has a right of redemption following a trustee-initiated bankruptcy sale, nor have appellants pointed us to any such authority.

**3. Appellate Review of Compromise Order**
This only leaves for our consideration the appellants' appeal from the compromise order. Arguably, the compromise order appeal also has been rendered moot under § 363(m). The Ninth Circuit has applied § 363(m) to the approval

of a settlement when the settlement involved a sale of the bankruptcy estate's legal claims and the bankruptcy court invoked and followed the legal standards applicable to § 363 sales. See In re Berkeley Delaware Court, LLC, 2016 WL 4437616 at *3.

**\*10** That being said, it is questionable whether we should extend the holding of In re Berkeley Delaware Court, LLC to the present compromise order appeal. Unlike in Berkeley Delaware Court, the estate property sold here really did not include the estate's legal claims, per se. Furthermore, the bankruptcy court here seemed to separately consider and rule upon the sale aspects and the compromise aspects of the transaction entered into between Gorski and Bush. As best we can tell from the limited record provided, the bankruptcy court's approval of the compromise aspects presumably focused on the legal standards governing compromise of controversies under Rule 9019(a) and not on the legal standards governing § 363 sales.

Therefore, under the unique procedural history of this case, we conclude that § 363(m) should not be applied to the bankruptcy court's compromise order, and the appeal therefrom is not moot. Even so, the appellants still cannot prevail. The appellants did not order the transcript from the final compromise hearing held on July 20, 2015, at which the bankruptcy court orally stated its findings of fact and conclusions of law on the record. This makes it impossible for us to conduct any meaningful, informed review of the bankruptcy court's compromise order. See Kyle v. Dye (In re Kyle), 317 B.R. 390, 393–94 (9th Cir. BAP 2004), aff'd, 170 Fed. Appx. 457 (9th Cir. 2006) (stating that the Panel may exercise its discretion to dismiss or summarily affirm when the appellant's failure to provide an adequate record prevents informed appellate review).

In addition, appellants' appeal brief did not contain any arguments specifically and distinctly challenging the bankruptcy court's compromise order. As a result, appellants have forfeited any such arguments they could have made. See Christian Legal Soc'y v. Wu, 626 F.3d 483, 487–88 (9th Cir. 2010); Brownfield v. City of Yakima, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010).

In short, appellants have not presented us with any grounds that would justify reversal of the bankruptcy court's compromise order, nor are any such grounds evident from

Case 2:21-bk-18205-DS    Doc 207    Filed 03/16/22    Entered 03/16/22 22:47:25    Desc
Main Document    Page 10 of 44

In re Keystone Mine Management II, Not Reported in B.R. Rptr. (2016)

the record available to us. Accordingly, the compromise order must be affirmed

**CONCLUSION**

For the reasons set forth above, we DISMISS AS MOOT the appeals from the bankruptcy court's bidding procedures order and its sale order. The compromise order is AFFIRMED.

**All Citations**

Not Reported in B.R. Rptr., 2016 WL 7189824

## Footnotes

**\*\***     Hon. Brenda K. Martin, United States Bankruptcy Judge for the District of Arizona, sitting by designation.

**\***        This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024–1.

**1**        Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

**2**        For ease of reference, our recitation of facts sometimes refers to the appellants as "DuShane and the non-debtor Keystone entities" because they are the most involved participants on behalf of the appellants. No disrespect is intended to O'Brien or Smith.

**3**        The bankruptcy court converted KMM II's bankruptcy case from chapter 11 to chapter 7 in February 2014.

**4**        It is somewhat difficult to reconcile the Keystone entities' asserted market value with: (1) the Keystone entities' admission that tens of millions of dollars in capital investment were necessary before the mining and milling operations could be rendered fully operational; and (2) the apparently undisputed fact that the Keystone entities had not been able to adequately capitalize or operate the mines and mill sites for decades.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

In re Pacific Cargo Services, LLC, Not Reported in F.Supp.3d (2014)

2014 WL 2041821
Only the Westlaw citation is currently available.
United States District Court, D. Oregon.

In re PACIFIC CARGO SERVICES, LLC, Debtor.

Nos. 6:13–mc–00369–AA, 3:13–cv–01978–AA.
|
Signed May 9, 2014.

**Attorneys and Law Firms**

Wilson C. Muhlheim, Luvaas Cobb, Eugene, OR, for
appellant General Electric Capital Corporation.

Susan S. Ford, Sussman Shank, LLP, Portland, OR, for
appellee Hilco Industrial, LLC.

David A. Foraker, Greene & Markley, PC, Portland, OR, for
debtor Pacific Cargo Services, LLC.

OPINION AND ORDER

AIKEN, Chief Judge:

**\*1** General Electric Capital Corporation ("GE") appeals the
bankruptcy court's decisions: (1) authorizing and approving
Hilco Industrial, LLC's ("Hilco") asset purchase agreement
("Sale Order"); and (2) denying GE's motion to vacate the
Sale Order. GE also moves to stay the Sale Order during the
pendency of this appeal. After the transaction contemplated
by the Sale Order was completed, Hilco filed a motion to
dismiss GE's appeal as moot. The estate trustee for the debtor,
Pacific Cargo Services, LLC ("Pacific Cargo"), joins in
Hilco's motion. For the reasons set forth below, GE's motion is
denied and Hilco's motion is granted. The bankruptcy court's
decision is therefore affirmed and this appeal is dismissed.

**BACKGROUND**

On August 8, 2012, Pacific Cargo and GE entered into two
Loan and Security Agreements, through which GE financed
Pacific Cargo's purchase of twelve Hino trucks.[1] Pacific
Cargo agreed to pay GE the original principal balance plus
pre-commuted interest, totaling $1,240,006.32, and granted
GE a first priority security interest in the trucks. Despite
receiving this loan, Pacific Cargo was unable to manage its

business in the ordinary course and, on January 28, 2013, filed
a petition for relief under Chapter 11 of the Bankruptcy Code.
Excerpt of Record ("ER") 66.[2] On March 6, 2013, GE filed
a proof of claim in the amount of $1,005,289.78.

I. *Bankruptcy Court Proceedings*
Pacific Cargo, its creditors, and the bankruptcy court decided
to focus on a going concern sale of Pacific Cargo's business
in order to maximize value for creditors and maintain
employment opportunities for Pacific Cargo's employees. ER
224. Pacific Cargo applied to retain Equity Partners CRB
LLC ("Equity Partners") as the broker for the sale after
completing an investigation and interview process between
Equity Partners, Pacific Cargo, the creditors' committee, and
Graystone Capital, Pacific Cargo's primary secured creditor.
ER 222–88.

On June 13, 2013, Pacific Cargo filed a motion to authorize
and schedule the auction and approve bidding procedures. ER
218. On June 25, 2013, following a hearing, the bankruptcy
court entered an order approving Equity Partners as the
broker. ER 142–43, 180. Thereafter, Equity Partners engaged
in substantial marketing efforts—i.e. setting up a data room
for review of documents and information relating to Pacific
Cargo, placing an advertisement in *The Wall Street Journal*,
directing targeted outreach, etc. ER 458, 462. That same
day, the bankruptcy court also entered an order approving
Pacific Cargo's auction motion with modifications ("Auction
Order"). ER 143. The Auction Order was served on GE
by mail and electronically. Specifically, it was sent to GE's
local counsel, who was also its counsel of record, and to the
other address specified on GE's proof of claim. ER 600–01.
After the Auction Order was not appealed, the bankruptcy
court made it final. *In re Pac. Cargo Servs., LLC,* 2013 WL
5299545, at \*5 (Bankr.D.Or. Sept. 18, 2013).

**\*2** On June 26, 2013, Cardinal Courier, a large logistics
and transportation company, made the "stalking horse" bid
on Pacific Cargo as a going concern in order to initiate the
auction process; the bid was a "low ball" offer, setting the
floor for the competitive auction, and was not expected to end
up as the winning bid. ER 232–33, 238, 270, 431. The auction
was structured so that interested parties could not only bid
on Pacific Cargo's entire business, but also on various lots
of assets, encompassing the collateral of the various secured
creditors, including GE. ER 243; *see also* ER 240–41.

On July 10, 2013, the notice of intent to auction Pacific Cargo's assets ("Notice of Intent") was served by mail on GE's registered agent, CT Corporation System ("CT"), and local counsel and counsel of record, Wilson Muhlheim, as well as to the address set forth in GE's proof of claim. This notice set the auction for July 23, 2013, at 9:00 a.m., and advised that a hearing, to approve the auction sale results and to consider any objections, would be held that same day at 1:30 p.m.

On July 11, 2013, Pacific Cargo filed a motion to sell its assets, including GE's collateral, free and clear of liens, claims, and encumbrances outside of the ordinary course of business pursuant to 11 U.S.C. § 363(b) and (f) ("Sale Motion"). That same day, the Sale Motion was served on GE's registered agent, and its local counsel and counsel of record, both electronically and by mail. ER 346.

The auction proceeded as scheduled on July 23 and July 24, 2013, overseen by Equity Partners. ER 429–38. At a hearing late in the afternoon on July 24, counsel for Pacific Cargo reported that Hilco [3] was the high bidder on Lot 2, in the amount of $180,000, encompassing the eleven Hino trucks in which GE had a security interest. ER 317–19. Pacific Cargo requested good faith purchaser determinations, pursuant to 11 U.S.C. § 363(m), from the bankruptcy court as to the various buyers at the auction, but no evidence was presented at that time. ER 329–30. GE did not appear or participate in the auction or the subsequent hearings. ER 317–18, 329.

On July 31, 2013, the Sale Order was entered approving, in relevant part: (1) the purchase of Pacific Cargo's eleven Hino trucks by Hilco for $180,000; and (2) Pacific Cargo's receipt of ten percent ($18,000) of the sale proceeds as a carve out. ER 139. The Sale Order concluded "one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied," such that "[t]hose holders of liens, claims, encumbrances and interests who have been properly noticed and who did not object to the Sale Motion are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code." ER 137.

On August 2, 2013, following an expedited hearing, the bankruptcy court entered an order converting Pacific Cargo's Chapter 11 case into a Chapter 7 case because Pacific Cargo's assets had been sold and it was no longer operating as a going concern. ER 80, 223. On August 8, 2013, GE filed a motion to vacate the Sale Order, alleging that it first heard about Hilco's

purchase of the Hino trucks when Hilco's representatives contacted it to obtain titles thereto. ER 80, 478. In particular, GE argued that the Sale Order should be vacated because it did not receive proper notice and the trucks were sold for below their fair market value. ER 80–81. On August 16, 2013, the bankruptcy court conducted a preliminary hearing on GE's motion. ER 346, 350. On August 30, 2013, following expedited discovery from both Hilco and GE, and further briefing, the bankruptcy court held an evidentiary hearing. ER 372. On September 18, 2013, the bankruptcy court denied, via a Memorandum Opinion ("Opinion"), GE's motion to vacate. *See generally Pac. Cargo Servs.,* 2013 WL 5299545.

**\*3** On September 23, 2013, GE moved to stay the Sale Order. ER 106. On October 2, 2013, the bankruptcy court held a hearing on GE's motion to stay. ER 171–72. Ultimately, the bankruptcy court denied GE's motion initially and upon reconsideration. [4] ER 171–72, 196–97.

II. *District Court Proceedings*
On October 1, 2013, GE filed an appeal in this Court. On October 17, 2013, GE moved to stay the Sale Order, although GE did not request an expedited hearing. Before GE's motion to stay was fully briefed, GE turned over title for the Hino trucks to Pacific Cargo. On November 1, 2013, the transfer of the Hino trucks to Hilco closed in exchange for $180,000.

On December 30, 2013, Hilco moved to dismiss GE's appeal as moot under 11 U.S.C. § 363(m). Subsequently, Hilco resold all eleven Hino trucks and the proceeds were deposited into Hilco's operating bank accounts, and have been used and consumed in the regular course of business. On January 15, 2014, Pacific Cargo joined Hilco's motion.

**STANDARD OF REVIEW**

On appeal from the bankruptcy court, the district court independently reviews findings of fact for clear error, while conclusions of law are reviewed de novo. *In re Schwarzkopf,* 626 F.3d 1032, 1035 (9th Cir.2010). Mixed questions of law and fact are also reviewed de novo. *Educ. Credit Mgmt. Corp. v. DeGroot,* 339 B.R. 201, 214–15 (D.Or.2006) (citing *In re Rifino,* 245 F.3d 1083, 1087 (9th Cir.2001)).

## DISCUSSION

GE appeals the bankruptcy court's Sale Order and Opinion. Specifically, GE argues "that the Bankruptcy Court erred in finding good faith because it failed to make a finding of value and erroneously found that the auction alone established value." GE's Resp. to Mot Dismiss 2. In addition, GE contends that Hilco failed to establish the requisite elements of statutory mootness because the bankruptcy court erroneously approved an un-negotiated carve out, found that notice was sufficient, and determined the sale was valid under 11 U.S.C. § 363(f). Conversely, Hilco asserts that the bankruptcy court interpreted the law correctly and, therefore, accurately determined its status as a good faith purchaser. Further, since GE failed to procure a stay and the elements of 11 U.S.C. § 363(m) are met, Hilco argues that GE's appeal is moot.

### I. Motion to Stay

The district court may enter a stay during the pendency of an appeal to protect the respective rights of the parties. *In re Ahmed,* 420 B.R. 518, 524 n. 5 (Bankr.C.D.Cal.2009). The court must consider four factors when analyzing a motion to stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder,* 556 U.S. 418, 434 (2009) (citation and internal quotations omitted). "The party moving for a stay has the burden on each of these elements." *In re Shenandoah Realty Partners, L.P.,* 248 B .R. 505, 510 (W.D.Va.2000) (citation omitted).

**\*4** As discussed in section II, GE is not likely to succeed on the merits of its appeal. Therefore, the Court need not consider the other three factors because failure on the merits is dispositive. *Nken,* 556 U.S. at 434; *In re N. Plaza, LLC,* 395 B.R. 113, 120–26 (S.D.Cal.2008). Nevertheless, the Court also finds that if a stay were granted, the harm to GE would be outweighed by the harm to Hilco and the public interest. Accordingly, GE's motion to stay is denied.

