1  DAVID B. GOLUBCHIK (State Bar No. 185520)
   TODD M. ARNOLD (State Bar No. 221868)
2  LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
3  2818 La Cienega Avenue
   Los Angeles, California 90034
4  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
5  Email: dbg@lnbyg.com; tma@lnbyg.com

6  Attorneys for Debtor and Debtor in Possession

7                 UNITED STATES BANKRUPTCY COURT
8                  CENTRAL DISTRICT OF CALIFORNIA
                      LOS ANGELES DIVISION
9

10  In re:                                    Case No.: 2:21-bk-18205-DS

11  CRESTLLOYD, LLC,                          Chapter 11 Case

12          Debtor and Debtor in Possession.  **DEBTOR'S OMNIBUS REPLY TO OPPOSITIONS
                                               TO MOTION FOR AN ORDER:**
13                                             **(1)  APPROVING THE SALE OF THE DEBTOR'S
                                               REAL PROPERTY FREE AND CLEAR OF ALL
14                                             LIENS, CLAIMS,  ENCUMBRANCES, AND
                                               INTERESTS, WITH THE EXCEPTION OF
15                                             ENUMERATED EXCLUSIONS;**
                                               **(2)  FINDING THAT THE BUYER IS A GOOD
16                                             FAITH PURCHASER;**
                                               **(3)  AUTHORIZING AND APPROVING THE
17                                             PAYMENT OF CERTAIN CLAIMS FROM SALE
                                               PROCEEDS;**
18                                             **(4)  WAIVING THE FOURTEEN-DAY STAY
                                               PERIOD SET FORTH IN BANKRUPTCY RULE
19                                             6004(h); AND**
                                               **(5)  PROVIDING RELATED RELIEF;
20                                             MEMORANDUM OF POINTS AND
                                               AUTHORITIES IN SUPPORT THEREOF**
21

22                                             Hearing:
23                                              Date:    March 18, 2022
                                                Time:    11:00 a.m.
24                                                Place:   Courtroom 1639
                                                         255 E. Temple St.
25                                                         Los Angeles, CA 90012
                                                         **VIA ZOOMGOV ONLY**
26

27

28

Crestlloyd, LLC, the Chapter 11 debtor and debtor in possession herein (the "Debtor"), hereby files its omnibus reply (the "Reply") to the oppositions (each an "Opposition" and collectively the "Oppositions") filed by (1) American Truck & Tool Rental ("American") [Dkt. 191], (2) J & E Texture, Inc. ("J&E") [Dkt. 192], (3) Yogi Securities Holdings, LLC ("Yogi") [Dkt. 193], (4) Nile Niami ("Niami") [Dkt. 191], and (5) Inferno Investment, Inc. ("Inferno" and, with the other parties that filed Oppositions, the "Objecting Parties") [Dkt. 1987] to the Debtor's *Motion For An Order: (1) Approving The Sale Of The Debtor's Real Property Free And Clear Of All Liens, Claims, Encumbrances, And Interests, With The Exception Of Enumerated Exclusions; (2) Finding That The Buyer Is A Good Faith Purchaser; (3) Authorizing And Approving The Payment Of Certain Claims From Sale Proceeds; (4) Waiving The Fourteen-Day Stay Period Set Forth In Bankruptcy Rule 6004(H); And (5) Providing Related Relief* (the "Sale Motion") [Dkt. 142]:[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### SUPPLEMENTAL STATEMENT OF FACTS

1.      On March 16, 2022, the Debtor entered into a stipulation with each of American and J&E (the "Stipulations"), and filed the Stipulations with the Court.  [Dkts. 203 and 204]  Subject to Court approval, the Stipulations provide that (a) American and J&E's claims will be deemed to be allowed secured claims in agreed discounted amounts and shall be paid from the sale proceeds on the close of escrow and (b) American and J&E will be deemed to have withdrawn their Oppositions to the Sale Motion and consented to the terms and conditions of the Sale Motion, subject to modification consistent with the Stipulations.

2.      As set forth in the Sale Motion, the Debtor will receive a total of $137.97 million in consideration for the sale of the Property comprised of the Purchase Price of $126 million, plus a $11.97 million Rebate from the Auctioneer.  Pursuant to the Sale Motion and this Reply, subject to Court approval, the Debtor is seeking to make certain payments out of escrow on closing.  Those payments and the amount of sale proceeds remaining after making such payments are set forth below:

---

[1] Any capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

2

| | Scenario 1 | Scenario 2 | |
|---|---|---|---|
| Sale Price | $126,000,000.00 | $126,000,000.00 | |
| Premium Rebate to Estate 9.5% | $11,970,000.00 | $11,970,000.00 | |
| Commission to Brokers 2% on $126mm sale (1% to Estate Brokers/1% to Buyer Broker) | ($2,520,000.00) | ($2,520,000.00) | |
| Mechanic's Lien Claims | | ($751,922.59) | *See* Secured Claims Summary Chart, Sale Motion, at pp. 7-17. Includes, American and J&E at pre-discount amounts and all other mechanic's lien claimants.[2] |
| Hankey DIP Loan | ($12,059,500.00) | ($12,059,500.00) | |
| Hankey Principle on First Loan | ($82,500,000.00) | ($82,500,000.00) | |
| Hankey Receivership Certificate | ($879,380.70) | ($879,380.70) | Est. |
| Property Taxes | ($2,488,815.00) | ($2,488,815.00) | Est. |
| Other Closing Costs | ($630,000.00) | ($630,000.00) | Est. |
| | $36,892,304.30 | $36,140,381.71 | |

In response to Inferno's inquiry, the Rebate paid to the estate will be subject to liens and available to pay allowed Secured Claims.

## II.

## LEGAL ARGUMENT

There is substantial overlap in in the arguments made in the Oppositions. Therefore, where possible, the Debtor responds to bases for such arguments, as opposed to responding separately to each Opposition to avoid redundancy in this Reply as much as possible.

A.    **THERE IS A GOOD BUSINESS REASON TO APPROVE THE SALE AND THE SALE IS IN THE BEST INTERESTS OF THE ESTATE, INCLUDING BECAUSE THE PURCHASE PRICE REPRESENTS THE HIGHEST AND BEST OFFER FOR THE PROPERTY UNDER THE CIRCUMSTANCES AND FAIR VALUE FOR THE PROPERTY.**

In its Sale Motion, the Debtor acknowledges that that approval of the Sale Motion requires that the Debtor demonstrate that (1) a "good business reason" exists for approval of the sale[3] and (2)

---

[2] Per the reasoning in American and J&E's Oppositions, but subject to agreement on amounts of claims, the Debtor agrees that the mechanic's lien claimants are senior to all other alleged Secured Creditors other than the County of Los Angeles for secured real property taxes and Hankey for the DIP Loan and the Receivership Certificates. *See* DIP Order and the Order Appointing Receiver in the Hankey v. Crestlloyd action (the "Receiver Order"), a true and correct copy of which is attached hereto as **Exhibit "1,"** at ¶ 8(b) ("b. Funds loaned to the Receiver by Plaintiff pursuant to Receivership Certificates shall become a first lien on the Receivership Property with super priority over all preexisting private liens and encumbrances, except for federal, state, or local tax liens of record upon the Receivership Property.").

[3] *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

1  the sale is in the best interest of the estate, which is determined by considering, *inter alia*, whether the

2  Purchase Price is adequate.[4]  The Debtor does not dispute the corollary that it also has to demonstrate

3  that it met its fiduciary duty to maximize the value of the Property by obtaining the best possible price

4  under the circumstances.  *In re Golden Empire Air Rescue, Inc.*, No. BAP EC-07-1086, 2007 WL

5  7540946, at *7 (B.A.P. 9th Cir. Oct. 25, 2007).  As stated in *Golden Empir*e, "A sale that is well

6  advertised and subject to overbids is usually the preferred method to achieve the best possible price.

7  However, the guiding principle is that the 'court's obligation in section 363(b) sales is to assure that

8  optimal value is realized by the estate **under the circumstances**.'"  *Id.* citing and quoting *Lahijani v.*

9  *Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 287 (B.A.P. 9th Cir. 2005) (emphasis added);

10  *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (referencing "maximizing the

11  value of the bankruptcy estate" as being among the "significant Code-related objectives"); *Toibb v.*

12  *Radloff*, 501 U.S. 157, 163 (1991) (highlighting how "Chapter 11 also embodies the general Code

13  policy of maximizing the value of the bankruptcy estate"); *Saddleback Valley Cmty. Church v. El*

14  *Toro Materials Co. (In re El Toro Materials Co.)*, 504 F.3d 978, 981 (9th Cir. 2007) (relying on the

15  "bankruptcy policy" of applying the Bankruptcy Code "to maximize the value of the estate to

16  creditors").

