1                    UNITED STATES BANKRUPTCY COURT

2            CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

3                            --oOo--

4    In Re:                      )   Case No. 2:21-bk-18205-DS
                                 )
5    CRESTLLOYD, LLC,            )   Chapter 11
                                 )   Los Angeles, California
6                                )
     Debtor,                     )   Monday, 11:30 A.M.
7                                )   March 21, 2022
     ----------------------------X

8                                    CONTINUED HEARING RE:
9                                    [142] DEBTOR'S MOTION FOR
                                     AN ORDER:
10                                   (1) APPROVING THE SALE OF
                                     THE DEBTOR'S REAL PROPERTY
11                                   FREE AND CLEAR OF ALL
                                     LIENS, CLAIM, ENCUMBRANCES
12                                   AND INTERESTS WITH THE
                                     EXCEPTION OF ENUMERATED
13                                   EXCLUSIONS;
                                     (2) FINDING THAT THE BUYER
14                                   IS A GOOD FAITH PURCHASER;
                                     (3) AUTHORIZING AND
15                                   APPROVING THE PAYMENT OF
                                     CERTAIN CLAIMS FROM SALE
16                                   PROCEEDS;
                                     (4) WAIVING THE 14-DAY
17                                   STAY PERIOD SET FORTH IN
                                     BANKRUPTCY RULE 6004(h);
18                                   AND
                                     (5) PROVIDING RELATED
19                                   RELIEF

20              TRANSCRIPT OF ZOOM PROCEEDINGS
          BEFORE THE HONORABLE DEBORAH SALTZMAN
21              UNITED STATES BANKRUPTCY JUDGE

22

23

24
     Proceedings produced by electronic sound recording;
25   transcript produced by transcription service.



1   <u>APPEARANCES</u>:

2   For the Debtor:            DAVID B. GOLUBCHIK, ESQ.
                               TODD ARNOLD, ESQ.
3                              Levene Neale Bender Yoo &
                                 Golubchik, LLP
4                              2818 La Cienga Avenue
                               Los Angeles, California  90034
5
    For Hankey Capital:        THOMAS M. GEHER, ESQ.
6                              Jeffer Mangels Butler &
                                 Mitchell, LLP
7                              1900 Avenue of the Stars
                               Seventh Floor
8                              Los Angeles, California  90067

9   For Hilldun Corporation:   JERROLD L. BREGMAN, ESQ.
                               BG Law, LLP
10                             21650 Oxnard Street
                               Suite #500
11                             Woodland Hills, California  90032

12  For Richard Saghian:       SAMUEL A. NEWMAN, ESQ.
                               Sidley Austin, LLP
13                             555 West Fifth Street
                               Los Angeles, California  90013
14
    For Yogi Securities        MARK SHINDERMAN, ESQ.
15  Holdings, LLC:             WILLIAM SCHUMACHER, ESQ.
                               Milbank, LLP
16                             2029 Century Park East
                               Los Angeles, California  90067
17
    For Nile Niami:            HAMID R. RAFATJOO, ESQ.
18                             Raines Feldman, LLP
                               1800 Avenue of the Stars
19                             12th Floor
                               Los Angeles, California  90067
20
    For Inferno Investment,    KYRA E. ANDRASSY, ESQ.
21  Inc.:                      Smiley Wang-Ekvall, LLP
                               3200 Park Center Drive
22                             Suite #250
                               Costa Mesa, California  92626

23

24

25

```
 1   For J&E Texture, Inc.:    MARGUERITE LEE DEVOLL, ESQ.
                               Watt Tieder Hoffar &
 2                                Fitzgerald, LLP
                               1765 Greensboro Station Place
 3                             Suite #1000
                               McLean, Virginia  22102
 4
     For American Truck &      RYAN D. O'DEA, ESQ.
 5   Tool Rentals:             Shulman Bastian Friedman &
                                  Bui, LLP
 6                             100 Spectrum Center Drive
                               Suite #600
 7                             Irvine, California  92618

 8   For Yvonne Niami:         MARK S. HOROUPIAN, ESQ.
                               SulmeyerKupetz
 9                             333 South Hope Street
                               Los Angeles, California  90071
10
     For Himself:             ANDRE MARIO SMITH, Pro Se
11
     For the U.S. Trustee:    NOREEN MADOYAN, ESQ.
12                            Office of the U.S. Trustee
                              915 Wilshire Boulevard
13                            Suite #1850
                              Los Angeles, California  90017
14
     For Italian Luxury        GREGORY MORROW, ESQ.
15   Group, LLC; Italian       The Morrow Group
     Luxury Design, LLC:       10401 Wilshire Boulevard
16                             Suite #1102
                               Los Angeles, California  90024
17
     Court Recorder:           Dawnette Francis
18                             U.S. Bankruptcy Court
                               Central District of California
19                             Edward R. Roybal Federal Building
                                  and Courthouse
20                             255 East Temple Street, Room #940
                               Los Angeles, California  90012
21                             (855) 460-9641

22   Court Transcriptionist:   Ruth Ann Hager, C.E.T.**D-641
                               Ben Hyatt Certified Deposition
23                                Reporters
                               17835 Ventura Boulevard, Suite 310
24                             Encino, California  91316

25
```

P 888.272.0022  F 818.343.7119    www.benhyatt.com

Page                                                                      4

1              LOS ANGELES, CALIFORNIA, MONDAY, MARCH 21, 2022

2                             11:47 A.M.

3                              --oOo--

4         THE CLERK:  Please come to order.  This court is

5   now in session, the Honorable Deborah J. Saltzman

6   presiding.

7         THE COURT:  Thank you.

8         Good morning.  It is March 11, 2022.  This is the

9   Bankruptcy Court for the Central District of California,

10  Los Angeles Division.  This is our continued hearing in the

11  Crestlloyd matter on the real property sale motion.  We're

12  all appearing by Zoom again.  For finding today's new Zoom

13  link and for following the instructions on the Court's

14  website, with your assistance my law clerks have collected

15  a list of appearances, so I'm going to run through those

16  first.

17        I'm going to call roll from the list of those of

18  you who have said that you plan to speak at today's

19  hearing.  If I get to the end of that list and you don't

20  hear your name but you do plan on addressing the Court,

21  please let me know your full name and who you represent.

22  And as I call roll, please tell me your name and who you

23  represent.  To mute and unmute you hover over the button on

24  your screen if you're on the video and if you're on the

25  phone you press *6.

Page                                                                    5

1          Mr. Golubchik and Mr. Arnold, good morning.

2          MR. GOLUBCHIK:   Good morning, Your Honor.  David

3  Golubchik, Todd Arnold of Levene Neale Bender Yoo &

4  Golubchik for the debtor.

5          THE COURT:  Mr. Shinderman and Mr. Schumacher,

6  good morning.

7          MR. SHINDERMAN:  Good morning, Your Honor.  Mark

8  Shinderman and Will Schumacher of Millbank on behalf of

9  Yogi Securities.  I believe we are joined by Mr. Englanoff,

10  the principal of Yogi Securities.

11          THE COURT:  Okay.  Good morning, all.

12          Ms. Andrassy, good morning.

13          MS. ANDRASSY:  Good morning, Your Honor.  Kyra

14  Andrassy of Smiley Wang-Ekvall, counsel for Inferno

15  Investment.

16          THE COURT:  Mr. Rafatjoo, good morning.

17          MR. RAFATJOO:  Good morning, Your Honor.  Hamid

18  Rafatjoo of Raines Feldman, LLP for Nile Niami.

19          THE COURT:  Mr. O'Dea, good morning.

20          MR. O'DEA:  Good morning, Your Honor.  Ryan O'Dea

21  of Shulman Bastian Friedman & Bui on behalf of secured

22  creditor American Truck & Tool Rentals.  I'm having some

23  difficulty with my camera.  I'll see if I can fix that this

24  morning.  I don't know that I have anything to address with

25  the Court, though.

Page                                                                          6

1            THE COURT:  Okay.  I may have a question for you,

2    as well as counsel for other objecting mechanics

3    lienholders, but I'm not sure how that will go, but we can

4    hear you just fine, in any event.

5            Ms. Lee DeVoll, good morning.

6            MS. LEE DEVOLL:  Good morning, Your Honor.

7    Marguerite Lee DeVoll on behalf of secured creditor J&E

8    Texture.

9            THE COURT:  Counsel, your audio was breaking up a

10   little bit.  Could you just try again?  I just want to make

11   sure we hear you okay.

12           MS. LEE DEVOLL:  Sure.  It may just be that I'm

13   not talking loud enough also.  Good morning, Your Honor.

14   Marguerite Lee DeVoll on behalf of secured creditor, J&E

15   Texture.

16           THE COURT:  Thank you.  Good morning.

17           Mr. Newman, good morning.

18           MR. NEWMAN:  Good morning, Your Honor.  Sam

19   Newman, Sidley Austin, on behalf of prospective purchaser

20   Richard Saghian.

21           THE COURT:  Mr. Geher, good morning.

22           MR. GEHER:  Excuse me.  Good morning, Your Honor.

23   Thomas M. Geher, Jeffer Mangels Butler & Mitchell,

24   appearing for secured creditor Hankey Capital, LLC.

25           THE COURT:  Mr. Horoupian, good morning.

Page                                                                              7

1          MR. HOROUPIAN:  Good morning, Your Honor.  Mark

2   Horoupian of SulmeyerKupetz on behalf of Yvonne Niami.

3          THE COURT:  Mr. Smith, good morning.

4          MR. SMITH:  Greetings to all.  Special appearance

5   only Smith Andre Mario for special interested party and

6   winning overbidder Andre Mario Smith.

7          THE COURT:  Ms. Madoyan, good morning.

8          MS. MADOYAN:  Good morning, Your Honor.  Noreen

9   Madoyan on behalf of the United States Trustee Peter C.

10  Anderson.

11         THE COURT:  And Mr. Morrow, good morning.

12         MR. MORROW:  Good morning, Your Honor.  Gregory

13  Morrow on behalf of Italian Luxury Group and Italian Luxury

14  Design, LLC.

15         THE COURT:  Okay.  I believe that is my list.

16  Anyone else needing to address the Court this morning?

17         MR. BREGMAN:  Yes, I would like to, Your Honor.

18         THE COURT:  Oh, please, go ahead, counsel.  Why

19  don't you make your appearance.

20         MR. BREGMAN:  Thank you very much.  Good morning,

21  Your Honor.  Jerrold Bregman of BG Law, LLP on behalf of

22  Hilldun Corp., a secured creditor.

23         THE COURT:  Thank you.  Need one moment here.

24  I'm going to update my list.

25         (Pause)

Page                                                                  8

1          Okay.  What I'd like to do is kind of treat this

2  as closing comments period.  As far as I'm concerned, I

3  think that there's no more testimony that's necessary

4  today.  What I'd like to do is give counsel to make any

5  closing thoughts in support of or in opposition to the

6  motion.

7          I would like to start with the movant and because

8  it is their motion and because we'll have a lot of

9  comments, after that we'll give the movant kind of a last

10 word at the end before I'm in a position to make a ruling.

11         So Mr. Golubchik, would you like to get us

12 started?

13         MR. GOLUBCHIK:  Yes, Your Honor.  Before I do, I

14 just wanted to inquire.  We filed extensive evidentiary

15 objections to various declarations.  Shall we deal with

16 them now or later?

17         THE COURT:  Why don't we deal with them later?

18         MR. GOLUBCHIK:  Okay.

19         THE COURT:  I have a lot of thoughts on them.

20         MR. GOLUBCHIK:  Got it.  Okay.  Well, Your Honor,

21 I guess my interpretation of the hearing on Friday and

22 continuance to today was I hoped by our encouragement that

23 the parties would be able to talk over the weekend and

24 maybe get somewhere to a better place.  Unfortunately, that

25 did not happen, so I think everyone is taken to their

Page                                                                        9

1  positions and we're moving forward.

2          In light of the testimony we had, I would like to

3  summarize the testimony, address some of the comments Your

4  Honor had and go through the elements of the sale motion

5  that we need to do.

6          THE COURT:  Okay.

7          MR. GOLUBCHIK:  And although, if you recall, I

8  said my theme was, what's the alternative probably

9  inartfully said.  I think at the end of the day that is an

10 issue because the argument of the other parties as I'll

11 discuss later give us a do-over and there should be another

12 auction based on the evidence provided.  There is a

13 question, what's the alternative.  So let me go through

14 this, Your Honor.

15         We have five elements again of 363(b) for a sale

16 motion.  We have a sound business purpose, which we

17 discussed.  I don't think there are any objections to that.

18 Fair and reasonable price.  That's where we have the big

19 issue including the consideration whether the purchase

20 price is grossly inadequate.  Adequate marketing.  I think

21 the marketing here was beyond adequate.  It was exceptional

22 and I don't think anyone has opposed that.

23         Good faith.  While the members focus on lack of

24 good faith of the brokers and the seller, for this element

25 it's good faith of relationship with the buyer and the

1    buyer's efforts in connection with the auction.  You have a

2    declaration submitted by the seller.  You have a

3    declaration submitted by the buyer as to the good faith

4    negotiations, public open auction, and I'm not aware of any

5    evidence to the contrary.  In fact, I'm not aware of any

6    substantive evidence that addresses the other elements to

7    the contrary.  And then we have the fifth one is accurate

8    and reasonable notice, which again no objection.

9         So really for 363(b), the main issue we focused

10   on and we discussed had to do with fair and reasonable

11   price and the gross inadequacy based on the appraisal from

12   19 and the parties' thoughts in connection even with the

13   bid procedures hearing and what we achieved.

14        You'll have testimony from Rayni Williams, one of

15   the brokers, that discussed the mark -- the extensive

16   marketing of the property that discussed her belief as to

17   the valuations, even on cross-examinations from

18   Mr. Shinderman that had to do with price per square foot

19   and lack of applicability of that to especially the larger,

20   more unique properties such as this.

21        She testified that she believed that in light of

22   the efforts in today's market this was the highest and best

23   price and I believe he used the term "optimum price"

24   because that was the question.  Either myself or Mr. Newman

25   asked that question.  I asked her if she thought maybe

1  something more could be achieved if there's a do-over or if

2  there's some more time and her response was no.

3          We also had Mr. Chad Roffers of Concierge discuss

4  the process and he focused on two things, the auction

5  itself as well as the reserve because a lot of parties have

6  been objecting to the fact that there was no reserve.

7          I'd like to reiterate that the issue reserve was

8  addressed as part of the bid procedures motion.  The

9  objections here appear to be for -- request for

10 reconsideration because we had testimony at the prior

11 hearing and there was a determination that it be acceptable

12 not to proceed with the reserve.  In addition to that,

13 Mr. Roffers discussed why on a property such as this he

14 believed a reserve was not necessary.  And then to the

15 extent throughout that whole discussion, if you do have a

16 reserve how do you set the reserve?  The reserve cannot be

17 tied to the liens or the obligations on the properties that

18 people wanted, so he supported what was prior -- previously

19 testified to without the reserve.

20         I think Ms. Williams also testified at first she

21 thought there should be a reserve and we went to the break.

22 And then when she heard Mr. Roffers discuss the reasoning

23 for having no reserve and since she did not have the online

24 auction experience she agreed and she changed her mind that

25 a reserve is not necessary.  So we had the two brokers

Page                                                                        12

1    discuss that issue.  And at the end of the day after a full

2    opportunity to market an auction we received this high bid

3    from the current buyer.

4           We already discussed that there was no funny

5    business in connection with the end of the auction.  It was

6    merely a time zone issue.  Under the procedure if there is

7    a last bid within three minutes it's extended, so we

8    discussed that and no funny business.

9           The other thing I did over the weekend, I looked

10   at the other cases out there that had to do with gross

11   inadequacy of the purchase price and the cases that I

12   looked at it seems in every case there was something going

13   on that was not above board, up and up.

14          There's a case called *Country Matter of Canton*,

15   172 B.R. 217 from Northern District of Ohio in '94.  In

16   that case the court denied a sale as grossly inadequate

17   based on the valuation.  It had to do with nursing homes

18   where the court found that the property wasn't advertised.

19   It wasn't even listed.  There was no public sale.  It was

20   private sales.  Something didn't smell right and at the end

21   of the day the price that was sought was substantially

22   lower than the value.

23          Looked at another case called *Alisa Partnership*

24   from Delaware, 15 B.R. 802, Bankruptcy Court District of

25   Delaware from 1981.  We had -- there was an auction.

1  Actually, it's kind of similar.  At the end of the auction

2  the high price was 410.  When they came to the sale

3  hearing, there was an outside offer of $475,000.  And while

4  the offer was not supported at the time with proof of funds

5  or deposit, the court stated, since I have to look out for

6  the best interests of the estate, this offer is $65,000

7  more and it should be considered.  We're not going to

8  approve the other offer.

9          Similar to our situation.  The numbers are very

10 different.  The only difference here is while we were still

11 willing to accept offers we did not receive any offers.  In

12 fact, in driving this morning to court I received a call I

13 think I received maybe eight or ten times from a person

14 every few days says, I'm submitting, I'm submitting.

15 Nothing happened.  So in that case there was another offer.

16         Another case I looked at was in the matter of

17 *Cossett*, 51 B.R. 166, Bankruptcy Court, Southern District

18 of Ohio from 1985.  In that case we had -- there was a

19 valuation for 85,000 and a sale for 40,000.  I smile a

20 little because I think a lot of our laws have to do --

21 although our numbers are very different kind of look at the

22 tail end of the truck case with interest rates but it's

23 still applicable.  The court found that a sale of 48,000

24 versus valuation of 85,000 shocks the conscience where

25 there was only one bidder who happened to be the sole

1  secured creditor and they'd have all the information.   No

2  one else.   Here we have full-blown auction after extensive

3  marketing.

4        Then we have one more case called *In Re: Oneida*

5  *Lake Development*, 114 B.R. 352, B.R. Northern District of

6  New York in 1990, where there was an appraisal of property

7  from 1987 for a million and a quarter.   Two years later

8  there was a sale.   There were three bidders.   The highest

9  price was 776, which was withdrawn, and eventually the

10  higher price was $750,000, 500,000 less than the offer.

11        The court made a finding that the requirements

12  for a sale because there was a public auction, although

13  substantially less, because it was properly marketed it was

14  available to the public, the court found that in such case

15  the requirement of fair and reasonable price was met.

16        So in every case that I looked at -- and there

17  aren't too many cases on this issue of gross inadequacy,

18  there is some problem here.   In our case there was no

19  problem.   We had a bid procedures order.   A bid procedures

20  order was followed to a T.   Everything happened.   We needed

21  to extend the time of the auction.   We submitted a motion

22  to modify.   I don't know if it was a motion or a

23  stipulation, but we had a proceeding and the Court ordered

24  the extension.   We had the auction as ordered by the Court

25  and the high bid resulted from that.

