1                    UNITED STATES BANKRUPTCY COURT

2            CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

3                              --oOo--

4    In Re:                      )   Case No. 2:21-bk-18205-DS
                                 )
5    CRESTLLOYD, LLC,            )   Chapter 11
                                 )   Los Angeles, California
6                                )
     Debtor,                     )   Friday, 12:00 P.M.
7    ----------------------------X   December 10, 2021

8
                                     HEARING RE: [66] DEBTOR'S
9                                    MOTION FOR ENTRY OF
                                     INTERIM AND FINAL ORDERS:
10                                   (I) AUTHORIZING DEBTOR TO
                                     OBTAIN SENIOR SECURED
11                                   POST-PETITION FINANCING
                                     PURSUANT TO SECTION 364 OF
12                                   THE BANKRUPTCY CODE;
                                     (II) GRANTING SUPER-
13                                   PRIORITY ADMINISTRATIVE
                                     CLAIMS AND SENIOR LIENS;
14                                   (III) SCHEDULING A FINAL
                                     HEARING; AND
15                                   (IV) GRANTING RELATED
                                     RELIEF

16

17                TRANSCRIPT OF ZOOM PROCEEDINGS
             BEFORE THE HONORABLE DEBORAH SALTZMAN
18               UNITED STATES BANKRUPTCY JUDGE

19

20   APPEARANCES:

21   For the Debtor:          DAVID B. GOLUBCHIK, ESQ.
                              TODD ARNOLD, ESQ.
22                            Levene Neale Bender Yoo &
                                 Golubchik, LLP
23                            2818 La Cienga Avenue
                              Los Angeles, California  90034
24
     Proceedings produced by electronic sound recording;
25   transcript produced by transcription service.



```
 1   For Hankey Capital:      THOMAS M. GEHER, ESQ.
                              Jeffer Mangels Butler &
 2                              Mitchell, LLP
                              1900 Avenue of the Stars
 3                            Seventh Floor
                              Los Angeles, California  90067
 4
     For Inferno Investment:  MATTHIEU ROBILLARD, ESQ.
 5
     For Yogi Securities:     ELSA HOROWITZ, ESQ.
 6                            Wolf Rifkin Shapiro Schulman
                                Rabkin, LLP
 7                            11400 West Olympic Boulevard
                              Ninth Floor
 8                            Los Angeles,  90064

 9   For Hilldun Corporation: JERROLD L. BREGMAN, ESQ.
                              BG Law, LLP
10                            21650 Oxnard Street
                              Suite #500
11                            Woodland Hills, California  90032

12   For the U.S. Trustee:    ERYK ESCOBAR, ESQ.
                              Office of the U.S. Trustee
13                            915 Wilshire Boulevard
                              Suite #1850
14                            Los Angeles, California  90017

15   Court Recorder:          Dawnette Francis
                              U.S. Bankruptcy Court
16                            Central District of California
                              Edward R. Roybal Federal Building
17                              and Courthouse
                              255 East Temple Street, Room #940
18                            Los Angeles, California  90012
                              (855) 460-9641
19
     Court Transcriptionist:  Ruth Ann Hager, C.E.T.**D-641
20                            Ben Hyatt Certified Deposition
                                Reporters
21                            17835 Ventura Boulevard, Suite 310
                              Encino, California  91316
22

23

24

25
```



1          LOS ANGELES, CALIFORNIA, FRIDAY, DECEMBER 10, 2021

2                              12:18 P.M.

3                               --oOo--

4          THE CLERK:  Please come to order.  This United

5    States Bankruptcy Court is now in session, the Honorable

6    Deborah J. Saltzman presiding.

7          THE COURT:  Good afternoon.  It is -- I'm sorry.

8    I'm getting a little bit of an echo.  I think the

9    courtroom, I need to move.

10         COMPUTER VOICE:  You are muted.  You can mute or

11   unmute yourself by pressing *6 --

12         THE COURT:  It is December 10, 2021.  This is the

13   Bankruptcy Court for the Central District of California,

14   Los Angeles Division.  My apologies for the late start.  I

15   have a quarterly Board of Judges meeting for the court and

16   it ran a little bit over, so thank you all for waiting and

17   being patient these last 20 minutes or so.

