1                  UNITED STATES BANKRUPTCY COURT

2            CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES

3                           --oOo--

4    In Re:                      ) Case No. 2:21-bk-18205-DS
                                 )
5    CRESTLLOYD, LLC,            )
                                 )
6                                ) Los Angeles, California
     Debtor.                     ) Friday, 11:00 A.M.
7    ----------------------------X  March 18, 2022

8
                                 HEARING RE: [142] DEBTOR'S
9                                MOTION FOR AN ORDER:
                                 (1) APPROVING THE SALE OF
10                               THE DEBTOR'S REAL PROPERTY
                                 FREE AND CLEAR OF ALL
11                               LIENS, CLAIMS,
                                 ENCUMBRANCES, AND
12                               INTERESTS, WITH THE
                                 EXCEPTION OF ENUMERATED
13                               EXCLUSIONS;
                                 (2) FINDING THE BUYER IS A
14                               GOOD FAITH PURCHASER;
                                 (3) AUTHORIZING AND
15                               APPROVING THE PAYMENT OF
                                 CERTAIN CLAIMS FROM SALE
16                               PROCEEDS;
                                 (4) WAIVING THE STAY PERIOD
17                               SET FORTH IN BANKRUPTCY
                                 RULE 6004(h); AND
18                               (5) PROVIDING RELATED
                                 RELIEF
19
                                 HEARING RE: [144] MOTION
20                               FOR AN ORDER:
                                 (1) APPROVING THE SALE OF
21                               THE DEBTOR'S PERSONAL
                                 PROPERTY FREE AND CLEAR OF
22                               ALL LIENS, CLAIMS,
                                 ENCUMBRANCES;
23

24
     Proceedings produced by electronic sound recording;
25   transcript produced by transcription service.

1                                          (2) WAIVING THE 14-DAY STAY
                                          PERIOD SET FORTH IN
2                                          BANKRUPTCY RULE 6004(h);
                                          AND PROVIDING RELATED
3                                          RELIEF

4
                    TRANSCRIPT OF TELEPHONIC PROCEEDINGS
5              BEFORE THE HONORABLE DEBORAH SALTZMAN
                    UNITED STATES BANKRUPTCY JUDGE
6

7    <u>APPEARANCES</u>:

8    For the Debtor:          DAVID B. GOLUBCHIK, ESQ.
                              TODD M. ARNOLD, ESQ.
9                             Levene, Neale, Bender, Yoo &
                                 Golubchik, LLP
10                            2818 La Cienega Avenue
                              Los Angeles, California  90034
11
     For Inferno              KYRA E. ANDRASSY, ESQ.
12   Investment:              Smiley Want-Ekvall
                              3200 Park Center Drive
13                            Suite #250
                              Costa Mesa, California  92626
14
     For J&E Textures:        MARGUERITE LEE DeVOLL, ESQ.
15                            Watt, Tieder, Hoffar &
                                 Fitzgerald, LLP
16                            1765 Greensboro Station Place
                              Suite #1000
17                            McLean, Virginia  22102

18   For American Truck &     RYAN O'DEA, ESQ.
     Tool Rentals:            100 Spectrum Center Drive
19                            Suite #600
                              Irvine, California  92618
20
21   For Yogi Securities:     MARK SHINDERMAN, ESQ.
                              WILLIAM J. SCHUMACHER, ESQ.
22                            2029 Century Park East
                              33rd Floor
23                            Los Angeles, California  90067

24

25

```
 1   For Nile Niami:          HAMID R. RAFATJOO, ESQ.
                              Raines Feldman LLP
 2                            1800 Avenue of the Stars
                              12th Floor
 3                            Los Angeles, California  90067

 4   For Richard Saghian:     SAMUEL NEWMAN, ESQ.
                              Sidley Austin, LLP
 5                            1 South Dearborn
                              Chicago, Illinois  60603
 6

 7   For Hankey Capital:      THOMAS M. GEHER, ESQ.
                              Jeffer Mangels Butler &
 8                              Mitchell, LLP
                              1900 Avenue of the Stars
 9                            7th Floor
                              Los Angeles, California  90067
10

11   For Hilldun Corporation: JERROLD L. BREGMAN, ESQ.
                              BG Law, LLP
12                            21650 Oxnard Street
                              Suite #50
13                            Woodland Hills, California  91367

14   For Yvonne Niami:        MARK S. HOROUPIAN, ESQ.
                              SulmeyerKupetz
15                            333 South Grand Avenue
                              Suite #3400
16                            Los Angeles, California  90071

17   For Himself:             ANDRE MARIO SMITH, Pro Se

18
     For the U.S. Trustee:    NOREEN A. MADOYAN, ESQ.
19                            915 Wilshire Boulevard
                              Suite #1850
20                            Los Angeles, California  90017

21
     For Italian Luxury       GREGORY J. MORROW, ESQ.
22   Group; Italian Luxury    The Morrow Law Group
     Design, LLC:             10401 Wilshire Boulevard
23                            Suite #1102
                              Los Angeles, California 90024
24

25
```

```
 1   For the Bel Air          CHARLES FREDERICK ROSEN, ESQ.
     Association:             Law Office of A. Lavar Taylor
 2                            3 Hutton Center
                             Suite #500
 3                            Santa Ana, California  92707

 4
     Court Recorder:          Dawnette Francis
 5                            U.S. Bankruptcy Court
                             Central District of California
 6                            Edward R. Roybal Federal Building
                               and Courthouse
 7                            255 East Temple Street, Room #1639
                             Los Angeles, California  90012
 8                            (855) 460-9641

 9   Court Transcriptionist:  Ruth Ann Hager, C.E.T.**D-641
                             Ben Hyatt Certified Deposition
10                              Reporters
                             17835 Ventura Boulevard
11                            Suite #310
                             Encino, California   91316
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1                                         INDEX

2

3     WITNESSES:              Direct    Cross    Redirect    Recross

4     RAYNI WILLIAMS
        By Mr. Shinderman              146
5       By Mr. Newman                  150
        By Ms. Andrassy                154
6       By Mr. Morrow                  155
        By Mr. Golubchik                        156
7
      BRANDEN WILLIAMS
8       By Mr. Shinderman              162

9     AARON KIRMAN
        By Mr. Shinderman              168
10      By Mr. Rafatjoo                168
        By Mr. Geher                   169
11      By Mr. Horoupian               170

12    CHAD ROFFERS
        By Mr. Shinderman              174
13      By Mr. Newman                  184
        By Mr. Shinderman              189
14      By Ms. Andrassy                192
        By Mr. Horoupian               195
15      By Mr. Geher        196
        By The Court        201
16
      RICHARD SAGHIAN
17      By the Court        212

18    LAWRENCE RUSSELL PERKINS
        By Mr. Golubchik    215
19

20    EXHIBITS:                                    Ident.   Rec'd

21    (None.)

22

23

24

25



Page                                                            6

1              LOS ANGELES, CALIFORNIA, FRIDAY, MARCH 18, 2022

2                            11:29 A.M.

3                             --oOo--

4          THE CLERK:  Please come to order.  This United

5    States Bankruptcy Court is now in session, the Honorable

6    Deborah J. Saltzman presiding.

7          THE COURT:  Thank you.  Good morning.  It is

8    March 18, 2022.  This is the Bankruptcy Court for the

9    Central District of California, Los Angeles Division.  We

10   are appearing on Zoom this morning.  Thank you for

11   following the instructions on the court's calendar and

12   website and for assisting my law clerks in recording your

13   appearances.

14          On a matter like this one where we have a lot of

15   observers, it's important to remind everyone that this is a

16   court proceeding.  It is intended to be a public

17   proceeding, and I feel very strongly about that, so anyone

18   is welcome to attend this proceeding.   It just has to be

19   consistent with the Court's security procedures.  That is

20   why we ask for your name, even if you don't plan on

21   speaking.  If you were entering the courthouse and coming

22   into the courtroom, you would show identification to the

23   security officers and you would identify yourself to the

24   courtroom deputy.  So that is why we have taken the time to

25   record all of our appearances today.

Page                                                              7

1          We are only here on the two motions in the

2    Crestlloyd matter.  I'm going to begin with appearances

3    with the list that my law clerks have collected with your

4    assistance.  I'm only going to call appearances for those

5    who I believe will be speaking today.  So when I call your

6    name, please state your full name and who you represent.

7    When I get to the end of that list, if you do intend to

8    speak, please let me know your name and who you represent.

9          I also know that we have, I believe, all of the

10   individuals here who have submitted declarations.  Thank

11   you for appearing.  I may have a few questions for a couple

12   of people who submitted declarations and that's why I've

13   asked you to attend today.

14          So let's begin with counsel for the debtor,

15   Mr. Golubchik, Mr. Arnold.  Good morning.

16          MR. GOLUBCHIK:  Good morning, Your Honor.  David

17   Golubchik, Levene, Neale, Bender, Yoo & Golubchik for the

18   debtor.

19          THE COURT:  Mr. Shinderman and Mr. Schumacher,

20   good morning.

21          MR. SHINDERMAN:  Good morning, Your Honor.  Mark

22   Shinderman of Milbank, LLP.  I'm here with my colleague,

23   William Schumacher, on behalf of Yogi Securities.

24          THE COURT:  Ms. Andrassy, good morning.

25          MS. ANDRASSY:  Good morning, Your Honor.  Kyra

Page                                                              8

1   Andrassy of Smiley Wang-Ekvall, counsel for Inferno

2   Investment.

3          THE COURT:  Ms. DeVoll, good morning.

4          MS. DeVOLL:  Good morning, Your Honor.

5   Marguerite Lee DeVoll with Watt Tieder Hoffer & Fitzgerald

6   on behalf of J&E Texture, Inc.

7          THE COURT:  Mr. O'Dea, good morning.

8          MR. O'DEA:  Good morning, Your Honor.  Ryan O'Dea

9   of Schulman Bastian Friedman and Bui on behalf of secured

10  creditor American Truck & Tool Rentals.

11         THE COURT:  Mr. Rafatjoo, good morning.

12         MR. RAFATJOO:  Good morning, Your Honor. Hamid

13  Rafatjoo of Raines Feldman, LLP for Nile Niami.

14         THE COURT:  Mr. Newman, good morning.

15         MR. NEWMAN:  Good morning.  Sam Newman, Sidley

16  Austin LLP, on behalf of Richard Saghian, respective

17  purchaser.

18         THE COURT:  Mr. Newman, I am not sure if

19  Mr. Saghian has joined us or if he is going to be able to

20  join us.  I -- do you intend -- he's probably one of the

21  two most likely people I will need to speak to today.

22         MR. NEWMAN:  Mr. Saghian is here in our office

23  and we have the ability to put him on.

24         THE COURT:  Okay.

25         MR. NEWMAN:  But --

Page                                                              9

1            THE COURT:  Thank you.  Mr. Geher, good morning.

2            MR. GOLUBCHIK:  Good morning, Your Honor.

3    Thomas M. Geher, Jeffers Mangels Butler & Mitchell,

4    appearing for secured creditor Hankey Capital, LLC.

5            THE COURT:  Mr. Bregman, good morning.

6            MR. BREGMAN:  Good morning.  Excuse me.  Good

7    morning, Your Honor.  Jerrold Bregman for Hilldun Corp.

8            THE COURT:  Mr. Horoupian, good morning.

9            MR. BREGMAN:  Excuse --

10           THE COURT:  Oh.

11           MR. BREGMAN:  Excuse me.  I'm not able to be on

12   video.

13           THE COURT:  Not a problem.  We can hear you just

14   fine.

15           Mr. Horoupian, good morning.

16           MR. HOROUPIAN:  Good morning, Your Honor.  Mark

17   Horoupian of SulmeyerKupetz on behalf of Yvonne Niami.

18           THE COURT:  Mr. Rosen, good morning.

19           MR. ROSEN:  Good morning, but I wasn't planning

20   on speaking.

21           THE COURT:  Thank you.  Thank you, sir.

22           Mr. Smith, good morning.

23           MR. SMITH:  By special appearance only.  Smith,

24   Andre Mario for special interested party and winning

25   overbidder, Andre Mario Smith, all rights reserved.

Page                                                              10

1           THE COURT:  Ms. Madoyan, good morning.

2           MS. MADOYAN:  (Inaudible.)

3           THE COURT:  Oh, Ms. Madoyan, you are on mute.

4           MS. MADOYAN:  Good morning, Your Honor.  I'm

5  sorry about that.  Noreen Madoyan, U.S. Trustee's Office.

6           THE COURT:  I think that's everyone who intends

7  to address the motion and any objections.  If I have missed

8  anyone, please let me know.

9           MR. MORROW:  Good morning, Your Honor.  Gregory

10  Morrow, I'm the Morrow Law Group on behalf of creditor

11  Italian Luxury Group and Italian Luxury Design, LLC.

12          THE COURT:  Good morning.

13          MR. MORROW:  Good morning, Your Honor.

14          THE COURT:  Give me one moment here to update my

15  list.

16          MR. MORROW:  Certainly.

17          THE COURT:  Have I missed anyone else?

18          MR. GOLUBCHIK:  Your Honor, may I ask if a

19  gentleman by the name of Armen (phonetic) -- Armen, what's

20  her last name?  On number two, the proposed purchaser.  I

21  think he just called in.

22          THE COURT:  Ah, okay.

23          MR. GOLUBCHIK:  Topachikyan (phonetic).

24          THE COURT:  Yes.  Let me look at the waiting

25  room.  Yes.  I am adding -- okay.  So I've added that

Page                                                          11

1  individual, as well.

2           Well, Mr. Golubchik, I think my first question

3  will probably decide whether this is a very short hearing.

4  Is there a signed addendum, signed -- the same document

5  signed by both parties?

6           MR. GOLUBCHIK:  We do not have the addendum

7  signed by Mr. Newman's client.  I had asked Mr. Newman --

8  our understanding is, for all intents and purposes, they

9  are proceeding with the sale without any changes.

10          THE COURT:  My understanding from the reply was

11 that you were expecting a signed addendum and that that

12 would be necessary to go forward.

13          MR. GOLUBCHIK:  That's correct and I'm wondering

14 with all the craziness with the short schedule if it

15 slipped through.  I have not seen it.  Again, if it's okay

16 to ask Mr. Newman as to the status.

17          THE COURT:  Sure.  Mr. Newman?

18          MR. NEWMAN:  Yes, Your Honor.  We have signed the

19 addendum.  I believe my client signed the addendum that

20 Mr. Golubchik has requested and if it hasn't -- if he has

21 not seen it, we can send him a copy, you know, presently.

22          MR. GOLUBCHIK:  That would be one -- great.

23          THE COURT:  When was that time?

24          MR. NEWMAN:  I have to pull out the time.  I

25 think it -- I don't have it handy, but I can find out and

Page                                                              12

1  get to you.

2          THE COURT:  Okay.  For anyone who's raising a

3  hand, asking a question, we're going to go in order.  I'm

4  going to call on people in an order that I think makes

5  sense to get through all of the issues that we have.  We

6  will begin with the moving party.  I will go to then anyone

7  objecting and then back to the movant.

8          As I said, I may need to hear from a couple of

9  witnesses to ask a couple of supplemental questions to the

10 declarations, but we'll go in order, so no need to be

11 raising hands and asking to be heard at this point.

12         Mr. Golubchik, then again, let me clarify.  So

13 the addendum that we are talking about is the same document

14 signed by all parties, correct?

15         MR. GOLUBCHIK:  That is correct, Your Honor.  The

16 dispute we had earlier, which we discussed at last Friday's

17 hearing, is the buyer wanted to change rights that the

18 buyer may have in case the debtor sold the property to

19 somebody else, which was not acceptable to us.

20         So we advised the buyer the original addendum is

21 what you signed to move forward.  So that's what we've been

22 waiting, Mr. Newman's.  I'd appreciate for him to send it

23 over.  I just haven't seen it maybe in light of all these

24 filings.

25         Prior to that, Your Honor, I'm sorry to interrupt

Page                                                                        13

1  and change the topic.  I'm wondering, if there are no

2  objections or no issues, would it make sense for us to get

3  #2.00 out of the way and have Mr. Topachikyan free?  And I

4  just have one clarification as to a lien issue.

5            THE COURT:  Just give me a moment.

6            MR. GOLUBCHIK:  Thank you.

7            (Pause)

8            THE COURT:  There.  Okay.  This is the personal

9  property motion.  Mr. Golubchik, what would you like to

10 highlight?

11           MR. GOLUBCHIK:  Well, Your Honor, as stated in

12 the motion, in storage the debtor discovered there's

13 certain miscellaneous appliances.  Just the value is not

14 high, but the cost associated to removing it would be costs

15 the estate would have to incur.

16           Mr. Perkins and Mr. Staglik of Sierra

17 Constellation, worked out an arrangement with gentleman

18 Armen Topachikyan to purchase the appliances for $10,000

19 and he would have to remove it prior to the close of escrow

20 so we would not incur any costs and we would not interfere

21 with the escrow closing.

22           One clarification, as Mr. Geher is staring at me,

23 is we ran a UCC because it's personal property and there

24 were no liens, but Mr. Geher correctly reminded me that

25 notwithstanding the UCC search, part of the DIP financing

Page                                                          14

1  Hankey had a lien on all assets.

2          So this 10,000 is collateral of Hankey Capital,

3  which is fine, but we just want to clean the property up so

4  that when there's a sale, we can deliver it.

5          MR. GEHER:  And, Your Honor, Hankey Capital

6  consents to this sale.

7          THE COURT:  Okay.  Thank you.

8          MR. GOLUBCHIK:  And, Your Honor, one more thing

9  just to address what maybe Mr. Newman may be thinking, but

10  we discussed previously -- I apologize.  There are

11  airplanes in the back.

12          THE COURT:  No problem.

13          MR. GOLUBCHIK:  None of the appliances were

14  installed or used in the property, so it's not a fixture of

15  the house in any way.  Nothing was removed from the

16  kitchen, for example, to sell here.  This is stuff standing

17  in storage.

18          THE COURT:  Okay.  Understood.  There were --

19          MR. SMITH:  I would like to object, I'm so sorry,

20  to any removal of fixtures.  No objection to appliances or

21  otherwise.

22          THE COURT:  Thank you.  Counsel indicated that

23  these are not fixtures.

24          There are no objections to the sale.  There was a

25  request to waive the 14-day stay period, which given the

Page                                                                15

1  interest and time I think is justified here.  So I will

2  grant the motion with the 14-day stay waived and I'll look

3  for the order, Mr. Golubchik.

4          MR. GOLUBCHIK:  Thank you, Your Honor, and just

5  for, Mr. Topachikyan, you're done for today and we'll

6  contact you later after the hearing.

7          THE COURT:  Thank you.  Thank you, sir.

8          MR. GOLUBCHIK:  Back to work.

9          THE COURT:  All right.  So, Mr. Golubchik, I

10 don't know in that few minutes whether you've received a

11 copy or another copy of that addendum.

12         MR. GOLUBCHIK:  I have not.

13         So, Mr. Newman, could you please make sure?

14         MR. NEWMAN:  Yeah, Your Honor.  It's being

15 transmitted right now to Mr. Golubchik by .pdf.  We have --

16         MR. GOLUBCHIK:  Okay.

17         MR. NEWMAN:  -- we have a copy of it signed in

18 the office right here.

19         THE COURT:  Okay.

20         MR. SMITH:  If you could forward the addendum?

21 I'm sorry.

22         THE COURT:  All right.

23         MR. SMITH:  I'm a noticed party.  I did not

24 receive it.

25         THE COURT:  This is a document only between the

Page                                                                16

1   proposed buyer and, at this point, the debtor.  I'm going

2   to ask again that everyone refrain from interrupting.

3   Everyone is going to have an opportunity to speak.

4           We're going to do so in order so that I am in a

5   position to make the findings I need to make in connection

6   with this motion, so I'm going to ask again for no

7   interruptions.  I appreciate your assistance.

8           Mr. Golubchik?

9           MR. GOLUBCHIK:  Yes, Your Honor.  Should I -- oh,

10  I'm sorry.

11          THE COURT:  I think what I'd like to do is to ask

12  you to kind of walk through the highlights of the motion.

13  Please focus on the numbers in the distributions because I

14  know there were some stipulations and some changes there.

15          I'm interested in the proposed distributions,

16  what happens with the remaining funds.  I am very

17  interested in, of course, meeting the statutory

18  requirements of 363(b)(2), 363(f), very interested in that,

19  and I may be interrupting you and asking questions as we

20  go.

21          MR. GOLUBCHIK:  That's fine.  Thank you, Your

22  Honor.

23          I think the theme, at least for me, for this

24  presentation is, what is the alternative.  This case

25  started with a property that was in a receivership and it

1  was on the eve of foreclosure by Hankey Capital.

2           The bankruptcy was filed to preserve value

3  because parties believe there's substantial value in the

4  property.  The bankruptcy case commenced.  We had

5  substantial expenses in connection with the property,

6  including the need to obtain insurance coverage, which

7  costs I think somewhere around five million dollars or so.

8  Fortunately, we're able to reach a DIP financing

9  arrangement with Hankey Capital pursuant to which 12

10 million dollars in principal was provided.

11          THE COURT:  What was the representation at the

12 time of the DIP motion as to the value of the property?

13          MR. GOLUBCHIK:  I believe from our position,

14 including the schedules, the thought was that the value was

15 325 million dollars based on the appraisal that was

16 obtained previously and based on information provided to us

17 by the brokers.

18          THE COURT:  Um-hum.

19          MR. GOLUBCHIK:  So we proceeded with making

20 necessary improvements, repairs to the property, obtaining

21 insurance, spoke with the brokers, spoke with Concierge,

22 which is the top international online auction house for

23 real property, and we came to the court with a plan, and

24 the plan, the timing had to do with respect to Hankey and

25 the timing of the DIP loan and discussions.  But the plan

Page                                                                18

1  was there's going to be an exorbitant marketing effort by

2  all parties and then we're going to have an auction.

3          And at the end of the day, notwithstanding what

4  an appraisal is and the jokes that people say MAI stands

5  for Made As Instructed, different appraisers can have

6  different values and different beliefs, a properly exposed

7  house through an auction process is going to result in what

8  is believed to be a fair and reasonable price or the

9  highest possible price.

10         At the time of the bid procedures hearing, there

11 were numerous objections as to the timing of the auction,

12 as to no minimum reserve with respect to the property.  If

13 the Court recalls, Chad Roffers of Concierge took the

14 witness stand, provided testimony under oath in his

15 experience, that he believed that a property such as this,

16 which is a very unique property, should not have a minimum

17 reserve so that we could have a bidding frenzy and some

18 emotions associated with one-of-a-kind property.

19         At the end of the hearing, the Court granted the

20 bid procedures as to the timing, as to how the person --

21 the auction is going to proceed.  All the brokers worked

22 hard on a domestic, international basis in order to expose

23 the property.

24         In addition to the declarations that have a

25 summary of the exposure for the property, I'm sure the

Page                                                                    19

1    Court's seen *Bloomberg* articles, *Los Angeles Times*

2    articles, *Robb Report*.  Basically the property was

3    everywhere and everyone knew about the property.  I don't

4    think there's any -- I don't recall any objections to

5    saying the property was not exposed.  It really was.

6            So we came to the auction.  Between the filing of

7    the bankruptcy case and the auction, the world changed

8    quite a bit, but the auction still happened.  We started

9    with a minimum bid of 50 million dollars and I'm not even

10   sure if that same day we had an increase to 60, but the

11   information we received from Concierge is everything is

12   going to happen at the very end, including registering.

13           Concierge's hope was to have three to five

14   qualified bidders.  We had five qualified bidders.  In the

15   auction --

16           THE COURT:  By the very end, do you mean 4:00?

17           MR. GOLUBCHIK:  4:00 on the last day, because

18   this was a multi-day auction.

19           THE COURT:  Um-hum.  Okay.

20           MR. GOLUBCHIK:  And consistent with the

21   expectations of Concierge, based on their experience, we

22   had five credible bidders until the very end.  The number

23   did not come up to the 100s.  In fact, the bid before the

24   current proposed buyer was 100 million, not even 110, and

25   at the very last moment the buyer went to 120 and himself

Page                                                                    20

1   overbid himself by going to 126.

2            THE COURT:  When you say at the very last moment,

3   you're actually talking about after the very last moment.

4   All of this is after 4:00.

5            MR. GOLUBCHIK:  After 4:00, correct.  Correct.

6            THE COURT:  Okay.  So after the end of the

7   auction.

8            MR. GOLUBCHIK:  Right.  Because pursuant to the

9   bid procedures, Concierge, based on development, had the

10  ability to extend the deadline of the auction.  If we had

11  cut off sooner, we might have had a 100 million dollar

12  offer, but we had the buyer come in at 126 and I'm told the

13  reason he overbid himself is 126 is his lucky number.

14           At the end of the day, the property was exposed.

15  That was the highest and best bid received in the current

16  environment, the current marketplace.  We understand that

17  people were not happy.  Frankly, we expected a much higher

18  number.  But the property was exposed.  It's not like

19  something was not done.  Had it been done, we would get to

20  a higher number.  Everything that could be done was done,

21  at least that's our belief and the broker's -- the broker's

22  and Concierge.

23           So we filed the sale motion in accordance with

24  the requirement by the Court on March 8th and there were

25  some objections.  Let me go through the elements.

Page                                                                                    21

1            363(b) has five elements.  One is -- first

2    element is sound business purpose.  The goal from the

3    beginning has been to sell the property for the highest

4    maximum price.  Consistent with that, throughout the

5    bankruptcy case, everyone worked on preparing the property

6    for sale, marketing the property, and having the auction.

7    The business purpose is sale and that's consistent with

8    what we have.

9            Let's skip for a moment the second element, fair

10   and reasonable price, because that's what everyone's

11   fighting about.  Let's go to adequate marketing, which is

12   the third element.

13           Again, you have two declarations:  one from

14   Brandon Williams, who's with us, and then one from Chad

15   Roffers that discusses the extent.  In fact, when I was

16   watching the Super Bowl, just before the Super Bowl it had

17   a little snippet on the property as part of their marketing

18   of Los Angeles.  So I don't think there's any question that

19   marketing was not adequate.

20           Good faith.  There are objections to good faith

21   based on the price, and since we did not sell it for what

22   we thought the property was worth it's not good faith, but

23   that's not the standard as we read.  The standard is

24   whether there's any collusion, inappropriate activity

25   between the buyer and the seller.

Page                                                                22

1          We have provided declarations that there is not.

2     Mr. Newman, I believe, recently filed in response to the

3     buyer's declaration that confirms it.  This is an above-

4     board public auction process, so there's good faith

5     involved.

6          Fifth is accurate and reasonable notice.

7     Everyone has been aware of the schedule based -- from the

8     time of the bid procedures and we've complied with a

9     schedule ordered by the Court, filing papers, filing the

10    6004-1 notice with the clerk, so we believe that we have

11    accurate and reasonable notice.  Now the question is --

12         THE COURT:  Well, I mean, the notice isn't

13    perfect.  There are a couple of deficiencies in that

14    notice, but we can talk about those later.

15         MR. GOLUBCHIK:  Okay.  All right.

16         Fair and reasonable price.  Part of our briefing

17    is, has been authority that the Trustee is given

18    substantial discretion, as is the Court, with respect to

19    fair and reasonable price.

20         I can go back to what I started the presentation

21    with.  At the end of the day, notwithstanding what an

22    appraisal may say or really what a broker believes the

23    value is, it is once the property is exposed what a willing

24    buyer is willing to pay a willing seller having all

25    information.

Page                                                              23

1          The property was exposed.  We have provided all

2    information.  We received a high bid of 126 and based on

3    the credit from Concierge, it's almost 12 million dollars

4    more.  So it's just under 138 million dollars.  Again,

5    because an appraisal set a number for their beliefs that is

6    not a fair and reasonable price however, the exposure to

7    the marketplace results in.

8          Now, what's interesting is the objections talk

9    about we need more time, there are other interested parties

10   and, frankly, we were contacted by people expressing

11   interest, which prompted the buyer's motion that we were in

12   court on Friday.

13         To this date, we don't have any, at least myself,

14   and I checked with Mr. Perkins as the primary manager.  We

15   have nothing else.  So the question is, what is the

16   alternative.  If this sale does not occur, when will the

17   next sale be or what will happen?

18         Well, I was born in Kyiv, Ukraine, so I follow

19   what's going on.  Is the war going to end?  Are the

20   sanctions going to end?  Are suddenly interest rates going

21   to drop over here as inflation is continuing and, to the

22   extent anything happens, when will it happen?

23         We have --

24         THE COURT:  Interest rates dropping have to do

25   with anything.  You told me a couple times this isn't a

Page                                                                    24

1  typical situation where you'd have a buyer getting

2  financing from Citibank.

3          MR. GOLUBCHIK:  I agree, Your Honor.  Not in

4  connection with financing.  Just the general economy.

5  Costs are going up.  We can even forget the interest rate.

6  But the point is, what is going to change and --

7          THE COURT:  Can that matter?  I mean this is your

8  burden --

9          MR. GOLUBCHIK:  Of course.

10          THE COURT:  -- to show that this is a sale that

11  is in the best interests of the estate and creditors, with

12  an S.

13          MR. GOLUBCHIK:  And we're going to go through

14  that part, too, so you can see why we think it's in the

15  best interests of the creditors once we do the waterfall

16  discussion because there's something here, an alternative.

17          So we believe, based on all of the efforts and

18  all the declaration that the price is fair and reasonable

19  under today's circumstances.  In the reply, we cited

20  authority that you don't look at best reasonable in a

21  vacuum.  Based on today's circumstances, this is a fair and

22  reasonable price.

23          So now let's look at -- should I talk about

24  benefits to the creditors before I discuss 363(f), Your

25  Honor?

Page                                                                25

1              THE COURT:  Please.

2              MR. GOLUBCHIK:  Okay.  So let's talk about the

3     numbers.  We have the following.  We have mechanics lien

4     creditors who are entitled to priority.  The number is

5     approximately $800,000 -- under one million dollars.

6              THE COURT:  But is that all the mechanics liens?

7              MR. GOLUBCHIK:  Yes, Your Honor.  It's under a

8     million dollars.  So when we were talking outside of court,

9     we rounded off to a million dollars.  Oh, I'm sorry.  You

10    were checking, so I was waiting.

11             THE COURT:  Yeah.

12             MR. GOLUBCHIK:  Shall I --

13             THE COURT:  Go ahead.

14             MR. GOLUBCHIK:  -- continue?  Okay.  So there's

15    money to pay the mechanics lien creditors.

16             We have broker commission of two-and-a-half-

17    million dollars.  We have property taxes.  I believe the

18    amount, and I didn't put that in my note, unless Mr. Arnold

19    can correct me, I think it's about one-and-a-half that has

20    to be paid.

21             THE COURT:  I think your motion says two-and-a-

22    half, but --

23             MR. GOLUBCHIK:  Two.  But we paid a portion of

24    that amount.  But let's go with two-and-a-half for now.

25             Then we have Hankey.  So right now our numbers

Page                                                                26

1   add up to six million dollars.  Then we have Hankey's 12

2   million-dollar DIP and we have Hankey's receivership

3   certificate, which is entitled to priority.  That's

4   approximately 12.9, but let's call it 13 million dollars.

5   Now we're at 19 million dollars.

6           Next is we have Hankey's 82.5 million-dollar --

7   there -- we currently have a dispute and I expect Mr. Geher

8   to chime in.  Hankey's total loan package is 106 million

9   dollars.  It was broken up 82.5 and 23.5.

10          82.5 subject to a first lien, at least from the

11  debtor's view.  That's valid.  The 23.5, there's an issue

12  whether that should be part of the first lien or it should

13  be a subsequent lien and if it is subsequent that that 23.5

14  plus interest goes into fourth position behind Yogi.

15          But the 82.5, our client's -- the debtor's

16  calculation with interest is approximately 101 million

17  dollars.  So between the 19 that we discuss and 101, we're

18  at 120 million dollars.  Now, the question -- so we have

19  about 18 million dollars left over from this amount.

20          We have Inferno that asserts a claim for

21  approximately 20 million dollars and Yogi that asserts a

22  claim for approximately 20 million dollars.  As part of our

23  motion, we provided to the Court Exhibit 6 with a -- which

24  is a profit participation agreement between Inferno and

25  Crestlloyd, pursuant to which, the way we read it, Inferno

Page                                                                    27

1   agreed to have third-party loans and costs of construction

2   paid before it receives any money.

3          Our rating is it subordinated itself to other

4   creditors.  That's the basis for us also to allege claim

5   being subject to *bona fide* dispute.  I don't think

6   there's -- there was argument or objection that the claim

7   is subject to *bona fide* dispute.

8          If that is accurate, then Yogi presumably moves

9   up and Yogi -- with Yogi we've asserted also an objection.

10  If you look at the proof of claim in the documents, Yogi

11  and Inferno, for that matter, provided financing on

12  numerous properties.

13         We're still trying to obtain documents to

14  determine what part of the loan was for Crestlloyd, what

15  part of the loan was for Hillcrest or any other properties

16  that were associated.  So there is a possibility that even

17  once we go through the claims of Yogi and Inferno, there's

18  going to be money left over for other creditors of the

19  estate from this sale of the property.

20         However, this bankruptcy is not only about the

21  sale of the property.  We are -- we have to go through a

22  money flow, a money trail.  Hundred eighty million or so

23  was provided to the debtor.  If there's no record of all

24  the money being used by the debtor, where did the money go?

25  There may be other claims and causes of action, but right

Page                                                              28

1   now, we're only talking with respect to real property.

