**SMILEY WANG-EKVALL, LLP**
Kyra E. Andrassy, State Bar No. 207959
*kandrassy@swelawfirm.com*
Sharon Oh-Kubisch, State Bar No. 197573
*sokubisch@swelawfirm.com*
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Telephone:   714 445-1000
Facsimile:   714 445-1002

**LAVELY & SINGER
PROFESSIONAL CORPORATION**
Martin Singer, State Bar No. 78166
Paul N. Sorrell, State Bar No. 126346
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
Telephone: (310) 556-3501
Facsimile: (310) 556-3615
Email: mdsinger@lavelysinger.com
         psorrell@lavelysinger.com

Attorneys for Inferno Investment, Inc.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:21-bk-18205-DS |
| | Chapter 11 |
| CRESTLLOYD, LLC, | |
| Debtor in Possession. | **SUPPLEMENTAL OPPOSITION OF SECURED CREDITOR INFERNO INVESTMENT, INC. TO MOTION FOR AUTHORITY TO DISBURSE FUNDS TO HANKEY CAPITAL, LLC, A SENIOR SECURED CREDITOR** |
| | Date:     June 23, 2022 |
| | Time:     11:30 a.m. |
| | Crtrm.:   1639 |

**TO THE HONORABLE DEBORAH SALTZMAN, UNITED STATES BANKRUPTCY JUDGE, CRESTLLOYD, LLC, AND ITS COUNSEL, AND ALL OTHER PARTIES IN INTEREST:**

In its supplemental brief, Crestlloyd simply repeats the arguments that it made before, again without any citation to authority as to why a secured creditor with a disputed

2911064.2

1

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1   claim should receive a substantial payment on account of its alleged lien now, before

2   resolution of the disputes.  The Debtor justifies this proposed additional payment by

3   asserting that the claim of Hankey Capital is an allowed claim, there being no formal

4   objection on file.  But, there is now.  In order to move this case forward and since

5   settlement discussions have ceased, Inferno has filed a complaint that seeks a judicial

6   declaration as to the priorities of the liens against the proceeds being held by Crestlloyd

7   and that objects to the claim of Hankey Capital.  A copy of the complaint is attached as

8   Exhibit "1."

9          The complaint raises important issues.  Based on the documents filed by the

10  various parties in litigation that pre-dates this bankruptcy case and after, counsel for

11  Inferno assumed that Inferno had agreed to subordinate its debt to that of Hankey

12  Capital.  Once it was apparent that the auction was a dismal failure, Inferno retained

13  litigation counsel in order to conduct an investigation of Inferno's rights and

14  responsibilities to Crestlloyd and the other secured creditors.  As a result of that counsel's

15  investigation, it was determined the subordination agreement is not enforceable because:

16  (1) as set forth in Mr. Remillard's declaration submitted in support of Inferno's initial

17  opposition to this motion, Inferno did not sign the subordination agreement; (2) Mr.

18  Remillard was in Montreal on the date it was allegedly signed, not Los Angeles as

19  indicated on the notary certificate; (3) a revised draft of the agreement was circulated on

20  October 31, 2018, the day after the agreement was allegedly signed; and (4) the notary

21  certificate describes the document as being dated October 25, 2018, when the

22  agreement to which it is attached is actually dated October 30, 2018.

23         The complaint also addresses the Memorandum of Agreement relied upon by

24  Crestlloyd to support its contention that Inferno gave a blanket subordination to all

25  secured debt against the Property.  The complaint alleges and Inferno will prove that it

26  did no such thing.

27         Thus, Hankey's debt and the validity and priority of its lien are very much in

28  question.  Although payment of interest on the original $82.5 million may stop the accrual

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

1    of additional interest, Inferno believes that it will prove that Hankey is not actually

2    oversecured and therefore is not entitled to postpetition interest.  Paying it something to

3    which it is not entitled would prejudice all other creditors and give them the risk of having

4    to seek disgorgement from Hankey Capital.  If Inferno prevails in the litigation, then it

5    would have to seek disgorgement from Hankey Capital because there would not be

6    sufficient funds left in the estate to pay its secured claim  If Hankey Capital refuses to

7    disgorge or is unable to, then that would lead to additional legal expenses and the

8    possibility that Inferno may not be paid all of the money to which it is entitled.  In addition,

9    as a very practical matter, Inferno believes that if there are to be any further settlement

10   discussions, Hankey Capital is far more likely to engage if it has not been paid in full on

11   its $82.5 million loan than if it has been paid.

        For these reasons, Inferno objects to the payment to Hankey Capital of anything

13   other than the $82.5 million previously authorized with a reservation of rights.

16   DATED:  June 9, 2022                    Respectfully submitted,

17                                           SMILEY WANG-EKVALL, LLP

19                                           By:      /s/ Kyra E. Andrassy
20                                                 KYRA E. ANDRASSY
                                                 Attorneys for Inferno Investment, Inc.

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

# EXHIBIT "1"

**MARTIN D. SINGER (BAR NO. 78166)**
**PAUL N. SORRELL (BAR NO. 126346)**
**LAVELY & SINGER**
**PROFESSIONAL CORPORATION**
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
Telephone: (310) 556-3501
Facsimile: (310) 556-3615
Email:  mdsinger@lavelysinger.com
         psorrell@lavelysinger.com

**KYRA E. ANDRASSY (BAR NO. 207959)**
**SMILEY WANG-EKVALL, LLP**
3200 Park Center Drive, Suite 250
Costa Mesa, CA 92626
Telephone: (714) 445-1000
Email:  kandrassy@swelawfirm.com

Attorneys for Plaintiff INFERNO
INVESTMENT, INC.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>CRESTLLOYD, LLC,<br><br>            Debtor. | Case No. 2:21-bk-18205-DS<br><br>Chapter 11<br><br>Adversary Proceeding No. _____ |
| INFERNO INVESTMENT, INC., a Quebec corporation,<br><br>            Plaintiff,<br><br>v.<br><br>CRESTLLOYD, LLC, a California limited liability company; HANKEY CAPITAL, LLC, a California limited liability company; YOGI SECURITIES HOLDINGS, LLC, a Nevada limited liability Company; and HILLDUN CORPORATION, a New York corporation,<br><br>            Defendants. | **COMPLAINT OF INFERNO INVESTMENT, INC. FOR:**<br>**(1) DECLARATORY RELIEF;**<br>**(2) UNFAIR BUSINESS PRACTICES;**<br>**(3) DISALLOWANCE OF CLAIMS; AND**<br>**(4) RESCISSION** |

COMPLAINT FOR DECLARATORY RELIEF

Plaintiff Inferno Investment, Inc. ("Inferno"), for its Complaint in this adversary proceeding pursuant to the Federal Rules of Bankruptcy Procedure, alleges as follows:

## NATURE OF THIS PROCEEDING

1.      Inferno's early involvement was critical to development of "The One." Its initial loans to Debtor and Defendant Crestlloyd, LLC ("Debtor" or "Crestlloyd") financed the acquisition of the land located at 944 Airole Way in Bel-Air ("the Property") and construction long before any other party was involved.  But for Inferno, there would be no asset to liquidate.  Inferno's lien is senior to those of Hankey Capital, LLC ("Hankey Capital"), Yogi Securities Holdings, LLC ("Yogi"), and Hilldun Corporation ("Hilldun") (together, the "Defendant Lienholders") and all amounts owed to Inferno should be paid from proceeds of the sale of the Property prior to payments to any other creditor.

2.      Recognizing that the estate is insufficient to pay all claims, Hankey Capital asserts that Inferno agreed to subordinate its claim to theirs and the Debtor joins in this contention.  The assertions are unsupported and unavailing.  Because of these assertions, Inferno brings this adversary proceeding for a determination of the priority of its lien.  Inferno seeks a judicial determination that its "first in time" and first-recorded secured debt is not subordinated to any lien of the Defendant Lienholders and must be paid before the Defendant Lienholders' are paid.

3.      The Debtor, Hankey Capital, and presumably other Defendant Lienholders seek to rely on an alleged 2016 "Memorandum of Agreement" between Inferno and Debtor ("the MOA") to claim that Inferno subordinated its debt to Defendant Lienholders' debt, including with respect to loans made to the Debtor even after the MOA was signed.  Not so.  Inferno and Debtor agreed that Inferno would subordinate only to future debts to which they specifically agreed in writing. It is for that reason that there were amendments to the MOA that specifically referenced potential debt obligations to which Inferno might subordinate – none of

COMPLAINT FOR DECLARATORY RELIEF

1   which involved the Defendant Lienholders.  Furthermore, the MOA is of no force or

2   effect because Crestlloyd committed fraud and repudiated the MOA by

3   misappropriating millions of dollars that were to be used for the Property for other

4   properties and the personal benefit of Nile Niami and Yvonne Niami, the principals

5   of Crestlloyd.  The MOA did not, as Defendants contend, constitute an open-ended

6   agreement to subordinate indefinitely the Inferno debt to all future debts secured by

7   the Property.  Inferno seeks a declaration to this effect. As a result of Crestlloyd's

8   conduct, Inferno is also seeking to rescind the MOA.

9        4.     In addition, as alleged in further detail below, the signature of Inferno's

10  principal on its alleged agreement to subordinate to the initial $82.5 million advance

11  by Hankey Capital in October 2018 *was forged*.  Inferno did not agree to sign the

12  Subordination Agreement for the Hankey Capital debt.  Email communications

13  between the parties evidence the duplicitous nature of the alleged October 2018

14  Subordination Agreement on which Hankey Capital relies.  Specific requests from

15  Hankey Capital for Inferno to subordinate its debt to Hankey Capital's later

16  advances to Debtor were refused in 2021.

17       5.     California law generally provides that "first in time, first in right" is the

18  principle governing priority of secured lienholders, subject to the effect of recording

19  statutes.  Inferno's "first in time" secured debt was recorded before Defendant

20  Lienholders' debts and was never subordinated as Defendants allege.  Inferno has

21  priority and its claim must be paid first, before other creditor claims.  Inferno brings

22  this action seeking determination of its first priority.  In addition, Inferno asserts

23  claims attributable to Hankey Capital's unfair and unscrupulous predatory business

24  practices, including its scheme to secure payment of exorbitant default interest

25  payments and potentially misappropriate a valuable asset while leaving other

26  creditors "high and dry."  Had Hankey Capital acted responsibly, the Property would

27  have been completed and all creditors paid.  In reality, when the Debtor filed its

28  bankruptcy petition, the Property was still incomplete despite the fact that it should

COMPLAINT FOR DECLARATORY RELIEF

1  have been finished long ago, and there is a shortfall in available assets to satisfy all

2  claims.  Inferno alleges claims for unfair business practices against Hankey Capital

3  and therefore seeks adjustment of its debt and its proof of claim.

4  **JURISDICTION AND VENUE**

5       6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C.

6  Sections 151, 157, and 1334. Jurisdiction to grant declaratory relief is conferred by

7  28 U.S.C. Section 2201 and Rule 7001 of the Federal Rules of Bankruptcy

8  Procedure.

9       7.     This adversary proceeding is brought pursuant to Rule 7001 *et seq.* of

10  the Federal Rules of Bankruptcy Procedure.

11      8.     Venue is proper pursuant to 28 U.S.C. Section 1409 as this adversary

12  proceeding arises in and relates to a case under Title 11 that is now pending in this

13  District.

14      9.     This adversary proceeding is a "core" proceeding as defined in

15  subparagraphs (A), (B), (K), and (O) of 28 U.S.C. Section 157(b)(2).

16  **THE PARTIES**

17      10.    Inferno is a corporation organized and existing under the laws of

18  Quebec, Canada.  Inferno is a secured creditor of Debtor.  It filed Proof of Claim No.

19  11 on or about January 4, 2022.

20      11.    Defendant Crestlloyd is the Debtor in this bankruptcy case ("the

21  Debtor") and its Chapter 11 case remains pending.  Inferno is informed and believes

22  and thereon alleges that Crestlloyd is a limited liability company duly organized and

23  existing under the laws of the State of California.

24      12.    Plaintiff is informed and believes and thereon alleges that Defendant

25  Hankey Capital is a limited liability company duly organized and existing under the

26  laws of the State of California.  Hankey Capital has asserted claims as an alleged

27  secured lender pursuant to its Proofs of Claim Nos. 17, 18 and 20 filed January 14,

28  2022, in the amounts of $3,500,000, $5,000,000 and $122,638,623.41, respectively.

13.    Plaintiff is informed and believes and thereon alleges that Defendant Yogi is a limited liability company duly organized and existing under the laws of the State of California. Yogi asserted a claim as an alleged secured lender in Proof of Claim No. 15 filed January 14, 2022.

14.    Plaintiff is informed and believes and thereon alleges that Defendant Hilldun is a corporation duly organized and existing under the laws of the State of New York.  Hilldun asserted a claim as an alleged secured lender in Proof of Claim No. 9 filed December 23, 2021.

## FACTUAL BACKGROUND OF THIS DISPUTE

## Commencement of the Airole Project With Inferno Funds

15.    By late 2012 and early 2013, Nile Niami, one of the Debtor's principals, was actively seeking financing to acquire real property at 944 Airole Way in Bel-Air ("the Property") and other locations to build luxury homes.  Niami used Debtor to acquire the Property, but the Debtor had neither the property nor the financing to obtain the Property and complete construction.  Inferno and its assignors had provided funding to prior projects involving the principals of Debtor and determined to accept the risk of loaning funds to Debtor necessary to acquire the Property and construct a home.

16.    On March 13, 2013, Debtor entered into agreements by which it received loans from (a) Inferno in the amount of $3,925,545, (b) Inferno Realty, L.P. in the amount of $7,040,000, and (c) Maybach Holdings Corporation, Inc. in the amount of $7,000,000.  These loans were made for the purpose of acquiring the Property and constructing a luxury home that was then intended to be approximately 40,000 square feet, which was a large home but not the mammoth home that was ultimately billed as the luxurious and unique "The One."  The loans were memorialized by promissory notes secured by recorded deeds of trust on the Property.

17. Subsequently, Inferno Realty, L.P. and Maybach Holdings Corporation, Inc. assigned their interests in the loans secured by the Property to Inferno. As an accommodation to the Debtor, and without receiving consideration, Inferno amended the note that was in the principal amount of $14,040,000 to reduce the face amount of that secured note to $7,000,000, which was the principal balance owing on that note as of October 15, 2015. On November 10, 2015, Debtor and Inferno recorded a Modification and Supplement to Deed of Trust in which they confirmed that the amount of secured debt owed to Inferno was $10,925,545 as of that time. As of October 25, 2021, the amount owed to Inferno for its secured debt was $20,902,106.12.

18. On January 1, 2016, Inferno and Debtor signed the MOA, a copy of which as amended is attached as Exhibit 1.

19. The MOA states that proceeds from sale of the Property shall be used first to repay loans obtained from a bank or third parties, before Debtor and Inferno receive proceeds. The context of this language was to implement the agreement that the Debtor and Inferno would authorize subordination to certain additional debt agreed to in writing by the Parties. It was agreed that subordination to a particular debt would require execution of a written amendment to the MOA. And that is how Debtor and Inferno always conducted business. Debtor and Hankey Capital later sought subordination agreements from Inferno with respect to specific loans, which were not signed.

20. Inferno is informed and believes that Defendants allege that the MOA subordinates Inferno's debt to the debts of the Defendant Lienholders. This interpretation contravenes the agreement. In the MOA, Inferno only agreed to subordinate to loans to which it specifically agreed. The MOA was not an agreement, in advance, to give a blanket subordination to any debt incurred by Debtor in the future regardless of nature or amount. Inferno did not agree in the MOA to subordinate to the debts of Hankey Capital, Yogi or Hilldun. The MOA is

1   also of no force and effect because Crestlloyd committed fraud and repudiated the

2   MOA by misappropriating tens of millions of dollars that should have been used for

3   the Property.

**The Original Hankey Capital Loan and**

**Alleged Subordination by Inferno**

6        21.    On or about October 25, 2018, Hankey Capital and Debtor entered into

7   a written Construction Loan Agreement pursuant to which Hankey Capital agreed to

8   loan Debtor $82.5 million ("the Hankey Initial Loan") and that states that the Hankey

9   Initial Loan was to be secured by a first priority lien against the Property (the

10  "Construction Loan Agreement").  A copy of the Construction Loan Agreement is

11  attached as Exhibit 2.

12       22.    The Construction Loan Agreement provided that Hankey Capital was

13  lending $82.5 million to finance the construction of the Property.  Inferno is informed

14  and believes and thereon alleges that a large portion of the money allegedly lent (not

15  only with respect to the Hankey Initial Loan but subsequent disbursements from

16  Hankey Capital) was prepaid interest that Hankey Capital simply paid itself.  The

17  amounts actually available to Debtor for use at the Property from Hankey Capital's

18  loans were far less than what Hankey Capital claims it lent for the benefit of the

19  Property.

20       23.    Hankey Capital and Debtor expressly agreed that the monies Hankey

21  Capital was lending would be sufficient to complete construction, and agreed to a

22  procedure to ensure that result.  Paragraph 6.9 of the Construction Loan Agreement

23  states that the "undisbursed Loan proceeds, together with Borrower's Funds and all

24  other sums, if any, to be provided by Borrower as shown in EXHIBIT C [which was

25  intentionally left blank], are sufficient to construct the Improvements in accordance

26  with the terms and conditions of this Agreement."  The Construction Loan

27  Agreement provides in Section 3.4 that disbursements to Debtor shall be in

28  accordance with Exhibit D thereto.  Exhibit D sets forth the procedure by which

2911183.1

7

**COMPLAINT FOR DECLARATORY RELIEF**

1   Debtor shall obtain all disbursements under the Hankey Capital loan.  Exhibit D

2   requires that Debtor substantiate each request for payment for materials or services

3   and provide documentation establishing that the work being funded is actually being

4   accomplished.  There is no evidence that Hankey Capital required Debtor to follow

5   the Exhibit D procedure or that Debtor followed the procedure.  Inferno is informed

6   and believes that Debtor, with Hankey Capital's active assistance or gross negligence

7   or both, padded alleged invoices owed to suppliers and contractors including its

8   general contractor JR Construction in order to finance construction of other projects.

9         24.    Hankey Capital alleges that a Subordination Agreement with respect to

10   Hankey Capital's loan facility of $82.5 million in October 2018 gives it priority.  A

11   copy of the Subordination Agreement Debtor requested Inferno to sign is attached as

12   Exhibit 3.  Inferno did not sign the agreement.  The Subordination Agreement

13   advanced by Defendants is an unenforceable forgery.

14         25.    The purported Subordination Agreement bears an alleged signature of

15   Inferno's principal, Julien Remillard.  It attaches separate pages constituting alleged

16   notary certifications from a Notary Public, Nigel Gibbs.  Plaintiff is informed and

17   believes and thereon alleges that Niami frequently used Gibbs to notarize documents

18   for Debtor and Niami's other businesses.  Gibbs falsely states in the notarizations

19   attached to the alleged Subordination Agreement that both Nile Niami of Debtor and

20   Remillard appeared in Los Angeles and signed the document there in his presence on

21   October 30, 2018.  Remillard was in Montreal, Quebec, Canada, on October 30,

22   2018, not in Los Angeles.  In addition, an "updated" draft of the Subordination

23   Agreement was emailed by Debtor to Inferno for its consideration on *October 31,*

24   *2018*, a day *after* Inferno had allegedly already signed before Notary Gibbs.  A copy

25   of the email from Crestlloyd to Inferno forwarding the "updated" draft (the day after

26   the document was allegedly signed) is attached as Exhibit 4.  Notary Gibbs also

27   further falsely states on the notarization page that the document he is notarizing is

28

1   dated October 25, 2018.  The Subordination Agreement advanced by Debtor and

2   Hankey Capital is a forgery. It is null and void.

3       26.     Inferno is informed and believes and thereon alleges that the attempt to

4   obtain a Subordination Agreement by Hankey Capital was part and parcel of an effort

5   by Hankey Capital to insinuate itself into the project by making substantial loans,

6   unmonitored and unchecked by Hankey Capital as alleged herein, that would be

7   likely to generate substantial default interest opportunities as well as a potential

8   opportunity to foreclose on a valuable asset to the prejudice of other creditors.

9       27.     Inferno is informed and believes and thereon alleges that on or about

10  December 10, 2019, Hankey Capital agreed to loan additional funds to Debtor which

11  Hankey Capital claims increased the principal balance to $91 million.

12      28.     Inferno is informed and believes and thereon alleges that on or about

13  August 20, 2020, Hankey Capital agreed to loan additional funds to the Debtor, and

14  that Debtor and Hankey Capital entered into amended loan documents under which

15  Debtor agreed to pay Hankey Capital the principal amount of $106 million.

16      29.     As stated, the signature of Inferno's principal was forged on the

17  Subordination Agreement in 2018 when Inferno did not sign when asked.  In

18  February, 2021, Inferno was again requested by Hankey Capital to subordinate its

19  loan to the increased Hankey Capital loan of $106 million, but Inferno declined to do

20  so.  Thus, even faced with threats of foreclosure that endangered its investment,

21  Inferno refused to agree to subordinate to Hankey Capital's debt.  Hankey Capital

22  recklessly loaned additional funds to Debtor without ensuring that the Debtor

23  complied with the loan disbursement provisions of Exhibit D to the Construction

24  Loan Agreement or otherwise ensuring that the loan proceeds were used for

25  construction and improvements at the Property.  Hankey Capital loaned Debtor at

26  least an additional $23.5 million even after it provided its initial $82.5 million loan

27  that was supposed to complete construction and improvements at the Property.

28  Despite lending these substantial sums, the Property is still not complete.

**Loans by Yogi Securities**

30.     Beginning in 2017 (possibly earlier), Yogi made loans to Debtor and possibly other entities associated with Nile Niami, which included loans on multiple speculative real property developments on North Hillcrest Road, Bellagio Road, North Carcassonne Road, Stone Ridge Lane and Londonderry Place.  On or about October 16, 2018, Debtor signed a Secured Promissory Note agreeing to pay Yogi the amount of $30,188,235 plus interest for loans on these projects, secured by the Property.  Yogi filed its Proof of Claim No. 15 on January 13, 2022, asserting a secured claim in the amount of $21,943,053.75.

31.     Plaintiff is informed and believes and thereon alleges that the proceeds of loans made by Yogi were not used for the benefit of the Property and did not contribute to any asset available to satisfy creditors.  Yogi's loan documents submitted in support of Proof of Claim No. 15 confirm that its loans to Debtor were *not lent with the intention, and were not used for purposes, of developing the Property.*  The documentation instead reflects that Yogi's loans to Debtor were used by Debtor elsewhere as it pleased, including on multiple spec developments located on North Hillcrest, Bellagio, North Carcassonne, Stone Ridge and Londonderry.

**The Bankruptcy Filing**

32.     On October 26, 2021, the Debtor filed its voluntary chapter 11 bankruptcy petition.  Claiming that it needed to pay for insurance, maintenance and improvements to the Property, and professional expenses, and that the Property was worth $325,000,000 so that the existing lienholders were adequately protected, the Debtor obtained Court approval to obtain a postpetition loan of $12,000,000 from Hankey Capital that was secured by a first priority lien against the Property.  As of May 5, 2022, on information and belief, Inferno alleges that the Debtor was holding approximately $3.6 million of funds attributable to the postpetition loan (the "DIP Loan Balance").  The Debtor's counsel has contended that these funds are unencumbered.

## **Proofs of Claim**

33.     As it pertains to the Property, Hankey Capital has filed three secured

claims: (1) Claim 17 in the amount of $3,500,000, allegedly based on a Profit

Participation Agreement dated October 25, 2018, that is memorialized by a

Memorandum of Agreement recorded on November 6, 2018 as Document No.

20181122919; (2) Claim 18 in the amount of $5,000,000, allegedly based on a Profit

Participation Agreement dated August 20, 2020, that is memorialized by a

Memorandum of Agreement recorded on August 31, 2020, as Document No.

20201030294; and (3) Claim 20, which asserts a secured claim in the amount of

$122,638,623.41 based on the deed of trust recorded on November 6, 2018, as

Document No. 20181122917.  On information and belief, Inferno alleges that Claim

17 and Claim 18 are not actually secured claims because neither the Memorandums

of Agreement nor the underlying Profit Participation Agreements created or

perfected a lien.