### II. *Motion to Dismiss*

The Bankruptcy Code's statutory mootness provision specifies:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Thus, pursuant to 11 U.S.C. § 363(m), an unstayed order authorizing the sale of property to a good faith purchaser cannot be invalidated or modified on appeal. *In re S.W. Prods.,* 144 B.R. 100, 105 (B.A.P. 9th Cir.1992); *see also In re M Capital Corp.,* 290 B.R. 743, 748 n. 4 (B.A.P. 9th Cir.2003) ("section 363(m) merely limits appellate remedies in event of reversal by precluding any effect on the validity of the sale, but it does not preclude other remedies"). [5]

Despite this general rule, statutory mootness does not apply, in pertinent part, where: (1) the purchaser acted in bad faith; (2) "the Appellant seeks to attack the sale of estate property on the grounds of improper notice"; or (3) the appellant challenges the validity of the sale made free of liens and encumbrances pursuant to 11 U.S.C. § 363(f). *Sumwalt v. Equity Sec.,* 956 F.2d 275, 275 (9th Cir.1992) (citing *In re Onouli–Kona Land Co.,* 846 F.2d 1170, 1173 (9th Cir.1988); *In re Moberg Trucking Inc.,* 112 B.R. 362, 363 (B.A.P. 9th Cir.1990)); *In re Namco Capital Grp., Inc.,* 2011 WL 2312090, at \*2–3 (C.D.Cal. June 7, 2011). These issues may be considered on appeal, even without a stay in place and after the subject assets have been transferred, because they each relate to a statutory element of a valid sale. *See* 11 U.S.C. § 363. Outside of these issues, where the sale has been effectuated in the absence of a stay, an appeal is moot. *Sumwalt,* 956 F.2d at 275. The party invoking 11 U.S.C. § 363(m) bears the burden of demonstrating that all of the statutory elements

*In re Pacific Cargo Services, LLC, Not Reported in F.Supp.3d (2014)*

are met. *In re Fitzgerald,* 428 B.R. 872, 880 (B.A.P. 9th Cir.2010).

GE raises four issues on appeal: (1) Hilco's status as a good faith purchaser for value; (2) whether the carve out was properly negotiated; (3) whether notice was sufficient; and (4) whether the sale was valid under 11 U.S.C. § 363(f). [6]

A. *Good Faith Purchaser*

"[A] good faith purchaser is one who buys 'in good faith' and 'for value.' " *In re Ewell,* 958 F.2d 276, 281 (9th Cir.1992) (internal citation omitted). Lack of good faith is typically "shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.' " *Id.* (quoting *In re Suchy,* 786 F.2d 900, 902 (9th Cir.1985)). As such, a good faith purchaser determination is generally not dependent on a sale generating a specific level of value, particularly in a public auction context. *Id.* In other words, "[a]n auction is sufficient to establish that the purchaser has paid value so long as the purchaser bought the debtor's property in good faith." *Onouli–Kona,* 846 F.2d at 1174 n. 1 (citing *Abbotts Dairies,* 788 F.2d at 149).

**\*5** Generally, the issue of good faith is factual and reviewed for clear error. *In re Thomas,* 287 B.R. 782, 785 (B.A.P. 9th Cir.2002). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing Court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573 (1985) (citation omitted). GE contends, however, that the bankruptcy court applied the wrong legal standard to determine that Hilco was a good faith purchaser. Specifically, GE attacks the bankruptcy court's use of a public auction to establish value and instead asserts that value must equate to a certain percentage of the asset's market price.

Here, it is undisputed that there was no collusion, fraud, or other impropriety. GE's Resp. to Mot. Dismiss 1; Hilco's Reply to Mot. Dismiss 3. In fact, GE conceded before the bankruptcy court that no such factors were present and that Hilco's purchase was an arms-length transaction. ER 393. Yet GE has not cited to, and the Court is not aware of, any authority in which value was successfully challenged after a public auction without allegations of fraud or collusion.

*See generally* GE's Resp. to Mot. Dismiss; *see also In re Lahijani,* 325 B.R. 282, 289 (B.A.P. 9th Cir.2005) ("[t]he price achieved by an auction is ordinarily assumed to approximate market value when there is competition by an appropriate number of bidders [but][w]hen competition is constrained ... the price is less likely to be reliable and should be examined more carefully").

Indeed, the cases GE relies on in support of its assertion that the bankruptcy court erred in this regard involved fraud and/or collusion, or no affirmative evidence of good faith. *See In re Schugg,* 2006 WL 1455568, at *7 (D.Ariz. May 22, 2006) (value not established because evidence of fraud and collusion existed); *Abbotts Dairies,* 788 F.2d at 149 (value not established, despite the occurrence of an auction, because evidence of fraud and collusion existed); *Fitzgerald,* 428 B.R. at 872 (good faith not established, despite the occurrence of an auction, where there was no good faith determination made by the bankruptcy court, no evidence of good faith was presented, and allegations of fraud and collusion existed); *Lahijani,* 325 B.R. at 289– 90 (good faith not established because there was a question as to whether the designated "high bidder" was actually the highest bidder); *In re Perona Bros., Inc.,* 186 B.R. 833, 839–40 (D.N.J.1995) (good faith not established due to the existence of an insider purchaser with an unexamined fiduciary relationship). Therefore, the bankruptcy court did not err as a matter of law in holding that the auction was sufficient to establish value for the Hino trucks.

Moreover, to the extent GE contends that no real auction occurred because "the debtor engineered a process in which only one party was prepared to bid on the lots in the room," such that value was not determined by the purchase price, its argument fails. GE's Resp. to Mot. Dismiss 2. Initially, Pacific Cargo's actions have no bearing on Hilco's rights pursuant to the Sale Order, especially because GE concedes that there is no collusion, fraud, or other impropriety at issue. Regardless, the record is replete with evidence that a competitive auction occurred. For example, the bidding procedures were approved at a hearing, well in advance of the auction, wherein most of Pacific Cargo's secured creditors participated. ER 243–47. As discussed in greater detail below, GE had the opportunity to object to the bidding procedures and auction process, but did not participate. Equity Partners advertised the auction; Hilco's attendance is evidence of Equity Partners' successful marketing. ER 263–65, 458, 471. Additionally, Hilco was

outbid on other lots at the auction. ER 453, 471, 476. Under these circumstances, this Court finds no clear error in the bankruptcy court's factual finding that Pacific Cargo's assets were sold pursuant to a competitive auction.[7]

**\*6** Finally, contrary to GE's assertion, the price paid by Hilco for the Hino trucks did not constitute an unconscionable windfall. The record indicates that the purchase price was calculated to provide a profit to Hilco and account for risks associated with the transaction. ER 527–28. Ms. Ford, Hilco's Vice President of Asset Sales, testified at the evidentiary hearing that, as of August 30, 2013, Hilco had received conditional, non-binding offers on the trucks ranging from $260,000 to $473,000. ER 546. "After subtracting expected transactional costs, marketing expenses, storage charges, and other amounts," Hilco represents that it "might have made a large or small profit from the re-sale of the trucks, and perhaps no profit at all." Hilco's Reply to Mot. Dismiss 13 (citations omitted). As such, the bankruptcy court did not err in determining that "Hilco's winning bid [is not] so inadequate that it supports setting [it] aside." *Pac. Cargo Servs.,* 2013 WL 5299545 at \*23.

In sum, the bankruptcy court interpreted the law correctly and determined that a public auction, conducted in accordance with court-approved procedures and without fraud or collusion, is compelling evidence of value. *Pac. Cargo Servs.,* 2013 WL 5299545 at \*23; *see also Onouli–Kona,* 846 F.2d at 1174 n. 1; *Ewell,* 958 F.2d at 281–82. Accordingly, the bankruptcy court's finding that Hilco was a good faith purchaser for value pursuant to 11 U.S.C. § 363(m) was based on the proper legal standards and was not clearly erroneous.

### B. *Notice*

A valid sale "specifically requires a notice and hearing [such that] § 363(m) mootness is not applicable when the Appellant seeks to attack the § 363 sale of estate property on the grounds of improper notice." *Moberg Trucking,* 112 B.R. at 363–64 (citations and internal quotations omitted). Whether the notice of a sale in a bankruptcy case was sufficient requires analysis of several interrelated provisions of the Federal Rules of Bankruptcy Procedure. Rule 2002 states that creditors shall be given at least 21 days notice by mail of a proposed sale, "unless the court for cause shown shortens the time or directs another method of giving notice."

Fed. R. Bankr.P.2002(a)(2); *see also* Fed. R. Bankr.P. 6004(a). This rule provides further that such notice shall be sent to the mailing address specified in the creditors' proof of claims. Fed. R. Bankr.P.2002(g)(1)(A).

Likewise, Rule 6004 specifies:

> a motion for authority to sell property free and clear of liens or other interests shall be made in accordance with Rule 9014 and shall be served on the parties who have liens or other interests in the property to be sold. The notice required by subdivision (a) of this rule shall include the date of the hearing on the motion and the time within which objections may be filed and served on the debtor in possession or trustee.

Fed. R. Bankr.P. 6004(c). In turn, Rule 9014 requires that a motion in a contested matter shall be served by first class mail, postage prepaid. Fed. R. Bankr.P. 9014(b); Fed. R. Bankr.P. 7004(b). Service on a United States corporation may be made by mailing a copy of the motion "to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process." Fed. R. Bankr.P. 7004(b). In sum, notice regarding a proposed sale of the property of bankruptcy estate must be served by first class mail on an authorized representative of the creditor who will have some understanding as to what the piece of paper in the mail actually means.

**\*7** GE made three arguments before the bankruptcy court regarding alleged deficiencies in the notices sent by Pacific Cargo: (1) notice relating to the auction-including the Notice of Intent and Sale Motion-should have been sent to GE's lead counsel, Reed Smith, LLP; (2) notice was not served at the address specified in GE's proof of claim; and (3) the Notice of Intent informed of a hearing in less than the 21 days. *Pac. Cargo Servs.,* 2013 WL 5299545 at \*6. The bankruptcy court considered each argument in detail and found that notice was sufficient under 11 U.S.C. § 363. *Id.* at \*10.

The bankruptcy court determined that the notice sent to Mr. Muhlheim was appropriate because he was the attorney of record, Reed Smith's connection to Pacific Cargo's

bankruptcy was limited, and, if Mr. Muhlheim had been authorized to view the notices, he would have recognized their significance immediately. *Id.* at *18–19. Additionally, the bankruptcy court found that GE failed to provide sufficient evidence to overcome the presumption that notice was received since "the steps taken by Pacific Cargo to provide notice of the auction sale of its assets ... were reasonable, appropriate and adequate under the Rules." *Id.* at *16. Finally, the bankruptcy court concluded that Pacific Cargo's actions were reasonably calculated to provide notice to all creditors because the Auction Order granting the shortened timeline was not appealed and, further, it provided similarly situated secured creditors sufficient time to participate adequately. *Id.* at *17.

On appeal, GE raises virtually the same notice issues. *See* GE's Mot. to Stay 10. Whether notice was received is a factual issue reviewed for clear error. 🔖 *In re Bucknum,* 951 F.2d 204, 206 (9th Cir.1991). As noted above, when applying the clear error standard, "a reviewing court must ask whether, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed." 🔖 *Easley v. Cromartie,* 532 U.S. 234, 242 (2001) (citations and internal quotations omitted). Additionally, "whether adequate due process notice was given in any particular instance is a mixed question of law and fact that [is] review[ed] de novo." *Id.* (citation omitted). After reviewing the record and briefs, the Court finds that the bankruptcy court's reasoning, as explained in the Opinion, is correct as to each allegation of error raised by GE.

Regarding GE's first assertion, notice sent to an attorney of record is generally adequate when it is reasonably calculated "to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 🔖 *In re Schicke,* 97 Fed.App'x 249, 251 (10th Cir.2004) (citation and internal quotations omitted). This is because "[a]n attorney of record is the attorney upon whom service is to be made, and to whom notices will be directed by the court." Local Bankr.R. ("LBR") 9010–1(b)(1); *see also* 🔖 *Shicke,* 97 Fed.App'x at 251 (debtor complied with due process by serving notice of the bankruptcy petition on the creditor's attorney of record). GE admitted that Mr. Muhlheim's firm, Luvaas Cobb, was its attorney of record during Pacific Cargo's bankruptcy proceedings. ER 581, 602–04. It is further undisputed that Mr. Muhlheim remains the attorney of record for GE during these appellate proceedings. GE, however, withheld authorization for Mr. Muhlheim

to view certain notices, likely as a cost saving measure; Reed Smith, GE's lead counsel, never filed a special notice requirement and Reed Smith attorneys Alexander Terras and Aaron Chapin did not apply for pro had vice admission until after GE moved to vacate the Sale Order. ER 581, 601–04. Under the circumstances, it was reasonable for Pacific Cargo to notify Mr. Muhlheim and not Reed Smith, such that the Notice of Intent and Sale Motion were served consistent with the Federal Rules of Bankruptcy Procedure.

**\*8** In any event, the record reflects that the Auction Order, Notice of Intent, and Sale Motion were, in fact, sent to and received by Mr. Mulheim. ER 468–69. If he had been authorized to review these notices, he would have understood and likely communicated their significance. *Id.* The fact that Mr. Muhlheim was precluded from doing so because he was not authorized by GE is immaterial to whether the bankruptcy court erred in finding that Pacific Cargo complied with the Bankruptcy Code's statutory notice provisions.

Regarding GE's second contention, proof of mailing a properly addressed and stamped notice creates a rebuttable presumption of its receipt. 🔖 *In re Williams,* 185 B.R. 598, 599 (B.A.P. 9th Cir.1995) (citation omitted). "If a party were permitted to defeat the presumption of receipt of notice resulting from the certificate of mailing by a simple affidavit to the contrary, the scheme of deadlines and bar dates under the Bankruptcy Code would come unraveled." 🔖 *Id.* at 599–600 (citation and internal quotations omitted). Accordingly, rebuttal of this presumption requires clear and convincing evidence. 🔖 *Bucknum,* 951 F.2d at 207.