17       American, Yogi, Niami, and Inferno all assert that the Debtor has not satisfied the

18  foregoing requirements.  American's argument on this point is very generalized.  American

19  Opposition, p. 2, ll. 8-19.  Yogi argues that the Purchase Price is not fair market value because there

20  was no minimum bid amount set, there was a "soft gavel" (*i.e.*, allowing extension of the Auction time

21  for other bids), and geopolitical issues resulting from the conflict in Eastern Europe, such that the

22  Auction should have been extended.  Yogi Opposition, pp. 2-5.  Niami and Inferno make some of the

23  same arguments and other similar arguments.  Niami Opposition, ¶ 5; Inferno Opposition, p. 2, ll. 23-

24  28, p. 3, ll. 14-25.

25

26

27

28  _____
[4] *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991); *In re The Landing*, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993); *In re Mama's Original Foods, Inc.*, 234 B.R. 500, 502-505 (C.D. Cal. 1999).

1   The foregoing arguments, many of which is based on inadmissible evidence,[5] lack merit.

2   In its Bid Procedures Motion, the Debtor sought to conduct the Auction with no minimum bid/reserve

3   price.  Bid Procedures Motion [Dkt. 88].  Annexed to the  Bid Procedures Motion was the Declaration

4   of Lawrence R. Perkins ("Perkins"), the Founder and CEO of SCP, the Debtor's Non-Member

5   Manager, wherein Perkins testified that, in his business judgment, the Bid Procedures, including the

6   lack of a minimum bid/reserve price, would foster competitive bidding and maximize the price

7   obtained for the Property.  Bid Procedures Motion [Dkt. 88], at Perkins Declaration, ¶ 19.

8   Yogi and Inferno opposed the Bid Procedures Motion based on, among other things, the

9   failure to set a minimum bid/reserve price.  [Dkts. 97 and 98]  At the hearing on the Bid Procedures

10  Motion, the Court took testimony from Chad Roffers ("Roffers"), the President of the Auctioneer,

11  Concierge Auctions, LLC, on the issue of whether or not the Bid Procedures should include a

12  minimum bid/reserve price.   Based on the Bid Procedures Motion, the Perkins Declaration, and

13  Roffers' testimony the Court entered its Bid Procedures Order granting the Bid Procedures Motion

14  and approving the Bid Procedures, including not having a minimum bid/reserve price.  [Dkt. 105]

15  Yogi, Niami, and Inferno are now improperly trying to collaterally attack the Bid Procedures Order,

16  based on inadmissible hearsay and innuendo.  *See* Yogi Opposition, at Englanoff Declaration, ¶¶ 2-5;

17  Yvonne Niami Declaration [Dkt. 202], ¶¶ 4-6; and Evidentiary Objections thereto.

18  Further, there is no evidence that the outcome of the Auction would have been any better

19  if a minimum bid/reserve price had been set.  To the contrary, as discussed in the Sale Motion, there

20  were five qualified Bidders and four of them submitted at least one bid and some of them submitted

21  multiple bids.  Sale Motion [Dkt. 142], p. 20.   Under these facts and because, as discussed in the Sale

22  Motion and herein, the Property was extensively marketed, the Auction was well advertised, and the

23  Auction was subject to overbids [Sale Motion [Dkt. 142], pp. 19-20, Ex. 3 Exposure Report, and

24  Roffers and Williams Declarations], the Auction likely achieved the best possible price under the

25  circumstances.  *Golden Empire*, *supra*, at *7; *Lahijani, supra*, at 287.

26

27

28  [5] *See* concurrently filed evidentiary objections to various declarations filed in support of the Oppositions (the "Evidentiary Objections").

1    Yogi, Niami, and Inferno also argue that the Purchase Price cannot represent fair market

2    value, because there was an appraisal of the Property in 2019 for $228 million and the Debtor made

3    representations in prior pleadings that the Property was worth approximately $325 million. Yogi

4    Opposition, p. 2, ll. 8-19; Niami Opposition, ¶¶  1, 3, 4, 7, 8, 11, and 14 (framing the issue as a due

5    process violation and good faith issue), Inferno Opposition, p. 2, ll. 12-13, p. 6, ll. 5-8.  Niami goes so

6    far as to assert that the Debtor should be judicially estopped from selling the Property for the Purchase

7    price because it is so much lower than $325 million.  Niami Opposition, ¶¶ 1 and 7.

8    In regard to the appraisal, Niami attached a November 2019 $228 million appraisal for the

9    Property to his Opposition and then asserted in the introduction and with no evidentiary support that

10   "the value of [the Property] has only increased since then."  Niami Opposition, ¶ 1.  Yogi attached the

11   same appraisal to its Opposition and Inferno did not submit any evidence regarding appraised value.

12   Setting aside evidentiary issues raised in the Debtor's Evidentiary Objections, the appraisal is over

13   two years old and does not take into consideration a global change in circumstances due to war in

14   Eastern Europe so it cannot be relied on and, in fact, is not necessary to establish whether fair value

15   was paid.  Indeed, Niami argues that fair value is established only if a property sells for 75% of

16   appraised value.  Niami Opposition, § VI. (citing *Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 281

17   (9th Cir. 1992) (citing *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)).

18   Niami conveniently leaves out that in *Abbotts* the court also held that "[g]enerally speaking, an auction

19   may be sufficient to establish that one has paid 'value' for the assets of a bankrupt" as long as there is

20   not collusion between the debtor and the buyer.  *Abbotts*, 788 F.2d, at 149.  Here, the Debtor obtained

21   this Court's approval of Bid Procedures for an Auction of the Property, and the Property was sold

22   pursuant to an Auction conducted in accordance with the Court-approved Bid Procedures.  Neither

23   Niami, nor any other party, has established any collusion or other bad acts by the Debtor or the Buyer

24   in connection with the Auction.  Therefore, there is sufficient evidence to establish that the Buyer paid

25   fair value for the Property.

26   As to the arguments regarding prior pleadings filed by the Debtor indicating that the

27   Property was worth approximately $325 million and Niami's related judicial estoppel argument,

28   Niami argues that, because prior pleadings indicated that the property had a fair market value of over

1  $300 million, the Debtor is now judicially estopped[6] from selling the Property for substantially less

2  than $300 million.  Niami Opposition, § VI.  Niami ignores that SCP came in as the Non-Member

3  Manager of the Debtor less than a month before the Petition Date when the Receiver still had control

4  over some of the Debtor's books and records and that those representation were made based on

5  information provided to SCP by Niami and others and that such representations were made before the

6  geopolitical unrest in Eastern Europe.  Sale Motion [Dkt. 142], at Perkins Declaration, ¶¶ 5, and 13-

7  16.  More importantly, in regard to the Bid Procedures Motion, the Debtor and SCP specifically stated

8  that while they "believe[d] that the Property ha[d] a current fair market value of approximately $325

9  million in its 'as-is' nearly complete condition, [they] understand that *the market will ultimately*

10  *dictate the price*."  Bid Procedures Motion [Dkt. 88], at p. 14 and Perkins Declaration thereon, at ¶ 10

11  (emphasis added).  As with the Bid Procedures Motion, in other pleadings the Debtor always indicated

12  that it "*believed* the Property ha[d] a current fair market value of approximately $325 million," not

13  that the Property was definitely worth $325 million.  *See e.g.*, DIP Motion [Dkt. 66] at p. 12 (emphasis

14  added).  Based on the foregoing, judicial estoppel does not apply because seeking to sell the Property

15  for $137.97 million (inclusive of the Rebate from the Auctioneer) is not inconsistent with earlier

16  positions regarding the value of the Property, because the Property is being sold for a purchase price

17  determined by the market.  For the same reasons set forth above, the Debtor did not mislead the Court

18  into accepting that the Property was absolutely worth approximately $325 million.  The Debtor gave

19  its opinion of the value of the Property with the caveat that the market would ultimately set the value..

20  The argument that a "soft gavel" (*i.e.*, allowing extension of the Auction time for other

21  bids) chilled bidding and the maximization of value is based wholly on impermissible hearsay.  *See*

22  Yogi Opposition, at Englanoff Declaration, ¶ 5; Yvonne Niami Declaration [Dkt. 202], ¶ 8; and

23  Evidentiary Objections thereto.  In addition to the evidentiary issues that defeat the argument, the

24  argument is unpersuasive. The Bid Procedures attached to the Bid Procedures Motion and approved

25  by the Court, provided that (1) the Auction would end at "approximately 4:00 p.m." on the Auction

26  _____

27  [6] Application of judicial estoppel is within the Court's discretion and is generally informed by considerations such as (1) whether a party's later position is "clearly inconsistent" with its earlier position, (2) whether judicial acceptance of the later position would create the perception that the court was misled into accepting either the earlier or later position, and (3)

28  "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001).

End Date and (2) the Auctioneer could waive or modify previously announced requirements and otherwise control the conduct of the Auction.  Bid Procedures Motion [Dkt. 88], at Exhibit "1," at "Bidding" and "Auction Procedures" provisions.