Page                                                                              15

1          Between March 8th when we filed the motion to

2   today, two weeks approximately, right?  Yes.  We do not

3   have one additional offer whether high or lower.  There's

4   just nothing else out there and the brokers as well as the

5   auctioneer testified that they believed that nothing would

6   change.  In fact, it may be worse if there's a do-over if

7   this buyer walks because, remember, this buyer was the

8   highest bid by 16 million dollars because the other one

9   was -- no, I'm sorry, 26 million, but there was no 110; 100

10  was the next bid below this buyer, so that's a concern.

11          Again, if you look at the evidence, and that's

12  why we had evidentiary objections, while objecting parties

13  talk about the war in Ukraine and all these different

14  things, at the end of the day it is argument but not

15  evidence.

16          THE COURT:  Well, Mr. Golubchik, I was going to

17  ask you that question.  I mean, if you assume for the

18  purposes of your comments that I overrule all of your

19  evidentiary objections and we accept all of the evidence

20  given as true, does any of that evidence, you know, support

21  any conclusion other than that the sale should be approved?

22          MR. GOLUBCHIK:  No, because again, you'll have

23  arguments.  And even if it's evidence of the parties you do

24  not have evidence even proffered from any other real estate

25  broker, real estate professional, economist, someone that

Page                                                                 16

1   would say anything is different.  If you look at both sides

2   of the evidence scale you have one -- you have principals

3   discussing that they are not happy with the situation, but

4   you have no credible evidence of anything that would be

5   different.  That's my "what's the alternative" point.

6          On the other side you have the brokers and the

7   auctioneer from the seller's side that discuss that this --

8   there was exhaustive marketing, this is the highest price

9   and they believe things would not be any better and there's

10  a chance they may be worse if there's a do-over.  And

11  that's setting aside the whole public policy, preserving

12  the integrity of judicial orders and auctions.  Just purely

13  realistic market and the experts because the only experts

14  that have presented any evidence are the seller's experts.

15  So even if everything is a rule, even if all of their

16  declarations are admitted, it doesn't change anything, at

17  least from our point of view.  Okay.

18         So then we go to  363(f), they're free and clear.

19  And again, I'd like to point out that this is in the

20  disjunctive, so we do not have to meet everything, only

21  one.  Your Honor said you may have some questions for the

22  mechanics lien creditors.  I was going to initially start

23  out with based on the stipulations we have their objections

24  are withdrawn.

25         THE COURT:  Okay.  But there are mechanics

Page                                                                    17

1   lienholders that have not consented to the sale, so up to

2   wouldn't apply there as it would to the two where there are

3   stipulations, so what sub-provision of 363(f) would apply

4   to those?

5         MR. GOLUBCHIK:  So first, it is our view and our

6   belief that the -- and we stated in a reply the mechanics

7   lien creditors are entitled to priority.  As far as I

8   understand, the only party that questions that is Inferno

9   and Inferno's position is they recorded their deed of trust

10  prior to mechanics lien creditors.

11        Hankey and Yogi, I do not believe, are disputing

12  that.  As part of our motion we submitted that infamous

13  Exhibit 6 that was executed by Inferno, Crestlloyd pursuant

14  to which Inferno agreed that any payouts first go to pay

15  third-party loans and costs of construction.  And after all

16  that is paid, there's an allocation of profit between

17  Inferno and Crestlloyd.

18        So the only objecting creditors actually signed

19  the subordination which may apply not only to secured, by

20  unsecured creditors as well.  We don't need to deal with

21  that right now.

22        Now, separate and apart from that, we believe

23  that the other non-filing mechanics lien creditors fall

24  into consent, implied consent as we briefed in the reply.

25  The *ACCEL Concrete* case, Ninth Circuit BAP, 95, 178 B.R.

Page                                                                        18

1   198, where the BAP found that when -- it referred to

2   Citibank in that case, but it found you need either consent

3   or non-opposition.  And I believe that our Local Rules

4   always provide that you're non-opposition may be viewed as

5   consent to the relief granted, the standard language.  But

6   the *ACCEL Concrete* discusses that, as well as numerous

7   other cases we have in our reply.

8           Next -- so we have two objections, formal

9   objections to the sale.  Those are the objections of Yogi

10  and Inferno.  As part of our motion we argued that both

11  objections are subject to *bona fide* dispute.  Neither

12  creditor contested that.  I know we had discussions at the

13  last hearing, but as part of the briefing, neither one

14  contested it.

15          Then finally is (f)(5), whether the creditor

16  could be compelled to accept a money judgment in a

17  proceeding and it's not a proceeding that has to be

18  pending.  It's one that could be brought.  As always

19  happens with objecting creditors everyone argues *Clear

20  Channel*.  *Clear Channel*, however, did not discuss the

21  foreclosure process, which is, I guess, the out that

22  debtors are moving -- or sellers always argue in connection

23  with this.

24          We have three possible proceedings.  Some are

25  pending and some could be brought.  One, as part of the

1  reply we briefed the receivership proceeding and attach the

2  receivership orders which expressly states that the

3  property can be sold free and clear of liens, everything

4  attaches with the same validity extent and priority to be

5  addressed at a future time and that's exactly what we're

6  proposing.

7          The second we briefed under state law that could

8  be a foreclosure proceeding.  So Hankey, as the creditor

9  that's senior to Yogi and Inferno, has the ability to have

10 a non-judicial foreclosure which was scheduled the day

11 before -- or the day after we filed bankruptcy and under

12 state law the junior creditors receive what they receive,

13 if anything.

14         And finally, we brief the possibility --

15         THE COURT:  Oh, I'm sorry, Mr. Golubchik.  So

16 you're talking about (indiscernible) related to the

17 prepetition loan?

18         MR. GOLUBCHIK:  Yes.  Well, right now we're

19 dealing -- based on our mind, we're dealing with two

20 objecting parties, Yogi and Inferno, both of whose liens

21 are  junior to Hankey.

22         THE COURT:  Okay.

23         MR. GOLUBCHIK:  Prepetition Hankey was commencing

24 the foreclosure of its prepetition, not the DIP loan, and

25 under state law senior creditor has the foreclosure unless

Page                                                                        20

1   someone pays them off, wipes out the juniors.

2           And the final is the plan of reorganization.

3           THE COURT:  Then if -- let's go back for a sec.

4   Then what about the mechanics lien?

5           MR. GOLUBCHIK:  Oh, it doesn't wipe out the

6   mechanics lien because Hankey comes behind the mechanics

7   lien.  I don't think there's an objection.  Just like you

8   can have a second or a third have a foreclosure sale, you

9   wipe out everyone after you, but you take it subject to the

10  senior interest.

11          THE COURT:  Okay.  So your (f)(5) argument there

12  as to foreclosure would not apply as to any mechanics

13  lienholders, who've not consented?

14          MR. GOLUBCHIK:  That is correct.  I -- our

15  position is the mechanics lien creditors have consented

16  based on the implied consent of the *ACCEL Concrete*.

17          THE COURT:  What if I disagree with that?  What

18  if I think that implied consent actually doesn't work here?

19          MR. GOLUBCHIK:  That didn't work?

20          THE COURT:  Yes, the *Roberts* case, which kind of

21  gets brushed aside in the reply has been cited with

22  approval by the BAP and that was --

23          MR. GOLUBCHIK:  I --

24          THE COURT:  -- in Eastern (indiscernible) --

25          MR. GOLUBCHIK:  I believe in the *Roberts* case

Page                                                                                    21

1   there was actually a formal objection by the lender, which

2   is different.

3              THE COURT:   *Roberts* states -- and again, the BAP

4   citing to *Roberts* in *East Capital View Development* states,

5   "363(f)(2) requires unequivocal manifestation of the

6   lienholders' affirmation."

7              MR. GOLUBCHIK:   Okay.  So we had -- this is the

8   *Roberts* case out of Michigan, correct?

9              THE COURT:   Let me see where that was from.  My

10  apologies.

11             MR. GOLUBCHIK:   I have 249 B.R. --

12             THE COURT:   Not -- no, I'm -- yeah, 249 B.R. 152.

13             MR. GOLUBCHIK:   Yeah, I'm looking at it.  It's

14  from the Western --

15             THE COURT:   Yeah.

16             MR. GOLUBCHIK:   -- District of --

17             THE COURT:   Okay.

18             MR. GOLUBCHIK:   Our position is the local BAP,

19  while BAP is not binding --

20             THE COURT:   Um-hum.

21             MR. GOLUBCHIK:   -- it should be more persuasive.

22             THE COURT:   Okay.

23             MR. GOLUBCHIK:   But at the end of the day if

24  that's the supposition of the Court -- I wanted to take a

25  look at -- one second -- 363(f)(1).

Page                                                                        22

1          (Pause)

2          Yes, Your Honor.  At this point if you disagree

3    with the theory that if you did not file anything it should

4    be viewed as non-consent, as opposed to implied consent.  I

5    will dig through it.  I will dig through it and then -- and

6    then when I respond because I know that there is a Ninth

7    Circuit case that we saw.

8          THE COURT:  Well, you cite to *ACCEL Concrete*.

9          MR. GOLUBCHIK:  Correct.

10         THE COURT:  That was a defective notice case and

11   I think what you're really citing to is a footnote.  But in

12   any event, my question was simply if (f)(2) doesn't work as

13   to all the mechanics liens, is there an (f)(5) argument or

14   something else?

15         MR. GOLUBCHIK:  Well, yes, Your Honor.  Look, if

16   there's a foreclosure, the -- whoever succeed -- for

17   example, Hankey as a foreclosure sale.  Hankey wipes out

18   everyone before, but Hankey doesn't wipe out the mechanics

19   lien creditors.  Hankey would have to pay them off.  That

20   debt is still there so they can receive funds.  It's a

21   reverse process, but it's not the mechanics lien creditors

22   are left out in the cold.  They'd be paid by Hankey.

23         THE COURT:  Okay.

24         MR. GOLUBCHIK:  Okay.  So that's that as to

25   (f)(4).  And then going back to -- no, I'm sorry.  That's

1  as to (f)(5).

2          THE COURT:  You went through receivership and

3  foreclosure on the senior prepetition.

4          THE COURT:  And the plan as well.  Alternative is

5  we have ability to foreclose a plan of reorganization.

6  Under 506, the secured -- the amount of secured claims

7  would be only as to the value of the collateral.  Any

8  unsecured claims would go down to be part of the unsecured

9  creditor pool and you can have a cram down plan of

10  reorganization.  It's just a separate proceeding that could

11  be done.

12          But I think that the easier way to have Yogi and

13  Mr. Shinderman just fall into (f)(4) where we've asserted

14  *bona fide* dispute to which there was no opposition.

15          So after that, Your Honor, two things.  One is --

16  and I mentioned the public policy.  It's not that anyone

17  asserts that we did something or a seller did something.

18  I'm just term -- that the seller did something that is

19  inconsistent with Your Honor's order or the process.  We

20  went forward.  We had hearings.  We had testimony and the

21  court ordered the process and it was followed and this is

22  where we ended up.  So there is an interest in preserving

23  the integrity of the process and the auction so that in the

24  future interested parties don't say, wait a second,

25  auctions really mean nothing; unless we have an auction

1  before the judge, this third party auction process doesn't

2  work and I may not be interested in bidding.

3          The second and I think it's more of the bigger

4  picture and it was touched on at the last hearing, to the

5  extent that there is a concern about looking after the

6  unsecured creditors because that's always the case,

7  although it's not within 363(b) or (f) specifically, I

8  think this auction is the best chance for having a recovery

9  for unsecured creditors.  It was addressed by Mr. Newman, I

10  believe, at the last hearing that this buyer's premium that

11  was paid where the estate received nine-and-a-half percent

12  of the sale price, is not subject to collateral because it

13  was not from the seller's side.  It was not from the real

14  estate side.

15          For purposes of this hearing, I don't think it's

16  necessary to address or resolve it.  I don't think you have

17  enough before you to deal with it, but we -- remember, we

18  have secured debts close to 200 million dollars all in.  In

19  order for unsecured creditors to share in everything, it'd

20  have to be probably over 70 million dollars more, which is

21  not there, 141 with the buyer's premium, cost of sale.

22  Definitely over 60 million dollars, which based on what

23  transpired is not realistic.

24          So the unsecured creditors may be out of the

25  money, at least from the sale.  There are other claims of

1   cause of action, but that's -- that's not a certainty like

2   a sale is a certainty.

3           But one thing we have here, whether technicality

4   or what we have almost 12 million dollars that was paid

5   pursuant to a contract between the buyer and the

6   auctioneer, not the estate, which is available to be dealt

7   with at a future time.  Of course, arguments will be made

8   that the purchase price was adjusted based on this

9   commission and that's something that will have to be dealt

10  with.  I don't know the answer to it, but I'm just focusing

11  on based on this property and the sale of this property,

12  the best chance of unsecured creditors to receive a

13  recovery is to have this technicality of a buyer's premium

14  available.

15          So with that, I have nothing else and I'll focus

16  on (f)(5) while other people are doing their closings.

17          THE COURT:  Okay.  Let's go to the objections

18  that were received.  I'll start with those.

19          MR. BREGMAN:  Excuse me, Your Honor, as a point

20  of order I'd like to be heard in support of the auction and

21  it might be helpful just to group those in support

22  together.  If so, I'm prepared to --

23          THE COURT:  That was --

24          MR. BREGMAN:  -- tell it.

25          THE COURT:  -- putting you.

Page                                                                        26

1          MR. SHINDERMAN:  Your Honor, I'm not sure that

2    Mr. Bregman has a standing as the receiver.  They don't

3    have a role in the bankruptcy case.

4          MR. BREGMAN:  We represent -- Your Honor, our

5    firm represented Hilldun Corp., a five million-dollar

6    secured creditor and it's on Hilldun's behalf that I'm

7    appearing today.

8          MR. SHINDERMAN:  I -- my apologies, Your Honor.

9    I thought they represented the receiver.

10          THE COURT:  Thank you.

11          Well, then we'll move on and begin with those in

12    support of the sale then.  Mr. Bregman, briefly.

13          MR. BREGMAN:  Yes, briefly.  Thank you, Your

14    Honor.  Again, Jerrold Bregman of BG Law on behalf of

15    Hilldun Corp.  We are a five million-dollar secured

16    creditor.  We filed a time -- timely filed a proof of claim

17    to which there's been no objection filed.

18          We support the Court ordering a sale for 250

19    million dollars, but since the Court does not have that

20    power, our request is that the Court approve the sale

21    motion that's before it, the sale that followed a highly

22    publicized process conducted in good faith by experienced,

23    capable professionals.  It even included a power bid -- new

24    term for me -- that brought an additional six million

25    dollars into this case.

Page                                                                    27

1          The objectors are not offering to protect the

2    estate from the downside risk of losing this buyer and

3    obtaining less at a future sale or to pay the costs of

4    additional interests, fees, cost of additional delay.  They

5    are taking the classic out-of-the-money gambit of gambling

6    with other people's money.  It's not fair.  It's not

7    appropriate under these circumstances.

8          Our client's position is based on the salient,

9    indeed, we submit, dispositive fact that there is no

10   evidence presented of any other bidder who -- whether one

11   participated or who showed up afterwards in all this time

12   and the auction was delayed a little bit to allow more

13   time, more exposure, all of which occurred.  There's no one

14   here other than a buyer who's prepared to pay the market

15   price of 126 million dollars for this property.

16         Your Honor, wishing does not equal value.  Market

17   set value, pricing is set by supply and demand with proper

18   exposure.  That's what we have here today.  I wish the

19   price were higher.  Of course, everyone does, but it isn't

20   because that's not the market price.  This has been a fair

21   process.  If there had -- if there were defects in the

22   process, I get it.  If there was interested parties, side

23   deals, some clandestine activity or bad faith shown, none

24   of that is present here.  This is a good faith deal.  It's

25   the market price and it should be approved on that basis.

Page                                                                                            28

1   None of us has a crystal ball, but we have before us now a

2   good faith *bona fide* fair market value offer that should be

3   accepted.

4            Lastly, I also want to point out that my client,

5   whose secured claim also is out of the money supports this

6   closing because it brings about 12 million dollars in for

7   unsecured creditors.  This is the carveout.  This -- the

8   negotiated commission has been agreed to be split to give a

9   12 million-dollar chunk for unsecured creditors in this

10  case.  Well, it's true in every case that the cost of

11  realtors and other costs are a cost of the property.

12  That's appropriate.  That was a cost here, but the debtor's

13  counsel and the debtor's professionals who were able to

14  negotiate a kick-back carveout for the benefit of unsecured

15  creditors all in plain sight with full disclosure and

16  that's a wonderful thing for unsecured creditors.  We'd

17  like to see that come into the estate for the benefit of

18  unsecured creditors.  I recognize that issue is not

19  directly before the Court today, but what is before the

20  Court is 126 million plus and the plus includes this 12

21  million dollars.

22           So for those reasons, Your Honor, we respectfully

23  urge the Court to approve the sale and capture this bird in

24  the hand, which is a bit of a cliché and it was referred to

25  last time, but it's super true.  That's the issue.  We have

Page                                                                      29

1   a buyer.  We'd like to see it closed.  Thank you very much,

2   Your Honor.

3            THE COURT:  Thank you.

4            Next -- I'm going with my list here then of who I

5   think is speaking in support of the sale.  Mr. Smith.

6            MR. SMITH:  Thank you.  I did want to take this

7   opportunity to inform everybody at the UCC issue we didn't

8   get to Friday.  The UCC process is through the mail.  If

9   it's approved, it's still six to eight weeks.  If it's not,

10  it can be redacted and take a very long time, but I do have

11  a copy of the unfiled UCC for all interested parties.  The

12  email address is available.

13           I think the motion should be approved.  It left

14  an opening for an overbidder.  From what the record shows

15  it appears that there is a 500 million-dollar overbidder.

16  Not sure how that got lost on everyone, but everyone was

17  served lawfully.  It's a certified amount.  The money has

18  been deposited with the Court.  I think it should be

19  approved based on what Mr. Golubchik filed.  It's there.

20  Let's get it done and pay everybody.

21           THE COURT:  Thank you.

22           Mr. Geher?

23           MR. SMITH:  I yield.

24           THE COURT:  Thank you, sir.

25           Mr. Geher.

Page                                                                          30

1          MR. GEHER:   Thank you, Your Honor.   Your Honor,

2    you spent a lot of time with us on Friday and I don't want

3    to rehash Friday with you.   I'm sure Your Honor, like many

4    of us, spent a good amount of time over the weekend going

5    over what happened, what didn't happen, what was said and

6    what wasn't said.   So I don't want to go through and repeat

7    everything I said to Your Honor last Friday.   It is all

8    applicable and I'll incorporate it by reference, as lawyers

9    like to say, and move on.

10         Your Honor, just tagging on to Mr. Golubchik and

11   raising what the salient points are, as I believe it's

12   important to Your Honor to approve the sale as required by

13   the Code.   I think the 363(b) issue, as Mr. Golubchik put

14   his finger on it, is the issue of whether the price is

15   adequate.   And as I said on Friday, the adequacy of the

16   price is not to be measured against the debt of the debtor.