18         We are here in the Crestlloyd matter on the

19   debtor's DIP financing motion.  I'm going to begin by

20   asking for appearances.  We're all appearing on Zoom and my

21   law clerks have collected with your assistance a list of

22   everyone who I think is planning on speaking on the matter,

23   so I'm going to start by calling roll from the list.  When

24   you hear your name just state your full name for the record

25   and who you represent.  When I get to the end of that list,

Page                                                                                    4

1  if you plan to speak on today's matter and not to observe,

2  just please let me know your name and who you represent.

3          Mr. Golubchik, good afternoon.  Oh, counsel, you

4  are muted.

5          MR. GOLUBCHIK:  Good afternoon.  David Golubchik,

6  Levene Neale Bender Yoo & Golubchik on behalf of the

7  debtor.

8          THE COURT:  Okay.  Mr. Geher, good afternoon.

9          MR. GEHER:  Good afternoon, Your Honor.  Thomas

10  M. Geher, Jeffer Mangels Butler & Mitchell, appearing for

11  secured creditor Hankey Capital, LLC, also the proposed DIP

12  lender -- who is also the proposed DIP lender.

13          THE COURT:  Ms. Horowitz, good afternoon.

14          MS. HOROWITZ:  Good afternoon, Your Honor.  Elsa

15  Horowitz of Wolf Rifkin Shapiro Schulman and Rabkin on

16  behalf of Yogi Securities Holding, LLC.

17          THE COURT:  Mr. Robillard, good afternoon.

18          MR. ROBILLARD:  Good afternoon, Matthieu

19  Robillard, counsel for Inferno Investment.

20          THE COURT:  Mr. Staglik, good afternoon.

21          MR. STAGLIK:  Good afternoon.  Miles Staglik for

22  Sierra Constellation Partners, manager of Crestlloyd, LLC.

23          THE COURT:  And Mr. Escobar, good afternoon.

24          MR. ESCOBAR:  Good afternoon, Your Honor.  Eryk

25  Escobar for the U.S. Trustee.

Page                                                                    5

1          THE COURT:  Anyone else plan on speaking on the

2    motion?

3          MR. BREGMAN:  Yes, Your Honor.  Good afternoon.

4    My name is Jerrold Bregman.  I'm a partner at Brutkus

5    Gubner appearing on behalf of Hilldun Corporation, a

6    secured creditor.

7          THE COURT:  Good afternoon.

8          MR. BREGMAN:  I had responded to Your Honor's law

9    clerk.  Apologies for not responding to Your Honor in the

10   chat.

11         THE COURT:  Not a problem, thank you.  Okay.

12         Well, we set this hearing not long ago.  Thank

13   you, Mr. Golubchik, Mr. Arnold, and your firm for following

14   our instruction regarding notice.  I think we are fine

15   there.  Why don't you walk me through where we are and what

16   you're looking for?  I've had a chance to look at the

17   papers and the proposed order and I'll have a couple of

18   questions for you, but why don't you give us an overview?

19         MR. GOLUBCHIK:  Sure.  Thank you, Your Honor,

20   first of all, for setting this on an expedited basis.  As

21   the Court knows, this property was inherited by the manager

22   on the verge of a foreclosure by Hankey Capital.  There was

23   a receiver in place.  We did an initial stipulation for

24   transition, which expired November 30th, and everything

25   with respect to the property was transferred over to Sierra

P 888.272.0022 F 818.343.7119     BENHYATT  www.benhyatt.com
Certified Deposition Reporters

Page                                                                        6

1  Constellation.

2         This is -- based on the accrual of interest, this

3  was not a type of property that can set around bankruptcy

4  for a long time.  So based on discussions, the game plan

5  was to have an expedited sale process.  Mr. Perkins and his

6  team reached out to numerous brokers and selected a team of

7  two brokers, two firms, stock (phonetic) firms in Los

8  Angeles, as well as an online auction house that deals with

9  a lot of international firms.  And the schedule that was

10 determined that would make sense is to have an auction by

11 February 10th with a closing of the sale by the end of the

12 month and they seem unusual in most cases between getting a

13 sale order, appeal period, financing lined up.  But from

14 what we understand from the brokers, this was not the type

15 of property that anyone needs to go through financing, due

16 diligence or contingency.  This was a person or entity that

17 has cash sitting around.