2          So the real property we know will pay -- besides

3   the professionals, will pay property taxes, will pay

4   mechanics liens, will pay the DIP loan, will pay the first

5   loan and money will be set aside for Yogi and Inferno

6   subject to resolution of claims and other creditors.   So

7   that's how I view the money flow to go, Your Honor.

8          Before I go to --

9          THE COURT:  Okay.

10         MR. GOLUBCHIK:  -- F, do you have any questions

11  about the money flow?

12         THE COURT:  Not right now.  Thank you.

13         MR. GOLUBCHIK:  Okay.  So with respect to 363(f)

14  and two of the objections, one by American and one by J&E,

15  we acknowledge that mechanics liens subject to review of

16  the claims are entitled to priority, so all the mechanics

17  lien creditors are protected.

18         We have stipulations with both creditors.  They

19  have agreed to a slight reduction of their claims for a

20  payout as part of the closing of the sale and we filed both

21  the stipulations with the Court.  We did not submit

22  separate orders because we thought maybe it would be more

23  appropriate to -- to the extent the sale is approved and

24  the stipulations are approved to include it in the global

25  sale order.

Page                                                                29

1          THE COURT:  So the proposed amount in your chart

2    reflects a -- so you've -- you're paying a lower amount to

3    the parties who have objected and then -- all amounts to

4    everyone else?

5          MR. GOLUBCHIK:  No, Your Honor.  Monies -- money

6    is going to sit in a trust account.  All interest liens are

7    going to attach with the same extent, validity, priority as

8    they were entitled to prior to.  The next step, once we

9    have money, is to go through the individual claims and deal

10   with the individual creditors, but their mechanics liens

11   are going to attach to the sale proceeds.

12         So as we resolve each claim individually, we

13   would file a stipulation or a motion for authority to play

14   those claims.  So there is no agreement at this time to pay

15   all other mechanics lien claims in full because we have to,

16   frankly, review those claims.

17         Over here, we have the objecting parties and that

18   brought their claims to the forefront.  We looked at them.

19   We negotiated with them and we reached agreement.

20         THE COURT:  Okay.

21         MR. GOLUBCHIK:  Okay.  And with American, it's a

22   claim of approximately $188,000.  It's being reduced to

23   160.  And J&E, a claim of approximately 366,000 is being

24   reduced to 288,000.  And based on the stipulation, both

25   parties have agreed to withdraw objections and supporting

Page                                                                          30

1   consent of a sale.

2           So then we have the *bona fide* dispute issues.

3   I've discussed and we provided evidence in our motion that

4   we have *bona fide* dispute with respect to Yogi, with

5   respect to Inferno.  Hankey, I believe, supports and

6   consents to the sale.  Hilldun, which is another junior

7   creditor, we've submitted a stipulation where Hilldun

8   consents or agrees that the claim is subject to a *bona fide*

9   dispute.

10          THE COURT:  Now go back to the *bona fide* dispute.

11  So you've got this chart in the motion, a summary chart.

12  There's no citation.  I don't know where these facts

13  come -- the factual assertions come from and the chart.

14  And it seems to me that the case law requires that there

15  has to be factual grounds presented to show an objective

16  basis for the dispute.

17          So what is there, other than this chart that -- I

18  don't know where it comes from.

19          MR. GOLUBCHIK:  So, Your Honor, what the law is,

20  there needs to be an objective basis for a factual or legal

21  dispute, and the Court doesn't even need to make a

22  determination of the likely outcome, just that there is a

23  dispute that exists, and that's the *Capital Cove Bank Corp.*

24  case that we cited.

25          Let me go to the chart.  With respect to Inferno,

Page                                                                           31

1   the chart refers to Exhibit 6, which is attached in the

2   motion, and that's the profit participation agreement where

3   Inferno states, "Third party" --

4           THE COURT:  Mr. Golubchik, you -- your video and

5   audio have frozen for a moment.  I'm not sure if it's me or

6   you.  Now I can see you moving again.

7           MR. GOLUBCHIK:  I'm sorry.  Can you hear me now?

8           THE COURT:  Yes.  Yes.

9           MR. GOLUBCHIK:  Okay.  I'm sorry.  What I was

10  saying is, with respect to Inferno in the chart and the

11  document, we attached Exhibit 6.

12          THE COURT:  Um-hum.

13          MR. GOLUBCHIK:  Exhibit 6 is an agreement that

14  provides that Inferno agrees when money comes out of the

15  property, first you have third-party loans, then you have

16  cost of construction, and then money is split between

17  Inferno and Crestlloyd.  Oh --

18          THE COURT:  That, to me, suggests that there's a

19  dispute perhaps as to amount, but not as to the existence

20  of an interest.

21          MR. GOLUBCHIK:  -- I -- Your Honor, can you hear

22  me?

23          THE COURT:  Yes, I can.

24          MR. GOLUBCHIK:  I'm sorry.  My computer's going a

25  little wacko.  Okay.  I won't touch it.

Page                                                                    32

1          So with respect to the inter -- two things.  This

2    is the first part.  If Inferno has subordinated itself to

3    all other creditors, it may not effectively have a secured

4    claim at all of all -- to all other creditors.

5          The second part of our objection is the fact that

6    Inferno -- and it's the same argument with Yogi.  Their

7    loan documents refer to providing financing on numerous

8    properties.  The question is, the benefit that Crestlloyd

9    received and what portion of the financing was for

10   Crestlloyd.

11         If the money was not for Crestlloyd, whether it's

12   lack of consideration, fraudulent conveyance, any of those

13   arguments, if it is not for Crestlloyd, there's a dispute.

14   There's a basis to reduce the amount of their claim.

15   That's what we have in the chart, the discussion.

16         THE COURT:  Okay.  So it's not as to the -- so

17   there is a suggestion that there is a dispute as to the

18   amount of the secured claim, but there is not an objective

19   basis to support a conclusion that the interest themselves

20   are a *bona fide* dispute.

21         MR. GOLUBCHIK:  No, Your Honor.  That -- so the

22   interests are, for example, you have a 20 million-dollar

23   debt.  If only three million dollars applies to Crestlloyd,

24   17 million dollars would be subject to a disallowance as a

25   secured claim.  As a secured --

Page                                                                33

1            THE COURT:  But case would support that

2    contention that the interest itself is in *bona fide* dispute

3    because the amount of the interest might be in dispute?

4            MR. GOLUBCHIK:  It's not just --

5            THE COURT:  And, again, it's --

6            MR. GOLUBCHIK:  -- amount, Your Honor.

7            THE COURT:  -- it's not (indiscernible)?

8            MR. GOLUBCHIK:  No, Your Honor.  It's not simply

9    the amount.  It's the security interests, as well, because

10   the security --

11           THE COURT:  Right.

12           MR. GOLUBCHIK:  -- interest --

13           THE COURT:  What case would you rely on there?

14           MR. GOLUBCHIK:  I will --

15           THE COURT:  If there's a dispute as to the

16   amount --

17           MR. GOLUBCHIK:  I will have to -- I don't have --

18           THE COURT:  Okay.

19           MR. GOLUBCHIK:  -- the case --

20           THE COURT:  We can circle back.  I'm sure that --

21           MR. GOLUBCHIK:  Yeah.  Let's circle back.

22           THE COURT:  I'm sure Ms. Andrassy and

23   Mr. Shinderman will have some comments on 363(f)(4), as

24   well.

25           MR. GOLUBCHIK:  So then -- so that's with respect



Page                                                                    34

1    to Inferno and Yogi.

2              Then we have (f)(5), whether a creditor could be

3    compelled to accept the money satisfaction.  The objecting

4    parties focus on *Clear Channel*, but *Clear Channel*'s

5    discussion was whether there was a -- if there is no other

6    proceeding where one could be compelled to receive a

7    satisfaction judgment, then that doesn't work.  We have the

8    *Bank of Hammett v. U.S.*, a Ninth Circuit case, that talks

9    about other proceedings, including foreclosure.

10             There are three proceedings, Your Honor.  There

11   was a receivership proceeding, which has a provision for

12   foreclosure; there's an express order we attached as part

13   of our reply, which authorizes a sale and any liens and

14   interests to attach to the sale proceeds; we have the

15   nonjudicial approach and under state law Hankey as a

16   secured creditor, senior secured creditor, has the ability

17   to foreclose and either wipe everyone out behind him or if

18   there's payment made, they receive the monetary amount of

19   the payment; and three was the plan of reorganization

20   route, which we discussed in the -- in our sale motion.

21             So there are procedures pursuant to which a

22   junior creditor could be compelled to accept a money

23   judgment instead of its lien.  Based on that, we believe

24   that (f)(5) is satisfied as well.  So between an (f)(4) and

25   (f)(5), I think 363(f) is satisfied.

Page                                                                35

1          THE COURT:  What if there's nothing?

2          MR. GOLUBCHIK:  I'm sorry?

3          THE COURT:  What if there's no money?

4          MR. GOLUBCHIK:  If there's -- so under --

5          THE COURT:  Right?  Right?  So, like, what is

6   after a proceeding, whether it's a foreclosure or -- I mean

7   your reply basically just talk about a receivership sale.

8   If there's nothing left, does (f)(5) even apply because

9   there's nothing to accept.

10          MR. GOLUBCHIK:  Isn't zero something?

11          THE COURT:  I don't know.  Are we -- is this,

12  like, a metaphysical question now that --

13          MR. GOLUBCHIK:  Oh, no.  No, Your Honor.

14          THE COURT:  -- you're -- I'm asking you for case

15  law.

16          MR. GOLUBCHIK:  I don't have authority over here,

17  Your Honor, that says zero (f)(5) still applies.

18          THE COURT:  Okay.

19          MR. GOLUBCHIK:  Because my understanding based on

20  the cases that we cited where you can have a foreclosure

21  proceeding, there is an alternative because under (f)(5),

22  it does not say, you know, an actual positive money

23  judgment.  It's any money judgment, whether it's zero or

24  whatever it is.  That's our interpretation, but I do not

25  have authority to support that right now.

Page                                                                    36

1              THE COURT:  Okay.  Oh, and we skipped (f)(2).

2              MR. GOLUBCHIK:  Consent.  In our reply, so we

3    have, in our reply, we've cited authority that consent can

4    be implied through a lack of objection.  We have consent of

5    Hankey.  We have withdrawals of the objections by American

6    and J&E.

7              Any other parties had notice and, Your Honor, you

8    said there are some issue with proof of service, so we'll

9    talk about that.  But our view is, to the extent there's no

10   objection filed, consent could be implied.

11             THE COURT:  Yogi and Inferno have both objected.

12             MR. GOLUBCHIK:  Yes, Your Honor.  But for Yogi

13   and Inferno, we believe that we can still satisfy it under

14   (f)(4) and (f)(5).

15             THE COURT:  Okay.  So you agree that they don't

16   consent.

17             MR. GOLUBCHIK:  Yes.  We agree they don't

18   consent.

19             THE COURT:  All right.

20             MR. GOLUBCHIK:  Because it doesn't require

21   everything.  It's an order situation.

22             THE COURT:  One thing we'll need to circle back

23   on also on these stipulations, there are no orders on the

24   stipulations that have been lodged and I don't think the

25   J&E stipulation is executed properly.  So you're going to

Page                                                                    37

1  need to nail that down.  Okay.  What --

2          MR. GOLUBCHIK:  Your Honor, I'm sorry.  Are you

3  saying it wasn't executed properly because it looks like

4  there was an electronic signature?

5          THE COURT:  Yes.

6          MR. GOLUBCHIK:  Okay.  So that's for Ms. DeVoll.

7  Got it.

8          THE COURT:  What else would you like to cover?

9          MR. GOLUBCHIK:  Nothing, Your Honor.  I think

10 that covers it.  The point is that everything that could be

11 done has been done.  This is the highest bid received.  We

12 have a --

13         THE COURT:  But it was received after the close

14 of the auction.

15         MR. GOLUBCHIK:  Sure.  Pursuant to the bid

16 procedures, Concierge had the ability to extend the

17 process.

18         THE COURT:  Um-hum.

19         MR. GOLUBCHIK:  Otherwise, the number would be --

20         THE COURT:  So the two-hour -- this is what is

21 confusing to me.  If extending -- I mean I'm looking, let's

22 see, at before the close of the auction, there's a 70

23 million-dollar bid and then two hours later, two hours

24 after the close of the auction, there are bids by, I guess,

25 two bidders, including the winning bidder.

Page                                                                38

1          What makes it appropriate to accept bids after

2     the auction to some point, but then not beyond that?

3          MR. GOLUBCHIK:  Your Honor, Mister -- so Chad

4     Roffers, maybe he'd be a better party when it's time --

5          THE COURT:  Yeah.

6          MR. GOLUBCHIK:  -- for him to speak.

7          THE COURT:  I do.  I would like to speak with

8     him.

9          MR. GOLUBCHIK:  Sure.

10         THE COURT:  I think maybe we'll do that after I

11    hear from objecting parties.

12         MR. GOLUBCHIK:  That's fine.  But --

13         THE COURT:  Um-hum.

14         MR. GOLUBCHIK:  But one thing, again, I just want

15    to emphasize that under the procedures, they had the

16    ability to do it.  So your question is, why did they extend

17    to this time and not further, right?

18         THE COURT:  That's a question.

19         MR. GOLUBCHIK:  Okay.

20         THE COURT:  So there are a couple of other issues

21    that were raised in some of the objections that I'd like to

22    hear your comments on.  The *sub rosa* plan argument, how

23    would you respond to that?

24         MR. GOLUBCHIK:  There is no *sub rosa* plan because

25    we are not asking to -- for the Court to allocate payments

1  to any claims other than the initial secured creditors and

2  the mechanics liens.  There's no plan provision.  We're not

3  trying to move funds around, whether it's SPM or otherwise.

4         This has nothing to do with the plan.  The money

5  is going to be deposited in an account.  The liens are

6  going to attach to the sale proceeds and we're going to

7  deal with it.  This is purely a sale of the property.  And

8  to the extent there are disputed claims and we shouldn't

9  pay them, from our point of view that's fine.  We don't

10  have to pay them, but we're not seeking to adjudicate and

11  elevate any claim over any other claim or treated

12  differently, as the argument may be connection with the

13  plan.

14         THE COURT:  Well, I think some others may have

15  some other comments on that.  I do have a very big issue

16  with the comment in the addendum that lists as a condition

17  to the sale, "Entry of an order of the court approving the

18  sale of the property to the buyer that is not subject to a

19  stay pending appeal."  That, to me, makes an order utterly

20  non-refutable.  I don't think that's within this Court's

21  authority to enter.  I think what this must mean is entry

22  of a final order and I can -- you know, that would subject

23  to, you know, waiver of the 14-day stay.  But I do not

24  think that you can make an order unreviewable in this

25  fashion.

Page                                                                    40

1          MR. GOLUBCHIK:  You are correct.  I suspect the

2    intention -- the intent was for closing to occur assuming

3    that the order is not subject to a stay, but I understand.

4          THE COURT:  But the premium rebate, the

5    auctioneer premium rebate that goes -- that comes back to

6    the estate, why would this be subject to liens?

7          MR. GOLUBCHIK:  Your Honor, at this point, we're

8    not saying anything is subject to liens.  What we're saying

9    is, the money gets deposited in an account -- and I just

10   realized that somehow my screen is dark.  I can't figure it

11   out.

12         THE COURT:  I can hear you just fine.

13         MR. GOLUBCHIK:  The money gets deposited in an

14   account.  All liens, all interest attached with the same

15   extent, validity and priority, if at the end of the day

16   this is not subject to the lien, it's not subject to lien.

17   We're not asking for any finding here that anything is

18   subject to any liens.

19         THE COURT:  Now there have been a couple of

20   documents filed -- well, actually let me go back to

21   something else.  Give me a minute here.  I have a lot of

22   paper.

23         You said that the theme of your comments for

24   today would essentially be, you know, that this is the best

25   we could do or, you know, what's the alternative.

Page                                                                    41

1              MR. GOLUBCHIK:  What's the alternative.

2              THE COURT:  What's the alternative?

3              MR. GOLUBCHIK:  Yeah.

4              THE COURT:  I don't think that that's the legal

5    standard so much and I'm thinking of the line of case laws

6    discussing whether a court ought to approve the sale under

7    363 when the sale price is grossly inadequate, and that

8    would be as compared to a proposed price, the price

9    contemplated by the parties, amount of secured claims and

10   so forth.  And I'm sure that you've looked at some of the

11   cases that were cited and there are a lot of cases that

12   weren't cited there.

13             When this case was filed, when a lot of motions

14   were filed, including the DIP motion, the debtor asserted

15   repeatedly this -- that the value of the property was

16   thought to be approximately 325 million dollars.

17             MR. GOLUBCHIK:  Correct.

18             THE COURT:  It is difficult to conclude that 126

19   million dollars would not fall under the line of cases

20   where sales are disapproved because the price is grossly

21   inadequate, and I think it's important in this first

22   discussion that you and I have that you address that issue.

23             MR. GOLUBCHIK:  But, Your Honor, again, the fair

24   market price of a property is -- or any sale is what a

25   willing buyer is will -- is going to pay a willing seller

Page                                                                42

1   having all the information, being fully informed.  The only

2   thing that the brokers can do is to market the property and

3   expose it to the marketplace.  By definition, when you have

4   an auction and the property is exposed, you have the -- a

5   fair and reasonable, if not the highest price, based on the

6   exposure.

7          Unfortunately, in this case, it did not turn out

8   that what a prior appraisal stated or what the brokers

9   thought, that did not turn out to be the price of the

10  property.  And while it is less than the secured debt, it

11  was adequate marketed and exposed.  And the reason Your

12  Honor initially I said for me the theme is what's the

13  alternative, in their discussions about having more time

14  and have another auction, 30, 60 days out, whatever it is,

15  and the question, again, is what is going to be different.

16         We've had the sale.  The auction concluded.  We

17  haven't received any bids.  We have a DIP loan that is due

18  at the end of this month in favor of Hankey.  Otherwise,

19  it's in default.  We have interest continuing to accrue --

20         THE COURT:  That loan can be extended.  I mean

21  you acknowledge that in the papers.

22         MR. GOLUBCHIK:  It could be extended.

23         THE COURT:  There's a fee.  I understand.

24         MR. GOLUBCHIK:  There is a fee and it's --

25         THE COURT:  Yes.

Page                                                                    43

1          MR. GOLUBCHIK:  -- and it's extended for one

2    month.

3          THE COURT:  Um-hum.

4          MR. GOLUBCHIK:  So what is one month achieve?

5    That's the question, Your Honor.  And later, when you will

6    be speaking with the brokers, you will get their views

7    based on what has happened and what they see can or cannot

8    happen.  That's the question.

9          Had we received any interest in the property

10   since the auction, I -- we had this hearing on Friday.  I

11   presented to Your Honor we want to have the highest

12   possible price because that's our obligation to maximize

13   the value of the estate.  There hasn't been anything.  And

14   the concern is, if this buyer walks and there's no sale,

15   the alternative may be worse, and we have --

16         THE COURT:  Worse for who?

17         MR. GOLUBCHIK:  Your Honor?

18         THE COURT:  Worse for Hankey?

19         MR. GOLUBCHIK:  It could -- your question was

20   whether a -- the credit bid is -- should be collateral or

21   not.  Potentially that's something that would be dealt with

22   later, but potentially that would be available funds for

23   creditors, because how this buyer's premium situation

24   played out.

25         But, yes, Hankey is the primary secured creditor.



1   We have the mechanics liens creditors who are ahead of

2   Hankey.  Yes.  I don't have anything else that I can tell

3   the Court because the reality is, these are the numbers and

4   these are the secured claims we have.

5          But if it's worse, then whoever gets this -- the

6   residual at the end is worse off.  It's not just unsecured

7   creditors.  It's not just certain creditors.  It's all

8   creditors.  That's all I have to say on that issue, Your

9   Honor.

10          THE COURT:  Now I know that -- I'm sure that

11  you're also familiar with the case law that says that the

12  mere fact that an auction was held does not automatically

13  mean that the Court ought to give deference to that auction

14  and that process, particularly when, as in this case, the

15  auction had some irregularities and even the --

16          MR. GOLUBCHIK:  And when, Your Honor, when you

17  say --

18          THE COURT:  -- fact that the highest bidder

19  didn't come in until over two hours after the close of the

20  auction.

21          MR. GOLUBCHIK:  So while --

22          THE COURT:  And the fact that there's a sale

23  addendum still -- again, no one confirmed to me that

24  there's a document signed by the parties who need to sign

25  it.

Page                                                                    45

1          MR. GOLUBCHIK:  I'm looking on my phone.  Oh,

2    we've received it now, Your Honor.  What -- okay.

3          MR. GEHER:  Your Honor, I -- may I --

4          THE COURT:  I'm sorry.  Who?  Give me one moment

5    here.  My screen is too crowded.

6          Mr. Geher, go ahead.

7          MR. GEHER:  Yes.  I'm sorry to interrupt.  May I

8    make a statement, Your Honor?

9          THE COURT:  Yeah.

10         MR. GEHER:  My -- and I'm only doing this because

11   of the colloquy right now with Mr. Golubchik concerning the

12   ending of the final bids.  May -- I don't -- with all due

13   respect, I don't believe Your Honor is accurate when she --

14   when the Court said when the final bids were put in.

15         Maybe it may be a time -- Eastern time versus

16   Western time.  My understanding, and Mr. Roffers is shaking

17   his head, is Mr. Newman's client while maybe bid after

18   4:00, he may have bid at like 4:03, 4:04.  I would request

19   that maybe Mr. Roffers or the Court relook at this

20   information because I do not believe it is accurate.  And

21   as Mr. Golubchik said, the set -- order approving the sale

22   procedures order did allow this to happen.

23         So in my view, it wasn't irregular.  But I don't

24   want to argue.  I just want to point out, I think from a

25   factual issue, I'm not sure it's accurate to say the final

Page                                                                46

1   winning bid came in two to three hours after 4:00 Pacific

2   Time.

3          MR. NEWMAN:  And, Your Honor --

4          MR. GEHER:  That's all I want to say, Your Honor.

5   Thank you.

6          MR. NEWMAN:  Not to interrupt, but if I may be

7   heard on that topic, Your Honor?

8          THE COURT:  Attorney Newman, go ahead.

9          MR. NEWMAN:  So I believe, and as I said my

10  client is here prepared to testify, but I think what he

11  would testify to is that the time frame was the 4:00 hour

12  Pacific and there were a couple of incremental extensions

13  due to active bidding that occurred right at 4:00 Pacific.

14  I don't think it was 7:00 Pacific and I think he would

15  testify to that.

16         MR. ROFFERS:  And, Your Honor, if I may speak to

17  it just because -- this is Chad Roffers.  Good afternoon.

18         THE COURT:  Mr. Roffers, I'm going to ask to

19  wait.  I'm going to swear you in later.

20         MR. ROFFERS:  Okay.

21         THE COURT:  Okay, and we'll --

22         MR. ROFFERS:  But it was 4:00, just so you know.

23         THE COURT:  We'll have some questions later.

24         MR. GOLUBCHIK:  Your Honor, I do have an update

25  from Mr. Roffers that I can explain if it helps, unless

Page                                                                    47

1  whether it's --

2          THE COURT:  Okay.

3          MR. GOLUBCHIK:  -- different timing.

4          THE COURT:  Go ahead.

5          MR. GOLUBCHIK:  May I?

6          THE COURT:  Yes.

7          MR. GOLUBCHIK:  It is two hours.

8          So Concierge employs the -- a soft gavel system

9   where if, at the end of the auction, within three minutes

10  there's a bid, there's an extension of time so that someone

11  does not get left out at the last moment.

12          So if you look at it with the time difference,

13  and that's -- I was wrong on the time -- we have a 5:58

14  bid, which is 3:58 Pacific Time.  There's -- so it gets

15  extended three minutes.

16          So it goes from 6:00 or 4:00 p.m. until 6:03 and

17  that's when the bid came in, and then they give three

18  minutes at the conclusion of the current bidder's bid and

19  because there was no other bid, that's when it closed.  So

20  I do apologize.  I wasn't paying attention to the time

21  zone; 5:58, which is 3:58, followed by 6:02 because there

22  was a three-minute extension to 6:03, which is 4:03 Pacific

23  Time.

24          THE COURT:  I'm going to go in an order that I

25  think makes some sense.  Perhaps we'll begin with the

Page                                                                48

1   mechanic lien creditors.

2          Ms. DeVoll?

3          MS. DeVOLL:  Good -- it is afternoon now, Your

4   Honor.  We have filed a stipulation.  I apologize that they

5   needed to be -- it needs to be a signature.  But we have

6   filed a stipulation and pursuant to the stipulation, and

7   J&E has agreed, to withdraw its objection under the terms

8   of the stipulation and, therefore, that's where we stand.

9   I understand that there's some other issues, which the

10  other parties have raised, that the Court has raised.  But

11  at this time, that's what our stipulation says for the

12  debtor.

13         THE COURT:  Okay.  Thank you.

14         And Mr. O'Dea?

15         MR. O'DEA:  Good afternoon, Your Honor.  Same

16  position for American Rentals in the sense that we have a

17  signed stipulation that states that in exchange for the

18  consideration be with the objection, the stay will be

19  withdrawn.

20         THE COURT:  Okay.  Thank you.  All right.

21         Now let me try to go in some order here.  I'm

22  going to kind of go by docket number if I'm able to here.

23  Just give me a moment.  Mr. Shinderman -- or would you

24  like --

25         MR. SHINDERMAN:  Good --

Page                                                                    49

1           THE COURT:  -- to highlight regarding --

2           MR. SHINDERMAN:  -- good --

3           THE COURT:  -- objections?

4           MR. SHINDERMAN:  Good afternoon, Your Honor.

5   Mark Shinderman, Milbank, on behalf of Yogi Securities.

6   Your Honor, I need about five or ten minutes, but let me

7   start backwards, please.

8           When you look at page 46 of the debtor's sale

9   motion, the debtor indicated that there, "may be basis to

10  object."  That doesn't mean it's a disputed claim, number

11  one.  Number two is, Your Honor has it right.  A disputed

12  interest means do I have a lien or not have a lien, not the

13  amount of my claim.

14          Mr. Golubchik, who's a terrific lawyer, reached

15  out to us last week and asked for some proof of the

16  funding.  We provided that.  There needs to be some

17  clarification.  So, for example, buyers went to Surfside

18  Realty, which was the escrow agent for Crestlloyd.  So we

19  need to just connect some dots.  But we've given *prima*

20  *facie* evidence of most, if not all, of the claim.  Mr.

21  Golubchik has asked for some follow-up, which we will

22  provide.

23          But I just want to be very, very clear that we do

24  have a claim.  We do have an interest.  It is not disputed.

25  It "may be disputed."

1          And, lastly, Exhibit 6 is very important to us,

2     but that also underscores the importance of the uncertainty

3     here that Your Honor was alluding to.  We don't know, for

4     example, exactly what Mr. Hankey's claim is.  We don't know

5     the priority between securities creditors, so we don't know

6     where the money would otherwise go.

7          The debtor has done a good job of illuminating

8     what the problems are, the issues are, but, again, an issue

9     as to distribution creates uncertainty.  So and let me go

10    back.

11         Your Honor, when you first took the stand at the

12    bid procedures hearing, you stated, and I'm reading from

13    the transcript of pages 7 to 8, "I mean it -- it really is

14    the procedures that -- I don't understand the lack of any

15    minimum bid and, again, I don't see how these proposed

16    procedures will help accomplish the goal in maximizing the

17    return."  So your statement.

18         And then later on, on page 34, Mr. Bregman had

19    said, "Judge, why don't we put something in that says you

20    could always revisit.  It'd prove to be improvident," and

21    Your Honor stated, "That's always a basis not to approve a

22    sale."  So Your Honor clearly left open the possibility

23    that something might not be copacetic here.

24         So, Your Honor, our basic premise, and I'll just

25    summarize our pleading, was that the auction did not elicit

Page                                                           51

1   a fair price because of confusion, lack of scaffolding, and

2   the geopolitical events.

3          Three parts.  The minimum bid.  We heard

4   testimony from Mr. Roffers that they were concerned that a

5   minimum bid would set the message that the price is too

6   high.  It might dissuade bidders.  But instead what we had

7   was a low bid that sat out there of 50 million dollars for

8   two days, right?  That may have confused buyers.  And the

9   fact that all the reports and newspapers kept saying this

10  was going to be 325 million dollars, that may have scared

11  buyers.  So what's different today than a week ago or two

12  weeks ago is that now people know the price range was 120-

13  something million dollars, they should come forward based

14  on that price.

15         There was no pegging.  There was no sense and I

16  think, if you allow us to cross-examine the witnesses, the

17  brokers and Mr. Roffers, you'll hear testimony from them

18  that people had disagreed but there was an opinion amongst

19  the brokers that a minimum bid would have been a good idea

20  at the time.

21         I would also point out with respect to the bid

22  that within hours of the auction closing, Concierge

23  reported that they were happy to announce the results, put

24  out press releases, that this was the greatest auction in

25  history.  It was more than double any other price ever

Page                                                                    52

1   achieved at auction of a house in the U.S.

2           So, again, Your Honor, there -- we just -- if you

3   look at the, I'll use the word penumbra, the situation,

4   there was confusion, uncertainty, no scaffolding.

5           Then we go to the soft gavel.  The soft gavel is

6   not just about the closing at 4:00, 4:03, 4:10.  There were

7   people -- and, again, we'll ask on cross-examination.  The

8   sense was there'd be an opportunity to bid post-auction.

9   The motion that was brought last Friday was because there

10  was confusion about whether or not bidding would be allowed

11  post-auction and you heard Mr. Golubchik say quite rightly

12  that if we had other offers, we'll bring it to the

13  attention of the court.  But that message got out to the

14  bidding public and it creates uncertainty.

15          And then, of course, I cannot fathom the horrific

16  geopolitical events and, you know, many of us have

17  relatives from there originally, still there, and we wish

18  them all the best.  But it caused disruption in the market.

19  That disruption in the market, also I point, again, when

20  the brokers get on, there's a selling season.  January,

21  February, and March are generally not the best seasons to

22  sell.  So what would be different?

23          What would be different is now people really

24  understand what the price is, the range is, to make this an

25  acceptable bid.  We're in the right selling season and

Page                                                              53

1   we'll have proper exposure.

2          The other thing that's missing is that Inferno

3   and Yogi have offered to replace Mr. Hankey's DIP loan to

4   extend the process longer.  So what's different?  So Mr.

5   Hankey won't do it voluntarily, extend the process.  We've

6   agreed, between Yogi and Inferno, to put up 15 million

7   dollars.  So the economics --

8          THE COURT:  Did I -- I'm sorry, Mr. Shinderman.

9   I don't think I saw that in any papers.

10         MR. SHINDERMAN:  It was not in any papers, Your

11  Honor.  It was an offer that we've made to the debtor's

12  estate last night.  It took us awhile to bring it together.

13  But, yes, so I would --

14         MR. GEHER:  Your Honor, this is the first I'm

15  hearing of this.  This is my property, my client's loan.

16  So somebody's going to somebody else to say they want to

17  buy my property?  This is completely irrelevant, outside

18  the scope and being hit with this right now.

19         It has nothing to do with whether or not this

20  sale should be approved under 363(h).  I object to this

21  testimony.  Am I getting adequately protected?  What's

22  going on here?  Now we're --

23         THE COURT:  Thank you, Mr. Geher.

24         MR. GEHER:  -- we're -- this is flying out into

25  somewhere else.

Page                                                                54

1              THE COURT:  Mr. Geher, I understand that the

2    strength of your reaction and I want to assure you, as I

3    assured folks earlier in this hearing, everyone is going to

4    have an opportunity to address things.  I really want to

5    try to keep interruptions to a minimum, but I certainly

6    expected to hear from you shortly.

7              MR. GEHER:  I apologize, Your Honor.

8              THE COURT:  No --

9              MR. GEHER:  It was just a shock --

10             THE COURT:  -- no --

11             MR. GEHER:  -- in statements --

12             THE COURT:  No apology needed.  Thank you.

13             MR. SHINDERMAN:  Your Honor, to be --

14             THE COURT:  Mr. Shinderman?  Yeah.  Go ahead.

15             MR. SHINDERMAN:  To be clear, Your Honor, you

16   asked what's different and what could be done, and that's

17   why we mentioned that not only as you pointed out that the

18   debtor could extend the existing DIP, there's a DIP that

19   would take out the existing DIP, right, and we'd have to

20   show adequate protection and consent.

21             But the price -- you know, we heard from

22   Mr. Golubchik the price obtained for the property suggests

23   that there's an equity cushion for Mister -- you know, for

24   Mr. Hankey.  So we think the DIP loan, whether it's a take

25   out, an extension of the existing loan or a new loan, we

Page                                                              55

1   think it would be appropriate.

2         But, again, I'm just addressing your question

3   about what's possible.  So let's go back and reset.  One,

4   the minimum --

5         THE COURT:  I think --

6         MR. SHINDERMAN:  -- bid --

7         THE COURT:  -- you -- I wanted to also probe one

8   of the issues that you raised, which, of course, is the

9   invasion of Ukraine and the impact on the global economy.

10   I don't know how that factors into the Court's approval or

11   disapproval of this proposed sale.