34.     Yogi filed Claim 15, asserting a secured claim in the amount of

$21,943,053.75 based on its deed of trust recorded on November 7, 2018, as

Document No. 20181126580, as amended.

35.     Hilldun filed Claim 9, asserting a secured claim in the amount of

$5,000,000 based on its deed of trust recorded on September 4, 2020, as Document

No. 20201058770.

## **The Sale of the Property**

36.     By order entered on March 28, 2022, the Court overruled objections to

the sale of the Property and approved the sale of the Property for $126,000,000, plus

$11,970,000 attributable to a rebate of the buyer's premium by Concierge Auctions

(the "Rebate"), ordering that the net proceeds after payment of the lien attributable to

the postpetition loan by Hankey Capital, the lien attributable to the receiver's

certificates, brokers' commissions, property taxes, and closing costs be held pending

further Court order and remain subject to all liens with the same validity, priority,

1 and extent as they were attached to the Property. Based on a closing statement

2 provided by the Debtor, the Debtor received net proceeds of $119,943,690.74.

3       37.    By order entered on May 27, 2022, the Court authorized the Debtor to

4 pay $82,500,000 of the net proceeds to Hankey Capital "without prejudice to any and

5 all parties' rights to assert claims and defenses as may be appropriate, including but

6 not limited to the right to claw back any portion of the monies paid." Inferno alleges

7 on information and belief that this payment has been made. Inferno and Yogi

8 consented to the payment, subject to the reservation of rights, in order to mitigate a

9 potential claim for interest.

10 **FIRST CLAIM FOR RELIEF**

11 **(Declaratory Relief Against All Defendants to the Effect That Inferno's**

12 **Secured Debt Is Not Subordinated to the Debt of Hankey Capital)**

13       38.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1

14 through 37, inclusive, and incorporates them herein by reference as if set forth in full

15 herein.

16       39.    Inferno's debt was incurred and its liens recorded prior to the liens

17 Defendant Lienholders seek to enforce in this bankruptcy proceeding.

18       40.    There is no basis for subordination of Inferno's secured claim which is

19 the subject of Proof of Claim No. 11 to any of the alleged Hankey Capital debt. The

20 alleged Subordination Agreement advanced by Defendants is a forgery. Inferno did

21 not sign the Subordination Agreement for the Hankey Capital debt. Furthermore,

22 Inferno is informed and believes that Hankey Capital refused to comply with the

23 requirements imposed to protect the asset embodied by the Property, particularly its

24 own disbursement requirements in Exhibit D of the Construction Loan Agreement

25 and to ensure that the construction of the Property be completed. Inferno is informed

26 and believes and thereon alleges that Hankey Capital's failure to monitor and require

27 compliance with Exhibit D or other reasonable distribution procedures led to

28 dissipation of the Debtor's assets and damaged all of Debtor's creditors. The Hankey

Initial Loan was to be used to complete construction of the Property and was agreed

to be sufficient for that purpose.  Had that occurred, all secured creditors of Debtor

would have been paid from the sale of the Property.  Instead, Hankey Capital allowed

Debtor to use the proceeds from the Hankey Capital loan for other properties of Nile

Niami or for his personal benefit.

41.    Moreover, Inferno alleges that the Memorandums of Agreement

recorded by Hankey Capital as reflected in Claims 17 and 18 were not sufficient to

perfect liens against the Property, nor were liens intended to be created or perfected.

42.    Under California Code of Civil Procedure section 1060 *et seq.*, 28

U.S.C. 2201 and Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, the

Court can and should determine the validity, priority and extent of the liens involved

herein.  An actual controversy has arisen and now exists between Defendants and

Inferno in that, among other things, Defendants (and particularly Hankey Capital)

contend that Inferno's secured debt was subordinated to Hankey Capital's debt.

Inferno disputes these contentions and contends to the contrary that its secured debt

is highest priority and should be paid prior to debts of other creditors, particularly the

debts of the Defendant Lienholders.  A declaration from the Court is necessary to

determine the rights and responsibilities of the parties, and particularly the priority of

liens as between Inferno and Hankey Capital.  Inferno has first priority.

43.    Inferno seeks a declaration from the Court to the effect that Inferno's

debt is not subordinated to the debt of Hankey Capital on the ground that, among

other things, the alleged Subordination Agreement is a forgery and is null and

unenforceable.

2911183.1

13

COMPLAINT FOR DECLARATORY RELIEF

## **SECOND CLAIM FOR RELIEF**

**(Declaratory Relief Against All Defendants to the Effect That Inferno**

**Did Not Subordinate Its Debt to the Defendant Lienholders' Claims**

**Pursuant to the MOA)**

44.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 37, inclusive, and incorporates them herein by reference as if set forth in full herein.

45.     Inferno's debt was incurred, and its liens recorded prior to the liens Defendant Lienholders seek to enforce in this bankruptcy proceeding.

46.     No factual or legal basis exists to subordinate Inferno's secured claim referenced in Proof of Claim No. 11 to secured debts allegedly owed to Defendant Lienholders on the basis of the MOA.  Among other things, the MOA was prepared in the context of subordination only with respect to specific loans to which Inferno agreed in writing to subordinate.  None of Defendant Lienholders' alleged secured loans are in this category.  The MOA was not an advance agreement to subordinate to all future liens secured by the Property.  Moreover, the MOA is invalid due to Debtor's fraudulent conduct including false representations, and repudiation through its principals' misappropriation of tens of millions of dollars that should have been used for the Property.

47.     Under California Code of Civil Procedure section 1060 *et seq.*, 28 U.S.C. 2201 and Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, the Court can and should determine the validity, priority and extent of the liens involved herein.  An actual controversy has arisen and now exists between Defendants and Inferno in that, among other things, Defendants contend that Inferno's secured debt was subordinated to Defendant Lienholders' secured debts pursuant to the terms of the MOA.  Inferno disputes these contentions and contends that its secured debt is highest priority and should be paid prior to debts of other creditors, particularly the Defendant Lienholders.  A declaration from the Court is necessary to determine the

rights and responsibilities of the parties, and particularly the priority of liens as between Inferno and Defendant Lienholders.  Inferno has first priority.

48.    Inferno seeks a declaration from the Court to the effect that the MOA is of no effect in terms of priority of the claims of the secured parties, and that Inferno's debt is not subordinated to debt of Defendant Lienholders pursuant to the alleged MOA.

## THIRD CLAIM FOR RELIEF

### (Declaratory Relief Against All Defendants to the Effect That Inferno's Claim Is Senior to and Has Priority Over Debts of Other Secured Creditors Including Those of Defendant Lienholders)

49.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 37, inclusive, and incorporates them herein by reference as if set forth in full herein.

50.    Inferno's debt was incurred and its liens recorded prior to the liens Defendant Lienholders seek to enforce in this bankruptcy proceeding.

51.    There is no basis for subordination of Inferno's secured claim, which is the subject of Proof of Claim No. 11, to secured debts allegedly owed to Defendant Lienholders.  Inferno's secured claim was prior in time and was the subject of recorded deeds of trust prior to the inception of Defendant Lienholders' liens.  The MOA is ineffective to subordinate Inferno's claim to Defendant Lienholders' claims as alleged above.  The MOA did not effect a subordination to subsequent debts as to which Inferno did not agree in writing.  The MOA is otherwise null and void due to Crestlloyd's fraud and misappropriation of funds intended for the Property.  The purported Subordination Agreement in October 2018 was a forgery and otherwise null and void.

52.    The recording by Hankey Capital of the two Memorandums of Agreement was insufficient to create liens against the Property.  Neither of the Profit Participation Agreements give any indication that they were intended to constitute

COMPLAINT FOR DECLARATORY RELIEF

liens against the Property and, on information and belief, Inferno alleges that they do not, in fact, constitute valid liens against the Property.

53.    Under California Code of Civil Procedure section 1060 *et seq.*, 28 U.S.C. 2201 and Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, the Court can and should determine the validity, priority and extent of the liens involved herein.  An actual controversy has arisen and now exists between Defendants and Inferno in that, among other things, Defendants contend that Inferno's secured debt was subordinated to Defendant Lienholders' secured debts pursuant to the terms of the MOA and Subordination Agreement.  Inferno disputes these contentions and contends that its secured debt is senior to other debts and should be paid prior to debts of other creditors, particularly those of Defendant Lienholders.  A declaration from the Court is necessary to determine the rights and responsibilities of the parties, and particularly the priority of liens as between Inferno and Defendant Lienholders.  Inferno has first priority.

54.    Inferno seeks a declaration from the Court to the effect that its debt is first priority, is not subordinated to debt allegedly owed to Defendant Lienholders, and all amounts owed to Inferno shall be paid from proceeds of the sale of Debtor's assets prior to payments to Defendant Lienholders.  Inferno requests that the Court declare the parties' respective Property lien priorities.

## **FOURTH CLAIM FOR RELIEF**

### **(Unfair Business Practices Under California Business and Professions Code Section 17200 et seq. Against Hankey Capital)**

55.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 37, inclusive, and incorporates them herein by reference as if set forth in full herein.

56.    Hankey Capital engaged in unfair and predatory lending practices and other conduct designed to unjustly enrich Hankey Capital at the expense of Debtor

1   and its other creditors, particularly Inferno, in violation of California Business and

2   Professions Code Section 17200 et seq.

3        57.    Hankey Capital made a loan of $82.5 million in October 2018, agreeing

4   pursuant to the Construction Loan Agreement that those proceeds would be sufficient

5   to complete construction of the Property, would be used for that purpose exclusively

6   and the Property's development would be ensured through the commitment of Debtor

7   and Hankey Capital to seek and disburse loan funds pursuant to Exhibit D of the

8   Construction Loan Agreement.  Instead, Hankey Capital sought to loan even more

9   interest-generating funds as the project proceeded, obtain exorbitant enhanced,

10   default-rate interest payments, and potentially foreclose on a valuable asset of the

11   Debtor at the expense of the Debtor's creditors, including Inferno.  The fact that

12   Hankey Capital sought to capitalize on its reckless and predatory lending is

13   evidenced by the fact that only 14 months after it made a loan meant to complete

14   construction, it gave the Debtor another $8.5 million, and then nine months after that

15   $15 million more.

16        58.    Hankey Capital continued recklessly to lend these substantial additional

17   funds to Debtor following the Initial Hankey Loan without ensuring that Debtor

18   complied with the loan disbursement provisions of Exhibit D to the Construction

19   Loan Agreement or otherwise taking steps to ensure that the loan proceeds were used

20   for construction at the Property.  Inferno is informed and believes that Hankey

21   Capital loaned Debtor nearly $23.5 million in additional funds even after its $82.5

22   million initial loan, which was to complete construction and improvements at the

23   Property and to pay itself interest.  Hankey Capital did not take steps to ensure its

24   loan funds were used for purposes of construction at the Property or that Debtor

25   fulfilled the requirements of Exhibit D in order to make substantial loans to Debtor,

26   because it sought and anticipated Debtor's default allowing Hankey Capital to assert

27   a right to increased default interest, and seek to foreclose on the Property and obtain

28

2911183.1

17

COMPLAINT FOR DECLARATORY RELIEF

1  a very valuable and world-renowned asset at the expense of other creditors, including

2  Inferno, who would sustain significant losses on their claims against Debtor.

3       59.    Hankey Capital obtained its position as a secured creditor, which it now

4  seeks wrongfully to improve at Inferno's expense through alleged subordination, as

5  well as massive interest payments from Debtor to date which it continues to assert, as

6  a result of its unlawful, unfair or fraudulent business practices within the scope of

7  California Business and Professions Code Section 17200 et seq.  Based on Hankey

8  Capital's unfair business practices, it should be permanently enjoined (a) from

9  seeking increased or default rate interest pursuant to its loans to Debtor, or (b)

10  asserting or obtaining a right to payment of its alleged loans to Debtor prior to

11  payment of Inferno's claim.  Hankey Capital should be further ordered to disgorge

12  and return all funds that the Court determines Hankey Capital has received as a result

13  of its unfair business practices, including but not limited to its exorbitant default

14  interest rate.  Inferno objects to Claim 20 filed by Hankey Capital to the extent that it

15  contains interest that is not ultimately allowed by the Court or is for an amount that

16  the Court determines Hankey Capital is not entitled to.

17       60.    Based on the foregoing, to the extent that the Court disallows interest or

18  determines that Hankey Capital's conduct harmed the Debtor's bankruptcy estate and

19  the other secured creditors, the Court should allow the claim of Hankey Capital in a

20  reduced amount consistent with its ruling.

21                  **FIFTH CLAIM FOR RELIEF**

22  **(Declaratory Relief Regarding Whether the Rebate and the DIP Loan Proceeds**

23  **Are Unencumbered)**

24       61.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1

25  through 37, inclusive, and incorporates them herein by reference as if set forth in full

26  herein.

27       62.    In order to obtain the postpetition loan from Hankey Capital, the Debtor

28  represented that the Property was worth as much as $325 million so that the secured

creditors were adequately protected by the equity in the Property.  Relying on the

Debtor's representations, the Court authorized the Debtor to borrow up to $12 million

secured by a first priority lien against the Property.  Upon Court approval, the Debtor

immediately drew down the entire $12 million loan.  The Debtor did not spend the

full $12 million.

63.    In connection with the sale of the Property, the Debtor repaid Hankey

Capital $12,084,999.98 from the proceeds from the sale of the Property instead of

returning the unused DIP Loan Proceeds and paying the difference from the sale

proceeds.  Inferno is informed and believes and on that basis alleges that the Debtor

is holding approximately $3.6 million, less professional fees recently authorized to be

paid, that are attributable to the postpetition loan and the Debtor contends that these

DIP Loan Proceeds are unencumbered funds.  The Court has not made a finding

about whether the DIP Loan Proceeds are unencumbered or not.

64.    Further, in connection with the employment of Concierge Auctions, the

Debtor negotiated for Concierge to rebate to the estate 9.5% of the 12% buyer's

premium to which Concierge was otherwise entitled.  The Debtor and its agents have

conceded on the record that buyers factor in the buyer's premium when bidding on

property so that the amount of the buyer's premium has a direct negative impact on

the purchase price to be paid by the bidder for the property.  The Court has not made

a finding about whether the Rebate is unencumbered.  Inferno alleges that the Rebate

resulted in a decreased purchase price for the Property that has directly harmed the

lienholders, including Inferno.

65.    No one anticipated that the auction of the Property would have the

dismal outcome that it did.  The Debtor and its agents repeatedly testified before and

represented to the Court that the Property was worth $325 million but that even if it

went for as low as $200 million, all secured creditors would be adequately protected.

If the parties were aware that the sale of the Property would result in a purchase price

of only $126 million, Inferno would have objected to the Debtor obtaining the

COMPLAINT FOR DECLARATORY RELIEF

postpetition loan from Hankey Capital and/or to certain of its terms on the basis that
it was not in fact adequately protected.  If the parties knew that the Property would be
sold for $126 million, they would have objected to the Debtor's proposal for a rebate
of the buyer's premium and instead insisted that Concierge just reduce its buyer's
premium for this transaction so that the purchase price was not artificially depressed.
The Court likely would have sustained the objections.

66.    Inferno believes that there is a dispute between the lienholders and the
Debtor about whether the Rebate and the DIP Loan Proceeds are available to pay the
secured lienholders and seeks a declaration that the Rebate and the DIP Loan
Proceeds are not unencumbered and cannot be used to pay unsecured claims unless
all parties with liens against the Property, including Inferno and Defendant
Lienholders, are paid in full.

## SIXTH CLAIM FOR RELIEF

### (Rescission of the MOA As Against All Defendants)

67.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1
through 37, inclusive, and incorporates them herein by reference as if set forth in full
herein.

68.    The MOA was entered into solely as a result of material
misrepresentations by Debtor concerning its intended scope, the fact that any monies
obtained as loans for the Property to be covered by the MOA would be used solely to
complete construction and improvements on the Property, and that Inferno's debt
would only be subordinated to debts specifically agreed to in writing.  As a result,
there were certain amendments to the MOA in which Inferno agreed in writing for
subordination of its debt.  But none of the debts of Defendant Lienholders were
agreed to be subordinated in writing by Inferno.

69.    Debtor has received tens of millions of dollars in loans that were to be
used solely for construction and improvements of the Property. However, Debtor
committed fraud by misappropriating these sums for other properties affiliated with

COMPLAINT FOR DECLARATORY RELIEF

the principals Nile Niami and Yvonne Niami or for themselves individually.  Debtor
further repudiated and materially breached the MOA by allowing secured creditors to
place liens on the Property when loan funds were not used for the Property and which
Inferno never agreed in writing could be subordinated to its debt.

70.    Based upon Debtor's fraud, misappropriation and material breach of the
MOA, Inferno is entitled to rescission of the MOA and a determination that it is null
and void.

## **PRAYER FOR RELIEF**

WHEREFORE, Inferno prays for judgment as follows:

**As to the First Claim for Relief:**

1.    For a judicial determination that the secured debt owed to Inferno in the
amount determined by the Court pursuant to Proof of Claim No. 11 is not subordinate
to secured debts claimed by Hankey Capital based on the alleged Subordination
Agreement, and that Inferno's debt has priority over Hankey Capital's claim and
should be paid first from the proceeds of the sale of Debtor's assets prior to payments
to Defendants;

2.    For a judicial determination that Claims 17 and 18 of Hankey Capital
are unsecured claims, not secured claims;

**As to the Second Claim for Relief:**

3.    For a judicial determination that the secured debt to Inferno in the
amount determined by the Court pursuant to Proof of Claim No. 11 is not subordinate
to any amounts alleged owed to Defendant Lienholders based on the MOA, and that
Inferno's debt has priority and should be paid first from the proceeds of the sale of
Debtor's assets prior to payments to Defendant Lienholders;

4.    For a judicial determination that Claims 17 and 18 of Hankey Capital
are unsecured claims, not secured claims;

**As to the Third Claim for Relief:**

5. For a determination that the claim of Inferno as referenced in Proof of Claim No. 11 has never been subordinated to debts allegedly owing to Defendant Lienholders and Inferno's claim has priority over the claims of all other secured creditors of Debtor including Defendant Lienholders' claims, and all amounts owed to Inferno shall be paid from proceeds of the sale of Debtor's assets prior to payments to Defendant Lienholders;

6. For a judicial determination that Claims 17 and 18 of Hankey Capital are unsecured claims, not secured claims;

**As to the Fourth Claim for Relief:**

7. For an order that Hankey Capital is permanently enjoined as a result of its unfair business practices (a) from seeking increased or default rate interest pursuant to its loans to Debtor, or (b) asserting or obtaining a right to payment of its alleged loans to Debtor prior to payment of Inferno's claim, and is required to disgorge and provide restitution of all sums found to have been obtained through its unfair business practices and adjusting Claim 20 accordingly;

**As to the Fifth Claim for Relief:**

8. For an order that the Rebate and the DIP Loan Proceeds are not unencumbered funds and may not be used to pay unsecured claims;

**As to the Sixth Claim for Relief:**

9. For an order rescinding the MOA;

**As to All Claims for Relief:**

10. For costs of suit incurred herein;

COMPLAINT FOR DECLARATORY RELIEF

11.   For such other and further relief as the Court deems appropriate.

DATE:  June 9, 2022

LAVELY & SINGER
PROFESSIONAL CORPORATION
MARTIN D. SINGER
PAUL N. SORRELL

By:   _____
      MARTIN D. SINGER
Attorneys for Plaintiff and Interested Party
INFERNO INVESTMENT, INC.

DATED:  June 9, 2022

SMILEY WANG-EKVALL, LLP

By:   ____/s/ Kyra E. Andrassy_____
      KYRA E. ANDRASSY
Attorneys for Inferno Investment, Inc.

2911183.1

23

COMPLAINT FOR DECLARATORY RELIEF

# EXHIBIT 1

# MEMORANDUM OF AGREEMENT

This Memorandum of Agreement is made and entered into this *1st* day of *January*, 2016 by and between CRESTLLOYD, LLC, a California Limited Liability Company ("Crestlloyd") and INFERNO INVESTMENTS INC. ("Inferno").

## RECITALS

The parties desire to set forth their respective rights with regard to distribution of proceeds at such time as the residence being constructed by Crestlloyd (as successor to the Company) at 944 Airole Way, Los Angeles, California (the "Residence") is sold.

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

1.  <u>Incorporation of Recitals</u>.  The above Recital is incorporated herein by this reference as though made a part hereof.

2.  <u>Division of Profits and Losses</u>.  Profits and Losses shall be allocated as follows:  Fifty percent (50%) to Crestlloyd for Developer fee and fifty percent (50%) to Crestlloyd and Inferno in proportion to the money loaned by each to finance the construction of the Residence.

For Example: Assume Inferno loaned $18,000,000.00 and Crestlloyd loaned $41,000,000.00.  Inferno's share of the profits and losses is 15.25% ($18,000,000 ÷ $59,000,000 = 30.5% multiplied by 50% = 15.25%).  Crestlloyd's share of the profits and losses is 84.75% ($41,000,000 ÷ $59,000,000 = 69.5% multiplied by 50% = 34.75%), plus Crestlloyd's Developer fee of 50% = 84.75%.

3.  <u>Distributions</u>. All proceeds received from a sale, condemnation, financing or refinancing of the Residence shall be distributed in the following manner:

First, to repay the loan(s) obtained from a bank or third parties (excluding Crestlloyd and Inferno) and all other unpaid costs of construction of the Residence.

Second, to Crestlloyd and Inferno, pro rata, in repayment of any loans owing them, together with simple interest thereon at the rate of eight percent (8%) per annum.

Third, to Crestlloyd, the sum of ONE HUNDRED FORTY-FIVE THOUSAND DOLLARS ($145,000.00) as compensation for general office overhead and services rendered by it in connection with the construction of the Residence.

Thereafter, to Crestlloyd and Inferno in accordance with their share of the profits and losses determined in the manner set forth in paragraph 2 above.

IN WITNESS HEREOF, the parties have executed this Memorandum of Agreement, effective as of the date set forth above.

CRESTLLOYD, LLC, a California
Limited Liability Company

INFERNO INVESTMENTS INC.

By _____
Nile Niami, Manager

By _____
Julian Remillard, Director

AMENDMENT NO. 1

TO MEMORANDUM OF AGREEMENT

**AMENDMENT NO. 1**

**TO AMENDMENT OF AGREEMENT**

This Amendment No. 1 to Memorandum of Agreement is entered into this ____ day of July, 2016 by and between CRESTLLOYD, LLC, a California Limited Liability Company ("Crestlloyd") and INFERNO INVESTMENTS INC. ("Inferno").

**RECITALS**

A.    Crestlloyd and Inferno previously entered into a Memorandum of Agreement dated January 1, 2016 with regard to division of profits and losses on the sale of the real property located at 944 Airole Way, Los Angeles, California (the "Residence").

B.    Deeds of Trust have been recorded against the Residence in favor of Inferno to secure the loans which it, and its predecessor, previously made to Crestlloyd.

C.    Crestlloyd previously obtained a loan from First Republic Bank which loan is secured by a first Deed of Trust on the Residence. Crestlloyd desires to refinance the existing loan with a new loan to be made by First Credit Bank ("New Lender"). In order to refinance the existing loan New Lender requires that Inferno subordinate the Liens of its Deeds of Trust on the Residence to the new loan to be obtained by Crestlloyd from New Lender in the amount of Forty Million Dollars ($40,000,000.00) which will be secured by a First Trust Deed on the Residence (the "New Loan").

D.    Inferno is willing to subordinate the Liens of its Deeds of Trust on the Residence to the New Loan for the consideration hereafter set forth.

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1.    Incorporation of Recitals. Each and all of the above Recitals are incorporated herein by this reference as though set forth in full hereat.

2.    Subordination. Inferno hereby agrees to subordinate the Liens of its Deeds of Trust on the Residence to the Lien of the First Deed of Trust securing the New Loan. In connection therewith Inferno agrees to execute any and all documents reasonably required by New Lender to evidence the subordination.

3.    Consideration. In consideration of Inferno subordinating the Liens of its Deeds of Trust to a first Deed of Trust that will secure the New Loan, Crestlloyd agrees that the percentage of profits and losses set forth in paragraph 2 of the Memorandum of Agreement shall be adjusted to provide for Inferno to be allocated an additional one and one-half percent (1.5%) of the profits and losses on the sale of the Residence (the "Additional Percentage"). The Additional Percentage to be allocated to Inferno shall be deducted from the percentage of profits and losses allocated to Crestlloyd.