Here, Pacific Cargo provided evidence that the requisite notices were sent to GE. Pacific Cargo's counsel, Margot Lutzenhiser, testified that its mailing matrix was amended to incorporate the address specified in GE's proof of claim. ER 445, 464–65. David Cakarnis, the managing partner of DTI, the entity hired to handle the matrix mailing of the Notice of Intent, testified that, under his supervision, this notice was properly addressed and mailed by first class mail, postage prepaid, to all listed parties. ER 492. The amended certification of service for the Notice of Intent, from July 11, 2013, reflects service on GE at its proof of claim address, registered agent, and counsel of record. ER 466, 472, 477. Moreover, copies of the Sale Motion were properly addressed and mailed to GE's registered agent, as required by Rules 6004(c), 9014(b), and 7004(b)(3), and to GE's counsel of record. ER 350. Likewise, the Auction Order was properly

addressed and mailed to GE at the address specified on its proof of claim and to its counsel of record. ER 466–68. The only pertinent rebuttal evidence GE provided was testimony from Elizabeth Steel, a litigation specialist at GE dealing with bankruptcy, stating she did not receive any notice of the sale. ER 571, 593; *but see* ER 571 (Ms. Steel testifying that her office received at least some of the documents sent to creditors).

Based on this record, the Court finds that GE failed to provide clear and convincing evidence to rebut the presumption that notice was received. As discussed above, GE conceded that its counsel of record, Mr. Muhlheim, received statutory notice, including the Notice of Intent and Sale Motion. ER 594. Additionally, GE admitted that its registered agent, CT, also received the Notice of Intent and Sale Motion prior to the public auction of Pacific Cargo's assets. ER 350, 356, 359, 472–74. There is no evidence in the record concerning what, if any, information was passed on to GE by CT regarding the Pacific Cargo asset sale. Regardless, because Pacific Cargo sent the requisite notices to the proper addresses, Ms. Steel's testimony does not constitute clear and convincing evidence, especially in light of the other evidence of record. Therefore, the bankruptcy court did not err in finding that Pacific Cargo presented credible evidence that notice was sent or that GE failed to rebut the presumption of receipt.

**\*9** Concerning GE's third contention, GE is correct that Rule 2002(a) generally establishes a requirement of 21 days notice for parties with an interest in the sale of assets outside the ordinary course of business, "unless the court for cause shown shortens the time." Fed. R. Bankr.P.2002(a). That is precisely what occurred here. The bankruptcy court, in order to best meet the needs of all parties involved, shortened the timeline after specifically finding that all creditors had received sufficient notice "of the Debtor's bid procedures and auction." *Pac. Cargo Servs.,* 2013 WL 5299545 at \*17. As the bankruptcy court observed, other similarly situated creditors participated effectively at the auction; indeed, some creditors even filed objections in advance of the sale, indicating that the notes-including the Auction Order, Notice of Intent, and Sale Motion-sent by Pacific Cargo furnished adequate time for creditors to respond and meaningfully participate. *Id.* Accordingly, the bankruptcy court did not err in rejecting GE's argument as to the shortened timeline.

For the reasons discussed above and in the bankruptcy court's Opinion, this Court finds that notice was sufficient under the circumstances presented here, such that GE's due process

rights were not violated. Therefore, the bankruptcy court's decision is affirmed as to this issue.

### C. *Free of Liens and Encumbrances*

"A bankruptcy trustee may sell property of the estate free and clear of a lien or other interest where the holder of the lien or interest consents [under] 11 U.S.C. § 363(f)(2)." *In re E. Airport Dev., LLC,* 443 B.R. 823, 831 (B.A.P. 9th Cir.2011) (citation omitted). "Those holders of Liens against the Debtor or their respective estates or any of the Acquired Assets who did not object are deemed to have consented thereto." *In re R Star Restaurants, Inc.,* 2010 WL 3329814, at \*4 (Bankr.C.D.Cal. June 29, 2010). In other words, holders of liens, claims, encumbrances, and interests who have been properly noticed and who did not object to the sale motion are deemed to have consented to the sale. *See, e.g., In re Blixseth,* 2011 WL 1519914, at \*14–18 (Bankr.D.Mont. Apr. 20, 2011).

GE contends, for the first time on appeal, that the bankruptcy court erred in finding that the sale of its collateral was valid pursuant to 11 U.S.C. § 363(b) and (f). *Compare* GE's Resp. to Mot. Dismiss 17, *with* ER 471. Initially, because GE failed to raise this issue below, it has not been preserved for appeal. *See generally Pac. Cargo Servs.,* 2013 WL 5299545; *see also In re Rains,* 428 F.3d 893, 902 (9th Cir.2005) (courts do "not consider an issue raised for the first time on appeal") (citation omitted). Nevertheless, as noted above, the bankruptcy court reviewed the sufficiency of the notice Pacific Cargo sent to GE and heard testimony. The court determined that GE consented to the sale based on its failure to object after receiving "adequate and legally sufficient" notice. *Pac. Cargo Servs.,* 2013 WL 5299545 at \*20. Because the record confirms that GE received sufficient notice and did not subsequently object to the Sale Order, this Court agrees with the bankruptcy court. *See R Star Restaurants,* 2010 WL 3329814 at \*4; *see also* 11 U.S.C. § 363(f).

**\*10** Accordingly, GE's argument, which is contingent upon a finding of error in regard to the bankruptcy court's notice ruling, is without merit. Therefore, because Hilco was a good faith purchaser and GE received adequate notice, such that the sale of GE's assets to Hilco pursuant to 11 U.S.C. § 363 was valid, the elements of statutory mootness are fulfilled. As a result, GE's appeal is dismissed.

D. *Carve Out*

Even if GE's challenge to Pacific Cargo's carve out was not statutorily moot, it nonetheless fails on the merits. "A carve out generally refers to an agreement between a secured lender, on the one hand, and the trustee or debtor-in-possession, on the other, providing that a portion of the secured creditor's collateral may be used to pay administrative expenses." *In re Cal. Webbing Indus., Inc.,* 370 B.R. 480, 483 (Bankr.D.R.I.2007) (citations omitted); *see also In re Besset,* 2012 WL 6554706, at *5 n. 5 (B.A.P. 9th Cir. Dec. 14, 2012). "While there is no reference in the Bankruptcy Code to 'carve outs' for professionals," such that "[t]here is no established form for a carve out agreement, and ... it can mean different things to different people," out of practical necessity, "the term is commonly included in [sale or asset purchase] agreements." *Cal. Webbing,* 370 B.R. at 483 (citations omitted). The details of such agreements are "frequently the result of negotiations between the post-petition lender, the unsecured creditor's committee, and approval by the bankruptcy court." *Id.* at 483–84.

Here, the record indicates that a carve out for the benefit of unsecured creditors was requested by the United States Trustee. ER 227. Throughout the bankruptcy proceedings, the goal was to sell Pacific Cargo as a going concern in order to obtain the highest value for creditors while "protect[ing] the jobs of approximately 200 employees and 50 independent contractors [who] are creditors, unsecured creditors of the estate." ER 224. Even though the attempt to sell Pacific Cargo as a going concern ultimately failed, it was kept open for business in order to enhance the possibility of a going concern sale. ER 224, 606. As such, the United States Trustee recognized Pacific Cargo needed to maintain a "pay to play position [and was] looking for a carve out" to mitigate expenses and pay employees and independent contractors as unsecured creditors of the estate. ER 228.

During each bankruptcy court hearing prior to the auction, a carve out was contemplated, but the specifics remained undefined because it depended on the amount bid and whether Pacific Cargo could be sold as a going concern. ER 224–25. When approving the sale of GE's collateral to Hilco, the bankruptcy court recognized that "as set out by Debtor's counsel at the Sale Hearing, 10% of the total sales proceeds will be distributed to the bankruptcy estate (i.e. $18,000)" because such relief was "in the best interests of the estate, its creditors and other parties in interest ." ER 134–35. There is no indication that any other secured creditor objected to this carve out. ER 224–35, 241.

**\*11** GE now argues, for the first time on appeal, that the bankruptcy court erred in permitting Pacific Cargo to extract a carve out from the sale proceeds without first receiving its consent as the affected secured creditor. GE does not contend that it would have objected to the carve out, only that it was deprived of the opportunity to negotiate or consent thereto. *See* GE's Resp. to Mot. Dismiss 16–17; GE's Mot. to Stay 8–10.

The Court observes that the resolution of this issue has no effect on Hilco's rights pursuant to the Sale Order, as the carve out only concerns funds in the bankrupt estate trustee's possession. *See* Hilco's Reply to Mot. Dismiss 19. More importantly, GE failed to raise this issue before the bankruptcy court and therefore it was not preserved for appeal.[8] *Rains,* 428 F.3d at 902. Regardless, as discussed in section II(B), GE received requisite notice relating to Pacific Cargo's bankruptcy and/or the auction. Other secured creditors received notice, the same notice that was sent to GE, and had the opportunity to oppose the carve out. ER 218–20, 229, 578. Because GE received adequate notice, its failure to object to Pacific Cargo's carve out pursuant to Hilco's purchase, or to otherwise participate in the bankruptcy court proceedings, constitutes waiver. ER 506–07; *Cal. Webbing,* 370 B.R. at 486 ("a secured creditor's collateral may only be diminished to the extent that the secured creditor waives its right to the protections afforded by the Code") (citation and internal quotations omitted). Thus, the carve out in this case was appropriately approved by the bankruptcy court because consent was obtained from Pacific Cargo, Hilco, and GE.

### CONCLUSION

The bankruptcy court's Sale Order and Opinion are AFFIRMED. As such, Hilco's motion to dismiss (doc. 20) is GRANTED and GE's motion to stay (doc. 1) is DENIED. Pacific Cargo's motion for joinder (doc. 26) is GRANTED. Hilco's request for oral argument is DENIED as unnecessary. This appeal is DISMISSED.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 2041821

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

## Footnotes

1    Pacific Cargo purchased one of these trucks from GE prior to the bankruptcy petition date, such that GE's interest is comprised of the remaining eleven Hino trucks.

2    Because the parties did not chronologically number the appellate record, which also includes duplicates, the Court cites to the page numbers assigned in the docket for ease of reference.

3    Hilco is an international industrial auctioneer, liquidator, and appraiser. Its business frequently involves buying and reselling industrial machinery and equipment at a profit.

4    In denying GE's motion to stay, the bankruptcy court stipulated that any renewed motion should be "supported by a superseadeas bond in an appropriate amount to protect the interests of Hilco and the bankruptcy estate." ER 172. GE, however, filed its renewed motion absent a superseadeas bond. It is common practice to require the posting of a supersedeas bond when a party requests a stay, unless "the appellant's financial condition prevents it from obtaining such a bond." *In re Byrd,* 172 B.R. 970, 974 (Bankr.W.D.Wash.1994); *Vacation Vill., Inc. v. Clark Cnty., Nev.,* 497 F.3d 902, 913 (9th Cir.2007). In requesting a stay before this Court, GE continues to oppose the posting of a superseadeas bond despite the fact that there is no evidence that it was or is financially unable to do so.

5    To the extent GE asserts that nothing precludes the Court from furnishing the alternate equitable relief it proposes, even if it finds that Hilco was a good faith purchaser, GE's argument is unavailing. GE has not cited to, and this Court is not aware of, any authority where equitable relief has been granted in this or an analogous context, indicating that such relief is used rarely and only under circumstances not presented here.

6    The Bankruptcy Code does not contain a carve out provision and GE has not cited to any authority indicating that a court may consider this issue where the elements of 11 U.S.C. 363(m) are met. In other words, unlike GE's other three challenges, the carve out issue is not a recognized exception to statutory mootness, likely because it is not a statutory element and would entail modification of the sale order.

7    As Hilco observes, "[i]f GE did not like the proposed structure of the auction ... it should have responded to the notices it received and objected to the Bidding Procedures Order." Hilco's Reply to Mot. Dismiss 15. Moreover, it is undisputed that Hilco played no role in the planning or execution of the auction, raising the question of "what, exactly, does GE believe Hilco should have done differently to act in 'good faith'?" *Id.* at 16.

8    GE's argument that its blanket opposition to the Sale Order included a challenge to the carve out is unpersuasive. *Rains,* 428 F.3d at 902 (issues must be articulated "with sufficient clarity to preserve the alleged error").

---

End of Document                                  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2:13-CV-00639-PMP-CWH

UNITED STATES DISTRICT COURT DISTRICT OF NEVADA

# Boh Park Highlands NV, L.P. v. Wilmington Trust (In re November 2005 Land Investors, LLC)

Decided Jan 20, 2014

2:13-CV-00639-PMP-CWH Bankr. No. BK-S-11-20704-MKN Adv. No. 11-01333-MKN 2:13-CV-01204-PMP-CWH

01-20-2014

IN RE NOVEMBER 2005 LAND INVESTORS, LLC, Debtor. BOH PARK HIGHLANDS NV, L.P., Appellant, v. WILMINGTON TRUST, NATIONAL ASSOCIATION, Appellee.

PHILIP M. PRO

## OPINION

Before the Court is Appellant BOH Park Highlands NV, L.P.'s appeal of the bankruptcy court's order granting summary judgment in favor of Appellee Wilmington Trust regarding the disposition of approximately $4.9 million realized from the sale of the Debtor's property. *2

2

## I. BACKGROUND

The following factual recitation is taken largely from the parties' stipulated facts. The Debtor, November 2005 Land Investors, L.L.C. ("November 2005"),[1] was formed in 2005 for the purpose of acquiring land in North Las Vegas, Nevada to develop a master planned community with another company, DRHI, Inc. ("DRHI"). (Appx. Vol. 6 (Doc. #24) at R226.) November 2005 was wholly owned by NLV Holding, LLC, which in turn was owned by a consortium of four home builders referred to in the relevant agreements as the "Participants." (Id. at R227.)

[1] Debtor November 2005's bankruptcy was jointly administered with Debtors NLV Holding, LLC and BOPH, Inc. (Appx. Vol. 6 at R225.)

On March 1, 2006, November 2005 entered into the Amended and Restated Infrastructure Funding Agreement ("IFA") with DRHI and another company which was to become the development manager for the project. (Id. at R228.) Under the IFA, November 2005 and DRHI were responsible for funding infrastructure costs associated with the development, with November 2005 paying eighty percent of the costs and DRHI paying twenty percent. (Id.) Pursuant to the IFA, the development manager could make cash calls on DRHI and November 2005 to fund an infrastructure escrow, which the development manager would use to pay infrastructure costs. (Id. at R228-29.) The IFA contained a funding schedule which required DRHI to fund cash calls on an accelerated basis during the initial stages of the project. (Id. at R229.) As a result, the agreement contemplated that DRHI would fund more than its twenty percent share of costs in the early stages of the project. (Id.) The IFA referred to these excess payments as Builder Excess Funding. (Id.) The IFA was not recorded against the property. (Id.)