As stated by certain of the Objecting Parties, in the Sale Motion, the Debtor acknowledges that "the already limited pool of buyers with the means to purchase the Property may have been further reduced due to the conflict in Ukraine and related sanctions against Russia, which may have taken potential Russian, Ukrainian, Chinese and other international buyers out of the market."  Sale Motion [Dkt. 142], p. 25.  However, that does not amount to an admission that the Debtor did not obtain the highest and best price under the circumstances pursuant to the Auction.  The circumstances at the time of the Auction and still continuing are that there is an international conflict that may have caused viable bidders not to participate in the Auction, but that does not mean that the highest price from participating bidders was not obtained, and the Objecting parties have not shown otherwise.  Further, the Objecting Parties have not shown (nor can they) that the conflict will soon abate such that a sale at a higher price can be obtained and close in the near future.   Conversely, there is a possibility that the conflict could get worse such that extending the Auction could result on the Debtor obtaining a lower value for the Property, which supports Perkins' conclusion, in an exercise of his business judgment, that proceeding with the proposed sale is in the best interests of the estate.

Despite the foregoing material uncertainties as to what outcome might be achieved if the Auction was continued, some of the Objecting parties argue that the Debtor has not shown that the proposed sale is in the best interests of the estate, because (1) it will only benefit certain alleged Secured Creditors due to the fact that the estimated $137.97 million in consideration to be received by the Debtor if the sale is approved is materially lower than the asserted and projected alleged Secured Claims and (2) there may be better alternatives to the proposed sale.[7]  Inferno Opposition, p. 2, l. 17-p.

---

[7] Inferno makes a related argument that the proposed sale should not be approved because there will be no benefit for general unsecured creditors since the Property is over encumbered and in such situations sales are strongly disfavored. Inferno Opposition, p. 5, l. 4-p. 6, l. 4.  In support of this argument, Inferno cites to *In re KVN Corp.*, Inc., 514 B.R. 1, 5 (9th Cir. BAP 2014) and the string cite of cases in *KVN*.  As Inferno admits, however, those cases are all distinguishable because they are in the context of Chapter 7 cases.  Inferno Opposition, p. 5, l. 4-p. 6, l. 4.  Even so, there potential benefits to general unsecured creditors that will result from the proposed sale.  As discussed above, closing the sale will curtail administrative expenses that would come ahead of general unsecured creditors.  Further, the Debtor believes that it has viable avoidance causes of action and the proceeds therefrom would be free and clear of liens.

3, l. 3; p. 3, ll. 19-24, p. 4, ll. 5-11; p. 6, ll. 8-14; Niami Opposition, ¶ 2; Yogi Opposition, p. 4, ll. 14-17.  These arguments tie into the issue discussed above of whether the Debtor obtained the highest price possible under the circumstances.  There is always a possibility of obtaining a higher price if you wait long enough, but, as noted, there is also a possibility of a worse result, in which case creditors would be worse off.  The Objecting Parties are essentially demanding that the Debtor gamble with an in hand offer with an over $15 million deposit having been made to secure performance. The mere delay of closing a sale is already detrimental to the estate, because, in the absence of the approval of the proposed sale, the distribution on allowed claims would likely be much lower, because, among other things, (1) the Debtor would continue to incur huge per deim interest in the approximate amount of $50,000 on the senior Secured Claims asserted by Hankey, (2) the Debtor would have to pay an extension fee of $126,000 on the DIP Loan, (3) the Debtor would continue to incur large administrative claims arising from the costs associated with securing, insuring, and maintaining the Property, as well as for material ongoing services provided b estate professionals, and (4) the Debtor would continue to incur bi-yearly property taxes in the approximate amount of $700,000.  Sale Motion [Dkt. 142], at Perkins Declaration, ¶ 26.

Further, the Objecting Parties' assertion that there may be a higher and better offer right around the corner are wholly speculative.  Niami merely posits that the Debtor has not "established that the proposed sale price is the best alternative available," without any concrete alternatives other than burning time and estate resources in the hope that a better deal comes along.  Niami Opposition, ¶ 2.  Yogi's ideas regarding another buyer are similarly lacking in substance.  Yogi Opposition, p. 4, ll. 14-17 ("At this juncture, the Court should deny the Sale Motion, require the Debtors to re-notice the Auction for a later date and continue marketing efforts for the Property to ensure that the estate maximizes value for stakeholders.")

Inferno does not fare any better by (1) referencing an offer with a long closing date and contingencies by a buyer that could have participated in the Auction [Inferno Opposition, at Exhibit "A" (email exchange with purported broker for buyer stating, "With regards to the auction, I did try and push the client to enter and bid, but it was the one thing his trustees did not want him to do. The Buyer wasn't averse to it, unfortunately his Trustees were.") and Exhibit "B" (the $160 million offer)

9

and (2) the hearsay statement of declarant Anthony Aquino that "I am further informed that there is a potential Chinese buyer interested in acquiring the Property for more than the amount proposed to be paid by Richard Saghian, although I am also informed this buyer requires additional time to submit the offer and provide verification of their financial wherewithal" [Inferno Opposition, at Aquino Declaration, ¶ 2]. All of these purported buyers can make a higher offer before or at the hearing on the Sale Motion with terms comparable to the current offer in terms of deposit, closing date and no contingencies if they really wanted the property and to pay a higher price. The absence of any such offers (at lease at present) wholly contradicts the argument that there is a viable buyer ready to make a higher offer with all other terms the same.

Again, the notion that risking the loss of the Buyer and incurring substantial additional administrative claims and interest accrual in the hopes of obtaining a higher sale price and closing on such transaction that is not in prospect would be consistent with a reasonable exercise of business judgement does not withstand scrutiny. On the other hand, choosing to pursue the benefits of the proposed sale in terms of an highly assured result now backed by a large security deposit and the curtailment of additional secured claims for interest and administrative is consistent with a valid exercise of business judgment and maximizing value. With that said, as indicated in the Sale Motion if a bona fide higher offer is made for the Property before the hearing on the Sale Motion, the Debtor will disclose it to the Court for its consideration.

For all of the foregoing reasons, and others set forth in the Sale Motion, the Debtor submits that the requirements to grant the Sale Motion have been satisfied.

**B.        THE SALE IS BEING PROPOSED AND PURSUED IN GOOD FAITH.**

Niami and Inferno argue that the Debtor and/or the Buyer are not proposing or pursuing the proposed sale in good faith and that the Buyer is not entitled to a good faith finding under Section 363(m). Niami Opposition, ¶¶ 2, 11-15; Inferno Opposition, p. 6, l. 16-p. 17, l. 14. In asserting that the Debtor is not proposing the sale in good faith, Niami relies on the same unconvincing arguments he made regarding judicial estoppel, which are discussed above – *i.e.*, that the sale is not in good faith because of representations in prior pleadings by the Debtor and SCP that, while they "believe[d] that the Property ha[d] a current fair market value of approximately $325 million in its 'as-is' nearly

1  complete condition, [they] understand that ***the market will ultimately dictate the price***." Bid

2  Procedures Motion [Dkt. 88], at p. 14 and Perkins Declaration thereon, at ¶ 10 (emphasis added).  As

3  with the Bid Procedures Motion, in other pleadings the Debtor always indicated that it "***believed*** the

4  Property ha[d] a current fair market value of approximately $325 million," not that the Property was

5  definitely worth $325 million.  *See e.g.*, DIP Motion [Dkt. 66] at p. 12 (emphasis added).

6  More importantly, Niami's unfounded assertion that the Debtor somehow guaranteed that

7  the Property was worth approximately $325 million does not even address what the Court considers in

8  determining good faith on the part of a debtor in a sale transaction.   The good faith requirement

9  focuses principally on whether there is any evidence of "fraud, collusion between the purchaser and

10  other bidders or the [debtor in possession], or an attempt to take grossly unfair advantage of other

11  bidders." *Abbotts*, 788 F.2d at 147; Wilde Horse, 136 B.R. at 842.  Niami provides no evidence or

12  arguments on these considerations that actually apply.  Assuming arguendo that Niami was correct

13  and the Debtor knowingly overstated the value of the Property in prior pleadings, that would indicate

14  to the market that the bids for the Property should be higher than what was obtained – *i.e.*, the opposite

15  of what would be done in an effort to engage in fraud, collusion, or to take unfair advantage of other

16  bidders.

17  Niami's argument that the sale is not in good faith because the Debtor did not provide

18  evidence as to the sufficiency of its sale efforts and merely relied on the efforts of the Brokers and

19  Auctioneer also misses the mark.  Niami Opposition, § V.  Again, this is not a consideration related to

20  good faith, but the general requirements for approval of a sale under Section 363 discussed above.