17   It's to be measured again what is this property and has it

18   received a fair value.

19         Your Honor heard a lot of testimony and argument

20   last Friday.   What Your Honor did not hear was anybody say

21   that, gee, you never advertised it here and you didn't

22   contact this person.   Not one identifiable issue with

23   marketing.   It was just like somebody was saying, that

24   costs too much.   I'm not telling you what the problem is.

25   This isn't like pornography, you know it when you see it.

1           This is we have an asset.  It was marketed

2    extensively.  We heard about it being on the Super Bowl

3    right before the game.  People flying to foreign countries.

4    People going through their Rolodex of million-dollar buyers

5    in this space.  It was clearly adequately marketed.  Thus,

6    if it was adequately marketed, the right people saw it and

7    if they wanted to buy it, they knew about it and they

8    showed up if they wanted to pursue it and they didn't show

9    up if they didn't want to pursue it.

10          We had very few auction bidders as -- excuse

11   me -- as expected and predicted in testimony given to this

12   Court.  So since it was marketed properly and advertised

13   it, right, people showed up and they bid what it was worth.

14   It is not for us or anybody as a lawyer to say that's not

15   the right place.  A lawyer has no idea what the right price

16   is.  He could tell us the law.  He's not a real estate

17   person.  He didn't put his money it.  He thought it was

18   such a great deal, they could have bought it.  They didn't.

19          So the price is clearly adequate.  It may be

20   disappointing.  That doesn't mean it's not adequate, that

21   adequate value, true value was not obtained.  Nobody has

22   told this Court there is any collusion.  Again, what this

23   Court didn't hear is speaking volumes.

24          So we had a non-collusive, properly marketed

25   auction that produced a winning bid with no collusion, no

BENHYATT
Certified Deposition Reporters

Page                                                                    32

1   irregularities.  The three-minute issues were fully

2   explained to this Court.  No auction if it says we're

3   ending at 4:00, stops at 4:00, if the final guy hits the

4   button right at 4:00 and somebody else wanted to go right

5   behind him they don't say, sorry, buddy, you're out of luck

6   because he hit the button at 4:00, not you.

7            So properly marketed.  People showed up that he

8   bid without collusion.  So the price is clearly adequate.

9   So can we sell it free and clear of liens.  My client

10  consents.  So the lien of Hankey is not an issue.

11           THE COURT:  That pre -- on the prepetition loan?

12           MR. GEHER:  The consent for all of our debt.  The

13  DIP loan, the receiver loan and the prepetition loan, all

14  three loans we've ever had, we want to wear we consent.  So

15  the Hankey loans consent.

16           We have Inferno.  Inferno has objected, but

17  there's clearly a good faith dispute as to Inferno's lien,

18  but the document it signed saying we don't get paid on our

19  claim and our debt until other construction loans are paid

20  and unpaid costs of construction.  Not mechanics lien.

21  Unpaid costs of construction.

22           I believe Mr. Golubchik's interpretation of that

23  plain language is correct that it could cover unsecureds,

24  but we don't have to decide that today.  Objectively, does

25  that document in and of itself rise to the level of their

Page                                                                      33

1  being a good faith dispute as to Inferno and I believe the

2  inescapable answer is yes.  Court doesn't have to decide.

3  We canvassed the issues.  Is it objective good faith

4  dispute?  If the answer is yes, end of story, move on.  So

5  there's a good faith dispute as to Inferno it can --

6  property can be sold free and clear of Inferno's claim.

7          THE COURT:  Mr. Geher, are you saying there's a

8  dispute as to amount or priority?

9          MR. GEHER:  Yes, to both.

10         THE COURT:  Okay.  But not as to existence of a

11 security interest?

12         MR. GEHER:  It does have a recorded deed of

13 trust.  I'm not going to tell the Court that document

14 recorded in the county recorder's office does not exist, so

15 on its face it has a lien.

16         The extent, validity and priority of that lien

17 remains to be determined because if all their money maybe

18 it's a fraudulent obligation, as I explained to the Court

19 on Friday and I won't go through all that again, the whole

20 thing is gone.  Good faith dispute.  We don't have to say

21 who's right or who's wrong or what the odds are.  Is there

22 a good faith dispute and I think the document in and of

23 itself creates the good faith dispute.  Second -- so as to

24 Inferno, as well as they loan money to other property, so,

25 you know, those two issues alone, good faith dispute.

1          Yogi has a similar good faith dispute because, as

2    we see from the proof of claim, the evidence in front of

3    the Court, their loans made to Crestlloyd, funded other

4    properties owned by other LLCs owned by Mr. Niami.

5    Their -- that is a fraudulent obligation that the debtor

6    would dispute.  Again, is it a good faith dispute?  I think

7    based upon what the debtor has received from Yogi at this

8    point and hasn't even gotten everything notwithstanding

9    these many months, it said it still was missing documents,

10   about a couple million dollars' worth of loan proceeds.

11   It's a good faith dispute.  Again, we don't have to

12   determine the dispute today.  Is there subjectively such a

13   dispute?  We believe the answer is yes.  Thus, the Yogi

14   claim that's being subject to a good faith dispute can

15   be -- property can be sold free and clear.

16          Mr. Bregman's client has already stipulated that

17   his claim is subject to a good faith dispute.  That leaves

18   all lienholders with the exception of property taxes who

19   nobody disputes and will be paid upon the close of escrow

20   and mechanics lienholders.  We have two mechanics

21   lienholders today who consent if this Court approves the

22   sale and they'll be paid.  We have other mechanics

23   lienholders who have had notice, know exactly what's

24   happening.  We're told in a notice if you don't object it

25   can be deemed consent.  I understand the Court may or may

1   not have an issue about affirmative consent versus consent

2   by not filing an opposition which one would say if one

3   doesn't file an opposition they must consent.  If you're

4   not consenting you've got to stand up and say something

5   somewhere along the line they haven't done so.

6          Notwithstanding, Your Honor, under 363(f)(1), the

7   mechanics liens can be sold free and clear because as part

8   of the sale motion Mr. Golubchik's client, Crestlloyd

9   attacks an order from the California Superior Court

10  appointing the receiver and giving the receiver duties and

11  obligations and rights.  And one of those rights afforded

12  to the receiver pursuant to that order was the right to

13  sell the property free and clear of liens.

14         The Superior Court had already determined pre-

15  bankruptcy that can happen.  So applicable non-bankruptcy

16  law like a receiver order in and of itself.  The property

17  can be sold free and clear of the receiver order.

18         Additionally, under (f)(5) Hankey -- (f)(5) talks

19  about an entity that could be compelled.  Not must; could

20  be.  Hypothetically could this happen.  And when this case

21  was -- this case today has a DIP loan, as well as -- of my

22  client as well as receiver loans of my client, both of

23  which by their terms and court orders, one an order of this

24  court, another an order of the Superior Court, that --

25  pardon the phrase -- trumps and primes all other liens.

Page                                                                         36

1             So if no sale is going to happen here or be

2    approved, we're never going to approve the sale because

3    there will never be enough money to sell free and clear

4    and, thus, Hankey under its DIP loan can and will foreclose

5    and assuming that as -- and correctly, I believe, that the

6    value given in the sale would be paid, they'll be paid.

7    The mechanics lienholders, the waterfall will happen and

8    they'll be paid and they'll be compelled to accept it as

9    far as the waterfall goes.  They get something or nothing.

10   They're compelled to accept that in satisfaction of their

11   claim and, thus, under (f)(1) we can sell free and clear --

12   excuse me, under (f)(1) and (f)(5) through the foreclosure

13   sales of the Hankey DIP loan and the loan in and of itself

14   from the -- or excuse me, the receiver order that gave the

15   right to sell free and clear, we meet the standards for

16   every lien of record here for this court to determine that

17   this property can be sold free and clear of all liens.

18             And let's also remember what Ms. Williams told

19   this Court.  She said that if this sale is not approved,

20   based on her market experience, which was extensive in

21   selling this type of property, which is what she does.  She

22   doesn't sell my house, houses like I live in; she sells

23   these types of homes and she said this will be viewed as a

24   failed sale.  Her word was failed.  Not mine.  Failed and

25   we will get less.

Page                                                                  37

1          So, Your Honor, from a strictly legal

2    perspective, has 363(b) and (f) been complied with, and the

3    answer is yes.  And that's all this Court needs to ask and

4    get an answer to.  Ukraine, it's nice, it's important.

5    That's not what this Court needs to know to decide.  This

6    Court does not need to become a political analyst and try

7    to figure out when the world gets better from the present

8    strife.  This Court doesn't need to be an economist to

9    figure out maybe inflation and interest rates gets better.

10   That's not for this Court or for any lawyer to be

11   speculating about.  We have to deal with what the facts are

12   and what's before us and the facts tell this Court that

13   this sale should be approved because it's a true *bona fide*

14   sale that was non-collusive that brought value and it could

15   be sold free and clear because 363(f)(1) -- whether (f)(1),

16   (2), (4) or (5) -- we all know (3) doesn't apply.  But as

17   to every other lien we could use (1), (2), (4) and (5) and

18   the sale should be approved.  Thank you, Your Honor.

19             THE COURT:  Thank you.

20             MR. GEHER:  Oh, one last thing, Your Honor.  I'm

21   commenting on -- again, I want to focus on what's

22   important.  The buyer premium issue, where it lands, not

23   for today.  Just like the disputes, not for today.  Thank

24   you.

25             THE COURT:  Okay.  Thank you.



Page                                                                    38

1         I thank, Mr. Newman, even though obviously you

2    are in support of the sale, I'd actually like to turn to

3    you before we go back to Mr. Golubchik because I think that

4    perhaps some of those who oppose the sale may raise 363(m)

5    issues and I want you to have an opportunity to respond to

6    those.  So, Mr. Newman, I think I'm going to -- if it's all

7    right with you -- put you a little bit more toward the end

8    of the commentary.

9         So next -- Your Honor

10        MR. NEWMAN:  Thank you, Your Honor.

11        THE COURT:  Thank you.

12        Next, I think we have some oppositions.

13   Mr. Shinderman.

14        MR. SHINDERMAN:  Good afternoon, Your Honor.

15   Mark Shinderman, Millbank, on behalf of Yogi Securities.

16   Your Honor, I'll be short and to the point.

17        Mr. Roffers testified on Friday in response to

18   the point that he has a minimum reserve on a property less

19   than two-tenths of a mile away that had never been

20   disclosed to the Court.  But he wasn't opposed to a minimum

21   bid, just the wrong minimum bid, but that's not what he

22   suggested at the bid procedures hearing.  And you were

23   there and you have your own impression, but the testimony

24   was no minimum bid.  The dispute Mr. Williams' opinion --

25   Mr. Williams' opinion, the other broker's opinion about

1    that there should be a minimum bid was never presented to

2    you.  It was given to you as a *fait accompli* that there

3    should be no minimum bid.  On Friday that's not the

4    testimony that you heard.

5             To be fair, what Mr. Roffers said at the bid

6    procedures hearing is that setting a minimum bid might

7    scare away people who would bid low, but he wanted people

8    to bid low because he wanted to have more bidders and

9    create a competition.

10            But the actual opposite happened here.  The 50

11   million-dollar low bid by the buyer set out there

12   uncontested for two-and-a-half days suggesting that the

13   property was worth a lot less.  Remember, again,

14   Mr. Roffers testified that setting a bid too high would

15   tell people they'd have to bid too high to compete.  Well,

16   Mr. Roffers -- the buyer comes in with a very low bid.

17            So I submit we have just the opposite the

18   situation of what Mr. Roffers had explained to us would be

19   the problem at the first hearing.  And then we also come

20   back to the 295 million-dollar asking price of what the

21   brokers were telling people.  I submit to you that that

22   caused confusion.  Right?  Mr. Roffers said, "We don't want

23   to set a minimum too high because that might keep people

24   away from the bid and we don't want to set it too low

25   because it may discourage lookee-loos."

Page                                                                    40

1          So here we have a situation we had a low bid sit

2     out there for two days and we had asking price of 295.

3     Nobody and nobody testified that anyone understood that a

4     bid of 160 or 170 million dollars may have been in the

5     ballpark.  That guidance to the marketplace wasn't there.

6     It wasn't the asking price and there was no minimum.

7          At the bid procedures hearing Ms. Andrassy

8     clearly indicated that a bid would need to clear the

9     secured debt to get consent and that didn't happen.  And

10    Your Honor was very clear to everybody that you would have

11    the ability to review the sale.  It wasn't present -- the

12    auction was not presumptively game set, match.  And

13    Mr. Golubchik -- and this is on the transcript of pages 32

14    to 33 -- noted that the auction wouldn't be the be-all/end-

15    all.  And Mr. Roffers at page 38 said, "Your Honor,

16    everyone understands we have to come back to court."

17         So where does that leave us?  Have five points.

18    First, it's not clear that we achieved fair value.

19    Auctions do not necessarily represent fair market value.

20    We should have had a minimum bid, just like the property

21    two-tenths of a mile away.  Mr. Roffers confirmed, one of

22    the brokers confirmed that they're using a minimum bid.

23    Now, you'll remember they kept fighting with us, but

24    actually they conceded that there is a minimum bid.

25         Second, the price per square foot is $1300 a

**P** 888.272.0022  **F** 818.343.7119          **BENHYATT**          www.benhyatt.com
Certified Deposition Reporters

Page                                                                          41

1    square foot, which is very below market average.  We heard

2    testimony from Ms. Williams that we would have expected a

3    price of $2500 or more per square foot.  But without being

4    asked she said the reason was, is because we didn't have a

5    certificate of occupancy.

6           But, Your Honor, the difference between 1300 and

7    2500 is 1200 or about 48 percent of the value.  So we're to

8    believe that the lack of a certificate of occupancy cost

9    the property 48 percent less -- you know, hurt the property

10   by 48 percent or approximately half the selling price.  At

11   $2500 a square foot assuming 100 is 6,000 square feet

12   probably should have sold for about 256 million dollars.

13   The 137 million dollars, right, suggest that the C of O,

14   the head winds that Mr. Roffers kept talking about, cost

15   132 million dollars.  That's just not credible, right.  The

16   C of O is the last step.  Yes, it could be $5.00, it could

17   be a new roof, it could be a new elevator, but there's no

18   evidence before you that it's half the property.  Half of

19   the value of property should impaired.  What we do know,

20   what the testimony is, is the property sold or is selling

21   for approximately half of what the per square footage

22   should be.

23          Second, secured creditors have not consented to

24   the sale.  Third, you heard conflicting testimony on Friday

25   about foreign buyers and the geopolitical catastrophe.

1   Ms. Williams said unequivocally that foreign buyers did not

2   matter, but that was not the testimony of Mr. Roffers at

3   the initial hearing where they hoped to get worldwide

4   interest or one of the brokers who went to France or Mr.

5   Williams' testimony in his declaration that he acknowledged

6   that the war did hurt and cause disruption.

7            But here's why this point matters.  No one

8   bothered to suggest that the debtor or the parties in

9   interest or this Court that we should bump the auction a

10  month to see what would happen, as would have been prudent.

11  The conflict caused a major pause in reset, just like any

12  other geopolitical or pandemic would have done.  What you

13  do is you wait.  Things may not get better.  Things may not

14  improve, but things will normalize.  Things will accept the

15  situation.  But what you don't do is in the midst of the

16  turmoil, in the midst of the uncertainty of something that

17  was unfathomable, you don't pretend that the situation is

18  normal because it is not.

19           THE COURT:  Is there a difference, Mr.

20  Shinderman, between picking a 30 to 60-day pause before the

21  March 3rd auction and taking a 30 to 60-day pause now

22  from --

23           MR. SHINDERMAN:  Yes, because there's a big --

24           THE COURT:  -- after the sale hearing?

25           MR. SHINDERMAN:  There's a big difference.  We

1    now have a market -- we now have a real proposal out there,

2    137 million dollars that we had hold up to everyone and

3    say, this is the price you have to beat.  And I'll come

4    back to this at the very end about what I think we should

5    do, Your Honor, but the idea is we didn't have a minimum

6    and we had an asking price of 295.  So we either scared

7    people away or we anchored them too low.  But now the world

8    knows what they have to beat.  That's number one.

9          Number two is today, you know, three, four weeks

10   into the dispute the world is back to normal.  The stock

11   market is back up.  It's down a little bit today, right.

12   Housing prices are going up, but things have normalized.

13   They've -- and I hate to say this.  They've normalized the

14   geopolitical mess in the world and people are trying to

15   figure out what that means.

16         But what they didn't understand, just like the

17   analogy is to COVID, what we didn't understand when it

18   first happened what the disruption will be.  But eventually

19   people figure out how to normalize things, so that's what

20   we're doing now.  So, yes, I do think it matters.

21         The fourth of my five points is a review of the

22   transcript and your reservations lets everyone know.  And I

23   want to be fair to Mr. Newman's client that there was a

24   chance that just because they were a high bidder doesn't

25   mean they were going to be approved today.  But everyone

Page                                                                44

1    talks about fairness and, you know, the person did what

2    they were supposed to do, the would-be buyer.  But

3    everyone, including the debtor's counsel, Mr. Golubchik,

4    repeatedly said, it will be subject to your approval and

5    Your Honor had the right to not approve for various

6    reasons.

7            Fifth, Mr. Geher had something on Friday to the

8    effect that secured creditors were playing games here and I

9    submit it's just the opposite.  If Mr. Geher's client,

10   Mr. Hankey, and the buyer want to obtain the consent of the

11   secured creditors, they need to contribute more people into

12   the pot to make this work, and we made that offer over the

13   weekend and people chose not to take it up.

14           I won't disclose any settlement communications,

15   but clearly the game here was to put more money on the

16   table for people and that hasn't happened.  Mr. Hankey and

17   the buyer had that option, right?  If the buyer wants the

18   property he knows what he has to do.  If not, the property

19   can go to foreclosure.  Mr. Hankey doesn't want to go

20   through foreclosure he knows what he has to do.  The

21   secured creditors have no reason to accept the sale that

22   doesn't pay them anything for only a fraction of what

23   they're owed.

24           So with that, I want to turn to a few

25   housekeeping items.  I want to be very clear.  Yogi

1    Securities filed a proof of claim.  There's not a single

2    objection to that claim on file.  What the motion itself

3    said was the debtor may have a basis to object, not that

4    they did object or the basis for that objection but that it

5    may object.  That's not a dispute, number one.

6            Number two is there's no question that we have an

7    interest, a recorded lien on the property.

8            Three, there's no evidence -- Mr. Geher cited

9    evidence -- there's no evidence that the funds, the

10   proceeds of the Yogi loan went to any other property.