18        So in order to prepare the property we need to

19 spend money and one of the big issues we have is there was

20 an insurance and there is an insurance policy in place, but

21 it is insufficient and we dealt with that issue with the

22 U.S. Trustee at the meeting of creditors recently.

23        So Mr. Perkins and his team have been working

24 with a top broker.  I think we're at the very end in order

25 to obtain the policy and as you can see in Exhibit F, which

Page                                                                        7

1  is the budget, it's estimated it could be four to five

2  million.  We still don't know the amount, but it's a pretty

3  expensive policy, so a big chunk of the proposed 12 million

4  dollars would be used for that.

5          SCP reached out to numerous lenders, parties in

6  interest in providing financing and the initial approach

7  was, "We need money, what can you do?" as opposed to do we

8  get it on a priming basis.  And not surprisingly,

9  everyone's response is, "You have a lot of secured debt

10 here, you have mechanics liens, you have a property that is

11 not completed yet, we're not willing to give you unsecured,

12 junior secured," so the only thing was senior secured.

13         And initially, although we reached out to all the

14 secured creditors to give them first stab at it, we did not

15 receive any proposals, so it went out to third parties.  We

16 received numerous proposals, selected best one.  And then

17 Hankey Capital, which is in first position, stated that

18 they're willing to provide financing to us.  The terms were

19 reasonable, attractive as stated in Mr. Perkins'

20 declaration, 12 million dollars, eight-and-a-half percent

21 interest, one point, and it would coincide with a schedule

22 we have in place in order for the sale to happen and close

23 by the end of February.

24         We've attached -- rather than filing a motion

25 without all the documents, everyone has worked hard with

Page                                                                                    8

1   Mr. Geher and his team to put together the credit

2   agreement, the promissory note, the deed of trust, all the

3   loan documents, as well as the budget so that everyone has

4   a chance to prepare.  And throughout this process I have

5   had discussions with the primary secured creditors.  My

6   understanding is they were on board.

7           I don't think we received an official response

8   from Mr. Bregman's client yet, but I understand the Court

9   stated that today at 9:00 a.m. was the response deadline

10  and I'm hopeful the fact that we have not received

11  responses that everyone is generally on board that we need

12  to fix the property up, clean it up, and get it sold, as

13  opposed to if we don't have insurance, if we don't have

14  what we need to do if this case is dismissed or relief from

15  stay is obtained, then we go back to that foreclosure

16  process where the myriad of secured creditors will be

17  prejudiced, presumably.  That's my spiel for today.

18          THE COURT:  Okay.  Thank you.

19          Well, let me go around.  I did not see an

20  objection by the deadline, but I would like to hear from

21  those who are appearing to see if there are any issues.

22          Mr. Geher, since your client is providing the

23  financing, anything you want to comment on?

24          MR. GEHER:  No, Mr. Golubchik accurately told the

25  Court what's been going on and the material general terms

Page                                                                                              9

 1  of the proposed transaction.  I have nothing further to say

 2  unless other people have anything else to say, which would

 3  warrant a response.

 4          THE COURT:  Okay.  Well, why don't I open it up,

 5  then?  Any comment from those who are appearing this

 6  afternoon?

 7          MS. HOROWITZ:  Your Honor, this is Elsa --

 8          MR. BREGMAN:  Yes, Your Honor.  I --

 9          THE COURT:  Okay.  We'll go one at a time.

10  Ms. Horowitz?

11          MR. BREGMAN:  Go ahead, Ms. Horowitz.

12          MS. HOROWITZ:  Thank you.  I apologize.  I didn't

13  hear you speaking.  I just wanted to have the opportunity

14  to speak in the event I needed to comment on a roll-up, but

15  I haven't heard any talk of a roll-up and that was the only

16  reason I wanted to be heard, so we are generally on board

17  with this.

18          MR. GOLUBCHIK:  Yes, Your Honor.  In the

19  introduction -- because we knew about the big issue --

20  introduction we actually spent a couple of paragraphs

21  making clear to everyone we know there is litigation, we

22  know there are disputes.  This was a clean transaction with

23  financing only.  No protections, no waivers, no roll-ups of

24  any kind for the balance of Hankey's debt.