12         MR. SHINDERMAN:  Your Honor, that's a fair

13   question.  The question really is whether or not a fair

14   price was obtained under the -- was obtained.  And because

15   of geopolitical events, there was a disruption in the

16   market, which suggests the price that we obtained, and

17   given the other issues with the minimum bid and the

18   confusion in the soft gavel, may not have reflected fair

19   value.

20         You have testimony in the reply, in the brief --

21   the reply brief from the debtor, from Mr. Williams, that

22   they expected more foreign buyers and that the geopolitical

23   did, indeed, have an effect.  So it goes to the question

24   whether or not fair value was obtained.

25         But, again, it goes to the larger rubric of what

Page                                                                56

1    would be different going forward.  Look, we all --

2              THE COURT:  Well --

3              MR. SHINDERMAN:  -- hope they're --

4              THE COURT:  -- so let me pretend I'm Mr.

5    Golubchik for a moment and say that what he's going to come

6    back and say is, it's not going to get any better anytime

7    soon, at least on the geopolitical global economy front.

8    Now how would you respond to that?

9              MR. SHINDERMAN:  Your Honor, of course I'm not

10   going to deny that comment.  There's no way of knowing.  We

11   all hope for the best, of course.  What I'm suggesting is

12   that this, what I call penumbra, all these things together,

13   the soft gavel, the minimum bid, the uncertainty of the

14   pricing, lack of scaffolding, and the geopolitical all

15   conspire to not give us fair value.

16             But with more time, we could correct at least

17   some of these issues, right?  We might not address the --

18   geopolitical, unfortunately, may not resolve itself.  But

19   all these -- plus the selling season, as we talked about

20   when we get to the brokers, I do think all these things

21   taken together create more certainty.

22             Look.  It's -- the real question to me is whose

23   ox is gored.

24             THE COURT:  So let me just stop you right -- do

25   you have to how the Court today that there's more certainty

Page                                                                    57

1    or do you just have to show the Court today that the record

2    hasn't been made to establish that the sale should be

3    approved?  I'm not sure.

4            MR. SHINDERMAN:  I'll take the bait.  The latter,

5    Your Honor.  The debtor's -- it's the debtor's burden to

6    show that they had the adequate sale, that they achieved

7    fair value under the circumstances.  What we've shown is

8    that these -- again, the penumbra suggests that they

9    didn't.

10           But it goes -- there's a couple other points I

11   wanted to make.  It goes to what's the alternative and I'm

12   trying to address both of them.  So, one, fair value wasn't

13   achieved to -- oh, and last point is consent.  We clearly

14   did not consent.

15           *Clear Channel* says what it says.  *Clear Channel*

16   in the Ninth Circuit is different than other circuits come

17   out, okay?  Clearly, and if *Clear Channel* stands for the

18   proposition the ability to have a foreclosure sale is

19   sufficient to be an other to force -- to force money

20   judgments and go away, then *Clear Channel* never has to be

21   decided because *Clear Channel*, you're always have the

22   ability for judicial or non-judicial foreclosure, right?

23           *Clear Channel* meant what it meant and that is,

24   363 may not be the appropriate mechanism for selling free

25   and clear.  You have secured creditors who have an interest

Page                                                                58

1  in property, don't consent.

2          And that leads to my last point is --

3          THE COURT:  Well, can I jump -- can I stick with

4  *Clear Channel* for a minute?

5          MR. SHINDERMAN:  Sure, Your Honor.

6          THE COURT:  I mean obviously we never found out

7  what would happen later on in that particular case, but we

8  do know that there are courts in the Ninth Circuit that

9  have looked to the existence of a foreclosure proceeding

10 where secured creditors may be compelled to take cash in an

11 amount less than the amount of their secured claims.

12         So how would you respond to those cases and do

13 you think the inquiry is different if it's not just less

14 but it's nothing?

15         MR. SHINDERMAN:  Well, I think it's a slippery

16 slope, right?  Less and nothing could arguably be the same

17 thing as a matter of math because it just means you don't

18 get paid in full.  So I understand that argument and,

19 again, to be fair and honest, the other circuits disagree.

20         But *Clear Channel* has no meaning if it means that

21 you could have had a foreclosure sale to satisfy it, like

22 some courts have subsequently found, because that ability

23 to have a foreclosure sale exists in *Clear Channel*.  So

24 *Clear Channel* clearly indicated it needed to be something

25 more than the ability to foreclose and force something

Page                                                                59

1    else.  They were really looking to procedure.  They were

2    taking Congress literally in 363(f)(5), which ironically

3    for the Ninth Circuit is welcomed.  So, Your Honor, therein

4    lies the problem.

5          But that gets to the last point, right, is who's

6    harmed by the delay?  You asked this question.  Who's

7    really going to be harmed?  The proof that the sale, under

8    these circumstances, shows that the first position of Mr.

9    Hankey is protected, that there is existing DIP loan that

10   the debtor could exercise.

11         What we would propose is another 60 to 75 days

12   and let the brokers try to do their best.  But now we have

13   certainty and clarity, scaffolding, around what the sale

14   should be.

15         Your Honor, we have questions on cross-

16   examination for the brokers when we get there later.  But

17   at this point, I will rest.  So thank you, Your Honor.

18         THE COURT:  Mr. Shinderman.  I do -- I want to

19   hear from the affected parties and then I'm sure all of us

20   who are wearing fitness tracker devices are getting lots of

21   alarms saying that we need to get up and move.  But I'd

22   like to, if we could, run through the objections before we

23   take a quick break.

24         Mr. Rafatjoo, I'm kind of going in order of when

25   the oppositions were filed on the docket, so we go from 193

Page                                                                60

1   to 196.

2          MR. RAFATJOO:  Thank you, Your Honor.  For the

3   record, Hamid Rafatjoo of Raines Feldman for Nile Niami.

4          Your Honor, the person who has, not by dollar

5   amount of course, the most on the line is my client.  He

6   spent -- this was his vision.  He spent ten years of his

7   life building this and to see it get obliterated through an

8   auction process like this is very hard for him.

9          Your Honor, we're here today not because we're

10  saying the property shouldn't sell.  It should sell.  But

11  it should not sell as it's currently structured and it

12  should certainly not sell at this price.  There are

13  numerous objecting creditors here and the debtor can go and

14  cut the deals for the mechanics liens holders.  That still

15  isn't going to satisfy 363(f)(5) and the *Clear Channel*

16  ruling.

17         The reality of this situation, Your Honor, is

18  that this auction process and how we got here was based on

19  certain representations made to this Court, certain

20  evidence that was placed before this Court.  Your Honor is

21  fully aware that, you know, auction around the holidays,

22  people aren't -- you know, they're going to be focused on

23  the family and everything.

24         But when you hear 325 million, 250 million, 228

25  thou -- 228 million-dollar appraisal and let's go to

**BEN HYATT**
Certified Deposition Reporters

Page                                                            61

1  auction.  You know, we'll have an auction that'll be at the

2  end of February.  Everything will work out fine because

3  there's just so much value here.  There may not be, but

4  there's so much value and they put that there may not be.

5  Just it's, frankly, a CYA, for lack of a better term.  But

6  the reality is that when you get there and you get past

7  December, people start coming around.

8           It's January and you hear in the press is COVID,

9  Russia.  COVID, Russia, Ukraine.  Covid, Russia, Ukraine.

10 Then you come to the month of February and the U.S. issues

11 a warning about the imminent threat of a Russian invasion.

12 February 24th, it happens.  February 28th, we go to

13 auction.

14          You asked the question of, how does that impact

15 things, is there any evidence of as to what's -- it cannot

16 be.  That's what the fear of this war and a potential World

17 War III, that that did not impact bidding auction process,

18 the market fluctuations leading up to that.

19          Yes, the market rebounded.  You know, stock

20 market is going to do whatever it's going to do, but the

21 people who are buying this caliber of home are impacted by

22 these things.  They pay attention to this.  Their financial

23 advisors pay attention to this.

24          The proper exercise of business judgment on

25 February 25th would have been, hey, let's go to our DIP

Page                                                                                    62

1  lender, get this thing kicked.  We can't start the auction

2  in three days, four days.  Let's give it a couple of weeks,

3  see what happens, how the world responds and then we can go

4  to auction.

5           We're not selling a tract home.  We're selling --

6           THE COURT:  Right, but the deadlines here were

7  already extended deadlines.  So --

8           MR. RAFATJOO:  They were already extended

9  deadlines.  No, absolutely.  They were.  But that doesn't

10 mean they were extended at a time when we weren't dealing

11 with a war, Your Honor.  They were expend -- extended and I

12 get it and -- but the reality is, and no one can deny it,

13 there was a war and that war scared everyone.  You didn't

14 need to be in Ukraine.  You don't know what the ripple

15 effect of it is when you have all of this rhetoric all over

16 CNN and, you know, all the news channels about what's going

17 to happen and people telling -- you know, world leaders

18 telling each other to stay in their lane and mind their own

19 business, it impacts things.

20          Again, we're not selling a tract home.  We're

21 selling property dubbed "the one" because it is one of a

22 kind.  It is the only one like it and, Your Honor, when you

23 try and ram through the auction process, you see the

24 results.

25          The bid that is a fraction of what was stated

Page                                                              63

1 would be the value, it is not sufficient to pay the secured

2 creditors, let alone get any money to my client who has put

3 30 to 40 million dollars of his own money into this

4 property.

5           For some reason, you know, when you read the

6 reply, my client has been pegged as the antagonist in the

7 story.  Apparently, if you are not willing to go down

8 without a fight in the sale process that people are trying

9 to ram through, you automatically become the antagonist.

10          But the reality is, and your question that you

11 asked of Mr. Newman has not -- was not answered.  When was

12 this addendum signed?  This buyer, this debtor, came to a

13 sale hearing without fully executed documents.  You haven't

14 seen it.  It's not in the record.  I haven't seen it and

15 here we are.

16          We still don't know.  When was it signed, and

17 Mr. Golubchik himself tellingly, Your Honor, given the rush

18 of everything that was going on, yeah, I don't have it.  I

19 may have not seen it, and Mr. Newman said, "Oh, I'll send

20 it to you.  It's somewhere around here."

21          That's not the record for a sale here.  This

22 buyer left himself an out to the very last second and they

23 can file all the pleadings that they want and other as to

24 the issue of good faith, this buyer is not a creditor of

25 this estate and does not have standing to argue any other

Page                                                              64

1  issues.  So to the extent that they have filed these

2  pleadings, Your Honor, we ask that they be stricken or not

3  taken into consideration.

4           Your Honor, even though we are being dubbed as

5  the antagonist in this case, the reality is that as

6  unfortunate as it is to see this property sell, my client

7  has repeatedly tried to find a solution alternatives.  I

8  have reached out to parties to see if there is discussions

9  we can have to see if a deal can be cut between the

10 parties.

11          Your Honor, Mr. Golubchik started this thing that

12 the theme is what is the alternative.  One of the things

13 that my client -- again, he's a fighter.  He's not going

14 down without a fight.

15          Earlier this week, there's a tremendous amount of

16 interest in this property from various people.  My client

17 has, you know, you may have seen from press releases that

18 pre-date this bankruptcy filing, was going to turn this

19 venue into an entertainment venue, maybe host various

20 concerts and events there, decided that maybe a -- given

21 the low sale price, given the possibility that this sale is

22 not going to close, creditors aren't going to get paid,

23 that he would go out there and, for lack of a better term,

24 crowd-fund it, set a dollar amount minimum, people who sign

25 up can come up and do it.

Page                                                                    65

1           We prepared a press release.  The debtor approved
2    that press release.  We sent out that press release.  We
3    get an email saying you're limited to 20 people and no
4    social media.  Well, it's a back and forth.  We say, you
5    know, we can't limit the numbers.  But what if we just do a
6    couple of interviews and get the message out that way.  No.
7    We're pulling your permission to access the property.  This
8    is Wednesday, two days ago.
9           After they had approved the press release, after
10   we had sent out the press release, we have incurred
11   expenses in doing all of this stuff, organizing all of
12   this -- and I will be filing an admin claim for our damages
13   in connection with that -- but what's the alternative?  We
14   were trying to find an alternative.  What is the
15   alternative?  The alternative is, as Mr. Shinderman put it,
16   you have the ability to extend this DIP.  We also -- I
17   don't want to upset Mr. Geher again.  There is this
18   potential other DIP out there.
19          Restart this auction.  Do it with a reserve bid.
20   People now understand where we are in the process.  People
21   now understand what it's going to take to get this deal
22   approved and done.  It's not 300 million, but it certainly
23   isn't 126.  And an auction that is restarted, an auction
24   that has structure, an auction that is not four days after
25   people are sitting glued to their television sets wondering

Page                                                        66

1   if World War III is going to break out, that's an auction

2   worth having.  That's an auction worth attending and you

3   will see how the bids are.

4          If this 126 million-dollar bid is still the only

5   bid, and I'm sure Mr. Newman say, if you don't approve it

6   today, we've got to withdraw it, and as you said, for whose

7   Mr. Hankey's?  You know, if that's the market, that's the

8   market.  You know, and at that point, everybody can come to

9   the table, as I have requested many times, and we can have

10   a discussion as to what it's going to take to get this

11   thing done and across the finish line.

12          Ramming it through on this record without signed

13   documents that have been submitted to this Court, what are

14   we running from, a DIP that's going to mature in May?  Your

15   Honor, we have raised numerous issues in our opposition and

16   I don't want to repeat everything that's in there.  It's

17   part of the Court's record.

18          THE COURT:  I did want to ask you before we

19   conclude our conversation.  You argue that the fees to the

20   broker and auctioneer would be inappropriate.  I think

21   that's interesting maybe not so much for the actual

22   analysis of the fees, because I think that, you know, if,

23   as you argue, the sale should not be approved, we don't get

24   really to the fees today.

25          But the debtor's response in the reply was

Page                                                                67

1    interesting because they -- you've discussed the sliding

2    scale of compensation and that the percentage, you know,

3    gets very, very low at 175 million dollars because, of

4    course, that would be thought to be a terrible failure.

5              So it seems to me that the discussion of the fees

6    kind of gets us back to the question that I asked

7    Mr. Golubchik, which is the line of cases where sales are

8    not approved because the purchase price is so grossly

9    inadequate.

10              And I know that your opposition didn't cite to

11    those cases specifically, but I think that the theme of the

12    objection really is that simply that this purchase price is

13    too low and it shouldn't be approved.

14              MR. RAFATJOO:  Your Honor, that is exactly the

15    theme of it and that is you cannot find a person who will

16    honestly state that when everybody was anticipating a

17    certain sale price and then this sale price comes through,

18    that it was not a majestic failure.  And because of that

19    difference in the sale price between what was projected,

20    what was the appraised value, what has been the testimony

21    before this court on multiple occasions and the schedules

22    and the DIP loan motion and the sale procedure's motion,

23    all of those times, now it's, like, oops.  Okay.  Never

24    mind.  This is the price.  And it's not -- we're not

25    talking about even ten percent.  This is a fraction of the

Page                                                                68

1 price.  It would not be prudent to approve the sale.  It

2 cannot -- the sale cannot be approved.

3          It is so frustrating.  I was drafting this thing

4 and it was an extremely frustrating pleading to draft, Your

5 Honor, because this is such an infuriating process.  What

6 has happened here is wrong.  What is going to happen here

7 if this Court approves this sale is wrong.

8          And I've got to tell you, with respect to last

9 Friday's motion and what was just stated here today that

10 this winning bidder, who still hasn't submitted a signed

11 addendum to this Court, submitted their bid after the

12 auction, yet they ran into court to argue, hey, close the

13 auction.  We don't want any more bids.

14          When were the -- so the rules apply to other

15 people, not to us and that's one of the many problems with

16 this case and with how this came about and where we are

17 today.  And I understand, there's a number of people who

18 are represented here who have ridiculous money and

19 everybody's just digging in, and that's okay.  They have

20 that right, but that doesn't mean that this Court is

21 obligated to approve this sale on this record.

22          Thank you, Your Honor.

23          THE COURT:  Thank you.  If everyone can hang in

24 there, I would like to hear from I believe I have three

25 other objections that were filed:  Ms. Andrassy, Mr. Smith

Page                                                                69

1   and Mr. Morrow.  I'd like to hear from the three.  Then

2   we'll kind of go to some responses.

3          MR. ROSEN:  Your Honor?  Your Honor, this is

4   Mr. Rosen.  If I could, I said I wasn't going to speak.

5          THE COURT:  Um-hum.

6          MR. ROSEN:  I would like to have a few minutes to

7   speak if that'd --

8          THE COURT:  Okay.

9          MR. ROSEN:  -- be okay.

10         THE COURT:  We'll -- so perhaps we'll do

11  that aft -- we're going to just take a short break after

12  this and we do have others to hear from.  We have Mr.

13  Rosen, Mr. Geher, Mr. Newman.  So we'll definitely get to

14  everyone.

15         MR. HOROUPIAN:  And, Your Honor, just for the

16  record, Mark Horoupian.  I'd like a chance to address the

17  Court as well.

18         THE COURT:  Okay.  Thank you.  Let me just update

19  notes.  Hold on.  And, of course, Ms. Madoyan from the U.S.

20  Trustee's Office.  I would like to hear from her as well if

21  she has any comments.

22         Okay.  Ms. Andrassy?

23         MS. ANDRASSY:  Thank you, Your Honor.  Kyra

24  Andrassy, counsel for Inferno Investment.  I think everyone

25  here, except for Mr. Saghian and perhaps the auction house,

1   would concede that the auction was a bust, whether it's

2   because of factors that are outside --

3          THE COURT:  Ms. Andrassy --

4          MS. ANDRASSY:  -- everyone's control --

5          THE COURT:  -- if I could interrupt you for a

6   minute, you audio is coming through a little choppy and I

7   am not sure that the recording is going to pick it up

8   properly.

9          MS. ANDRASSY:  Is that better, Your Honor?

10          THE COURT:  I think so.  Let's see how this goes.

11          MS. ANDRASSY:  Okay.  I had my AirPods in.

12   Perhaps they're running low just because we've gone a

13   little longer than we had anticipated.

14          THE COURT:  I'm not surprised.

15          MS. ANDRASSY:  So I -- restarting my comments

16   again.  So I think that everyone here, except for

17   Mr. Saghian and perhaps the auction house, would concede

18   that this auction was a bust, whether because of the

19   factors that were outside of everyone's control or factors

20   that were in the realm of control.  It is plain we did not

21   produce the expected results.  So the question everyone's

22   pondering is, what do we do now.

23          My client, who holds the lien in second position,

24   is so unhappy with the sale price and the auction process,

25   including the absence of a reserve, as well as the

Page                                                              71

1   improvident timing of the auction four days after war broke

2   out in Ukraine.  We think the motion should be denied and

3   the approval of the proposed -- that the process should

4   continue to play itself out.  You know, and it's true that

5   we're still -- there's still a war in Ukraine, but things

6   tend to normalize.

7          We saw this happen when COVID first occurred and

8   we had shutdowns in March and everyone thought the bottom

9   was going to fall out of the market, the stock market, and

10  the housing and that didn't occur.  In fact, we've had boom

11  times because things tend to normalize and I think that's

12  happened here.  You know, the stock market as not had some

13  the affects that we anticipated.  So I think people adjust.

14         And so while it's true that, you know, war is

15  likely, unfortunately not ending anytime soon, withholding

16  a sale process that's a month or two or three months

17  outside of the start of that will result in a new -- an

18  increased price, and everyone here concedes that it had a

19  negative impact on the auction.

20         My client is so confident that doing that would

21  result in a higher price for everyone that is willing to

22  partner with Yogi to make the DIP loan that Mr. Shinderman

23  referenced, to pay off Hankey's debt loan so that we don't

24  this problem of it coming out at the end of this month and

25  with extension payments, and giving Crestlloyd some

Page                                                                72

1  breathing room to go back to market to fetch a price that's

2  fair.

3          The Court raised some interesting issues with

4  respect to 363(f)(4).  You know, the question with my

5  client's liens is one of priority and suffice it to say

6  that my client takes issue with the characterizations of

7  Exhibit 6 of the motion.  You know, it says what it says,

8  but there are significant factual issues with it.  And it's

9  belied by the facts that subsequent to that document, my

10 client was asked to subordinate its lien to Hankey and did

11 so.  And, you know, that process needs time to play out, so

12 I don't concede -- you know, I don't dispute that there's

13 a -- to the issue as to the priority of my client's lien.

14         But I don't think there's any question that it

15 has an interest or about the amount of its debt.  You know,

16 the debtor tries to manufacture issues about the amount of

17 the debt by saying that it needs to verify that then all of

18 the money went to Crestlloyd, and we provided documentation

19 to counsel that shows that money went into Crestlloyd.

20         We had an issue with the initial seven million-

21 dollar loan because it was made by an entitle other than

22 Inferno.  Inferno was assigned the debt.  But that happened

23 back in 2013.  And Crestlloyd -- there's no dispute

24 Crestlloyd is buying the note, signed the deeds -- deed of

25 trust, signed the amendment to the deed of trust and so

Page                                                                73

1  it's not challengeable, and so that's not a good faith

2  argument or even a valid one for there to be a dispute.

3          We have issues with Hankey's liens that I think

4  are really important and my client strenuously would object

5  to Hankey getting paid anything out of escrow were the

6  Court's inclined to approve the sale at this time.  So

7  there's issues with the debtor --

8          THE COURT:  But then that --

9          MS. ANDRASSY:  -- (indiscernible) --

10         THE COURT:   -- would that issue go to simply the

11 distribution of proceeds or is -- does that -- I would also

12 like you to address 363(f)(5), if you could.

13         MS. ANDRASSY:  Okay.  So -- yeah.  The issue --

14 let me go with Hankey and then I need to address 363(f)(4),

15 as well and (f)(5).  I sort of --

16         THE COURT:  Okay.

17         MS. ANDRASSY:  -- gone out of order with where I

18 intended to go.

19         So with respect to Hankey's lien, the debtor's

20 own motion says that that entirely, and is disputed, is

21 proposed to pay the 825 out of escrow subject to

22 verification of an accounting.  I have not seen that

23 accounting.  The debtor hasn't submitted testimony that the

24 accounting has been provided and is satisfied.  I requested

25 an accounting documentation from counsel for Hankey several

Page                                                                 74

1  weeks ago or about a month ago.  I did get an Excel

2  spreadsheet of 600 individual transactions, some of which

3  say that they went to Crestlloyd, most of which didn't.  So

4  there's been significant issues there that we think need to

5  be explored.  I would concede that there's some amounts

6  that we would probably all agree Hankey should get paid to

7  stop accumulation of interest.

8          But were we to get over the major humps today and

9  get to the point of a sale order, my client has issues with

10 that.  It also has issues with the mechanics liens being

11 paid because there are the same issues with lien priority

12 as to those.  And so I think Your Honor might want to take

13 argument from counsel from the mechanics lien holders today

14 because it's not as simple as submitting a stipulation and

15 getting those paid because my client's lien dates back to

16 2013 before construction started.  And although it agreed

17 to subordinate the Hankey, it did not agree to subordinate

18 -- it's position is that it did not agree to subordinate

19 to, you know, anything else and their intervening mechanics

20 lien holders.

21         I know Mr. Golubchik's going to point to that

22 memorandum of understanding that the facts of the motion

23 could dispute that, but there are significant factual

24 disputes about the interpretation of that document.

25         So all this to say that there's issues about the

1   lien priority on those and they don't automatically take

2   priority in this sort a context.  The case law in

3   California looks to the intention of the parties and the

4   equities, and so I think it's premature to provide for

5   those to be paid at this time.

6            Now going back to 363(f)(4) and whether the sale

7   can even be approved to begin with.  So the issue is my

8   client's debt and I think with respect to some of the

9   others is that one of priority, and I'm not sure that

10  that's enough under 363(f)(4) to sell free and clear of the

11  lien because that section in the Ninth Circuit case law

12  talking about it is that the issue with whether there's a -

13  - the question is whether there's a *bona fide* dispute about

14  the validity of the debt, and it typically goes to the

15  amount, not the priority of the lien.

16           In *Austein v. Schwartz*, the case cite is 898 F.2d

17  730 (9th Cir. 1990), there was a dispute about whether an

18  interest was subject to 1160 -- U.S.C. Section 363(f)(4),

19  and the court ruled that the -- whether it's disputed is a

20  question of whether the outcome of the dispute has an

21  effect on the size or value of the estate.  And so when you

22  have a not a challenge -- a legitimate challenge to the

23  amount of my client's debt, but instead to where it falls

24  within the priorities, I'm not sure -- I don't believe that

25  that should satisfy 363(f)(4).

Page                                                                    76

1           On 363(f)(5), I didn't brief that issue.  I think

2    it's a pretty complex issue.  You know, there are cases

3    like the Gelan (phonetic) case that -- the Washington

4    Bankruptcy Court case that says that a foreclosure

5    proceeding or receivership might give rise to satisfaction

6    of 363(f)(5).

7           But there's also cases that cite to the contrary.

8    I was doing some quick research and there's one called *In*

9    *Re: Hassen Imports Partnership* out of the Central District

10   of California by Judge Snyder that took issue with that

11   holding.  And, you know, of course, I think that if you

12   take that broad of interpretation, it reads 363(f) right

13   out of the Code because you can come up with almost any

14   context where that section could be satisfied to enable a

15   property to be sold free and clear of a lien or an

16   interest.  I don't think that was Congress's intent with

17   363(f)(5).

18          There's also an issue about the rebate, the

19   rebate of the buyer's premium that I wanted to address

20   because my client has always been very concerned about that

21   because there's been representations made on the record I

22   think in connection with the bid procedures motion where

23   that there's a buyer's premium that the buyer's going to

24   pay is a factor that the buyer takes into consideration

25   when it's determining how much to bid.  So if it knows it

Page                                                                77

1    needs to pay 12 percent more to the auction house on top of

2    its winning bid, it's going to adjust its sale price

3    accordingly -- or purchase price accordingly.

4            And so what the debtor did here was basically

5    arranged for, you know, 9.5 percent, I believe it is, to

6    come back to the estate that should absolutely be subject

7    to secured claims and secured creditors because it is

8    derived from the property that is subject of the liens.

9    And I think it would turn priorities on its head if you

10   were to hold otherwise.  And if you took that out -- so

11   they're -- you know, the debtor is including that rebate

12   when it's doing its calculations on the back of a napkin,

13   you know, that says that there's going to be 18 million if

14   you pay Inferno its 825 plus its interest that it's due.

15   And if you take that out of it, we're talking about six

16   million, which is even worse than what we're all talking

17   about today.

18           So I have greater concerns and the comments that

19   have been made about the process, the timing of the

20   process, the absence of reserve, and they've indicated my

21   client is so confident in his position is willing to help

22   the debtor get some more time to do some adequate marketing

23   in a more stable economic environment so that we all

24   benefit, not just Hankey Capital.

25           Thank you.



Page                                                                    78

1           THE COURT:  Thank you.  As I said, I want to deal

2    with the parties who filed objections, then we'll take a

3    short break.  So we have two other filed objections.

4           Mr. Smith?

5           MR. SMITH:  (Inaudible.)

6           THE COURT:  And, sir, you just need to unmute.

7    There we go.

8           Mr. Smith, you filed an objection to the sale,

9    and what would you like to highlight?

10          MR. SMITH:  I'm not sure that it's an objection.

11   I believe it was actually an acceptance and -- special

12   interested party Andre Mario Smith buying through as daily

13   authorized representatives affirms that acceptance and

14   wants to declare peace in the matter and let everyone know

15   that it will be adjudicated in good faith.

16          And also I wanted to object to -- the only

17   objection I actually have is to Mr. David Golubchik's

18   alluding to or otherwise mentioning fraudulent conveyances.

19   At the end of the day, I think case law is clear on fraud.

20          The main component is harm, and it seems that

21   everyone here has a currency or otherwise, you know,

22   monetary associated claim and there's been -- it appears on

23   the record that there have -- the Court is in possession of

24   certified funds to, you know, accept and settle and close

25   all these claims.  And other than that, I think the papers

Page                                                              79

1   speak for themselves and I appreciate the opportunity to

2   speak.

3            THE COURT:  Thank you, sir.

4            Mr. Morrow?

5            MR. MORROW:  Yes.  Good afternoon, Your Honor.

6   We have filed an opposition and we're really want to echo

7   prior counsel's oppositions as well.  This really comes

8   down to the Court's initial question of what happens next.

9   The debtor has made a series of representations as to the

10  value of this real property throughout their motion

11  practice.  Their DIP motion makes reference to the fact

12  that the property's fair market value is approximately 325

13  million.

14           The debtor goes on the represent -- affirmatively

15  represent that even if the real property sold for

16  substantially less than that amount, for example, 250

17  million, the debtor would still have a 70 million --

18  approximately a 70 million-dollar cushion of equity in real

19  property that would more than substantially amount to funds

20  sufficient to pay all allowed claims.

21           Right now, Your Honor, we're looking at a, as

22  other counsel said, grossly inadequate results from the

23  auction process.  The debtor's argument now, or at least

24  primary argument, amounts to the classic expression "a bird

25  in the hand is worth two in the bush," and this --

Page                                                                    80

1          THE COURT:  If I could have had gone this many

2   hours without hearing that.

3          MR. MORROW:  Yes.  I'm sure Your Honor --

4          THE COURT:  So --

5          MR. MORROW:  -- was expecting to hear that from

6   somebody.  So but these birds in the bush, as it were,

7   appear to be bidders that showed up after the auction

8   process had already concluded.  The decision to accept

9   post-closing bids was entirely arbitrary, Your Honor, and

10  it was exit -- or that decision was made exclusively by the

11  auctioneer.

12         What difference is it, Your Honor, between these

13  post-closing bids and bids that are suggested now in the

14  various different oppositions that are on file?

15  Mr. Shinderman mentioned, you know, a 60 or 75-day

16  extension to adequately perform the sales process.

17         We would submit that that is an appropriate

18  period of time to extend the sale.  Going to our actual or

19  our legal argument, Your Honor, we submit that this -- that

20  the debtor is apparently proposing to obtain this Court's

21  approval of their sale motion without satisfying the

22  requirements of a plan and disclosure statement.  This sale

23  motion is tantamount to a *sub rosa* plan of reorganization

24  without taking any account of the rights of creditors,

25  including my client.

Page                                                            81

1              Your Honor, we've made several other arguments in

2    our opposition.  I won't belabor the Court with repeating

3    verbatim those arguments.  If the Court has any questions

4    of me or my client, we're perfectly willing to address

5    those questions.

6              THE COURT:  I noticed in the objection a

7    statement that there ought to be a carveout for unsecured

8    creditors.

9              MR. MORROW:  Correct, Your Honor.

10             THE COURT:  You want to explore that a little

11   bit?

12             MR. MORROW:  Yes.  I mean that is the real gist

13   of what we're looking for the Court to at least recognize

14   that, you know, without an appropriate non-nominal

15   carveout, this plan, or *sub rosa* plan, will result in --

16   will result in basically a freeze out of all the other

17   creditors, all the other -- at least all the other

18   unsecured creditors, which our client is allegedly an

19   unsecured creditor, and it would be outside of the approval

20   of that plan, the Court's approval of that plan.

21             And we're suggesting that the Court make the

22   condition of approval of the current sales motion for the

23   debtor to provide a defined, non-nominal carveout to the

24   benefit of general unsecured creditors.

25             THE COURT:  Thank you.

Page                                                                          82

1              MR. MORROW:  Okay.  Thank you, Your Honor.

2              THE COURT:  All right, everyone.  I -- what I

3    would like to do is take a short break.  When we return, I

4    want to be sure that I've heard from everyone who's

5    indicated they want to speak.  That would be -- and I

6    believe this is the order that makes sense:  Mr. Horoupian,

7    Mr. Rosen, Mr. Geher, Mr. Newman, Ms. Madoyan.

8              At that point, I'm going to see if there's any

9    testimony that's going to be necessary and then, of course,

10   we will return to Mr. Golubchik.

11             MR. GOLUBCHIK:  Your Honor, may --

12             THE COURT:  -- and I think --

13             MR. GOLUBCHIK:  May I ask a question?

14             THE COURT:  Um-hum.

15             MR. GOLUBCHIK:  As part of the benefit of our

16   broker, Rayni Williams, I think she has a scheduling issue,

17   and I know that Mr. Shinderman asked to cross-examine her.

18   So for her benefit, I wanted to find out if, at least from

19   his perspective, if that still will be necessary.  I think

20   it's a good idea, but if we could -- if it's possible to do

21   it sooner when we return, based on her scheduling.  I just

22   don't know.  I thought I'd throw it out.

23             THE COURT:  Okay.  Mr. Shinderman, is that going

24   to be necessary for you?  For my purposes, I think that

25   Mr. Roffers is the person I'm most interested in in

Page                                                          83

1   speaking to and possibly Mr. Saghian.

2            MR. SHINDERMAN:  Your Honor, we have some hearsay

3   concerns that were raised I would ask.  But I only have six

4   questions for her.

5            THE COURT:  Okay.

6            MR. SHINDERMAN:  Okay.

7            THE COURT:  Okay.  Then I -- if we need to do

8   that, we'll do that after we break.  I want to keep this

9   break short.  It is 1:24.  Let's resume at 1:45.  We're

10  going to stop recording at the court.