Y:\INIAMI\944Airole\AmendNo.1-MemoAgt.wpd

For Example: Assume that, pursuant to the formula set forth in paragraph 2 of the Memorandum of Agreement, Crestlloyd is allocated eighty-four and three-quarter percent (84.75%) of the profits and losses and Inferno is allocated fifteen and one-quarter percent (15.25%) of the profits and losses. The profits and losses will now be adjusted and allocated as follows:  83.25% to Crestlloyd and 16.75% to Inferno.

4.    No Other Changes. Except as herein expressly provided, all of the terms and provisions of the Memorandum of Agreement shall remain in full force and effect.

Dated the day and year set forth above.

CRESTLLOYD, LLC, a California                    INFERNO INVESTMENTS, INC.
Limited Liability Company


By _____              By _____
        Nile Niami, Manager                            Julien Remillard, Director

AMENDMENT NO 2.

TO MEMORANDUM OF AGREEMENT

This Amendment No. 2 to Memorandum of Agreement is entered into this 27th day of September , 2016 between CRESTLLOYD, LLC, a California Limited Liability Company ("Crestlloyd") and INFERNO INVESTMENT, INC. ("Inferno").

RECITALS

A.    Crestlloyd and Inferno previously entered into a Memorandum of Agreement dated January 1, 2016, which was amended July _____, 2016, with regard to division of profits and losses on the sale of the real property located at 944 Airole Way, Los Angeles, California (the "Residence").

B.    Deeds of Trust have been recorded against the Residence in favor of Inferno to secure the loans which it and its predecessor previously made to Crestlloyd.

C.    Crestlloyd previously obtained a loan with First Credit Bank which loan is secured by a first Deed of Trust on the Residence.  Crestlloyd desires to take on additional loans or refinance the existing loan with a new loan or loans to be made by First Credit Bank or another bank or a combination thereof (collectively "New Lender").  In order to accomplish same, New Lender requires that Inferno subordinate the Liens of its Deeds of Trust on the Residence to the new loan(s) to be obtained by Crestlloyd ("the New Loan") in an amount which, in the aggregate, including existing bank loans, shall not exceed fifty-two million dollars ($52 million), which shall be secured by a First Trust Deed on the Residence.

D.    Inferno is willing to subordinate the Liens of its Deeds of Trust on the Residence to the New Loan for the consideration hereafter set forth.

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1.    Incorporation of Recitals.  Each and all of the above Recitals are incorporated herein by this reference as though set forth in full hereat.

2.    Subordination.  Inferno hereby agrees to subordinate the Liens of its Deeds of Trust on the Residence to the Lien of the First Deed of Trust securing the New Loan.  In connection therewith Inferno agrees to execute any and all documents reasonably required by New Lender to evidence the subordination.

3.    Consideration.  In consideration of Inferno subordinating the Liens of its Deeds of Trust to a first Deed of Trust that will secure the New Loan,

Crestlloyd shall immediately pre pay two million dollars $2,000,000.00) of loan principal ("Principal") owed to Inferno, thereby reducing the total amount of Principal to sixteen million dollars ($16,000,000.00).  Notwithstanding the foregoing, Interest due Inferno shall continue to accrue from the date hereof on the amount of eighteen million dollars ($18,000,000.00).

      4.    <u>Interest Bearing Periods.</u>  The parties agree that Interest shall not be payable to either party during periods when the Property is being rented out to third parties.

      5.    <u>No Other Changes</u>.  Except as herein expressly provided, all of the terms and provisions of the Memorandum of Agreement as previously amended shall remain in full force and effect.

      Dated the day and year set forth above.


CRESTLLOYD, LLC, a California      INFERNO INVESTMENT, INC.,
Limited Liability Company      a Canadian Corporation


By _____      By _____
      Nile Niami, Manager        Julien Remillard, Director

REVISED AMENDMENT NO 2.

TO MEMORANDUM OF AGREEMENT

This Revised Amendment No. 2 to Memorandum of Agreement is entered into this 28th day of September , 2016 between CRESTLLOYD, LLC, a California Limited Liability Company ("Crestlloyd") and INFERNO INVESTMENT, INC. ("Inferno").

RECITALS

A.    Crestlloyd and Inferno previously entered into a Memorandum of Agreement dated January 1, 2016, which was amended July _____, 2016, with regard to division of profits and losses on the sale of the real property located at 944 Airole Way, Los Angeles, California (the "Residence").

B.    A document entitled Amendment No 2 was previously executed between the parties, however that document is deemed null and void upon execution of this Revised Amendment No. 2.

C.    Deeds of Trust have been recorded against the Residence in favor of Inferno to secure the loans which it and its predecessor previously made to Crestlloyd.

D.    Crestlloyd previously obtained a loan with First Credit Bank which loan is secured by a first Deed of Trust on the Residence.  Crestlloyd desires to take on additional loans or refinance the existing loan with a new loan or loans to be made by First Credit Bank or another bank or a combination thereof (collectively "New Lender").  In order to accomplish same, New Lender requires that Inferno subordinate the Liens of its Deeds of Trust on the Residence to the new loan(s) to be obtained by Crestlloyd ("the New Loan") in an amount which, in the aggregate, including existing bank loans, shall not exceed fifty-two million dollars ($52 million), which shall be secured by a First Trust Deed on the Residence.

E.    Inferno is willing to subordinate the Liens of its Deeds of Trust on the Residence to the New Loan for the consideration hereafter set forth.

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1.    Incorporation of Recitals.  Each and all of the above Recitals are incorporated herein by this reference as though set forth in full hereat.

2.    Subordination.  Inferno hereby agrees to subordinate the Liens of its Deeds of Trust on the Residence to the Lien of the First Deed of Trust securing the New Loan.  In connection therewith Inferno agrees to execute any

and all documents reasonably required by New Lender to evidence the
subordination.

     3.    <u>Incentive.</u>  As an incentive for Inferno to subordinate the Liens of its
Deeds of Trust to a first Deed of Trust that will secure the New Loan, Crestlloyd
shall immediately pre pay to Inferno two million dollars  $2,000,000.00.  It is
agreed that this payment shall be made in reduction of the outstanding
indebtedness owing to Inferno and not as consideration or Interest.

     4.    <u>Interest and Interest Bearing Periods.</u>  The parties agree that
Interest shall not be payable to either party during periods when the Property is
being rented out to third parties.

     5.    <u>No Other Changes.</u>  Except as herein expressly provided, all of the
terms and provisions of the Memorandum of Agreement as previously amended
shall remain in full force and effect.

     Dated the day and year set forth above.

CRESTLLOYD, LLC, a California        INFERNO INVESTMENT, INC.,
Limited Liability Company          a Canadian Corporation

By _____     By _____
      Nile Niami, Manager             Julien Remillard,  Director

AMENDMENT NO 3

TO MEMORANDUM OF AGREEMENT

This Amendment No. 3 to Memorandum of Agreement is entered into this _29th_ day of _Mar_ , 2018 between CRESTLLOYD, LLC, a California Limited Liability Company ("Crestlloyd") and INFERNO INVESTMENT INC. ("Inferno").

<u>RECITALS</u>

A.      Crestlloyd and Inferno previously entered into a Memorandum of Agreement dated January 1, 2016, which was amended July ____, 2016, and Feb ___, 2017 with regard to division of profits and losses on the sale of the real property located at 944 Airole Way, Los Angeles, California (the "Residence"). Except as modified by this Amendment No. 3, all previous items agreed to by the parties shall be incorporated herein.

B.      Deeds of Trust have been recorded against the Residence in favor of Inferno or its associates to secure the loans which it and its predecessor previously made to Crestlloyd. (the "Inferno DOTs")

C.      Deeds of Trust shall be recorded against the Residence in favor of Crestlloyd, its successor, designee or assigns, to secure the loans which it or its affiliated entities have made and may continue to make in order to complete construction and pay carrying costs associated with the Residence.  (the "Crestlloyd DOTs").

D.      Crestlloyd previously obtained loans with First Credit Bank which are secured by Deeds of Trust on the Residence. (the "FCB DOTs"). Crestlloyd desires to refinance these existing bank loans with a new loan to be made by ABP Capital, LLC or its affiliate, C3 Capital, LLC (hereafter "New Lender").  In order to accomplish same, New Lender requires that Inferno subordinate the Liens of the Inferno DOTs to the new loan(s) to be obtained by Crestlloyd ("the New Loan") in an amount which, in the aggregate, (including existing First Credit Bank loans), shall not exceed eighty-five million dollars ($85 million), and which shall be secured by a new First Trust Deed on the Residence. (the "ABP DOT").

E.      New Lender also requires that Crestlloyd subordinate the Liens of the Crestllloyd DOTs to the New Loan.

F.      Crestlloyd and Inferno are willing to subordinate the Liens of their respective Deeds of Trust on the Residence to the New Loan for the consideration hereafter set forth.

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1.    <u>Incorporation of Recitals.</u>  Each and all of the above Recitals are incorporated herein by this reference as though set forth in full hereat.

2.    <u>Subordination.</u>  Inferno hereby agrees (on a pari-passu basis with Crestlloyd) to subordinate the Liens of the Inferno DOTs to the ABP DOT.  In connection therewith, Inferno agrees to execute any and all documents reasonably required by New Lender to evidence the subordination.  Crestlloyd hereby agrees to subordinate the Liens of the Crestlloyd DOTs to the ABP DOT. In connection therewith Crestlloyd agrees to execute any and all documents reasonably required by New Lender to evidence the subordination.

3.    <u>Consideration due Inferno.</u>  In consideration of Inferno subordinating the Liens of the Inferno DOTs to the ABP DOT, Inferno shall receive from the first draw proceeds of the New Loan the sum of Five Million Four Hundred Fifty-Two Thousand One Hundred And Seventy-Four Dollars $5,452,174.00 ("Consideration").  This Consideration shall pay down $5,452,174.00 of loan principal owed to Inferno ("Inferno Principal").  Because an additional Two Million Dollars ($2,000,000.00) of Inferno Principal was previously paid down on October 3, 2016, the revised amount of Inferno Principal owing once this Consideration has been paid shall be Six Million Five Hundred Eighty-Seven Thousand Eight Hundred Twenty-Six Dollars ($6,587,826), (hereafter "Revised Inferno Principal").  Notwithstanding the foregoing, the Revised Inferno Principal amount is for Inferno internal accounting purposes only; Interest due Inferno shall continue to accrue from the date hereof on the full amount of Eighteen Million Dollars ($18,000,000.00).  The amount of Seven Million Four Hundred Fifty-Two Thousand One Hundred and Seventy-Four Dollars ($7,452,174.00) shall be deducted from Inferno's Share of Net Profits as defined in Section 5 below.

4.    <u>Consideration due Crestlloyd.</u>  In consideration of Crestlloyd subordinating the Liens of the Crestlloyd DOTs to the ABP DOT, and only in the event the New Loan has not been otherwise paid in full by the maturity date thereof, Inferno shall use its best efforts to loan or cause to be loaned to Crestlloyd, its designee, successor or assigns, the sum of at least Eighty-Five Million Dollars ($85,000,000.00) (the "Future Inferno-Arranged Loan") with terms mutually agreed to between the parties.:  The maturity date of the Future Inferno Loan shall be the date escrow closes upon the sale of the Residence ("Maturity Date").  The Future Inferno-Arranged Loan shall be secured by the lien of a new First Trust Deed to which the Inferno DOTs and Crestlloyd DOTs shall subordinate.  It is understood and agreed between the parties that the budget reflecting the Residence's construction and carrying costs shall be raised as necessary to accommodate the interest, points and/or fees required by the Future Inferno-Arranged Loan.

5.    <u>Distribution of Net Profits.</u>  All consideration paid to purchase the Residence shall be paid into escrow by the buyer.  "Gross Receipts" shall be defined as all monies so received by escrow.  "Net Receipts" shall be defined as that amount remaining after the deduction from Gross Receipts of the following:

2

a) all closing costs including but not limited to taxes, commissions, escrow fees, title fees, legal costs and fees, accounting fees, etc., b) that amount required to reconvey any First Trust Deeds from third-party lenders, it being agreed that the Inferno DOTs and the Crestlloyd DOTs shall NOT be considered as being from third-party lenders, however the Future Inferno-Arranged Loan SHALL be considered a third-party lender;  and c) the sum of One Hundred And Forty Five Thousand Dollars $145,000, which shall be paid to Skyline Development or its designee as reimbursement for overhead expenses.  Net Receipts shall be disbursed in the following order: on a pro-rata, pari passu basis, to Inferno and Crestlloyd or their designees, successors or assigns, the amounts required to reconvey fully their respective DOTs.  The amount remaining, if any, shall be defined as "Net Profits".  Net Profits shall be disbursed as follows: Twenty-Four Per Cent (24%) to Inferno ("Inferno Share of Net Profits") and Seventy-Six Per Cent (76%) to Crestlloyd ("Crestlloyd Share of Net Profits").  Notwithstanding the aforesaid, the Inferno Share of Net Profits shall be decreased by the amount of $7,452,174.00, and this amount shall be paid instead to Crestlloyd.

     5.   <u>No Other Changes</u>.  Except as herein expressly provided, all of the terms and provisions of the Memorandum of Agreement as previously amended shall remain in full force and effect.

     Dated the day and year set forth above.


CRESTLLOYD, LLC, a California
Limited Liability Company


By _____
    Nile Niami, Manager

INFERNO INVESTMENT INC.,
a Canadian Corporation


By _____
    Julien Remillard, Director

REVISED AMENDMENT NO 3

TO MEMORANDUM OF AGREEMENT


This Amendment No. 3 to Memorandum of Agreement is entered into this 16th day of May, 2018 between CRESTLLOYD, LLC, a California Limited Liability Company ("Crestlloyd") and INFERNO INVESTMENT INC. ("Inferno").


RECITALS

A.     Crestlloyd and Inferno previously entered into a Memorandum of Agreement dated January 1, 2016, which was amended July ____, 2016, and September 28, 2016 with regard to division of profits and losses on the sale of the real property located at 944 Airole Way, Los Angeles, California (the "Residence"). Except as modified by this Revised Amendment No. 3, all previous items agreed to by the parties shall be incorporated herein.

B.     A previous document entitled AMENDMENT NO 3 TO MEMORANDUM OF AGREEMENT was executed by the parties on the 29th of March 2018

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1.     Incorporation of Recitals.  Each and all of the above Recitals are incorporated herein by this reference as though set forth in full hereat.

2.     The aforementioned AMENDMENT NO 3 TO MEMORANDUM OF AGREEMENT shall be deemed null and void as if it never existed.

5.     No Other Changes.  Except as herein expressly provided, all of the terms and provisions of the Memorandum of Agreement as previously amended shall remain in full force and effect.

Dated the day and year set forth above.


CRESTLLOYD, LLC, a California
Limited Liability Company


By _____
      Nile Niami, Manager


INFERNO INVESTMENT INC.,
a Canadian Corporation


By _____
      Julien Remillard, Director

# EXHIBIT 2

21SMCV01113

CONSTRUCTION LOAN AGREEMENT

BETWEEN

CRESTLLOYD, LLC,
A CALIFORNIA LIMITED LIABILITY COMPANY,
AS BORROWER

AND

HANKEY CAPITAL, LLC,
A CALIFORNIA LIMITED LIABILITY COMPANY,
AS LENDER

EXECUTED AS OF OCTOBER 25, 2018

CONSTRUCTION LOAN AGREEMENT

THIS CONSTRUCTION LOAN AGREEMENT ("Agreement") is executed as of October 25, 2018 by and between CRESTLLOYD, LLC, a California limited liability company (the "Borrower"), and HANKEY CAPITAL, LLC, a California limited liability company ("Lender").

RECITALS

A. Borrower owns or will own certain real property described in EXHIBIT A hereto ("Property").

B. Borrower proposes to construct new improvements or renovate existing improvements on the Property consisting of: a single family residence, together with all appurtenances, fixtures, and tenant improvements now or hereafter located on the Property ("Improvements"). The Improvements shall be constructed in accordance with plans and specifications which Borrower has heretofore, or will hereafter deliver to Lender, as amended in order to comply with the terms and conditions of this Agreement ("Plans and Specifications"). Borrower has requested from Lender a loan for the purpose of such construction.

NOW, THEREFORE, Borrower and Lender agree as follows:

ARTICLE 1. DEFINITIONS

1.1. Defined Terms. The following capitalized terms generally used in this Agreement shall have the meanings defined or referenced below. Certain other capitalized terms used only in specific sections of this Agreement are defined in such sections.

1

"Account" - means an account with Bank, account number _____, in the name of Borrower or Borrower's designee into which Loan proceeds will be deposited.

"ADA" - means the Americans with Disabilities Act, 42 U.S.C. Section 12101, et seq. as now or hereafter amended or modified.

"Affiliate" - means, as to any person or entity, any person or entity which, directly or indirectly, controls, is controlled by or is under common control with, or which has the power to control the management or operations of, such person or entity.

"Bank" - means _____.

"Bankruptcy Code" - means the Bankruptcy Reform Act of 1978 (11 U.S.C. Section 101-1330) as now or hereafter amended or recodified.

"Bonded Work" - shall have the meaning ascribed to such term in Section 8.1.

"Border Zone Property" - means any property designated as "border zone property" under the provisions of California Health and Safety Code, Sections 25220 et seq., or any regulation adopted in accordance therewith.

"Borrower" - means CRESTLLOYD, LLC, a California limited liability company.

"Borrower's Funds" - means all funds of Borrower deposited with Lender into the Borrower's Funds Account maintained with Bank pursuant to the terms and conditions of this Agreement.

"Borrower's Funds Account" - means the account with Bank into which all funds deposited with Lender pursuant to this Agreement shall be placed.

"Business Day" - means a day of the week (but not a Saturday, Sunday or holiday) on which the offices of Bank are open to the public for carrying on substantially all of Bank's business functions. Unless specifically referenced in this Agreement as a Business Day, all references to "days" shall be to calendar days.

"Certificate of Approval" - means a certificate in the form of EXHIBIT F.

"Completion Date" - means the date upon which Borrower satisfies the last of the conditions for the release of the Retention, as provided in Paragraph C of EXHIBIT D, currently estimated to be _____, the date by which construction of the Improvements must be complete, subject to extension pursuant to change orders approved by Lender as provided herein or pursuant to the provisions of Section 4.3.

"Construction Agreements" - means those certain agreements to construct the Improvements by and between Borrower (in its capacity as the builder) and various contractors.

2

"Contractors" - means various contractors which have executed Construction Agreements for construction of the Improvements.

"Deed of Trust" - means that certain Deed of Trust and Fixture Filing with Assignment of Leases and Rents, of even date herewith executed by Borrower, as Trustor, to Chicago Title Company, as Trustee, for the benefit of Lender, as Beneficiary, as hereafter amended, supplemented, replaced or modified.

"Deemed Approval Matter" - means any matter requiring the consent of Lender under the Loan Documents including, without limitation, the following: (1) contracts for which Lender approval is required hereunder, as contemplated in Sections 4.4 and 4.5, (2) Plans and Specifications and changes thereto for which Lender approval is required hereunder, as contemplated in Section 4.6, (3) Borrower's contracting for any materials, furnishings, equipment, fixtures or other parts or components of the Improvements in which any third party will retain any interest for which Lender approval is required hereunder, as contemplated in Section 4.8, (4) the inclusion of the Property in any assessment district or community facilities district for which Lender approval is required hereunder, as contemplated in Section 4.11, (5) formation and authorization documents of Borrower, and modifications thereto, for which Lender approval is required hereunder, as contemplated in Sections 6.3 and 9.10, (6) the issuance of any Set Aside Letter for which Lender approval is required hereunder, as contemplated in Section 8.1; (7) leases and leasing parameters for which Lender approval is required hereunder, as contemplated in Section 9.4, (8) any Subdivision Map for which Lender approval is required hereunder, as contemplated in Section 9.6, (9) assignment of all or any portion of Borrower's interest under the Loan documents or any moneys due or to become due thereunder for which Lender approval is required hereunder, as contemplated in Section 9.8, and (10) agreements providing for the management, leasing or operation of the Property or Improvements for which Lender approval is required hereunder, as contemplated in Section 9.9.

"Default" - shall have the meaning ascribed to such term in Section 11.1.

"Disbursement Budget" - means the design and construction budget for the Improvements, as approved by Lender from time to time.

"Distribution" - means any transfer of cash or other property from Borrower to any constituent member or statutory manager thereof, whether characterized as a distribution, dividend, redemption, fee, repayment of a loan or otherwise, but excluding the payment of any fees, commissions or expenses pursuant to the Development and Management Agreements prior to the date that Lender requires Borrower to terminate the Development and Management Agreements under the provisions of Section 11.6 and following the date of any reinstatement of any terminated Development and Management Agreements under the provisions of Section 11.6.

3

"Effective Date" - means the date the Deed of Trust is recorded in the Office of the County Recorder of the county where the Property is located.

"Environmental Report" - means the reports actually received by Lender as contemplated in Section 3.1(d) of this Agreement.

"Hazardous Materials" - shall have the meaning ascribed to such term in Section 7.1(a).

"Hazardous Materials Claims" - shall have the meaning ascribed to such term in Section 7.1(c).

"Hazardous Materials Laws" - shall have the meaning ascribed to such term in Section 7.1(b).

"Improvements" - shall have the meaning ascribed to such term in Recital B.

"Lender" - means Hankey Capital, LLC, a California limited liability company.

"Lender Payment Turnaround Period" - means, provided that Borrower delivers the applicable application for payment to Lender under cover of a written notice stating in bold, all-capitalized letters what the outside date for such Lender Payment Turnaround Period is for that specific application for payment, ten (10) calendar days.

"Loan" - means the principal sum that Lender agrees to lend and Borrower agrees to borrow pursuant to the terms and conditions of this Agreement: EIGHTY TWO MILLION, FIVE HUNDRED THOUSAND AND NO/100THS DOLLARS ($82,500,000.00).

"Loan Documents" - means those documents, as hereafter amended, supplemented, replaced or modified, properly executed and in recordable form, if necessary, listed in EXHIBIT B as Loan Documents.

"Maturity Date" – October 31, 2020.

"Note" - means that certain Promissory Note of even date herewith, in the original principal amount of the Loan, executed by Borrower and payable to the order of Lender, as hereafter amended, supplemented, replaced or modified.

"Obligee" - shall have the meaning ascribed to such term in Section 8.1.

"Other Borrower Loan Documents" - means those documents, as hereafter amended, supplemented, replaced or modified from time to time, properly executed and in recordable form, if necessary, listed in EXHIBIT B as "Other Borrower Loan Documents."

4

"Other Related Documents" - means those documents, as hereafter amended, supplemented, replaced or modified from time to time, properly executed and in recordable form, if necessary, listed in EXHIBIT B as Other Related Documents.

"Out of Balance Notice" - shall have the meaning ascribed to such term in Section 3.1(b).

"Plans and Specifications" - shall have the meaning ascribed to such term in Recital B.

"Principal Subs" - shall have the meaning ascribed to such term in Section 4.7.

"Project Entitlements" - means the Los Angeles Department of Building and Safety Permit Nos. _____.

"Property" - shall have the meaning ascribed to such term in Recital A.

"Secured Obligations" - shall have the meaning ascribed to such term in the Deed of Trust.

"Set Aside Letter" - shall have the meaning ascribed to such term in Section 8.1.

"Subdivision Map" - shall have the meaning ascribed to such term in Section 9.6.

"Surety" - shall have the meaning ascribed to such term in Section 8.1.

"Title Policy" - means the ALTA Lender's Policy of Title Insurance as issued by First American Title Company, together with such special endorsements as Lender may require thereto, including, without limitation, forms CLTA 100 (making particular reference to any easement or encroachment listed in the Title Policy), 116, 116.1 (survey), 102.7 (foundation), 103.7 (modified to insure access to a physically open public street sufficient to provide vehicular and pedestrian ingress and egress), 111.5 (variable interest rate), 129-06 (separate tax parcel), 122.4 (advances), 137.1-06, and such other special endorsements as Lender may require.

"Working Capital" - means all proceeds of the Loan disbursed by Lender into the Working Capital Reserve Account maintained with Bank pursuant to the terms and conditions of this Agreement.