November 2005, DRHI, the development manager, and the Participants also entered into the Conditional Repayment and Funding Agreement ("CRFA"). (Id.) Pursuant *3 to Section 1 of the CRFA, if a lender "exercises remedies" in connection with the purchase financing, and "the exercise of such remedies results in a transfer of

3

title to all or any portion" of the property, "whether by foreclosure, deed-in-lieu of foreclosure, or otherwise," then the acquirer must elect either to assume the CRFA or buy out DRHI by making a Buyout Payment. (Appx. Vol. 4 (Doc. #22) at R131-32.)

Section 6 of the CRFA governs releases from the CRFA in the event November 2005 sold the property or otherwise wanted to release the property or a portion thereof from the CRFA. (Id. at R135.) Pursuant to Section 6.1.b, if November 2005 sold or otherwise transferred the property to someone other than a Participant or someone who obtained the property through a foreclosure, the purchased property would be released from the CRFA automatically upon recordation of a Development Declaration encumbering the released property. (Id. at R135-36; see also Appx. Vol. 1 at R22.) A form of Development Declaration was attached to the IFA, and generally provides that the owner of property within the project agrees to develop the property in conformity with the development plan for the master planned community. (Appx. Vol. 13 (Doc. #31) at R501-20, Vol. 14 (Doc. #32) at R521-34.) The Development Declaration refers to the IFA, but not the CRFA. (Appx. Vol. 13 at R502, R532.)

Section 6.1.c of the CRFA permits a release when a Participant transfers property upon recording a Development Agreement and by the Participant providing a letter of credit sufficient to cover that Participant's Buyout Share. (Appx. Vol. 4 at R135.) Section 6.1.d permits a release for any reason, upon November 2005 or a Participant providing a letter of credit sufficient to cover the Buyout Payment, which could be drawn upon if there is a default in the required payment of the Partial Share or Participant Buyout Share. (Id. at R135.) The Partial Share and Participant Buyout Share refer back to Section 1's buyout option. (Id.

4    at R131-32.) *4

Pursuant to Section 27(iii), the CRFA "shall automatically terminate and be of no further force and effect upon . . . the payment to [DRHI] of the Builder Excess Funding."[2] (Id. at R141; see also Appx. Vol. 5 (Doc. #23) at R176.) Pursuant to Section 7 of the CRFA, all obligations in the CRFA "are intended by the Parties to be, and shall be construed as, covenants running with" the land. (Appx. Vol. 4 at R137.)

> 2    The parties agree Section 27(i) and (ii) are
>      not relevant to this dispute.

On May 9, 2006, November 2005 and DRHI purchased the property from the Bureau of Land Management. (Appx. Vol. 6 at R227.) November 2005 financed the land purchase through a consortium of lenders who obtained first and second liens on the property to secure the debt. (Id. at R227.) The first and second lien lenders recorded their liens on May 9, 2006, but after the CRFA was recorded against the property. (Id. at R227-28.)

In 2008, Appellant BOH Park Highlands NV, L.P. ("BOH") purchased and was assigned all of DRHI's rights and interests in the project. (Id. at R230.) In 2009, November 2005 filed its first voluntary petition for bankruptcy. (Id.) To settle various claims amongst the parties, November 2005, the development manager, BOH, and others entered into the Second Amendment to the IFA, the First Amendment to the CRFA, and the 2009 Letter Agreement. (Id.) Pursuant to the Second Amendment to the IFA, BOH was formally substituted as DRHI's assignee. (Appx. Vol. 4 at R153, R155.) Additionally, the parties agreed that BOH would be relieved from making any further accelerated infrastructure payments under the IFA. (Id. at R157.) The parties still were obligated to fund their respective share of all costs and expenses contemplated by the development budget then in effect. (Id.) However, the parties agreed that until the Builder Excess Funding was eliminated, BOH had to pay only ten percent of its share of costs, and November 2005 would pay the

other ten percent of BOH's share until Builder
5  Excess *5 Funding was reduced to zero. (Id.) The
parties also agreed that as of that date, the Builder
Excess Funding was $4,980,687.66, and a Buyout
Payment would amount to $3,230,264.00. (Id. at
R158; see also Appx. Vol. 6 at R230.)

The parties made similar changes in the First
Amendment to CRFA regarding the identity of the
relevant contracting parties and the amount of the
Builder Excess Funding. (Appx. Vol. 5 at R174-
75.) In the 2009 Letter Agreement, BOH
"acknowledge[d] that all of [its] rights and
interests in and to the Infrastructure Agreement
are subject and subordinate to the lien of any deed
of trust or security interest securing the obligations
of Borrower, Holdings or any guarantor of any
Credit Agreement pursuant to the terms of the
Credit Agreements." (Id. at R192.) Appellee
Wilmington Trust ("Wilmington") became the
administrative agent for the first lien lenders in
December 2009. (Appx. Vol. 6 at R231.)

November 2005 thereafter failed to make a full
payment to the first lien lenders in March 2010,
and November 2005 filed its second bankruptcy
petition on July 6, 2011. (Id. at R232.) November
2005's assets consisted primarily of the property.
(Id.) At the time of the petition, the first lien
lenders held first and second liens in the amount
of $238,886,627.49. (Id.) November 2005's
schedules listed BOH as having a secured claim of
$3,230,264.00. (Id.)

November 2005 moved the bankruptcy court to
permit a sale of the property free and clear of any
liens pursuant to Section 363 of the Bankruptcy
Code. (Id.) BOH and Wilmington disputed the
procedures to effect a sale as well as the priority of
their competing claims. (Id. at R233-34.)
Wilmington brought an adversary complaint
against BOH seeking to permit the sale of the
property free and clear of the CRFA and for a
determination of the validity, priority, and amount
of the parties' liens. (Id. at R234.)

The parties thereafter entered into a stipulation
regarding the sale of the property pursuant to
which the property would be sold free and clear of
6  the CRFA under Section *6 363. (Id.) Specifically,
the parties stipulated the property would "be sold
free and clear of the CRFA pursuant to either, or
both (1) Section 363(f)(4) of the Bankruptcy Code
on the basis that the CRFA may be subject to a
bona fide dispute and/or (ii) Section 363(f)(5) of
the Bankruptcy Code on the basis that BOH can
be compelled to accept a money satisfaction of the
CRFA." (Appx. Vol. 19 (Doc. #37) at R751.)
Additionally, the parties stipulated that the
"interests of BOH in the Property arising by virtue
of the CRFA and the liens of the First Lien
Lenders in the Property shall attach to the
proceeds of the sale of the Property to the same
extent and with the same priority that such
interests and liens have with respect to the
Property." (Id. at R751.) The parties "reserve[d] all
rights and arguments as to what effect a sale free
and clear of the CRFA pursuant to either, or both,
Section 363(f)(4) and/or 363(f)(5) of the
Bankruptcy Code has upon their respective rights
to the Held Proceeds." (Id. at R752.) As a result,
approximately $4.9 million of the proceeds
reflecting the full amount of the Builder Excess
Funding would be held by November 2005
following the sale pending the resolution of the
competing claims between BOH and Wilmington.
(Id.) The property was sold in December 2011 to a
third party for $21 million. (Appx. Vol. 6 at
R234.)

Following the sale, the parties filed cross motions
for summary judgment. BOH filed two summary
judgment motions. In its first motion, BOH argued
that the property could not have been sold
pursuant to Section 363(f)(4) because property can
be sold free and clear of an interest under Section
363(f)(4) only where that interest is the subject of
a bona fide dispute. BOH contends there was no
dispute over BOH's priority interest under the

Boh Park Highlands NV, L.P. v. Wilmington...    ...CV-00681-PMP-CWH (D. Nev. Jan. 20, 2014)

CRFA because both parties agreed the CRFA was valid and was recorded prior to the lenders' liens. (Appx. Vol. 18 (Doc. #36) at R709-10.)

As for Section 363(f)(5), BOH argued the only way November 2005 could force BOH to accept a monetary satisfaction of its contractual rights would be to terminate the CRFA under Section 27(iii) by paying BOH the full amount of the Builder Excess Funding. *7 (Id.) BOH also argued that because its rights under the CRFA were recorded prior to the first and second lender liens, BOH's claim to the proceeds was superior to the lenders' liens. (Id.) BOH therefore requested the bankruptcy court award it $4,980,687.66 in held proceeds as the amount the parties previously had agreed reflected the Builder Excess Funding. (Id. at R709.) In its second motion for summary judgment, BOH argued in the alternative that if the bankruptcy court concluded that Section 1 of the CRFA, which provided for a buyout of BOH's rights under the CRFA upon foreclosure by the lenders, was relevant, then BOH was entitled to the Buyout Payment of $3,230,264.00. (Appx. Vol. 19 (Doc. #37) at R727-28.)

Wilmington also moved for summary judgment, arguing that the sale could have been approved under either Section 363(f)(4) or Section 363(f)(5). As to Section 363(f)(4), Wilmington argued a genuine dispute existed between the parties as to whether BOH held a valid lien in any amount. (Appx. Vol. 20 (Doc. #38) at R769.) Specifically, Wilmington argued that BOH was entitled to payment under the CRFA only if Section 1 were triggered, and that required the lenders to foreclose resulting in a transfer of the property. (Id. at R766-69.) Because the lenders did not foreclose and the transfer of the property was not the result of a foreclosure, Wilmington contends BOH had no right to payment under the CRFA. (Id.) As to Section 363(f)(5), Wilmington argues BOH's interests in the CRFA theoretically were capable of monetary satisfaction, but because Section 1 was never triggered, that interest was of no value. (Id. at R771-74.) Wilmington asserted

that Section 27(iii) had no application because Section 363(f)(5) does not require terminating a contract to sell a property free and clear of that contract. (Id.)

The bankruptcy court granted summary judgment in Wilmington's favor. (Notice of Appeal (Doc. #1), Ex. A.) The bankruptcy court found the sale was authorized under Section 363(f)(4) because the parties had a bona fide dispute about whether BOH had a valid entitlement to payment under the CRFA. (Id. at 13.) The bankruptcy court also found *8 BOH was not entitled to the Buyout Payment because Section 1 of the CRFA was not triggered where the debtor, rather than the first lien holders, sold the property. (Id. at 12-20.) The bankruptcy court further concluded Section 27(iii) of the CFRA did not compel termination and payment of the buyout amount in the event of a voluntary bankruptcy petition. (Id.) The bankruptcy court thus ruled that BOH had no right to a Buyout Payment, and Wilmington therefore was entitled to summary judgment. (Id. at 20.)

BOH now appeals. BOH argues Wilmington never has challenged the existence or validity of the CRFA, and the parties agree that Section 1 of the CRFA never was triggered. BOH argues the parties therefore never had a bona fide dispute over the validity of BOH's interest; rather the parties disputed only the value of that interest. BOH contends the sale consequently could not have been authorized under Section 363(f)(4). BOH contends the sale could have been authorized only under Section 363(f)(5), and only through the termination provision of Section 27(iii) of the CRFA, pursuant to which BOH is entitled to the entire amount of the Builder Excess Funding. BOH argues that regardless, BOH is entitled to the full value of its senior interest under Section 363(e), which requires adequate protection for the extinguished interest when a sale is made free and clear of that interest under Section 363(f). Alternatively, BOH contends genuine issues of

Boh Park Highlands NV, L.P. v. Wilmington Trust… , Not Reported in…2014 WL…06 at…MP-CWH (D. Nev. Jan. 20, 2014)

fact remain regarding the value of BOH's interest given other provisions in the CRFA relating to release and termination of BOH's rights.

Wilmington responds by arguing the bankruptcy court correctly found the parties had a bona fide dispute regarding BOH's interest because the parties disputed BOH's entitlement to recovery under the CRFA. Wilmington contends that BOH's contractual right to payment under the CRFA was conditional on the first lien lenders foreclosing and the foreclosure resulting in a transfer of the property. Because neither of those things occurred, and now can never occur given the sale by the Debtor, Wilmington asserts BOH has no rights under the CRFA. *9

9

As to Section 363(f)(5), Wilmington argues BOH theoretically could have been compelled to accept monetary satisfaction of its interests under both Section 27(iii) and Section 6.1 of the CRFA. As to Section 6.1, Wilmington asserts BOH's interests could be satisfied by a letter of credit to be drawn upon if and when a foreclosure occurred and a buyout payment became due. Wilmington argues Section 6.1 reflects the conditional nature of BOH's right to payment under the CRFA, which could have been satisfied by a conditional payment mechanism such as a letter of credit. As to Section 27(iii), Wilmington argues that provision merely describes when the agreement terminates, but it does not independently require payment absent Section 1 being triggered. Wilmington further argues that Section 363(f)(5) requires only that an interest hypothetically be subject to monetary satisfaction, not that it actually be paid in full. Finally, Wilmington contends BOH raises the argument that it nevertheless is entitled to adequate protection under Section 363(e) for the first time on appeal, and for the reasons already stated that BOH's interest in the property is worth nothing.

## II. DISCUSSION

The Court reviews de novo the Bankruptcy Court's conclusions of law, "including its interpretation of the Bankruptcy Code." In re Rains, 428 F.3d 893, 900 (9th Cir. 2005). The Court may affirm the bankruptcy court's decision "on any ground fairly supported by the record." In re Warren, 568 F.3d 1113, 1116 (9th Cir. 2009).

Title 11 U.S.C. Section 363(f)(5) permits a sale free and clear of a third party's interest if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." To satisfy Section 363(f)(5), there must exist a possible legal or equitable proceeding "in which the nondebtor could be compelled to take less than the value of the claim secured by the interest." In re PW, LLC, 391 B.R. 25, 42, 45 (B.A.P. 9th Cir. 2008) (emphasis omitted). "The [phrase] 'could be compelled' has been interpreted to mean that, on a hypothetical basis, a creditor could be required to accept *10 money in satisfaction of its interest, not that the condition must actually have occurred." In re MMH Auto Group, LLC, 385 B.R. 347, 371 (Bankr. S.D. Fla. 2008). Examples of such mechanisms include a buyout provision or a liquidated damages clause in an agreement that may compel a party to the agreement to accept less than what its claim is worth. In re PW, LLC, at 43-44. Full payment to satisfy the third party's interest "is not necessary," because "it is not the amount of the payment that is at issue, but whether a mechanism exists to address extinguishing the lien or interest without paying such interest in full." Id. (quotation omitted); see also id. at 43 ("If full payment were required, § 363(f)(5) would merely mirror § 363(f)(3) and render it superfluous.").