21  Also, the Debtor's engagement of the Brokers and Auctioneer and their efforts to market and sell the

22  Property where in furtherance of Debtor's efforts to market and sell the Property.  Those extensive

23  efforts are detailed in the Sale Motion, the Exposure Report attached to the Sale Motion as Exhibit

24  "3," and the declarations of Chad Roffers and Branden Williams in support of the Sale Motion.  Niami

25  does not at all address how the marketing was insufficient.  In addition, contrary to Niami's argument,

26  the Bid Procedures did provide evidence of the prior and expected ongoing marketing efforts by the

27  Debtor's Brokers and Auctioneer and why the Debtor believed the Bid Procedures and marketing

28  would were reasonable and would maximize the price ultimately obtained for the Property while still

11

1  protecting the estate from parties who may wish to bid on the Property but who are ultimately unable

2  to consummate a purchase of the Property.  Bid Procedures Motion [Dkt. 88], at pp. 17-18 and Perkins

3  Declaration thereon, at ¶ 19.

4          On the other side of the transaction, Niami claims that the Buyer is not a good faith

5  purchaser for the purposes of Section 363(m), because he did not buy the Property in good faith and

6  for value.  Niami Opposition, § VI.  Inferno makes the same argument and relies on the same cases in

7  doing so.  Inferno Opposition, p. 6, ll. 16-24.  There can be no doubt that the Buyer is providing value

8  for the Property, because he is paying $126 million to the Debtor, plus the Buyer's Premium in the

9  amount of $15.120 million paid to the Auctioneer, $11.97 million of which will be Rebated to the

10  Debtor, resulting in gross sale proceeds in the amount of $137.97 million being paid to the Debtor.  As

11  discussed above, despite the foregoing, Niami asserts that fair value is established only if a property

12  sells for 75% of appraised value.  That argument is addressed above.  As noted, neither Niami, nor any

13  other party, has established any collusion or other bad acts by the Debtor of the Buyer in connection

14  with the Auction.  Therefore, there is sufficient evidence to establish that the Buyer is a "good faith"

15  purchaser entitled to the protections afforded under Section 363(m).  The Debtor is informed that the

16  Buyer will also submit a declaration further establishing that he is a "good faith" purchaser.

17          Inferno further argues that there is no evidence of good faith in the Sale Motion other than

18  that the Buyer was the high bidder. Inferno Opposition, p. 6, ll. 22-24.  That simply is not true.  The

19  Sale Motion contains other indicia of good faith.  Sale Motion, p. 24 ("[T]he form of the Purchase

20  Agreement, which was required to be used by all Bidders, was prepared and approved by the Court

21  before the Auction pursuant to the Bid Procedures Order. Also, the property was sold pursuant to an

22  Auction conducted in accordance with the Court-approved Bid Procedures. Therefore, the Debtor

23  submits that the terms of the Purchase Agreement are the result of more than arms-length negotiations.

24  As also discussed above, the Debtor is informed and believes that, other than in connection with the

25  proposed sale of the Property, the Buyer has no prior connections with the Debtor or its current non-

26  Member manager, SierraConstellation Partners LLC, and the Debtor has no basis to believe that the

27  Auction and resulting winning bid by the Buyer were the product of any collusion.")

28          Inferno goes on the claim a lack of good faith, because a bidder had technical difficulties

that prevented it from registering and bidding.  Inferno Opposition, p. 6, l. 24-p.7, l. 2.  The inability

of one bidder to bid would not change the good faith of the Buyer, unless he caused the technical

issues for the other bidder.  Of course, there is no claim that was the case or any evidence of bad

conduct by the Buyer.  The same is true regarding the geopolitical environment that Inferno cites as a

basis to deny a good faith finding.  Inferno Opposition, p. 7, ll. 2-7.  The Buyer cannot be blamed for

something that was wholly out of his control and in no way caused by him.

In addition to the evidence submitted by the Debtor concerning good faith, the Debtor

understands that the Buyer will be submitting a declaration to further support a good faith finding.

One point on which the Debtor is in agreement with Niami and Inferno is that the Buyer

must sign the Court-approved Supplemental Addendum to the Purchase Agreement ***before*** the hearing

on the Sale Motion. the Debtor is in agreement with

## C.   NIAMI'S UNIQUE ARGUMENTS IN OPPOSITION TO THE SALE MOTION ALSO LACK MERIT.

In addition to his arguments in opposition to the Sale Motion that had some overlap with

those made by Yogi and Inferno, Niami made some additional arguments.  As discussed below, none

of those arguments support denial of the Sale Motion.

First, Niami asserts that the Sale Motion is not consistent with due process, because (1)

the Purchase Price is materially less than what was represented in the Bid Procedures Motion, (2)

there was a lack of time to obtain expert reports and conduct discovery, (3) parties were only given a

week to object to the Sale Motion.  Niami Opposition, ¶ 4.  The issue regarding the difference

between the Purchase Price and the Debtor's prior estimations of the value of the Property is

discussed above.  In regard to discovery, it is no surprise that the Debtor would seek approval of a

sale of the Property.  All pleadings, and especially Employment Application for the Debtor's

Brokers filed on December 12, 2021 [Dkt. 74] and the Bid Procedure Motion filed on December 29,

2021 [Dkt. 88], all indicated as such, yet Niami did not have any expert reports prepared and

conducted no discovery.  Thus, he cannot now complain of his own inaction.  The week that parties

were provided to prepare oppositions is the same amount of time that parties would have to file

1    oppositions to a regularly scheduled sale motion pursuant to LBR 9013-1.  The scheduling for the

2    Sale Motion in no way prejudiced the ability of creditors to oppose the Sale Motion.

3        Second, Niami takes the position that the proposed sale and allocation of "all" of the

4    property of the estate among creditors is a sub rosa plan.  Niami Opposition, ¶ 10.  A sub rosa plan

5    can occur when a transaction, usually a sale of estate assets, "dictated plan terms, essentially binding

6    creditors to a particular distribution scheme."   *In re Mega-C Power Corp.*, No. BAP NV-06-1060-

7    BSJ, 2006 WL 6810965, at *6 (B.A.P. 9th Cir. Sept. 29, 2006); *see also In re Def. Drug Stores, Inc.*,

8    145 B.R. 312, 318 (B.A.P. 9th Cir. 1992) (holding that a sub rosa plan occurs "[w]hen

9    preconfirmation transactions, such as the sale of substantially all of the debtor's assets, have the

10   effect of or dictate the terms of a future reorganization plan.)

11       Contrary to Niami's argument, the Debtor is not seeking to allocate all proceeds from the

12   sale of the Property, nor is the Debtor trying to dictate the terms of a future plan of reorganization.

13   Pursuant to the Sale Motion, the Debtor is seeking to sell the Property and to disburse between

14   approximately $101.077 and $101.829 million of the $137.97 million in sale proceeds from escrow

15   to pay some or all of the agreed mechanic's lien claims, a portion of Hankey's secured claims, the

16   secured claim of the County of Los Angeles for property taxes, the commission's payable to the

17   Debtor's and Buyer's Brokers, and closing costs, which would leave between approximately $36.14

18   and $36.89 million in proceeds to distribute.  All of the requested payments are consistent with

19   allowed disbursements of sale proceeds under LBR 6004-1(h) and the payment to the Debtor's and

20   Buyer's Brokers is also consistent with the Court's Employment Order.

21       The liens of the alleged Secured Creditors for any unpaid claims would attach balance of

22   the sale proceeds with the same extent, validity, and priority as the alleged pre-petition liens held by

23   the Secured Creditors.  Further, the Debtor believes that it has viable avoidance causes of action and

24   the proceeds therefrom would be free and clear of liens.  Those proceeds and the balance of sale

25   proceeds remaining after the foregoing payments from escrow would have to be distributed under a

26   plan (or further orders of the Court) and only after issues regarding, inter alia, the amount and

27   priority of the unpaid Secured Claims are resolved.  Based on the foregoing, the proposed sale is not

28   a sub rosa plan.

Third, Niami asserts that pursuant to the Sale Motion the Debtor is seeking approval to pay $2.52 million in commissions to the Debtor's Brokers and $3.15 million in fees to the Auctioneer. Niami Opposition, § VII. The Debtor is not seeking to pay any fees to the Auctioneer [Sale Motion, at p. 3, Item (3)], because that is not necessary. The Employment Application for the Debtor's Brokers and the Auctioneer provides that, "any buyer (the 'Buyer') shall pay a fee (the 'Buyer's Premium') equal to 12% of the bidder's purchase price …, which Buyer's Premium shall []be separate from the Purchase Price for the Property to be paid to the Debtor and is an obligation of the Buyer to the Auctioneer … The Buyer's Premium paid to the Auctioneer will be paid by the Buyer and not the estate," provided that the Auctioneer will rebate a substantial portion of its Buyer's Premium to the Debtor – 9.5% or $11.970 million under the current proposed sale. Employment Application [Dkt. 74], at p. 10. The Employment Application was approved by the Court's Employment Order. [Dkt. 104] The same provisions are included in the Bid Procedures and Auction Agreement approved by the Court. [Dkts. 88 and 105]

In regard to the Debtor's Broker's commission, Niami asserts that the approval of the employment and commission for the Debtor's Brokers was premised on the representation that the Property was worth much more. As already noted above, the Debtor always represented that it believed that the Property was worth approximately $325 million, but that the price would ultimately be determined by the market, which it was pursuant to the Auction. Niami also argues that, given that the Property sold for substantially less, the commission to be paid to the brokers should be reduced because the amount has "prove[d] to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." Niami Opposition, § VII (quoting 11 U.S.C. § 328(a)). That argument does not hold-up. The Listing Agreement for the Debtor's Brokers and the Employment Application seeking to employ them pursuant to the Listing Agreement both contemplate a potential sale well below $325 million and account for it by starting with a low commission rate and having it increase as the purchase price increases. Employment Application [Dkt. 74], at p. 8 ("Commission to Brokers: a. 1% of sale price up to $175 million (plus 1% payable to any buyer broker); b. 1.5% of sale price over $175 million and up to $200 million (plus 1% payable to any buyer broker); and c. 2.0% of sale price over $200

1  million (plus 1% payable to any buyer broker)"); *see also* Listing Agreement attached to the

2  Employment Application [Dkt. 74] as Exhibit "1," at Addendum.  Therefore, it was contemplated

3  that there could be a sale price below $200 million and the compensation in such a sale was is

4  in an amount of only 1% to the Debtor's Brokers and 1% payable to any Buyer Broker.  As the

5  Court likely knows from reviewing many listing agreements, a 1% commission is extremely low.

6  Based on the foregoing, there were no "developments not capable of being anticipated at the time of

7  the fixing of [the  Debtor's Brokers' commission]" and, therefore, no reason not to allow the

8  payment of commissions to the Debtor's Brokers and the Buyer's Broker based on reduced rates for

9  the instant sale that were previously approved by the Court.