11   Other properties cross-collateralized loan.  What I

12   represented to the Court on Friday was that we've accounted

13   for direct deposits of 27 to 28 million to Crestlloyd

14   account or to Surfside Realty, the escrow agent, for

15   Crestlloyd.  Some of them reference Crestlloyd, some of

16   them don't reference anything.  Those need to be checked by

17   the debtor, but that's not a dispute.  No one has said, we

18   object to the claim.  The fact that there may theoretically

19   be some claim somewhere, the kitchen sink of claims, is not

20   a dispute.  We have a *prima facie* case.  No dispute.

21           But the uncertainty about who's owed what

22   complicates matters.  Mr. Hankey hasn't conceded that part

23   of his claim is entitled to a fourth priority security as

24   the debtor noted.  The debtor knows there's a question

25   about mis -- the accounting of Mr. Hankey's claim and that

1  effects what value was left over for other secured

2  creditors that would be junior to Mr. Hankey's first

3  secured claim.

4        Similarly, a lot has been said about this issue

5  about the buyer's premium but the -- excuse me, the

6  auctioneer's refund, but the auctioneer's refund is

7  proceeds of the real property.  If the -- if instead of

8  having this fiction that it's a 12 percent commission, but

9  we'll give back ten percent, they simply charged two

10 percent.  Let there be no question.  It was a fallacy.  It

11 was done to help Concierge keep its 12 percent premium in

12 other deals, but everything here, every dollar here is the

13 proceed of real property.  But the uncertainty that people

14 have introduced as that means that neither Yogi or Inferno

15 can know with a certainty what they're going to get.  It's

16 complicated.  It's confusing.  But these things that other

17 people are raising only underscore that consent is not

18 forthcoming here because nobody knows what they're going to

19 get.

20        Now, ironically, the debtor in its moving papers

21 showed a water fall that all the proceeds of the sale were,

22 indeed, were available to Inferno and Yogi beyond

23 Mr. Hankey.  Okay.  They did not take the position in their

24 moving papers that the give-back of the auctioneer's

25 premium was for unsecured (indiscernible).

Page                                                                47

1          So that leaves me to choices.  On behalf of Yogi

2    and I think Inferno, but Ms. Andrassy will speak, we're

3    okay if the sale is not approved.  And contrary to Mr.

4    Bregman's position the people whose ox are being gored, the

5    people who are taking the risk here are Yogi and Inferno.

6    Right now the way the money breaks out under

7    Mr. Golubchik's analysis in his motion, it either goes to

8    Inferno or to Yogi depending on how exhibit -- the fight

9    over Exhibit 6 comes out.

10          But both Yogi and Inferno are willing to risk

11   that recovery because there's insufficient proceeds to make

12   this a worthwhile endeavor for consent.  Mechanics liens

13   will still take first in a foreclosure, just like property

14   tax.  All administrative claims have been paid and there's

15   no indication that there's value above the amount of

16   secured claims such that the unsecureds are entitled to

17   anything and, of course, unsecureds are not mentioned as

18   part of the 363 analysis.

19          So, Your Honor, the people really have skin in

20   the game.  Yogi and Inferno are willing to risk this sale

21   not closing.  Against that backdrop we reiterate that we're

22   prepared to make a 15 million-dollar DIP loan to pay off

23   the 12 million-dollar DIP and extend the sale process or,

24   as you heard on Friday, the estate still has about two to

25   three million dollars of availability under the existing

1    Hankey DIP loan that can be used, so lets -- lets the

2    brokers try to beat the 137 million dollars that's out

3    there.

4             And so we have no -- so we have no issues, we

5    could make the proposed buyer the stalking horse and give

6    him adequate protection and give him liens so that

7    Mister -- that the would-be buyer will sit here for the

8    next 45 to 60 days and if he's overbid he'll get a topping

9    fee and reimbursement of his costs or if the failure to

10   come forward in 45 to 60 days the sale will be allowed to

11   proceed.  But that's how we can tease out from the market

12   what the real value is given this uncertainty.

13            Lastly, Your Honor, and I really hate to do this,

14   I find this one of the most distasteful parts of my job,

15   but I really need to get into the testimony that was given

16   because I've really limited my questions to three things.

17   The minimum bid, the effect of foreign buyers and the price

18   per square foot.  But you heard and I -- you'll recall from

19   Friday that the brokers and Mr. Roffers went far beyond the

20   questions I asked.  They couldn't wait to explain them

21   away.  On occasion they refused to answer my question and I

22   had to keep coming back.

23            So I looked at the testimony from Friday and I

24   said, thus doth protest too much, right?  First, the

25   minimum bid you heard on Friday is a nuanced discussion.

1   That's not what was presented to Your Honor and other

2   parties in interest at the bid procedures.

3          Second, you heard testimony that was an

4   extraordinary marketing effort.  No one explained to you

5   what that effort was, that it cost more than 10 million

6   dollars.  That can't be right.  The DIP loan was 12

7   million.  It wasn't paid out of the DIP loan.  And if the

8   property sold for 200 million dollars, the total amount of

9   brokerage and auction commissions would be less than eight

10   million dollars.  There's no way ten million dollars was

11   spent.  It was a false representation.  It's hyperbole, but

12   there's no evidence for that.

13          You heard Mr. Roffers refuse to answer a very

14   simple question.  If there's no sale would you and the

15   brokers be paid a commission.  I'd asked that four times

16   before they conceded, of course.  Well, that's what it is.

17   I get it.  The brokers work hard.  Okay.  The auctioneer

18   works hard.  They're entitled to something at the end of

19   the day but that doesn't mean today is the end of the day,

20   right.  They have to finish the job, right, and that's

21   what's going on here.

22          You heard inconsistent testimony on the foreign

23   buyers.  Ms. Williams said unequivocally, no foreign

24   buyers.  Well, first of all, it's not true.  Second, we

25   need to have a full evidentiary hearing where I can bring

1 in other witnesses to say that she helped sell properties

2 with foreign buyers.  But you heard testimony from Mr.

3 Williams that there was disruption with foreign.  You heard

4 from Mister -- the other broker that they want to France to

5 get buyers.  You heard testimony from Mr. Roffers they were

6 getting interest from all over the world.  So again,

7 there's an inconsistency in this rush to get this over

8 with.

9          You heard finally reluctantly -- reluctantly.  It

10 took five minutes to get the answer that, yes, there's a

11 minimum bid on a property two-tenths of a mile away.  You

12 heard about the price per square foot, that it was impacted

13 by the certificate of occupancy.  But no one said it's a 50

14 percent discount to value, which this seems to have been.

15          You heard testimony that people speculated.  And

16 given where we are in the hour and Your Honor will discount

17 and weigh testimony accordingly, we'll talk about evidence

18 later, we didn't make every objection about speculation, et

19 cetera, because what was the point.  You know, we all know

20 the rules.  But no one said it's not possible to generate

21 more money.  No one said it's impossible and no one is not

22 going to bet their reputation that it's not possible to

23 generate more now that we know what the playing field is.

24          We also heard from Mr. Horoupian on the cross-

25 examination of Mr. Roffers that in March of 2021

1   Mr. Roffers tells Ms. Niami that the property will get more

2   than 256 million.  Not may.  And at the time there was no C

3   of O and the property was in the condition it was in but he

4   said, we will.  Again, this goes back to the confusion of

5   cause by the debtor's motion and the schedules and the

6   asking price.

7           And finally, and this is the issue that I have

8   the biggest problem with is nobody suggested to delay the

9   auction until the world became normalized.  There is no

10  testimony that anybody suggested -- and maybe it's because

11  they wouldn't get paid, but no one suggested that given the

12  disruption on certainty of the market that we take the

13  pause for a week or two weeks.  We took it.  Remember when

14  I asked Ms. Roffers, "Would you delay the motion?"  He

15  said, "Yes."  He delayed the motion because of the

16  condition of the property, but did not seek to delay the

17  sale of the property because of the geopolitical conflict

18  and that's very, very important.

19          With that, Your Honor, I want to turn to the

20  comments real quickly of Mr. Golubchik.  What's the

21  alternative is not the question, but I give you the

22  alternative.  The alternative is, make the buyer the

23  stalking horse, extend the process out.  Mr. Geher's client

24  has two to three million dollars in the DIP.  We'll replace

25  the DIP.  But now that the world knows that the price is

Page                                                                      52

1   137 million, plus or minus, let's go ahead and tell the

2   world that he's got 45 to 60 days to be there.

3          Second, we could submit further briefly on 363(b)

4   and (f), but I think Your Honor is familiar enough with the

5   issues.

6          The bottom line is *Clear Channel* says what it

7   says.  A secured creditor always has the right to

8   foreclosure, so it couldn't be the case of *Clear Channel*

9   that the mere ability to foreclose or have a receiver is

10  enough, otherwise *Clear Channel* means nothing.

11         And then a word about the evidence.  Most of the

12  evidentiary objections to my client's declaration were

13  actually substantiated by the broker's.  Conversations,

14  proffers and the like.  So I think at the end of the day we

15  don't need formal rulings on there.  We're relying on the

16  broker's testimony to collaborate that which we said.

17         But I would point out that this wasn't originally

18  set as an evidentiary hearing and we didn't do formal

19  discovery, right.  So to the extent we have some

20  speculation about what could happen in the future, what was

21  proffered without any evidence whatsoever, either we need

22  to discount that, which I trust Your Honor will do, or we

23  do have further evidentiary work to do.

24         At the end of the day, I think there's enough

25  questions here that -- well, we know that the buyers

1  haven't completely -- secured creditors haven't consented.

2  There is no dispute, not reasonable dispute, there's no

3  dispute before Your Honor suggested by anyone as to my

4  client's claim.  My client does not consent to the sale.

5          For these reasons, Your Honor, we think that the

6  Court should deny the motion at this time.  Thank you, Your

7  Honor.

8          THE COURT:  Thank you.

9          Ms. Andrassy.

10          MS. ANDRASSY:  Thank you, Your Honor.  Kyra

11  Andrassy, counsel for Inferno Investment.

12          The evidence demonstrates that the auction was

13  poorly timed and resulted in a grossly inadequate sales

14  price of 43 percent of what the debtor and Hankey

15  represented to the Court that the property was worth, 48

16  percent of the listing price that was approved by the

17  Court, and 62 percent of the appraised value.

18          Everyone knows and knew that there were issue

19  with the property, including the lack of the C of O and

20  everyone knew those issues when they placed millions on the

21  property.  So was everyone including the appraisal firm

22  wrong or was the sale process flawed and Inferno would

23  submit that it's the latter.

24          More time was required to adequately market this

25  property.  The application to employ the real estate

1  professionals is not filed until December.  In December we

2  had a significant amount of rain and the testimony from

3  Friday was that there was significant water damage to the

4  property that had to be fixed before it could be shown.

5  Indeed, that's why there was a stipulation that was

6  submitted to the Court to extend the base by three weeks.

7  And why only three weeks?  Because Hankey's DIP loan is

8  becoming due at the end of March.

9        In addition to the water damage issue, that

10 limited the amount of showings that could occur at the

11 property, it's uncontested that the war in Ukraine

12 negatively impacted the auction.  The auction should have

13 been delayed so that it did not start four days after the

14 war began before things began to stabilize.  If Mr. Saghian

15 is willing to stay under contract for another 60 days or

16 so, I join in Mr. Shinderman's proposal that you serve as a

17 stalking horse and we can give him bidding protections and

18 see if a higher offer can be received.

19        Yogi and Inferno have offered to put their money

20 where their mouth is and to make a new DIP loan, to take

21 out  Hankey's loan and give the debtor a little more

22 breathing room.  It also would give time to adequately

23 market the property in a more stable economic environment.

24 My client is confident that letting the brokers do their

25 job with adequate time will result in a higher price for

1  the property and it benefits everyone.  There's no reason

2  that the property had to be sold in what amounted to a fire

3  sale.  Right now the only parties who benefit are the

4  brokers, the auction house and Hankey.  Because they're the

5  parties who benefit from the proposed sale, their testimony

6  and arguments have to be deemed with some skepticism.

7         Much has been made about this buyer's premium and

8  whether it's going to benefit unsecured creditors.  First

9  of all, the debtor has represented in its reply and it's

10  available to pay secured claims, but I'll note that even if

11  you characterize that rebate as personal property, well,

12  guess what, it's subject to Hankey's DIP lien.  And you can

13  bet that my client is going to argue that Hankey is --

14  should have to marshal its assets, its collateral and look

15  to the proceeds of the buyer's premium before taking

16  proceeds from the sale that deplete my client's collateral.

17  Although I still believe, as I argued on Friday, that that

18  buyer's premium should be considered proceeds from the sale

19  of real property subject to the claims of secured

20  creditors.

21         Now, if the client -- Court is inclined to --

22  well, let me say one other thing about the 363(f)(4) issue

23  and like Yogi's lien, the issue with my client's lien is

24  not over the amount.  Mr. Geher was represented to this

25  court wrongly that my client may have made loans -- some of

1  the proceeds from my client's loan went to other entities

2  and that's simply not true and there's no evidence before

3  the Court that that is the case.  There's no objection to

4  my client's claim.  Much has been made of this memorandum

5  of agreement that the debtor attached as Exhibit 6 and that

6  goes to priority, not the amount of my client's lien or the

7  existence of the lien.  And we heavily dispute how it's

8  been characterized, but the Court doesn't need to resolve

9  that.  We will -- we're confident that we're going to prove

10 that it doesn't mean that my client agrees to subordinate

11 to all debt on the property.  And in fact, that's belied by

12 the fact that my client had to sign a written subordination

13 agreement to Hankey Capital of 82.5 million left.

14         Now, if the Court is inclined to approve the

15 sale, my client objects to the payment out of escrow of

16 anything other than the commission, property taxes, closing

17 costs, the receiver certificate and the DIP loan.  There's

18 questions about the calculation of the amount that that's

19 allegedly through Hankey Capital.  And as Mr. Perkins

20 testified in his declaration, the 82.5 million-dollar loan

21 has not been verified and is subject to an account.

22         Now, what little documentation that I've been

23 able to obtain and my client has been able to obtain raises

24 far more questions than it answers.  We can't even figure

25 out how it calculates if there's 113 million dollars owing

1  with interest on a 82.5 million-dollar debt.  My client

2  intends to conduct discovery on the amount of Hankey's

3  claim what the proceeds were used for and the extent of

4  Hankey's knowledge of misappropriation of funds and whether

5  Hankey's loan or portions of it are collateralized by a

6  second property.

7          So if the Court approves this, my client -- we

8  would suggest that maybe the Court hold a continued hearing

9  in a couple of weeks to figure out if there was some amount

10 that we could pay to Hankey that would be in -- we would

11 agree went into the property so that we can stop the

12 accrual of interest while the parties litigate their

13 dispute.

14         And to the extent that Hankey is authorized to be

15 paid any portion of it now it has to be subject to a full

16 reservation of rights, but again, we object to that.

17         There's also an issue with the mechanics liens

18 because our client feels the Court --

19         THE COURT:  Hold on one moment.  I'm going to

20 interrupt you for one moment.  There is no recording

21 permitted of this proceeding.  I have seen one individual,

22 Mr. Smith, holding up a phone more than once now.  There is

23 no recording of this proceeding.

24         MR. SMITH:  There's no recording.  Text message.

25 Sorry.  I'll be sure to keep it out of view.

Page                                                                              58

1              THE COURT:  Thank you.

2              Ms. Andrassy.

3              MS. ANDRASSY:  There's also an issue -- thank

4    you, Your Honor.  There's also an issue with the mechanics

5    lien because my client's lien was recorded in 2013.  It was

6    incurred in connection with the acquisition of the real

7    property and the house that was on that property at the

8    time before any construction started on the property and

9    the Court, again, doesn't have to resolve this dispute.

10   It's my client's position that it believes it will prove is

11   that it only agreed to subordinate the Hankey's 82.5

12   million-dollar loan.  It did not agree to subordinate the

13   mechanics lien holders, so we object to them being paid.

14             Now, the amounts of the mechanics lien holders

15   are owed cumulatively I will concede is not significant

16   when compared to the purchase price.  It is significant

17   when you compare it to what's left.  So for those reasons,

18   I echo Mr. Shinderman's comments about the inadequacy of

19   the sale price and the process and I would request that the

20   motion be denied.

21             THE COURT:  Thank you.

22             I'm going to go to Mr. Rafatjoo next.  I would

23   like to warn Mr. O'Dea, as well as -- I apologize.  Give me

24   one moment here.  I want to make sure I have everyone on my

25   list.  As well as Ms. Lee DeVoll that given Inferno's

Page                                                                    59

1   position that Ms. Andrassy just again referred to, I'm not

2   consenting to payment of the mechanics lien.  I would like

3   to hear argument as to that issue briefly from counsel.  So

4   we'll go to Mr. Rafatjoo first, and then Mr. Horoupian, and

5   then I'd like to circle back both to Ms. Lee DeVoll and

6   Mr. O'Dea.

7          Mr. Rafatjoo.

8          MR. RAFATJOO:  Thank you, Your Honor.  Hamid

9   Rafatjoo of Raines Feldman for Nile Niami.

10         Your Honor, when the hearing started on Friday

11  things were not looking good for the debtor because the

12  Court focused on what everyone's been focused on, which is

13  that the sale price is grossly inadequate.  And as the day

14  progressed, I don't know if it was fatigued or the

15  testimony.  I personally felt that some of that wind may

16  have shifted based on the testimony of the brokers.

17         So I spent the weekend thinking about what was

18  that testimony, but it -- why did I feel like, you know,

19  things had changed.  Why were we going off the path of

20  having another sale?  And when you kind of sift through

21  that testimony and the fast talking and the buzz words, all

22  that stuff is peeled back.  You take a look at that

23  testimony and you see that while people testified about

24  having tried to sell this property for years, they have not

25  been to the property until recently.

1          While people testified about having sold billions

2    and billions of dollars' worth of real estate, they have no

3    experience with auctions.  While people talked about doing

4    world tours to attract international buyers, they have

5    flown to two countries and spoken to a total of four

6    people.

7          While people testified about years of experience

8    in selling ultra-luxury homes, they have no idea that the

9    lack of a C of O would suppress the sale price.  Thus, they

10   want this court to rely on testimony of brokers who told

11   Nile Niami, Joe Englanoff, Ted Lanes, who's the ousted

12   receiver, Mr. Perkins, and this court who came before this

13   court and everyone said everything that they needed to say

14   to people to convince them that they could get well over

15   200 million dollars for this things, non-issue, let's just

16   ram this thing through, we're going to get it done.  They

17   told everyone everything that they needed to hear to get

18   the listing.  They told everyone everything that they

19   needed to hear to get their employment approved.  They told

20   everyone everything they needed to hear to get the sales

21   process approved and now they're telling everyone

22   everything that they feel you need to hear to get the sale

23   approved.

24          Well, the first three proved wrong.  They haven't

25   been to the house.  The sale price didn't come nearly as

Page                                                                      61

1    high as anticipated.  The auction was an absolute failure

2    and now we're supposed to rely on this fourth part of their

3    testimony.