25          THE COURT:  Thank you, Mr. Golubchik.

Page                                                                    10

1              MR. GEHER:  This is not a roll-up, Your Honor.

2    Whatever protections that are in the agreement applies to

3    the DIP loan.  It doesn't -- whatever -- whatever issues

4    remain about the other loans remains those in effect, the

5    priorities about any other secured debt except this new

6    money is going into first position above all the

7    preexisting secured debt.

8              THE COURT:  All right.  Thank you, Mr. Geher.

9              Ms. Horowitz, anything else?

10             MS. HOROWITZ:  No, thank you, Your Honor.

11             THE COURT:   Thank you.

12             And Mr. Bregman.

13             MR. BREGMAN:  Thank you, Your Honor.  First of

14   all, I'm impressed and want to congratulate the debtor's

15   counsel and Hankey's counsel for doing a terrific job in

16   getting a lot of work done in short order.  There's no

17   doubt this property needs the financing.  I think they've

18   presented this very well to the Court and to the creditors.

19   My client does not object, for the record, and

20   congratulates, frankly.

21             I do have just a couple of comments.  I think

22   they've been mostly obviated, but I'll state them just for

23   the benefit of the Court.  These representations that I saw

24   in the motion that Mr. Geher has confirmed and

25   Mr. Golubchik has also confirmed, I just want to state my

Page                                                                    11

1  take.  If it -- if anything is different than that, that'd

2  be helpful.  There are quite a few pages in this

3  submission.  I endeavored to go through them diligently,

4  but can't say that my efforts were exhausted.

5         Just to confirm, there's no waiver of any claims

6  against the DIP lender or any waiver of the right to

7  contest the DIP lender's lien except, of course, for the

8  DIP loan itself and for the liens resulting from the DIP

9  loan, is our understanding.

10        We also understand that the DIP lender would have

11 no influence over the substance of the plan other than to

12 confirm that there's any plan that may result in payoff

13 would provide for full payment of repayment of the DIP

14 loan, so there would not be any right to, for example,

15 object to a plan or to call a default to the extent a plan

16 is inconsistent with the best interests of the DIP lender

17 in its capacity as a lender.  I think those are non-

18 controversial in that those are the facts.

19        I would like to just note that it's probably

20 beneficial to include the idea that while the interim DIP

21 order provides for an acknowledgement of what's

22 characterized as a 20 percent equity cushion and we had no

23 problems with that being included for purposes of DIP

24 financing, we want it understood that that finding is not a

25 finding in the case that's binding on parties in interest,

1    but instead is a finding for purposes of the DIP loan here

2    in the beginning of the case so it would be without

3    prejudice to other matters outside of the DIP loan.

4            And finally, just putting my business hat on, you

5    know, from -- I guess, from the cheap seats, in that I

6    wasn't in the room in terms of putting the documentation

7    together -- it seems like a pretty expensive loan for an

8    LTB of less than five percent, which is a foreign exchange

9    percent of the claimed value of the property.  To have an

10   eight-and-a-half percent interest rate and two percent

11   points, I know it's characterized as one point right off

12   the bat, but the only point kicks in almost automatically

13   on February 28th.

14           I think those of us who have done real estate

15   deals, even normal real estate deals, and this is an

16   abnormal deal because it's -- it would be perhaps the

17   most -- the highest priced residential property in the

18   history of California perhaps, but it's pretty darn close

19   to that.  So I don't think anyone would seriously contend

20   that there's a substantial prospect that this does not

21   close by February 28th and, from that standpoint, it seems

22   a bit pricey at two percent and the term seems pretty darn

23   short.  It seems almost an invitation to default, even with

24   an April 30th outside date and then the loan interest kicks

25   up to 13 percent.

Page                                                                  13

1          Again, it's -- you know, the beauty of the market

2   is you get to see what willing -- you know, willing lenders

3   are willing to do.  I wasn't in that process, which I've

4   acknowledged, but I didn't see any details about what

5   others were willing to do.  I know there's hard money

6   lenders.  It's just in effect a hard money loan.  It seems

7   from the perspective of my client, who may be in a fulcrum

8   position or potentially even out of the money depending on

9   the actual economics here, every penny counts.  You know,

10  if we were higher up in the capital structure we might be

11  more sanguine about it, but for us this seems like a pretty

12  expensive loan.  That's more of an observation, just for

13  the benefit of the process, but --

14          THE COURT:  Observation, but not objections.  I

15  get it.