11           What I will do is turn off my video and mute my

12  screen.  I would suggest that you all do the same and we

13  will return and resume recording at 1:45.  Thank you

14  everyone.

15           MR. GOLUBCHIK:  Thank you.  Thank you, Your

16  Honor.

17           (Off the record at 1:24 p.m.  Back on the record

18  at 1:50 p.m.)

19           THE CLERK:  Please come to order.  This court is

20  again in session.

21           THE COURT:  Good afternoon, everyone.  Thank you

22  for coming back.  I see that there are a couple of

23  additional participants here with our hearing.  So I am

24  going to have the additional participants join the hearing

25  who did not check in earlier this morning.

Page                                                                84

1              As I said this morning, court proceedings are

2    public so anyone is welcome to attend subject to security

3    considerations.  The requirements in this courtroom is that

4    everyone include their full name and inform the Court of

5    who they represent or whether they're observing.  That

6    would be the rule if we were in person in the courtroom.

7    You would show your identification as you enter the

8    building and also as you enter the courtroom.  So I am

9    going to ask one of my law clerks to just check in with

10   those who have joined who were not checked in earlier so

11   that we can just make sure we have all the appearances

12   before we resume.

13              (Pause.)

14              THE CLERK:  She joined us by phone.

15              And your area code is (310) and the last three

16   digits of your phone number are 400.  Could you give me

17   your first and last name and who you represent?

18              MR. GITTELSOHN:  John Gittelsohn, observer from

19   *Bloomberg News*.

20              THE CLERK:  Understood.  Thank you.  And

21   finally -- actually, I think every name is cleared up,

22   Judge.  And the final -- that second phone number signed

23   off.

24              THE COURT:  Okay.  Thank you.

25              And I am just going to make sure everyone is

Page                                                                    85

1  muted so that we don't get any audio feedback or echo.  All

2  right.

3           When we broke, I had an idea of where we would go

4  next and then I was informed that one of the witnesses had

5  a timing issue.  So perhaps we would turn to a brief

6  swearing in and a little bit of cross-examination of that

7  witness before we go back to argument.

8           Mr. Golubchik, is that still the case?

9           MR. GOLUBCHIK:  Yes.  Your Honor --

10          THE COURT:  Is that (indiscernible) --

11          MR. GOLUBCHIK:  -- Rayni Williams is on with us,

12 so I -- can we just check in with her if that's still a

13 timing issue and she wants to go now?

14          THE COURT:  Okay.  Ms. Williams?

15          MS. WILLIAMS:  Yes.  Hi, Your Honor.

16          THE COURT:  I understand that you need to leave

17 us?

18          MS. WILLIAMS:  I did push things back.  So I'm

19 okay.  So if you want to go in your order, that's fine or

20 you can hear me now, whichever you prefer.

21          THE COURT:  Okay.  I think that would be my

22 preference.  If there is a timing issue, please just let

23 Mister --

24          MS. WILLIAMS:  I'm fine.

25          THE COURT:  -- Golubchik know.

Page                                                                    86

1           MS. WILLIAMS:  I canceled my day.  Thank you.

2           THE COURT:  Okay.  Thank you very much.

3           MR. GOLUBCHIK:  Thank you.

4           THE COURT:  All right.  So I think that next,

5    those are our filed objections but I did have some others

6    who wanted to be heard and also wanted to be -- I wanted to

7    hear from both Mr. Geher and Mr. Newman and Ms. Madoyan as

8    well if she has any comments.

9           So I think next we'll go to Mr. Horoupian.

10          MR. HOROUPIAN:  Your Honor, thank you.  Mark

11   Horoupian on behalf of Yvonne Niami.  I know I told you

12   that I'd like to address the Court, but after listening to

13   the excellent arguments by my colleagues, Mr. Shinderman,

14   Mr. Rafatjoo, and Ms. Andrassy, I think we've covered all

15   the basis and I defer to them.

16          THE COURT:  Okay.  Thank you, counsel.

17          Mr. Rosen, you indicated that you wanted to

18   comment.

19          MR. ROSEN:  Yeah.  Yes, Your Honor, I do, and

20   thank you for your consideration.

21          MR. SHINDERMAN:  Your Honor?  Excuse me.

22          THE COURT:  Thank you, and --

23          MR. SHINDERMAN:  Objection.

24          MR. ROSEN:  Your Honor --

25          MR. SHINDERMAN:  Mr. Rosen doesn't represent a

Page                                                                87

1  party in interest.

2          MR. ROSEN:  But I represent the --

3          THE COURT:  -- Mr. Rosen --

4          MR. ROSEN:  -- Bel Air Association --

5          MR. SHINDERMAN:  -- I --

6          MR. ROSEN:  -- and I'm certainly a party in

7  interest in terms of what happens with this property.

8          MR. GOLUBCHIK:  And the debtor objects as well.

9  This is not a creditor, not a party to the motion who

10 hasn't involved in anything, Your Honor.

11         MR. GEHER:  And, Your Honor, Hankey objects as

12 well.  He's -- this -- Mr. Rosen personally, nor is the

13 homeowner's association, a party in interest.  They are not

14 a creditor.  They have no interest in this property as

15 "interest" would be defined by the Bankruptcy Code.

16         MR. ROSEN:  But, Your Honor, in terms of a lot of

17 the misstatements that have been made by some of the

18 representatives here, not Mr. Hankey's group, I think it

19 would be interesting perspective for you to hear in

20 connection with some of the objections that have been made.

21         THE COURT:  Mr. Rosen, I am going to sustain the

22 objections.  While you are welcome to observe and if there

23 are further proceedings if you want to submit any filings,

24 you are always free to do that.  I think for purposes of

25 today's hearing, I'm going to decline your offer to offer

Page                                                                      88

1   some perspective.  But, again, you are welcome to remain on

2   an as an observer and to participate in the future.

3           MR. ROSEN:  Okay.  Thank you.

4           THE COURT:  Thank you.

5           Mr. Geher?

6           MR. GEHER:  Yes.  Good afternoon.  Thank you,

7   Your Honor.  So, Your Honor, I'd just like to back up and

8   sort of cover the bases, as the Court was doing earlier,

9   and address the issues and concerns.  So first I'd like to

10  start with basically Bankruptcy Code Section 363(b) and

11  just the overall best interest of the estate.

12          And the objections for that I sort of put in two

13  boxes; (1) there's the auction issues and (2) is we've been

14  hearing the phrase, and even from the Court, about a

15  grossly inadequate sale price.  I'd like to start with this

16  issue of the grossly inadequate sale price.

17          THE COURT:  Okay.

18          MR. GEHER:  Your Honor, I believe that that

19  phrase is being used in an improper way in an improper

20  perspective.  People are talking about the sales price

21  being grossly inadequate with respect to the claims against

22  the debtor.

23          A sales price is not grossly inadequate because

24  it doesn't pay all the creditors.  That's like saying I

25  can't sell my car for the Bluebook value because it's over

Page                                                                89

1   encumbered and thus it's an inadequate sales price.  If I'm

2   selling my car for value, it's -- it is an adequate sales

3   price.  It is not inadequate.  So I believe --

4           THE COURT:  Well, Mr. Geher, I guess I want to

5   interrupt you.  The phrase "grossly inadequate" comes out

6   of case law and gross inadequacy exists under the cases

7   when apart from situations involving fraud or unfairness

8   there is a substantial disparity between the highest bid

9   and the appraised or fair market value and there is a

10  reasonable degree of probability that a substantially

11  better price will be obtained by a resale.  And there's a

12  line of cases discussing what "grossly inadequate" means

13  and it's not what is solely to the relationship to secured

14  claims.

15          MR. GEHER:  Correct.  And that's my point, Your

16  Honor.  It's not in relation to the claims.  It's what is

17  the value.  Are you selling the thing, the res, the

18  property, for fair value.  That's the end quote.

19          And people are say -- and what have we heard from

20  every single person in every single hearing in this case,

21  starting with the man who built it and developed it down to

22  everybody who loaned money to him; that this is a property

23  unlike any other.  This is unique.  So you can't -- if

24  something is unlike anything other and unique, that means

25  you can't compare it too much of anything.  So while there

Page                                                                    90

1   may have been a pre-petition appraisal several years old,

2   it's aged, it's stale, and it's based on -- it's compared

3   to things which is not comparable to because this property,

4   as everybody has said, is unique.

5            So we have a unique asset that is worth what

6   someone will pay for it, because you can't say, well, look

7   at the house down the block.  The house down the block is

8   irrelevant.  We're not selling the house down the block.

9   We're selling something that has never existed before in

10  the history of the United States of America.

11           So with that needs to be the perspective as to

12  how we look at the phrase "grossly inadequate sales price,"

13  and what we know is, people have been trying to sell this

14  house for quite a while.  Mr. Niami's lawyer has been

15  telling you he's out banging the streets and firing up

16  ideas, let's get this property sold.

17           He hasn't come here with anything.  No other

18  creditor has come here with anything and there's been no

19  asserted collusion between any bidders because none exist.

20  So we have it -- we have an asset that everybody has

21  basically agreed to has a limited number of potential

22  buyers.

23           Nobody is saying a person like me would buy this

24  property, because a person like me can no way buy this

25  property.  So we have a limited market for a unique asset

Page                                                                    91

1   that really nobody knows what it's worth.  Nobody has said,

2   gee, how come it's -- there wasn't an ad placed here or you

3   didn't market to this group or that group.

4          This property was extensively marketed.  I don't

5   believe there's any objections that the marketing was no

6   good.  What people are saying now is the market may have

7   changed and they point to geopolitical events that have

8   happened in the world.

9          I don't think a bankruptcy or any transaction

10  should be dependent upon when the world is right for this

11  to happen because then we could be waiting here an awful

12  long time and I know that is nobody's intention.  So when

13  we back up and talk about this grossly inadequate sales

14  price, I would suggest that that is not true.  You may say

15  that relative to the claims, but that is the improper

16  analysis.

17         So with this unique asset that has been marketed

18  to all the rich people in the world, only four or five

19  showed up, which is what the facts in prior testimony said

20  what happened, so that's not a surprise.

21         Now maybe people will say, I didn't get a Russian

22  oligarch.  Correct, you didn't get a Russian oligarch.  But

23  is that what drives this bankruptcy when we start calling

24  up Russian oligarchs and asking them when is a good time

25  for us to sell this so that maybe you're interested to buy

Page                                                                  92

1  it?    I'd suggest the answer to that inquiry is no.    So

2  while geopolitical events every day affect everything

3  anybody does, that's irrelevant.    The market today is what

4  the market today is.

5          Now, there's talk about the soft gavel and what

6  the evidence and facts are is people knew about this.    The

7  bid came in three minutes later, as approved by this

8  Court's prior order that said if the -- if a bid comes in

9  in the last couple minutes, we extend for three minutes and

10 if a bid comes in, we extend for another three minutes.

11         That is exactly what happened.    Those are the

12 facts and that is consistent and in compliance with this

13 Court's approved bidding procedures.    So there is nothing

14 untoward about the winning bid coming in three minutes

15 later and then three minutes later he outbid himself.

16         THE COURT:    Well, but it's not three minutes.

17 6:02 to 6:10.

18         MR. GEHER:    Your Honor, that's Eastern -- that's

19 the wrong --

20         THE COURT:    6:02 to 6:10, that's three --

21         MR. GEHER:    -- that's not --

22         THE COURT:    -- minutes and that's the bidder

23 going from 120 million to 126 million.

24         MR. GEHER:    He trumped himself.    Are we to tell

25 him --

Page                                                                93

1          THE COURT:  Right.

2          MR. GEHER:  -- no, we don't want your extra

3   money, that you outbid yourself in the three-minute

4   increment that this Court authorized to keep the bid open?

5   I think the answer to that is no.  So, again, it's not 6:00

6   when this happened.  This happened 6:00 in another time

7   zone.

8          When we go to the relevant time zone of the

9   Pacific Time, as Mr. Roffers previously confirmed, the

10  first bid that came in after 4:00 came in at 4:03.  Three

11  minutes later, because the prior bid before 4:00 was, like,

12  two minutes before 4:00, which allowed for the extra six-

13  minute increment.  And then, since he overbid, it allowed

14  another six-minute increment and for whatever reason, he

15  overbid himself.  That was authorized by this Court's bid

16  procedure order.  So nothing wrong with that.  Nothing

17  untoward about that.  Nothing unauthorized about that.  So

18  that's -- that was all fine just to make it simple.

19         The geopolitical events, they are what they are.

20  Are we -- it's all speculation what happens tomorrow, next

21  week, World War III happens in two months and we're in this

22  for God knows how long, so I would respectfully suggest

23  that's not a factor.

24         We've also heard the phrase about all this is for

25  the benefit of Hankey.  That's not true.  We have other

Page                                                                94

1  creditors that have come in here to negotiate with Your

2  Honor to say, we're going to take out the Hankey DIP loan.

3  First of all, the creditors can't buy it and the only

4  person that has an ability to pay it is the debtor.

5          It's not -- it comes due and it needs to be paid.

6  If the debtor wants to get new financing to take us out,

7  that the debtor would have to comply with Bankruptcy Code

8  Section 364.  It's getting financing, post-petition

9  finance.  And while some people may try to tell Your Honor

10  all we're doing is swapping the names in the legend,

11  everything's the same; it's not the same because where we

12  are today is, we have an auction that was proper, properly

13  marketed without bid collusion with a high bidder that bid

14  with -- and that high bid came in in the time authorized by

15  the Court.

16          The whole world bluntly has known what has been

17  going on with this property since the auction.  It's been

18  in every newspaper.  Every time I turn on the news, it's

19  like I can't avoid working anymore because it's always

20  right there.  It's okay.  We signed up for this job and so

21  be it.

22          The whole world knows about what happened at the

23  auction, and while we're all disappointed, myself and my

24  client included, this is what we have to deal with.  This

25  is the facts.  This is the reality.

1          So if the debtor's going to get new financing,

2    what we have as the facts is what is the value of this

3    property; 141 million.  I'll give the benefit of the

4    buyer's premium rebate.  In order for the debtor to get new

5    post-petition financing and have that new post-petition

6    financing prime all the existing secured creditors, we have

7    to be adequately protected.  I scratch my head as to how

8    that would ever be able to be shown, because the only way

9    that they'll -- that it can be shown is if other people

10   speculate that if there's a do-over -- because let's just

11   talk reality.  That's what creditors -- other creditors are

12   arguing for.  They're arguing for a do-over.

13         So if there's new post-petition financing, senior

14   creditors that they think they need -- want to prime need

15   to be adequately protected.  The value of the property

16   cannot adequately protect that.  The debtor has nothing

17   else to offer.  Don't see how that's going to happen

18   unless, of course, Yogi and Inferno want to make a DIP loan

19   and go to the back of the line.  Okay with me, because

20   otherwise I don't know how they're adequately protecting

21   all these senior creditors.

22         Now they may consent with their own liens, but I

23   don't know that my client would consent.  So how do they

24   make that happen?  I would respectfully suggest they can't.

25   So they -- if they want to make a new loan, the debtor to

Page                                                                    96

1   take out the DIP loan and put their new loan at the back of

2   the line behind every other secured creditor, including

3   Hilldun, then I guess so be it.

4          Now, I'll get to this a little later, but I will

5   tell the Court, because I know, oh, every -- just like in

6   any movie.  Somebody needs to have a black hat and some of

7   the secured creditors want to hoist that black hat on me.

8   Saul Hankey, cram it down my throat.  Hankey, Hankey,

9   Hankey.

10          Your Honor, there's no -- if this sale were to be

11  approved, what my client, A, does consent to the sale, but

12  what we would additionally consent to is the following.

13  The DIP loan is undisputed.  It should be paid.  The

14  receiver certificates loans are undisputed and should be

15  paid.

16          Those are court-ordered super priority liens.

17  The receiver loan is the equivalent to a DIP loan done

18  pursuant to a Superior Court order that primed everybody.

19  Pay them.  Let's stop the bleeding there.

20          My client, for purposes of this hearing, believes

21  that the mechanics lien holders have priority because we

22  all know, if we're honest, that the mechanic lienholder's

23  priority has nothing to do with the day they record their

24  mechanics lien.  We all know it relates back to when they

25  did work.

Page                                                                    97

1          Pretty much all these people were probably there

2    a long, long time ago before Yogi, Inferno and Hankey

3    touched this property.  So let's pay those people who built

4    this, the people, the material, men and laborers who put

5    their sweat and need to pay their mortgage and put food in

6    their families' mouths, let's pay them.

7          So what does that leave?  That will then leave

8    three secured creditors.  Hilldun has already stipulated

9    good faith dispute and that leaves Hankey, Yogi and

10   Inferno, and when the sale closes, Your Honor, we'll leave

11   our 82 million point five in the pot.

12         Okay?  If I want to cram anything down my throat,

13   would people offer me 82.5 million?  I shut my mouth, I

14   grab it and I run out the door.  Not doing that here.

15   We're willing to put our money where our mouth is.  I don't

16   know that other creditors are willing to do it because

17   they're here to negotiate with you.

18         We'll give a DIP loan.  We'll take this out.

19   We'll take this out.  All on the hope and prayer and

20   speculation that if there's an auction pursuant to

21   Mr. Shinderman's proposed proposal two months, three months

22   down the road, a pile of not gold turns into gold.  Based

23   on what?  A hope and a prayer and a speculation.  But what

24   is being jeopardized?  A hundred and forty-one million

25   dollars.  Are they -- so if they want to negotiate and

1  think they're going to do deals, how about adequately

2  protecting the 141 million dollars?

3          Are they putting up that money?  What happens,

4  Your Honor, if we do another auction, and I do believe

5  Mr. Newman's client evaporates, says bye-bye, goes around

6  the corner to the other house for -- on the market for 87

7  million dollars that Concierge is going to auction off in a

8  couple months and he goes and buys that and says, I don't

9  need this headache.  They -- because that's -- someone's

10  already put that out there in the pleadings about that

11  house around the corner and, bluntly, I know about it

12  because I'm involved in that bankruptcy case.

13          But putting all that aside, in addition, what

14  about the interest accrual that happens in the next 60 to

15  90 days on my client's 105 million-dollar loan?  We are

16  running interest at $46,845.34 a day.  So that's a few

17  million more to throw in the debt heap for people to

18  speculate on a hope and a prayer that a do-over does

19  better.

20          So 363(b), this is a sale in the best interest of

21  the estate because there's no evidence that the sales price

22  is grossly inadequate.  The evidence and all the fair

23  inferences that can be drawn from the evidence from an

24  auction sale that was non-collusive, done pursuant to this

25  Court's bid procedures, extensively marketed is this is the

Page                                                                    99

1  real value of the property.

2         It's not the make believe, fairytale value of a

3  developer.  It's not the fairy tale hope and a prayer value

4  of junior creditors who speculated with the developer on

5  his dream.  I had dreams to be a hockey player.  Here I am.

6  So 363(b)?  Complied with.

7         Let's talk about 363(f).  Your Honor, if the

8  mechanics lienholders get paid, which they should because

9  they have priority, and the sale -- and everybody gets paid

10 above the Hankey pre-bankruptcy 105 million-dollar loan,

11 again, we're talking about three secured creditors.

12        And let's look at the evidence that Mr. Golubchik

13 has put before you -- and before I say that, because I'm

14 going to talk about the good faith dispute B.  I forget the

15 numbers.  I'm not that good with the memory.  Ms. Andrassy

16 cited you a Ninth Circuit case that said what a good faith

17 dispute was, and it goes to the value of the interest.

18 That's what she said.  She cited you the case.  I saw Your

19 Honor writing it down.  It affects the value of the estate.

20 It affects the amount and distributions of the claims.

21 Thus, it's not whether -- a good faith dispute, Your Honor,

22 is not do you or do you not have a valid lien to any

23 extent.  That is, I suggest respectfully, the improper

24 analysis.

25        The analysis is, is there a good faith -- is

1   there such interest in *bona fide* dispute.  They claim an

2   interest of X million dollars secured.  There's a good

3   faith dispute.

4          Let's talk about what I think the easier is, and

5   that's Inferno.  Inferno, when it finally turned over its

6   loan documents to the debtor, provided a document called

7   Memorandum of Agreement.  Mr. Golubchik put this into

8   evidence stating it came from Ms. Andrassy.  Ms. Andrassy

9   doesn't deny it.  She knows her client signed it.  What she

10  wants to tell you is, it doesn't mean what it says.  Let's

11  stop that.

12         I don't care what people think it means, what it

13  doesn't mean, what it says, that it means something other

14  than what it says because, Your Honor, today is neither --

15  is not the time nor the place for this Court to be making

16  any findings and determinations as to the amount of

17  anybody's claim and the validity and priority of extent of

18  their lien.  That is left for another day.

19         This Court should not, in this summary-type

20  proceeding, be adjudicating extent, validity and priority

21  of the liens because Bankruptcy Rule 7001 says adversary

22  proceeding, discovery, lawsuit.  So that is an issue for

23  another day.

24         We need to just look.  The Court just needs to

25  sort of like a 9019 motion, canvass the issues, just like a

Page                                                            101

1    9019 motion.  The Court doesn't decide who would have won

2    or lost the lawsuit to figure out is this the right

3    settlement.  The Court canvasses what's in front of you and

4    says objectively, is there a good faith dispute, and the

5    very words of the memorandum of agreement says all proceeds

6    received from a sale shall be distributed in the following

7    manner.

8            First, to repay the loans obtained from a bank or

9    third parties, Inferno, Hankey, and all other unpaid costs

10   of construction of the residence, the mechanic lienholders

11   and those other workers who didn't record mechanics liens.

12   It's the plain language of the document.

13           Ms. Andrassy disagrees.  I stipulate she

14   disagrees.  But that -- Your Honor, you don't have to

15   dis -- you should not bluntly decide today who's right or

16   who's wrong.  You just should look at this document, like I

17   did, read the words and the inescapable conclusion is, oh,

18   there's a dispute here.

19           You wrote.  You signed.  You don't get paid until

20   loans get paid and all unpaid costs of construction.  Okay?

21   So you're on -- I would suggest they've subordinated to

22   unsecured creditors who worked on this property and

23   provided materials and labor because that's unpaid costs of

24   construction of the residence, residence being defined as

25   the property we're talking about.  Good faith dispute.

Page                                                                102

1    Period.  Full stop.  We can sell free and clear of the lien
2    of Inferno.  Nothing more needs to be said.
3              However, I, unfortunately, will because in
4    addition, pursuant to the claim they filed as pointed out
5    by Mr. Golubchik in this motion on the chart of -- on page
6    -- of the motion, pages 7 to 17, he says, wow, and you know
7    what, from documents we got, the money didn't go for the
8    property owned by Crestlloyd.  It went to other properties.
9    Wow.  That's a fraudulent -- we all talk fraudulent
10   conveyance.  Technically, it's a fraudulent obligation, and
11   fraudulent obligations, like fraudulent conveyances, can be
12   avoided.
13             Just because you used the debtor as a strawman to
14   funnel money through to go support other properties or
15   other entities owned by the equity holder, that's a
16   fraudulent obligation of the debtor.  It obligated itself
17   to take a loan to give the money to somebody else and to
18   benefit somebody else.
19             That's a fraudulent obligation and there's taxing
20   authorities here who are owed money.  So the lookback
21   period, as we all know, is ten years, not four; 2022 minus
22   ten, 2012.
23             There's a problem with that loan.  The debtor's
24   obligation is fraudulent.  Again, I'm sure other people
25   disagree, but this is the evidence that the debtor has put

Page                                                                    103

1  in front of you based upon the -- Inferno's own mouth.

2  Their proof of claim.  Good faith dispute.  Full stop.  Can

3  sell free and clear.

4          So now we're down to one lien creditor because,

5  of course, the other, Hankey, consents.  Inferno -- excuse

6  me.  Yogi.  I apologize, and Yogi has the same issue.  The

7  evidence Mr. Golubchik and the debtor put before you on the

8  chart from their own words, looks like money went to other

9  properties owned by other LLCs owned by Mr. Niami.

10         Same analysis.  Fraudulent obligation.  Full

11  stop.  Additionally, the debtor is still investigating this

12  and has not tied all the money to the property.  So there's

13  a good faith dispute here and, again, Your Honor, today is

14  not the day to figure out who's right and who's wrong.

15         Based on what's before you, objectively, is it a

16  basis for a good faith dispute?  Is it not -- if it's not

17  frivolous, it's a good faith dispute.  It's not frivolous.

18  If it was frivolous, of course, that's the pleadings you

19  would've got, this is frivolous, this is nonsense.

20  Interest -- and also, let me point out, this analysis for

21  Yogi is not even necessary.  Yogi, if you look at their

22  pleading, they don't object on the basis of 363(f).  None

23  at all.  Yogi, they're not dumb people.  They're playing

24  both ends against the middle.

25         If you're not going to do a do over then, fine,

Page                                                                      104

1  I'll take the money and my lien will attach to the

2  proceeds.  Their argument, Judge, is 363(b).  It's not

3  363(f).  Look at their pleading.  Mr. Shinderman knows

4  this.  They're playing both ends against the middle.  It's

5  okay.  I don't -- I make no aspersions about that, but

6  that's the facts.

7          So, Your Honor, there is a good basis to sell

8  this property supported by the law and the facts, and if

9  we're -- and, Your Honor, I'm not here to talk about the

10 what-ifs and what's the alternative, but it appears to be

11 that that's sort of overtaken this process and if there's a

12 negotiation, let's remember.  If people want to gamble with

13 their own money, that's fine, but they shouldn't be allowed

14 to gamble with other people's money.  They want to put me

15 and other people at risk, back stop.  Put your money where

16 your mouth is.  You're so sure because of all of these

17 parades of alleged horribles of the auction and how it

18 proceeded.

19         They're basically telling you it's going to be

20 better, but they don't want to guarantee it and who -- they

21 put me at risk.  Me.  My client is at risk, as well as

22 other creditors.  Let -- so because let's talk about it,

23 because what happens, Your Honor, if the issues with the

24 other two liens, and maybe even my own because other people

25 have said they have disputes about it, so so be it.

Page                                                                105

1          I told Your Honor; give me the 82.5 in the pot.

2    It's a lot of money in the pot now.  It's 100 million-plus

3    in the pot.  What happens if, as a result of the -- because

4    you want to talk about what-ifs?  What happens if those

5    disputes turn out favorable to the estate and the unsecured

6    creditors?  Again, two secured creditors, they don't care

7    about them.  They're willing to gamble with other people's

8    money.  They want to gamble with their own?  No issue.

9    Want to gamble with other people's money?  Put your money

10   up to tell them you have no -- you have no -- you want to

11   take a risk?  That's fine.  You want to run across the 405?

12   You do it.  I'm not going with you.

13         So, Your Honor, and I just want to check my notes

14   before I just simply conclude.  There is a basis to approve

15   this sale.  A strong, legitimate, legal basis to approve

16   this sale, and if I could just get a minute to flip my

17   notes, I would greatly appreciate it.

18         People talked about harm, Your Honor.  The harm

19   is, because everybody's -- everyone's saying there's no

20   harm because everybody is basing that statement a do-over

21   does better.  My crystal ball isn't that good.  What

22   happens if nobody bids?

23         What happens if the next time we do this, it's

24   100 million?  Mr. Shinderman, Ms. Andrassy's client going

25   to make up the difference?  Make -- pay all the additional

1  interest accrual that was lost based upon their playing Don

2  Quixote and chasing windmills?  The answer is no.

3         Is this a *sub rosa* plan?  Absolutely not.  This

4  is we're taking a res and we're turning into a pot of money

5  and their -- other than the payment of the obvious, the

6  cost of sale, property tax clicking at 18 percent -- 18.5

7  percent or eight a year, point-and-a-half a month, got to

8  protect that too, but we've got to pay that.

9         And the mechanics lienholders should be paid.  If

10 Ms. Andrassy and Mr. Shinderman's client wants to play

11 hardball with those poor folks, I guess that's their

12 prerogative.  I believe push came to shove at least one of

13 the two, I'm pretty sure, would do it and I think the other

14 would agree to do it, but they want to leverage them all

15 into the do-over.  A do-over is completely inappropriate.

16 We can't wait for Ukraine to be figured out.  I could be

17 dead by then.  We can't wait and hope that just a new

18 option brings somebody out of the woodwork who otherwise

19 did not know about it, because they talk about those who

20 knew.  Well, where are they today?  If they knew about it,

21 then you're telling me they've decided to walk away and

22 forget about it and when we do a do-over they're going to

23 be back?  If -- me, Tom Geher.  If I was -- if I had the

24 means to do this and I really thought, my God, this buyer

25 is stealing it, Your Honor, I'd be telling you right now

Page                                                                107

1   I'll pay more than him.  But where is that?  Where are

2   those people?  They're not stupid, and I'll bet you they're

3   not shy.  They'd be here today to say hold up.  I'll pay

4   more.

5            With that, Your Honor, I will conclude by saying,

6   if there's a do-over, I need adequate protection to let go

7   of what we know would happen versus speculation, and it's

8   not just me.  It's the county for their taxes.  It's

9   everybody else, because everybody's debt will grow and

10  further harm those who may not be able to get something out

11  of this sale if certain things happen but would if other

12  things happened.

13           So thank you, Your Honor.  The sale should be

14  approved.

15           THE COURT:  So, Mr. Geher, I just wanted to ask

16  you one question because I think what happens in a lot of

17  these conversations, because I think it's human nature, is

18  to wonder, well, what -- what would happen if some -- if we

19  waited, if there were a new auction, if something else was

20  tried new.  It's human nature to try to predict the world.

21  But I don't that that's the legal standard and I hear what

22  you're saying and I appreciate your comments, but I think

23  that the legal standard still is that the Court needs to

24  determine under 363(b) that the estate has received optimal

25  value.

Page                                                                      108

1          MR. GEHER:  But the re -- I would phrase it

2    slightly different.  I don't believe it's optimal value.

3    I'm -- no need --

4          THE COURT:  That's the term that the BAP used in

5    *Lahijani*.

6          MR. GEHER:  I don't think, Your Honor, you need

7    to get to the mountaintop.  If you are a little -- a couple

8    steps from the mountaintop that's adequate sales price.

9    But again, in order for this Court to say that that sales

10   price is inadequate, whether grossly or not, there needs to

11   be some evidence.  And the only evidence we, I guess,

12   potentially have is an appraisal report that is

13   unauthenticated because I didn't see a declaration from the

14   appraiser, if my memory is correct.  I'm not accusing

15   anybody or anything but, you know, Rules of Evidence are

16   there for a reason.  They're supposed to be followed.

17         So we have an unauthenticated appraisal report

18   done years before the bankruptcy by management that is not

19   the debtor's present management done by a developer.  And I

20   don't know what his real reason for is getting an appraisal

21   at that point, to get investors, get loans, I don't know.

22   But I would suggest to Your Honor that that, first of all,

23   is inadmissible, and secondly, stale and unreliable because

24   we're talking something that some --

25         THE COURT:  There's something newer that I can

Page                                                                    109

1   look and that's the motion to approve the DIP financing.

2   That was provided by your client where there was a range

3   from the debtor's estimated value of 328.5 million to a

4   substantially lower value of 250 million.

5           MR. GEHER:  And Your Honor --

6           THE COURT:  Can I look to that?

7           MR. GEHER:  You can look to that as a debtor's

8   prior representation.  You can look to that for exactly

9   what it is.  That's what the debtor thought it was worth

10  for this unique asset -- let's not lose sight of that -- of

11  this unique assets -- based upon the debtor's prior

12  management's books and records.

13          We've seen already things the debtor's done with

14  loans, the taking money and it looks like it went over to

15  his other LLCs to support other properties.  That -- that's

16  what the debtor thought.  I'm not going to deny that.  Your

17  Honor, we all hoped, my client included.  This is not where

18  any of us wanted to be but it's where we're at based upon

19  what the market spoke, okay.  Just like people pump up

20  stocks and they'll tell you, "I think this stock is a $500

21  stock," and it never gets there.  It doesn't mean that

22  person wasn't wrong but that's what he thought, but that

23  didn't make it the value of the property.  That's

24  somebody's opinion.  And that opinion of the debtor was not

25  based on the debtor's present management's analysis because

1  they were just appointed and got in the saddle right before

2  this case was filed.

3           And let's talk reality.  That was strategic.

4  Why?  So that nobody was filing trustee motions because

5  there's no way in God's green earth that this group of

6  creditors was going to let Nile Niami run this show.  Okay.

7  So they did that strategically.  Let's let them -- let's

8  not lose sight of some reality.  Let's not lose common

9  sense either.

10          So that was debtor's present management basing

11  its statement on what had happened before it got in the

12  saddle based upon books and records it had available to it.

13          The debtor has also been trying to market this

14  property.  It didn't rely solely on the auction.  We've had

15  two brokers whose reputations in this city is pretty --

16  pretty damn good.  Excuse me.  It's pretty good.  Just --

17  and that's -- like they're supposedly the -- some of the

18  top brokers in this business in this space.  And let's not

19  forget how they make their money.  The more they get to

20  for -- to someone to buy it, the more they make.  So they

21  are clearly incentivized to maximize that price.

22          These brokers -- I'm sure if we elicited a

23  testimony from them and they're allowed to tell us who's in

24  their Rolodex, that's just pretty impressive.  I bet you

25  they've been in contact with lots of rich people and I'm

1    not talking your ordinary rich.  I'm talking your uber-

2    wealthy as they like to call themselves.  And they've been

3    on the phone and they've been marketing and they've been

4    dealing with all these people.  And these people -- some

5    may have just won the genetic lottery.  Others are probably

6    very smart.