"Working Capital Reserve Account" - means the account with Bank into which all funds disbursed as Working Capital by Lender pursuant to this Agreement shall be placed.

1.2. Exhibits Incorporated. EXHIBITS A, B, C, D, E, F and G, all attached hereto, are hereby incorporated into this Agreement.

5

## ARTICLE 2. LOAN

2.1. Loan. By and subject to the terms of this Agreement, Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender the principal sum of EIGHTY-TWO MILLION, FIVE HUNDRED THOUSAND AND NO/100THS DOLLARS ($82,500,000.00), said sum to be evidenced by the Note of even date herewith. The Note shall be secured, in part, by the Deed of Trust, of even date herewith, encumbering certain real property and improvements as legally defined therein. Amounts disbursed to or on behalf of Borrower pursuant to the Note shall be used to purchase and finance the construction of the Property and Improvements and for such other purposes and uses as may be permitted under this Agreement and the other Loan Documents.

2.2. Loan Documents. Borrower shall deliver to Lender concurrently with this Agreement each of the documents, properly executed and in recordable form, as applicable, described in EXHIBIT B as Loan Documents, together with those documents described in EXHIBIT B as Other Related Documents. Notwithstanding anything to the contrary contained elsewhere within this Agreement, the lien of the Deed of Trust shall not secure any obligation under any of the Loan Documents that are designated on EXHIBIT B as not being secured by liens upon real property.

2.3. Effective Date. The date of the Loan Documents is for reference purposes only. The Effective Date of delivery and transfer to Lender of the security under the Loan Documents and of Borrower's and Lender's obligations under the Loan Documents shall be the date the Deed of Trust is recorded in the Office of the County Recorder of the county where the Property is located.

2.4. Maturity Date; Prepayment. Upon the Maturity Date, all sums due and owing under this Agreement and the other Loan Documents shall be repaid in full. All payments due to Lender under this Agreement, whether at the Maturity Date or otherwise, shall be paid in immediately available funds. Amounts owing under the Note may be prepaid by Borrower, in whole or in part, at any time, without premium or penalty.

2.5. Credit for Principal Payments. Any payment made upon the outstanding principal balance of the Loan shall be credited as of the Business Day received, provided such payment is received by Lender no later than 11:00 a.m. Pacific Time) and constitutes immediately available funds. Any principal payment received after said time or which does not constitute immediately available funds shall be credited upon such funds having become unconditionally and immediately available to Lender.

2.6. Full Repayment and Reconveyance. Upon receipt of all sums owing and outstanding under the Loan Documents, Lender shall issue a full reconveyance of the Property and Improvements from the lien of the Deed of Trust and otherwise release Lender's security interest in all other personal property collateral that secure the Loan; provided, however, that all of the following conditions shall be satisfied at the time of,

6

and with respect to, such reconveyance: (a) Lender shall have received all escrow, closing and recording costs, the costs of preparing and delivering such reconveyance and any sums then due and payable under the Loan Documents, and (b) Lender shall have received a written release satisfactory to Lender of any set aside letter, letter of credit or other form of undertaking which Lender has issued to any surety, governmental agency or any other party in connection with the Loan and/or the Property and Improvements. Lender's obligation to make further disbursements under the Loan shall terminate as to any portion of the Loan undisbursed as of the date of issuance of such full release or reconveyance, and any commitment of Lender to lend any undisbursed portion of the Loan shall be canceled.

2.7. Lender Profit Participation.  If, at any time, during the term of the Loan or following repayment of the Loan, the Property is sold for a purchase price in excess of $200,000,000, Lender shall be entitled to a Lender Profit Participation Payment in the amount of $3,500,000. The Lender Profit Participation Payment shall be collected at the close of the sale of the Property. Contemporaneous with this Agreement, Borrower and Lender shall enter into a Profit Participation Agreement memorializing the parties' agreement with respect to the Lender Profit Participation Payment, and upon the closing of the Loan, Lender shall record a Memorandum of Agreement in the Official Records of the County Recorder of Los Angeles County, California, evidencing the existence of the Profit Participation Agreement.

## ARTICLE 3. DISBURSEMENT

3.1. Conditions Precedent. Lender's obligation to make any disbursements or take any other action under the Loan Documents shall be subject at all times to satisfaction of each of the following conditions precedent:

(a) There shall exist no Default, as defined in this Agreement, Default as defined in any of the other Loan Documents, event, omission or failure of condition which would constitute a Default after notice or lapse of time, or both, or default by Borrower (following any applicable notice and cure period) under any of the Other Related Documents, except to the extent that such event, omission or failure (i) is of a nature that it could ripen into a monetary Default, and that event, omission or failure will be cured by the requested disbursement or with funds that Borrower is then attempting to raise during the 60-day cure period set forth in the provisions of the final paragraph of Section 11.1, or (ii) is of a nature that it could ripen into a non-monetary Default, such event, omission or failure is curable, and Borrower is then diligently prosecuting such cure to completion within the applicable cure period; and

(b) Any undisbursed Loan funds together with all sums, if any, to be provided by Borrower, shall be at all times equal to or greater than the amount which Lender from time to time reasonably determines necessary to: (i) pay, through completion, all costs of renovation, development, construction, operation, marketing and sale or leasing of the Property and Improvements in accordance with the Loan Documents; (ii) pay all sums which may accrue under the Loan Documents prior to repayment of the Loan; and (iii)

7

enable Borrower to perform and satisfy all of the covenants of Borrower contained in the Loan Documents. If Lender reasonably determines at any time that the undisbursed Loan funds are insufficient for said purposes, Lender may deliver to Borrower written notice demanding that Borrower then deposit funds equal to such deficiency in the Borrower's Funds Account (an "Out of Balance Notice"), in which event Borrower shall deposit the amount of such deficiency in the Borrower's Funds Account within thirty (30) days after the date of delivery of the applicable Out of Balance Notice; and

(c) Lender shall have received all Loan Documents, other documents, instruments, policies, and forms of evidence or other materials requested by Lender under the terms of this Agreement or any of the other Loan Documents, including, without limitation, such forms of estoppel certificates and subordination, non-disturbance and attornment agreements as Lender may then require from existing tenants of the Property; and

(d) Lender acknowledges that it has received and approved in form and substance satisfactory to Lender: (i) a soils report for the Property and Improvements; (ii) an environmental questionnaire and environmental site assessment with respect to the presence, if any, of Hazardous Materials on the Property and Improvements; (iii) two sets of the Plans and Specifications (or if the Plans and Specifications for the entirety of the Improvements are not then complete or some portion of the Improvements are to be constructed using a design/build process, in either such case pursuant to partial Plans and Specifications approved by Lender under the provisions of Section 4.6 of this Agreement and for which a valid building permit has been issued, then such portion of the Plans and Specifications to the extent that payment for such portion of the Improvements is to be covered by a current disbursement request), together with evidence of all necessary or appropriate approvals of governmental agencies; (iv) copies of all agreements which are material to completion of the Improvements; (v) copies of all building permits and similar permits, licenses, approvals, development agreements and other authorizations of governmental agencies required in connection with the development of the Property and Improvements, or, if such approvals are to be issued on a staged basis, then for the current and all prior stages of development, provided that such staged development has been approved by Lender, as contemplated in Section 4.6; and (vi) copies of any initial study, negative declaration, mitigated negative declaration, environmental impact report, notice of determination or notice of exemption prepared, adopted, certified or filed by any governmental agency in connection with the Property; and

(e) Lender shall have received and approved the Disbursement Budget.

3.2. Account, Pledge and Assignment, and Disbursement Authorization. The proceeds of the Loan and Borrower's Funds, when qualified for disbursement, shall be deposited into an account to be designated by Borrower or otherwise disbursed to or for the benefit or account of Borrower under the terms of this Agreement. Disbursements hereunder may be made by Lender upon the written request of any person who has been authorized by

8

Borrower to request such disbursements until such time as written notice of Borrower's revocation of such authority is received by Lender at the address shown in EXHIBIT D.

3.3. Borrower's Funds Account, Pledge and Assignment. Except as otherwise provided in this Agreement, all of the Borrower's Funds which are deposited with Lender by Borrower as shown in EXHIBIT C, or any other provision of the Loan Documents, shall be placed in the Borrower's Funds Account for disbursement under this Agreement. As additional security for Borrower's performance under the Loan Documents, Borrower hereby irrevocably pledges and assigns to Lender the Borrower's Funds Account and all monies at any time deposited in the Borrower's Funds Account.

3.4. Loan Disbursements. Subject to the conditions set forth in Section 3.1(b), the proceeds of the Loan and Borrower's Funds shall be disbursed in accordance with the terms and conditions of EXHIBIT D. Disbursements made after the deposit of Borrower's Funds shall be made first from the Borrower's Funds Account until depleted. All disbursements shall be held by Borrower in trust and applied by Borrower solely for the purposes for which the funds have been disbursed. Lender has no obligation to monitor or determine Borrower's use or application of the disbursements. Partial disbursements shall be permitted under the terms and subject to the conditions set forth in EXHIBIT D.

3.5. Working Capital. From time to time, in Borrower's Applications for Payment, Borrower may request the disbursement of proceeds of the Loan and Borrower's Funds into the Working Capital Reserve Account to maintain the balance of the Working Capital Reserve Account at the amount specified in the Disbursement Budget, provided that amounts in the Working Capital Reserve Account may only be used to pay reasonable costs of the design or construction of the Improvements, and that Borrower shall have delivered the monthly reports with respect to the Working Capital Reserve Account that are required under the provisions of Section 10.1 of this Agreement for all prior months. As additional security for Borrower's performance under the Loan Documents, Borrower hereby irrevocably pledges and assigns to Lender the Working Capital Reserve Account and all monies at any time deposited in the Working Capital Reserve Account.

3.6. Interest Reserve. Interest charged on the Loan shall be applied monthly from an interest reserve account to be maintained by the Lender, in accordance with the budget approved by the Lender. Borrower shall make timely payments of monthly interest upon depletion of the interest reserve maintained by the Lender.

## ARTICLE 4. CONSTRUCTION

4.1. Commencement and Completion. Borrower shall commence construction of the Improvements without delay after recordation of the Deed of Trust and shall complete construction of the Improvements on or before the Completion Date.

4.2. Commencement and Completion of Offsite Improvements. Borrower shall commence construction of any offsite improvements required by any governmental

9

authority to be performed by Borrower under any Project Entitlements in connection with the construction of the Improvements without delay after recordation of the Deed of Trust and shall complete construction of any such offsite improvements on or before the date required under the applicable Project Entitlements.

4.3. Force Majeure. The time within which construction of the Improvements must be completed shall be extended for a period of time equal to the period of any delay directly affecting construction which is caused by fire, earthquake or other acts of God, unexpected inclement weather, utility shortages or interruptions, strike, lockout, acts of public enemy, riot, insurrection, or governmental regulation of the sale or transportation of materials, supplies or labor, the failure of any governmental authority to issue any Project Entitlement for reasons beyond Borrower's reasonable control, the failure of any condition of approval on any Project Entitlement for any reason beyond Borrower's reasonable control, or any moratorium enacted by any governmental authority over Borrower's good faith opposition that prohibits, impairs, delays or restricts development of the Improvements; provided, however, that Borrower shall furnish Lender with written notice satisfactory to Lender evidencing any such delay within ten (10) days after the occurrence of any such delay. In no event shall the time the anticipated date for completion of the Improvements be extended beyond the Maturity Date or more than one hundred twenty (120) days beyond the Completion Date as scheduled prior to such delay.

4.4. Construction Agreements. Borrower and Contractors have entered into various Construction Agreements pursuant to the terms and conditions of which Contractors are to construct the Improvements. Borrower shall require each Contractor to perform in accordance with the terms of the Construction Agreements and shall not amend, modify or alter the Construction Agreements without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Borrower shall execute, upon Lender's request, an assignment of Borrower's rights under the Construction Agreements to Lender as security for Borrower's obligations under this Agreement and the other Loan Documents and shall cause the Contractors to consent to any such assignment.

4.5. [Deleted].

4.6. Plans and Specifications.

(a) Changes; Lender Consent. If the Plans and Specifications contemplate staged design and construction, and if Lender has approved Plans and Specifications that contemplate that certain stages will be designed in the future, then any stages of such Plans and Specifications that have not been approved by Lender as of the date of this Agreement shall be subject to Lender's prior written approval, which consent shall not be unreasonably withheld, conditioned or delayed. Except as otherwise provided in this Agreement, Borrower shall not make any changes in the Plans and Specifications or the Improvements without Lender's prior written consent if such change, taken together with all other changes for which Lender's approval was not required hereunder, could materially affect the overall quality or efficiency of the Improvements or the

10

Improvements' exterior, lobbies or building systems. Without limiting the above, Lender agrees that Borrower may make minor changes in the Plans and Specifications and Improvements without Lender's prior written consent, provided that such changes do not violate any of the conditions specified herein. Notwithstanding the foregoing, Lender shall not have any approval rights respecting any change in the Plans and Specifications or the Improvements if such change follows inevitably from previously approved Plans and Specifications or changes thereto. Borrower shall at all times maintain, for inspection by Lender, a set of working drawings of the Improvements, which, if there is staged design that has not yet occurred, if applicable, shall at least cover the portions of the Improvements completed and under construction or fully designed at such time.

(b) Changes; Submission Requirements. Borrower shall submit any proposed change in the Plans and Specifications requiring Lender's consent to Lender prior to the commencement of construction relating to such proposed change, at least ten (10) Business Days prior to the commencement of construction. Requests for any change which requires consent shall be accompanied by working drawings (or appropriate submittals) and a written description of the proposed change, submitted on a change order form acceptable to Lender, signed by Borrower and, if required by Lender, also by the Contractors. At its option, Lender may require Borrower to provide: (i) evidence satisfactory to Lender of the cost and time necessary to complete the proposed change; and (ii) a deposit in the amount of any increased costs into Borrower's Funds Account.

(c) Consent Process. Borrower acknowledges that Lender's review of any changes and required consent may result in delays in construction and hereby consents to any such delays. Nevertheless, Lender shall use commercially reasonable efforts to respond to requests for approval within the time periods provided in this Agreement. Lender shall not declare a Default under the terms of the Loan in the event the Default has been caused by a delay in Lender's approval.

(d) Final Plans and Specifications. Upon completion of the Improvements, Borrower shall deliver to Lender within sixty (60) days a set of final, as-built Plans and Specifications.

4.7. Contractor/Construction Information. Borrower shall deliver to Lender in a form acceptable to Lender: (a) a list detailing the name, address and phone number of each contractor, subcontractor and material supplier to be employed or used for construction of the Improvements who is under contract or otherwise has been selected to supply goods or services or perform work for the Project costing in excess of $5,000 in the aggregate and any other person or entity who delivers a Preliminary Notice to Owner or Lender under Civil Code Sections 3097 or 3098 (collectively, "Principal Subs") together with the dollar amount, including changes, if any, reflected in each contract and subcontract for the Principal Subs, and the portion thereof, if any, paid through the date of such list of Principle Subs; (b) copies of each contract and subcontract identified in such list of Principal Subs, including any changes thereto; (c) a cost breakdown of the projected total cost of constructing the Improvements, and that portion, if any, of each cost item which has been incurred; and (d) a construction progress schedule detailing the progress of

11

construction and the projected sequencing and completion time for uncompleted work, all as of the date of such schedule.

Borrower agrees that Lender's approval of any contractor, subcontractor or material supplier if and to the extent permitted under the terms of this Agreement shall not constitute a warranty or representation of qualification by Lender. Lender may contact any contractor, subcontractor or material supplier to discuss the course of construction.

4.8. Prohibited Contracts. Without Lender's prior written consent, Borrower shall not contract for any materials, furnishings, equipment, fixtures or other parts or components of the Improvements, if any third party shall retain any ownership interest (other than lien rights created by operation of law) in such items after their delivery to the Property and Improvements. Borrower shall have twenty (20) days to effect the removal of any such retained interest not otherwise permitted above, or, provided that such interest or the holder's realization thereon will not jeopardize Borrower's title to or use of the Property, if such retained interest cannot be reasonably removed in such period, Borrower shall have commenced such removal within such time and shall diligently pursue its removal until completed.

4.9. Liens and Stop Notices. If a claim of lien is recorded which affects the Property or Improvements or a bonded stop notice is served upon Lender, within twenty (20) calendar days after such recording or service or within five (5) Business Days after Lender's demand, whichever occurs first, Borrower, at Borrower's election, shall do one of the following: (a) pay and discharge the claim of lien or bonded stop notice; (b) effect the release thereof by recording or delivering to Lender a surety bond in sufficient form and amount; or (c) provide Lender with other assurances which Lender deems, in its sole discretion, to be satisfactory for the payment of such claim of lien or bonded stop notice and for the full and continuous protection of Lender from the effect of such lien or bonded stop notice.

4.10. Construction Responsibilities. Borrower shall construct the Improvements in a workmanlike manner substantially in accordance with the Plans and Specifications and the recommendations of any soils or engineering report approved by Lender pursuant to Section 3.1(d) above. Borrower shall substantially comply with all applicable laws, ordinances, rules, regulations, building restrictions, recorded covenants and restrictions, and requirements of all regulatory authorities having jurisdiction over the Property or Improvements. Borrower shall be solely responsible for all aspects of Borrower's business and conduct in connection with the Property and Improvements, including, without limitation, for the quality and suitability of the Plans and Specifications and their compliance with all governmental requirements, the supervision of the work of construction, the qualifications, financial condition and performance of all architects, engineers, contractors, material suppliers, consultants and property managers, and the accuracy of all applications for payment and the proper application of all disbursements. Lender is not obligated to supervise, inspect or inform Borrower or any third party of any aspect of the construction of the Improvements or any other matter referred to above.

12

4.11. Assessments and Community Facilities Districts. Without Lender's prior written consent, Borrower shall not cause or suffer to become effective or otherwise consent to the formation of any assessment district or community facilities district which includes all or any part of the Property and Improvements pursuant to: (a) the Mello-Roos Community Facilities Act of 1982; (b) the Municipal Improvement Act of 1913; or (c) any other comparable or similar statute or regulation. Nor shall Borrower cause or otherwise consent to the levying of special taxes or assessments against the Property and Improvements by any such assessment district or community facilities district.

4.12. Delay. Borrower shall promptly notify Lender in writing of any event causing delay or interruption of construction, or the timely completion of construction. The notice shall specify the particular work delayed, and the cause and period of each delay.

4.13. Inspections. Lender shall have the right to enter upon the Property at all reasonable times to inspect the Improvements and the construction work to verify information disclosed or required pursuant to this Agreement. Any inspection or review of the Improvements by Lender is solely to determine whether Borrower is properly discharging its obligations to Lender and may not be relied upon by Borrower or by any third party as a representation or warranty of compliance with this Agreement or any other agreement. Lender owes no duty of care to Borrower or any third party to protect against, or to inform Borrower or any third party of, any negligent, faulty, inadequate or defective design or construction of the Improvements as determined by Lender.

4.14. Surveys. Upon Lender's written request, Borrower shall promptly deliver to Lender: (a) a current survey of the Property showing the location of the Improvements on the Property (as constructed as of the date of such survey), all easements, encroachments and applicable governmental set backs; and (b) upon completion of the Improvements, an as-built survey acceptable to a title insurer for purposes of issuing an ALTA policy of title insurance. All such surveys shall be performed and certified by a licensed engineer or surveyor acceptable to the title insurer.

ARTICLE 5. INSURANCE

Borrower shall, while any obligation of Borrower under any Loan Document remains outstanding, maintain at Borrower's sole expense, with licensed insurers approved by Lender, the following policies of insurance in form and substance satisfactory to Lender:

5.1. Title Insurance. A Title Policy insuring Lender, in the principal amount of the Loan, of the validity and the priority of the lien of the Deed of Trust upon the Property and Improvements, subject only to matters approved by Lender in writing. During the term of the Loan, Borrower shall deliver to Lender, within five (5) Business Days after Lender's written request, such other endorsements to the Title Policy as Lender may reasonably require.

5.2. Property Insurance. A Builders Risk Completed Value Hazard Insurance policy, including, without limitation, such endorsements as Lender may require, insuring Lender

13

against damage to the Property and Improvements in an amount acceptable to Lender. Lender shall be named on the policy under a Lender's Loss Payable Endorsement (form #438BFU or equivalent).

5.3. **Flood Hazard Insurance.** A policy of flood insurance, as required by applicable governmental regulations, or as deemed necessary by Lender.

5.4. **Liability Insurance.** A policy of commercial general liability insurance with limits as required by Lender, insuring against liability for injury and/or death to any person and/or damage to any property occurring on the Property and/or in the Improvements from any cause whatsoever.

5.5. **General.** Borrower shall provide to Lender the originals of all required insurance policies, or other evidence of insurance acceptable to Lender. All insurance policies shall provide that the insurance shall not be cancelable or materially changed without ten (10) days prior written notice to Lender. Lender shall be named under a Lender's Loss Payable Endorsement (form #438BFU or equivalent) on all insurance policies which Borrower actually maintains with respect to the Property and Improvements. Borrower shall provide to Lender evidence of any other hazard insurance Lender may deem necessary at any time during the Loan.

## ARTICLE 6. REPRESENTATIONS AND WARRANTIES

As a material inducement to Lender's entry into this Agreement, Borrower represents and warrants to Lender as of the Effective Date and as of the date each Application for Payment is submitted to Lender pursuant to EXHIBIT D (provided, however, that to the extent circumstances have changed for reasons beyond the reasonable control of Borrower such that Borrower must qualify such representations and warranties as of the date of delivery of any such Application for Payment, such qualification, to the extent it renders the applicable representation materially untrue or breaches the applicable warranty, shall merely be a failure of condition to Lender's obligation to disburse funds under the provisions of EXHIBIT D, as opposed to constituting an Event of Default) that:

6.1. **Authority/Enforceability.** Borrower is in substantial compliance with all laws and regulations applicable to its organization, existence and transaction of business and has all necessary rights and powers to own, develop and operate the Property and Improvements as contemplated by the Loan Documents.

6.2. **Binding Obligations.** Borrower is authorized to execute, deliver and perform its obligations under the Loan Documents and such obligations are and shall continue to be valid and binding obligations of Borrower.

6.3. **Intentionally Omitted.**

6.4. **No Violation.** Borrower's execution, delivery, and performance under the Loan Documents do not: (a) require any consent or approval not heretofore obtained under any

14

partnership agreement, operating agreement, limited liability company agreement, articles of incorporation, bylaws or other document; (b) materially violate any governmental requirement applicable to the Property and Improvements or any other statute, law, regulation or ordinance or any order or ruling of any court or governmental entity; (c) materially conflict with, or constitute a material breach or default or permit the acceleration of obligations under any agreement, contract, lease, or other document by which the Borrower is or the Property and Improvements are bound or regulated; or (d) materially violate any statute, law, regulation or ordinance, or any order of any court or governmental entity.

6.5. Compliance with Laws. Borrower has, and at all applicable times shall have obtained, all permits, licenses, exemptions, and approvals necessary to construct, occupy, operate and market the Property and Improvements for the applicable stage of development and operation, and shall maintain substantial compliance with all governmental requirements applicable to the Property and Improvements and all other applicable statutes, laws, regulations and ordinances necessary for the transaction of its business.

6.6. Litigation. Except as disclosed to Lender in writing, there are no claims, actions, suits, or proceedings pending, or to Borrower's knowledge threatened, against Borrower or affecting the Property or Improvements that are of a material nature and that, if successfully prosecuted against Borrower would create a material adverse change in the financial condition of Borrower.

6.7. Financial Condition. All financial statements and information relating to the financial condition of Borrower, the Property, and the Improvements, which have been heretofore and hereafter are delivered to Lender by Borrower, fairly and accurately represent as of the date of such delivery the financial condition of the subject thereof and have been prepared (except as noted therein) in accordance with generally accepted accounting principles consistently applied. Borrower acknowledges and agrees that Lender may request and obtain additional information from third parties regarding any of the above, including, without limitation, credit reports.

6.8. [Deleted]

6.9. Loan Proceeds and Adequacy. The undisbursed Loan proceeds, together with Borrower's Funds and all other sums, if any, to be provided by Borrower as shown in EXHIBIT C, are sufficient to construct the Improvements in accordance with the terms and conditions of this Agreement.