10

Here, BOH argues Section 27(iii) is the only mechanism by which November 2005 could have compelled BOH to accept a money satisfaction of its interests in the CRFA. However, at least two other provisions of the CRFA provide a possible means of forcing BOH to accept less than the full value of its claim under the CRFA.[3] Under Section 1, BOH could have been compelled to accept a

Buyout Payment in the event the first lien lenders foreclosed. The full amount of BOH's interest in the CRFA is the full amount of the Builder Excess Funding, amounting to $4,980,687.66. The Buyout Payment, in contrast, would amount to $3,230,264.00, less than full satisfaction of BOH's interest. Although the first lien lenders did not foreclose, hypothetically a mechanism existed to force BOH to release its interest in the CRFA for less than full satisfaction, even if that circumstance did not actually occur.

> 3  BOH contends that under Section 27(iii), BOH would be entitled to the entire Builder Excess Funding amount, and thus its interest would be paid in full. If so, Section 27(iii) is not a mechanism by which BOH could be compelled to accept money satisfaction for less than the full amount of BOH's interest in the CRFA, as payment of the entire Builder Excess Funding amount would be full satisfaction of BOH's interest in the CRFA. See In re PW, LLC, 391 B.R. at 42.

Further, Section 6.1.d allows for any portion or all of the property to be released from the CRFA automatically upon November 2005 or a Participant providing a letter of *11 credit sufficient to cover the Buyout Payment. The letter of credit could be drawn upon only if there is a default in the required payment of the Partial Share or Participant Buyout Share. The Partial Share and the Participant Buyout Share become relevant only if the first lien lenders foreclosed and the foreclosure resulted in a transfer of the property. Consequently, under Section 6.1.d, BOH could be required to accept a conditional letter of credit in full satisfaction of its interests under the CRFA, the letter of credit could be drawn on only under certain circumstances, and then only up to the amount of the Partial Share or Participant Buyout Share, not the full amount of the Builder Excess Funding. Section 6.1.c similarly permits a release of property from the CRFA when a Participant transfers property upon recording a Development Agreement and by the Participant

providing a letter of credit sufficient to cover that Participant's Buyout Share, not the full amount of the Builder Excess Funding. The sale of the Debtor's property therefore was authorized under Section 363(f)(5), but that does not compel awarding BOH the Builder Excess Funding under Section 27(iii) of the CRFA.

BOH argues it nevertheless is entitled to the Builder Excess Funding under Section 363(e).[4] Section 363(e) provides that "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest . . . ." Typically this is accomplished through granting a replacement lien in the proceeds of the sale, and then distributing the proceeds in accordance with the resolution of the dispute. In re Clark, 266 B.R. 163, 171-72 (B.A.P. 9th Cir. 2001); see also 11 U.S.C. §§ 363(e), 361.

*12

> 4  Wilmington argues BOH raises Section 363(e) for the first time on appeal, and therefore waived its arguments regarding Section 363(e). However, BOH referenced Section 363(e) in its summary judgment briefing before the bankruptcy court. (Appx. Vol. 19 (Doc. #37) at R722, R732.)
>
> --------

Here, the bankruptcy court provided adequate protection for BOH's interest through approval of the parties' stipulation regarding the sale. The stipulation provided that the maximum amount of BOH's interest would be withheld from the proceeds of the sale, and the parties' interests would attach to the proceeds to the same extent and with the same priority as they had with respect to the property. However, affording adequate protection under § 363(e) does not mean BOH is entitled to full satisfaction of its claim. It simply preserved the status quo pending resolution of the dispute between the parties as to the priority of their claims.

Boh Park Highlands NV, L.P. v. Wilmington Trust, National..., Not Reported in... (D. Nev. Jan. 20, 2014)

As the bankruptcy court concluded, no genuine issue of fact remains that BOH had no right to payment senior to the first lien lenders. BOH's rights under the CRFA were contingent on a foreclosure by the first lien lenders resulting in a transfer of the property, which undisputably did not happen and now can never happen because the Debtor sold the property. Under Section 1 of the CRFA, BOH was entitled to a Buyout Payment only if the first lien lenders foreclosed, the foreclosure resulted in a transfer of property, and the successor elected to buyout BOH. Until those events occurred, BOH had no right to payment under Section 1 of the CRFA. It is undisputed none of those events occurred to trigger a right to payment.

Further, BOH had no right to payment under any release provision in Section 6. Although Section 6 required Development Declarations or conditional letters of credit under the various release scenarios, none provided for an unconditional right to payment. Because none of the conditions for drawing on a letter of credit were triggered, BOH had no right to payment under Section 6. Even if BOH had a senior right to a conditional letter of credit under Section 6, the letter of credit would be worth nothing, because the conditions allowing BOH to draw on the letter of credit never can occur. Under Sections 6.1.c and 6.1.d, BOH could draw on the letter of credit only in the event of a later foreclosure by the first lien lenders in the amount of the Participant Buyout Share or the *13 applicable share of the *13 Buyout Election. As the first lien lenders could not foreclosure during the automatic stay, and now never can foreclose, any letter of credit under Section 6 would be for zero dollars.

Finally, Section 27(iii) does not compel payment, and therefore does not provide BOH with a senior right to payment. Section 27(iii) states only that if the Builder Excess Funding reaches zero, the CRFA automatically terminates.

For the reasons discussed, the sale was authorized under Section 363(f)(5), and no genuine issue of material fact remains that BOH has no right to payment senior to the first lien lenders. The Court therefore will affirm the bankruptcy court's order. As a result, the Court need not address the parties' arguments regarding whether the sale also was authorized under Section 363(f)(4).

## III. CONCLUSION

The sale was authorized under Section 363(f)(5). The parties' respective interests attached to the sale proceeds to the same extent and with the same priority as they had with respect to the property. No genuine issue of fact remains that BOH had no senior right to payment in any amount. The bankruptcy court's Memorandum Decision on Motions for Summary Judgment and Order on Motions for Summary Judgment are hereby AFFIRMED.

Judgment is hereby entered in favor of Appellee Wilmington Trust, National Association and against Appellant BOH Park Highlands NV, L.P.

_____

PHILIP M. PRO

United States District Judge



Bankruptcy Case No. 13-61627-tmr7

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF OREGON

# In re Smith

Decided Feb 26, 2014

Bankruptcy Case No. 13-61627-tmr7

02-26-2014

IN RE CLAYTON SMITH and CRISTLE
SMITH, Debtors.

FRANK R. ALLEY, III

## MEMORANDUM OPINION

The Trustee filed a motion for authority to sell real
property held by the estate free and clear of liens
under 11 U.S.C. § 363(f).[1] Because the
requirements of that provision have not been met,
the Trustee's motion will be denied. My reasons
follow.

[1] Unless otherwise indicated, all statutory
references are to the Bankruptcy Code, 11
U.S.C. §§ 101 to 1532.

## FACTS

Debtors filed bankruptcy under chapter 7, listing
their real property with a value of $78,000. The
property is subject to a first mortgage in favor of
Bank of America Home Loans in the amount of
$178,825.[2] The Trustee filed a Notice of Intent to
Sell Real Property and a Motion for Authority to
Sell Free and Clear of Liens, listing the property
with a gross sales price of $68,500. Costs of the
sale in the amount of $5,110 and allocation of
insurance and taxes of $787.35 are to be paid from
sale proceeds. Bank of America would be paid the
amount of $62,602.65 from the proceeds of the
2    sale, in full payment of its lien interest. In *2
addition to the gross sales price and miscellaneous
amounts, the buyer is to pay a "Trustee Fee" in the
amount of $11,500, payable to the Trustee.

Although served with the notice of intent to sell,
Bank of America has not filed an objection to the
sale. This case and two others in which the Trustee
filed similar motions were consolidated for
hearing by the Court. The other two matters were
settled, leaving this as the sole case under review.
A hearing was held for which the Trustee provided
his memorandum in support and the matter was
taken under advisement by the Court.

[2] Debtors' schedules indicated a loan balance
of $167,724, while the Trustee's Notice of
Intent to Sell indicates the lien held by
Bank of America at the higher amount.

## DISCUSSION

Because § 363(f) deprives secured creditors of a
significant right, Congress provided five narrow
circumstances in which a debtor may sell property
free of all liens:[3]

[3] See In re CDKP Development, No. 12-
06871, 2012 WL 5993219 (Bankr.
E.D.N.C. Nov. 30, 2012).

(1) applicable non-bankruptcy law permits
sale of such property free and clear of such
interests;
(2) such entity consents;
(3) such interest is a lien and the price at
which such property is to be sold is greater
than the aggregate value of all liens on
such property;
(4) such interest is in *bona fide* dispute; or
(5) such entity could be compelled, in a
legal or equitable proceeding, to accept a
money satisfaction of such interest.

The Notice of Intent indicates that the Trustee relies on sections (2), (3), and (5) as authority for the sale free and clear of liens. We must therefore determine whether the requirements of any one of those three sections have been met. A. Section 363(f)(2):

The Trustee argues that Bank of America's failure to object to the sale, after being given proper notice, should be viewed as consent. He cites to *FutureSource, LLC v. Reuters Ltd.,* 312 F.3d 281 (7th Cir. 2002) and several other opinions which so held. The court in *FutureSource* gave as its rationale that "[i]t could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the *3 bankrupt's assets had to execute a formal consent before they could be sold." *Id.* at 285-86. It then went on to rule that the collateral attack on the bankruptcy court's order approving the sale did not meet the necessary limits that Fed.R.Civ.P. 60(b) imposes on collateral attacks on civil judgments and "now that more than a year has passed since the order was issued, it is doubtful, to say the least, that [appellant] could succeed in such an attack." Likewise, the court in *Pelican Homestead v. Wooten (In re Gabel),* 61 B.R. 661, 667 (Bankr. W.D. La. 1985), an opinion cited as justification in many subsequent opinions, as well as by the Trustee, held not that lack of objection constitutes consent, but that the party in that case objecting to the sale "is estopped to deny its implied consent at this late stage." In any case, as none of the opinions cited constitutes binding authority on this Court, I find that the holding and reasoning by the courts in *In re Roberts,* 249 B.R. 152 (Bankr. W.D. Mich. 2000) and *In re Decellis,* 349 B.R. 465 (Bankr. E.D. Virginia 2006) that consent for purposes of § 363(f)(2) requires <u>actual</u> consent is more persuasive. They held that "'consent' obligates the trustee to approach the lienholder and secure the lienholder's assent if the trustee wishes to sell the property free and clear of the lien." *Decellis* at 468. This Court adopts that interpretation of consent for purposes of § 363(f)

(2). This is consistent with *Pac. Capital Corp. v. East Airport Dev., LLC (In re East Airport Dev., LLC),* 443 B.R. 823 (9th Cir. BAP 2011), wherein the court determined that a lack of objection did not constitute consent for purposes of § 363(f)(2), but nevertheless found that the sale was authorized under § 363(f)(5). B. Section 363(f)(3):

The Bankruptcy Appellate Panel for the Ninth Circuit held in *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC),* 391 B.R. 25, 41 (9th Cir. BAP 2008)[4] that "§ 363(f)(3) does not authorize the sale free and clear of a lienholder's interest if the price of the estate property is equal to or less than the <u>amount</u> of *4 all <u>claims</u> held by creditors who hold a lien or security interest in the property being sold." (Emphasis added).

> [4] This Court has held that where the Ninth Circuit BAP has issued an opinion applicable to the facts before the bankruptcy court and there is no District Court opinion applicable from the district in which the bankruptcy court sits, the BAP's opinion will be binding on the bankruptcy court. *In re Tong Seng and Mai Yer Vue,* 364 B.R. 767, 771-72 (Bankr. D. Or. 2007).

Because Bank of America has a claim in the amount of $178,835 which is secured by its lien against the property to be sold, a sale free and clear of its lien could not be authorized under § 363(f)(3) unless the sales price is greater than that amount.[5] Clearly, that is not the case. C. Section 363(f)(5):

> [5] As disclosed earlier in this opinion, the buyer is paying not only the "gross sales price" of $68,500, but also the amount of $11,500 as a "Trustee Fee," to be paid directly to the Trustee upon consummation of the sale. The combined amount ($80,000) constitutes gross proceeds of the sale, thus validating the value of the property pursuant to Debtors' bankruptcy schedules. The gross proceeds are subject to Bank of America's lien. A portion of the

proceeds cannot simply be re-labeled as a "Trustee Fee" or a "Buyer's Premium" in derogation of the rights of a secured creditor in the proceeds of its collateral. This is in contrast to the situation in *Clear Channel* in which the court held that available evidence indicated that the "carve out" obligation was "physically and logically isolated" from the buyer's obligation to pay the sales price and was not part of the "Strike Price" paid by the buyer. *Clear Channel* at 46-47.

The panel in *Clear Channel* separated the requirements of this provision into three elements: "that (1) a proceeding exists or could be brought, in which (2) the nondebtor could be compelled to accept a money satisfaction of (3) its interest." *Id.* at 41. The court held that a consensual lien interest in real property is an interest subject to § 363(f)(5). The question thus became: "whether there is an available type or form of legal or equitable proceeding in which a court could compel [the lienholder] to release its lien for payment of an amount that was less than full value of [the lienholder's] claim." *Id.* at 45-46.

The Trustee urges the Court to adopt an expansive interpretation of § 363(f)(5) which would authorize a sale free and clear of Bank of America's lien if there exists a hypothetical proceeding which could be brought by any entity with a hypothetical interest in any property, by which the holder of an interest in that property could be compelled to accept a money satisfaction of its interest. As examples of such hypothetical proceedings, the Trustee offers the following: *5

1) UCC 9-617 and 9-615[6] which involve the rights of a transferee in collateral and the application of proceeds of a sale. (These provisions, and the UCC generally, do not apply to a real property lien interest).