10 **D.      THE PROPERTY CAN BE SOLD FREE AND CLEAR OF ANY AND ALL
11          LIENS, CLAIM, ENCUMBRANCES, AND INTERESTS, WITH THE
           EXCEPTION OF THE EXCEPTED ITEMS.**

12          Pursuant to the Oppositions, (1) Yogi and Inferno did not contest that there is a basis to

13 sell the Property free and clear of any and all liens, claims, encumbrances, and interests, with the

14 exception of the Excepted Items pursuant to Sections 363(f)(4) or (5) ("Free and Clear"), (2) Niami

15 did not contest that there is a basis to sell the Property Free and Clear pursuant to Section 363(f)(4);

16 he only asserted that the Property could not be sold Free and Clear pursuant to Section 363(f)(2)

17 based on implied consent due to non-opposition to the Sale Motion [Niami Opposition, ¶ 9], and (3)

18 American and J&E asserted that the Property could not be sold Free and Clear pursuant to Sections

19 363(f)(2) based on implied consent due to non-opposition to the Sale Motion, (f)4) based on bona

20 fide disputes as to the amounts and priority of the alleged Secured Claims, and (f)(5) based a legal or

21 equitable proceeding pursuant to which a lien holder could be compelled to accept a money

22 satisfaction of such interest; however, if the Stipulations with American and J&E are approved by the

23 Court, then their Oppositions will be deemed to be withdrawn.

24          In consideration of the foregoing, if the Stipulations are approved and American and

25 J&E's Oppositions are withdrawn, then there will be no party objecting to the Debtor's position that

26 it can sell Free and Clear due to bona fide disputes as to the amounts and priority of the alleged

27 Secured Claims.  Therefore, the Debtor has truncated its Section 363(f) analysis, because it may be

28 moot, and the Debtor only addresses Sections 363(f)(2) and (f)(5).

### 1.    SECTION 363(f)(2).

Pursuant to Section 363(f)(2), property of the estate can be sold free and clear of an entity's interest in the property of the entity consents.  11 U.S.C. § 363(f)(2).  In the Sale Motion, the Debtor asserts that consent can be either affirmative or implied if an entity fails to make a timely objection to the sale free and clear after receiving notice of the sale.  The Debtor relies on a number of cases in support of implied consent.  *In re Ex-Cel Concrete Company, Inc.*, 178 B.R. 198, 203 (B.A.P. 9th Cir. 1995) (In a case regarding consent under Section 363(f)(2),the B.A.P. held that, "The issue here is whether there was consent or non-opposition by Citicorp."); *In re Eliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *In re Paddlewheels, Inc.*, 2007 WL 1035151 (Bankr. E.D. La. April 2, 2007) ("The Sale Motion complies with section 363(f) of the Bankruptcy Code, in that the Trustee either obtained the consent of Whitney to the sale of the Vessel to Purchaser or Whitney had no objection to the Sale."); *In re Gabel*, 61 B.R. 661 (Bankr. W.D. La. 1985) (implied consent is sufficient to authorize a sale under § 363(f)(2)).

Notwithstanding that there is a Ninth Circuit B.A.P. case directly on point, American, whose Opposition may be withdrawn pursuant to the Stipulations, asserts that *In re Roberts*, 249 B.R. 152 (Bankr. W.D. Mich. 2000) and *In re Decellis*, 349 B.R. 465 (Bankr. E.D. Virginia 2006), which require actual consent, should control the issue.  American provides no reasoning as to why cases from bankruptcy courts in Michigan and Virginia should control over *In re Ex-Cel Concrete* and there is no bases for them to control.  The Court should be guided by over *In re Ex-Cel Concrete.*

Likely aware of this, American also cites to *Pac. Capital Corp. v. East Airport Dev., LLC (In re East Airport Dev., LLC)*, 443 B.R. 823 (B.A.P. 9th Cir.), wherein the court determined that a lack of objection did not constitute consent for purposes of § 363(f)(2).  In *East Airport*, the lender opposed the sale and the argument about consent was based on the objecting lender's prior agreement to a release price for the property to be sold.  The bankruptcy court approved the sale free and clear based on Sections 363(f)(1), (2) or (5).  The B.A.P. held that release agreement did not amount to consent under 363(f)(2) for a sale free and clear and acknowledged that the lender filed an opposition to the sale.  *Id.* at 831.  Thus, consent by failure to object was not even at issue in *East Airport,* and

American does not cite to any such authority in *East Airport*. In fact the discussion on (f)(2) is dicta, because the B.A.P. affirmed on pursuant to Section (f)(5). *Id.*

## 2. <u>SECTION 363(f)(5).</u>

Under Section 363(f)(5), a debtor in possession may sell property free and clear of any interest if the holder of that interest "***could*** be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5) (emphasis added). Section 363(f)(5) has generally been interpreted to mean that if, under applicable law, the holder of the lien or interest could be compelled to accept payment in exchange for its interest, the debtor in possession may take advantage of that right by replacing the holder's lien or interest with a payment or other adequate protection. COLLIER ON BANKRUPTCY, ¶ 363.06 [6] (15th ed. rev. 2003).

In the Sale Motion, the Debtor details how the Debtor could sell free and clear under Section 363(f)(5) based on the legal and equitable proceedings for a judicial or non-judicial foreclosure sale by Hankey. Sale Motion, pp. 31-33 Much if that discussion centers on authority from In *Clear Channel Out-door, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25 (B.A.P. 9th Cir. 2008) ("<u>*PW*</u>").

In addition to foreclosure sales by a secured creditors, foreclosure sales by receivers are another means for selling free and clear of all liens on property, even senior liens. In fact, the Receivership Order in the Hankey v. Crestlloyd proves the point. *See* Receiver Order, Exhibit "1" hereto, at ¶¶ 4(c), (e), (f), (j), and (k) (the Receiver can "c. Maintain or obtain any certificates, licenses, entitlements, or permits that the Receiver reasonably believes necessary to maintain or increase the value of the Receivership Property, or which may be useful or necessary for the completion, marketing, and ***sale*** of the Receivership Property" … "e. Collect all issues, profits, and income resulting from the ***sale*** of the Receivership Property … "f…The Receiver shall manage the Receivership Property until it may be ***sold***, as set forth in this Order" … The Receiver can exercise discretion for the purposes of "j. Engaging a broker and others to market and assist with the ***sale*** of the Real Property, and to do all things appropriate or necessary to complete, market, and ***sell*** the Real Property; k. Entering into a conditional contract(s) to ***sell*** the Real Property, and disclose to any proposed purchaser(s) that any contract for sale entered into by the Receiver shall be subject to final approval of the Court pursuant to California Code of Civil Procedure §568.5. ***The claims of any***

*lienholders shall attach to the net sale proceeds and the Court shall determine how any such proceeds shall be distributed based upon the priority of any lienholder's respective interests in the Real Property*.")  In turn, California Civil Code § 568.5 provides that, "A receiver may, pursuant to an order of the court, sell real or personal property in the receiver's possession upon the notice and in the manner prescribed by Article 6 (commencing with Section 701.510) of Chapter 3 of Division 2 of Title 9. The sale is not final until confirmed by the court.")  Sales under California Civil Code § 568.5 can be made free and clear of all liens, even ones senior to the creditor that placed the receiver. *City of La Habra Heights v. McAlister Invs., Inc.*, No. B227308, 2012 WL 274828, at *3 (Cal. Ct. App. Jan. 30, 2012) ("The Receiver requested the sale be made free and clear of three mechanic's liens filed against the Property on behalf of contractors who had done remediation work because there were insufficient funds to pay those liens in full. On February 2, 2010, the court approved the Receiver's sale of the Property"); *Cty. of Sonoma v. Quail*, 56 Cal. App. 5th 657, 664, 270 Cal. Rptr. 3d 1, 4–5 (2020), as modified on denial of reh'g (Oct. 28, 2020), review denied (Dec. 30, 2020) ("On April 19, 2019, the court issued its order confirming the sale of the property as proposed by the receiver, free and clear of all liens and encumbrances. The order directed that unsatisfied liens on the property would attach to the sale proceeds. … pending a court determination regarding appropriate distribution.").