4            Your Honor, based on the record in this case,

5    based on the testimony from the various parties, the sale

6    cannot be approved.  We heard that Mr. Shinderman asked the

7    question of, do you think the timing of this auction may

8    have impacted things and the answer was no.  So we are to

9    believe that the uber wealthy are not impacted by the

10   holidays because they apparently don't spend time with

11   their families.  They don't get on their private planes and

12   yachts and go to their vacation homes.  They instead stick

13   around and focus on the next house to buy.  That cannot be

14   reality.

15           A few months after having said and done whatever

16   it took to get their listings, laser focused on that

17   commission and the tag line that they were the broker for

18   selling the one, they took the house to auction four days

19   after the war started.  They expect this Court to believe

20   that the uber wealthy are not impacted by holidays, they

21   are not impacted by market fluctuations and the possibility

22   of World War III.

23           What the brokers are selling is a fantasy that

24   they did nothing wrong, nothing impacted the sale process

25   and that they did everything right and it was just purely

1  that lack of a C of O.  That was the only thing to blame

2  because while the uber wealthy don't celebrate the holidays

3  and don't care about war and don't care about market

4  fluctuations, the thought of having to spend a few million

5  dollars to finish a house, that is crippling to them, that

6  is why they did not come forward.

7           Your Honor, it was the totality of the

8  circumstances that impacted things.  That testimony at the

9  end of the day once you remove all the layers and the

10 theatrics from it, is that people came to this court, made

11 representations.  They told you everything you needed to

12 hear to approve a sale process right before the holidays

13 and when you approve that sale process, Your Honor, they

14 had said, we're going to clear the debt stack, don't worry

15 about it, we've got to go forward.  Then for the first time

16 right before the auction starts they set foot on the

17 premises to take a look around.  They're like oh, it was a

18 disarray.

19          And let's make something perfectly clear.  My

20 client has not been in possession of that property for some

21 time.  It was in the hands of a receiver and then in the

22 hands of the CRO who through the DIP loan was able to

23 address some of the issues and clean it up.

24          Your Honor, testimony like that when there is

25 such incentives that are misaligned with the incentives of

1    the estate and its creditors, that testimony cannot be

2    given much probative value.  Instead, the Court should, in

3    my opinion, focus on what it focused on at the beginning of

4    the hearing.  The Court should focus on the reality that

5    there is a material difference between the listing price

6    and the sale price.  The Court should focus on the reality

7    that 90 to 100 days before the auction there was testimony

8    and evidence presented to this court under penalty of

9    perjury as to the value of this home.

10          The Court should focus on the fact that people

11    have a lot of money, but they still have families, they

12    have friends, they have kids and while not everyone

13    celebrates Christmas, that time of the year is typically a

14    slow time for anything to get done.  Thus, the testimony

15    that this segment is not impacted by the holiday is

16    nonsensical.

17          And as far as January is concerned, I know we all

18    claim to be, you know, hearing less and less about COVID.

19    That was omicron's heyday.  I know because I had to cancel

20    a trip in January because we didn't know if we could come

21    back to the country if we took that trip.  And in January

22    the news of COVID was somewhat silenced by news of Russia.

23    In February the news of Russia kept getting more and more

24    and the war on -- potential war in Ukraine.  The U.S.

25    issues a warning about an imminent attack on Ukraine.  That

1 imminent attack unfortunately does take place.  And while

2 people thought that perhaps that grass that wasn't mowed at

3 the house would impact the sale price and that the auction

4 should be delayed for, you know, fixing a leak or just

5 cosmetic things like that, people didn't think that

6 starting an auction four days later with market

7 fluctuations and fear of war should be delay ed.  That's

8 really the problem.

9        And we go back to the fact that this court

10 received certain evidence and made -- issue its orders and

11 its ruling based on that evidence and the Court should

12 really hold people's feet top the fire.  People should not

13 be allowed to come in one day, say one thing and come in

14 shortly thereafter and take a different position.  That's

15 why the doctrine of judicial estoppel exists and the facts

16 of this case, the representations made to this court by all

17 the supporters of this sale fall squarely within the

18 elements of judicial estoppel.  Some people have talked

19 about what they have to lose here, what they have on the

20 line.

21        My client has a lot on the line.  Ten years of

22 his life, almost 40 million dollars of his own money, and a

23 personal guarantee and he doesn't think that this sale

24 should be approved because the sale price is grossly

25 inadequate.

Page                                                                      65

1        Your Honor, I don't want to run down the list of

2    arguments and issues that we raised in our objection

3    because I'm sure the Court has reviewed it.  And while I

4    don't remember, I think we've beat that dead horse on

5    Friday, but I do want to raise the objection to the buyer's

6    good faith and I want to raise that because you asked Mr.

7    Newman, "When was this addendum signed?"  You didn't get an

8    answer to that question.  I repeated that question.  I

9    didn't get an answer to that question.

10       So when this motion was filed all thew ay to the

11   time of this hearing, this buyer whenever they signed that

12   addendum, we still don't have an answer to that, had that

13   in his back pocket.  If they thought this thing, you know,

14   and they were at the property and I'm sure doing their due

15   diligence, if they thought this wasn't worth buying he had

16   created that out for himself.

17       The record of this case is incomplete.  Filing

18   the addendum, the complete asset purchase agreement after

19   the hearing has started doesn't meet the rules.  You have

20   to file all of your evidence and everything at the same

21   time.

22       Finally, as to the brokers and the commission, I

23   know they're anxious to get it.  We object to the payment

24   to it.  And the Court has the authority and the power to

25   revisit the constructure that it has approved before.

1   Section 328 allows for that because the terms and

2   conditions have proven improvident in light of the

3   developments not capable of being anticipated at the time

4   of fixing the terms and conditions of such compensation.

5   I'm not trying to pick on them, but at the end of the day

6   the testimony is questionable and someone should have made

7   that judgment call not to take this property to auction

8   four days after a war broke out.  That's the issue.  No one

9   wants to accept responsibility for it.  And Mr. Golubchik

10  can comment about the lack of evidence regarding that.  We

11  don't need a political science professor from Berkeley or

12  Harvard or anywhere to opine on this issue.  There's not a

13  single person on this out of the 61 people on the Zoom call

14  who doesn't live in reality, who didn't look at the

15  television set that day and say, oh my gosh, what's going

16  to happen.

17          Your Honor, we do not believe that this sale

18  should be approved.  We like Mr. Shinderman's idea of

19  stalking horse and I'm sure Mr. Newman is going to say, you

20  don't approve it, we're out of here, and that's okay.  We

21  have a lot on the line and we're willing to take that risk.

22  We believe that a new sale process should be started.

23  However, if the Court is inclined to approve the sale we

24  object to a 363(m) finding.  We object to the payment of

25  the brokers' commissions and as far as that -- this issue

Page                                                                        67

1   of the refund of the buyer's premium is concerned, that's

2   not an issue for today.

3          And finally, Your Honor, I said this before and,

4   like Mr. Shinderman, I am dismayed that people did not use

5   the weekend to try and bridge the gap to reach a resolution

6   to the issues that are before the Court.  And to the extent

7   the Court is inclined, I would request that parties be

8   ordered to mediation to try and resolve the issues because

9   these issues are big issues.  There's a lot on the line

10  across the board for everyone and this is not something

11  that, in my opinion, cannot be addressed by people hearing

12  what they should hear.  And if the Court is not inclined to

13  do that, it's perfectly fine.  We just don't believe that

14  this sale should be approved as is.  The sale price is

15  grossly inadequate.  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          We'll go to Mr. Horoupian, Mr. Morrow, Mr. O'Dea,

18  Ms. Lee DeVoll and I believe it will be back to

19  Mr. Golubchik.

20          Mr. Horoupian.

21          MR. HOROUPIAN:  Thank you, Your Honor.  Again, I

22  don't want to belabor the points that have been aptly made

23  by those that are objecting, Mr. Rafatjoo on behalf of his

24  client, Mr. Shinderman on behalf of his, then Ms. Andrassy

25  on behalf of hers.  The issues are all the same.  This

Page                                                                    68

1   price is grossly inadequate when you compare it against the

2   evidence.  Mr. Golubchik will tell you that the evidence is

3   what was achieved at the auction, but that's not the only

4   evidence in this case.  And in fact, there was evidence

5   that was presented to you early on in this case by Mr.

6   Perkins and the debtor where Mr. Perkins opined that the

7   property was worth 325 million dollars as is in nearly

8   complete condition.

9            And Mr. Golubchik may say that, well, that was

10  the and that was for a different purpose, but it wasn't a

11  passing submission of evidence.  It was important and it

12  was used by you, Your Honor, in making a finding that the

13  property was worth enough to provide all secured creditors

14  with a 20 percent equity cushion in this case.  And now --

15  and I believe it's that evidence that troubled you at the

16  beginning of the hearing on Friday.  At least that's what I

17  read from your comments and you should be troubled by it

18  because now you're being asked to approve a sale that is a

19  small fraction of what was represented to you as the value.

20  It's a small fraction of the cost of even developing this

21  property.  It doesn't even cover the construction costs.

22  And like Mr. Shinderman said, you heard evidence that this

23  yields a $1200 or $1300 per square foot purchase price,

24  which is at least 25 -- at least 15 -- $1600 less than what

25  the average for this type of home should be.  And the

1   brokers now will tell you, oh, we don't use price per

2   square foot when we're talking about a property of this

3   caliber.  But like Mr. Rafatjoo said, I think you have to

4   look at that evidence right now with a little bit of

5   skepticism because they have an agenda here and that's to

6   have the sale approved so that they can get their

7   commissions paid.

8           Mist -- you may be wondering why Ms. Niami is

9   here objecting to the sale approval.  She, like her ex-

10  husband, Mr. Rafatjoo's client, has a personal guarantee of

11  the Hankey debt.  And while she may have written off the

12  hope of recouping some of the money that she personally put

13  into this, along with her ex-husband, it was never within

14  her -- the realm of her imagination that she would remain

15  exposed on her personal guarantee because the

16  representations have been made to her and to this court

17  that the sale would cover the capital stack.

18          Representations were made to you or were made to

19  her by Mr. Roffers who told her that the auction would

20  generate 265 to 300 million dollars.  That was told to her

21  last year.  Now we're being asked to accept and swallow a

22  price that 100 million dollars less.  More than a 100

23  million dollars less than that.

24          These aren't rounding errors.  They are -- it's

25  an epic failure.  We listened to Mr. Roffers and his

1  opinion that there should not be a reserve price despite

2  what he represented that he would recommend to Mr.

3  Shinderman's client and to my client and comes in and puts

4  before you a proposal that there should be no reserve price

5  and that we should trust him and that the no reserve price

6  auction would generate the optimum price.  That was just

7  wrong.  It's proven to be wrong.  We are -- we've ended up

8  with a number that's grossly inadequate and we would urge

9  the Court to deny approval.

10          THE COURT:  Thank you.

11          Mr. Morrow.

12          MR. MORROW:  Thank you, Your Honor.  On behalf of

13  Battalion Luxury Group, LLC, as well as Battalion Luxury

14  Design, LLC -- pardon me, Your Honor -- we will refrain

15  from reiterating the arguments that we have made, Your

16  Honor, in our pleadings.  Our opposition sets forth very

17  succinctly what our arguments are in relationship to the

18  current motion to approve the sale of this property based

19  on the grossly inadequate amount obtained from that

20  auction.

21          We would submit, Your Honor, that approval of

22  this current motion is tantamount to a *sub rosa* plan of

23  reorganization, the terms and conditions of which have been

24  outlined at this hearing by the proponents of the motion.

25  We would also request that if the Court is so inclined to

Page                                                                     71

1  otherwise grant this motion that the Court sets aside the

2  buyer's premium as the non-nominal carveout for the benefit

3  of unsecured creditors, such as my client, and we will rest

4  on that argument, Your Honor.

5          THE COURT:  Thank you.

6          MR. MORROW:  Thank you.

7          THE COURT:  To the objecting mechanics lien

8  holders who've signed stipulations, I would like to just

9  hear any argument you may have given the position that

10 Ms. Andrassy confirmed today regarding potential contesting

11 of the priority of those liens and whether that impacts

12 your position regarding the motion.

13         Ms. Lee DeVall.

14         MS. LEE DEVALL:  Yes, Your Honor.  Marguerite Lee

15 DeVall on behalf of J&E Texture, Inc.  So the stip -- as we

16 noted on Friday, we entered into the stipulation and we

17 included a wet signature copy for the Court's --

18         THE COURT:  I saw that.  Thank you.

19         MS. LEE DEVALL:  You're welcome.

20         And the stipulation is clear that we withdraw

21 opposition if the stipulation were complied with which

22 require our payment out of the proceeds on or before

23 April 30th.  We take a slight haircut on portion of secured

24 claim, as well as waiver of attorney's fees.  And so I --

25 that is what the stipulation is for.

Page                                                                72

1        With regard to Ms. Andrassy's comments, you know,

2   there's been a lot oof words thrown around over this

3   hearing and I've sat through all of it, which I would like

4   to note that my client, mechanics lien creditors at best

5   represent a total of one million dollars collectively here.

6   And just to give some figures, that is approximately .3389

7   percent of the total secured debt or in context of the sale

8   price that's 0.275 percent of the sale price.

9        So it's funny that the tiny little mechanics lien

10  creditors who built this property that's being sold to

11  generate the sale proceeds per the Hankey -- for Hankey and

12  Inferno and other creditors are being picked on.  Someone

13  mentioned some greed earlier on Friday and I think it's

14  interesting that in equities I do think those were some

15  interesting comments and an interesting position to be

16  taken by a secured creditor who did enter into a

17  subordination agreement with Hankey.  And I think

18  California law is pretty clear.  No one seems to dispute

19  the fact that construction had already commenced by the

20  time that Hankey recorded its lien and for that reason

21  that's why we have had the concessions on the debtor's side

22  and Hankey's side.  And Ms. Andrassy's client, Inferno,

23  agreed to be subordinate to Hankey.  And, you know, I cite

24  some case law in the front note of my brief onto this

25  point.  I think it's very instructive.

1          Mechanics liens are a constitutional right in

2   California and California courts have a very long history

3   of protecting the claims of mechanics lienholders and

4   they've liberally construed the laws.  And I -- you know, I

5   did my research.  I didn't find any case specifically -- a

6   published case on point, but I did find an unpublished case

7   and I did cite in my brief, it's *Santa Cruz Lumber v. Bank*

8   *of America*, 160 Cal. App. 3(d), 858 and it dealt with this

9   very situation.

10         And I think it's very important time to note some

11  of the comments made by the court there.  There they say

12  other courts have considered the expectations, knowledge

13  and intention of the parties to arrive at an equitable

14  solution that represents the benefits of each of their

15  bargain.  And at the end of the day the mechanics lien

16  creditors including my client didn't bargain to be -- to

17  build something and not get paid.  We don't bear the risk

18  of lending money at exorbitant interest rates to not be

19  paid.   Those were the risks borne by the secured lenders.

20  So for us to be picked on by Inferno is, you know, a little

21  jarring.  But ultimately at the end of the day the

22  California court held that when a secured creditor decides

23  to subordinate itself to the construction lender, the

24  mechanics lien takes first priority.

25         So I really don't think Ms. Andrassy's comments

1  with regards to Inferno's claims of having superiority -- a

2  priority really have any legal merit.  And for that reason

3  I think the stipulation can be approved and the mechanics

4  liens creditors can be paid.  And frankly, if they're

5  willing to put their money where their mouth is to take out

6  Hankey on the DIP loan, get rid of the mechanics lien

7  creditors.  We're not that much.  We just want to get paid

8  for the work that we did and not be carried along for the

9  risk that we did not agree to take upon.  And for that

10 reason, you know, we do support in the sense that we've

11 entered into the stipulation and if we get paid, then our

12 objection has been withdrawn, but if we don't get paid we

13 obviously reserve all rights and arguments presented in our

14 opposition.

15           THE COURT:  Thank you.

16           Mr. O'Dea.

17           MR. O'DEA:  Good afternoon, Your Honor.  I echo

18 the comments of Ms. DeVall, but I do want to put at least a

19 finer point on certain issues.  Ms. Andrassy raises a

20 general objection to the notion of mechanics liens being

21 paid and it's an argument of priority, but we don't have

22 the factual or legal predicate of her objection.

23           And again, I will refer the Court to doc number

24 192, page 5 at line 14 through page 6, line 8.  There it's

25 made clear that California law since 1925 has afforded

Page                                                                    75

1  mechanics liens priority.  Going forward to 2021, *Miller &*
2  *Starr Real Estate Manual,* the notion is that a mechanics
3  lien priority attaches when work commences and is
4  applicable to all mechanics lienholders, ergo, the work
5  started before Hankey's first priority deed was even
6  recorded.  Everyone else down (indiscernible).  And I think
7  the underlying rationale for that finding is that what
8  would be sold, what value is conferred but for the efforts
9  of those who build the property and that's where we sit
10  now.

11         And reading between the lines, I don't know it
12  was expressly stated but it sure seems that Hankey's
13  counsel has cheerleaded the notion that at the end of the
14  day the mechanics liens have priority over its own lien.
15  So I don't really know why we are looking down the chain
16  over a dispute that isn't substantiated legally or
17  factually to raise this issue.

18         So with that, unless Your Honor has any
19  questions, I have nothing further.

20         THE COURT:  Thank you.

21         Mister -- I realize that I left out Mr. Newman
22  when I said we would circle back to Mr. Golubchik.
23  Mr. Newman, I would like to hear from you and in particular
24  we did have some reference to 363(m).  I'd like you to
25  speak to that.

1          There have also been some suggestions, commentary

2     about some sort of stalking horse arrangements and if

3     there's any response to that I'd be interested in that as

4     well.

5          MR. NEWMAN:  Certainly, Your Honor.  So starting

6     with the 363(m) argument I think both the debtor's

7     declaration and our declaration make clear there's no

8     collusion.  This is entirely an arm's length transition

9     including my client's participation in the auction.  I hope

10    and I think Your Honor's question regarding the conduct of

11    the auction made clear and my testimony made clear that he

12    participated in the auction in good faith and made a bid

13    solely for the purpose of making the bid within the auction

14    rules, all of which I think are -- support the 363(f)

15    finding.

16         And welcome Your Honor's questions.  The only

17    discussion I heard in the objector's comment about 363(m)

18    came from Mr. Niami's counsel and it was a question about

19    this addendum.  And just so we're clear on what happened so

20    that Your Honor understands the process, we promptly filled

21    out the purchase agreement, signed the purchase agreement

22    and an addendum with some comments to it which were

23    approved over the prior weekend by debtor's counsel and

24    believed we had fully complied and we're sure we fully

25    complied with the requirement.  And in fact, my client

1    intended and never suggested to the contrary that he was

2    fully bound by a purchase agreement that we understood the

3    debtors to find acceptable.