16          MR. BREGMAN:  Very good.  And the big picture

17  here, Your Honor, is not to detract from the kudos to the

18  professionals involved and their clients who are able to

19  put a deal together.  Thank you.

20          THE COURT:  Thank you.  Again, I understand.  Not

21  an objection, but any response to the comments.

22          MR. GOLUBCHIK:  I can respond.  I'd like to

23  start.  I don't know if Mr. Geher has.

24          With respect to the first comment from

25  Mr. Bregman, the DIP loan has diplomatic immunity.  It is

1  golden.  It cannot be touched.  That is the loan.  Absent a

2  balance of Hankey's obligation, they are fair game for

3  anybody at this time.  No prejudice.

4         There is nothing in the loan documents that

5  allows -- including the DIP loan documents -- that allows

6  Hankey to get in the way of the plan formulation process,

7  any of that sort, so nothing nefarious there.

8         With respect to the loan terms, if the Court

9  wants Mr. Perkins and Mr. Staglik are available, but as

10  I've stated, we went out to the market.  We got terms.  I

11  agree with Mr. Bregman.  This is a sure thing.  If I had 12

12  million laying around, I would love to make this loan.

13  It's a certainty.  But based on the terms that were

14  provided by everybody, this was a fair and reasonable

15  proposal from Hankey.  And to the extent the Court wants

16  any information from SCP folks, the business folks that

17  have been involved, they can testify.

18         Our goal is -- well, yes, there's a one point

19  origination and then one point to extend the loan to end of

20  April from February 28th.  Our goal and the plan is not to

21  seek it so it's not automatic.  If we have a sale, as the

22  brokers believe is achievable in February, closing by

23  February 28th, then we'll pay it off from escrow.  The idea

24  is to do that rather extend, but that is a possibility.

25  Terms are based on the business judgment of SCP as the

Page                                                                                              15

1   manager after having gone out to the marketplace.

2             THE COURT:  All right.  Thank you.

3             Is there anything else?

4             MR. GEHER:  No, Your Honor.  There's no releases

5   in any -- on any of these loan documents.  While people may

6   think it's expensive, I think if we were to elicit

7   testimony what you'll hear is these terms will benefit any

8   other terms the debtor got.  So "expensive" is a relative

9   term.  I'll leave it at that.

10            THE COURT:  Thank you.  And I did, you know,

11  review the papers and I did see the discussion of the

12  debtor's efforts to obtain other financing.  So I think

13  that the record has been established.

14            Any other comments from anyone joining us?

15            (No response.)

16            Okay.  Mr. Golubchik, I had a couple of questions

17  for you --

18            MR. GOLUBCHIK:  Sure.

19            THE COURT:  -- on the proposed order.  If you

20  have that in front of you, looking again at the proposed

21  order, I'm looking at paragraph 5.

22            MR. GOLUBCHIK:  Let me --

23            THE COURT:  And --

24            MR. GOLUBCHIK:  Okay.

25            THE COURT:  Hold on one second now.  I can't

Page                                                                16

1  find -- okay.  So if we go down close to the end, this (z),

2  there's this language "any lien or security interest

3  avoided pursuant to any or all of Section 551, 552 shall

4  have the same priority as such avoided lien."  I don't

5  understand --

6          MR. GOLUBCHIK:  Your Honor --

7          THE COURT:  -- that.

8          MR. GOLUBCHIK:  Can you point to me

9  again where -- you're looking at the interim -- the

10 proposed interim order?

11         THE COURT:  Yes, paragraph 5.

12         MR. GOLUBCHIK:  Paragraph 5.

13         THE COURT:  And then just at the very end of

14 paragraph 5 there's a (z) and the language again, "any lien

15 or security interest avoided pursuant to any or all of

16 Section 550, 551, 552 shall have the same priority as such

17 avoided lien."  That --

18         MR. GOLUBCHIK:  It sounds goofy.

19         THE COURT:  It sounds sort of circular or

20 nonsensical and I'm wondering if there's something maybe

21 that -- some words that was dropped out or -- I don't know.