7           And so it's been exposed to the world literally.

8    And the market has spoken because how many times has this

9    Court seen appraisal reports that you knew, nah, that

10   ain't -- that ain't really it, and we know what appraisal

11   reports do and we know people get them done for particular

12   purposes and they get skewed towards that particular

13   purpose.

14          So we have a unique asset here that is unlike

15   anything else in the world that has been shown to everybody

16   in the world.  If it's -- if 141 million all in is so cheap

17   where are these people because they ain't dumb.  They'd be

18   here trying and say, "I'll do it for a buck 50."  Okay.

19   Why?  Because it's worth 325 and if I can it for a 150

20   they'd be here.  They'd be yelling at the top of their

21   lungs, "I'll pay 150."  But they're not.

22          And Mr. Golubchik has told this Court he has not

23   shut them out.  He's kept the door open, not because he's

24   telling them, "You'll be the winner," but he kept the door

25   open to allow them to show up and tell Your Honor, "Here I

Page                                                              112

1   am and here's what I'll do."  Where are they?  Silence is

2   speaking volumes to me.

3        So let's -- if you want to revisit the price

4   issue, again we have to be realistic what a unique asset

5   that has no other comparable thing so we can't compare BMWs

6   to each other.  We can't compare my house on my block,

7   which is at the end of my block, to the house at the

8   beginning of my block.  This isn't what we're talking

9   about.

10       The people who are the market for this asset have

11  seen it and they've spoken.  Just because you or I or

12  anybody else on the -- 60 people here on this -- these

13  screens would say, "Oh, I think it's worth whatever because

14  look at what's in there.  It's a bowling alley.  It's this,

15  it's that."  We don't have the money to do it so do we

16  really know?  We know nothing, respectfully.  The people

17  that can afford this have spoken and say, "It ain't worth

18  that," because the debtor has been trying to get more than

19  all of this.

20       So is the sale price grossly inadequate?

21  Absolutely not, but we view it correctly.  We don't view it

22  versus the amount of claims.  We don't view it against the

23  developer's dream.  We don't view it against trying to hit

24  goals and set records.  When something's worth that someone

25  will pay for it.  And everybody that was -- that was in --

Page                                                                113

1   in the solar system with an ability to pay for this has

2   looked at it and they've spoken.  That is the best evidence

3   of what this property is worth, not me calling my favorite

4   friendly appraiser and see what he says.  And then when he

5   tells me what he says I tell him, "Well, you know, but

6   can't you do this?" and they find a way to do it.  Let's

7   not lose common sense while we're here.  The alternative is

8   to chase windmills and cross our fingers because there's no

9   guarantee.  Nobody is putting their money where their mouth

10  is.

11              So again 363(b), it is met.  The evidence is

12  there because what -- other than that appraisal report,

13  which is not admissible evidence and I object to its

14  admission -- there's no evidence to suggest, let alone tell

15  or mandate to this Court that 141 million is not the value

16  of this property.

17              THE COURT:  Thank you.

18              MR. GEHER:  Thank you, Your Honor.

19              THE COURT:  Mr. Newman.

20              MR. RAFATJOO:  Your Honor, we want to -- Hamid

21  Rafatjoo.

22              THE COURT:  Oh, yes.

23              MR. RAFATJOO:  Raines Feldman.  If I may renew my

24  objection to the buyer standing to address anything other

25  than the good faith issues.

Page                                                           114

1              THE COURT:  Thank you.

2              Mr. Newman, I will note for the record that the

3    reply that was filed was not an authorized document.  It's

4    only the movant who is entitled under the Local Bankruptcy

5    Rules to file a reply.  However, I -- I've been, you know,

6    very liberal today in permitting people to speak to

7    anything that they think is relevant to the sale.  So I'm

8    going to allow some leeway, but I will let you know that to

9    the extent there is anything new or unique in their reply,

10   which I don't think there was particularly.  You know,

11   there's been a lot of briefing by a lot of very able

12   attorneys.  I -- I'm not going to consider the -- that

13   written document.

14             MR. NEWMAN:  Thank you, Your Honor.  I guess a

15   couple of things just in terms of the formalities of

16   standing and pleading.  With respect to standing we are not

17   the -- you know, the cases say a disgruntled or

18   disappointed bidder is not -- don't say -- we don't say the

19   current administrative claimant who has submitted millions

20   and millions of dollars in deposit to the debtor's estate

21   does not have standing.  We are a party in interest.  We

22   are respective contract counter-party.  So I don't think

23   that the same standard applies.  However, I think and I

24   appreciate Your Honor's indulgence and we'll keep it very

25   brief, and I'll try to keep --

Page                                                          115

1          THE COURT:  But I want to make sure that you

2    address everything you think you need to address.

3          MR. NEWMAN:  I appreciate it and I will.  You

4    know, I think our initial joinder to the debtor's pleading

5    I think set forth basically in sum and substance also was

6    in their reply and I think the reply itself simply was an

7    effort to kind of contextualize some of the -- some of the

8    points that we were making with respect to the other

9    information that had been seen in opposition.  So -- but I

10   do appreciate Your Honor hearing us out.

11         And I will try to contain my comments, sort of

12   the perspective of my client as a bidder, a buyer and a

13   participant in the market.  And I think the parties have

14   ably argued in many events in the inner-creditor disputes

15   that exist in this case, which are manifold.  But I think

16   there's a few things that our perspective is maybe a little

17   bit different than those of the parties who are on the

18   receiving end of the inbound payment of 141 million dollars

19   that my client bears to make if Your Honor should decide to

20   approve the sale.

21         The first question that Your Honor has raised and

22   I think, you know, asked some very strong and good

23   questions about it is this question of whether the price is

24   either in the best interests of the estate, this 363(b)

25   issue is it in the best interest of the estate, is it the

Page                                                                116

1   optimum value I think you've asked or is there some reason

2   to believe that it is grossly inadequate?  And I think -- I

3   would argue and I think it's correct that the standard here

4   for value should be in great deference to two items of

5   evidence which I think Your Honor will hear today.

6           One is the opinion of the debtor's professionals

7   who went into the market and conducted this auction.  I

8   know from our perspective it was an auction that was, you

9   know, aggressive, induced my client to bid and again, as

10  you heard from this last week, we even felt part of the

11  problem was that the rules were perhaps not -- were perhaps

12  not clear in terms of whether or not additional bids would

13  be permitted.  But we believed and we did participate in

14  the auction based on the representations made to us that

15  that was the opportunity to bid.

16          And we cited in our papers -- and I'll draw your

17  atten -- Your Honor's attention to *Anulikona* (phonetic).

18  It's a Ninth Circuit case.  And in that case they talk --

19  it's a good faith purchase case but they talk about the

20  deference -- the deference due to a properly conducted

21  auction in the absence of fraud or collusion.  And I think

22  there is just no evidence in this case that there was any

23  fraud or collusion involving the auction.  In fact, much

24  has been made of the bidding timeline and I just want to --

25  from my -- Your Honor, my client's perspective and he -- he

Page                                                                117

1    actually is, you know, one who participated -- made clear

2    that -- Your Honor, this is what we think happened at the

3    auction.

4            And I'm looking at the doc -- the debtor's

5    document 142 on page 58, but it's the bidding timeline and

6    it shows that my client who is bidder 8043 actually bid 90

7    million dollars two minutes before the technical close of

8    the auction.  So had we stopped that, if that was what the

9    market had said, market focused, my client would have been

10   entitled to purchase this property at 90 million dollars,

11   well below what the current proposed purchase price is.

12   Plus the broker fee, which adds another 12-and-a-half

13   percent to the amount.

14           There was one final bid after the automatic

15   extension of time, which was publicized under the Rules, if

16   you go back and look at their screenshots and that there

17   was -- it was clear that after any bid the auction was

18   going to entitle three more minutes to bid.  And after that

19   point the 100 million-dollar bid came in and within the

20   proposed -- almost immediately actually, Your Honor, within

21   seconds my client overbid that bid to what would have been

22   at the close of the auction under the extension time was

23   120 million dollars.

24           At that point and, you know, my client is the

25   only person harmed by this and is not complaining, the

Page                                                                118

1   auction house asked if he wished to increase his bid at all

2   before the final gavel fell and he did say 126 million

3   dollars.  And there's no indication, at least from him or

4   from any direct source, anything that's not hearsay, that

5   any bidder who was then participating in the auction was

6   told there's no evidence that any bidder was told that they

7   could bid once the auction concluded.

8          And further, as we stand here today with all of

9   the time and attention and all the 61 parties on the phone

10  today, no one has provided Your Honor with a declaration

11  from any bidder saying either that I was dissuaded from

12  bidding by the rules of the auction or that I have tried to

13  submit a further bid or that there's any other, you know,

14  dissuasion of some actual bidder.  There's the whispers we

15  hear about, about a Saudi participant and perhaps someone

16  from China, but at -- you know, this -- this transaction

17  has been in the paper almost every day in the national news

18  since last week.  And there is not one bit of declaration

19  from any bidder saying that they are ready, willing and

20  able to consummate a bid and somehow have been prevented by

21  the auction -- by the hearing.

22         And I will say -- and this is another item that I

23  think the debtor's representatives can speak to from an

24  evidentiary perspective -- this is not uncommon for high-

25  end properties.  They are often listed well above the --

1  what the market actually transacts on.  The appraisals, as

2  Mr. Geher indicated, are often inflated for a variety of

3  reasons.  People, you know, who own these houses like to

4  say that they have the most expensive house on some block.

5  They may have financing or other reasons that they want to

6  have generous appraisals.  But if you look at a case that

7  occurred just over the last 18 months in this very district

8  with your colleague Judge Rozella supervising, there was a

9  house called the Beverly House.  The case -- and to the

10 extent you either take judicial notice or ask the brokers

11 about it -- is TBH19.  The property was 1 -- 1011 Bev --

12 North Beverly Drive.  In that case the pre-bankruptcy

13 listing price for the property was 121 million dollars and

14 that number was supported by a variety of appraisals.  And

15 in that case there was a bankruptcy auction at which the

16 property was listed for 90 -- approximately 90 million

17 dollars.  And after the auction was concluded, after again

18 a variety of buyers all over the world were purportedly

19 approached and vetted, the final purchase price accepted by

20 the Court over the objection of parties in interest was 63

21 million dollars.  And the reason for that, Your Honor, is

22 among other things -- and I think debtor's brokers can talk

23 to this with more expertise than I can -- there are

24 probably 200 people in the world that could possibly be

25 interested in a property of this magnitude and this type

Page                                                                120

1   between the amount of carry costs that exist, between the

2   amount of cash needed in order to purchase them, between

3   what it cost to maintain such a property over time.

4           And what I think you will find when you interview

5   the debtor's brokers and Concierge is that those people

6   have been canvassed.  And there's no specific indication,

7   whether based on the unpleasantness in Europe or the

8   current economic downturn, that there's anyone saying, "I

9   can't bid now because -- but I am the person that the

10  debtors think we should sell to."  And the reason is, Your

11  Honor, this house -- and again, my client is still,

12  amazingly to me, enthusiastic about going through this

13  process after all the -- what I would consider kind of

14  morosing over the bid process and frankly attacks on his

15  participation and character, but my client is enthusiastic

16  about purchasing this house if the Court approves it.

17          But I will say, since he has dug in over the

18  past, you know, week-and-a-half he has found, for example,

19  that the LA Building Code wants potentially the roof to be

20  removed, that there are contract counterparties that don't

21  intend to -- that don't intend to permit existing AV and

22  other equipment to be used.

23          Mr. Niami, who is well recognized for his history

24  as a developer of such properties, has been unable over

25  many, many years, Your Honor, to complete the development

Page                                                                121

1   of this house to even receive a certificate of occupancy.

2   And don't miss that point I urge you, Your Honor.  No one

3   can live in this house today.  No one knows when you could

4   live in this house.  No one can finance this house today

5   because it doesn't have the final sign-off required to get

6   a certificate of occupancy.  And no one knows, Your Honor,

7   how much more money is going to have to be poured into this

8   property before such a property can be, you know, either

9   used or sold at a higher price.

10          And I think -- I harken you back, Your Honor, to

11  the 200 or 250 people in the world who could possibly

12  afford what this property entails.  And, you know, maybe

13  I'm off by a few hundred -- 100 people but not there is a

14  magnitude.  Imagine their lives and drawing on their time

15  from day to day.  Very few people in that position are

16  signing up for a project that someone with the

17  qualifications of Mr. Niami has been unable to complete for

18  many, many years despite vigorous efforts.

19          So, Your Honor, I think the reason that it is

20  inaccurate to say that there's any reason to believe that

21  this property is grossly inadequately priced is that this

22  process was designed to get the best price.  And I think

23  the brokers will testify -- I hope they will -- that they

24  will.

25          And when you look back to Mr. Roffers' testimony

Page                                                          122

1   this -- from the bid procedures hearing, which we quote in

2   our reply but it's a transcript so it's available to Your

3   Honor through the transcript, he said -- and I just quote

4   from this brief on the record:

5           "The liabilities in the property have really

6       nothing to do with what it's worth.  As you know, it

7       might bring 250 million dollars at auction; it might

8       bring 100 million dollars."

9           I mean, that is exact -- we are at 141, Your

10  Honor.  We are right in the middle of that range given to

11  the Court and to the creditors at the bid procedures here.

12  And he said and I recall, "The purist way to maximize the

13  value for this property is just to make it clear this

14  property is selling."  And I think that the brokers will

15  tell you and I think the debtors will tell you that they

16  have tried repeatedly to get a transaction to coalesce.

17  Even today, Your Honor, with two weeks since the auction

18  closed and all the hubbub that's been available about

19  whether or not this property is going to close, there isn't

20  even a firm offer from Mr. Shinderman's client and from

21  Inferno suggesting that they are, in fact, prepared to fund

22  a new DIP financing.

23          And, in fact, Your Honor, if you look really at

24  what they're saying they will do, they are only saying that

25  they're willing to put, as I understand it, three million

Page                                                                123

1   dollars new cash in if they can get in front of Mr.

2   Hankey's debt.

3           Your Honor, they are voting with their feet.

4   These are well-heeled developers and contractors

5   knowledgeable about the local market and they are not

6   willing to buy this property including their credit bid in

7   an amount sufficient to pay off Mr. Geher, and I'll tell

8   you why.

9           If you look back at the bidding process, if my

10  client hadn't shown up and bid when he did, they would have

11  been at 80 million dollars, Your Honor.  Eighty million

12  dollars is what this auction could have resulted with.  And

13  I -- I think as Mr. Geher was able to articulate that could

14  very well be the price in the future.  There's no reason to

15  believe that things are going up as opposed to going down.

16  And I think, Your Honor, aptly asked whose burden is it to

17  prove which way things are going to happen or why are we

18  worried about what's going to happen next.  I think that's

19  not the point.  My point is everybody in the world might

20  have an interest in this property including, Your Honor,

21  the junior secured creditors have had the opportunity to go

22  find financing, go find a partner, go raise additional

23  capital, go find a deal with Mister -- with Mr. Hankey in

24  order to take him out in full and pay him what he's owed

25  and no one has been willing to do it.  In fact, the three

Page                                                                124

1   highest bidders in the world for this property are my

2   client and he has made it clear that he's willing to close.

3   He's willing to move forward.  He's willing to step into

4   the shoes of this problem but, Your Honor, we need that to

5   happen today or he is going to lose interest and move on to

6   the next thing.

7           And I will say one other thing, Your Honor, that

8   you should just be aware of, which I think answers another

9   question and I believe Mr. Morrow asked and I think Your

10  Honor had some questions about.  At least in our view

11  Mister -- my client bid the 126 million dollars for the

12  property.  There was then a fee tacked onto that amount

13  which gets you up to the 141 million dollars.  And I think

14  there are at least some creditors here -- and by the way,

15  the only ones who continue to object, except for

16  Mr. Marrow, are the two senior secured creditors.  But I

17  think there are at least some creditors, including

18  potentially Mr. Marrow, who might argue that that's an

19  encumbered value that could be made available to other

20  parties including unsecured creditors.

21          So the deal on the table today not only takes

22  care of Mr. Hankey, not only puts -- almost completely

23  takes care of Mr. Yogi or -- of the -- I'm sorry, Yogi or

24  Inferno, depending on who wins their inner creditor

25  dispute, leave some dollars on the table for the junior of

Page                                                          125

1  them but also pay us off and provides liquidity to pay off

2  all the mechanic's lien creditors.

3        Now, granted, their interest is protected but

4  they don't -- if you ask any one of them where they'd

5  rather have dollars today or dollars in a year when this

6  process continues to unfold I'll tell you they'll tell you

7  today.  Mr. Marrow's client I'm sure would much prefer to

8  have cash in a pot that he can assert is unencumbered and

9  available to his client's interest.

10       So the only people who really are opposing this

11 closing are Yogi and Inferno because they can't agree

12 between themselves who gets the next 20 million and who

13 gets the 20 million after that.

14       THE COURT:  Well, I think I'm going to let the

15 objecting party speak for themselves.  I did want to -- you

16 mentioned the Hurst estate auction, which actually yielded

17 better than expected results.  The initial bid requirement

18 of that was, I think, 47 or 48 million dollars and

19 eventually sold for 63 million dollars.  So I think that

20 it's clear that those auctions were different.  Now I --

21       MR. NEWMAN:  I will --

22       THE COURT:  I appreciate your comments.

23       MR. NEWMAN:  Yeah.  I will -- I will definitely

24 let the broker speak to that but I will say that the

25 marketing process in that case started off at 90 million

Page                                                      126

1  and ultimately went down to the 63 million that was bid.

2            THE COURT:  I thought you told me --

3            MR. NEWMAN:  And I --

4            THE COURT:  I thought you told me though that I

5  shouldn't consider the higher number of, say, the appraisal

6  or what the debtor has said throughout this process, the

7  number was.  I thought I shouldn't think about that.

8            MR. NEWMAN:  No.  I -- Your Honor, I didn't say

9  you shouldn't think about it.  I said what I think you

10 should do is rely and provide weight to the market and the

11 conduct of the auction and frankly, the analysis and expert

12 opinion of the debtor's professionals.  That I think is

13 where the most weight should go.  And I think what -- what

14 I was trying to say -- and if it wasn't clear I apologize,

15 Your Honor; I know it's been a long day for all of us --

16 was that if you look at the course of marketing of a

17 property like this, they often are over-appraised and over-

18 listed and ultimately sell for lower numbers.

19           And I think, Your Honor -- and again, this is not

20 for me to testify.  I was simply trying to contextualize

21 what I believe would be the view of the brokers who are the

22 experts on selling properties like this.

23           THE COURT:  Okay.  Thank you.

24           MR. NEWMAN:  So I will try to keep my comments

25 brief.  I know that it's been a long day, Your Honor, and I

P 888.272.0022  F 818.343.7119      BENHYATT  www.benhyatt.com
                                    Certified Deposition Reporters

1   appreciate your moving this forward.

2          Just want to make a couple comments about how the

3   auction was conducted and I think Your Honor has heard but

4   I'll just from our perspective, I think the last several

5   minutes of the auction is not in my mind.  But, again, I

6   would hear from the debtor's professionals.  The extension

7   of time was not something that was meaningful or

8   substantially in any way detracted from the bidding.  In

9   fact, it incentivized my client to make a bid that has

10  raised the price substantially.  Again, as I indicated and

11  I think it's true and it's borne out by others' papers that

12  my client, you know, at the auction was originally at the

13  90-million-dollar level before he would have -- before he

14  would have overbid.

15         I'd also say under the auction rules if there had

16  been any dispute at the time that would have been for

17  Concierge to approve of those where the -- that was the

18  Court's approved bidding procedures.

19         This reference to ga -- soft gavel, - although I

20  would strongly encourage Concierge to consider changing the

21  branding, I think it is not exactly as it has been

22  described.  And again, that's something you can hear from

23  Concierge about.

24         But at any rate, the point was that at the end of

25  an auction if there's a high bid the participants are

Page                                                                128

1    entitled to submit another bid within a brief period of

2    time so the auction doesn't arbitrarily cut off value.  I

3    think that's what the soft gavel has been described, not as

4    it's been represented in hearsay and declarations.  Some

5    whisper that if people hold off their last bid now they'll

6    be able to come back later.  I don't think there's any

7    evidence that anyone heard that.  I think you'll see

8    evidence from Concierge and from the brokers that this

9    auction was conducted with I think five aggressive bidders,

10   which was basically again what Concierge predicted at the

11   bid procedures hearing.

12           I would look, Your Honor, at *Allied Systems* which

13   we cite and others which in -- which indicates again that

14   we're looking at both the price itself and the conduct of

15   an auction or the sale process.  The Court should give

16   deference to both the auction process -- if fairly

17   conducted and I think the undisputed evidence here will

18   show that the auction was fairly conducted and the

19   fiduciary duties of the debtors are empowered with to try

20   to maximize value for the estate.  And I think the debtors

21   have said -- and hopefully you'll hear from them further --

22   that they think this is the maximum value that can be

23   attained for this property under these circumstances.  And

24   I think that, Your Honor, satisfies the legal standard that

25   you have articulated.

Page                                                          129

1         I will comment briefly on *Clear Channel* just

2    because I do find it interesting, so I hope you'll indulge

3    me for a brief comment.  But I think the truth of the

4    matter is the BAP case *Clear Channel* is not binding on

5    yourself or other Bankruptcy Courts and *Silverman* and

6    others.  The Ninth Circuit made that clear.

7         So really the question, Your Honor, I think is

8    for you -- and frankly for everybody on this call because

9    we're all active in this market -- do you think it's right?

10   And I think the truth of the matter is both F-1 and F-5 say

11   that you can sell free and clear either if a party could be

12   compelled to release its lien or could be compelled to seek

13   a monetary judgment.  Every other circuit that's looked at

14   this has said that means if there's a proceeding that could

15   do it, not that it could be done specifically under these

16   facts.  And I think the question of "what if it's zero,"

17   which is a very fair question.  I want to be clear though,

18   is under these facts through this process the debtors

19   could -- I'm sorry.  The junior lienholders could be

20   compelled either to release their lien in a foreclosure or

21   to be compelled to take a money payment of their --

22   whatever the last dollars are available, and that's F-1 and

23   F-5.

24        I will just also reiterate Mr. Geher's point

25   because I do think -- I do think it's telling neither Yogi

Page                                                              130

1  nor Inferno's papers mention 363(f).  And, in fact, both of

2  them are clearly prepared if Your Honor were to approve the

3  sale to deal with the dispute over the extent, priority and

4  validity of their liens and that's really the result that

5  the Bankruptcy Code and I think 363(b) isn't -- and (f) are

6  intended to achieve, which is these disputes shouldn't hold

7  up a sale that's otherwise gaining the most money for the

8  estate.

9            So I appreciate Your Honor's concern and I think

10 there's been a lot -- a lot said today about the reasons

11 why 300 million dollars or something more wasn't achieved.

12 I think you should listen to the brokers in terms of why

13 they think that might be true.  I think I've given you my

14 client's perspective, which is anybody who buys this

15 property is not -- is buying an opportunity to spend tens

16 of millions of dollars more on trying to make it livable.

17 So that is a deducts to what people are going to be willing

18 to pay.  The appraisals did not, you know, give those

19 deducts and I think the brokers can explain hopefully that

20 to you.

21           So I think the answer is there's no indication

22 that the auction was fair -- was so fair -- it was -- I'm

23 sorry, it was improper or not well conducted.  The

24 marketing wasn't proper or well conducted or importantly in

25 accordance with the judge's bank -- bid procedures order.

Page                                                          131

1          My client bid a fair price.  He's willing to

2     stand behind it.  It provides value for the cancelling

3     claimants.  It provides value for unsecured claimants

4     through the rebate of the brokerage fee.  It provides value

5     to Mr. Hankey.  And will without doubt provide value to

6     either Yogi or Inferno once it's determined who's next in

7     line.

8          The last point I'll make, Your Honor, just

9     because it's been specifically directed at us, first off,

10    we believe and I think my client's declaration makes clear,

11    he has participated in this auction in good faith.  He read

12    the rules.  He showed up.  He bid on time.  He believed

13    that if he run the auction he would be the bidder and he

14    has tried to comply with those rules.

15         The one comment people keep making is about this

16    addendum, which was I think a difference of opinion over

17    what a couple of words in a document that my client had

18    signed and delivered meant.  My client has now delivered

19    and the debtor has an addendum that I believe is completely

20    acceptable to them.  And frankly, the only issue there was

21    whether or not the debtors would comply with their

22    obligations to conduct an appropriate bid process, which we

23    now acknowledge they have done.  They have not tried to

24    submit other bids.  They have -- I assume bidders have been

25    directed into possible but at this point, given that we're

Page                                                                    132

1   the only bidder up or down for approval we don't think

2   there's any substantive difference between the documents

3   that were signed and therefore turned in to them assigned

4   agreement.

5            So with that, Your Honor, I'm certainly open for

6   any questions, but I do think Your Honor has conducted a

7   great hearing and I appreciate your hearing.

8            THE COURT:  Thank you.

9            MR. VETTERICK:  Your -- Your Honor, this is

10  Stuart Vetterick.  May I speak for a second?

11           THE COURT:  Who do you represent, sir?

12           MR. VETTERICK:  I represent Richard.  I'm one of

13  the buyer's agents for Richard at Hilton and Hyland.

14           THE COURT:  I'm sorry, sir.  I didn't hear you.

15           MR. VETTERICK:  Stuart Vetterick from Hilton and

16  Hyland.  I represent Richard on the purchase.

17           MR. NEWMAN:  Your Honor, Mr. Vetterick is a

18  broker for Mr. Saghian.

19           THE COURT:  I see.  Okay.

20           Mr. Vetterick, I don't think it's appropriate for

21  you to comment at this time.  If I need some testimony I'll

22  ask for it.  Okay?

23           MR. VETTERICK:  Understood.  Thank you.

24           THE COURT:  Thank you.

25           All right.  I think that next, if there are any

Page                                                                133

1  comments from the U.S. Trustee's perspective this would be

2  the appropriate time.

3          Ms. Madoyan.

4          MS. MADOYAN:  Thank you very much, Your Honor.

5  Good afternoon.  Noreen Madoyan for the U.S. Trustee's

6  Office.

7          Your Honor, we are just monitoring this case.  We

8  do not take a position as to the sale.  However, to the

9  extent and if the Court does not approve this sale and

10 there is another bidder that comes in we would like to see

11 the providence of such funds in light of the geopolitical

12 sanctions in place.  So that's a consideration I wanted to

13 put out for the Court.

14         In addition, there was a mention of crowd

15 funding, again in the event the sale is not approved.  To

16 the extent that that is something that occurs in the future

17 we would like to get more information about that.  So other

18 than that, Your Honor, no further comment.

19         THE COURT:  Understood.  Thank you.

20         Mr. Golubchik, let me return to you.  I'm -- as

21 we work through this and looking at the clock I'm concerned

22 about a couple of things here.  I have some questions on --

23 for Mister -- and I -- now I've heard his name pronounced

24 two ways.  Is it Mr. Rotofers (phonetic) or Mr. Roffers?  I

25 apologize for not knowing it at this hour which is right.

Page                                                                134

1   I do have some questions for him and I have some questions

2   for Mr. Saghian.

3            Other than that, I know that Mr. Shinderman has

4   indicated that he has some questions for Ms. Williams.  And

5   I apologize.  I also have some questions for Ms. Williams.

6   I don't know if they are the same questions, you know,

7   Mr. Shinderman has.  But other than that, to the extent

8   that there are individuals who filed declarations I don't

9   expect to need to hear from them.

10           Mr. Golubchik, does it make sense to have some

11  testimony before you make your comments?

12           MR. GOLUBCHIK:  Your Honor --

13           THE COURT:  Or would you like to comment first?

14           MR. GOLUBCHIK:  It's okay.  I'm going to try to

15  keep my comments short.  I think in light of other

16  comments, five minutes, and then we can go to the testimony

17  because I think --

18           THE COURT:  Okay.

19           MR. GOLUBCHIK:  -- at the end of the day that's

20  the critical to address the Court's concern about gross

21  inadequacy.

22           THE COURT:  Okay.

23           MR. GOLUBCHIK:  Our comments.

24           THE COURT:  So we'll -- let's have you come up

25  for a couple of minutes.  Then we'll take a very, very

Page                                                                    135

1  brief break, like a five-minute.

2          MR. GOLUBCHIK:  Yes.

3          THE COURT:  And then we'll go to some testimony.

4          MR. GOLUBCHIK:  Okay.  Ms. Madoyan mentioned this

5  crowdfunding and to respond to Mr. Rafatjoo, kind of a

6  quick issue.  Said debtor for Mr. Perkins has always tried

7  to be as accommodating as possible to Mr. Rafatjoo and this

8  counsel.  I think end of -- earlier this week we received a

9  proposed press release that says the debtor is going to do

10 all this, responded "not acceptable."  Mr. Rafatjoo asked

11 for a redline.  So we changed it so there's no reference to

12 the debtor.

13         The only request that Mr. Perkins had is 20

14 people maximum because of the investors and no media.

15 Eighteen hours later I receive a forward of an email from

16 the PR firm to media -- to reporter inviting him to the

17 property.  Based on that initial violation that the visit

18 was kiboshed and that didn't happen.  So there's a

19 reference to filing an administrative claim, just we'll

20 deal with it.

21         Now, Your Honor, with respect to -- let me go

22 backwards.  Let me start with 363(f).  As we discussed

23 previously, we have -- we had objections from American and

24 J&E, the two mechanics liens that are resolved through the

25 stipulations.  Objections withdrawn and they support.  We

Page                                                        136

1  have an unsecured creditor, Mr. Morrow's counsel, and then

2  we have Inferno and Yogi, both of which did not oppose our

3  363(f) discussion.  So this -- at this point it is our

4  belief that there are no oppositions to it, separate and

5  apart from showing the *bona fide* dispute issues.

6         THE COURT:  Well, I don't agree with you

7  necessarily that not citing 363(f) in a sale opposition is

8  considered consent, but I understand your position.

9         MR. GOLUBCHIK:  These are sophisticated attorneys

10 and sophisticated parties.  They file things.  But separate

11 and apart from that we discussed the *bona fide* dispute.

12        Let's go to the 363(b) which I think is the big

13 issue and look at a few things.  Keep in mind, Your Honor,

14 often in these closely held entities you have the debtor's

15 management is looking out for someone's interest, whether

16 the member or somebody else.  Here, because of the disputes

17 that were arising, Mr. Perkins was brought in as a neutral.

18 No allegiance to member.  No allegiance to any secured

19 creditor.  Just allegiance to do his job and carry out his

20 fiduciary duty and carry it out properly.

21        He went through a bid procedures process

22 supported by the brokers and Concierge.  Your Honor had a

23 hearing.  An order was entered.  The auction took place

24 consistent with the order.  A high bidder arrived and

25 Mr. Perkins as he manager has the obligation to bring it to

Page                                                          137

1  the Court's attention.  In discussions with the brokers --

2  and that's where we'll get to in a moment -- you're going

3  to hear testimony that this is the highest bid under the

4  current circumstances that if things -- if the sale is not

5  approved it is possible that there may be a lower number

6  but things won't happen in the future.

7           If you take a look at even the employment

8  application.  Someone mentioned earlier you recall it had a

9  provision for the brokers to get one percent if it's less

10 than 175 million.  And what's the reference to that

11 possibility?  Maybe someone wasn't acknowledging it but

12 there was a reference to that possibility and that's what

13 happened.

14          We had Mr. Shinderman and Mr. Rafatjoo saying

15 that what's happening in Ukraine changed the landscape,

16 that changed the world.  It's a little strange to say the

17 war changed the world for the auction but the appraisal

18 should still follow the same -- the same timeline as

19 before.  This is an appraisal for 20 -- from 2019.  If it's

20 good -- if one changes, the other changes also.  An

21 appraisal that's almost two-and-a-half years old to an

22 extent that war is in an issue -- because they argue it --

23 for the auction it should apply to that appraisal.

24          The main thing that I got from this discussion

25 today, Your Honor, is your concern about getting over the

Page                                                                138

1   gross inadequacy -- the belief or thought or the question

2   whether those -- there's gross inadequacy.

3          So two points raised.  One is the difference

4   between the sale price and the appraised value.  The

5   appraised value we -- my client believed based on

6   information from brokers that the value was substantial but

7   based on the exposure and the auction that turned out not

8   to be the case.  The second is whether there's a reasonable

9   chance of the probability of a higher price in the near

10  future.  I think that's where the brokers' testimony is

11  going to come in critical.  And you will hear from the

12  brokers that that is not the case.

13         At the end of the day we have done everything

14  possible including with the brokers to expose the property

15  and to maximize value.  And we're there right now and

16  that's why we believe the sale is appropriate and

17  especially now when both Mr. Geher commenting that Hankey

18  will not take the 82.5, which means we will pay maybe 50

19  million dollars out from the purchase price.  The rest is

20  going to sit in a trust account with all the liens still

21  attached.  No one benefits from the money and, of course,

22  unfortunately interest continues to accrue on the secured

23  debt but the money sits there so that all parties can deal

24  with the issue.