6.10. Accuracy. All reports, documents, instruments, information and forms of evidence delivered to Lender concerning the Loan or security for the Loan or required by the Loan Documents are accurate, correct and sufficiently complete to give Lender true and accurate knowledge of their subject matter, and do not contain any material misrepresentation or omission.

15

6.11. Tax Liability. Borrower has filed all required federal, state, county and municipal tax returns and has paid all taxes and assessments owed and payable by Borrower or with respect to the Property, and Borrower has no knowledge of any basis for any additional payment with respect to any such taxes and assessments.

6.12. Utilities. Subject to the provisions of Section 4.3 of this Agreement, all utility services, including, without limitation, gas, water, sewage, electrical and telephone, necessary for the development and occupancy of the Property and Improvements are available at or within the boundaries of the Property, or Borrower has taken all steps reasonably necessary to date to assure that all such services will be available upon completion of the Improvements.

6.13. Compliance. Borrower is familiar with and in substantial compliance with all governmental requirements for the development of the Property and construction of the Improvements and, subject to the provisions of Section 4.3 of this Agreement, will substantially conform to and comply with all governmental requirements and the Plans and Specifications.

6.14. [Deleted].

6.15. Business Loan. The Loan is a business loan transaction in the stated amount solely for the purpose of carrying on the business of Borrower and none of the proceeds of the Loan will be used for the personal, family or agricultural purposes of the Borrower. Lender acknowledges that a portion of the Loan, up to Six Million and No/100 Dollars ($6,000,000.00), may be used by Borrower for distributions to members and other affiliates of the Borrower.

## ARTICLE 7. HAZARDOUS MATERIALS

7.1. Special Representations and Warranties. Without in any way limiting the other representations and warranties set forth in this Agreement, and after reasonable investigation and inquiry, and except as disclosed in the Environmental Report or otherwise disclosed in writing to Lender prior to the date of this Agreement, Borrower hereby specially represents and warrants to the best of Borrower's knowledge as of the date of this Agreement as follows:

(a) Hazardous Materials. The Property and Improvements are not and have not been a site for the use, generation, manufacture, storage, treatment, release, threatened release, discharge, disposal, transportation or presence of any oil, flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, hazardous wastes, toxic or contaminated substances or similar materials, including, without limitation, any substances which are "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "wastes," "regulated substances," "industrial solid wastes," or "pollutants" under the Hazardous Materials Laws, as described below, and/or other applicable environmental laws, ordinances or regulations (collectively, the "Hazardous Materials"). "Hazardous Materials" shall not include commercially reasonable amounts of

16

such materials used in the ordinary course of preparation of the Property for construction, construction of the Improvements and operation of the Property which are used and stored in accordance with all applicable environmental laws, ordinances and regulations.

(b) Hazardous Materials Laws. The Property and Improvements are in substantial compliance with all laws, ordinances and regulations relating to Hazardous Materials ("Hazardous Materials Laws"), including, without limitation: the Clean Air Act, as amended, 42 U.S.C. Section 7401 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251 et seq.; the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 et seq.; the Comprehensive Environment Response, Compensation and Liability Act of 1980, as amended (including the Superfund Amendments and Reauthorization Act of 1986, "CERCLA"), 42 U.S.C. Section 9601 et seq.; the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601 et seq.; the Occupational Safety and Health Act, as amended, 29 U.S.C. Section 651, the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Section 11001 et seq.; the Mine Safety and Health Act of 1977, as amended, 30 U.S.C. Section 801 et seq.; the Safe Drinking Water Act, as amended, 42 U.S.C. Section 300f et seq.; and all comparable state and local laws, laws of other applicable jurisdictions or orders and regulations.

(c) Hazardous Materials Claims. To the actual knowledge of the Borrower, there are no claims or actions ("Hazardous Materials Claims") pending or threatened against Borrower, the Property or Improvements by any governmental entity or agency or by any other person or entity relating to Hazardous Materials or pursuant to the Hazardous Materials Laws.

(d) Border Zone Property. To the actual knowledge of the Borrower, the Property has not been designated as Border Zone Property under the provisions of California Health and Safety Code, Sections 25220 et seq. and there has been no occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be designated as Border Zone Property.

7.2. Hazardous Materials Covenants. Borrower agrees as follows:

(a) No Hazardous Activities. Except for the implementation of remediation programs or plans required under agreements, orders or consent decrees referenced in the Environmental Report, Borrower shall not cause or permit the Property or Improvements to be used as a site for the use, generation, manufacture, storage, treatment, release, discharge, disposal, transportation or presence of any Hazardous Materials.

(b) Compliance. Except to the extent such compliance is to be the result of the implementation of remediation programs or plans required under agreements, orders or consent decrees referenced in the Environmental Report, Borrower shall comply and cause the Property and Improvements to comply with all Hazardous Materials Laws.

(c) Notices. Except for those matters set forth in the Environmental Report or otherwise disclosed in writing to Lender prior to the date of this Agreement, Borrower

17

shall immediately notify Lender in writing of: (i) the discovery of any Hazardous Materials on, under or about the Property and Improvements; (ii) any knowledge by Borrower that the Property and Improvements are not in material compliance with any Hazardous Materials Laws; (iii) any Hazardous Materials Claims; and (iv) the discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be designated as Border Zone Property.

(d) Remedial Action. Except with respect to any Hazardous Materials, violations of Hazardous Materials Laws and Hazardous Materials Claims that are to be remedied by the implementation of remediation programs or plans required under agreements, orders or consent decrees referenced in the Environmental Report, in response to the presence of any Hazardous Materials on, under or about the Property or Improvements, Borrower shall immediately take, at Borrower's sole expense, all remedial action required by any Hazardous Materials Laws or any judgment, consent decree, settlement or compromise in respect to any Hazardous Materials Claims.

(e) Inspection By Lender. Upon reasonable prior notice to Borrower, Lender, its employees and agents, may from time to time (whether before or after the commencement of a nonjudicial or judicial foreclosure proceeding) enter and inspect the Property and Improvements for the purpose of determining the existence, location, nature and magnitude of any past or present release or threatened release of any Hazardous Materials into, onto, beneath or from the Property and Improvements.

(f) Hazardous Materials Indemnity. BORROWER HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER, ITS DIRECTORS, OFFICERS, MEMBERS, MANAGERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS FROM AND AGAINST ANY AND ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, ACTIONS, JUDGMENTS, COURT COSTS AND LEGAL OR OTHER EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES) WHICH LENDER MAY INCUR AS A DIRECT OR INDIRECT CONSEQUENCE OF THE USE, GENERATION, MANUFACTURE, STORAGE, DISPOSAL, THREATENED DISPOSAL, TRANSPORTATION OR PRESENCE OF HAZARDOUS MATERIALS IN, ON, UNDER OR ABOUT THE PROPERTY OR IMPROVEMENTS. BORROWER SHALL IMMEDIATELY PAY TO LENDER UPON DEMAND ANY AMOUNTS OWING UNDER THIS INDEMNITY, TOGETHER WITH INTEREST FROM THE DATE THE INDEBTEDNESS ARISES UNTIL PAID AT THE RATE OF INTEREST APPLICABLE TO THE PRINCIPAL BALANCE OF THE NOTE. BORROWER'S DUTY AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER SHALL SURVIVE THE CANCELLATION OF THE NOTE AND THE RELEASE, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE DEED OF TRUST.

(g) Legal Effect of Section. Borrower and Lender agree that: (a) this Article VII is intended as Lender's written request for information (and Borrower's response) concerning the environmental condition of the real property security as required by

18

California Code of Civil Procedure Section 726.5; and (b) each provision in this Article (together with any indemnity applicable to a breach of any such provision) with respect to the environmental condition of the real property security is intended by Lender and Borrower to be an "environmental provision" for purposes of California Code of Civil Procedure Section 736, and as such it is expressly understood that Borrower's duty to indemnify Lender hereunder shall survive: (i) any judicial or non-judicial foreclosure under the Deed of Trust, or transfer of the Property in lieu thereof; (ii) the release and reconveyance or cancellation of the Deed of Trust; and (iii) the satisfaction of all of Borrower's obligations under the Loan Documents.

## ARTICLE 8. SET ASIDE LETTERS

8.1. Set Aside Letters. If, at Borrower's request, Lender issues any letter or letters ("Set Aside Letter") to any governmental agency ("Obligee") or bonding company ("Surety") whereby Lender agrees to allocate Loan proceeds for the construction of off-site, common area, or other improvements required by any governmental agency or for which bonds may be required ("Bonded Work") in connection with the development of the Property, Borrower represents, warrants, covenants and agrees as follows:

(a) The sum which Borrower requests Lender to allocate for the Bonded Work shall be sufficient to pay for the construction and completion cost of the Bonded Work in accordance with any agreement between Borrower and Obligee or as may be required under the Project Entitlements, and a copy of such agreement shall be furnished to Lender by Borrower prior to and as a condition precedent to the issuance by Lender of any Set Aside Letter;

(b) Lender is irrevocably and unconditionally authorized to disburse to the Obligee or Surety all or any portion of said allocated Loan proceeds upon a demand of such Surety or Obligee made in accordance with the terms and conditions of the Set Aside Letter;

(c) Any disbursements or payments which Lender makes or may be obligated to make under any Set Aside Letter, whether made directly to the Surety, Obligee, or to others for completion of all or part of the Bonded Work, shall be deemed a disbursement under this Agreement to or for the benefit or account of Borrower;

(d) BORROWER SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER FROM ANY CLAIM, DEMAND, CAUSE OF ACTION, DAMAGE, LOSS OR LIABILITY, INCLUDING, WITHOUT LIMITATION, ANY COURT COSTS AND ATTORNEYS' FEES AND EXPENSES, WHICH LENDER MAY SUFFER OR INCUR AS A DIRECT OR INDIRECT CONSEQUENCE OF ITS ISSUANCE OF OR COMPLIANCE WITH ANY REQUESTED SET ASIDE LETTER. BORROWER SHALL PAY ANY INDEBTEDNESS ARISING UNDER THIS INDEMNITY TO LENDER IMMEDIATELY UPON DEMAND OF LENDER. BORROWER'S DUTY TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER HEREUNDER SHALL SURVIVE THE RELEASE AND CANCELLATION OF THE NOTE AND

19

THE FULL OR PARTIAL RELEASE OR RECONVEYANCE OF THE DEED OF
TRUST OR OTHER LOAN DOCUMENTS;

(e) Lender shall have no obligation to release any collateral or security under the
Loan Documents unless and until Lender has received a full and final written release of
its obligations under each Set Aside Letter; and

(f) Lender is not obligated to issue any Set Aside Letter and may refuse to do so
in Lender's sole and absolute discretion, excepting only the following Set Aside Letters:
None.

## ARTICLE 9. COVENANTS OF BORROWER

9.1. Expenses. Borrower shall immediately pay Lender upon demand all Lender's
reasonable out-of-pocket costs and expenses actually incurred by Lender in connection
with: (a) the preparation of this Agreement, all other Loan Documents and Other Related
Documents contemplated hereby; (b) the administration of this Agreement, the other
Loan Documents and Other Related Documents for the term of the Loan; and (c) the
enforcement or satisfaction by Lender of any of Borrower's obligations under this
Agreement, the other Loan Documents or the Other Related Documents. For all purposes
of this Agreement, Lender's costs and expenses shall include, without limitation, all
appraisal fees, cost engineering and inspection fees, legal fees and expenses, accounting
fees, environmental consultant fees, auditor fees, and the cost to Lender of any title
insurance premiums, title surveys, reconveyance and notary fees. Borrower recognizes
and agrees that Lender may, at its option, require inspection of the Property and
Improvements by an independent supervising architect and/or cost engineering specialist:
(i) prior to each advance; (ii) at least once each month during the course of construction
even though no disbursement is to be made for that month; (iii) upon completion of the
Improvements; and (iv) at least semi-annually thereafter during the term of the Loan. To
the extent that any of the foregoing are performed or incurred by employees of Lender or
any Affiliate of Lender, no such costs, or any associated travel, lodging, subsistence or
other expenses for such goods and services shall be owed by Borrower.

9.2. ERISA Compliance. Borrower shall at all times comply with the provisions of
ERISA with respect to any retirement or other employee benefit plan to which it is a
party as employer, and as soon as possible after Borrower knows, or has reason to know,
that any Reportable Event (as defined in ERISA) with respect to any such plan of
Borrower has occurred, it shall furnish to Lender a written statement setting forth details
as to such Reportable Event and the action, if any, which Borrower proposes to take with
respect thereto, together with a copy of the notice of such Reportable Event furnished to
the Pension Benefit Guaranty Corporation.

9.3. [Deleted]

9.4. [Deleted]

20

9.5. Revenue to be Applied to Debt Service. Following the occurrence and during the continuation of any Default, no Distributions shall be made or distributed to any partner, venturer, member or equity investor of Borrower.

9.6. Subdivision Maps. Prior to recording any final map, plat, parcel map, lot line adjustment or other subdivision map of any kind covering any portion of the Property (collectively, "Subdivision Map"), Borrower shall submit such Subdivision Map to Lender for Lender's review and approval, which approval shall not be unreasonably withheld. Within ten (10) Business Days after Lender's receipt of such Subdivision Map, Lender shall provide Borrower written notice if Lender disapproves of said Subdivision Map. Lender shall be deemed to have approved the Subdivision Map if such notice is not so provided to Borrower. Within five (5) Business Days after Lender's request, Borrower shall execute, acknowledge and deliver to Lender such amendments to the Loan Documents as Lender may reasonably require to reflect the change in the legal description of the Property resulting from the recordation of any Subdivision Map. In connection with and promptly after the recordation of any amendment or other modification to the Deed of Trust recorded in connection with such amendments, Borrower shall deliver to Lender, at Borrower's sole expense, a title endorsement to the Title Policy in form and substance satisfactory to Lender insuring the continued first priority lien of the Deed of Trust. Subject to the execution and delivery by Borrower of any documents required under this Section, Lender shall, if required by applicable law, sign any Subdivision Map approved, or deemed to be approved, by Lender pursuant to this Section.

9.7. Further Assurances. Upon Lender's request and at Borrower's sole cost and expense, Borrower shall execute, acknowledge and deliver any other instruments and perform any other acts necessary, desirable or proper, as determined by Lender, to carry out the purposes of this Agreement and the other Loan Documents or to perfect and preserve any liens created by the Loan Documents.

9.8. Assignment. Without the prior written consent of Lender, Borrower shall not assign Borrower's interest under any of the Loan Documents, or in any monies due or to become due thereunder, and any assignment without such consent shall be void. In this regard, Borrower acknowledges that Lender would not make this Loan except in reliance on Borrower's expertise, reputation, prior experience in developing and constructing commercial real property, Lender's knowledge of Borrower, and Lender's understanding that this Agreement is more in the nature of an agreement involving personal services than a standard loan where Lender would rely on security which already exists.

9.9. [Deleted]

9.10. Governing Documents. Without the prior written consent of Lender, Borrower shall not modify or permit to be modified the formation or organizational documents of the Borrower, or any partners, joint venturers or members thereof.

9.11. [Deleted]

21

## ARTICLE 10. REPORTING COVENANTS

10.1. Financial Information. Borrower hereby consents to Lender's obtaining from other parties copies of any and all reports that Borrower delivers to any party. In addition, on or before the tenth (10th) day of each month, Borrower shall deliver to Lender a reconciliation showing the balance of the Working Capital Reserve Account as of the beginning of the first day of the preceding calendar month, the balance of the Working Capital Reserve as of the end of the last day of the preceding calendar month, and a line item listing of all expenditures, together with supporting documentation, of amounts expended from the Working Capital Reserve Account during such period.

To the extent not otherwise obtained as provided above, within thirty (30) days after Lender's request, Borrower shall also deliver to Lender such quarterly and other financial information regarding the Property or Borrower. If audited financial information is prepared, Borrower shall deliver to Lender copies of that information within fifteen (15) days after its final preparation. Except as otherwise agreed to by Lender, all such financial information shall be prepared in accordance with generally accepted accounting principles consistently applied. Upon written request of Lender, Borrower use good faith efforts to obtain and deliver to Lender any specific financial reports and information pertaining to the members, managers, partners and shareholders of Borrower.

10.2. Books and Records. Borrower shall maintain complete books of account and other records for the Property and Improvements and for disbursement and use of the proceeds of the Loan and Borrower's Funds, and the same shall be available for inspection and copying by Lender upon reasonable prior notice.

## ARTICLE 11. DEFAULTS AND REMEDIES

11.1. Default. The occurrence of any one or more of the following shall constitute an event of default (hereinafter, "Default") under this Agreement and the other Loan Documents:

(a) Monetary. Borrower's failure to pay within ten (10) Business Days following the date of delivery of written notice from Lender to Borrower that such amount was not received when due, any sums payable under the Note or any of the other Loan Documents or Borrower's failure to deposit any Borrower's Funds as and when required under this Agreement; provided, however, that if such written notice from Lender is an Out of Balance Notice, then, in lieu of such 10-Business Day period, Borrower shall have a thirty (30) day period following the date of delivery of such Out of Balance Notice before a Default shall occur in which to deposit funds equal to the amount of the applicable deficiency into the Borrower's Funds Account, as contemplated by the provisions of Section 3.1(b); further, provided, however, that no such notice or cure period shall apply at maturity or upon acceleration; or

22

21SMCV01113

(b) Performance of Obligations. Borrower's failure to perform any obligation in addition to those in Section 11.1(a) above under any of the Loan Documents within thirty (30) days following the date of delivery of written notice from Lender; provided, however, that if a longer or shorter cure period is expressly provided for the remedy of any such failure, Borrower's failure to perform will not constitute a Default until such longer or shorter date as the specified cure period expires; but provided further, however, if such Default is curable, but the nature of such failure is such that it cannot reasonably be cured within said thirty (30) days (or longer or shorter specified cure period), then if Borrower fails to commence a cure thereof within said time and thereafter fails to diligently pursue a cure thereof and fails to complete same within ninety (90) days after Lender's written demand; or a default by Borrower (following any applicable notice and cure period) under any of the Other Related Documents; or

(c) Construction; Use. (i) There is any material deviation in the work of construction from the Plans and Specifications or governmental requirements from that required under this Agreement or the appearance or use of defective workmanship or materials in constructing the Improvements, and Borrower fails to remedy the same to Lender's satisfaction within ten (10) Business Days after Lender's written demand to do so, or if the nature of such deviation or defect is curable but such that it cannot reasonably be cured within said ten (10) Business Days, then if Borrower fails to commence a cure thereof within said ten (10) Business Days and thereafter fails to diligently pursue a cure thereof and complete same within ninety (90) days after Lender's written demand; or (ii) subject to the provisions of Section 4.3, there is a cessation of construction of the Improvements prior to completion for a continuous period of more than fifteen (15) days; or (iii) the construction, renovation, sale or leasing of any of the Improvements in accordance with the Loan Documents is prohibited, enjoined or delayed for a continuous period of more than forty-five (45) days; or (iv) subject to the provisions of Section 4.3, utilities or other public services necessary for the full occupancy and utilization of the Property and Improvements are curtailed for a continuous period of more than thirty (30) days; or

(d) Liens, Attachment; Condemnation. (i) The recording of any claim of lien against the Property or Improvements or the service on Lender of any bonded stop notice relating to the Loan and the continuance of such claim of lien or bonded stop notice for twenty (20) days without discharge, satisfaction or provision for payment being made by Borrower in a manner satisfactory to Lender, subject to the provisions of Section 4.9 hereof and Section 5.5 of the Deed of Trust; or (ii) the condemnation, seizure or appropriation of, or occurrence of an uninsured casualty with respect to any material portion of the Property or Improvements that is not otherwise offset by Borrower's deposit of sufficient restoration funds (including any applicable deductible amount under any applicable policy of casualty insurance) into the Borrower's Funds Account within forty-five (45) days after the occurrence of such event; or (iii) the sequestration or attachment of, or any levy or execution upon any of the Property or Improvements, any other collateral provided by Borrower under any of the Loan Documents, any monies in the Account or in the Borrower's Funds Account, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released,

23

21SMCV01113

expunged or dismissed prior to the earlier of forty-five (45) days or the sale of the assets affected thereby; or

(e) Representations and Warranties. (i) The material failure of any representation or warranty of Borrower in any of the Loan Documents to be true, correct and complete as of the date made, and the continuation of such failure for more than ten (10) Business Days after written notice to Borrower from Lender requesting that Borrower cure such failure; or

(f) Voluntary Bankruptcy; Insolvency; Dissolution. (i) The filing of a petition by Borrower for relief under the Bankruptcy Code, or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law; (ii) a general assignment by Borrower for the benefit of creditors; or (iii) Borrower applying for, or the appointment of, a receiver, trustee, custodian or liquidator of Borrower or any of its property; or

(g) Involuntary Bankruptcy. (i) The filing of any pleading or an answer by Borrower in any involuntary proceeding under the Bankruptcy Code or other debtor relief law which admits the jurisdiction of the court or the petition's material allegations regarding Borrower's insolvency; or (ii) the failure of Borrower to effect a full dismissal of any involuntary petition under the Bankruptcy Code or under any other debtor relief law that is filed against Borrower or in any way restrains or limits Borrower or Lender regarding the Loan, the Property or the Improvements, prior to the earlier of the entry of any court order granting relief sought in such involuntary petition, or forty-five (45) days after the date of filing of such involuntary petition; or

(h) [Deleted]; or

(i) Change In Management or Control. The occurrence of any material management or organizational change in Borrower or in the partners, venturers or members of Borrower, including, without limitation, any dispute among the constituent members or partners of Borrower, and which Lender determines, in its sole and absolute discretion, shall have a material adverse effect on the Loan, on the Property and Improvements, or on the ability of Borrower or its partners, venturers or members to perform their obligations under the Loan Documents; or

(j) Loss of Priority. The failure at any time of the Deed of Trust to be a valid first lien upon the Property and Improvements or any portion thereof, other than as a result of any release or reconveyance of the Deed of Trust with respect to all or any portion of the Property and Improvements pursuant to the terms and conditions of this Agreement; or

(k) Hazardous Materials. The discovery of any significant Hazardous Materials in, on or about the Property or Improvements subsequent to the Effective Date (to the extent not disclosed in the Environmental Report or otherwise disclosed in writing to Lender prior to the date of this Agreement); provided, however, if such Default is curable, but the nature of such failure is such that it cannot reasonably be cured within thirty (30) days,

24

then if Borrower fails to commence a cure thereof within said time and thereafter fails to diligently pursue a cure thereof and fails to complete same within ninety (90) days after Lender's written demand. Any such Hazardous Materials shall be "significant" for this purpose if said Hazardous Materials, in Lender's sole discretion, have a materially adverse impact on the value of the Property and Improvements.

Notwithstanding any of the foregoing or anything to the contrary in this Agreement, to the extent that any Default can be cured by the payment of money directly to Lender, to Borrower's Funds Account or to any third party to reimburse same for materials or services already delivered or performed or for the purpose of delivering materials or performing services which if so done would cure said Default, the applicable cure period specified in this Agreement shall be extended by an additional sixty (60) days to allow Borrower to undertake any necessary capital calls or to seek or arrange the necessary partnership loans.

11.2. Acceleration Upon Default; Remedies. Upon the occurrence of any Default specified in this Article XI, Lender may, at its sole option, declare all sums owing to Lender under the Note, this Agreement and the other Loan Documents immediately due and payable. Upon such acceleration, Lender may, in addition to all other remedies permitted under this Agreement and the other Loan Documents and at law or equity, apply any sums in the Account and Borrower's Funds Account to the sums owing under the Loan Documents and any and all obligations of Lender to fund further disbursements under the Loan shall terminate.

11.3. Disbursements to Third Parties. Upon the occurrence of a Default occasioned by Borrower's failure to pay money to a third party as required by this Agreement, Lender may but shall not be obligated to make such payment from the Loan proceeds, Borrower's Funds, or other funds of Lender. If such payment is made from proceeds of the Loan or from Borrower's Funds, Borrower shall immediately deposit with Lender, upon written demand, an amount equal to such payment. If such payment is made from funds of Lender, Borrower shall immediately repay such funds upon written demand of Lender. In either case, the Default with respect to which any such payment has been made by Lender shall not be deemed cured until such deposit or repayment (as the case may be) has been made by Borrower to Lender.