---

[6] Codified in Oregon law at ORS 79.0617 and 79.0615.

2) ORS Chapter 312 involving procedures by which real property tax liens may be foreclosed.

3) Foreclosure of construction liens and the like under ORS Chapter 87, including labor and material liens on chattel, innkeepers liens on chattels brought into the innkeeper's establishment, and landlord's liens on chattel.

4) Judicial and nonjudicial lien foreclosures on real property in which junior lienholders' interests may be extinguished.

5) Foreclosure of federal tax liens which extinguish junior lien interests.

6) Condemnation proceedings by a government in which entities with interests in property may be compelled to accept a money satisfaction of that interest.

The approach advocated by the Trustee, however, is not consistent with either the language of § 363(f)(5) or the analysis advanced in *Clear Channel*. The question is not whether there is a hypothetical proceeding by which a hypothetical interest in property may be extinguished, or the entity holding such interest may be compelled to accept a money satisfaction of its interest. Such an interpretation would in most cases make the other paragraphs of § 363(f) superfluous as the sale free and clear of nearly all property interests would satisfy the requirement of paragraph (5). Rather, the question is whether there is at least the possibility of an available "legal or equitable proceeding in which a court could compel [Bank of America] to release its lien for payment of an amount that [is] less than full value of [Bank of America's] claim." *Clear Channel* at 45-46. The Trustee may propose a foreclosure sale under Oregon law as just such a proceeding. However, there is no evidence that a foreclosure sale brought by the Trustee would produce the result he seeks. If a foreclosure sale were brought by the Trustee as a junior lien creditor,[7] the senior lien of Bank of America would not be extinguished by the foreclosure sale. Rather, the rights of a senior

6   lienholder *6 are generally not affected by the foreclosure of a junior lien interest. *U.S. Nat. Bank of Portland v. Meyer, 213* Or. 1, 15, 321 P.2d 1054 (1958) (citing *Giesy v. Aurora State Bank,* 122 Or. 1, 6, 256 P. 763 (1927)).

      7  Pursuant to § 544(a)(1).

      --------

In *East Airport Dev.,* 443 B.R. 823, an order was entered by the bankruptcy court authorizing the debtor to sell individual lots free and clear of any lien rights possessed by the construction lender, upon payment of a release price allegedly negotiated by the parties prepetition. Surplus funds would be used by the debtor as cash collateral. Lender appealed. The BAP affirmed the order of the bankruptcy court on the basis that the sale was authorized under § 363(f)(5). It held that the debtor in that case could bring an action for specific performance (an available equitable proceeding) by which the lender could be compelled to accept less than the full amount of its claim (i.e. the negotiated release price).

In a situation similar to the one in the *East Airport Dev.* case, in which the debtor proposed to sell five lots in a subdivision free and clear of the liens of secured creditors, the bankruptcy court denied debtor's motion under § 363(f)(5). *CDKP Development,* 2012 WL 5993219. The court held that the secured creditor for which there was no release fee agreement could not be compelled in a specific performance action (nor, presumably, in any other sort of action) to release its lien.

As the cases discussed above illustrate, and as the court in *Clear Channel* stated, the narrow view of § 363(f)(5) "leads to a relatively small role for paragraph (5). . . . So long as its breadth complements the other four paragraphs consistent with congressional intent, without overlap, our narrow view is justified." *Clear Channel* at 43.

As the Trustee has not directed the Court to a specific <u>available</u> proceeding by which a court could compel Bank of America to release its lien for payment of an amount that is less than the full amount of its claim, a sale free and clear of Bank of America's lien cannot be authorized under §
7 363(f)(5). *7

## CONCLUSION

Based on the foregoing, the Trustee's motion for authority to sell real property free and clear of liens will be denied. An order will be entered by the Court consistent with this Memorandum Opinion.

FRANK R. ALLEY, III

Chief Bankruptcy Judge

casetext

Case No.: 2:12-bk-51208-RN

UNITED STATES BANKRUPTCY COURT CENTRAL DISTRICT OF CALIFORNIA LOS ANGELES DIVISION

# In re Kellogg-Taxe

Decided Mar 17, 2014

Case No.: 2:12-bk-51208-RN

03-17-2014

In re KATHLEEN KELLOGG-TAXE, Debtor.

Richard M. Neiter

## Chapter 7

**MEMORANDUM OF DECISION REGARDING**

**CHAPTER 7 TRUSTEE'S "MOTION FOR**

**ORDER AUTHORIZING SALE OF REAL**

**PROPERTY OF THE ESTATE [10535**

**Vestone Way, Los Angeles, California**

**90077] FREE AND CLEAR OF LIENS AND**

**INTERESTS, SUBJECT TO HIGHER AND**

**BETTER OFFERS, AND APPROVING**

**OVERBIDDING PROCEDURES"**

## I. INTRODUCTION

This matter came before this Court on December 19, 2013, on a motion by the Chapter 7 Trustee, Carolyn A. Dye (the "Trustee"), for an order approving the sale of Kathleen Kellogg-Taxe's (the

2 "Debtor") real property located at 10535 Vestone Way, Los Angeles, *2 California 90077 (the "Vestone Way Property") pursuant to 11 U.S.C. §§ 363(b)(1), (f), (h) and (m), subject to a higher and better offer, and approving overbid procedures (the "Sale Motion"). The Debtor; Richard Taxe, the Debtor's husband; and Kellspin, Inc., a Nevada corporation ( "Kellspin, Inc."), one of the alleged secured creditors of the Vestone Way Property, opposed the sale. This memorandum of decision addresses the Sale Motion based on the pleadings, evidentiary record, and arguments of counsel.[1]

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330. "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P."). "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

## II. BACKGROUND

On December 18, 2012, the Debtor filed her voluntary chapter 11 petition. See Docket No. 1. This was the Debtor's fifth bankruptcy filing. The Debtor had commenced four prior chapter 13 cases, all of which were dismissed shortly after they were filed. Three of the four prior bankruptcies were filed and dismissed within the year prior to the commencement of this case.[2]

---

[2] The Debtor's four prior bankruptcy filings include:

In re Kellogg-Taxe ... 1208 ... (Bankr. ... Cal. Mar. 17, 2014)

| Case No. | Date Filed | Date Dismissed |
|---|---|---|
| 2:09-bk-29787-EC | July 30, 2009 | October 16, 2009 |
| 2:12-bk-33767-NB | July 10, 2012 | August 20, 2012 |
| 2:12-bk-40808-SK | September 10, 2012 | October 1, 2012 |
| 2:12-bk-44947-WB | October 17, 2012 | November 29, 2012 |

After filing this case, the Debtor failed to timely file any schedules and other required documents. The Court scheduled a status conference for January 22, 2013. See Docket No. 11. No appearance was made by or on behalf of the Debtor at the status conference. On January 24, 2013, the Court entered its "Order *3 Converting Case to a Case Under Chapter 7." See Docket No. 18. Thereafter Chapter 7 Trustee (the " was appointed on or about January 29, 2013. See Docket No. 20.

On February 20, 2013, the Trustee filed a "Notice of [the] Trustee's Intent to Administer Case and Request that the Clerk of the Court Not Dismiss [the] Debtor's Case for Her Failure to Timely File Her Schedules and Other Required Documents to Complete Her Filing." See Docket No. 23. The Trustee sought such relief on the following grounds: (i) the Debtor is a chronic filer; (ii) the Trustee was investigating the Debtor's financial affairs; and (iii) there may be potential equity in the Debtor'?s primary residence, located at 10535 Vestone Way, Los Angeles, CA 90077 (the "Vestone Way Property"). See id.

In light of there being no automatic stay pursuant to § 362(c)(4)(A)(i) because of the Debtor's prior bankruptcy filings, the Trustee sought to impose a stay under § 3 62(c)(4)(B). See Docket No. 28. However, due to the untimeliness of the Trustee's motion, and other cause appearing, the Court entered an "Order Denying Motion in Individual

Case for Order Imposing a Stay or Continuing the Automatic Stay as the Court Deems Appropriate" on April 25, 2013. See Docket No. 53. As a result, there is no stay in the Debtor's pending chapter 7 case.

The Trustee then filed schedules in the Debtor's case on April 12, 2013 based on the Debtor's schedules that had been filed in her previous bankruptcy cases and the Trustee's ongoing investigation. See Docket Nos. 39-50. The Debtor then filed her own schedules as amended through her counsel on May 13, 2013. See Docket Nos. 57-65. *4

Per the Claims Register, thirteen proofs of claim have been filed in this case, two of which have been withdrawn (Claim Nos. 3 and 4). One of the claims was disallowed by an Order of this Court as to the Debtor's separate property, subject to a motion being filed by the claimant to have the claim (Claim No. 9) against the Debtor's community property allowed. That motion has not yet been filed.[3] The Debtor's general unsecured claims as filed total $836,221.57 (Claim Nos. 2 and 10-13).[4] The United States Trustee also filed an administrative claim against the estate in the amount of $650.00 (Claim No. 5). The remaining proofs of claim were filed by the Debtor's alleged secured creditors whose claims are allegedly secured by liens against the Vestone Way Property (Claim Nos. 1 and 6-8). In addition, the Trustee and her counsel have indicated that they assert administrative claims for services rendered that so far total $235,646.00.[5] *5

---

[3] On February 27, 2014, the Court entered an "Order on [the] Debtor's Objection to Claim No. 9-1 of Daniel A. Seigel," the Claimant (the "Seigel Order"), in which the Court sustained the Debtor's objection "to the extent that the Claimant's Proof of Claim No. 9-1 (the 'Claim [No. 9]') is disallowed as a secured claim against the separate property of the Debtor." See Docket No. 264. The Court further ordered that "[t]he Claimant is not precluded from

In re Kellogg-Taxe    Case No. 2:21-bk-18205-BR (Bankr. C.D. Cal. Mar. 17, 2014)

filing a motion to have the Claim allowed against any community property of this estate should there be community property that is collected and liquidated in the event of the entry of a renewal of the underlying judgment, nor does it preclude the Trustee from objecting to such a motion." See id. Per the Docket, the Claimant has not brought a motion to have Claim No. 9 allowed as against the Debtor's community property. Accordingly, pursuant to the Seigel Order, the Claimant currently does not have an allowed claim against the Debtor's separate estate or community property.

4   The Trustee sought to extend the claims bar date for filing proofs of claim. See Docket No. 89. On January 30, 2013, a "Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines" setting the deadline for filing proofs of claim at June 10, 2013 was filed. It was served on all creditors known to the Trustee at the time. See Docket Nos. 21-22. However, the Debtor's schedules as amended identified additional creditors. On October 18, 2013, the Court entered an Order denying the Trustee's request to extend the claims bar deadline. The Court found that the Trustee had failed to show that one of the five exceptions for extending the deadline under FRBP 3002(c) applied. The Court expressly noted that, "as provided for in 11 U.S.C. § 726(a)(2)(C), unsecured creditors who filed late claims will be paid at the same time as unsecured creditors who file[d] timely claims as long as (1) the creditors did not have 'notice or actual knowledge of the case' in time to file a timely claim and (2) proof of the claim is filed before distribution occurs." See Docket No. 136.

5   The Trustee declares that she has spent "56.5 hours in connection with the Debtor's bankruptcy case [so far] and associated adversary proceedings." At her normal hourly rate of $450.00, the Trustee declares that her fees would total approximately

$25,425.00. Trustee's Decl., ¶ 2 (attached to Opp'n of the Debtor's Dismissal Motion). The Trustee's counsel also submitted a declaration in which her counsel declares that, to date, it has incurred in excess of $210,221.00 in legal fees in this case. Trustee's Counsel's Decl., ¶ 2 (attached to Opp'n of the Debtor's Dismissal Motion).

On October 18, 2013, the Court entered an Order granting the Trustee's application to employ Coldwell Banker as her real estate broker (the "Broker") to market and sell the Vestone Way Property. See Docket No. 135. On November 5, 2013, the Trustee filed the Sale Motion. The Sale Motion prompted the filing of the Debtor's motion to dismiss her case on an emergency basis (the "Dismissal Motion"). See Docket No. 182. The Sale Motion was initially scheduled to be heard on November 26, 2013, but was continued to December 19, 2013 to coincide with the hearing on the Debtor's Dismissal Motion. See Docket No. 196. The Sale Motion and Dismissal Motion were heard on December 19, 2013 and taken under submission. The Dismissal Motion was denied in a separate memorandum of decision, dated February 18, 2014. See Docket No. 256. The Sale Motion is addressed in this memorandum of decision.

The Vestone Way Property is comprised of four parcels, the largest of which is improved with an approximate 6,000 sq. ft. house, two of which are drive-way easements, and one of which is unimproved. Mot. at 3; Sahakian Decl., ¶ 8 (attached to Mot.). The Trustee and Debtor agree that the Property is the Debtor's separate property and not community property.[6] *6

6   The Debtor and Richard Taxe were married in 1984. Dumas Decl., at Exh. A (p. 50, lns. 11-15) (filed as Docket No. 152). In 1989, David and Rose Taxe, the parents of Richard Taxe, owned the Vestone Way Property as "joint tenants" and "husband and wife," and they transferred their

In re Kellogg-Taxe    Cal. Mar. 17, 2014)

interest in the Property by Grant Deed to the Debtor, as her separate property, and Richard Taxe's brother, Ronald Taxe, as his separate property. The Debtor and Ronald Taxe each received an "undivided one-half interest" in the Property. Mot. at 3; see JN Req., at Exhs. 2 & 3 (filed as Docket No. 153); see also Salvato Decl., at Exh. 4 (Grant Deed) (attached to the Debtor's Objection to Claim No. 9 filed as Docket No. 115). On May 25, 1998, Ronald Taxe transferred his ownership interest in the Property to the Debtor as "a married woman as her sole and separate property." See JN Req., at Exh. 4 (filed as Docket No. 153). Thus, without any evidence to the contrary, the Debtor appears to own the Property as her sole and separate property.

According to the Trustee, based on a "Covenant and Agreement to Hold Property as One Parcel" (the "Covenant"), recorded on September 26, 1983, the Property cannot be sold as separate parcels. See JN Req., at Exh. 6 (filed as Docket No. 153). The Covenant, which runs with the land, was signed and executed by David Taxe, Richard Taxe's father, as the former owner of the Property prior to the transfer of the Property to the Debtor. See id.; see also supra, at n.7.