Even though the Debtor cited and discussed to legal proceedings that could be used to satisfy Section 363(f)(5), certain Objection Parties argued that the Debtor had to identify a legal and equitable proceeding it could use (not that another creditor could use) to compel an interest holder to accept money satisfaction. That argument is inconsistent with the plain language of Section 363(f)(5) as well as the holding in PW that (1) did not require that the legal and equitable proceeding to be used had to be available to the debtor and (2) that cramdown under Section 1129(b) could not be utilized as the legal or equitable proceeding to compel an interest holder to accept money satisfaction.  If that was the case, then the Debtor would have no way to sell free and clear under Section 363(f)(5).

Based on the foregoing, to the extent needed since there are no oppositions to a sale free and clear pursuant to Section 363(f)(4), Sections 363(f)(2) and (f)(5) can also be used to sell the Property free and clear.

1

2

### III.

### <u>CONCLUSION</u>

**WHEREFORE**, the Debtor respectfully requests that this Court enter a Sale Order granting the Sale Motion and providing the relief requested in paragraphs (1) through (5) of the Sale Motion and granting such further and additional relief as the Court deems just and proper.

Dated: March 16, 2022                            CRESTLLOYD, LLC

*/s/ David B. Golubchik*
DAVID B. GOLUBCHIK
TODD M. ARNOLD
LEVENE, NEALE, BENDER, YOO
    & GOLUBCHIK L.L.P.
Attorneys for Debtor and Debtor in Possession

**EXHIBIT "1"**

Electronically Received 07/01/2021 09:12 AM

1  | BUCHALTER
2  | A Professional Corporation
   | JEFFREY S. WRUBLE (SBN: 94734)
   | JACK R. SCHARRINGHAUSEN (SBN: 205483)
3  | DAVID E. MARK (SBN: 247283)
   | 1000 Wilshire Boulevard, Suite 1500
4  | Los Angeles, CA 90017-1730
   | Telephone: 213.891.0700
5  | Fax: 213.896.0400
   | Email: jwruble@buchalter.com

**FILED**
Superior Court of California
County of Los Angeles

**JUL 02 2021**

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
K. Metoyer

7  | Attorneys for Plaintiff,
   | HANKEY CAPITAL, LLC,
8  | a California limited liability company

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF LOS ANGELES, WEST DISTRICT

| | |
|---|---|
| HANKEY CAPITAL, LLC, a California limited liability company,<br><br>        Plaintiff,<br><br>    v.<br><br>CRESTLLOYD, LLC, a California limited liability company; and DOES 1 through 100, inclusive,<br><br>        Defendants. | Case No. 21SMCV01113<br>Assigned to: Hon. Mark Young<br>Department: M<br><br>**[PROPOSED] ORDER:**<br><br>**(1) APPOINTING RECEIVER;**<br><br>**(2) ISSUING TEMPORARY RESTRAINING ORDER; AND**<br><br>**(3) ORDER TO SHOW CAUSE WHY RECEIVER SHOULD NOT BE CONFIRMED *PENDENTE LITE* AND WHY PRELIMINARY INJUNCTION IN AID OF RECEIVER SHOULD NOT BE GRANTED**<br><br>Date:  July 2, 2021<br>Time:  9:00 a.m.<br>Place:  Dept. M<br><br>**Order to Show Cause Hearing**<br>Date:  July 23 , 2021<br>Time:  9: 00 a.m.<br>Place:  Dept. M |

**ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER
SHOULD NOT BE CONFIRMED, ETC.**

The Court considered the *ex parte* application of Plaintiff, Hankey Capital, LLC, a California limited liability company ("**Plaintiff**"), for an Order Appointing Receiver and related orders, the memorandum of points and authorities and declarations filed in support thereof, including the declaration filed by Defendant, Crestlloyd, LLC, a California limited liability company ("**Borrower**"), the Declaration of Theodore Lanes, the proposed receiver, including the disclosures made in that declaration, all pleadings and documentary evidence in the Court's file, and oral arguments of the parties and their counsel. Based upon the record, the agreement of the parties, and good cause appearing:

### *EX PARTE* ORDER APPOINTING RECEIVER

**IT IS HEREBY ORDERED** that Theodore Lanes (the "**Receiver**") is appointed as receiver to take possession, custody and control of the Receivership Property, as defined herein, and to protect the Receivership Property. The Receiver shall have all the usual and customary powers of a receiver to take control of and preserve the Receivership Property, in addition to the duties and powers enumerated in this Order.

**IT IS FURTHER ORDERED** that:

1. **Plaintiff's *Ex Parte* Bond**. Plaintiff shall immediately file an applicant's bond under Code of Civil Procedure section 566(b) in the amount of $10,000.00.

2. **Receivership Property**. Includes the following: The real property commonly known as 944 Airole Way, Los Angeles, CA 90077 (APN: 4369-026-021) (the "**Real Property**"), together with improvements thereon, all permits, plans (including all architectural, building, electrical, plumbing, and landscape plans), entitlements and certificates pending, prepared, or issued in connection with the Real Property, all books, records, and bank records of Borrower (including all digital and electronic versions) and all revenues, profits, and proceeds thereof (the "**Personal Property**" and, together with the Real Property, the "**Receivership Property**").

3. **Receiver's Oath and Bond**. Before performing his duties, the Receiver shall execute a receiver's oath and file a bond in the sum of $100,000.00, conditioned upon the faithful performance of the Receiver's duties. The bond shall be from a surety approved by the Court and shall be filed in this Court by no later than 4:00 p.m., on July 9, 2021.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

2

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER
SHOULD NOT BE CONFIRMED, ETC.

4.    **Receiver's Duties and Powers**.  The Receiver shall be vested with the authority to do each and all of the following:

a.    Take possession, custody, and control of the Receivership Property, wherever located, and all of Borrower's bank and brokerage accounts, deposits, equities, profits, and all books, records and writings (as defined in California Evidence Code § 250) related thereto; and open, transfer and change all bank and trade accounts relating to the Receivership Property, so that all such accounts are in the name of the Receiver;

b.    Protect, care for, and preserve the Receivership Property and incur the expenses necessary for such care, preservation and maintenance of the Receivership Property;

c.    Maintain or obtain any certificates, licenses, entitlements, or permits that the Receiver reasonably believes necessary to maintain or increase the value of the Receivership Property, or which may be useful or necessary for the completion, marketing, and sale of the Receivership Property;

d.    Maintain or obtain and pay for any insurance that the Receiver reasonably believes necessary for the protection of the Receivership Property; and

e.    Collect all issues, profits, and income resulting from the sale of the Receivership Property.

f.    **Protection, Management and Liquidation of the Receivership Property**.  The Receiver shall manage the Receivership Property until it may be sold, as set forth in this Order, and may employ agents, clerks, contractors or other professionals needed to assist him with the completion of his duties as receiver.  In the exercise of his discretion, the Receiver is authorized and directed, and the Court appoints and makes the Receiver, the attorney in fact for Borrower, for the limited purpose of managing, protecting and preparing the Receivership Property for sale, including:

g.    Protecting and completing construction of the Real Property;

h.    Doing all things necessary to obtain any required permits and sign-offs of all open permits;

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

3

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER
SHOULD NOT BE CONFIRMED, ETC.

1    i.    Obtaining a Certificate of Occupancy and any other governmental approval

2 necessary or useful to complete, sell, and transfer title to the Real Property;

3    j.    Engaging a broker and others to market and assist with the sale of the Real

4 Property, and to do all things appropriate or necessary to complete, market, and sell the Real

5 Property;

6    k.    Entering into a conditional contract(s) to sell the Real Property, and disclose to

7 any proposed purchaser(s) that any contract for sale entered into by the Receiver shall be subject to

8 final approval of the Court pursuant to California Code of Civil Procedure §568.5. The claims of

9 any lienholders shall attach to the net sale proceeds and the Court shall determine how any such

10 proceeds shall be distributed based upon the priority of any lienholder's respective interests in the

11 Real Property; and

12    l.    Opening an escrow for the sale of the Real Property, and to sell the Real Property,

13 on behalf of, and in the name of, Borrower, subject to the terms of this Order.

14    All fees, charges, commissions, and expenses charged or incurred by anyone engaged by

15 the Receiver for any of the foregoing shall be subject to the Court's review and approval.

16    5.    **No Risk to Receiver**.  No risk, obligation, or expense incurred by the Receiver shall

17 be the personal risk or obligation of the Receiver, but shall be the risk, obligation, and expense of

18 the Receivership estate established hereby.

19    6.    **Trustee's Sale, Deed-In Lieu and Cure**.  Upon receipt by the Receiver of a

20 Trustee's Deed Upon Sale, notice that Plaintiff has accepted a deed in lieu of foreclosure, or notice

21 from Plaintiff that Borrower has cured the defaults existing under the applicable Loan Documents

22 (as defined in the Complaint in this matter), the Receiver shall turn over possession, custody and

23 control of the Real Property to Plaintiff, Borrower, or a successful bidder at a Trustee's Sale

24 (whichever is appropriate) without further order of this Court. To the extent that the Receiver is

25 divested of possession, custody, and control of the Real Property, and, if consistent with existing

26 law, the Receiver shall thereafter have no liability as to the divested Real Property. After the

27 Receiver turns over possession, custody, and control of the Real Property, the Receiver shall file

28 an application to be discharged by the Court, which may only be accomplished by a court order

1  after a properly noticed motion approving the Receiver's Final Report and Account and any

2  exoneration of the Receiver's Bond.