4           The further the conversation that occurred over

5    the course of the subsequent week had not to do with

6    whether my client was bound to close, which we always

7    believed he was and the debtor has already believed he was,

8    but whether if there was any rent available to my client in

9    the event that the debtors intentionally failed to comply

10   with the bid procedures.  That was finally resolved with my

11   client, executed and delivered at the beginning of the

12   hearing an addendum exactly in a form approved by the bid

13   procedures.  And again, I don't think there was any

14   suggestion by the debtors or otherwise that my client was

15   not bound through the entire process of the week but simply

16   was seeking to hold the debtors to comply with the bid

17   procedures, which Your Honor had entered and which they had

18   assured my client that they would.

19          So I don't think there's any thing within that

20   factual underpinning that suggests that my client did

21   anything other than participate in good faith and

22   participate in connection with the bid procedures as set

23   out in the court to the best of his ability.  And I think

24   the suggestion to the contrary is simply an effort to cast

25   aspersion on the process, which I think has in no way been

1   impacted by anything related to this addendum and that I

2   think the debtors now have lodged a copy of the addendum

3   executed by both parties which is fully compliant with the

4   bid procedures and I don't think there's any suggestion

5   that anything about that issue -- certainly no evidence

6   that anything about that issue ever impacted the sale

7   process or was, frankly, intended to impact the sale

8   process.

9           I don't know if Your Honor has any other

10  questions about that or 363(m).  I honestly didn't hear

11  anything else in the argument.

12          THE COURT:  I don't have any other questions.

13          MR. NEWMAN:  Thank you, Your Honor.  So talking

14  about the stalking horse question and I guess what I would

15  say is this.  My client's point starting from the hearing

16  we requested in front of Your Honor shortly after -- a week

17  on Friday was, is this sale process going to be respected

18  in the market and is the sale process set out by the

19  Court's order and by the debtor's motion going to be

20  respected in the market.  And it clearly was not a pre-

21  shock to try to identify a stalking horse.  It was never

22  suggested that that's what my client was being asked to

23  participate in.  It was never suggested to any other party

24  to my knowledge that that was what they were asking bidders

25  to participate in.

1          And I think what you were told, Your Honor, by

2   Mr. Roffers at the bid procedures hearing was that what was

3   important was to give parties the impression that the

4   property was going to be sold.  That was the purest way to

5   drive value, I believe was the testimony on Friday, and I

6   think that was what these bid procedures were intended to

7   do and I think that is what, in fact, my client believes

8   what he read and understood the bid procedures.

9          And in fact, as I argued a week ago Friday, these

10  bid procedures were particular the point that this auction

11  was the process through which the bidder and buyer was

12  going to be identified.  And in fact, the debtors agreed

13  and the auction house represented that the highest bidder

14  at the auction would be the bidder and would be -- I'm

15  sorry, the high bidder would be the buyer presented at the

16  auction and that's, in fact, what occurred.  So our concern

17  perhaps is unfounded, but it seems like the debtors have

18  proceeded in good faith.

19         Now, I will note Mr. Perkins probably went above

20  and beyond what my client would have been comfortable with

21  and said that he did continue to interrogate, engage with

22  other potentially interested parties over the past week

23  and, as he said at testimony on Friday whenever he asked

24  for some proof of funds or other certainties that those

25  buyers -- potential buyers were damaged.

1          So what we have here today with respect to the

2    question of whether there was adequate marketing and an

3    appropriately conducted auction process was frankly a lot

4    of argument by lawyers and that's what I'm doing, so I

5    acknowledge it's something we're good at, but not a lot of

6    effort.  We've had arguments by lawyers but not what I

7    would refer to as evidence presented by bidders or

8    potential bidders indicating that any of the concerns or

9    questions raised by either the junior secured lenders or

10   Mr. Rafatjoo's client or frankly anyone that there is a

11   bidder.  Not one bidder out there in the world who says

12   that any of these items have precluded them from taking the

13   opportunity to present a higher or better offer.  And, in

14   fact, as has been discussed in this hearing, the next

15   highest bid that was received at the auction was 100

16   million dollars, 25 million dollars less than my client's

17   bid.  And after adding the broker's premium even more less

18   than my client.

19          So I think, Your Honor, there's no evidence in

20   the record guessing that any of the alleged defects or

21   hypothetical concerns that have been expressed by any of

22   the parties actually impacted any bidder's position to

23   present an offer and they've had, you know, more than two

24   weeks since the auction was conducted in order to find one

25   bidder who would be out there.

Page                                                                    81

1              In fact, I'll also add in terms of value, and I

2    understand everyone's frustrated, that people hoped and

3    thought that the price would be higher.  In fact,

4    Mr. Roffers testified that this is, in fact, not uncommon

5    with properties listed by this particular builder, that the

6    list price or the initially identified price is often as

7    much as 48 percent less similar to the results here than

8    what is ultimately when the properties ultimately convey.

9    And I think the truth of the matter is there are lots of

10   reasons why a price that might deal with price or an

11   aberrational price or a hoped-for price doesn't

12   materialize.  And in this case I think we've articulated

13   many of them, and Mr. Roffers testified head winds that

14   were known, but the magnitude of which were not known and

15   there's not one piece of evidence that's been adduced by

16   anybody that any of the head winds or challenges were

17   somehow misapp -- misapprehended or misunderstood and,

18   therefore, there's someone out there in the world who

19   believed that notwithstanding all of these other issues

20   that they are ready, willing and able to anywhere near

21   ready, willing and able to bid more than what my client has

22   bid as of today.

23             I note that the question of the -- what's been

24   referred to as the gross inadequacy of the price was pretty

25   fully discussed I think by the brokers in the testimony on

Page                                                                            82

1   Friday.  I think Ms. Williams did -- crystalized the issue

2   when she said, you know, although she was competitive and

3   wanted to try to brief the previous record and did

4   everything in her power to do so to get the aspirational

5   purchase price that she supervised a process that was fair

6   and that, you know, when asked whether or not she through

7   that process, the optimum price of the property, she said

8   that despite her hope to do better that she did and

9   similarly Mr. Roffers said that we don't know -- in fact,

10  there has been much made in this hearing by both sides this

11  is a unique one-of-a-kind property.

12          And what Mr. Roffers said rings true.  You don't

13  know what properties like this are worth until the market

14  speaks, until bidders appear and actually engage in bidding

15  and there was an active competitive auction in which

16  several parties appeared, made their bids, and that is the

17  surest and best evidence of what the property is worth in

18  its present condition.  And its present condition has all

19  kinds of issues, which you've heard and which have been

20  discussed, you know, sort of summed up by the idea of a

21  certificate of occupancy.  No one has told anyone, did not

22  receive assurance that this property can be habited and

23  there's no question -- there's no evidence today in front

24  of you as to how much that will be, but obviously the

25  market has spoken.  There are very, very sophisticated real

1   estate parties right here in Los Angeles with lots of

2   money, who knew every -- all about this property.  It's

3   been in the paper every day.

4          So where someone who really knew the real estate

5   market who thought that by putting in a higher bid and

6   putting in additional money and effort in the length of

7   time it would take them to achieve occupancy in this

8   property could do better, you would have heard from them

9   already, Your Honor.  Certainly the creditors are

10  incentivized to try to identify those people and provide

11  evidence from them and they have not.

12         I would say your problem here is under any

13  circumstance you could put whatever new procedure in place

14  that the parties want and conduct another process.  And

15  there's no guarantee that at the end of that process you

16  won't have the same complaints a higher price is not

17  achieved.  And, in fact, you know, I would indicate what

18  Ms. Williams said is the only evidence before Your Honor

19  which is that if this goes back to market in what she

20  referred to as a "failed escrow," you're likely to get less

21  money.

22         And certainly there are many parties here,

23  mechanics lien claimants, unsecured creditors who may

24  benefit from the purchase price carveout, the broker's

25  premium rebate and others, who are not coming before Your

1   Honor today to try and undo the sale.  They recognize that

2   getting paid now out of cash that's generated now through a

3   sale process that has been conducted fairly without

4   collusion and without any interference by other parties and

5   in accordance with this Court's rule is the best option to

6   get people paid now.  Certainly Mr. Hankey, but also other

7   parties owed less money, a million dollars to, you know,

8   what I'd refer to as mom-and-pop creditors who are owed

9   mechanics liens and want to be paid sooner rather than

10  later, as opposed to the two junior creditors who are in a

11  position to try to leverage the process for more money.

12          I would say, Your Honor, that the question about

13  the square footage which Mr. Shinderman raised is addressed

14  I think pretty squarely by Mr. Roffers' comment that you

15  don't know what properties like this are worth until the

16  market speaks.  And the thing to remember is every process

17  is different.  Every process is the best judgment

18  available.  And one thing you haven't heard from any of the

19  objecting parties is any evidence from any competing

20  expert, any other broker or auctioneer or other party that

21  would come forward and say there was something specific in

22  this auction that negatively impacted that.  You had a lot

23  of questions and you heard a lot of testimony on Friday

24  that I think answered those questions and you should be

25  giving more weight I believe, Your Honor, to the answers

1   being given by witnesses under oath with expertise than the

2   insinuations of the lawyers asking questions that don't

3   have that behind them.

4           For example, the issue for buyers, there's no

5   question that some brokers tried to solicit interest in

6   foreign buyers, but there's also no question that there's

7   no evidence that those buyers are likely to materialize in

8   the event that the failed auction goes back to the market.

9           Certainly it was clear -- now I'm going a little

10  bit, I apologize, out of order, but just taking some notes

11  on comments that were made, question about whether or not

12  this should be subject to court approval.  That was

13  certainly understood, but that should not be used, Your

14  Honor, by the creditors now to try to involuntary convert

15  my client into some sort of stalking horse or suggest now

16  that the auction is concluded we know what the market has

17  to be.  That, Your Honor, is, in my mind, highly unlikely

18  to incentivize other sophisticated parties who want to

19  participate in this process.  Certainly my client would

20  testify that had he known that he was not bidding to be the

21  high bidder but somehow bidding to be a bidder, he would

22  not have submitted the did he submitted, would not be

23  looking at a bid 26 million dollars higher than the next

24  highest bidder.

25          And I think, Your Honor, the counter proposal, if

1   you will, of the junior creditors to submit a DIP proposal

2   kind of demonstrate that, in fact, even they are

3   (indiscernible).  They haven't offered additional money to

4   sit behind Mr. Hankey's debt.  They've only offered

5   additional money if they get the benefit of priority that

6   those last dollars will come out first.  They are not, in

7   fact, with their own money voting for a proposal that would

8   recognize more money than what I had -- what my client has

9   bid, but rather seeking to extend the process.

10          You heard much about the minimum bid.  Again,

11  there's no evidence, there's no party providing any expert

12  testimony that such a minimum bid would have changed the

13  result.  In fact, it was just the contrary from Mr. Roffers

14  and Ms. Williams that a minimum bid in this case under the

15  fact and particularly a minimum bid that would have been

16  artificially set pay all the secured debt would not have

17  enhanced (phonetic).

18          I'm harking back to a conversation I had with a

19  friend of mine when I was younger, who was trying to sell

20  his house and I asked, "Well, what price do you plan to

21  set?" and he said, "Well, I owe the bank $100,000.  I have

22  a $10,000 credit card bill and I have $10,000 left on my

23  student loan, so I'd kind of like to set it at $140,000."

24  Needless to say, Your Honor, he didn't get the $140,000 and

25  the market was the surest way to determine what he was

Page                                                                87

1  going to get for that house, not what he owed the various

2  parties.

3           I'll note one of the things on the profit.

4  There's been much made right now about how there should

5  have been an extension.  Someone should have said there

6  should have been an extension.  I'll note no motion was

7  brought, Your Honor.  No emergency motion.  We certainly

8  know how to bring an emergency motion.  None of the

9  creditors complaining here today filed papers, asked Your

10 Honor to reconsider her earlier order.

11          And, in fact, Your Honor, one could say in

12 looking at the matter with a jaundiced eye that perhaps

13 they were interested to see how the auction turned out so

14 that they could involuntarily convert the winner of that

15 auction into a stalking horse, as opposed to the winning

16 bidder.  I think had these concerns cause as much concern

17 as -- then as they appear to now would have been prudent

18 for the market, for the marketing process, for the

19 infallibility of judicial process in this Court's order to

20 have raised that issue before parties, including my client,

21 spent three days participating in an ongoing auction.  And

22 frankly, although -- and Your Honor recognized that these

23 issues were raised with respect to minimum bid at the time,

24 the evidence was heard and decision was made and the market

25 relied on it and people participated.  And if we change the

Page                                                                          88

1  rules only after we're disappointed in the results it's

2  hard for parties, my client and others, to have any

3  confidence that they are not going to waste their time by

4  participating in a judicial sale, such as this one.

5          Your Honor, I would like to cover just a couple

6  of things and, again, not to reiterate what's been said by

7  the parties and not to reiterate what we said in our papers

8  on the 363(f) issue, but I would like to make a couple of

9  notes on this conversation.  I think the mechanics lien

10 claimants as indicated have consented.  And in addition, to

11 the extent they are not being paid ahead of Mr. Hankey as

12 there's been some suggestion they may not, their rights

13 fall also under then the 363(f)(5) and (f)(1) analysis that

14 if they're junior to Mr. Hankey's lien, then they are

15 subject to being sold free of either through a foreclosure

16 action or a receivership action.

17         THE COURT:  Are you referring now to the DIP

18 lien, the receivership certificate or the first priority --

19 the prepetition loan or all of them?

20         MR. NEWMAN:  Well, as Mister -- all -- I would

21 say not all them, right.  As Mr. Golubchik indicated, there

22 is a -- the 363(f) test is in the injunctive.  So if

23 there's any basis upon which to sell free and clear, that

24 should be sufficient for Your Honor to order free and

25 clear.  There's no contention, I don't believe, that the

1   mechanics lien claimants are senior to the DIP loan.  So

2   were the DIP loan foreclosed, it would be possible under

3   applicable non-bankruptcy law to compel a monetary

4   satisfaction (indiscernible) or under 363(f)(1) to sell

5   free and clear of their interests in a judicial

6   foreclosure.

7          And I guess I would note -- this is the thing

8   that occurred to me as I heard the discussion, which is

9   Your Honor can rightly be concerned about *Clear Channel* and

10  what it means and is it precedential given the fact that

11  it's a BAP decision, therefore not binding on this court.

12  And certainly harkening back to my comments on Friday that

13  maybe it's just wrong.  Certainly all other circuits have

14  taken the view that it's just wrong.

15         But even without looking at that broader

16  question, all Your Honor is really being asked to determine

17  is whether in this case as applied it -- 363(f) provides

18  justification for selling free and clear.  And I think,

19  Your Honor, as you heard from Mr. Golubchik and I'll just

20  reiterate, under 363(f)(2) there are disputes about the --

21  I'm sorry, there's a consent of certain parties and we've

22  gone through the list.

23         Again, I believe just reading Mister -- the Yogi

24  and Inferno papers they've impliedly or expressly consented

25  to sell free and clear because they didn't argue 363(f) in

Page                                                                      90

1   their written papers and any arguments not made in the

2   written papers are waived.

3           But regardless of whether that's the issue, I

4   think 363(f)(1) as applied would permit under the

5   receivership order in this case to sell free and clear of

6   any of these interests.  363(f)(5) in the foreclosure of

7   the DIP lien, which is senior to all of these interests,

8   would permit under applicable non-bankruptcy law.  The

9   loans -- the liens to be sold free of or converted to

10  monetary judgment and I think Your Honor raised the

11  question, what about the fact that we know or we think in

12  this case that the amount is zero and I think the answer to

13  that question is two-fold.

14          One, is it doesn't say in 363(f)(5) that it has

15  to receive a monetary judgment.  It's just whether the

16  presentation, in this case being junior to a senior

17  perfected lien that's entitled to foreclose, would allow

18  those liens to receive the monetary judgment or be sold

19  free and clear of under 363(f)(1).  Again, the receivership

20  order in this case would allow that to occur and I think

21  that applies in equal force to all of the liens in the debt

22  stack since there is in this case a senior DIP loan that by

23  judicial order is senior to all the other liens.

24          I'll just note briefly I think that Your Honor

25  should in closing kind of remember that there is benefit to

1  many parties in this transaction as there are in most

2  bankruptcy sales and that the reason that 363(f) gives so

3  many alternatives to sell free and clear of junior liens

4  and other liens in interests is that what bankruptcy does

5  is it converts interest to dollars.  It doesn't try to

6  maintain a cloud on title of property with the asset of the

7  debtor and allows the debtor to transact those assets,

8  gather the most money and distribute it *pro rata* to parties

9  based on their respective interests.  And that respects the

10 interest of the mechanics lien claimants in this instance

11 and respect the interests of creditors who will have the

12 opportunity to assert interest in the broker's premium and,

13 in this case, allow parties to let the property become

14 disentangled from this whole process and move on for its

15 best use.  And I think the key issue really I hope Your

16 Honor focuses on is that this auction was conducted by

17 people with expertise. They were fully cognizant of many

18 issues that have been asserted today and they did their

19 best to try to achieve in actual value.  My client relied

20 on their efforts, participated in good faith in the auction

21 and is now offering what we believe to be a fair price in

22 light of all the circumstances and the highest price

23 available in the market.

24          And we hope Your Honor approves the sale free and

25 clear of all the liens in interest and find my client to be

1   a good faith purchaser within the meaning of 363(f).

2   Unless Your Honor has any questions that was all I wanted

3   to cover.

4          THE COURT:  Would you support waiver of the 14-

5   day stay that would otherwise be applicable under Federal

6   Rules of Bankruptcy Procedure?

7          MR. NEWMAN:  We would, Your Honor.  We would like

8   the stay to be waived and we'd like to be able to proceed

9   as rapidly as possible upon entry of an acceptable order by

10  the Court.

11         THE COURT:  Thank you.

12         Mr. Golubchik, I want to --

13         MR. NEWMAN:  Thank you, Your Honor.

14         THE COURT:  Thank you.

15         Mr. Golubchik, I want to turn to respond to

16  anything you think would be necessary.  I think that the

17  framework you gave in your introductory comments today

18  focusing first on 363(b) and then on (f) is probably the

19  structure that makes the most sense here again.

20         MR. GOLUBCHIK:  That's fine, Your Honor.  And I

21  will address some of the commentary.  Let's start with

22  Mr. Shinderman's commentary as to the credibility of

23  Ms. Williams.

24         Well, it'd be great, Mr. Shinderman, if you have

25  a copy of the transcript, you were referring to the

1  testimony, if we could put it on screen share to discuss

2  her testimony.

3            (No response.)

4            Silence.  Okay.  So --

5            MR. SHINDERMAN:  Excuse me.  No, I don't have a

6  copy, but I took copious notes, Mr. Golubchik.

7            MR. GOLUBCHIK:  Okay.

8            MR. SHINDERMAN:  And she said we didn't look at

9  foreign buyers, but clearly other people did.