22         MR. GOLUBCHIK:  I would ask for -- because we

23 need the support -- agreement of the secured creditor for

24 Mr. Geher to comment on this, but you're right.  I think it

25 should be revised.

Page                                                                          17

1            MR. ARNOLD:  I might have -- this is Todd.  I

2   might have a reason for this.  I think the idea that I

3   think under the Bankruptcy Code that if a lien is avoided

4   it could end up being senior to the DIP lien.  And the idea

5   is that if you have a second position lien, they get

6   avoided, you know, stays in second position.  It doesn't

7   get transferred to the estate and senior to the DIP lien.

8            MR. GOLUBCHIK:  Oh.

9            THE COURT:  Okay.  Okay.  I'm not sure this

10  language actually says that and you avoided -- I mean,

11  couldn't we just say after 552, any -- we executed to

12  (indiscernible) pursuant to any of these subsections I

13  think shall be subject in priority only to the carveout.

14  Is that right or is that --

15           MR. ARNOLD:  I'll leave it to Hankey, but maybe

16  after that we could say shall not be.  If so, in no

17  instance be senior to the DIP lien.

18           THE COURT:  Okay.  Okay.

19           MR. GOLUBCHIK:  Thank you, Mr. Arnold.

20           THE COURT:  I saw Mr. Geher wince as I was saying

21  it, so I knew there would be a revision.

22           I think something like that makes a little more

23  sense.  I do see what you're getting at and I don't have a

24  problem with it.  I just didn't understand exactly what the

25  sentence was getting at.  Okay.

Page                                                                    18

1              So Mr. Arnold, Mr. Golubchik, Mr. Geher, the next
2    question I have is moving down to paragraph 13 of the
3    proposed order.
4              MR. GOLUBCHIK:  All right.
5              THE COURT:  The very last line, "we see any
6    subsequent Chapter 7 case."  I assume that just means in
7    this case if converted to Chapter 7, not any future Chapter
8    7 case or something like that.
9              MR. GOLUBCHIK:  That is correct.
10             THE COURT:  Okay.
11             MR. ARNOLD:  Right.
12             THE COURT:  I think a slight revision there would
13   be helpful.  And then finally paragraph --
14             MR. GOLUBCHIK:  Should we say "or in event this
15   case is converted to Chapter 7"?
16             THE COURT:  Yeah, I leave it up to you to --
17   whatever works for the parties is fine.
18             Paragraph 15, this interim order shall not be
19   modified, amended or extended without prior written consent
20   of Hankey.  When I enter an order that I sign I make a
21   number of revisions that I consider to be not substantive,
22   some stylistic changes.  I usually -- Mr. Arnold and
23   Mr. Golubchik are familiar with my shortening of their
24   orders.  So that's my revision.  I don't expect that I'll
25   be calling Mr. Geher to get Hankey's consent to doing that,

Page                                                                 19

1  so I wasn't sure if this was getting at something else.

2          MR. GEHER:  Your Honor, I think what that's meant

3  to be is once you sign this order it's sort of -- it's in

4  concrete.

5          THE COURT:  Yes.

6          MR. GEHER:  And it's not getting changed.

7          Mr. Golubchik and Mr. Arnold, do you agree with

8  that?

9          MR. GOLUBCHIK:  Yes.

10         THE COURT:  Okay.  Gotcha.

11         MR. GEHER:  We -- as much as we'd like to, Your

12  Honor, we can't tell you what to put in the order that we

13  don't want to put in.

14         THE COURT:  You have an awful lot of influence,

15  but there are a few things that --

16         MR. GEHER:  Sure.

17         THE COURT:  -- is just my practice to change a

18  little bit, but again, nothing substantive.

19         Okay.  Actually, I do have on more question.

20  Paragraph 16, when -- it's a little odd because the money

21  is going to be out the door by the time there is a final

22  hearing, but I guess the rules provide for a final hearing,

23  the Code provides for a final hearing.  So when do we want

24  it?

25         MR. GOLUBCHIK:  Your Honor, in light of the funds

Page                                                                    20

1  being used and there's no urgency since we have holidays

2  coming up does it make sense to do it maybe early January

3  rather than Christmas/New Year's time frame?