25         So subject to that, I think it would be

Page                                                           139

1  appropriate now to go -- to hear from the brokers because I

2  think that's the critical issue.

3           THE COURT:  Okay.  Thank you.

4           MR. SHINDERMAN:  Your Honor.

5           THE COURT:  Mr. Shinderman, yes.

6           MR. SHINDERMAN:  I do want to get to the brokers

7  but if I may indulge you for two minutes because people

8  keep talking about a disputed claim.

9           THE COURT:  Okay.

10          MR. SHINDERMAN:  So again, we filed a proof of

11 claim which is *prima facie* evidence of the claim.  There's

12 no objection to that claim.  In the debtor's reply it says

13 there may be a basis to object.  That's not evidence that

14 the claim is in dispute and it doesn't go as to the lien,

15 right?  There's no evidence that the money didn't go or

16 went.  We've given stuff privately to Mr. Golubchik.  He's

17 asked for follow-up information.  We're not subject to a

18 dispute right now.  We have a *prima facie* claim.

19          Second, with respect to the 82.5, to save the

20 estate interest we're okay paying the 82.5 provided it's

21 without prejudice and could be disgorged.  So if the sale

22 is approved we're okay with the 82.5.

23          With that said, I want to talk to both brokers,

24 Your Honor, as well as the auctioneer.  So thank you, Your

25 Honor.

Page                                                              140

1          THE COURT:  Thank you.

2          MR. RAFATJOO:  Your Honor, if I may?

3          THE COURT:  Mr. Rafatjoo, yes.

4          MR. RAFATJOO:  Your Honor, just briefly.

5   Mr. Geher spoke about -- spoke about the fact that because

6   this property is unique it can't be appraised.  This client

7   is a lender.  I'm sure they did not put money out, a

8   hundred million -- 82 million five, and whatever profit

9   participation without doing an appraisal.  And the

10  appraisal that everyone keeps talking about from 2019 that

11  was an appraisal that was prepared for financing.  It

12  wasn't prepared by Mr. Nile Niami's cousin or friend.  It

13  was prepared by Cushman and Wakefield.  This is not a fly-

14  by-night shop that you can just say, "Hey, how about if you

15  bump the price up?"  If anything, those appraisals are

16  deflated.

17          And again, some of the statements that have been

18  made would have you believe that all of the articles that

19  we read about the housing market going crazy, home prices

20  increasing by X percent year over year, quarter over

21  quarter.  That applies to every home except this one.

22          MR. GEHER:  Your Honor, I (indiscernible) --

23          MR. RAFATJOO:  His statements regarding the

24  certificate of occupancy.  What happened there is that this

25  property isn't finished.

Page                                                        141

1          MR. GEHER:  Your Honor, there's no evidence of

2    this.  This is getting -- I don't mean to interrupt --

3          MR. RAFATJOO:  I didn't interrupt you when you

4    were going on for half an hour talking about various

5    things.  I expect the same courtesy.  If you would like,

6    next time I'll interrupt you, too, and then we could keep

7    at this thing.  So --

8          MR. GEHER:  Mr. Rafatjoo, I will give you the

9    same courtesy.  I just want --

10          MR. RAFATJOO:  Okay.  Let's go.

11          MR. GEHER:  I -- Your Honor, strike (phonetic)

12    that down.  Your Honor, I would --

13          THE COURT:  I really -- I don't -- I don't want

14    to start muting people.  I really don't.  I -- this is --

15    this is a hearing about an issue that's important to

16    everyone who's involved here and I understand that everyone

17    has strong feelings about this.  I also understand that

18    this has been a long hearing and a long day.  So I

19    understand where everyone's coming from here.

20          MR. GEHER:  Your Honor, I just -- I --

21          THE COURT:  I just want -- I didn't expect to

22    start having another round of argument.  We have a

23    substantial record.  I think everyone's had a long

24    opportunity to be heard.  I understand what appraisals are.

25    I understand what statements made by all parties about

Page                                                                142

1   value are.  I understand statements made in connection with

2   DIP financing motions, what sale procedures motions are.  I

3   think everyone understands the dollars that have been

4   thrown out and represented as value throughout this case.

5   I have a record here.

6          What I think is helpful is to hear from a few

7   witnesses, and this doesn't need to be long, but I think

8   it's important that the record be complete on a few

9   questions regarding the sale price, regarding the auction

10  process, regarding the winning bid and the curiosity of the

11  events that happen at the end of the auction.  So I need

12  some additional testimony but I did not intend for us to

13  have another go-around of argument at this point before we

14  had testimony.

15         So let me do this.  We all need about five

16  minutes and then I think we will begin with Ms. Williams.

17  There was some interest in some cross-examination of her,

18  so we'll begin there.

19         MR. RAFATJOO:  Your Honor, before we break, on a

20  housekeeping matter, my (indiscernible) just -- I had

21  initially set up meetings and conference calls for 4:00

22  p.m. thinking I would have plenty of time to get to them.

23         THE COURT:  Um-hum.

24         MR. RAFATJOO:  Well, are we going to just

25  continue through the afternoon and early evening with this

Page                                                              143

1   or --

2              THE COURT:  I need to stop at 5:00 o'clock.  We

3   will stop at 5:00 o'clock.

4              MR. RAFATJOO:  Okay.

5              THE COURT:  I will tell you this.  This is

6   important.  This is something that the Court needs to think

7   about.  So if we're thinking that there's going to be a

8   ruling at 5:00 o'clock I think that's doubtful.  I have

9   Monday morning free but I do not think that anyone should

10  expect that there's going to be a ruling at 5:00 o'clock

11  here today.

12             We're going to take five minutes and come back.

13  As I said, we're going to stop recording.  I'm going to

14  turn off my microphone and my video.  I would suggest that

15  you do the same unless you want everyone to hear what

16  you're talking about.  So in five minutes we'll be back.

17             (Off the record at 3:21 p.m.  Back on the record

18  at 3:35 p.m.)

19             THE CLERK:  Please come to order.  This Court is

20  again in session.

21             THE COURT:  Thank you.  We are back on the record

22  in the Crestlloyd matter.  Let me just make sure we don't

23  have any participants in the waiting room.  No.  I think we

24  are ready to go.

25             Why don't we begin with some cross-examination

Page                                                          144

1    testimony.  We'll begin with Ms. Williams.

2            Ms. Williams, let me see here.  We are going to

3    get you sworn in.  So my courtroom deputy is going to

4    administer an oath to you.

5            COURTROOM DEPUTY:  Okay.  That's great.

6            Please raise your right hand.

7                    RAYNI WILLIAMS, Sworn

8            COURTROOM DEPUTY:  Please --

9            MR. GOLUBCHIK:  Your Honor --

10           COURTROOM DEPUTY:  Please state --

11           MR. GOLUBCHIK:  I'm sorry.  Just --

12           THE COURT:  Mr. Golubchik, why don't you wait

13   until we finish the oath.

14           COURTROOM DEPUTY:  Please state your name and

15   spell it for the record.

16           THE WITNESS:  Rayni William, R-A-Y-N-I, W-I-L-L-

17   I-A-M-S.

18           THE COURT:  Thank you.

19           COURTROOM DEPUTY:  Thank you.

20           THE COURT:  Mr. Golubchik, yes.

21           MR. GOLUBCHIK:  Yes.  Just for the record, Your

22   Honor, Ms. Williams did not submit a declaration.  This is

23   not a cross.  Branden Williams did but I know

24   Mr. Shinderman asked to have her present.  So to

25   accommodate him she's here, but it's not a cross.

Page                                                          145

1          THE WITNESS:  We're both here so who -- what --

2   which -- whichever you prefer.

3          MR. GOLUBCHIK:  Well, it's a cross without a

4   direct, how about that?

5          THE COURT:  Okay.  Thank you.  Thank you for

6   clarifying that.

7          Why don't we begin -- I did have a couple of

8   housekeeping matters that I'm going to ask all of our

9   witnesses.  Since we're appearing on Zoom things are a

10  little bit different and it's important for the record for

11  me to understand.

12         Ms. Williams, who is in the room with you?

13         THE WITNESS:  Aaron Kirman to my left.

14         MR. KIRMAN:  Hi, Your Honor.

15         THE WITNESS:  Branden Williams to my right.

16         THE COURT:  Thank you.  And, Ms. Williams, I am

17  going to ask you please not to be looking at a phone or any

18  other electronic device during your call-in and I'm also

19  going to ask Mr. Kirman and Mr. Williams not to speak

20  during your testimony, okay?

21         THE WITNESS:  Okay.

22         THE COURT:  Thank you.

23         Mr. Shinderman, I understand that you have some

24  questions for Ms. Williams.  Why don't you go ahead?

25         MR. SHINDERMAN:  Yes, Your Honor.  Just quick

Page                    Rayni Williams - Cross              146

1    housekeeping.  So Ms. Williams -- instead of a subpoena

2    Mr. Golubchik made her available.

3              So thank you for the courtesy.

4              The other two who did submit declarations we'll

5    want to cross-examine as well.

6              THE COURT:  Understood.

7              MR. GOLUBCHIK:  This will be brief.

8              THE COURT:  Okay.

9                        CROSS-EXAMINATION

10   BY MR. SHINDERMAN:

11       Q.   So, Ms. Williams, good afternoon.  Prior to the

12   auction you spoke to Mr. Englanoff and Ms. Niami about

13   setting a minimum bid, correct?

14       A.   Correct.

15       Q.   And at the time you thought it was a good idea,

16   correct?

17       A.   Correct.

18       Q.   And you communicated that to Mr. Englanoff,

19   correct?

20       A.   Yes.

21       Q.   Did you communicate it to Concierge as well?

22       A.   I did.

23       Q.   Okay.  Thank you.  And you recall the bid

24   procedures hearing about three weeks ago, four weeks ago,

25   correct?

Page                    Rayni Williams - Cross                147

1      A.   Yes.

2      Q.   And do you recall that during that hearing we

3  took a little break for the debtor and the brokers to meet

4  and discuss the minimum bid?  Do you remember --

5      A.   Yes.

6      Q.   -- that break?

7      A.   Yes.

8      Q.   And during that break did you recommend still

9  that a minimum bid was a good idea?

10      A.   Yes.

11      Q.   And you communicated that?

12      A.   I did.

13      Q.   Great.  Thank you.  Turning to a slightly

14  different question, in your experience is it more common or

15  better to sell properties between April, May and June or

16  January, February and March?

17      A.   The luxury sector doesn't -- doesn't really

18  matter.

19      Q.   Now, how about foreign buyers?

20      A.   You know, we haven't had foreign buyers for

21  several years.  So we have been relying on the American

22  buyer and it's been a very globe -- the global market has

23  been very localized by our one percent, you know, our

24  billionaire buyers that are local.  So the last 300-plus-

25  million-dollar sales have all been local buyers.

Page                    Rayni Williams - Cross            148

1      Q.    The average price per square foot in Bel Air --

2   this part of Bel Air is about $2500 a square foot or more,

3   is that correct?

4      A.    It varies on that location, view, you know,

5   things like that.

6      Q.    But is $4,000 a square foot unheard of?

7      A.    Pretty high.

8      Q.    Three thousand a square foot?

9      A.    Yeah.  I would say somewhere between 25 and 3500

10  depending.

11     Q.    And this sale would be $1200 a square foot,

12  correct?

13     A.    Well, the one thing we need to clarify is when

14  you get to this square footage it's very uncommon to do a

15  price per square foot.  The price per square foot really

16  applies to -- at that point you either use it for the land

17  or the quality of the view.  But the home price per square

18  foot at this caliber is really skewed, so it's not really

19  something we go off of.

20     Q.    But it -- but your testimony is, is 2500 for this

21  area is not uncommon?

22     A.    Yes.  It varies, is my testimony.

23     Q.    And I don't want to cut you off as a courtesy but

24  my question was this sale is for 1200 a square foot,

25  correct?

Page                    Rayni Williams - Cross              149

1      A.    This would be -- yeah, this -- well, this would

2    be, you know, 1400 a foot.

3      Q.    Okay.  And this is a very unique property?

4      A.    Correct.

5      Q.    This is not, as Mr. Geher said, the house at the

6    end of the block.  This is a very unique, high-end

7    limited -- limited number of buyer interest, correct?

8      A.    Correct.

9      Q.    Okay.

10            MR. SHINDERMAN:  Thank you, Your Honor.  I have

11   nothing further.

12            THE COURT:  Thank you.

13            Mr. Golubchik, did you want to follow up on any

14   questions?  Counsel, you're muted.

15            MR. GOLUBCHIK:  I do, Your Honor, but I wanted to

16   wait just in case somebody else has some questions so then

17   we could cover it all in one shot.

18            THE COURT:  Okay.

19            Anyone else?

20            MR. GOLUBCHIK:  Well, Your Honor has questions

21   that you said you may.

22            THE COURT:  Thank you.

23            Anyone else have questions for Ms. Williams?

24            MR. NEWMAN:  Your Honor, just -- yes, just a

25   couple just to clarify a couple things that she said in her

Page                    Rayni Williams - Cross              150

1  cross.  If I may?

2           THE COURT:  Go ahead, please.

3           MR. NEWMAN:  Thank you, Your Honor.

4                        CROSS-EXAMINATION

5  BY MR. NEWMAN:

6       Q.  Ms. Williams, just a couple of questions.  The --

7  you testified a moment ago that this is a very unique

8  property.  Is that necessarily going to drive the price up

9  or down on this property?

10      A.   Well, it limits the buyer pool when it's

11 something of this caliber.  Anything that's very unique has

12 a very limited audience, so there's that factor.  And then

13 I also think, you know, this is extraordinarily special.

14 It's the view.  It's the land.  It's the square footage.

15 It's height.  But we've had a major deficit on this

16 property that has really hurt us and what we've found out

17 during our marketing process, which has been both the lack

18 of C of O, not having a certificate of occupancy, has

19 really hurt us and the repairs that are needed to be done.

20 So most of the buyers that we've seen shy away from this

21 property have been for that reason.

22      Q.   Explain that -- why that matters to the buyer.

23      A.   Well, buyers usually want, especially at this

24 purchase price, to move right in.  And this property cannot

25 be lived in as it is.  There's no hot water.  It's

Page                    Rayni Williams - Cross            151

1   impossible for somebody to really know what the path of

2   C of O is and for that reason I think most people have

3   turned away.  We had a multitude of showings to very

4   qualified people, Branden and I and Aaron Kirman also had

5   over ten showings.  So between the two of us I think we had

6   20 extremely qualified buyers.  Aaron Kirman also flew

7   overseas to find a buyer.  So the feedback that we have

8   been given was that had it had a C of O perhaps we would be

9   in a different situation.  Were it move-in ready then maybe

10  we would have a bigger buyer pool, but even still, because

11  of the uniqueness of it and because of its price point we

12  have a limited buyer pool.

13       Q.   And do you believe after the work you've done --

14            MR. SHINDERMAN:  Your Honor, objection.  This

15  goes beyond the scope of her direct in the bid procedures

16  and the cross.

17            MR. GOLUBCHIK:  Your Honor, there is -- again, to

18  remind you there is -- there was no direct.  This is a

19  third-party witness that was made available as a courtesy.

20  So I don't think there's a testimony that limits the scope.

21            MR. RAFATJOO:  And, Your Honor, I would object to

22  the standing of the buyer again.

23            MR. SHINDERMAN:  And I share that objection.

24            THE COURT:  Okay.  Then let me -- let me re -- do

25  you have any response to the response to your objection?

Page              Rayni Williams - Cross              152

1          MR. SHINDERMAN:  No, Your Honor.  I --
2    Ms. Williams was part of the team that consulted at the bid
3    procedures.  I'm only asking her about that and Mr. Newman
4    doesn't represent -- doesn't represent a party in interest.
5    He represents the buyer, but Your Honor knows the
6    arguments.
7          MR. NEWMAN:  Your Honor, I think defer to
8    Mr. Golubchik but I -- just to respond briefly I think,
9    first of all, I've articulated my basis for standing.  We
10   are currently the administrative claimant with significant
11   a deposit being the only bidder.  And frankly, I
12   believe -- and again, we realize we're the bidder and we're
13   not trying to interlope here but I believe that the most
14   important information that Your Honor will hear about the
15   bid process, the fairness of the process, the level at
16   which the process has achieved, the appropriate value under
17   these circumstances will come from the brokers that were in
18   the process.  I mean, you know, cutting off her testimony
19   when Mr. Shinderman asked that she be available to testify
20   doesn't seem appropriate, Your Honor.
21         THE COURT:  I'm going to overrule the objection.
22   But again, Mr. Newman, I'm going to ask you to keep things
23   as brief as you're able to.
24         MR. NEWMAN:  I only have one other question, Your
25   Honor.

Page                    Rayni Williams - Cross               153

1           THE COURT:  Okay.

2    BY MR. NEWMAN:

3       Q.   Which is, under the circumstances the process

4    that has been run, Ms. Williams, has it provided the

5    optimum value under these circumstances and, if so, could

6    you explain that?

7       A.   Well, I think that the optimum value is, you

8    know, the buyer that -- buyer or buyers that come forward

9    and the price that they're willing to pay.  So I think we

10   had a worldwide campaign.  I think in a six-week period we

11   covered more territory and changed the narrative and had

12   really beautiful press and exposure.  And optically I think

13   we turned everything around to make it a very positive

14   thing and not focus on the bankruptcy and not focus on any

15   other negative narrative that had previously existed.  And

16   having said that, the -- it was very clear what the

17   proceedings were and I think that in our experience in

18   working with the one percent, like that other world that

19   can purchase homes like this, they know how to get what

20   they want.  And we were very disappointed that we didn't

21   get a higher number, especially the three of us have been

22   on this project for a long time and we were hoping to fetch

23   a minimum of the debt and even try to win the record-

24   breaking sale, which would be 239, which in our mind was

25   our goal.  We were really disillusioned by all of it, but

Page                    Rayni Williams - Cross              154

1   at the same time it went in line with exactly what Chad

2   Roffers told us, whom I've never worked with before.  It

3   was almost verbatim to what he told me.  It will be a low

4   day.  The second day will be no bidders and the third day

5   just before gavel down the buyer will come.  And so, you

6   know, it was exactly what he said would happen.  So did we

7   get the optimal price?  I would have to say unfortunately

8   we did.

9           MR. NEWMAN:  I have no further questions, Your

10  Honor.

11          THE COURT:  Okay.  Thank you.

12          Anyone else?

13          Ms. Andrassy.  Oops, counsel, I can't hear you.

14          (Pause.)

15          Now you're muted on your Zoom.  There we go.

16          MS. ANDRASSY:  There we go.

17          THE COURT:  Okay.  I can hear --

18          MS. ANDRASSY:  I'm sorry.  It's been a long day.

19  It's been a long day for everybody here.

20                    CROSS-EXAMINATION

21  BY MS. ANDRASSY:

22     Q.   Ms. Williams, when did you start marketing the

23  property?

24     A.   Several years ago without entering into the MLS.

25  But I would say a little over two years ago we started

Page                    Rayni Williams - Cross              155

1  pushing the property, showing it to qualified buyers.

2       Q.   After you were hired by Crestlloyd, the debtor-

3  in-possession, employed during the bankruptcy case, when

4  did you actively start marketing the property again?

5       A.   We started actively marketing the property before

6  the bankruptcy and then we briefly were engaged with the

7  receivership, Mr. Lanes, and then he formally hired two

8  other brokers.  So at that time we still continued to try

9  to procure buyers but we weren't the listing agents

10 marketing it and we were officially hired again when

11 Trustee, Mr. Perkins, took over.  And that was a little

12 over maybe four months ago.

13         MS. ANDRASSY:  Okay.  I have no other questions,

14 Your Honor.

15         THE COURT:  Anyone else?

16         MR. MORROW:  I have one question of the witness,

17 Your Honor, if I may.

18         THE COURT:  Mr. Morrow, go ahead.

19         MR. MORROW:  Yes, please.

20                    CROSS-EXAMINATION

21 BY MR. MORROW:

22      Q.   Ms. Williams, during this six-week period where

23 your firm engaged in the marketing of the property at issue

24 did anyone associated with the sale or auction of the

25 property obtain or request an estimate of what it would

Page                    Rayni Williams - Redirect              156

1   take to get a certificate of occupancy for this property?

2       A.   Yes, we did.

3       Q.   And what was the result of that inquiry on a

4   certificate of occupancy?

5       A.   It was really incomplete.  We had consulted with

6   previous expediters.  We had spoken with Ms. Niami. We'd

7   spoken with other people involved in the property and we

8   had a very inconclusive path to say about it.

9       Q.   Okay.  If you would have -- I believe your

10  testimony is that if the property had a certificate of

11  occupancy the property would have sold for a higher value

12  than what was obtained in the auction process.  Is that an

13  accurate statement of your testimony?

14      A.   That's speculative but, yes, I do believe so.

15          MR. MORROW:  I have no further questions, Your

16  Honor.

17          THE COURT:  Thank you.

18          Anyone else?

19          MR. GOLUBCHIK:  Yes.  Me, Your Honor.

20          THE COURT:  Mr. Golubchik, go ahead.

21                      REDIRECT EXAMINATION

22  BY MR. GOLUBCHIK:

23      Q.   Ms. Williams, with Mr. Shinderman you talked

24  about the minimum reserve and I believe during a break at

25  the bid procedures hearing you said you thought a minimum

Page                 Rayni Williams - Redirect              157

1  reserve is a good idea.  Do you recall that?

2       A.   I do, yes.

3       Q.   Did anything -- eventually the order was to not

4  have a minimum reserve, correct?

5       A.   That's correct.

6       Q.   Did an -- when the order was entered at the time

7  did you agree at that time that there should not be a

8  minimum reserve?

9       A.   Yeah.  So the process -- well, what happened was

10 we were in the first hearing.  We discussed it and then we

11 went out into a breakout room where I believe Mr. Kirman

12 and I both suggested that if this would be a better process

13 we would like to do it.  First of all, it would make the

14 lienholders much happier, which why not try to make them

15 more comfortable with the process?  We were all going into

16 unchartered territory and for that reason alone, because

17 being a novice at the auction process myself, I don't know

18 whether this hurts or helps but I would like to try it just

19 to make them happy and make them feel a little more

20 content.

21           At that time Mr. Roffers spoke and explained to

22 use the process and adamantly said that the -- and gave us

23 examples of if we do not get that first day where we will

24 get low bidders but that is the emotional foundation that

25 we need to set so that we can bring in other buyers.  He

Page                    Rayni Williams - Redirect              158

1   felt that if we did -- if we took --

2          MR. SHINDERMAN:  Your Honor, objection.  Hearsay.

3   Let Mr. Roffers testify to this.

4          THE WITNESS:  Sure.  Yeah.  Exactly.  Mr. Roffers

5   should talk about that.

6   BY MR. GOLUBCHIK:

7      Q.   My ques -- my question to you, Ms. Williams, is

8   what made you change your mind that no reserve is the

9   better way to go?

10     A.   Well, Judge Saltzman overruled it.  So that was

11  the deciding factor.

12     Q.   No, no.  I'm sorry.  Initially -- and you were

13  speaking about Mr. Roffers.  I just want to make sure that

14  the record is clear.  At first you thought a reserve is a

15  good idea.  Later on you believed that a reserve is not

16  necessary, correct?

17     A.   Correct.

18     Q.   So that's what I'm trying to understand.

19     A.   So after hearing from Chad and to hearing why

20  exactly the process of the auction is better without a

21  reserve then I -- we said, "Okay, well, you're the expert

22  so let's -- let's do it.  Let's do it your way."

23     Q.   With respect to the marketing of the property do

24  you believe that the broker group adequately marketed the

25  property?

Page                 Rayni Williams - Redirect          159

1       A.    Absolutely.  I think it one -- is one of the --

2   I've sold almost nine billion dollars in luxury real estate

3   alongside my husband and this is the biggest campaign we've

4   ever had.  I think it would be over a ten-million-dollar

5   campaign if we were to pay for this.  From *Bloomberg* to

6   *Forbes* to *Wall Street Journal* we had the most media

7   attention week after week after week and, might I add, very

8   positive and amazing attention.  Our marketing department

9   took a look at the eyes and views that we've had and

10  they're north of 30 million hits on, you know,

11  collaborative efforts.

12      Q.    And do you believe that based on your efforts on

13  the auction that transpired you obtained the optimum price

14  for the property under the current circumstances?

15      A.    Under the current circumstances, yes.

16      Q.    And that's the price by the current proposed

17  bidder, correct -- buyer?

18      A.    Correct.

19      Q.    Let me ask you this.  If for some reason there is

20  no sale today but we -- in the next 30, 60 days do you see

21  based on your experience anything that would improve the

22  valuation and possible sale of the property?

23      A.    The two issues that I would have with that is --

24  is, number one, I would be weary that we would lose

25  Mr. Saghian; and number two, my fear is optically that it

Page                    Rayni Williams - Redirect              160

1  looks like a failure to the open market.  And I believe --

2  in my experience when we have a failed escrow and then you

3  go back on the market you usually get less money.  So I

4  just think that if -- you know, if we were to go do a do-

5  over -- redo or do-over that it could be very harmful.

6            MR. GOLUBCHIK:  Thank you.  Nothing further.

7            THE COURT:  Ms. Williams, I have a couple of

8  questions.  You just said something kind of interesting in

9  answering Mr. Golubchik's question.  He asked you if you

10 changed your opinion about having a reserve price and

11 initially I think what you just -- what you said was, well,

12 the judge overruled it.  So did you change your opinion as

13 to the wisdom of the sale price or was it just that I

14 listened to Mr. Roffers?

15           THE WITNESS:  Well, thank you for clarifying.  I

16 think that initially I went in wanting it and had -- again,

17 not having experience with an auction and then hearing

18 Mr. Roffers is out I understood what he was saying.  But

19 again, I had no experience and he has the expertise so I

20 believe at that moment in the breakout room I was the only

21 person that felt that way.  After Mr. Roffers spoke I then

22 agreed with everybody else, that we should go with the

23 expertise of the auction house.  And it made sense what he

24 was saying.

25           THE COURT:  Okay.  Thank you.  All right.  Thank

Page                                                                161

1   you.

2          THE WITNESS:  Thank you.

3          THE COURT:  Why don't we then turn to some cross-

4   examination of Mr. Williams.

5          Mr. Williams, I think you're in the same Zoom

6   tile in the same room as Ms. Williams.  Sir, I'm going to

7   ask you to be sworn in.  So the next voice you will hear

8   will be my courtroom deputy.

9          COURTROOM DEPUTY:  Please raise your right hand.

10                  BRANDEN WILLIAMS, SWORN

11         COURTROOM DEPUTY:  Please state and spell your

12   name for the record.

13         THE WITNESS:  Branden Williams, B-R-A-N-D-E-N,

14   W-I-L-L-I-A-M-S.

15         COURTROOM DEPUTY:  Thank you.

16         THE COURT:  Mr. Williams, thank you.  I'm going

17   to again say the same thing to you that I said to

18   Ms. Williams.  I do understand that there are others in the

19   room with you.  Would you just tell me who else is in the

20   room with you right now?

21         THE WITNESS:  Rayni Williams and Aaron Kirman.

22         THE COURT:  Okay.  Thank you.  I'm going to ask

23   that they not speak during this testimony and I'm also

24   going to ask you not to look to any other devices, you

25   know, phone, iPad, computer or anything else.  Okay?

Page                    Branden Williams - Cross              162

1              THE WITNESS:  All right.

2              THE COURT:  Thank you.  Let me see here.  Who is

3      unmuted?

4              Mr. Shinderman, do you want to start?

5              MR. SHINDERMAN:  Sure, Your Honor.

6                        CROSS-EXAMINATION

7      BY MR. SHINDERMAN:

8          Q.   Good afternoon, Mr. Williams.  How are you?

9          A.   Great.  Thank you.

10         Q.   Are you familiar with the potential sale of the

11     property at 777 Sarbonne Road?

12         A.   Yes, I am.

13         Q.   Are you the broker on that property?

14         A.   No, I am not.

15         Q.   Is Concierge the auction house on that property?

16         A.   I believe so, yes.

17         Q.   Is there a minimum bid on that property?

18             MR. GOLUBCHIK:  Your Honor, I'm sorry to

19     interrupt but I just want to assert an objection.  I'm

20     looking at Mr. Williams' declaration and it seems the scope

21     of the cross is unrelated to his declaration.

22             MR. SHINDERMAN:  I'll withdraw, Your Honor.  I'll

23     save it for Mr. Roffers.

24             THE COURT:  Okay.  Thank you.

25             MR. SHINDERMAN:  Mister -- sir, let me put my

Page                    Branden Williams - Cross              163

1  note on.  I'm sorry.

2  BY MR. SHINDERMAN:

3      Q.   Mr. Williams, do you recall having a conversation

4  with Ms. Niami and Mr. Englanoff about a minimum bid?

5          MR. GOLUBCHIK:  Same objection.

6          THE COURT:  Any response?

7          THE WITNESS:  I was never part of the --

8          THE COURT:  I'm sorry, Mis -- I'm sorry,

9  Mr. Williams.  Hold on one second.  I wanted to see if

10 counsel had a response the legal --

11         MR. SHINDERMAN:  Your Honor, it's all part of

12 the -- of the declaration supported the sale.

13         THE COURT:  Yeah.  I'm going to overrule -- I'm

14 going to overrule the objection.

15         And, Mr. Williams, you can answer the question.

16         THE WITNESS:  I was never part of the -- and I

17 think -- I was never part of this.  That was Aaron Kirman

18 and Rayni who went that day and discussed the minimum bid.

19 BY MR. SHINDERMAN:

20     Q.   Fair enough.  I'll move on to Mr. Golubchik's

21 point.  In your declaration that you submitted in

22 connection with the sale motion at paragraph 6 you

23 testified that:

24         "I believe the already limited pool of buyers

25     with the means to purchase the property may have been

Page                   Branden Williams - Cross              164

1       further reduced due to the conflict in Ukraine or

2       related sanctions against Russia."

3           Is that correct?

4       A.   But I don't -- I don't --

5       Q.   I'm quoting from your declaration.  Do you

6   disagree with that statement, sir?

7       A.   I don't -- declaration.  When did I take a

8   declaration on this?

9       Q.   It's --

10      A.   I don't remember ever taking a declaration.

11          MR. SHINDERMAN:  It's attached to the reply in

12  connection with the reply, Your Honor.

13          THE COURT:  The -- what Mr. Shinderman is

14  referring to -- and hold on.  I need to make sure that I

15  have it.

16          MR. SHINDERMAN:  It's at page 59 of the debtor's

17  motion.  Or page 60.

18          THE COURT:  I'm sorry.  The -- Mr. Shinderman,

19  you're referring to the motion, not their reply, correct?

20          MR. SHINDERMAN:  Correct.

21          THE COURT:  Okay.  Everyone is getting a little

22  tired here and I wanted to make sure that --

23          MR. SHINDERMAN:  Yeah.  My apologies.

24          THE COURT:   -- that we were referring to the

25  right document.

Page              Branden Williams - Cross          165

1         So, Mr. Williams, this document is on March 8th.

2    The debtor filed a motion to approve the sale and it

3    included a declaration signed by you which is essentially

4    your testimony to the Court about the sale and the process.

5    Are you familiar with that document?

6         THE WITNESS:  Yes, now I am.

7         THE COURT:  Okay.  Thank you.

8         Mr. Shinderman, why don't you try to ask your

9    question again?

10        MR. SHINDERMAN:  Sure.

11   BY MR. SHINDERMAN:

12   Q.   In that statement in paragraph 6, your concern,

13   did you share that concern with the debtor or the auction

14   house?

15   A.   Yes, I did.  And --

16   Q.   And did -- I'm sorry.  Go ahead.

17   A.   I -- just the international buyer pool has gotten

18   really small since COVID and Ukraine hasn't helped.

19   Q.   Right.  And did you suggest delaying the auction

20   as a result?

21   A.   Yes, I did.

22   Q.   Okay.

23   A.   And we did delay the auction, I think.  We

24   delayed it also because the house wasn't be -- ready to

25   show and I think we delayed it four to six weeks.

Page                 Branden Williams - Cross           166

1       Q.   I don't believe your dates are correct, sir.  I

2    believe the continuation of the auction were cleared way

3    before the Russian invasion.  Are you sure -- is it your

4    testimony that you agreed to continue the hearing after

5    that Russian invasion or before the Russian invasion?

6       A.   Well, I originally -- I originally -- we were

7    supposed to originally -- we were supposed to originally

8    have the auction and I -- and I held off.  I said that we

9    should hold off the auction because the house wasn't ready

10   yet.  And then, yes, I said it again, you know, the -- I --

11   the whole Russia war didn't help us.

12      Q.   Okay.

13           MR. SHINDERMAN:  Thank you, Your Honor.  I've got

14   nothing further.

15           THE COURT:  Okay.  Thank you.

16           Anyone else?

17           Okay.  Thank you, Mr. Williams.

18           (Witness excused.)

19           We're going to go next to Mr. Kirman.

20           Mr. Kirman, the next voice you will hear will be

21   my courtroom deputy to get you sworn in.

22           MR. KIRMAN:  Thank you, Your Honor.

23           COURTROOM DEPUTY:  Please raise your right hand.

24                     AARON KIRMAN, SWORN

25           COURTROOM DEPUTY:  Please state your name and

Page                                                              167

1  spell it for the record.