11.4. Lender's Completion of Construction. Upon the occurrence of a Default, Lender may, upon five (5) Business Days prior written notice to Borrower, and with or without legal process, take possession of the Property and Improvements, remove Borrower and all agents, employees and contractors of Borrower from the Property and Improvements, complete the work of construction and market for lease and lease space within the Property and/or Improvements. For this purpose, Borrower irrevocably appoints Lender as its attorney-in-fact, which agency is coupled with an interest. As attorney-in-fact, Lender may, in Borrower's name, take or omit to take any action Lender may deem appropriate with respect to third parties, including, without limitation, exercising

25

Borrower's rights under all contracts concerning the Property and/or Improvements, but excluding the Loan Documents.

11.5. Lender's Cessation of Construction. If Lender determines at any time that the Improvements are not being constructed substantially in accordance with the requirements under this Agreement, then upon the occurrence of a Default therefor, Lender may, upon five (5) Business Days prior written notice to Borrower, immediately cause all construction to cease on any of the Improvements affected by the condition of nonconformance. Borrower shall thereafter not allow any construction work, other than corrective work, to be performed on any of the Improvements affected by the condition of nonconformance until such time as Lender notifies Borrower in writing that the nonconforming condition has been corrected.

11.6. Termination or Continuation of Development and Management Agreements. Upon the occurrence of a Default wherein Lender elects to accelerate the Loan and records a notice of default to foreclose the lien of the Deed of Trust, Lender may elect to require Borrower to terminate the Development and Management Agreements (and Borrower shall immediately do so), without any termination fee or penalty, provided that all fees and expenses previously accrued thereunder up to the effective date of such termination are paid in full; provided however, so long as the Development and Management Agreements are not terminated, the respective party or parties performing services thereunder shall be entitled to continue to receive all fees and expenses owed such party or parties under the applicable Development and Management Agreements. In the event that Borrower reinstates the Loan under California law prior to the foreclosure of the lien of the Deed of Trust, such Development and Management Agreements shall be deemed to have been reinstated as of the date of such reinstatement of the Loan.

11.7. Repayment of Funds Advanced. Any funds expended by Lender in the exercise of its rights or remedies under this Agreement and the other Loan Documents shall be payable to Lender upon demand, together with interest at the rate applicable to the principal balance of the Note from the date the funds were expended.

11.8. Rights Cumulative, No Waiver. All Lender's rights and remedies provided in this Agreement and the other Loan Documents, together with those granted by law or at equity, are cumulative and may be exercised by Lender at any time. Lender's exercise of any right or remedy shall not constitute a cure of any Default unless all sums then due and payable to Lender under the Loan Documents are repaid and Borrower has cured all other Defaults. No waiver shall be implied from any failure of Lender to take, or any delay by Lender in taking, action concerning any Default or failure of condition under the Loan Documents, or from any previous waiver of any similar or unrelated Default or failure of condition. Any waiver or approval under any of the Loan Documents must be in writing and shall be limited to its specific terms.

ARTICLE 12. MISCELLANEOUS PROVISIONS

26

12.1. Indemnity. BORROWER HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER, ITS DIRECTORS, OFFICERS, MEMBERS, MANAGERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS FROM AND AGAINST ANY AND ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, ACTIONS, JUDGMENTS, COURT COSTS AND LEGAL OR OTHER EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES) WHICH LENDER MAY INCUR AS A DIRECT OR INDIRECT CONSEQUENCE OF: (A) THE PURPOSE TO WHICH BORROWER APPLIES THE LOAN PROCEEDS; (B) THE FAILURE OF BORROWER TO PERFORM ANY OBLIGATIONS AS AND WHEN REQUIRED BY THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; (C) ANY FAILURE AT ANY TIME OF ANY OF BORROWER'S REPRESENTATIONS OR WARRANTIES TO BE TRUE AND CORRECT; OR (D) ANY ACT OR OMISSION BY BORROWER, ANY CONSTITUENT PARTNER OR MEMBER OF BORROWER, ANY CONTRACTOR, SUBCONTRACTOR OR MATERIAL SUPPLIER, ENGINEER, ARCHITECT OR OTHER PERSON OR ENTITY WITH RESPECT TO ANY OF THE PROPERTY OR IMPROVEMENTS, EXCEPT TO THE EXTENT CAUSED OR CONTRIBUTED TO BY THE BAD FAITH, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF LENDER. BORROWER SHALL IMMEDIATELY PAY TO LENDER UPON DEMAND ANY AMOUNTS OWING UNDER THIS INDEMNITY, TOGETHER WITH INTEREST FROM THE DATE THE INDEBTEDNESS ARISES UNTIL PAID AT THE RATE OF INTEREST APPLICABLE TO THE PRINCIPAL BALANCE OF THE NOTE. BORROWER'S DUTY AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER SHALL SURVIVE CANCELLATION OF THE NOTE AND THE RELEASE, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE DEED OF TRUST.

12.2. Form of Documents. The form and substance of all documents, instruments, and forms of evidence to be delivered to Lender under the terms of this Agreement and any of the other Loan Documents shall be subject to Lender's approval and shall not be modified, superseded or terminated in any respect without Lender's prior written approval, except to the extent otherwise provided in this Agreement.

12.3. No Third Parties Benefited. No person other than Lender and Borrower and their permitted successors and assigns shall have any right of action under any of the Loan Documents.

12.4. Notices. All notices, demands, or other communications under this Agreement and the other Loan Documents shall be in writing and shall be delivered to the appropriate party at the address set forth on the signature page of this Agreement and as specified in EXHIBIT D (subject to change from time to time by written notice to all other parties to this Agreement). All communications shall be deemed served upon delivery of, or if mailed, upon receipt or rejection after the deposit in the United States Postal Service mail, certified postage prepaid-return receipt requested and addressed to the address of Borrower or Lender at the address specified; provided, however, that non-receipt of any communication as the result of any change of address of which the sending

27

party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such communication.

12.5. Attorney-in-Fact. Borrower hereby irrevocably appoints and authorizes Lender, as Borrower's attorney-in-fact, which agency is coupled with an interest, to execute and/or record in Lender's or Borrower's name any notices, instruments or documents that Lender deems appropriate to protect Lender's interest under any of the Loan Documents.

12.6. Actions. Borrower agrees that Lender, in exercising the rights, duties or liabilities of Lender or Borrower under the Loan Documents, may commence, appear in or defend any action or proceeding purporting to affect the Property, the Improvements, or the Loan Documents and Borrower shall immediately reimburse Lender upon demand for all such expenses so incurred or paid by Lender, including, without limitation, attorneys' fees and expenses and court costs.

12.7. Right of Contest. Borrower may contest in good faith any claim, demand, levy or assessment (other than liens and stop notices, subject to the provisions of Section 4.9 of this Agreement) by any person other than Lender which would constitute a Default if: (a) Borrower pursues the contest diligently, in a manner which Lender determines is not prejudicial to Lender, and does not impair the rights of Lender under any of the Loan Documents; and (b) Borrower deposits with Lender any funds or other forms of assurance which Lender in good faith determines from time to time appropriate to protect Lender from the consequences of the contest being unsuccessful. Borrower's compliance with this Section shall operate to prevent such claim, demand, levy or assessment from becoming a Default.

12.8. Relationship of Parties. The relationship of Borrower and Lender under the Loan Documents is, and shall at all times remain, solely that of borrower and lender, and Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any third party with respect to the Property or Improvements, except as expressly provided in this Agreement and the other Loan Documents.

12.9. Delay Outside Lender's Control. Lender shall not be liable in any way to Borrower or any third party for Lender's failure to perform or delay in performing under the Loan Documents if such failure to perform or delay in performing results directly or indirectly from, or is based upon, the action, inaction, or purported action, of any governmental or local authority, or because of war, rebellion, insurrection, strike, lock-out, boycott or blockade (whether presently in effect, announced or in the sole judgment of Lender deemed probable), or from any Act of God or other cause or event beyond Lender's control.

12.10. Attorneys' Fees and Expenses; Enforcement. If any attorney is engaged by Lender to enforce or defend any provision of this Agreement, any of the other Loan Documents or Other Related Documents, or as a consequence of any Default under the Loan Documents, with or without the filing of any legal action or proceeding, and including, without limitation, any fees and expenses incurred in any bankruptcy

28

proceeding of the Borrower, then Borrower shall immediately pay to Lender, upon demand, the amount of all reasonable attorneys' fees and expenses and all costs incurred by Lender in connection therewith, together with interest thereon from the date of such demand until paid at the rate of interest applicable to the principal balance of the Note as specified therein.

12.11. Immediately Available Funds. Unless otherwise expressly provided for in this Agreement, all amounts payable by Borrower to Lender shall be payable only in United States currency, immediately available funds.

12.12. Lender's Consent. Wherever in this Agreement there is a requirement for Lender's consent and/or a document to be provided or an action taken "to the satisfaction of Lender", it is understood by such phrase that Lender shall exercise its consent, right or judgment in a reasonable manner given the specific facts and circumstance applicable at the time.

12.13. Signs. Lender may place on the Property reasonable signs standard to construction loan transactions stating that construction financing is being provided by Lender and any other lenders or participants in the Loan, subject to the requirements of the Project Entitlements and applicable law.

12.14. Lender's Agents. Lender may designate an agent or independent contractor to exercise any of Lender's rights under this Agreement and any of the other Loan Documents. Any reference to Lender in any of the Loan Documents shall include Lender's agents, employees or independent contractors. Borrower shall pay the costs of such agent or independent contractor either directly to such person or to Lender in reimbursement of such costs, as applicable.

12.15. Tax Service. Lender is authorized to secure, at Borrower's expense, a tax service contract with a third party vendor which shall provide tax information on the Property and Improvements satisfactory to Lender.

12.16. WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THE LOAN DOCUMENTS (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM,

DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

12.17. Severability. If any provision or obligation under this Agreement and the other Loan Documents shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that provision shall be deemed severed from the Loan Documents and the validity, legality and enforceability of the remaining provisions or obligations shall remain in full force as though the invalid, illegal, or unenforceable provision had never been a part of the Loan Documents, provided, however, that if the rate of interest or any other amount payable under the Note or this Agreement or any other Loan Document, or the right of collectability therefor, are declared to be or become invalid, illegal or unenforceable, Lender's obligations to make advances under the Loan Documents shall not be enforceable by Borrower.

12.18. Heirs, Successors and Assigns. Except as otherwise expressly provided under the terms and conditions of this Agreement, the terms of the Loan Documents shall bind and inure to the benefit of the heirs, successors and assigns of the parties.

12.19. Time. Time is of the essence of each and every term of this Agreement.

12.20. Headings. All article, section or other headings appearing in this Agreement and any of the other Loan Documents are for convenience of reference only and shall be disregarded in construing this Agreement and any of the other Loan Documents.

12.21. Governing Law. This Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of California, except to the extent preempted by federal laws. Borrower and all persons and entities in any manner obligated to Lender under the Loan Documents consent to the jurisdiction of any federal or state court within the State of California having proper venue and also consent to service of process by any means authorized by California or federal law.

12.22. Integration; Interpretation. The Loan Documents contain or expressly incorporate by reference the entire agreement of the parties with respect to the matters contemplated therein and supersede all prior negotiations or agreements, written or oral. The Loan Documents shall not be modified except by written instrument executed by all parties. Any reference in any of the Loan Documents to the Property or Improvements shall include all or any part of the Property or Improvements. Any reference to the Loan Documents includes any amendments, renewals or extensions now or hereafter approved by Lender in writing.

30

12.23. Joint and Several Liability. The liability of all persons and entities obligated in any manner under this Agreement and any of the Loan Documents shall be joint and several.

12.24. Counterparts. This Agreement, any of the other Loan Documents (except for the Note), any Other Related Documents and any subsequent modifications, amendments, waivers, consents or supplements thereof, if any, may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original and all such counterparts together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date appearing on the first page of this Agreement.

[SIGNATURE PAGES TO FOLLOW]

31

"Lender"

Hankey Capital, LLC,
a California limited liability company


By: _____
        W. Scott Dobbins, President

Lender's Address:

4751 Wilshire Blvd., Suite 110
Los Angeles, CA 90010

32

BORROWER:

CRESTLLOYD, LLC,
a California limited liability company


By: _____
     Nile Niami, Manager



Borrower's Address:

c/o Skyline Development
8981 W. Sunset Blvd., Suite 303
West Hollywood, CA 90069

33

**CALIFORNIA ACKNOWLEDGMENT** CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of LOS ANGELES }

On OCTOBER 30, 2018 before me, Nigel Gibbs Notary Public
    Date                        Here Insert Name and Title of the Officer

personally appeared Nile Niami
                                   Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

NIGEL GIBBS
Notary Public - California
Los Angeles County
Commission # 2164239
My Comm. Expires Oct 4, 2020

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                Signature of Notary Public

*Place Notary Seal and/or Stamp Above*

——————————— OPTIONAL ———————————
*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: CONSTRUCTION LOAN Agreement
Document Date: 10/25/18        Number of Pages: 43
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer – Title(s): _____ | ☐ Corporate Officer – Title(s): _____ |
| ☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer is Representing: _____ | Signer is Representing: _____ |

©2018 National Notary Association

EXHIBIT A

DESCRIPTION OF PROPERTY

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" 'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE

34

OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY
OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE
THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY
TERMINUS OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON
SAID MAP AS HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST
106.35 FEET; THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS,
TO A POINT IN THE WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY
THEREON 54.93 FEET FROM THE NORTHERLY TERMINUS OF THAT CERTAIN
CURVE IN SAID WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: **4369-026-021**

35

EXHIBIT B

DOCUMENTS

A. Loan Documents. The documents listed below, numbered 1 through 7, inclusive, and amendments, modifications and supplements thereto which have received the prior written consent of Lender, together with any documents executed in the future that are approved by Lender and that recite that they are "Loan Documents" for purposes of this Agreement are collectively referred to herein as the Loan Documents.

1. This Agreement;

2. Promissory Note of even date herewith in the original principal amount of the Loan made by Borrower payable to the order of Lender;

3. Deed of Trust, Security Agreement and Fixture Filing With Assignment of Rents of even date herewith executed by Borrower, as Trustor, to Chicago Title Company, as Trustee, for the benefit of Lender, as Beneficiary;

4. Hazardous Materials Indemnification Agreement of even date herewith executed by Borrower.

5. Assignment of Contracts

B. Other Related Documents (Which Are Not Loan Documents):

1. Manager's Consent;

2. Certificate Regarding Loan Purpose;

3. Truth-In-Lending Affidavit;

4. Summary of Loan Terms and Good Faith Estimate

5. Profit Participation Agreement

36

EXHIBIT C

FINANCIAL REQUIREMENT ANALYSIS

THIS SPACE INTENTIONALLY LEFT BLANK

EXHIBIT D

DISBURSEMENT PLAN

A. Timing of Disbursement. Unless another provision of this Agreement specifies otherwise, on or before the fifteenth (15th) day of each month, Borrower shall submit to:

Hankey Capital, LLC
c/o Scott Dobbins
4751 Wilshire Blvd., Suite 110
Los Angeles, California 90010
Phone :   (323) 692-4022
Facsimile:  (323) 692-4122

with a copy to:

[none]

a written itemized statement, signed by Borrower ("Application for Payment") setting forth:

1. A description of the work performed, material supplied and/or costs incurred or due for which disbursement is requested with respect to any line item ("Item") shown in the Disbursement Budget. Notwithstanding the amount of any line item shown in the Disbursement Budget, Borrower may reallocate amounts among the line items by allocating cost savings in any line item to Contingency, and amounts from the Contingency to any line item with a cost overrun; provided, however, that the aggregate amount of all disbursements under the Loan shall not exceed the Loan amount; and

2. The total amount incurred, expended and/or due for each requested Item less prior disbursements.

Each Application for Payment by Borrower shall constitute a representation and warranty by Borrower that Borrower is in compliance with all the conditions precedent to a disbursement specified in this Agreement. With respect to Borrower's remaking of the representations and warranties set forth in Article 6 of this Agreement on the date of submission of each Application for Payment, to the extent circumstances have changed for reasons beyond the reasonable control of Borrower such that Borrower must qualify such representations and warranties as of the date of delivery of any such Application for Payment, such qualification, to the extent it renders the applicable representation materially untrue or breaches the applicable warranty, shall merely be a failure of condition to Lender's obligation to disburse funds under the provisions of this EXHIBIT D, as opposed to constituting an Event of Default.

B. Lender's Right to Condition Disbursements. Lender shall have the right to condition any disbursement upon Lender's receipt in the appropriate form of the

38

following submissions and Lender's reasonable determination that such submissions comply with the requirements set forth below:

1. The Application for Payment and an itemized requisition for payment;

2. Bills, invoices, documents of title, vouchers, statements, receipts and any other documents evidencing the total amount expended, incurred or due for any requested Items;

3. Evidence of Borrower's use of a lien release, joint check and voucher system acceptable to Lender for payments or disbursements to any contractor, subcontractor, materialman, supplier or lien claimant;

4. Architect's, inspector's and/or engineer's periodic certifications of the percentage and/or stage of construction that has been completed and its conformance to the Plans and Specifications and governmental requirements based upon any such architect's, inspector's and/or engineer's periodic physical inspections of the Property and Improvements;

5. Waivers and releases of any mechanics' lien, stop notice claim, equitable lien claim or other lien claim rights (conditional for costs to be paid from the current Application for Payment, and unconditional for all prior costs which have been disbursed by Lender by the twenty-fifth (25th) day of the immediately preceding month or were to have been paid from Borrower's own funds under the Disbursement Budget);

6. Reasonable evidence of Borrower's compliance with the provisions of the Sections of this Agreement entitled CONSTRUCTION and AUTHORITY/ENFORCEABILITY. Where this Agreement calls for the delivery of a certificate as evidence of any action, such certificate, if factually accurate, shall constitute such reasonable evidence;

7. A written release executed by any surety to whom Lender has issued or will issue a set-aside letter and/or any public entity or agency which is a beneficiary under any instrument of credit, set-aside letter or standby letter of credit which Lender has issued or will issue with respect to the Loan;

8. For final payment only with respect all or any separate, independent portion of the Improvements, valid, recorded Notice(s) of Completion for the Improvements or any portions of the Improvements for which Notice(s) of Completion may be recorded under applicable law, and final payment lien release waivers (conditional with respect to costs to be paid from such final payment, and unconditional for all other costs);

9. Certificate of Substantial Completion from the Architect and Engineer, if any, prior to the final retention disbursement;

39

10. Any other document, requirement, evidence or information that Lender may have reasonably requested under any provision of the Loan Documents at least thirty (30) days prior to the Application for Payment in question; and

11. Except with respect to items covered under #12 and #13 below, evidence that any goods, materials, supplies, fixtures or other work in process for which disbursement is requested have been incorporated into the Improvements.

12. In the event any Application for Payment includes the cost of materials stored at a location other than the Property ("Offsite Materials"), each of the following: (a) evidence that the Offsite Materials have been purchased by Borrower, have been segregated from other materials in the facility and have been appropriately marked to indicate Borrower's ownership thereof and Lender's security interest therein; and (b) evidence that the Offsite Materials are insured as required by this Agreement.

13. In the event that any Application for Payment includes the cost of materials stored on the Property ("Onsite Materials"), each of the following: (a) evidence that the Onsite Materials have been purchased for or by Borrower; (b) evidence that the Onsite Materials are insured as required hereunder; and (c) evidence that the Onsite Materials are stored in an area on the Property for which adequate security is provided against theft and vandalism.

Borrower acknowledges that this approval process may result in disbursement delays and Borrower hereby consents to all such delays; provided, however, that Lender shall use commercially reasonable efforts to respond to all requests for approval within the time periods designated in this Agreement.

C. Periodic Disbursement of Construction Costs, Site Work Costs and Offsite Costs. As construction progresses, the amount of the retention as provided under any construction contract to which Borrower is a party (the "Retention") shall be disbursed into the Account or to or for the benefit or account of the Borrower, Property or Improvements upon Borrower's delivery to Lender of (1) the applicable lien releases specified above in Paragraph B.8 of this EXHIBIT D, (2) the applicable certificate specified above in Paragraph B.9 of this EXHIBIT D and (3) solely with respect to the Construction Contract, a duly issued temporary certificate of occupancy for the Improvements and completion of the Improvements in accordance with the Plans and Specifications.

D. Partial Disbursements. No disbursement shall be made for a particular Application for Payment unless all required supporting materials are included for Items totaling at least sixty-five percent (65%) of the total amount of funds requested thereunder. Subject to the foregoing, to the extent that an unconditional lien release and waiver for an Item that was included in a prior disbursement is not delivered to Lender prior to the date that Lender approves the subsequent disbursement, Lender may withhold from the then current approved disbursement an amount equal to one hundred fifty percent (150%) of the amount for the Item(s) which had been previously funded. Thereafter, such withheld

40

amount shall be disbursed as part of the next ensuing disbursement upon Lender's receipt of the missing unconditional lien release and waiver.

E. Timing of Disbursements. Lender shall exercise diligent and good faith efforts to disburse funds for all approved Items in any Application for Payment within the applicable Lender Payment Turnaround Period.

EXHIBIT E

LEASING PARAMETERS

THIS SPACE INTENTIONALLY LEFT BLANK

EXHIBIT F

CERTIFICATE OF APPROVAL

THIS SPACE INTENTIONALLY LEFT BLANK

EXHIBIT G

SCHEDULE OF PRE-CLOSING DISBURSEMENTS

THIS SPACE INTENTIONALLY LEFT BLANK

# EXHIBIT 3

2

RECORDING REQUESTED BY
CHICAGO
**WHEN RECORDED, RETURN TO:**

Hankey Capital, LLC
4751 Wilshire Blvd., Ste 110
Los Angeles, CA 90010
Attn: Eugene M. Leydiker

APN No. 4369-026-021



11/06/2018

*20181122920*

---

## SUBORDINATION
## AGREEMENT

### (Deed of Trust to Deed of Trust)

**NOTICE: THIS SUBORDINATION AGREEMENT RESULTS IN YOUR SECURITY INTEREST IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

THIS SUBORDINATION AGREEMENT ("Agreement") is entered into as of October 30, 2018, by and between CRESTLLOYD, LLC, a California limited liability company ("Owner"); and INFERNO INVESTMENT INC. ("Subordinate Lender"); and Hankey Capital, LLC ("Lender").

### RECITALS

**A.** Subject to the terms and provisions of that certain Deed of Trust With Assignment of Rents dated March 13, 2013, executed by Owner, as Trustor, in favor of INFERNO REALTY, L.P. and MAYBACH CORPORATION HOLDINGS, INC., Subordinate Lender's predecessors-in-interest, recorded on March 13, 2013, as Document Number 20130384037 in the official records of the County of Los Angeles, State of California ("Official Records") ("Subordinate Lender's Deed of Trust"), Owner granted to Subordinate Lender's predecessors-in-interest a security interest in and to the property described in Exhibit "A" attached hereto and incorporated herein located at 944 Airole Way, Los Angeles, California (which property, together with all improvements now or hereafter located on the property, is hereinafter collectively referred to as the "Property") to secure Owner's obligations to Subordinate Lender's predecessors-in-interest (the "Subordinated Debt").

**B.** MAYBACH CORPORATION HOLDINGS, INC. assigned the entirety of its interest in the Subordinate Lender's Deed of Trust to INFERNO REALTY, L.P. by means of that certain Assignment of Note and Deed of Trust/Mortgage, dated June 2, 2014 and recorded on November 10, 2015 in the Official Records as Document Number 20151375606.

**C.** INFERNO REALTY, L.P. assigned the entirety of its interest in the Subordinate Lender's Deed of Trust to Subordinate Lender by means of that certain Assignment of Note and Deed of Trust/Mortgage, dated October 21, 2015 and recorded on November 10, 2015 in the Official Records as Document Number 20151375607.

**D.** Owner has executed or will execute a Deed of Trust, Security Agreement and Fixture Filing With Assignment of Rents ("Lender's Deed of Trust") securing, among other things, Owner's obligations to Lender as set forth in that certain Promissory Note dated October 25, 2018, in favor of Lender, in the principal amount of Eighty Two Million Five Hundred Thousand and No/100 Dollars ($82,500,000.00) (the "Note"). Lender's Deed of Trust is being recorded in the Official

1

94109

Exempt from fee per GC 27388.1 (a) (1);
fee cap of $225 reached

20E

*3*

Records concurrently herewith. The Note and the Lender's Deed of Trust are collectively referred to herein as the "Loan Agreement".