Five Star Global Resources, LLC ( "Five Star"), which is controlled by Bruce Taylor ( "Taylor"), claims a 50% ownership interest in the unimproved parcel that is subject to the Covenant. Taylor Decl., 5 4 (attached to Mot.). Taylor declares that the transfer was intended as security for numerous loans, totaling $148,986.00, made by Taylor to Debtor and Richard Taxe between September 2011 through April 2012. Id., ¶¶ 3-4. On July 31, 2013, the Trustee commenced an adversary proceeding against Five Star and other parties to quiet title in the Property, entitled Carolyn A. Dye, Chapter 7 Trustee v. Kellspin, Inc. et al. (Case No. 2:13-ap-01781-RN) (the "Quiet Title Action"), which is currently pending before this Court.

On November 25, 2013, the Trustee and Five Star executed a stipulation in which the Trustee agreed to pay Five Star $35,000.00 from the sales proceeds of the Vestone Way Property "on account of its ownership interest." See Docket No. 179. In exchange, Five Star agreed to the sale of the Property free and clear of its ownership interest and any lien it may have in the Property. Id. The Trustee further agreed to dismiss her Quiet Title Action against Five Star with prejudice. Id. Counsel for the Trustee also filed a declaration attaching a "Settlement Agreement and Mutual Release" *7 (the "Settlement Agreement") reiterating the above terms. See Docket No. 180. The Settlement Agreement additionally provided that "Taylor shall have an unsecured general claim against the Estate in the amount of $113,986.00." Id. The Trustee agreed to submit a motion for approval of the compromise upon receipt of proof supporting Taylor's claim. Id.

The Trustee recently filed and served the compromise motion on February 20, 2014 pursuant to FRBP 9019 and LBR 9013-1(o). See Docket Nos. 258 & 259. On March 6, 2014, the Debtor and her husband Richard Taxe filed separate oppositions to the Trustee's compromise motion. See Docket Nos. 266 & 267. In light of Five Star's potential interest in the Property, and the pending compromise motion, the Trustee seeks approval of the sale pursuant to § 363(h).

Several liens encumber the Vestone Way Property. The Los Angeles County Tax Assessor holds two tax liens: the first for the year 2012-2013, in the amount of $8,507.38 (Claim No. 6-2, amended); and the second for the year 2013-2014, in an amount to be determined at the sale's closing. Astoria Federal Savings ("Astoria") holds a deed of trust in the amount of $1,209,118.91 (Claim No. 7-1).[7] These liens are undisputed, and the Trustee intends to pay them in full through an escrow to be opened to facilitate the closing of the *8 sale. In addition, Morrison Management, S.A. ("Morrison") holds a lien in the amount of $3,830, 158.68 (Claim No. 1-1). This lien originated

In re Kellogg-Taxe    Case No. 2:21-bk-18205-DS (Bankr. C.D. Cal. Mar. 17, 2014)

in 1984, when a deed of trust was recorded to secure a purported loan of $750,000 to David and Rose Taxe, Richard Taxe's parents ("Euramex lien").[8] See JN Req., at Ex. 9. Finally, Kellspin, Inc. ("Kellspin") holds a judgment lien in the amount of $1,519,696.94 (Claim No. 8-2).[9] Morrison and Kellspin are also defendants in the Quiet Title Action discussed above.

[7] Debtor was also able to obtain a $1 million loan from Astoria Bank in 2007, which the Bank understood to be secured by a first DOT in its favor, and a further $200,000 loan from Countrywide (now Bank of America) on July 29, 2007, which was presumably secured by a second DOT. Mot. at 4; Exh. D, at 12-13. Bank of America's loan has since been reconveyed as part of the bank's loan forgiveness program. Mot. at 4; Exh. D, at 13. When Astoria Bank became aware that Morrison was seeking to enforce its lien, Astoria intervened in a lawsuit between the Taxes and Morrison Management, obtaining a judgment establishing Astoria's priority. Mot. at 4; see also JN Req., Exh. 11, at 3. Astoria sought to foreclose on its secured interest in the Property following Debtor's default, but the Trustee alleges that Debtor's bankruptcy filings have frustrated the foreclosure process. Mot. at 5. After negotiations, the Trustee and Astoria stipulated that the Trustee would agree to the allowance of Astoria's claim in the amount of $1,209,118.91 through the date of the bankruptcy filing, and Astoria would forego recommencing its foreclosure procedure for at least four months. Mot. at 6-7; see Docket No. 71. The Stipulation was approved over the Debtor's objection by an order entered on August 9, 2013. See Docket No. 95.

[8] The beneficiary of the Euramex lien was Euramex Services, Ltd., a Nevada corporation. See JN Req., at Exh. 9 (filed as Docket No. 153). Morrison is the latest

assignee of the Euramex Lien. See Claim No. 1, Declaration of Aleksandr Blyumkin, Exh. 16.

[9] Kellspin is a Nevada corporation whose registered entity address is Vestone Way Property address. Richard Taxe is the registered agent for service of process, and the agent's address is also the Vestone Way Property address. See JN Req., at Exh. 7. Kellspin's lien arises from a 1984 abstract of judgment in favor of an entity known as Omni Group and against David and Rose Taxe, Debtor's husband's parents. See JN Req., at Exh. 8, p. 3.

The Trustee's terms of sale are summarized as follows:

| Buyer | John Levin and/or Assignee (subject to overbid) |
|---|---|
| Purchase Price | $2,500,000 on an "as is, where is" basis and not subject to any contingencies |
| Deposit | $75,000 (already paid into escrow) |
| | $150,000 (6% of sales proceeds) (per Order approving application to employ Broker) (to be |
| Broker's Commission | split equally between Trustee's Broker and Buyer's broker or any broker for the successful bidder) |
| Closing costs | $50,000 (estimated at 2%) |

In re Kellogg-Taxe   Case No. 2:21-bk-18205-NB (Bankr. C.D. Cal. Mar. 17, 2014)

| | Escrow scheduled to close within 14 days of the |
|---|---|
| Closing date | date on which the order is entered approving sale |
| Failure to perform | Deposit forfeited |
| Court approval | Required |

See Mot., Exhs. A (Counter-Offer) & B (Escrow Instructions). *9

The Trustee also proposed the following overbid procedures:

| | |
|---|---|
| Initial overbid | $2,510,000 ($10,000 above present offer) |
| Subsequent overbids | Minimum increments of at least $5,000 |
| Deposit | $85,000 ($75,000 plus the initial overbid of $10,000) |
| Failure to perform | Deposit forfeited |
| Deadline to overbid | 48 hrs before Hearing Date (requires evidence of ability to perform) |
| All Overbids | On an "as is, where is" basis and not subject to any contingencies |

9

| | Escrow scheduled to close within 14-days of |
|---|---|
| Closing Date | the date on which the order is entered approving sale |
| Back Up Bidder | Trustee requests approval of Back-up Bidder |

See Mot. at 12-14.

Furthermore, the Trustee proposes the following treatment of the Debtor's homestead exemption.

• Trustee to pay $30,000 of buyer's $75,000 deposit to Debtor within 24 hours of entry of order approving sale;
• Debtor will have until January 3, 2013 to vacate the Property, but will be charged rent $750 per day which will be credited against the balance of the homestead;
• Any moving, cleaning, or repair expenses incurred by the Trustee, in addition to rent and forcible eviction costs, will be charged against Debtor's homestead exemption;[10] and
10   *10 • The balance of Debtor's homestead exemption shall be paid once the occupants of the Property have vacated.

See Mot. at 11.

[10]   Such surcharge may not be permitted in view of the Supreme Court's recent ruling in the case of Law v. Siegel, Case No. 12-5196, 2014 WL 813702 (U.S. Mar. 4, 2014).

[10]   Such surcharge may not be permitted in view of the Supreme Court's recent ruling in the case of Law v. Siegel, Case No. 12-5196, 2014 WL 813702 (U.S. Mar. 4, 2014).

The Trustee estimates that, after deductions are made for the Brokers' commission (at 6%), closing costs, and Debtor's homestead exemption, as well

In re Kellogg-Taxe    C... 208 NvB...r... Cal. Mar. 17, 2014)

as the LA County's Property Tax ($8, 270.94) and
Astoria Bank's lien, approximately $907,610.15 of
the sales proceeds will remain (not accounting for
the Los Angeles County property taxes for 2013-
2014 which amount was currently unknown when
this Motion was prepared). When Five Star's
secured claim is paid, there will be less than $872,
610.15 sales proceeds remaining for the estate.
See Mot., Exh. D. As explained above, the secured
interests of Morrison Management and Kellspin
are currently disputed and are not included in the
Trustee's calculations.[11] Neither are the 2013-2014
taxes.

> [11] However, if either or both the Morrison
> Management and Kellspin liens are found
> to be valid, there will be no equity left over
> in the estate.

## III. <u>DISCUSSION</u>

The Court has jurisdiction over this contested
matter pursuant to 28 U.S.C. §§ 157(b) and
1334(b) and 11 U.S.C. § 363. This is a core
proceeding under 28 U.S.C. §§ 157(b)(2) (A) and
(O). Venue is proper in this Court pursuant to 28
U.S.C. § 1409(a).

### A. 11 U.S.C. § 363(b)(1)

The Trustee contends that the sale of the Vestone
Way Property satisfies the requirements of §
363(b)(1). The Court agrees.

A trustee may sell property of the estate other than
in the ordinary course of business after notice and
a hearing. 11 U.S.C. § 363(b)(1). The
requirements of § 363(b) are designed to protect
[11] *11 creditors' interests in the assets of the estate. In
re 240 N. Brand Partners, Ltd., 200 B.R. 653, 659
(9th Cir. B.A.P. 1996). A bankruptcy court can
authorize the sale of substantially all of the assets
of the estate under § 363(b) upon a proper
showing that the sale is in the best interests of the
estate, that there is a sound business purpose for
the sale, and that it was proposed in good faith.

See id. at 659; In re Wilde Horse Enters., Inc., 136
B.R. 830, 841 (Bankr. CD. Cal 1991); In re
Lionel, 722 F.2d 1063, 1070 (2nd Cir. 1983).

Here, the Court finds that the Trustee's sale is
proposed in good faith for a sound business
purpose and is in the best interests of the estate.
The Trustee declares that she has marketed the
Property at arms-length through her real estate
broker in order to create a fund from which to pay
general unsecured creditors and administrative
expenses. Trustee Decl., ¶ 10. The Property was
listed on the Multi-Regional Multiple Listing
Service, on Coldwell Banker's website,
Californiamoves.com and on Itech.com. See
Sahakian Decl., ¶ 4. The Trustee further declares
that the sale to Buyer and/or overbidder is the
highest and best available price for the Property,
and the proposed sale is an arms-length
transaction. Trustee Decl., ¶ 5. In addition, if
Morrison's and Kellspin's disputed liens are found
to be invalid, the estate will reap significant
proceeds from the sale of the Vestone Way
Property.

In her Opposition, Debtor raises several arguments
against selling the Vestone Way Property, none of
which have merit.

First, Debtor argues that it would be unjust to sell
the Property to satisfy Astoria's lien, even though
Kellspin's lien has priority. Nevertheless, Debtor
[12] appears to concede that Kellspin's *12 lien is
disputed by vigorously disputing the lien's validity
and priority in opposing the Trustee's Sale Motion.
Because Kellspin's lien is the subject of a bona
fide dispute, the Trustee may sell the Vestone Way
Property free and clear of Kellspin's lien. See
infra, at III.B.

Second, Debtor contends that she has less than
$37,000 in general unsecured debts and an
administrative claim by the United States Trustee
in the amount of $650 that can be paid off with the
sale of her other assets. However, as the Court
noted in denying the Debtor's motion to dismiss
her chapter 7 case, Debtor failed to show "that she

In re Kellogg-Taxe, ___ B.R. ___, 2014 WL 1208048 (Bankr. C.D. Cal. Mar. 17, 2014)

can raise sufficient funds to pay all her allowed general unsecured creditors and administrative expenses prior to dismissal." Docket No. 256, at p. 7.

Third, with respect to Astoria's secured claim, Debtor asserts that she will bring the loan current by selling off the small parcel adjacent to the main parcel. However, selling the small parcel does not appear possible in light of the Covenant that runs with the land. See JN Req., at Ex. 6. Debtor fails to provide any legal argument or evidence challenging the validity of the recorded Covenant.[12]

> [12] Debtor concedes that she is "not opposed to permitting Astoria to exercise its rights to foreclose on the parcels subject to its lien" (Debtor's Opp'n at 9); and that Kellspin, Inc., which she alleges is controlled by Ronald Taxe, is willing to wait until the Property is "voluntarily sold" (id. at 2, n.4). Despite this concession, Debtor argues that Astoria's lien only attaches to one of the parcels, APN 4370-016-029, and she does not understand why the other parcels are being sold to satisfy Astoria's lien. She argues that the adjacent parcel can be sold separately from the residence with a tax assessed value in excess of $250,000; however, per the Covenant neither parcel can be sold separately. See JN Req., at Exh. 6. Furthermore, Debtor argues that "it is not clear that the agreement to which the Trustee has referred even applies to the fourth, unencumbered parcel." Debtor's Opp'n at 9. Debtor is incorrect. The Covenant clearly provides the legal descriptions of the two parcels subject to the restriction on sale. See JN Req., Exh. 6 at p. 2.

Fourth, Debtor argues that the Trustee has accepted a purchase offer substantially below fair market value. Debtor notes that the *13 Property was initially listed at $2.85 million by the Trustee's Broker. Docket No. 93 at Exh. E of Applicant to Employ Broker. Debtor argues that

there is "no need to force a sale to resolve the lender Astoria Federal Savings' problematic title issues [as Astoria is not prejudiced by the delay and has not taken efforts to commence foreclosure], or before the dispute among the competing senior liens on the Property are resolved." Debtor's Opp'n at 2-4. However, the Sale Motion is subject to overbid, and Debtor provides no persuasive evidence that the proposed purchase price is below market value.

Fifth, Debtor argues that her case is fundamentally a two-party dispute between her and Morrison. Debtor's Opp'n at 5. Debtor notes that she has objected to Morrison's proof of claim, arguing that the "remaining claims are *de minimus* unsecured claims, or disputed encumbrances on the Property arising from judgments against Richard Taxe for which neither the Debtor nor the Property are liable." Id. Nevertheless, based on the evidence proffered thus far, Debtor's case appears to involve multiple claims and parties (such as Kellspin and Astoria).