3      7.    **Litigation**.  Any litigation or other legal proceeding involving the Receivership

4  Property will be reviewed by the Receiver and, at the Receiver's discretion and with Plaintiff's and

5  the Court's approval, the Receiver can prosecute or defend such claims.  Any proceeds or other

6  assets generated from such legal proceedings are Receivership Property, and any expenses incurred

7  in prosecuting or defending such claims are expenses of the Estate.

8      8.    **Receiver Certificates**.

9      a.    The Receiver may borrow funds from Plaintiff and issue Receivership Certificates

10  to obtain funds necessary to complete the Receiver's duties.  At its sole discretion, Plaintiff may

11  advance funds in exchange for Receivership Certificates, upon agreed-upon terms, to fund the

12  Receiver's operations.

13      b.    Funds loaned to the Receiver by Plaintiff pursuant to Receivership Certificates

14  shall become a first lien on the Receivership Property with super priority over all preexisting private

15  liens and encumbrances, except for federal, state, or local tax liens of record upon the Receivership

16  Property.

17      9.    **Use of Funds**.  All monies coming into the Receiver's possession shall only be

18  expended for the purposes herein authorized, and the balance of funds shall be held by the Receiver

19  pending further Order of this Court.

20      10.    **Prohibited Agreements**.  Except as otherwise provided in this Order, the Receiver

21  shall not enter into an agreement with any party to this action about the administration of the

22  receivership or about any post-receivership matter without further Court order. The Court

23  acknowledges receipt of the disclosures made by the Receiver in connection with the application

24  for this Order.

25      11.    **Receivership Fees and Costs**.  The Receiver may charge, as interim fees, his or her

26  standard hourly billing rate, which is currently **$395** per hour, plus reimbursement of costs, for the

27  Receiver's services.   The Receiver's staff's hourly rates range from **$85** to **$275**. Where

28  appropriate, the Receiver will have an appropriate staff member handle certain aspects of the

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

5

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER
SHOULD NOT BE CONFIRMED, ETC.

1    Receivership as a cost saving measure.  The Receiver is also authorized to employ the services of

2    accountants and attorneys without further Court Order and pay for those services in the amount of

3    the normal fees charged by those professionals.

4        12.    **Monthly Reports and Statements**.  The Receiver shall prepare monthly reports

5    that conform with California Rules of Court, Rule 3.1182 and serve monthly statements reflecting

6    the Receiver's fees and administrative expenses, including fees and costs of staff, as well as

7    professionals or others the Court has authorized the Receiver to engage, incurred for each monthly

8    period in the operation and administration of the Receivership Property.  Pursuant to California

9    Rules of Court Rule 3.1183, objections to each of the Receiver's interim reports and statements of

10    account, if any, must be made within ten (10) days of notice of the report and statement.  If an

11    objection, which shall be made in writing on a line item basis with a statement of the reason for

12    such objection, is timely served, the specific items objected to in such statement of account shall

13    not be paid absent further order of the Court.  Failure of a party to object within this ten-day period

14    shall constitute a waiver of that party's objection(s) to the fees for that period. Upon expiration of

15    this ten-day period, the Receiver may disburse from estate funds, if any, the amount of each item

16    that has not been objected to in accordance with this Order. Notwithstanding periodic payment of

17    fees and expenses, all fees and expenses shall be submitted to the Court for its approval and

18    confirmation, in the form of either a properly noticed interim request for fees, a stipulation of all

19    parties, or in the Receiver's Final Account and Report.

20        13.    **Inventory**.  Within thirty (30) days after qualification, the Receiver shall file an

21    inventory of all of the property of which the Receiver has taken possession.

22        14.    **Opening of Bank Accounts.**  The Receiver is empowered to establish bank

23    accounts for the deposit of monies collected and received in connection with the Receivership

24    Property, at federally insured banking institutions or savings associations located within this state

25    which are not parties to this case.  Monies coming into the possession of the Receiver and not

26    expended for any purposes herein authorized shall be held by the Receiver in interest-bearing

27    accounts.

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER
SHOULD NOT BE CONFIRMED, ETC.

15.    **Insurance**.  The Receiver shall determine whether, in the Receiver's judgment, there is sufficient insurance coverage for the Receivership Property.  With respect to any insurance coverage, the Receiver shall be named as an additional insured on the policies for the period that the Receiver shall be in possession of the Receivership Property.  If the Receiver determines that sufficient insurance coverage does not exist, the Receiver shall immediately notify the parties to this lawsuit and shall, within thirty (30) calendar days, procure such insurance for the Receivership Property; provided, however, that if the Receiver does not have sufficient funds to do so, or if Plaintiff will neither purchase such insurance nor lend the Receivership Estate the monies necessary to do so, the Receiver shall seek instructions from the Court with regard to whether insurance shall be obtained and the mechanism for payment of any insurance policy.  If consistent with existing law, the Receiver shall not be responsible for claims arising from the lack of procurement or inability to obtain insurance.

16.    **Entry to Receivership Property**.  The Receiver shall be entitled to engage a locksmith and security or alarm experts for the purposes of gaining entry to the Receivership Property.  The Receiver may have locks or security codes changed, or have keys created that will work for the existing locks.

17.    **Tax Identification**.  Borrower shall provide the Receiver with all tax identification numbers utilized in connection with the operation of the Receivership Property.  The Receiver shall also be entitled to utilize the tax identification numbers during the Receiver's operation of the Receivership Property, or at the Receiver's discretion, the Receiver may obtain new tax identification numbers. Notwithstanding the foregoing, the Receiver shall the ability, but have no obligation, to prepare or file any tax returns on behalf of Borrower.

18.    **Mail**.  The Receiver is authorized to have all mail addressed to Borrower or the Real Property forwarded to an address to be designated by the Receiver and is authorized to open and review such mail.

19.    **Documents in Receiver's Possession**.  The parties to this action shall be entitled to have access to, and make copies of, documents in the Receiver's possession—including electronic records—during normal business hours, or at such times as the Receiver may otherwise agree,

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

7

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER
SHOULD NOT BE CONFIRMED, ETC.

1  consistent with all applicable government orders regarding the emergency response to the Covid-

2  19 pandemic.

3       20.   **Further Instructions**.  The Receiver and the parties to this case may at any time

4  apply to this Court for further or other instructions or Orders and for further powers necessary to

5  enable the Receiver to perform the Receiver's duties, including issues arising from the Covid-19

6  pandemic. Any such application by the Receiver for further or other instructions or Orders and for

7  further powers necessary to enable the Receiver to perform the Receiver's duties may be filed on

8  an ex parte basis or by noticed motion, as the Receiver shall determine. The parties shall file any

9  application for further or other instructions by noticed motion unless exigent circumstances support

10  the filing of any such application on an ex parte basis.

11       21.   **Discharge**.  Discharge of the Receiver shall require a Court Order after a properly

12  noticed motion approving the Receiver's Final Report and Account.

13       22.   **Plaintiff's Notice to Receiver**.  Plaintiff shall promptly notify the Receiver in

14  writing of the names, addresses, and telephone numbers of all parties who appear in the action and

15  their counsel.  The parties to this action shall give notice to the Receiver of all events that affect the

16  Receivership, including all Court proceedings in this action.

17       23.   **Bankruptcy – Plaintiff's Duty to Give Notice**.  If any of the Defendants files a

18  bankruptcy case during the receivership, Plaintiff shall give notice of the bankruptcy case to the

19  Court, to all parties, and to the Receiver by the close of the next business day after the day on which

20  Plaintiff receives notice of the bankruptcy filing.

21       24.   **Bankruptcy – Receiver's Duties**.  If the Receiver receives notice that a bankruptcy

22  has been filed and part of the bankruptcy estate includes property that is the subject of this Order,

23  the Receiver shall comply with 11 U.S.C. § 543.  The Receiver may retain legal counsel to assist

24  the Receiver with issues arising out of the bankruptcy proceedings that affect the receivership.

25                      **TEMPORARY RESTRAINING ORDER**

26       **IT IS FURTHER ORDERED** that, pending further Order of this Court, Borrower, all other

27  defendants, and each of them, and their respective members, agents, employees, assignees,

28  successors, representatives, and all persons acting under, in concert with, or for them shall not:

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

8

ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER
SHOULD NOT BE CONFIRMED, ETC.

1        1.     Directly or indirectly interfere in any manner with the discharge of the Receiver's duties under this Order, including the Receiver's control, management, preservation, marketing and sale of the Receivership Property;

2.     Conceal, remove, expend, disburse, transfer, assign, sell, convey, devise, pledge, create a security interest in, encumber, or in any manner whatsoever deal in or dispose of the whole or any part of the Receivership Property;

3.     Withhold from the Receiver any Receivership Property, including any plans, permits, monies, books, or records;

4.     Commit or permit any waste of the Receivership Property or any part thereof, or suffer or commit or permit any act on the Receivership Property or any part thereof in violation of law, or remove, transfer, encumber or otherwise dispose of any of the Receivership Property or any part thereof; and

5.     Do any act which will, or which will tend to, impair, defeat, divert, prevent, or prejudice the preservation, marketing, and sale of the Receivership Property.