10           MR. GOLUBCHIK:  Okay.  Let's proceed.

11           Your Honor, Mr. Shinderman referred to

12  Ms. Williams' testimony as not being credible for numerous

13  reasons.  One is he said she testified that the price of a

14  house in that area is $2500 a square foot and here $1200 a

15  square foot.  And if you consider the C of O issue, that's

16  impossible.  She actually stated that a completed house

17  with a C of O based on comparables is in the range of 2500

18  and to help Mr. Shinderman's position I think she said 2500

19  to 3500 per square foot based on comparables.  This house

20  has no comparables.  People that are in real estate are

21  aware that generally when you have a per square foot price

22  the larger something is the lower the per square foot

23  price, but that's not even the issue.

24           The issue is, does anybody, including

25  Mr. Shinderman, know what needs to go into to obtain a

1  certificate of occupancy and I'll tell you no.  There are a

2  lot of unresolved issues.  And it's not simply a

3  certificate of occupancy.  My father is a contractor.  He'd

4  buy houses, fixer uppers, fix them up and sell.  Like you

5  could move into this house.  With this house it is a fixer.

6  There's things need to be done, but you can't even move

7  into the house.  And there's no indication of when you'd be

8  able to move into the house.  The broker opined as to the

9  value based on the broker's expertise.  And to say that the

10 number is substantially lower so it's not credible and I

11 think such a statement is not credible.

12         Mr. Shinderman said that Ms. Williams' testimony

13 that ten million dollars was spent on marketing is not

14 credible because even at 200 million dollars, they wouldn't

15 make enough money to cover that.  Well, Ms. Williams didn't

16 say it would cost ten million dollars.  She said the

17 marketing efforts were so vast and so thorough that had

18 there been a value it would have cost had they had to pay a

19 third party.  It would cost ten million dollars.

20         We all know.  We have declarations attached to

21 the motion and that goes to Mr. Rafatjoo's comments about

22 insufficient evidence of marketing of everywhere there was

23 publication all of the efforts done, Ms. Williams testified

24 that his store -- and the recent history, the majority of

25 high-priced sales in around Beverly Hills, Bel Aire, were

1  American individuals.  I think we know from the news the

2  crypto current where all this has been responsible for

3  making a lot of wealthy individuals.

4         But she is not the one broker.  That is exactly

5  why we have a team.  Aaron Kirman testified he went to

6  Europe.  He met with four people.  Not as Mr. Rafatjoo

7  stated that he only talked to four overseas individuals.

8  This is meetings.  People talk by phone, by email, you

9  know, Signal, WhatsApp, but he went over there.

10        The point is the goal here was to have a team.

11 We had the Williams doing what they do best around here.

12 Aaron Kirman traveled and we had Concierge with their

13 online expertise.  So to say based on this she's not

14 credible, that doesn't even make sense.

15        There's a discussion by Mr. Shinderman that

16 Mr. Roffers finally admitted that there was a minimum price

17 on a related property nearby and I think a few people at

18 this hearing are also involved in the bankruptcy case.  I

19 think he has claimed why he didn't answer directly and the

20 reason is there's no employment order.  There are no terms.

21 I think the suggestion is to have a 50 million-dollar

22 reserve, but until there's an order there's nothing set.

23        But this point is, again, has been -- and that's

24 Ms. Williams.  When you can compare properties and you have

25 similar comps it's easier to formulate the strategy.  Here

1  that was not a case.  Here you have a very unusual property

2  and the message for Mr. Roffers was that we all need to

3  know the property will be sold at the end of the auction.

4  No lookee-loos sitting around.

5        Now, Mr. Shinderman properly said that as a

6  result there was as 50  million-dollar offer which sat

7  there for two -- or he might have said two-and-a-half days.

8  Absolutely accurate.  Mr. Roffers explained and

9  Ms. Williams yesterday said because she doesn't have

10  experience with the online auction she learned that the

11  first -- until the very end it's going to be dead.  There's

12  going to be a low number and at the end that's when action

13  is going to happen consistent with what Mr. Roffers told

14  us.  Everything happened exactly.  The only difference is

15  the numbers did not go up.

16        Again, there's no evidence, there's no testimony

17  that there was any issue with the marketing.  Mr. Rafatjoo

18  made a great presentation about the war except he dresses

19  really well, but I don't know how much insight he has into

20  the ultra-rich and what their plans are, whether holiday or

21  ready to bid.

22        Had we had evidence or maybe even one of the

23  people that was interested to provided some testimony, we

24  have nothing to balance the testimony of the debtor's side

25  to say that something is different.

Page                                                                    97

1          There -- a lot has been said of Mr. Roffers'

2   discussion with Ms. Niami earlier about 265 million-dollar

3   sale price, but it seems the parties are ignoring his

4   testimony that he didn't appreciate the scope of the C of O

5   issue that happened and how much work may need to be done.

6   At the time brokers need -- of course, brokers want --

7   everyone wants to get employment.  He learned afterwards,

8   but remember, it wasn't Ms. Niami that employed him.  It

9   was Mr. Perkins on behalf of the debtor employed him and he

10  employed not because someone says, I'm going to sell

11  something for a certain price.  But Concierge has a

12  reputation, came across after interviews as a top online

13  auction house, that deal saying international real estate.

14  Same thing with the Williams and Mr. Kirman.

15          I couldn't follow Mr. Rafatjoo saying that they

16  didn't come to the property until the very end.  They've

17  been to the property many times.  I've seen them at the

18  property several times, so I have no idea where there was

19  testimony that they were not on the property until just

20  before the auction.  They've been to the property many

21  times.  They're well aware of the property.

22          Then we have Yogi and Inferno.  I'm going to talk

23  about (f) issues later.  But initially Ms. Andrassy said,

24  "Your Honor, Yogi and Inferno are willing to put their

25  money where their mouth is.  We're willing to step into

Page                                                                    98

1   Hankey issues and have a first super priority lien." There

2   are several problems with that.  One is we need Hankey to

3   consent to be paid out.  Another problem is adequate

4   protection because now this auction seems to have an

5   indication of the value of the property.  Don't know if we

6   can provide adequate protection to get a new loan in first

7   position.

8            And then what happens if there is no sale later

9   on?  When does Yogi and Inferno then get to foreclose on

10  the property?  They are not putting their money where their

11  mouth is.  If I can have a piece of it, I would love to be

12  in first position of that property and take a return, as

13  I'm sure many other people, but this is not a risk.  It's a

14  sure thing loan.

15           If they really want to put their money where

16  their mouth is, they can guarantee to the estate 141

17  million dollars and if the property doesn't sell in a month

18  or two months, they buy it for that price.  That's putting

19  your money where your mouth is.  And we know that the buyer

20  doesn't want to stick around.  I have no idea whether

21  they'll change their mind, but right now the buyer is not

22  going to sit and be a stalking horse bidder.

23           It appears instead that Yogi and Inferno, as

24  often happens, basically trying to rail on Hankey as the

25  first lienholder.  Yogi and Inferno have personal

1  relationships with Mr. Niami.  They're buddies.  They've

2  invested in lots of properties.  That's why their liens

3  refer to numerous properties, had numerous deals.

4  Unfortunately based on their current circumstances this was

5  not a good deal for them.

6         Now, while Mr. Geher is properly sitting quite,

7  our view, as we express in our motion, is Hankey's 106

8  million-dollar principal loan, 23 or 23 and a half of that

9  is likely in fourth position.

10         So while Yogi asserts approximately 20 million,

11  Hankey asserts approximately 20 million -- I'm sorry, Yogi

12  and Inferno each approximately 20 million, Hankey is 23

13  million based on the waterfall Hankey additional money is

14  going to be out of the money.

15         So it seems over here, though, rather than

16  suggesting a reasonable solution, they're not doing

17  anything other than trying to get a beneficial return by

18  stepping in Hankey's shoes, which doesn't resolve anything.

19  Now, this weekend I was hoping would be used to work

20  something out and really it's the buyer and presumably Yogi

21  and Inferno.  That hasn't happened, but we have no choice.

22  We have to deal with this situation that we're facing.

23         We have Hankey who provided initial loan didn't

24  provide any representations or warranties, didn't do --

25  provide a valuation.  Their loan is split up, 82 and a

Page                                                                    100

1  half, 23 and a half.  Yogi has a disputed claim.  Now, when

2  there's a discussion when Mr. Shinderman stated that we

3  didn't assert an objection, I'm looking at our motion and

4  the chart on page 14 to 15, which discusses that the loan

5  also went to certain other properties including Hillcrest,

6  Londonberry, Bellagio, Carcason (phonetic), Stone Ridge

7  properties.  This is something to be investigated later,

8  but this is some -- and plus, there's a profit

9  participation.  Not a regular lender/borrower relationship.

10        Then we have Inferno.  Inferno says they're only

11 objecting based on that Exhibit 6, the subordination and

12 nothing else.  I looked at the same chart on page 12 and

13 there's discussion of two other properties, Mapleton and

14 Hillcrest, for which loans were made at various times.  We

15 have asserted objections -- not objections, but assertions

16 of *bona fide* dispute.  And importantly, while they argue it

17 on Friday and today, their pleadings did not assert any

18 responses to either one.

19        THE COURT:  Would you turn to a couple of things?

20        MR. GOLUBCHIK:  Sure.

21        THE COURT:  First, the proposed payments to be

22 made at closing.  Where is the debtor in that?  I just want

23 to -- I want to make sure I have that clear because we've

24 had a lot of discussions of who gets paid first and when.

25 So what is -- and even in the motion -- or actually in the

Page                                                                101

1   reply I guess the debtor had two scenarios.

2           MR. GOLUBCHIK:  I can tell you that a standing

3   desk does not have much room to work on.

4           MR. SHINDERMAN:  Your Honor, while Mr. Golubchik

5   looks for that I just have to quote from their pleading

6   that says the debtor believes that there "may be basis to

7   object."  That's on page 44.  Mr. Golubchik also knows we

8   give him information.  Fortunately, we requested more

9   follow-up.  The proffered participation doesn't appear in

10  any of our documents, so may one day object is not a

11  dispute.  Anyway, thank you, Your Honor.

12          THE COURT:  Okay.  Thank you.

13          MR. GOLUBCHIK:  Page 3 of the reply.

14          THE COURT:  Okay.  So let's walk through the

15  proposed payments then.  What would you ask the Court to

16  approve?

17          MR. GOLUBCHIK:  All right.  Let's go in order.

18  We would ask the Court -- the brokers did their job, Your

19  Honor.  The deal was -- if the property is marketed, the

20  brokers -- and there's actually a provision, less than 175

21  million they get one percent.  But this specific

22  possibility is provided for in the broker employment

23  agreement, so they're entitled to the money, so they

24  should -- there should be the commission.

25          THE COURT:  Okay.

Page                                                                        102

1          MR. GOLUBCHIK:  Buyer's broker did his or her job

2    and the seller's.  So we would like to be able to pay out

3    the two mechanic liens objections because we've looked at

4    them.  If the court says no, then they'll be -- the liens

5    will attach to the proceeds with the same extent and

6    priority and we'll have to deal with it.

7          We would like next to pay the Hankey DIP loan.

8    We would like to pay -- let's skip over the 82.5 Hankey for

9    now if we're on the same chart.  We'd like to pay the

10   receiver certificate loan which was ordered in the

11   receivership estate as priority.  We'd like to pay the

12   property taxes and closing costs.

13         THE COURT:  Okay.

14         MR. GOLUBCHIK:  We would like to pay the

15   principal amount of the Hankey 82.5 so interest doesn't

16   accrue because interest on such a large amount is a lot --

17   larger amount.

18         THE COURT:  Now, this is probably a question for

19   Mr. Geher because on Friday Mr. Geher did say a couple of

20   times, "We don't need to be paid our 82.5." I wanted to

21   hear the position there.

22         MR. GEHER:  Your Honor, if payment of the 82.5 is

23   the sole reason you would say, I can't approve the sale, we

24   don't need to be paid the 82.5.  That is our position.  We

25   don't -- so we're fine not being paid 82.5 because I don't

Page                                                                       103

1   want Mr. Shinderman and Ms. Andrassy something untoward is

2   happening.  Nothing untoward is happening.  We'll take it

3   later because we know we're going to get it based on the

4   facts, not people's speculations.

5          So we have no problem leaving 82.5 million

6   dollars in the pot, as I said on Friday, so that everyone,

7   certain creditors can still fantasize about whens and ifs

8   and when reality hits, reality hits and what -- and the

9   money goes where it's supposed to go.  So we are -- we are

10  satisfied.  I know the debtor wants to pay us because of

11  the interest accrual issue and I understand, appreciate and

12  respect that.

13         But because Hankey's position is this sale should

14  be approved, I'm not here to throw a hurdle or a roadblock

15  to having what we believe is this sale being approved

16  because it's the best we're going to get and getting true

17  value for the property.

18         MR. GOLUBCHIK:  Your Honor, there is a twist

19  here, which I think is important.  If the Court is inclined

20  to approve and we're talking about distribution, I have a

21  feeling that Yogi and Inferno may agree that the 82.5

22  should be paid.  I think the interest rate right now is 16

23  percent per annum.  That is a very nice return and I don't

24  want to pay that return to Mr. Geher's client.  I would

25  rather pay the money out, so that's the question to you.

Page                                                                       104

1          MR. GEHER:  Sixteen is the default rate of

2    interest, Your Honor, which I believe originally 11 as a

3    result of the defaults where, like every other normal

4    commercial loan had a default interest rate.

5          THE COURT:  I believe you've indicated on Friday,

6    Mr. Geher, that that works out to about $46,000 a day?

7          MR. GEHER:  It was -- that number of -- I'm

8    looking because I've -- yes, 46,845.  That interest amount,

9    Your Honor, is on the entirety of our whole principal

10   amount --

11         THE COURT:  Okay.

12         MR. GEHER:  -- which is over 100 million dollars.

13         THE COURT:  Okay.

14         MR. GEHER:  So it -- the interest on the 82 is

15   obviously a large chunk of the 46 but not the entirety of

16   the 46.

17         THE COURT:  Okay.  Thank you.

18         MR. GOLUBCHIK:  Sixteen percent is $13,200,000

19   per year, 1.1 per month, 36,666 per day.

20         MR. SHINDERMAN:  Your Honor, if you are going to

21   put on the motion I think Mr. Golubchik is right that

22   Yogi -- and Ms. Andrassy could speak for Inferno -- we'd

23   have it paid without prejudice to disgorgement claw-back,

24   et cetera.  It's not prejudiced.  It's not final, but we'd

25   like to save the default interest as well.

1          THE COURT:  Okay.  Thank you.  I just want to

2     make sure I have all my opening questions covered here as

3     we get to the end of all of your presentations and I know

4     you've all spent a long time on seeing the last couple of

5     days.

6          The one thing, Mr. Golubchik, that you and I

7     talked about coming back to was also 363(f)(5) in

8     particular and, you know, we've heard from a lot of people

9     on (f)(5) and I wanted to give you an opportunity to

10    address whatever you'd like to address there.

11         MR. GOLUBCHIK:  Sure, Your Honor.  That's -- I'd

12    like to comment about other people.  While Mr. Geher is

13    very animated in his presentations, he's also very astute

14    when it brought up I skipped over (f)(1), which provides

15    that applicable non-bankruptcy law permits sale of such

16    property free and clear of such interest without reference

17    to a money judgment.

18         We have the receivership proceeding which

19    specifically provides for a sale.  So even if you were to

20    ignore the consents, which we don't think you should, *bona*

21    *fide* dispute money judgment about (5) on your (f)(1) based

22    on the proceeding before the receivership court, a sale

23    free and clear is appropriate and we attach a copy of the

24    order to the reply which clearly states that the property

25    can be sold free and clear of liens and everything attaches

Page                                                                        106

1   to the sale proceeds.

2            And again, we've proposed several different

3   options disjunctive.  Only one needs to apply for this to

4   work and we think it does.

5            The main thing, Your Honor, the other thing -- I

6   wanted to say two things -- one is the discussion from

7   Mr. Shinderman and Mr. Horoupian and Ms. Andrassy

8   discussing the war and things should have happened, we

9   should have delayed it.  They're all competent attorneys.

10  They could have filed something with the Court.  Mr. Newman

11  wasn't happy with us not agreeing to his provision for

12  reservation of rights and he files something.  Any of them

13  could have done something, but they did not.

14           The issue is -- and if you recall at our -- on

15  Friday during questioning of both Mr. Roffers and

16  Ms. Williams, Mr. Newman and I focused on the term "optimal

17  value" for the sale of the price -- of the property.  The

18  reason is as stated in our brief reference to the *Lahijani*

19  case, 325 B.R. 282 (9th Cir. BAP, 2005), which was cited by

20  *Golden Empires*, a Ninth Circuit from 2007 where the court

21  stated:

22           "A sale that is well advertised and subject to

23       overbids is usually the preferred method to achieve

24       the best possible price.  However, the guiding

25       principal is that the court obligations, Section

1        363(b) sales, is to assure that optimal value is

2        realized by the estate under the circumstances.  Based

3        on the current circumstances we have testimony from

4        the brokers and the auctioneer that optimal value was

5        realized."

6            It's that circumstances may not be great

7    circumstances, but for 363(b) we have to operate within the

8    circumstances we've given.  None of the objecting creditors

9    filed any motion with the Court or any request to do

10   anything different than what we did.

11           And then the final thing I wanted, Your Honor,

12   just so the record is clear, we have that individual and

13   Mr. Smith specially appearing discussing an offer for 500

14   million.  Just so the record is clear, I have not seen that

15   offer, but to the extent there's any reference to the

16   offer, we'd ask the Court not to accept it.  And if the

17   Court is going to proceed with the sale, proceed with Mr.

18   Newman's client.

19           THE COURT:  Thank you.

20           I want to thank everyone for their really

21   excellent work and exceptional patience.  It is 2:24.  I

22   have told you that there is going to be a ruling today.  I

23   need a 15-minute break.  I guess everyone could use a 15-

24   minute break and then we'll resume for a ruling.  We're

25   going to stop recording.  I'd encourage you to mute your

Page                                                                        108

1  own line and stop your video if you're on.  We will resume

2  just about at 2:40, okay?

3              ATTORNEYS:  Thank you, Your Honor.

4              (Off the record at 2:25 p.m.  Back on the record

5  at 3:01 p.m.)

6              THE CLERK:  Please come to order.  This court is

7  again in session.

8              THE COURT:  Thank you very much.  And thank you,

9  everyone, for all of your patience.  Oh, give me one moment

10 here.  Let me mute everyone's lines so we don't have any

11 feedback.  Okay.  Thank you for waiting.  I apologize that

12 my 15-minute estimate was a bit off.

13             So it occurred to me on Friday that that date was

14 the 12-year anniversary of the day that I was sworn in as a

15 bankruptcy judge.  And I first thought, well, what better

16 way to celebrate and to have a really fascinating hearing

17 with excellent lawyering all around on a really interesting

18 case.