4          THE COURT:  If that's fine for everyone else,

5  that's fine with me.  Let me give you a couple of options

6  and --

7          MR. BREGMAN:  If I may be heard, Your Honor, it's

8  a little unconventional, but given the fact the funds are

9  going to be out and the state of play with everyone on

10 board and our interest in preserving the pennies in the

11 estate, we would, you know, orally move for the Court's

12 consideration to consider the final hearing to happen now

13 and just combine it and make this a final order.  That may

14 be a bit unconventional, but if nobody opposes it and we

15 would oppose it -- I mean, we would support it in the

16 interest of saving estate funds.  Just a suggestion, Your

17 Honor.

18         MR. GOLUBCHIK:  The debtor would not oppose it.

19 I just think the rules require a minimum of 14 days for a

20 final.

21         THE COURT:  I don't think I can get rid of the

22 final hearing.  What I can do is I can schedule it.  If

23 there is no objection I will put out a tentative ruling

24 that is the final ruling and waive appearances but I do

25 think I have to have the final hearing and an opportunity

Page                                                                    21

1  to object.

2           MR. GEHER:  Your Honor, no offense.  As much as

3  we all like to speed things along to save money, as the

4  lender I want to make sure the I's are dotted, T's are

5  crossed and nothing comes back to bite us in any body part,

6  so I think the Court's suggestion is a wise one.

7           THE COURT:  Okay.  We could do either January 6th

8  at 11:30 or the 13th at 11:30.

9           MR. GOLUBCHIK:  For me either one works, so

10 whatever works for everybody else.  We do have -- I notice

11 on the 13th at 11:30 we have a continued status conference

12 and a final utility motion.

13          THE COURT:  Okay.

14          MR. GOLUBCHIK:  Could we do it at the same time?

15          THE COURT:  Does that work?

16          MR. GEHER:  That's acceptable to me.  I was just

17 going to suggest that.

18          THE COURT:  Great.  So we'll do -- final hearing

19 will be January 13th, 11:30.  Let's see.  When do you want

20 any objections and do you want a written reply?

21          MR. GOLUBCHIK:  December 31 would be great for --

22          (Laughter.)

23          THE COURT:  11:59?

24          MR. GOLUBCHIK:  Exactly, and that's going to

25 (indiscernible).  Whatever works, Your Honor.  I guess with

Page                                                                22

1   the creditors here if anyone has a suggestion.

2           THE COURT:  Yeah, I want to be reasonable.

3           MR. GOLUBCHIK:  Shall we do it ten days before,

4   maybe January 3rd if that's a weekday so people come back

5   from the holidays?

6           THE COURT:  Sure.  That's fine.  So objection

7   January 3rd.

8           MR. GOLUBCHIK:  Maybe a response January 10th on

9   my birthday.

10          THE COURT:  That works.  And happy birthday in

11  advance.  Okay.  So our final hearing January 13th, 11:30.

12  That will be on Zoom.  Any objections January 3rd, reply

13  January 10th.

14          MR. GOLUBCHIK:  Excellent.  So we will clean up

15  the order.  and, Your Honor, if we submit it to you in the

16  next hour, hour and a half, would you be able to enter it

17  today?

18          THE COURT:  Yes.

19          MR. GOLUBCHIK:  All right.

20          THE COURT:  We'll be looking for it.

21          MR. GOLUBCHIK:  Great.

22          THE COURT:  Okay.  Great.  Thank you so much,

23  everyone.

24          MR. GOLUBCHIK:  Thank you.

25          MR. GEHER:  Your Honor, if I could --

Page                                                                    23

1          THE COURT:  Yes.

2          MR. GEHER:  David, can you call me to work out

3   the order and logistics?

4          MR. GOLUBCHIK:  Yes.  Yeah.

5          MR. GEHER:  Thank you.

6          THE COURT:  Okay.  Wonderful.  Thanks again,

7   everyone.

8   (At 12:46 p.m.)

9                    *  *  *  *  *  *  *

10          I certify that the foregoing is a correct

11   transcript from the electronic sound recording of the

12   proceedings in the above-entitled matter.

13

14   *Ruth Ann Hager*

15

16   _____      Date:  3/27/2022

17   RUTH ANN HAGER, C.E.T.**D-641

18

19

20

21

22

23

24

25