2          THE WITNESS:  Aaron Kirman, A-A-R-O-N, K-I-R-M-

3  A-N.

4          COURTROOM DEPUTY:  Thank you.

5          THE COURT:  Mr. Kirman, I'm going to start by

6  confirming with you who else is in the room with you?

7          THE WITNESS:  I'm here with Rayni and Branden.

8          THE COURT:  Okay.  Thank you.  I'm going to ask

9  that they not speak during your testimony and I'm also

10 going to ask you not to look at any devices during your

11 testimony.

12         THE WITNESS:  Of course, Your Honor.

13         THE COURT:  Thank you.

14         Who would like to --

15         MR. GOLUBCHIK:  Your Honor, be -- before we

16 begin -- I'm sorry.  Is this Your Honor calling Mr. Kirman?

17 The reason I ask, is he did not submit a declaration and

18 he's not one of the people that Mr. Shinderman asked to be

19 here today to testify.  So I just am checking.

20         THE COURT:  I wanted to just give the brokers an

21 opportunity to testify if there were any questions that

22 anyone had.

23         MR. GOLUBCHIK:  Right.  So you want to go through

24 all the brokers.  Okay.

25         THE COURT:  Yes.

Page                 Aaron Kirman - Cross                 168

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  Are there any questions for

3    Mr. Kirman?

4          MR. SHINDERMAN:  Yes, Your Honor.  Mark

5    Shinderman.

6          THE COURT:  Mr. Shinderman, please go ahead.

7          MR. SHINDERMAN:  And, Your Honor, I'll be very --

8    this will be very simple.

9                    CROSS-EXAMINATION

10   BY MR. SHINDERMAN:

11      Q.   Mr. Kirman, good afternoon.  Do you have the

12   listing at 777 Sarbonne?

13      A.   I do.

14      Q.   And is there a minimum bid on that property?

15      A.   There is.

16          MR. SHINDERMAN:  Thank you, Your Honor.  No

17   further questions.

18          THE COURT:  Mr. Rafatjoo?

19          MR. RAFATJOO:  Yes.

20                    CROSS-EXAMINATION

21   BY MR. RAFATJOO:

22      Q.   Mr. Kirman, just a quick question.  Did you

23   travel outside of California to meet with any buyers for

24   this property?

25      A.   I did, yes.

Page                    Aaron Kirman - Cross                    169

1      Q.    Where did you go?

2      A.    I went to London and Paris.

3      Q.    And how many people did you meet with there?

4      A.    I met with a total of four.

5      Q.    Thank you.

6            THE COURT:  Anyone else?

7            MR. GEHER:  Your Honor, me.

8            THE COURT:  Mr. Geher.

9                     CROSS-EXAMINATION

10  BY MR. GEHER:

11     Q.    Mr. Kirman, concerning 777 Sarbonne are

12  you -- has the Court approved auction procedures?

13     A.    Not yet, no.

14     Q.    So there has been no minimum bid established by

15  the Court with respect to that property, is that correct?

16     A.    The Court has not approved that yet.

17     Q.    It hasn't approved anything yet, correct?

18     A.    That is correct.

19     Q.    Thank you.  No further questions.

20           THE COURT:  Mr. Geher, is Concierge the

21  auctioneer on that 777 property?

22           THE WITNESS:  They are.  I brought them in and

23  the property is a very different type of property with a

24  very clear price point.

25           THE COURT:  Okay.

Page                    Aaron Kirman - Cross                170

1          THE WITNESS:  And it --

2          THE COURT:  Go ahead.

3          THE WITNESS:  It -- you know, the property has a

4    very clear price point.  It has a C of O.  So I think it's

5    a totally different animal altogether.  I think it's

6    completely unrelated to this one.

7          THE COURT:  Thank you.

8          MR. HOROUPIAN:  Your Honor, if I might.

9          THE COURT:  Mr. Horoupian, go ahead.

10                   CROSS-EXAMINATION

11   BY MR. HOROUPIAN:

12      Q.   Staying on 777 Sarbonne what is the minimum --

13   the proposed minimum bid on that property?

14      A.   The proposed minimum is 50 million.

15      Q.   And how many square feet is that property?

16      A.   Give or take 16,000.

17      Q.   So that would be a price of over $3,000 a foot?

18      A.   That is correct.

19          MR. HOROUPIAN:  Thank you, Your Honor.

20          THE WITNESS:  The -- may I say something?

21          THE COURT:  Go ahead.

22          THE WITNESS:  You know, the price per square foot

23   issue always becomes something that we deal with in selling

24   real estate.  The reality is when we sell real estate we

25   really never know what the value of any given entity is

Page                                                               171

1    especially in the luxury segment until we bring it to

2    market and until we find a buyer.

3            So if you look historically a lot of our list

4    prices are significantly different than our sales prices

5    and it's not uncommon in the uber luxury segment to see a

6    variation of anywhere between 50 and 60 percent difference

7    between actual list price and sales price.  And we see that

8    repetitively over and over again in our marketplace.

9            THE COURT:  Thank you.

10           I want to go back to Ms. Williams.

11           Ms. Williams, are you there?

12           MS. WILLIAMS:  Yes, I am.

13           THE COURT:  Thank you.  I thank you and you're

14   still under oath.  I -- I was just struck by something that

15   you mentioned in your testimony.  You mentioned that there

16   was a hope of achieving some kind of record price of

17   230 -- I'm sorry, 238 million, was it?

18           MS. WILLIAMS:  Yes, 239.  Well, understandably

19   we're competitive because this is what we do.  So we had

20   high hopes of having the highest sale in the world.  So

21   that was our goal.  And also, you know, that was sort of

22   how we priced it and also, you know, we took a lot of

23   different things in it -- into consideration in pricing and

24   that was our ultimate goal, yes.

25           THE COURT:  Then you were employed the debtor was

Page                                                        172

1   referring to the value of 325 million.  Why was there such

2   a disparity between that number and what you've just

3   testified you were hoping to achieve?

4          MS. WILLIAMS:  Meaning the list -- the three --

5   the 350?  I'm sorry, meaning the --

6          THE COURT:  Well, the number that the debtor was

7   using at the time your firm was employed was 325 million

8   dollars as the value of the property.

9          MS. WILLIAMS:  Well, so there's always something

10  that we call runway or, you know, having a sale to allow

11  for negotiation.  I think that that is probably what you're

12  referring to.  So generally speaking the asking price is

13  not the full dollar amount that you -- that you receive

14  unless you are in a multiple situation where you are

15  grossly under value to drive up multiple bidders.  And in

16  this -- in this high-end market that's not usually a

17  technique.

18         THE COURT:  Okay.

19         MS. WILLIAMS:  Am I answering your question or am

20  I not understanding it?

21         THE COURT:  No, I think you answered it.  Thank

22     you.

23         Any other questions?  I apologize for jumping

24  around.  All right.

25         Thank you.

BENHYATT
Certified Deposition Reporters    www.benhyatt.com

Page                                                                        173

1          What I think I would like to do now is turn to

2     Mr. Roffers.  Let me see.  Yes, you are there.  There's a

3     lot of tiles to look at here.  So we are going to get your

4     sworn in.  So you will next hear the voice of my courtroom

5     deputy administering an oath.

6          COURTROOM DEPUTY:  Please raise your right hand.

7                    CHAD ROFFERS, SWORN

8          COURTROOM DEPUTY:  Please state your name and

9     spell it for the record.

10         THE WITNESS:  Yes.  It's Chad Roffers.  And it's

11    C-H-A-D, R-O-F-F-E-R-S.

12         COURTROOM DEPUTY:  Thank you.

13         THE COURT:  Mr. Roffers, I apologize for

14    occasionally pronouncing your name incorrectly.  I will get

15    it right now.  I'm going to ask you the same kind of

16    housekeeping questions that I've asked the other witnesses

17    so far.  Is anyone else in the room with you?

18         THE WITNESS:  No.

19         THE COURT:  Okay.  And please refrain from

20    looking at your phone, any other device during your

21    testimony, okay?

22         THE WITNESS:  Understood.

23         THE COURT:  Okay.  Thank you.

24         I am just looking through my papers.  I

25    apologize.  I'm going to just quickly send a message.  For

Page                    Chad Roffers - Cross                174

1  some reason I do not have your declaration in front of me.

2  I may have left it in another room.

3          Okay.  Who would like to begin?  I guess we've

4  kind of been going in the same order.

5          Mr. Shinderman, do you want to start?

6          MR. SHINDERMAN:  Certainly, Your Honor.  Thank

7  you.

8                     CROSS-EXAMINATION

9  BY MR. SHINDERMAN:

10     Q.   Mr. Roffers, good afternoon.  You're the

11 auctioneer for the house at 777 Sarbonne Road, correct?

12     A.   Yes, I am.  We are.

13     Q.   And that house is expected to sell for tens of

14 millions of dollars, correct?

15     A.   I don't understand the question.

16     Q.   Do you expect the sale of that home to generate

17 more than 50 million dollars?

18     A.   I -- it would be -- that would be great but, you

19 know, we'll find out when the auction happens.

20     Q.   Is there a reserve on the property?

21     A.   As previously discussed, our employment has not

22 been finalized by the Bankruptcy Court.  So --

23     Q.   That wasn't my question, sir.  Is there a reserve

24 on the property?

25     A.   As I've indicated there has not been a final

Page                    Chad Roffers - Cross                175

1   procedure or minimum bid established by the Court.

2   Tentatively, it's set for 50 million dollars.

3        Q.   So the answer is yes, there is currently reserve

4   on the property?

5             MR. GOLUBCHIK:  Objection.  Argumentative.  He

6   stated that there hasn't been an order yet.

7             THE COURT:  Overruled.  I don't find that to be

8   argumentative.

9             THE WITNESS:  So the proposed reserve is 50

10  million dollars against an asking price of about eight -- I

11  think it's 88 million.  So that's 60 percent of the asking

12  price is what the proposed reserve is.

13  BY MR. SHINDERMAN:

14       Q.   Thank you.  Before the bid procedures --

15       A.   Further, what the -- which is different from this

16  proceeding -- the -- if the high bid at auction exceed --

17  equals or exceeds 50 million, there will not be a

18  requirement for Court approval.  However, if the high bid

19  is less than 50 million dollars then the high bid will be

20  submitted to the Bankruptcy Court and subject to their

21  approval.  So just to be clear about that.

22       Q.   But the 50 million is being advertised to people,

23  correct?

24       A.   Yes.

25       Q.   Thank you.  Before the bid procedures hearing do

Page                Chad Roffers - Cross                176

1   you recall having a conversation with Ms. Niami,

2   Mr. Englanoff about a minimum reserve bid?

3        A.   I do.

4        Q.   And do you recall telling them that it's not a

5   bad idea?

6        A.   I think to be -- to be clear what I said -- and

7   this is my position here and in every situation -- there's

8   nothing wrong with utilizing a reserve.  However, where

9   things can go wrong is when a reserve is established

10  arbitrarily and/or I think as Mister -- I believe it's

11  Mister -- is it Geher -- and hopefully I'm pronouncing your

12  name correctly.  I think he adequate -- eloquently pointed

13  out, which I think is very spot on, just because you owe

14  $50,000 on your car and, therefore, you know, you establish

15  a minimum of 50,000 and you go to trade it in and the

16  dealer will only give you 35, you know, you can ask

17  whatever you want or you can try to set an arbitrary

18  number.  But when that number is really related to the

19  needs or wishes of a seller versus a compelling floor that

20  invites competition and is -- that's when it becomes

21  problematic.  And I think -- you know, I understand people

22  here are, you know, maybe laypeople to the auction process

23  and I respect that.  Probably one of the biggest misnomers

24  as it relates to setting minimums at auction is a minimum

25  is really not the number that the seller should be willing

Page                  Chad Roffers - Cross                    177

1   to accept.  The minimum -- the litmus test for --

2           MR. SHINDERMAN:  Judge, motion to dis -- motion

3   to strike.  Is not responsive.  I asked whether or not he

4   recommended a minimum bid to Ms. Niami and Mr. Englanoff.

5           THE COURT:  Well, I'm going to let the witness

6   answer -- continue because I have some questions in this

7   area and I think this testimony is still helpful and if you

8   want to ask a question that you feel hasn't been answered

9   then I'll let you do that after Mr. Roffers finishes.

10          MR. SHINDERMAN:  Thank you, Your Honor.

11          THE WITNESS:  Thank you.

12          THE COURT:  Go ahead, sir.

13          THE WITNESS:  Thank you, Your Honor.  And to be

14  clear, I didn't recommend a reserve.  I said that -- that I

15  wouldn't be opposed to one.  So I want to be clear about

16  that first and foremost.

17          Secondly, as I was stating, you know, misnomer is

18  a reserve is set as some sort of, you know, aspirational

19  number that people, you know, the stakeholders, you know,

20  are comfortable with.  And quite frankly, that's typically

21  a recipe for disaster.  And versus setting a minimum number

22  where -- especially if there are comparable transactions or

23  comparable sales where you can establish a minimum that

24  represents a compelling opportunity to qualify buyers and

25  also it -- and also isn't set at a threshold where a

Page              Chad Roffers - Cross              178

1   qualified buyer can say, "You know what, thanks, Rayni, or

2   thanks, Branden, or thanks, Aaron, or thanks, Chad for

3   telling about this auction.  Call me if it doesn't sell."

4   Right.  That's when then you've established a minimum

5   that's utter -- it ineffective and working against you.

6   And so I think once again that's really important.

7        And I will also say furthermore here, because we're

8   all here today, there is a minimum in this transaction.

9   It's the judge.  Okay.  So it's semantics to talk about

10  whether or not there was a minimum or not because, you

11  know, ultimately the judge is going to decide whether or

12  not market value was achieved.

13       I'm confident that market value was achieved.  We

14  always want more for our clients, right?  But I think it's

15  really a circular argument.  You know, had the judge ruled

16  that it's a minimum and she's -- it's not going to come

17  back to the Court for approval, maybe it's a fair argument.

18  But, you know, I don't understand the argument.

19  BY MR. SHINDERMAN:

20       Q.   Is it possible that you actually told

21  Mr. Englanoff and Ms. Niami that you would support a

22  minimum bid?

23       A.   To be clear, I said I wasn't opposed to a minimum

24  bid as long as it was an effective and compelling one.

25       Q.   Okay.  And did you discuss what a minimum bid

Page                    Chad Roffers - Cross              179

1   could be?

2        A.   We did not discuss figures.

3        Q.   And was your testimony --

4        A.   We discussed the content.

5        Q.   And was your testimony a few moments ago that

6   setting a minimum bid is an art, but it's not prohibited?

7        A.   What I said I didn't use the term "art."  What I

8   said is, is that I'm not opposed to using a minimum bid.

9   The litmus test for an effective minimum bid is to make

10  sure it's -- first of all, it tends to be predicated on

11  whether or not there are comparable sales.  Okay.  So there

12  was one headwind that we had with this particular property.

13  There are no comps.  Right.  Further compounded by the fact

14  that there's not a certificate of occupancy, further

15  compounded by prior to the commencement of the marketing

16  when I had the opportunity along with Mr. Kirman and

17  Mr. and Mrs. Williams to walk through the property, we

18  discovered, you know, quite frankly the condition of the

19  property wasn't what was anticipated.

20             So the -- in light of those headwinds, which are

21  real and legitimate headwinds, once again I wasn't opposed

22  and I'm never opposed to a minimum but it shouldn't be set

23  at a threshold that's arbitrary, right.  It needs to be

24  aspirational.  It needs to be set based on facts and it

25  needs to pass a litmus test that qualified buyers will say,

Page                    Chad Roffers - Cross                    180

1  "You know what, I'm willing to compete," versus saying,

2  "You know what, call me if it doesn't sell."

3      Q.   Did anyone suggest to you at -- in connection

4  with the bid procedures hearing to set an irrational

5  minimum reserve?

6      A.   Yes.  So when the topic was put on the table by

7  the various stakeholders, you know, the conversation

8  quickly went to, "Well, what other liabilities are on the

9  property?"  Right, which -- and I don't have the transcript

10 in front of me but I recall that specifically and, you

11 know, we're -- I know that the amount of liabilities is in

12 dispute but, you know, the figure's been thrown out

13 somewhere between 180 and 200 million dollars.

14     Q.   Do you recall -- do you recall that your

15 testimony before the judge when you came back live was that

16 there should be no minimum reserve?

17     A.   Yes.  In light --

18     Q.   As opposed to --

19     A.   In light of the facts that were presented that

20 day, yes.

21     Q.   The facts that were presented at the hearing or

22 outside the hearing?

23     A.   Both.

24     Q.   Okay.  We'll have to go back and look at the

25 transcript.  If there's a minimum reserve set and we didn't



Page                    Chad Roffers - Cross                181

1   hit the minimum reserve would you get -- would you earn

2   your commission?

3        A.   If ultimately the Court decided that that was the

4   true market value of the property and approved the sale

5   then, yes.

6        Q.   But if there's -- if we didn't hit the minimum

7   reserve and we didn't sell the property you wouldn't get

8   paid, correct?

9        A.   I just gave you the answer to that.

10       Q.   No, I don't think you did.  I think you answered

11   a different question.

12       A.   I did.  I said that if there's a minimum and

13   the -- and if the minimum is hit the property sells.  If

14   the minimum is not hit and the property doesn't sell then,

15   no, we would not be paid.

16       Q.   Okay.  Thank you.  Switching gears.  You were

17   hoping to attract interest from foreign nationals for this

18   property, correct?

19       A.   Yes.

20       Q.   Okay.  And you testified that at the bid

21   procedures hearing that you were hoping to generate

22   1,000 -- your word, 1,000 inquiries from around the world,

23   is that correct?

24       A.   We had -- and Ms. Williams just testified to

25   this -- exposure to this property on a global scale is

Page                    Chad Roffers - Cross                182

1   not -- was not the issue or was not the problem.

2        Q.   That's not the question.

3        A.   We had global interest.  We had thousands of

4   inquiries on the property, including buyers from around the

5   world, including a registered bidder who was from, you

6   know, somewhere in Asia.  So, you know, we had plenty of

7   interest.  I was on the phone with a potential bidder the

8   day of the auction in London who was interested.  However,

9   ultimately were totally freaked out by the lack of C of O

10  and then the publicity around the Haddad property, you

11  know, adjacent to this that, you know, I think the week

12  before this auction, you know, it was ordered to be torn

13  down.

14       Q.   Shortly after the auction concluded the Concierge

15  published it.  They were proud to be part of the largest

16  sale ever at auction?

17       A.   Yes.

18       Q.   And was that within days or hours?

19       A.   So I'm not sure where you're going with the

20  question but this auction, the sale of this property was,

21  you know, cert -- exposed at a level I've never seen

22  before.  I doubt it will ever be repeated again, quite

23  frankly, including, you know, I think there are people on

24  this call from *Bloomberg*, from *Wall Street Journal*, et

25  cetera.  So they were watching the auction in real time as

Page                    Chad Roffers - Cross                    183

1   it was taking place and they wanted a statement as to what

2   we thought about the out -- the outcome.  So it's customary

3   to issue a press release and answer that.  So furthermore,

4   in that press release it was also clear Mr. Perkins is on

5   the call -- or not in the press release but in the *Wall*

6   *Street Journal* article and it wasn't something I was

7   necessarily thrilled about but I understood his fiduciary

8   responsibility.  He made it clear to the world, you know,

9   "I have an obligation to accept better offers."  Right.

10  And to this day there's been no better offer.

11       Q.   So let's explore that for a second.  Did you or

12  Mr. Perkins or anyone to your knowledge indicate that there

13  might be an opportunity to buy the property outside of the

14  auction?

15       A.   First of all, the -- Mr. Perkins is on the record

16  in the Wall Street Journal of saying that.  So it -- you

17  know, yes.

18       Q.   Okay.

19            MR. SHINDERMAN:  Your Honor, no further

20  questions.

21            THE COURT:  Okay.  Thank you.

22            Anyone else?

23            MR. GEHER:  Your Honor, I --

24            Oh, Mr. Newman, go right ahead.

25            THE COURT:  Mr. Newman.

Page                  Chad Roffers - Cross              184

1          MR. NEWMAN:  Testing one, two, three.

2          THE COURT:  There you go.  We can hear you.

3          MR. NEWMAN:  Okay.  Sorry, Your Honor.

4                        CROSS-EXAMINATION

5    BY MR. NEWMAN:

6      Q.   Just on that last question about whether or not

7    there was ever indication to anyone that they could make a

8    bid and buy outside the auction.  To your knowledge was any

9    bidder actively bidding at the auction told they would be

10   able to make a bid after the auction?

11     A.   Not that I'm aware of.

12     Q.   Did you ever tell any bidder participating in the

13   auction that they -- if they didn't bid then they'd have an

14   opportunity to bid later?

15     A.   No.  I was surprised when Mr. Perkins made that

16   statement but I respected it and in some respects it's been

17   over two weeks since the auction and, you know, despite the

18   fact that I don't think that would -- is appropriate.

19   That's my opinion.  But nonetheless, Mr. Perkins made it

20   clear to the world that he would entertain offers and the

21   fact that there hasn't been one, you know, tell -- and if

22   it was such a bargain price, you know, there would have

23   been one in my opinion.

24     Q.   And to your knowledge, no one who was actually

25   bidding at the auction was told that they could bid after

Page                     Chad Roffers - Cross                  185

1    the auction, correct?

2         A.    To the best of my knowledge that's correct.

3         Q.    And one other question.  You had testified at the

4    bid procedures hearing that the purest way to maximize the

5    value for this property is just to make it clear that the

6    property is selling.  Do you believe that today?

7         A.    Absolutely.  And I think the reality is people

8    can ask whatever they want to ask for a property.  You

9    know, it's interesting, in preparing for this I was doing

10   my homework, you know, on recent transactions.  In fact,

11   the last three properties that Mr. Niami developed and

12   sold, the Bel -- the Hillcrest property, the Opus property,

13   it's like Carcassonne property.  Interestingly enough all

14   three of those properties, which was all within the last

15   year, sold at 48 percent of their list price.  Right.  So

16   interesting -- it's kind of uncanny, 48 -- I do have a

17   calculator, Your Honor.  Sorry.  But, you know, 48

18   percent --

19          MR. RAFATJOO:  Your Honor, I object to relevance

20   on this.

21          THE WITNESS:  Forty-eight percent --

22          (Parties speaking simultaneously.)

23          THE WITNESS:  No, actually --

24          MR. NEWMAN:  On the one hand we're talking about

25   this is a unique property.



Page                  Chad Roffers - Cross                  186

1            THE WITNESS:  I'm answering your question about

2   that.  I'm answering your question.

3            THE COURT:  Hold that.

4            MR. NEWMAN:  But Mr. Roffers, let's let the judge

5   rule on the objection is the procedure here.  So, thank

6   you.

7            THE COURT:  The objection is overruled.

8            You can answer the question.

9            THE WITNESS:  Thank you, Your Honor.

10  BY MR. NEWMAN:

11     Q.   Mr. Roffers, do you have anything else to say in

12  response to the question I asked you?

13     A.   I do.  You know, once again, anybody can ask

14  anything they want for a property.  And quite frankly, the

15  best time to sell a property like this is when it's not on

16  the market.  Right.  And somebody knocks on your door and

17  says, "Will you sell it to me?"  But the reality is the --

18  the harsh reality of properties like this, in Los Angeles

19  in particular, is a -- is a very similar tale.  As I

20  mentioned the last three spec houses -- and, yes, they

21  were one -- okay.  They were listed for 100 million

22  dollars, right?  So I'm sorry, they weren't listed for 295

23  million, but where I grew up 100 million dollars is rare

24  air as well.  And, you know, all three of those properties

25  sold for 48 percent of their list price, which

Page                    Chad Roffers - Cross                    187

1   coincidentally enough equals 141 million dollars on the

2   property we're talking about today.  You can't make that

3   up, interestingly enough.

4           One of the biggest sales in Bel Air, 924 Bel Air

5   Road, was listed for 250 million, sold for 94 million

6   dollars after three years.  The Danny Thomas property, I

7   think it was listed for 135 million, sold for 65 million.

8   The Beverly Hillbillies house was listed for 295, sold for

9   150.  Can go on and on and on and on and on about -- about

10  the, you know, list prices versus market prices.  But the

11  purest way to figure out what something's worth is to run a

12  fair, transparent process, right, maximize exposure.  Make

13  sure the people who are participating are qualified, right?

14  Level the playing the field.  Make it clear to everybody

15  you're buying this property as-is with all faults, right?

16  You're required to put -- which I believe your client has

17  14-some-odd million dollars sitting in escrow.  Put a

18  deposit forward and be able to close within I think ten

19  days or whatever it is after the Court rules, something to

20  that effect, right?

21          And that's what we did.  We followed the bid

22  procedures to the letter of the procedures, right?  Every

23  single element of it.  The world was watching.  We run

24  every auction that way but the entire world was watching.

25  And, you know, we res -- we arrived at what this property

Page                    Chad Roffers - Cross                    188

1   was worth.

2        Q.   And I just -- and I know it's getting late.   I

3   just have two quick additional questions.   One is you've

4   described in your testimony just now kind of the

5   requirements for an auction that will drive optimum value.

6   And as conducted you believe this auction satisfied those

7   requirements?

8        A.   Without a doubt.

9        Q.   The last question is do you believe the results

10  of this auction were grossly inadequate in any way?

11       A.    I certainly have -- I have a lot of respect for

12  Mr. and Mrs. Niami and developers and risk-takers, all of

13  that, right?  So I want to be respectful to them and, you

14  know, I'm sure everybody went into this hoping for an

15  amazing result.   I would love to have achieved 295 million

16  dollars, right?  But the reality is that -- you know, and I

17  think especially, right, and I want to also be clear, in

18  advance of the auction the Williams and Mr. Kirman were

19  soliciting offers, right, which was part of the strategy,

20  et cetera.   There were no *bona fide* offers, right?  We ran

21  a process, a global marketing campaign, once again, that I

22  don't think will ever be repeated.   The property -- the

23  auction was featured on the Super Bowl.   I think the Super

24  Bowl spot is like ten million bucks alone, right?  We

25  exposed this property at an unprecedented level.

Page                  Chad Roffers - Cross              189

1   Ultimately we had, you know, well over 20 qualified

2   showings.  We had five qualified bidders.  And that is what

3   it is worth today.  You know, will it be -- could it be

4   worth less tomorrow?  Yes.  Could it be worth more

5   tomorrow?  Maybe.

6        Q.   So the last question just so I'm clear.  The

7   results of this auction as conducted in your opinion were

8   not inadequate, let alone grossly inadequate, correct?

9        A.   Correct.

10       Q.   Thank you.

11            MR. NEWMAN:  I have no further questions, Your

12   Honor.

13            MR. SHINDERMAN:  Your Honor.

14            THE COURT:  Yes.

15            MR. SHINDERMAN:  Your Honor, Mr. Newman's

16   questions elicited to in response to Mr. Roffers that I

17   want to follow up on, please.

18            THE COURT:  Go ahead.

19            MR. SHINDERMAN:  I can put him questions.

20                         CROSS-EXAMINATION

21   BY MR. SHINDERMAN:

22       Q.   Mr. Roffers, you said in preparing for today you

23   did a case study about what things are sold for recently,

24   correct?

25       A.   In preparing for today I anticipated -- I saw --

Page                    Chad Roffers - Cross                    190

1    I read your -- I read the opposition briefs and -- and so

2    in making sure I was prepared and a qualified witness did

3    I?  Yes.  I boned up on my facts.

4        Q.   And did you prepare case studies and an executive

5    summary for Ms. Niami at the beginning of March?

6        A.   I don't recall specifically.  I think I met

7    Ms. Niami back maybe last fall, September, when this topic

8    was originally floated.  So I suspect we provided case

9    studies, for sure.  In fact, we talked about we sold the

10   property, the Villa Firenze, in Beverly Park a year ago

11   right now.  It was a real-time example.  That property, by

12   the way, was listed I think for 150 or 151.  It sold for

13   52.  And the various people that were involved in that

14   meeting thought it was a great result, you know, because

15   nothing had ever been sold in Beverly Park for that kind of

16   money.

17           MR. SHINDERMAN:  Motion to strike, Your Honor.

18   I've been very indulgent but this goes way too far.

19           THE COURT:  You know what, I'll allow the answer.

20           MR. SHINDERMAN:  Okay.  Thank you, Your Honor.

21           THE COURT:  Thank you.

22           Anyone else?

23           MR. SHINDERMAN:  Oh, no.  I have one more

24   question.

25           THE COURT:  Yeah.  Oh, go ahead.

Page                    Chad Roffers - Cross                    191

1  BY MR. SHINDERMAN:

2      Q.   So do you recall telling Ms. Niami last year that

3  you were expected to get between 265 million and 310

4  million dollars for the property?

5      A.   Well, I recall during that meeting as I thought

6  that was possible.  Now, I will tell you, and I just

7  testified to this before, I really did not appreciate at

8  the time the issue about a lack of C of O.  And that's

9  number one.  Number two is did not appreciate at the time

10 the condition of the property.  And, in fact, the fir --

11 from when I saw it the first time with Mar -- with Yvonne

12 to -- you know, to February of this year the property

13 deteriorated substantially.  So those were issues.  Those

14 were real -- those were real issues.  Plus what happened in

15 the press with Mister -- I'm probably not pronouncing his

16 correctly, but Mr. Haddad's, you know, kind of spec house

17 that's similar size and scale of this property.  So those

18 were big headwinds that I -- at the time when Yvonne and I

19 first met I didn't anticipate.

20     Q.   But there wasn't a certificate of occupancy when

21 you first said you'd get 265 million or more.

22     A.   To be clear, I didn't say that I would get 265

23 million dollars or more.  What I said was I think it was

24 possible.  I believed -- I believed it was possible.

25 That's number one.  Number two is what I just said is I

Page                 Chad Roffers - Cross              192

1   didn't anticipate at the time how significant the headwind

2   was going to be.  I was aware that there was not a

3   certificate of occupancy.  We've sold other properties in

4   the past without a certificate of occupancy.  But I think

5   quite frankly as -- and quite frankly, as we got educated

6   by highly qualified buyers, right?  Of the 20-plus showings

7   that we had, you know, the net worth of those people

8   combined is astonishing and sophisticated people.  And as

9   they started to peel back the layer, you know, of the onion

10  and start to understand the complexity and uncertainty in

11  terms of a path to a C of O, it became a greater and

12  greater headwind.

13          MR. SHINDERMAN:  Thank you, Your Honor.  I have

14  nothing further.

15          THE COURT:  Thank you.

16          MR. GEHER:  Your Honor, I have --

17          MR. HOROUPIAN:  Your Honor --

18          THE COURT:  Who wants to be next?

19          MR. GEHER:  Well, I'll let Mr. Horoupian go.

20          THE COURT:  And Ms. Andrassy as well.  Okay?

21          MR. GEHER:  I didn't notice her.  Sorry, I didn't

22  mean to exclude her.

23          THE COURT:  Ms. Andrassy, go ahead.

24          MS. ANDRASSY:  Thank you, Your Honor.

25                        CROSS-EXAMINATION

Page                    Chad Roffers - Cross                193

1   BY MS. ANDRASSY:

2       Q.   A few minutes ago you testified that no other

3   higher office had been received for this property.  Are you

4   aware that on -- in February a buyer had been vetted by

5   Mr. Lanes, the receiver, submitted an offer to our

6   brokers -- the debtor's brokers for 143 million that was

7   subsequently increased to 160 million?

8       A.   What I testified earlier is that there has not

9   been a *bona fide* offer in advance of the auction or after

10  the auction.  And the litmus test for a *bona fide* offer is,

11  you know, number one, first of all, one of the biggest

12  headwinds in selling this property is the lack of

13  certificate of occupancy.

14      Q.   I'm sorry.  That's beyond the --

15      A.   No, I'm trying to answer your question.  So the

16  certificate of occupancy --

17      Q.   (Indiscernible) quicker.

18      A.   Okay.  So not a certificate occupancy.  So, first

19  of all, when an offer has an inspection contingency that

20  basically says, "Yeah, we know it's as-is but we're going

21  to negotiate a price but we can bail out of this or

22  renegotiate it."  Number one, that's a big red flag, right?

23           The second thing is when an offer is tendered

24  without an earnest money deposit, right?  You can buy a

25  proof of funds on the internet for five bucks to tell I

Page                    Chad Roffers - Cross                    194

1    could say I'm worth 20 billion dollars.  Proof of funds are

2    bogus and are unreliable.  But when somebody tenders an

3    offer and there's no consideration, right, that's a huge

4    red flag.  The world is full of phony disingenuous buyers

5    that either want to get publicity to be able to get

6    notoriety to say, "Oh, I'm buying the one" or they get

7    their kicks on telling, you know, somebody they're dating

8    that they're buying this property and let me go show it to

9    you or whatever else.  But I don't believe that was a

10   credible offer.  If it was, it would have been considered

11   but it wasn't a credible offer in my opinion.

12        Q.   Do you know if any of the brokers did any due

13   diligence whatsoever with respect to that offer?