    E.    As a condition to Lender making a Loan (the "Loan"), to be secured by, among other things, the Lender's Deed of Trust (the "Senior Debt"), Lender requires that Lender's Deed of Trust be unconditionally and at all times remain a lien or charge upon the Property, prior and superior to all the rights of Subordinate Lender under its deed of trust and that Subordinate Lender specifically and unconditionally subordinates its deed of trust to the lien or charge of Lender's Deed of Trust.

    F.    Subordinate Lender and Owner agree to the subordination in favor of Lender.

**NOW THEREFORE**, for good and valuable consideration and the receipt and adequacy of which is hereby acknowledged, and to induce Lender to make the Loan, Owner and Subordinate Lender hereby agree for the benefit of Lender as follows:

    **Section 1.**    **Subordination.**  Lender's Deed of Trust securing the Note in favor of Lender, shall unconditionally be and at all times remain a lien or charge on the Property prior and superior to Subordinate Lender's Deed of Trust.

    **Section 2.**    **Entire Agreement.**  This Agreement shall be the whole agreement with regard to the subordination of Subordinate Lender's Deed of Trust to the lien or charge of Lender's Deed of Trust, and shall supersede and cancel, but only insofar as would affect the priority of Lender's Deed of Trust, any prior agreements as to such subordination, including, without limitation, those provisions, if any, contained in Subordinate Lender's deed of trust which provide for the subordination of the deed of trust to a deed or deeds of trust or to a mortgage or mortgages.

    **Section 3. Lien Subordination.**  Subordinate Lender intentionally and unconditionally waives, relinquishes and subordinates all of Subordinate Lender's right, title and interest in and to the Property to the lien or charge of Lender's Deed of Trust, upon the Property and understands that in reliance upon, and in consideration of, this waiver, relinquishment and subordination, specific loans and advances are being and will be made by Lender and, as part and parcel thereof, specific monetary and other obligations are being and will be entered into which would not be made or entered into but for said reliance upon this waiver, relinquishment and subordination.

    **Section 4. Rights Upon Insolvency.**  In the event of (1) any insolvency, bankruptcy, receivership, liquidation, reorganization, arrangement, assignment for the benefit of creditors, or other similar proceeding relative to the Owner or its property (as defined in the Loan Agreement), or (2) any proceeding for the voluntary or involuntary liquidation, dissolution or other winding up of the Owner whether or not involving insolvency or bankruptcy proceedings, then and in any such event:

        (a) the principal amount of, and all interest on, and all other amounts in respect of, the Senior Debt (including interest thereon accruing after the commencement of any such proceeding, whether or not such interest shall be allowed in such proceeding) shall be paid in full before any payment or distribution of any character, whether in cash, securities or other property, shall be made in respect of the Subordinated Debt; and

        (b) any payment or distribution of any character, whether in cash, securities or other property, which would otherwise (but for the terms hereof) be payable or deliverable in respect of Subordinated Debt (including any payment or distribution in respect of the Subordinated Debt by reason of any other indebtedness of the Owner being subordinated to the Subordinated Debt), shall be paid or delivered directly to the Lender, or its representatives, until the principal amount of, and all interest and premium on, and all other amounts in respect of, the Senior Debt shall have been paid in full and the Subordinate Lender or any other holder of the Subordinated Debt

2

irrevocably authorizes, empowers and directs all receivers, trustees, liquidators, conservators and others having authority in the premises to effect all such payments and deliveries.

**Section 5.   Owner Obligations.** Owner agrees that, in the event that any note or other obligation of the Owner not evidencing Senior Debt, or any portion thereof, shall become due and payable before its expressed maturity for any reason, Owner will give prompt notice, in writing, of such occurrence to the Lender.

**Section 6.      Rights of Lender.**

(a)      Subordinate Lender further declares, agrees and acknowledges for the benefit of the Lender, that Lender, in making disbursement pursuant to the Loan Agreement (whether obligatory or optional), is under no obligation or duty to, nor has Lender represented that it will, see to the application of such proceeds by the person or persons to whom Lender disburses such proceeds, an any application or use of such proceeds for purposes other than those provided for in such agreement or agreements shall not defeat the subordination herein made in whole or in part.

(b)      Except as otherwise provided herein, so long as any of the Senior Debt shall remain unpaid, Lender may at all times exercise any and all powers and rights which it now has or may hereafter acquire with respect to the Loan Agreement, any other security instrument, including, but not limited to deed of trust or mortgage, Collateral Security Agreement, or Membership Interest Pledge Agreement (collectively, "Security Document"), or any of the collateral subject to the Loan Agreement or any other Security Document without having to obtain any consent or approval of the Subordinate Lender and without any accountability to the Subordinate Lender, nor shall it have any liability to the Subordinate Lender for any action taken or failure to act with respect to this Agreement, the Loan Agreement, any other Security Document or the aforesaid collateral.

**Section 7. Constructive Trust.** If, notwithstanding the provisions of this Agreement, any payment or distribution of any character (whether in cash, securities or other property) shall be received by the Subordinate Lender in contravention of the terms of this Agreement, such payment or distribution shall not be commingled with any asset of the Subordinate Lender, but shall be held in trust for the benefit of, and shall be paid over or delivered and transferred to, the Lender, or its representatives or agents, for application to the payment of all Senior Debt remaining unpaid, until the principal amount of, and all interest and premium (including interest thereon accruing after the commencement of any proceedings described herein) on, and all other amounts in respect of, the Senior Debt shall have been paid in full.

**Section 8.      Successors and Assigns.** This Agreement, without further reference, shall pass to and may be relied on and enforced by any transferee or subsequent holder of the Senior Debt and the Subordinated Debt.

**Section 9. Modification.** The terms of this Agreement, the subordination effectuated hereby, and the rights of the Lender and the obligations of the Subordinate Lender arising hereunder, shall not be affected, modified or impaired in any manner or to any extent by: (i) any amendment or modification of or supplement to the Loan Agreement, any other Security Document or any other instrument or document executed or delivered pursuant thereto.

**Section 10. Notices.** All notice, consents, approvals, requests, demands, instruments or other communications to be made, given or furnished pursuant to, under or by virtue of their Agreement (each, a "Notice") shall be in writing and shall be deemed given or furnished if addressed to the party intended to receive the same at the address or such party as set forth below (i) upon receipt when personally delivered at such address, or (ii) one (1) business day after the date of delivery of such notice to a nationwide, reputable commercial courier service:

3

5

Lender:                 HANKEY CAPITAL, LLC
                        4751 Wilshire Blvd., Suite 110
                        Los Angeles, CA 90010
                        Attention: Eugene M. Leydiker

Subordinate Lender:     INFERNO INVESTMENT INC.
                        95-4 Chemin de Kandahar
                        Mont-Tremblant, Quebec J8E 1E2

Owner:                  CRESTLLOYD, LLC
                        c/o Skyline Development
                        8981 W. Sunset Blvd., Suite 303
                        West Hollywood, CA 90069
                        Attn: Nile Niami

Any party may change the address to which any notice is to be delivered to any other address within the United States of America by furnishing written notice of such change at least fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no such notice of change shall be effective unless and until received by such other parties. Notices may be given on behalf of any party by its attorneys.

     **Section 11.    Miscellaneous.** This Agreement may not be amended or modified orally but may be amended or modified only in writing, signed by all parties hereto. No waiver of any term or provision of this Agreement shall be effective unless it is in writing, making specific reference to this Agreement and signed by the party against whom such waiver is sought to be enforced. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof. This Agreement shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

     **Section 12.    Definitions.**    Terms used in this Agreement and not defined herein shall have the respective meanings ascribed to them in the Loan Agreement. The recitals hereto shall be a part of this Agreement.

     **Section 13. Termination.** This Agreement shall terminate upon the final and indefeasible payment in full of the principal amount of, and all interest and premium on, and all other amounts in respect of, the Senior Debt.

     **Section 14. Counterparts.** This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute and be construed as one and the same instrument.

NOTICE: THIS SUBORDINATION AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON YOUR REAL PROPERTY SECURITY TO OBTAIN A LOAN A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND.

IT IS RECOMMENDED THAT, PRIOR TO THE EXECUTION OF THIS AGREEMENT, THE PARTIES CONSULT WITH THEIR ATTORNEYS WITH RESPECT HERETO.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date hereof.

NOTE:  THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS.

[SIGNATURES COMMENCE ON THE FOLLOWING PAGE.]

5

**OWNER:**

CRESTLLOYD, LLC,
a California limited liability company

By: _____

Nile Niami, Manager

---

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                    )

County of LOS ANGELES )

On OCTOBER 30, 2018 before me, Nigel Gibbs, Notary Public
    Date                        Here Insert Name and Title of the Officer

Personally Appeared _____ Nile Niami _____
                                    Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

NIGEL GIBBS
Notary Public - California
Los Angeles County
Commission # 2164239
My Comm. Expires Oct 4, 2020

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                        Signature of Notary Public

6

SUBORDINATE LENDER:

INFERNO INVESTMENT INC.

By: _____

Name:  Julien Rémillard

Title:  Director

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                              )

County of_____)

On_____before me, _____
            Date                                              Here Insert Name and Title of the Officer
Personally Appeared _____
                                    Name(s) of Signer(s)
_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s)  is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____
                    Signature of Notary Public

7

**CALIFORNIA ACKNOWLEDGMENT**  CIVIL CODE § 1189

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
|---|

State of California

County of _LOS ANGELES_ }

On _OCTOBER 30 2018_ before me, _Nigel Gibbs Notary Public_,
    *Date)*           *Here Insert Name and Title of the Officer*

personally appeared _Julien Remillard_
                            *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

> **NIGEL GIBBS**
> Notary Public - California
> Los Angeles County
> Commission # 2164239
> My Comm. Expires Oct 4, 2020

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
            *Signature of Notary Public*

*Place Notary Seal and/or Stamp Above*

━━━━━━━━━━━━━━━━━ **OPTIONAL** ━━━━━━━━━━━━━━━━━

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _Subordination Agreement_

Document Date: _10/25/18_ _____ Number of Pages: _10_

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer – Title(s): _____ | ☐ Corporate Officer – Title(s): _____ |
| ☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General |
| ☐ Individual    ☐ Attorney in Fact | ☐ Individual    ☐ Attorney in Fact |
| ☐ Trustee    ☐ Guardian or Conservator | ☐ Trustee    ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer is Representing: _____ | Signer is Representing: _____ |

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

©2018 National Notary Association

10

LENDER:

**HANKEY CAPITAL, LLC**

By: _____

    W. Scott Dobbins, President

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California               )

County of Los Angeles        )

On November 1, 2018 _____ before me, ___T. Douglas, Notary Public_____
    Date                                  *Here Insert Name and Title of the Officer*
Personally Appeared ___W. Scott Dobbins___
                                          *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.



T. DOUGLAS
Notary Public – California
Los Angeles County
Commission # 2184270
My Comm. Expires Mar 22, 2021

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____
                         *Signature of Notary Public*

8

Ⅱ

## Exhibit "A"

## Property Description

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS
ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS
DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF
LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623
PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF
THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY,
30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07"
'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE
LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A
RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE
WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE
NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF
03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE
SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE
NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL
ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE
BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS
OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE
THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST
208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING
A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE
THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST
42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40
FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS
ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP
RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF
THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE
FOLLOWING DESCRIBED LINE:

12

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE
THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS
OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS
HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET;
THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE
WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET
FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID
WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: 4369-026-021

# EXHIBIT 4

**From:** Julien Rémillard - II <jremillard@investissementinferno.com>
**Sent:** Sunday, October 31, 2021 7:27:32 PM
**To:** Anthony Aquino <aaquino@investissementinferno.com>
**Subject:** Fwd: 944 Airole Way -- Draft Loan Docs


Envoyé de mon iPad

Début du message transféré :

1

**De:** Doug Witkins <doug@skylinedevelopment.net>
**Date:** 31 octobre 2018 à 12:39:45 HAE
**À:** Linda Riberdy - II <lriberdy@investissementinferno.com>, Julien
Rémillard - II <jremillard@investissementinferno.com>
**Objet: Rép : 944 Airole Way -- Draft Loan Docs**


Attached please find updated version that includes

1.  Inferno address
2.  Proper name of Inferno on the signature sign (Inc. not LLC)
3.  Julien's title.

**From:** Linda Riberdy - II <lriberdy@investissementinferno.com>
**Date:** Wednesday, October 31, 2018 at 4:12 AM
**To:** Doug Witkins <doug@skylinedevelopment.net>, Julien
Rémillard - II <jremillard@investissementinferno.com>
**Subject:** RE: 944 Airole Way -- Draft Loan Docs

Thank you



**LINDA RIBERDY | DIRECTRICE GÉNÉRALE**
C.P. 218, Succursale Place-d'Armes, Montréal, Québec H2Y 3G7
**T** 514.307.0821 / 222 / **C** 438.871.1340
| lriberdy@investissementinferno.com

**De :** Doug Witkins <doug@skylinedevelopment.net>
**Envoyé :** Tuesday, October 30, 2018 2:59 PM
**À :** Julien Rémillard - II <jremillard@investissementinferno.com>; Linda
Riberdy - II <lriberdy@investissementinferno.com>
**Objet :** FW: 944 Airole Way -- Draft Loan Docs

Julien,

Attached please find the subordination agreement the new lender
needs signed by Inferno.

Best
Doug

**WHEN RECORDED, RETURN TO:**

Hankey Capital, LLC
4751 Wilshire Blvd., Ste 110
Los Angeles, CA 90010
Attn: Eugene M. Leydiker

APN No. 4369-026-021

**SUBORDINATION
AGREEMENT**

**(Deed of Trust to Deed of Trust)**

**NOTICE: THIS SUBORDINATION AGREEMENT RESULTS IN YOUR SECURITY INTEREST IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

THIS SUBORDINATION AGREEMENT ("Agreement") is entered into as of October 30, 2018, by and between CRESTLLOYD, LLC, a California limited liability company ("Owner"); and INFERNO INVESTMENT INC. ("Subordinate Lender"); and Hankey Capital, LLC ("Lender").

**RECITALS**

**A.** Subject to the terms and provisions of that certain Deed of Trust With Assignment of Rents dated March 13, 2013, executed by Owner, as Trustor, in favor of INFERNO REALTY, L.P. and MAYBACH CORPORATION HOLDINGS, INC., Subordinate Lender's predecessors-in-interest, recorded on March 13, 2013, as Document Number 20130384037 in the official records of the County of Los Angeles, State of California ("Official Records") ("Subordinate Lender's Deed of Trust"), Owner granted to Subordinate Lender's predecessors-in-interest a security interest in and to the property described in Exhibit "A" attached hereto and incorporated herein located at 944 Airole Way, Los Angeles, California (which property, together with all improvements now or hereafter located on the property, is hereinafter collectively referred to as the "Property") to secure Owner's obligations to Subordinate Lender's predecessors-in-interest (the "Subordinated Debt").

**B.** MAYBACH CORPORATION HOLDINGS, INC. assigned the entirety of its interest in the Subordinate Lender's Deed of Trust to INFERNO REALTY, L.P. by means of that certain Assignment of Note and Deed of Trust/Mortgage, dated June 2, 2014 and recorded on November 10, 2015 in the Official Records as Document Number 20151375606.

**C.** INFERNO REALTY, L.P. assigned the entirety of its interest in the Subordinate Lender's Deed of Trust to Subordinate Lender by means of that certain Assignment of Note and Deed of Trust/Mortgage, dated October 21, 2015 and recorded on November 10, 2015 in the Official Records as Document Number 20151375607.

**D.** Owner has executed or will execute a Deed of Trust, Security Agreement and Fixture Filing With Assignment of Rents ("Lender's Deed of Trust") securing, among other things, Owner's obligations to Lender as set forth in that certain Promissory Note dated October 25, 2018, in favor of Lender, in the principal amount of Eighty Two Million Five Hundred Thousand and No/100 Dollars ($82,500,000.00) (the "Note"). Lender's Deed of Trust is being recorded in the Official

1

Records concurrently herewith. The Note and the Lender's Deed of Trust are collectively referred to herein as the "Loan Agreement".

      **E.**     As a condition to Lender making a Loan (the "Loan"), to be secured by, among other things, the Lender's Deed of Trust (the "Senior Debt"), Lender requires that Lender's Deed of Trust be unconditionally and at all times remain a lien or charge upon the Property, prior and superior to all the rights of Subordinate Lender under its deed of trust and that Subordinate Lender specifically and unconditionally subordinates its deed of trust to the lien or charge of Lender's Deed of Trust.

      **F.**     Subordinate Lender and Owner agree to the subordination in favor of Lender.

     **NOW THEREFORE**, for good and valuable consideration and the receipt and adequacy of which is hereby acknowledged, and to induce Lender to make the Loan, Owner and Subordinate Lender hereby agree for the benefit of Lender as follows:

     **Section 1.**   **Subordination.**  Lender's Deed of Trust securing the Note in favor of Lender, shall unconditionally be and at all times remain a lien or charge on the Property prior and superior to Subordinate Lender's Deed of Trust.

     **Section 2.**   **Entire Agreement.**  This Agreement shall be the whole agreement with regard to the subordination of Subordinate Lender's Deed of Trust to the lien or charge of Lender's Deed of Trust, and shall supersede and cancel, but only insofar as would affect the priority of Lender's Deed of Trust, any prior agreements as to such subordination, including, without limitation, those provisions, if any, contained in Subordinate Lender's deed of trust which provide for the subordination of the deed of trust to a deed or deeds of trust or to a mortgage or mortgages.

     **Section 3. Lien Subordination.**  Subordinate Lender intentionally and unconditionally waives, relinquishes and subordinates all of Subordinate Lender's right, title and interest in and to the Property to the lien or charge of Lender's Deed of Trust, upon the Property and understands that in reliance upon, and in consideration of, this waiver, relinquishment and subordination, specific loans and advances are being and will be made by Lender and, as part and parcel thereof, specific monetary and other obligations are being and will be entered into which would not be made or entered into but for said reliance upon this waiver, relinquishment and subordination.

     **Section 4. Rights Upon Insolvency.**  In the event of (1) any insolvency, bankruptcy, receivership, liquidation, reorganization, arrangement, assignment for the benefit of creditors, or other similar proceeding relative to the Owner or its property (as defined in the Loan Agreement), or (2) any proceeding for the voluntary or involuntary liquidation, dissolution or other winding up of the Owner whether or not involving insolvency or bankruptcy proceedings, then and in any such event:

        (a) the principal amount of, and all interest on, and all other amounts in respect of, the Senior Debt (including interest thereon accruing after the commencement of any such proceeding, whether or not such interest shall be allowed in such proceeding) shall be paid in full before any payment or distribution of any character, whether in cash, securities or other property, shall be made in respect of the Subordinated Debt; and

        (b) any payment or distribution of any character, whether in cash, securities or other property, which would otherwise (but for the terms hereof) be payable or deliverable in respect of Subordinated Debt (including any payment or distribution in respect of the Subordinated Debt by reason of any other indebtedness of the Owner being subordinated to the Subordinated Debt), shall be paid or delivered directly to the Lender, or its representatives, until the principal amount of, and all interest and premium on, and all other amounts in respect of, the Senior Debt shall have been paid in full and the Subordinate Lender or any other holder of the Subordinated Debt

2

irrevocably authorizes, empowers and directs all receivers, trustees, liquidators, conservators and others having authority in the premises to effect all such payments and deliveries.

Section 5. **Owner Obligations.** Owner agrees that, in the event that any note or other obligation of the Owner not evidencing Senior Debt, or any portion thereof, shall become due and payable before its expressed maturity for any reason, Owner will give prompt notice, in writing, of such occurrence to the Lender.

Section 6. **Rights of Lender.**

(a) Subordinate Lender further declares, agrees and acknowledges for the benefit of the Lender, that Lender, in making disbursement pursuant to the Loan Agreement (whether obligatory or optional), is under no obligation or duty to, nor has Lender represented that it will, see to the application of such proceeds by the person or persons to whom Lender disburses such proceeds, an any application or use of such proceeds for purposes other than those provided for in such agreement or agreements shall not defeat the subordination herein made in whole or in part.

(b) Except as otherwise provided herein, so long as any of the Senior Debt shall remain unpaid, Lender may at all times exercise any and all powers and rights which it now has or may hereafter acquire with respect to the Loan Agreement, any other security instrument, including, but not limited to deed of trust or mortgage, Collateral Security Agreement, or Membership Interest Pledge Agreement (collectively, "Security Document"), or any of the collateral subject to the Loan Agreement or any other Security Document without having to obtain any consent or approval of the Subordinate Lender and without any accountability to the Subordinate Lender, nor shall it have any liability to the Subordinate Lender for any action taken or failure to act with respect to this Agreement, the Loan Agreement, any other Security Document or the aforesaid collateral.

Section 7. **Constructive Trust.** If, notwithstanding the provisions of this Agreement, any payment or distribution of any character (whether in cash, securities or other property) shall be received by the Subordinate Lender in contravention of the terms of this Agreement, such payment or distribution shall not be commingled with any asset of the Subordinate Lender, but shall be held in trust for the benefit of, and shall be paid over or delivered and transferred to, the Lender, or its representatives or agents, for application to the payment of all Senior Debt remaining unpaid, until the principal amount of, and all interest and premium (including interest thereon accruing after the commencement of any proceedings described herein) on, and all other amounts in respect of, the Senior Debt shall have been paid in full.

Section 8. **Successors and Assigns.** This Agreement, without further reference, shall pass to and may be relied on and enforced by any transferee or subsequent holder of the Senior Debt and the Subordinated Debt.

Section 9. **Modification.** The terms of this Agreement, the subordination effectuated hereby, and the rights of the Lender and the obligations of the Subordinate Lender arising hereunder, shall not be affected, modified or impaired in any manner or to any extent by: (i) any amendment or modification of or supplement to the Loan Agreement, any other Security Document or any other instrument or document executed or delivered pursuant thereto.

Section 10. **Notices.** All notice, consents, approvals, requests, demands, instruments or other communications to be made, given or furnished pursuant to, under or by virtue of their Agreement (each, a "Notice") shall be in writing and shall be deemed given or furnished if addressed to the party intended to receive the same at the address or such party as set forth below (i) upon receipt when personally delivered at such address, or (ii) one (1) business day after the date of delivery of such notice to a nationwide, reputable commercial courier service:

3

Lender:                    HANKEY CAPITAL, LLC
                           4751 Wilshire Blvd., Suite 110
                           Los Angeles, CA 90010
                           Attention: Eugene M. Leydiker

Subordinate Lender:        INFERNO INVESTMENT INC.
                           95-4 Chemin de Kandahar
                           Mont-Tremblant, Quebec J8E 1E2

Owner:                     CRESTLLOYD, LLC
                           c/o Skyline Development
                           8981 W. Sunset Blvd., Suite 303
                           West Hollywood, CA 90069
                           Attn: Nile Niami

Any party may change the address to which any notice is to be delivered to any other address within the United States of America by furnishing written notice of such change at least fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no such notice of change shall be effective unless and until received by such other parties. Notices may be given on behalf of any party by its attorneys.

**Section 11.    Miscellaneous.** This Agreement may not be amended or modified orally but may be amended or modified only in writing, signed by all parties hereto. No waiver of any term or provision of this Agreement shall be effective unless it is in writing, making specific reference to this Agreement and signed by the party against whom such waiver is sought to be enforced. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof. This Agreement shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Section 12.    Definitions.**    Terms used in this Agreement and not defined herein shall have the respective meanings ascribed to them in the Loan Agreement. The recitals hereto shall be a part of this Agreement.

**Section 13. Termination.** This Agreement shall terminate upon the final and indefeasible payment in full of the principal amount of, and all interest and premium on, and all other amounts in respect of, the Senior Debt.

**Section 14. Counterparts.** This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute and be construed as one and the same instrument.

NOTICE: THIS SUBORDINATION AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON YOUR REAL PROPERTY SECURITY TO OBTAIN A LOAN A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND.

IT IS RECOMMENDED THAT, PRIOR TO THE EXECUTION OF THIS AGREEMENT, THE PARTIES CONSULT WITH THEIR ATTORNEYS WITH RESPECT HERETO.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date hereof.

4

NOTE:  THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS.