Based on the foregoing, it appears that the sale is in the best interest of creditors at this time.

### B. 11 U.S.C. §§ 363(f)(2) and (4)

The Trustee also seeks to sell the Property free and clear of Morrison Management and Kellspin, Inc.'s disputed liens pursuant to see sections 363(f)(2) and (4). See Mot. at 18-23. Subsection 363(f) provides that a trustee may sell property "free and clear" of third party interests under certain enumerated conditions. 11 U.S.C. § 363(f). *14

#### 1. 11 U.S.C. § 363(f)(2)

Subsection 363(f)(2) permits a sale free and clear of an interest if that interest holder consents. 11 U.S.C. 5 363(f)(2). Here, Morrison has filed a Joinder to the Sale Motion, and thus is deemed to have consented to the sale pursuant to § 363(f)(2). See Docket No. 202.

#### 2. 11 U.S.C. § 363(f)(4)

In addition, a trustee may sell estate property free and clear of a nondebtor's interest that is in "bona fide dispute." 11 U.S.C. § 363(f)(4); see also In re Gerwer, 898 F.2d 730, 733 (9th Cir. 1990). In ruling on a motion to sell estate property free and clear under § 363(f)(4), "a court need not determine the probable outcome of the dispute, but merely whether one exists." In re Octagon Roofing, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991). The parties must provide some factual grounds to show some objective basis for the dispute. In re Gaylord Grain L.L.C., 306 B.R. 624, 627 (8th Cir. B.A.P. 2004). To qualify as a bona fide dispute under § 363(f)(4), the disputed lien need not be the subject of an immediate or concurrent adversary proceeding. Id. (collecting cases).

Here, the Court finds that Kellspin's lien is the subject of a bona fide dispute for purposes of § 363(f)(4). Kellspin claims to have a valid judgment lien against the Property in the amount of $1.5 million. As noted above, the Trustee is currently challenging the validity of this lien in a pending adversary proceeding before this Court. In its Opposition, Kellspin attempts to show that no bona dispute exists by recounting at length the tortuous history of *15 its lien against the Vestone Way Property.[13] Yet in doing so, Kellspin undermines its own argument and provides a sufficient objective basis to support a finding that a bona fide dispute exists.[14] The Court need not decide the ultimate question of the validity of Kellspin's lien here. It is enough for purposes of § 363(f)(4) that the record shows the objective existence of a bona fide dispute. Because Kellspin's lien is the subject of a bona fide dispute, the Court will approve the Trustee's proposed sale free and clear of Kellspin's lien. However, the Court will stay the payment of Astoria's and Kellspin's liens from the proceeds of the sale until the Quiet Title Action resolves the validity and priority of these liens on the Property.[15]

13  In 1984, Kellspin admits that Omni Group, Inc., a Washington corporation ("Omni") obtained a judgment against David and Rose Taxe and others, from which Kellspin's lien arose. This appears to be the same judgment that was found to be fraudulent by the state appellate court in Ralph Fernandez v. G.J. Siegel & Associates Inc., and Ronald Taxe (Case No. BC045545) (the "Fraud Action"), see JN Req. at Ex. 8, and the basis for the Trustee's argument that Kellspin's lien is disputed. However, Kellspin contends that the parties settled the case after it was remanded and thus there was no finality to the judgment. See Kellspin Opp'n at 8. In support, Kellspin submits a declaration from Herber Papenfuss, attorney for Ralph Fernandez, in support of its argument that the Fraud Action was ultimately dismissed as a result of settlement. The Court sustains the Trustee's evidentiary objection on the grounds that Mr. Papenfuss never gave his consent to sign the declaration. See Docket No. 198. The Court also sustains the Trustee's objection to Ronald Taxe's assertion that Fernandez was obligated to vacate the Judgment as hearsay. See Docket No. 173.

14  In his declaration, Kellspin's counsel declares that during the pendency of the Trustee's Sale Motion, several defects were cured: (1) Kellspin reinstated its corporate charter; (2) the Declaration of Laurason T. Hunt establishes that the Taxes never had control of Omni Group, Inc.; and (3) an order setting aside the judgment in Fernandez v. Taxe was entered on December 11, 2013. Grantham Decl., U ¶ 8, Docket No. 227. These facts further establish the objective existence of a bona fide dispute regarding the Kellspin lien. Whether these facts actually resolve the dispute is not before the Court on the Trustee's Sale Motion. Such a determination is more properly the subject of the pending Quiet Title Action.

In re Kellogg-Taxe   Cal. Mar. 17, 2014)

15 "Typically, the proceeds of sale are held subject to the disputed interest and then distributed as dictated by the resolution of the dispute; such procedure preserves all parties' rights by simply transferring interests from property to dollars that represent its value." Moldo v. Clark (In re Clark), 266 B.R. at 171; In re Dewey Ranch Hockey, LLC, 414 B.R. at 590-91 (citing In re Clark, 266 B.R. 163 (9th Cir. B.A.P. 2001)).

## C. 11 U.S.C. § 363(h)

Five Star has stipulated with the Trustee to forego its interest in the small parcel for $35,000. The Trustee's motion to approve this compromise is currently pending. See supra, at p. 6. Even absent such compromise, however, the Court holds that the *16 Trustee may sell the Vestone Way Property pursuant to § 363(h), despite Five Star's 50% ownership interest in the small parcel adjacent to the main parcel of the Property.

Subsection 363(h) provides that the trustee may sell both the estate's interest, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if:

(1) partition in kind of such property is impracticable;
(2) the sale of the estate's interest in such property would realize significantly less for the estate than sale of such property free of the interests of co-owners;
(3) the benefit to the estate of such sale outweighs the detriment, if any, to such co-owners; and
(4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

11 U.S.C. § 363(h)(1)-(4).

The statute also gives the non-debtor co-owner certain protections. That is, the co-owner has the right to purchase the property at the trustee's sale price and the co-owner is entitled to the proceeds of the sale according to his interest. 11 U.S.C. § 363(i); In re Addario, 53 B.R. 335, 338 (Bankr. D. Mass. 1985).

Here, the Trustee satisfies all four requirements of § 363(h). First, partition in kind of the Vestone Way Property is impracticable. Five Star has an interest in only one of the sale parcels, which is small, unimproved, and unimproveable. See Sahakian Decl., ¶ 8. In addition, pursuant to the Covenant and Agreement to Hold Property as One Parcel, recorded on September 26, *17 1983, neither this parcel nor the improved parcel can be sold separately. See JN Req., at Exh. 6. Next, selling the estate's interest in this small parcel co-owned with Five Star would realize significantly less for the Estate than the sale of such property free of Five Star's interest. Because of the restrictive covenant above, the Trustee is barred from selling the estate's 50% interest in the small parcel.[16] For similar reasons, the benefit to the estate of such sale free of Five Star's interest outweighs the detriment since the parcels cannot be sold separately. Finally, the small parcel does not appear to be used for electric energy or natural/synthetic gas purposes.

16 The Covenant instrument clearly indicates that the restriction "shall run with all of the above described land and shall be binding upon ourselves, and future owners, encumbrancers, their successors, heirs or assignees." See JN Req., at Exh. 6. This language is consistent with California law. See Cal. Civ. Code § 1468. That the Covenant was previously breached when a 50% interest was sold to Five Star does not invalidate the Covenant and permit the Trustee to sell the small parcel.

Thus, Five Star's 50% interest in the small parcel does not bar the Trustee's proposed sale of the entirety of the Vestone Way Property.

*In re Kellogg-Taxe*, C.D.Cal., No. 2:12-bk-31208-BB (NDF), Cal. Mar. 17, 2014)

### D. 11 U.S.C. § 363(m)

Subsection 363(m) moots most appeals of sale orders. A sale to a good faith purchaser may not be reversed or modified unless the sale was stayed pending appeal. 11 U.S.C. § 363(m); In re Filtercorp, Inc., 163 F.3d 570, 576 (9th Cir. 1998). "A good faith purchaser is one who buys in good faith and for value." In re Ewell, 958 F.2d 276, 281 (9th Cir. 1992) (internal quotations omitted). " [L]ack of good faith is shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." Id. *18

Here, the Trustee's proposed buyer, John Levin, appears to satisfy this good faith requirement. Mr. Levin has filed a declaration stating that:

> • He has no connection or relationship with the Trustee, the Trustee's brokers, or the Trustee's counsel;
> • He does not know the Debtor or any of her family members;
> • He has no connection or relationship with any creditor in this case;
> • He learned about the sale from his broker and by seeing an advertisement of the Property for sale;
> • He has not been contacted by anyone involved in the case except through his broker regarding his interest in the Property; and
> • No one attempted to influence his bidding and he is ready and willing to pay the agreed-upon sale price upon Court approval.

See Levin Decl., ¶¶ 3-8 (Docket No. 226).

Based on these facts, the Court finds that Mr

### E. Debtor's Homestead Exemption

Pursuant to Schedule C as amended, the Debtor claimed a homestead exemption in the Vestone Way Property in the amount of $175,000.00 pursuant to California Code of Civil Procedure

("Cal. Code Civ. Pro.") § 704.730. See Docket No. 61. The Trustee did not file an objection to the Debtor's claimed homestead exemption per the Docket, and she did not challenge the Debtor's claimed homestead exemption in the Motion. However, the Trustee requests that this Court impose certain terms and conditions on the distribution of the *19 Debtor's exempt proceeds without citing to any authority in support thereof. Mot. at 10-12. Such terms and conditions may be impermissible in light of the Supreme Court's recent decision in Law v. Siegel, supra note 10.

The Court, therefore, denies the Trustee's request with respect to the treatment of the Debtor's homestead exemption without prejudice to the Trustee seeking to recover the proceeds pursuant to California Code of Civil Procecure § 704.720(b).[17]

> [17] Under Cal. Code Civ. Pro. § 704.720(b), " [i]f the debtor does not reinvest his[/her] proceeds in a new homestead within six months of receipt, they lose their exempt status." Wolfe v. Jacobson (In re Jacobson), 676 F.3d 1193, 1198 (9th Cir. 2012).
>
> --------

## IV. CONCLUSION

In light of the foregoing, the Court grants in part and denies in part the Trustee's Sale Motion. The Trustee's proposed sale of the Vestone Way Property satisfies the requirements of §§ 363(b)(1), 363(f)(2), 363(f)(4), and 363(h). As such, the Court approves the terms of the sale and overbid procedures. Proceeds of the sale shall be held in escrow pending the resolution of the Quiet Title Action unless this Court orders otherwise following a noticed motion and an opportunity to be heard. The Court further finds that the Trustee's proposed Buyer, John Levin, is a good faith purchaser under § 363(m).

However, the Court denies without prejudice the Trustee's proposed treatment of Debtor's homestead exemption. *20

In re Kellogg-Taxe    Case No. 2:9-bk-11208-BB (Bankr. C.D. Cal. Mar. 17, 2014)

The foregoing constitutes the Findings of Fact and Conclusions of Law and based thereon Trustee's counsel is directed to prepare and submit an order consistent with this Memorandum of Decision.

_____

Richard M. Neiter

United States Bankruptcy Judge

casetext

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
Sidley Austin LLP, 555 West Fifth Street, Los Angeles, California 90013

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF FILING OF UNPUBLISHED OPINIONS PURSUANT TO LOCAL BANKRUPTCY RULE 9013-2(b)(4)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On March 16, 2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On March 16, 2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on March 16, 2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 3/16/22 | Pamela Santos | /s/Pamela Santos |
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012    **F 9013-3.1.PROOF.SERVICE**

## SERVICE LIST
### (Via NEF)

- Kyra E Andrassy kandrassy@swelawfirm.com; lgarrett@swelawfirm.com; gcruz@swelawfirm.com; jchung@swelawfirm.com
- Todd M Arnold tma@lnbyg.com
- Jerrold L Bregman jbregman@bg.law, ecf@bg.law
- Marguerite Lee DeVoll mdevoll@watttieder.com, zabrams@watttieder.com
- Danielle R Gabai dgabai@danninggill.com; dgabai@ecf.courtdrive.com
- Thomas M Geher tmg@jmbm.com; bt@jmbm.com; fc3@jmbm.com; tmg@ecf.inforuptcy.com
- David B Golubchik dbg@lnbyg.com; stephanie@lnbyb.com
- James Andrew Hinds jhinds@hindslawgroup.com; mduran@hindslawgroup.com; mduran@hindslawgroup.com
- Robert B Kaplan rbk@jmbm.com
- Jane G Kearl jkearl@watttieder.com
- Jennifer Larkin Kneeland jkneeland@watttieder.com, zabrams@watttieder.com
- Michael S Kogan mkogan@koganlawfirm.com
- Noreen A Madoyan Noreen.Madoyan@usdoj.gov
- Ryan D O'Dea rodea@shulmanbastian.com; lgauthier@shulmanbastian.com
- Sharon Oh-Kubisch sokubisch@swelawfirm.com; gcruz@swelawfirm.com; lgarrett@swelawfirm.com; jchung@swelawfirm.com
- Hamid R Rafatjoo hrafatjoo@raineslaw.com; bclark@raineslaw.com
- Ronald N Richards ron@ronaldrichards.com; 7206828420@filings.docketbird.com
- Victor A Sahn vsahn@sulmeyerlaw.com; pdillamar@sulmeyerlaw.com; pdillamar@ecf.inforuptcy.com; vsahn@ecf.inforuptcy.com; cblair@sulmeyerlaw.com; cblair@ecf.inforuptcy.com
- William Schumacher wschumac@milbank.com, autodocketecf@milbank.com
- David Seror dseror@bg.law, ecf@bg.law
- Zev Shechtman zshechtman@DanningGill.com; danninggill@gmail.com; zshechtman@ecf.inforuptcy.com
- Mark Shinderman mshinderman@milbank.com; dmuhrez@milbank.com; dlbatie@milbank.com
- Lindsey L Smith lls@lnbyb.com; lls@ecf.inforuptcy.com
- United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov
- Jessica Wellington jwellington@bg.law; ecf@bg.law

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_                                                     **F 9013-3.1.PROOF.SERVICE**