**THE COURT ORDERS PLAINTIFF** to promptly file a temporary restraining order bond under Code of Civil Procedure section 529 in the amount of $\$\underline{\hspace{3cm}}$.

**IT IS FURTHER ORDERED** that no individual or entity may sue the Receiver without first obtaining permission of this Court.

## ORDER TO SHOW CAUSE

**IT IS HEREBY ORDERED** that Borrower appear on $\underline{\hspace{5cm}}$, 2021, at $\underline{\hspace{2cm}}$ .m., in Department $\underline{\hspace{2cm}}$ of the above-captioned Court, located at 1725 Main St., Santa Monica, CA 90401, to show cause, if Borrower has any:

1.     Why Borrower, all other defendants, and each of them, and their respective members, agents, employees, assignees, successors, representatives, and all persons acting under, in concert with, or for them should not be enjoined and restrained from, in any manner, directly or indirectly, receiving, collecting, diverting or otherwise taking any Receivership Property, or any revenue or profit derived therefrom, expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering,

**ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER
SHOULD NOT BE CONFIRMED, ETC.**

1  concealing, or in any manner whatsoever dealing in, disposing of or impairing the value of the

2  whole or any part of the Receivership Property, or any proceeds or other income derived therefrom;

3  and

4      2.    Why the Receiver should not be confirmed *pendente lite* to take possession, custody

5  and control of the Receivership Property, and to maintain, conserve and liquidate such Receivership

6  Property with the powers and duties enumerated above and in accordance with the terms of this

7  Order and until further Order of this Court.

8                    <u>**SERVICE AND BRIEFING SCHEDULE**</u>

9      The Summons and Complaint, Plaintiff's *ex parte* Application, Memorandum of Points and

10  Authorities, this Order and all declarations and supporting papers are to be personally served on

11  Borrower, or its attorneys of record, no later than _____ July 9 _____, 2021, with proof of service

12  to be filed in Department M no later than _____ July 12 _____, 2021.

13      Any opposition to this Order to Show Cause is to be personally served on Plaintiff's

14  attorneys of record and filed in Department M no later than _____ July 15 _____, 2021.

15      Any reply is to be personally served on Borrower, or its attorneys of records, and filed in

16  Department M _____ by no later than _____ July 20 _____, 2021.

17      **IT IS SO ORDERED.**

18

19  Dated: _____ July 2, 2021 _____

20                              _____

21                              Judge of the Los Angeles Superior Court

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**ORDER APPOINTING RECEIVER; ISSUING TRO; AND OSC WHY RECEIVER
SHOULD NOT BE CONFIRMED, ETC.**

## PROOF OF SERVICE

### HANKEY CAPITAL, LLC v. CRESTLLOYD, LLC, et al.
### LASC CASE NO. 21SMCV01113

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is at BUCHALTER, A Professional Corporation, 1000 Wilshire Blvd., 15th Floor, Los Angeles, CA 90017; and my email address is rauceda@buchalter.com.

On the date set forth below, I served the foregoing document described as:

**[PROPOSED] ORDER: (1) APPOINTING RECEIVER; (2) ISSUING TEMPORARY RESTRAINING ORDER; AND (3) ORDER TO SHOW CAUSE WHY RECEIVER SHOULD NOT BE CONFIRMED *PEDENTE LITE* AND WHY PRELIMINARY INJUNCTION SHOULD NOT BE GRANTED**

on all other parties and/or their attorney(s) of record to this action by ☐ electronically serving ☒ emailing, and/or ☐ placing a true copy thereof in a sealed envelope as follows:

**See attached Service List**

☐    **BY MAIL**   I am readily familiar with the business' practice for collection and processing of correspondence for mailing with the United States Postal Service. The address(es) shown above is(are) the same as shown on the envelope. The envelope was placed for deposit in the United States Postal Service at Buchalter in Irvine, California on July 1, 2021. The envelope was sealed and placed for collection and mailing with first-class prepaid postage on this date following ordinary business practices.

☑    **BY EMAIL**  On July 1, 2021, I caused the above-referenced document(s) to be sent in electronic PDF format as an attachment to an email addressed to the person(s) on whom such document(s) is/are to be served at the email address(es) shown above, as last given by that person(s) or as obtained from an internet website(s) relating to such person(s), and I did not receive an email response upon sending such email indicating that such email was not delivered.

☐    **BY ELECTRONIC SERVICE**  On July 1, 2021, via electronic transmission to One Legal LLC e-service via the Internet as a pdf scanned image of the document.

☑    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge. Executed on July 1, 2021, at Los Angeles, California.

_____
Ronnie Auceda
(Print Name)

*/s/ Ronnie Auceda*
_____
(Signature)

1

## SERVICE LIST

2

| | |
|---|---|
| Theodore "Ted" Lanes<br>Lanes Management Services<br>655 Deep Valley Drive, Suite 125-P<br>Rolling Hills Estate, CA 90274<br><br>Email: tl@lanesmgmt.com<br>Telephone: (310) 766-1414 | Manager and Agent for Service of Process for Defendant Crestlloyd, LLC |
| Marcos Almeida<br>Legal Executive<br>Southpac Group<br>Registrado na Ordem dos Advogados do Brasil/MG 132.407 | Advisor to Southpac Trust International, Inc., as Trustee of the Park City Family Settlement, the sole member of Crestlloyd, LLC ("Borrower")<br><br>Email: malmeida@southpacgroup.com |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

BN 46109192v1

2
SERVICE LIST

1

## PROOF OF SERVICE OF DOCUMENT

2

3

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

4

5

6

7

8

A true and correct copy of the foregoing document entitled **DEBTOR'S OMNIBUS REPLY TO OPPOSITIONS TO MOTION FOR AN ORDER: (1) APPROVING THE SALE OF THE DEBTOR'S REAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS,  ENCUMBRANCES, AND INTERESTS, WITH THE EXCEPTION OF ENUMERATED EXCLUSIONS; (2) FINDING THAT THE BUYER IS A GOOD FAITH PURCHASER; (3) AUTHORIZING AND APPROVING THE PAYMENT OF CERTAIN CLAIMS FROM SALE PROCEEDS; (4) WAIVING THE FOURTEEN-DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULE 6004(h); AND (5) PROVIDING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

9

10

11

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **March 16, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- **Kyra E Andrassy    kandrassy@swelawfirm.com, lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com**
- **Todd M Arnold    tma@lnbyg.com**
- **Jerrold L Bregman    jbregman@bg.law, ecf@bg.law**
- **Marguerite Lee DeVoll    mdevoll@watttieder.com, zabrams@watttieder.com**
- **Danielle R Gabai    dgabai@danninggill.com, dgabai@ecf.courtdrive.com**
- **Thomas M Geher    tmg@jmbm.com, bt@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com**
- **David B Golubchik    dbg@lnbyg.com, stephanie@lnbyb.com**
- **James Andrew Hinds    jhinds@hindslawgroup.com;mduran@hindslawgroup.com, mduran@hindslawgroup.com**
- **Robert B Kaplan    rbk@jmbm.com**
- **Jane G Kearl    jkearl@watttieder.com**
- **Jennifer Larkin Kneeland    jkneeland@watttieder.com, zabrams@watttieder.com**
- **Michael S Kogan    mkogan@koganlawfirm.com**
- **Noreen A Madoyan    Noreen.Madoyan@usdoj.gov**
- **Samuel A Newman    sam.newman@sidley.com, samuel-newman-2492@ecf.pacerpro.com;laefilingnotice@sidley.com**
- **Ryan D O'Dea    rodea@shulmanbastian.com, lgauthier@shulmanbastian.com**
- **Sharon Oh-Kubisch    sokubisch@swelawfirm.com, gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com**
- **Hamid R Rafatjoo    hrafatjoo@raineslaw.com, bclark@raineslaw.com**
- **Ronald N Richards    ron@ronaldrichards.com, 7206828420@filings.docketbird.com**
- **Victor A Sahn    vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;cblair@ecf.inforuptcy.com**
- **William Schumacher    wschumac@milbank.com, autodocketecf@milbank.com**
- **David Seror    dseror@bg.law, ecf@bg.law**
- **Zev Shechtman    zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com**
- **Mark Shinderman    mshinderman@milbank.com, dmuhrez@milbank.com;dlbatie@milbank.com**
- **Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

- **Genevieve G Weiner    gweiner@sidley.com, laefilingnotice@sidley.com;genevieve-weiner-0813@ecf.pacerpro.com**
- **Jessica Wellington    jwellington@bg.law, ecf@bg.law**

**2.  SERVED BY UNITED STATES MAIL**: On **March 16, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

*None.*

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **March 16, 2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

*None.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| March 16, 2022 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                          **F 9013-3.1.PROOF.SERVICE**