19             And as I've been thinking about this motion I was

20 brought back to a question that I was asked in my Ninth

21 Circuit interview by Judge William Fletcher, a wonderful

22 judge, who asked me what did I think was a successful

23 bankruptcy case.  You know, that is -- that's a loaded

24 question and I remember at the time answering that I

25 thought that a successful case in the context of Chapter

Page                                                                      109

1  11, which is what I practiced as an attorney, you know,

2  early in my practice it was, you know, a confirmation of a

3  plan of reorganization.  That's what most people think of

4  when they go into Chapter 11 practice, but that over the

5  years I had seen that a lot of successful cases end up in

6  sales of properties and even though, you know, maybe that's

7  not what you typically think of as a reorganization that

8  could be viewed as a successful case.

9          And then in the consumer context you think of,

10 well, what's a successful Chapter 13 case.  Well, I guess

11 it's a case where a plan is completed or someone

12 accomplishes the goals of the plan, but it's not

13 necessarily the case where all creditors get paid or where

14 in Chapter 13 where any creditors get paid.  And I think

15 that what is so difficult about a case like this one is

16 that this proposed sale doesn't feel like a success to

17 anyone.  Well, maybe to the proposed buyer, but other than

18 that, I don't think it feels like a success to anyone.

19         But that's not the legal standard under Section

20 363 and I think that under Section 363 the case law and the

21 statute have to approve this sale.  So I'm going to walk

22 through the law and how I think it applies to the facts

23 here, but, you know, under 363(2)(b) the Court can

24 authorize a sale of property of the estate if it finds that

25 there's a valid business purpose.  There's no dispute

Page                                                                    110

1  there.  There's a fair and reasonable price.  We'll get

2  back to that in a minute.  There's been adequate marketing

3  and notice.  I think here the record demonstrates that

4  there was adequate marketing and notice.  I think there was

5  some issue of dispute as to the marketing, but I don't

6  think that looking at the totality of the record that there

7  is really any question that there is some population of

8  eligible buyers that was not reached.

9          Some of the cases require a finding of good

10  faith.  Others do not.  I think that in this case that the

11  seller has demonstrated that it was proceeding in good

12  faith, which is the 363(b) standard.  We'll get to buyer

13  good faith later, but I think the real concern here was

14  whether this was a fair and reasonable price.  And when I

15  said that this doesn't feel successful it's because this

16  price seems very low.

17          And under the case law it is the debtor's burden

18  to establish that there is a fair and reasonable price

19  under the circumstances.  And the cases are also clear

20  that, you know, an auction that is conducted pursuant to

21  court approved procedures generally presume to be a process

22  that will lead to a fair and reasonable price.

23          Now, the *Lahijani* case directs the Court to

24  remember that it has an independent duty to look at the

25  provisions of the sale particularly when it appears that

1   bidding has been somehow constrained.  And there was some

2   evidence that was submitted as the objecting parties argued

3   that this was not a fair and reasonable price and perhaps

4   bidding was constrained.  And at this point I'm going to

5   note for the record that I'm going to overrule all of the

6   evidentiary objections that were raised by the debtor and

7   I'm going to -- I will consider as admissible all of the

8   evidence submitted in opposition to the sale.

9           And when I do that, there is some -- nothing in

10  the record to suggest me -- to me that competition was

11  constrained, that there are any irregularities in the

12  procedures.  And this concept of a grossly inadequate sales

13  price is important because it comes from the case law.  And

14  even when I look at the case law and even if I accept --

15  well, I can accept a number of prices to compare to the

16  proposed sale price when I consider whether the dollars are

17  grossly inadequate.  A 125 million dollars is within the

18  range of what other courts have accepted as a fair and

19  reasonable price.  It would not be grossly inadequate and

20  cases come down on one side or the other.  Those that do

21  make findings of grossly inadequate, those cases typically

22  involve other irregularities in the procedures.  A lot of

23  them involve a topping bid, as we say, from another party

24  where the question for the Court is, does the Court reopen

25  an auction because other bids have come in or another bid

1  has come in or a bid came in late and wasn't accepted.

2          That is not the case here.  There are no other

3  bids that have come in.  And let me clearly state for the

4  record the sale that I am approving today is the sale

5  pursuant to the auction.  The Court is not in possession of

6  other funds from any proposed buyers.  The debtor has made

7  it clear that the debtor is not holding funds from other

8  buyers and that there have been no other qualified bids by

9  the auction procedures.

10         So there have been no other activities outside of

11 the auction that was conducted to suggest to me that there

12 were any irregularities or any other activity that would

13 suggest that this auction was flawed.

14         Now, I actually think that the testimony of the

15 proposed buyer, Mr. Saghian, made it very clear that if

16 anything this auction ended up leading to a high bid that

17 was actually higher than what would have been yielded.  For

18 example, if the auction had closed at the actual time that

19 the additional eight-minute gap led to an extra six million

20 dollars where the top bidder outbid himself, that his

21 conversations with representatives of the auction house

22 again didn't chill bidding, didn't depress the price, but

23 rather led to an enhanced price.

24         Now, we talked a lot about the issue of Ukraine

25 and global circumstances and what happened in the world and

1  how that impacted or didn't impact the market.  And I think

2  that there are credible arguments made on both sides that,

3  you know, the situation could have led to fewer bids.

4  There have been credible arguments that perhaps markets

5  could have adjusted and that things would be different now,

6  but there are also arguments to suggest that things could

7  be worse now.

8       There also have been a lot of arguments made

9  about the lack of a minimum bid here in the auction and

10 whether that was the best idea or not the best idea.  But

11 these arguments about global circumstances, whether there

12 should have been a reserve or not all end up essentially

13 being arguments that would ask me to substitute my judgment

14 for that of the debtor in possession and that's not what

15 the case law requires me to do.

16      The case law requires me to look at the totality

17 of the circumstances and look to whether as the *Lahijani*

18 court states, an optimal value was achieved under all of

19 these circumstances.  And I think here while again it

20 doesn't feel like a good result, I think it is a justified

21 result under the case law interpreting Section 363(b).

22 This was an auction conducted pursuant to the procedures

23 that the court approved.  Could different procedures have

24 led to a different result?  I -- nobody knows the answer to

25 that, but that's not the inquiry that the Court has to

Page                                                                114

1    make.  The Court has to look to the circumstances, how the

2    auction was conducted in connection with the order, was

3    this property marketed, was there an opportunity to bid,

4         If a price is found to be grossly inadequate

5    under the majority of the case law there are other factors

6    involved in how the auction was conducted and whether there

7    are other bids out there.  And the record is clear that

8    there hasn't been a bid.  And, in fact, after this sale

9    with the emergency motion that was brought by the proposed

10   buyer, it was very clear that additional bids were being

11   sought out and they just didn't come in.  So the

12   requirements of 363(b) I think are satisfied here.

13        363(f), which goes to the approval of a sale free

14   and clear of liens, 363(f) offers five alternatives to sell

15   free and clear there in the disjunctive, which means only

16   one needs to be satisfied.  363(f)(1) really wasn't argued.

17   It was a half a sentence in the motion.  We've had some

18   commentary on it today in particular, but I don't think

19   that the argument was developed adequately really for the

20   court really to make a finding on that today.

21        363(f)(2) I think is satisfied only as to the

22   consenting mechanics lien creditors.  That is the two that

23   have entered into stipulations with the debtor.  I do not

24   believe, as the debtor has argued, that silence equals

25   consent.  I don't think that the *ACCEL Concrete* case is as

Page                                                                        115

1  helpful as the debtor thinks that it is.  It seems to me

2  that the reasoning in *Roberts*, which is cited by the BAP --

3  the Ninth Circuit BAP in *East Airport Development* made

4  clear that some affirmative consent is required to

5  constitute consent under 363(f)(2).  So I don't think that

6  his subsection applies other than again as to the

7  specifically consenting mechanics lien creditors and as Mr.

8  Geher noted Hankey as a creditor, but as to any other

9  creditors that doesn't apply.  Obviously 363(f)(3) is not

10 applicable here.

11           363(f)(4) *bona fide* disputes, I don't think that

12 this is applicable either.  The language of the statute is

13 clear that the *bona fide* dispute has to be as to the

14 existence of the interests, not as to its amount or

15 priority here.  So 363(f)(4) is not appropriate.

16           So that leaves us with 363(f)(5).  Let me make

17 sure that I am clear in quoting the exact language.

18           "Such entity could be compelled in a legal or

19      equitable proceeding to accept a money satisfaction of

20      such interest."

21           So what is the legal or equitable proceeding that

22 would apply here and under this record the legal or

23 equitable proceeding would be a foreclosure on the DIP

24 loan.  There is a Bankruptcy Court order that says that the

25 priority of that lien is senior to all other liens.  So a

Page                                                              116

1   foreclosure proceeding as to that loan would be sufficient

2   to extinguish all other interests.  That satisfies *Clear*

3   *Channel*.  That satisfies *Clear Channel* and beats the

4   analysis that was raised in other cases, including *Hassan*

5   *Imports* (phonetic) and that is how I make the finding under

6   363(f)(5) that the sale would be free and clear of all

7   liens.

8           363(n), this is the protection provided by the

9   statute after a finding of good faith on the part of the

10  buyer.  We've had some commentary with respect to the

11  addendum and the timing of the file -- filing of the

12  addendum and the signature on the addendum.  That document

13  has been signed.  It has been filed.  There is a signed

14  contract by the parties.  The evidence demonstrates to me

15  quite clearly that this is a buyer who has proceeded in

16  good faith.  There is no evidence of any collusion.  There

17  is no evidence to suggest that this is anything other than

18  an arm's length transaction between the seller and the

19  buyer and the buyer is entitled to a finding of good faith

20  here.

21          I do want to make it clear, though, that any

22  order approving the sale is not to include the language

23  that it seems like a million years ago that Mr. Golubchik

24  and I discussed at the very beginning of this hearing that

25  the order would not be subject to any stay pending appeal

1   because I do not think that that language is appropriate

2   for anything that this Court would have authority to put

3   into an order because it would effectively make it

4   unreviewable.

5           The proposed distribution of proceeds.  So what

6   this order is going to authorize from the proceeds, the

7   sale price of 126 million dollars, what has been referred

8   to as the premium rebate of $11,970,000 issues regarding

9   that rebate and how it is used, what interests it might be

10  subject to, that is all to be decided another day.

11          So what will be paid is the broker's commission.

12  While I think that there were again compelling arguments

13  about how low the sale price is, I don't think that any of

14  those arguments suggest that the professionals did not do

15  their jobs and that a result was achieved that was in

16  accordance with their requirements of the Bankruptcy Code.

17  They are entitled to be paid.  That amount is $2,520,000,

18  the amount owed on the DIP loan.

19          And here I actually have a question if counsel

20  for the debtor is available.  Mr. Golubchik, my question to

21  you is whether there is still cash on hand for the debtor

22  from the DIP loan proceeds and whether that cash is going

23  to go toward repayment of the DIP loan or whether all of it

24  comes from proceeds of the sale.

25          MR. GOLUBCHIK:  Your Honor, first of all, I just

Page                                                                    118

1  wanted to let you know, I have to pick up a child, so I

2  switched to mobile.  That's why I --

3          THE COURT:  Not a problem.

4          MR. GOLUBCHIK:  -- am not on video, but --

5          THE COURT:  I can hear you just fine.

6          MR. GOLUBCHIK:  The intent -- I believe that

7  there are still funds in the estate and I don't know if

8  Mr. Perkins is on the line with us to the extent the Court

9  wants to know how much.  I think it's around two million

10  dollars.  With that anticipation is because the estate is

11  still going to have expenses whether those that have

12  accrued or not that the sale proceeds at this time will be

13  used to pay the DIP loan.

14          THE COURT:  Okay.  So the amount -- and you may

15  not have the papers in front of you.

16          MR. GOLUBCHIK:  I think it's $12,059,000

17  approximately.

18          THE COURT:  Okay.  Okay.  All right.  So the

19  order will authorize payment of that.  the order will

20  authorize payment of the receivership loan, which I'm

21  showing you --

22          MR. GEHER:  Excuse me, Your Honor.

23          THE COURT:  Yes.  Mr. Geher.

24          MR. GEHER:  I'm sorry to interrupt.  So on the

25  receiver loan -- excuse me, the DIP loan, yes, I believe

Page                                                                     119

1  the number of $12,059,500 was as of March 21 because that

2  was the then closing date.  It has -- it will accrue a

3  little extra interest.  I don't know if the Court is

4  cutting it off at the 82 -- at the 12,059,000 or it's just

5  allowing Mr. Golubchik to pay it off in full.  It's just a

6  matter --

7            THE COURT:  That could be --

8            MR. GEHER:  I'm sorry?

9            THE COURT:  That can be updated if there's been a

10 little -- I understand that the number might be slightly

11 different.

12           MR. GEHER:  Thank you, Your Honor.

13           THE COURT:  The receivership certificate I'm

14 showing as $879,380.70.  Property taxes -- and again --

15           MR. GEHER:  Again, Your Honor, that --

16           THE COURT:  Yeah.

17           MR. GEHER:  I'm sorry.  That number is slightly

18 off.  I think Mr. Golubchik was off by a few thousand, but

19 not material in terms of 100 million dollars.  Talking just

20 a few thousand.

21           THE COURT:  Okay.  And I think this is going to

22 be the same for the next couple items as well.  Property

23 taxes which on the debtor's chart is listed as $2,488,815.

24 Again, that's, you know, an estimate.  Other closing costs

25 again estimated at $630,000.

Page                                                                    120

1           All mechanics lien claims and the principal as to

2      the Hankey loan will be held and not distributed subject to

3      further agreement among those parties asserting interests

4      in the proceeds.  I wish that that were not the case,

5      particularly  with respect to the mechanics liens and

6      Ms. Lee DeVoll I think aptly pointed out.  These are not

7      large claims, but given that there is a dispute as to

8      priority and given the very large amount of interest on the

9      prepetition loan, again I think it's in the parties'

10     interest to try to resolve this, but for purposes of the

11     order those amounts will not be distributed from sales

12     proceeds.  They will be subject to further agreement among

13     the parties and the Court's available for proposing a

14     stipulation if you need a hearing or anything like that.

15     The Court will be available for that.

16           MR. GOLUBCHIK:  Your Honor, so --

17           THE COURT:  Yeah, go ahead, Mr. Golubchik.

18           MR. GOLUBCHIK:  I assume that's the case.  Just

19     want to make sure what we put in the order.

20           THE COURT:  Okay.  Thank you.  I think that given

21     these distributions it is clear that this is not a *sub rosa*

22     plan to the extent that there were any objections to the

23     proposed sale of the *sub rosa* plan they are overruled.

24     There has been a request to waive the 14-day stay under

25     Rule 6004 and given the maturity date of the DIP loan I

Page                                                                    121

1  think that there is a basis to waive the 14-day stays.

2         Now, to the extent that there is relief that

3  anyone is going to seek from this order, the Court is

4  available if any relief needs to be sought on shortened

5  time.  I don't intend to make it difficult for anyone to

6  seek whatever relief they think might be appropriate.

7         So Mr. Golubchik, I will look for an order from

8  you.  It's getting late in the day.  I wouldn't expect to

9  have that entered today.  I don't even know if it would be

10 lodged today but I certainly will review and enter it as

11 quickly as possible.

12        MR. SHINDERMAN:  Your Honor, may I be heard --

13        MR. GOLUBCHIK:  I understand.

14        MR. SHINDERMAN:  -- real quickly, Your Honor?

15 This is Mr. Shinderman.

16        THE COURT:  Oh, do you have a question?

17        MR. SHINDERMAN:  I don't understand there to be a

18 dispute as to the 82 million -- excuse me.  So again, I'd

19 like to save interest for the estate.

20        THE COURT:  I understand.

21        MR. SHINDERMAN:  So is it possible?  Again, I'm

22 not aware of anyone not wanting to pay the 82.5.

23        THE COURT:  Well, I thought that -- I think

24 Ms. Andrassy might disagree since my understanding was that

25 as to Inferno there was a dispute as to not only the

Page                                                                122

1   priority of the Hankey lien, but also mechanics liens,

2   which is why they --

3           MR. GOLUBCHIK:  Well, Your Honor --

4           THE COURT:  -- need to be held.

5           MR. GOLUBCHIK:  Your Honor, Inferno only asserted

6   that objection as to the mechanics lien.  Ms. Andrassy can

7   speak for herself but I don't think there's any dispute

8   that they subordinated too any.

9           THE COURT:  Okay.  Ms. Andrassy.

10          MS. ANDRASSY:  Yeah, I raised the issue.  Your

11  Honor is correct.  I raised issues with respect to both the

12  mechanics lien holders and with respect to Hankey Capital,

13  although I did suggest that there was a number that my

14  client would consent to and I propose that the Court might

15  set a continued hearing on that issue about what amount the

16  parties could agree to pay Hankey to cut off the interest

17  accumulation, but I'm not sure how Your Honor wants to

18  proceed with that.

19          THE COURT:  Well, again, I think it's got to just

20  be subject to some agreement among the parties.  If you

21  need to have a hearing, you know, I think that there are

22  broader issues which might require a briefing which might

23  not be expedited.  I don't know, but I'm going to have to

24  leave it to the parties to, you know, I would hope to

25  attempt to resolve something as, you know, expeditiously as

Page                                                                    123

1  possible.

2          MR. GEHER:  Your Honor, just as a question --

3          THE COURT:  Yes, Mr. Geher.

4          MR. GEHER:  -- and I'm not going to ask about the

5  82.5, but based on the Court's rulings do Mr. Shinderman

6  and Ms. Andrassy reconsider their position as to the

7  mechanics lienholders?  I'd like to see these people get

8  paid who worked on the property, but I'm not carving it out

9  of me.  If they all agree to be paid, we will agree to

10 subordinate it.  So I would just see if we could remove an

11 issue to get hard working people paid.

12         THE COURT:  Understood.  I don't know if they're

13 in a position to agree or not today.  Ms. Andrassy?

14         MS. ANDRASSY:  I am not, Your Honor.  I'd have to

15 talk to my client about that.

16         THE COURT:  Okay.  Thank you.

17         MR. SHINDERMAN:  We do not object.

18         THE COURT:  You would not object, but I think it

19 would require both the objecting secured creditors.

20         All right.  Well, again, I do want to thank

21 everyone for their hard work.  I wish that this was a

22 little bit different, but I think that the legal standard

23 has been satisfied here, so I'm going to enter the order

24 when it is lodged.  Thank you so much, everyone.

25         ATTORNEYS:  Thank you, Your Honor.



Page                                                                    124

1    (At 3:29 p.m.)

2                         *  *  *  *  *  *  *

3              I certify that the foregoing is a correct

4    transcript from the electronic sound recording of the

5    proceedings in the above-entitled matter.

6

7    *Ruth Ann Hager*

8

9    _____      Date:  3/27/2022

10   RUTH ANN HAGER, C.E.T.**D-641

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