14        A.   Of course.  We all did due diligence as it

15   relates to the offer.  We had a conversation.  We actually

16   did a conversation or conference call with the debtor,

17   attorneys, et cetera.  And it was clear you need to

18   provide, you know, the more proof of funds in a -- put

19   the -- put a deposit in escrow, right, and they evaporated,

20   which unfortunately is un -- what we often see in this

21   ultra-luxury market.  Lots of people.  Talk's cheap, right?

22   And once again, if the price achieved at auction was such a

23   bargain there would have, you know, and if -- whoever was

24   talking about this earlier was spot on, there would have

25   been somebody here today saying "I'm willing to pay more.

Page              Chad Roffers - Cross            195

1   I'll beat it by a dollar.  I'll beat it by ten million."

2   Nobody exists as far as I'm aware of.

3           MS. ANDRASSY:  I have no further questions, Your

4   Honor.

5           THE COURT:  Okay.

6           Mr. Horoupian.

7                 CROSS-EXAMINATION

8   BY MR. HOROUPIAN:

9       Q.   Mr. Roffers, do you recall sending an email to

10  Yvonne Niami and Aaron Kirman on or about March 5, 2021?

11      A.   That was the -- like March, a year ago March?

12      Q.   Yes.

13      A.   I don't -- I mean, I don't recall.

14      Q.   Do you -- well, in that email do you recall

15  saying, "As discussed we believe the final high bid will

16  fall somewhere between 265 and 310 million dollars"?

17      A.   As I testified earlier, you know, but that --

18      Q.   I'm just asking if you recall making that

19  statement.

20      A.   I'm -- as I'm -- I'm answering your question.  As

21  I testified earlier, at the time with the information that

22  I had and input from Aaron, input from other brokers in the

23  market I thought that was possible, right?  Once again, the

24  reality was as the onion, you know, layers unraveled with

25  this property it had become clear that that probably wasn't

Page              Chad Roffers - Cross              196

1  likely.  I'd hoped it would be.  We would all be -- I think

2  everybody here would be a lot happier if that was the case.

3      Q.   But your email didn't say, "We believe it's

4  possible."  It said, "We believe the final bid will be

5  between 265 and 310 million dollars."  Is that correct?

6      A.   I don't have the email in front of me.  Once

7  again, that was over a year ago and at the time with the

8  information that I had that was the information I put

9  forward.  When I testified before this Court 90 days ago,

10  right, I didn't say -- I didn't say that.  What I said

11  is -- actually somebody read the transcript.  I don't know.

12  The result could be 100 million.  It could be 200-plus

13  million.  I don't know, right?  And quite frankly, I never

14  know.  I can believe and I need to believe in the

15  properties we market.  I wanted to break a world record.  I

16  wanted Yvonne to be happy.  I wanted everybody to be happy.

17  We always do.  But the reality is like in -- I guess I'm

18  the black hat guy in this equation, which I'm comfortable

19  being.  Like I have to deal in facts and reality, right,

20  and reality is what the result of the auction was, right?

21  And that's my position.

22      Q.   And you made that representation that you bel --

23  what you believed the final sale would be in connection

24  with you making a proposal to be hired as the auctioneer

25  for this property, correct?

Page            Chad Roffers - Cross              197

1      A.    I think a year ago plus under -- with a different

2   trustee, a different time, a different set of facts and we

3   submitted a new proposal pertaining to this sale, you know,

4   sometime in December I believe and with -- David could

5   probably, you know, remind me of exactly when -- based on

6   the current market conditions and based on, you know, what

7   we knew about the property at that point in time, the

8   bankruptcy proceeding, which was also, you know, a factor

9   that wasn't a factor the year before.

10             MR. HOROUPIAN:   Thank you, Your Honor.   No

11   further questions.

12             THE COURT:   Mr. Geher.

13             MR. GEHER:   Thank you, Your Honor.

14                     DIRECT EXAMINATION

15   BY MR. GEHER:

16      Q.    Mr. Roffers -- and I'm sorry if I mispronounce

17   your name.   Thank you for trying to pronounce mine.   Don't

18   worry about it.   Let's talk about the onion you were

19   talking about, peeling that onion.   When the Court approved

20   the bid procedures and as -- do you recall that the Court

21   approved bid procedures originally with a certain schedule

22   of when the auction would be conducted?   Do you recall

23   that?

24      A.    Yes, I do.

25      Q.    Do you recall that that schedule then had a

Page                    Chad Roffers - Cross                198

1   change?

2        A.   I do.

3        Q.   Isn't it true that that schedule had to get

4   changed because the property was damaged and could not be

5   shown in its then present condition?

6        A.   That's correct.

7        Q.   I didn't know about all that until you showed up

8   and the brokers and debtor's lawyers and saw all that,

9   correct?

10       A.   Yeah.  We were all pretty shocked.

11       Q.   It was a mess, right?

12       A.   That's an understatement.

13       Q.   Because prior to that there had been rains,

14   correct?

15       A.   Yes.

16       Q.   And those rains caused some damage, correct?

17       A.   That's correct.

18       Q.   And that impacts what someone is going to pay for

19   this property, correct?

20       A.   Yes.

21       Q.   And that's part of the property deterioration

22   that you were referring to, isn't that correct?

23       A.   That's correct.

24       Q.   Are you -- before we took a break there was a

25   gentleman whose last name was Rosen.  I unfortunately can't

Page                     Chad Roffers - Cross                     199

1  remember his first name.  Do you know how that is?

2       A.   Yeah.  He -- well, I don't know him personally.

3       Q.   Well, let's -- Mr. Roffers.  I want to try to

4  prevent what's happened before with people trying to object

5  to you.  So I want to hear everything you have to say but

6  just listen to the question and just answer.  I'm -- trust

7  me, I'm going to get to where you want to go.  And let's

8  just do this slowly, methodically, in a peaceful fashion so

9  everybody can follow the bouncing ball.  Okay?

10      A.   Understood.

11           THE COURT:  Mister -- Mr. Geher, don't let that

12  ball bounce too slowly.  We are in --

13           MR. GEHER:  I am watching 17 minutes.  Yes.

14  Thank you, Your Honor.

15  BY MR. GEHER:

16      Q.   You know who Mr. Rosen is, correct?

17      A.   Yes.

18      Q.   Who is Mr. Rosen?

19      A.   I believe he's the president of the Bel Air

20  Homeowners Association.

21      Q.   Has the Bel Air Homeowners Association's

22  activities been beneficial to the sale of this property in

23  your opinion?

24      A.   No.

25      Q.   Please explain to me why they haven't been.

Page                    Chad Roffers - Cross                200

1      A.    They are of the opinion that Mr. Niami deviated

2   from the approved plans in a way that were inappropriate.

3      Q.    Isn't it true that the Bel Air's Homeowner's

4   Association has been advertising in the press that they're

5   going after this property because they think it's just like

6   Haddad?

7      A.    Yes.

8      Q.    And they think things need to be torn down from

9   that property, isn't that your understanding?

10     A.    Yes.

11     Q.    Do you think that helps selling this property?

12     A.    No.

13     Q.    You're familiar with the Haddad property,

14  correct?

15     A.    I am.

16     Q.    And you're familiar that the Bel Air Homeowners

17  Association played a big hand in causing that property to

18  be destroyed and torn down.  Is -- do you know that?

19     A.    I do.

20     Q.    And in your opinion did the Bel Air Homeowners

21  Association make enough noise that potential buyers heard

22  this?

23     A.    Definitely in the public record.

24     Q.    When -- in between the original auction dates and

25  the postponed auction dates what was going on at that

Page                    Chad Roffers - Cross                    201

1   property to your knowledge?

2        A.    The team was working feverish -- feveriously to

3   try to get it as show ready as possible.

4        Q.    Because in your opinion if it was not done would

5   we have had a worse result?

6        A.    In all likelihood, yes.

7        Q.    I have no further questions.   Thank you.

8              THE COURT:   Thank you.

9              Mr. Roffers, I want to just talk a little bit

10  about the end of the auction.   You know, those final --

11  that final hour or so.

12                          EXAMINATION

13  BY THE COURT:

14       Q.    So the procedures and I think your plan what --

15  was your plan to end the auction at 4:00 o'clock?

16       A.    Yeah.   So -- thanks, Your Honor.   So the

17  procedures which we followed here and essentially on every

18  auction and including what was planned for this auction,

19  the end time was 4:00 p.m. Pacific and unless there's a bid

20  placed with three minutes or less on the clock.   And the

21  reason for that is, you know, while technology is

22  fantastic, like we've had today Ms. Andrassy, you know, we

23  couldn't hear her for a bit, et cetera.   Like technology is

24  not perfect.

25              And so we don't want it to be in a situation

Page                    Chad Roffers - Cross               202

1   where we gavel down and then a bid or another bidder says,

2   "Wait a minute.  I was treated in -- unfairly.  I was

3   trying to place a bid," et cetera.  So all bidders are

4   informed of what's called -- and it's -- the term "soft

5   gavel" is jargon, okay?  So somehow it's made its way into

6   some of the different opposition motions that were filed.

7   But it's jargon, right?  And it's really -- you know, what

8   our -- what our procedure is, is that there's a clock.

9   We're going to end the auction at 4:00 o'clock.  The only

10  reason why the auction would be continued is if somebody

11  places a bid with less than three minutes to go.

12       Q.   Okay.  Let me -- quickly because there was some

13  confusion earlier on.  Your declaration, you know,

14  references that these bids have been at -- in the final

15  hours.  What time zone does -- is that chart in?

16       A.   Yes, Your Honor.  So it's in the se -- it's where

17  the server is for the auction.  And if it's -- it's in the

18  Central Time Zone.  So --

19       Q.   Okay.

20       A.   Yeah.

21       Q.   Okay.  Thank you.  So then I'm going to just look

22  at these bids.  So the -- at 5:58 Central, which is 3:58

23  Pacific Time, there's a bid, paddle number 618043, that --

24  that's Mr. Saghian.  That bid was 90 million dollars,

25  correct?

Page                    Chad Roffers - Cross              203

1      A.   Yes.

2      Q.   Okay.  So then under the soft gavel procedure

3   there -- you push the end of the auction by three minutes,

4   right?

5      A.   Yes.

6      Q.   Okay.  So then there was a bid at 4:02 for 100

7   million, right?

8      A.   Yes.

9      Q.   Okay.  And then it appears that almost instantly

10  after that there was another bid from Mr. Saghian for 120

11  million, correct?

12     A.   Yes.

13     Q.   Okay.  So then what happened there?  Because from

14  what you've told me there will be another three-minute

15  period for someone else to bid, right?

16     A.   Yes.  And I think it shows -- you know, I honored

17  your instructions.  I don't have anything up in front of

18  me.  I think maybe the bid has -- reaches four minutes or

19  something -- something to that effect after that.

20     Q.   Eight minutes.

21     A.   Say that again.

22     Q.   It's eight minutes.

23     A.   Eight minutes, yes.  So at that point in time

24  when there are no other bids in the abundance of -- well,

25  so a couple of things happened there.  What the winning

Page                    Chad Roffers - Cross              204

1    bidder did is what's called a power bid.  It's not unusual

2    for somebody who's in first place to say, "I want to

3    increase my bid."  It's a strategy.  It's a -- you know,

4    let's just -- you know, he was clearly competing with

5    another bidder at that point in time.

6         Q.   Okay.  Are you talking about the power bid being

7    the 120 million?  So to go from 100 to 120?

8         A.   No.  To go to the 126.  You know, so to bid up --

9    to bid -- there's two ways to look at it.  One is he

10   offered 120 which was definitely a strong move, you know,

11   at the time.  We were -- and so -- but to actually outbid

12   himself is what's called a power bid.  And really what

13   that's -- what he's -- at that point in time he recognized

14   he had one other kind of remaining competitor, at least it

15   appeared to be at that point in time.  So for bidder to

16   say, "I want to go one more time because I want -- I got --

17   I want to win.  I want to knock everybody else out."

18        Q.   Okay.  And help me out a little bit.  So I'm

19   trying to understand -- do you know this because you

20   were -- were you communicating with the bidders at this

21   point during the auction?  How does that work?

22        A.    Yes, Your Honor.  So what happens is we -- all

23   the bidders have the opportunity, if they're -- if they

24   want to, to have what's called a bid assistant.  So it's

25   one of our employees who will be on the phone with a bidder

Page                    Chad Roffers - Cross              205

1    in addition to them being, you know, on their computer.  So

2    bidders don't have the obligation to be on the phone but

3    they have the option to.  And so in that case this

4    particular bidder --  I'm not sure if he was in the -- he

5    was in communication with a bid assistant and kind of

6    having that communication.  And so there's a team of us,

7    you know, probably a dozen or so people, you know, on a

8    call like this where the auction is going on, where you

9    have the auction up on your screen.  And once again, our

10   responsibility is just to make sure that it's fair.  We --

11   you know, that we -- and we don't have somebody after the

12   fact that says they didn't have a chance to participate.

13   So we really are, you know, really diligent in the closing

14   of bidding in that regard.

15        Q.   Okay.  Thank you.  But were the other bidders in

16   communication with bid assistants at the same time then?

17        A.   They all have the option.  So all bidders are

18   given instructions.

19        Q.   Right.  Were -- but -- so again, were they in

20   communication?

21        A.   Some were; some weren't.  There were at least

22   one -- at least one of the bidders, one of the people from

23   somewhere in Asia.  I don't recall exactly where they're

24   from.

25        Q.   Is that paddle number 463985?

Page                    Chad Roffers - Cross                    206

1       A.    It was the fir --

2       Q.    Was that the --

3       A.    It was the first bid that we had.  Those -- that

4  was the party from Southeast Asia.  And once they kind of

5  saw us get past 70 they basically said, "We're out," right?

6  So they didn't dial in that bid.

7       Q.    (Indiscernible) about the bid that was at 100

8  million.  Was that bidder in communication with a bid

9  assistant?

10       A.    I believe so, yes.

11       Q.    Yes.

12       A.    Yes.

13       Q.    Okay.  Were you aware at this time, kind of

14  toward the end of the auction, that there was any

15  difficulty or inability of potential bidders to register or

16  otherwise communicate or participate in the auction?

17       A.    No.

18       Q.    Was any of your staff aware of any issue?

19       A.    No.  In fact, I mean, more bidders is better than

20  fewer bidders.  So we have an interest to make sure as many

21  bidders as possible can participate.  We'll -- as I

22  testified earlier talk's cheap, right?  So we -- on -- you

23  know, and the Williams have to deal with this.  Aaron has

24  to deal with this.  You know, there's lots of people that

25  say, "Oh, I want to -- I want to bid," and they're just not

Page                    Chad Roffers - Cross                    207

1  qualified.  But even in the abund -- even then in the

2  abundance of caution we kissed the frog, if you will, and,

3  you know, do everything we can to get that bidder, you

4  know, enabled to participate.  But also, too, it's --

5  it's -- you know, there was also a requirement to have a

6  bidder deposit in escrow, 250,000.  In fact, the winner

7  bidder I was concerned because we knew he was interested

8  but I was very concerned that we were -- he was going to

9  miss the cutoff to get a deposit in escrow.  And --

10        Q.    A couple other questions if I could.

11        A.    Sure.

12        Q.    So these top two bidders were in communication

13  with bidding assistants.  How was it communicated to these

14  bidders when the auction would end?

15        A.    Sure.  So, you know, it's interesting.  As we

16  were sitting here today there was another auction going on

17  that I had kind of off in the periphery and it was supposed

18  to end I think at 5:00 Central and it went to 5:45, right?

19  And it was one of those situations where there were lots of

20  bids placed within the final three minutes.  So as a bidder

21  if you're not talking to us but you're watching it on the

22  computer, it's very clear.  In fact, a message gets

23  displayed that, you know -- you know, we do first -- you

24  know, going once, going twice, fair warning, last call.  So

25  like that's at the very end of the auction, which probably,

BENHYATT
Certified Deposition Reporters

Page              Chad Roffers - Cross              208

1  you know, does take in -- take into account what you saw of

2  that gap between the 126 and when it said "sold" because,

3  you know, when we're closing the bidding we go one more

4  time through all the bidders.  You know, fir -- one --

5  going once, twice, three times, final call, closing.

6      Q.   The gap -- the gap, Mr. Roffers, that I'm looking

7  at actually is not there.  It's between 120 and 126.

8      A.   Do you mind if I pull up the sheet?

9      Q.   Oh, not at all.

10     A.   Okay.  Need one second.  One more second.  I was

11 really honoring your destruct -- instructions.  I had shut

12 everything down.  So -- one more minute, please.  Okay.  I

13 One more minute.  I'm not trying to keep you in suspense.

14 I'm just trying to make sure I have all --

15     Q.   No problem.

16          (Pause.)

17     A.   Sorry, Your Honor.

18          (Pause.)

19          Okay.  I have it, Your Honor.

20     Q.   Okay.  Great.  So what I'm looking at again is

21 this gap from 6:02 with the 120-million-dollar bid from

22 paddle number 618043 and then a six-million-dollar increase

23 from the same bidder eight minutes later to 126 million.

24 I'm interested in what happened in that time period.

25     A.   Sure.  So what happened in that time period, I

Page                    Chad Roffers - Cross              209

1  was involved in the -- in the -- I was in the room, if you

2  will, so to speak.  So we were at 120 at that time asking

3  130.  We were moving in those increments and we were at the

4  end of the three minutes and then we went through our final

5  procedure, which is going once, going twice, going three

6  times, last and final call.  And during that period of time

7  in the abundance of caution we're contacting every

8  registered bidder because it's not unusual for a bidder to

9  say, "Oh, I'm out" and then we get them back on the phone

10 and they decide to place another bid.  So we're going

11 through our final protocols.  We want -- the auctioneer

12 wants to make sure we have confirmation that we've at least

13 reached out to every registered bidder and whether -- you

14 know, at some point in time if we haven't heard back, we

15 haven't heard back.  But -- so during that period of time

16 was we were going through that.  The high bidder decided he

17 wanted to up his bid.  And I can't speculate to what his

18 motivation was other than I suspect he wanted to, you know,

19 seal the deal, if you will.  So that's what happened.

20      Q.   And so what was the end of the auction?  What was

21 the last time at which anyone could bid?

22      A.    At the point where we say "sold."  So that

23 that -- you know, you see it there on the -- that was it,

24 right?  So after we went through all those four things and

25 we say "sold."  And by the way, if somebody doesn't reach

Page                  Chad Roffers - Cross              210

1   us on the phone but they're watching on their computer, all

2   this information is being -- you know, transparent.  So we

3   have reporters on this call, for example, or this hearing

4   today watching this.  The whole world could have watched

5   it.  And it said -- you know, so if we add a three-minute

6   extension because a bid was placed a message goes up on the

7   screen saying a bid was placed with less than minutes to

8   go.  Three minutes have been added.  Or at the end they'll

9   see first call, second call, third and final, fair warning,

10  you know, et cetera.

11      Q.   So the last bid came in at 6:10 according to this

12  chart, right?

13      A.   Yeah.

14      Q.   Okay.  So then the end of the auction I guess is

15  three minutes later?

16      A.   Yes.

17      Q.   Okay.  Okay.  Thank you.

18      A.   Sure.

19          THE COURT:  I do not see Mr. Newman but I have a

20  couple of questions.

21          Mr. Newman, there you are.  I'm hoping that

22  Mr. Saghian has hung in there.

23          MR. NEWMAN:  Yes, Your Honor.  He's available.

24          THE COURT:  I have a very, very small number of

25  questions.

Page                                                            211

1            MR. NEWMAN:  Yes.  So he's here.  He's in our

2     conference room and he is turning on his camera now.

3            THE COURT:  Okay.  Great.  Let's see.  I'm not

4     sure.  There we go.

5            MR. GOLUBCHIK:  Your Honor, while we're waiting

6     for the witness I was thinking of calling Mr. Perkins just

7     for one issue based on the comment.  If I could make -- can

8     make an offer of proof and then would wrap it up.  Or no?

9            THE COURT:  We are really out of time.

10           MR. GOLUBCHIK:  Oh, okay.

11           THE COURT:  He can -- he can -- if you think it's

12    necessary.

13           MR. GOLUBCHIK:  Well, I wasn't sure because you

14    said I think 5:00 o'clock.  So I'll be quiet.  I'll wait.

15           THE COURT:  Okay.  Thank you.

16           Mr. Saghian, good afternoon.  Am I pronouncing

17    your name correctly?

18           MR. SAGHIAN:  Good afternoon.

19           THE COURT:  I'm going to get you sworn in.

20    You're going to hear my courtroom deputy administering an

21    oath.

22           COURTROOM DEPUTY:  Please raise your right hand.

23                  RICHARD SAGHIAN, SWORN

24           COURTROOM DEPUTY:  Please state your name and

25    spell it for the record.

Page                Richard Sghian - By the Court        212

1           THE WITNESS:  Richard Saghian, R-I-C-H-A-R-D,

2     last name, S-A-G-H-I-A-N.

3           COURTROOM DEPUTY:  Thank you.

4           THE COURT:  Mr. Saghian, thank you for hanging in

5     there until the end of the day here.  Is anyone else in the

6     room with you?

7           THE WITNESS:  Our legal team.

8           THE COURT:  Okay.  I'm going to ask that you not

9     to speak with them during this brief conversation.  I am

10    also going to ask that you not look at any electronic

11    devices during our conversation.

12                       EXAMINATION

13    BY THE COURT:

14        Q.   When did you first bid on the property?

15        A.   At 4 -- 4:50-something PST.  I think it was 4:58.

16    I'm sorry, 3:58 Pacific Standard Time.

17        Q.   3:58.  Okay.  And do you recall -- do you

18    remember that bid?

19        A.   Yes.

20        Q.   What was it?

21        A.   90 million.

22        Q.   Okay.  And were you in conversations with what

23    Mr. Roffers has called a bid assistant or another person

24    from the -- from Concierge during the auction?

25        A.   Yes.

Page                 Richard Sghian - By the Court         213

1       Q.    Okay.  Was it your understanding when you made

2   the 90-million-dollar bid that the end of the auction was

3   4:00 o'clock?

4       A.    Yes.

5       Q.    Okay.  Did you anticipate that there could be an

6   extension at the end of the auction?

7       A.    Yes.

8       Q.    Okay.  So your next bid then was at I believe

9   4:02 p.m. for 120 million dollars.  Is that your

10  recollection?

11      A.    Yes.

12      Q.    Okay.  Can you just describe to me what happened

13  after that?  How you went from that bid to the ultimate 126

14  million-dollar bid.  If you could just kind of describe

15  what happened that would be really helpful.

16      A.    The clock kept on resetting, going once, going

17  twice.  It reset a couple times and the auctioneer said

18  since you're the high bidder if you'd like you can bid

19  again and I was very, you know, nervous.  Will I get it?

20  Would I not get it?  And I basically chose my lucky number

21  of 126 and I didn't expect to -- I didn't know what would

22  happen.  And the auction said, "You're the winning bidder"

23  at the end.  I was actually waiting for a few minutes until

24  they would announce it.  I was just on edge waiting for --

25  to see what would happen.

P 888.272.0022 F 818.343.7119          BENHYATT          www.benhyatt.com
                                     Certified Deposition Reporters

Page              Richard Sghian - By the Court       214

1     Q.    Were you told there might be other bids?

2     A.    No.

3     Q.    Then what was the reason for increasing your bid?

4     A.    They said there could be more bids.  Would you

5  like to go up any more?  And they said you can bid in less

6  intervals of ten because I was going in intervals of ten.

7     Q.    I see.

8     A.    And they said you can bid less than ten.  And I

9  took a couple seconds to think about it and I picked my

10  lucky number.

11     Q.    Okay.  Thank you.

12     A.    Which I actually have proof.  I mean, that's -- I

13  mean, you can look at my social handles from many, many

14  years.  It's 26.  Sounds pretty crazy, but when I got the

15  house I thought it was meant to be.

16          THE COURT:  Okay.  Thank you.

17          Just quickly because we really are at the time

18  where I need to end, any other questions for Mr. Saghian?

19  Okay.  Thank you.

20          Thank you, sir.

21          (Witness excused.)

22          THE COURT:  Mr. Golubchik, you mentioned that you

23  needed or that you wanted to ask Mr. Perkins a question.

24          MR. GOLUBCHIK:  Yes.  Mr. Perkins.  Can we just

25  swear him in for -- I think it will be one or two minutes,

Page                    Lawrence Perkins - Direct      215

1  Your Honor.

2          THE COURT:  Okay.

3          Mr. Perkins, if you could just unmute yourself.

4  We're going to get you sworn in.

5          COURTROOM DEPUTY:  Please raise your right hand.

6              LAWRENCE RUSSELL PERKINS, Sworn

7          COURTROOM DEPUTY:  Please state your name and

8  spell it for the record.

9          THE WITNESS:  Lawrence Russell Perkins, L-A-W-R-

10 E-N-C-E, R-U-S-S-E-L-L, P-E-R-K-I-N-S.

11         COURTROOM DEPUTY:  Thank you.

12         THE COURT:  Mr. Perkins, is anyone in the room

13 with you?

14         THE WITNESS:  No.  Just me, myself and I.

15         THE COURT:  Thank you.  I'm going to ask you not

16 to con -- look at any electronic device during your brief

17 testimony, okay?

18         THE WITNESS:  Yes.

19         THE COURT:  Thank you.

20         Mr. Golubchik.

21         MR. GOLUBCHIK:  Thank you.

22                  DIRECT EXAMINATION

23 BY MR. GOLUBCHIK:

24     Q.  Mr. Perkins, we'll dispense with the background

25 because you submitted a declaration.  What I wanted to ask

Page                    Lawrence Perkins - Direct        216

1    you about is Mr. Roffers talked about a newspaper article

2    where you discussed willing to accept additional offers.

3    Do you recall that?

4        A.    I do.

5        Q.    Can you tell us was that before or after the

6    conclusion of the auction?

7        A.    That was after the auction.

8        Q.    And you did so because you believed it's your

9    fiduciary obligation to try to maximize the value?

10       A.    Yes.

11       Q.    Have you received any offers since the auction

12   was completed?

13       A.    Well, it's a little bit of trick question.  We've

14   received no bona fide offer as other people have spoken

15   about.  We've heard lots of numbers and lots of crazy

16   things here but nothing that was remotely *bona fide* or

17   verifiable.

18       Q.    Have you received any offers that have a proof of

19   funds in a deposit of any kind?

20       A.    No.

21            MR. GOLUBCHIK:    That's it, Your Honor.

22            THE COURT:  Mr. Perkins, there is no procedure

23   for any sort of deposit or any solicitation or acceptance

24   of offers or determination of *bona fide* offers after the

25   action, was there?  Because I don't think I signed an

Page                                                        217

1  order.

2          THE WITNESS:  There certainly was not.

3          THE COURT:  Okay.  How would you decide what was

4  a bona fide offer and what wasn't?

5          THE WITNESS:  Well, it really came down to I

6  guess a couple of different things.  You know, the auction

7  was closed so as far as we were concerned we were going to

8  go forward with the auction.  But my belief and in speaking

9  with counsel, you know, if someone came in and said it was

10 going to be worth a billion dollars and it was somewhat

11 credible I felt it was my duty to go in front of the --

12 well, not to go in front of the judge but to offer that to

13 the Court and say, "Hey, you know, we ran an auction.  The

14 auction yielded this but someone come -- came in

15 subsequently and put a bunch of -- a higher number

16 together."  So we weren't necessarily soliciting anything

17 but there was continued calls that were coming in as there

18 have been since I've been involved here on issues.

19         So to the extent that someone was interested in

20 doing that it could potentially provide value to the estate

21 in a meaningful number, you know, we would take the call

22 and try and put that in front of the Court because it feels

23 like the right thing to do.  I don't know how to say it

24 better than that.  With that said, I wasn't going to waste

25 anybody's times and frankly embarrass myself in front of

1  the Court by saying, "Hey, here's a billion-dollar offer

2  that's not real."  So we felt it -- I felt it was my duty

3  to determine if it was just a scammer, which pardon the

4  expression but it's been one I've used a lot on this case,

5  or if it was somebody who was actually real and credible to

6  be able to buy.

7          THE COURT:  Okay.  Thank you.

8          Any other questions for Mr. Perkins?

9          MR. GOLUBCHIK:  None from me.

10         THE COURT:  Okay.  Anyone else?  All right.

11         Thank you.

12         THE WITNESS:  (Indiscernible.)

13         THE COURT:  Again, everyone, I do need to end.  I

14  understand how important this is to everyone.  I understand

15  how important this is to everyone.  I understand how time

16  sensitive it is, but I think that you all understand

17  there's been a lot of -- there's been a lot of argument.

18  There have been a lot of law discussed.  There's been a lot

19  of facts discussed.  I do need some time to think.

20         I am available to resume on Monday at 11:00

21  o'clock.  I do not anticipate that there would be a need

22  for further testimony.  I do think that to the extent there

23  are still outstanding objection that it would be worthwhile

24  for sort of a brief closing statement and also a closing

25  statement from those in support of the sale but I don't

Page                                                      219

1    anticipate anything even remotely close to the length of

2    the hearing that we've had today.  I don't want to ruin

3    your weekends anticipating that.

4         So I want to thank everyone for your thoughtful

5    arguments and I am about to create a new Zoom link that

6    will be posted on the Court's calendar because I don't

7    think we can keep using this one once today is over.  But

8    we will resume Monday at 11:00 o'clock for any closing

9    thoughts.  And I will be in a position to make a ruling on

10   Monday at the close of that hearing.  Okay?

11        MR. GOLUBCHIK:  Your Honor, because the sale is

12   dependent in part on the current DIP financing terms, may I

13   ask Mr. Geher on behalf of Hankey whatever dates are

14   upcoming Hankey agrees to extend it for three days to get

15   us from here until Monday?  Whenever they are.

16        THE COURT:  Mr. Geher is muted.

17        MR. GEHER:  Yeah.  I wish I could have kept it

18   that way.  Sorry.  I don't have authority from my client.

19   I believe that probably would not be an issue but I would

20   need to talk to my client.  No, we're okay with that.  I

21   just got a communication.  I was using my cell back and

22   forth.

23        We will agree to the three-day extension,

24   Mr. Golubchik.

25        MR. GOLUBCHIK:  Great.  Thank you very much.

Page                                                                    220

 1              THE COURT:  All right.

 2              Mr. Newman, I know that there were dates for your

 3    client as well.

 4              MR. NEWMAN:  Can't hear you.

 5              THE COURT:  I -- we can't hear you.

 6              MR. NEWMAN:  The closing date is --

 7              THE COURT:  No, you're not muted but -- okay,

 8    there we go.

 9              MR. NEWMAN:  Can you hear me now?

10              THE COURT:  Yes.  You're coming in very faint.

11    But --

12              MR. GOLUBCHIK:  Your Honor, the dates that I was

13    referring to do apply to Mr. Newman's client because it has

14    to do with deadlines with respect to the sale.  So I think

15    it addresses his client.  I hope it does.

16              MR. NEWMAN:  Well, I just want to make clear,

17    Your Honor, I don't think if we don't have a court order

18    approving the sale until Monday we will -- we'll likely not

19    be able to close, assuming the sale is approved and my

20    client still wants to proceed to close, until Thursday.

21    We'll need a day for wiring funds.  So I just want to make

22    as we're talking about extending dates that we are all on

23    agreement that we'll -- if we're not going to conclude this

24    hearing until Monday that we'll have those dates extended I

25    think until Thursday is what we'll require.

Page                                                                221

1          MR. GOLUBCHIK:  So the current deadline is Monday

2    for the sale closing.  Mr. Geher agreed to a three-day

3    extension which takes -- it takes us through Thursday, so I

4    think we're good.

5          MR. NEWMAN:  Great.  I just want to make sure

6    we're all on the same page.  Thank you.

7          MR. GOLUBCHIK:  Yes.

8          THE COURT:  Okay.  Okay.

9          MR. RAFATJOO:  Your Honor, I just --

10         THE COURT:  Again, Mr. Rafatjoo, we are stopping

11   now.

12         MR. RAFATJOO:  Just saying that I have a doctor's

13   appointment on Monday and I was planning on being out of

14   town.  So --

15         THE COURT:  Okay.

16         MR. RAFATJOO:  -- that's my concern.

17         THE COURT:  I don't know if you have a colleague

18   who is able to cover the hearing.  I need to continue this

19   Monday.

20         MR. RAFATJOO:  Can we do it at 11:30 or 12:00

21   perhaps, so I can at least go to my doctor's appointment?

22         THE COURT:  I think that's fine.  That's fine.

23   11:30.

24         MR. GOLUBCHIK:  That's all right.

25         THE COURT:  Okay.  Great.

Page                                                          222

1           MR. RAFATJOO:  Thank you.

2           THE COURT:  Mr. Rafatjoo, my apologies for being

3   short with you there.  We will resume at 11:30 on Monday.

4   There's going to be a Zoom link available to you very

5   shortly.

6           ATTORNEYS:  Thank you, Your Honor.

7   (End at 5:14 p.m.)

8                      * * * * * * * *

9           I certify that the foregoing is a correct

10  transcript from the electronic sound recording of the

11  proceedings in the above-entitled matter.

12

13  *Ruth Ann Hager*

14  _____          Date:  3/30/2022

15  RUTH ANN HAGER, C.E.T.**D-641

16

17

18

19

20

21

22

23

24

25



P 888.272.0022  F 818.343.7119                            www.benhyatt.com