[SIGNATURES COMMENCE ON THE FOLLOWING PAGE.]

**OWNER:**

CRESTLLOYD, LLC,
a California limited liability company


By: _____
    Nile Niami, Manager


---

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California               )

County of_____)

On_____before me, _____
        *Date*                                *Here Insert Name and Title of the Officer*
Personally Appeared _____
                                   *Name(s) of Signer(s)*

_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

                           I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
                           WITNESS my hand and official seal.

                           Signature _____
                                     *Signature of Notary Public*

**SUBORDINATE LENDER:**

**INFERNO INVESTMENT INC.**

By: _____
Name:  Julien Rémillard
Title:  Director

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California                          )

County of_____)

On_____before me, _____
         *Date*                                                    *Here Insert Name and Title of the Officer*
Personally Appeared _____
                                                   *Name(s) of Signer(s)*

_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____
                              *Signature of Notary Public*

7

LENDER:

**HANKEY CAPITAL, LLC**

By: _____
      W. Scott Dobbins, President

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California              )

County of_____)

On_____before me, _____
          *Date*                                  *Here Insert Name and Title of the Officer*
Personally Appeared _____
                                *Name(s) of Signer(s)*
_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

                                I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
                                WITNESS my hand and official seal.

                                Signature _____
                                        *Signature of Notary Public*

## Exhibit "A"

## Property Description

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" 'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE
THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS
OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS
HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET;
THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE
WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET
FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID
WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: **4369-026-021**

# EXHIBIT 5

**De :** Douglas Witkins
**Envoyé le :** 24 février 2021 13:47
**À :** Me Mathieu Robillard
**Objet :** Hankey Loan, The One

Hello, Mathieu,

Hankey Capital has informed Crestlloyd that they will file a file Notice of Default tomorrow unless Crestlloyd and the secured parties agree for them to extend the maturity date on their loan to May 31, 2021 and also raise their loan to $115M to cover interest payments through that time and additional loan fee and continued draws required to get the final permits, etc.

They are requiring the junior lienholders to sign Subordination Agreements.  I am attaching the one pertaining to Julien's interest.  Please read it over and let me know if you are on board.  If you have questions, I will try to get answers for you.

Thank you

Doug

WHEN RECORDED, RETURN TO:

Hankey Capital, LLC
4751 Wilshire Blvd., Ste 110
Los Angeles, CA 90010
Attn: Eugene M. Leydiker

APN No. 4369-026-021

# SUBORDINATION
# AGREEMENT

### (Deed of Trust to Deed of Trust)

**NOTICE: THIS SUBORDINATION AGREEMENT RESULTS IN YOUR SECURITY INTEREST IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

THIS SUBORDINATION AGREEMENT ("Agreement") is entered into as of February 23, 2021, by and between CRESTLLOYD, LLC, a California limited liability company ("Owner"); and INFERNO INVESTMENT INC. ("Subordinate Lender"); and Hankey Capital, LLC ("Lender").

## RECITALS

**A.**     Subject to the terms and provisions of that certain Deed of Trust With Assignment of Rents dated March 13, 2013, executed by Owner, as Trustor, in favor of INFERNO REALTY, L.P. and MAYBACH CORPORATION HOLDINGS, INC., Subordinate Lender's predecessors-in-interest, recorded on March 13, 2013, as Document Number 20130384037 in the official records of the County of Los Angeles, State of California ("Official Records") ("Subordinate Lender's Deed of Trust"), Owner granted to Subordinate Lender's predecessors-in-interest a security interest in and to the property described in Exhibit "A" attached hereto and incorporated herein located at 944 Airole Way, Los Angeles, California (which property, together with all improvements now or hereafter located on the property, is hereinafter collectively referred to as the "Property") to secure Owner's obligations to Subordinate Lender's predecessors-in-interest (the "Subordinated Debt").

**B.**     MAYBACH CORPORATION HOLDINGS, INC. assigned the entirety of its interest in the Subordinate Lender's Deed of Trust to INFERNO REALTY, L.P. by means of that certain Assignment of Note and Deed of Trust/Mortgage, dated June 2, 2014 and recorded on November 10, 2015 in the Official Records as Document Number 20151375606.

**C.**     INFERNO REALTY, L.P. assigned the entirety of its interest in the Subordinate Lender's Deed of Trust to Subordinate Lender by means of that certain Assignment of Note and Deed of Trust/Mortgage, dated October 21, 2015 and recorded on November 10, 2015 in the Official Records as Document Number 20151375607.

**D.**     Owner has executed a Deed of Trust, Security Agreement and Fixture Filing With Assignment of Rents ("Lender's Deed of Trust") securing, among other things, Owner's obligations to Lender as set forth in that certain Promissory Note dated October 25, 2018, in favor of Lender, in the principal amount of Eighty Two Million Five Hundred Thousand and No/100 Dollars ($82,500,000.00) (the "Note"). Lender's Deed of Trust was recorded in the Official Records on

1

November 6, 2018 as Document No. 20181122917. The Note and the Lender's Deed of Trust are collectively referred to herein as the "Loan Agreement".

      **E.**    Subordinate Lender executed a Subordination Agreement on October 31, 2018, subordinating the Subordinated Debt to Lender's Deed of Trust, which Subordination Agreement was recorded on November 6, 2018 as Document No. 20181122920.

      **F.**    Separate from the Lender's Deed of Trust, Owner and Lender have entered into two (2) separate agreements, a memorandum of each of which has been recorded in the Official Records on November 6, 2018 as Document No. 20181122919 (the "First Memorandum of Agreement") and on August 31, 2020 as Document No. 20201030294 (the "Second Memorandum of Agreement").

      **G.**    Owner has requested that Lender increase the amount of the Note to One Hundred Fifteen Million and No/100 Dollars ($115,000,000.00) (the "Loan Increase").

      **H.**    As a condition to Lender making the Loan Increase, to be secured by, among other things, the Lender's Deed of Trust, to be modified by that certain Modification of Deed of Trust of even date herewith, Lender requires that Lender's Deed of Trust, as modified, the First Memorandum of Agreement and the Second Memorandum of Agreement be unconditionally and at all times remain a lien or charge upon the Property, prior and superior to all the rights of Subordinate Lender under its deed of trust and that Subordinate Lender specifically and unconditionally subordinates its deed of trust to the lien or charge of (i) Lender's Deed of Trust, as modified by that certain Modification of Deed of Trust of even date herewith, (ii) the First Memorandum of Agreement, and (iii) the Second Memorandum of Agreement (collectively, the "Senior Debt").

      **I.**    Subordinate Lender and Owner agree to the subordination in favor of Lender.

      **NOW THEREFORE**, for good and valuable consideration and the receipt and adequacy of which is hereby acknowledged, and to induce Lender to make the Loan, Owner and Subordinate Lender hereby agree for the benefit of Lender as follows:

      **Section 1.**   **Subordination.**  Lender's Deed of Trust, as modified by that certain Modification of Deed of Trust of even date herewith, securing the Note (evidencing the Loan Increase) in favor of Lender, the First Memorandum of Agreement and the Second Memorandum of Agreement, shall unconditionally be and at all times remain a lien or charge on the Property prior and superior to Subordinate Lender's Deed of Trust.

      **Section 2.**   **Entire Agreement**. This Agreement shall be the whole agreement with regard to the subordination of Subordinate Lender's Deed of Trust to the lien or charge of Lender's Deed of Trust, as modified by that certain Modification of Deed of Trust of even date herewith, the First Memorandum of Agreement and the Second Memorandum of Agreement, and shall supersede and cancel, but only insofar as would affect the priority of Lender's Deed of Trust, as modified by that certain Modification of Deed of Trust of even date herewith, of the First Memorandum of Agreement, of the Second Memorandum of Agreement, any prior agreements as to such subordination, including, without limitation, those provisions, if any, contained in Subordinate Lender's deed of trust which provide for the subordination of the deed of trust to a deed or deeds of trust or to a mortgage or mortgages.

      **Section 3. Lien Subordination.** Subordinate Lender intentionally and unconditionally waives, relinquishes and subordinates all of Subordinate Lender's right, title and interest in and to the Property to the lien or charge of Lender's Deed of Trust, as modified by that certain Modification of Deed of Trust of even date herewith, the First Memorandum of Agreement and the Second Memorandum of Agreement, upon the Property and understands that in reliance upon, and in consideration of, this waiver, relinquishment and subordination, specific loans and advances are being and will be made by

Lender and, as part and parcel thereof, specific monetary and other obligations are being and will be entered into which would not be made or entered into but for said reliance upon this waiver, relinquishment and subordination.

Section 4. **Rights Upon Insolvency.** In the event of (1) any insolvency, bankruptcy, receivership, liquidation, reorganization, arrangement, assignment for the benefit of creditors, or other similar proceeding relative to the Owner or its property (as defined in the Loan Agreement), or (2) any proceeding for the voluntary or involuntary liquidation, dissolution or other winding up of the Owner whether or not involving insolvency or bankruptcy proceedings, then and in any such event:

(a) the principal amount of, and all interest on, and all other amounts in respect of, the Senior Debt (including interest thereon accruing after the commencement of any such proceeding, whether or not such interest shall be allowed in such proceeding) shall be paid in full before any payment or distribution of any character, whether in cash, securities or other property, shall be made in respect of the Subordinated Debt; and

(b) any payment or distribution of any character, whether in cash, securities or other property, which would otherwise (but for the terms hereof) be payable or deliverable in respect of Subordinated Debt (including any payment or distribution in respect of the Subordinated Debt by reason of any other indebtedness of the Owner being subordinated to the Subordinated Debt), shall be paid or delivered directly to the Lender, or its representatives, until the principal amount of, and all interest and premium on, and all other amounts in respect of, the Senior Debt shall have been paid in full and the Subordinate Lender or any other holder of the Subordinated Debt irrevocably authorizes, empowers and directs all receivers, trustees, liquidators, conservators and others having authority in the premises to effect all such payments and deliveries.

Section 5. **Owner Obligations.** Owner agrees that, in the event that any note or other obligation of the Owner not evidencing Senior Debt, or any portion thereof, shall become due and payable before its expressed maturity for any reason, Owner will give prompt notice, in writing, of such occurrence to the Lender.

Section 6.    **Rights of Lender.**

(a)    Subordinate Lender further declares, agrees and acknowledges for the benefit of the Lender, that Lender, in making disbursement pursuant to the Loan Agreement (whether obligatory or optional), is under no obligation or duty to, nor has Lender represented that it will, see to the application of such proceeds by the person or persons to whom Lender disburses such proceeds, an any application or use of such proceeds for purposes other than those provided for in such agreement or agreements shall not defeat the subordination herein made in whole or in part.

(b)    Except as otherwise provided herein, so long as any of the Senior Debt shall remain unpaid, Lender may at all times exercise any and all powers and rights which it now has or may hereafter acquire with respect to the Loan Agreement, any other security instrument, including, but not limited to deed of trust or mortgage, Collateral Security Agreement, or Membership Interest Pledge Agreement (collectively, "Security Document"), or any of the collateral subject to the Loan Agreement or any other Security Document without having to obtain any consent or approval of the Subordinate Lender and without any accountability to the Subordinate Lender, nor shall it have any liability to the Subordinate Lender for any action taken or failure to act with respect to this Agreement, the Loan Agreement, any other Security Document or the aforesaid collateral.

Section 7. **Constructive Trust.** If, notwithstanding the provisions of this Agreement, any payment or distribution of any character (whether in cash, securities or other property) shall be received by the Subordinate Lender in contravention of the terms of this Agreement, such payment or distribution shall not be commingled with any asset of the Subordinate Lender, but shall be held in trust for the benefit

3

of, and shall be paid over or delivered and transferred to, the Lender, or its representatives or agents, for application to the payment of all Senior Debt remaining unpaid, until the principal amount of, and all interest and premium (including interest thereon accruing after the commencement of any proceedings described herein) on, and all other amounts in respect of, the Senior Debt shall have been paid in full.

**Section 8.** **Successors and Assigns.** This Agreement, without further reference, shall pass to and may be relied on and enforced by any transferee or subsequent holder of the Senior Debt and the Subordinated Debt.

**Section 9.** **Modification.** The terms of this Agreement, the subordination effectuated hereby, and the rights of the Lender and the obligations of the Subordinate Lender arising hereunder, shall not be affected, modified or impaired in any manner or to any extent by: (i) any amendment or modification of or supplement to the Loan Agreement, any other Security Document or any other instrument or document executed or delivered pursuant thereto.

**Section 10.** **Notices.** All notice, consents, approvals, requests, demands, instruments or other communications to be made, given or furnished pursuant to, under or by virtue of their Agreement (each, a "Notice") shall be in writing and shall be deemed given or furnished if addressed to the party intended to receive the same at the address or such party as set forth below (i) upon receipt when personally delivered at such address, or (ii) one (1) business day after the date of delivery of such notice to a nationwide, reputable commercial courier service:

| | |
|---|---|
| Lender: | HANKEY CAPITAL, LLC |
| | 4751 Wilshire Blvd., Suite 110 |
| | Los Angeles, CA 90010 |
| | Attention: Eugene M. Leydiker |
| | |
| Subordinate Lender: | INFERNO INVESTMENT INC. |
| | 95-4 Chemin de Kandahar |
| | Mont-Tremblant, Quebec J8E 1E2 |
| | |
| Owner: | CRESTLLOYD, LLC |
| | c/o Skyline Development |
| | 8981 W. Sunset Blvd., Suite 303 |
| | West Hollywood, CA 90069 |
| | Attn: Nile Niami |

Any party may change the address to which any notice is to be delivered to any other address within the United States of America by furnishing written notice of such change at least fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no such notice of change shall be effective unless and until received by such other parties. Notices may be given on behalf of any party by its attorneys.

**Section 11.** **Miscellaneous.** This Agreement may not be amended or modified orally but may be amended or modified only in writing, signed by all parties hereto. No waiver of any term or provision of this Agreement shall be effective unless it is in writing, making specific reference to this Agreement and signed by the party against whom such waiver is sought to be enforced. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof. This Agreement shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Section 12.** **Definitions.** Terms used in this Agreement and not defined herein shall have the

4

respective meanings ascribed to them in the Loan Agreement. The recitals hereto shall be a part of this Agreement.

      **Section 13. <u>Termination</u>.** This Agreement shall terminate upon the final and indefeasible payment in full of the principal amount of, and all interest and premium on, and all other amounts in respect of, the Senior Debt.

      **Section 14. <u>Counterparts</u>.** This Agreement may be executed in two (2) or more  counterparts, each of which shall be deemed an original and all of which together shall constitute and be  construed as one and the same instrument.

NOTICE: THIS SUBORDINATION AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON YOUR REAL PROPERTY SECURITY TO OBTAIN A LOAN A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND.

IT IS RECOMMENDED THAT, PRIOR TO THE EXECUTION OF THIS AGREEMENT, THE PARTIES CONSULT WITH THEIR ATTORNEYS WITH RESPECT HERETO.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date hereof.

**NOTE:  THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS.**

**[SIGNATURES COMMENCE ON THE FOLLOWING PAGE.]**

**OWNER**:

CRESTLLOYD, LLC,
a California limited liability company

By: _____

    Nile Niami, Manager

---

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
|---|

---

State of California                     )

County of_____)

On_____before me, _____
          *Date*                                 *Here Insert Name and Title of the Officer*
Personally Appeared _____
                                     *Name(s) of Signer(s)*

_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

                                 I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
                                 WITNESS my hand and official seal.

                                 Signature _____
                                           *Signature of Notary Public*

6

SUBORDINATE LENDER:

INFERNO INVESTMENT INC.


By:      _____
Name:  Julien Rémillard
Title:   Director




| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |


State of California                              )

County of_____)

On_____before me, _____
            *Date*                                                  *Here Insert Name and Title of the Officer*
Personally Appeared _____
                                          *Name(s) of Signer(s)*
_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s)  is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____
                        *Signature of Notary Public*

7

LENDER:

**HANKEY CAPITAL, LLC**


By: _____
    W. Scott Dobbins, President


| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California               )

County of_____)

On_____before me, _____
       *Date*                       *Here Insert Name and Title of the Officer*
Personally Appeared _____
                             *Name(s) of Signer(s)*
_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

                                    I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
                                    WITNESS my hand and official seal.

                                    Signature _____
                                           *Signature of Notary Public*

8

# Exhibit "A"

## Property Description

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 1 AND 2 OF TRACT NO. 22727, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 623 PAGE(S) 81 TO 83 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THAT PORTION OF SAID LOTS LYING WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF AIROLE WAY, 30 FEET WIDE, AS SHOWN ON SAID MAP, DISTANT THEREON SOUTH 76° 06' 07" 'WEST 2.86 FEET FROM THE MOST NORTHERLY CORNER THEREOF; THENCE LEAVING SAID TERMINUS ALONG A CURVE CONCAVE WESTERLY, HAVING A RADIUS OF 361.97 FEET AND CONCENTRIC WITH THAT CERTAIN CURVE IN THE WESTERLY LINE OF SAID LOT 1 HAVING A RADIUS OF 349.83 FEET; THENCE NORTHERLY 22.69 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 03° 35' 48" TO THE BEGINNING OF A COMPOUND CURVE, CONCAVE SOUTHWESTERLY AND HAVING A RADIUS OF 175.66 FEET; THENCE NORTHWESTERLY 119.88 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 39° 06' 53"; THENCE NORTH 56° 36' 22" WEST 7.97 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 90.80 FEET; THENCE NORTHWESTERLY 71.18 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 44° 55' 04"; THENCE NORTH 11° 41' 18" WEST 208.55 FEET TO THE BEGINNING OF A CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 35.90 FEET; THENCE NORTHERLY 34.44 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 56° 32' 34"; THENCE NORTH 44° 51' 16" EAST 42.37 FEET TO THE CURVED SOUTHEASTERLY LINE OF STRADELLA ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP.

PARCEL 2:

THAT PORTION OF LOT 3 IN BLOCK 3 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141 PAGES 93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

9

BEGINNING AT A POINT IN THE EASTERLY LINE OF SAID LOT, DISTANCE
THEREON SOUTH 13° 13' 20" EAST 34.33 FEET FROM THE NORTHERLY TERMINUS
OF THAT CERTAIN COURSE IN SAID EASTERLY LINE SHOWN ON SAID MAP AS
HAVING A BEARING AND LENGTH OF NORTH 13° 13' 20" WEST 106.35 FEET;
THENCE NORTH 89° 27' 20" WEST 214.07 FEET, MORE OR LESS, TO A POINT IN THE
WESTERLY LINE OF SAID LOT, DISTANT SOUTHERLY THEREON 54.93 FEET
FROM THE NORTHERLY TERMINUS OF THAT CERTAIN CURVE IN SAID
WESTERLY LINE HAVING A LENGTH OF 115.83 FEET.

APN: **4369-026-021**

10

B1040 (FORM 1040) (12/15)

<table>
<tr><td colspan="2">**ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse)</td><td>**ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only)</td></tr>
</table>

| PLAINTIFFS<br>INFERNO INVESTMENT, INC., a Quebec corporation | DEFENDANTS<br>CRESTLLOYD, LLC, a California limited liability company;<br>HANKEY CAPITAL, LLC, a California limited liability company;<br>YOGI SECURITIES HOLDINGS, LLC, a Nevada limited liability<br>Company; and HILLDUN CORPORATION, a New York corporation |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>LAVELY & SINGER<br>2049 Century Park East, Suite 2400<br>Los Angeles, California 90067-2906<br>Telephone: (310) 556-3501<br><br>SMILEY WANG-EKVALL, LLP<br>3200 Park Center Drive, Suite 250<br>Costa Mesa, CA 92626<br>Telephone: (714) 445-1000 | ATTORNEYS (If Known) |
|---|---|

| PARTY (Check One Box Only)<br>□ Debtor    □ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor    □ Other<br>□ Trustee | PARTY (Check One Box Only)<br>☒ Debtor    □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>□ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Declaratory Relief, Unfair Business Practices, Disallowance of Claims, and Rescission

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
□ 11-Recovery of money/property - §542 turnover of property
□ 12-Recovery of money/property - §547 preference
□ 13-Recovery of money/property - §548 fraudulent transfer
□ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
□ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
□ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
□ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
□ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
□ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
□ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
□ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
□ 61-Dischargeability - §523(a)(5), domestic support
□ 68-Dischargeability - §523(a)(6), willful and malicious injury
□ 63-Dischargeability - §523(a)(8), student loan
□ 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
□ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
□ 71-Injunctive relief – imposition of stay
□ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
□ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
□ 01-Determination of removed claim or cause

**Other**
□ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES |||
| NAME OF DEBTOR<br>CRESTLLOYD, LLC | BANKRUPTCY CASE NO.<br>2:21-bk-18205-DS ||
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Los Angeles | NAME OF JUDGE<br>Hon. Deborah J. Saltzman |
| RELATED ADVERSARY PROCEEDING (IF ANY) |||
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*/s/ Kyra E. Andrassy* |||
| DATE<br><br>June 9, 2022 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Kyra E. Andrassy ||

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**3200 Park Center Drive, Suite 250, Costa Mesa, CA. 92626**

A true and correct copy of the foregoing document entitled (*specify*): **Supplemental Opposition of Secured Creditor Inferno Investment, Inc. to Motion for Authority to Disburse Funds to Hankey Capital, LLC, a Senior Secured Creditor**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **6/9/2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **6/9/2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

<u>Via Overnight Mail:</u>
Honorable Deborah J. Saltzman
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1634 / Courtroom 1639
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 6/9/2022 | Lynnette Garrett | /s/ Lynnette Garrett |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- Kyra E Andrassy    kandrassy@swelawfirm.com,
  lgarrett@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- Todd M Arnold    tma@lnbyg.com
- Jerrold L Bregman    jbregman@bg.law, ecf@bg.law
- Marguerite Lee DeVoll    mdevoll@watttieder.com, zabrams@watttieder.com
- Karol K Denniston    karol.denniston@squirepb.com,
  travis.mcroberts@squirepb.com;sarah.conley@squirepb.com;karol-k-denniston-9025@ecf.pacerpro.com
- Oscar Estrada    oestrada@ttc.lacounty.gov
- Danielle R Gabai    dgabai@danninggill.com, dgabai@ecf.courtdrive.com
- Thomas M Geher    tmg@jmbm.com, bt@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com
- David B Golubchik    dbg@lnbyg.com, stephanie@lnbyb.com
- Jonathan Gottlieb    jdg@lnbyg.com
- James Andrew Hinds    jhinds@hindslawgroup.com;mduran@hindslawgroup.com, mduran@hindslawgroup.com
- Robert B Kaplan    rbk@jmbm.com
- Jane G Kearl    jkearl@watttieder.com
- Jennifer Larkin Kneeland    jkneeland@watttieder.com, zabrams@watttieder.com
- Michael S Kogan    mkogan@koganlawfirm.com
- Noreen A Madoyan    Noreen.Madoyan@usdoj.gov
- John A Moe    john.moe@dentons.com, glenda.spratt@dentons.com;derry.kalve@dentons.com
- Samuel A Newman    sam.newman@sidley.com, samuel-newman-
  2492@ecf.pacerpro.com;laefilingnotice@sidley.com
- Ryan D O'Dea    rodea@shulmanbastian.com, lgauthier@shulmanbastian.com
- Sharon Oh-Kubisch    sokubisch@swelawfirm.com,
  gcruz@swelawfirm.com;1garrett@swelawfirm.com;jchung@swelawfirm.com
- Hamid R Rafatjoo    hrafatjoo@raineslaw.com, bclark@raineslaw.com
- Ronald N Richards    ron@ronaldrichards.com, 7206828420@filings.docketbird.com
- Victor A Sahn    vsahn@sulmeyerlaw.com,
  pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sulmeyerlaw.com;
  cblair@ecf.inforuptcy.com
- William Schumacher    wschumac@milbank.com, autodocketecf@milbank.com
- David Seror    dseror@bg.law, ecf@bg.law
- Zev Shechtman    zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com
- Mark Shinderman    mshinderman@milbank.com, dmuhrez@milbank.com;dlbatie@milbank.com
- Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Genevieve G Weiner    gweiner@sidley.com, laefilingnotice@sidley.com;genevieve-weiner-
  0813@ecf.pacerpro.com
- Jessica Wellington    jwellington@bg.law, ecf@bg.law

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                        **F 9013-3.1.PROOF.SERVICE**